JAMES PATRICK SHEA
Nevada Bar No. 405
BART K. LARSEN
Nevada Bar No. 8538
KYLE M. WYANT
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email: jshea@shea.law
blarsen@shea.law
kwyant@shea.law

JENNIFER E. HOEKEL
Nevada Bar No. 12775
jennifer.hoekel@huschblackwell.com
**HUSCH BLACKWELL LLP**
8001 Forsyth Boulevard Suite 1500
St. Louis, Missouri 63105
Telephone: 314.480.1500
Facsimile: 314.480.1505

-and-

PATRICK M. HARVEY
*Admitted Pro Hac Vice*
Patrick.Harvey@huschblackwell.com
**HUSCH BLACKWELL LLP**
511 North Broadway, Suite 1100
Milwaukee, WI 53202
Telephone: 414.273.2100
Facsimile: 414.223.5000

*Attorneys for Plaintiff,*
*James V. Deppoleto Jr.*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

1
2
3

JAMES V. DEPPOLETO JR.,
Individually and Derivatively on Behalf of
Nominal Defendant Takeover Industries
Incorporated

CASE NO. 2:22-cv-02013-GMN-MDC

4
5

**PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT PURSUANT TO
FED. R. CIV. P. 56(a)**

Plaintiff,

6
7

v.

8
9

TAKEOVER INDUSTRIES
INCORPORATED,
Defendant and Nominal Defendant

10

MICHAEL HOLLEY,

11
12

TOBY MCBRIDE,

13

JOSEPH PAVLIK,

14

TOM ZARRO,

15

and

16
17

NEXTGEN BEVERAGES, LLC

Defendants.

18
19

Plaintiff, James V. Deppoleto Jr. ("Plaintiff" or "Deppoleto"), by and through his

20

undersigned counsel, moves the Court for Partial Summary Judgment against Takeover

21

Industries Incorporated ("Takeover") with respect to Count II – Breach of Contract, and against

22

Takeover, Michael Holley ("Holley"), Tom Zarro ("Zarro") and NextGen Beverages, LLC

23

("NextGen Beverages") with respect to Count VII – Fraudulent Transfer.[1]  In support of this

24

Motion for Partial Summary Judgment, Deppoleto relies on the Memorandum below, the

25
26
27
28

---

[1] Deppoleto reserves all remaining claims against all Defendants.  In particular, Takeover contends that
it does not have funds to satisfy a judgment against it.  As such, Deppoleto reserves his right to prove
his claims against the individual Defendants and NextGen Beverages, LLC at trial.

1

Declaration of Patrick M. Harvey and supporting exhibits, the Declaration of Deppoleto, and the pleadings and papers on file that are specifically referenced below.

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

Generally speaking, this case arises from Deppoleto's investment in Takeover, and Takeover's subsequent refusal to repay Deppoleto, as required by the parties' contracts. Takeover owes Deppoleto over $2 million – and yet, without any valid basis for refusing to do so, Takeover has not paid Deppoleto.

Between May 25, 2022, and November 4, 2022, by way of three Promissory Notes and two Supplemental Loans, Deppoleto loaned Takeover the principal sum of $2,015,698.48. Shortly after his final investment, Takeover defaulted on its repayment obligations to Deppoleto. Upon default, Deppoleto demanded immediate payment – as is his right under the contracts – but, to date, Takeover has not paid any money to Deppoleto, and Takeover remains in default. Because of Takeover's refusal to repay Deppoleto, he was forced to file this lawsuit on December 2, 2022.

Not only has Takeover breached its contract with Deppoleto, but Takeover has gone to great lengths to transfer property out of Deppoleto's reach. After Takeover defaulted on its payment obligations and Plaintiff filed suit, Takeover's directors formed a new company, NextGen Beverages, LLC ("<u>NextGen Beverages</u>"), that is virtually indistinguishable from Takeover. Takeover's directors subsequently put their best efforts towards growing NextGen Beverages, rather than growing Takeover and repaying Deppoleto. Around the same time, Takeover began transferring assets to NextGen Beverages and company insiders, including Tom Zarro ("<u>Zarro</u>") and Michael Holley ("<u>Holley</u>"). The efforts by Takeover, NextGen Beverages, Zarro, and Holley to transfer and conceal Takeover's assets from Deppoleto constitute fraudulent transfers under Nevada law.

Takeover cannot raise a genuine dispute as to any material facts at issue in this Motion. Takeover entered into enforceable contracts with Deppoleto, as evidenced by their mutual agreements and writings. Deppoleto fulfilled his obligations, and Takeover has not. Takeover

breached its contracts by not reimbursing Deppoleto when required, and Deppoleto has been damaged, and continues to incur damages, as a result. Rather than repaying Deppoleto, Takeover has started a competing business and transferred its assets away from Deppoleto's reach. As such, the Court should grant Deppoleto's Motion for Partial Summary Judgment as to his breach of contract claim and fraudulent transfer claim.

## STATEMENT OF UNDISPUTED FACTS

**A.    Takeover's formation and Board of Directors.**

1.      In 2021, Michael Holley ("Holley") and a colleague, Toby McBride ("McBride"), established a beverage business named Takeover Industries, Inc. ("Takeover"). (Patrick M. Harvey Declaration ("Harvey Decl.") ¶¶ 2, 3, Exhibit 1,[2] Holley Dep. at 13:23-14:1; Ex. 2, Holley-Takeover Corp. Rep. Dep. at 11:14-12:2.)

2.      Takeover sold products under the brand name "NXT LVL." (*Id.* ¶¶ 2, 3, Ex. 1, Holley Dep. at 13:23-14:1; Ex. 2, Holley-Takeover Corp. Rep. Dep. at 11:14-12:2.)

3.      NXT LVL's product line focuses on performance water products and energy drinks, including "gamer shots." (*Id.* ¶ 2, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 12:6-12:15.)

4.      Shortly after Takeover's formation, Labor Smart, Inc. ("Labor Smart") acquired Takeover, and Takeover became a wholly-owned subsidiary of Labor Smart. (*Id.* ¶ 2, Ex. 1, Holley Dep. at 37:2-12, 42:12-23.) Labor Smart is a publicly-traded company, and Michael Costello ("Costello") served as its Chief Executive Officer. (*Id.* ¶ 3, Ex. 2, Holley Dep. at 42:12-23, 56:21-57:5.)

5.      As of Takeover's formation, Holley and McBride both became Directors of Takeover. (*Id.* ¶ 2, Ex. 1, Holley Dep. at 28:7-28:15.) Holley and McBride also became Officers: Holley became Takeover's Chief Executive Officer, and McBride became the Chief Operating Officer. (*Id.* ¶ 2, Ex. 1, Holley Dep. at 28:7-28:15.)

---

[2] All exhibits are attached to the January 10, 2025, Declaration of Patrick M. Harvey, submitted contemporaneously herewith.

3

6.      By November 2021, Takeover's Board of Directors resolved that it would add two more Directors: Joseph Pavlik ("Pavlik") and Jason Tucker ("Tucker").  (*Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 77:18-78:7.)  As such, as of November 2021, the Takeover Board of Directors consisted of Holley, McBride, Pavlik, and Tucker.  (*Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 77:18-78:7.)

7.      At the same time, Takeover's Board of Directors also resolved that Tucker would become Takeover's President.  (*Id.* ¶ 2, Ex. 1, Holley Dep. at 36:4-21.)

8.      Subsequently, Takeover changed the composition of its Board of Directors in December 2021, when the Directors voted to remove Holley on the basis that: (a) Holley had made unauthorized distributions of over $750,000.00 on behalf of Takeover; (b) he charged personal expenses to Takeover; and (c) he allowed family members to use Takeover funds for personal expenses.  (*Id.* ¶¶ 2-5, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 81:14-21, 82:11-16; Ex. 1, Holley Dep. at 93:24-95:1, 97:5-11, 98:1-100:6; Ex. 3, McBride Dep. at 155:15-21; Ex. 4, Pavlik Dep. at 84:23-86:11.)

9.      In fact, Takeover initiated a lawsuit against Holley based on these same accusations in the U.S. District Court, District of Arizona (*Takeover Industries Incorporated v. Michael Holley, et. al.*, No. CV-22-00357-PHX-JJT (D. Ariz. Mar. 3, 2022), ECF No. 1) (the "Arizona Lawsuit").  (*Id.* ¶¶ 2, 4, Ex. 1, Holley Dep. at 93:24-94:23, 97:5-11, 98:1-100:6; Ex. 3 McBride Dep. at 194:3-194:15.)

10.     After Takeover's Board of Directors removed Holley from the Takeover Board in December 2021, the Takeover Board solely consisted of McBride, Tucker, and Pavlik.  (*Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 82:11-20.)

**B.      Deppoleto's secured convertible debt interest in Takeover.**

11.     Takeover began soliciting an investment from Deppoleto in August 2021.  (*Id.* ¶ 4, Ex. 3, McBride Dep. at 173:6-16, 174:1-175:9.)   And by November 2022, Deppoleto loaned Takeover approximately $2,000,000.00 in principal.  (*Id.* ¶ 16, Ex. 15, Deppoleto Dep. at 82:25-83:3; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep at 117:22-25.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### i. Deppoleto loans Takeover $1.5 million in principal pursuant to three promissory notes.

12.     Deppoleto's debt interest is documented by way of the Convertible Note Purchase Agreement dated May 25, 2022, by and between Deppoleto, Takeover, and Labor Smart ("NPA"), and certain secured notes issued pursuant to the NPA as it has been amended. (*Id.* ¶ 6, Ex. 5, NPA; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 16:21-17:15.)

13.     The NPA was executed by: (a) Tucker, Takeover's President, on behalf of Takeover; (b) Costello, Chief Executive Officer of Labor Smart, on behalf of Labor Smart; and (c) Deppoleto.  (*Id.* ¶ 6, Ex. 5, NPA at 20-21; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 16:21-17:15, 18:3-6.)

14.     Along with the NPA, Tucker, McBride, and Pavlik, as the Board of Directors of Takeover, and Costello, on behalf of Labor Smart as the primary shareholder of Takeover, signed a joint written consent approving the NPA ("First Consent").  (*Id.* ¶ 7, Ex. 6, First Consent; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 19:16-21:12.)

15.     The First Consent authorizes and directs the President of Takeover to take such actions to execute and deliver, and otherwise effect, the transaction involving the NPA and Deppoleto's related debt interest.  (*Id.* ¶ 7, Ex. 6, First Consent; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 20:12-24.)

16.     The principal amount of the first secured note, under the NPA, was $500,000.00, which was issued as of May 25, 2022 ("First Note").  (*Id.* ¶ 8, Ex. 7, First Note at 1; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 18:7-19:15.)

17.     Shortly after issuance of the First Note, the parties amended the NPA by entering into the First Amendment to the Convertible Note Purchase Agreement, dated as of July 6, 2022 ("First Amendment").  (*Id.* ¶ 9, Ex. 8, First Amendment at 1; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 22:1-22:25.)

18.     As with the initial NPA, the First Amendment was executed by: Tucker, on behalf of Takeover; Costello; on behalf of Labor Smart; and Deppoleto. (*Id.* ¶ 9, Ex. 8, First

Amendment at 4-5.)

19.    Along with the First Amendment, Tucker, McBride, and Pavlik, as the Board of Directors of Takeover, and Costello, on behalf of Labor Smart as the primary shareholder of Takeover, signed a joint written consent approving the First Amendment ("Second Consent"). (*Id.* ¶ 10, Ex. 9, Second Consent; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 19:16-21:12.)

20.    The Second Consent authorizes and directs the President of Takeover to take such actions to execute and deliver, and otherwise effect, the transaction involving the First Amendment and Deppoleto's related debt interest. (*Id.* ¶ 10, Ex. 9, Second Consent; *Id.* ¶ 3, Ex, 2, Holley-Takeover Corp. Rep. Dep. at 25:6-16.)

21.    The principal amount of the second secured note, under the NPA, was $500,000.00, which was issued as of July 6, 2022 ("Second Note").   (*Id.* ¶ 11, Ex. 10, Second Note at 1; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 23:5-24.)

22.    Then, Takeover issued a third note to Deppoleto.  The NPA and First Amendment thereto were amended by that certain Second Amendment to the Convertible Note Purchase Agreement, dated August 19, 2022 ("Second Amendment").   (*Id.* ¶ 12, Ex. 11, Second Amendment; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 26:9-27:11.)

23.    The Second Amendment was executed by: Tucker, on behalf of Takeover; Costello, on behalf of Labor Smart; and Deppoleto. (*Id.* ¶ 12, Ex. 11, Second Amendment at 4-5.)

24.    Along with the Second Amendment, Tucker, McBride, and Pavlik, as the Board of Directors of Takeover, and Costello, on behalf of Labor Smart as the primary shareholder of Takeover, signed a joint written consent approving the Second Amendment ("Third Consent"). (*Id.* ¶ 13, Ex. 12, Third Consent; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 28:22-.30:9.)

25.    The Third Consent authorizes and directs the President of Takeover to take such actions to execute and deliver, and otherwise effect, the transaction involving the Second

6

Amendment and Deppoleto's related debt interest.  (*Id.* ¶ 13, Ex. 12, Third Consent; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 29:19-30:1.)

26.    The principal amount of the third secured note, under the NPA, was $500,000.00, which was issued as of August 19, 2022 ("Third Note," and, collectively with the First Note and the Second Note, the "Notes").  (*Id.* ¶ 12, Ex. 11, Second Amendment at 1; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 28:22-30:9.)

27.    In total, Takeover issued three written Notes to Deppoleto, for a principal amount of $1,500,000.00 – and in all of which Takeover agreed to repay to Deppoleto.  (*Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 19:12-15, 23:21-24:3, 27:8-11, 28:8-28:14, 62:1-4.)

ii.    **Deppoleto loans Takeover an additional $515,698.48 in principal pursuant to two supplemental loans.**

28.    In addition to the Notes, on or about October 13, 2022, Deppoleto loaned Takeover $386,773.86.  Deppoleto made this payment, on Takeover's behalf, directly to one of Takeover's vendors, Great Northern Corporation, which was making display shelves for Takeover's gamer shots ("First Supplemental Loan").  (*Id.* ¶ 14, Ex. 13, First Supplemental Loan; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 67:21-68:6, 70:5-71:5.)

29.    And then, on or about November 4, 2022, Deppoleto loaned Takeover an additional $128,924.62 ("Second Supplemental Loan" and together with the First Supplemental Loan, the "Supplemental Loans").  Once again, Deppoleto made this payment directly to Great Northern Corporation on Takeover's behalf.  (*Id.* ¶ 15, Ex. 14, Second Supplemental Loan; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 71:9-72:4.)

30.    Deppoleto and Takeover agreed that the Supplemental Loans would be funded as part of the NPA and result in a fourth Note, similar to the Third Note, and similarly as secured indebtedness.  (*Id.* ¶ 16, Ex. 15, Deppoleto Dep. at 98:22-99:24; James V. Deppoleto Declaration ¶ 6.)

31.    Deppoleto and Takeover were in the process of documenting the Supplemental Loans at the time of Deppoleto's payments to Great Northern Corporation, but the documents

were not finalized.  (Declaration of James V. Deppoleto Jr. In Support of Plaintiff's Motion for Partial Summary Judgment ("Deppoleto Decl.") ¶ 10.)

**C.     Takeover defaults on its obligations to Deppoleto.**

32.     Takeover defaulted on its Notes and Supplemental Loans to Deppoleto, and remains in default.  Because of Takeover's breach of representations, warranties, and covenants as set forth in the NPA of the First Note, Second Note, and Third Note, Takeover has triggered several Events of Default.  (*Id.* ¶ 6, Ex. 5, NPA at 2, ¶¶ 4, 7.1(b).)  These breaches include, but are not limited to:

> a.     Takeover and Labor Smart breached the representation that it made under Section 4.7 of the NPA, because there was, at the time of the NPA's execution, and still remains, material litigation involving Takeover in the Arizona Lawsuit.  (*Id.* ¶¶ 4-6, Ex. 5, NPA at 4-5; Ex. 2, Holley-Takeover Corp. Rep. Dep. at 95:18-96:5; Ex. 3, McBride Dep. at 195:25-196:3; Ex. 4, Pavlik Dep. at 137:8-138-25.)
>
> b.     Takeover breached the representation it made under Section 4.15 of the NPA, because Takeover intentionally withheld from Deppoleto information related to the Arizona Lawsuit.  (*Id.* ¶¶ 3-5, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 95:18-96:5; Ex. 3, McBride Dep. at 195:25-196:3; Ex. 4, Pavlik Dep. at 137:8-138-25.)
>
> c.     Takeover also breached Section 8.8 of the NPA, because it failed to maintain Directors & Officers liability insurance.  (*Id.* ¶¶ 3, 6, Ex. 5, NPA at 11; Ex. 2, Holley-Takeover Corp. Rep. Dep. at 94:3-8.)
>
> d.     In addition, Takeover breached Section 4 of the First Amendment and Section 4 of the Second Amendment, because the above-referenced misrepresentations were made upon the execution of those Amendments. (*Id.* ¶¶ 9, 12, Ex. 8, First Amendment at 2; Ex. 11, Second Amendment at 2.)

e.    Takeover also breached Section 5 of the First Amendment and Second Amendment, because Takeover resolved in November 2022 to add Holley to Takeover's Board of Directors, without obtaining Deppoleto's consent.[3]  (*Id.* ¶¶ 3, 9, 12, 17, Ex. 8, First Amendment at 2, ¶ 5; Ex. 11, Second Amendment at 2, ¶ 5; Ex. 16, Labor Smart Resolution at DEF00004; Ex. 2, Holley-Takeover Corp. Rep. at 84:8-85:5.)

33.    In light of Takeover's defaults, Deppoleto sent Takeover his first Notice of Default and Demand for Payment on November 8, 2022.  (*Id.* ¶ 18, Ex. 17, First Notice of Default; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 88:13-89:6.)

34.    In accordance with the loan documents, upon the occurrence of an Event of Default, and during any period in which such Event of Default is ongoing: (1) Deppoleto, as Holder, may declare all outstanding loan amounts immediately due and payable in full; and (2) all amounts due but not paid under the Notes shall bear interest at a rate of eighteen percent (18%) per annum (or, if lower, the highest rate permissible under applicable law), compounded monthly.  (*Id.* ¶ 6, Ex. 5, NPA at 2 ¶¶ 7.2, 7.3.)

35.    In the First Notice, Deppoleto declared the Outstanding Principal, plus all accrued interest (including default interest) immediately due and payable.  (*Id.* ¶ 18, Ex. 17, First Notice of Default at 4.)

36.    As of Takeover's default on November 8, 2022, Takeover's liabilities exceeded its assets – a status that remains unchanged to this day.  (*Id.* ¶ 2, Ex. 1, Holley Dep. at 153:23-154:15.)

37.    Because Takeover did not remedy its default, on November 22, 2022, Deppoleto sent Takeover a second Notice of Default and Demand for Payment.  (*Id.* ¶ 19, Ex. 18, Second Notice of Default; *Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 118:4-21.)

---

[3] Deppoleto does not admit that any of the resolutions allegedly passed by Takeover's Board of Directors from the beginning of November 2022 through the present are valid corporation actions. Nonetheless, for purposes of this Motion, whether Takeover's Board of Directors' resolutions in that timeframe were actually valid corporate actions is not a genuine dispute of material fact.

9

38.    Deppoleto's Second Notice of Default also alerted Takeover to the fact that it did not repay Deppoleto's First Note on or before the Maturity Date of November 21, 2022. (*Id.* ¶ 19, Ex. 18, Second Notice of Default at 2; *Id.* ¶ 6, Ex. 5, NPA at 1, 2, ¶ 7.1(b), 15, ¶ 9.1(k).)  Takeover's failure to repay Deppoleto the amount due under the First Note on or before November 21, 2022, constituted an additional Event of Default.  (*Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep at 117:22-25.)

39.    The Second Note became due and payable on the Maturity Date of January 2, 2023, but Takeover has failed to repay any portion of the Second Note.  (*Id.* ¶¶ 3, 6, 11; Ex. 5, NPA at 15, ¶ 9.1(k); Ex. 10, Second Note at 1; Ex. 2, Holley-Takeover Corp. Rep. Dep at 117:22-25.)

40.    The Third Note became due and payable on the Maturity Date of February 15, 2023, but Takeover has failed to repay any portion of the Third Note. (*Id.* ¶ 3, 6, 12; Ex. 5, NPA at 15, ¶ 9.1(k); Ex. 11, Third Note at 1; Ex. 2, Holley-Takeover Corp. Rep. Dep at 117:22-25.)

41.    The First Supplemental Loan became due and payable on the Maturity Date of April 11, 2023, but Takeover has failed to repay any portion of the First Supplemental Loan. (*See Id.* ¶¶ 3, 6, 14, 16; Ex. 5, NPA at 15, ¶ 9.1(k); Ex. 13, First Supplemental Loan; Ex. 15, Deppoleto Dep. at 98:22-99:24; Ex. 2, Holley-Takeover Corp. Rep. Dep at 117:22-25; Deppoleto Decl. ¶ 8.)

42.    The Second Supplemental Loan became due and payable on the Maturity Date of May 3, 2023, but Takeover has failed to repay any portion of the Second Supplemental Loan.  (*See Id.* ¶¶ 3, 6, 15, 16; Ex. 5, NPA at 15, ¶ 9.1(k); Ex. 14, Second Supplemental Loan; Ex. 15, Deppoleto Dep. at 98:22-99:24; Ex. 2, Holley-Takeover Corp. Rep. Dep at 117:22-25; Deppoleto Decl. ¶ 8.)

43.    As of this Motion, Takeover owes Deppoleto a total of $2,070,098.36 in principal, plus interest and attorneys' fees.  (*Id.* ¶¶ 3, 6; Ex. 5, NPA at 2, ¶ 7.3, 18, ¶ 9.9; Ex. 2, Holley-Takeover Corp. Rep. Dep at 117:22-25.)

**D.** **Takeover's corporate misdeeds and formation of NextGen Beverages.**

44.    On November 7, 2022, Takeover purported to modify its Board of Directors and change its officers.  (*Id.* ¶¶ 3, 17; Ex. 16, Labor Smart Resolution at DEF00004; Ex. 2, Holley-Takeover Corp. Rep. Dep. at 85:1-12.)  The Board resolved to appoint Holley to Takeover's Board of Directors and to serve as Takeover's Interim Chief Executive Officer.  (*Id.* ¶¶ 3, 17; Ex. 16, Labor Smart Resolution at DEF00004; Ex. 2, Holley Dep. at 108:12-23.)

45.    After Holley purportedly re-joined Takeover's alleged Board of Directors, Takeover – without notifying Deppoleto beforehand, or seeking his approval to do so – dismissed the claims that Takeover filed against Holley in the Arizona Lawsuit.  (*Id.* ¶ 3; Ex. 2, Holley Dep. at 147:4-10, 147:23-148:22.)  Takeover did not receive any consideration in return for dismissing its claims against Holley.  (*Id.* ¶ 2, Ex. 1, Holley Dep. at 149:4-150:9.)  Instead, Takeover actually paid Holley a $5,000.00 "settlement payment" as compensation for "put[ting]" Holley through the Arizona Lawsuit.  (*Id.* ¶ 2, Ex. 1, Holley Dep. at 185:6-187:3.)  The only alleged Takeover Directors to approve this were Defendants (and insiders), Zarro and Pavlik.  (*Id.* ¶ 2, Ex. 1, Holley Dep. at 187:4-11.)

46.    On April 17, 2023, Takeover once again purported to modify its Board of Directors and change its Officers.  Takeover's Board of Directors resolved to appoint Tom Zarro ("Zarro") as a Board Member and Officer.  (*Id.* ¶¶ 3, 16, 22; Ex. 20, Takeover Resolution at DEF00421; Ex. 2, Holley-Takeover Corp. Rep. Dep. at 86:1-16, 87:4-6; Zarro Dep. at 32:5-24.)

47.    As of April 2023, Takeover's Board of Directors was comprised of Zarro, Pavlik, and Holley.  (*Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 87:10-13.)

48.    After Zarro's appointment, because Takeover had no assets, and because it was a Defendant in this lawsuit, Takeover's Board of Directors began discussions to form a new beverage company (*Id.* ¶23, Ex. 22, Zarro Dep. at 233:7-234:7, 234:14-235:2), which ended with them forming NextGen Beverages in June 2023 (*Id.* ¶ 23, Ex. 22, Zarro Dep. at 35:14-19).

49.    Zarro, among others, provided the start-up capital for NextGen Beverages.  (*Id.*

¶ 23, Ex. 22, Zarro Dep. at 71:4-14.)  Since the formation of NextGen Beverages, Zarro and Holley have served as its only two Member-Managers.  (*Id.* ¶ 23, Ex. 22, Zarro Dep. at 52:14-24.)

50.    Like Takeover, NextGen Beverages is also wholly-owned by Labor Smart, Inc., and NextGen Beverages is a "sister subsidiary" to Takeover.  (*Id.* ¶ 23, Ex. 22, Zarro Dep. at 52:11-13, 15:22-16:1.)

51.    NextGen Beverages operates under the brand name "Lock'd In" and, like Takeover, NextGen Beverages sells energy drinks.  (*Id.* ¶ 23, Ex. 2, Zarro Dep. at 56:19-23, 73:5-74:10.)  In fact, Takeover shared the recipe for its hydrogen water with NextGen Beverages, which now sells its own hydrogen water.  (*Id.* ¶ 24, Ex. 23, Zarro-NextGen Corp. Rep. Dep. at 13:17-14:3.)

52.    After the formation of NextGen Beverages, Zarro, Holley, and Pavlik shifted their efforts away from Takeover and towards growing NextGen.  (*Id.* ¶¶ 2, 5, 23; Ex. 22, Zarro Dep. at 262:15-263:19; Ex. 1, Holley Dep. at 191:14-192:18, 195:3-24; Ex. 4, Pavlik Dep. at 57:23-13.)

53.    In or about January 2023, Zarro claims to have "purchased" some of Takeover's inventory of hydrogen water and gamer shots.  (*Id.* ¶ 23; Ex. 22, Zarro Dep. at 196:10-22, 197:5-11, 197:20-198:2, 198:10-12, 200:8-15.)

54.    Zarro paid approximately $50,000.00 for the hydrogen water, which he concedes represented the amount that Takeover paid to manufacture the hydrogen water, not the retail value of the hydrogen water.  (*Id.* ¶ 23, Ex. 22, Zarro Dep. at 197:20-24, 200:22-24.)  The cost to manufacture is approximately 40% of the retail price.  (*Id.* ¶ 23, Ex. 22, Zarro Dep. at 201:20-23.)

55.    As for the gamer shots, Zarro purchased the gamer shots in three payments, totaling approximately $100,000.00.  (*Id.* ¶ 23, Ex. 22, Zarro Dep. at 202:9-15, 245:12-247:12.)

56.    Zarro paid less than retail value for the gamer shots.  Specifically, Zarro's first payment for the gamer shots ($33,692.00) represented the amount that Takeover paid to

manufacture the shots, approximately 40% of the retail price.  (*Id.* ¶¶ 22, 23; Ex. 21, Takeover Bank Statement at DEF00210; Ex. 22, Zarro Dep. at 201:20-202:1, 245:12-25.)  And Zarro's remaining payments for the gamer shots ($66,692.00) represented even less than the cost to manufacture, approximately 25% to 30% of the retail price.  (*Id.* ¶¶ 22, 23; Ex. 21, Takeover Bank Statement at DEF00210, DEF00234; Ex. 22, Zarro Dep. at 202:2-6, 246:4-247:12.)

57.    NextGen Beverages, Takeover, and Labor Smart have comingled assets.  For instance, NextGen, Takeover, and Labor Smart share a bank account for operating expenses (*Id.* ¶ 23, Ex. 22, Zarro Dep. at 174:5-24, 236:16-21), and Takeover has paid for NextGen Beverage's legal expenses (*Id.* ¶ 23, Ex. 22, Zarro Dep. at 258:6-13).

58.    Further, Takeover has repeatedly transferred money to NextGen Beverages, with no consideration received in return, in at least the following instances:

    a.    On July 7, 2023, Takeover transferred $10,000.00 to NextGen Beverages.  (*Id.* ¶ 24, Ex. 23, Zarro-NextGen Corp. Rep. Dep. at 17:17-18:2.)

    b.    On July 14, 2023, Takeover transferred $5,000.00 to NextGen Beverages.  (*Id.* ¶ 24, Ex. 23, Zarro-NextGen Corp. Rep. Dep. at 18:3-7, 20:19-23.)

    c.    On September 21, 2023, Takeover transferred $10,000.00 to NextGen Beverages.  (*Id.* ¶ 24, Ex. 23, Zarro-NextGen Corp. Rep. Dep. at 20:24-22:2, 22:12-18.)

## LEGAL STANDARDS

### A.    The summary judgment standard.

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Only genuine disputes over material facts preclude summary judgment; "factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that material facts are those that may affect the outcome of the case).  A dispute as to a material fact is "genuine" if the evidence is such

that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Liberty Lobby*, 477 U.S. at 248. Although the Court must view the evidence in a light most favorable to the non-moving party, the non-movant "must present more than mere speculation or conjecture to defeat a summary judgment motion." *Sybron Transition Corp. v. Security Ins. Co. of Hartford*, 107 F. 3d 1250, 1255 (7th Cir. 1997); *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (mere "metaphysical doubt as to the material facts" is not enough to avoid summary judgment).

## ARGUMENT

### A.   The Court should grant Deppoleto summary judgment on his breach of contract claim against Takeover.

There is no genuine dispute that Takeover breached its contracts with Deppoleto. To succeed on a breach of contract claim, a plaintiff only needs to demonstrate: (1) the existence of a valid contract; (2) breach by the defendant; and (3) damage resulting from the breach. *See, e.g.*, *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 920 (D. Nev. 2006). The undisputed, material facts show that Deppoleto has satisfied his burden and is entitled to judgment as a matter of law. As such, the Court should grant Deppoleto's Motion for Partial Summary Judgment against Takeover on Count II.

#### 1.   Takeover and Deppoleto entered into a valid and enforceable contract.

The first element required to prove a breach of contract claim is an enforceable contract. An enforceable contract requires an offer and acceptance, a meeting of the minds, and consideration. *See, e.g.*, *May v. Anderson*, 119 P.3d 1254, 1257 (2005). A "meeting of the minds exists when the parties have agreed upon the contract's essential terms," *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 255 (2012), even if the contract's exact language has not yet been finalized, *May*, 119 P.3d at 1257. Mutual assent is determined "under an objective standard applied to the outward manifestations or expressions of the parties." *Kurian v. SNAPS Holding Co.*, No. 219CV01757GMNEJY, 2021 WL 4429309, at *4 (D. Nev. Sept.

27, 2021) (quoting *Alter v. Resort Props. of Am.*, 130 Nev. 1148 (2014)).  If the outward manifestations "can reasonably be interpreted as acceptance, then mutual assent exists."  *Id.* at *4.  Finally, consideration is the exchange of a promise or performance that is bargained for by the parties.  *Jones v. SunTrust Mortg., Inc.*, 274 P.3d 762, 764 (2012).

In this case, the NPA, First Amendment, Second Amendment, Notes, and Supplemental Loans that Takeover entered into with Deppoleto are valid contracts because all three elements for an enforceable contract are satisfied.  As to the NPA, First Amendment, Second Amendment, and Notes, Takeover and Deppoleto agreed to essential terms and memorialized those terms in the written instruments that both parties signed.  (Harvey Decl. ¶¶ 6, 8, 9, 11, 12, 14; Ex. 5, NPA; Ex. 7, First Note; Ex. 8, First Amendment; Ex. 10, Second Note; Ex. 11, Second Amendment; Ex. 13, Third Note.)  The terms are clear and definite.  (*Id.*)  Takeover agreed to issue to Deppoleto the Notes in exchange for Deppoleto's payments.  (*Id.*)  As to each of the Notes, Deppoleto paid Takeover $500,000.00 in consideration, for a total of $1,500,000.00.  (*Id.*)  In fact, Takeover's corporate representative agreed that Takeover accepted $1.5 million from Deppoleto and promised to repay that sum to Deppoleto.  (Harvey Decl. ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 19:8-11, 8:15, 23:21-24:3, 28:8-14.)  In summary: (1) Takeover offered Deppoleto a secured convertible promissory note and three Notes thereto; (2) the offer was subject to specific terms and conditions that the parties mutually agreed to and memorialized in their writings; and (3) Deppoleto accepted the terms by paying the required principal.

In addition to the NPA and the Notes, the Supplemental Loans also constitute an enforceable contract.  Even though the Supplemental Loans were not reduced to writing, Takeover and Deppoleto agreed that the Supplemental Loans would be funded as part of the NPA and result in a fourth Note, similar to the Third Note.  *See May*, 119 P.3d at 1257 (holding that an enforceable contract exists when the parties agree to the material terms); (Harvey Decl. ¶ 16, Ex. 15, Deppoleto Dep. at 98:22-99:24; Deppoleto Decl. ¶¶ 2-7.)  After agreeing that the Supplemental Loans would be funded as part of the NPA, Deppoleto made two payments on

15

Takeover's behalf directly to Takeover's vendor, Great Northern Corporation, for development of product displays for Takeover's gamer shots. (Harvey Decl. ¶¶ 3, 14, 15; Ex. 13, First Supplemental Loan; Ex. 14, Second Supplemental Loan; Ex. 2, Holley-Takeover Corp. Rep. Dep. at 67:21-68:6, 70:5-71:5, 71:9-72:4; Deppoleto Decl. ¶¶ 2-7.) In conjunction and consultation with Takeover management, Deppoleto made the payments directly to Great Northern Corporation because, after Deppoleto discussed the issue with Takeover management, the parties agreed that he would make the payment directly to Great Northern Corporation, rather than to Takeover, because by that point in time, Deppoleto was getting concerned that Takeover was not using his previous loans in the manner upon which the parties agreed – *i.e.*, solely for business-related expenses – so Deppoleto wanted to be certain that this money was used solely to pay for a Takeover business expense. (Deppoleto Decl. ¶¶ 3, 5.) Deppoleto would not have agreed to pay Great Northern Corporation a total of $515,698.48 without Takeover's agreement that Takeover would pay him back. (*Id.* ¶ 7.) Deppoleto expedited his payment of the Supplemental Loans because Takeover informed him that it was an urgent necessity for its business operations. (*Id.* ¶ 8.) In summary, the Supplemental Loans are enforceable contracts because Takeover and Deppoleto agreed to terms and conditions of the loans, and Deppoleto paid consideration for the Supplemental Loan, totaling $515,698.48.

Indeed, even Takeover's official, internal corporate records from dates *after* Plaintiff initiated this lawsuit in December 2022 contain admissions against interest that conclusively demonstrate that Takeover owes Deppoleto the entirety of the principal amount that Deppoleto claimed, including the Supplemental Loans. For example, Takeover's Balance Sheet dated December 31, 2022 shows that Takeover still recognized the entirety of Deppoleto's loans – $2,016,697 – as one of Takeover's liabilities as of that date. (Harvey Decl. ¶ 25, Ex. 24, Takeover Balance Sheet.)

Moreover, late in the day on January 8, 2025 – *i.e.*, the day after Plaintiff filed his Motion to Compel Reply Memorandum, and two business days before Plaintiff's Motion for Summary Judgment was due – Defendants' counsel produced a Takeover corporate record that

is time-stamped December 28, 2024, and which clearly shows that, even as of that date, Takeover's corporate records still list as "Loans Payable: James Deppoleto" the entire principle balance that Plaintiff has been claiming for the two years that this lawsuit has been pending, $2,016,697:



**Takeover Industries Inc.**

**Account QuickReport**

All Dates

| DATE | TRANSACTION TYPE | NUM | NAME | MEMO/DESCRIPTION | ACCOUNT | CLR | AMOUNT | BALANCE |
|------|------|------|------|------|------|------|------|------|
| **Loans Payable** | | | | | | | | |
| **James Deppoleto** | | | | | | | | |
| 05/25/2022 | Deposit | | James V. Deppoleto Jr. | WIRE TYPE:WIRE IN DATE: 220525 TIME:1206 ET TRN SEQ:█ ORIG:QUINTEC INTEGRATION INC ID:█ SND BK:W ATERSTONE BANK ID:█ | Loans Payable/James Deppoleto | | 500,000.00 | 500,000.00 |
| 07/07/2022 | Deposit | | James V. Deppoleto Jr. | WIRE TYPE:WIRE IN DATE: 220707 TIME:1442 ET TRN SEQ:█ ORIG:QUINTEC INTEGRATION INC ID:█ SND BK:W ATERSTONE BANK ID:█ | Loans Payable/James Deppoleto | | 500,000.00 | 1,000,000.00 |
| 08/19/2022 | Deposit | | James V. Deppoleto Jr. | WIRE TYPE:WIRE IN DATE: 220819 TIME:1312 ET TR SEQ:█ ORIG:QUINTEC INTEGRATION INC ID:█ SND BK:W ATERSTONE BANK ID:█ | Loans Payable/James Deppoleto | | 500,000.00 | 1,500,000.00 |
| 12/31/2022 | Journal Entry | AE-2064 | | | Loans Payable/James Deppoleto | | 516,697.00 | 2,016,697.00 |
| **Total for James Deppoleto** | | | | | | | | $2,016,697.00 |
| **Total for Loans Payable** | | | | | | | | $2,016,697.00 |
| **TOTAL** | | | | | | | | $2,016,697.00 |

DEF01383

Saturday, December 28, 2024 09:28 AM GMT-08:00                    1/1

(Harvey Decl. ¶ 26, Ex. 25 at DEF01383)

In addition, as part of the same January 8, 2025, document production, Defendants produced documents that clearly demonstrate that, in January 2023 – after Plaintiff initiated this lawsuit, and at a point in time when Holley, McBride, and Pavlik (as well as their counsel, Attorney Jennifer Reiter) were obviously involved, Great Northern Corporation issued "revised" invoices to Takeover that totaled $469,146.94, and communicated to Holley, McBride, and Pavlik that Great Northern Corporation would be issuing a credit to Takeover in the amount of $46,236.47, because Great Northern Corporation received $515,699.48[4] in

_____

[4] The $515,699.48 total is, of course, a mere $1 difference from the $515,698.48 that Plaintiff initially

17

response to Great Northern Corporation's initial invoices to Takeover dated late August 2022. (Harvey Decl. ¶ 26, Ex. 25 at DEF01375-DEF01382.) Plaintiff similarly produced evidence that Plaintiff, *not* Takeover, paid Great Northern Corporation $515,699.48. (*Id.* ¶¶ 14, 15; Ex. 13, 14 at PLTF000346, PLTF000359.) Combined, this evidence conclusively confirms that: (a) Great Northern Corporation initially invoiced Takeover for approximately $515,000; (b) Great Northern Corporation received payments totaling approximately $515,000 from Deppoleto on Takeover's behalf; and (c) in early 2023, Great Northern Corporation notified Takeover – through Defendants Holley, McBride, and Pavlik – that it was going to issue a credit to Takeover in the amount of approximately $46,000 because of an overpayment.[5]

Those Takeover corporate records are not only undeniable admissions against interest that conclusively prove that Takeover owes Deppoleto the entirety of the principal amount that Deppoleto is seeking, including contractual interest and contractual attorneys' fees, but they also demonstrate that Defendants' denial – for the duration of this lawsuit – that Takeover owes Plaintiff those amounts has been frivolous.

### 2.    Takeover breached its contracts with Deppoleto.

Takeover breached the NPA, the First Amendment, the Second Amendment, the Notes, and the Supplemental Loans by not repaying Deppoleto by its deadline to do so. On November 8, 2022, Deppoleto provided Takeover with proper notice that Takeover committed several Events of Default. (*See* Section II.C.; *see also* Ex. 17, First Notice of Default.) Among other Events of Default, Takeover breached its representations and warranties by: (a) not disclosing to Deppoleto that Takeover was a litigant in the Arizona Lawsuit (Harvey Decl. ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 95:18-96:5); (b) failing to maintain Directors & Officers liability insurance (*Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 94:3-8); and (c) adding Holley to Takeover's Board of Directors in November 2022 without Deppoleto's consent (*Id.* ¶

---

pleaded as his "Supplemental Loan" claim, meaning there was presumably a scrivener's error.

[5] In February 2023, Great Northern Corporation issued a refund of $35,177.93 to Deppoleto as a result of his overpayment. Presumably, Great Northern Corporation issued the remaining $10,822.07 of the overpayment to Takeover.

3, Ex. 2, Holley-Takeover Corp. Rep. at 84:8-85:5).    In fact, Takeover's corporate representative agreed that Takeover defaulted on its obligations to Deppoleto. (*Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 90:13-20.)    In accordance with the loan documents, Deppoleto declared all outstanding loan amounts immediately due and payable in full. (*Id.* ¶ 6, 18; Ex. 17, First Notice of Default at 2; Ex. 5, NPA at 2 ¶ 7.3.)  Despite that demand, Takeover has failed and refused, and continues to fail and refuse, to pay its obligations to Deppoleto. (*Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 117:22-25.)

Further, Takeover has defaulted on its loans by failing to repay any of them on or before their respective Maturity Dates.  The Maturity Dates for Deppoleto's loans were as follows:

    a.    November 21, 2022, for the First Note (Harvey Decl.¶ 6, Ex. 5, NPA at 1, 2, ¶ 7.1(b), 15, ¶ 9.1(k));

    b.    January 2, 2023, for the Second Note (*Id.* ¶ 11, Ex. 10, Second Note at 1);

    c.    February 15, 2023, for the Third Note (*Id.* ¶ 14, Ex. 13, Third Note at 1);

    d.    April 11, 2023, for the First Supplemental Loan (*Id.* ¶ 14, 16; Ex. 13, First Supplemental Loan; Ex. 15, Deppoleto Dep. at 98:22-99:24; Deppoleto Decl. ¶ 8); and

    e.    May 3, 2023, for the Second Supplemental Loan (*Id.* ¶ 15, 16; Ex. 14, Second Supplemental Loan; Ex. 15, Deppoleto Dep. at 98:22-99:24; Deppoleto Decl. ¶ 8).

To date, Takeover has not repaid Deppoleto any of the funds that he loaned Takeover. (*Id.* ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 117:22-25.)

**3.    Takeover's breach of contract has damaged Deppoleto.**

Deppoleto has been damaged by Takeover's breach.  By way of the Notes and Supplemental Loan, Deppoleto loaned a principal sum of $2,015,698.48 to Takeover, and Takeover has not repaid its obligation.[6] (Harvey Decl. ¶ 3, Ex. 2, Holley-Takeover Corp. Rep.

---

[6] Because Deppoleto received a refund from Great Northern Corporation of $35,177.93, Deppoleto

Dep. at 117:22-25.)  Takeover also owes Deppoleto accrued interest and attorneys' fees, both of which continue to increase.  (*Id.* ¶¶ 3, 6; Ex. 5, NPA at 2, ¶ 7.3, 18, ¶ 9.9; Ex. 2, Holley-Takeover Corp. Rep. Dep at 117:22-25.)  Takeover has not repaid its obligations, and Deppoleto continues to be damaged as a result of Takeover's breach.

**B.**    **The Court should grant Deppoleto summary judgment on his fraudulent transfer claim.**

There is no genuine dispute that Takeover transferred assets to NextGen Beverages, Holley, and Zarro to place them out of Deppoleto's reach.  As such, the Court should grant Deppoleto's Motion for Partial Summary Judgment on Count VII against Takeover for fraudulently transferring assets, and against NextGen Beverages, Holley, and Zarro for receiving and benefitting from the fraudulently transferred assets.

**1.**    **Legal standard for fraudulent transfer.**

"A fraudulent transfer claim under Nevada's Uniform Fraudulent Transfer Act (UFTA) is a claim by a creditor that a debtor transferred property with the intent to defraud the creditor by placing the property out of the creditor's reach." *Tahican, LLC v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 139 Nev. Adv. Op. 2, 523 P.3d 550, 554 (2023), *as amended* (Feb. 9, 2023). Nevada recognizes three types of fraudulent transfer claims: (1) actual fraudulent transfer under Nev. Rev. Stat. § 112.180(1)(a); (2) constructive fraudulent transfer under Nev. Rev. Stat. § 112.180(1)(b); and (3) certain transfers by insolvent debtors under Nev. Rev. Stat. § 112.190(1).

A creditor proves a claim of actual fraudulent transfer when the debtor made the transfer "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor." Nev. Rev. Stat. § 112.180(1)(a).  To determine actual intent, "consideration may be given, among other factors [and as relevant here], to whether:

(a) The transfer or obligation was to an insider; . . .

_____

requests judgment on his breach of contract claim in the principal amount of $1,980,520.55.  Deppoleto will also ask the Court to award attorneys' fees, interest, and costs in accordance with Fed. R. Civ. P. 54(d)(2) and LR 54-1 upon entry of judgment.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; . . .

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

Nev. Rev. Stat. §§ 112.180(2)(a), (d), (h), (i), (j).

In addition, a creditor proves a claim of constructive fraudulent transfer when the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer or obligation," and the debtor:

      (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

      (2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond his or her ability to pay as they became due.

Nev. Rev. Stat. §§ 112.180(b)(1)-(2).

Lastly, a fraudulent transfer by an insolvent debtor occurs when the debtor transfers an asset "without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . . ." Nev. Rev. Stat. § 112.190(1). A debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Nev. Rev. Stat. § 112.160(1).

Nevada law broadly provides that a "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." Nev. Rev. Stat. § 112.150(12). As relevant to a debtor corporation, an "insider" means a director, officer, or "person in control of the debtor." Nev. Rev. Stat.

§§ 112.150(7)(b)(1)-(3).  Nevada law provides several remedies for a fraudulent transfer claim, including avoidance of the transfer, execution on the asset transferred or its proceeds, an "injunction against further disposition by the debtor . . . of other property," or "[a]ny other relief the circumstances may require."  Nev. Rev. Stat. §§ 112.210(1)(a), (1)(c)(1), (1)(c)(3), (2).  When a transfer is voidable under Nev. Rev. Stat. § 112.210(1)(a), the judgment may be entered against "[t]he first transferee of the asset or the person for whose benefit the transfer was made."  Nev. Rev. Stat. § 112.220(2)(a).

**2.    Under Nevada law, Takeover is liable for fraudulent transfer.**

Takeover transferred several assets to NextGen Beverages, Zarro, and Holley, which constitute fraudulent transfers under all three of Nevada's fraudulent transfer standards (*i.e.*, actual fraudulent transfer, constructive fraudulent transfer, and fraudulent transfer by an insolvent debtor).  It is undisputed that Takeover made the following transfers:

  a.    Takeover dismissed its legal claims against Holley.  *See* Nev. Rev. Stat. § 112.150(1) (defining transfer to include a release); (Harvey Decl. ¶ 2, Ex. 1, Holley Dep. at 147:4-10, 147:23-148:22.)

  b.    Takeover paid Holley a $5,000.00 "settlement payment" after other Takeover insiders agreed to dismiss its claim against him in the Arizona Lawsuit.  (*Id.* ¶ 2, Ex. 1, Holley Dep. at 185:6-187:3.)

  c.    Takeover sold hydrogen water to Zarro for $50,000.00, which represented approximately 40% of its retail value of $125,000.  (*Id.* ¶ 23, Ex. 22, Zarro Dep. at 197:20-24, 200:22-24, 201:20-23.)

  d.    Takeover sold gamer shots to Zarro for around $100,000.00, approximately 30% of its approximate retail value of $350,000.00.  (*Id.* ¶ 22, 23; Ex. 21, Takeover Bank Statement at DEF00210, 234; Ex. 22, Zarro Dep. at 201:20-202:15, 245:12-247:12.)

  e.    Takeover transferred the recipe for its hydrogen water to NextGen Beverages, which now sells its own hydrogen water.  (*Id.* ¶ 24, Ex. 23,

Zarro-NextGen Corp. Rep. Dep. at 13:17-14:3.)

f.    Takeover transferred to NextGen Beverages at least $25,000.00.  (*Id.* ¶ 24, Ex. 23, Zarro-NextGen Corp. Rep. Dep. at 17:17-18:2, 18:3-7, 20:19-23, 20:24-22:2, 22:12-18.)

Takeover (the debtor) is liable for actual fraudulent transfer because it acted with actual intent to "hinder, delay or defraud" Deppoleto, Takeover's creditor.  *See* Nev. Rev. Stat. § 112.180(1)(a).  As an initial matter, there is no dispute that Deppoleto is a creditor of Takeover's.  (Harvey Decl. ¶ 3, Ex. 2, Holley-Takeover Corp. Rep. Dep. at 121:16-23.)  In addition, there are numerous undisputed indicia to demonstrate that Takeover acted with "actual intent" to hinder Deppoleto.  *See* Nev. Rev. Stat. § 112.180(2).  First, Takeover's transfers to Zarro (sale of hydrogen water and gamer shots) and Holley (dismissal of the Arizona Lawsuit claims against him, and then giving him a $5,000.00 "settlement payment") were to "insiders" because they both served as Officers and Directors of Takeover at the time of the transfers.  *See* Nev. Rev. Stat. 112.150(12); (*Id.* ¶¶ 3, 23; Ex. 2, Holley Dep. at 86:1-16, 87:4-6, 108:12-23, 147:4-10, 147:23-148:22, 185:6-187:3; Ex. 22, Zarro Dep. at 32:5-24.)  Second, Takeover's transfers to Zarro, Holley, and NextGen Beverages all occurred after Deppoleto sued Takeover.  *See* Nev. Rev. Stat. 112.180(2)(d); (*see* ECF. No. 1.)  Third, the consideration that Takeover received for the transfers was not reasonably equivalent to the value of the asset transferred.  *See* Nev. Rev. Stat. 112.180(2)(h).  Takeover did not receive any consideration for dismissing its claims against Holley in the Arizona Lawsuit (*Id.* ¶ 3, Ex. 2, Holley Dep. at 149:4-150:9), or for transferring its hydrogen water recipe to NextGen Beverages (*Id.* ¶ 24, Ex. 23, Zarro-NextGen Corp. Rep. Dep. at 13:17-14:3).  And Takeover did not receive consideration of equal value for the hydrogen water and gamer shots that it sold to Zarro.  (*Id.* ¶ 23, Ex. 22, Zarro Dep. at 197:20-24, 200:22-24, 201:20-202:15, 245:12-247:12.)  Fourth, there is no dispute that Takeover was insolvent at the time of its fraudulent transfers, because Takeover's liabilities have exceeded its assets since at least November 8, 2022.  *See* Nev. Rev. Stat. 112.180(2)(i) (defining an insolvent debtor as an entity with debts "greater than

all of the debtor's assets at a fair valuation"); (*Id.* ¶ 2, Ex. 1, Holley Dep. at 153:23-154:15). Finally, Takeover's transfers occurred shortly after it incurred a substantial debt of approximately $2 million to Deppoleto by way of the Notes and Supplemental Loans.

For many of the same reasons, Takeover is also liable for constructive fraudulent transfer, and for fraudulent transfer by an insolvent debtor. For both claims, a plaintiff need only prove that the defendant did not receive "a reasonably equivalent value in exchange for the transfer[s]." Nev. Rev. Stat. § 112.180(b) (constructive fraudulent transfer); Nev. Rev. Stat. § 112.190(1) (fraudulent transfer by an insolvent debtor). As explained above, there is no dispute that Takeover did not receive any consideration for its transfers to Holley and NextGen Beverages, and that Takeover did not receive consideration of equal value for the hydrogen water and gamer shots that it "sold" to Zarro. Further, there is no dispute that Takeover made these transfers at a time when its assets "were unreasonably small in relation to the business." Nev. Rev. Stat. § 112.180(b)(1) (constructive fraudulent transfer). And, in fact, Takeover was insolvent at the time of these transfers. Nev. Rev. Stat. § 112.190(1) (fraudulent transfer by an insolvent debtor).

Because there is no dispute that Takeover fraudulently transferred assets, the Court should enter judgment against Takeover for the value of the transferred assets, and should also issue an injunction in order to prevent Takeover from further disposition of assets. *See* Nev. Rev. Stat. §§ 112.210(1)(c)(1), (2). It is undisputed that Takeover has transferred at least $25,000.00 to NextGen Beverages, and at least $5,000.00 to Holley as a "settlement payment." In addition, it is undisputed that Takeover sold Zarro hydrogen water for approximately $75,000.00 less than its retail value, and gamer shots for approximately $250,000.00 less than retail value. Takeover also transferred its hydrogen water formula to NextGen. The Court should order those transfers voided, and grant Deppoleto recovery of the value of the transferred assets, totaling at least $355,000.00, and the Court should also hold an evidentiary hearing to determine the value of the hydrogen water formula that Takeover transferred. *See* Nev. Rev. Stat. §§ 112.210(1)(a), 112.220(2).

The Court should also enter judgment against NextGen Beverages, Holley, and Zarro. Under Nevada law, a fraudulent transfer judgment may be entered against "[t]he first transferee of the asset or the person for whose benefit the transfer was made." Nev. Rev. Stat. § 112.220(2)(a); *see also Trina Solar US, Inc. v. Carson-Selman*, No. 2:20-CV-1308 JCM (BNW), 2020 WL 7338552, at *5 (D. Nev. Dec. 14, 2020) (acknowledging the validity of a claim against transferees). In this case, Holley, Zarro, and NextGen Beverages have admitted to receiving assets from Takeover, meaning they should therefore have judgment entered against them for the value of the transferred assets ($355,000.00). *See Plaza Bank v. Green*, 599 F. App'x 801, 802 (9th Cir. 2015) (affirming determination that individual who received the fraudulent transfer was personally liable under Nev. Rev. Stat. § 112.220(2)(a)).

In addition, the Court should grant injunctive relief against Takeover. Injunctive relief is particularly appropriate in this case, in part because, despite serving discovery requests months ago for Takeover's complete bank statements from May 1, 2022, through the present, Takeover has not complied with Deppoleto's discovery requests, so Deppoleto has no way of knowing the full extent of Takeover's fraudulent transfers. Deppoleto has moved the Court for an order compelling Takeover's compliance with its discovery obligation, which is currently pending the Court's review. (*See* ECF No. 94 at 8.) Without Takeover's complete bank records, Deppoleto has no way of knowing whether Takeover is continuing to fraudulently transfer other assets to hinder Deppoleto's ability to collect his judgment against Takeover. For the same reason, and in to be able to prove additional instances of Defendants' fraudulent transfers, Deppoleto respectfully requests that the Court grant him the ability to supplement this Motion after he receives Takeover's outstanding discovery.

## CONCLUSION

For all the above reasons, the Court should grant partial summary judgment against Takeover on Count II (breach of contract), and against Takeover, NextGen Beverages, Holley, and Zarro on Count VII (fraudulent transfer).

DATED this 10th day of January, 2025.

HUSCH BLACKWELL LLP

/s/ *Patrick M. Harvey*
JAMES PATRICK SHEA
Nevada Bar No. 405
BART K. LARSEN
Nevada Bar No. 8538
KYLE M. WYANT
Nevada Bar No. 14652
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email: jshea@shea.law
blarsen@shea.law
kwyant@shea.law

JENNIFER E. HOEKEL
Nevada Bar No. 12775
jennifer.hoekel@huschblackwell.com
HUSCH BLACKWELL LLP
8001 Forsyth Boulevard, Suite 1500
St. Louis, Missouri 63105
Telephone: 314.480.1500
Facsimile: 314.480.1505

And

PATRICK M. HARVEY
*Admitted Pro Hac Vice*
Patrick.Harvey@huschblackwell.com
HUSCH BLACKWELL LLP
511 North Broadway, Suite 1100
Milwaukee, WI 53202
Telephone: 414.273.2100
Facsimile: 414.223.5000

*Attorneys for Plaintiff*
*James V. Deppoleto Jr.*

## CERTIFICATE OF SERVICE

1.  On January 10, 2025, I served the following document(s): **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(a)**

2.  I served the above document(s) by the following means to the persons as listed below:

☒  a.  ECF System:

On all parties appearing, receiving, and requesting notice.

☐  b.  United States mail, postage fully prepaid:

☐  c.  Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐  For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐  For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐  d.  By direct email (as opposed to through the ECF System): Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐  e.  By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐  f.  By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 10, 2025.

By: /s/ *Patrick M. Harvey*