# EXHIBIT 2

**Page 1**

```
1           UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF NEVADA
3      - - - - - - - - - - - - - - x
4   JAMES DEPPOLETO,              :
5              Plaintiff,         :
6       v.          : Civil Action No.:
7   TAKEOVER INDUSTRIES,      : 2:22-CV-02013
8   INCORPORATED, et al.,        :
9              Defendants.    :
10     - - - - - - - - - - - - - - x
11
12           Videotaped Deposition of
13       TAKEOVER INDUSTRIES, INCORPORATED,
14     By and through its Designated Representative,
15               MIKE HOLLEY
16           Conducted Virtually
17       Tuesday, November 19, 2024
18             8:13 a.m. PST
19
20
21
22
23   Job No.:  559922
24   Pages:  1 - 127
25   Transcribed By:  Catherine Galati
```

**Page 2**

```
1     Videotaped Deposition of TAKEOVER INDUSTRIES,
2   INCORPORATED, By and through its Designated
3   Representative, MIKE HOLLEY, conducted virtually.
4
5
6
7
8
9
10
11
12
13
14     Pursuant to notice, before Charlie McGrath,
15   Notary Public in and for the State of California.
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1           A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4       PATRICK HARVEY, ESQUIRE
5       HUSCH BLACKWELL, LLP
6       511 North Broadway, Suite 1100
7       Milwaukee, Wisconsin 53202
8       (414) 273-2100
9
10
11   ON BEHALF OF THE DEFENDANTS:
12       DON BENNION, ESQUIRE
13       LAW OFFICE OF DON BENNION
14       10801 West Charleston Boulevard
15       Las Vegas, Nevada 89135
16       (702) 333-0777
17
18
19   ALSO PRESENT:
20       Mylene Santiano, Videographer
21
22
23
24
25
```

**Page 4**

```
1                 C O N T E N T S
2
3   EXAMINATION OF MIKE HOLLEY            PAGE
4       By Mr. Harvey                      6
5
6             E X H I B I T S
7         (Attached to the transcript.)
8   DEPOSITION EXHIBIT                    PAGE
```

```
9   Exhibit 1    Subpoena                   8
10  Exhibit 2    Note Purchase Agreement    16
11  Exhibit 3    5/25/22 Promissory Note    18
12  Exhibit 4    5/20/22 Joint Written Consent   19
13  Exhibit 5    7/6/22 Note Agreement Amendment   22
14  Exhibit 6    7/6/22 Promissory Note     23
15  Exhibit 7    7/1/22 Joint Written Consent   24
16  Exhibit 8    8/19/22 Note Agreement Amendment   26
17  Exhibit 9    8/19/22 Promissory Note     27
18  Exhibit 10   8/18/22 Joint Written Consent   28
19  Exhibit 11   5/2022 Checking Account Statement   51
20  Exhibit 12   Labor Smart Board Resolution   84
21  Exhibit 13   Takeover Board Resolution   86
22  Exhibit 14   Notice of Default          88
23  Exhibit 15   11/22/22 Husch Blackwell Letter   118
24  Exhibit 17   10/13/22 Great Northern Receipt   70
25  Exhibit 18   11/4/22 Great Northern Receipt   71
```

**5**

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped deposition of Michael Holley, corporate representative of Takeover Industries, Incorporated, in the matter of Deppoleto versus Takeover Industries, Incorporated, et al., in the United States District Court for the District of Nevada, Case Number 2:22-CV-02013.

Today's date is 11/19/2024. The time on the video monitor is 8:13 a.m. Pacific Standard Time. The remote videographer today is Mylene Santiano, representing Planet Depos. All parties of this video deposition are attending remotely.

Would counsel please voice-identify themselves and state whom they represent, starting with the taking attorney.

MR. HARVEY: Patrick Harvey for the plaintiff.

MR. BENNION: Don Bennion for the defendants, specifically today Michael Holley as the designated representative of Takeover Industries, Incorporated.

THE VIDEOGRAPHER: The court reporter today is Charlie McGrath, representing Planet

**6**

Depos. The witness will now be sworn.

THE REPORTER: I am a notary authorized to administer oaths, and this deposition will be recorded by electronic means. All parties understand and agree that any certified transcript produced from the recording of this proceeding is intended for all uses permitted under applicable procedural and evidentiary rules and laws and shall constitute written stipulation. The parties stipulate to the use and certification of this testimony consistent with applicable law of such.

Hearing no objection, I will now swear in the witness.

Whereupon,

MIKE HOLLEY,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Counsel, you may proceed.

MR. HARVEY: Thank you.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF, JAMES DEPPOLETO

BY MR. HARVEY:

Q Good morning, Mr. Holley.

**A Good morning. How are you?**

**7**

Q Good. Yourself?

**A Good, thanks.**

Q Good. Could you state and spell your full name for us, please?

**A Michael Holley, M-I-C-H-A-E-L; Holley is H-O-L-L-E-Y.**

Q And is your address still the same as it was in your last deposition a couple weeks ago?

**A It is.**

Q Any new plans to move since then?

**A No.**

Q Okay. And I know we deposed you a couple weeks ago, so I don't need to go over the deposition rules again; is that correct?

**A I'm good. Yeah.**

Q Okay. I'm just going to remind you that if you answer a question, I'm going to assume that you understood it. Fair?

**A Yes.**

Q Okay. Has your employment changed since your last deposition?

**A No.**

Q Okay. I'm going to show you my screen. Are you able to see my screen, Mr. Holley?

**A Yes.**

**8**

Q And have you seen this document before, the subpoena to testify at deposition in a civil action --

**A Yes.**

Q -- to Takeover Industries, Incorporated? I'm sorry. Did you say yes?

**A Yes.**

Q Thank you. And I understand that you are prepared to offer testimony today as the corporate representative on behalf of Takeover Industries, Incorporated; is that correct?

**A Yes.**

Q And then if we scroll down -- and by the way, we'll make this Exhibit Number 1, please.

MR. BENNION: Yes.

(Exhibit 1 was marked for identification and is attached to the transcript.)

Q And then if we scroll down, there's an Exhibit A, which has deposition topics in numbered paragraphs 1 through 5. Do you see that?

**A Yes.**

Q And it's my understanding that you are here to testify today as to Topics 1, 2, 3, and 4, but not 5. Is that correct in your understanding?

**A Correct. Yes, correct.**

**9**

1    Q  Okay.  Thank you.  What, if anything, did
2  you do to prepare to offer testimony as the
3  corporate representative on behalf of Takeover
4  with respect to those topics?
5    **A  Just spoke with my attorney.**
6    Q  Did you review any documents?
7       THE REPORTER:  I'm sorry.  You cut out,
8  your question.
9    Q  Did you review any documents?
10   **A  No.**
11   Q  Did you review any communications?
12   **A  No.**
13   Q  Did you ask anyone else affiliated with
14 Takeover either now or in the past to provide you
15 with information that would help you educate
16 yourself on the topics list in the notice about
17 which you're going to testify?
18   **A  No.**
19   Q  And you said you just spoke with your
20 lawyer?
21   **A  Correct.**
22   Q  How long did you speak to your lawyer?
23   **A  I don't know.  Maybe a half hour.**
24   Q  When was this?
25   **A  Yesterday.**

**10**

1    Q  Was anyone else at the meeting other than
2  you and your lawyer?
3    **A  No.**
4    Q  And was this your current lawyer or your
5  potentially former lawyer, Mr. Sexton or Mr. Bond?
6    **A  Current.**
7    Q  And I thought I understood the answer before
8  to be no to this, but I'm going to ask anyways.
9  During that meeting, did you review any documents?
10   **A  No.**
11   Q  Other than that 30-minute meeting
12 yesterday, did you have any other discussions with
13 counsel about this deposition?
14   **A  No.**
15   Q  Did you make any handwritten notes to
16 assist you in testifying here today?
17      THE REPORTER:  I'm sorry.  Part of your
18 question got cut out.
19   Q  Did you make any handwritten or
20 typewritten notes to assist you?
21   **A  No.  No.**
22   Q  Okay.  I'm going to go through these
23 topics in the order we've got them listed.  So the
24 first topic is the nature of Takeover Industries,
25 Incorporated -- Incorporated's relationship with

**11**

1  James (inaudible), including the amounts received
2  by Takeover from Mr. Deppoleto.
3    Q  Are we on the same page?
4    **A  Yeah, you keep cutting out.**
5    Q  I'm sorry.  And let me know if that
6  happens.  I'll ask again.
7       I'm going to go through these topics in
8  order.  The first topic is the nature of Takeover
9  Industries, Incorporated's relationship with James
10 V. Deppoleto, Jr., including the amounts of funds
11 received by Takeover from Mr. Deppoleto.
12      Are we on the same page?
13   **A  Yes.**
14   Q  Can you briefly describe what Takeover
15 Industries, Incorporated, is?
16   **A  Takeover Industries is a beverage company.**
17   Q  And it is currently still in business?
18   **A  It has no sales for the last year.**
19   Q  But it is still an ongoing legal entity,
20 correct?
21   **A  Correct.**
22   Q  And it was founded by yourself, Mr. -- and
23 Mr. McBride, correct?
24   **A  Yes.**
25   Q  And it sold products under the brand name

**12**

1  NXT LVL, N-X-T, space, L-V-L, correct?
2    **A  Correct.**
3    Q  And I know I asked you this before in your
4  personal capacity, but now you're speaking on
5  behalf of the company, so I want to ask you again.
6  What products were sold under the brand name,
7  NXT LVL?
8    **A  Initially, it was a hydrogen water and**
9  **energy shots.**
10   Q  And the energy shots are also known as
11 gamer shots; is that correct?
12   **A  Correct.**
13   Q  What were the name of the gamer shots?
14   **A  NXT LVL Gamer Shot and a T-Pain Gamer**
15 **Shot.**
16   Q  And at the time that Mr. Deppoleto started
17 doing business with Takeover, how many employees
18 did Takeover have?
19   **A  When you mean doing business, you mean the**
20 **loans?**
21   Q  Yes.
22   **A  I wasn't there at that time, but I**
23 **believe, from my knowledge, there was probably**
24 **five or six employees.**
25   Q  Who were those five or six employees?

**13**

1     **A Jason Tucker, Toby McBride, Joseph Pavlik,**
2   **Michael Tzanetatos, Michael Costello, and Kerby**
3   **Fortner and, I believe, Melissa Tucker.**
4     Q Anyone else?
5     **A No.**
6     Q And you said you were not there at the
7 time. From when to when were you not at Takeover?
8     **A When I was not at Takeover? From December**
9   **of '21 until November of '22.**
10     Q And all of Mr. Deppoleto's loans to
11 Takeover occurred in that window when you were not
12 there, true?
13     **A Yes.**
14     Q So how did you come to the knowledge about
15 the details of the amount of funds received by
16 Takeover from Mr. Deppoleto?
17     **A I've seen the documents and through the**
18 **court case.**
19     Q Which court case?
20     **A This one.**
21     Q How did Takeover's relationship with
22 Mr. Deppoleto begin?
23     **A I'm not sure. I wasn't there.**
24     Q Who from Takeover had the initial contact
25 with Mr. Deppoleto?

**14**

1     **A From my knowledge, I believe it's Toby or**
2 **Joe.**
3     Q Toby McBride or Joe Pavlik?
4     **A Correct.**
5     Q When did Mr. Deppoleto's relationship
6 begin with Toby McBride and/or Joe Pavlik?
7     **A I don't know exactly.**
8     Q What was the nature of the relationship
9 between Mr. Deppoleto and Mr. McBride and/or
10 Mr. Pavlik?
11     **A I don't know that either.**
12     Q Who from Takeover first approached
13 Mr. Deppoleto about investing in Takeover?
14     **A I don't know that.**
15     Q When did Takeover first approach
16 Mr. Deppoleto about investing in Takeover?
17     **A I don't know that either.**
18     Q Do you know whether the first approach to
19 Mr. Deppoleto about investing in Takeover, was
20 that in person, via email?
21     **A I don't know. I was not there.**
22     Q What specifically did the Takeover
23 representative say to Mr. Deppoleto to solicit his
24 investment?
25     **A I wouldn't know that either.**

**15**

1     Q Why did Takeover solicit Mr. Deppoleto's
2 investment?
3     **A I don't know.**
4     Q In the initial conversation about
5 Mr. Deppoleto investing in Takeover, what amount
6 of funds did Takeover request Mr. Deppoleto to
7 loan to Takeover?
8     **A That, I don't know either.**
9     Q Before Mr. Deppoleto loaned Takeover the
10 initial amount of money, what did Takeover
11 represent to Mr. Deppoleto that the funds would be
12 used for?
13     **A I don't know.**
14     Q In preparation -- let me go back.
15     You said it was your belief, although you
16 weren't sure, that Mr. McBride or Mr. Pavlik had
17 the initial contact with Mr. Deppoleto as
18 representative of Takeover; is that correct?
19     **A Correct.**
20     Q And you're telling me that you did not
21 speak to either Mr. McBride or Mr. Pavlik in
22 preparation for this deposition; is that correct?
23     **A Correct.**
24     Q Why not?
25     **A I don't believe that I needed to.**

**16**

1     Q Even though that you understood the topic
2 -- the first topic was the nature of Takeover
3 Industries, Incorporated's relationship with James
4 V. Deppoleto, Jr., including the amount of funds
5 received by Takeover from Mr. Deppoleto?
6     **A Yeah. I've seen the documents.**
7     Q But in terms of the relationship and how
8 it started, for example, you have no knowledge
9 whatsoever as you sit here today; is that true?
10     **A Correct.**
11     Q In May of 2022, who were the members of
12 Takeover's board of directors?
13     **A I'm not sure, but I believe it was Jason**
14 **Tucker, Toby McBride, and Joseph Pavlik.**
15     Q In May of 2022, who were the officers of
16 Takeover?
17     **A I believe the same three.**
18     Q I'm going to show you another document.
19 Are you able to see my screen?
20     **A I am.**
21     Q And we see from the bottom -- and we'll
22 make this Exhibit 2, by the way.
23     (Exhibit 2 was marked for identification
24 and is attached to the transcript.)
25     Q This one has an exhibit sticker on the

17

1  bottom that says, Holley Exhibit 5, with a date of
2  October 4, 2024. Do you see that at the bottom
3  here?
4  **A Yes.**
5  Q So you've seen this document at least at
6  your deposition, your previous deposition,
7  correct?
8  **A Yes.**
9  Q And at the top, it says, convertible note
10 purchase agreement, correct?
11 **A Uh-huh. Yes.**
12 Q And so what is this document? What's your
13 understanding.
14 **A It's a convertible note between**
15 **Mr. Deppoleto and Takeover Industries.**
16 Q And the Takeover board of directors
17 discussed this note purchase agreement prior to
18 its execution, correct?
19 **A I don't have knowledge of that.**
20 Q So you can't say when or who specifically
21 from the Takeover board of directors discussed
22 this note purchase agreement prior to its
23 execution? Is that what you're telling me?
24 **A Yes.**
25 Q And you also don't know what they

18

1  discussed. Is that what you're telling me?
2  **A Correct.**
3  Q And the purpose of this document was to
4  memorialize Mr. Deppoleto's $500,000 loan to
5  Takeover, correct?
6  **A Yes.**
7  Q We'll take that one down. I'll show you
8  another document. We'll mark this as Exhibit 3.
9  (Exhibit 3 was marked for identification
10 and is attached to the transcript.)
11 Q This one is labeled, secured convertible
12 promissory note, and it's dated May 25, 2022,
13 correct?
14 **A Yes. Yes.**
15 Q And in the top left, it also says,
16 500,000, correct?
17 **A Yes.**
18 Q Do you recognize this document?
19 **A Yes.**
20 Q What is it?
21 **A It's a convertible promissory note between**
22 **Mr. Deppoleto and Takeover Industries.**
23 Q And the first portion of the first full
24 paragraph says, for value received, Takeover
25 Industries, Inc., a Nevada corporation, the

19

1  company, hereby promises to pay James V.
2  Deppoleto, Jr., the holder, the principal sum of
3  $500,000 together with interest thereon from the
4  date of this convertible promissory note.
5  Interest will accrue at a rate of 8 percent
6  compounded annually, correct?
7  **A Correct.**
8  Q And Takeover received Mr. Deppoleto's
9  $500,000 payment in accordance with this
10 promissory note, correct?
11 **A Correct.**
12 Q And Takeover promised to repay
13 Mr. Deppoleto his $500,000 loan with
14 (indiscernible), correct?
15 **A Correct.**
16 Q Okay. We'll take that one down. We'll
17 mark -- I'm going to share this one with you, and
18 we'll mark this next one Exhibit Number 4.
19 (Exhibit 4 was marked for identification
20 and is attached to the transcript.)
21 Q And this one at the top says, joint
22 written consent of the board of directors and
23 shareholders of Takeover Industries, Inc., dated
24 May 20, '22, correct?
25 **A Yes.**

20

1  Q Do you recognize this document?
2  **A Yes.**
3  Q And what is it?
4  **A It's a joint written consent of the board**
5  **of directors of Takeover.**
6  Q And the purpose was to provide written
7  consent to both the board of directors and
8  shareholders of Takeover for Takeover to enter
9  into the loan agreement with Mr. Deppoleto,
10 correct?
11 **A Yes, I think so.**
12 Q Okay. And if we go down, there are some
13 resolutions. There's a resolution about halfway
14 down the page that starts off, further resolved
15 that the company's president be, and hereby is,
16 authorized and directed to do and perform or cause
17 to be done and perform all such acts, deeds, and
18 things and to make, execute -- and it goes on.
19 But essentially, what that paragraph is saying,
20 that Takeover's president, Jason Tucker, is
21 authorized to take all necessary actions to
22 effectuate Mr. Deppoleto's note purchase
23 agreement, correct?
24 **A Correct.**
25 Q And then if we go down, there's a

21

1  signature page.  And under board of directors,
2  it's got Toby McBride, Jason Tucker, and Joseph
3  Pavlik, correct?
4  **A  Correct.**
5  Q  And under shareholders, we've got Michael
6  Costello, correct?
7  **A  I don't believe he was a shareholder,**
8  **though.**
9  Q  This document -- according to this
10 document, he's listed as a shareholder consenting
11 to this agreement, correct?
12 **A  Yeah.  He owned no shares, though.**
13 Q  Okay.  And this was during a time you were
14 not at the company, true?
15 **A  True.**
16 Q  Now, the board of directors, again, it's
17 got McBride, Tucker, and Pavlik.  Were there any
18 other board of directors of Takeover as of this
19 May 20, 2022, document, other than those three?
20 **A  Technically, I was still a director, but**
21 **-- because they removed me improperly, but I was**
22 **not active during that time.**
23 Q  Okay.  So this is all three active
24 directors of Takeover as of May 20, 2022, correct?
25 **A  Yes.**

22

1  Q  Okay.  We'll take that one down.  I'll
2  show you another document here.  We'll mark this
3  one as Exhibit Number 5.
4     (Exhibit 5 was marked for identification
5  and is attached to the transcript.)
6  Q  At the top, this is labeled, first
7  amendment to convertible note purchase agreement,
8  correct?
9  **A  Correct.**
10 Q  And it's entered into as of July 6, 2022,
11 correct?
12 **A  Correct.**
13 Q  Do you recognize this document?
14 **A  Yes.**
15 Q  What is it?
16 **A  It's a convertible note purchase agreement**
17 **between Mr. Deppoleto and Takeover Industries.**
18 Q  And it's an amendment to the May 25, 2022,
19 convertible note purchase agreement we were just
20 talking about, correct?
21 **A  Yes.**
22 Q  And with this first amendment,
23 Mr. Deppoleto is loaning Takeover an additional
24 $500,000, correct?
25 **A  Yes.**

23

1  Q  So as of July 6, 2022, Mr. Deppoleto has
2  loaned Takeover a total of one million in
3  principal, correct?
4  **A  Correct.**
5  Q  Okay.  We'll take that down.  Next one
6  we'll show you is going to be Exhibit Number 6.
7     (Exhibit 6 was marked for identification
8  and is attached to the transcript.)
9  Q  And this one is labeled, second secured
10 convertible promissory note, and it's dated July
11 6, 2022, correct?
12 **A  Correct.**
13 Q  Do you recognize this document?
14 **A  Yes.**
15 Q  What is it?
16 **A  It's a convertible note between Takeover**
17 **Industries and James Deppoleto.**
18 Q  A second secured convertible promissory
19 note, correct?
20 **A  Yes.**
21 Q  And Takeover received Mr. Deppoleto's
22 $500,000 loan in accordance with this second
23 promissory note, correct?
24 **A  Yes.**
25 Q  And Takeover promised to repay

24

1  Mr. Deppoleto his $500,000 loan plus interest,
2  correct?
3  **A  Or converted to shares, yes.**
4  Q  What did Takeover intend to use
5  Mr. Deppoleto's second $500,000 loan for?
6  **A  I don't know.  I wasn't there.**
7  Q  Do you know whether the second $500,000
8  loan was supposed to be used differently than the
9  first $500,000 loan?
10 **A  No idea.**
11 Q  Okay.  I'll show you another document now.
12 We'll mark this as Exhibit 7.
13    (Exhibit 7 was marked for identification
14 and is attached to the transcript.)
15 Q  This one at the top is joint written
16 consent to the board of directors and shareholders
17 of Takeover Industries, Inc., and it's dated July
18 1, 2022, correct?
19 **A  Correct.**
20 Q  And do you recognize this document?
21 **A  Yes.**
22 Q  What is it?
23 **A  It's a joint written consent of the board**
24 **of directors and shareholders of Takeover**
25 **Industries.**

25

1    Q  And the purpose of this document is to
2  provide written consent to the board of directors
3  and shareholders of Takeover to enter into the
4  second $500,000 loan with Mr. Deppoleto, correct?
5    **A  Correct.**
6    Q  If we go down, at the bottom of page 1,
7  there's another paragraph that starts off similar
8  to the one we were just talking about, further
9  resolved, comma, that the company's president be,
10  comma, and hereby is, and then it goes on.  And
11  essentially what that paragraph is telling us is
12  that Takeover's president, Jason Tucker, was
13  authorized to take all necessary actions to effect
14  Mr. Deppoleto's first amendment to the note
15  purchase agreement, correct?
16    **A  Correct.**
17    Q  If we go down, we've got another signature
18  page at the bottom.  And under the board of
19  directors, we've got listed Toby McBride, Jason
20  Tucker, and Joseph Pavlik, correct?
21    **A  Correct.**
22    Q  And under shareholders, it lists Michael
23  Costello, correct?
24    **A  Correct.**
25    Q  So all of them consented to the second

26

1  $500,000 loan, correct?
2    **A  Yeah.  Once again, Michael Costello was**
3  **not a shareholder.**
4    Q  And as of July 1, 2022, there were no
5  other active directors, other than the three
6  listed in this document, being Mr. McBride,
7  Mr. Tucker, and Mr. Pavlik, correct?
8    **A  Correct.**
9    Q  Okay.  We'll take that one down.  Next
10  document we'll show you we're going to mark as
11  Exhibit Number 8.
12     (Exhibit 8 was marked for identification
13  and is attached to the transcript.)
14    Q  And this one is labeled, second amendment
15  to convertible note purchase agreement, correct?
16    **A  Correct.**
17    Q  And it was entered into as of August 19,
18  2022, correct?
19    **A  Correct.**
20    Q  Do you recognize this document?
21    **A  Yes.**
22    Q  What is it?
23    **A  It's a second amendment to the convertible**
24  **note purchase agreement.**
25    Q  And this document amends the initial

27

1  convertible note purchase agreement dated May 25,
2  2022, correct?
3    **A  Correct.**
4    Q  And with this second amendment,
5  Mr. Deppoleto is loaning Takeover an additional
6  $500,000, correct?
7    **A  Correct.**
8    Q  So as of August 19, 2022, Mr. Deppoleto
9  has loaned Takeover a total of $1.5 million in
10  principal, correct?
11    **A  Correct.**
12    Q  Okay.  We'll take that one down.  Okay.
13  The next one I'm going to show you we're going to
14  mark Exhibit Number 9.
15     (Exhibit 9 was marked for identification
16  and is attached to the transcript.)
17    Q  And this is labeled, third secured
18  convertible promissory note, dated August 19,
19  2022, correct?
20    **A  Correct.**
21    Q  Do you recognize this document?
22    **A  Yes.**
23    Q  What is it?
24    **A  It is a third secured convertible**
25  **promissory note between Takeover and James**

28

1  **Deppoleto.**
2     THE REPORTER:  I'm sorry.  The end of your
3  answer is kind of trailing off.  It was hard to
4  hear.
5    **A  Convertible note between Takeover**
6  **Industries and James Deppoleto.**
7     THE REPORTER:  Thank you.
8    Q  And Takeover received Mr. Deppoleto's
9  $500,000 loan in accordance with this third
10  promissory note, correct?
11    **A  Correct.**
12    Q  Takeover promised to repay Mr. Deppoleto
13  his $500,000 loan, correct?
14    **A  Or convert into shares, yes.**
15    Q  What did Takeover intend to use
16  Mr. Deppoleto's third $500,000 for?
17    **A  I don't know.**
18    Q  Do you know whether it was for a use that
19  was different than the use to which the first and
20  second $500,000 loans were for?
21    **A  I don't know that.**
22    Q  Okay.  We'll take that one down.  Next one
23  we're going to show you we'll mark as
24  Exhibit Number 10.
25     (Exhibit 10 was marked for identification

29

1 and is attached to the transcript.)

2    Q And Exhibit Number 10 is labeled, joint

3 written consent of the board of -- I'm sorry.

4 Joint written consent of the board of directors

5 and shareholders of Takeover Industries, Inc., and

6 it's dated August 20 -- or August 18, 2022,

7 correct?

8    **A Correct.**

9    Q Do you recognize this document?

10    **A Yes.**

11    Q What is it?

12    **A It's a written consent of the board of**

13 **directors and shareholders of Takeover Industries.**

14    Q And the purpose was to provide a joint

15 written consent of the board of directors and

16 shareholders for Takeover to be able to enter into

17 the third loan from Mr. Deppoleto, correct?

18    **A Correct.**

19    Q And if we go down, we've got at the bottom

20 of page 1 another paragraph that, again, like the

21 other paragraphs that we were talking about,

22 authorizes Takeover's president, Jason Tucker, to

23 take all necessary actions to effect

24 Mr. Deppoleto's second amendment to note purchase

25 agreement, correct?

30

1    **A Correct.**

2    Q And then if we go down, there's a

3 signature page, and on the signature page, we've

4 got board of directors, Toby McBride, Jason

5 Tucker, and Joseph Pavlik, correct?

6    **A Correct.**

7    Q And then under shareholders, it lists

8 Michael Costello, correct?

9    **A Correct.**

10    Q As of the date, August 18, 2022, are there

11 any board of directors other than -- active board

12 of directors other than Mr. McBride, Mr. Tucker,

13 and Mr. Pavlik?

14    **A No.**

15    Q Take that one down.

16    Mr. Deppoleto also loaned Takeover

17 $386,773.86 in October 2022, correct?

18    **A I've seen no loan documents for it.**

19    Q Are you taking the position that

20 Mr. Deppoleto did not loan Takeover $386,773.86 in

21 October 2022, whether there were loan documents or

22 not?

23    **A I don't know. I wasn't there.**

24    Q So as you sit here today, you can't say

25 one way or another whether Mr. Deppoleto loaned

31

1 Takeover $386,000 and change in October 2022; is

2 that correct?

3    **A Correct.**

4    Q And you also don't -- well, let me ask you

5 this: Who from Takeover negotiated with

6 Mr. Deppoleto in October 2022 about a supplemental

7 loan?

8    **A There was no documentation, so I don't**

9    **know.**

10    Q And you didn't speak to any current or

11 former Takeover employees, officers, or directors

12 about this supplemental loan in preparation for

13 your deposition; is that correct?

14    **A Correct.**

15    Q Are you taking the position that Takeover

16 did not receive $386,000 and change from

17 Mr. Deppoleto in October 2022?

18    **A Correct.**

19    Q I'm not sure if we had a double-negative

20 there. Maybe that was my fault.

21    **A Sorry. No.**

22    Q Did Takeover --

23    **A No money was received from Mr. Deppoleto**

24 **in that amount.**

25    Q And I'm sorry. We were talking over each

32

1 other. What did you just say?

2    **A There was no money received by Takeover in**

3 **that amount.**

4    Q Okay. So I want to make sure I

5 understand. You're telling me that Takeover did

6 not receive $386,000, or even a number close to

7 that, from Mr. Deppoleto in October 2022? Is that

8 what you're telling me?

9    **A Correct.**

10    Q And what are you basing that statement off

11 of?

12    **A Bank statements.**

13    Q What bank statements?

14    **A Takeover Industries' bank statements.**

15    Q When did you review those?

16    **A I don't know. Last year.**

17    Q You didn't review them in preparation for

18 today?

19    **A No.**

20    Q And if the bank statements show that there

21 was, in fact, a loan of $386,000 and change from

22 Mr. Deppoleto in October 2022, you wouldn't

23 dispute those bank statements, would you?

24    **A No.**

25    Q And so you're basing that answer solely on

33

1 your personal review of the bank statements last
2 year, correct?
3 **A Correct.**
4 Q And if the bank statements show that there
5 was a payment from Mr. Deppoleto to Takeover in
6 that time frame, do you know why there was not
7 another amendment to the convertible note purchase
8 agreement to facilitate that loan?
9 MR. BENNION: Objection to the extent it
10 may call for speculation.
11 Go ahead.
12 **A I don't know. I wasn't there.**
13 Q And as the corporate representative for
14 Takeover, you're not in a position to say whether
15 there was even a discussion about entering into
16 another written amendment to amend the convertible
17 note purchase agreement; is that what you're
18 telling me?
19 **A One more time. I'm sorry.**
20 Q Sure. You're here as the corporate
21 representative for Takeover Industries, correct?
22 **A Yes.**
23 Q And the first topic to discuss were -- was
24 the various loans that Mr. Deppoleto provided to
25 Takeover. You understand that, correct?

34

1 **A Yes.**
2 Q And what I'm asking you is, as the
3 corporate representative of Takeover, whether you
4 were personally working there at the time of
5 October 2022 or not, in your capacity as the
6 corporate representative for Takeover, you're not
7 in a position to tell me why there wasn't a fourth
8 note entered into. Is that what you're telling
9 me?
10 MR. BENNION: Objection, vague and
11 ambiguous.
12 Go ahead.
13 **A Yeah, I don't -- I don't understand. I**
14 **don't -- like, there's -- what are you asking me**
15 **directly?**
16 Q Sure. Happy to try and come at it a
17 different way. I was asking you a series of
18 questions about -- well, let me back up.
19 You understand that Mr. Deppoleto is
20 alleging that he provided an additional loan in
21 October 2022 for about $386,000. You understand
22 that, correct?
23 **A Yeah. And I said, I have never seen any**
24 **loan documents or any amount of that deposited**
25 **into Takeover's accounts.**

35

1 Q Correct.
2 **A I've seen no proof of it.**
3 Q And when I was asking you those questions
4 earlier, I thought you told me, but correct me if
5 I'm wrong, part of the reason you didn't know why
6 there was no loan document was because you weren't
7 there at the time, correct?
8 **A I don't know of any discussions about any**
9 **of it. So --**
10 Q And I understand that if this was your
11 deposition a couple weeks ago when I was asking
12 you questions in your personal capacity. Now I'm
13 asking you as the corporate representative of
14 Takeover, who is here to testify today about the
15 various loans and allegations about the loans and
16 whatnot. You don't -- you can't answer why there
17 wasn't a fourth note if there was, in fact, a
18 loan. Is that what you're telling me?
19 **A I don't believe that there was.**
20 Q And do you know why there was not?
21 **A No.**
22 Q And you didn't -- who was there at the
23 time? I know you said you were out. Who was at
24 Takeover in October 2022?
25 **A Jason Tucker.**

36

1 Q Did you speak to Mr. Tucker about the
2 allegations --
3 **A No.**
4 Q -- of the October 2022 loan?
5 **A No.**
6 Q Did you speak -- well, was Mr. Pavlik
7 there in October 2022?
8 **A Yes.**
9 Q Did you speak to Mr. Pavlik about the
10 allegations about the October 2022 loan?
11 **A No.**
12 Q Was Mr. McBride there in October 2022?
13 **A I'm not sure.**
14 Q Did you speak to Mr. McBride about the
15 allegations about the October 2022 loan?
16 **A No.**
17 Q Was Mr. Costello at Takeover in October
18 2022?
19 **A I believe so, yes.**
20 Q Did you speak to Mr. Costello about the
21 allegations about the October 2022 loan?
22 **A No.**
23 Q Did you review Mr. Deppoleto's document
24 production in preparation for the corporate
25 representative deposition today?

37

1    A  I don't believe he produced any documents.
2    Q  So the answer to my question is, you did
3  not review any documents from Mr. Deppoleto in
4  preparation for your answer today?
5    A  Is that the same thing you just asked me?
6    Q  Yes.  I asked it slightly differently
7  because I got the sense you didn't understand when
8  I asked the first time.  I'm happy to ask it again
9  if you're still not understanding.  Just let me
10  know.
11    A  So did you ask me if he produced any
12  documents?
13    Q  No.  I'll ask -- I'll ask it again.
14     In preparation for your deposition today,
15  you didn't review anything that Mr. Deppoleto
16  produced in this case; is that correct?
17    A  No.
18    Q  What's incorrect about it?
19    A  He hasn't produced any documents.
20    Q  Your testimony is that Mr. Deppoleto
21  hasn't produced any documents in this case?
22    A  Not that we've asked for.
23    Q  Okay.  You were not -- strike that.
24     Were you personally involved in any
25  discussions with Mr. Deppoleto in October 2022

38

1  about loans or potential loans?
2    A  No.
3    Q  Do you know whether anyone from Takeover
4  spoke to Mr. Deppoleto in or around October 2220
5  about loans or potential loans?
6    A  No.
7    Q  Did Takeover tell Mr. Deppoleto it would
8  repay him any October 2022 loan that he might
9  make?
10    A  No.
11    Q  And what's your basis for saying that?
12    A  I don't know.
13    Q  So Takeover could have told Mr. Deppoleto
14  that they would repay him any loan that he might
15  make around October 2022, but you can't say one
16  way or another?
17    A  I have no idea.
18    Q  And so because you have no idea, if
19  Mr. Deppoleto says that he was told by a Takeover
20  representative that he would be repaid, you're not
21  in a position to personally contradict him,
22  correct?
23    A  I told you, I don't know.
24    Q  Right.  And that's my point.  Since you
25  weren't involved in any discussions with

39

1  Mr. Deppoleto in October 2022, if Mr. Deppoleto
2  testifies that he was told by someone from
3  Takeover that he would be repaid, you're not in a
4  position to contradict his testimony, true?
5     MR. BENNION:  Objection to the extent it
6  may call for a legal conclusion.
7     Go ahead.
8    A  I don't know.  I'm not an attorney.
9    Q  Well, you said you didn't have any
10  discussions directly with Mr. Deppoleto in October
11  2022, correct?
12    A  Correct.
13    Q  And you don't know -- I think you told me
14  you don't know whether anyone from Takeover had
15  any discussions with Mr. Deppoleto in 2022,
16  correct?
17    A  Correct.
18    Q  Okay.  And so what I'm asking you is, if
19  Mr. Deppoleto testifies, I did speak to someone
20  from Takeover in October 2022, you don't have any
21  personal knowledge to contradict that, correct?
22    A  I don't.
23    Q  Okay.  And similarly, if Mr. Deppoleto
24  testifies that someone from Takeover promised to
25  repay him in October 2022, you don't have any

40

1  personal knowledge to contradict Mr. Deppoleto's
2  testimony, correct?
3    A  No, I don't.
4    Q  Mr. Deppoleto also loaned Takeover
5  $128,924.62 in November 2022, correct?
6    A  Not that I know of.
7    Q  Did you speak to anyone who is currently
8  at Takeover or was formerly with Takeover about
9  whether, in fact, Mr. Deppoleto loaned Takeover
10  over $128,000 in November 2022?
11    A  No.
12    Q  And does your answer span going back to
13  November 2022 up through today, or would that just
14  be in preparation for your deposition?  In other
15  words, when you got the topic list for today and
16  made the determination you were going to be the
17  corporate representative for Topic Number 1, did
18  you reach out to anyone and ask whether
19  Mr. Deppoleto's allegation about loaning Takeover
20  over $128,000 in November 2022 was correct?
21    A  I don't remember.
22    Q  Well, let me ask it this way:  When is the
23  last time you spoke to Mr. Tucker?
24    A  About two years ago.
25    Q  And you didn't have the topic list two

**41**

1 years ago, so fair to assume you haven't talked to
2 Mr. Tucker about the topic list, true?
3   A Correct.
4   Q Have you spoken to Mr. McBride since you
5 received the topic list about Topic Number 1?
6   A No.
7   Q Have you spoken to Mr. Pavlik since you
8 received the topic list about Topic Number 1?
9   A No.
10   Q Have you spoken to Mr. Costello since you
11 received the topic list about Topic Number 1?
12   A No.
13   Q And you don't know one way or another
14 whether Mr. Deppoleto loaned Takeover
15 $128,000-plus in November 2022, correct?
16   A It was not in the bank statements, and
17 I've seen no loan documents.
18   Q And the last time you reviewed the bank
19 statements was about a year ago, you said?
20   A Possibly, yeah.
21   Q You didn't review the bank statements in
22 preparation for your deposition today, correct?
23   A Correct.
24   Q And if the bank statements show that
25 Mr. Deppoleto did, in fact, loan Takeover over

**42**

1 128,000 in November 2022, you would defer to the
2 bank statements, correct?
3   A Yes.
4   Q And you said you didn't see any loan
5 documents related to the November 2022 loan,
6 correct?
7   A Correct.
8   Q Do you know why there was no -- why there
9 were no loan documents related to the November
10 2022 loan?
11   A I haven't -- I don't know. There's no
12 proof.
13   Q Because you weren't personally involved in
14 the discussions with Mr. Deppoleto at that time;
15 is that true?
16   A True.
17   Q And because you weren't involved in
18 discussions with Mr. Deppoleto at that time, you
19 have no personal knowledge as to what anyone from
20 Takeover may have said to Mr. Deppoleto in
21 November 2022 about a supplemental loan; is that
22 correct?
23   A Correct.
24   Q And you also did not learn anything about
25 a potential November 2022 loan in preparation for

**43**

1 your deposition as the corporate representative of
2 Takeover today, correct?
3   A I'm sorry. What was that again?
4   Q In preparation to speak as the corporate
5 representative for Takeover as to Topic Number 1
6 today, you didn't learn any information about a
7 potential loan from Mr. Deppoleto to Takeover in
8 November 2022, correct?
9   A Correct.
10   Q Did you do anything to specifically look
11 into whether Mr. Deppoleto's allegations about the
12 November 2022 loan were correct in preparation for
13 your deposition today?
14   A Not for the deposition, no.
15   Q After November 2022, did Takeover seek any
16 additional funding from Mr. Deppoleto?
17   A No.
18   Q Why not?
19   A No idea.
20   Q You were back with the company around
21 November 2022, correct?
22   A Correct.
23   Q You never had any discussions with anyone
24 at Takeover about seeking additional funding from
25 Mr. Deppoleto after November 2022?

**44**

1   A No. We didn't.
2   Q How did Takeover book Mr. Deppoleto's
3 loans to Takeover?
4       MR. BENNION: Same objection, vague and
5   ambiguous. Lacks foundation.
6       Go ahead.
7   A In what way?
8   Q You're familiar with the phrase, booking,
9 for instance, liabilities, assets, things of that
10 nature? Are you familiar with that?
11   A Yes.
12   Q How did Takeover book Mr. Deppoleto's
13 loans to the company?
14       MR. BENNION: Same objection.
15   A I wasn't directly involved with it.
16   Q Who was?
17   A I don't know.
18   Q Did Takeover have a CFO or a similar
19 position?
20   A No.
21   Q Who did Takeover use for its accounting
22 functions?
23   A I believe it was QuickBooks.
24   Q And who would have actually input the raw
25 data into QuickBooks for Takeover?

45

1    A I'm not sure, but probably Jason Tucker.
2    Q Okay. Did you review Takeover's books in
3 preparation for your deposition today?
4    A No.
5    Q Do you know whether Takeover's books
6 reflect all of the loans that you did see the loan
7 paperwork for?
8    A Yes.
9       MR. BENNION: I'm going to state a belated
10 objection. Lacks foundation.
11    Q Do you know whether Takeover's books
12 reflect the October 2022 and November 2022 loans
13 for which there were not loan documents?
14    A No.
15    Q You don't know one way or another?
16    A No. They weren't documented.
17    Q And when was the last time you reviewed
18 Takeover's books?
19    A I don't know. A few months ago.
20    Q In preparation for your deposition
21 today --
22    A No.
23    Q -- or for some other reason?
24    A Some other reason.
25    Q And if Takeover's books reflect the

46

1 October 2022 and November 2022 loans, you would
2 defer to the books, correct?
3    A I still haven't seen any loan documents or
4 anything for it, and the money was never received.
5    Q My question was slightly different. If
6 Takeover's books actually reflect the October 2022
7 and November 2022 loans from Mr. Deppoleto, as
8 between your memory and Takeover's books, in terms
9 of which is more accurate, you would defer to
10 Takeover's books, correct?
11       MR. BENNION: Objection, lacks foundation,
12 vague and ambiguous.
13       Go ahead.
14    A No.
15    Q Why would you rely on your memory over
16 Takeover's books?
17    A I haven't seen any loan documents. Have
18 you seen any?
19    Q That's not how this works.
20       Why would you rely on your memory over
21 Takeover's books?
22    A Why would I?
23    Q Yes.
24    A I don't know how to answer that.
25    Q Are you -- as the corporate representative

47

1 of Takeover, are you taking the position that
2 Takeover's books were improperly kept or
3 fraudulent?
4    A They could have. I'm not sure.
5       MR. BENNION: I'm going to state a
6 belated --
7    Q What position --
8       MR. BENNION: I'm going to state a belated
9 objection. Calls for a legal conclusion.
10    Q What position did you hold at Takeover
11 before you were let go initially?
12    A Director, COO.
13    Q And when you came back to the company,
14 what position did you hold?
15    A Director.
16    Q Did the director sign off on the accuracy
17 of Takeover's books?
18       MR. BENNION: Objection, vague and
19 ambiguous.
20    A I don't know. I wasn't there.
21    Q At the time you were there.
22    A When I was there?
23    Q Yes.
24    A Yes.
25    Q Would you have signed off if you thought

48

1 the books were inaccurate?
2       MR. BENNION: Objection, vague and
3 ambiguous.
4    A I don't -- I'm not sure.
5    Q You wouldn't have knowingly signed off on
6 books that you believed were inaccurate; would
7 you?
8    A I don't know.
9    Q Did Takeover ever share its book or books
10 with investors in order to secure investments?
11    A I don't know.
12    Q Could have happened; you just don't know
13 one way or another?
14    A I don't know.
15    Q Did Takeover share its books with
16 Mr. Deppoleto before he made any of the loans?
17    A I don't know that either.
18    Q And when I asked you earlier about whether
19 you were taking the position that Takeover's books
20 were inaccurate, you said you didn't know. Do you
21 remember answering that way a couple minutes ago?
22 I'm giving you context for my next question.
23    A Yes.
24    Q Do you have any affirmative evidence or
25 proof that Takeover's books were not accurate?

49

1     MR. BENNION: Objection, may call for a
2 legal conclusion.
3     Go ahead and answer.
4   **A** I'm not sure.
5   Q So when you said before that they may have
6 -- that the books may have been inaccurate, you're
7 speculating. You don't have any personal
8 knowledge or proof that they were inaccurate,
9 correct?
10   **A** I don't.
11   Q Okay. That ends Topic Number 1. Now
12 we're going to switch over to Topic Number 2,
13 which was each and every method that Takeover
14 utilized the funds received from Mr. Deppoleto.
15     Okay. Mr. Deppoleto's first loan
16 installment to Takeover was for $500,000 in May
17 2022, correct?
18   **A** Yes.
19   Q When did Takeover begin spending funds
20 received from Mr. Deppoleto's first loan
21 installment?
22   **A** I don't know.
23   Q What did you do in preparation for your
24 deposition as the corporate representative on
25 Topic 2 to prepare for it?

50

1   **A** Spoke to my attorney.
2   Q Did you review any of Takeover's books and
3 records that showed, for example, Takeover's
4 payments made in the May 2022 time frame?
5   **A** I have some knowledge of that after
6 **looking at bank statements.**
7   Q When did you look at bank statements?
8   **A** Around six months ago.
9   Q So not in preparation for this deposition,
10 correct?
11   **A** Correct.
12   Q The first $500,000 that Mr. Deppoleto
13 loaned to Takeover in May 2022, what did Takeover
14 use those funds for?
15   **A** It looked like production.
16   Q And when you say, looked like production,
17 can you elaborate on that? What do you mean by
18 looked like and production? Start with the looked
19 like. Where are you -- when you say, looked like,
20 what looked like? What were you looking at
21 specifically?
22   **A** I saw payments made to manufacturing
23 **companies.**
24   Q What were the manufacturing companies?
25   **A** I don't remember the names specifically.

51

1   Q Do you know when that $500,000 was used?
2   **A** No.
3   Q When did Takeover fully deplete the first
4 $500,000 that Mr. Deppoleto loaned to Takeover?
5   **A** I don't know.
6   Q I'm going to mark another exhibit here and
7 show it to you. We'll mark this as Exhibit 11.
8     (Exhibit 11 was marked for identification
9 and is attached to the transcript.)
10   Q And at the top, it says, your checking
11 account, then it says, Takeover Industries. It's
12 got an account number, and it says, May 1, 2022,
13 to May 31, 2022. Do you see that?
14   **A** Yes.
15   Q Excuse me. If we go down a little bit,
16 there's a number of entries. First one I want to
17 ask you about is one on May 25th, which is near
18 the bottom of page 5 of 12. And it's
19 Bates-labeled DEF 00088. And going forward, to be
20 a little more efficient today, when I talk about
21 Bates labels, I'm just going to say DEF 88 instead
22 of reading out all the zeroes. Is that okay?
23     MR. BENNION: Sure. Yes.
24   Q Okay. So then the first one I want to ask
25 you about, at DEF 88, there's a payment from

52

1 Takeover to NVE, Inc.
2   **A** Yes.
3   Q And it is for $206,263.20, correct?
4   **A** Correct.
5   Q So the payment went from Takeover to NVE,
6 correct?
7   **A** Yes.
8   Q What is NVE, Inc.?
9   **A** It is a beverage manufacturer.
10   Q And why would Takeover have been paying
11 NVE over $206,000 on May 25, 2022?
12   **A** I believe they made the gamer shots.
13   Q And when you say, they made the gamer
14 shots, what do you mean by that specifically?
15   **A** Manufactured them.
16   Q What did -- well, can you describe the
17 relationship between NVE and Takeover in a little
18 more detail? In other words, what -- what did
19 Takeover provide to NVE in order to allow NVE to
20 make the gamer shots, as you said?
21   **A** What did they provide? Like, they gave
22 **them money to make -- make the energy drinks, the**
23 **energy shots for them.**
24   Q Did Takeover send a recipe? I don't know
25 if that's the right term in the industry, but did

53

1  they provide a list of ingredients and a recipe
2  for NVE to then take those ingredients and then
3  convert them into the ultimate gamer shot? Or how
4  did that work? That's what I'm getting at.
5  **A Yeah. Something like that, I believe.**
6  Q Did Takeover provide the raw products for
7  NVE, and then NVE just assembled them? Or how did
8  that work?
9  **A I believe it was all-encompassing, that**
10 **they would provide all the ingredients, all that,**
11 **then they would bottle it, manufacture it, label**
12 **it, package it.**
13 Q So Takeover -- essentially, Takeover would
14 contact NVE and say, we'd like you to make gamer
15 shots. Here's the recipe. NVE, you take it from
16 here. NVE would do everything and then deliver
17 back to Takeover the finished product? Is that
18 basically what happened?
19 **A Yes.**
20 Q Where is NVE, Inc., based out of?
21 **A I think New Jersey.**
22 Q I think I asked you this before, but I
23 want to ask it just to make sure. So why did
24 Takeover pay NVE over $206,000 just a few days
25 after Mr. Deppoleto's first investment?

54

1  **A It appears to be for them to manufacture**
2  **product for them.**
3  Q Would Takeover have been able to make that
4  payment to NVE without Mr. Deppoleto's $500,000
5  loan?
6  **A I don't know.**
7  Q Then if we go down a little further in
8  this same document, this statement is June 1,
9  2022, through June 30, 2022, correct?
10 **A Correct.**
11 Q Go to June 15. You see there's another
12 payment to NVE on June 15, 2022, and this one is
13 for a little over $93,000, correct?
14 **A Correct.**
15 Q And that's on DEF 104. What was the
16 purpose of Takeover's payment to NVE on June 15,
17 2022?
18 **A I would assume it's for the same thing,**
19 **manufacturing of energy shots.**
20 Q You're assuming. You don't actually know,
21 though?
22 **A I don't know specifically what it was for.**
23 Q Who from Takeover was responsible for the
24 interaction, communications with NVE?
25 **A I don't know. I would assume Jason**

55

1  Tucker.
2  Q Okay. If we go back up to DEF 88, the
3  second-to-last transaction on that page is May 25,
4  2022. It's Takeover paying Faith Springs, LLC.
5  Do you see that?
6  **A Yes.**
7  Q What is Faith Springs, LLC?
8  **A Another beverage manufacturer.**
9  Q I'm sorry. Another what?
10 **A Beverage manufacturer.**
11 Q What beverages -- beverage or beverages
12 did Faith Springs manufacture for Takeover?
13 **A Hydrogen water.**
14 Q Was it the same process as it was with NVE
15 in terms of Takeover would give Faith Springs the
16 recipe, and then Faith Springs would do everything
17 else and deliver the hydrogen water to Takeover in
18 a finished can or whatever it was in?
19 **A Yes. Very similar.**
20 Q Okay. And this payment was for $18,144,
21 correct?
22 **A Correct.**
23 Q Why did Takeover pay Faith Springs over
24 $18,000 a few days after Mr. Deppoleto's
25 investment?

56

1  **A I don't know exactly.**
2  Q You don't know the purpose of that
3  payment?
4  **A No.**
5  Q Do you know whether Takeover needed
6  Mr. Deppoleto's initial $500,000 loan in order to
7  pay Faith Springs on May 25, 2022?
8  **A I don't know that.**
9  Q Okay. Then if we go down, this one is
10 DEF 89. There's an entry on May 31, 2022, and it
11 lists an LA Libations, correct?
12 **A Correct.**
13 Q What is LA Libations?
14 **A They are a beverage broker.**
15 Q What is a beverage broker?
16 **A You pay them, and they help you get**
17 **distribution.**
18 Q Why did Takeover pay LA Libations $30,000
19 a few days after Mr. Deppoleto's initial $500,000
20 loan?
21 **A I don't know exactly.**
22 Q Did Takeover need Mr. Deppoleto's payment
23 in order to pay LA Libations on May 31, 2022?
24 **A I don't know that either.**
25 Q I'm sorry. I didn't hear your answer.

57

1    A  I don't know.
2    Q  Who is John Abraham?
3    A  I don't know.
4    Q  If we go down to DEF 104, there's an entry
5  on June 6, 2022, that indicates that Takeover paid
6  John Abraham $10,000, correct?
7    A  Correct.
8    Q  Why did Takeover pay John Abraham $10,000
9  on June 2022 -- or in June 2022?
10    A  I don't know who that is.
11    Q  As of June 20 -- or June 6, 2022, would
12  Takeover have been able to pay Mr. Abraham $10,000
13  if Mr. Deppoleto had not made the initial $500,000
14  loan?
15    A  I don't know.
16    Q  We talked about before that
17  Mr. Deppoleto's second loan to Takeover was for
18  $500,000 and it was made in July 2022, correct?
19    A  Correct.
20    Q  When did Takeover begin spending the funds
21  that Mr. Deppoleto provided from that second
22  $500,000 loan?
23    A  I don't know.
24    Q  What did Takeover use the second $500,000
25  loan for?

58

1    A  I don't know.
2    Q  When did Takeover fully deplete the second
3  $500,000 loan from Mr. Deppoleto?
4    A  I don't know.
5    Q  What is the Stephen Gould Corporation,
6  G-O-U-L-D?
7    A  I don't know what that is either.
8    Q  If we go down to DEF 118, there's an entry
9  on July 8, 2022, that indicates that Takeover paid
10  the Stephen Gould Corporation $32,998, correct?
11    A  Correct.
12    Q  Reviewing it in that context, why did
13  Takeover pay the Stephen Gould Corporation 32,000
14  -- almost $33,000 in July 2022?
15    A  I don't know.
16    Q  Would Mr. -- or strike that.
17      Would Takeover have been able to make that
18  $33,000, approximately, payment to the Stephen
19  Gould corporation but for Mr. Deppoleto's July
20  2022 loan?
21    A  No, I don't know.
22    Q  We keep scrolling down in that same
23  document.  On DEF 119, there's a notation
24  indicating that Takeover paid the professional --
25  well, it just says, professional fighter.  Paid it

59

1  $50,000 on July 26, 2022.  Do you see that?
2    A  Yes.
3    Q  What was the purpose of that payment?
4    A  I believe it was for a sponsorship.
5    Q  Would Takeover have been able to make that
6  payment but for Mr. Deppoleto's July 22 $50,000
7  loan?
8    A  I don't know.
9    Q  If we keep scrolling down in the same
10  document, DEF 121, there's another entry on July
11  27, 2022, indicating Takeover made a payment to LA
12  Libations of 49,200.  Do you see that?
13    A  I do.
14    Q  What was the purpose of that payment?
15    A  I don't know.
16    Q  Would Takeover have been able to make that
17  $49,000 payment but for Mr. Deppoleto's July 2022
18  loan?
19    A  I don't know.
20    Q  Mr. Deppoleto's third loan to Takeover was
21  for $500,000, and it was also made in August 2022,
22  correct?
23    A  Yes.
24    Q  When did Takeover begin spending the money
25  it received from Mr. Deppoleto in that third loan

60

1  in August 2022?
2    A  I don't know.
3    Q  What was the third $500,000 for
4  Mr. Deppoleto used for?
5    A  I don't know.
6    Q  Do you know when Takeover fully depleted
7  the third $500,000 loan that Mr. Deppoleto made?
8    A  I don't know.
9    Q  If we scroll down in that the same
10  document we've been looking at, at DEF 136, we've
11  got an August 5, 2022, payment to professional
12  fighter for $50,000, correct?
13    A  Correct.
14    Q  What was that payment for?
15    A  I believe it was part of the sponsorship
16  agreement they have.
17    Q  Would Takeover have been able to make that
18  August 5, 2022, payment to professional fighter
19  but for Mr. Deppoleto's August loan to Takeover?
20    A  I don't know.
21    Q  If we go down a little further, still on
22  DEF 136, there's an August 19, 2022, payment from
23  Takeover to NVE for $124,504.62.  Correct?
24    A  Correct.
25    Q  Why did Takeover pay NVE over $124,000 on

---

61

1  August 19, 2022?
2  **A  I don't know.**
3  Q  Would Takeover have been able to make that
4  $124,000 payment to NVE but for Mr. Deppoleto's
5  August loan?
6  **A  I don't know.**
7  Q  What is Manolio & Firestone,
8  M-A-N-O-L-I-O, and Firestone, all one word?
9  **A  They're an attorney.**
10  Q  A law firm?
11  **A  Yes.**
12  Q  If we keep going down in the same
13  document, DEF 184, there's a November 21, 2022,
14  payment to LA Libations for $15,000, correct?
15  **A  Correct.**
16  Q  What was the purpose of Takeover's
17  November 21, 2022, payment to LA Libations?
18  **A  I don't know.**
19  Q  Now, you were back with Takeover as of
20  November 21, 2022, correct?
21  **A  Correct.**
22  Q  But you're telling me you don't have any
23  idea what this payment was for?
24  **A  We had no control over the bank account.**
25  **Jason Tucker had it.**

---

62

1  Q  We've discussed the three loans -- the
2  three initial loans that totaled 1.5 million,
3  correct?
4  **A  Yes.**
5  Q  Of that first 5 -- or, sorry.  Of that
6  first 1.5 million in loans from Mr. Deppoleto,
7  were any of those funds used for Takeover's deal
8  with Dollar General?
9  **A  I don't know.**
10      MR. BENNION:  I'm going to state a belated
11  objection.  Vague and ambiguous.  Lacks
12  foundation.
13      Go ahead.
14  Q  Do you know how much, if any, of -- strike
15  that.
16      Of the 1.5 million that Mr. Deppoleto
17  initially loaned to Takeover, were any of the
18  funds used for salaries?
19  **A  Looks like this says payroll right there,**
20  **11/18.**
21  Q  Are you looking at DEF 184?
22  **A  Yes.**
23  Q  And there's several entries.  For example,
24  there's one on November 22, 2022, correct?
25  **A  Payroll taxes, yeah.**

---

63

1  Q  And then there's another entry on November
2  18, 2022, for payroll for about $1500, correct?
3  **A  Correct.**
4  Q  There's some additional November 18
5  entries for payroll for 3700 and another one for
6  3200, correct?
7  **A  Correct.**
8  Q  Do you know whose salaries those were?
9  **A  Michael Tzanetatos, Michael Costello, and**
10  **Kerby Fortner.**
11  Q  How are you able to tell that?
12  **A  I just -- I have knowledge of the payroll**
13  **from previously.**
14  Q  Who was getting 3700?
15  **A  Michael Tzanetatos.**
16  Q  Who was getting 3200?
17  **A  Michael Costello.**
18  Q  And who was getting the 1400?
19  **A  Kerby.**
20  Q  Other than those that we just talked
21  about, do you know whether any of the 1.5 million
22  Mr. Deppoleto loaned to Takeover was used to pay
23  for salary for Mr. Tucker?
24  **A  Yes.  I've seen withdrawals in there for**
25  **Mr. Tucker.**

---

64

1  Q  How much was Mr. Tucker's salary?
2  **A  20,000 a month.**
3  Q  Were any of the funds used for salaries
4  for Mr. Tucker's wife?
5  **A  Yes.**
6  Q  How much?
7  **A  I believe 7500 a month.**
8  Q  Were any of the 1.5 million funds from
9  Mr. Deppoleto to Takeover used to compensate
10  Mr. McBride?
11  **A  I believe so, yes.**
12  Q  How much?
13  **A  I don't know.  They appeared to be all**
14  **different amounts.**
15  Q  Approximately how much to how much?
16  **A  I would say between 3,000 and 7,000.**
17  Q  Per month?
18  **A  Per month, yeah.**
19  Q  And was Mr. McBride an actual employee at
20  that time, or was he just a member of the board of
21  directors?
22  **A  He was an officer and a director, I**
23  **believe.**
24  Q  When you say officer, what title?
25  **A  CEO.**

---

65

1    Q  And were any of the $1.5 million that
2  Mr. Deppoleto loaned to Takeover, were they used
3  to compensate yourself?
4    A  No.
5    Q  Any of the $1.5 million from
6  Mr. Deppoleto's initial loans used to compensate
7  Joseph Pavlik?
8    A  I believe so, yes.
9    Q  How much?
10    A  I think his was 3500 a month.
11    Q  Were any of the $1.5 million that
12  Mr. Deppoleto loaned to Takeover used to
13  compensate Tom Zarro?
14    A  Not compensation, no.
15    Q  Why did you phrase it like that?
16    A  Looked like he was being -- there was some
17  loan payments being made.
18    Q  So Takeover owed Mr. Zarro payments
19  pursuant to a loan that Takeover and Mr. Zarro
20  entered into, and you're telling me that
21  Mr. Deppoleto's money was used to pay off some or
22  all of Mr. Zarro's loan?  Is that what you're
23  saying?
24    A  I don't know if it was Mr. Deppoleto's
25  money directly.

---

66

1    Q  But some of the money that Takeover spent
2  in the time in which Mr. Deppoleto was making the
3  investments in Takeover, some of Takeover's money
4  in that time frame was used to pay Mr. Zarro's
5  loan either down or off; is that correct?
6      MR. BENNION:  I'm going to state an
7  objection.  Lacks foundation.  May call for
8  speculation.
9      Go ahead.
10    A  Yeah, I'm not sure exactly.
11    Q  Let me ask it this way:  We talked about
12  the first three loans that Mr. Deppoleto made to
13  Takeover.  And the dates, just to give ourselves
14  some guideposts, were May 2022 through August
15  2022, correct?
16    A  Yes.
17    Q  In that May to August 2022 time frame, did
18  Takeover make payments to Mr. Zarro to either pay
19  off or pay down Mr. Zarro's loan?
20    A  Looks like I saw one payment.
21    Q  In the exhibit we were just looking at?
22    A  Yes.
23    Q  Other than what we've discussed over the
24  last few minutes here, are you aware of
25  Mr. Deppoleto's funds being used for anything

---

67

1  else?
2    A  Not directly, no.
3    Q  When you say, not directly, what do you
4  mean by that?
5    A  I don't know if it was his money directly
6  or not.
7      MR. HARVEY:  We've been going for a little
8  over an hour and a half.  Now is probably a good
9  time for a five-minute break.  I assume people
10  would like to take a quick five-minute break or
11  so.
12      MR. BENNION:  Can we do 10, please?
13      MR. HARVEY:  Sure.
14      MR. BENNION:  Thank you.
15      THE VIDEOGRAPHER:  Going off the record.
16  The time is 9:42.
17      (Whereupon, a recess was taken.)
18      THE VIDEOGRAPHER:  We're back on the
19  record.  The time is 9:57.
20  BY MR. HARVEY:
21    Q  What was Takeover's relationship with
22  Great Northern Corp.?
23    A  I'm not sure.
24    Q  Great Northern Packaging?
25    A  Oh, I believe they were making a display

---

68

1  for the -- for the gamer shots.
2    Q  So it was a vendor of Takeover's, correct?
3    A  Yes.
4    Q  So at some point, Takeover would have owed
5  Great Northern money, correct?
6    A  I believe so, yes.
7    Q  We discussed a couple of times the October
8  and November 2022 loans that Mr. Deppoleto alleged
9  that he made to Takeover.  Do you remember those
10  questions from a little bit ago?
11    A  Yes.
12    Q  Are you aware of Mr. Deppoleto making
13  those payments directly to Great Northern
14  Packaging or Great Northern Corp. on Takeover's
15  behalf?
16    A  I'm not sure.
17    Q  And you said you didn't look at
18  Mr. Deppoleto's document production before today,
19  correct?
20    A  Correct.
21    Q  So you didn't see, for example,
22  Bates-labeled document PLTF 338, correct?
23      MR. BENNION:  I'm going to state an
24  objection.  Lacks foundation.
25      Go ahead.

**69**

1    **A** I don't know what that is, no.
2    **Q** Did you ever see a document Bates-labeled
3 PLTF 346?
4    **A** I don't know what that is.
5    **Q** You would agree with me that if
6 Mr. Deppoleto made payments to Great Northern on
7 behalf of Takeover, that's the same as making a
8 loan to Takeover, correct?
9      MR. BENNION: Objection to the extent it
10 may call for a legal conclusion.
11    **A No.**
12    **Q** Why do you say no?
13    **A** I don't agree with that.
14    **Q** Yeah, but why?
15    **A** I have no knowledge of it.
16    **Q** Okay.
17      MR. HARVEY: Don, I'll have to forward
18 these to you in a moment. I wasn't expecting to
19 have to use these today. But you'll be able to
20 see them on my screen.
21    **Q** So I'm going to show you a couple
22 documents, Mr. Holley.
23    Are you able to see my screen?
24    **A Yes.**
25      MR. HARVEY: And I forgot, what exhibit

**70**

1 did we leave -- what exhibit number did we leave
2 off on?
3      THE REPORTER: One moment. This will be
4 12.
5      MR. HARVEY: Let's actually make this 17.
6 I know we're going out of order, but it will make
7 sense as we go forward.
8    (Exhibit 17 was marked for identification
9 and is attached to the transcript.)
10    **Q** So Exhibit 17 is Bates-labeled PLTF 346,
11 and the top of it is a receipt dated 10/13/2022
12 from Great Northern Corp. Do you see that?
13    **A I do.**
14    **Q** And the total amount Great Northern Corp.
15 received was $386,773.86, correct?
16    **A Okay.**
17    **Q** And that is the same number that matches
18 up with the October 2022 loan number that
19 Mr. Deppoleto was alleging that we were talking
20 about, correct?
21    **A** I believe so, yes.
22    **Q** Okay. And we see the customer
23 information, name, James Deppoleto, correct?
24    **A Okay.**
25    **Q** So according to this receipt,

**71**

1 Mr. Deppoleto paid $386,773.86 to Takeover's
2 vendor, Great Northern Corp., correct?
3    **A To Great Northern Corp., yes.**
4    **Q** In October 2022, correct?
5    **A Okay.**
6    **Q** Okay. Now I'm going to show you -- give
7 me one second. Take that down. I'm going to show
8 you another document. This will be Exhibit 18.
9    (Exhibit 18 was marked for identification
10 and is attached to the transcript.)
11    **Q** This document is Bates-labeled PLTF 359,
12 correct? Do you see that?
13    **A** Oh, yeah. Okay.
14    **Q** And at the top, it's dated November 4,
15 2022, and it's a receipt from Great Northern Corp.
16 again, correct?
17    **A Okay.**
18    **Q** And the customer information again is
19 James Deppoleto, correct?
20    **A Correct.**
21    **Q** And the amount is $128,924.62, correct?
22    **A (Indiscernible.)**
23      THE REPORTER: I'm sorry. I didn't catch
24 that answer.
25    **A Correct.**

**72**

1    **Q** And that's the same number that matches up
2 with the November 2022 loan that Mr. Deppoleto
3 alleges that he gave to Takeover, correct?
4    **A** I believe so.
5    **Q** And again, this is a receipt provided by
6 Takeover's vendor, Great Northern Corp., correct?
7      MR. BENNION: Objection, calls for
8 speculation.
9    **A Yeah, I don't know. It's from Great**
10 **Northern Corp. It doesn't say anything about**
11 **Takeover.**
12    **Q** Correct. But Great Northern is Takeover's
13 vendor, correct?
14    **A** I don't know.
15    **Q** I thought you told me a few minutes ago
16 that Great Northern was building packaging
17 displays for Takeover?
18    **A I'm not sure if they are. I said they**
19 **were building them for the energy shots.**
20    **Q** Takeover's energy shots?
21    **A** I don't know.
22    **Q** Well, who other than Takeover?
23    **A Clearly it's for Mr. Deppoleto.**
24    **Q** So are you telling me that Takeover did
25 not order anything from Great Northern in the

73

1   October through November 2022 time frame?
2   **A  Not that I'm aware of.**
3   Q  Did Takeover ever order anything from
4   Great Northern?
5   **A  I don't know.**
6   Q  Who would know that?
7   **A  I guess James Deppoleto.**
8   Q  He would know if Takeover ordered
9   something from Great Northern?
10  **A  I don't know.**
11  Q  Mr. Deppoleto's never worked for Takeover,
12  correct?
13  **A  I believe he was a director.**
14  Q  He was never an employee, correct?
15  **A  Just a director, as far as I know.**
16  Q  Which is different than an employee,
17  correct?
18  **A  Correct.**
19  Q  And you're not aware of Mr. Deppoleto ever
20  making his own beverages for sale, correct?
21  **A  Not that I'm aware of.**
22  Q  You're not aware of any reason why
23  Mr. Deppoleto would need packaging displays,
24  correct?
25  **A  I don't know.**

74

1   Q  Who would have been responsible for
2   interactions with Great Northern at Takeover?
3   **A  I'm not sure.**
4   Q  Having seen these documents, is it still
5   your testimony that Takeover did not receive value
6   in the amounts of 128,924.62 and 386,773.86 from
7   Mr. Deppoleto in the November and October 2022
8   time frame?
9   **A  Correct.**
10  Q  And why do you say that?
11  **A  No money was received, and I've never seen**
12  **any loan documents.**
13  Q  And you told me that in the October 2022
14  time frame, you didn't have any discussions with
15  Mr. Deppoleto whatsoever, correct?
16  **A  Correct.**
17  Q  And you also don't have personal knowledge
18  about what anyone else from Takeover may have
19  discussed with Mr. Deppoleto, correct?
20  **A  Correct.**
21  Q  And so you don't know whether anyone from
22  Takeover asked Mr. Deppoleto to pay any vendor for
23  Takeover, correct?
24  **A  There's no record of it as I've seen.**
25  Q  You don't have personal knowledge as to

75

1   whether anyone from Takeover ever asked
2   Mr. Deppoleto to pay any of Takeover's vendors,
3   correct?
4   **A  Not that I know of.**
5   Q  You don't have personal knowledge?
6   **A  No.**
7   Q  And so you'd agree with me that it's
8   possible that someone from Takeover asked
9   Mr. Deppoleto to pay Great Northern on Takeover's
10  behalf, correct?
11  **A  I don't know.**
12  Q  It's possible, true?
13  **A  I'm not sure.**
14  Q  You're not saying it's impossible, are
15  you?
16  **A  Pretty sure I've answered the question.**
17  Q  I asked a slightly different one.  You
18  keep saying, I don't know.  I'm asking you now,
19  are you saying it's impossible?
20  **A  I don't know.**
21  Q  Who from Takeover in the October 2022 --
22  well, let's say June 2022 through October 2022,
23  who from Takeover would have been responsible for
24  receipt and appropriate handling of invoices from
25  Takeover's vendors?

76

1   **A  I believe Jason Tucker.**
2   Q  And so if Mr. Tucker received a vendor
3   invoice from Great Northern Corp. -- strike that.
4   If Takeover received an invoice from Great
5   Northern Corp., it would have been Mr. Tucker who
6   would have handled that invoice, correct?
7   MR. BENNION:  Objection, calls for
8   speculation.
9   **A  Yeah, I'm not sure.**
10  Q  Well, I just asked you who would have
11  handled invoices, and you told me Mr. Tucker.  Is
12  there somebody else?
13  **A  (Inaudible.)**
14  Q  I didn't hear you.  Is there somebody else
15  other than Mr. Tucker?
16  **A  Possibly.**
17  Q  Who?
18  **A  I don't know.**
19  Q  You weren't there at the time frame of
20  June 2022 through October 2022, so you can't
21  answer one way or another, true?
22  **A  Correct.**
23  Q  And so if Mr. Tucker testified that he was
24  responsible for invoices, and he actually received
25  invoices from Great Northern totaling the two

77

1 amounts that we've been talking about for October
2 2022 and November 2022, you wouldn't have any
3 personal knowledge or basis to dispute his
4 testimony, true?
5 **A Not that I'm aware of.**
6 Q Okay. Okay. Now I'm going to move to
7 Topic Number 3, which is the identification of all
8 individuals comprising the board of directors of
9 Takeover and compensation of those directors.
10 So first question on that topic. As of
11 June 10, 2021, who comprised Takeover's board of
12 directors?
13 **A Which date? I'm sorry.**
14 Q June 10, 2021.
15 **A '21?**
16 Q Yes.
17 **A Myself and Toby McBride.**
18 Q And at or around that date, there was a
19 resolution that was passed that appointed
20 yourself, Jason Tucker, Joseph Pavlik, and Toby
21 McBride as the directors of Takeover. Correct?
22 **A No.**
23 Q I'm sorry. I didn't hear you.
24 **A No.**
25 Q Why do you say no?

78

1 **A That wasn't done until November of '21.**
2 Q Okay. So it's your testimony that as of
3 November 2021, there was a resolution that was
4 passed that appointed Mr. Holley, yourself,
5 Mr. Tucker, Joseph Pavlik, and Toby McBride as the
6 directors of Takeover, correct?
7 **A Correct.**
8 Q And who authorized those appointments at
9 that time? In other words -- I think you just
10 answered it. Before that meeting and the
11 resolution was passed, who was on the board of
12 directors for Takeover?
13 **A Myself and Toby McBride.**
14 Q So you two authorized the appointment of
15 the other individuals in November 2021, correct?
16 **A Yes.**
17 Q Beginning in June of 2021, were any of the
18 directors receiving compensation from Takeover?
19 In their role as director, not as an employee.
20 **A No.**
21 Q Now, I thought you told me that in your
22 previous deposition -- or in your previous
23 deposition, I thought you told me that there was a
24 time when you and Mr. McBride were receiving
25 compensation in your role as a board director.

79

1 Did you not --
2 **A Not as a director, no.**
3 Q What's that?
4 **A Not as a director.**
5 Q Do you remember telling me in your
6 previous deposition about taking a percentage --
7 when an investment came in, you and Mr. McBride
8 would take a percentage of the investment and keep
9 it for yourselves? Do you remember that testimony
10 from a couple weeks ago?
11 **A Yes.**
12 Q And are you telling me that you took that
13 not in your capacity as a board member --
14 **A Correct.**
15 Q -- but in some other capacity?
16 **A Yes.**
17 Q What capacity did you take it in?
18 **A As an officer.**
19 Q And what was your role when this was going
20 on?
21 **A COO.**
22 Q And what was his role?
23 **A CEO.**
24 Q And you said you didn't disclose that
25 compensation scheme to your investors, correct?

80

1 MR. BENNION: I'm going to state an
2 objection. It lacks foundation. May call for
3 speculation.
4 Go ahead.
5 **A No.**
6 Q As you sit here today, you're telling me
7 that in your deposition testimony from October 4,
8 you did not tell me --
9 **A Oh, I'm sorry. I think I double-negatived**
10 **you again. We did not --**
11 Q Let me ask it cleaner.
12 **A Okay.**
13 Q I'll ask it cleaner.
14 The compensation scheme that we were
15 discussing where you and Mr. McBride were taking a
16 portion of the investments that investors made and
17 keeping it for yourselves, did you disclose that
18 to the investors?
19 **A No.**
20 Q Okay. Now, going back to the question
21 that started all this. I had asked you, in June
22 2021, were any directors receiving compensation
23 from Takeover. And I think you said, no, true?
24 **A Correct.**
25 Q Is that what you said?

81

1    A   Yes.
2    Q   How about at any point from June 2021 on?
3  Did directors of Takeover receive any compensation
4  from Takeover?
5    A   Not that I recall.
6    Q   Would there be records reflecting that?
7  Because you're saying, not that I recall.  Would
8  there be records that would tell us whether
9  there's a certain answer to that?
10   A   Well, I mean, after December, I wasn't
11 there, so I'm not sure.
12   Q   In the time that you were there?
13   A   Then no.
14   Q   In December 2021, did the Takeover board
15 of directors vote to remove you from Takeover's
16 board of directors?
17   A   Improperly, but yes.
18   Q   Why did the Takeover board of directors
19 vote to remove you?
20   A   Jason Tucker alleged that I had
21 wrongdoing.
22   Q   From that point forward, did you receive
23 any compensation from Takeover?
24   A   From December until probably December of
25 '22, no.

82

1    Q   After that point, you received
2  compensation from Takeover; is that true?
3    A   Yes.
4    Q   And why were you receiving compensation
5  after December 2022?
6    A   For working.
7    Q   In what role?
8    A   As an officer.
9    Q   What type of officer?
10   A   I believe COO.
11   Q   Going back to the December 2022 board of
12 directors meeting where they voted to remove you.
13 After that vote, the Takeover board of directors
14 consisted of Mr. McBride, Mr. Tucker, and
15 Mr. Pavlik, correct?
16   A   Yes.
17   Q   And that remained the list of active board
18 of directors until the end of November 2022,
19 correct?
20   A   Correct.
21   Q   And you said you don't know whether any of
22 the directors were receiving compensation from
23 Takeover from the time you left in December 2021
24 until you were reinstated towards the end of 2022;
25 is that correct?

83

1    A   Correct.
2    Q   And I understand you weren't personally
3  there, but did you -- in preparation for your
4  testimony today, did you speak to, for example,
5  Mr. Tucker to determine whether he received any
6  compensation as a director in that time frame?
7    A   No.
8    Q   Did you speak to Mr. Pavlik in preparation
9  for your testimony today about whether he received
10 any compensation as a director in that time frame?
11   A   No.
12   Q   Did you speak to Mr. McBride in
13 preparation for your deposition --
14   A   No.
15   Q   -- today to determine whether he received
16 any compensation as a director in the time frame
17 you were gone?
18   A   No.
19   Q   Did the Takeover board of directors
20 convene a meeting on November 7, 2022?
21   A   I believe so, yes.
22   Q   Who called that meeting?
23   A   Toby McBride.
24   Q   It wasn't you?
25   A   No.

84

1    Q   In what format did he call the meeting?
2  In other words, via phone call or email or letter?
3    A   Email.
4    Q   I'm going to share my screen with you to
5  show you another document.  Are you able to see my
6  screen?
7    A   Yes.
8    Q   And this one was previously marked as
9  Holley Exhibit 3.  We're going to mark it for this
10 deposition as Exhibit 12.
11       (Exhibit 12 was marked for identification
12 and is attached to the transcript.)
13   Q   And this is labeled, resolution of the
14 board of directors of Labor Smart, Inc., correct?
15   A   Yeah.  Yes.
16   Q   What is this, generally speaking?
17   A   It's a resolution from the board of
18 directors of Labor Smart.
19   Q   And it deals with the November 7 meeting
20 that was apparently noticed via November 4, 2022,
21 email, correct?
22   A   Correct.
23   Q   And it says this was held via conference
24 call?
25   A   Yes.

85

1    Q  And if we look down at DEF 4, towards the
2  bottom of the page, that tells us that as of
3  November 7, 2022, you were appointed to Takeover's
4  board of directors, correct?
5    **A  Yes.**
6    Q  And it says Jason Tucker was removed from
7  Takeover's board of directors, correct?
8    **A  Yes.**
9    Q  And so who comprised Takeover's board of
10  directors after that November 7, 2022, board
11  meeting?
12    **A  Myself, Toby McBride, Joseph Pavlik.**
13    Q  How long did that group remain as the
14  board of directors?
15    **A  I believe that Toby resigned in April of
16  '23.**
17    Q  How about Mr. Pavlik?
18    **A  I believe he's still on the board.**
19    Q  Yourself?
20    **A  Yes.**
21    Q  Still on the board?
22    **A  Yes.**
23    Q  And from this point forward, were any
24  directors receiving compensation from Takeover?
25    **A  No.**

86

1    Q  Take that one down.  Show you what we're
2  going to mark as Exhibit 13.
3      (Exhibit 13 was marked for identification
4  and is attached to the transcript.)
5    Q  This is Bates-labeled DEF 421, and the top
6  says, resolution of board of directors, Takeover
7  Industries, Inc., correct?
8    **A  Correct.**
9    Q  And it's describing a meeting held on
10  April 17, 2023, correct?
11    **A  Correct.**
12    Q  You recognize this document?
13    **A  I do.**
14    Q  And what is it?
15    **A  It was the minutes from the board of
16  directors meeting.**
17    Q  And if we look down, there's a couple
18  whereas clauses and a couple resolve clauses,
19  there about halfway down that first page.  And I
20  don't need you to read all of them into the
21  record, but go ahead and just read the highlighted
22  portion that I have there for you.  And let me
23  know when you're done, and I'll ask you a couple
24  questions about that portion.
25    **A  Okay.**

87

1    Q  So as of April 17, 2023, did Toby McBride
2  resign from Takeover's board of directors?
3    **A  Yes.**
4    Q  And as of April 17, 2023, did Tom Zarro
5  become a Takeover board member?
6    **A  Yes.**
7    Q  Did Takeover seek Mr. Deppoleto's consent
8  prior to Mr. Zarro becoming a board member?
9    **A  No.**
10    Q  So after this meeting, as of April 17,
11  2023, Takeover's board consisted of yourself,
12  Mr. Pavlik, and Mr. Zarro, correct?
13    **A  Yes.**
14    Q  How long did that group remain as the
15  board of directors?
16    **A  I believe it still is.**
17    Q  Have there been any changes to the
18  compensation -- or, I'm sorry, any changes to the
19  composition of the board of directors since April
20  17, 2023?  I know you said you three are still on.
21  Has there been anyone else added or --
22    **A  No.**
23    Q  So as of today, Takeover believes the
24  board is comprised of yourself, Mr. Pavlik, and
25  Mr. Zarro?

88

1    **A  Correct.**
2    Q  After this April 2023 meeting, were any
3  directors receiving compensation from Takeover?
4    **A  No.**
5    Q  Okay.  I'm going to take that one down,
6  and now I want to move to Topic Number 4, which is
7  information regarding the decision not to repay
8  Mr. Deppoleto after he sent the notice of
9  defaults.
10      So the first document -- bless you.  The
11  first document I'm going to show you will be
12  Exhibit 14.
13      (Exhibit 14 was marked for identification
14  and is attached to the transcript.)
15    Q  Are you able to see my screen?
16    **A  Yes.**
17    Q  And we see this one has a Holley Exhibit 7
18  sticker on the bottom right, so you've seen this
19  at your deposition before, correct?
20    **A  Correct.**
21    Q  And just generally describe what is
22  Exhibit 14 for today's deposition.
23    **A  A notice of default.**
24    Q  And you have seen this document before
25  your previous deposition in October of this year

89

1 too, correct?
2    A Correct.
3    Q When did you first receive it?
4    A On or about November 8th, I guess.
5    Q 2022?
6    A Yes.
7    Q After Takeover received this notice, did
8 Takeover's officers or directors discuss the
9 notice?
10    A Only with our attorneys.
11    Q Who in particular was in those
12 discussions?
13    A Probably myself, Joseph Pavlik, Toby
14 McBride, and --
15    Q And what lawyers?
16    A Jennifer Reiter. Possibly Matthew Canini.
17    Q Jennifer Reiter and Matthew --
18    A Canini.
19    Q Anyone else?
20    A Not that I remember.
21    Q When did this discussion take place?
22    A I don't recall.
23    Q With this notice, Mr. Deppoleto is
24 providing notice to Takeover that it defaulted on
25 Mr. Deppoleto's loans, correct?

90

1    A Yes.
2    Q Takeover agrees that it did default on its
3 obligations to Mr. Deppoleto, correct?
4       MR. BENNION: Objection, calls for a legal
5 conclusion.
6    A I'm sorry. Can you repeat?
7    Q Yeah. And we've went through this before,
8 but just to remind you, your lawyer may object.
9 There's no judge here to rule on it. So just let
10 him get his objection on the record, and then
11 unless he tells you otherwise, go ahead and
12 answer.
13       My question was, Takeover agrees that it
14 defaulted on its obligations to Mr. Deppoleto,
15 correct?
16       MR. BENNION: Same objection.
17    A Yes.
18    Q Did you say yes? I'm sorry. I didn't
19 hear you.
20    A Yes.
21    Q Okay. Upon receiving this notice, did
22 Takeover begin a process to repay Mr. Deppoleto's
23 loans?
24    A No. There was no money in the accounts.
25    Q Any other reasons why Takeover didn't

91

1 begin a process to repay Mr. Deppoleto?
2    A Truthfully, we didn't even have control of
3 the account.
4       MR. BENNION: Let me state an objection.
5 I apologize for my belated response. I'll state
6 an objection. May call for a legal conclusion.
7 Vague and ambiguous.
8    A Yeah. We had no control of the bank
9 account. Jason Tucker was the only one on the
10 account. He would not relinquish control.
11    Q At some point, you did regain control of
12 the Takeover bank account, correct?
13    A A couple months later, yeah.
14    Q At that point, did you -- why didn't you
15 begin a process to repay Mr. Deppoleto's loans?
16    A There was no money left in the accounts.
17    Q Upon receiving this notice, did Takeover
18 begin a process to cure its default?
19       MR. BENNION: Objection. May call for a
20 legal conclusion. Vague and ambiguous.
21    A We started settlement talks with
22 Mr. Deppoleto.
23    Q You understood that there were cure
24 provisions in the loan documents, though, correct?
25       MR. BENNION: Objection. Vague and

92

1 ambiguous. Lacks foundation.
2    A I don't recall what they are firsthand,
3 no.
4    Q If there were cure provisions -- well, let
5 me ask you this way: Other than starting
6 settlement talks with Mr. Deppoleto, did Takeover
7 begin any other process to cure its default?
8       MR. BENNION: Same objection.
9    A Not that I'm aware of.
10    Q Why not? Why didn't -- other than
11 beginning settlement discussions, why didn't
12 Takeover begin any other process to cure its
13 default?
14       MR. BENNION: Same objection.
15    A There was no money, no products. We were
16 losing our trademarks. I mean, there was -- the
17 company was -- there was nothing left.
18    Q I'll zoom in a little bit. And you see
19 there's a section here on page 2 of this
20 Exhibit 14, starts off with, events of default.
21 And I'll zoom in, like I said, so you can see a
22 little better. I know it's a little fuzzy right
23 now. Are you able to read it now?
24    A Yes.
25    Q So under that section, it says, events of

93

1 default. It goes on to have several paragraphs.
2 And like I said, I don't need you to read all
3 those into the record, but I would like you to
4 read them, and then I'm going to ask you a
5 question about it. So -- and I understand I'll
6 have to scroll down for you. So tell me when you
7 need me to scroll down so that you can read all
8 these subparagraphs under paragraph 2, events of
9 default.
10 **A Okay. Okay.**
11 Q You've read through all of Section 2,
12 including subparagraphs A through G --
13 **A Yes.**
14 Q -- of Exhibit 14?
15 I'm sorry. Did you say yes?
16 **A Yes.**
17 Q Oh, I'm sorry. I didn't hear you.
18 **A Oh.**
19 Q Does Takeover disagree with with any of
20 the listed events of default in paragraph 2?
21 MR. BENNION: Objection to the extent it
22 may call for a legal conclusion.
23 **A Yes.**
24 Q Which ones? I can go back up too.
25 **A A, B, C, E. Can you scroll down for me?**

94

1 Q Yeah.
2 **A F, G.**
3 Q Okay. So you are in agreement with 2D,
4 that that was an event of default, correct?
5 MR. BENNION: Objection to the extent it
6 may call for a legal conclusion.
7 **A From my knowledge, I don't believe that**
8 **there was ever a directors or officers insurance.**
9 Q Okay. You said you disagreed with 2A.
10 Why specifically do you disagree with 2A?
11 **A I know that Mr. Deppoleto has personal**
12 **knowledge of the Takeover versus Holley case and**
13 **of the opposition of NXT LVL fitness water.**
14 Q And this is focusing on whether there was
15 at the time of the NPA's execution. You're
16 telling me that you knew or you know that
17 Mr. Deppoleto had knowledge of those at the time
18 of the execution, or are you saying you know he
19 learned of them later?
20 MR. BENNION: Objection, vague and
21 ambiguous.
22 **A Yeah, I don't know exactly. I wasn't**
23 **there when these were signed.**
24 Q Okay. So when it comes to A, which is
25 focusing at the time -- on at the time of the

95

1 NPA's execution, you have no personal knowledge as
2 to whether Mr. Deppoleto was aware of the other
3 litigation at the time of the NPA's execution,
4 correct?
5 **A I don't know.**
6 Q Okay. So when you said earlier you know
7 that Mr. Deppoleto was aware of them, you're
8 referring to the fact that at some later date, you
9 do know that he became aware of it, but you can't
10 say for sure whether at the time of the NPA's
11 execution he actually had knowledge of those other
12 litigations, correct?
13 MR. BENNION: Objection, compound.
14 **A Yeah, I don't know.**
15 MR. HARVEY: That actually was compound.
16 I agree with you, Counsel. Let me break it down a
17 little bit.
18 Q You testified a moment ago that the reason
19 you disagreed with 2A was because you said Mr. --
20 you knew that Mr. Deppoleto was aware of the other
21 two pieces of litigation referenced there,
22 correct?
23 **A I wasn't sure if he knew at the time of**
24 **signing it, no. I'm not sure.**
25 Q Okay. Correct. And so when you said that

96

1 before, you were referring to you know that at
2 some later date, he became aware of that, those
3 other pieces of litigation; you just don't know
4 when, true?
5 **A Correct.**
6 Q Okay. All right. As to 2B, you said you
7 disagreed with 2B. What in particular do you
8 agree about -- or disagree about in 2B?
9 **A From my knowledge, I believe that**
10 **Mr. Deppoleto was copied on all of these**
11 **correspondence about this.**
12 Q This one in particular is referring to a
13 related party receivable communication attached to
14 this letter as Exhibit C, correct?
15 **A Correct.**
16 Q So if we go down to Exhibit C.
17 MR. BENNION: And just for a point of
18 clarification, Counsel, is this exhibit 73 pages?
19 It appears to be.
20 MR. HARVEY: Yes.
21 MR. BENNION: Okay. Thank you.
22 MR. HARVEY: Mm-hmm.
23 Q So Exhibit C is actually page 72 and 73 of
24 the PDF that comprises Exhibit 14. If we look at
25 the related party receivable confirmation that was

97

1 referenced in paragraph 2B, there's a date on it
2 of March 25, 2022, correct?
3   **A   Correct.**
4     Q   And we've established several times today,
5 Mr. Deppoleto's first loan to Takeover was in May
6 2022, correct?
7   **A   Yes.**
8     Q   So this related party receivable
9 confirmation is several months before his first
10 loan to Takeover, correct?
11  **A   Correct.**
12    Q   And in this document that's dated March
13 25, 2022, it's saying that as of December 31,
14 2021, so even earlier, Mr. McBride is saying he
15 owed Takeover Industries $243,000 and change,
16 correct?
17       MR. BENNION:  Objection, calls for a legal
18 conclusion.
19  **A   Yeah, I'm not sure.  I wasn't there when**
20 **this happened.**
21    Q   Right.  But as the corporate
22 representative to speak on behalf of Takeover as
23 it related to the decision not to repay
24 Mr. Deppoleto after issuance of the notices in
25 default, you have seen this document before, true?

98

1   **A   I have seen this, yes.**
2     Q   And this document is a Takeover document,
3 correct?
4   **A   No.  I believe it's an audit document from**
5 **Ben Borges.**
6     Q   Okay.  In any event, going all the way
7 back up to 2B, now that we've refreshed our memory
8 by looking at this March 25, 2022, related party
9 receivable confirmation, so paragraph 2B, which is
10 on page 3 of 73 of the Exhibit 14, when I asked
11 you a couple minutes ago why you disagreed with
12 paragraph 2B, I believe you told me because you
13 thought that Mr. Deppoleto was copied on the
14 related party receivable communication.  Is that
15 what you answered before?
16  **A   I believe so.  I know that this was found**
17 **in the Arizona case to not be true.**
18    Q   You've said several times you weren't
19 involved with Takeover at any point in the first
20 half of 2022, just to narrow our time frame,
21 correct?
22  **A   Correct.**
23    Q   And you weren't involved with any of the
24 initial discussions or any discussions with
25 Mr. Deppoleto in the first half of 2022, correct?

99

1   **A   Correct.**
2     Q   So what is your basis for saying that
3 Mr. Deppoleto had -- was copied on this related
4 party receivable communication when it was issued
5 in March of 2022?
6       MR. BENNION:  Objection, misstates prior
7 testimony.  Go ahead.
8   **A   Yeah, I didn't say that he was copied on**
9 **it when it happened.**
10    Q   What did you say?  If I misunderstood you,
11 I apologize.  What did you say?
12  **A   I just thought that he had knowledge of**
13 **it.**
14    Q   And what's your factual basis for saying
15 that?
16  **A   I know that he's been copied on multiple**
17 **emails about this.**
18    Q   Okay.  He wasn't -- we just looked at it.
19 We can look at it again.  He wasn't listed as a cc
20 on the related party receivable communication,
21 correct?
22  **A   Not at the time the -- when it was signed,**
23 **no.**
24    Q   And you've never seen an email or a letter
25 or anything along those lines from anyone to

100

1 Mr. Deppoleto before the first loan that he made
2 in which he was sent a copy of this related party
3 receivable communication, correct?
4   **A   Not that I'm aware of, no.**
5     Q   And you never sent him a copy of this
6 related party receivable communication before he
7 made the first loan, correct?
8   **A   No.**
9     Q   So when you say that he had knowledge
10 before he made the first loan about this related
11 party receivable communication, you're
12 speculating, correct?
13       MR. BENNION:  Objection, lacks foundation.
14  **A   Yeah, I don't know.**
15    Q   You agree you are speculating, or do you
16 have some personal knowledge of him receiving it
17 before?
18  **A   I am not sure if he received it before.**
19    Q   So you're speculating, correct?
20  **A   Correct.**
21    Q   Okay.  Then you said you disagreed with
22 paragraph 2C as well.
23  **A   Yeah.**
24    Q   Why do you disagree with paragraph 2C?
25  **A   I think the word, intentional.**

**101**

1    Q But again, you had -- in May of 2022, when
2 the first loan was made, you had no involvement
3 whatsoever with Takeover, correct?
4    **A Correct.**
5    Q So you have no personal knowledge as to
6 whether that information was intentionally
7 withheld, correct?
8    **A Correct.**
9    Q And you haven't spoken to anybody in
10 preparation for your deposition today who was at
11 Takeover at the time, true?
12   **A Correct.**
13   Q And you haven't seen any -- you didn't
14 review any documents in preparation for your
15 deposition today, true?
16   **A True.**
17   Q So when you --
18      THE REPORTER: I'm sorry. I didn't catch
19 the last answer.
20      THE WITNESS: True.
21   Q So when you say you dispute because of the
22 phrase, intentional withholding, you don't know
23 one way or another whether Takeover did
24 intentionally withhold that information, correct?
25   **A No, I guess not.**

**102**

1    Q Okay. Then we've got paragraph 2E. You
2 said you disagreed with paragraph 2E, true?
3    **A True.**
4    Q And why do you disagree with paragraph 2E?
5    **A That the personal misuse by Mr. McBride**
6 **was unfounded and --**
7    Q And what's your basis -- oh, I'm sorry.
8 Sorry. I spoke over you. Go ahead. Finish your
9 answer.
10   **A Sorry. It was in the -- it was a ruling**
11 **in the Arizona case.**
12   Q I'm not sure I'm tracking.
13   **A The judge --**
14   Q What do you mean by that?
15   **A -- from the Arizona case said that there**
16 **was no misuse of funds by Mr. McBride.**
17   Q Now, I know you weren't at Mr. McBride's
18 -- well, the beginning of Mr. McBride's deposition
19 the other day, but in your deposition and in his
20 deposition, you both referenced a ruling from the
21 Arizona case, and I'm having trouble understanding
22 what you mean by that. Was there -- is it your
23 position that there was some sort of written
24 decision in the Arizona case that exonerated
25 everything that Mr. McBride did?

**103**

1    **A I believe so, yes.**
2    Q And do you understand the distinction
3 between a written decision from the judge --
4    **A Yes.**
5    Q -- with analysis and law and stuff like
6 that on the one hand, and on the other hand, a
7 stipulation that the parties filed and asked that
8 the judge just dismiss certain claims in the case?
9 Do you understand the distinction between those
10 two?
11   **A I do.**
12      MR. BENNION: Objection, lacks foundation.
13 May call for speculation.
14   Q What was your answer, sir? I didn't hear
15 you.
16   **A Yes, I do.**
17   Q Now, the decision that you were referring
18 to a moment ago, was it a written decision with
19 analysis and case cites and things of nature, or
20 was it a stipulation?
21   **A It was written from the judge as a ruling.**
22   Q Okay. And was this a -- was it an oral
23 ruling that got put into a written transcript, or
24 was it a written decision that the judge wrote
25 out?

**104**

1      MR. BENNION: Same objection.
2    **A I'm not sure.**
3    Q Could have been one or the other? You
4 don't know one way or another?
5    **A I don't know. I don't recall.**
6    Q And approximately when is -- when was this
7 decision -- the reason I'm asking, I looked at the
8 docket again today, and I'm having trouble finding
9 this decision that you two are referencing, so I'm
10 just trying to get a better sense for -- do you
11 know when this decision was issued?
12   **A I don't know exactly, no.**
13   Q Ballpark is fine. Do you remember the
14 year?
15   **A '22.**
16   Q And was it fall, winter, spring, summer?
17   **A I don't recall. It could have been**
18 **anywhere between maybe May and November.**
19   Q So that's helpful. Thank you.
20      Was this -- there was a -- as I understand
21 it, there was a hearing around that November time
22 frame, within a month or two of there. Do you
23 remember that hearing?
24   **A I do.**
25   Q And this decision that you're talking

105

1 about, was it issued -- whether it be a transcript
2 or a written decision, was it issued right around
3 then?
4 **A I don't remember if it was then or**
5 **previously.**
6 Q Did you see the -- so now I think I do
7 understand what decision you're talking about.
8 Did you see the clarification that the judge in
9 Arizona forced your Nevada lawyers to file in our
10 case?
11 MR. BENNION: Objection, may call for
12 speculation. Lacks foundation.
13 **A I don't believe I've seen the -- or read**
14 **the whole thing or any of that.**
15 Q Okay. So going back to 2E. Your basis
16 for this is -- your basis for your disagreement is
17 you believe that the Arizona judge conclusively
18 ruled that Mr. McBride did not misuse company
19 funds. Is that what you're telling me?
20 **A Yes.**
21 Q And that's your only basis for saying
22 that, is that the judge ruled that, correct?
23 **A Yes.**
24 Q The Arizona judge. Is that correct?
25 **A I said yes.**

106

1 Q Okay. So if the Arizona judge
2 subsequently required a clarification to be filed
3 in the Nevada court to make clear that he, in
4 fact, had not made a ruling on the merits of that
5 question, you would still defer to the Arizona
6 judge, correct?
7 MR. BENNION: Objection, vague and
8 ambiguous. Lacks foundation. May call for a
9 legal conclusion.
10 **A Yeah, I'm not sure.**
11 Q Well, let me ask it this way: I asked you
12 why you disagreed with paragraph 2B, and you said
13 because the Arizona judge ruled on this issue and
14 said that Mr. McBride did not misuse company
15 funds, correct?
16 **A Yeah. It's pretty vague, though, so --**
17 Q Okay. And so if after that decision that
18 you're referring to, if subsequent to that, the
19 Arizona judge issued a ruling requiring that a
20 clarification be filed in the Nevada court on that
21 very -- or on that point, you'd still defer to the
22 Arizona judge, correct?
23 MR. BENNION: Same objections.
24 **A I'm not sure.**
25 Q Why would you defer to the judge in the

107

1 first instance, but not in the second instance?
2 **A Well, it was a ruling in a court case.**
3 Q I'm sorry. I didn't hear you or I didn't
4 understand you.
5 **A I said it was a written ruling in a court**
6 **case.**
7 Q And you're saying that because you believe
8 that the initial -- we'll call it ruling -- was a
9 final ruling and determination on the merits of
10 whether Mr. McBride misused company funds. Is
11 that what you're telling me?
12 MR. BENNION: Objection, lacks foundation.
13 Calls for a legal conclusion.
14 **A I'm not sure what you're asking.**
15 Q I'm asking for why you personally
16 disagree, or why you, as the corporate
17 representative for Takeover, disagree with 2E.
18 And I thought you told me three or four times that
19 the reason and the sole reason is because you
20 believe the Arizona judge conclusively ruled
21 Mr. McBride did not misuse company funds, correct?
22 **A Yes. We've looked into it as a company,**
23 **and we also found that it was no misuse.**
24 Q Okay. So that's a second reason. That's
25 what I was asking you. All right. So there's two

108

1 reasons you disagree with 2E. One, you think the
2 Arizona judge conclusively ruled on this issue and
3 found Mr. McBride to not misuse company funds,
4 correct?
5 **A Correct.**
6 Q And your second reason for disagreeing
7 with 2E is Takeover -- you and the others at
8 Takeover have looked into this issue and
9 determined that Mr. McBride did not misuse company
10 funds. Is that what you're saying?
11 **A Correct.**
12 Q Okay. Let's focus on the second of those
13 for a moment, then. What specifically did
14 Takeover as a company do to determine that
15 Mr. McBride did not misuse company funds?
16 **A It was in conjunction with an audit.**
17 Q And who was involved with both the audit
18 and the conclusion there was no misuse of company
19 funds?
20 **A The auditing company --**
21 Q Which was?
22 **A Ben Borges.**
23 Q Can you spell the second portion there?
24 **A B-O-R-G-E-S.**
25 Q Is that a name or a firm?

109

1     A  I believe it's his name and the firm.
2     Q  Okay.  And I'm sorry.  I cut you off.  Who
3  else?  Ben Borges and — who else?
4     A  We had a guy on our team named Marty
5  Scott, was an accountant.
6     Q  And was he employed by Takeover or by --
7  or was he an employee of Takeover, or was he an
8  employee of somebody else?
9     A  Just we contracted him for the audit
10  through Labor Smart.
11     Q  And who was his employer?
12     A  It's his own company.
13     Q  Okay.  Who else was involved?
14     A  The board of directors of Labor Smart and
15  Takeover.
16     Q  And who -- you already told me the --
17  well, actually, when was this audit?
18     A  I believe June of 2023.
19     Q  So this was after Mr. McBride had already
20  resigned from Takeover's board?
21     A  Yes.
22     Q  What was the purpose of doing the audit of
23  Mr. McBride after he had already left the company?
24     A  It was in conjunction with the audit for
25  the -- for both companies.

110

1     Q  Both companies being Takeover and Labor
2  Smart?
3     A  Correct.
4     Q  And this audit was after the Arizona court
5  ruling that you've been referring to several times
6  today, correct?
7     A  Yes.
8     Q  What did you personally do in conjunction
9  with that audit before coming to the conclusion
10  that there was no personal misuse?
11     A  I don't remember.
12     Q  Now, until the company made that
13  conclusion on its own in June of 2023, Mr. McBride
14  was still on the board of directors, correct?  At
15  least for a portion of the time, because he didn't
16  resign until April 2023, correct?
17     A  Correct.
18     Q  So we've got an individual who was on the
19  board who at least had allegations against him of
20  company -- or misuse of company property, correct?
21     A  I guess previous allegations from 2022 or
22  2021.
23     Q  Okay.  So then taking you back to your
24  first reason, you said the Arizona judge ruled on
25  it.  Just I think we've been talking past each

111

1  other.  Hopefully we can get to the bottom of it
2  quickly.  Are you aware of any subsequent writing
3  from the Arizona judge after the decision you
4  talked about that addressed whether Mr. McBride
5  misused company funds or whether acts that were
6  taken by Takeover while you were off the board
7  were valid or invalid?
8     MR. BENNION:  Objection, vague and
9  ambiguous, compound.
10     A  Yeah, two different questions.  I'm not
11  sure.
12     Q  Sure.  Let me try and ask it this way.  I
13  know you don't know the exact date of the decision
14  you've been referring to.  Just for -- just so we
15  can pin a date down, let's just pretend it was
16  November 15, 2022.  Are we on the same page?
17     A  Okay.
18     Q  Okay.  So the decision you've been
19  referring to on November 15, 2022.  My question
20  is, are you aware of any --
21     THE REPORTER:  I'm sorry.  Part of your
22  question cut out.
23     Q  -- decision or writing from the Arizona
24  judge --
25     THE REPORTER:  I'm sorry to interrupt, but

112

1  the question cut out.
2     MR. HARVEY:  Oh, I'm sorry.  I cut out, or
3  somebody else did?
4     THE REPORTER:  Part of your question cut
5  out.
6     MR. HARVEY:  I'm sorry.  Are you guys able
7  to hear me?
8     MR. BENNION:  I am.
9     THE WITNESS:  Yeah, you sound good now.
10     MR. HARVEY:  Okay.  Everyone else hear me?
11     THE REPORTER:  Yes.  It was just part of
12  that question.
13     THE WITNESS:  You just went out for a
14  split second there.
15     MR. HARVEY:  Okay.  So let me start over
16  again to make sure we can all hear me.
17  BY MR. HARVEY:
18     Q  So we've got our hypothetical date of
19  November 15, 2022, as the date of the decision
20  you've been referring to in relation to paragraph
21  2E.  Are we on the same page?
22     A  Okay.
23     Q  Are you aware of any post-November 15,
24  2022, decision from the judge or writing from the
25  judge that addresses the question of whether

---

**113**

1 Mr. McBride, in fact, conclusively misused company
2 funds?
3    MR. BENNION: Same objections.
4    **A No, I'm not aware of that.**
5    Q Are you aware of any post-November 15,
6 2022, written decision or other writing from the
7 judge that addressed the question of whether
8 actions that were taken by Takeover in the period
9 when you were not there, whether those were valid
10 actions taken on Takeover's behalf?
11    MR. BENNION: Same objections.
12    **A I know that he did say that they were**
13 **possibly invalid, yeah.**
14    Q After November 15, 2022?
15    **A Yes.**
16    Q Okay. So the decision we were talking
17 about, about the November 15 decision we've been
18 talking about, that only addressed the misuse of
19 company funds by Mr. McBride. It didn't address
20 the question of whether Takeover's acts were valid
21 in the time you were gone. Is that what you're
22 telling me?
23    MR. BENNION: Objection, lacks foundation,
24 calls for speculation.
25    **A From what I recall, they did say that they**

---

**114**

1 **-- said that they may not be valid, including**
2 **Mr. Deppoleto's notes.**
3    Q And I'm asking you, was that -- what you
4 were just referring to, was that in the November
5 15, 2022, decision, or was that in some different
6 decision?
7    **A I believe it was in the November 15 one.**
8    Q I'm sorry. It was in the November 15?
9    **A I believe so.**
10    Q Okay. All right. So moving on to
11 paragraph 2F. You said you disagreed with
12 paragraph 2F as well. Why do you disagree with
13 paragraph 2F?
14    **A I'm not sure.**
15    Q Again, because this one is focusing on
16 made upon the execution of such amendments, and
17 you weren't involved with Takeover upon the
18 execution of the amendments, correct?
19    **A Correct.**
20    Q So you don't have any personal knowledge
21 about whether this was actually an event of
22 default, correct?
23    **A Correct.**
24    MR. BENNION: I'm going to state a belated
25 objection that it may call for a legal conclusion.

---

**115**

1    Q And you also didn't talk to anyone who was
2 involved at Takeover at the time of the
3 amendments, and you also didn't review any
4 documents to prepare for today's deposition to
5 address the question of whether there were
6 misrepresentations on execution of the amendments,
7 correct?
8    **A Correct.**
9    Q And then you said you disagreed with
10 paragraph 2G; is that correct?
11    **A Correct.**
12    Q Why do you disagree with paragraph 2G?
13    **A Well, Toby had no access to the accounts,**
14 **so he couldn't pay himself in compensation. Jason**
15 **Tucker was the only one with access.**
16    Q Now, does that include the time after
17 Mr. Tucker was released from the board? In other
18 words, I thought you told me earlier that you
19 couldn't access the bank accounts for a couple
20 months, but then you regained access to them,
21 correct?
22    **A Yes.**
23    Q So who had access to the company accounts
24 after Tucker was gone and Takeover regained
25 control of the accounts?

---

**116**

1    **A Yeah, I guess Toby was -- had access.**
2    Q Okay. So does that change your answer?
3    **A So, yeah, there's probably a three-month**
4 **period where he had access to the account.**
5    Q And do you have personal knowledge --
6    **A No misuse by it.**
7    Q Oh, I'm sorry. What?
8    **A I said there was no -- there was no**
9 **misuse, and there was no longer any**
10 **(indiscernible) from Mr. Deppoleto at the time.**
11    Q So you're saying that by the time
12 Mr. McBride had access to the accounts, all of
13 Mr. Deppoleto's loans had been spent?
14    **A There was, yeah, no money left in the**
15 **accounts.**
16    Q As of today, has Takeover undertaken any
17 steps in an effort to repay Mr. Deppoleto?
18    **A Ongoing settlement negotiations.**
19    Q Other than settlement negotiations?
20    **A No.**
21    Q Did Takeover ever solicit funding from
22 other investors to repay Mr. Deppoleto?
23    **A Yes.**
24    Q When?
25    **A 2023.**

117

1    Q  What other investors?
2    A  I don't remember.
3    Q  Was it one investor?  Several investors?
4    A  Probably several.
5    Q  You don't remember any of them?
6    A  No.
7    Q  What specific steps did Takeover do to
8    solicit those investors?
9    A  I guess ask them for money.
10   Q  Were these face-to-face meetings, emails,
11   phone calls?
12   A  Probably phone calls, yeah.
13   Q  When is the last time Takeover attempted
14   to solicit funding from another investor?
15   A  I'm not sure.
16   Q  Did Takeover increase its efforts to sell
17   more product?
18   A  There was no product to sell.
19   Q  Well, Takeover could, in theory, have more
20   product made, correct?
21   A  Yeah.  Just not in the NXT LVL name.
22   Q  And to date, Takeover has not repaid any
23   amount of the funds that Mr. Deppoleto loaned to
24   Takeover, correct?
25   A  Correct.

118

1    Q  Does Takeover intend to repay
2    Mr. Deppoleto?
3    A  If possible, yes.
4    Q  Let me take that one down.  I'm going to
5    show you Exhibit -- let's mark this 15.
6       (Exhibit 15 was marked for identification
7    and is attached to the transcript.)
8    Q  This is dated November 22, 2022.  It's a
9    letter from Husch Blackwell, Michael Brandess to
10   several people, including Joseph Pavlik and then
11   some lawyers, correct?
12   A  Yes.
13   Q  You recognize this document?
14   A  I do.
15   Q  And what is this document?
16   A  It's a notice of default.
17   Q  Second notice of default?
18   A  Yes.
19   Q  When did Takeover first receive this
20   document?
21   A  I believe on or about November 22nd.
22   Q  And the lawyers listed -- we've got a
23   couple of them, but we've got Manolio & Firestone,
24   PLC, correct?
25   A  Yes.

119

1    Q  That's the name that we saw in the bank
2    statements in the earlier exhibit, correct?
3    A  Correct.
4    Q  And who did Manolio & Firestone represent?
5    A  Takeover.
6    Q  Then we've got Eric Bjorgum from Karish &
7    Bjorgum, correct?
8    A  Correct.
9    Q  Who did Mr. Bjorgum represent?
10   A  He was previously Labor Smart.
11   Q  Then we've got Matthew Canini.  Who did
12   Mr. Canini represent?
13   A  Me.
14   Q  And then we've got Jennifer Reiter.  Who
15   did Jennifer Reiter represent?
16   A  Toby McBride.
17   Q  And then Joseph Pavlik apparently didn't
18   have counsel.  That's why he's getting this on his
19   own --
20   A  Yeah.
21   Q  -- is that correct?
22      Did Takeover's officers or directors
23   discuss this notice after receiving it?
24   A  With our attorneys.
25   Q  Who all participated in the discussions?

120

1    A  I believe they were with Jennifer Reiter
2    and Matthew Canini, myself, Toby McBride, and
3    Joseph Pavlik.
4    Q  Anyone else?
5    A  I don't believe so.
6    Q  When was this -- well, was it one
7    discussion, or was it several?
8    A  I don't recall.
9    Q  Shortly after November 22, within a couple
10   days?
11   A  I would assume so, yes.
12   Q  Upon receiving this notice, did Takeover
13   begin a process to repay Mr. Deppoleto's loans?
14      MR. BENNION:  Objection, may call for a
15   legal conclusion.
16   A  Yeah.  Still at this time, we had no
17   access to the accounts, and there was no money in
18   them.
19   Q  So Takeover did not begin a process to
20   repay Mr. Deppoleto's loans?
21   A  No.
22   Q  I think we had a double-negative.  That
23   was my fault.
24      Once Takeover received this notice, did
25   Takeover begin a process to repay Mr. Deppoleto's

121

1  loans?
2  **A No.**
3  MR. BENNION: Same objection.
4  Q And you said the reason was because
5  Takeover didn't have any money in its account?
6  **A No access to the account.**
7  Q What about after Takeover received access
8  to the account? Did it begin a process to repay
9  Mr. Deppoleto at that point?
10 **A When we got access to the account, the**
11 **account was negative.**
12 Q So after Takeover got access to the
13 account, Takeover did not begin a process of any
14 sort to repay Mr. Deppoleto's loans, true?
15 **A Just settlement negotiations.**
16 Q Okay. As of today, how much money does
17 Takeover owe Mr. Deppoleto?
18 MR. BENNION: Objection, calls for legal
19 conclusion, may call for speculation, lacks
20 foundation.
21 **A I think 1.5 million.**
22 Q Plus interest?
23 **A Yeah, I would assume so.**
24 MR. HARVEY: Okay. Why don't we take a
25 quick five-minute break. I may be done. I just

122

1  want to go through my notes and make sure I didn't
2  miss anything.
3  MR. BENNION: Sure.
4  MR. HARVEY: Okay. So I'm going to go on
5  mute and whatnot, and we'll hop back on in five
6  minutes.
7  THE VIDEOGRAPHER: Off the record at
8  11:13.
9  (Whereupon, a recess was taken.)
10 THE VIDEOGRAPHER: The time is 11:21.
11 We're back on the record.
12 MR. HARVEY: So there were five topics
13 listed in the Takeover deposition notice. We went
14 over this before, but just to be clear, we're
15 holding the deposition open as to Topic 5 because
16 Mr. Holley is not testifying on that topic;
17 Mr. Zarro is. So we're holding over -- or we're
18 holding open the Takeover corporate representative
19 deposition for that reason.
20 We're also holding it open because I don't
21 think this witness was sufficiently prepared on
22 some of the topics, but -- so that we're holding
23 it open, I don't have any additional questions for
24 Mr. Holley on Topics 1 through 4 today.
25 MR. BENNION: It's -- your point is noted,

123

1  Counsel. Mr. Tom Zarro is going to address, as my
2  understanding, Deposition Topic Number 5 as well
3  as the topics set forth in the email that I sent
4  to you -- I believe it was the day before
5  yesterday in the Next Gen deposition subpoena or
6  the deposition topics. And you received that,
7  correct?
8  MR. HARVEY: Yes.
9  MR. BENNION: Okay. And I believe
10 Mr. Holley is designated with respect to
11 deposition topics for the Next Gen Beverages
12 deposition subpoena for Topics 4 and 6, and
13 Mr. Zarro for Topics 1, 2, and -- 1, 2, 3, and 5.
14 MR. HARVEY: For Next Gen.
15 MR. BENNION: Correct. With respect to
16 holding the deposition open, I mean, I'm going to
17 leave that. I'm not going to make any
18 representations on the record in response to that.
19 I appreciate your position. And I'm going to
20 leave it at that.
21 MR. HARVEY: Okay. So I believe we're
22 done for today then.
23 MR. BENNION: Thank you. Counsel, can I
24 call you --
25 MR. HARVEY: Should we go off the record

124

1  first?
2  MR. BENNION: Yeah. Let's go off the
3  record.
4  THE VIDEOGRAPHER: This marks the end of
5  the deposition of Michael Holley, corporate
6  representative of Takeover Industries,
7  Incorporated. The time is 11:24. We are off the
8  record.
9  (Off the record at 11:24 a.m. PST.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

125

ACKNOWLEDGMENT OF DEPONENT

1
2    I, MIKE HOLLEY, do hereby acknowledge that
3  I have read and examined the foregoing testimony
4  and the same is a true, correct, and complete
5  transcription of the testimony given by me and any
6  corrections appear on the attached errata sheet
7  signed by me.
8
9  _____   _____
10    (SIGNATURE)          (DATE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

127

CERTIFICATE OF TRANSCRIBER

1
2
3    I, Catherine Galati, do hereby certify
4  that the foregoing transcript is a true and
5  correct record of the recorded proceedings; that
6  said proceedings were transcribed to the best of
7  my ability from the audio recording and supporting
8  information; and that I am neither counsel for,
9  related to, nor employed by any of the parties to
10  this case and have no interest, financial or
11  otherwise, in its outcome.
12
13
14
15
16
17
18  _____
19  CATHERINE GALATI
20
21
22
23
24
25

126

CERTIFICATE OF NOTARY PUBLIC

1
2
3    I, CHARLIE McGRATH, Notary Public in and
4  for the State of California, do hereby certify
5  that on November 19, 2024, the witness, MIKE
6  HOLLEY, was sworn before me at the aforementioned
7  location, and that I am neither counsel for,
8  related to, nor employed by any of the parties to
9  this case and have no interest, financial or
10  otherwise, in its outcome.
11    IN WITNESS WHEREOF, I have hereunto set my hand
12  this 27th day of November 2024.
13
14
15
16
17  _____
18  NOTARY PUBLIC IN AND FOR
19  THE STATE OF CALIFORNIA
20
21
22
23
24
25

## A

**ability**
127:7
**able**
7:24, 16:19,
29:16, 54:3,
57:12, 58:17,
59:5, 59:16,
60:17, 61:3,
63:11, 69:19,
69:23, 84:5,
88:15, 92:23,
112:6
**about**
9:16, 10:13,
13:14, 14:13,
14:16, 14:19,
15:4, 20:13,
22:20, 25:8,
29:21, 31:6,
31:12, 33:15,
34:18, 34:21,
35:8, 35:14,
35:15, 36:1,
36:9, 36:10,
36:14, 36:15,
36:20, 36:21,
37:18, 38:1,
38:5, 40:8,
40:19, 40:24,
41:2, 41:5,
41:8, 41:11,
41:19, 42:21,
42:24, 43:6,
43:11, 43:24,
48:18, 51:17,
51:20, 51:25,
57:16, 63:2,
63:21, 66:11,
70:20, 72:10,
74:18, 77:1,
79:6, 81:2,
83:9, 85:17,
86:19, 86:24,
89:4, 93:5,
96:8, 96:11,
99:17, 100:10,

105:1, 105:7,
111:4, 113:17,
113:18, 114:21,
118:21, 121:7
**abraham**
57:2, 57:6,
57:8, 57:12
**access**
115:13, 115:15,
115:19, 115:20,
115:23, 116:1,
116:4, 116:12,
120:17, 121:6,
121:7, 121:10,
121:12
**accordance**
19:9, 23:22,
28:9
**according**
21:9, 70:25
**account**
4:19, 51:11,
51:12, 61:24,
91:3, 91:9,
91:10, 91:12,
116:4, 121:5,
121:6, 121:8,
121:10, 121:11,
121:13
**accountant**
109:5
**accounting**
44:21
**accounts**
34:25, 90:24,
91:16, 115:13,
115:19, 115:23,
115:25, 116:12,
116:15, 120:17
**accrue**
19:5
**accuracy**
47:16
**accurate**
46:9, 48:25
**acknowledge**
125:2
**acknowledgment**
125:1

**action**
1:6, 8:3
**actions**
20:21, 25:13,
29:23, 113:8,
113:10
**active**
21:22, 21:23,
26:5, 30:11,
82:17
**acts**
20:17, 111:5,
113:20
**actual**
64:19
**actually**
44:24, 46:6,
54:20, 70:5,
76:24, 95:11,
95:15, 96:23,
109:17, 114:21
**added**
87:21
**additional**
22:23, 27:5,
34:20, 43:16,
43:24, 63:4,
122:23
**address**
7:7, 113:19,
115:5, 123:1
**addressed**
111:4, 113:7,
113:18
**addresses**
112:25
**administer**
6:3
**affiliated**
9:13
**affirmative**
48:24
**affirmed**
6:16
**aforementioned**
126:6
**after**
43:15, 43:25,

50:5, 53:25,
55:24, 56:19,
81:10, 82:1,
82:5, 82:13,
85:10, 87:10,
88:2, 88:8,
89:7, 97:24,
106:17, 109:19,
109:23, 110:4,
111:3, 113:14,
115:16, 115:24,
119:23, 120:9,
121:7, 121:12
**again**
7:14, 11:6,
12:5, 21:16,
26:2, 29:20,
37:8, 37:13,
43:3, 71:16,
71:18, 72:5,
80:10, 99:19,
101:1, 104:8,
112:16, 114:15
**against**
110:19
**ago**
7:8, 7:13,
35:11, 40:24,
41:1, 41:19,
45:19, 48:21,
50:8, 68:10,
72:15, 79:10,
95:18, 98:11,
103:18
**agree**
6:5, 69:5,
69:13, 75:7,
95:16, 96:8,
100:15
**agreement**
4:10, 4:13,
4:16, 17:10,
17:17, 17:22,
20:9, 20:23,
21:11, 22:7,
22:16, 22:19,
25:15, 26:15,
26:24, 27:1,

29:25, 33:8,
33:17, 60:16,
94:3

**agrees**
90:2, 90:13

**ahead**
33:11, 34:12,
39:7, 44:6,
46:13, 49:3,
62:13, 66:9,
68:25, 80:4,
86:21, 90:11,
99:7, 102:8

**al**
1:8, 5:7

**all**
5:13, 6:4, 6:7,
13:10, 20:17,
20:21, 21:23,
25:13, 25:25,
29:23, 45:6,
51:22, 53:10,
61:8, 64:13,
65:22, 77:7,
80:21, 86:20,
93:2, 93:7,
93:11, 96:6,
96:10, 98:6,
107:25, 112:16,
114:10, 116:12,
119:25

**all-encompassing**
53:9

**allegation**
40:19

**allegations**
35:15, 36:2,
36:10, 36:15,
36:21, 43:11,
110:19, 110:21

**alleged**
68:8, 81:20

**alleges**
72:3

**alleging**
34:20, 70:19

**allow**
52:19

**almost**
58:14

**along**
99:25

**already**
109:16, 109:19,
109:23

**also**
3:19, 12:10,
17:25, 18:15,
30:16, 31:4,
40:4, 42:24,
59:21, 74:17,
107:23, 115:1,
115:3, 122:20

**although**
15:15

**ambiguous**
34:11, 44:5,
46:12, 47:19,
48:3, 62:11,
91:7, 91:20,
92:1, 94:21,
106:8, 111:9

**amend**
33:16

**amendment**
4:13, 4:16,
22:7, 22:18,
22:22, 25:14,
26:14, 26:23,
27:4, 29:24,
33:7, 33:16

**amendments**
114:16, 114:18,
115:3, 115:6

**amends**
26:25

**amount**
13:15, 15:5,
15:10, 16:4,
31:24, 32:3,
34:24, 70:14,
71:21, 117:23

**amounts**
11:1, 11:10,
64:14, 74:6,
77:1

**analysis**
103:5, 103:19

**annually**
19:6

**another**
16:18, 18:8,
22:2, 24:11,
25:7, 25:17,
29:20, 30:25,
33:7, 33:16,
38:16, 41:13,
45:15, 48:13,
51:6, 54:11,
55:8, 55:9,
59:10, 63:1,
63:5, 71:8,
76:21, 84:5,
101:13, 104:4,
117:14

**answer**
7:17, 10:7,
28:3, 32:25,
35:16, 37:2,
37:4, 40:12,
46:24, 49:3,
56:25, 71:24,
76:21, 81:9,
90:12, 101:19,
102:9, 103:14,
116:2

**answered**
75:16, 78:10,
98:15

**answering**
48:21

**any**
6:5, 7:10, 9:6,
9:9, 9:11, 10:9,
10:12, 10:15,
10:19, 21:17,
30:11, 31:10,
34:23, 34:24,
35:8, 37:1,
37:3, 37:11,
37:19, 37:21,
37:24, 38:8,
38:14, 38:25,
39:9, 39:15,

39:20, 39:25,
42:4, 43:6,
43:15, 43:23,
46:3, 46:17,
46:18, 48:16,
48:24, 49:7,
50:2, 61:22,
62:7, 62:14,
62:17, 63:21,
64:3, 64:8,
65:1, 65:5,
65:11, 73:22,
74:12, 74:14,
74:22, 75:2,
77:2, 78:17,
80:22, 81:2,
81:3, 81:23,
82:21, 83:5,
83:10, 83:16,
85:23, 87:17,
87:18, 88:2,
90:25, 92:7,
92:12, 93:19,
98:6, 98:19,
98:23, 98:24,
101:13, 101:14,
105:14, 111:2,
111:20, 112:23,
113:5, 114:20,
115:3, 116:9,
116:16, 117:5,
117:22, 121:5,
121:13, 122:23,
123:17, 125:5,
126:8, 127:9

**anybody**
101:9

**anyone**
9:13, 10:1,
13:4, 38:3,
39:14, 40:7,
40:18, 42:19,
43:23, 74:18,
74:21, 75:1,
87:21, 89:19,
99:25, 115:1,
120:4

**anything**
9:1, 37:15,

42:24, 43:10,
46:4, 66:25,
72:10, 72:25,
73:3, 99:25,
122:2
**anyways**
10:8
**anywhere**
104:18
**apologize**
91:5, 99:11
**apparently**
84:20, 119:17
**appear**
125:6
**appeared**
64:13
**appears**
54:1, 96:19
**applicable**
6:7, 6:11
**appointed**
77:19, 78:4,
85:3
**appointment**
78:14
**appointments**
78:8
**appreciate**
123:19
**approach**
14:15, 14:18
**approached**
14:12
**appropriate**
75:24
**approximately**
58:18, 64:15,
104:6
**april**
85:15, 86:10,
87:1, 87:4,
87:10, 87:19,
88:2, 110:16
**arizona**
98:17, 102:11,
102:15, 102:21,
102:24, 105:9,

105:17, 105:24,
106:1, 106:5,
106:13, 106:19,
106:22, 107:20,
108:2, 110:4,
110:24, 111:3,
111:23
**around**
38:4, 38:15,
43:20, 50:8,
77:18, 104:21,
105:2
**asked**
12:3, 37:5,
37:6, 37:8,
37:22, 48:18,
53:22, 74:22,
75:1, 75:8,
75:17, 76:10,
80:21, 98:10,
103:7, 106:11
**asking**
34:2, 34:14,
34:17, 35:3,
35:11, 35:13,
39:18, 75:18,
104:7, 107:14,
107:15, 107:25,
114:3
**assembled**
53:7
**assets**
44:9
**assist**
10:16, 10:20
**assume**
7:17, 41:1,
54:18, 54:25,
67:9, 120:11,
121:23
**assuming**
54:20
**attached**
4:7, 8:17,
16:24, 18:10,
19:20, 22:5,
23:8, 24:14,
26:13, 27:16,

29:1, 51:9,
70:9, 71:10,
84:12, 86:4,
88:14, 96:13,
118:7, 125:6
**attempted**
117:13
**attending**
5:14
**attorney**
5:17, 9:5,
39:8, 50:1, 61:9
**attorneys**
89:10, 119:24
**audio**
127:7
**audit**
98:4, 108:16,
108:17, 109:9,
109:17, 109:22,
109:24, 110:4,
110:9
**auditing**
108:20
**august**
26:17, 27:8,
27:18, 29:6,
30:10, 59:21,
60:1, 60:11,
60:18, 60:19,
60:22, 61:1,
61:5, 66:14,
66:17
**authorized**
6:2, 20:16,
20:21, 25:13,
78:8, 78:14
**authorizes**
29:22
**aware**
66:24, 68:12,
73:2, 73:19,
73:21, 73:22,
77:5, 92:9,
95:2, 95:7,
95:9, 95:20,
96:2, 100:4,
111:2, 111:20,

112:23, 113:4,
113:5

**B**

**b-o-r-g-e-s**
108:24
**back**
15:14, 34:18,
40:12, 43:20,
47:13, 53:17,
55:2, 61:19,
67:18, 80:20,
82:11, 93:24,
98:7, 105:15,
110:23, 122:5,
122:11
**ballpark**
104:13
**bank**
32:12, 32:13,
32:14, 32:20,
32:23, 33:1,
33:4, 41:16,
41:18, 41:21,
41:24, 42:2,
50:6, 50:7,
61:24, 91:8,
91:12, 115:19,
119:1
**based**
53:20
**basically**
53:18
**basing**
32:10, 32:25
**basis**
38:11, 77:3,
99:2, 99:14,
102:7, 105:15,
105:16, 105:21
**bates**
51:21
**bates-labeled**
51:19, 68:22,
69:2, 70:10,
71:11, 86:5
**became**
95:9, 96:2

**because**
21:21, 35:6,
37:7, 38:18,
42:13, 42:17,
81:7, 95:19,
98:12, 101:21,
106:13, 107:7,
107:19, 110:15,
114:15, 121:4,
122:15, 122:20
**become**
87:5
**becoming**
87:8
**been**
49:6, 52:10,
54:3, 57:12,
58:17, 59:5,
59:16, 60:10,
60:17, 61:3,
67:7, 74:1,
75:23, 76:5,
77:1, 87:17,
87:21, 99:16,
104:3, 104:17,
110:5, 110:25,
111:14, 111:18,
112:20, 113:17,
116:13
**before**
2:14, 8:1,
10:7, 12:3,
15:9, 47:11,
48:16, 49:5,
53:22, 57:16,
68:18, 78:10,
88:19, 88:24,
90:7, 96:1,
97:9, 97:25,
98:15, 100:1,
100:6, 100:10,
100:17, 100:18,
110:9, 122:14,
123:4, 126:6
**begin**
13:22, 14:6,
49:19, 57:20,
59:24, 90:22,

91:1, 91:15,
91:18, 92:7,
92:12, 120:13,
120:19, 120:25,
121:8, 121:13
**beginning**
78:17, 92:11,
102:18
**begins**
5:2
**behalf**
3:3, 3:11,
8:10, 9:3, 12:5,
68:15, 69:7,
75:10, 97:22,
113:10
**being**
6:16, 26:6,
65:16, 65:17,
66:25, 110:1
**belated**
45:9, 47:6,
47:8, 62:10,
91:5, 114:24
**belief**
15:15
**believe**
12:23, 13:3,
14:1, 15:25,
16:13, 16:17,
21:7, 35:19,
36:19, 37:1,
44:23, 52:12,
53:5, 53:9,
59:4, 60:15,
64:7, 64:11,
64:23, 65:8,
67:25, 68:6,
70:21, 72:4,
73:13, 76:1,
82:10, 83:21,
85:15, 85:18,
87:16, 94:7,
96:9, 98:4,
98:12, 98:16,
103:1, 105:13,
105:17, 107:7,
107:20, 109:1,

109:18, 114:7,
114:9, 118:21,
120:1, 120:5,
123:4, 123:9,
123:21
**believed**
48:6
**believes**
87:23
**ben**
98:5, 108:22,
109:3
**bennion**
3:12, 3:13,
5:20, 8:15,
33:9, 34:10,
39:5, 44:4,
44:14, 45:9,
46:11, 47:5,
47:8, 47:18,
48:2, 49:1,
51:23, 62:10,
66:6, 67:12,
67:14, 68:23,
69:9, 72:7,
76:7, 80:1,
90:4, 90:16,
91:4, 91:19,
91:25, 92:8,
92:14, 93:21,
94:5, 94:20,
95:13, 96:17,
96:21, 97:17,
99:6, 100:13,
103:12, 104:1,
105:11, 106:7,
106:23, 107:12,
111:8, 112:8,
113:3, 113:11,
113:23, 114:24,
120:14, 121:3,
121:18, 122:3,
122:25, 123:9,
123:15, 123:23,
124:2
**best**
127:6
**better**
92:22, 104:10

**between**
14:9, 17:14,
18:21, 22:17,
23:16, 27:25,
28:5, 46:8,
52:17, 64:16,
103:3, 103:9,
104:18
**beverage**
11:16, 52:9,
55:8, 55:10,
55:11, 56:14,
56:15
**beverages**
55:11, 73:20,
123:11
**bit**
51:15, 68:10,
92:18, 95:17
**bjorgum**
119:6, 119:7,
119:9
**blackwell**
3:5, 4:23,
118:9
**bless**
88:10
**board**
4:20, 4:21,
16:12, 17:16,
17:21, 19:22,
20:4, 20:7,
21:1, 21:16,
21:18, 24:16,
24:23, 25:2,
25:18, 29:3,
29:4, 29:12,
29:15, 30:4,
30:11, 64:20,
77:8, 77:11,
78:11, 78:25,
79:13, 81:14,
81:16, 81:18,
82:11, 82:13,
82:17, 83:19,
84:14, 84:17,
85:4, 85:7,
85:9, 85:10,

85:14, 85:18,
85:21, 86:6,
86:15, 87:2,
87:5, 87:8,
87:11, 87:15,
87:19, 87:24,
109:14, 109:20,
110:14, 110:19,
111:6, 115:17
**bond**
10:5
**book**
44:2, 44:12,
48:9
**booking**
44:8
**books**
45:2, 45:5,
45:11, 45:18,
45:25, 46:2,
46:6, 46:8,
46:10, 46:16,
46:21, 47:2,
47:17, 48:1,
48:6, 48:9,
48:15, 48:19,
48:25, 49:6,
50:2
**borges**
98:5, 108:22,
109:3
**both**
20:7, 102:20,
108:17, 109:25,
110:1
**bottle**
53:11
**bottom**
16:21, 17:1,
17:2, 25:6,
25:18, 29:19,
51:18, 85:2,
88:18, 111:1
**boulevard**
3:14
**brand**
11:25, 12:6
**brandess**
118:9

**break**
67:9, 67:10,
95:16, 121:25
**briefly**
11:14
**broadway**
3:6
**broker**
56:14, 56:15
**building**
72:16, 72:19
**business**
11:17, 12:17,
12:19

---
### C
---

**california**
2:15, 126:4,
126:19
**call**
33:10, 39:6,
49:1, 66:7,
69:10, 80:2,
84:1, 84:2,
84:24, 91:6,
91:19, 93:22,
94:6, 103:13,
105:11, 106:8,
107:8, 114:25,
120:14, 121:19,
123:24
**called**
83:22
**calls**
47:9, 72:7,
76:7, 90:4,
97:17, 107:13,
113:24, 117:11,
117:12, 121:18
**came**
47:13, 79:7
**can't**
17:20, 30:24,
35:16, 38:15,
76:20, 95:9
**canini**
89:16, 89:18,
119:11, 119:12,

120:2
**capacity**
12:4, 34:5,
35:12, 79:13,
79:15, 79:17
**case**
5:8, 13:18,
13:19, 37:16,
37:21, 94:12,
98:17, 102:11,
102:15, 102:21,
102:24, 103:8,
103:19, 105:10,
107:2, 107:6,
126:9, 127:10
**catch**
71:23, 101:18
**catherine**
1:25, 127:3,
127:19
**cause**
20:16
**cc**
99:19
**ceo**
64:25, 79:23
**certain**
81:9, 103:8
**certificate**
126:1, 127:1
**certification**
6:10
**certified**
6:5
**certify**
126:4, 127:3
**cfo**
44:18
**change**
31:1, 31:16,
32:21, 97:15,
116:2
**changed**
7:20
**changes**
87:17, 87:18
**charleston**
3:14

**charlie**
2:14, 5:25,
126:3
**checking**
4:19, 51:10
**cites**
103:19
**civil**
1:6, 8:2
**claims**
103:8
**clarification**
96:18, 105:8,
106:2, 106:20
**clauses**
86:18
**cleaner**
80:11, 80:13
**clear**
106:3, 122:14
**clearly**
72:23
**close**
32:6
**come**
13:14, 34:16
**comes**
94:24
**coming**
110:9
**comma**
25:9, 25:10
**communication**
96:13, 98:14,
99:4, 99:20,
100:3, 100:6,
100:11
**communications**
9:11, 54:24
**companies**
50:23, 50:24,
109:25, 110:1
**company**
11:16, 12:5,
19:1, 21:14,
43:20, 44:13,
47:13, 92:17,
105:18, 106:14,

107:10, 107:21,
107:22, 108:3,
108:9, 108:14,
108:15, 108:18,
108:20, 109:12,
109:23, 110:12,
110:20, 111:5,
113:1, 113:19,
115:23
**company's**
20:15, 25:9
**compensate**
64:9, 65:3,
65:6, 65:13
**compensation**
65:14, 77:9,
78:18, 78:25,
79:25, 80:14,
80:22, 81:3,
81:23, 82:2,
82:4, 82:22,
83:6, 83:10,
83:16, 85:24,
87:18, 88:3,
115:14
**complete**
125:4
**composition**
87:19
**compound**
95:13, 95:15,
111:9
**compounded**
19:6
**comprised**
77:11, 85:9,
87:24
**comprises**
96:24
**comprising**
77:8
**conclusion**
39:6, 47:9,
49:2, 69:10,
90:5, 91:6,
91:20, 93:22,
94:6, 97:18,
106:9, 107:13,

108:18, 110:9,
110:13, 114:25,
120:15, 121:19
**conclusively**
105:17, 107:20,
108:2, 113:1
**conducted**
1:16, 2:3
**conference**
84:23
**confirmation**
96:25, 97:9,
98:9
**conjunction**
108:16, 109:24,
110:8
**consent**
4:12, 4:15,
4:18, 19:22,
20:4, 20:7,
24:16, 24:23,
25:2, 29:3,
29:4, 29:12,
29:15, 87:7
**consented**
25:25
**consenting**
21:10
**consisted**
82:14, 87:11
**consistent**
6:11
**constitute**
6:9
**contact**
13:24, 15:17,
53:14
**context**
48:22, 58:12
**contracted**
109:9
**contradict**
38:21, 39:4,
39:21, 40:1
**control**
61:24, 91:2,
91:8, 91:10,
91:11, 115:25

**convene**
83:20
**conversation**
15:4
**convert**
28:14, 53:3
**converted**
24:3
**convertible**
17:9, 17:14,
18:11, 18:21,
19:4, 22:7,
22:16, 22:19,
23:10, 23:16,
23:18, 26:15,
26:23, 27:1,
27:18, 27:24,
28:5, 33:7,
33:16
**coo**
47:12, 79:21,
82:10
**copied**
96:10, 98:13,
99:3, 99:8,
99:16
**copy**
100:2, 100:5
**corp**
67:22, 68:14,
70:12, 70:14,
71:2, 71:3,
71:15, 72:6,
72:10, 76:3,
76:5
**corporate**
5:4, 8:9, 9:3,
33:13, 33:20,
34:3, 34:6,
35:13, 36:24,
40:17, 43:1,
43:4, 46:25,
49:24, 97:21,
107:16, 122:18,
124:5
**corporation**
18:25, 58:5,
58:10, 58:13,

58:19
**corrections**
125:6
**correspondence**
96:11
**costello**
13:2, 21:6,
25:23, 26:2,
30:8, 36:17,
36:20, 41:10,
63:9, 63:17
**could**
7:3, 38:13,
47:4, 48:12,
104:3, 104:17,
117:19
**couldn't**
115:14, 115:19
**counsel**
5:15, 6:19,
6:21, 10:13,
95:16, 96:18,
119:18, 123:1,
123:23, 126:7,
127:8
**couple**
7:8, 7:12,
35:11, 48:21,
68:7, 69:21,
79:10, 86:17,
86:18, 86:23,
91:13, 98:11,
115:19, 118:23,
120:9
**court**
1:1, 5:8, 5:24,
13:18, 13:19,
106:3, 106:20,
107:2, 107:5,
110:4
**cure**
91:18, 91:23,
92:4, 92:7,
92:12
**current**
10:4, 10:6,
31:10
**currently**
11:17, 40:7

**customer**
70:22, 71:18
**cut**
9:7, 10:18,
109:2, 111:22,
112:1, 112:2,
112:4
**cutting**
11:4

---
**D**
---

**data**
44:25
**date**
5:10, 17:1,
19:4, 30:10,
77:13, 77:18,
95:8, 96:2,
97:1, 111:13,
111:15, 112:18,
112:19, 117:22,
125:10
**dated**
18:12, 19:23,
23:10, 24:17,
27:1, 27:18,
29:6, 70:11,
71:14, 97:12,
118:8
**dates**
66:13
**day**
102:19, 123:4,
126:12
**days**
53:24, 55:24,
56:19, 120:10
**deal**
62:7
**deals**
84:19
**december**
13:8, 81:10,
81:14, 81:24,
82:5, 82:11,
82:23, 97:13
**decision**
88:7, 97:23,

102:24, 103:3,
103:17, 103:18,
103:24, 104:7,
104:9, 104:11,
104:25, 105:2,
105:7, 106:17,
111:3, 111:13,
111:18, 111:23,
112:19, 112:24,
113:6, 113:16,
113:17, 114:5,
114:6
**deeds**
20:17
**def**
51:19, 51:21,
51:25, 54:15,
55:2, 56:10,
57:4, 58:8,
58:23, 59:10,
60:10, 60:22,
61:13, 62:21,
85:1, 86:5
**default**
4:22, 88:23,
90:2, 91:18,
92:7, 92:13,
92:20, 93:1,
93:9, 93:20,
94:4, 97:25,
114:22, 118:16,
118:17
**defaulted**
89:24, 90:14
**defaults**
88:9
**defendants**
1:9, 3:11, 5:21
**defer**
42:1, 46:2,
46:9, 106:5,
106:21, 106:25
**deliver**
53:16, 55:17
**deplete**
51:3, 58:2
**depleted**
60:6

**deponent**
125:1
**depos**
5:13, 6:1
**deposed**
7:12
**deposited**
34:24
**deposition**
1:12, 2:1, 4:8,
5:3, 5:14, 6:3,
7:8, 7:14, 7:21,
8:2, 8:19,
10:13, 15:22,
17:6, 31:13,
35:11, 36:25,
37:14, 40:14,
41:22, 43:1,
43:13, 43:14,
45:3, 45:20,
49:24, 50:9,
78:22, 78:23,
79:6, 80:7,
83:13, 84:10,
88:19, 88:22,
88:25, 101:10,
101:15, 102:18,
102:19, 102:20,
115:4, 122:13,
122:15, 122:19,
123:2, 123:5,
123:6, 123:11,
123:12, 123:16,
124:5
**deppoleto's**
13:10, 14:5,
15:1, 18:4,
19:8, 20:22,
23:21, 24:5,
25:14, 28:8,
28:16, 29:24,
36:23, 40:1,
40:19, 43:11,
44:2, 44:12,
49:15, 49:20,
53:25, 54:4,
55:24, 56:6,
56:19, 56:22,

57:17, 58:19,
59:6, 59:17,
59:20, 60:19,
61:4, 65:6,
65:21, 65:24,
66:25, 68:18,
73:11, 87:7,
89:25, 90:22,
91:15, 97:5,
114:2, 116:13,
120:13, 120:20,
120:25, 121:14
**describe**
11:14, 52:16,
88:21
**describing**
86:9
**designated**
1:14, 2:2,
5:22, 123:10
**detail**
52:18
**details**
13:15
**determination**
40:16, 107:9
**determine**
83:5, 83:15,
108:14
**determined**
108:9
**different**
28:19, 34:17,
46:5, 64:14,
73:16, 75:17,
111:10, 114:5
**differently**
24:8, 37:6
**directed**
20:16
**directly**
34:15, 39:10,
44:15, 65:25,
67:2, 67:3,
67:5, 68:13
**director**
21:20, 47:12,
47:15, 47:16,

64:22, 73:13,
73:15, 78:19,
78:25, 79:2,
79:4, 83:6,
83:10, 83:16
**directors**
16:12, 17:16,
17:21, 19:22,
20:5, 20:7,
21:1, 21:16,
21:18, 21:24,
24:16, 24:24,
25:2, 25:19,
26:5, 29:4,
29:13, 29:15,
30:4, 30:11,
30:12, 31:11,
64:21, 77:8,
77:9, 77:12,
77:21, 78:6,
78:12, 78:18,
80:22, 81:3,
81:15, 81:16,
81:18, 82:12,
82:13, 82:18,
82:22, 83:19,
84:14, 84:18,
85:4, 85:7,
85:10, 85:14,
85:24, 86:6,
86:16, 87:2,
87:15, 87:19,
88:3, 89:8,
94:8, 109:14,
110:14, 119:22
**disagree**
93:19, 94:10,
96:8, 100:24,
102:4, 107:16,
107:17, 108:1,
114:12, 115:12
**disagreed**
94:9, 95:19,
96:7, 98:11,
100:21, 102:2,
106:12, 114:11,
115:9
**disagreeing**
108:6

**disagreement**
105:16
**disclose**
79:24, 80:17
**discuss**
33:23, 89:8,
119:23
**discussed**
17:17, 17:21,
18:1, 62:1,
66:23, 68:7,
74:19
**discussing**
80:15
**discussion**
33:15, 89:21,
120:7
**discussions**
10:12, 35:8,
37:25, 38:25,
39:10, 39:15,
42:14, 42:18,
43:23, 74:14,
89:12, 92:11,
98:24, 119:25
**dismiss**
103:8
**display**
67:25
**displays**
72:17, 73:23
**dispute**
32:23, 77:3,
101:21
**distinction**
103:2, 103:9
**distribution**
56:17
**district**
1:1, 1:2, 5:8
**docket**
104:8
**document**
8:1, 16:18,
17:5, 17:12,
18:3, 18:8,
18:18, 20:1,
21:9, 21:10,

21:19, 22:2,
22:13, 23:13,
24:11, 24:20,
25:1, 26:6,
26:10, 26:20,
26:25, 27:21,
29:9, 35:6,
36:23, 54:8,
58:23, 59:10,
60:10, 61:13,
68:18, 68:22,
69:2, 71:8,
71:11, 84:5,
86:12, 88:10,
88:11, 88:24,
97:12, 97:25,
98:2, 98:4,
118:13, 118:15,
118:20
**documentation**
31:8
**documented**
45:16
**documents**
9:6, 9:9, 10:9,
13:17, 16:6,
30:18, 30:21,
34:24, 37:1,
37:3, 37:12,
37:19, 37:21,
41:17, 42:5,
42:9, 45:13,
46:3, 46:17,
69:22, 74:4,
74:12, 91:24,
101:14, 115:4
**doing**
12:17, 12:19,
109:22
**dollar**
62:8
**don**
3:12, 3:13,
5:20, 69:17
**done**
20:17, 78:1,
86:23, 121:25,
123:22

**double-negative**
31:19, 120:22
**double-negatived**
80:9
**down**
8:13, 8:18,
18:7, 19:16,
20:12, 20:14,
20:25, 22:1,
23:5, 25:6,
25:17, 26:9,
27:12, 28:22,
29:19, 30:2,
30:15, 51:15,
54:7, 56:9,
57:4, 58:8,
58:22, 59:9,
60:9, 60:21,
61:12, 66:5,
66:19, 71:7,
85:1, 86:1,
86:17, 86:19,
88:5, 93:6,
93:7, 93:25,
95:16, 96:16,
111:15, 118:4
**drinks**
52:22
**duly**
6:16
**during**
10:9, 21:13,
21:22

**E**

**each**
31:25, 49:13,
110:25
**earlier**
35:4, 48:18,
95:6, 97:14,
115:18, 119:2
**educate**
9:15
**effect**
25:13, 29:23
**effectuate**
20:22

efficient
51:20
effort
116:17
efforts
117:16
either
9:14, 14:11,
14:17, 14:25,
15:8, 15:21,
48:17, 56:24,
58:7, 66:5,
66:18
elaborate
50:17
electronic
6:4
else
9:13, 10:1,
13:4, 55:17,
67:1, 74:18,
76:12, 76:14,
87:21, 89:19,
109:13, 112:3,
112:10, 120:4
email
14:20, 84:2,
84:3, 84:21,
99:24, 123:3
emails
99:17, 117:10
employed
109:6, 126:8,
127:9
employee
64:19, 73:14,
73:16, 78:19,
109:7, 109:8
employees
12:17, 12:24,
12:25, 31:11
employer
109:11
employment
7:20
end
28:2, 82:18,

82:24, 124:4
ends
49:11
energy
12:9, 12:10,
52:22, 52:23,
54:19, 72:19,
72:20
enter
20:8, 25:3,
29:16
entered
22:10, 26:17,
34:8, 65:20
entering
33:15
entity
11:19
entries
51:16, 62:23,
63:5
entry
56:10, 57:4,
58:8, 59:10,
63:1
eric
119:6
errata
125:6
esquire
3:4, 3:12
essentially
20:19, 25:11,
53:13
established
97:4
et
1:8, 5:7
even
16:1, 32:6,
33:15, 91:2,
97:14
event
94:4, 98:6,
114:21
events
92:20, 92:25,
93:8, 93:20

ever
48:9, 69:2,
73:3, 73:19,
75:1, 94:8,
116:21
every
49:13
everyone
112:10
everything
53:16, 55:16,
102:25
evidence
48:24
evidentiary
6:8
exact
111:13
exactly
14:7, 56:1,
56:21, 66:10,
94:22, 104:12
examination
4:3, 6:21
examined
6:18, 125:3
example
16:8, 50:3,
62:23, 68:21,
83:4
excuse
51:15
execute
20:18
execution
17:18, 17:23,
94:15, 94:18,
95:1, 95:3,
95:11, 114:16,
114:18, 115:6
exhibit
4:8, 4:9, 4:10,
4:11, 4:12,
4:13, 4:14,
4:15, 4:16,
4:17, 4:18,
4:19, 4:20,
4:21, 4:22,

4:23, 4:24,
4:25, 8:14,
8:16, 8:19,
16:22, 16:23,
16:25, 17:1,
18:8, 18:9,
19:18, 19:19,
22:3, 22:4,
23:6, 23:7,
24:12, 24:13,
26:11, 26:12,
27:14, 27:15,
28:24, 28:25,
29:2, 51:6,
51:7, 51:8,
66:21, 69:25,
70:1, 70:8,
70:10, 71:8,
71:9, 84:9,
84:10, 84:11,
86:2, 86:3,
88:12, 88:13,
88:17, 88:22,
92:20, 93:14,
96:14, 96:16,
96:18, 96:23,
96:24, 98:10,
118:5, 118:6,
119:2
exonerated
102:24
expecting
69:18
extent
33:9, 39:5,
69:9, 93:21,
94:5

**F**

face-to-face
117:10
facilitate
33:8
fact
32:21, 35:17,
40:9, 41:25,
95:8, 106:4,
113:1

factual
99:14
fair
7:18, 41:1
faith
55:4, 55:7,
55:12, 55:15,
55:16, 55:23,
56:7
fall
104:16
familiar
44:8, 44:10
far
73:15
fault
31:20, 120:23
few
45:19, 53:24,
55:24, 56:19,
66:24, 72:15
fighter
58:25, 60:12,
60:18
file
105:9
filed
103:7, 106:2,
106:20
final
107:9
financial
126:9, 127:10
finding
104:8
fine
104:13
finish
102:8
finished
53:17, 55:18
firestone
61:7, 61:8,
118:23, 119:4
firm
61:10, 108:25,
109:1
first
6:16, 10:24,

11:8, 14:12,
14:15, 14:18,
16:2, 18:23,
22:6, 22:22,
24:9, 25:14,
28:19, 33:23,
37:8, 49:15,
49:20, 50:12,
51:3, 51:16,
51:24, 53:25,
62:5, 62:6,
66:12, 77:10,
86:19, 88:10,
88:11, 89:3,
97:5, 97:9,
98:19, 98:25,
100:1, 100:7,
100:10, 101:2,
107:1, 110:24,
118:19, 124:1
firsthand
92:2
fitness
94:13
five
12:24, 12:25,
122:5, 122:12
five-minute
67:9, 67:10,
121:25
focus
108:12
focusing
94:14, 94:25,
114:15
follows
6:18
forced
105:9
foregoing
125:3, 127:4
forgot
69:25
format
84:1
former
10:5, 31:11
formerly
40:8

forth
123:3
fortner
13:3, 63:10
forward
51:19, 69:17,
70:7, 81:22,
85:23
found
98:16, 107:23,
108:3
foundation
44:5, 45:10,
46:11, 62:12,
66:7, 68:24,
80:2, 92:1,
100:13, 103:12,
105:12, 106:8,
107:12, 113:23,
121:20
founded
11:22
four
107:18
fourth
34:7, 35:17
frame
33:6, 50:4,
66:4, 66:17,
73:1, 74:8,
74:14, 76:19,
83:6, 83:10,
83:16, 98:20,
104:22
fraudulent
47:3
full
7:3, 18:23
fully
51:3, 58:2,
60:6
functions
44:22
funding
43:16, 43:24,
116:21, 117:14
funds
11:10, 13:15,

15:6, 15:11,
16:4, 49:14,
49:19, 50:14,
57:20, 62:7,
62:18, 64:3,
64:8, 66:25,
102:16, 105:19,
106:15, 107:10,
107:21, 108:3,
108:10, 108:15,
108:19, 111:5,
113:2, 113:19,
117:23
further
20:14, 25:8,
54:7, 60:21
fuzzy
92:22

**G**

g-o-u-l-d
58:6
galati
1:25, 127:3,
127:19
gamer
12:11, 12:13,
12:14, 52:12,
52:13, 52:20,
53:3, 53:14,
68:1
gave
52:21, 72:3
gen
123:5, 123:11,
123:14
general
62:8
generally
84:16, 88:21
getting
53:4, 63:14,
63:16, 63:18,
119:18
give
55:15, 66:13,
71:6
given
125:5

**giving**
48:22
**go**
7:13, 10:22,
11:7, 15:14,
20:12, 20:25,
25:6, 25:17,
29:19, 30:2,
33:11, 34:12,
39:7, 44:6,
46:13, 47:11,
49:3, 51:15,
54:7, 54:11,
55:2, 56:9,
57:4, 58:8,
60:21, 62:13,
66:9, 68:25,
70:7, 80:4,
86:21, 90:11,
93:24, 96:16,
99:7, 102:8,
122:1, 122:4,
123:25, 124:2
**goes**
20:18, 25:10,
93:1
**going**
7:16, 7:17,
7:23, 9:17,
10:8, 10:22,
11:7, 16:18,
19:17, 23:6,
26:10, 27:13,
28:23, 40:12,
40:16, 45:9,
47:5, 47:8,
49:12, 51:6,
51:19, 51:21,
61:12, 62:10,
66:6, 67:7,
67:15, 68:23,
69:21, 70:6,
71:6, 71:7,
77:6, 79:19,
80:1, 80:20,
82:11, 84:4,
84:9, 86:2,
88:5, 88:11,

93:4, 98:6,
105:15, 114:24,
118:4, 122:4,
123:1, 123:16,
123:17, 123:19
**gone**
83:17, 113:21,
115:24
**good**
6:24, 6:25,
7:1, 7:2, 7:3,
7:15, 67:8,
112:9
**gould**
58:5, 58:10,
58:13, 58:19
**great**
4:24, 4:25,
67:22, 67:24,
68:5, 68:13,
68:14, 69:6,
70:12, 70:14,
71:2, 71:3,
71:15, 72:6,
72:9, 72:12,
72:16, 72:25,
73:4, 73:9,
74:2, 75:9,
76:3, 76:4,
76:25
**group**
85:13, 87:14
**guess**
73:7, 89:4,
101:25, 110:21,
116:1, 117:9
**guideposts**
66:14
**guy**
109:4
**guys**
112:6

----

**H**

**h-o-l-l-e-y**
7:6
**half**
9:23, 67:8,

98:20, 98:25
**halfway**
20:13, 86:19
**hand**
103:6, 126:11
**handled**
76:6, 76:11
**handling**
75:24
**handwritten**
10:15, 10:19
**happened**
48:12, 53:18,
97:20, 99:9
**happens**
11:6
**happy**
34:16, 37:8
**hard**
28:3
**harvey**
3:4, 4:4, 5:18,
6:20, 6:23,
67:7, 67:13,
67:20, 69:17,
69:25, 70:5,
95:15, 96:20,
96:22, 112:2,
112:6, 112:10,
112:15, 112:17,
121:24, 122:4,
122:12, 123:8,
123:14, 123:21,
123:25
**hear**
28:4, 56:25,
76:14, 77:23,
90:19, 93:17,
103:14, 107:3,
112:7, 112:10,
112:16
**hearing**
6:12, 104:21,
104:23
**held**
84:23, 86:9
**help**
9:15, 56:16

**helpful**
104:19
**here**
5:2, 8:23,
10:16, 16:9,
17:3, 22:2,
30:24, 33:20,
35:14, 51:6,
53:16, 66:24,
80:6, 90:9,
92:19
**here's**
53:15
**hereby**
19:1, 20:15,
25:10, 125:2,
126:4, 127:3
**hereunto**
126:11
**highlighted**
86:21
**himself**
115:14
**hold**
47:10, 47:14
**holder**
19:2
**holding**
122:15, 122:17,
122:18, 122:20,
122:22, 123:16
**holley**
1:15, 2:3, 4:3,
5:4, 5:21, 6:15,
6:24, 7:5, 7:24,
17:1, 69:22,
78:4, 84:9,
88:17, 94:12,
122:16, 122:24,
123:10, 124:5,
125:2, 126:6
**hop**
122:5
**hopefully**
111:1
**hour**
9:23, 67:8
**husch**
3:5, 4:23,

**118:9**

**hydrogen**
12:8, 55:13,
55:17

**hypothetical**
112:18

**I**

**idea**
24:10, 38:17,
38:18, 43:19,
61:23

**identification**
8:16, 16:23,
18:9, 19:19,
22:4, 23:7,
24:13, 26:12,
27:15, 28:25,
51:8, 70:8,
71:9, 77:7,
84:11, 86:3,
88:13, 118:6

**impossible**
75:14, 75:19

**improperly**
21:21, 47:2,
81:17

**inaccurate**
48:1, 48:6,
48:20, 49:6,
49:8

**inc**
18:25, 19:23,
24:17, 29:5,
52:1, 52:8,
53:20, 84:14,
86:7

**include**
115:16

**including**
11:1, 11:10,
16:4, 93:12,
114:1, 118:10

**incorporated**
1:8, 1:13, 2:2,
5:5, 5:7, 5:23,
8:5, 8:11,
10:25, 11:15,

**124:7**

**incorporated's**
10:25, 11:9,
16:3

**incorrect**
37:18

**increase**
117:16

**indicates**
57:5, 58:9

**indicating**
58:24, 59:11

**individual**
110:18

**individuals**
77:8, 78:15

**industries**
1:7, 1:13, 2:1,
5:5, 5:6, 5:23,
8:5, 8:10,
10:24, 11:9,
11:15, 11:16,
16:3, 17:15,
18:22, 18:25,
19:23, 22:17,
23:17, 24:17,
24:25, 28:6,
29:5, 29:13,
32:14, 33:21,
51:11, 86:7,
97:15, 124:6

**industry**
52:25

**information**
9:15, 43:6,
70:23, 71:18,
88:7, 101:6,
101:24, 127:8

**ingredients**
53:1, 53:2,
53:10

**initial**
13:24, 15:4,
15:10, 15:17,
26:25, 56:6,
56:19, 57:13,
62:2, 65:6,
98:24, 107:8

**initially**
12:8, 47:11,
62:17

**input**
44:24

**installment**
49:16, 49:21

**instance**
44:9, 107:1

**instead**
51:21

**insurance**
94:8

**intend**
24:4, 28:15,
118:1

**intended**
6:7

**intentional**
100:25, 101:22

**intentionally**
101:6, 101:24

**interaction**
54:24

**interactions**
74:2

**interest**
19:3, 19:5,
24:1, 121:22,
126:9, 127:10

**interrupt**
111:25

**invalid**
111:7, 113:13

**investing**
14:13, 14:16,
14:19, 15:5

**investment**
14:24, 15:2,
53:25, 55:25,
79:7, 79:8

**investments**
48:10, 66:3,
80:16

**investor**
117:3, 117:14

**investors**
48:10, 79:25,

**80:16, 80:18,**
116:22, 117:1,
117:3, 117:8

**invoice**
76:3, 76:4,
76:6

**invoices**
75:24, 76:11,
76:24, 76:25

**involved**
37:24, 38:25,
42:13, 42:17,
44:15, 98:19,
98:23, 108:17,
109:13, 114:17,
115:2

**involvement**
101:2

**issuance**
97:24

**issue**
106:13, 108:2,
108:8

**issued**
99:4, 104:11,
105:1, 105:2,
106:19

**J**

**james**
1:4, 6:22,
11:1, 11:9,
16:3, 19:1,
23:17, 27:25,
28:6, 70:23,
71:19, 73:7

**jason**
13:1, 16:13,
20:20, 21:2,
25:12, 25:19,
29:22, 30:4,
35:25, 45:1,
54:25, 61:25,
76:1, 77:20,
81:20, 85:6,
91:9, 115:14

**jennifer**
89:16, 89:17,

**119:14, 119:15,**
**120:1**
**jersey**
53:21
**job**
1:23
**joe**
14:2, 14:3,
14:6
**john**
57:2, 57:6,
57:8
**joint**
4:12, 4:15,
4:18, 19:21,
20:4, 24:15,
24:23, 29:2,
29:4, 29:14
**joseph**
13:1, 16:14,
21:2, 25:20,
30:5, 65:7,
77:20, 78:5,
85:12, 89:13,
118:10, 119:17,
120:3
**jr**
11:10, 16:4,
19:2
**judge**
90:9, 102:13,
103:3, 103:8,
103:21, 103:24,
105:8, 105:17,
105:22, 105:24,
106:1, 106:6,
106:13, 106:19,
106:22, 106:25,
107:20, 108:2,
110:24, 111:3,
111:24, 112:24,
112:25, 113:7
**july**
22:10, 23:1,
23:10, 24:17,
26:4, 57:18,
58:9, 58:14,
58:19, 59:1,

**59:6, 59:10,**
**59:17**
**june**
54:8, 54:9,
54:11, 54:12,
54:16, 57:5,
57:9, 57:11,
75:22, 76:20,
77:11, 77:14,
78:17, 80:21,
81:2, 109:18,
110:13

**K**

**karish**
119:6
**keep**
11:4, 58:22,
59:9, 61:12,
75:18, 79:8
**keeping**
80:17
**kept**
47:2
**kerby**
13:2, 63:10,
63:19
**kind**
28:3
**knew**
94:16, 95:20,
95:23
**knowingly**
48:5
**knowledge**
12:23, 13:14,
14:1, 16:8,
17:19, 39:21,
40:1, 42:19,
49:8, 50:5,
63:12, 69:15,
74:17, 74:25,
75:5, 77:3,
94:7, 94:12,
94:17, 95:1,
95:11, 96:9,
99:12, 100:9,
100:16, 101:5,

**114:20, 116:5**
**known**
12:10

**L**

**l-v-l**
12:1
**la**
56:11, 56:13,
56:18, 56:23,
59:11, 61:14,
61:17
**label**
53:11
**labeled**
18:11, 22:6,
23:9, 26:14,
27:17, 29:2,
84:13
**labels**
51:21
**labor**
4:20, 84:14,
84:18, 109:10,
109:14, 110:1,
119:10
**lacks**
44:5, 45:10,
46:11, 62:11,
66:7, 68:24,
80:2, 92:1,
100:13, 103:12,
105:12, 106:8,
107:12, 113:23,
121:19
**las**
3:15
**last**
7:8, 7:21,
11:18, 32:16,
33:1, 40:23,
41:18, 45:17,
66:24, 101:19,
117:13
**later**
91:13, 94:19,
95:8, 96:2
**law**
3:13, 6:11,

**61:10, 103:5**
**laws**
6:8
**lawyer**
9:20, 9:22,
10:2, 10:4,
10:5, 90:8
**lawyers**
89:15, 105:9,
118:11, 118:22
**learn**
42:24, 43:6
**learned**
94:19
**least**
17:5, 110:15,
110:19
**leave**
70:1, 123:17,
123:20
**left**
18:15, 82:23,
91:16, 92:17,
109:23, 116:14
**legal**
11:19, 39:6,
47:9, 49:2,
69:10, 90:4,
91:6, 91:20,
93:22, 94:6,
97:17, 106:9,
107:13, 114:25,
120:15, 121:18
**let's**
70:5, 75:22,
108:12, 111:15,
118:5, 124:2
**letter**
4:23, 84:2,
96:14, 99:24,
118:9
**liabilities**
44:9
**libations**
56:11, 56:13,
56:18, 56:23,
59:12, 61:14,
61:17

**lines**
99:25
**list**
9:16, 40:15,
40:25, 41:2,
41:5, 41:8,
41:11, 53:1,
82:17
**listed**
10:23, 21:10,
25:19, 26:6,
93:20, 99:19,
118:22, 122:13
**lists**
25:22, 30:7,
56:11
**litigation**
95:3, 95:21,
96:3
**litigations**
95:12
**little**
51:15, 51:20,
52:17, 54:7,
54:13, 60:21,
67:7, 68:10,
92:18, 92:22,
95:17
**llc**
55:4, 55:7
**llp**
3:5
**loan**
15:7, 18:4,
19:13, 20:9,
23:22, 24:1,
24:5, 24:8,
24:9, 25:4,
26:1, 28:9,
28:13, 29:17,
30:18, 30:20,
30:21, 31:7,
31:12, 32:21,
33:8, 34:20,
34:24, 35:6,
35:18, 36:4,
36:10, 36:15,
36:21, 38:8,

38:14, 41:17,
41:25, 42:4,
42:5, 42:9,
42:10, 42:21,
42:25, 43:7,
43:12, 45:6,
45:13, 46:3,
46:17, 49:15,
49:20, 54:5,
56:6, 56:20,
57:14, 57:17,
57:22, 57:25,
58:3, 58:20,
59:7, 59:18,
59:20, 59:25,
60:7, 60:19,
61:5, 65:17,
65:19, 65:22,
66:5, 66:19,
69:8, 70:18,
72:2, 74:12,
91:24, 97:5,
97:10, 100:1,
100:7, 100:10,
101:2
**loaned**
15:9, 23:2,
27:9, 30:16,
30:25, 40:4,
40:9, 41:14,
50:13, 51:4,
62:17, 63:22,
65:2, 65:12,
117:23
**loaning**
22:23, 27:5,
40:19
**loans**
12:20, 13:10,
28:20, 33:24,
35:15, 38:1,
38:5, 44:3,
44:13, 45:6,
45:12, 46:1,
46:7, 48:16,
62:1, 62:2,
62:6, 65:6,
66:12, 68:8,

89:25, 90:23,
91:15, 116:13,
120:13, 120:20,
121:1, 121:14
**location**
126:7
**long**
9:22, 85:13,
87:14
**longer**
116:9
**look**
43:10, 50:7,
68:17, 85:1,
86:17, 96:24,
99:19
**looked**
50:15, 50:16,
50:18, 50:19,
50:20, 65:16,
99:18, 104:7,
107:22, 108:8
**looking**
50:6, 50:20,
60:10, 62:21,
66:21, 98:8
**looks**
62:19, 66:20
**losing**
92:16
**lvl**
12:1, 12:7,
12:14, 94:13,
117:21

---

**M**

**m-a-n-o-l-i-o**
61:8
**m-i-c-h-a-e-l**
7:5
**made**
40:16, 48:16,
50:4, 50:22,
52:12, 52:13,
57:13, 57:18,
59:11, 59:21,
60:7, 65:17,
66:12, 68:9,

69:6, 80:16,
100:1, 100:7,
100:10, 101:2,
106:4, 110:12,
114:16, 117:20
**make**
8:14, 10:15,
10:19, 16:22,
20:18, 32:4,
38:9, 38:15,
52:20, 52:22,
53:14, 53:23,
54:3, 58:17,
59:5, 59:16,
60:17, 61:3,
66:18, 70:5,
70:6, 106:3,
112:16, 122:1,
123:17
**making**
66:2, 67:25,
68:12, 69:7,
73:20
**manolio**
61:7, 118:23,
119:4
**manufacture**
53:11, 54:1,
55:12
**manufactured**
52:15
**manufacturer**
52:9, 55:8,
55:10
**manufacturing**
50:22, 50:24,
54:19
**many**
12:17
**march**
97:2, 97:12,
98:8, 99:5
**mark**
18:8, 19:17,
19:18, 22:2,
24:12, 26:10,
27:14, 28:23,
51:6, 51:7,

84:9, 86:2,
118:5
**marked**
8:16, 16:23,
18:9, 19:19,
22:4, 23:7,
24:13, 26:12,
27:15, 28:25,
51:8, 70:8,
71:9, 84:8,
84:11, 86:3,
88:13, 118:6
**marks**
124:4
**marty**
109:4
**matches**
70:17, 72:1
**matter**
5:5
**matthew**
89:16, 89:17,
119:11, 120:2
**maybe**
9:23, 31:20,
104:18
**mcbride**
11:23, 13:1,
14:3, 14:6,
14:9, 15:16,
15:21, 16:14,
21:2, 21:17,
25:19, 26:6,
30:4, 30:12,
36:12, 36:14,
41:4, 64:10,
64:19, 77:17,
77:21, 78:5,
78:13, 78:24,
79:7, 80:15,
82:14, 83:12,
83:23, 85:12,
87:1, 89:14,
97:14, 102:5,
102:16, 102:25,
105:18, 106:14,
107:10, 107:21,
108:3, 108:9,

108:15, 109:19,
109:23, 110:13,
111:4, 113:1,
113:19, 116:12,
119:16, 120:2
**mcbride's**
102:17, 102:18
**mcgrath**
2:14, 5:25,
126:3
**mean**
12:19, 50:17,
52:14, 67:4,
81:10, 92:16,
102:14, 102:22,
123:16
**means**
6:4
**media**
5:2
**meeting**
10:1, 10:9,
10:11, 78:10,
82:12, 83:20,
83:22, 84:1,
84:19, 85:11,
86:9, 86:16,
87:10, 88:2
**meetings**
117:10
**melissa**
13:3
**member**
64:20, 79:13,
87:5, 87:8
**members**
16:11
**memorialize**
18:4
**memory**
46:8, 46:15,
46:20, 98:7
**merits**
106:4, 107:9
**method**
49:13
**michael**
5:3, 5:21, 7:5,

13:2, 21:5,
25:22, 26:2,
30:8, 63:9,
63:15, 63:17,
118:9, 124:5
**might**
38:8, 38:14
**mike**
1:15, 2:3, 4:3,
6:15, 125:2,
126:5
**million**
23:2, 27:9,
62:2, 62:6,
62:16, 63:21,
64:8, 65:1,
65:5, 65:11,
121:21
**milwaukee**
3:7
**minute**
10:11
**minutes**
48:21, 66:24,
72:15, 86:15,
98:11, 122:6
**misrepresentatio-
ns**
115:6
**miss**
122:2
**misstates**
99:6
**misunderstood**
99:10
**misuse**
102:5, 102:16,
105:18, 106:14,
107:21, 107:23,
108:3, 108:9,
108:15, 108:18,
110:10, 110:20,
113:18, 116:6,
116:9
**misused**
107:10, 111:5,
113:1
**mm-hmm**
96:22

**moment**
69:18, 70:3,
95:18, 103:18,
108:13
**money**
15:10, 31:23,
32:2, 46:4,
52:22, 59:24,
65:21, 65:25,
66:1, 66:3,
67:5, 68:5,
74:11, 90:24,
91:16, 92:15,
116:14, 117:9,
120:17, 121:5,
121:16
**monitor**
5:11
**month**
64:2, 64:7,
64:17, 64:18,
65:10, 104:22
**months**
45:19, 50:8,
91:13, 97:9,
115:20
**more**
33:19, 46:9,
51:20, 52:18,
117:17, 117:19
**morning**
6:24, 6:25
**move**
7:10, 77:6,
88:6
**moving**
114:10
**much**
62:14, 64:1,
64:6, 64:12,
64:15, 65:9,
121:16
**multiple**
99:16
**mute**
122:5
**mylene**
3:20, 5:12

**myself**
77:17, 78:13,
85:12, 89:13,
120:2

## N

**n-x-t**
12:1
**name**
7:4, 11:25,
12:6, 12:13,
70:23, 108:25,
109:1, 117:21,
119:1
**named**
109:4
**names**
50:25
**narrow**
98:20
**nature**
10:24, 11:8,
14:8, 16:2,
44:10, 103:19
**nd**
118:21
**near**
51:17
**necessary**
20:21, 25:13,
29:23
**need**
7:13, 56:22,
73:23, 86:20,
93:2, 93:7
**needed**
15:25, 56:5
**negative**
121:11
**negotiated**
31:5
**negotiations**
116:18, 116:19,
121:15
**neither**
126:7, 127:8
**nevada**
1:2, 3:15, 5:8,

18:25, 105:9,
106:3, 106:20
**never**
34:23, 43:23,
46:4, 73:11,
73:14, 74:11,
99:24, 100:5
**new**
7:10, 53:21
**next**
19:18, 23:5,
26:9, 27:13,
28:22, 48:22,
123:5, 123:11,
123:14
**north**
3:6
**northern**
4:24, 4:25,
67:22, 67:24,
68:5, 68:13,
68:14, 69:6,
70:12, 70:14,
71:2, 71:3,
71:15, 72:6,
72:10, 72:12,
72:16, 72:25,
73:4, 73:9,
74:2, 75:9,
76:3, 76:5,
76:25
**notary**
2:15, 6:2,
126:1, 126:3,
126:18
**notation**
58:23
**note**
4:10, 4:11,
4:13, 4:14,
4:16, 4:17,
17:9, 17:14,
17:17, 17:22,
18:12, 18:21,
19:4, 19:10,
20:22, 22:7,
22:16, 22:19,
23:10, 23:16,

23:19, 23:23,
25:14, 26:15,
26:24, 27:1,
27:18, 27:25,
28:5, 28:10,
29:24, 33:7,
33:17, 34:8,
35:17
**noted**
122:25
**notes**
10:15, 10:20,
114:2, 122:1
**nothing**
6:17, 92:17
**notice**
2:14, 4:22,
9:16, 88:8,
88:23, 89:7,
89:9, 89:23,
89:24, 90:21,
91:17, 118:16,
118:17, 119:23,
120:12, 120:24,
122:13
**noticed**
84:20
**notices**
97:24
**november**
1:17, 13:9,
40:5, 40:10,
40:13, 40:20,
41:15, 42:1,
42:5, 42:9,
42:21, 42:25,
43:8, 43:12,
43:15, 43:21,
43:25, 45:12,
46:1, 46:7,
61:13, 61:17,
61:20, 62:24,
63:1, 63:4,
68:8, 71:14,
72:2, 73:1,
74:7, 77:2,
78:1, 78:3,
78:15, 82:18,

83:20, 84:19,
84:20, 85:3,
85:10, 89:4,
104:18, 104:21,
111:16, 111:19,
112:19, 113:14,
113:17, 114:4,
114:7, 114:8,
118:8, 118:21,
120:9, 126:5,
126:12
**npa's**
94:15, 95:1,
95:3, 95:10
**number**
5:3, 5:9, 8:14,
19:18, 22:3,
23:6, 26:11,
27:14, 28:24,
29:2, 32:6,
40:17, 41:5,
41:8, 41:11,
43:5, 49:11,
49:12, 51:12,
51:16, 70:1,
70:17, 70:18,
72:1, 77:7,
88:6, 123:2
**numbered**
8:19
**nve**
52:1, 52:5,
52:8, 52:11,
52:17, 52:19,
53:2, 53:7,
53:14, 53:15,
53:16, 53:20,
53:24, 54:4,
54:12, 54:16,
54:24, 55:14,
60:23, 60:25,
61:4
**nxt**
12:1, 12:7,
12:14, 94:13,
117:21

## O

**oaths**
6:3

**object**
90:8
**objection**
6:12, 33:9,
34:10, 39:5,
44:4, 44:14,
45:10, 46:11,
47:9, 47:18,
48:2, 49:1,
62:11, 66:7,
68:24, 69:9,
72:7, 76:7,
80:2, 90:4,
90:10, 90:16,
91:4, 91:6,
91:19, 91:25,
92:8, 92:14,
93:21, 94:5,
94:20, 95:13,
97:17, 99:6,
100:13, 103:12,
104:1, 105:11,
106:7, 107:12,
111:8, 113:23,
114:25, 120:14,
121:3, 121:18
**objections**
106:23, 113:3,
113:11
**obligations**
90:3, 90:14
**occurred**
13:11
**october**
17:2, 30:17,
30:21, 31:1,
31:6, 31:17,
32:7, 32:22,
34:5, 34:21,
35:24, 36:4,
36:7, 36:10,
36:12, 36:15,
36:17, 36:21,
37:25, 38:4,
38:8, 38:15,
39:1, 39:10,
39:20, 39:25,
45:12, 46:1,

46:6, 68:7,
70:18, 71:4,
73:1, 74:7,
74:13, 75:21,
75:22, 76:20,
77:1, 80:7,
88:25
**offer**
8:9, 9:2
**office**
3:13
**officer**
64:22, 64:24,
79:18, 82:8,
82:9
**officers**
16:15, 31:11,
89:8, 94:8,
119:22
**oh**
67:25, 71:13,
80:9, 93:17,
93:18, 102:7,
112:2, 116:7
**okay**
7:12, 7:16,
7:20, 7:23, 9:1,
10:22, 19:16,
20:12, 21:13,
21:23, 22:1,
23:5, 24:11,
26:9, 27:12,
28:22, 32:4,
37:23, 39:18,
39:23, 45:2,
49:11, 49:15,
51:22, 51:24,
55:2, 55:20,
56:9, 69:16,
70:16, 70:22,
70:24, 71:5,
71:6, 71:13,
71:17, 77:6,
78:2, 80:12,
80:20, 86:25,
88:5, 90:21,
93:10, 94:3,
94:9, 94:24,

95:6, 95:25,
96:6, 96:21,
98:6, 99:18,
100:21, 102:1,
103:22, 105:15,
106:1, 106:17,
107:24, 108:12,
109:2, 109:13,
110:23, 111:17,
111:18, 112:10,
112:15, 112:22,
113:16, 114:10,
116:2, 121:16,
121:24, 122:4,
123:9, 123:21
**once**
26:2, 120:24
**one**
13:20, 16:25,
18:7, 18:11,
19:16, 19:17,
19:18, 19:21,
22:1, 22:3,
23:2, 23:5,
23:9, 24:15,
25:8, 26:9,
26:14, 27:12,
27:13, 28:22,
30:15, 30:25,
33:19, 38:15,
41:13, 45:15,
48:13, 51:16,
51:17, 51:24,
54:12, 56:9,
61:8, 62:24,
63:5, 66:20,
70:3, 71:7,
75:17, 76:21,
84:8, 86:1,
88:5, 88:17,
91:9, 96:12,
101:23, 103:6,
104:3, 104:4,
108:1, 114:7,
114:15, 115:15,
117:3, 118:4,
120:6
**ones**
93:24

**ongoing**
11:19, 116:18
**only**
89:10, 91:9,
105:21, 113:18,
115:15
**open**
122:15, 122:18,
122:20, 122:23,
123:16
**opposition**
94:13
**oral**
103:22
**order**
10:23, 11:8,
48:10, 52:19,
56:6, 56:23,
70:6, 72:25,
73:3
**ordered**
73:8
**other**
10:1, 10:11,
10:12, 21:18,
21:19, 26:5,
29:21, 30:11,
30:12, 32:1,
40:14, 45:23,
45:24, 52:18,
63:20, 66:23,
72:22, 76:15,
78:9, 78:15,
79:15, 84:2,
90:25, 92:5,
92:7, 92:10,
92:12, 95:2,
95:11, 95:20,
96:3, 102:19,
103:6, 104:3,
111:1, 113:6,
115:17, 116:19,
116:22, 117:1
**others**
108:7
**otherwise**
90:11, 126:10,
127:11

**ourselves**
66:13
**out**
9:7, 10:18,
11:4, 35:23,
40:18, 51:22,
53:20, 70:6,
103:25, 111:22,
112:1, 112:2,
112:5, 112:13
**outcome**
126:10, 127:11
**over**
7:13, 31:25,
40:10, 40:20,
41:25, 46:15,
46:20, 49:12,
52:11, 53:24,
54:13, 55:23,
60:25, 61:24,
66:23, 67:8,
102:8, 112:15,
122:14, 122:17
**owe**
121:17
**owed**
65:18, 68:4,
97:15
**own**
73:20, 109:12,
110:13, 119:19
**owned**
21:12

**P**

**pacific**
5:11
**package**
53:12
**packaging**
67:24, 68:14,
72:16, 73:23
**page**
4:3, 4:8, 11:3,
11:12, 20:14,
21:1, 25:6,
25:18, 29:20,
30:3, 51:18,

55:3, 85:2,
86:19, 92:19,
96:23, 98:10,
111:16, 112:21
**pages**
1:24, 96:18
**paid**
57:5, 58:9,
58:24, 58:25,
71:1
**paperwork**
45:7
**paragraph**
18:24, 20:19,
25:7, 25:11,
29:20, 93:8,
93:20, 97:1,
98:9, 98:12,
100:22, 100:24,
102:1, 102:2,
102:4, 106:12,
112:20, 114:11,
114:12, 114:13,
115:10, 115:12
**paragraphs**
8:20, 29:21,
93:1
**part**
10:17, 35:5,
60:15, 111:21,
112:4, 112:11
**participated**
119:25
**particular**
89:11, 96:7,
96:12
**parties**
5:13, 6:4, 6:9,
103:7, 126:8,
127:9
**party**
96:13, 96:25,
97:8, 98:8,
98:14, 99:4,
99:20, 100:2,
100:6, 100:11
**passed**
77:19, 78:4,

78:11
**past**
9:14, 110:25
**patrick**
3:4, 5:18
**pavlik**
13:1, 14:3,
14:6, 14:10,
15:16, 15:21,
16:14, 21:3,
21:17, 25:20,
26:7, 30:5,
30:13, 36:6,
36:9, 41:7,
65:7, 77:20,
78:5, 82:15,
83:8, 85:12,
85:17, 87:12,
87:24, 89:13,
118:10, 119:17,
120:3
**pay**
19:1, 53:24,
55:23, 56:7,
56:16, 56:18,
56:23, 57:8,
57:12, 58:13,
60:25, 63:22,
65:21, 66:4,
66:18, 66:19,
74:22, 75:2,
75:9, 115:14
**paying**
52:10, 55:4
**payment**
19:9, 33:5,
51:25, 52:5,
54:4, 54:12,
54:16, 55:20,
56:3, 56:22,
58:18, 59:3,
59:6, 59:11,
59:14, 59:17,
60:11, 60:14,
60:18, 60:22,
61:4, 61:14,
61:17, 61:23,
66:20

**payments**
50:4, 50:22,
65:17, 65:18,
66:18, 68:13,
69:6
**payroll**
62:19, 62:25,
63:2, 63:5,
63:12
**pdf**
96:24
**people**
67:9, 118:10
**percent**
19:5
**percentage**
79:6, 79:8
**perform**
20:16, 20:17
**period**
113:8, 116:4
**permitted**
6:7
**person**
14:20
**personal**
12:4, 33:1,
35:12, 39:21,
40:1, 42:19,
49:7, 74:17,
74:25, 75:5,
77:3, 94:11,
95:1, 100:16,
101:5, 102:5,
110:10, 114:20,
116:5
**personally**
34:4, 37:24,
38:21, 42:13,
83:2, 107:15,
110:8
**phone**
84:2, 117:11,
117:12
**phrase**
44:8, 65:15,
101:22
**pieces**
95:21, 96:3

**pin**
111:15
**place**
89:21
**plaintiff**
1:5, 3:3, 5:19,
6:21
**planet**
5:13, 5:25
**plans**
7:10
**plc**
118:24
**please**
5:15, 7:4,
8:14, 67:12
**pltf**
68:22, 69:3,
70:10, 71:11
**plus**
24:1, 41:15,
121:22
**point**
38:24, 68:4,
81:2, 81:22,
82:1, 85:23,
91:11, 91:14,
96:17, 98:19,
106:21, 121:9,
122:25
**portion**
18:23, 80:16,
86:22, 86:24,
108:23, 110:15
**position**
30:19, 31:15,
33:14, 34:7,
38:21, 39:4,
44:19, 47:1,
47:7, 47:10,
47:14, 48:19,
102:23, 123:19
**possible**
75:8, 75:12,
118:3
**possibly**
41:20, 76:16,
89:16, 113:13

**post-november**
112:23, 113:5
**potential**
38:1, 38:5,
42:25, 43:7
**potentially**
10:5
**preparation**
15:14, 15:22,
31:12, 32:17,
36:24, 37:4,
37:14, 40:14,
41:22, 42:25,
43:4, 43:12,
45:3, 45:20,
49:23, 50:9,
83:3, 83:8,
83:13, 101:10,
101:14
**prepare**
9:2, 49:25,
115:4
**prepared**
8:9, 122:21
**present**
3:19
**president**
20:15, 20:20,
25:9, 25:12,
29:22
**pretend**
111:15
**pretty**
75:16, 106:16
**previous**
17:6, 78:22,
79:6, 88:25,
110:21
**previously**
63:13, 84:8,
105:5, 119:10
**principal**
19:2, 23:3,
27:10
**prior**
17:17, 17:22,
87:8, 99:6
**probably**
12:23, 45:1,

67:8, 81:24,
89:13, 116:3,
117:4, 117:12
**procedural**
6:8
**proceed**
6:19
**proceeding**
6:6
**proceedings**
127:5, 127:6
**process**
55:14, 90:22,
91:1, 91:15,
91:18, 92:7,
92:12, 120:13,
120:19, 120:25,
121:8, 121:13
**produced**
6:6, 37:1,
37:11, 37:16,
37:19, 37:21
**product**
53:17, 54:2,
117:17, 117:18,
117:20
**production**
36:24, 50:15,
50:16, 50:18,
68:18
**products**
11:25, 12:6,
53:6, 92:15
**professional**
58:24, 58:25,
60:11, 60:18
**promised**
19:12, 23:25,
28:12, 39:24
**promises**
19:1
**promissory**
4:11, 4:14,
4:17, 18:12,
18:21, 19:4,
19:10, 23:10,
23:18, 23:23,
27:18, 27:25,

28:10
**proof**
35:2, 42:12,
48:25, 49:8
**property**
110:20
**provide**
9:14, 20:6,
25:2, 29:14,
52:19, 52:21,
53:1, 53:6,
53:10
**provided**
33:24, 34:20,
57:21, 72:5
**providing**
89:24
**provisions**
91:24, 92:4
**pst**
1:18, 124:9
**public**
2:15, 126:1,
126:3, 126:18
**purchase**
4:10, 17:10,
17:17, 17:22,
20:22, 22:7,
22:16, 22:19,
25:15, 26:15,
26:24, 27:1,
29:24, 33:7,
33:17
**purpose**
18:3, 20:6,
25:1, 29:14,
54:16, 56:2,
59:3, 59:14,
61:16, 109:22
**pursuant**
2:14, 65:19
**put**
103:23

**———— Q ————**

**question**
7:17, 9:8,
10:18, 37:2,

46:5, 48:22,
75:16, 77:10,
80:20, 90:13,
93:5, 106:5,
111:19, 111:22,
112:1, 112:4,
112:12, 112:25,
113:7, 113:20,
115:5
**questions**
34:18, 35:3,
35:12, 68:10,
86:24, 111:10,
122:23
**quick**
67:10, 121:25
**quickbooks**
44:23, 44:25
**quickly**
111:2

**R**

**rate**
19:5
**raw**
44:24, 53:6
**reach**
40:18
**read**
86:20, 86:21,
92:23, 93:2,
93:4, 93:7,
93:11, 105:13,
125:3
**reading**
51:22
**reason**
35:5, 45:23,
45:24, 73:22,
95:18, 104:7,
107:19, 107:24,
108:6, 110:24,
121:4, 122:19
**reasons**
90:25, 108:1
**recall**
81:5, 81:7,
89:22, 92:2,

104:5, 104:17,
113:25, 120:8
**receipt**
4:24, 4:25,
70:11, 70:25,
71:15, 72:5,
75:24
**receivable**
96:13, 96:25,
97:8, 98:9,
98:14, 99:4,
99:20, 100:3,
100:6, 100:11
**receive**
31:16, 32:6,
74:5, 81:3,
81:22, 89:3,
118:19
**received**
11:1, 11:11,
13:15, 16:5,
18:24, 19:8,
23:21, 28:8,
31:23, 32:2,
41:5, 41:8,
41:11, 46:4,
49:14, 49:20,
59:25, 70:15,
74:11, 76:2,
76:4, 76:24,
82:1, 83:5,
83:9, 83:15,
89:7, 100:18,
120:24, 121:7,
123:6
**receiving**
78:18, 78:24,
80:22, 82:4,
82:22, 85:24,
88:3, 90:21,
91:17, 100:16,
119:23, 120:12
**recess**
67:17, 122:9
**recipe**
52:24, 53:1,
53:15, 55:16
**recognize**
18:18, 20:1,

22:13, 23:13,
24:20, 26:20,
27:21, 29:9,
86:12, 118:13
**record**
67:15, 67:19,
74:24, 86:21,
90:10, 93:3,
122:7, 122:11,
123:18, 123:25,
124:3, 124:8,
124:9, 127:5
**recorded**
6:4, 127:5
**recording**
6:6, 127:7
**records**
50:3, 81:6,
81:8
**referenced**
95:21, 97:1,
102:20
**referencing**
104:9
**referring**
95:8, 96:1,
96:12, 103:17,
106:18, 110:5,
111:14, 111:19,
112:20, 114:4
**reflect**
45:6, 45:12,
45:25, 46:6
**reflecting**
81:6
**refreshed**
98:7
**regain**
91:11
**regained**
115:20, 115:24
**regarding**
88:7
**reinstated**
82:24
**reiter**
89:16, 89:17,
119:14, 119:15,

120:1
**related**
42:5, 42:9,
96:13, 96:25,
97:8, 97:23,
98:8, 98:14,
99:3, 99:20,
100:2, 100:6,
100:10, 126:8,
127:9
**relation**
112:20
**relationship**
10:25, 11:9,
13:21, 14:5,
14:8, 16:3,
16:7, 52:17,
67:21
**released**
115:17
**relinquish**
91:10
**rely**
46:15, 46:20
**remain**
85:13, 87:14
**remained**
82:17
**remember**
40:21, 48:21,
50:25, 68:9,
79:5, 79:9,
89:20, 104:13,
104:23, 105:4,
110:11, 117:2,
117:5
**remind**
7:16, 90:8
**remote**
5:12
**remotely**
5:14
**remove**
81:15, 81:19,
82:12
**removed**
21:21, 85:6
**repaid**
38:20, 39:3,

117:22
**repay**
19:12, 23:25,
28:12, 38:8,
38:14, 39:25,
88:7, 90:22,
91:1, 91:15,
97:23, 116:17,
116:22, 118:1,
120:13, 120:20,
120:25, 121:8,
121:14
**repeat**
90:6
**reporter**
5:24, 6:2,
6:19, 9:7,
10:17, 28:2,
28:7, 70:3,
71:23, 101:18,
111:21, 111:25,
112:4, 112:11
**represent**
5:16, 15:11,
119:4, 119:9,
119:12, 119:15
**representations**
123:18
**representative**
1:14, 2:3, 5:4,
5:22, 8:10, 9:3,
14:23, 15:18,
33:13, 33:21,
34:3, 34:6,
35:13, 36:25,
38:20, 40:17,
43:1, 43:5,
46:25, 49:24,
97:22, 107:17,
122:18, 124:6
**representing**
5:13, 5:25
**request**
15:6
**required**
106:2
**requiring**
106:19

**resign**
87:2, 110:16
**resigned**
85:15, 109:20
**resolution**
4:20, 4:21,
20:13, 77:19,
78:3, 78:11,
84:13, 84:17,
86:6
**resolutions**
20:13
**resolve**
86:18
**resolved**
20:14, 25:9
**respect**
9:4, 123:10,
123:15
**response**
91:5, 123:18
**responsible**
54:23, 74:1,
75:23, 76:24
**review**
9:6, 9:9, 9:11,
10:9, 32:15,
32:17, 33:1,
36:23, 37:3,
37:15, 41:21,
45:2, 50:2,
101:14, 115:3
**reviewed**
41:18, 45:17
**reviewing**
58:12
**right**
38:24, 52:25,
62:19, 88:18,
92:22, 96:6,
97:21, 105:2,
107:25, 114:10
**role**
78:19, 78:25,
79:19, 79:22,
82:7
**rule**
90:9

**ruled**
105:18, 105:22,
106:13, 107:20,
108:2, 110:24
**rules**
6:8, 7:14
**ruling**
102:10, 102:20,
103:21, 103:23,
106:4, 106:19,
107:2, 107:5,
107:8, 107:9,
110:5

**S**

**said**
9:19, 13:6,
15:15, 34:23,
35:23, 39:9,
41:19, 42:4,
42:20, 48:20,
49:5, 52:20,
68:17, 72:18,
79:24, 80:23,
80:25, 82:21,
87:20, 92:21,
93:2, 94:9,
95:6, 95:19,
95:25, 96:6,
98:18, 100:21,
102:2, 102:15,
105:25, 106:12,
106:14, 107:5,
110:24, 114:1,
114:11, 115:9,
116:8, 121:4,
127:6
**salaries**
62:18, 63:8,
64:3
**salary**
63:23, 64:1
**sale**
73:20
**sales**
11:18
**same**
7:7, 11:3,

11:12, 16:17,
37:5, 44:4,
44:14, 54:8,
54:18, 55:14,
58:22, 59:9,
60:9, 61:12,
69:7, 70:17,
72:1, 90:16,
92:8, 92:14,
104:1, 106:23,
111:16, 112:21,
113:3, 113:11,
121:3, 125:4
**santiano**
3:20, 5:13
**saw**
50:22, 66:20,
119:1
**say**
8:6, 14:23,
17:20, 30:24,
32:1, 33:14,
38:15, 50:16,
50:19, 51:21,
52:13, 53:14,
64:16, 64:24,
67:3, 69:12,
72:10, 74:10,
75:22, 77:25,
90:18, 93:15,
95:10, 99:8,
99:10, 99:11,
100:9, 101:21,
113:12, 113:25
**saying**
20:19, 38:11,
65:23, 75:14,
75:18, 75:19,
81:7, 94:18,
97:13, 97:14,
99:2, 99:14,
105:21, 107:7,
108:10, 116:11
**says**
17:1, 17:9,
18:15, 18:24,
19:21, 38:19,
51:10, 51:11,

51:12, 58:25,
62:19, 84:23,
85:6, 86:6,
92:25
**scheme**
79:25, 80:14
**scott**
109:5
**screen**
7:23, 7:24,
16:19, 69:20,
69:23, 84:4,
84:6, 88:15
**scroll**
8:13, 8:18,
60:9, 93:6,
93:7, 93:25
**scrolling**
58:22, 59:9
**second**
23:9, 23:18,
23:22, 24:5,
24:7, 25:4,
25:25, 26:14,
26:23, 27:4,
28:20, 29:24,
57:17, 57:21,
57:24, 58:2,
71:7, 107:1,
107:24, 108:6,
108:12, 108:23,
112:14, 118:17
**second-to-last**
55:3
**section**
92:19, 92:25,
93:11
**secure**
48:10
**secured**
18:11, 23:9,
23:18, 27:17,
27:24
**see**
7:24, 8:20,
16:19, 16:21,
17:2, 42:4,
45:6, 51:13,

54:11, 55:5,
59:1, 59:12,
68:21, 69:2,
69:20, 69:23,
70:12, 70:22,
71:12, 84:5,
88:15, 88:17,
92:18, 92:21,
105:6, 105:8
**seek**
43:15, 87:7
**seeking**
43:24
**seen**
8:1, 13:17,
16:6, 17:5,
30:18, 34:23,
35:2, 41:17,
46:3, 46:17,
46:18, 63:24,
74:4, 74:11,
74:24, 88:18,
88:24, 97:25,
98:1, 99:24,
101:13, 105:13
**sell**
117:16, 117:18
**send**
52:24
**sense**
37:7, 70:7,
104:10
**sent**
88:8, 100:2,
100:5, 123:3
**series**
34:17
**set**
123:3, 126:11
**settlement**
91:21, 92:6,
92:11, 116:18,
116:19, 121:15
**several**
62:23, 93:1,
97:4, 97:9,
98:18, 110:5,
117:3, 117:4,

118:10, 120:7
**sexton**
10:5
**shall**
6:9
**share**
19:17, 48:9,
48:15, 84:4
**shareholder**
21:7, 21:10,
26:3
**shareholders**
19:23, 20:8,
21:5, 24:16,
24:24, 25:3,
25:22, 29:5,
29:13, 29:16,
30:7
**shares**
21:12, 24:3,
28:14
**sheet**
125:6
**shortly**
120:9
**shot**
12:14, 12:15,
53:3
**shots**
12:9, 12:10,
12:11, 12:13,
52:12, 52:14,
52:20, 52:23,
53:15, 54:19,
68:1, 72:19,
72:20
**should**
123:25
**show**
7:23, 16:18,
18:7, 22:2,
23:6, 24:11,
26:10, 27:13,
28:23, 32:20,
33:4, 41:24,
51:7, 69:21,
71:6, 71:7,
84:5, 86:1,

88:11, 118:5
**showed**
50:3
**sign**
47:16
**signature**
21:1, 25:17,
30:3, 125:10
**signature-mig2k**
127:15
**signature-p1kal**
126:14
**signed**
47:25, 48:5,
94:23, 99:22,
125:7
**signing**
95:24
**similar**
25:7, 44:18,
55:19
**similarly**
39:23
**since**
7:10, 7:20,
38:24, 41:4,
41:7, 41:10,
87:19
**sir**
103:14
**sit**
16:9, 30:24,
80:6
**six**
12:24, 12:25,
50:8
**slightly**
37:6, 46:5,
75:17
**smart**
4:20, 84:14,
84:18, 109:10,
109:14, 110:2,
119:10
**sold**
11:25, 12:6
**sole**
107:19

| | | | |
|---|---|---|---|
| **solely** | **span** | **spring** | **still** |
| 32:25 | 40:12 | 104:16 | 7:7, 11:17, |
| **solicit** | **speak** | **springs** | 11:19, 21:20, |
| 14:23, 15:1, | 9:22, 15:21, | 55:4, 55:7, | 37:9, 46:3, |
| 116:21, 117:8, | 31:10, 36:1, | 55:12, 55:15, | 60:21, 74:4, |
| 117:14 | 36:6, 36:9, | 55:16, 55:23, | 85:18, 85:21, |
| **some** | 36:14, 36:20, | 56:7 | 87:16, 87:20, |
| 20:12, 45:23, | 39:19, 40:7, | **standard** | 106:5, 106:21, |
| 45:24, 50:5, | 43:4, 83:4, | 5:11 | 110:14, 120:16 |
| 63:4, 65:16, | 83:8, 83:12, | **start** | **stipulate** |
| 65:21, 66:1, | 97:22 | 50:18, 112:15 | 6:10 |
| 66:3, 66:14, | **speaking** | **started** | **stipulation** |
| 68:4, 79:15, | 12:4, 84:16 | 12:16, 16:8, | 6:9, 103:7, |
| 91:11, 95:8, | **specific** | 80:21, 91:21 | 103:20 |
| 96:2, 100:16, | 117:7 | **starting** | **strike** |
| 102:23, 114:5, | **specifically** | 5:16, 92:5 | 37:23, 58:16, |
| 118:11, 122:22 | 5:21, 14:22, | **starts** | 62:14, 76:3 |
| **somebody** | 17:20, 43:10, | 20:14, 25:7, | **stuff** |
| 76:12, 76:14, | 50:21, 50:25, | 92:20 | 103:5 |
| 109:8, 112:3 | 52:14, 54:22, | **state** | **subparagraphs** |
| **someone** | 94:10, 108:13 | 2:15, 5:16, | 93:8, 93:12 |
| 39:2, 39:19, | **speculating** | 7:3, 45:9, 47:5, | **subpoena** |
| 39:24, 75:8 | 49:7, 100:12, | 47:8, 62:10, | 4:9, 8:2, |
| **something** | 100:15, 100:19 | 66:6, 68:23, | 123:5, 123:12 |
| 53:5, 73:9 | **speculation** | 80:1, 91:4, | **subsequent** |
| **sorry** | 33:10, 66:8, | 91:5, 114:24, | 106:18, 111:2 |
| 8:6, 9:7, | 72:8, 76:8, | 126:4, 126:19 | **subsequently** |
| 10:17, 11:5, | 80:3, 103:13, | **statement** | 106:2 |
| 28:2, 29:3, | 105:12, 113:24, | 4:19, 32:10, | **sufficiently** |
| 31:21, 31:25, | 121:19 | 54:8 | 122:21 |
| 33:19, 43:3, | **spell** | **statements** | **suite** |
| 55:9, 56:25, | 7:3, 108:23 | 32:12, 32:13, | 3:6 |
| 62:5, 71:23, | **spending** | 32:14, 32:20, | **sum** |
| 77:13, 77:23, | 49:19, 57:20, | 32:23, 33:1, | 19:2 |
| 80:9, 87:18, | 59:24 | 33:4, 41:16, | **summer** |
| 90:6, 90:18, | **spent** | 41:19, 41:21, | 104:16 |
| 93:15, 93:17, | 66:1, 116:13 | 41:24, 42:2, | **supplemental** |
| 101:18, 102:7, | **split** | 50:6, 50:7, | 31:6, 31:12, |
| 102:8, 102:10, | 112:14 | 119:2 | 42:21 |
| 107:3, 109:2, | **spoke** | **states** | **supporting** |
| 111:21, 111:25, | 9:5, 9:19, | 1:1, 5:7 | 127:7 |
| 112:2, 112:6, | 38:4, 40:23, | **stephen** | **supposed** |
| 114:8, 116:7 | 50:1, 102:8 | 58:5, 58:10, | 24:8 |
| **sort** | **spoken** | 58:13, 58:18 | **sure** |
| 102:23, 121:14 | 41:4, 41:7, | **steps** | 13:23, 15:16, |
| **sound** | 41:10, 101:9 | 116:17, 117:7 | 16:13, 31:19, |
| 112:9 | **sponsorship** | **sticker** | 32:4, 33:20, |
| **space** | 59:4, 60:15 | 16:25, 88:18 | 34:16, 36:13, |
| 12:1 | | | |

45:1, 47:4,
48:4, 49:4,
51:23, 53:23,
66:10, 67:13,
67:23, 68:16,
72:18, 74:3,
75:13, 75:16,
76:9, 81:11,
95:10, 95:23,
95:24, 97:19,
100:18, 102:12,
104:2, 106:10,
106:24, 107:14,
111:11, 111:12,
112:16, 114:14,
117:15, 122:1,
122:3
**swear**
6:12
**switch**
49:12
**sworn**
6:1, 6:16,
126:6

**T**

**t-pain**
12:14
**take**
18:7, 19:16,
20:21, 22:1,
23:5, 25:13,
26:9, 27:12,
28:22, 29:23,
30:15, 53:2,
53:15, 67:10,
71:7, 79:8,
79:17, 86:1,
88:5, 89:21,
118:4, 121:24
**taken**
67:17, 111:6,
113:8, 113:10,
122:9
**takeover's**
13:21, 16:12,
20:20, 25:12,
29:22, 34:25,

45:2, 45:5,
45:11, 45:18,
45:25, 46:6,
46:8, 46:10,
46:16, 46:21,
47:2, 47:17,
48:19, 48:25,
50:2, 50:3,
54:16, 61:16,
62:7, 66:3,
67:21, 68:2,
68:14, 71:1,
72:6, 72:12,
72:20, 75:2,
75:9, 75:25,
77:11, 81:15,
85:3, 85:7,
85:9, 87:2,
87:11, 89:8,
109:20, 113:10,
113:20, 119:22
**taking**
5:17, 30:19,
31:15, 47:1,
48:19, 79:6,
80:15, 110:23
**talk**
51:20, 115:1
**talked**
41:1, 57:16,
63:20, 66:11,
111:4
**talking**
22:20, 25:8,
29:21, 31:25,
70:19, 77:1,
104:25, 105:7,
110:25, 113:16,
113:18
**talks**
91:21, 92:6
**taxes**
62:25
**team**
109:4
**technically**
21:20
**tell**
34:7, 38:7,

63:11, 80:8,
81:8, 93:6
**telling**
15:20, 17:23,
18:1, 25:11,
32:5, 32:8,
33:18, 34:8,
35:18, 61:22,
65:20, 72:24,
79:5, 79:12,
80:6, 94:16,
105:19, 107:11,
113:22
**tells**
85:2, 90:11
**term**
52:25
**terms**
16:7, 46:8,
55:15
**testified**
6:18, 76:23,
95:18
**testifies**
39:2, 39:19,
39:24
**testify**
6:16, 8:2,
8:23, 9:17,
35:14
**testifying**
10:16, 122:16
**testimony**
6:11, 8:9, 9:2,
37:20, 39:4,
40:2, 74:5,
77:4, 78:2,
79:9, 80:7,
83:4, 83:9,
99:7, 125:3,
125:5
**th**
51:17, 126:12
**thank**
6:20, 8:8, 9:1,
28:7, 67:14,
96:21, 104:19,
123:23

**thanks**
7:2
**themselves**
5:16
**theory**
117:19
**thereon**
19:3
**thing**
37:5, 54:18,
105:14
**things**
20:18, 44:9,
103:19
**think**
10:7, 20:11,
39:13, 53:21,
53:22, 65:10,
78:9, 80:9,
80:23, 100:25,
105:6, 108:1,
110:25, 120:22,
121:21, 122:21
**third**
27:17, 27:24,
28:9, 28:16,
29:17, 59:20,
59:25, 60:3,
60:7
**thought**
35:4, 47:25,
72:15, 78:21,
78:23, 98:13,
99:12, 107:18,
115:18
**three**
16:17, 21:19,
21:23, 26:5,
62:1, 62:2,
66:12, 87:20,
107:18
**three-month**
116:3
**through**
1:14, 2:2,
8:20, 10:22,
11:7, 13:17,
40:13, 54:9,

66:14, 73:1,
75:22, 76:20,
90:7, 93:11,
93:12, 109:10,
122:1, 122:24
**time**
5:10, 5:12,
12:16, 12:22,
13:7, 21:13,
21:22, 33:6,
33:19, 34:4,
35:7, 35:23,
37:8, 40:23,
41:18, 42:14,
42:18, 45:17,
47:21, 50:4,
64:20, 66:2,
66:4, 66:17,
67:9, 67:16,
67:19, 73:1,
74:8, 74:14,
76:19, 78:9,
78:24, 81:12,
82:23, 83:6,
83:10, 83:16,
94:15, 94:17,
94:25, 95:3,
95:10, 95:23,
98:20, 99:22,
101:11, 104:21,
110:15, 113:21,
115:2, 115:16,
116:10, 116:11,
117:13, 120:16,
122:10, 124:7
**times**
68:7, 97:4,
98:18, 107:18,
110:5
**title**
64:24
**toby**
13:1, 14:1,
14:3, 14:6,
16:14, 21:2,
25:19, 30:4,
77:17, 77:20,
78:5, 78:13,

83:23, 85:12,
85:15, 87:1,
89:13, 115:13,
116:1, 119:16,
120:2
**today**
5:12, 5:21,
5:25, 8:9, 8:23,
10:16, 16:9,
30:24, 32:18,
35:14, 36:25,
37:4, 37:14,
40:13, 40:15,
41:22, 43:2,
43:6, 43:13,
45:3, 45:21,
51:20, 68:18,
69:19, 80:6,
83:4, 83:9,
83:15, 87:23,
97:4, 101:10,
101:15, 104:8,
110:6, 116:16,
121:16, 122:24,
123:22
**today's**
5:10, 88:22,
115:4
**together**
19:3
**told**
35:4, 38:13,
38:19, 38:23,
39:2, 39:13,
72:15, 74:13,
76:11, 78:21,
78:23, 98:12,
107:18, 109:16,
115:18
**tom**
65:13, 87:4,
123:1
**took**
79:12
**top**
17:9, 18:15,
19:21, 22:6,
24:15, 51:10,

70:11, 71:14,
86:5
**topic**
10:24, 11:8,
16:1, 16:2,
33:23, 40:15,
40:17, 40:25,
41:2, 41:5,
41:8, 41:11,
43:5, 49:11,
49:12, 49:25,
77:7, 77:10,
88:6, 122:15,
122:16, 123:2
**topics**
8:19, 8:23,
9:4, 9:16,
10:23, 11:7,
122:12, 122:22,
122:24, 123:3,
123:6, 123:11,
123:12, 123:13
**total**
23:2, 27:9,
70:14
**totaled**
62:2
**totaling**
76:25
**towards**
82:24, 85:1
**tracking**
102:12
**trademarks**
92:16
**trailing**
28:3
**transaction**
55:3
**transcribed**
1:25, 127:6
**transcriber**
127:1
**transcript**
4:7, 6:5, 8:17,
16:24, 18:10,
19:20, 22:5,
23:8, 24:14,

26:13, 27:16,
29:1, 51:9,
70:9, 71:10,
84:12, 86:4,
88:14, 103:23,
105:1, 118:7,
127:4
**transcription**
125:5
**trouble**
102:21, 104:8
**true**
13:12, 16:9,
21:14, 21:15,
39:4, 41:2,
42:15, 42:16,
75:12, 76:21,
77:4, 80:23,
82:2, 96:4,
97:25, 98:17,
101:11, 101:15,
101:16, 101:20,
102:2, 102:3,
121:14, 125:4,
127:4
**truth**
6:17, 6:18
**truthfully**
91:2
**try**
34:16, 111:12
**trying**
104:10
**tucker**
13:1, 13:3,
16:14, 20:20,
21:2, 21:17,
25:12, 25:20,
26:7, 29:22,
30:5, 30:12,
35:25, 36:1,
40:23, 41:2,
45:1, 55:1,
61:25, 63:23,
63:25, 76:1,
76:2, 76:5,
76:11, 76:15,
76:23, 77:20,

78:5, 81:20,
82:14, 83:5,
85:6, 91:9,
115:15, 115:17,
115:24
**tucker's**
64:1, 64:4
**tuesday**
1:17
**two**
40:24, 40:25,
76:25, 78:14,
95:21, 103:10,
104:9, 104:22,
107:25, 111:10
**type**
82:9
**typewritten**
10:20
**tzanetatos**
13:2, 63:9,
63:15

**U**

**uh-huh**
17:11
**ultimate**
53:3
**under**
6:7, 11:25,
12:6, 21:1,
21:5, 25:18,
25:22, 30:7,
92:25, 93:8
**understand**
6:5, 8:8, 32:5,
33:25, 34:13,
34:19, 34:21,
35:10, 37:7,
83:2, 93:5,
103:2, 103:9,
104:20, 105:7,
107:4
**understanding**
8:22, 8:24,
17:13, 37:9,
102:21, 123:2
**understood**
7:18, 10:7,

16:1, 91:23
**undertaken**
116:16
**unfounded**
102:6
**united**
1:1, 5:7
**unless**
90:11
**until**
13:9, 78:1,
81:24, 82:18,
82:24, 110:12,
110:16
**use**
6:10, 24:4,
28:15, 28:18,
28:19, 44:21,
50:14, 57:24,
69:19
**uses**
6:7
**utilized**
49:14

**V**

**vague**
34:10, 44:4,
46:12, 47:18,
48:2, 62:11,
91:7, 91:20,
91:25, 94:20,
106:7, 106:16,
111:8
**valid**
111:7, 113:9,
113:20, 114:1
**value**
18:24, 74:5
**various**
33:24, 35:15
**vegas**
3:15
**vendor**
68:2, 71:2,
72:6, 72:13,
74:22, 76:2
**vendors**
75:2, 75:25

**versus**
5:6, 94:12
**via**
14:20, 84:2,
84:20, 84:23
**video**
5:11, 5:14
**videographer**
3:20, 5:2,
5:12, 5:24,
67:15, 67:18,
122:7, 122:10,
124:4
**videotaped**
1:12, 2:1, 5:3
**virtually**
1:16, 2:3
**voice-identify**
5:15
**vote**
81:15, 81:19,
82:13
**voted**
82:12

**W**

**want**
12:5, 32:4,
51:16, 51:24,
53:23, 88:6,
122:1
**water**
12:8, 55:13,
55:17, 94:13
**way**
8:14, 16:22,
30:25, 34:17,
38:16, 40:22,
41:13, 44:7,
45:15, 48:13,
48:21, 66:11,
76:21, 92:5,
98:6, 101:23,
104:4, 106:11,
111:12
**we'll**
8:14, 16:21,
18:7, 18:8,

19:16, 19:18,
22:1, 22:2,
23:5, 23:6,
24:12, 26:9,
26:10, 27:12,
28:22, 28:23,
51:7, 107:8,
122:5
**we're**
26:10, 27:13,
28:23, 49:12,
67:18, 70:6,
84:9, 86:1,
122:11, 122:14,
122:17, 122:20,
122:22, 123:21
**we've**
10:23, 21:5,
25:17, 25:19,
29:19, 30:3,
37:22, 60:10,
62:1, 66:23,
67:7, 77:1,
90:7, 97:4,
98:7, 102:1,
107:22, 110:25,
112:18, 113:17,
118:22, 118:23,
119:6, 119:11,
119:14
**weeks**
7:8, 7:13,
35:11, 79:10
**went**
52:5, 90:7,
112:13, 122:13
**weren't**
15:16, 35:6,
38:25, 42:13,
42:17, 45:16,
76:19, 83:2,
98:18, 98:23,
102:17, 114:17
**west**
3:14
**whatever**
55:18
**whatnot**
35:16, 122:5

**whatsoever**
16:9, 74:15,
101:3
**whereas**
86:18
**whereof**
126:11
**whereupon**
6:14, 67:17,
122:9
**whether**
14:18, 24:7,
28:18, 30:21,
30:25, 33:14,
34:3, 38:3,
39:14, 40:9,
40:18, 41:14,
43:11, 45:5,
45:11, 48:18,
56:5, 63:21,
74:21, 75:1,
81:8, 82:21,
83:5, 83:9,
83:15, 94:14,
95:2, 95:10,
101:6, 101:23,
105:1, 107:10,
111:4, 111:5,
112:25, 113:7,
113:9, 113:20,
114:21, 115:5
**whole**
6:17, 105:14
**wife**
64:4
**window**
13:11
**winter**
104:16
**wisconsin**
3:7
**withdrawals**
63:24
**withheld**
101:7
**withhold**
101:24
**withholding**
101:22

**within**
104:22, 120:9
**without**
54:4
**witness**
6:1, 6:13,
101:20, 112:9,
112:13, 122:21,
126:5, 126:11
**word**
61:8, 100:25
**words**
40:15, 52:18,
78:9, 84:2,
115:18
**work**
53:4, 53:8
**worked**
73:11
**working**
34:4, 82:6
**works**
46:19
**wouldn't**
14:25, 32:22,
48:5, 77:2
**writing**
111:2, 111:23,
112:24, 113:6
**written**
4:12, 4:15,
4:18, 6:9,
19:22, 20:4,
20:6, 24:15,
24:23, 25:2,
29:3, 29:4,
29:12, 29:15,
33:16, 102:23,
103:3, 103:18,
103:21, 103:23,
103:24, 105:2,
107:5, 113:6
**wrong**
35:5
**wrongdoing**
81:21
**wrote**
103:24

### Y

**yeah**
7:15, 11:4,
16:6, 21:12,
26:2, 34:13,
34:23, 41:20,
53:5, 62:25,
64:18, 66:10,
69:14, 71:13,
72:9, 76:9,
84:15, 90:7,
91:8, 91:13,
94:1, 94:22,
95:14, 97:19,
99:8, 100:14,
100:23, 106:10,
106:16, 111:10,
112:9, 113:13,
116:1, 116:3,
116:14, 117:12,
117:21, 119:20,
120:16, 121:23,
124:2
**year**
11:18, 32:16,
33:2, 41:19,
88:25, 104:14
**years**
40:24, 41:1
**yesterday**
9:25, 10:12,
123:5
**yourself**
7:1, 9:16,
11:22, 65:3,
77:20, 78:4,
85:19, 87:11,
87:24
**yourselves**
79:9, 80:17

### Z

**zarro**
65:13, 65:18,
65:19, 66:18,
87:4, 87:8,
87:12, 87:25,

122:17, 123:1,
123:13
**zarro's**
65:22, 66:4,
66:19
**zeroes**
51:22
**zoom**
92:18, 92:21

### $

**$1.5**
27:9, 65:1,
65:5, 65:11
**$10,000**
57:6, 57:8,
57:12
**$124,000**
60:25, 61:4
**$124,504.62**
60:23
**$128,000**
40:10, 40:20,
41:15
**$128,924.62**
40:5, 71:21
**$15,000**
61:14
**$1500**
63:2
**$18,000**
55:24
**$18,144**
55:20
**$206,000**
52:11, 53:24
**$206,263.20**
52:3
**$243,000**
97:15
**$30,000**
56:18
**$32,998**
58:10
**$33,000**
58:14, 58:18
**$386,000**
31:1, 31:16,

32:6, 32:21,
34:21
**$386,773.86**
30:17, 30:20,
70:15, 71:1
**$49,000**
59:17
**$50,000**
59:1, 59:6,
60:12
**$500,000**
18:4, 19:3,
19:9, 19:13,
22:24, 23:22,
24:1, 24:5,
24:7, 24:9,
25:4, 26:1,
27:6, 28:9,
28:13, 28:16,
28:20, 49:16,
50:12, 51:1,
51:4, 54:4,
56:6, 56:19,
57:13, 57:18,
57:22, 57:24,
58:3, 59:21,
60:3, 60:7
**$93,000**
54:13

**0**

**00088**
51:19
**02013**
1:7, 5:9
**0777**
3:16

**1**

**1.5**
62:2, 62:6,
62:16, 63:21,
64:8, 121:21
**1/4/22**
4:25
**10**
4:18, 4:24,
28:24, 28:25,

29:2, 67:12,
70:11, 77:11,
77:14
**104**
54:15, 57:4
**10801**
3:14
**11**
4:19, 4:23,
5:10, 51:7,
51:8, 62:20,
122:8, 122:10,
124:7, 124:9
**1100**
3:6
**118**
4:23, 58:8
**119**
58:23
**12**
4:20, 51:18,
70:4, 84:10,
84:11
**121**
59:10
**127**
1:24
**128,000**
42:1
**128,924.62**
74:6
**13**
1:18, 4:21,
4:24, 5:11,
70:11, 86:2,
86:3, 122:8
**136**
60:10, 60:22
**14**
4:22, 88:12,
88:13, 88:22,
92:20, 93:14,
96:24, 98:10
**1400**
63:18
**15**
4:23, 54:11,
54:12, 54:16,

111:16, 111:19,
112:19, 112:23,
113:5, 113:14,
113:17, 114:5,
114:7, 114:8,
118:5, 118:6
**16**
4:10
**17**
4:24, 70:5,
70:8, 70:10,
86:10, 87:1,
87:4, 87:10,
87:20
**18**
4:11, 4:18,
4:25, 29:6,
30:10, 62:20,
63:2, 63:4,
71:8, 71:9
**184**
61:13, 62:21
**19**
1:17, 4:12,
4:16, 4:17,
5:10, 26:17,
27:8, 27:18,
60:22, 61:1,
126:5

**2**

**20**
4:12, 19:24,
21:19, 21:24,
29:6, 57:11,
62:24, 118:8
**20,000**
64:2
**2021**
77:11, 77:14,
78:3, 78:15,
78:17, 80:22,
81:2, 81:14,
82:23, 97:14,
110:22
**2023**
86:10, 87:1,
87:4, 87:11,

87:20, 88:2,
109:18, 110:13,
110:16, 116:25
**2024**
1:17, 5:10,
17:2, 126:5,
126:12
**21**
13:9, 61:13,
61:17, 61:20,
77:15, 78:1,
122:10
**2100**
3:8
**22**
1:7, 4:11,
4:12, 4:13,
4:16, 4:17,
4:18, 4:23,
4:24, 5:9, 13:9,
19:24, 21:19,
21:24, 29:6,
57:11, 59:6,
62:24, 81:25,
104:15, 118:8,
118:21, 120:9
**2220**
38:4
**23**
4:14, 85:16
**24**
4:15, 124:7,
124:9
**25**
4:11, 18:12,
22:18, 27:1,
51:17, 52:11,
55:3, 56:7,
97:2, 97:13,
98:8
**26**
4:16, 59:1
**27**
4:17, 59:11,
126:12
**273**
3:8
**28**
4:18

**2:-cv**
1:7, 5:9
**2a**
94:9, 94:10,
95:19
**2b**
96:6, 96:7,
96:8, 97:1,
98:7, 98:9,
98:12, 106:12
**2c**
100:22, 100:24
**2d**
94:3
**2e**
102:1, 102:2,
102:4, 105:15,
107:17, 108:1,
108:7, 112:21
**2f**
114:11, 114:12,
114:13
**2g**
115:10, 115:12

---
**3**
---

**3,000**
64:16
**30**
10:11, 54:9
**31**
51:13, 56:10,
56:23, 97:13
**32,000**
58:13
**3200**
63:6, 63:16
**333**
3:16
**338**
68:22
**346**
69:3, 70:10
**3500**
65:10
**359**
71:11
**3700**
63:5, 63:14

**386,773.86**
74:6

---
**4**
---

**414**
3:8
**42**
67:16
**421**
86:5
**49,200**
59:12

---
**5**
---

**500,000**
18:16
**51**
4:19
**511**
3:6
**53202**
3:7
**559922**
1:23
**57**
67:19

---
**7**
---

**7,000**
64:16
**7/1/22**
4:15
**7/6/22**
4:13, 4:14
**70**
4:24
**702**
3:16
**71**
4:25
**72**
96:23
**73**
96:18, 96:23,
98:10
**7500**
64:7

---
**8**
---

**8**
1:18, 5:11

**84**
4:20
**86**
4:21
**88**
4:22, 51:21,
51:25, 55:2
**89**
56:10
**89135**
3:15
**8th**
89:4

---
**9**
---

**9**
67:16, 67:19

Transcript of Michael Holley, Corporate Representative
Conducted on November 22, 2024

---

128

```
1              UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF NEVADA
3    ------------------------------------x
4    JAMES DEPPOLETO,              :
5         Plaintiff,              :
6       vs.                       :   Case No.
7    TAKEOVER INDUSTRIES INCORPORATED,  :   2:22CV02013
8    et al.,                      :
9         Defendants.             :
10   ------------------------------------x
11
12
13
14        Videotaped Deposition of MICHAEL HOLLEY
15   CORPORATE REPRESENTATIVE OF NEXGEN BEVERAGES, LLC
16                 Volume II
17             Conducted Virtually
18         November, Friday 22, 2024
19              11:32 a.m. PST
20
21
22
23   Job No.: 559923
24   Pages: 128 - 162
25   Recorded By: Charlie McGrath, AAERT CER
```

---

129

```
1         Deposition of MICHAEL HOLLEY, held virtually.
2
3
4
5
6
7
8
9
10
11
12
13         Pursuant to Notice, before Charlie McGrath,
14   AAERT CER, Notary Public, in and for the State of
15   California.
16
17
18
19
20
21
22
23
24
25
```

---

130

```
1                  A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4         PATRICK HARVEY, ESQUIRE
5         HUSCH BLACKWELL, LLP
6         511 N. Broadway
7         Suite 1100
8         Milwaukee, Wisconsin 53202
9         Phone: 414.273.2100
10        (Present via videoconference)
11
12   ON BEHALF OF THE DEFENDANTS:
13        DON BENNION, ESQUIRE
14        LAW OFFICE OF DON BENNION
15        6980 O Bannon Drive
16        Suite 400
17        Las Vegas, Nevada 89117
18        Phone: 702.333.0777
19        (Present via videoconference)
20
21
22
23
24   ALSO PRESENT:
25        Jesse Castro - PD Videographer
```

---

131

```
1                  C O N T E N T S
2    EXAMINATION OF MICHAEL HOLLEY              PAGE
3       By Mr. Harvey                          133
4
5
6                  E X H I B I T S
7            (Attached to transcript.)
8    DEPOSITION EXHIBIT                        PAGE
9    Exhibit A   Subpoena Duces Tecum to NextGen  135
10   Exhibit B   First Notice of Default 11/8/2022  141
11   Exhibit C   6/14/23 Cease and Desist        155
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

132

1 PROCEEDINGS
2 THE VIDEOGRAPHER: Here begins Media
3 Number 1 in the videotaped deposition of Mike
4 Holley in the matter of Deppoleto v. Takeover
5 Industries Incorporated, et al., in the United
6 States District Court for the District of Nevada,
7 case number 2:22CV02013. Today's date is November
8 22nd, 2024. The time on the video monitor is
9 11:32 a.m. The remote videographer today is Jesse
10 Castro representing Planet Depos.
11 All parties of this video deposition are
12 attending remotely. Would counsel please voice
13 identify themselves and state whom they represent?
14 MR. HARVEY: Patrick Harvey for the
15 Plaintiff.
16 MR. BENNION: Don Bennion for Defendant
17 Mike Holley and the other Defendants in the case.
18 THE VIDEOGRAPHER: And the court
19 reporter today is Charlie McGrath, also
20 representing Planet Depos. The witness may now be
21 sworn.
22 THE REPORTER: I am a notary authorized
23 to administer oaths, and this deposition will be
24 recorded by electronic means. All parties
25 understand and agree that any certified transcript

133

1 produced from the recording of this proceeding is
2 intended for all uses permitted under applicable
3 procedural and evidentiary rules and laws and
4 shall constitute written stipulation. The parties
5 stipulate to the use and certification of this
6 testimony consistent with applicable law of such.
7 Hearing no objection, I will now swear the
8 witness.
9 Whereupon,
10 MICHAEL HOLLEY,
11 being first duly sworn or affirmed to testify to
12 the truth, the whole truth, and nothing but the
13 truth, was examined and testified as follows:
14 EXAMINATION BY COUNSEL FOR THE PLAINTIFF
15 BY MR. HARVEY:
16 Q Good afternoon for me. Good morning for
17 you, Mr. Holley.
18 A How are you today?
19 Q Good. Yourself?
20 A Good. Thanks.
21 Q So, you've been deposed a couple of
22 times in this case already. I'm not going to
23 bother going over the deposition rules again if
24 that's okay with you.
25 A Yes. That's fine.

134

1 Q Okay. The first exhibit I'm going to
2 show you is the subpoena for today's deposition.
3 Are you able to see my screen?
4 A Yes, I am.
5 Q Okay. And I understand that you are
6 here today to speak as the corporate
7 representative for NextGen Beverages, LLC, as to
8 some of the topics on this topic list that I'm
9 showing you in the subpoena; is that accurate?
10 A That is.
11 Q And my understanding is that you are
12 going to be offering testimony on Topic 4, which
13 is information regarding the decisions not to
14 repay Mr. Deppoleto after issuance of his notice
15 of default; is that correct?
16 A Correct.
17 Q And you were also here to offer
18 testimony about information regarding the sale of
19 -- that should be next-level products on NextGen's
20 website; is that correct?
21 A Yes.
22 Q Okay.
23 THE REPORTER: And forgive me. Will
24 that be -- will that be Exhibit 16 or 19? Because
25 we -- those -- it could be --

135

1 MR. HARVEY: This will be -- actually,
2 Counsel, do you remember if we did exhibits at
3 yesterday's?
4 MR. BENNION: I could take a look. I --
5 I think it was about that, about 17 that we went
6 through.
7 MR. HARVEY: Well, no, just for the
8 NextGen deposition -- the NextGen corporate
9 representative deposition. I think I did do the
10 subpoena as one. You know what? Let's just -- to
11 move things along, let's mark that as Exhibit A
12 because we used numbers yesterday.
13 (EXHIBIT A MARKED)
14 MR. BENNION: Yeah.
15 MR. HARVEY: And to clarify for the
16 record, we started the NextGen corporate
17 representative deposition yesterday, and we
18 covered Topics 1, 2, 3, and 5 with Mr. Zarro
19 acting as the corporate representative for NextGen
20 Beverages for those topics. So, this is actually
21 a continuation of the NextGen corporate
22 representative deposition, and we're just
23 finishing the final two topics, which are, again,
24 Topics 4 and 6.
25 MR. BENNION: Correct.

136

1  BY MR. HARVEY:
2    Q   Okay.  Okay.  Mr. Holley, what, if
3  anything, did you do to prepare to offer testimony
4  as a corporate representative on behalf of NextGen
5  Beverages with respect to Topics 4 and 6?
6    **A   I spoke with my attorney, Don Bennion.**
7  **I spoke with Tom Zarro.  I have gone over some**
8  **interrogatories, looked at some bank records,**
9  **things like that.**
10   Q   Okay.  You said a couple of things
11 there.  What documents did you review?
12   **A   Some of the interrogatory questions,**
13 **some bank statements, e-mails.**
14   Q   Anything else?  Oh, I'm sorry.  Go
15 ahead.  You said e-mails?
16   **A   Yeah.**
17   Q   Which e-mails?
18   **A   I don't know exactly.  Just went through**
19 **a bunch.**
20   Q   And this was specifically to prepare for
21 your deposition today on Topics 4 and 6 for
22 NextGen.
23   **A   Yes.**
24   Q   You don't remember the topic of any of
25 those e-mails?

137

1    **A   Most of them were back and forth with my**
2  **attorney.**
3    Q   Okay.  So, not e-mails that have been
4  produced in this case?
5    **A   No.**
6    Q   Okay.  And you said bank statements?
7    **A   Yes.**
8    Q   Which bank statements?
9    **A   Takeover and NextGen's.**
10   Q   And the NextGen, were they Wells Fargo
11 bank statements?
12   **A   Yes.**
13   Q   Okay.  And you said interrogatory
14 responses; is that correct?
15   **A   Correct.**
16   Q   Okay.  And then you said you spoke with
17 Tom Zarro; correct?
18   **A   Yes.**
19   Q   When did you speak with Tom Zarro?
20   **A   Last night.**
21   Q   Was anyone else on that call?
22   **A   It was just Tom and I.**
23   Q   How long did you speak to Mr. Zarro last
24 night?
25   **A   45 minutes.  Maybe an hour.**

138

1    Q   And what did you discuss?
2    **A   Just his -- just going over some things**
3  **from NextGen and from his deposition yesterday.**
4    Q   What specifically did you go over with
5  respect to NextGen?
6    **A   I can't recall directly.**
7    Q   So just last night, you don't remember
8  what you spoke to him about?
9    **A   I mean, it was a number of things that I**
10 **-- I don't remember exactly what I took -- spoke**
11 **about.**
12   Q   Did you speak about NextGen selling
13 next-level products on NextGen's website?
14       MR. BENNION:  And -- and I just want --
15 I -- I just want to interpose an objection to the
16 extent that I was also on a call with Mr. Zarro
17 and Mr. Holley.  I don't think it's the one he's
18 referring to.  But to the extent anything that I
19 was involved in my -- that's attorney-client
20 privilege, so I -- I would object.  But anything
21 with Mr. Zarro, go ahead.
22       THE WITNESS:  Yeah.  No.  I think when
23 -- when I spoke about the -- the questions it was
24 with Don on the phone.
25 BY MR. HARVEY:

139

1    Q   Okay.  I just want to make sure I'm
2  clear because I thought you said you spoke to just
3  Mr. Zarro, just you two on the phone yesterday; is
4  that --
5    **A   Yeah.  It was mostly about his**
6  **deposition.**
7    Q   I -- I'm still confused.  Was there a
8  phone call yesterday that just involved you and
9  Mr. Zarro and no one else?
10   **A   Yes.**
11   Q   And when did that occur?
12   **A   Last night.**
13   Q   Okay.  Did you also speak about NextGen
14 during that call with just you and Mr. Zarro?
15   **A   I believe so.**
16   Q   Okay.  What did you discuss with Mr.
17 Zarro last night about NextGen?
18   **A   I don't remember exactly.**
19   Q   Did you discuss NextGen selling
20 next-level products on NextGen's website?
21   **A   Possibly.**
22   Q   And again, this is just last night, but
23 you don't remember?
24   **A   No, I don't remember.**
25   Q   Did you discuss why Mr. Deppoleto was

140

1  not repaid?
2      A  I don't recall.
3      Q  Okay.  Did you speak to anyone other
4  than Mr. Zarro and your counsel in preparation for
5  today?
6      A  No.
7      Q  Why not?
8      A  I don't believe there's anybody else
9  that anyone would need to talk to about this.
10     Q  You counsel referenced a call that he
11 had with you and Mr. Zarro yesterday.  Do you
12 remember that call where the three of you were on
13 the line?
14     A  I do.
15     Q  How long was that call?
16     A  Maybe a half hour.
17     Q  Was anyone else on the line other than
18 you three?
19     A  No.
20     Q  Did you review any documents during that
21 call?
22     A  No.
23     Q  Other than that -- the two calls that
24 you've told me about from yesterday, have you
25 spoken to anyone else in preparation for your

141

1  deposition today?
2      A  No.
3      Q  Did you make any handwritten or
4  typewritten notes to assist you in testifying here
5  today?
6      A  No.
7      Q  Okay.  I'm going to show you a document
8  here.
9      A  Okay.
10        MR. HARVEY:  One moment.  So, we'll make
11 this Exhibit B for the NextGen corporate
12 representative deposition.
13        (EXHIBIT B MARKED)
14 BY MR. HARVEY:
15     Q  Are you able to see my screen, Mr.
16 Holley?
17     A  Yes.
18     Q  This is the November 8th letter from
19 Husch Blackwell to a number of people.  The ray
20 line says, Notice of default, demand for payment,
21 and cease and desist; correct?
22     A  Correct.
23     Q  Do you recognize this document?
24     A  I do.
25     Q  And what is it?

142

1      A  The notice of default, demand for
2  payment, and the cease and desist.
3      Q  I know we've talked about this when you
4  were wearing your hat as the Takeover corporate
5  representative, but today, you're wearing the hat
6  of the NextGen corporate representative.
7      A  Yes.
8      Q  My question for you, knowing that you're
9  wearing that hat, did any NextGen representatives
10 participate in discussions regarding Mr.
11 Deppoleto's notice of default to Takeover?
12        MR. BENNION:  Patrick, you -- you --
13 you're breaking up.  I didn't hear the question at
14 all.
15        MR. HARVEY:  Sure.
16 BY MR. HARVEY:
17     Q  Did any NextGen representatives
18 participate in discussions regarding Mr.
19 Deppoleto's notice of default to Takeover?
20     A  In November?  No.
21     Q  At any point?
22        MR. BENNION:  Counsel, you -- you cut
23 out it again on -- could you repeat the question?
24 I apologize.  I just couldn't hear it.
25        THE WITNESS:  Did you hear me, or are we

143

1  frozen?
2      MR. HARVEY:  You said in November -- are
3  you guys able to hear me?
4      MR. BENNION:  Yeah, but it -- it's
5  choppy.  And it -- this could be on my end.  I
6  just didn't hear the full question, Patrick, about
7  the discussions.  That's about all I heard.
8      MR. HARVEY:  Yeah.  Mike looks like he's
9  frozen.  Mike, are you -- are you frozen?
10        MR. BENNION:  Yes.  Mike --
11        MR. HARVEY:  Why don't we go off the
12 record until he is able to unfreeze?
13        THE VIDEOGRAPHER:  We are going off the
14 record.  The time is 11:44 a.m.
15        (OFF THE RECORD)
16        THE VIDEOGRAPHER:  Standby.  We are
17 going back on the record.  The time is 11:48 a.m.
18 BY MR. HARVEY:
19     Q  Mr. Holley, before we had the technical
20 difficulties, I was asking you about Exhibit B,
21 which was the first notice of default that was
22 sent to Takeover.  And I can pull it up again if
23 you want, but before we hopped off, I was asking
24 you whether any NextGen representatives
25 participated in discussions regarding Mr.

144

1 Deppoleto's notice of default. And I think you
2 said, you mean in November, and I said, at any
3 point thereafter, and I think you froze at that
4 point --
5 **A  Oh, okay.**
6 Q  -- or your screen froze. So, if you
7 answered it, I'm sorry, but I'm going to ask you
8 again. At any point in time, did any NextGen
9 representative participate in discussions
10 regarding Mr. Deppoleto's notice of default to
11 Takeover?
12 **A  I mean, yes, because, you know, I'm --**
13 **I'm a Takeover and NextGen director, since --**
14 **along with Tom Zarro. So, yeah, it's all been**
15 **spoken about.**
16 Q  Did any other NextGen representatives,
17 other than you and Mr. Zarro, participate in
18 discussions regarding Mr. Deppoleto's notice of
19 default to Takeover?
20 **A  No.**
21 Q  And the discussion, was it you and Mr.
22 Zarro then that discussed it?
23 **A  Yes.**
24 Q  When did you discuss it with Mr. Zarro?
25 **A  I don't recall exactly.**

145

1 Q  Was it around the date of the November
2 8th, 2022, notice of default, or was this later
3 on?
4 **A  NextGen wasn't formed until June of**
5 **2023, so like eight months later.**
6 Q  Right. But I'm asking, at any point,
7 did you and Mr. Zarro discuss the November 8th,
8 2022 notice of default?
9 **A  Yes.**
10 Q  When and how many times?
11 **A  I don't recall exactly.**
12 Q  2022?
13 **A  No. NextGen wasn't formed until '23.**
14 Q  No. Whether you were wearing NextGen
15 hats or not, I'm asking if you had a discussion
16 with Mr. Zarro.
17 **A  Yes. Probably December or late**
18 **November.**
19 Q  And what were the content -- or what was
20 the content of those discussions?
21 **A  Mr. Zarro reached out to James Deppoleto**
22 **and tried to come to an agreement with him. Tried**
23 **to -- tried to see if we could work something out**
24 **together.**
25 Q  And after Mr. -- am I inferring

146

1 correctly that after that discussion, you spoke to
2 Mr. Zarro about his discussion with Mr. Deppoleto?
3 **A  Yes.**
4 Q  And can you walk me through that
5 discussion that you had with Mr. Zarro?
6 **A  You know, I think there was a number of**
7 **different things where -- that were offered to Mr.**
8 **Deppoleto where he would take the -- the game of**
9 **shots and -- and take over for, you know -- and --**
10 **and he would remove his default. Other -- other**
11 **-- I don't know if there was other things that**
12 **were spoken about.**
13 Q  That's all you recall from the
14 discussion that you had with Mr. Zarro in late
15 November, early December 2022.
16 **A  And then there was other talks of**
17 **settlements with shares and things like that.**
18 Q  Other than the late November or December
19 2022 discussion with Mr. Zarro that you just
20 described, how many other discussions were there
21 between you and Mr. Zarro?
22       MR. BENNION: I -- I want to state an
23 objection, just to the extent that if any of these
24 discussions were had with their attorneys present,
25 that the objection would be based on the

147

1 attorney/client privilege. But anyway, just for
2 clarity.
3       MR. HARVEY: Well, and on that point,
4 too, Mr. Zarro was not a party to this case and I
5 don't believe was represented for a number of
6 months after we filed it. So, if he was
7 participating in discussions with attorneys
8 involved when he was not represented by counsel, I
9 -- those are not privileged, so that we're on the
10 same page.
11       MR. BENNION: I understand your point.
12 Just wanted to make a record.
13 BY MR. HARVEY:
14 Q  So, now we've thoroughly confused you,
15 Mr. Holley. Let me ask it this way.
16 **A  Okay.**
17 Q  Setting aside the late November, early
18 December discussion you had with Mr. Zarro, when's
19 the next time you remember discussing these issues
20 with Mr. Zarro and was there a lawyer on the call
21 at that point?
22 **A  I mean, most of the time there was a**
23 **lawyer on the call. We -- we -- we've been in,**
24 **you know, on and off in settlement negotiations.**
25 **We're trying to -- since -- since November.**

148

1    Q   Now, was -- you said most of the time a
2 lawyer was on the call with -- were there calls
3 before Mr. Zarro was added as an individual
4 Defendant? Like, you were added as an individual
5 Defendant?
6    **A   Were there calls before that?**
7    Q   Do you understand the distinction I'm
8 drawing? Yeah. Let me give you some context.
9 So, when we initially filed the complaint in
10 December 2022, it was initially just against
11 takeover. Yourself, Mr. Zarro, the other
12 individuals were not individual defendants at that
13 point. And it wasn't until later that we amended
14 the complaint. And I can find the date on that.
15       If you give me two seconds. But my
16 understanding is that Mr. Zarro was not
17 represented until we actually named him as a
18 Defendant. And give me two seconds. I can tell
19 you filed the amended complaint. And September
20 19th, 2023. So, from December 2022 through
21 September 19th, 2023, and you can tell me if I'm
22 wrong. I don't believe Mr. Zarro was represented
23 by counsel.
24    **A   He had his own counsel on a lot of the**
25 **calls.**

149

1       MR. BENNION: And therefore, I'm going
2 to say a belated objection to repeat my -- my
3 prior objection about the attorney/client
4 privilege.
5       THE REPORTER: I'm sorry. The end of
6 your objection trailed off.
7       MR. BENNION: To the extent it existed,
8 meaning the attorney/client privilege.
9 BY MR. HARVEY:
10    Q   So, let's try -- let's try and do this a
11 little easier. Set aside any discussions you had
12 with Mr. Zarro at any point when lawyers were on
13 the call. So, put those in one bucket. Were
14 there any discussions that were between you and
15 Mr. Zarro and anyone else when there were no
16 lawyers on the call other than the November --
17 December 2022 discussion you already told me
18 about?
19    **A   I'm going to say most of them were with**
20 **-- with the attorneys.**
21    Q   Do you remember anything that did not
22 involve attorneys?
23    **A   I'm sure there probably was, but I don't**
24 **recall exactly what was said or when they were or**
25 **how many there were.**

150

1    Q   Did you ever exchange text messages or
2 e-mails with Mr. Zarro with no lawyer copied on
3 them?
4    **A   Text messages, no. E-mails, probably**
5 **not.**
6    Q   Okay. Now, the -- now we're going into
7 the bucket where attorneys may have been on the
8 calls. During those calls, do you remember any
9 calls on which Mr. Zarro's lawyer was not present?
10    **A   No.**
11    Q   Okay. So, in any event, you told me
12 that there was a discussion that you had with him
13 in late November or December 2022; correct?
14    **A   Yes.**
15    Q   These subsequent discussions, whether
16 there were lawyers involved or not, do you
17 remember when those occurred?
18    **A   Not exactly, no.**
19    Q   Was it --
20    **A   They were fairly regular --**
21    Q   I want to say --
22    **A   -- maybe once or twice a week.**
23    Q   Throughout the course of the litigation?
24    **A   Yes.**
25    Q   Okay. All right. And I know we've

151

1 talked about this a little bit in other
2 depositions, but again, you're wearing the NextGen
3 corporate representative hat today. So, now I'm
4 asking you in your capacity as the NextGen
5 corporate representative. First of all, NextGen
6 sells its product through a brand called LOCK'DIN;
7 correct?
8    **A   Correct.**
9    Q   And that's L-O-C-K-'-D I-N; correct?
10    **A   Yes.**
11    Q   Did NextGen/LOCK'DIN sell NXT LVL, and
12 that's NXT space LVL products on
13 LOCK'DIN/NextGen's website?
14    **A   They were posted on there for**
15 **approximately two days.**
16    Q   And they were only pulled down --
17    **A   Just again.**
18    Q   They were only pulled down because --
19 you got to let me finish my question; remember?
20    **A   Okay.**
21    Q   No problem. They were only pulled down
22 because you received our cease and desist letter;
23 correct?
24    **A   I believe.**
25       MR. BENNION: Objection. Calls for

152

1 speculation. Go ahead.
2        THE WITNESS: I believe so, yes.
3 BY MR. HARVEY:
4    Q   And the products that were advertised or
5 the next level products that were advertised on
6 the NextGen/LOCK'DIN website, did NextGen pay
7 takeover for those products?
8    A   No. No. If -- if you clicked on the
9 products, they would go right to the takeover
10 Shopify account. Then the money would go directly
11 into a takeover account.
12    Q   What was the purpose of advertising
13 takeovers products on NexGen's website?
14    A   Well, we were given a few months to sell
15 off any next level products in the trademark
16 dispute. And so we were trying to make some money
17 for takeover.
18    Q   Why not sell them on takeover's own
19 website?
20    A   We were locked out of that website.
21 Jason Tucker and his wife had all the passwords.
22    Q   How did NextGen obtain those next level
23 products?
24    A   In what -- what way are you asking?
25    Q   Well, if somebody clicked on the link to

153

1 purchase those next level products, somebody would
2 have had to ship them to the purchaser; correct?
3    A   Yeah. It goes directly to a
4 distribution company where the takeover products
5 were.
6    Q   And -- and that distribution company
7 that was one warehouse in Georgia; correct?
8    A   I believe it was Wisconsin.
9    Q   Okay. Well, wherever the warehouse was,
10 it was the same warehouse where NextGen's products
11 were stored; correct?
12    A   No. A different warehouse.
13    Q   Different warehouse. So, your testimony
14 is that the NextGen/LOCK'DIN products were stored
15 in a completely different facility than the
16 takeover next level products. Is that what you're
17 telling me?
18    A   Those particular products, yes.
19    Q   So, how was NextGen going to ensure
20 delivery if someone had clicked on the next level
21 products?
22    A   It -- it's all on --
23    Q   In other words -- in other words, if
24 NextGen didn't have physical control over the next
25 level products, how was NextGen going to ensure

154

1 that they would be delivered and that the order
2 would be completed?
3    A   It's just a -- it's a third party
4 function, so there's a Shopify account and when
5 you click on it, it sends the order to that
6 warehouse, and then the warehouse delivers it.
7    Q   But next level -- not next level.
8 NextGen had the authority to call the warehouse
9 and say, don't ship anything; correct?
10    A   NextGen wouldn't have, no.
11    Q   Who decided to sell the Next level
12 products on LOCK'DIN's website?
13    A   I don't know who that was.
14    Q   NextGen didn't sell any other
15 competitive products on its website; did it?
16        MR. BENNION: Just state an objection to
17 the form of the question. Maybe be vague and
18 ambiguous. Go ahead.
19        THE WITNESS: Competitive products. We
20 didn't -- NextGen didn't have any competitive
21 products to the -- the energy shot, the gamer
22 shot.
23 BY MR. HARVEY:
24    Q   Did NextGen sell any products other than
25 locked In products on its website, other than

155

1 NextGen products?
2    A   Yeah, we sold merchandise, we sold -- I
3 don't know, other -- other things.
4    Q   Other than NextGen products, and the
5 next level products, NextGen did not sell any
6 other products on its website; correct?
7    A   Correct.
8    Q   And NextGen was advertising the next
9 level products to be sold at a 50 percent discount
10 off of the retail price; correct?
11    A   NextGen did not do that. That was a
12 takeover.
13    Q   Well, here, let's pull the website up.
14 I'm going to share my screen with you. We'll mark
15 this Exhibit C.
16        (EXHIBIT C MARKED)
17 BY MR. HARVEY:
18    Q   Are you able to see my screen, Mr.
19 Holley?
20    A   Yeah, it looks like the notice of
21 default.
22    Q   This is actually a little different.
23 This is a June 14th, 2023 letter from Husch
24 Blackwell saying, cease and desist and notice of
25 default. So, it's not the notice of default we

---

156

1  were talking about before. This is a later one --
2     A  Okay.
3     Q  -- June 2023. Are you with me?
4     A  Yes.
5     Q  And you've seen this Exhibit 4 because
6  it's also marked Holley Exhibit 1; correct?
7     A  Yes.
8     Q  So, if we go down a couple of pages, I
9  think it's page 5 of the PDF is where it starts.
10 And continue to go down. We've got LOCK'DIN
11 products, and this is the LOCK'DIN website;
12 correct?
13    A  Yes. Appears to be.
14    Q  In the bottom left, it says
15 HTTPS://lockedin.com, and then there's some other
16 information; correct?
17    A  Correct.
18    Q  And we see this was printed on June
19 12th, 2023; correct?
20    A  Okay.
21    Q  And then if we scroll down, on the
22 LOCK'DIN website, we've got next level products
23 being advertised; correct?
24    A  Yeah. Do you see how it says takeover
25 Industries ran on it.

---

157

1     Q  This is the LOCK'DIN website, though;
2  correct?
3     A  It's on the LOCK'DIN website, yes.
4     Q  And the price for the -- well, for both
5  of the gamer shots, being advertised from next
6  level is half of the retail price; correct?
7     A  Yeah. I mean, that's not normal retail
8  price, but yeah.
9     Q  Well, Lock In's website, it's suggesting
10 the retail price is 4,199. Are you saying that
11 LOCK'DIN was falsely advertising the retail price?
12    A  LOCK'DIN was not doing any of that.
13 Next level products were --
14    Q  Retail.
15    A  Next level products were available on
16 multiple people's websites.
17    Q  Who else's?
18    A  Amazon, there was Shopify, there's Etsy,
19 eBay, Walmart.
20    Q  None of those companies are competitors
21 to takeover; are they?
22    A  They all sell competing products, yes.
23    Q  No, but the companies themselves are not
24 competitors to takeover; correct?
25      MR. BENNION: I'm going to state an

---

158

1  objection. May call for a legal conclusion. Go
2  ahead.
3       THE WITNESS: Yeah. I what manner would
4  you consider that a competitor?
5  BY MR. HARVEY:
6     Q  Well, Amazon sells basically everything
7  in the world. They're not a competitor to
8  takeover; correct?
9     A  No. They sold takeover, yeah
10    Q  Let me ask you this way. Amazon is not
11 a beverage company; correct?
12    A  No, but they sell beverages.
13    Q  Shopify is not a beverage company;
14 correct?
15    A  No. But they sell beverages.
16    Q  Etsy is not a beverage company; correct?
17    A  No.
18    Q  We have a double negative. Is there a
19 beverage company?
20    A  I said, no.
21    Q  Is eBay a beverage company?
22    A  No.
23    Q  Do any companies that are beverage
24 companies sell next level products on their
25 website other than LOCK'DIN?

---

159

1     A  I believe there was a couple. I don't
2  remember what they were exactly.
3     Q  You believe that other beverage
4  companies sold next level products on their
5  website?
6     A  Yes.
7     Q  From when to when?
8     A  I don't know, I would say, middle of '21
9  to until sometime the end of 2022.
10    Q  Why did takeover/Next level stop selling
11 next level products on other beverage companies'
12 website at the end of 2022?
13    A  There was no more products. Trademark
14 was gone --
15    Q  And yet --
16    A  -- and told not to sell them. We only
17 had three months.
18    Q  And yet -- and yet in June 2023,
19 LOCK'DIN had next level product to sell because it
20 was advertising it on its website; correct?
21    A  I think that was right at the end of the
22 time frame to sell off next level products.
23    Q  So, there was product at the end of 2022
24 that other beverage companies could have sold for
25 takeover; correct?

160

1    **A    They could have, yes.  I believe they're**
2    **actually still listed on eBay and a couple of**
3    **other sites, too.**
4        Q    And your testimony is that despite
5    advertising these next level products on
6    LOCK'DIN's website, there were no actual sales.
7    Is that what you said?
8        **A    Yeah.  They none of them sold.**
9        Q    And that's because you took them down
10    after two days because of the cease and desist
11    letter?
12        **A    Correct.**
13        MR. HARVEY:  Okay.  I believe that's all
14    I have for you, Mr. Holley.  Thank you.
15        THE WITNESS:  All right.
16        MR. BENNION:  No questions.
17        THE REPORTER:  Okay, where I'll sit
18    then.
19        MR. HARVEY:  Thanks, Mike.  I think you
20    can go unless the court reporters have anything.
21        THE REPORTER:  One second.  We just have
22    to read off the record, Jesse.
23        THE VIDEOGRAPHER:  We are going off the
24    record.  The time is 2:10 p.m.
25        (Off the record at 12:10 p.m.)

161

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2        I, Charlie McGrath, AAERT CER, the officer
3    before whom the foregoing proceedings were
4    taken, do hereby certify that any witness(es) in
5    the foregoing proceedings were fully sworn;
6    that the proceedings were recorded by me and
7    thereafter reduced to typewriting by a
8    qualified transcriptionist; that said digital
9    audio recording of said proceedings are a
10    true and accurate record to the best of my
11    knowledge, skills, and ability; and that I am
12    neither counsel for, related to, nor employed
13    by any of the parties to this case and have
14    no interest, financial or otherwise, in its
15    outcome.
16    _____
17    _____
18    Charlie McGrath, AAERT CER, Notary Public, for the
19    State of California
20    December 6, 2024
21
22
23
24
25

162

1    CERTIFICATE OF TRANSCRIBER
2        I, Krystin Spolar, CET, do hereby certify
3    that this transcript was prepared from the digital
4    audio recording of the foregoing proceeding; that
5    said proceedings were reduced to typewriting under
6    my supervision; that said transcript is a true and
7    accurate record of the proceedings to the best of
8    my knowledge, skills, and ability; and that I am
9    neither counsel for, related to, nor employed by any
10    of the parties to the case and have no interest,
11    financial or otherwise, in its outcome.
12    *Krystin Spolar*
13    _____
14    Krystin Spolar, CET
15    Planet Depos, LLC
16    December 6, 2024
17
18
19
20
21
22
23
24
25

## A

**aaert**
128:25, 129:14,
161:2, 161:18
**ability**
161:11, 162:8
**able**
134:3, 141:15,
143:3, 143:12,
155:18
**about**
134:18, 135:5,
138:8, 138:11,
138:12, 138:23,
139:5, 139:13,
139:17, 140:9,
140:24, 142:3,
143:6, 143:7,
143:20, 144:15,
146:2, 146:12,
149:3, 149:18,
151:1, 156:1
**account**
152:10, 152:11,
154:4
**accurate**
134:9, 161:10,
162:7
**acting**
135:19
**actual**
160:6
**actually**
135:1, 135:20,
148:17, 155:22,
160:2
**added**
148:3, 148:4
**administer**
132:23
**advertised**
152:4, 152:5,
156:23, 157:5
**advertising**
152:12, 155:8,
157:11, 159:20,
160:5

**affirmed**
133:11
**after**
134:14, 145:25,
146:1, 147:6,
160:10
**afternoon**
133:16
**again**
133:23, 135:23,
139:22, 142:23,
143:22, 144:8,
151:2, 151:17
**against**
148:10
**agree**
132:25
**agreement**
145:22
**ahead**
136:15, 138:21,
152:1, 154:18,
158:2
**al**
128:8, 132:5
**all**
132:11, 132:24,
133:2, 142:14,
143:7, 144:14,
146:13, 150:25,
151:5, 152:21,
153:22, 157:22,
160:13, 160:15
**along**
135:11, 144:14
**already**
133:22, 149:17
**also**
130:24, 132:19,
134:17, 138:16,
139:13, 156:6
**amazon**
157:18, 158:6,
158:10
**ambiguous**
154:18
**amended**
148:13, 148:19

**answered**
144:7
**any**
132:25, 136:24,
140:20, 141:3,
142:9, 142:17,
142:21, 143:24,
144:2, 144:8,
144:16, 145:6,
146:23, 149:11,
149:12, 149:14,
150:8, 150:11,
152:15, 154:14,
154:20, 154:24,
155:5, 157:12,
158:23, 161:4,
161:13, 162:9
**anybody**
140:8
**anyone**
137:21, 140:3,
140:9, 140:17,
140:25, 149:15
**anything**
136:3, 136:14,
138:18, 138:20,
149:21, 154:9,
160:20
**anyway**
147:1
**apologize**
142:24
**appears**
156:13
**applicable**
133:2, 133:6
**approximately**
151:15
**around**
145:1
**aside**
147:17, 149:11
**asking**
143:20, 143:23,
145:6, 145:15,
151:4, 152:24
**assist**
141:4

**attached**
131:7
**attending**
132:12
**attorney**
136:6, 137:2,
147:1, 149:3,
149:8
**attorney-client**
138:19
**attorneys**
146:24, 147:7,
149:20, 149:22,
150:7
**audio**
161:9, 162:4
**authority**
154:8
**authorized**
132:22
**available**
157:15

## B

**back**
137:1, 143:17
**bank**
136:8, 136:13,
137:6, 137:8,
137:11
**bannon**
130:15
**based**
146:25
**basically**
158:6
**because**
134:24, 135:12,
139:2, 144:12,
151:18, 151:22,
156:5, 159:19,
160:9, 160:10
**been**
133:21, 137:3,
144:14, 147:23,
150:7
**before**
129:13, 143:19,

143:23, 148:3,
148:6, 156:1,
161:3
**begins**
132:2
**behalf**
130:3, 130:12,
136:4
**being**
133:11, 156:23,
157:5
**belated**
149:2
**believe**
139:15, 140:8,
147:5, 148:22,
151:24, 152:2,
153:8, 159:1,
159:3, 160:1,
160:13
**bennion**
130:13, 130:14,
132:16, 135:4,
135:14, 135:25,
136:6, 138:14,
142:12, 142:22,
143:4, 143:10,
146:22, 147:11,
149:1, 149:7,
151:25, 154:16,
157:25, 160:16
**best**
161:10, 162:7
**between**
146:21, 149:14
**beverage**
158:11, 158:13,
158:16, 158:19,
158:21, 158:23,
159:3, 159:11,
159:24
**beverages**
128:15, 134:7,
135:20, 136:5,
158:12, 158:15
**bit**
151:1
**blackwell**
130:5, 141:19,

155:24
**both**
157:4
**bother**
133:23
**bottom**
156:14
**brand**
151:6
**breaking**
142:13
**broadway**
130:6
**bucket**
149:13, 150:7
**bunch**
136:19

### C

**california**
129:15, 161:19
**call**
137:21, 138:16,
139:8, 139:14,
140:10, 140:12,
140:15, 140:21,
147:20, 147:23,
148:2, 149:13,
149:16, 154:8,
158:1
**called**
151:6
**calls**
140:23, 148:2,
148:6, 148:25,
150:8, 150:9,
151:25
**can't**
138:6
**capacity**
151:4
**case**
128:6, 132:7,
132:17, 133:22,
137:4, 147:4,
161:13, 162:10
**castro**
130:25, 132:10

**cease**
131:11, 141:21,
142:2, 151:22,
155:24, 160:10
**cer**
128:25, 129:14,
161:2, 161:18
**certificate**
161:1, 162:1
**certification**
133:5
**certified**
132:25
**certify**
161:4, 162:2
**cet**
162:2, 162:14
**charlie**
128:25, 129:13,
132:19, 161:2,
161:18
**choppy**
143:5
**clarify**
135:15
**clarity**
147:2
**clear**
139:2
**click**
154:5
**clicked**
152:8, 152:25,
153:20
**client**
147:1, 149:3,
149:8
**com**
156:15
**come**
145:22
**companies**
157:20, 157:23,
158:23, 158:24,
159:4, 159:11,
159:24
**company**
153:4, 153:6,

158:11, 158:13,
158:16, 158:19,
158:21
**competiting**
157:22
**competitive**
154:15, 154:19,
154:20
**competitor**
158:4, 158:7
**competitors**
157:20, 157:24
**complaint**
148:9, 148:14,
148:19
**completed**
154:2
**completely**
153:15
**conclusion**
158:1
**conducted**
128:17
**confused**
139:7, 147:14
**consider**
158:4
**consistent**
133:6
**constitute**
133:4
**content**
145:19, 145:20
**context**
148:8
**continuation**
135:21
**continue**
156:10
**control**
153:24
**copied**
150:2
**corporate**
128:15, 134:6,
135:8, 135:16,
135:19, 135:21,
136:4, 141:11,

142:4, 142:6,
151:3, 151:5
**correct**
134:15, 134:16,
134:20, 135:25,
137:14, 137:15,
137:17, 141:21,
141:22, 150:13,
151:7, 151:8,
151:9, 151:23,
153:2, 153:7,
153:11, 154:9,
155:6, 155:7,
155:10, 156:6,
156:12, 156:16,
156:17, 156:19,
156:23, 157:2,
157:6, 157:24,
158:8, 158:11,
158:14, 158:16,
159:20, 159:25,
160:12
**correctly**
146:1
**could**
134:25, 135:4,
142:23, 143:5,
145:23, 159:24,
160:1
**couldn't**
142:24
**counsel**
132:12, 133:14,
135:2, 140:4,
140:10, 142:22,
147:8, 148:23,
148:24, 161:12,
162:9
**couple**
133:21, 136:10,
156:8, 159:1,
160:2
**course**
150:23
**court**
128:1, 132:6,
132:18, 160:20,
161:1

**covered**
135:18
**cut**
142:22

### D

**date**
132:7, 145:1,
148:14
**days**
151:15, 160:10
**december**
145:17, 146:15,
146:18, 147:18,
148:10, 148:20,
149:17, 150:13,
161:20, 162:16
**decided**
154:11
**decisions**
134:13
**default**
131:10, 134:15,
141:20, 142:1,
142:11, 142:19,
143:21, 144:1,
144:10, 144:19,
145:2, 145:8,
146:10, 155:21,
155:25
**defendant**
132:16, 148:4,
148:5, 148:18
**defendants**
128:9, 130:12,
132:17, 148:12
**delivered**
154:1
**delivers**
154:6
**delivery**
153:20
**demand**
141:20, 142:1
**depos**
132:10, 132:20,
162:15
**deposed**
133:21

**deposition**
128:14, 129:1,
131:8, 132:3,
132:11, 132:23,
133:23, 134:2,
135:8, 135:9,
135:17, 135:22,
136:21, 138:3,
139:6, 141:1,
141:12
**depositions**
151:2
**deppoleto**
128:4, 132:4,
134:14, 139:25,
145:21, 146:2,
146:8
**deppoleto's**
142:11, 142:19,
144:1, 144:10,
144:18
**described**
146:20
**desist**
131:11, 141:21,
142:2, 151:22,
155:24, 160:10
**despite**
160:4
**different**
146:7, 153:12,
153:13, 153:15,
155:22
**difficulties**
143:20
**digital**
161:8, 162:3
**directly**
138:6, 152:10,
153:3
**director**
144:13
**discount**
155:9
**discuss**
138:1, 139:16,
139:19, 139:25,
144:24, 145:7

**discussed**
144:22
**discussing**
147:19
**discussion**
144:21, 145:15,
146:1, 146:2,
146:5, 146:14,
146:19, 147:18,
149:17, 150:12
**discussions**
142:10, 142:18,
143:7, 143:25,
144:9, 144:18,
145:20, 146:20,
146:24, 147:7,
149:11, 149:14,
150:15
**dispute**
152:16
**distinction**
148:7
**distribution**
153:4, 153:6
**district**
128:1, 128:2,
132:6
**document**
141:7, 141:23
**documents**
136:11, 140:20
**doing**
157:12
**don**
130:13, 130:14,
132:16, 136:6,
138:24
**double**
158:18
**down**
151:16, 151:18,
151:21, 156:8,
156:10, 156:21,
160:9
**drawing**
148:8
**drive**
130:15

**duces**
131:9
**duly**
133:11
**during**
139:14, 140:20,
150:8

**E**

**e-mails**
136:13, 136:15,
136:17, 136:25,
137:3, 150:2,
150:4
**early**
146:15, 147:17
**easier**
149:11
**ebay**
157:19, 158:21,
160:2
**eight**
145:5
**electronic**
132:24
**else**
136:14, 137:21,
139:9, 140:8,
140:17, 140:25,
149:15
**else's**
157:17
**employed**
161:12, 162:9
**end**
143:5, 149:5,
159:9, 159:12,
159:21, 159:23
**energy**
154:21
**ensure**
153:19, 153:25
**esquire**
130:4, 130:13
**et**
128:8, 132:5
**etsy**
157:18, 158:16

**event**
150:11
**ever**
150:1
**everything**
158:6
**evidentiary**
133:3
**exactly**
136:18, 138:10,
139:18, 144:25,
145:11, 149:24,
150:18, 159:2
**examination**
131:2, 133:14
**examined**
133:13
**exchange**
150:1
**exhibit**
131:8, 131:9,
131:10, 131:11,
134:1, 134:24,
135:11, 135:13,
141:11, 141:13,
143:20, 155:15,
155:16, 156:5,
156:6
**exhibits**
135:2
**existed**
149:7
**extent**
138:16, 138:18,
146:23, 149:7

**F**

**facility**
153:15
**fairly**
150:20
**falsely**
157:11
**fargo**
137:10
**few**
152:14
**filed**
147:6, 148:9,

148:19
**final**
135:23
**financial**
161:14, 162:11
**find**
148:14
**fine**
133:25
**finish**
151:19
**finishing**
135:23
**first**
131:10, 133:11,
134:1, 143:21,
151:5
**follows**
133:13
**foregoing**
161:3, 161:5,
162:4
**forgive**
134:23
**form**
154:17
**formed**
145:4, 145:13
**forth**
137:1
**frame**
159:22
**friday**
128:18
**froze**
144:3, 144:6
**frozen**
143:1, 143:9
**full**
143:6
**fully**
161:5
**function**
154:4

**G**

**game**
146:8

**gamer**
154:21, 157:5
**georgia**
153:7
**give**
148:8, 148:15,
148:18
**given**
152:14
**go**
136:14, 138:4,
138:21, 143:11,
152:1, 152:9,
152:10, 154:18,
156:8, 156:10,
158:1, 160:20
**goes**
153:3
**going**
133:22, 133:23,
134:1, 134:12,
138:2, 141:7,
143:13, 143:17,
144:7, 149:1,
149:19, 150:6,
153:19, 153:25,
155:14, 157:25,
160:23
**gone**
136:7, 159:14
**good**
133:16, 133:19,
133:20
**guys**
143:3

**H**

**half**
140:16, 157:6
**handwritten**
141:3
**harvey**
130:4, 131:3,
132:14, 133:15,
135:1, 135:7,
135:15, 136:1,
138:25, 141:10,
141:14, 142:15,

142:16, 143:2,
143:8, 143:11,
143:18, 147:3,
147:13, 149:9,
152:3, 154:23,
155:17, 158:5,
160:13, 160:19
**hat**
142:4, 142:5,
142:9, 151:3
**hats**
145:15
**hear**
142:13, 142:24,
142:25, 143:3,
143:6
**heard**
143:7
**hearing**
133:7
**held**
129:1
**here**
132:2, 134:6,
134:17, 141:4,
141:8, 155:13
**hereby**
161:4, 162:2
**holley**
128:14, 129:1,
131:2, 132:4,
132:17, 133:10,
133:17, 136:2,
138:17, 141:16,
143:19, 147:15,
155:19, 156:6,
160:14
**hopped**
143:23
**hour**
137:25, 140:16
**https**
156:15
**husch**
130:5, 141:19,
155:23

**I**

**i-n**
151:9

**identify**
132:13
**ii**
128:16
**in's**
157:9
**incorporated**
128:7, 132:5
**individual**
148:3, 148:4,
148:12
**individuals**
148:12
**industries**
128:7, 132:5,
156:25
**inferring**
145:25
**information**
134:13, 134:18,
156:16
**initially**
148:9, 148:10
**intended**
133:2
**interest**
161:14, 162:10
**interpose**
138:15
**interrogatories**
136:8
**interrogatory**
136:12, 137:13
**involve**
149:22
**involved**
138:19, 139:8,
147:8, 150:16
**issuance**
134:14
**issues**
147:19

**J**

**james**
128:4, 145:21
**jason**
152:21

**jesse**
130:25, 132:9,
160:22
**job**
128:23
**june**
145:4, 155:23,
156:3, 156:18,
159:18

**K**

**know**
135:10, 136:18,
142:3, 144:12,
146:6, 146:9,
146:11, 147:24,
150:25, 154:13,
155:3, 159:8
**knowing**
142:8
**knowledge**
161:11, 162:8
**krystin**
162:2, 162:14

**L**

**l-o-c-k-'-d**
151:9
**las**
130:17
**last**
137:20, 137:23,
138:7, 139:12,
139:17, 139:22
**late**
145:17, 146:14,
146:18, 147:17,
150:13
**later**
145:2, 145:5,
148:13, 156:1
**law**
130:14, 133:6
**laws**
133:3
**lawyer**
147:20, 147:23,
148:2, 150:2,

**150:9**
**lawyers**
149:12, 149:16,
150:16
**left**
156:14
**legal**
158:1
**let's**
135:10, 135:11,
149:10, 155:13
**letter**
141:18, 151:22,
155:23, 160:11
**level**
152:5, 152:15,
152:22, 153:1,
153:16, 153:20,
153:25, 154:7,
154:11, 155:5,
155:9, 156:22,
157:6, 157:13,
157:15, 158:24,
159:4, 159:10,
159:11, 159:19,
159:22, 160:5
**line**
140:13, 140:17,
141:20
**link**
152:25
**list**
134:8
**listed**
160:2
**litigation**
150:23
**little**
149:11, 151:1,
155:22
**llc**
128:15, 134:7,
162:15
**llp**
130:5
**lock**
157:9
**lock'din**
151:6, 151:11,

151:13, 152:6,
153:14, 156:10,
156:11, 156:22,
157:1, 157:3,
157:11, 157:12,
158:25, 159:19
**lock'din's**
154:12, 160:6
**locked**
152:20, 154:25
**lockedin**
156:15
**long**
137:23, 140:15
**look**
135:4
**looked**
136:8
**looks**
143:8, 155:20
**lot**
148:24
**lvl**
151:11, 151:12

**M**

**make**
139:1, 141:3,
141:10, 147:12,
152:16
**manner**
158:3
**many**
145:10, 146:20,
149:25
**mark**
135:11, 155:14
**marked**
135:13, 141:13,
155:16, 156:6
**matter**
132:4
**maybe**
137:25, 140:16,
150:22, 154:17
**mcgrath**
128:25, 129:13,
132:19, 161:2,

161:18
**mean**
138:9, 144:2,
144:12, 147:22,
157:7
**meaning**
149:8
**means**
132:24
**media**
132:2
**merchandise**
155:2
**messages**
150:1, 150:4
**michael**
128:14, 129:1,
131:2, 133:10
**middle**
159:8
**mike**
132:3, 132:17,
143:8, 143:9,
143:10, 160:19
**milwaukee**
130:8
**minutes**
137:25
**moment**
141:10
**money**
152:10, 152:16
**monitor**
132:8
**months**
145:5, 147:6,
152:14, 159:17
**more**
159:13
**morning**
133:16
**most**
137:1, 147:22,
148:1, 149:19
**mostly**
139:5
**move**
135:11

**multiple**
157:16

**N**

**named**
148:17
**nd**
132:8
**need**
140:9
**negative**
158:18
**negotiations**
147:24
**neither**
161:12, 162:9
**nevada**
128:2, 130:17,
132:6
**nexgen**
128:15
**nexgen's**
152:13
**next**
147:19, 152:5,
152:15, 152:22,
153:1, 153:16,
153:20, 153:24,
154:7, 154:11,
155:5, 155:8,
156:22, 157:5,
157:13, 157:15,
158:24, 159:4,
159:10, 159:11,
159:19, 159:22,
160:5
**next-level**
134:19, 138:13,
139:20
**nextgen**
131:9, 134:7,
135:8, 135:16,
135:19, 135:21,
136:4, 136:22,
137:10, 138:3,
138:5, 138:12,
139:13, 139:17,
139:19, 141:11,

142:6, 142:9,
142:17, 143:24,
144:8, 144:13,
144:16, 145:4,
145:13, 145:14,
151:2, 151:4,
151:5, 151:11,
152:6, 152:22,
153:14, 153:19,
153:24, 153:25,
154:8, 154:10,
154:14, 154:20,
154:24, 155:1,
155:4, 155:5,
155:8, 155:11
**nextgen's**
134:19, 137:9,
138:13, 139:20,
151:13, 153:10
**night**
137:20, 137:24,
138:7, 139:12,
139:17, 139:22
**none**
157:20, 160:8
**normal**
157:7
**notary**
129:14, 132:22,
161:1, 161:18
**notes**
141:4
**nothing**
133:12
**notice**
129:13, 131:10,
134:14, 141:20,
142:1, 142:11,
142:19, 143:21,
144:1, 144:10,
144:18, 145:2,
145:8, 155:20,
155:24, 155:25
**november**
128:18, 132:7,
141:18, 142:20,
143:2, 144:2,
145:1, 145:7,

145:18, 146:15,
146:18, 147:17,
147:25, 149:16,
150:13
**number**
132:3, 132:7,
138:9, 141:19,
146:6, 147:5
**numbers**
135:12
**nxt**
151:11, 151:12

## O

**oaths**
132:23
**object**
138:20
**objection**
133:7, 138:15,
146:23, 146:25,
149:2, 149:3,
149:6, 151:25,
154:16, 158:1
**obtain**
152:22
**occur**
139:11
**occurred**
150:17
**offer**
134:17, 136:3
**offered**
146:7
**offering**
134:12
**office**
130:14
**officer**
161:2
**oh**
136:14, 144:5
**okay**
133:24, 134:1,
134:5, 134:22,
136:2, 136:10,
137:3, 137:6,
137:13, 137:16,

139:1, 139:13,
139:16, 140:3,
141:7, 141:9,
144:5, 147:16,
150:6, 150:11,
150:25, 151:20,
153:9, 156:2,
156:20, 160:13,
160:17
**once**
150:22
**one**
135:10, 138:17,
139:9, 141:10,
149:13, 153:7,
156:1, 160:21
**only**
151:16, 151:18,
151:21, 159:16
**order**
154:1, 154:5
**other**
132:17, 140:3,
140:17, 140:23,
144:16, 144:17,
146:10, 146:11,
146:16, 146:18,
146:20, 148:11,
149:16, 151:1,
153:23, 154:14,
154:24, 154:25,
155:3, 155:4,
155:6, 156:15,
158:25, 159:3,
159:11, 159:24,
160:3
**otherwise**
161:14, 162:11
**out**
142:23, 145:21,
145:23, 152:20
**outcome**
161:15, 162:11
**over**
133:23, 136:7,
138:2, 138:4,
146:9, 153:24
**own**
148:24, 152:18

## P

**page**
131:2, 131:8,
147:10, 156:9
**pages**
128:24, 156:8
**participate**
142:10, 142:18,
144:9, 144:17
**participated**
143:25
**participating**
147:7
**particular**
153:18
**parties**
132:11, 132:24,
133:4, 161:13,
162:10
**party**
147:4, 154:3
**passwords**
152:21
**patrick**
130:4, 132:14,
142:12, 143:6
**pay**
152:6
**payment**
141:20, 142:2
**pd**
130:25
**pdf**
156:9
**people**
141:19
**people's**
157:16
**percent**
155:9
**permitted**
133:2
**phone**
130:9, 130:18,
138:24, 139:3,
139:8
**physical**
153:24

**plaintiff**
128:5, 130:3,
132:15, 133:14
**planet**
132:10, 132:20,
162:15
**please**
132:12
**point**
142:21, 144:3,
144:4, 144:8,
145:6, 147:3,
147:11, 147:21,
148:13, 149:12
**possibly**
139:21
**posted**
151:14
**preparation**
140:4, 140:25
**prepare**
136:3, 136:20
**prepared**
162:3
**present**
130:10, 130:19,
130:24, 146:24,
150:9
**price**
155:10, 157:4,
157:6, 157:8,
157:10, 157:11
**printed**
156:18
**prior**
149:3
**privilege**
138:20, 147:1,
149:4, 149:8
**privileged**
147:9
**probably**
145:17, 149:23,
150:4
**problem**
151:21
**procedural**
133:3

proceeding
133:1, 162:4
proceedings
161:3, 161:5,
161:6, 161:9,
162:5, 162:7
produced
133:1, 137:4
product
151:6, 159:19,
159:23
products
134:19, 138:13,
139:20, 151:12,
152:4, 152:5,
152:7, 152:9,
152:13, 152:15,
152:23, 153:1,
153:4, 153:10,
153:14, 153:16,
153:18, 153:21,
153:25, 154:12,
154:15, 154:19,
154:21, 154:24,
154:25, 155:1,
155:4, 155:5,
155:6, 155:9,
156:11, 156:22,
157:13, 157:15,
157:22, 158:24,
159:4, 159:11,
159:13, 159:22,
160:5
pst
128:19
public
129:14, 161:1,
161:18
pull
143:22, 155:13
pulled
151:16, 151:18,
151:21
purchase
153:1
purchaser
153:2
purpose
152:12

pursuant
129:13
put
149:13

**Q**

qualified
161:8
question
142:8, 142:13,
142:23, 143:6,
151:19, 154:17
questions
136:12, 138:23,
160:16

**R**

ran
156:25
ray
141:19
reached
145:21
read
160:22
recall
138:6, 140:2,
144:25, 145:11,
146:13, 149:24
received
151:22
recognize
141:23
record
135:16, 143:12,
143:14, 143:15,
143:17, 147:12,
160:22, 160:24,
160:25, 161:10,
162:7
recorded
128:25, 132:24,
161:6
recording
133:1, 161:9,
162:4
records
136:8

reduced
161:7, 162:5
referenced
140:10
referring
138:18
regarding
134:13, 134:18,
142:10, 142:18,
143:25, 144:10,
144:18
regular
150:20
related
161:12, 162:9
remember
135:2, 136:24,
138:7, 138:10,
139:18, 139:23,
139:24, 140:12,
147:19, 149:21,
150:8, 150:17,
151:19, 159:2
remote
132:9
remotely
132:12
remove
146:10
repaid
140:1
repay
134:14
repeat
142:23, 149:2
reporter
132:19, 132:22,
134:23, 149:5,
160:17, 160:21,
161:1
reporters
160:20
represent
132:13
representative
128:15, 134:7,
135:9, 135:17,
135:19, 135:22,

136:4, 141:12,
142:5, 142:6,
144:9, 151:3,
151:5
representatives
142:9, 142:17,
143:24, 144:16
represented
147:5, 147:8,
148:17, 148:22
representing
132:10, 132:20
respect
136:5, 138:5
responses
137:14
retail
155:10, 157:6,
157:7, 157:10,
157:11, 157:14
review
136:11, 140:20
right
145:6, 150:25,
152:9, 159:21,
160:15
rules
133:3, 133:23

**S**

said
136:10, 136:15,
137:6, 137:13,
137:16, 139:2,
143:2, 144:2,
148:1, 149:24,
158:20, 160:7,
161:8, 161:9,
162:5, 162:6
sale
134:18
sales
160:6
same
147:10, 153:10
say
149:2, 149:19,
150:21, 154:9,

159:8
**saying**
155:24, 157:10
**says**
141:20, 156:14,
156:24
**screen**
134:3, 141:15,
144:6, 155:14,
155:18
**scroll**
156:21
**second**
160:21
**seconds**
148:15, 148:18
**see**
134:3, 141:15,
145:23, 155:18,
156:18, 156:24
**seen**
156:5
**sell**
151:11, 152:14,
152:18, 154:11,
154:14, 154:24,
155:5, 157:22,
158:12, 158:15,
158:24, 159:16,
159:19, 159:22
**selling**
138:12, 139:19,
159:10
**sells**
151:6, 158:6
**sends**
154:5
**sent**
143:22
**september**
148:19, 148:21
**set**
149:11
**setting**
147:17
**settlement**
147:24
**settlements**
146:17

**shall**
133:4
**share**
155:14
**shares**
146:17
**ship**
153:2, 154:9
**shopify**
152:10, 154:4,
157:18, 158:13
**shot**
154:21, 154:22
**shots**
146:9, 157:5
**should**
134:19
**show**
134:2, 141:7
**showing**
134:9
**signature-mig2k**
162:12
**signature-p1kal**
161:16
**since**
144:13, 147:25
**sit**
160:17
**sites**
160:3
**skills**
161:11, 162:8
**sold**
155:2, 155:9,
158:9, 159:4,
159:24, 160:8
**some**
134:8, 136:7,
136:8, 136:12,
136:13, 138:2,
148:8, 152:16,
156:15
**somebody**
152:25, 153:1
**someone**
153:20
**something**
145:23

**sometime**
159:9
**sorry**
136:14, 144:7,
149:5
**space**
151:12
**speak**
134:6, 137:19,
137:23, 138:12,
139:13, 140:3
**specifically**
136:20, 138:4
**speculation**
152:1
**spoke**
136:6, 136:7,
137:16, 138:8,
138:10, 138:23,
139:2, 146:1
**spoken**
140:25, 144:15,
146:12
**spolar**
162:2, 162:14
**standby**
143:16
**started**
135:16
**starts**
156:9
**state**
129:14, 132:13,
146:22, 154:16,
157:25, 161:19
**statements**
136:13, 137:6,
137:8, 137:11
**states**
128:1, 132:6
**still**
139:7, 160:2
**stipulate**
133:5
**stipulation**
133:4
**stop**
159:10

**stored**
153:11, 153:14
**subpoena**
131:9, 134:2,
134:9, 135:10
**subsequent**
150:15
**suggesting**
157:9
**suite**
130:7, 130:16
**supervision**
162:6
**sure**
139:1, 142:15,
149:23
**swear**
133:7
**sworn**
132:21, 133:11,
161:5

|T|
|---|

**take**
135:4, 146:8,
146:9
**taken**
161:4
**takeover**
128:7, 132:4,
137:9, 142:4,
142:11, 142:19,
143:22, 144:11,
144:13, 144:19,
148:11, 152:7,
152:9, 152:11,
152:17, 153:4,
153:16, 155:12,
156:24, 157:21,
157:24, 158:8,
158:9, 159:10,
159:25
**takeover's**
152:18
**takeovers**
152:13
**talk**
140:9

**talked**
142:3, 151:1
**talking**
156:1
**talks**
146:16
**technical**
143:19
**tecum**
131:9
**tell**
148:18, 148:21
**telling**
153:17
**testified**
133:13
**testify**
133:11
**testifying**
141:4
**testimony**
133:6, 134:12,
134:18, 136:3,
153:13, 160:4
**text**
150:1, 150:4
**th**
148:20, 148:21,
155:23, 156:19
**thank**
160:14
**thanks**
133:20, 160:19
**themselves**
132:13, 157:23
**thereafter**
144:3, 161:7
**therefore**
149:1
**things**
135:11, 136:9,
136:10, 138:2,
138:9, 146:7,
146:11, 146:17,
155:3
**think**
135:5, 135:9,
138:17, 138:22,

144:1, 144:3,
146:6, 156:9,
159:21, 160:19
**third**
154:3
**thoroughly**
147:14
**thought**
139:2
**three**
140:12, 140:18,
159:17
**through**
135:6, 136:18,
146:4, 148:20,
151:6
**throughout**
150:23
**time**
132:8, 143:14,
143:17, 144:8,
147:19, 147:22,
148:1, 159:22,
160:24
**times**
133:22, 145:10
**today**
132:9, 132:19,
133:18, 134:6,
136:21, 140:5,
141:1, 141:5,
142:5, 151:3
**today's**
132:7, 134:2
**together**
145:24
**told**
140:24, 149:17,
150:11, 159:16
**tom**
136:7, 137:17,
137:19, 137:22,
144:14
**took**
138:10, 160:9
**topic**
134:8, 134:12,
136:24

**topics**
134:8, 135:18,
135:20, 135:23,
135:24, 136:5,
136:21
**trademark**
152:15, 159:13
**trailed**
149:6
**transcriber**
162:1
**transcript**
131:7, 132:25,
162:3, 162:6
**transcriptionist**
161:8
**tried**
145:22, 145:23
**true**
161:10, 162:6
**truth**
133:12, 133:13
**try**
149:10
**trying**
147:25, 152:16
**tucker**
152:21
**twice**
150:22
**two**
135:23, 139:3,
140:23, 148:15,
148:18, 151:15,
160:10
**typewriting**
161:7, 162:5
**typewritten**
141:4

| U |
**under**
133:2, 162:5
**understand**
132:25, 134:5,
147:11, 148:7
**understanding**
134:11, 148:16

**unfreeze**
143:12
**united**
128:1, 132:5
**unless**
160:20
**until**
143:12, 145:4,
145:13, 148:13,
148:17, 159:9
**use**
133:5
**uses**
133:2

| V |
**vague**
154:17
**vegas**
130:17
**via**
130:10, 130:19
**video**
132:8, 132:11
**videoconference**
130:10, 130:19
**videographer**
130:25, 132:2,
132:9, 132:18,
143:13, 143:16,
160:23
**videotaped**
128:14, 132:3
**virtually**
128:17, 129:1
**voice**
132:12
**volume**
128:16
**vs**
128:6

| W |
**walk**
146:4
**walmart**
157:19
**want**
138:14, 138:15,

139:1, 143:23,
146:22, 150:21
**wanted**
147:12
**warehouse**
153:7, 153:9,
153:10, 153:12,
153:13, 154:6,
154:8
**way**
147:15, 152:24,
158:10
**we'll**
141:10, 155:14
**we're**
135:22, 147:9,
147:25, 150:6
**we've**
142:3, 147:14,
147:23, 150:25,
156:10, 156:22
**wearing**
142:4, 142:5,
142:9, 145:14,
151:2
**website**
134:20, 138:13,
139:20, 151:13,
152:6, 152:13,
152:19, 152:20,
154:12, 154:15,
154:25, 155:6,
155:13, 156:11,
156:22, 157:1,
157:3, 157:9,
158:25, 159:5,
159:12, 159:20,
160:6
**websites**
157:16
**week**
150:22
**wells**
137:10
**went**
135:5, 136:18
**when's**
147:18

**whereupon**
133:9
**wherever**
153:9
**whether**
143:24, 145:14,
150:15
**whole**
133:12
**wife**
152:21
**wisconsin**
130:8, 153:8
**witness**
132:20, 133:8,
138:22, 142:25,
152:2, 154:19,
158:3, 160:15
**witness(es**
161:4
**words**
153:23
**work**
145:23
**world**
158:7
**wouldn't**
154:10
**written**
133:4
**wrong**
148:22

**Y**

**yeah**
135:14, 136:16,
138:22, 139:5,
143:4, 143:8,
144:14, 148:8,
153:3, 155:2,
155:20, 156:24,
157:7, 157:8,
158:3, 158:9,
160:8
**yesterday**
135:12, 135:17,
138:3, 139:3,
139:8, 140:11,

140:24
**yesterday's**
135:3
**yourself**
133:19, 148:11

**Z**

**zarro**
135:18, 136:7,
137:17, 137:19,
137:23, 138:16,
138:21, 139:3,
139:9, 139:14,
139:17, 140:4,
140:11, 144:14,
144:17, 144:22,
144:24, 145:7,
145:16, 145:21,
146:2, 146:5,
146:14, 146:19,
146:21, 147:4,
147:18, 147:20,
148:3, 148:11,
148:16, 148:22,
149:12, 149:15,
150:2
**zarro's**
150:9

**.**

**.0777**
130:18
**.2100**
130:9

**0**

**02013**
128:7, 132:7

**1**

**1**
156:6
**1/8/2022**
131:10
**10**
160:24, 160:25
**11**
128:19, 132:9,

143:14, 143:17
**1100**
130:7
**12**
156:19, 160:25
**128**
128:24
**133**
131:3
**135**
131:9
**14**
131:11, 155:23
**141**
131:10
**155**
131:11
**16**
134:24
**162**
128:24
**17**
135:5
**19**
134:24, 148:20,
148:21

**2**

**2**
160:24
**2022**
145:2, 145:8,
145:12, 146:15,
146:19, 148:10,
148:20, 149:17,
150:13, 159:9,
159:12, 159:23
**2023**
145:5, 148:20,
148:21, 155:23,
156:3, 156:19,
159:18
**2024**
128:18, 132:8,
161:20, 162:16
**21**
159:8
**22**
128:7, 128:18,

```
132:7, 132:8
23
131:11, 145:13
2:cv
128:7, 132:7
```
_____ 3 _____
```
32
128:19, 132:9
```
_____ 4 _____
```
4,199
157:10
400
130:16
414.273
130:9
44
143:14
45
137:25
48
143:17
```
_____ 5 _____
```
50
155:9
511
130:6
53202
130:8
559923
128:23
```
_____ 6 _____
```
6980
130:15
```
_____ 7 _____
```
702.333
130:18
```
_____ 8 _____
```
89117
130:17
8th
141:18, 145:2,
145:7
```