# EXHIBIT 3

Transcript of Toby McBride

1 (1 to 4)

Conducted on November 15, 2024

---

**Page 1**

```
1        UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF NEVADA
3   ----------------------------x
4   JAMES DEPPOLETO,              :
5        Plaintiff,               :   Civil Action No.
6        v.                       :   2:22CV02013
7   TAKEOVER INDUSTRIES           :
8   INCORPORATED, et al.,         :
9        Defendants.              :
10  ----------------------------x
11
12
13
14        Videotaped Deposition of TOBY MCBRIDE
15              Conducted Virtually
16          Friday, November 15, 2024
17               8:17 AM PST
18
19
20
21
22
23  Job No.: 561276
24  Pages: 1 - 71
25  Recorded By: Charlie McGrath, AAERT CER
```

**Page 2**

```
1        Deposition of TOBY MCBRIDE, conducted
2   virtually.
3
4
5
6
7
8
9
10
11
12
13        Pursuant to notice, before Charlie McGrath,
14  AAERT CER, Notary Public in and for the State of
15  California.
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1            A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4        PATRICK HARVEY, ESQUIRE
5        HUSCH BLACKWELL, LLP
6        511 North Broadway, Suite 1100
7        Milwaukee, WI 53202
8        (414) 273-2100
9
10
11  ON BEHALF OF THE DEFENDANTS:
12        DON BENNION, JR., ESQUIRE
13        LAW OFFICE OF S. DON BENNION
14        6980 O Bannon Drive, Suite 400
15        Las Vegas, NV 89117
16        (702) 333-0777
17
18
19  ALSO PRESENT:
20        Jesse Castro, Videographer
21
22
23
24
25
```

**Page 4**

```
1              C O N T E N T S
2   EXAMINATION OF TOBY MCBRIDE            PAGE
3        By Mr. Harvey                        6
4
5
6              E X H I B I T S
7            (Attached to transcript.)
8   DEPOSITION EXHIBIT                     PAGE
9    Exhibit 1   December 9, 2022 Email       50
10   Exhibit 2   Party Receivable Confirmation  64
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins media number 1 in the videotaped deposition of Toby McBride in the matter of Deppoleto v. Takeover Industries, Incorporated, et al., in the United States District Court for the District of Nevada, Case number 2:22CV02013.

Today's date is November 15th, 2024. The time on the video monitor is 8:18 a.m. The remote videographer today is Jesse Castro, representing Planet Depos. All parties at this video deposition are attending remotely.

Would Counsel please voice identify themselves and state whom they represent?

MR. HARVEY: Patrick Harvey for the plaintiff.

MR. BENNION: Don Bennion for Defendant Toby Maguire, who's being deposed today, as well as the -- the other five defendants. I'll list them if you want me to, but I think the caption speaks for itself.

THE WITNESS: McBride.

THE VIDEOGRAPHER: The court reporter today is Charlie McGrath, also representing Planet Depos. The witness may now be sworn.

**6**

COURT REPORTER: All righty. And I just have a short read-on statement because I'm in California.

I am a notary authorized to administer oaths, and this deposition will be recorded by electronic means. All parties understand and agree that any certified transcript produced from the recording of this proceeding is intended for all uses permitted under applicable, procedural, and evidentiary rules and laws, and shall constitute written stipulation. The parties stipulate to the use and certification of this testimony consistent with applicable law of such. Hearing no objection, I will now swear the witness.

All right, sir, if you could raise your right hand for me?

Whereupon,

TOBY MCBRIDE,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. HARVEY:

Q   Good morning, Mr. McBride.

A   How are you?

**7**

Q   Good. Are you able to hear me okay?

A   Yes, sir.

Q   Okay. Good. Could you please state and spell your full name for us, please?

A   Toby McBride, T-O-B-Y, M-C-B-R-I-D-E.

Q   And what's your current address, sir?

A   7426 -- I mean, 2948 Monticello Drive, Stockton, California, 95209.

Q   Any plans to move in the next year or so?

A   Not right now, no. No.

Q   Okay. Could you walk me through your education, please, just high school onward?

A   High School then straight to -- straight to work, so --

Q   What year did you graduate high school?

A   '86.

Q   And where did you go to high school?

A   Kennedy -- John F. Kennedy.

Q   What state?

A   California.

Q   In Stockton?

A   No, Sacramento.

Q   Have you ever been deposed before today?

A   No, sir.

**8**

Q   I know you have a new lawyer as of last night, but am I correct in assuming that you had a chance to talk to either him or your former lawyer and go over the deposition rules, things like answering out loud and things like that?

A   Yes, sir.

Q   Okay. So I don't need to go over those again?

A   No. We're good.

Q   Okay. Thanks.

The one that I am going to reiterate is that if I ask a question and you don't understand any portion of it, feel free to let me know. I'm happy to rephrase it to make sure that we're on the same page before you answer; is that fair?

A   Yes, sir.

Q   And the flip side of that, though, is, if you answer one of my questions, I'm going to assume that you understood it; is that fair?

A   Yes, sir.

Q   Okay. Thank you.

Did you review any documents to prepare for your deposition today?

A   Just the complaint, that's it.

Q   Nothing else?

9

1    A    No, sir.
2    Q    Okay.  Can you walk me through,
3  quickly, your employment history for the last 10
4  years?
5    A    Ten would go back to when, '14?
6    Q    Yeah, ballpark.
7    A    So I -- I'm 32 years in the beverage
8  industry, so I helped build brands on the national
9  level through Budweiser and Miller distributors,
10  national through retail.  I'm one of three guys
11  that does that throughout the nation.
12       So I mean, before IGNITE, I'm trying to
13  remember where I was at, but IGNITE was 2019.  So
14  over a year, Philip Dan's brand, resigned from
15  that, and that's how kind of started Takeover.
16  I've consulted here and there for the last 10, 15
17  years, consulting meaning I get brought into a
18  beverage company and either fix it or get it going.
19    Q    What was your title when you were
20  working at IGNITE?
21    A    CEO of the beverage side.
22    Q    What was the other side?
23    A    They had vapes and stuff like that.
24  And IGNITE was a THC marijuana company and then
25  broke into energy drinks and alcohol.  That's why

10

1  I got brought in.  I had nothing to do with the
2  other side of it, separated.
3    Q    Where did you work before IGNITE?
4    A    I was just consulting for other
5  beverage companies.
6    Q    Were you doing that through an LLC or
7  something or --
8    A    Yeah, through -- Mike and I had a --
9  had a company, One Elite.
10    Q    I'm sorry.  I didn't hear what you
11  said.  What?
12    A    We had a company called One Elite that
13  was an LLC.
14    Q    And when you say Mike, do you mean Mike
15  Holley?
16    A    Yes, sir.
17    Q    How long were you consulting through
18  One Elite, LLC?
19    A    I'm not even sure if it was an LLC --
20  it was an LLC.  I'm trying to remember if it was
21  or not.  We just consulted independently, so --
22    Q    For approximately how long before you
23  started working at IGNITE?
24    A    Off and on for five or six years,
25  depending on where -- what beverage company I was

11

1  at, where we'd consult for four or five months or
2  I'd end up taking a position, so --
3    Q    And when you say consult, what
4  specifically did you do?
5    A    So I would come in to a beverage
6  company to see where they were at.  If they were
7  at the beginning stages, seeing the capital they
8  had, make sure it was being appropriate in the
9  right positions to whether it was production or --
10  or marketing, and then trying to get them
11  benchmarks, building them a foundation regionally,
12  not nationally, to start building their beverage
13  brand.  Consulting also --
14    Q    You -- you -- oh, go ahead.
15    A    Go ahead.  Also on --
16    Q    No, (crosstalk).
17    A    Yeah, also on formulations.  Sorry.
18    Q    And when you say formulations, you mean
19  you put together the ingredients?
20    A    We help -- we assist, yeah.
21    Q    Okay.  Other than working for One Elite
22  during that time frame, were you working for
23  anyone else?
24    A    No.
25    Q    Okay.  So then you started at IGNITE.

12

1  I think you said 2019; is that correct?
2    A    2018, 2019, yeah.
3    Q    And you said you worked there for about
4  a year?
5    A    Yeah.
6    Q    And why did you leave IGNITE?
7    A    I resigned.  I don't want to really get
8  into that.  That's IGNITE's -- those are IGNITE's
9  things.  There was just things going on there that
10  I walked away with my team and --
11    Q    Why did you walk away?
12    A    They were spending money in places that
13  money shouldn't be spent in and we didn't want to
14  have no part of it.
15    Q    And when you say they, who's they?
16    A    IGNITE.
17    Q    Who -- was there a particular
18  individual?
19    A    I -- I don't want to -- that has
20  nothing to do with this.  I don't want to get into
21  that.  I resigned from that and --
22    Q    That's not how this works.  You don't
23  get to pick and choose what questions you answer.
24  So why did you resign?
25    A    I resigned because I was on a board

**13**

1 call and heard things I shouldn't have heard, so
2 that's why I resigned.
3    Q   You resigned?
4    A   Yeah.
5    Q   When did you resign?
6    A   Not that I recall, I think it's
7 September.
8    Q   Of 2019?
9    A   Yeah.
10    Q   And did you work anywhere else?
11    A   2020 -- 2020. Sorry.
12    Q   September 2020 is when you resigned?
13    A   Yeah.
14    Q   Did you work anywhere else in between
15 there and working for Takeover?
16    A   No.
17    Q   And as I understand it, around January
18 2021, you, Mr. Holley, and Mr. Pavlik founded
19 Takeover; does that sound correct?
20    A   Yes.
21    Q   And can you just generally describe
22 what is Takeover Industries, Incorporated?
23    A   It's just a beverage company.
24    Q   What types of beverages?
25    A   We were doing hydrogen water at that

**14**

1 time.
2    Q   When you founded it?
3    A   We founded the company and then came
4 into hydrogen water.
5    Q   And you said, at time. Did you -- did
6 Takeover branch out into other beverages other
7 than hydrogen water?
8    A   There was a shot down the road, but I
9 don't classify that as a beverage.
10    Q   And you're referring to the gamer shot?
11    A   Yes, sir.
12    Q   When did Takeover start selling gamer
13 shots?
14    A   May, June, that I recall. I can't
15 recall. I didn't -- I didn't -- I don't remember
16 that much about when that came.
17    Q   When you say May, June, do you mean
18 May, June 2021?
19    A   Yeah.
20    Q   What is the brand NXT LVL, spelled
21 N-X-T, L-V-L?
22    A   Part of Takeover.
23    Q   What products were sold under the brand
24 name NXT LVL?
25    A   Hydrogen water --

**15**

1    Q   Anything else?
2    A   -- and the gamer shot was.
3    Q   Are any products still being sold under
4 the brand name NXT LVL?
5    A   Not to my knowledge.
6    Q   Does Takeover have any employees today?
7    A   Not to my knowledge.
8    Q   Are you still working for Takeover
9 today?
10    A   No, I'm not.
11    Q   When did you stop working for Takeover?
12    A   January '23.
13    Q   When Takeover was first founded in
14 early 2021, what was your title there?
15    A   CEO.
16    Q   Did you have that title the entire time
17 you were at Takeover?
18    A   Yes, sir.
19    Q   Why did you leave in January 2023?
20    A   Stress level, too much --
21    Q   What do you mean by that?
22    A   It was too much for me to handle at
23 that point. I needed to get my life back on track.
24    Q   Too much --
25    COURT REPORTER: Sorry. You cut out.

**16**

1 BY MR. HARVEY:
2    Q   Why was it too much for you to handle?
3    A   Just too much drama, too much stress
4 drove me --
5    Q   Can you say a little bit more? Go
6 ahead.
7    A   -- put me in a place I didn't want to
8 be, so I had to change my life, change my
9 perspective, fix my life.
10    Q   Can you be a little bit more specific
11 about what you're talking about?
12    A   No.
13    Q   So something at Takeover is causing you
14 stress, but you can't delineate what that was?
15    A   Reliving this is very, very difficult
16 for me, so my apologies. The stress of what we
17 got put through, the stress that Jason Tucker put
18 us through, the things that we had to go through
19 to get our company back made me -- had to walk
20 away. I still feel it to this day.
21    Q   And what do you mean -- when you say
22 what you got put through, what specifically did
23 you --
24    COURT REPORTER: I'm sorry. Your
25 question -- your question cut out again.

17

1    MR. HARVEY:  Are you hearing
2  (inaudible)?
3    COURT REPORTER:  The -- that -- the
4  question cut out as well.
5    THE VIDEOGRAPHER:  Counsel, I'm having
6  -- I'm having a little bit of difficulty.  We are
7  cutting out maybe three or four times thus far.
8    MR. HARVEY:  Hmm.  My audio marker
9  shows that it's working every time I talk, on the
10  bottom left.
11    THE VIDEOGRAPHER:  It'll stop -- it'll
12  -- it'll stop a little bit, Patrick, at the end.
13  It'll just pivot like -- like that, so --
14    MR. HARVEY:  Okay.  Well, let me know
15  if -- if you don't hear the end of one of my
16  questions.  We'll try and plow through it.  I
17  don't really know what to do.  This is the usual
18  microphone I use for these.
19  BY MR. HARVEY:
20    Q   You said that the stress of what you
21  got put through.  What specifically did you get
22  put through that you're referring to?
23    A   I mean, the monotony of Jason Tucker
24  putting out lies on us, separating me and my
25  partner for a year with lies, having to relive

18

1  that again, having to deal with the attorneys and
2  trying to get our company back was just too much
3  for me.  And I had the better --
4    Q   What specific -- oh, go ahead.
5    A   No, I'm done.  I'm done.
6    Q   What specific lies did Mr. Tucker tell
7  about you?
8    A   I -- I -- I -- I mean, everything there
9  is out there that he's put out there on social
10  media is -- the hit piece on BevNET, I mean, go
11  read it.  I mean, I don't have time to -- there's
12  -- there's too much stuff that -- that he did that
13  it's -- you know, I just -- I don't want to relive
14  that stuff.  It's just too much.  I'm in a better
15  place in my life right now that -- reliving things
16  that this guy did to us is -- it's all in the
17  Court documents.  It's all in.  It's just the
18  slander, the -- makes me nauseous.
19    Q   You said a hit piece?
20    A   Pretty much a hit piece.  A buddy of
21  his that used to work for us when we had Manny
22  Pacquiao as part of the company, a writer, I can't
23  remember his freaking name now, did a hit piece on
24  me, Mike, and Joe.  That was all lies.  They wrote
25  it, put it out the day that -- I believe after --

19

1  after James's note was -- after we got out of
2  court in AriZona, I believe that piece went out on
3  us.  I think it was November.  I couldn't believe
4  -- BevNET still has it.  You could pull it up.
5  That was all lies.
6    Q   And this was in a publication?
7    A   Yes, sir.  BevNET is a -- is a place
8  where, in the beverage industry, we all go, so
9  distributors, suppliers, retailers.  It's a
10  website for the beverage industry.
11    Q   What did you -- I didn't what you
12  called it.  What is it called?
13    A   BevNET, B-E-V-N-E-T.  So anybody that's
14  in the beverage industry, liquor, alcohol,
15  non-alcohol, beer, we all are on that website.  So
16  when somebody -- BevNET is for, like, when brands
17  start or brands do press or get retail, they post
18  everything on BevNET.  Pretty much just, like, a
19  -- it's updated every 30 minutes, I believe.
20    And so when press gets put out if a
21  company is bought, like, GHOST or something like
22  that that just sold for 990 million, that -- that
23  information is put on BevNET.  If you're looking
24  for work, you go to BevNET.
25    So there's millions of people that see

20

1  that website, people in my industry that know me
2  very well.  So when that hit piece went out, you
3  can imagine the phone calls that I got, but people
4  know who I am.  I've built my reputation in this
5  industry very strong.  I'm not one to do what was
6  -- was told that we did, so they all knew.  So we
7  got our chance to rebuttal it, I believe, a month
8  and a half later, that showed the documents from
9  court that showed it was all lies.
10    Q   Where did you start working after you
11  left Takeover in January of 2023?
12    A   I consulted for a company out at Canada
13  called Exponent.
14    Q   Called what?
15    A   Exponent, E-X-P-O-N-E-N-T.
16    Q   And from when to when did you do that?
17    A   January until the end of the year.
18    Q   Until the end of 2023?
19    A   Just about, yeah.
20    Q   Did you go to work after that?
21    A   I've just been consulting and taking
22  time off.
23    Q   And are you doing this through an LLC
24  or some other business?
25    A   I do it through My Krazy Leprechaun.

21

1    Q   Is that an LLC or what is it?
2    A   Yeah.  It's out in Nevada.
3    Q   Now, I apologize.  I've been under the
4  weather this whole week, so I'm probably going to
5  be coughing quite a bit today.
6    A   So have I.
7    Q   When you -- sorry to hear about that.
8    A   Yeah.
9    Q   When you left in January 2023, how many
10  employees did Takeover have at that point?
11    A   Just Mike and Joe.
12    Q   And that's Mike Holley and Joe --
13    A   Mike, CSO Joe Pavlik.
14    Q   What were their titles at that time?
15    A   Mike was COO and Joe was the CSO, chief
16  science officer.
17    Q   And you said you don't know if Takeover
18  has any employees today?
19    A   I can't tell you.  I don't -- I'm not
20  involved.
21    Q   Do you still work with either Mr.
22  Holley or Mr. Pavlik?
23    A   I do not.
24    Q   What was the most employees that
25  Takeover ever had when you were working there?

22

1    A   Mike Tzanetatos --
2    Q   Do you mind -- for the court reporter?
3    A   Say it again?
4    Q   Would you mind spelling that name that
5  you just said for the court reporter?
6    A   Oh, I couldn't -- can I -- can I look
7  on my phone?  There's the only way I can tell you
8  Tzanetatos's -- his last name.
9    Q   Yeah, that's fine.  Go ahead.
10    A   One second.  I believe it's a Greek
11  name.  Mike -- and I could be butchering it when I
12  send it to you when I tell you what it is for
13  Mike's.  Tzanetatos, T-S-O-N-A-T-A-T-O-S (sic),
14  Tzanetatos.  I can't even remember how to spell
15  it.  I'm trying to find it on my phone, so sorry.
16  And I can guarantee you I even butchered it on
17  here.  I'm trying to find his e-mail.  Mike T --
18    Q   Oh, I think I actually might have it
19  here.
20    A   You might.  It should be in the Court
21  documents, Patrick.  Sorry.
22    Q   T --
23    A   I -- I butchered it -- I butchered it
24  when I had him as an employee, so apologies.
25    Q   T-Z-A --

23

1    A   There it is.
2    Q   T-Z -- T-Z-A-N-E-T-A-T-O-S; does that
3  sound right?
4    A   That's -- yeah.  You're -- that's
5  better than what I had.
6    Q   Okay.  So that was one individual that
7  you named that worked for Takeover.  Who else
8  worked there?
9    A   Mike Costello.
10    Q   Anyone else?
11    A   Kerby Fortner.
12    Q   What was Mr. Fortner's role?
13    A   Gamer, social media, stuff like that.
14    Q   What was Mr. Costello's role?
15    A   They're just sales guys.
16    Q   How about Mr. Tzanetatos?
17    A   Mike and Mike were both the same, just
18  sales guys.
19    Q   Okay.  Anyone else other than those
20  three?
21    A   David was our back end of the house
22  guy, does all the -- I forget David's last -- is
23  it Martin?  You might have it.  I don't -- I don't
24  -- I forget David's last name.
25    Q   What do you mean by back of the house

24

1  guy?
2    A   Ordering supplies, EID, stuff we need
3  to do with chains or stores, he does all the
4  computer stuff for that -- shipping, receiving,
5  affiliates, stuff nobody else wants to do.
6    Q   Any others?
7    A   No, sir.  Well, me -- me, Mike, Joe,
8  and Tucker -- oh, and Tucker's wife, Melissa.
9  Sorry.
10    Q   Jason Tucker?
11    A   Yes, sir.
12    Q   And then Melissa Tucker?
13    A   Yes, sir.
14    Q   What were their roles?
15    A   Melissa was allegedly marketing.  And
16  then Jason was -- we made Jason president.
17    Q   Anyone else?
18    A   No, that's it.
19    Q   What was Mr. Pavlik's role?
20    A   Chief science officer.
21    Q   What was Mr. Holley's role?
22    A   Operations.
23    Q   Anyone else?
24    A   No.
25    Q   How did you become involved in Takeover

25

1  Industries?
2      A   After IGNITE, we were looking all to do
3  something again and because I was the only one at
4  IGNITE -- Mike and Joe weren't there.  So just
5  took the -- do something together, and Joe had
6  found a shell and we thought we'd give it a go.
7      Q   When you said Joe found a shell
8  (inaudible) by that?
9      A   Well, he had a -- he had another guy, I
10 forget his name, that knew Ryan Schadel.  Ryan
11 Schadel originally owned LTNC.  And then we worked
12 a deal to -- in between at that time is Alex.
13 Alex Guerrero is Tom Brady's trainer.
14         COURT REPORTER:  I'm sorry, could you
15 say the name one more time?
16         THE WITNESS:  Alex Guerrero.
17         COURT REPORTER:  Thank you.
18         THE WITNESS:  Which is Tom's trainer --
19 Brady's trainer, and he wanted to speak to me
20 about a -- a brand he had.  So we flew out to
21 Florida, sat down with Alex, and that's when I
22 found out about hydrogen water.  That's how
23 hydrogen --
24 BY MR. HARVEY:
25     Q   You said quite a bit -- you said quite

26

1  a bit there.  So Ryan Schadel, how do you spell
2  his last name?
3      A   Ryan -- Ryan, R-Y-A-N.
4      Q   Okay.
5      A   Schadel - I believe it -- Patrick,
6  it's S-C-H-A-D-E-L.  He was the original owner of
7  LTNC, which was the company that we acquired.
8      Q   LTNC is also known as Labor Smart,
9  correct?
10     A   Yes, sir.
11     Q   That's a different company than
12 Takeover Industries, correct?
13     A   They're subsidiaries.
14     Q   Which one is a subsidiary of which?
15     A   I believe they're both under Labor --
16 they're both under LTNC.  Labor Smart was Ryan's
17 company.
18     Q   So am I hearing you correctly that LTNC
19 was the parent company and then Labor Smart was a
20 subsidiary of LTNC?
21     A   I believe that's -- that and Takeover,
22 that's how it broke down.  I can't be for sure on
23 that, but --
24     Q   Were you involved with Mr. Schadel at
25 all when Takeover Industries, Incorporated, was

27

1  formed?
2      A   I was on calls, but I wasn't in the
3  weeds with Mike when they were doing it.  As far
4  as percentages, what he -- the debt he owed on
5  LTNC, the accounting and all that stuff behind it,
6  I had nothing to do with that.
7      Q   Is it your understanding that Takeover
8  is a subsidiary of Labor Smart?
9      A   Takeover is under LTNC, so I'm not too
10 --
11     Q   But LTNC is -- but you told me a minute
12 ago, I thought, LTNC was the parent company of
13 Labor Smart, correct?
14     A   That's how I believe they work.  I
15 can't -- I don't -- not for sure about that, but
16 that's how I'm -- that's my understanding how it
17 works.
18     Q   And then is Takeover a subsidiary of
19 just Labor Smart or is it only a subsidiary of
20 LTNC?
21     A   I believe it's only of -- of LTNC.
22 It's been a while.  Sorry.
23     Q   And what were you saying about Mr. --
24 your meeting with Mr. Guerrero?  What -- can you
25 say that again?  What was the meeting about?

28

1      A   Well, that -- that -- he had me -- he
2  had us come there and look at a product that he
3  wanted me to see if I could do.  So that's when
4  hydrogen water was put on the table.  And I tried
5  it and I asked him what it was.
6          He told me what it was.  He told me who
7  he was training with it.  He told me this is why
8  people's careers are extending.  That's why Tom
9  was playing as long as he was playing.  Serena and
10 LeBron playing into their late stages of their
11 careers is because of hydrogen water.  So he asked
12 me if I could figure out a way to do it better,
13 and we --
14     Q   When was this meeting with -- I'm
15 sorry.  Go ahead.
16     A   December, before we started --
17     Q   Of 2020?
18     A   Yeah, before we started, yeah --
19 November, December.
20     Q   Was he involved with the formation of
21 Takeover?
22     A   No.  Alex had nothing to do with the
23 company.
24     Q   So was he asking you to start a company
25 for him?

29

1    A    He wanted to see if there was a way I
2  could make the hydrogen water better than the way
3  they were getting it from Texas.  And then we were
4  going to bring Alex involved with Takeover at one
5  time, but Ryan and those guys -- Ryan had leaked
6  it somehow, and that kind of killed that off.
7    Q    Why would Ryan leaking it have killed
8  that off?
9    A    I -- because it got to the -- it got to
10  the shareholders and then they thought Brady was
11  involved when he was never involved.  Alex was
12  going to be involved in the early stages.  And
13  then it got out to the shareholders.  And if you
14  know anything about a public company, that once it
15  gets out, you know, Tom Brady is now an owner, you
16  know, then that got back to us pretty quick.
17    Q    When was this?
18    A    Same year, 2021.
19    Q    Beginning of 2021?
20    A    Yeah, of March, April.
21    Q    Other than CEO, have you held any other
22  officer positions at Takeover?
23    A    No.
24    Q    Were you a board member of Takeover?
25    A    Yes.

30

1    Q    From when to when?
2    A    The start until January of '23.
3    Q    Who else was on the board during that
4  time?
5    A    Mike, Joe, Jason.
6    Q    The whole time?
7    A    No.  For the last -- for 2022, Mike was
8  taken off.  It was just me, Joe, and Jason.
9    Q    Why was Mr. Holley taken off in 2022?
10    A    Because of Jason Tucker's lies.
11    Q    What do you mean by that?
12    A    Jason Tucker made a lot of accusations
13  about my ex-partner and had us believing that he
14  did --
15    Q    What, specifically?
16    A    Taking money, which he never did.
17    Q    Were you responsible for finances while
18  you were working at Takeover?
19    A    My name has never been on a bank
20  account in 20 years with any of my partners.
21    Q    So how did you know that Mr. Tucker was
22  lying about whether Mr. Holley took money?
23    A    I found that out that he was lying when
24  we found out about all this stuff, so October of
25  2023 -- or '22.

31

1    Q    How specifically were you convinced
2  that he was lying?
3    A    Through my original attorneys and
4  through Mike's lawyers and through the AriZona
5  case, that he was lying.
6    Q    What was your -- did you have a
7  specific title as a board member of Takeover,
8  chairman or anything like that?
9    A    I don't recall.
10    Q    What were your duties and
11  responsibilities as a board member of Takeover?
12    A    I don't recall what was on there.
13    Q    Did you receive compensation from
14  Takeover?
15    A    I had a salary, yes.
16    Q    What was it?
17    A    240 a year.
18    Q    Was that for the whole time or did that
19  go up or --
20    A    No, the whole time.
21    Q    And were you paid on a biweekly basis
22  or how were you paid?
23    A    Monthly.
24    Q    And you continued to receive that until
25  you -- January 2023?

32

1    A    No.  That's -- I stopped in August,
2  September.
3    Q    Of --
4    A    '23 -- '22.
5    Q    Why did you stop getting paid in
6  September or August of 2022?
7    A    Again, Jason Tucker's finagling of
8  maneuvering documents and making up lies, which
9  was --
10    Q    You were CEO, correct?
11    A    Yes, sir.
12    Q    So you outranked Mr. Tucker, correct?
13    A    We all worked on a level playing field,
14  but yeah.
15    Q    Because he was just the president,
16  correct?
17    A    Yes, sir.
18    Q    And so how did he specifically going
19  about -- or go about getting your salary to be not
20  paid?
21    A    By bringing him -- his attorney at the
22  beginning, which was his attorney at Battleship
23  Stance, Eric Borgard, number one.  Eric was --
24  Eric's -- Eric's position was just to be an IP
25  attorney, just come in and protect our IP.  That's

---

33

1  what Battleship Stance is, Jason's Company.  It's
2  a company that -- it's an IP company that protects
3  IP, but we found out a lot more about that.
4        So he brought Eric in.  We didn't have
5  counsel at that time.  So Eric came in and did
6  some IP work for us because we were still securing
7  the NXT LVL name, because it was in competition
8  with another water brand out of New York, so we
9  were negotiating the terms with that.  So Eric was
10  -- and was supposed to be taking care of that.
11  And then all of a sudden he's our -- our, you
12  know, company lawyer.
13        So with that and with him putting the
14  case on Mike, which was BS, he then brought in
15  another attorneys, I forget her name, out of
16  AriZona, another personal attorney for him that
17  has his benefit in mind.  So them all three
18  together coordinating their efforts to do what
19  they had to do what they did, which was to get us
20  out, which was to separate me and Mike, number one.
21     Q   I'm still not following how any of that
22  would have resulted in you not getting a paycheck.
23  How did -- how did he specifically stop you from
24  getting a paycheck when you were the CEO?
25     A   Because they alleged that I -- I was

---

34

1  spending money and they wanted to suspend me for
2  30 days, which was overturned by the AriZona
3  Court, because I didn't do anything.  And that's
4  when we came back in and took the company back
5  from Jason.  Jason was trying to change my bylaws
6  and change notes and tried to take the company
7  private behind my back and Joe's back, without our
8  knowledge.
9        Anything that we had to do as a
10  company, Patrick, me, Joe, and Jason had to agree.
11  That's it, real simple.  Let's take the Dollar
12  General deal.  I said no to that in February of
13  2022.  They wanted to do a Dollar General deal,
14  Mike and -- Costello and Tzanetatos, and I said,
15  no with the shots; too much money, too much risk.
16  You have to pay slotting fees.  There's over a
17  million dollars in slotting fees you have to have.
18  We're not a Dollar General brand.  Well, that deal
19  kept going on behind my back without my knowledge
20  and Joe's knowledge, with Jason.
21     Q   So you said Mr. Tucker wanted to
22  suspend you for 30 days.  Did he suspend you for
23  30 days?
24     A   It was forced.  Yeah.  I was back into
25  a corner and it's better for the shareholders.  I

---

35

1  mean, it's a whole -- I really hate reliving this
2  thing because that's just a place I don't want to
3  go back to, so my apologies.  It put me in a place
4  where I contemplated suicide at one point because
5  of what he was doing to me and pushing me into a
6  corner.  So I stepped away for 30 days, really, a
7  couple weeks, until we figured out what was going
8  on, what his plan was, and then the judge
9  overturned it --
10     Q   When was this -- judge overturned it?
11     A   In AriZona -- whenever the AriZona --
12  whenever everybody was in AriZona.  I wasn't
13  there.  I believe it was October.
14     Q   Where you were gone for 30 days --
15     A   I believe it was October.  I believe it
16  was November.  So the whole month of October, I
17  was gone.
18     Q   So then when you came back, why didn't
19  she start getting paid then?
20     A   Me and Mike got back together.  We had
21  to go seize the account -- took two weeks for us
22  to seize the account.  In that time, money was
23  being spent out of that account by Jason.  Money
24  was being moved around by Jason.  Over 75,000 was
25  put into an escrow account into his attorney's

---

36

1  name, which is illegal, that we got back.
2        So the account was drained, so we
3  didn't pull anything.  We were just trying to get
4  the company back and figuring out what we were
5  going to do, you know?  He had -- he had spent the
6  money that -- on making all these shots, which
7  none of us agreed to.  I mean, there was $800,000
8  in shots that they spent money on with shippers
9  and stuff that was sitting there going to Dollar
10  General, that the deal was dead.  So this is why
11  we said no to it in February, because we knew that
12  it was a bad idea, to not do this, and they moved
13  forward with it.
14        So the money that came into the company
15  from when he took over the account, I don't know
16  anything about.  I've never seen it, and my name
17  was never -- I never seen a statement.  I never
18  was attached to it.  For six months, I was --
19  Jennifer was trying to get me to get on the
20  account with Jason.  He always had an excuse, so --
21     Q   And we had a deal with the PFL at that
22  time, so I was doing the events with the PFL and
23  furthering our brand with the PFL and athletes and
24  stuff like that, so -- while at that time, he was
25  just plotting his moves.

---

37

1 Q So after you stopped getting paid in
2 September or August of 2022, you never received
3 any other compensation from Takeover?
4 A No. No. I had my shares.
5 Q You mentioned -- I'm sorry. What?
6 A I had my shares in the company, but
7 I've never moved a share during a day in my life,
8 so -- they weren't worth anything.
9 Q You still have your shares?
10 A No.
11 Q When did you -- well, how did you --
12 when did you stop having them?
13 A February of '23.
14 Q What did you do with them?
15 A Sold them back to the company and then
16 that was it.
17 Q How many shares did you have?
18 A Just under half a billion -- half a
19 billion shares. I had originally two point
20 billion -- 2 -- 2 billion shares, but 1.5 billion
21 went to lies that Jason perpetuated that said they
22 were going to go somewhere else that they didn't
23 go to.
24     They were supposed to go to pay off
25 Manny Pacquiao debt, and that's not what happened.

---

38

1 That's the only reason why I gave up my 1.5
2 million shares -- billion shares.
3 Q When did you give up the 1.5 billion?
4 A Jason had contacted me February or
5 March of 2022 and said that, you know, hey, we got
6 to pay Manny and, you know, let's use your shares
7 to give to him. We'll give him -- we'll give them
8 back to you.
9     Of course. You know, it's for the
10 shareholders. It's for the company. If their --
11 shares weren't worth anything right then, so it's
12 like, yeah. If it's going to help subside and
13 make him happy, no problem. Did it in the drop of
14 a hat; would've done it for anybody that would've
15 had a note or would've been a part of the company.
16 If I'm going to get them back down later, no
17 problem. If it's going to help us leverage, no
18 problem.
19 Q Now, as I understood it, these were
20 shares -- you're talking about shares. They
21 weren't actually shares in Takeover. They were
22 shares in Labor Smart; is that correct?
23 A Yeah. I'm not too sure how all that --
24 you know, that whole thing worked. I mean, but
25 eventually, my shares did not go to Manny

---

39

1 Pacquiao. They went to Jason Tucker. They went
2 to Melissa Tucker. They went to Deppoleto. They
3 went to -- to Anthony Pettis. They went to Josh.
4 My shares did not go to Manny Pacquiao. So my
5 shares were used for other things, not to go to
6 Manny Pacquiao.
7 Q But Takeover wasn't a publicly traded
8 company, correct?
9 A Well, it was part of LTNC, so however
10 that works.
11 Q How much did you receive for the 500
12 million shares when you sold them back in February
13 2023?
14 A Just under -- probably just under 30
15 grand.
16 Q You mentioned it a couple times, but
17 Labor Smart -- what is Labor Smart?
18 A I believe that was part of Schadel's
19 company. I can't be -- I'm not too sure, Patrick.
20 Sorry.
21 Q It sounds like you weren't really
22 responsible for --
23 A No.
24 Q -- figuring out or executing which --
25 between Labor Smart, LTNC, and Takeover in the

---

40

1 interlap -- or overlap between them. It sounds
2 like that wasn't really your responsibility; is
3 that fair?
4 A Yes, sir.
5 Q Whose responsibility was it from the
6 Takeover side?
7 A I wouldn't -- I wouldn't say
8 responsibility, but --
9     MR. BENNION: I'm going to state an
10 objection.
11     Toby -- Toby --
12     I'm going to state an objection to the
13 extent it may call for a legal conclusion or
14 speculation.
15     Go ahead.
16 BY MR. HARVEY:
17 Q You can go ahead and answer.
18 A Can you -- want to say it again,
19 Patrick? Sorry.
20 Q Sure. I had asked you a moment ago if
21 you were the one who was responsible for the
22 interaction between Labor Smart, LTNC, Takeover,
23 shares, things of that nature, and you said, no,
24 that wasn't you.
25     And then my question was, who from

41

1  Takeover was responsible for those types of things?
2      A   And like I said, I don't know if it's
3  responsible, but Mike was -- Mike was more on top
4  of it. And Jason -- well, Jason -- at that time,
5  Mike was out of the picture, so Jason ran all of
6  it at that time.
7      Q   When to when was Mike out of Takeover?
8      A   November of 2021 -- no, '22, yeah.  No,
9  wait -- yeah, '21 -- November of '21, when he was
10 sick.
11     Q   That's when he first left Takeover?
12     A   Well, Jason pushed him out.
13     Q   And then when did Mr. Holley come back
14 to Takeover?
15     A   '22, October -- at the end of October,
16 beginning of November is when we figured
17 everything out.
18     Q   Have you ever held any positions with
19 Labor Smart?
20     A   Not that I'm aware of, no.
21     Q   And as you sit here today, do you know
22 whether Labor Smart is the majority shareholder of
23 Takeover Industries, Inc.?
24     A   I couldn't tell you.  I'm out of it.
25     Q   Do you know if it ever was?

42

1      A   I'm not too sure.  I don't recall.
2      Q   What is Next Gen Beverages, LLC?
3      A   I believe that's their -- that --
4  that's their company.
5      Q   Who's they?
6      A   I believe that's Tom and Mike's
7  company. I have nothing to do with that.
8      Q   Tom Zarro?
9      A   Yeah.
10     Q   Z-A-R-R-O?
11     A   I believe so.
12     Q   And Mike Holley?
13     A   Mm-hmm.
14         COURT REPORTER:  I'm sorry --
15 BY MR. HARVEY:
16     Q   Yes?
17     A   Yes.
18     Q   Thanks.  So I think you just said it,
19 but I want to make sure.  Have you ever had any
20 involvement with Next Gen Beverages?
21     A   No. No.
22     Q   Have you ever received any compensation
23 from Next Gen Beverages?
24     A   No, sir.
25     Q   Did they ask you to be part of it?

43

1      A   No, sir.
2      Q   Did you ever ask to be part of it?
3      A   No, sir.
4      Q   Do you know how Next Gen Beverages
5  obtained its startup capital?
6      A   No, sir.
7      Q   Do you know what type of products Next
8  Gen Beverages sells?
9      A   All I've seen is the hydrogen water,
10 and briefly, flavors.
11     Q   And when you said seen, did you mean
12 you saw them online?
13     A   I -- I believe so.  On -- well, on
14 social media.  Just so you know, I try to stay out
15 of -- I'm too busy doing what I do, so I try to
16 stay out of what they're doing and --
17         COURT REPORTER:  Could you say the name
18 one more time?  You said Sillwell Media?
19         THE WITNESS:  Oh, social.  Sorry.
20 Like, Instagram -- yeah.
21         COURT REPORTER:  Thank you.
22         THE WITNESS:  Sorry.
23         Shareholders --
24 BY MR. HARVEY:
25     Q   To your knowledge, is there any

44

1  difference -- I'm sorry.  What?
2      A   Shareholders will post stuff on social
3  media, and I'll see it that way.
4      Q   To your knowledge, is there any
5  difference between the hydrogen water that Next
6  Gen Beverages is selling and the hydrogen water
7  that Takeover was selling?
8      A   No, no idea.  I couldn't tell you.
9  Like I said, I'm not involved.  I haven't tried
10 it.  I haven't -- I've just seen pictures.  Every
11 brand is different.  Every -- SoBe, Snapple, it's
12 all different.  You could say it's the same thing,
13 but it's different, so --
14     Q   Do you know whether Takeover
15 transferred any assets to Next Gen Beverages?
16     A   No.
17     Q   Do you know whether Takeover
18 transferred any trades to Next Gen Beverages?
19     A   No, sir.
20     Q   Do you know whether Next Gen entered
21 into any agreements with Manny Pacquiao?
22     A   No, sir.
23     Q   Do you know whether Next Gen Beverages
24 sold NXT LVL products on the Next Gen and/or
25 LinkedIn -- or LOCK'DIN website?

---

45

1    A   No, sir. Like I said, Patrick, I'm --
2  I have nothing to do with that to -- nor do I pay
3  attention to it unless I'm on social media and see
4  --
5    Q   Have you ever promote -- oh, I'm sorry.
6  Go ahead.
7    A   Unless I see it that way, that's the
8  only way I would know.
9    Q   Have you ever promoted any Next Gen
10 Beverages or LOCK'DIN products on your personal
11 social media channels?
12   A   No.
13   Q   When did you first meet Mr. Holley?
14   A   Oh, my God, way back.
15   Q   Ballpark is fine.
16   A   Way back when we did AriZona, 2010,
17 2011, 2012, right in between -- somewhere in
18 there. Sorry. That was a long time ago. It's
19 over 20 --
20   Q   What were the --
21   A   Over 20 years, Patrick.
22   Q   What were the circumstances?
23   A   He was working at AriZona and I got
24 brought in.
25   Q   AriZona, the tea company?

---

46

1    A   Yes, sir.
2    Q   And was that your consulting firm?
3    A   No. It was -- I got brought into
4  AriZona, so I got brought into AriZona iced tea as
5  an -- as an employee.
6    Q   Okay. And did you two work together
7  then?
8    A   Yeah. Yeah.
9    Q   What was he doing at AriZona at that
10 time?
11   A   Sales here in Northern California.
12   Q   And were you doing marketing?
13   A   No. I was doing sales, too, to come in
14 and -- that's the year that the 99 cent can came
15 out. So I came in to increase their market share
16 on the West Coast.
17   Q   When did you first meet Joseph Pavlik?
18   A   Oh, God, a couple of -- probably a year
19 or two after that. So Mike was early 2006, 2007.
20 Mike -- because it has been over 20 years with
21 Mike. So Joe would've been around 2010, yeah.
22 No, not even 2010. Probably '05 or '06 with Mike
23 -- 2005, 2006 with Mike. And then Joe, probably
24 -- Mike -- yeah, 2009 with Mike, and then Joe,
25 probably a year after -- Joe, probably a year

---

47

1  after that. I could be off three or four years on
2  that. Sorry, Patrick -- been a while.
3    Q   No problem. What were the
4  circumstances under which you met Mr. Pavlik?
5    A   So we got brought into a company called
6  -- oh, my God. What was it called? It was in
7  Florida. It was a supplement brand. E -- god,
8  what was the name of the brand? Wasn't -- it
9  wasn't Evolve.
10   E2, that was it, so the -- the letter E
11 and then the number 2. So it was a -- it was a
12 drink that had, was it 8 ounces, that had a lot of
13 beta-alanine. So if you're working out, it would
14 wake up your -- it would -- beta-alanine makes you
15 tingle. So what it's -- when it's tingling, it's
16 waking up your blood vessels that have died.
17   So they made a brand called E2 that had
18 a lot of beta-alanine in it. At that time was a
19 lot because it would make you feel like you're on
20 fire, make you feel like you were going into a
21 different place, so -- and we came in to show E2
22 and tried to get a distribution. That's how we
23 met Joe.
24   Q   When did you first meet Tom Zarro?
25   A   When he originally did his note, I was

---

48

1  on the call, but --
2    Q   When was that?
3    A   Early '21, when we started.
4    Q   And when you say his note, do you mean
5  he had a promissory note with Takeover?
6    A   Yes, sir.
7    Q   Did you know him at all before that
8  call?
9    A   No, sir.
10   Q   How did Takeover come into contact with
11 him, such that it was giving him a note?
12   A   I believe through Ryan Schadel.
13   Q   How much was his note worth?
14   A   I don't recall.
15   Q   And from that point, going forward
16 after that, Mr. Zarro took kind of a role within
17 Takeover, correct?
18   A   No, sir. There was no role for Tom
19 Zarro.
20   Q   Was he ever on the board?
21   A   Not at -- no, not to my -- not to my
22 knowledge, no.
23   Q   Okay. When did you first meet Ryan
24 Schadel?
25   A   When we started the company, early

---

49

1  January, February of '21.
2      Q    What were the circumstances under which
3  you met him?
4      A    Through Joe's contact -- through Joe's
5  contact. That's how we got to Ryan. Ryan is the
6  original one that had LTNC.
7      Q    Was Mr. Schadel ever an employee,
8  agent, officer, director of Takeover?
9      A    No, sir.
10     Q    Do you know whether he has any of those
11  positions with Next Gen?
12     A    Not to my -- I -- I couldn't tell you.
13  I'm not -- I'm not involved, especially with --
14     Q    And you said Mike Tzanetatos was a
15  Takeover employee, correct?
16     A    Yes, sir.
17     Q    And you said he was a former sales
18  representative; is that true?
19     A    Yes, sir.
20     Q    Do you know whether he's working for
21  Takeover today?
22     A    No, sir.
23     Q    Do you know whether he works for Next
24  Gen today?
25     A    He does not. He's -- he works for a --

50

1  a -- a jam company -- a jelly company.
2      Q    Okay. I'm going to share my screen
3  with you and show you an exhibit.
4          Are you able to see that? Are you able
5  to see my screen, Mr. McBride?
6      A    Yeah, I can see it. Sorry about that.
7  Yes, sir.
8      Q    No problem.
9          MR. HARVEY: So we'll mark this as
10  Exhibit 1.
11         (EXHIBIT 1 MARKED)
12  BY MR. HARVEY:
13     Q    And this is a December 9, 2022 e-mail
14  from you to Mr. Tzanetatos, Jennifer Reiter, Joe
15  Pavlik, and Mike Holley, correct?
16     A    Yes, sir.
17     Q    And you say, Mike, unfortunately, at
18  this time, your employment with Takeover
19  Industries is laying you off, correct?
20     A    Yes, sir.
21     Q    Do you recognize this e-mail?
22     A    Yes.
23     Q    And at the time, was
24  Toby@TakeoverInd.com your e-mail address?
25     A    Yes, sir.

51

1      Q    Did you make the decision to terminate
2  Mr. Tzanetatos?
3      A    No. It -- it -- it hurt us to even
4  have to let those guys go because we couldn't
5  afford to keep them anymore.
6      Q    But did you make the decision to
7  terminate him?
8      A    Well, we laid them off, so me, Mike,
9  and Joe and the attorneys.
10     Q    And why did you lay him off?
11     A    We couldn't -- we had no revenue to
12  keep them there, or we would've kept them. This
13  sucks to have to relive this. Sorry, Patrick.
14     Q    Did Takeover terminate any other
15  employees other than Mr. Tzanetatos around this
16  time frame?
17     A    Costello and Tzanetatos were at the
18  same time.
19     Q    Who took over for sales after Mr.
20  Tzanetatos and Mr. Costello were terminated?
21     A    Well, I mean, we were too busy with
22  figuring out what Jason did, so sales were off the
23  table at that point. We were trying to figure out
24  what was going on and what Jason had gotten the
25  company into, and unraveling that onion was pretty

52

1  much our full-time job.
2      Q    How long did it take you to get that
3  done?
4      A    Took us almost --
5          MR. BENNION: State an -- I'm going to
6  state an objection to the extent it may call for
7  speculation. Vague and ambiguous.
8          Go ahead.
9          THE WITNESS: It took us almost three
10  months to figure out what -- everything had
11  happened in that year that Jason was left alone to
12  conspire what he did. I mean, we seized his
13  emails --
14  BY MR. HARVEY:
15     Q    After that three months, did Takeover
16  begin trying to sell again?
17     A    I had -- I had stepped away at that
18  point. I had had enough, so --
19     Q    Shortly thereafter?
20     A    Yes, sir.
21     Q    To your knowledge, did Mr. Tzanetatos
22  ever go back to work for Takeover after this
23  December 2022 termination?
24     A    I don't believe so.
25     Q    To your knowledge, did Mr. Costello

53

1 ever go back to Takeover?
2    A   I don't believe so.  They all found
3 jobs right after, thank God.
4    Q   Do you know whether either of them went
5 to go work for Next Gen?
6    A   No, sir.
7    Q   Who is Maurice Salem?
8    A   I couldn't tell you who that was if my
9 life depended on it.
10   Q   Okay.  And you mentioned an individual
11 named Kerby Fortner before, correct?
12   A   Yes, sir.
13   Q   And that's Kerby, K-E-R-B-Y, correct?
14   A   I believe so.
15   Q   And what was his role, did you say,
16 with Takeover?
17   A   Social media, the gamer -- the gamer
18 stuff, kind of watching over that.
19   Q   Was he still working at Takeover by the
20 time you left in January 2023?
21   A   No.
22   Q   When did he leave Takeover?
23   A   He was there before I was -- before I
24 was suspended and then I don't know what happened
25 after that.

54

1    Q   He was gone by the time you came back?
2    A   He wasn't on the radar at that point.
3 So he was just being paid here and there for what
4 he did, so that was him and Jason.  I had nothing
5 to do with it.
6    Q   Have you ever met James Deppoleto?
7    A   Yes, sir.
8    Q   How many times have you met him?
9    A   I met James in Dallas and I met him in
10 Atlanta.
11   Q   When was the first time you met Mr.
12 Deppoleto?
13   A   Oh, God, I -- I'm not sure, Patrick.
14 Maybe June -- it was when the fight was in -- PFL
15 was in Dallas.  Him and his -- him and his dad
16 came out.
17   Q   And PFL is Professional Fighting League?
18   A   Yes, sir.
19   Q   And why did you meet him at that time?
20 What were the circumstances that led to you guys
21 meeting?
22   A   Me and Anthony Pettis go way back.
23 Anthony met me when we first came into the PFL in
24 2021 and wanted to invest, him and Josh, and
25 that's how I met James.  James wanted to be a part

55

1 of what Anthony was doing, so that's how that kind
2 of -- that's the connection.  I've known Anthony
3 for a long time, 14 years.
4    Q   When did you first -- first meet
5 Anthony Pettis?
6    A   Oh, God, Sacramento when I was running
7 Xyience with the UFC, so him and Duke Roufus.
8 Duke had him --
9    Q   Sacramento --
10   A   Sacramento had a fight with the UFC.  I
11 was running Xyience at that time, which was the
12 energy drink on the met.  And Duke Roufus brought
13 Anthony out and Sergio.  Sergio was, like 15, 14,
14 whatever he was then.  And they were -- they
15 needed a gym to work out.  So I got Urijah's Gym
16 for them to work out for all the UFC guys to come
17 out and work out at Urijah's Gym.  That's how I
18 met Duke Roufus and met Anthony, and then it just
19 prolonged from there.  That's when Anthony first
20 came into the UFC -- or WEC, sorry, at that time.
21   Q   And so what was Mr. Pettis's
22 relationship with Takeover?
23   A   See -- Pettis?  Zero.  Anthony had no
24 -- he was just an investor.
25   Q   When did he first invest in Takeover?

56

1    A   I don't recall the date that him and
2 Josh came in.  I don't remember.  It was after --
3 it was after that fight in Florida, so probably
4 early -- early February, March of '22.
5    Q   Who's the Josh you just referred to?
6    A   Rapkin.
7    Q   Can you spell that?
8    A   R-A-P-K-I-N.
9    Q   And who is Mr. Rapkin?
10   A   Buddy of Anthony's.
11   Q   And he also invested in Takeover?
12   A   Yes.  Him and Anthony first came in,
13 and then James came in, I believe, right after
14 that.
15   Q   Have Mr. Pettis and Mr. Rapkin been
16 repaid whatever their investment was?
17   A   I believe so.  I believe they --
18   Q   Did they get --
19   A   I believe they --
20   Q   Did they get notes or did they buy
21 shares?
22   A   I believe that they got shares, so they
23 moved them when the company went -- when Mike got
24 it trading back public, so I believe they did.  I
25 don't know.  I don't talk to Anthony anymore, so --

57

1    Q   I'm sorry.  Did you say that they had
2  shares or did they have a note like Mr. Deppoleto
3  had?
4    A   I believe they had a note that had
5  shares.  That's how we usually would've done it,
6  so -- but Jason put that all together, so --
7    Q   And when you met Mr. Deppoleto in
8  Dallas, I think you said -- well, I just want to
9  make -- I just want to make sure your
10  understanding is that he was interested in
11  investing in Takeover and that's why you were
12  meeting in Dallas; is that accurate?
13    A   He had mentioned he wanted to come in,
14  and so I told Jason just to have him come to
15  Dallas and we'll meet face-to-face.  That's how we
16  usually -- I'd rather see somebody's eyes and see
17  if they're -- this is something they want to do
18  and make them feel comfortable with us, with me
19  and Joe.  And he brought his father out, which is
20  a great -- was a great man.
21        We had a good time and he talked to me
22  for about 20, 30 minutes.  And then we had him at
23  dinner and took him to the fight and had a great
24  time.  And it was real nonchalant, real easy, and
25  if he came in, he came in.  If he didn't and he

58

1  didn't, and that's kind of how I left it.  Wished
2  him the best of luck, said, hopefully, see you
3  again, and then Jason said he wanted to come in.
4  There was no force.  There was no -- it was just
5  real nonchalant.  It was a great time.  He was a
6  nice guy.  He's a really nice guy.  So is his
7  father.  A lot of respect for the dad.  We had a
8  great time.
9    Q   Do you recall a June 10, 2021 special
10  meeting of Takeover's board of directors?
11    A   I don't recall that.
12    Q   Do you remember attending a meeting
13  around that time -- a -- a board of directors
14  meeting around that time?
15    A   I don't recall.  I would have to look
16  at it and see what it was about.
17    Q   Did you have any involvement in
18  soliciting celebrity endorsements for Takeover,
19  such as paying Manny Pacquiao?
20    A   Manny Pacquiao, I -- I was involved
21  after we got him.  T-Pain was told from day one
22  and there are people from me to Jason to get me on
23  the phone with him.  Just so you're aware, anybody
24  I've ever dealt with, I have to talk to you on the
25  phone.  I have to meet you.  I have to -- that's

59

1  just how I do things.  You have to be right for
2  the company.  Any brand I've ever been with, even
3  when we had our -- me and Mike had our own -- we
4  had Jonathan Quick, Haloti Ngata, and Aldon Smith
5  at one time.  They were all like family.
6        So anybody we brought in, I wanted to
7  make sure was there for the right reason, and we
8  weren't having to babysit, especially somebody
9  like T-Pain that was getting bigger.  And I had --
10  I'd never known the guy, didn't know his
11  intentions, so I was kept away from him.  I was
12  isolated from T-Pain.  For Manny, we did Manny's
13  fight and I met Manny then, and his people there.
14    Q   Why were you kept away from T-Pain?
15    A   I couldn't tell you.  Jason separated
16  that issue.  I think that was his starting point
17  of trying to manipulate what they were trying to
18  do; try to take the shot, separate it from the
19  company, and take it private.  I think that's when
20  his plan pretty much started.
21    Q   Have you reviewed --
22    A   So I was kept away from T-Pain and his
23  people.
24    Q   Have you -- have you reviewed the
25  contracts between Takeover and Manny Pacquiao and

60

1  T-Pain?
2    A   No.
3    Q   Did you --
4    A   I've seen them briefly.  That's it.
5    Q   Did you sign those contracts on behalf
6  of Takeover?
7    A   I believe so.
8    Q   Do you remember the length of the
9  Pacquiao contract?
10    A   I think that one was, like, 30 pages
11  long, wasn't it?  I don't recall.
12    Q   Oh, I mean, not the -- not the number
13  of pages in the document.
14    A   Oh.
15    Q   How long was the deal supposed to last?
16    A   I couldn't tell you, Patrick.  Sorry.
17  It's been so -- it's been a while.  I believe two
18  years.
19    Q   And that was executed in April 2021,
20  correct?
21    A   Yeah.  There was a lot that he had to
22  do, also; distribution in the Philippines, a lot
23  of the stuff that was supposed to go down that
24  Jason was supposed to make sure happened that
25  never happened.

61

1    Q   Was the Pacquiao contract exclusive?
2  In other words, was Pacquiao agreeing to refrain
3  from promoting products that competed with NXT LVL?
4    A   I would've made -- we would've made
5  sure that would've -- anybody would've made sure
6  that would happen.  I would assume that would've
7  been in there.  He was a fan of the brand, so he
8  was drinking it before.  Once we made it, it was
9  sent to him.  That's how we got -- that's how he
10 pretty much got through a shareholder, got to us,
11 and he wanted to be a part of it, so that's how he
12 came to us.  Otherwise, probably wouldn't have
13 been a part of the company.
14   Q   You spent Takeover's funds on personal
15 expenses, correct?
16       MR. BENNION:  Just state an objection
17 that calls for speculation.  Lacks foundation.
18       Go ahead.
19       THE WITNESS:  Whatever I spent, I -- I
20 paid back immediately.
21 BY MR. HARVEY:
22   Q   So the answer is yes, you did spend
23 Takeover funds on personal expenses?
24       MR. BENNION:  Same objection.
25       THE WITNESS:  Yes.

62

1  BY MR. HARVEY:
2    Q   When was the first instance when you
3  used Takeover funds for personal expenses?
4    A   I don't recall.
5    Q   When was the last instance when you
6  used Takeover funds for personal expenses?
7    A   I believe August when we were in New
8  York.
9    Q   August of 2022?
10   A   Yeah.  Yes.
11   Q   What types of personal expenses did you
12 charge to Takeover?
13   A   I don't recall.
14   Q   Shopping?
15   A   I don't recall.
16   Q   Travel?
17   A   Travel would've been paid by the
18 company.
19   Q   Personal travel?
20   A   It was never personal travel.  Anything
21 I traveled, anything I went to with -- with the
22 PFL or -- was -- was done through -- was all
23 through the company.
24   Q   And you spent over $250,000 of Takeover
25 funds for personal expenses, correct?

63

1        MR. BENNION:  Objection.  Lacks
2  foundation.  Calls for speculation.
3        THE WITNESS:  No.
4  BY MR. HARVEY:
5    Q   How much did you spend if it wasn't
6  over 250,000?
7    A   I don't recall what -- that was also
8  thrown out in the AriZona case, but you already
9  know that.
10   Q   Over 200,000?
11   A   I don't recall.
12   Q   Did Takeover reprimand you in any way?
13   A   Well, I was suspended by Jason over
14 false accusations.
15   Q   You were placed on a leave of absence?
16   A   Whatever -- yeah.
17   Q   And what was the time period?
18   A   Three weeks.  Supposed to be for 90
19 days, but Judge overturned it and then we exposed
20 Jason for what he was doing to our company and the
21 people he was doing it with.
22   Q   Were you placed on a leave of absence,
23 in -- in other words, removed from your role as a
24 director of Takeover, or were you only removed as
25 your role as CEO of Takeover or was it both?

64

1    A   I believe it was just as the role --
2  couldn't take me off the board.
3    Q   Just as CEO?
4    A   Yeah.  You can't take me off the board.
5  Yeah.
6        MR. HARVEY:  Let me show you my screen
7  again here.
8        We'll mark this as Exhibit 2.
9        (EXHIBIT 2 MARKED)
10 BY MR. HARVEY:
11   Q   Are you able to see it?
12   A   Yep.
13   Q   And at the top of this document, it's
14 got a case number on it.  And so it looks like
15 this was something that was filed in court on
16 September 2023.
17       Setting aside that portion, have you
18 seen this document before?
19   A   I don't recall this.
20   Q   It's -- at the top, it says, Related
21 Party Receivable Confirmation, correct?
22   A   Right.
23   Q   And it's dated March 25, 2022, correct?
24   A   Correct.
25   Q   And then it's -- a little bit further

65

1 down, it says, The following information relating
2 to amount owed by me to Takeover Industries as of
3 December 31st, 2021, agrees to my records due from
4 related party as of December 31st, 20201,
5 $243,253.84, correct?
6    **A   Correct.**
7    Q   And then you DocuSigned it on the
8 bottom, correct?
9    **A   It looks like it.**
10    Q   So as of March 25, 2022, you owed
11 Takeover $243,000 and change, correct?
12    **A   No. This is another made up document**
13 **by Jason. This is another made up money by Jason**
14 **Tucker. This was thrown out of court.**
15    Q   Why did you sign it if it was made up?
16    **A   This is all forcible stuff that Jason**
17 **put me through, put us through, put me and Joe**
18 **through, to release our shares, to threaten this,**
19 **threaten that, tell shareholders. That's why.**
20    Q   I don't think I understand your answer.
21 Why would you have signed this document if you
22 weren't agreeing that you owed $243,000 as of
23 March 25, 2022?
24    **A   Because he was threatening to do**
25 **certain things that were scaring the shit out of**

66

1 **me and Joe, so we didn't know better back then**
2 **what we know now.**
3    Q   So you signed a document saying you
4 owed the company $243,000, but you didn't actually
5 mean it?
6    **A   This was thrown out of court. So I**
7 **don't know why I'm even answering this question.**
8 **This is -- this is -- this is lies. So I don't --**
9 **I don't owe the company $243,000.**
10    Q   So your testimony is that you signed
11 this saying you owed the company 243,000, but you
12 didn't actually believe you owed the company
13 243,000. Is that what you're telling me?
14    **A   I'm telling you I don't owe the company**
15 **anything, that this was made up by Jason Tucker,**
16 **period, end of story. That's it.**
17    Q   It sounds like you're talking about you
18 don't owe the company anything today. I'm asking
19 you as of March 25 --
20    **A   No.**
21    Q   -- 2022, did you owe the company
22 $243,000?
23    **A   No, I did not.**
24    Q   So why did you sign this, then?
25    **A   Because at -- then Jason had us**

67

1 **convinced that I did.**
2    Q   And how did he go about convincing you?
3    **A   With his threats.**
4    Q   I'm not following that.
5        THE WITNESS:  Don, I need a -- I need a
6 few minutes.  I need a break.
7        MR. BENNION:  I -- I -- Counsel, I do
8 think this is time for a break.  You -- you -- you
9 -- your last statement was, I'm not following
10 that, so I don't think that's a question.  If you
11 want to -- I do have to use the bathroom as well.
12 Is this a good time for a break?
13        MR. HARVEY:  Sure.  We can take five
14 minutes.
15        MR. BENNION:  And by the way, could you
16 put the top of this document -- I can't see the
17 title of the document up top -- the related party
18 -- okay.  Thank you.  Can we take 10 minutes,
19 Patrick?
20        MR. HARVEY:  Sure.  Yeah.
21        THE WITNESS:  I need 10 minutes.  I got
22 to get my -- my (inaudible) and stuff situated
23 here.
24        THE VIDEOGRAPHER:  All right.  We are
25 going off the record.  The time is 9:35 a.m.

68

1        (OFF THE RECORD)
2        THE VIDEOGRAPHER:  We are going back on
3 the record.  The time is 9:54 a.m.
4        MR. HARVEY:  During the break, Mr.
5 McBride told his counsel that he is not feeling
6 well, such that we need to end the deposition
7 right now.  What -- I've agreed to do that,
8 obviously, holding it open.  We've agreed to
9 continue the deposition next Friday, November 22,
10 starting at 8:00 a.m. Pacific, 10:00 a.m.
11 Central.  We'll do that via Zoom as well.
12        Is that accurate, Counsel?
13        MR. BENNION:  Yes, it is.  Thank you,
14 Counsel.
15        MR. HARVEY:  No problem.  Okay.  So I
16 think we're all set then.
17        MR. BENNION:  Patrick, do you have a
18 second?  Maybe you and I could talk.  Maybe we --
19 maybe we can do it via phone.  We don't have to be
20 --
21        MR. HARVEY:  Yeah.  Sure.  I'm at my
22 office, if you want to give me a call.  We can go
23 off the record now.
24        MR. BENNION:  So Toby, take care and I
25 -- I -- I -- I'll call you later today.  Get some

**69**

1 rest.
2       THE VIDEOGRAPHER:  All right.  This
3 marks the end of part 1 of the deposition of Toby
4 McBride.  The time on the monitor is 9:55 a.m.
5       (Off the record at 9:55 AM.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**70**

1       CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2           I, Charlie McGrath, AAERT CER, the officer
3 before whom the foregoing proceedings were
4 taken, do hereby certify that any witness(es) in
5 the foregoing proceedings were fully sworn;
6 that the proceedings were recorded by me and
7 thereafter reduced to typewriting by a
8 qualified transcriptionist; that said digital
9 audio recording of said proceedings are a
10 true and accurate record to the best of my
11 knowledge, skills, and ability; and that I am
12 neither counsel for, related to, nor employed
13 by any of the parties to this case and have
14 no interest, financial or otherwise, in its
15 outcome.
16
17
18
19
20 _____
21 CHARLIE MCGRATH, AAERT CER, NOTARY PUBLIC,
22 FOR THE STATE OF CALIFORNIA
23 NOVEMBER 27, 2024
24
25

**71**

1       CERTIFICATE OF TRANSCRIBER
2           I, Carly Hurst, do hereby certify
3 that this transcript was prepared from the digital
4 audio recording of the foregoing proceeding; that
5 said proceedings were reduced to typewriting under
6 my supervision; that said transcript is a true and
7 accurate record of the proceedings to the best of
8 my knowledge, skills, and ability; and that I am
9 neither counsel for, related to, nor employed by any
10 of the parties to the case and have no interest,
11 financial or otherwise, in its outcome.
12
13 *Carly Hurst*
14
15 _____
16 CARLY HURST
17 PLANET DEPOS, LLC
18 NOVEMBER 27, 2024
19
20
21
22
23
24
25

| A |
|---|

**aaert**
1:25, 2:14,
70:2, 70:21
**ability**
70:11, 71:8
**able**
7:1, 50:4,
64:11
**about**
12:3, 14:16,
16:11, 18:7,
20:19, 21:7,
23:16, 25:20,
25:22, 27:15,
27:23, 27:25,
29:14, 30:13,
30:22, 30:24,
32:19, 33:3,
36:16, 38:20,
50:6, 57:22,
58:16, 66:17,
67:2
**absence**
63:15, 63:22
**account**
30:20, 35:21,
35:22, 35:23,
35:25, 36:2,
36:15, 36:20
**accounting**
27:5
**accurate**
57:12, 68:12,
70:10, 71:7
**accusations**
30:12, 63:14
**acquired**
26:7
**action**
1:5
**actually**
22:18, 38:21,
66:4, 66:12
**address**
7:6, 50:24
**administer**
6:4

**affiliates**
24:5
**affirmed**
6:19
**afford**
51:5
**after**
18:25, 19:1,
20:10, 20:20,
25:2, 37:1,
46:19, 46:25,
47:1, 48:16,
51:19, 52:15,
52:22, 53:3,
53:25, 56:2,
56:3, 56:13,
58:21
**again**
8:8, 16:25,
18:1, 22:3,
25:3, 27:25,
32:7, 40:18,
52:16, 58:3,
64:7
**agent**
49:8
**ago**
27:12, 40:20,
45:18
**agree**
6:7, 34:10
**agreed**
36:7, 68:7,
68:8
**agreeing**
61:2, 65:22
**agreements**
44:21
**agrees**
65:3
**ahead**
11:14, 11:15,
16:6, 18:4,
22:9, 28:15,
40:15, 40:17,
45:6, 52:8,
61:18
**al**
1:8, 5:5

**alcohol**
9:25, 19:14
**aldon**
59:4
**alex**
25:12, 25:13,
25:16, 25:21,
28:22, 29:4,
29:11
**all**
5:11, 6:1, 6:6,
6:9, 6:15,
18:16, 18:17,
18:24, 19:5,
19:8, 19:15,
20:6, 20:9,
23:22, 24:3,
25:2, 26:25,
27:5, 30:24,
32:13, 33:11,
33:17, 36:6,
38:23, 41:5,
43:9, 44:12,
48:7, 53:2,
55:16, 57:6,
59:5, 62:22,
65:16, 67:24,
68:16, 69:2
**alleged**
33:25
**allegedly**
24:15
**almost**
52:4, 52:9
**alone**
52:11
**already**
63:8
**also**
3:19, 5:24,
11:13, 11:15,
11:17, 26:8,
56:11, 60:22,
63:7
**always**
36:20
**ambiguous**
52:7

**amount**
65:2
**another**
25:9, 33:8,
33:15, 33:16,
65:12, 65:13
**answer**
8:15, 8:18,
12:23, 40:17,
61:22, 65:20
**answering**
8:5, 66:7
**anthony**
39:3, 54:22,
54:23, 55:1,
55:2, 55:5,
55:13, 55:18,
55:19, 55:23,
56:12, 56:25
**anthony's**
56:10
**any**
6:7, 7:9, 8:13,
8:22, 15:3,
15:6, 21:18,
24:6, 29:21,
30:20, 33:21,
37:3, 41:18,
42:19, 42:22,
43:25, 44:4,
44:15, 44:18,
44:21, 45:9,
49:10, 51:14,
58:17, 59:2,
63:12, 70:4,
70:13, 71:9
**anybody**
19:13, 38:14,
58:23, 59:6,
61:5
**anymore**
51:5, 56:25
**anyone**
11:23, 23:10,
23:19, 24:17,
24:23
**anything**
15:1, 29:14,

31:8, 34:3,
34:9, 36:3,
36:16, 37:8,
38:11, 62:20,
62:21, 66:15,
66:18
**anywhere**
13:10, 13:14
**apologies**
16:16, 22:24,
35:3
**apologize**
21:3
**applicable**
6:9, 6:13
**appropriate**
11:8
**approximately**
10:22
**april**
29:20, 60:19
**arizona**
19:2, 31:4,
33:16, 34:2,
35:11, 35:12,
45:16, 45:23,
45:25, 46:4,
46:9, 63:8
**around**
13:17, 35:24,
46:21, 51:15,
58:13, 58:14
**aside**
64:17
**asked**
28:5, 28:11,
40:20
**asking**
28:24, 66:18
**assets**
44:15
**assist**
11:20
**assume**
8:19, 61:6
**assuming**
8:2
**athletes**
36:23

**atlanta**
54:10
**attached**
4:7, 36:18
**attending**
5:12, 58:12
**attention**
45:3
**attorney**
32:21, 32:22,
32:25, 33:16
**attorney's**
35:25
**attorneys**
18:1, 31:3,
33:15, 51:9
**audio**
17:8, 70:9,
71:4
**august**
32:1, 32:6,
37:2, 62:7, 62:9
**authorized**
6:4
**aware**
41:20, 58:23
**away**
12:10, 12:11,
16:20, 35:6,
52:17, 59:11,
59:14, 59:22

**B**

**b-e-v-n-e-t**
19:13
**babysit**
59:8
**back**
9:5, 15:23,
16:19, 18:2,
23:21, 23:25,
29:16, 34:4,
34:7, 34:19,
34:24, 35:3,
35:18, 35:20,
36:1, 36:4,
37:15, 38:8,
38:16, 39:12,

41:13, 45:14,
45:16, 52:22,
53:1, 54:1,
54:22, 56:24,
61:20, 66:1,
68:2
**bad**
36:12
**ballpark**
9:6, 45:15
**bank**
30:19
**bannon**
3:14
**basis**
31:21
**bathroom**
67:11
**battleship**
32:22, 33:1
**because**
6:2, 12:25,
25:3, 28:11,
29:9, 30:10,
32:15, 33:6,
33:7, 33:25,
34:3, 35:2,
35:4, 36:11,
46:20, 47:19,
51:4, 65:24,
66:25
**become**
24:25
**been**
7:24, 20:21,
21:3, 27:22,
30:19, 38:15,
46:20, 46:21,
47:2, 56:15,
59:2, 60:17,
61:7, 61:13,
62:17
**beer**
19:15
**before**
2:13, 7:24,
8:15, 9:12,
10:3, 10:22,

28:16, 28:18,
48:7, 53:11,
53:23, 61:8,
64:18, 70:3
**begin**
52:16
**beginning**
11:7, 29:19,
32:22, 41:16
**begins**
5:2
**behalf**
3:3, 3:11, 60:5
**behind**
27:5, 34:7,
34:19
**being**
5:18, 6:19,
11:8, 15:3,
35:23, 35:24,
54:3
**believe**
18:25, 19:2,
19:3, 19:19,
20:7, 22:10,
26:5, 26:15,
26:21, 27:14,
27:21, 35:13,
35:15, 39:18,
42:3, 42:6,
42:11, 43:13,
48:12, 52:24,
53:2, 53:14,
56:13, 56:17,
56:19, 56:22,
56:24, 57:4,
60:7, 60:17,
62:7, 64:1,
66:12
**believing**
30:13
**benchmarks**
11:11
**benefit**
33:17
**bennion**
3:12, 3:13,
5:17, 40:9,

52:5, 61:16,
61:24, 63:1,
67:7, 67:15,
68:13, 68:17,
68:24
**best**
58:2, 70:10,
71:7
**beta-alanine**
47:13, 47:14,
47:18
**better**
18:3, 18:14,
23:5, 28:12,
29:2, 34:25,
66:1
**between**
13:14, 25:12,
39:25, 40:1,
40:22, 44:5,
45:17, 59:25
**beverage**
9:7, 9:18,
9:21, 10:5,
10:25, 11:5,
11:12, 13:23,
14:9, 19:8,
19:10, 19:14
**beverages**
13:24, 14:6,
42:2, 42:20,
42:23, 43:4,
43:8, 44:6,
44:15, 44:18,
44:23, 45:10
**bevnet**
18:10, 19:4,
19:7, 19:13,
19:16, 19:18,
19:23, 19:24
**bigger**
59:9
**billion**
37:18, 37:19,
37:20, 38:2,
38:3
**bit**
16:5, 16:10,

17:6, 17:12,
21:5, 25:25,
26:1, 64:25
**biweekly**
31:21
**blackwell**
3:5
**blood**
47:16
**board**
12:25, 29:24,
30:3, 31:7,
31:11, 48:20,
58:10, 58:13,
64:2, 64:4
**borgard**
32:23
**both**
23:17, 26:15,
26:16, 63:25
**bottom**
17:10, 65:8
**bought**
19:21
**brady**
29:10, 29:15
**brady's**
25:13, 25:19
**branch**
14:6
**brand**
9:14, 11:13,
14:20, 14:23,
15:4, 25:20,
33:8, 34:18,
36:23, 44:11,
47:7, 47:8,
47:17, 59:2,
61:7
**brands**
9:8, 19:16,
19:17
**break**
67:6, 67:8,
67:12, 68:4
**briefly**
43:10, 60:4
**bring**
29:4

**bringing**
32:21
**broadway**
3:6
**broke**
9:25, 26:22
**brought**
9:17, 10:1,
33:4, 33:14,
45:24, 46:3,
46:4, 47:5,
55:12, 57:19,
59:6
**bs**
33:14
**buddy**
18:20, 56:10
**budweiser**
9:9
**build**
9:8
**building**
11:11, 11:12
**built**
20:4
**business**
20:24
**busy**
43:15, 51:21
**butchered**
22:16, 22:23
**butchering**
22:11
**buy**
56:20
**bylaws**
34:5

---
**C**
---

**california**
2:15, 6:3, 7:8,
7:21, 46:11,
70:22
**call**
13:1, 40:13,
48:1, 48:8,
52:6, 68:22,
68:25

**called**
10:12, 19:12,
20:13, 20:14,
47:5, 47:6,
47:17
**calls**
20:3, 27:2,
61:17, 63:2
**came**
14:3, 14:16,
33:5, 34:4,
35:18, 36:14,
46:14, 46:15,
47:21, 54:1,
54:16, 54:23,
55:20, 56:2,
56:12, 56:13,
57:25, 61:12
**can't**
14:14, 16:14,
18:22, 21:19,
22:14, 26:22,
27:15, 39:19,
64:4, 67:16
**canada**
20:12
**capital**
11:7, 43:5
**caption**
5:20
**care**
33:10, 68:24
**careers**
28:8, 28:11
**carly**
71:2, 71:16
**case**
5:7, 31:5,
33:14, 63:8,
64:14, 70:13,
71:10
**castro**
3:20, 5:10
**causing**
16:13
**celebrity**
58:18
**cent**
46:14

central
68:11
ceo
9:21, 15:15,
29:21, 32:10,
33:24, 63:25,
64:3
cer
1:25, 2:14,
70:2, 70:21
certain
65:25
certificate
70:1, 71:1
certification
6:12
certified
6:7
certify
70:4, 71:2
chains
24:3
chairman
31:8
chance
8:3, 20:7
change
16:8, 34:5,
34:6, 65:11
channels
45:11
charge
62:12
charlie
1:25, 2:13,
5:24, 70:2,
70:21
chief
21:15, 24:20
choose
12:23
circumstances
45:22, 47:4,
49:2, 54:20
civil
1:5
classify
14:9

coast
46:16
com
50:24
come
11:5, 28:2,
32:25, 41:13,
46:13, 48:10,
55:16, 57:13,
57:14, 58:3
comfortable
57:18
companies
10:5
company
9:18, 9:24,
10:9, 10:12,
10:25, 11:6,
13:23, 14:3,
16:19, 18:2,
18:22, 19:21,
20:12, 26:7,
26:11, 26:17,
26:19, 27:12,
28:23, 28:24,
29:14, 33:1,
33:2, 33:12,
34:4, 34:6,
34:10, 36:4,
36:14, 37:6,
37:15, 38:10,
38:15, 39:8,
39:19, 42:4,
42:7, 45:25,
47:5, 48:25,
50:1, 51:25,
56:23, 59:2,
59:19, 61:13,
62:18, 62:23,
63:20, 66:4,
66:9, 66:11,
66:12, 66:14,
66:18, 66:21
compensation
31:13, 37:3,
42:22
competed
61:3

competition
33:7
complaint
8:24
computer
24:4
conclusion
40:13
conducted
1:15, 2:1
confirmation
4:10, 64:21
connection
55:2
consistent
6:13
conspire
52:12
constitute
6:11
consult
11:1, 11:3
consulted
9:16, 10:21,
20:12
consulting
9:17, 10:4,
10:17, 11:13,
20:21, 46:2
contact
48:10, 49:4,
49:5
contacted
38:4
contemplated
35:4
continue
68:9
continued
31:24
contract
60:9, 61:1
contracts
59:25, 60:5
convinced
31:1, 67:1
convincing
67:2

coo
21:15
coordinating
33:18
corner
34:25, 35:6
correct
8:2, 12:1,
13:19, 26:9,
26:12, 27:13,
32:10, 32:12,
32:16, 38:22,
39:8, 48:17,
49:15, 50:15,
50:19, 53:11,
53:13, 60:20,
61:15, 62:25,
64:21, 64:23,
64:24, 65:5,
65:6, 65:8,
65:11
correctly
26:18
costello
23:9, 34:14,
51:17, 51:20,
52:25
costello's
23:14
coughing
21:5
could
6:15, 7:3,
7:12, 19:4,
22:11, 25:14,
28:3, 28:12,
29:2, 43:17,
44:12, 47:1,
67:15, 68:18
couldn't
19:3, 22:6,
41:24, 44:8,
49:12, 51:4,
51:11, 53:8,
59:15, 60:16,
64:2
counsel
5:13, 6:22,

17:5, 33:5, 67:7, 68:5, 68:12, 68:14, 70:12, 71:9
**couple**
35:7, 39:16, 46:18
**course**
38:9
**court**
1:1, 5:6, 5:23, 6:1, 15:25, 16:24, 17:3, 18:17, 19:2, 20:9, 22:2, 22:5, 22:20, 25:14, 25:17, 34:3, 42:14, 43:17, 43:21, 64:15, 65:14, 66:6, 70:1
**crosstalk**
11:16
**cso**
21:13, 21:15
**current**
7:6
**cut**
15:25, 16:25, 17:4
**cutting**
17:7

**D**

**dad**
54:15, 58:7
**dallas**
54:9, 54:15, 57:8, 57:12, 57:15
**dan's**
9:14
**date**
5:8, 56:1
**dated**
64:23
**david**
23:21

**david's**
23:22, 23:24
**day**
16:20, 18:25, 37:7, 58:21
**days**
34:2, 34:22, 34:23, 35:6, 35:14, 63:19
**dead**
36:10
**deal**
18:1, 25:12, 34:12, 34:13, 34:18, 36:10, 36:21, 60:15
**dealt**
58:24
**debt**
27:4, 37:25
**december**
4:9, 28:16, 28:19, 50:13, 52:23, 65:3, 65:4
**decision**
51:1, 51:6
**defendant**
5:17
**defendants**
1:9, 3:11, 5:19
**delineate**
16:14
**depended**
53:9
**depending**
10:25
**depos**
5:11, 5:25, 71:17
**deposed**
5:18, 7:24
**deposition**
1:14, 2:1, 4:8, 5:3, 5:12, 6:5, 8:4, 8:23, 68:6, 68:9, 69:3
**deppoleto**
1:4, 5:4, 39:2,

54:6, 54:12, 57:2, 57:7
**describe**
13:21
**died**
47:16
**difference**
44:1, 44:5
**different**
26:11, 44:11, 44:12, 44:13, 47:21
**difficult**
16:15
**difficulty**
17:6
**digital**
70:8, 71:3
**dinner**
57:23
**director**
49:8, 63:24
**directors**
58:10, 58:13
**distribution**
47:22, 60:22
**distributors**
9:9, 19:9
**district**
1:1, 1:2, 5:6
**document**
60:13, 64:13, 64:18, 65:12, 65:21, 66:3, 67:16, 67:17
**documents**
8:22, 18:17, 20:8, 22:21, 32:8
**docusigned**
65:7
**doing**
10:6, 13:25, 20:23, 27:3, 35:5, 36:22, 43:15, 43:16, 46:9, 46:12, 46:13, 55:1,

63:20, 63:21
**dollar**
34:11, 34:13, 34:18, 36:9
**dollars**
34:17
**don**
3:12, 3:13, 5:17, 67:5
**done**
18:5, 38:14, 52:3, 57:5, 62:22
**down**
14:8, 25:21, 26:22, 38:16, 60:23, 65:1
**drained**
36:2
**drama**
16:3
**drink**
47:12, 55:12
**drinking**
61:8
**drinks**
9:25
**drive**
3:14, 7:7
**drop**
38:13
**drove**
16:4
**due**
65:3
**duke**
55:7, 55:8, 55:12, 55:18
**duly**
6:19
**during**
11:22, 30:3, 37:7, 68:4
**duties**
31:10

**E**

**e-mail**
22:17, 50:13,

50:21, 50:24
e-x-p-o-n-e-n-t
20:15
e2
47:10, 47:17,
47:21
early
15:14, 29:12,
46:19, 48:3,
48:25, 56:4
easy
57:24
education
7:13
efforts
33:18
eid
24:2
either
8:3, 9:18,
21:21, 53:4
electronic
6:6
elite
10:9, 10:12,
10:18, 11:21
else
8:25, 11:23,
13:10, 13:14,
15:1, 23:7,
23:10, 23:19,
24:5, 24:17,
24:23, 30:3,
37:22
email
4:9
emails
52:13
employed
70:12, 71:9
employee
22:24, 46:5,
49:7, 49:15
employees
15:6, 21:10,
21:18, 21:24,
51:15
employment
9:3, 50:18

end
11:2, 17:12,
17:15, 20:17,
20:18, 23:21,
41:15, 66:16,
68:6, 69:3
endorsements
58:18
energy
9:25, 55:12
enough
52:18
entered
44:20
entire
15:16
eric
32:23, 33:4,
33:5, 33:9
eric's
32:24
escrow
35:25
especially
49:13, 59:8
esquire
3:4, 3:12
et
1:8, 5:5
even
10:19, 22:14,
22:16, 46:22,
51:3, 59:2, 66:7
events
36:22
eventually
38:25
ever
7:24, 21:25,
41:18, 41:25,
42:19, 42:22,
43:2, 45:5,
45:9, 48:20,
49:7, 52:22,
53:1, 54:6,
58:24, 59:2
every
17:9, 19:19,

44:10, 44:11
everybody
35:12
everything
18:8, 19:18,
41:17, 52:10
evidentiary
6:10
evolve
47:9
ex-partner
30:13
examination
4:2, 6:22
examined
6:21
exclusive
61:1
excuse
36:20
executed
60:19
executing
39:24
exhibit
4:8, 4:9, 4:10,
50:3, 50:10,
50:11, 64:8,
64:9
expenses
61:15, 61:23,
62:3, 62:6,
62:11, 62:25
exponent
20:13, 20:15
exposed
63:19
extending
28:8
extent
40:13, 52:6
eyes
57:16

**F**

face-to-face
57:15
fair
8:15, 8:19,

40:3
false
63:14
family
59:5
fan
61:7
far
17:7, 27:3
father
57:19, 58:7
february
34:12, 36:11,
37:13, 38:4,
39:12, 49:1,
56:4
feel
8:13, 16:20,
47:19, 47:20,
57:18
feeling
68:5
fees
34:16, 34:17
few
67:6
field
32:13
fight
54:14, 55:10,
56:3, 57:23,
59:13
fighting
54:17
figure
28:12, 51:23,
52:10
figured
35:7, 41:16
figuring
36:4, 39:24,
51:22
filed
64:15
finagling
32:7
finances
30:17

**financial**
70:14, 71:11
**find**
22:15, 22:17
**fine**
22:9, 45:15
**fire**
47:20
**firm**
46:2
**first**
6:19, 15:13,
41:11, 45:13,
46:17, 47:24,
48:23, 54:11,
54:23, 55:4,
55:19, 55:25,
56:12, 62:2
**five**
5:19, 10:24,
11:1, 67:13
**fix**
9:18, 16:9
**flavors**
43:10
**flew**
25:20
**flip**
8:17
**florida**
25:21, 47:7,
56:3
**following**
33:21, 65:1,
67:4, 67:9
**follows**
6:21
**force**
58:4
**forced**
34:24
**forcible**
65:16
**foregoing**
70:3, 70:5,
71:4
**forget**
23:22, 23:24,

**formation**
28:20
**formed**
27:1
**former**
8:3, 49:17
**formulations**
11:17, 11:18
**fortner**
23:11, 53:11
**fortner's**
23:12
**forward**
36:13, 48:15
**found**
25:6, 25:7,
25:22, 30:23,
30:24, 33:3,
53:2
**foundation**
11:11, 61:17,
63:2
**founded**
13:18, 14:2,
14:3, 15:13
**four**
11:1, 17:7,
47:1
**frame**
11:22, 51:16
**freaking**
18:23
**free**
8:13
**friday**
1:16, 68:9
**full**
7:4
**full-time**
52:1
**fully**
70:5
**funds**
61:14, 61:23,
62:3, 62:6,
62:25
**further**
64:25

25:10, 33:15

**furthering**
36:23

**G**

**gamer**
14:10, 14:12,
15:2, 23:13,
53:17
**gave**
38:1
**gen**
42:2, 42:20,
42:23, 43:4,
43:8, 44:6,
44:15, 44:18,
44:20, 44:23,
44:24, 45:9,
49:11, 49:24,
53:5
**general**
34:12, 34:13,
34:18, 36:10
**generally**
13:21
**getting**
29:3, 32:5,
32:19, 33:22,
33:24, 35:19,
37:1, 59:9
**ghost**
19:21
**give**
25:6, 38:3,
38:7, 68:22
**giving**
48:11
**go**
7:18, 8:4, 8:7,
9:5, 11:14,
11:15, 16:5,
16:18, 18:4,
18:10, 19:8,
19:24, 20:20,
22:9, 25:6,
28:15, 31:19,
32:19, 35:3,
35:21, 37:22,
37:23, 37:24,

38:25, 39:4,
39:5, 40:15,
40:17, 45:6,
51:4, 52:8,
52:22, 53:1,
53:5, 54:22,
60:23, 61:18,
67:2, 68:22
**god**
45:14, 46:18,
47:6, 47:7,
53:3, 54:13,
55:6
**going**
8:11, 8:18,
9:18, 12:9,
21:4, 29:4,
29:12, 32:18,
34:19, 35:7,
36:5, 36:9,
37:22, 38:12,
38:16, 38:17,
40:9, 40:12,
47:20, 48:15,
50:2, 51:24,
52:5, 67:25,
68:2
**gone**
35:14, 35:17,
54:1
**good**
6:24, 7:1, 7:3,
8:9, 57:21,
67:12
**gotten**
51:24
**graduate**
7:16
**grand**
39:15
**great**
57:20, 57:23,
58:5, 58:8
**greek**
22:10
**guarantee**
22:16
**guerrero**
25:13, 25:16,

| | | | |
|---|---|---|---|
| **guy** 27:24 | **hear** | **house** | **individual** |
| 18:16, 23:22, 24:1, 25:9, 58:6, 59:10 | 7:1, 10:10, 17:15, 21:7 | 23:21, 23:25 | 12:18, 23:6, 53:10 |
| **guys** 9:10, 23:15, 23:18, 29:5, 51:4, 54:20, 55:16 | **heard** 13:1 | **however** 39:9 | **industries** 1:7, 5:5, 13:22, 25:1, 26:12, 26:25, 41:23, 50:19, 65:2 |
| **gym** 55:15, 55:17 | **hearing** 6:14, 17:1, 26:18 | **hurst** 71:2, 71:16 | |
| **H** | **held** 29:21, 41:18 | **hurt** 51:3 | **industry** 9:8, 19:8, 19:10, 19:14, 20:1, 20:5 |
| **half** 20:8, 37:18 | **help** 11:20, 38:12, 38:17 | **husch** 3:5 | |
| **haloti** 59:4 | **helped** 9:8 | **hydrogen** 13:25, 14:4, 14:7, 14:25, 25:22, 25:23, 28:4, 28:11, 29:2, 43:9, 44:5, 44:6 | **information** 19:23, 65:1 |
| **hand** 6:16 | **here** 5:2, 9:16, 22:17, 22:19, 41:21, 46:11, 54:3, 64:7, 67:23 | | **ingredients** 11:19 |
| **handle** 15:22, 16:2 | | | **instagram** 43:20 |
| **happen** 61:6 | | | **instance** 62:2, 62:5 |
| **happened** 37:25, 52:11, 53:24, 60:24, 60:25 | **hereby** 70:4, 71:2 | **I** | **intended** 6:8 |
| **happy** 8:14, 38:13 | **hey** 38:5 | **iced** 46:4 | **intentions** 59:11 |
| **harvey** 3:4, 4:3, 5:15, 6:23, 16:1, 17:1, 17:8, 17:14, 17:19, 25:24, 40:16, 42:15, 43:24, 50:9, 50:12, 52:14, 61:21, 62:1, 63:4, 64:6, 64:10, 67:13, 67:20, 68:4, 68:15, 68:21 | **high** 7:13, 7:14, 7:16, 7:18 | **idea** 36:12, 44:8 | **interaction** 40:22 |
| | **history** 9:3 | **identify** 5:13 | **interest** 70:14, 71:10 |
| | **hit** 18:10, 18:19, 18:20, 18:23, 20:2 | **ignite** 9:12, 9:13, 9:20, 9:24, 10:3, 10:23, 11:25, 12:6, 12:16, 25:2, 25:4 | **interested** 57:10 |
| | **hmm** 17:8 | | **interlap** 40:1 |
| | **holding** 68:8 | **ignite's** 12:8 | **invest** 54:24, 55:25 |
| | **holley** 10:15, 13:18, 21:12, 21:22, 30:9, 30:22, 41:13, 42:12, 45:13, 50:15 | **illegal** 36:1 | **invested** 56:11 |
| | | **imagine** 20:3 | **investing** 57:11 |
| **hat** 38:14 | | **immediately** 61:20 | **investment** 56:16 |
| **hate** 35:1 | **holley's** 24:21 | **inc** 41:23 | **investor** 55:24 |
| | **hopefully** 58:2 | **incorporated** 1:8, 5:5, 13:22, 26:25 | **involved** 21:20, 24:25, 26:24, 28:20, 29:4, 29:11, 29:12, 44:9, |
| | | **increase** 46:15 | |
| | | **independently** 10:21 | |

49:13, 58:20
**involvement**
42:20, 58:17
**ip**
32:24, 32:25,
33:2, 33:3, 33:6
**isolated**
59:12
**issue**
59:16
**it'll**
17:11, 17:12,
17:13
**itself**
5:21

**J**

**jam**
50:1
**james**
1:4, 54:6,
54:9, 54:25,
56:13
**james's**
19:1
**january**
13:17, 15:12,
15:19, 20:11,
20:17, 21:9,
30:2, 31:25,
49:1, 53:20
**jason**
16:17, 17:23,
24:10, 24:16,
30:5, 30:8,
30:10, 30:12,
32:7, 34:5,
34:10, 34:20,
35:23, 35:24,
36:20, 37:21,
38:4, 39:1,
41:4, 41:5,
41:12, 51:22,
51:24, 52:11,
54:4, 57:6,
57:14, 58:3,
58:22, 59:15,
60:24, 63:13,

63:20, 65:13,
65:16, 66:15,
66:25
**jason's**
33:1
**jelly**
50:1
**jennifer**
36:19, 50:14
**jesse**
3:20, 5:10
**job**
1:23, 52:1
**jobs**
53:3
**joe**
18:24, 21:11,
21:12, 21:13,
21:15, 24:7,
25:4, 25:5,
25:7, 30:5,
30:8, 34:10,
46:21, 46:23,
46:24, 46:25,
47:23, 50:14,
51:9, 57:19,
65:17, 66:1
**joe's**
34:7, 34:20,
49:4
**john**
7:19
**jonathan**
59:4
**joseph**
46:17
**josh**
39:3, 54:24,
56:2, 56:5
**jr**
3:12
**judge**
35:8, 35:10,
63:19
**june**
14:14, 14:17,
14:18, 54:14,
58:9

**K**

**k-e-r-b-y**
53:13
**keep**
51:5, 51:12
**kennedy**
7:19
**kept**
34:19, 51:12,
59:11, 59:14,
59:22
**kerby**
23:11, 53:11,
53:13
**killed**
29:6, 29:7
**kind**
9:15, 29:6,
48:16, 53:18,
55:1, 58:1
**knew**
20:6, 25:10,
36:11
**know**
8:1, 8:13,
17:14, 17:17,
18:13, 20:1,
20:4, 21:17,
29:14, 29:15,
29:16, 30:21,
33:12, 36:5,
36:15, 38:5,
38:6, 38:9,
38:24, 41:2,
41:21, 41:25,
43:4, 43:7,
43:14, 44:14,
44:17, 44:20,
44:23, 45:8,
48:7, 49:10,
49:20, 49:23,
53:4, 53:24,
56:25, 59:10,
63:9, 66:1,
66:2, 66:7
**knowledge**
15:5, 15:7,

34:8, 34:19,
34:20, 43:25,
44:4, 48:22,
52:21, 52:25,
70:11, 71:8
**known**
26:8, 55:2,
59:10
**krazy**
20:25

**L**

**l-v-l**
14:21
**labor**
26:8, 26:15,
26:16, 26:19,
27:8, 27:13,
27:19, 38:22,
39:17, 39:25,
40:22, 41:19,
41:22
**lacks**
61:17, 63:1
**laid**
51:8
**las**
3:15
**last**
8:1, 9:3, 9:16,
22:8, 23:22,
23:24, 26:2,
30:7, 60:15,
62:5, 67:9
**late**
28:10
**later**
20:8, 38:16,
68:25
**law**
3:13, 6:13
**laws**
6:10
**lawyer**
8:1, 8:3, 33:12
**lawyers**
31:4
**lay**
51:10

laying
50:19
league
54:17
leaked
29:5
leaking
29:7
leave
12:6, 15:19,
53:22, 63:15,
63:22
lebron
28:10
led
54:20
left
17:10, 20:11,
21:9, 41:11,
52:11, 53:20,
58:1
legal
40:13
length
60:8
leprechaun
20:25
let's
34:11, 38:6
letter
47:10
level
9:9, 15:20,
32:13
leverage
38:17
lies
17:24, 17:25,
18:6, 18:24,
19:5, 20:9,
30:10, 32:8,
37:21, 66:8
life
15:23, 16:8,
16:9, 18:15,
37:7, 53:9
linkedin
44:25

liquor
19:14
list
5:19
little
16:5, 16:10,
17:6, 17:12,
64:25
llc
10:6, 10:13,
10:18, 10:19,
10:20, 20:23,
21:1, 42:2,
71:17
llp
3:5
lock'din
44:25, 45:10
long
10:17, 10:22,
28:9, 45:18,
52:2, 55:3,
60:11, 60:15
look
22:6, 28:2,
58:15
looking
19:23, 25:2
looks
64:14, 65:9
lot
30:12, 33:3,
47:12, 47:18,
47:19, 58:7,
60:21, 60:22
loud
8:5
ltnc
25:11, 26:7,
26:8, 26:16,
26:18, 26:20,
27:5, 27:9,
27:11, 27:12,
27:20, 27:21,
39:9, 39:25,
40:22, 49:6
luck
58:2

lvl
14:20, 14:24,
15:4, 33:7,
44:24, 61:3
lying
30:22, 30:23,
31:2, 31:5

**M**

m-c-b-r-i-d-e
7:5
made
16:19, 24:16,
30:12, 47:17,
61:4, 61:5,
61:8, 65:12,
65:13, 65:15,
66:15
maguire
5:18
majority
41:22
make
8:14, 11:8,
29:2, 38:13,
42:19, 47:19,
47:20, 51:1,
51:6, 57:9,
57:18, 59:7,
60:24
makes
18:18, 47:14
making
32:8, 36:6
man
57:20
maneuvering
32:8
manipulate
59:17
manny
18:21, 37:25,
38:6, 38:25,
39:4, 39:6,
44:21, 58:19,
58:20, 59:12,
59:13, 59:25
manny's
59:12

many
21:9, 37:17,
54:8
march
29:20, 38:5,
56:4, 64:23,
65:10, 65:23,
66:19
marijuana
9:24
mark
50:9, 64:8
marked
50:11, 64:9
marker
17:8
market
46:15
marketing
11:10, 24:15,
46:12
marks
69:3
martin
23:23
matter
5:4
maurice
53:7
maybe
17:7, 54:14,
68:18, 68:19
mcbride
1:14, 2:1, 4:2,
5:4, 5:22, 6:18,
6:24, 7:5, 50:5,
68:5, 69:4
mcgrath
1:25, 2:13,
5:24, 70:2,
70:21
mean
7:7, 9:12,
10:14, 11:18,
14:17, 15:21,
16:21, 17:23,
18:8, 18:10,
18:11, 23:25,

30:11, 35:1,
36:7, 38:24,
43:11, 48:4,
51:21, 52:12,
60:12, 66:5
**meaning**
9:17
**means**
6:6
**media**
5:2, 18:10,
23:13, 43:14,
43:18, 44:3,
45:3, 45:11,
53:17
**meet**
45:13, 46:17,
47:24, 48:23,
54:19, 55:4,
57:15, 58:25
**meeting**
27:24, 27:25,
28:14, 54:21,
57:12, 58:10,
58:12, 58:14
**melissa**
24:8, 24:12,
24:15, 39:2
**member**
29:24, 31:7,
31:11
**mentioned**
37:5, 39:16,
53:10, 57:13
**met**
47:4, 47:23,
49:3, 54:6,
54:8, 54:9,
54:11, 54:23,
54:25, 55:12,
55:18, 57:7,
59:13
**microphone**
17:18
**might**
22:18, 22:20,
23:23
**mike**
10:8, 10:14,

18:24, 21:11,
21:12, 21:13,
21:15, 22:1,
22:11, 22:17,
23:9, 23:17,
24:7, 25:4,
27:3, 30:5,
30:7, 33:14,
33:20, 34:14,
35:20, 41:3,
41:5, 41:7,
42:12, 46:19,
46:20, 46:21,
46:22, 46:23,
46:24, 49:14,
50:15, 50:17,
51:8, 56:23,
59:3
**mike's**
22:13, 31:4,
42:6
**miller**
9:9
**million**
19:22, 34:17,
38:2, 39:12
**millions**
19:25
**milwaukee**
3:7
**mind**
22:2, 22:4,
33:17
**minute**
27:11
**minutes**
19:19, 57:22,
67:6, 67:14,
67:18, 67:21
**mm-hmm**
42:13
**moment**
40:20
**money**
12:12, 12:13,
30:16, 30:22,
34:1, 34:15,
35:22, 35:23,

36:6, 36:8,
36:14, 65:13
**monitor**
5:9, 69:4
**monotony**
17:23
**month**
20:7, 35:16
**monthly**
31:23
**months**
11:1, 36:18,
52:10, 52:15
**monticello**
7:7
**more**
16:5, 16:10,
25:15, 33:3,
41:3, 43:18
**morning**
6:24
**most**
21:24
**move**
7:9
**moved**
35:24, 36:12,
37:7, 56:23
**moves**
36:25
**much**
14:16, 15:20,
15:22, 15:24,
16:2, 16:3,
18:2, 18:12,
18:14, 18:20,
19:18, 34:15,
39:11, 48:13,
52:1, 59:20,
61:10, 63:5

## N

**n-x-t**
14:21
**name**
7:4, 14:24,
15:4, 18:23,
22:4, 22:8,

22:11, 23:24,
25:10, 25:15,
26:2, 30:19,
33:7, 33:15,
36:1, 36:16,
43:17, 47:8
**named**
23:7, 53:11
**nation**
9:11
**national**
9:8, 9:10
**nationally**
11:12
**nature**
40:23
**nauseous**
18:18
**need**
8:7, 24:2,
67:5, 67:6,
67:21, 68:6
**needed**
15:23, 55:15
**negotiating**
33:9
**neither**
70:12, 71:9
**nevada**
1:2, 5:6, 21:2
**never**
29:11, 30:16,
30:19, 36:16,
36:17, 37:2,
37:7, 59:10,
60:25, 62:20
**new**
8:1, 33:8, 62:7
**next**
7:9, 42:2,
42:20, 42:23,
43:4, 43:7,
44:5, 44:15,
44:18, 44:20,
44:23, 44:24,
45:9, 49:11,
49:23, 53:5,
68:9

ngata
59:4
nice
58:6
night
8:2
nobody
24:5
non-alcohol
19:15
nonchalant
57:24, 58:5
none
36:7
north
3:6
northern
46:11
notary
2:14, 6:4,
70:1, 70:21
note
19:1, 38:15,
47:25, 48:4,
48:5, 48:11,
48:13, 57:2,
57:4
notes
34:6, 56:20
nothing
6:20, 8:25,
10:1, 12:20,
27:6, 28:22,
42:7, 45:2, 54:4
notice
2:13
november
1:16, 5:8,
19:3, 28:19,
35:16, 41:8,
41:9, 41:16,
68:9, 70:23,
71:18
number
5:3, 5:7,
32:23, 33:20,
47:11, 60:12,
64:14

nv
3:15
nxt
14:20, 14:24,
15:4, 33:7,
44:24, 61:3

**O**

oaths
6:5
objection
6:14, 40:10,
40:12, 52:6,
61:16, 61:24,
63:1
obtained
43:5
obviously
68:8
october
30:24, 35:13,
35:15, 35:16,
41:15
office
3:13, 68:22
officer
21:16, 24:20,
29:22, 49:8,
70:2
oh
11:14, 18:4,
22:6, 22:18,
24:8, 43:19,
45:5, 45:14,
46:18, 47:6,
54:13, 55:6,
60:12, 60:14
okay
7:1, 7:3, 7:12,
8:7, 8:10, 8:21,
9:2, 11:21,
11:25, 17:14,
23:6, 23:19,
26:4, 46:6,
48:23, 50:2,
53:10, 67:18,
68:15
once
29:14, 61:8

one
8:11, 8:18,
9:10, 10:9,
10:12, 10:18,
11:21, 17:15,
20:5, 22:10,
23:6, 25:3,
25:15, 26:14,
29:4, 32:23,
33:20, 35:4,
40:21, 43:18,
49:6, 58:21,
59:5, 60:10
onion
51:25
online
43:12
only
22:7, 25:3,
27:19, 27:21,
38:1, 45:8,
63:24
onward
7:13
open
68:8
operations
24:22
ordering
24:2
original
26:6, 31:3,
49:6
originally
25:11, 37:19,
47:25
other
5:19, 9:22,
10:2, 10:4,
11:21, 14:6,
20:24, 23:19,
29:21, 37:3,
39:5, 51:14,
51:15, 61:2,
63:23
others
24:6
otherwise
61:12, 70:14,

71:11
ounces
47:12
out
8:5, 14:6,
15:25, 16:25,
17:4, 17:7,
17:24, 18:9,
18:25, 19:1,
19:2, 19:20,
20:2, 20:12,
21:2, 25:20,
25:22, 28:12,
29:13, 29:15,
30:23, 30:24,
33:3, 33:8,
33:15, 33:20,
35:7, 35:23,
36:4, 39:24,
41:5, 41:7,
41:12, 41:17,
41:24, 43:14,
43:16, 46:15,
47:13, 51:22,
51:23, 52:10,
54:16, 55:13,
55:15, 55:16,
55:17, 57:19,
63:8, 65:14,
65:25, 66:6
outcome
70:15, 71:11
outranked
32:12
over
8:4, 8:7, 9:14,
34:16, 35:24,
36:15, 45:19,
45:21, 46:20,
51:19, 53:18,
62:24, 63:6,
63:10, 63:13
overlap
40:1
overturned
34:2, 35:9,
35:10, 63:19
owe
66:9, 66:14,

66:18, 66:21
**owed**
27:4, 65:2,
65:10, 65:22,
66:4, 66:11,
66:12
**own**
59:3
**owned**
25:11
**owner**
26:6, 29:15

**P**

**pacific**
68:10
**pacquiao**
18:22, 37:25,
39:1, 39:4,
39:6, 44:21,
58:19, 58:20,
59:25, 60:9,
61:1, 61:2
**page**
4:2, 4:8, 8:15
**pages**
1:24, 60:10,
60:13
**paid**
31:21, 31:22,
32:5, 32:20,
35:19, 37:1,
54:3, 61:20,
62:17
**parent**
26:19, 27:12
**part**
12:14, 14:22,
18:22, 38:15,
39:9, 39:18,
42:25, 43:2,
54:25, 61:11,
61:13, 69:3
**particular**
12:17
**parties**
5:11, 6:6,
6:11, 70:13,

71:10
**partner**
17:25
**partners**
30:20
**party**
4:10, 64:21,
65:4, 67:17
**patrick**
3:4, 5:15,
17:12, 22:21,
26:5, 34:10,
39:19, 40:19,
45:1, 45:21,
47:2, 51:13,
54:13, 60:16,
67:19, 68:17
**pavlik**
13:18, 21:13,
21:22, 46:17,
47:4, 50:15
**pavlik's**
24:19
**pay**
34:16, 37:24,
38:6, 45:2
**paycheck**
33:22, 33:24
**paying**
58:19
**people**
19:25, 20:1,
20:3, 58:22,
59:13, 59:23,
63:21
**people's**
28:8
**percentages**
27:4
**period**
63:17, 66:16
**permitted**
6:9
**perpetuated**
37:21
**personal**
33:16, 45:10,
61:14, 61:23,

62:3, 62:6,
62:11, 62:19,
62:20, 62:25
**perspective**
16:9
**pettis**
39:3, 54:22,
55:5, 55:23,
56:15
**pettis's**
55:21
**pfl**
36:21, 36:22,
36:23, 54:14,
54:17, 54:23,
62:22
**philip**
9:14
**philippines**
60:22
**phone**
20:3, 22:7,
22:15, 58:23,
58:25, 68:19
**pick**
12:23
**picture**
41:5
**pictures**
44:10
**piece**
18:10, 18:19,
18:20, 18:23,
19:2, 20:2
**pivot**
17:13
**place**
16:7, 18:15,
19:7, 35:2,
35:3, 47:21
**placed**
63:15, 63:22
**places**
12:12
**plaintiff**
1:5, 3:3, 5:16,
6:22
**plan**
35:8, 59:20

**planet**
5:11, 5:24,
71:17
**plans**
7:9
**playing**
28:9, 28:10,
32:13
**please**
5:13, 7:3, 7:4,
7:13
**plotting**
36:25
**plow**
17:16
**point**
15:23, 21:10,
35:4, 37:19,
48:15, 51:23,
52:18, 54:2,
59:16
**portion**
8:13, 64:17
**position**
11:2, 32:24
**positions**
11:9, 29:22,
41:18, 49:11
**post**
19:17, 44:2
**prepare**
8:22
**prepared**
71:3
**present**
3:19
**president**
24:16, 32:15
**press**
19:17, 19:20
**pretty**
18:20, 19:18,
29:16, 51:25,
59:20, 61:10
**private**
34:7, 59:19
**probably**
21:4, 39:14,

46:18, 46:22,
46:23, 46:25,
56:3, 61:12
**problem**
38:13, 38:17,
38:18, 47:3,
50:8, 68:15
**procedural**
6:9
**proceeding**
6:8, 71:4
**proceedings**
70:3, 70:5,
70:6, 70:9,
71:5, 71:7
**produced**
6:7
**product**
28:2
**production**
11:9
**products**
14:23, 15:3,
43:7, 44:24,
45:10, 61:3
**professional**
54:17
**prolonged**
55:19
**promissory**
48:5
**promote**
45:5
**promoted**
45:9
**promoting**
61:3
**protect**
32:25
**protects**
33:2
**pst**
1:17
**public**
2:14, 29:14,
56:24, 70:1,
70:21
**publication**
19:6

**publicly**
39:7
**pull**
19:4, 36:3
**pursuant**
2:13
**pushed**
41:12
**pushing**
35:5
**put**
11:19, 16:7,
16:17, 16:22,
17:21, 17:22,
18:9, 18:25,
19:20, 19:23,
28:4, 35:3,
35:25, 57:6,
65:17, 67:16
**putting**
17:24, 33:13

---

**Q**

**qualified**
70:8
**question**
8:12, 16:25,
17:4, 40:25,
66:7, 67:10
**questions**
8:18, 12:23,
17:16
**quick**
29:16, 59:4
**quickly**
9:3
**quite**
21:5, 25:25

---

**R**

**r-a-p-k-i-n**
56:8
**r-y-a-n**
26:3
**radar**
54:2
**raise**
6:15

**ran**
41:5
**rapkin**
56:6, 56:9,
56:15
**rather**
57:16
**read**
18:11
**read-on**
6:2
**real**
34:11, 57:24,
58:5
**really**
12:7, 17:17,
35:1, 35:6,
39:21, 40:2,
58:6
**reason**
38:1, 59:7
**rebuttal**
20:7
**recall**
13:6, 14:14,
14:15, 31:9,
31:12, 42:1,
48:14, 56:1,
58:9, 58:11,
58:15, 60:11,
62:4, 62:13,
62:15, 63:7,
63:11, 64:19
**receivable**
4:10, 64:21
**receive**
31:13, 31:24,
39:11
**received**
37:2, 42:22
**receiving**
24:4
**recognize**
50:21
**record**
67:25, 68:1,
68:3, 68:23,
69:5, 70:10,

**71:7**
**recorded**
1:25, 6:5, 70:6
**recording**
6:8, 70:9, 71:4
**records**
65:3
**reduced**
70:7, 71:5
**referred**
56:5
**referring**
14:10, 17:22
**refrain**
61:2
**regionally**
11:11
**reiter**
50:14
**reiterate**
8:11
**related**
64:20, 65:4,
67:17, 70:12,
71:9
**relating**
65:1
**relationship**
55:22
**release**
65:18
**relive**
17:25, 18:13,
51:13
**reliving**
16:15, 18:15,
35:1
**remember**
9:13, 10:20,
14:15, 18:23,
22:14, 56:2,
58:12, 60:8
**remote**
5:10
**remotely**
5:12
**removed**
63:23, 63:24

repaid
56:16
rephrase
8:14
reporter
5:23, 6:1,
15:25, 16:24,
17:3, 22:2,
22:5, 25:14,
25:17, 42:14,
43:17, 43:21,
70:1
represent
5:14
representative
49:18
representing
5:11, 5:24
reprimand
63:12
reputation
20:4
resign
12:24, 13:5
resigned
9:14, 12:7,
12:21, 12:25,
13:2, 13:3,
13:12
respect
58:7
responsibilities
31:11
responsibility
40:2, 40:5,
40:8
responsible
30:17, 39:22,
40:21, 41:1,
41:3
rest
69:1
resulted
33:22
retail
9:10, 19:17
retailers
19:9

revenue
51:11
review
8:22
reviewed
59:21, 59:24
right
6:15, 6:16,
7:11, 11:9,
18:15, 23:3,
38:11, 45:17,
53:3, 56:13,
59:1, 59:7,
64:22, 67:24,
68:7, 69:2
righty
6:1
risk
34:15
road
14:8
role
23:12, 23:14,
24:19, 24:21,
48:16, 48:18,
53:15, 63:23,
63:25, 64:1
roles
24:14
roufus
55:7, 55:12,
55:18
rules
6:10, 8:4
running
55:6, 55:11
ryan
25:10, 26:1,
26:3, 29:5,
29:7, 48:12,
48:23, 49:5
ryan's
26:16

___S___

s-c-h-a-d-e-l
26:6
sacramento
7:23, 55:6,

55:9, 55:10
said
10:11, 12:1,
12:3, 14:5,
17:20, 18:19,
21:17, 22:5,
25:7, 25:25,
34:12, 34:14,
34:21, 36:11,
37:21, 38:5,
40:23, 41:2,
42:18, 43:11,
43:18, 44:9,
45:1, 49:14,
49:17, 57:8,
58:2, 58:3,
70:8, 70:9,
71:5, 71:6
salary
31:15, 32:19
salem
53:7
sales
23:15, 23:18,
46:11, 46:13,
49:17, 51:19,
51:22
same
8:15, 23:17,
29:18, 44:12,
51:18, 61:24
sat
25:21
saw
43:12
say
10:14, 11:3,
11:18, 12:15,
14:17, 16:5,
16:21, 22:3,
25:15, 27:25,
40:7, 40:18,
43:17, 44:12,
48:4, 50:17,
53:15, 57:1
saying
27:23, 66:3,
66:11

says
64:20, 65:1
scaring
65:25
schadel
25:10, 25:11,
26:1, 26:5,
26:24, 48:12,
48:24, 49:7
schadel's
39:18
school
7:13, 7:14,
7:16, 7:18
science
21:16, 24:20
screen
50:2, 50:5,
64:6
second
22:10, 68:18
securing
33:6
see
11:6, 19:25,
28:3, 29:1,
44:3, 45:3,
45:7, 50:4,
50:5, 50:6,
55:23, 57:16,
58:2, 58:16,
64:11, 67:16
seeing
11:7
seen
36:16, 36:17,
43:9, 43:11,
44:10, 60:4,
64:18
seize
35:21, 35:22
seized
52:12
sell
52:16
selling
14:12, 44:6,
44:7

sells
43:8
send
22:12
sent
61:9
separate
33:20, 59:18
separated
10:2, 59:15
separating
17:24
september
13:7, 13:12,
32:2, 32:6,
37:2, 64:16
serena
28:9
sergio
55:13
set
68:16
setting
64:17
shall
6:10
share
37:7, 46:15,
50:2
shareholder
41:22, 61:10
shareholders
29:10, 29:13,
34:25, 38:10,
43:23, 44:2,
65:19
shares
37:4, 37:6,
37:9, 37:17,
37:19, 37:20,
38:2, 38:6,
38:11, 38:20,
38:21, 38:22,
38:25, 39:4,
39:5, 39:12,
40:23, 56:21,
56:22, 57:2,
57:5, 65:18

shell
25:6, 25:7
shippers
36:8
shipping
24:4
shit
65:25
shopping
62:14
short
6:2
shortly
52:19
shot
14:8, 14:10,
15:2, 59:18
shots
14:13, 34:15,
36:6, 36:8
should
22:20
shouldn't
12:13, 13:1
show
47:21, 50:3,
64:6
showed
20:8, 20:9
shows
17:9
sic
22:13
sick
41:10
side
8:17, 9:21,
9:22, 10:2, 40:6
sign
60:5, 65:15,
66:24
signature-5tm1q
70:17
signature-bi6ds
71:13
signed
65:21, 66:3,
66:10

sillwell
43:18
simple
34:11
sir
6:15, 7:2, 7:6,
7:25, 8:6, 8:16,
8:20, 9:1,
10:16, 14:11,
15:18, 19:7,
24:7, 24:11,
24:13, 26:10,
32:11, 32:17,
40:4, 42:24,
43:1, 43:3,
43:6, 44:19,
44:22, 45:1,
46:1, 48:6,
48:9, 48:18,
49:9, 49:16,
49:19, 49:22,
50:7, 50:16,
50:20, 50:25,
52:20, 53:6,
53:12, 54:7,
54:18
sit
41:21
sitting
36:9
situated
67:22
six
10:24, 36:18
skills
70:11, 71:8
slander
18:18
slotting
34:16, 34:17
smart
26:8, 26:16,
26:19, 27:8,
27:13, 27:19,
38:22, 39:17,
39:25, 40:22,
41:19, 41:22
smith
59:4

snapple
44:11
sobe
44:11
social
18:9, 23:13,
43:14, 43:19,
44:2, 45:3,
45:11, 53:17
sold
14:23, 15:3,
19:22, 37:15,
39:12, 44:24
soliciting
58:18
some
20:24, 33:6,
68:25
somebody
19:16, 59:8
somebody's
57:16
somehow
29:6
something
10:7, 16:13,
19:21, 25:3,
25:5, 57:17,
64:15
somewhere
37:22, 45:17
sorry
10:10, 11:17,
13:11, 15:25,
16:24, 21:7,
22:15, 22:21,
24:9, 25:14,
27:22, 28:15,
37:5, 39:20,
40:19, 42:14,
43:19, 43:22,
44:1, 45:5,
45:18, 47:2,
50:6, 51:13,
55:20, 57:1,
60:16
sound
13:19, 23:3

sounds
39:21, 40:1,
66:17
speak
25:19
speaks
5:21
special
58:9
specific
16:10, 18:4,
18:6, 31:7
specifically
11:4, 16:22,
17:21, 30:15,
31:1, 32:18,
33:23
speculation
40:14, 52:7,
61:17, 63:2
spell
7:4, 22:14,
26:1, 56:7
spelled
14:20
spelling
22:4
spend
61:22, 63:5
spending
12:12, 34:1
spent
12:13, 35:23,
36:5, 36:8,
61:14, 61:19,
62:24
st
65:3, 65:4
stages
11:7, 28:10,
29:12
stance
32:23, 33:1
start
11:12, 14:12,
19:17, 20:10,
28:24, 30:2,
35:19

started
9:15, 10:23,
11:25, 28:16,
28:18, 48:3,
48:25, 59:20
starting
59:16, 68:10
startup
43:5
state
2:14, 5:14,
7:3, 7:20, 40:9,
40:12, 52:5,
52:6, 61:16,
70:22
statement
6:2, 36:17,
67:9
states
1:1, 5:6
stay
43:14, 43:16
stepped
35:6, 52:17
still
15:3, 15:8,
16:20, 19:4,
21:21, 33:6,
33:21, 37:9,
53:19
stipulate
6:12
stipulation
6:11
stockton
7:8, 7:22
stop
15:11, 17:11,
17:12, 32:5,
33:23, 37:12
stopped
32:1, 37:1
stores
24:3
story
66:16
straight
7:14, 7:15

stress
15:20, 16:3,
16:14, 16:16,
16:17, 17:20
strong
20:5
stuff
9:23, 18:12,
18:14, 23:13,
24:2, 24:4,
24:5, 27:5,
30:24, 36:9,
36:24, 44:2,
53:18, 60:23,
65:16, 67:22
subside
38:12
subsidiaries
26:13
subsidiary
26:14, 26:20,
27:8, 27:18,
27:19
sucks
51:13
sudden
33:11
suicide
35:4
suite
3:6, 3:14
supervision
71:6
supplement
47:7
suppliers
19:9
supplies
24:2
supposed
33:10, 37:24,
60:15, 60:23,
60:24, 63:18
sure
8:14, 10:19,
11:8, 26:22,
27:15, 38:23,
39:19, 40:20,

42:1, 42:19,
54:13, 57:9,
59:7, 60:24,
61:5, 67:13,
67:20, 68:21
suspend
34:1, 34:22
suspended
53:24, 63:13
swear
6:14
sworn
5:25, 6:19,
70:5

**T**

t-o-b-y
7:5
t-pain
58:21, 59:9,
59:12, 59:14,
59:22, 60:1
t-s-o-n-a-t-a-t--
o-s
22:13
t-z
23:2
t-z-a
22:25
t-z-a-n-e-t-a-t--
o-s
23:2
table
28:4, 51:23
take
34:6, 34:11,
52:2, 59:18,
59:19, 64:2,
64:4, 67:13,
67:18, 68:24
taken
30:8, 30:9,
70:4
takeover
1:7, 5:4, 9:15,
13:15, 13:19,
13:22, 14:6,
14:12, 14:22,

15:6, 15:8,
15:11, 15:13,
15:17, 16:13,
20:11, 21:10,
21:17, 21:25,
23:7, 24:25,
26:12, 26:21,
26:25, 27:7,
27:9, 27:18,
28:21, 29:4,
29:22, 29:24,
30:18, 31:7,
31:11, 31:14,
37:3, 38:21,
39:7, 39:25,
40:6, 40:22,
41:1, 41:7,
41:11, 41:14,
41:23, 44:7,
44:14, 44:17,
48:5, 48:10,
48:17, 49:8,
49:15, 49:21,
50:18, 51:14,
52:15, 52:22,
53:1, 53:16,
53:19, 53:22,
55:22, 55:25,
56:11, 57:11,
58:18, 59:25,
60:6, 61:23,
62:3, 62:6,
62:12, 62:24,
63:12, 63:24,
63:25, 65:2,
65:11

**takeover's**
58:10, 61:14

**taking**
11:2, 20:21,
30:16, 33:10

**talk**
8:3, 17:9,
56:25, 58:24,
68:18

**talked**
57:21

**talking**
16:11, 38:20,

66:17

**tea**
45:25, 46:4

**team**
12:10

**tell**
18:6, 21:19,
22:7, 22:12,
41:24, 44:8,
49:12, 53:8,
59:15, 60:16,
65:19

**telling**
66:13, 66:14

**ten**
9:5

**terminate**
51:1, 51:7,
51:14

**terminated**
51:20

**termination**
52:23

**terms**
33:9

**testified**
6:21

**testify**
6:19

**testimony**
6:13, 66:10

**texas**
29:3

**th**
5:8

**thank**
8:21, 25:17,
43:21, 53:3,
67:18, 68:13

**thanks**
8:10, 42:18

**thc**
9:24

**themselves**
5:14

**thereafter**
52:19, 70:7

**thing**
35:2, 38:24,

44:12

**things**
8:4, 8:5, 12:9,
13:1, 16:18,
18:15, 39:5,
40:23, 41:1,
59:1, 65:25

**think**
5:20, 12:1,
13:6, 19:3,
22:18, 42:18,
57:8, 59:16,
59:19, 60:10,
65:20, 67:8,
67:10, 68:16

**thought**
25:6, 27:12,
29:10

**threaten**
65:18, 65:19

**threatening**
65:24

**threats**
67:3

**three**
9:10, 17:7,
23:20, 33:17,
47:1, 52:9,
52:15, 63:18

**through**
7:12, 9:2, 9:9,
9:10, 10:6,
10:8, 10:17,
16:17, 16:18,
16:22, 17:16,
17:21, 17:22,
20:23, 20:25,
31:3, 31:4,
48:12, 49:4,
61:10, 62:22,
62:23, 65:17,
65:18

**throughout**
9:11

**thrown**
63:8, 65:14,
66:6

**time**
5:9, 11:22,

14:1, 14:5,
15:16, 17:9,
18:11, 20:22,
21:14, 25:12,
25:15, 29:5,
30:4, 30:6,
31:18, 31:20,
33:5, 35:22,
36:22, 36:24,
41:4, 41:6,
43:18, 45:18,
46:10, 47:18,
50:18, 50:23,
51:16, 51:18,
53:20, 54:1,
54:11, 54:19,
55:3, 55:11,
55:20, 57:21,
57:24, 58:5,
58:8, 58:13,
58:14, 59:5,
63:17, 67:8,
67:12, 67:25,
68:3, 69:4

**times**
17:7, 39:16,
54:8

**tingle**
47:15

**tingling**
47:15

**title**
9:19, 15:14,
15:16, 31:7,
67:17

**titles**
21:14

**toby**
1:14, 2:1, 4:2,
5:3, 5:18, 6:18,
7:5, 40:11,
68:24, 69:3

**toby@takeoverind**
50:24

**today**
5:10, 5:18,
5:24, 7:24,
8:23, 15:6,

15:9, 21:5,
21:18, 41:21,
49:21, 49:24,
66:18, 68:25
**today's**
5:8
**together**
11:19, 25:5,
33:18, 35:20,
46:6, 57:6
**told**
20:6, 27:11,
28:6, 28:7,
57:14, 58:21,
68:5
**tom**
25:13, 28:8,
29:15, 42:6,
42:8, 47:24,
48:18
**tom's**
25:18
**took**
25:5, 30:22,
34:4, 35:21,
36:15, 48:16,
51:19, 52:4,
52:9, 57:23
**top**
41:3, 64:13,
64:20, 67:16,
67:17
**track**
15:23
**traded**
39:7
**trades**
44:18
**trading**
56:24
**trainer**
25:13, 25:18,
25:19
**training**
28:7
**transcriber**
71:1
**transcript**
4:7, 6:7, 71:3,

71:6
**transcriptionist**
70:8
**transferred**
44:15, 44:18
**travel**
62:16, 62:17,
62:19, 62:20
**traveled**
62:21
**tried**
28:4, 34:6,
44:9, 47:22
**true**
49:18, 70:10,
71:6
**truth**
6:20, 6:21
**try**
17:16, 43:14,
43:15, 59:18
**trying**
9:12, 10:20,
11:10, 18:2,
22:15, 22:17,
34:5, 36:3,
36:19, 51:23,
52:16, 59:17
**tucker**
16:17, 17:23,
18:6, 24:8,
24:10, 24:12,
30:12, 30:21,
32:12, 34:21,
39:1, 39:2,
65:14, 66:15
**tucker's**
24:8, 30:10,
32:7
**two**
35:21, 37:19,
46:6, 46:19,
60:17
**type**
43:7
**types**
13:24, 41:1,
62:11

**typewriting**
70:7, 71:5
**tzanetatos**
22:1, 22:13,
22:14, 23:16,
34:14, 49:14,
50:14, 51:2,
51:15, 51:17,
51:20, 52:21
**tzanetatos's**
22:8

## U

**ufc**
55:7, 55:10,
55:16, 55:20
**under**
6:9, 14:23,
15:3, 21:3,
26:15, 26:16,
27:9, 37:18,
39:14, 47:4,
49:2, 71:5
**understand**
6:6, 8:12,
13:17, 65:20
**understanding**
27:7, 27:16,
57:10
**understood**
8:19, 38:19
**unfortunately**
50:17
**united**
1:1, 5:5
**unless**
45:3, 45:7
**unraveling**
51:25
**until**
20:17, 20:18,
30:2, 31:24,
35:7
**updated**
19:19
**urijah's**
55:15, 55:17
**use**
6:12, 17:18,

38:6, 67:11
**uses**
6:9
**usual**
17:17
**usually**
57:5, 57:16

## V

**vague**
52:7
**vapes**
9:23
**vegas**
3:15
**vessels**
47:16
**via**
68:11, 68:19
**video**
5:9, 5:12
**videographer**
3:20, 5:2,
5:10, 5:23,
17:5, 17:11,
67:24, 68:2,
69:2
**videotaped**
1:14, 5:3
**virtually**
1:15, 2:2
**voice**
5:13

## W

**wait**
41:9
**wake**
47:14
**waking**
47:16
**walk**
7:12, 9:2,
12:11, 16:19
**walked**
12:10
**want**
5:20, 12:7,

12:13, 12:19,
12:20, 16:7,
18:13, 35:2,
40:18, 42:19,
57:8, 57:9,
57:17, 67:11,
68:22
**wanted**
25:19, 28:3,
29:1, 34:1,
34:13, 34:21,
54:24, 54:25,
57:13, 58:3,
59:6, 61:11
**wants**
24:5
**watching**
53:18
**water**
13:25, 14:4,
14:7, 14:25,
25:22, 28:4,
28:11, 29:2,
33:8, 43:9,
44:5, 44:6
**way**
22:7, 28:12,
29:1, 29:2,
44:3, 45:7,
45:8, 45:14,
45:16, 54:22,
63:12, 67:15
**we'll**
17:16, 38:7,
50:9, 57:15,
64:8, 68:11
**we're**
8:9, 8:14,
34:18, 68:16
**we've**
68:8
**weather**
21:4
**website**
19:10, 19:15,
20:1, 44:25
**wec**
55:20

**weeds**
27:3
**week**
21:4
**weeks**
35:7, 35:21,
63:18
**went**
19:2, 20:2,
37:21, 39:1,
39:2, 39:3,
53:4, 56:23,
62:21
**weren't**
25:4, 37:8,
38:11, 38:21,
39:21, 59:8,
65:22
**west**
46:16
**whatever**
55:14, 56:16,
61:19, 63:16
**whenever**
35:11, 35:12
**whereupon**
6:17
**whether**
11:9, 30:22,
41:22, 44:14,
44:17, 44:20,
44:23, 49:10,
49:20, 49:23,
53:4
**whole**
6:20, 21:4,
30:6, 31:18,
31:20, 35:1,
35:16, 38:24
**wi**
3:7
**wife**
24:8
**wished**
58:1
**within**
48:16
**without**
34:7, 34:19

**witness**
5:22, 5:25,
6:14, 25:16,
25:18, 43:19,
43:22, 52:9,
61:19, 61:25,
63:3, 67:5,
67:21
**witness(es**
70:4
**words**
61:2, 63:23
**work**
7:15, 10:3,
13:10, 13:14,
18:21, 19:24,
20:20, 21:21,
27:14, 33:6,
46:6, 52:22,
53:5, 55:15,
55:16, 55:17
**worked**
12:3, 23:7,
23:8, 25:11,
32:13, 38:24
**working**
9:20, 10:23,
11:21, 11:22,
13:15, 15:8,
15:11, 17:9,
20:10, 21:25,
30:18, 45:23,
47:13, 49:20,
53:19
**works**
12:22, 27:17,
39:10, 49:23,
49:25
**worth**
37:8, 38:11,
48:13
**would've**
38:14, 38:15,
46:21, 51:12,
57:5, 61:4,
61:5, 61:6,
62:17
**wouldn't**
40:7, 61:12

**writer**
18:22
**written**
6:11
**wrote**
18:24

| X |
|---|

**xyience**
55:7, 55:11

| Y |
|---|

**yeah**
9:6, 10:8,
11:17, 11:20,
12:2, 12:5,
13:4, 13:9,
13:13, 14:19,
20:19, 21:2,
21:8, 22:9,
23:4, 28:18,
29:20, 32:14,
34:24, 38:12,
38:23, 41:8,
41:9, 42:9,
43:20, 46:8,
46:21, 46:24,
50:6, 60:21,
62:10, 63:16,
64:4, 64:5,
67:20, 68:21
**year**
7:9, 7:16,
9:14, 12:4,
17:25, 20:17,
29:18, 31:17,
46:14, 46:18,
46:25, 52:11
**years**
9:4, 9:7, 9:17,
10:24, 30:20,
45:21, 46:20,
47:1, 55:3,
60:18
**yep**
64:12
**york**
33:8, 62:8

**Z**

**z-a-r-r-o**
42:10
**zarro**
42:8, 47:24,
48:16, 48:19
**zero**
55:23
**zoom**
68:11

**$**

**$243,000**
65:11, 65:22,
66:4, 66:9,
66:22
**$243,253.84**
65:5
**$250,000**
62:24
**$800,000**
36:7

**0**

**00**
68:10
**02013**
1:6, 5:7
**05**
46:22
**06**
46:22
**0777**
3:16

**1**

**1.5**
37:20, 38:1,
38:3
**10**
9:3, 9:16,
58:9, 67:18,
67:21, 68:10
**1100**
3:6
**14**
9:5, 55:3,

55:13
**15**
1:16, 5:8,
9:16, 55:13
**18**
5:9

**2**

**20**
30:20, 45:19,
45:21, 46:20,
57:22
**200,000**
63:10
**2005**
46:23
**2006**
46:19, 46:23
**2007**
46:19
**2009**
46:24
**2010**
45:16, 46:21,
46:22
**2011**
45:17
**2012**
45:17
**2018**
12:2
**2019**
9:13, 12:1,
12:2, 13:8
**2020**
13:11, 13:12,
28:17
**20201**
65:4
**2021**
13:18, 14:18,
15:14, 29:18,
29:19, 41:8,
54:24, 58:9,
60:19, 65:3
**2022**
4:9, 30:7,
30:9, 32:6,

34:13, 37:2,
38:5, 50:13,
52:23, 62:9,
64:23, 65:10,
65:23, 66:21
**2023**
15:19, 20:11,
20:18, 21:9,
30:25, 31:25,
39:13, 53:20,
64:16
**2024**
1:16, 5:8,
70:23, 71:18
**21**
41:9, 48:3,
49:1
**2100**
3:8
**22**
1:6, 5:7,
30:25, 32:4,
41:8, 41:15,
56:4, 68:9
**23**
15:12, 30:2,
32:4, 37:13
**240**
31:17
**243,000**
66:11, 66:13
**25**
64:23, 65:10,
65:23, 66:19
**250,000**
63:6
**27**
70:23, 71:18
**273**
3:8
**2948**
7:7
**2:cv**
1:6, 5:7

**3**

**30**
19:19, 34:2,

34:22, 34:23,
35:6, 35:14,
39:14, 57:22,
60:10
**31**
65:3, 65:4
**32**
9:7
**333**
3:16
**35**
67:25

**4**

**400**
3:14
**414**
3:8

**5**

**50**
4:9
**500**
39:11
**511**
3:6
**53202**
3:7
**54**
68:3
**55**
69:4
**561276**
1:23

**6**

**64**
4:10
**6980**
3:14

**7**

**702**
3:16
**71**
1:24
**7426**
7:7

**75,000**
35:24

---
**8**

**8**
5:9, 68:10
**86**
7:17
**89117**
3:15
**8:17 am**
1:17

---
**9**

**9**
67:25, 68:3,
69:4
**90**
63:18
**95209**
7:8
**99**
46:14
**990**
19:22
**9:55 am**
69:5

**72**

1　　　　　　UNITED STATES DISTRICT COURT
2　　　　　　FOR THE DISTRICT OF NEVADA
3　------------------------------------x
4　JAMES DEPPOLETO,　　　　　　　　　:
5　　　　Plaintiff,　　　　　　　　　　:
6　　　vs.　　　　　　　　:　Case No.
7　TAKEOVER INDUSTRIES INCORPORATED,　:　2:22CV02013
8　et al.,　　　　　　　　　　　　　:
9　　　　Defendants.　　　　　　　　　:
10　------------------------------------x
11
12
13
14　　　Videotaped Deposition of TOBY MCBRIDE
15　　　　　　　　　　Volume II
16　　　　　　　　Conducted Virtually
17　　　　　　November, Friday 22, 2024
18　　　　　　　　8:08 a.m. PST
19
20
21
22
23　Job No.: 559923
24　Pages: 72 - 210
25　Recorded By: Charlie McGrath, AAERT CER

**73**

1　　　Deposition of TOBY MCBRIDE, held virtually.
2
3
4
5
6
7
8
9
10
11
12
13　　　Pursuant to Notice, before Charlie McGrath,
14　AAERT CER, Notary Public, in and for the State of
15　California.
16
17
18
19
20
21
22
23
24
25

**74**

1　　　　　　　A P P E A R A N C E S
2
3　ON BEHALF OF THE PLAINTIFF:
4　　　PATRICK HARVEY, ESQUIRE
5　　　HUSCH BLACKWELL, LLP
6　　　511 N. Broadway
7　　　Suite 1100
8　　　Milwaukee, Wisconsin 53202
9　　　Phone: 414.273.2100
10　　　(Present via videoconference)
11
12　ON BEHALF OF THE DEFENDANTS:
13　　　DON BENNION, ESQUIRE
14　　　LAW OFFICE OF DON BENNION
15　　　6980 O Bannon Drive
16　　　Suite 400
17　　　Las Vegas, Nevada 89117
18　　　Phone: 702.333.0777
19　　　(Present via videoconference)
20
21
22
23
24　ALSO PRESENT:
25　　　Jesse Castro - PD Videographer

**75**

1　　　　　　　C O N T E N T S
2　EXAMINATION OF TOBY MCBRIDE　　　　　　PAGE
3　　　By Mr. Harvey　　　　　　　　　　　77
4
5
6　　　　　　　E X H I B I T S
7　　　　　(Attached to transcript.)
8　DEPOSITION EXHIBIT　　　　　　　　　　PAGE
9　　Exhibit 3　　Excerpts from Bank Statements　　84
10　　Exhibit 4　　Email Re Payments　　　　　146
11　　Exhibit 5　　Resolution of Board of Directors　156
12　　Exhibit 6　　Written Consent Board of Directors　168
13　　Exhibit 7　　First Notice of Default　　　187
14　　Exhibit 8　　Second Notice of Default　　190
15　　Exhibit 9　　Verified Complaint　　　194
16　　Exhibit 10　Balance Sheet 2022　　　201
17
18
19
20
21
22
23
24
25

**76**

1    P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Here begins the
3    continued deposition of to Toby McBride in the
4    matter of Deppoleto v. Takeover Industries
5    Incorporated, et al., in the United States
6    District Court for the District of Nevada, Case
7    number 2:22CV02013.  Today's date is November
8    22nd, 2024.  The time on the video monitor is 8:08
9    a.m.  The remote videographer today is Jesse
10   Castro representing Planet Depos.  All parties of
11   this video deposition are attending remotely.
12           Would Counsel pleads voice
13   identify themselves and state whom they represent?
14       MR. HARVEY:  Patrick Harvey for the
15   plaintiff.
16       MR. BENNION:  Don Bennion for Toby
17   McBride and the other Defendants.
18       THE VIDEOGRAPHER:  And the court
19   reporter today is Charlie McGrath also
20   representing Planet Depos.  The witness may now be
21   sworn.
22       THE REPORTER:  All right.  One moment,
23   folks.
24       I am a notary authorized to
25   administer oaths and this deposition will be

**77**

1    recorded by electronic means.  All parties
2    understand and agree that any certified transcript
3    produced from the recording of this -- of this
4    proceeding is intended for all uses permitted
5    under applicable procedural and evidentiary rules
6    and laws and shall constitute written stipulation.
7    The parties stipulate to the use and certification
8    of this testimony consistent with applicable law
9    of such.  Hearing no objection, I will now swear
10   the witness.
11   Whereupon,
12           TOBY MCBRIDE,
13   being first duly sworn or affirmed to testify to
14   the truth, the whole truth, and nothing but the
15   truth, was examined and testified as follows:
16   EXAMINATION BY COUNSEL FOR THE PLAINTIFF
17   BY MR. HARVEY:
18       Q   Good morning, Mr. McBride.  Are you
19   able to hear me?
20       A   Yeah, I can hear you.
21       Q   Okay.  When we left off at your
22   deposition last Friday, we were looking at Exhibit
23   Number 2, and I was asking you some questions
24   about it.  I'm going to pull that up again.  Are
25   you able to see my screen?

**78**

1        A   Yeah.
2        Q   So again, this is Exhibit Number 2.
3    It's titled Related Party Receivable Confirmation,
4    dated March 25, 2022, correct?
5        A   Correct.
6        Q   And this is a document where you're
7    agreeing that you owe Takeover Industries $243,000
8    and change, correct?
9        A   Correct.
10       MR. BENNION:  Just state an objection
11   to the extent it may call for a legal conclusion.
12   Go ahead.
13   BY MR. HARVEY:
14       Q   Did you ever tell Mr. Deppoleto about
15   this money referenced in this document?
16       A   No.
17       Q   Do you know whether anyone else at
18   Takeover told Mr. Deppoleto about the money
19   referenced in this document?
20       A   The money referenced in this document
21   was my salary for 2021, which was thrown out of
22   court and proven that that's what it was.  So, no.
23   This money was not taken.  This is a manufactured
24   document made up by Jason to show your client what
25   was going --

**79**

1        Q   So I'm asking a slightly different
2    question, and we'll get through this a lot quicker
3    today if you can stick with my questions.
4            My question was, did anyone from
5    Takeover disclose the money referenced in this
6    document to Mr. Deppoleto?
7        MR. BENNION:  Objection, may call for
8    speculation.  Go ahead.
9        THE WITNESS:  Couldn't tell you.
10   BY MR. HARVEY:
11       Q   You're not aware of anyone from
12   Takeover disclosing this money referenced in
13   Exhibit 2 to Mr. Deppoleto before he made any of
14   the loans to Takeover, correct?
15       A   Not that I'm aware of.
16       Q   Did you repay Takeover $243,253.84?
17       A   Why would I repay my salary back to the
18   company?
19       Q   So the answer to my question is no --
20       A   No.
21       Q   You did not repay $243,000 to Takeover,
22   correct?
23       A   No, no.
24       Q   We had a double negative there.  Did
25   you repay Takeover $243,253.84?

---

**Page 80**

1     A   No.

2     Q   Are you aware that Michael Holley made

3 unauthorized distributions from Takeover, meaning

4 distributions without approval from Takeover's

5 board of directors?

6         MR. BENNION:  Objection to the form of

7 the question.  Lacks foundation.  Calls for

8 speculation.  Go ahead.

9         THE WITNESS:  No, untrue.

10 BY MR. HARVEY:

11    Q   You disagree that -- let me back up.

12 Strike that.

13        Are you saying that Michael Holley

14 did not make unauthorized distributions from

15 Takeover?

16    **A   No.  He never made unauthorized to my**

17 **knowledge.**

18    Q   So I think we -- we're talking past

19 each other a little bit.  Are you saying that Mr.

20 Holley never made unauthorized distributions from

21 Takeover?

22    **A   Not to my knowledge.**

23    Q   And are you saying you don't have

24 personal knowledge of that, meaning you didn't see

25 him do something like that, or you didn't hear

---

**Page 81**

1 directly him something like that?  Is that what

2 you're saying when you say, not to my knowledge?

3    **A   I'm saying that not to my knowledge,**

4 **that Mike did anything wrong in this company.**

5    Q   Are you aware of allegations that Mr.

6 Holley authorized unauthorized distributions of

7 around $750,000?

8    **A   The -- the -- the -- no.**

9    Q   You've never heard anyone allege that?

10   **A   They're false statements.**

11   Q   So you have heard people allege that?

12 You just disagree with the allegations?

13   **A   People, who?**

14   Q   I'm asking.

15   **A   Jason Tucker -- Jason Tucker.  First of**

16 **all, anything Jason Tucker touched from when he**

17 **came in until he was fired, let go, and voted off**

18 **the board of directors for stealing, changing my**

19 **bylaws, and everything that he did also with your**

20 **client is null and void.  That's why we're here is**

21 **to renegotiate his note, which we tried to do as**

22 **soon as we took the company back over.**

23   Q   Mr. McBride, like I mentioned a moment

24 ago, I'm trying to get you out of here as quickly

25 as possible today, and we'll be able to accomplish

---

**Page 82**

1 that goal if you stick to the questions I'm asking

2 you.

3        My question was, are you aware of

4 anyone alleging that Mr. Holley authorized

5 unauthorized distributions of over -- or around

6 $750,000 of Takeover's money?

7        MR. BENNION:  Same objection.  Go ahead.

8        THE WITNESS:  I was aware and it was

9 lies.

10 BY MR. HARVEY:

11   Q   Okay.  Who was raising those

12 allegations?

13   **A   Again, Jason Tucker.**

14   Q   Anyone else?

15   **A   Not that I'm aware of.**

16   Q   And you say that those allegations were

17 lies, correct?

18   **A   Yes, they were.**

19   Q   What's your basis for saying that?

20   **A   It was proven through three audits and**

21 **two account -- two accounting firms.**

22   Q   Was one of the accounting firms BF

23 Borgers, CPA, PC?

24   **A   He was our personal accountant.  We**

25 **brought in two more after that.**

---

**Page 83**

1    Q   And that's the same firm that's listed

2 on Exhibit 2 that you signed, correct?

3    **A   I'm not -- I don't recall.  It was two**

4 **years ago.**

5    Q   I'll pull it up again for you.  Showing

6 you again Exhibit Number 2, the box I've got

7 highlighted that says BF Borgers, CPA, PC, correct?

8    **A   Correct.**

9    Q   Okay.  What were the other accounting

10 firms that you're claiming proved that the

11 $750,000 were in fact authorized distributions?

12   **A   I couldn't tell you.  You'd have to**

13 **look at the Arizona case.**

14   Q   So you're relying solely on the Arizona

15 case?

16   **A   I'm relying on what the company did.  I**

17 **don't know who the accounting firms were.  I'm not**

18 **in contact with these people anymore.  I don't**

19 **talk to them anymore.**

20   Q   And you, as you are sitting here today,

21 you don't remember who these other accounting

22 firms were other than BF Borgers, CPA?

23   **A   Nope.  BF Borgers, CPA, was in line**

24 **with -- with Chase and Tucker trying to do what he**

25 **was trying to do.  And that was also proven.  So**

84

1 that's why we brought in two other accountants
2 that had nothing to do with this company to go
3 through everything. And we opened up our books to
4 do that.
5    Q   I'm going to show you another exhibit
6 here.
7    A   So Borgers did everything at the
8 direction of Jason Tucker.
9    Q   Did Jason Tucker pay Borgers directly
10 or did Takeover pay Borgers?
11    A   Again, my name was never on account.
12 Mike's was. Mike's was taken off by Jason Tucker.
13 Jason Tucker's was put on. So Jason Tucker --
14    Q   Borgers represented Takeover, not
15 Tucker individually, correct?
16    A   Exactly. But --
17    MR. HARVEY: Okay. So I'm showing you
18 another exhibit. This will be Exhibit Number 3.
19    (EXHIBIT 3 MARKED FOR IDENTIFICATION)
20 BY MR. HARVEY:
21    Q   Are you able to see my screen?
22    A   Yep.
23    Q   And at the top it says Bank of America.
24 And then it says Takeover Industries. And the
25 dates are December 8th, 2021 through January 7th,

85

1 2022, correct?
2    A   Correct.
3    Q   And then this is a 53-page exhibit as
4 you can see. I don't want to go through every
5 single one, but I did want to go through some of
6 these line items that we see here.
7    MR. BENNION: Counsel, could you give
8 me the -- the first Bates number on this exhibit
9 please?
10    MR. HARVEY: Yep. It's DEF-00012.
11    MR. BENNION: Thank you.
12 BY MR. HARVEY:
13    Q   And Mr. McBride, I think we talked
14 about this last time, but just in case. There's
15 Bates numbers in the bottom of these documents.
16 I'm not going to say the zeros. I'm just going to
17 say DEF-12 or whatever, going forward to speed
18 things along. Okay? Are you with me?
19    A   Yeah.
20    Q   Okay. So here we've got a section
21 labeled Toby McBride. And this is on Page 2 of
22 the 53-page PDF. It's DEF-14. Do you see that
23 section?
24    A   I see it.
25    Q   Okay. So I want to ask you about some

86

1 of these charges that we see here. Okay. So the
2 first one I want to ask you about are, there's two
3 charges on 12-13-2021, each for $1,000, and it is
4 charged to All Pro Smog Tire and WH, Stockton,
5 California. Do you see those?
6    A   Yep.
7    Q   What was the purpose of those charges?
8    A   Couldn't tell you, but my truck is
9 tagged with Takeover and with Next Level on it.
10 So my vehicle was rolling marketing for the
11 company.
12    Q   You still have that vehicle?
13    A   Yes, I do.
14    Q   And it still says Takeover?
15    A   Yes, it does.
16    Q   Okay. So are you claiming that these
17 $2,000 charges were for something related to a
18 Takeover advertising vehicle?
19    A   To my car being --
20    Q   I'm sorry, what?
21    A   Yeah, exactly.
22    Q   Do you know what you actually purchased?
23    A   Couldn't tell you.
24    Q   Okay. And if we go down on 12-16,
25 there's a charge for Lodi Beer Company.

87

1    A   Lodi.
2    Q   Lodi. What is that for?
3    A   I couldn't tell you. I probably took a
4 distributor out for lunch.
5    Q   But you don't remember as you sit here
6 today?
7    A   No.
8    Q   Who authorized you to make the $1,000
9 purchases at All Pro Smog Tire and Wheel?
10    A   Me, Mike, Jason, Joe.
11    Q   You had a specific discussion about
12 these $1,000 purchases?
13    A   No. When my -- when my vehicle -- when
14 -- when my vehicle is -- is driving 6,700 miles
15 every couple months to meet with distributors or
16 retailers, and it's my vehicle doing it and I'm
17 going to do it, it's covered by the company.
18    Q   Okay. You're just using the vague term
19 company. I'm asking who specifically authorized
20 these charges?
21    A   Me, Mike, Jason, and Joe --
22    Q   When --
23    A   -- all knew about it.
24    Q   Is -- is there a formal --
25    A   No.

**88**

1    Q   -- or any sort of written document that
2  authorized these charges?
3    A   No. No.
4    Q   Okay.  So you're telling me there was a
5  specific discussion about these charges.
6    A   No, there wasn't no specific discussion.
7    Q   Okay.  Well, so how did the other
8  people authorize it?
9    A   When I went and did it, I would call
10 Mike or Chase and say, hey, I got to grab the car
11 servicer, or whatever I needed to do if it was
12 that expensive.  And it was fine, there was never
13 -- never no -- you make it sound like somebody was
14 trying to steal money and do something.  That --
15 that doesn't happen here.  Never happened here.
16   Q   Okay.  So who specifically did you talk
17 to about the purchases at
18   A   I --
19   Q   -- all Pro Smog Tire & Wheel?
20   A   I don't recall.
21       THE REPORTER:  I'm sorry, try and wait
22 for the end of the question before answering.
23 Thank you.
24 BY MR. HARVEY:
25   Q   So as you sit here today, you can't

**89**

1  name anyone who authorized those specific charges
2  at All Pro Smog Tire & Wheel, correct?
3    A   Either Mike or Jason, one of the two.
4    Q   You can't specifically name --
5    A   No.
6    Q   Okay.  Next one I wanted to ask you
7  about is December '21, Pier Market in San
8  Francisco, $404.32; what was that charge for?
9    A   Business -- business lunch with a
10 Budweiser distributor.
11   Q   Who was the distributor?
12   A   Possibly Matagrano at that time.
13   Q   I'm sorry, could you spell that?
14   A   M-A-T-A-G-R-A-N-O.
15   Q   So you spent $434 on a lunch with one
16 other person?
17   A   There was four of us there.
18   Q   Who were the other people?
19   A   I don't recall, but there was four of
20 us there.
21   Q   And you four spent $434 on lunch?
22   A   That's what it says, yes.
23   Q   What did you have?
24   A   Couldn't tell you.
25   Q   Who authorized you to spend $434 on

**90**

1  lunch?
2    A   Again, I'm the CEO of this company when
3  I was there.  And everybody knew, Jason and Mike,
4  what I was doing.  So for me to go take some of
5  the lunch, I don't need authorization to go do
6  that.
7    Q   Is there a document that says that?
8    A   No.
9    Q   And you said you were the CEO at this
10 time?
11   A   Exactly.
12   Q   How did lunch with a Budweiser
13 distributor benefit Takeover?
14   A   It gets them distribution.
15   Q   Explain that a little more, if you
16 would.
17   A   I meet with distributors to show them
18 the product, to get it into retail, to get
19 distribution.  Relationship building.
20   Q   And the other two individuals, you have
21 no idea who they were?
22   A   Nope.
23   Q   So how did buying launch for them
24 benefit Takeover?
25   A   When we were ready to launch, they

**91**

1  would have been behind us.
2    Q   Hadn't you already launched by this
3  point, December 2021?
4    A   We were launching online.
5    Q   I'm not following there.
6    A   We were launching online.  Only online
7  sales.
8    Q   Before December 2021?
9    A   Exactly.
10   Q   And so what -- I'm not following the --
11 what's the distinction that you're drawing there?
12   A   The distinction is, in 2022, we would
13 go to retail and distribution.  That's the
14 distinction.
15   Q   By the way, I was giving you the wrong
16 dates.  I just noticed, up here, it says Posting
17 date, and the column -- the actual transaction
18 date is the second column.  So I apologize.  The
19 first one that I was asking you about was the All
20 Pro Smog & Tire.  The actual transaction date was
21 December 10, and then the Lodi Beer Company was
22 December 14.  So I just wanted to clarify that for
23 the record.  And then the Pier Market lunch was
24 December 19.  Did you submit receipts for the All
25 Pro Smog charges?

92

1    A    Receipts were sent all the time.
2    Q    Who -- well, I'm talking specifically
3 about these 12-10 charges for All Pro Smog. Did
4 you send receipts to Takeover for those?
5    A    Yes, I would -- yes.
6    Q    Who did you send those to?
7    A    I would have sent them to Mike at that
8 time.
9    Q    Was anyone else involved in the All Pro
10 Smog & Tire purchases?
11    A    No.
12    Q    The next one I want to ask you about
13 is, on 12-20, there's a charge for $300 for Great
14 Wolf Lodge. What's that for?
15    A    I'm not too sure.
16    Q    Apparently, the arrival was on the
17 19th, and the departure was the 20th. And it was
18 in Antica, California.
19    A    Business expense of some kind.
20    Q    I'm sorry, what?
21    A    Business expense of some kind. It was
22 three years ago, I don't know.
23    Q    Did you submit a receipt for that?
24    A    I'm not sure.
25    Q    How would staying at a Great Wolf Lodge

93

1 -- which, I believe, is a water park, how would
2 that be a business expense?
3    A    What difference is it -- it's a hotel.
4 Whether it's a water park or not, it's a hotel.
5    Q    So as you sit here today, you have no
6 justification for this expense, correct?
7    A    Exactly.
8    Q    Okay.
9        MR. BENNION: I'm going to state a
10 belated objection to that question. May call for
11 a legal conclusion.
12 BY MR. HARVEY:
13    Q    The next one I wanted to ask you about
14 is on DEF-32. So here, we've got another Toby
15 McBride section. And the first entry is January
16 -- the one that I wanted to ask you about is
17 January 10, 2022, Lodi Beer Company, for $111.
18 What was that for?
19    A    Either meeting with a distributor or
20 retailer.
21    Q    Who was it?
22    A    Couldn't tell you, that was three years
23 ago.
24    Q    Who authorized it?
25    A    Nobody.

94

1    Q    Did you submit a receipt?
2    A    The receipt is what you see.
3    Q    And you're telling me this was a
4 business expense?
5    A    Anything I put on that card is a
6 business expense.
7    Q    You said the receipt is what I see.
8 I'm looking at a bank statement. That isn't --
9 that's not a receipt.
10    A    I also kept the receipts.
11    Q    Does Takeover still have those?
12    A    I couldn't tell you
13    Q    Who would have controlled those?
14    A    Possibly Mike.
15    Q    Anyone else? You said possibly.
16    A    Nope.
17    Q    Next one is on January 13, 2020, $1,000
18 to Enterprise Rent-A-Car in Stockton, California.
19 What's that for?
20    A    I couldn't tell you.
21    Q    So you also couldn't tell me how that
22 benefited Takeover?
23    A    Probably driving down to L.A. for -- to
24 go meet with people. Instead of taking my truck,
25 I would rather rent something that had less gas in

95

1 it.
2    Q    At the company's expense?
3    A    Exactly.
4    Q    Even though the company was also
5 paying, for example, $2,000 for your truck to
6 advertise Takeover, correct?
7    A    And? Yes.
8    Q    Okay. And you're positive this was
9 business as opposed --
10    A    Exactly.
11    Q    -- to personal?
12    A    No.
13    Q    How are you positive about that?
14    A    It's business.
15    Q    Correct. But just calling it business
16 doesn't tell me that. How are you positive that
17 it was business as opposed to personal?
18    A    Because it wouldn't have been personal.
19    Q    And what makes you say that?
20    A    I'm saying it. We can do this all day
21 long.
22    Q    So you don't remember anything about
23 this $1,000 purchase to Enterprise Rent-A-Car,
24 true?
25    A    I wouldn't have put anything on there

96

1 that wasn't business-related at that time. So
2 it's business-related.
3    Q   You -- my question was -- and again,
4 we'll get through this quicker if you stick with
5 my questions as opposed to the ones you'd like to
6 answer.
7    A   Be very careful. Don't -- don't --
8 don't -- don't --
9        MR. BENNION:  Let -- let -- let --
10 let's just wait until there's a question, if -- if
11 -- it makes it easier for the transcriptionist.
12 BY MR. HARVEY:
13    Q   Do you remember a single detail about
14 this Enterprise Rent-A-Car $1,000 payment?
15    A   No.
16    Q   And if that's the case, how can you be
17 positive that it was a business expense?
18    A   Again, at that time, I wouldn't have
19 put anything on it that wasn't a business expense.
20    Q   You don't remember what kind of car you
21 rented, true?
22    A   I have no idea.
23    Q   You don't remember where you took that
24 car, true?
25    A   True.

97

1    Q   And you don't remember any specific
2 detail that would substantiate your claim that
3 this payment benefited Takeover, correct?
4    A   No.
5    Q   What's incorrect about it?
6    A   Because anything I would have done
7 would have been business-related. Whether I drove
8 to L.A., I don't know what that in.
9    Q   And my question was, you don't remember
10 a single detail --
11    A   No, not at this time --
12    Q   -- that would substantiate -- you got
13 to let me finish my question, sir.
14        You don't remember a single detail
15 that would substantiate your claim that this was
16 an expense that benefited Takeover, correct?
17        THE WITNESS:  Correct.
18        MR. BENNION:  Objection to the form of
19 the question.  If we can just go a little bit
20 slower, Toby, so I can object if necessary.
21 Thanks, Counsel.
22 BY MR. HARVEY:
23    Q   Next one -- the next one I wanted to
24 ask you about is a January 21, 2022 payment of
25 $374.44 to Dick's Sporting Goods in Lodi.  What

98

1 was that expense for?
2    A   Don't know.
3    Q   You don't remember a single detail
4 about this purchase?
5    A   Nope.
6    Q   How would a purchase from Dick's
7 Sporting Goods benefit Takeover?
8    A   I don't recall.
9    Q   How do you know this wasn't a personal
10 expense?
11    A   It's -- I don't recall.  It's not a
12 personal expense.
13    Q   What product from Dick's Sporting Goods
14 could possibly benefit Takeover?
15    A   I do not recall.
16    Q   Next one we've got is also January 21.
17 Zoom Car Wash, $262, on January 21, '22; do you
18 see that?
19    A   Yep.
20    Q   What was the purpose of spending
21 $262.49 at a car wash?
22    A   That was probably detailing the truck
23 and getting everything fixed up on it.  Oil
24 change, et cetera.
25    Q   And you said probably.  Are you

99

1 actually sure that's what that was for?
2    A   More than likely, to the best of my
3 recollection.  Again, that was back --
4    Q   You get what?
5    A   -- in 2021.
6    Q   You get oil changes at a car wash?
7    A   You can here.
8    Q   Did you regularly get oil changes at
9 Zoom Car Wash?
10    A   Once or twice a year, yeah.
11    Q   And do you believe the car was
12 detailed?  Is that what you're telling me?
13    A   To my best recollection, yes.
14    Q   Who authorized that purchase?
15    A   No one.
16    Q   Did you submit any receipts to take
17 over to substantiate that purchase?
18    A   Yes.  Plus the --
19    Q   I'm sorry, I didn't hear you.  What?
20    A   Yes, plus the statement.
21    Q   Who did you submit the receipt to?
22    A   It would've went to Mike.
23    Q   Mike Holley?
24    A   Yep.
25    Q   Next one I wanted to ask you about is

100

1 January 22, 2022, $472.46 to Dillard's, 960 Weber
2 stow -- weber style. What is that charge for?
3 **A That was personal, and that was paid**
4 **back.**
5 Q When did you pay it back?
6 **A Immediately.**
7 Q Why did you use --
8 **A Within two days.**
9 Q Why did you use a company credit card
10 for a personal purchase?
11 **A Because my other one wasn't with me,**
12 **that's why. And so I paid it right back.**
13 Q And there's a record of you paying that
14 back?
15 **A Of course there is.**
16 Q Is it going to be in this bank
17 statement that we're looking at?
18 **A I couldn't tell you. I don't -- I**
19 **don't control the bank. I don't control bank**
20 **statements. I don't -- I have no access to it.**
21 Q You said you paid it back within two
22 days?
23 **A It would've been taken out of my**
24 **monthly salary.**
25 Q So I want to make sure I'm clear. You

101

1 didn't actually cut the company a check. It just
2 was taken out of your monthly salary.
3 Is that what you're telling me?
4 **A To my best of my recollection, yes.**
5 Q Who did you alert to this to make sure
6 that it was taken out of your monthly salary?
7 **A Mike.**
8 Q What is Dillard's?
9 **A Dillard's is like a Macy's.**
10 Q Like a Macy's?
11 **A Exactly.**
12 Q Okay. Next one I wanted to ask you
13 about is January 24. It's a $477.44 charge to
14 Best Buy.
15 What was that for?
16 **A I can't -- I can't -- I -- I have no**
17 **idea what that one is.**
18 Q What products did Takeover use that
19 Best Buy sells?
20 **A I couldn't tell you. We were probably**
21 **buying a laptop or buying something to that, for**
22 **the company. I don't recall.**
23 Q As you sit here today, you have no
24 recollection of any detail about what this
25 purchase was for or how it benefited Takeover,

102

1 true?
2 **A No.**
3 Q What was incorrect about my question?
4 **A I don't recall it. I don't recall the**
5 **-- the purchase, so --**
6 Q Maybe we had a double negative. That
7 was probably my fault.
8 Do you remember any specific
9 detail about this purchase that would substantiate
10 a claim that it was made for Takeover's benefit?
11 **A I don't recall at this time.**
12 Q Okay. Next we've got -- need to go
13 forward a couple pages to DEF-47. So we're on
14 DEF-47, and if we scroll up a little we see this
15 is another Toby McBride section. And what I
16 wanted to ask you about first off -- let's see,
17 where is it? Ah, here we go.
18 On three -- or March 3, 2022,
19 we've got a $1,200 payment to Brookside Country
20 Club; do you see that?
21 **A Yep.**
22 Q What was that for?
23 **A That was approved by Jason Tucker.**
24 **That was a country club that we brought clients to**
25 **to do business with.**

103

1 Q So what was the actual payment for,
2 though?
3 **A Probably for the monthly fees, for two**
4 **months.**
5 Q Country club fees? Or when you say
6 fees, what do you mean?
7 **A We belonged to it for a short amount of**
8 **time to bring clients to, distributors, retailers,**
9 **here in California. And that was authorized by**
10 **Jason. Actually, his idea.**
11 Q Is there documentation of this
12 authorization that you're talking about?
13 **A I couldn't tell you.**
14 Q If there was --
15 **A I --**
16 Q Go ahead. I'm sorry.
17 **A No, go ahead.**
18 Q Did anyone other than Jason Tucker
19 authorize this?
20 **A No. Joe Pavlik knew about it, though,**
21 **also. All three of us knew about it. All three**
22 **of us agreed.**
23 Q And why -- well, did you have -- did
24 Takeover have country club memberships anywhere
25 other than Brookside Country Club?

104

1      A   No.
2      Q   And you're the only one who lives in
3  California out of the Takeover people who were in
4  charge at that time, correct?
5      A   Exactly.
6      Q   And so you had access to a country
7  club, whereas other directors and officers of
8  Takeover did not, correct?
9      A   Sure they did.
10         MR. BENNION:  Objection.  Objection.
11 Assumes facts not in evidence.  Calls for
12 speculation.  Lacks foundation.
13 BY MR. HARVEY:
14     Q   Go ahead, Mr. McBride.
15     A   I'm done.
16     Q   I didn't hear your answer.  I'm sorry,
17 what did you say?
18     A   I said sure they did.
19     Q   Which country club was Takeover paying
20 for access for them too?
21     A   Well, when they were here, they had
22 access to it.
23     Q   Okay.  None of the other ones even live
24 in California, though, correct?
25     A   No.

105

1      Q   What's incorrect about it?
2      A   Jason was here all the time.  Joe would
3  come through --
4      Q   Did he live there?
5      A   Joe would come through all the time.
6  No.
7      Q   Okay.  Did Joe live in California?
8      A   No.
9      Q   Did Jason live in California?
10     A   Here and there he did.
11     Q   At this time in March of 2022, did he
12 live in California?
13     A   No.
14     Q   And how far is Brookside Country Club
15 from your house?
16     A   15, 20 minutes.
17     Q   So this country club membership --
18 well, strike that.
19         It's your testimony, though, that
20 Mr. Tucker authorized a country club membership
21 for a country club 15, 20 minutes from your house,
22 correct?
23     A   Exactly.
24     Q   Did -- why didn't Takeover authorize
25 country club memberships for country clubs near

106

1  anyone else's house?
2      A   Because I'm the one that's meeting with
3  retailers and Budweiser distributors and Miller
4  distributors throughout the United States.  So
5  when they were here, I would take them to go do
6  stuff every once in a while.  That is why.
7      Q   Okay.  The next one --
8      A   It --
9      Q   -- I wanted to ask you -- I'm sorry,
10 what?
11     A   Go ahead.
12     Q   The next one I wanted to ask you about
13 -- we got to go down a few more pages to DEF-64.
14 And this is another Toby McBride section.  And
15 here we've got a March 13, 2022, charge of
16 $6,463.95 to the Hilton Buena Vista Palace, I'm
17 guessing that is.
18         Do you see that?
19     A   Exactly.
20     Q   What was that charge for?
21     A   PFL event.
22     Q   And say a little more on that if you
23 would.
24     A   Professional Fighting League that we
25 sponsored.

107

1      Q   I understood what you meant by PFL.  I
2  mean, what do you mean -- why did -- why did you
3  spend $6,400 for a PFL event?
4      A   We were there for a whole week.
5      Q   Who's the we?
6      A   Me, Kirby.  Joe came in.  That's the we.
7      Q   Why were you there for a week?
8      A   They invited us to come out and we went.
9      Q   Who's they?
10     A   The PFL.
11     Q   And it seems to show an arrival date of
12 March 5 and a departure date of March 13.  Do you
13 see that?  Do you see that?
14     A   Yep.
15     Q   PFL events are not typically five-day
16 affairs, are they?
17     A   PFL events at that time were filming
18 every other day, so yeah, they were.  They weren't
19 live events yet.
20     Q   And for eight days, how much were the
21 room -- was it one room or multiple?
22     A   I couldn't tell you.
23     Q   So you don't know if this was lodging
24 for just you?
25     A   It's not lodging for just me.

**108**

1    Q    Okay.  In any event, you're claiming
2  that the $6,400 charge was benefiting Takeover.
3        Is that what you're saying?
4    **A    Exactly.**
5    Q    And how was it benefiting Takeover?
6    **A    It's us broadening our brand with the**
7  **-- with the supplier that we're doing business**
8  **with.**
9    Q    And can you say a little more about
10  that?  What -- I didn't hear.  First of all, I
11  didn't hear what you said about something --
12  **A    It's us promoting -- it's us promoting**
13  **our brand with -- with the people we're doing**
14  **business with.**
15  Q    And what specifically did you do to
16  promote your van -- brand during that trip?
17  **A    Getting it in front of fighters,**
18  **getting it in front of other suppliers, getting it**
19  **in front of other sponsors that are involved**
20  **there, athletes, et cetera.**
21  Q    Who authorized that trip?
22  **A    Jason Tucker.**
23  Q    Anyone else?
24  **A    No.**
25  Q    Is there a written authorization?

**109**

1    **A    No.**
2    Q    Next one, we've got another March 29
3  payment to Brookside Country Club for $726.  Do
4  you see that?
5    **A    Yep.**
6    Q    What was that for?
7    **A    Probably the monthly fees.**
8    Q    You're saying probably, you're not sure?
9    **A    That's more than likely what it was.**
10  Q    By this time of March 29 -- well,
11  actually let me back up.  We asked a couple of
12  minutes ago -- or we were talking a couple minutes
13  ago about a payment on March 3rd, 2022 to
14  Brookside Country Club for $1,200.  Why were you
15  making an additional payment to Brookside Country
16  Club on March 29 the same month?
17  **A    I don't -- I don't -- I couldn't tell**
18  **you. I don't recall.**
19  Q    If you made two payments in the same
20  month that totaled about $2,000, are you -- how
21  can you be positive that this was for --
22  **A    More than likely -- more than likely it**
23  **would be lunches or -- or food that was during**
24  **that month. So during that two month time, that**
25  **was bought.**

**110**

1    Q    Who did you take to lunch during that
2  time --
3    **A    I would take Budweiser there.  I would**
4  **take Miller there.  I would take retailers there.**
5        THE REPORTER:  I'm sorry.  Just a -- a
6  reminder to try and wait for each other to finish.
7  There's a lot of crosstalk.  Thank you.
8  BY MR. HARVEY:
9    Q    Do you remember a specific individual
10  that you specifically took to Brookside Country
11  Club in that month?
12  **A    No.**
13  Q    And so you're guessing that that's who
14  you took, but you don't actually know as you sit
15  here today, correct?
16  **A    I don't know who I took at that time.**
17  Q    Did you ever take your family to eat at
18  Brookside Country Club?
19  **A    I did not.**
20  Q    Did you ever take anyone, for example,
21  a friend that had nothing to do with Takeover or
22  distribution?
23  **A    I did not.**
24  Q    Next one I want to ask you about was on
25  DEF-78, another McBride section.  And on April 15,

**111**

1  we've got a payment of $281 to a cigar club in
2  Modesto, California.
3        What was that for?
4    **A    Personal and I paid it back.**
5    Q    When did you pay it back?
6    **A    Again out of my -- it would've came out**
7  **of my salary.**
8    Q    Why did you use the company's credit
9  card in the first place?
10  **A    I couldn't -- don't recall.**
11  Q    And there's records of you paying that
12  back?
13  **A    There's always records of me paying**
14  **stuff back.**
15  Q    Who's got those records today?
16  **A    Auditors, accountants.**
17  Q    Which auditors and accountants?
18  **A    Again, I -- I told you I don't know who**
19  **these guys are.**
20  Q    So how are you positive that they have
21  the records?
22  **A    Because we went through an audit and**
23  **through two audits and through two different**
24  **accounting firms to get our book straight after**
25  **our client and -- and Jason Tucker tried to take**

112

1  my company back. That's how. That's why it's --
2  that's why it's -- that's why it's public again
3  right now.
4      Q   So the next one I wanted to ask you
5  about was on DEF-112. We've got a June 17, 2022
6  charge for the Georgia Aquarium.
7          Do you see that?
8      A   Exactly.
9      Q   What is that for?
10     A   That was a PFL event that we went with
11 a couple of the people that came in for the PFL,
12 too.
13     Q   What does a PFL event have to do with
14 the Georgia Aquarium?
15     A   They were going and asked us to go, so
16 we went.
17     Q   Who's the they?
18     A   They would be a part of the PFL.
19     Q   Names, though. Who are they?
20     A   Couldn't -- I couldn't tell you.
21     Q   How many of them were there?
22     A   I -- I don't recall.
23     Q   Who went with you?
24     A   Joe Pablo.
25     Q   So you're saying that PFL people, who

113

1  you can't name, said they were going to the
2  Georgia Aquarium and you went with them?
3      A   PFL, other -- other sponsors.
4      Q   How did going to an aquarium benefit
5  Takeover?
6      A   It's called relationship building.
7  That's how it benefits Takeover.
8      Q   How does going to an aquarium benefit
9  relationship building?
10     A   Number one, you're around people that
11 you're building relationships around to do better
12 business with and to understand how they do their
13 business and the -- and the push forward with
14 yours. That's how it's relationship building.
15     Q   Who authorized an expenditure at an
16 aquarium for Takeover?
17     A   Nobody.
18     Q   Next one I wanted to ask you about was
19 on DEF-127. So we're going to scroll out a little
20 more. So there's a couple of charges I wanted to
21 ask you about here. There's two to AT&T. The
22 total about $550 on July 23rd, 2022.
23         What were those for?
24     A   Probably my cell bill.
25     Q   And then beneath that we've got

114

1  Brookside Country Club $2,000 and change. What
2  was that for?
3      A   That was probably for three months of
4  payments that -- that Jay should push back and
5  then that's what was due then. He was pretty good
6  at not paying bills and telling you he paid bills,
7  so.
8      Q   As of July 2022, did Takeover have --
9  or was it paying for Country Club dues or fees for
10 any other officer or director other than you?
11     A   No.
12     Q   Next one, we're still on that same
13 page. We've got an August 1st, 2022 charge for
14 $342 to Yankee's Clubhouse in New York, New York.
15         What is that for?
16     A   Personal and paid it back.
17     Q   How did you pay it back?
18     A   With my salary within like five or six
19 days of me returning home.
20     Q   Why did you use your company credit
21 card for that?
22     A   Because my salary didn't come through
23 from Jason.
24     Q   Why not?
25     A   Couldn't tell you.

115

1      Q   Is the same true of the August 2 --
2  where is it. Purchased from the MLB store?
3      A   Yep. Same thing.
4      Q   Personal expense?
5      A   Yep.
6      Q   Did you pay that back?
7      A   Yes, sir.
8      Q   And why'd you use the company credit
9  card?
10     A   Same -- same trip.
11     Q   How about the NBA store purchase? Was
12 that also a personal expense?
13     A   Same.
14     Q   So yes, it was personal?
15     A   Yes, sir.
16     Q   And did you pay that back?
17     A   Yes, sir.
18     Q   Why'd you use the card -- the company
19 credit card?
20     A   I wasn't paid my salary by Jason and he
21 knew it. And I used the card and then paid it
22 back right when I got back.
23     Q   Now I want to go back up to the
24 beginning of this document and ask you a couple of
25 other questions. So if we look at DEF-23, this is

---

**116**

1  a section that says withdrawals and other debits.
2  Do you see that? Do you see that, Mr. McBride?
3      A  Yep.
4      Q  And in this section on January 3rd,
5  there's a transfer to you in the amount -- or
6  there's a transfer from Takeover to you in the
7  amount of $10,000, correct?
8      A  Yes.
9      Q  Why was Takeover transferring you
10 $10,000 on January 3rd, 2022?
11     A  Probably a part of my salary. Again, I
12 don't access the account. Have no access to
13 account. Can Zelle or not Zelle anything from the
14 account.
15     Q  What is Zelle?
16     A  Zelle is like a wire transfer that I
17 have zero access to.
18     Q  And when you say probably part of your
19 salary, why do you say probably part of your
20 salary?
21     A  It's more than likely what it was. I
22 -- I wasn't -- I don't recall what that is. If
23 I'm getting money from Takeover, it's my salary.
24     Q  Well, for example, beneath that there's
25 an entry that says payroll on January 4.

---

**117**

1        Do you see that?
2      A  Yep.
3      Q  So if that was your salary, why
4  wouldn't it say payroll --
5      A  I couldn't tell you --
6      Q  -- on that one?
7      A  -- again, maybe you're not -- maybe
8  you're not listening to what I'm saying. I have
9  zero access to the account. Cannot Zelle, cannot
10 pull from the account, cannot make deposits to the
11 account. So maybe you should ask Jason Tucker
12 these questions. Not me because I have no idea.
13     Q  So as you sit here today, you have no
14 idea why Takeover transferred $10,000 to you on
15 January 3rd, 2022?
16     A  Again, that was probably part of my
17 salary. That was two years ago. I don't recall
18 what that was. More than likely, 98 percent, it's
19 my salary.
20     Q  Were you paid -- what was the cadence
21 of your payments? Was it monthly, weekly? What
22 was the -- your salary payments?
23     A  When -- when Mike was in -- when Mike
24 had the account, it was monthly. When Jason was
25 in -- in charge of the account, it -- it was

---

**118**

1  scattered all over the place with everybody.
2      Q  Who -- who had control of the account
3  as of January 2022?
4      A  Jason.
5      Q  When did he obtain control of the
6  account?
7      A  November or December of '21.
8      Q  And did you have a regular salary that
9  you were paid? In other words, the same amount?
10     A  Yes.
11     Q  Because I think you told me you got
12 $240,000 a year, correct?
13     A  Right.
14     Q  Did you get a regular, whether it was
15 weekly, or monthly, or whatever, was the check the
16 same amount each time for your salary --
17     A  It would -- it would value from what it
18 was supposed to be, the minus five seven, grand
19 every month - -- - it would it would -- it would
20 vary. I -- I don't recall.
21     Q  Okay. As you sit here today, though,
22 you don't know for sure why you got a $10,000
23 payment from Takeover on January 3, 2022; is that
24 correct?
25        THE WITNESS: That would've been --

---

**119**

1        MR. BENNION: Excuse me, Toby.
2  Objection. Asked and answered. Go ahead. Go --
3  go ahead, Toby.
4        THE WITNESS: I'm done.
5  BY MR. HARVEY:
6      Q  You didn't actually answer that
7  question?
8      A  I answered it before. More than likely
9  it was part of my salary. It was in 2022. I
10 don't -- I don't recall.
11     Q  My question was slightly different. As
12 you sit here today, you don't remember for sure
13 why you received $10,000 from Takeover on January
14 3rd, 2022, correct?
15     A  Again, I would only receive money from
16 Takeover if it was part of my salary. That's it.
17 There is no gray area. It's black or it's white.
18 That's it.
19     Q  So you're positive that -- that was
20 part of your salary payment?
21     A  Yes.
22     Q  Next one I wanted to ask you about is
23 down on the next page, so DEF-24. So on -- oh,
24 wrong one. Sorry. January 10th. There's another
25 -- so we're just one week after January 3rd, 2022,

120

1  there's another transfer from Takeover to you in
2  the amount of $10,000, correct?
3     **A   Yes.**
4     Q   And so two weeks into the new year,
5  you've been paid $20,000 from Takeover, correct?
6     **A   Yes.**
7     Q   And if that cadence continued, you
8  would've been paid $40,000 that month, correct?
9     **A   If that cadence would've continued, but**
10 **that cadence didn't continue.**
11    Q   Okay.  Do you know what this payment
12 was for on January 10, 2022?
13    **A   Either late payment on my salary from**
14 **December not getting paid or I'm not too sure.**
15 **You have to ask Jason Tucker these questions.**
16    Q   Well, I'm asking you, is this --
17    **A   I have no -- I have no control.  I have**
18 **no control back in time.**
19    Q   You got to let me finish my question,
20 sir.
21        As you sit here today, do you know
22 specifically why you received $10,000 from
23 Takeover on January 10, 2022?
24    **A   No, I do not.  But it's funny how you**
25 **see Jason's name -- Jason's Company right**

121

1  **underneath mine.  Very odd.**
2     Q   So then the next one --
3     **A   I noticed, is there -- I -- I noticed**
4  **that Jason never brought up on this, it's probably**
5  **because he's still talking to your client.**
6  **Amazing.**
7     Q   The next one I wanted to ask you about
8  is January 27, 2022.  And we see another Takeover
9  transfer from -- to you in the amount of $7,500,
10 correct?
11    **A   Correct.**
12    Q   Why did you receive $7,500 from
13 Takeover on January 7 or 27, 2022?
14    **A   I don't recall.  You'd have to ask**
15 **Jason Tucker that question.**
16    Q   Next one is on DEF-39.  And the first
17 question I wanted to ask you is about this
18 February 2, 2022 transfer for Takeover to you in
19 the amount of a thousand dollars; do you see that?
20    **A   I see it, but I have no idea what that**
21 **is.  And again, I don't -- I can't make Zelle**
22 **transfers.  You have to ask Jason Tucker.**
23    Q   So you don't know why you received a
24 payment from Takeover of a thousand dollars on
25 February 2nd, 2022; is that correct?

122

1     **A   No.  Yes, sir.**
2     Q   Okay.  The next one is on DEF-40.
3  We've got a February 14, 2022 transfer from
4  Takeover to you in the amount of $5,000; do you
5  see that?
6     **A   Yep.**
7     Q   Why did you receive $5,000 from
8  Takeover on February 14, 2022?
9     **A   You'd have to ask -- would be part of**
10 **my salary, but again, you'd have to ask Jason**
11 **Tucker.**
12    Q   So you seem to be giving me the same
13 answer to every one of my questions about these
14 transfers.  I have -- I'll tell you I'm seeing
15 about 31 more.  I can go through them all one by
16 one or we can try and be a little more efficient.
17 I'll just tell you this document that we're
18 looking at, there are payments referenced on this
19 document from Takeover to you on February 24,
20 2022, and these dates are all 2022, unless I say
21 otherwise, February 24, March 1, March 14, March
22 29, April 5, April 15, April 20, April 29, May 6,
23 May 13, May 19, May 26, another one on May 26,
24 June 21, June 27, July 1, July 8, July 20, July
25 28, August 22, September 1, September 7, December

123

1  12, December 16, December 19, January 6, January
2  10.  Oh, I'm sorry.  So that's all the 2022 dates.
3  And then these dates are 2023, January 6, January
4  10, February 1, March 2, March 27, September 21,
5  December 6.
6         If I asked you the same questions
7  about all of those and by the same questions, I
8  mean, do you know why you received payments from
9  Takeover on those dates?  Would your answer be
10 what you've just been answering me, you don't know
11 why you received those payments?
12    **A   It would've been part of my salary.**
13    Q   Okay.  And I suspect you didn't commit
14 those dates to memory and we can go through one by
15 one, but if you look at them, there's not a
16 regular pattern to them.
17    **A   There was never a regular pattern on**
18 **how we were paid.  We made sure everybody else was**
19 **paid and they -- all the bills were taken cared of**
20 **before we were paid.  So it wasn't like the 1st**
21 **and the 15th.  So again, you'd have to ask Jason**
22 **Tucker how -- why those went out that way.  But**
23 **the only reason they would come to me would've**
24 **been part of my salary.  So just so we're clear.**
25 **And I have zero access again, to any bank account,**

124

1  in a wire, to money to know what's in there.  I
2  relied on Mike and Jason.
3     Q   So the -- and I'll tell you too, all of
4  these payments, and again, I'm happy to go through
5  all 31 additional if you'd like me to, but they
6  all end in the zero -- zero and they're differing
7  amounts.  For example, the December 12, 2022
8  payment is for 400 -- well, this one isn't a zero
9  -- zero, but ends in a round number.  It's $450,
10 but then we also see payments on, for example,
11 September 7, '22 for $10,000, but they all are
12 round numbers and they're all differing amounts.
13        So my question for you is
14 companies are generally with -- required to
15 withhold taxes, and I don't see how these could
16 all be round numbers if this was in fact payroll.
17        Do you have any explanation for
18 how these could all be round numbers, especially
19 given that they were so different?
20    A   I do not recall.
21    Q   Did the company withhold taxes from
22 your paycheck?
23    A   I pay -- I paid my taxes at the end of
24 the year.  Yes.
25    Q   Did the company withhold --

125

1     A   I believe so.
2     Q   What's that?  I'm sorry.  What did you
3  say?
4     A   I don't recall.
5     Q   So you don't know as the CEO one way or
6  another, whether Takeover was withholding taxes
7  from your payments; is that what you're telling me?
8     A   Taxes were claimed at the end of the
9  year.
10    Q   So you're telling me that Takeover did
11 not withhold taxes from your --
12    A   I'm -- I'm not -- not telling you
13 anything.  I don't recall.
14    Q   Well, that's what I'm asking you, did
15 Takeover withhold taxes from my payroll?
16    A   I don't recall.
17    Q   As the CEO of the company up through at
18 least a portion of 2023, you don't recall whether
19 the company withheld taxes; is that what you're
20 telling me?
21    A   I -- I -- I don't -- I don't recall.  I
22 -- I would assume that that's what would've
23 happened, but I don't recall.
24    Q   And so if you're assuming that that's
25 what would've happened, how is it possible that

126

1  you were receiving all of these 31 transfers on
2  the dates I just referenced and they all ended in
3  round numbers?
4     A   I could I -- I have no idea.  I don't
5  recall.
6     Q   Is the fact that they all ended in
7  round numbers, but you assume taxes were being
8  withheld; does that cause you to question your
9  assertion that this was all payroll payments?
10    A   No.
11    Q   Why not?
12    A   Just doesn't.
13    Q   Okay.  And the fact that one of these
14 payments, for example is for $450, you're telling
15 me that -- that was your payroll for that date?
16    A   Again, I don't recall.
17        MR. BENNION:  Hold -- hold on.
18 Objection.  Lacks foundation.  May call for
19 speculation.  Go ahead.
20 BY MR. HARVEY:
21    Q   If you answer, I didn't hear.  Your
22 lawyer was talking.
23    A   I don't recall.
24    Q   Okay.  So but you're telling me you're
25 positive that every one of these payments was

127

1  payroll?
2     A   To my best of my recollection, yes.
3     Q   Now --
4     A   So the reason why I would get -- only
5  reason why I would get transfers.
6     Q   At a certain point, you and the others
7  pushed Mr. Tucker out of Takeover, correct?
8        MR. BENNION:  Objection to the form of
9  the question.  Calls for speculation.  Go ahead.
10 Vague and ambiguous.
11        THE WITNESS:  Ask the question again?
12 BY MR. HARVEY:
13    Q   At a certain point, you and the others
14 pushed Mr. Tucker out of Takeover, correct?
15    A   Yeah, by finding out what he was doing
16 with your client, so yes.
17    Q   And when was this that he was pushed
18 out of Takeover?
19    A   Early November, I believe.
20    Q   So who was responsible for payroll
21 after he was pushed out of the company?
22    A   Mike.
23    Q   Mike Holley?
24    A   Yes.  It wasn't me.  It was Mike.
25    Q   Okay.  So any transfers to you after

**128**

1  Mr. Tucker was pushed out of the company, it's
2  your testimony that Mike Holley would've been
3  responsible for those; is that what you're telling
4  me?
5  **A  To the best of my recollection, we**
6  **didn't pull payroll after that point.**
7  Q  After what point?
8  **A  I don't believe after November,**
9  **December, if it was, it was like five grand.**
10  Q  So for example, if we go to DEF-334,
11  there's a December 6, 2023 payment from Takeover
12  to you for $10,000, correct?
13  **A  Yes.**
14  Q  And this was over a year after Mr.
15  Tucker had been pushed out of the company, correct?
16  **A  Yes.**
17  Q  And this was a year after the lawsuit,
18  this lawsuit had been filed, correct?
19  **A  That -- that would've been for -- for**
20  **-- for me leaving the company and moving my**
21  **shares, so that's what that is.**
22  Q  How are you sure about that?
23  **A  Because I know what that is. That's**
24  **when I left the company.**
25  Q  Is there some written document

**129**

1  authorizing a payment of $10,000 to you in
2  exchange for you leaving the company and doing
3  what with your shares?
4  **A  I sold part of my shares back to the**
5  **company. There is documents. There's -- there's**
6  **documents signed by the board of directors.**
7  Q  Authorizing this payment or a different
8  payment?
9  **A  Authorizing the whole transaction.**
10  Q  How much specifically -- well, are you
11  claiming this $10,000 all of it was in exchange
12  for selling your shares or only a portion of it?
13  **A  Portion of it.**
14  Q  How much of the 10,000?
15  **A  I don't recall.**
16  Q  And you're claiming that there's
17  documentation showing that this was authorized?
18  **A  There is documentation.**
19  Q  Okay. I'll represent to you that
20  yesterday, Mr. Zarro testified that Takeover's
21  liabilities exceeded its assets, essentially, from
22  the day after Takeover was opened in early 2021.
23  Do you disagree with Mr. Zarro's testimony on that?
24  **A  I would agree after Jason came in,**
25  **that's probably, you know -- could possibly be,**

**130**

1  but no, I -- I don't recall. I'm not going to
2  disagree with that. I'm not going to agree with
3  it either. So whatever Tom says -- tom says, that
4  has nothing to do with me.
5  Q  Okay. Well, let's use your -- let's
6  use your -- let's use your date. I'm just trying
7  to set up a bookend here. So when did Mr. Tucker
8  join the company? Ballpark is fine. I don't need
9  an exact date.
10  **A  If you remember what I told you,**
11  **February, March -- February or March, in between**
12  **there, of '21.**
13  Q  Okay. And so you're saying that at
14  least as of that date, Takeover's liabilities
15  exceeded its assets, correct?
16  **A  We were moving hydrogen water. We did**
17  **a quarter of a million our first month when we**
18  **started doing hydrogen water. And every month,**
19  **then we would probably bring in 100 to 150,000 a**
20  **month until, you know, four or five months in when**
21  **Jason wanted to go the short direction. So -- so**
22  **I wouldn't know. It's -- it's possible.**
23  Q  To your knowledge, when was the first
24  -- when was the first time that Takeover's assets
25  or Takeover's liabilities exceeded its assets?

**131**

1  MR. BENNION: Objection. Lacks
2  foundation. May call for speculation. Go ahead.
3  THE WITNESS: I couldn't tell you.
4  BY MR. HARVEY:
5  Q  As of November, 2022, you'd agree with
6  me that Takeover's liabilities exceeded its
7  assets, correct?
8  **A  No.**
9  Q  Why do you say no?
10  **A  I just don't believe they did. But**
11  **again, I'm not seeing the bank accounts. I'm only**
12  **seeing what my sales team is doing and what's**
13  **going on in the market. So whatever Tom told you,**
14  **Tom -- that's Tom's opinion.**
15  Q  Well, Tom has been CEO of Takeover
16  since April, 2023, correct?
17  **A  To the best of my knowledge.**
18  Q  Okay. And are you disagreeing with him
19  that Takeover's liabilities exceeded its assets at
20  least as of that date?
21  **A  Possibly, but I don't know for sure.**
22  Q  And in terms of why Mr. Deppoleto was
23  not repaid, several witnesses have testified that
24  one of the reasons was because Takeover didn't
25  have the money to repay him as well as PFL. Do

132

1 you disagree with that testimony?
2    A  I wouldn't disagree with that, but I'll
3 also say that Mr. Deppoleto was reached out to
4 more than enough times to pay him back and that
5 did not happen.  He would been paid back twice
6 over by now.
7         MR. BENNION:  I'm going to state a
8 belated objection that to that question.  That's a
9 compound question.  Go ahead.
10        THE WITNESS:  Just so you know,
11 Patrick, I have no knowledge of when he's reached
12 out to or what they do or -- or when they made,
13 what do you call it, settlement agreements with
14 him.  I'm -- I'm not kept in the loop on that
15 part, so I stay out of it.  It's the only way to
16 keep my distance.
17 BY MR. HARVEY:
18    Q  When did Takeover stop actively doing
19 business?
20    A  I couldn't tell you.  I was gone.
21    Q  When did you leave?
22    A  Early.  Excuse me.  Early January.
23    Q  Of --
24    A  '23.
25    Q  -- what year?  And was -- well, now I'm

133

1 confused.
2    A  Well, I was really, you know, the -- I
3 -- I started exiting in -- in -- in, you know,
4 kind of, December into January.  I just had to
5 stay away from it.
6    Q  2022 or 2023?
7    A  2022.
8    Q  So you exited in January, 2023?
9    A  Let me get the -- let me make sure the
10 dates are straight.  When the -- the year we got
11 -- the day we got rid of Jason was what year?
12 That was 2022, correct?  Was that '23?  I get
13 confused on years, so my apologies.  So whatever
14 the day -- day was we got rid of Jason, within a
15 couple of months, I had had enough.
16    Q  Okay.  Well, Mr. Holley, I believe the
17 evidence shows, reentered the company November.
18 In fact, I can go over the board resolutions if
19 you want.
20    A  Yes.
21    Q  But reentered company around November
22 '22?
23    A  There -- so it was -- I was right after
24 that.
25    Q  Okay.  So why were you receiving this

134

1 payment in December, 2023 from Takeover?
2    A  That would've been part of my
3 settlement when I walked away.
4    Q  Okay.  And is there a formal settlement
5 agreement?
6    A  Yep, there is.  Approved by the board
7 of directors and filed.  That was public.
8         MR. HARVEY:  Counsel, that's an --
9 counsel, that's another document that we have not
10 been provided.  So I'm going to request it.
11        MR. BENNION:  So for clarification,
12 that would be a settlement agreement drafted and
13 -- and perhaps filed when --
14        THE WITNESS:  It was filed public.
15        MR. BENNION:  Okay.  Okay.  Toby,
16 please -- please don't talk over me.  We need the
17 court reporter to get an accurate record.  That
18 was filed publicly showing the settlement of Toby
19 McBride when he left.  When you left Takeover.  Is
20 that what we're -- is that what you're requesting,
21 Counsel?
22        MR. HARVEY:  That's what I understood
23 him to be saying.
24        MR. BENNION:  Okay.
25 BY MR. HARVEY:

135

1    Q  All right.  So if you left -- so your
2 testimony is that even though you left the company
3 in around January, 2023, you were receiving this
4 $10,000 payment in December, 2023, because of a
5 settlement you entered into with Takeover.  Is
6 that what you're telling me?
7    A  Yeah, to separate myself and walk away.
8    Q  And when you say settlement, had you
9 threatened litigation against Takeover?
10    A  No.  We were all on the same page.  Why
11 would I sue my own company?  There's no reason to
12 do that.
13    Q  Well, that's what I was curious about,
14 too.  But you were calling it a settlement and
15 typically a settlement means you're settling
16 disputed claims.
17    A  No.  Settlement meaning that I had
18 shares.  I wanted to have nothing to do with
19 the company anymore.  I -- I needed to start my
20 life over, as you could understand, and get my own
21 life back.  And by doing that, it's me walking
22 away.  But me walking away as the CEO had to be
23 done the right way through the SEC through FINRA,
24 through -- so those are the processes that we took.
25    Q  Did anyone, to your knowledge -- well,

136

1  I'll ask it two ways.
2      One, did you consult Mr. Deppoleto
3  about receiving this $10,000 payment in December,
4  2023, before you received it?
5      **A   I haven't talked to your client since**
6  **July of '22.**
7      Q   So the answer to my question is --
8      **A   No.**
9      Q   And again, I'm trying to get you out of
10 here quickly.
11     **A   No, I gotcha.  Sorry, Patrick.**
12     Q   No problem.  To your knowledge, did
13 anyone from Takeover consult Mr. Deppoleto before
14 Takeover made this $10,000 payment to you in
15 December, 2023?
16     **A   I don't recall.**
17     Q   And then if we go up to DEF-300, and
18 we're in the withdrawals and debit section,
19 there's, you know, a September 21, 2023 payment
20 from Takeover to you of $5,000, correct?
21     **A   Yep.**
22     Q   Why did you receive a $5,000 payment
23 from Takeover in September, 2023, which was about
24 eight months after you left?
25     **A   That would've been probably the**

137

1  **remainder of what I was getting from them.**
2      Q   What do you mean the remainder of what
3  you were getting?
4      **A   The remainder of my settlement, I**
5  **believe, but I don't recall.**
6      Q   Well, so September, 2023 is before
7  December, 2023.  So why are you saying it's the
8  remainder?
9      **A   9-22-23?  Hold on a second.  I'm trying**
10 **to see what that -- that would've been part of my**
11 **-- I believe that would've been part of my**
12 **settlement agreement.**
13     Q   What was your understanding?  Because I
14 haven't been provided -- I obviously would prefer
15 to just look at it, but I haven't seen it.  So
16 what was your understanding of how the -- the
17 settlement as you keep describing it, what was the
18 deal?
19     **A   I would get so --**
20     Q   What were you --
21     **A   I would get so much upfront, and then**
22 **they would get the majority of my shares.**
23     Q   How much did you get upfront and how
24 much were you supposed to get total?
25     **A   I think I got 15 total and there was**

138

1  **probably still -- I don't remember.  20, 30**
2  **remaining, but I just squashed that out.**
3      Q   I'm not sure I'm tracking what you're
4  saying there.  Can you explain that a little more?
5      **A   I probably received about 15 in that**
6  **amount of time, and then they probably owed me**
7  **another 20, 30.  But, you know, they were going**
8  **through things, so I wasn't worried about it.**
9      Q   So if I'm understanding you, you
10 believe you were supposed to be receiving in total
11 35 to $45,000, correct?
12     **A   I believe so.  I don't recall.  I got**
13 **to go back and look.**
14     Q   Okay.  But you're telling me that you
15 think you only actually received $15,000 of that.
16 Is that what you're telling me?
17     **A   That's what it looks like, I believe**
18 **so.  But I'm not -- I couldn't be confident.**
19     Q   And when did you enter into this
20 agreement with Takeover?
21     **A   December, 2022, I believe.  I don't**
22 **recall.  Everything's -- everything was -- once we**
23 **took the company over, everything was detailed**
24 **that we did, because of Jason.  So everything was**
25 **written down.  Everything was spelled out.**

139

1  **Everything was very fine-tooth.  We were going**
2  **through two audits.  We had two different**
3  **accounting firms.  So everything had to be**
4  **checked, double-checked, triple-checked.  So even**
5  **that process, I know it was a four or five-page**
6  **document that I had.**
7      Q   And this was a signed agreement between
8  you and Takeover; is that correct?
9      **A   Yes, sir.  Total separation.**
10     Q   So you obviously signed on your own
11 behalf.  Who signed off on it from the Takeover
12 side?
13     **A   I believe it was Tom, and Mike, and**
14 **Joe.  I believe all of them had to sign up on it.**
15     Q   Tom Zarro.
16     **A   Mike Holley.**
17     Q   Mike Holley.
18     **A   Joe Pavlik.**
19     Q   So I want to make sure the record's
20 clear, because we were talking over each other.
21 So you're telling me that on behalf of Takeover,
22 Tom Zarro, Mike Holley, and Joe Pavlik signed off
23 on this settlement that you've been describing; is
24 that correct?
25     **A   Yeah, I believe that's how it worked.**

140

1    Q   Okay.  So then I want to ask you about
2  -- if we go to DEF-235, in the withdrawal section,
3  there's a March 27th, 2023, payment of $5,000 from
4  Takeover to you; do you see that?
5    **A   Yes, sir.**
6    Q   What was the purpose of that payment?
7    **A   Anything that would've come from them,**
8  **Patrick, would've been part of my settlement**
9  **agreement.**
10    Q   Okay.  So your testimony is that even
11 though you left the company in January, 2023, you
12 were receiving this payment from the company in
13 March or on March 27th, 2023 as part of the
14 settlement agreement that you've been describing;
15 is that correct?
16    **A   Right.  Because I didn't get it all**
17 **upfront, I got it pieced.  So whenever they could**
18 **manage to give me, they would.  I was more than**
19 **cooperative, to put it that way.**
20    Q   And I might have asked you this before,
21 but I -- I wanted to make sure just in case I
22 didn't.  Did Mister -- did you disclose to Mr.
23 Deppoleto before you signed it, this settlement
24 agreement that you've been referring to?
25    **A   I've had no conversation with -- with**

141

1  **your client.**
2    Q   To your knowledge, did anyone from
3  Takeover disclose this settlement agreement to Mr.
4  Deppoleto before it was executed?
5    **A   I don't believe so, but this is public**
6  **information, so --**
7    Q   So then --
8    **A   Okay.**
9    Q   -- if we go up to DEF-234.  On March 2,
10 2023, we see another payment from Takeover to you
11 of $4,000, correct?
12    **A   Yep.**
13    Q   And this was, again, after you had
14 already left the company, correct?
15    **A   Yes, sir.**
16    Q   And what was this payment for?
17    **A   That's part of my settlement.**
18    Q   Okay.  And then if we go up to --
19    **A   I believe the first one was in January**
20 **or February --**
21    Q   Okay.
22    **A   -- I believe.**
23    Q   DEF-222.  We've got a February transfer
24 of $5,000 from Takeover to you, correct?
25    **A   Same.**

142

1    Q   Same meaning this was part of your
2  settlement agreement, that's why you're receiving
3  it?
4    **A   Yes.  Yes, sir.  They were going to try**
5  **to do one big -- you know, one decent payment, and**
6  **then pay when they could.**
7    Q   So if we go up to DEF-211.  It's a
8  January 10 payment of $3,000 to you; do you see
9  that?
10    **A   Yeah.**
11    Q   What was that for?
12    **A   Same.**
13    Q   Settlement?
14    **A   Yes, sir.**
15    Q   And then if we go up to DEF-10.
16 January 6, 2023, there's a $2,000 payment from
17 Takeover to you, correct?
18    **A   Yes.  See, they were piecing them.**
19 **Yeah.  Yes, sir, same.**
20    Q   This was part of your settlement?
21    **A   Yes, sir.**
22       MR. BENNION:  I'm just going to state
23 an objection to the form of the question.
24       MR. HARVEY:  Okay.
25       MR. BENNION:  And -- in -- in concert

143

1  with the prior questions, where the dates were
2  rattled off very quickly, Counsel.  There were, I
3  think you said, 31 dates.  And there was testimony
4  received by Mr. McBride at that time.  My question
5  is foundation because now we're going back
6  through, it looks like, each of those transactions
7  with different questions.  So I just want to state
8  that for the record.
9  BY MR. HARVEY:
10    Q   So then, if we look at DEF-197.  On
11 12/19, 2022, there's a $3,200 payment to you from
12 Takeover, correct?
13    **A   Right.**
14    Q   What was this payment for?
15    **A   That would've just been part of just**
16 **getting caught up because I hadn't been paid,**
17 **probably, since September, October, November of**
18 **that whole year.  So that's pretty much all we**
19 **could manage to take care of, bills that were**
20 **stacking up on us, that I recall, so 3200.**
21    Q   When you -- I'm sorry, I thought you
22 were done.  When you say getting caught up, what
23 do you mean?  What specifically?  Why did you
24 receive that payment?
25    **A   We didn't take -- to my recollection,**

144

1  we didn't take any -- any salary or anything. We
2  were trying to get the account squared. Once we
3  got it back, we tried to take care of Michael and
4  Michael, and get them caught up before we had to
5  unfortunately let them go.
6      Q  So you're saying this December 19, 2022
7  payment was payroll?
8      A  I believe so.
9      Q  Okay.  And so, anything that you
10 received from the company before December 19,
11 2022, is it your testimony that that was all
12 payroll?
13     A  I believe so, yes, sir.
14     Q  But you're not positive?  You keep
15 saying I believe so.
16     A  Like I said, I have no access to the
17 account.  So anything that would've came to me
18 would've been part of payroll, until after I left.
19 Anything after I left would've been part of my
20 settlement agreement.
21     Q  Have you received any payments from
22 Takeover since December 6, 2023?
23     A  I don't believe so.
24     Q  Are you aware that Michael Holley
25 charged personal expenses to Takeover?

145

1      MR. BENNION:  Going to state an
2  objection.  Lacks foundation.  Calls for
3  speculation.  Go ahead.
4      MR. HARVEY:  Go ahead, Mr. McBride.
5      THE WITNESS:  I -- I don't -- I don't
6  think so.  I don't recall any of that.
7  BY MR. HARVEY:
8      Q  You were never aware of Mr. Holley
9  charging personal expenses to Takeover?
10     A  No.
11     Q  Do you remember allegations about Mr.
12 Holley charging personal expenses to Takeover?
13     A  Yeah, from Jason.
14     Q  Do you remember what the dollar amount
15 he was alleged to have taken?
16     A  I couldn't tell you.  It was some
17 exaggerated number by Jason Tucker.
18     Q  Do you know when Mr. Holley was alleged
19 to have charged personal expenses to Takeover?
20     A  Jason was forming his plot was when
21 Mike was in the hospital sick, I believe at late
22 October, early November.
23     Q  Did Mr. Holley's family members make
24 personal purchases that were charged to Takeover?
25     A  I don't recall.  Probably when he was

146

1  in the hospital.
2      Q  I -- I didn't hear the last part of
3  your answer, I'm sorry.
4      A  I said possibly one when he was in the
5  hospital.
6      Q  I'm going to show you another exhibit
7  now.
8      MR. HARVEY:  We'll mark -- is this
9  Exhibit 4?  I'm sorry, I lost count.
10     THE REPORTER:  Sorry.  Give me one
11 moment.
12     MR. BENNION:  Counsel, are we at a good
13 time for a stopping break, maybe in the next 10 or
14 15 minutes?
15     MR. HARVEY:  Yeah.  Next 10 or 15
16 minutes, maybe even closer to five.
17     MR. BENNION:  Okay.
18     THE REPORTER:  And yeah, so this would
19 be 4.
20     MR. HARVEY:  Okay.  Thank you.
21     (EXHIBIT 4 MARKED FOR IDENTIFICATION)
22 BY MR. HARVEY:
23     Q  So I'm showing you what we've marked as
24 Exhibit 4.  This is Bates labeled, on the first
25 page anyways, DEF-560.  And there's a couple

147

1  emails in here.
2      The one I wanted to ask you about
3  is this Jason Tucker e-mail dated March 2, 2022;
4  do you see that?
5      A  Yes.
6      Q  And you were copied on this e-mail,
7  correct?
8      A  Yep.
9      Q  Go ahead and read it to yourself real
10 quickly, and then I just want to ask you a quick
11 question about it.
12     A  I've seen this before.
13     Q  Okay.  Have you read it before?
14     A  Right.  Yes, sir.
15     Q  Okay.  You see the line where he says.
16     Again, I appreciate you
17 understanding the situation that Holley placed us
18 in.
19     A  Yeah.
20     Q  Do you know what he's referring to as,
21 the situation that Holley placed us in?
22     A  Jason had a very particular way of
23 putting blame on somebody else for his faults, of
24 what he was doing.  So again, he was trying to say
25 Mike took money.  Mike never took money.  That was

148

1  proven in court that Mike never took anything. So
2  he was just lying to Tom Zarro about payments.
3  And, mind you, he talked to Tom once or twice a
4  week, so this e-mail is just to back up his
5  bullshit lies.
6      Q   So this is dated March 2, 2022, which
7  is much earlier than the time frame you were just
8  referring to a couple of moments ago. Because you
9  were anchoring it to when Mr. Holley was in the
10 hospital, I thought?
11     MR. BENNION: Objection. Vague and
12 ambiguous. Go ahead.
13     THE WITNESS: Mike was in November of
14 2021.
15 BY MR. HARVEY:
16     Q   He was in the hospital November 2021?
17     A   Pretty much the whole month.
18     Q   Okay. So this -- at least as of March
19 2, 2022, someone was raising allegations that Mr.
20 Holley had wrongfully used Takeover money, correct?
21     A   Yeah, Jason. He was making things up.
22     Q   And before Mr. Deppoleto made his first
23 loan to the company in May 2022, did you tell Mr.
24 Deppoleto about these allegations about Mr. Holley
25 wrongfully using Takeover's money?

149

1      A   Number one, not my job to tell
2  Deppoleto anything; it's public information.
3  Number two, he talked directly with Jason. Number
4  three, these were lies.
5      Q   And again, sir, if you can just stick
6  with my questions, we're going to get out of here
7  a lot more quickly. Before Mr. Deppoleto loaned
8  Takeover the first loan in May 2022, did you tell
9  Mr. Deppoleto about these allegations about Mr.
10 Holley wrongfully using Takeover money?
11     MR. BENNION: I'm going to state an
12 objection.
13     THE WITNESS: I did not.
14     MR. BENNION: Lacks foundation. Calls
15 for speculation. Go ahead.
16     THE WITNESS: I did not, but this is
17 public information. Anthony Pettis knew, Josh
18 knew, anybody that --
19 BY MR. HARVEY:
20     Q   Okay, sir --
21     A   -- invested in this company knew.
22     Q   -- it was a -- it was a simple yes or
23 no question. It was a simple yes or no --
24     A   Yes -- but no -- but you don't want --
25 you don't want to hear -- you don't want to hear

150

1  the truth that it was public information. Isn't
2  this something his attorneys are supposed to do,
3  due diligence? That would be your job, not my
4  job. This was public information. We were a
5  public company, not private, which him and Jason
6  tried to take us private.
7      So yes, he knew. He can sit there
8  and tell you he didn't know. It was public
9  information. He knew at the Dallas event what was
10 going on. He asked me and Joe about it. So to
11 think he didn't know what was going on, he did
12 know what was going on. He had asked me and Joe
13 about it at the Dallas event, when he brought his
14 father. So you can sit there and keep looking
15 like that to me and, like, blah -- blah -- blah,
16 but that's -- that's what happened. You weren't
17 there, I was. This frustrates the shit out of me.
18     How long more do we have? I need
19 a break.
20     Q   I had a couple more questions on this
21 e-mail. We should have been past it four minutes
22 ago.
23     A   You know, the sarcasm is not going to
24 get anybody anywhere. I need a break.
25     MR. BENNION: I -- I -- hey, I -- I did

151

1  ask for a break about five minutes ago.
2      THE WITNESS: Yeah, I heard you. So
3  let's just -- let's take one because I'm --
4      MR. BENNION: Hey, Toby -- Toby, please
5  don't talk over me or Mr. Harvey. We have court
6  reporters here recording this. Anyway, Patrick
7  you -- you recall I asked for a break eight
8  minutes ago, be held in 10 to 15 minutes, maybe
9  this is a good time.
10     MR. HARVEY: I had two more questions,
11 so I would like to ask those, and then we can take
12 a break. And if he answers yes or no, we'll be
13 done in 30 seconds.
14     MR. BENNION: Toby, are you okay? You
15 requested a break. He said two more questions.
16     THE WITNESS: Go ahead.
17 BY MR. HARVEY:
18     Q   Before May 2022, when Mr. Deppoleto
19 made the first loan, are you aware of anyone from
20 Takeover disclosing these Holley allegations to
21 Mr. Deppoleto?
22     A   Me and Joe spoke to him about it in
23 Dallas, and Jason told him when he came out to
24 Mexico. So yes, he was.
25     Q   When -- when were the -- I don't know

152

1  the dates of Dallas and Mexico. What -- what
2  dates are you talking about?
3      **A   I couldn't tell you. When his father**
4  **-- him and his father came out, we discussed this**
5  **briefly.**
6      Q   This was before or after May 2022?
7      **A   I couldn't -- I don't recall. You'd**
8  **have to look -- you'd have to look at the**
9  **documents. I don't recall.**
10     Q   Okay. So then the answer to my
11 question is, you don't know. I asked you if
12 you're aware of anyone telling him before May 2022
13 about these allegations.
14     **A   I don't.**
15     Q   Your answer is, I don't know, correct?
16     **A   I don't recall. Yes. I don't recall.**
17         MR. HARVEY: Okay. Yeah. We can take
18 a break now.
19         MR. BENNION: Okay. In 10 minutes?
20         MR. HARVEY: Sure.
21         THE VIDEOGRAPHER: We are going off the
22 record. The time is 9:46 a.m.
23         (OFF THE RECORD)
24         THE VIDEOGRAPHER: We are going back on
25 the record. The time is 10:01 a.m.

153

1          MR. BENNION: Is the screen frozen?
2  Hello?
3          THE WITNESS: I'm here.
4          MR. BENNION: I can hear you, Toby, but
5  I -- it looks like Patrick's screen is frozen.
6          THE VIDEOGRAPHER: Counsel, I'm going
7  to go off record.
8          MR. BENNION: Okay.
9          THE VIDEOGRAPHER: All right. We are
10 going off the record. The time is 10:01 a.m.
11         (OFF THE RECORD)
12         THE VIDEOGRAPHER: We are going back on
13 the record. The time is 10:05 a.m.
14 BY MR. HARVEY:
15     Q   Mr. McBride, did you attend Takeover's
16 December 21st, 2021 board meeting?
17     **A   I did not.**
18     Q   Do you know what happened at that board
19 meeting?
20     **A   I do not.**
21     Q   Did you become aware that at some
22 point, the Takeover board of directors voted to
23 remove Mr. Holley from the Takeover board of
24 directors?
25     **A   I'm unaware of any of that.**

154

1      Q   All right. I'm going to show you
2  another exhibit. Well, actually, let me back up.
3          Why didn't you attend that
4  December 21, 2021 meeting?
5      **A   Oh, December 21. Oh, when -- when Mike**
6  **was -- I'm sorry. I'm thinking later. I'm**
7  **thinking when we took the company over. My fault.**
8  **It was just me, Joe, and Mike. I mean, me, Joe,**
9  **and Jason.**
10     Q   All right. So let me back up.
11     **A   Yeah. Sorry.**
12     Q   12-21 -- 12-21-2021 is the date I'm
13 asking about. December 21, the year of 2021.
14     **A   Yes.**
15     Q   Did you attend that board meeting?
16     **A   Yeah. It should have been a Zoom call**
17 **or whatever it was. I forget what it was.**
18     Q   Okay. Who else attended that meeting?
19     **A   It should have just been me and Joe**
20 **Pavlik and Jason Tucker.**
21     Q   Were you a board member in December
22 2021?
23     **A   Yes.**
24     Q   Had you been placed on a leave of
25 absence in September 2021?

155

1      **A   No.**
2      Q   Around September 2021, were you placed
3  on a leave of absence?
4      **A   Would've been '22.**
5      Q   2022? Why were you placed on a leave
6  of absence in 2022?
7      **A   For what we've been discussing, the 240**
8  **and the payments that I paid back that Jason made**
9  **up.**
10     Q   How long were you placed on a leave of
11 absence?
12     **A   I was actually gone three weeks. And**
13 **then the Arizona case brought me back probably**
14 **three to four weeks, so a whole month of October.**
15     Q   Okay. So at that December 2021
16 meeting, did the vote -- did the board vote to
17 remove Mr. Holley from the Takeover board of
18 directors?
19     **A   Yes.**
20     Q   Did you vote in favor of removal?
21     **A   Unfortunately, yes.**
22     Q   Did you say unfortunately or
23 fortunately?
24     **A   Unfortunately.**
25     Q   And was it a permanent removal or a

156

1 temporary?
2      MR. BENNION:  I'm going to state an
3 objection that that may call for speculation
4 and/or a legal conclusion.
5      Go ahead, Toby.
6 BY MR. HARVEY:
7      Q   If you answered, Mr. McBride, I didn't
8 hear you.
9      A   I'm not too sure if it was just
10 temporary, or there was no -- there was nothing
11 more to it.  So.
12      Q   There was no deadline by which he was
13 going to be reinstated?  Is that what you're
14 saying?
15      A   That I'm aware of.  Yeah.
16      Q   Okay.  So it was a permanent removal,
17 correct?
18      A   At -- probably at that time.
19      MR. BENNION:  Same -- same objection.
20      Go ahead, Toby.  You have to wait
21 a minute for me.  Allow me to -- to object.
22      THE WITNESS:  At that time, yes.
23      MR. HARVEY:  Okay.  I'm going to show
24 you another exhibit, which is Exhibit 5.
25      (EXHIBIT 5 MARKED FOR IDENTIFICATION)

157

1 BY MR. HARVEY:
2      Q   Are you able to see my screen?
3      A   Yes, sir.
4      Q   The top of Exhibit 5, which is Bates
5 labeled DEF-1, says, Resolution of Board, sorry,
6 Resolution of the Board of Directors of Labor
7 Smart, Inc.  And it's describing a November 7,
8 2022 meeting with you, Mr. Holley, and Mr. Pavlik
9 via conference call, correct?
10      A   Yes, sir.
11      Q   Do you recognize this document?
12      A   I haven't seen it in a while.
13      Q   But you have seen it before?
14      A   Yes.
15      Q   Okay.  And on the last page, which is
16 DEF5, is that your signature?
17      A   Looks like it.
18      Q   And did you, in fact, attend that board
19 meeting on November 7, 2022?
20      A   I believe so.
21      Q   Did you call the board meeting?
22      A   No.  Jason Tucker did.
23      Q   Jason Tucker called this meeting?
24      A   Yes.
25      Q   So this says it was noticed to Jason

158

1 Tucker, including the other folks, via a November
2 4, 2022 e-mail, but then Mr. Tucker didn't appear.
3 Are you certain that Mr. Tucker called this
4 meeting?
5      A   One second.  No, I called.  This is --
6 yeah.  I called this.
7      Q   Okay.
8      A   With Mike and Joe.  With Mike and Joe.
9 Mike --
10      Q   Did you call that --
11      THE REPORTER:  I'm sorry.  I didn't
12 catch the end of that answer.
13      THE WITNESS:  Special meeting, Board of
14 Directors, I guess, for -- one second, Counsel.
15 Okay.
16      MR. BENNION:  Patrick, can you -- can
17 you enlarge that at all?
18      THE WITNESS:  Yeah, I'm trying to --
19      MR. HARVEY:  Yeah, sure.
20      THE WITNESS:  There we go.
21      MR. BENNION:  Thank you.
22      THE WITNESS:  Sorry.  Now I can see it.
23 I'm getting mixed up with the -- the meeting Jason
24 called and the one we called after we -- after I
25 got brought back by the judge.  Sorry.

159

1 BY MR. HARVEY:
2      Q   No problem.
3      A   It's all around the same --
4      Q   So I think you were saying --
5      A   -- same months.
6      Q   So I think you were saying you, in
7 fact, called this meeting; is that correct?
8      A   With Joe and Mike, yeah.
9      Q   So you in conjunction with Mr. Holley
10 and Mr. Pavlik were the ones who called this board
11 meeting, correct?
12      A   Yes.  If this is the one that removes
13 Jason.
14      Q   Now, as of the moment before this
15 meeting started, Michael Holley was no longer on
16 the Takeover board of directors, correct?
17      A   Yes, he was.  Because he was taken off
18 -- he wasn't taken off the right way.  So he was
19 still -- my understanding was, by the courts, he
20 was still part of the board of directors, because
21 he wasn't taken off the right way.
22      Q   Between the December 2021 meeting where
23 you and others voted Mr. Holley off of the board
24 and this November 7, 2022 meeting, there's no
25 formal document saying that Mr. Holley was a board

160

1  of director of Takeover during that time frame,
2  correct?
3      MR. BENNION:  I'm going to state an
4  objection.  May call for speculation.
5      Go ahead.
6      THE WITNESS:  I'm not aware of that.
7  BY MR. HARVEY:
8      Q   Did any board members express concerns
9  to you that Mr. Holley was one of the ones calling
10  a board meeting, even though he was no longer an
11  active member of the board?
12     A   I'm not aware of that.
13     Q   Did Mr. Tucker express that concern?
14     A   No.  We only served him by emailing to
15  Veronica, so we wouldn't have heard anything.
16     Q   Did either Mr. Tucker or his counsel
17  express that concern?
18     A   Not that I recall.
19     Q   This whereas clause talking about
20  several minutes before the call, go ahead and read
21  that.  Let me know when you're done.
22     A   Go ahead.
23     Q   Do you remember what Veronica said in
24  her message referred to in that whereas clause?
25     A   That they weren't going to attend?

161

1      Q   Correct.
2      A   Yes, sir.
3      Q   Well, did they say anything else about
4  the reasons why they weren't going to attend?
5      A   My memory, they were caught.  And so
6  was she.  That's why they didn't attend it.
7      Q   Caught?  What do you mean?  What do you
8  mean by that?
9      A   Caught, meaning Jason's games were
10  unraveled.  The -- was -- was unraveling of what
11  he was doing with Veronica, hiding everything, and
12  what he was doing with your client, that we found
13  out everything.  That's why he didn't get on this
14  call.  Because he was going to be exposed.
15     Q   And that's what they said to you?
16     A   That's just what we know as fact.  I
17  know Jason Tucker.  That's why --
18     Q   My question was slightly different.
19  What -- what did they say to you?
20     A   Nobody said anything to me.  I didn't
21  respond to them.  Ryder (phonetic) and Canini did.
22     Q   I'm not asking what you said back to
23  them.  I'm asking what they reported to you about
24  why they weren't going to be appearing.
25     A   I -- I don't -- I don't know.  I didn't

162

1  have communication with them.  It would been done
2  through the attorneys.  They tried --
3      Q   At this board meeting.  Did the board
4  -- well, the people that were at the board
5  meeting, did they vote to suspend Michael Costello
6  from his role as CEO of Labor Smart?
7      A   I don't -- I don't recall that.  I
8  could be mistaken.  Could have happened, but I
9  don't -- I don't remember.
10     Q   We go down to DEF-3.  The resolved --
11  second-to-last before the bottom of the page has,
12  Resolved.  Michael Costello is suspended from his
13  position as CEO of the company for a period of 30
14  days with pay.  And his authority to act on behalf
15  of the company is in all aspects revoked during
16  this period.
17         Did I read that right?
18     A   Yes, sir.
19     Q   Why was Mr. Costello suspended?
20     A   He should have never been on the board
21  in the first place, and Jason was using him to --
22  to sign off on other things.  So that's why he was
23  removed.  He was never a board member.  He was
24  never an advisor.  He was -- he was a sales
25  associate.

163

1      Q   Well, this is saying he was the CEO,
2  not a board member.  Do you disagree with that?
3      A   That CEO reports to Takeover.  Has no
4  power.
5      Q   The CEO --
6      A   Labor Smart has no power.  Has no vote.
7  Has nothing.
8      Q   So you're -- so you're telling me that
9  the CEO of Labor Smart reports to Takeover?
10     A   Yes.  Labor Smart has no power in the
11  board of directors.
12     Q   And this is saying he's the CEO of the
13  company, which is defined up top as Labor Smart,
14  not Takeover.  Do you see that?  Do you see that?
15     A   Yeah, I see it.
16     Q   What did --
17     A   Go ahead.
18     Q   What did Mr. Costello do that merited
19  or justified him being suspended from his position
20  as CEO of Labor Smart?
21     A   He was being advised by Jason, number
22  one, about lies that he was spitting to the rest
23  of my team that were exposed and then they were
24  behind the Dollar General deal and that's why he
25  was let go, when we were told -- they were told

164

1 we're not doing the deal.
2    Q    The Dollar General deal was with
3 Takeover, though, not with Labor Smart, correct?
4    A    Exactly.
5    Q    So why suspend him as CEO of Labor
6 Smart?
7    A    They're still one.  They're still --
8 they still coexist with each other, Labor Smart
9 and -- it's still -- Labor Smart is the shell,
10 Takeover is the -- the way I understand, it's a
11 subsidiary of Labor Smart.  You'd have to get more
12 into the weeds with Mike on that.  I'm not the guy
13 to be asking that question.
14    Q    So you defer to Mr. Holley in terms of
15 corporate governance between --
16    A    Yeah.
17    Q    -- Labor Smart and Takeover?
18    A    Yeah.
19    Q    Is that fair?
20    A    Yes, sir.  More of a --
21    Q    Okay.
22    A    -- so you can understand it, whereas
23 I'm going to combobulate it more.  Sorry.
24    Q    No problem.  So then if we look at
25 DEF-4, it's referring to -- let's see.  The fourth

166

1    Q    You said Tucker was changing notes?
2    A    Terms, my bylaws, with the knowledge of
3 attorneys that were involved in it, meaning --
4    Q    I'm just focusing on the notes.  You --
5 I'm just focusing on the notes.  You said that
6 Tucker was changing notes.  Did I hear you
7 correctly?
8    A    He was changing the terms of the notes.
9 Me and Joe had signed the first two, I believe.
10 And then there was three or four after that.
11 That's where Costello got brought into.  Costello
12 had no proof of anything.  Costello had no power
13 to sign anything.
14    Q    So you said a lot there.  I'm trying to
15 understand.  Are you talking about Mr. Deppoleto's
16 notes or other notes?
17    A    That Deppoleto was the only note
18 we were -- we were dealing with.
19    Q    And you said you and Mr. Pavlik signed
20 off on two previous notes?
21    A    The first -- or the first two revisions
22 we were in agreement with.  Anything after that
23 things were changed that we found out about.
24 That's why the note is in dispute.  It's because
25 the note was --

165

1 resolved from the bottom is referring to a planned
2 spinoff of Takeover being suspended for 90 days.
3 Do you see that?
4    A    Yes, sir.
5    Q    What's the planned spinoff of Takeover?
6 What's that referring to?
7    A    I don't recall.
8    Q    It also says that Labor Smart was going
9 to undertake a review of documents and information
10 concerning the transaction.  Do you see that?
11    A    Yes, sir.
12    Q    Do you know whether Labor Smart in fact
13 conducted a review of documents and information
14 concerning the transaction?
15    A    The day that we took over the company,
16 we had auditors and accountants going through
17 everything, on top of our attorneys.  Attorneys,
18 meaning Ryder and -- and Mike's lawyer, so.
19    Q    What did that review -- what did that
20 review reveal?
21    A    That Tucker was taking money, that
22 Tucker was forging documents, that Tucker was
23 changing notes to benefit Deppoleto, that there
24 was -- there was a plethora of -- of things.  I
25 can't recall everything.

167

1    Q    Have you -- have you reviewed Mr.
2 Holley's deposition testimony as the corporate
3 representative for Takeover?
4    A    No.
5    Q    Have you spoken to Mr. Holley about his
6 deposition testimony as the corporate
7 representative for Takeover?
8    A    No.
9    Q    As between you and Mr. Holley -- well,
10 strike that.
11        Taking you back to this document,
12 at the end of that review that you were referring
13 to, what was Labor Smart's decision regarding the
14 planned spinoff?
15    A    I don't recall.
16    Q    Was the decision to move forward with
17 it?
18    A    I don't recall.  I was basically
19 working my way out to separate myself from
20 everything.
21    Q    If you were already doing that, why
22 were you voting on these issues at this meeting?
23    A    Well, this was in the beginning of it.
24 When the review was done, it took a couple of
25 months to figure all this stuff out.

168

1   Q   During this meeting, it was resolved
2 that you would remain on Takeover's board of
3 directors, correct?
4   A   I believe so.
5   Q   Okay.  I'm going to take this one down,
6 show you another one.
7       Are you able to see this document?
8   A   Yeah.
9   Q   It says, Written Consent, Board of
10 Directors of Takeover Industries, Inc., correct?
11   A   Correct.
12      MR. BENNION:  Is this Exhibit 6?
13      MR. HARVEY:  Yes.  Thank you for
14 reminding me.
15      This will be Exhibit 6.
16      (EXHIBIT 6 MARKED FOR IDENTIFICATION)
17 BY MR. HARVEY:
18   Q   And this is referring to that November
19 7, 2022 meeting, correct?
20   A   Yes, sir.
21   Q   At the bottom of this page, which is
22 DEF-11, is that your signature?
23   A   Yes.
24   Q   Now, you only signed as to Resolutions
25 1 through 6 and 8, but you abstained from 7,

169

1 correct?
2   A   If that's what it says.
3   Q   Why did you abstain from Resolution 7?
4   A   I don't -- I don't recall.
5   Q   Okay.  At numbered Paragraph 7, It is
6 resolved: Toby McBride is reappointed as CEO of
7 Takeover and any leave of absence or revocation of
8 his authority to act on Takeover's behalf -- I
9 think that's supposed to be is, not his, thereby
10 terminated; is that right?  Did I read that right?
11   A   I believe that's what it says.
12   Q   So you were reappointed as CEO of
13 Takeover, correct?
14   A   Yes.
15   Q   Did Mr. Deppoleto provide written
16 consent before you were reappointed as CEO?
17   A   I don't recall.
18   Q   Did you ever seek Mr. Deppoleto's
19 written consent before you were reappointed as CEO?
20   A   I don't recall.  That would've had to
21 come from our attorneys.  We had no conversation --
22   Q   Are you aware of any -- I'm sorry.  Go
23 ahead.
24   A   We had no communication with him.  He
25 did everything through the lawyers, so that's who

170

1 it would've been done through.
2   Q   Are you aware of any officer or
3 director of Takeover seeking Mr. Deppoleto's
4 consent before you were appointed a CEO?
5   A   Not to my recollection.
6   Q   Are you aware of any lawyer seeking --
7 or any of Takeover's lawyers seeking Mr.
8 Deppoleto's written consent before you were
9 appointed as CEO?
10   A   Not to my recollection.
11   Q   After your reappointment to CEO, did
12 you have access to Takeover's website?
13   A   I never had access to it.
14   Q   At any point after you were reappointed
15 as CEO?
16   A   No.
17   Q   Did you take any actions, direct or
18 indirect, that would affect what was on the
19 website?
20   A   I had no -- I had no access to the
21 website or social media.
22   Q   Who did?
23   A   I couldn't tell you.
24   Q   After your reappointment, did you
25 become involved with Takeover's online sales?

171

1   A   No.  I was too busy fighting Jason
2 Tucker.
3   Q   After your reappointment as CEO, did
4 you make any public statements to the effect that
5 you were back in control at Takeover?
6   A   I don't recall.
7   Q   Did you tell any of Takeover's
8 investors that you were back in control at
9 Takeover?
10   A   I would've never said I was in control
11 of Takeover.  It would've been me, Joe, and Mike
12 got the company back from Jason.
13   Q   Who solicited Mr. Deppoleto's first
14 loan to Takeover?
15   A   Soliciting?  You mean brought him in?
16   Q   Asked him to give the loan?
17   A   James had called me two or three times
18 after I met Anthony and Josh in Florida the first
19 time.  And then, like I said, I didn't know him --
20   Q   Were you the first --
21   A   -- when I met him.
22   Q   Go ahead.  I'm sorry.  I thought you
23 were done.
24   A   I said that I didn't know who he was
25 until I met him.  I thought he was just some buddy

172

1  of -- of Anthony's and Josh's and had no idea who
2  he was.  Nice guy.  I talked to him on the phone,
3  but I never solicited him for money.
4      Q   So it's your --
5      A   I never asked him for money.  I never
6  -- it got brought to me.
7      Q   So it's your testimony that, out of the
8  people affiliated with Takeover, you had the first
9  contact with Mr. Deppoleto about any sort of loan
10 or investment.  Is that what you're telling me?
11     A   It would've been Jason and then it
12 would've been -- then I chatted with him after
13 that, but it was more -- more --
14     Q   Mr. Tucker?
15     A   -- more personal than -- I never got
16 into money conversations.  It was just him getting
17 to know me and Joe, feel more comfortable about
18 what he was getting into.  And it wasn't for that
19 much money.  It was for four.  I never came after
20 him for a million or four.  I -- he wanted to come
21 in and be an exclusive and I was against it.
22 Like, no, we don't just want one person so -- but
23 he was a nice guy.  We met in Dallas with him and
24 his father, like I said, and it was more personal.
25 We didn't talk money.  Not that I recall.  I knew

173

1  --
2      Q   So Mr. Tucker was the first one?
3      A   Yes.  I would've pushed everything --
4      Q   Mr. Tucker --
5      A   -- on Jason and Mike at that time.
6      Q   We're talking over each other.  I just
7  want to make the -- sure the record is clear.  So
8  Mr. Tucker was the first person from Takeover to
9  solicit Mr. Deppoleto when it came to loans; is
10 that correct?
11     A   If he wanted -- if he wanted to invest,
12 yes.  It wouldn't have been me.
13     Q   Do you know when those discussions
14 between Mr. Deppoleto and Mr. Tucker began?
15     A   Immediately after I got back from
16 Florida the first time.
17     Q   Okay.  I thought you said you didn't
18 talk about money with Mr. Deppoleto?
19     A   I don't -- I don't talk money with
20 anybody, with -- with investors.  I have them talk
21 to Mike or -- or Jason.
22     Q   Okay.  And so the answer very well
23 could be you don't know, but when did discussions
24 between Takeover and Mr. Deppoleto begin about a
25 potential loan?

174

1      A   Probably two weeks after I got back is
2  when I knew he wanted to come in and I believe it
3  was 400 was his first.  I could be wrong, but --
4      Q   Two weeks after you got back, what --
5  help me with the time frame.  When -- what does
6  that mean?
7      A   That means discussions were, you know,
8  hey, do we want to do this?  Let's get paperwork
9  moving and --
10     Q   Got back from where, and when was that
11 trip is a better to ask it?
12     A   I -- I got back from Fort Lauderdale
13 when we first got involved with the PFL.  They
14 brought me and Trevor out to -- I forget.  The
15 hotel with the guitar on it is where they had
16 their first thing at so we could see what was
17 going on.  I believe it was late -- was it when
18 Mike was in the -- I think it was before Mike went
19 in the hospital.  So it could have been August of
20 '21.  Yeah, it could have been then.  Yeah.  It
21 probably was August of '21.  I'm not too sure,
22 Patrick.
23     Q   So it -- roughly speaking, it was two
24 weeks after this trip to Fort Lauderdale, and you
25 understood that Mr. Deppoleto was talking to Mr.

175

1  Tucker about a potential loan and you heard about
2  it from Mr. Tucker; is that fair?
3      A   James had called me once or twice just
4  to talk because I didn't know who he was.  I just
5  knew he was attached to Anthony somehow, so I was
6  okay with it.  Because we wanted to just let
7  certain people in.  We didn't want a lot of people
8  involved.  I think you could understand that.  So,
9  even Anthony --
10     Q   Why did Takeover -- why did Takeover
11 solicit Mr. Deppoleto's loan?
12     A   The way I understand it, he wanted to
13 come in because Anthony was coming in.  Anthony
14 had already owned shares of LTNC and the stock was
15 climbing, climbing, climbing, so Anthony had no
16 idea it was me behind it until he saw me at the
17 fight.
18     Q   How did Takeover use the first 1.5
19 million in funds that Mr. Deppoleto provided?
20     A   I couldn't tell you.  I never saw that
21 money.  I -- I know where I think it went now.  It
22 went to making the shots that we were against the
23 Dollar General, which we'd have never done that
24 deal.  I'd have never spent 1.5.  It's absolutely
25 -- makes me throw up.

176

1    Q   Were any of Mr. Deppoleto's funds used
2  for salaries?
3    **A   No. There was money in the bank to**
4  **make our payroll. That's ridiculous.**
5    Q   If there was, why were you getting
6  inconsistent payroll payments?
7    **A   We would wait for money to come in and**
8  **I'd make sure my -- our guys were taken care of**
9  **before I was.**
10   Q   Well, I thought you said you had money
11 in the bank already.
12   **A   Yeah. But when you're running a**
13 **beverage company or company, it -- it -- it -- it**
14 **could go all in within a week or two and then, you**
15 **know, POs come right back in again. So it's not**
16 **-- nothing's ever real consistent.**
17   Q   So is it your testimony that none of
18 Mr. Deppoleto's loans were used for salary for
19 yourself?
20   **A   Not that I'm aware of. I had no access**
21 **to the bank account.**
22   Q   So if it was used for salary, you
23 wouldn't know because you didn't have access to
24 the bank account; is that fair?
25   **A   Exactly. Jason Tucker was the only**

177

1  **access to the bank account.**
2    Q   And so you don't know how those funds
3  were spent at all, fair?
4    **A   Fair.**
5    Q   Okay. Just one second. I want to look
6  at one thing. You're aware that in addition to
7  the 1.5 million in loans that Mr. Deppoleto
8  provided via the notes, Mr. Deppoleto is also
9  alleging that he provided about 500,000 more than
10 that in supplemental loans that were not
11 documented via the same type of note as the first
12 three loans. Are you -- you're aware of that?
13   **A   I believe his first note with -- with**
14 **us is what I just told you about, was between four**
15 **and whatever it was. I -- I don't know the exact**
16 **number. But Jason would've handled all that.**
17   Q   And I -- yeah. And I'm -- I'm putting
18 the notes aside and I -- I had four or five pages
19 of questions about those notes and I was going to
20 show them to you, but I thought you'd --
21   **A   I'm not going to --**
22   Q   -- appreciate it.
23   **A   Sorry.**
24   Q   Okay. So, yeah, I'm putting the notes
25 to the side. I'll just represent to you unless

178

1  you want to see them.
2    **A   Yeah.**
3    Q   But the first three notes totals 1
4  point something --
5    **A   No, I believe you. I --**
6       THE REPORTER:  I'm sorry. I'm sorry.
7  One at a time.
8       THE WITNESS:  I believe you, Patrick.
9  BY MR. HARVEY:
10   Q   Okay. So set aside the 1.5 million for
11 those first three notes, I'm -- I'm -- for
12 purposes of this question or this line of
13 questioning, I'm asking you a slightly different
14 one. Setting aside the 1.5 million that was
15 documented in those first three notes, you're
16 aware that Mr. Deppoleto is alleging that he also
17 loaned an additional 500,000, which would bring
18 the total to a little over 2 million in
19 supplemental loans, correct?
20   **A   All I remember is the first one that**
21 **was smaller. The four to three to five, whatever**
22 **that was. That was his first one. Anything after**
23 **that would have been Jason. I wouldn't have known**
24 **--**
25   Q   And maybe I'm -- maybe I'm not being

179

1  clear here. Did you read the complaint in this
2  case?
3    **A   Yeah.**
4    Q   And you understand that Mr. Deppoleto's
5  damages claim is for a little over 2 million,
6  correct?
7    **A   Yes.**
8    Q   You got to say yes or no.
9    **A   Yes, sir. Sorry.**
10   Q   And -- and out of that a little more
11 than 2 million, 1.5 million is related to three
12 separate written notes, correct?
13   **A   Okay. I believe so. I -- I --**
14   Q   So set those --
15   **A   -- believe what you're saying.**
16   Q   Set those three notes aside for the
17 moment. I want to focus on that additional
18 500,000, that would put the total up to over 2
19 million. Are we on the same page?
20   **A   Okay.**
21   Q   Okay. Mr. Deppoleto loaned Takeover
22 386,000 and change in October 2022, correct?
23      MR. BENNION:  I'm going to object to
24 the form of the question. Lacks foundation.
25 Calls for speculation. May call for a legal

180

1 conclusion. Go ahead, Toby.
2    THE WITNESS: I don't recall. I had no
3 access, Patrick, to the account or seeing things
4 come in, or how bills were paid out by whoever.
5 You know, I had no access to it.
6 BY MR. HARVEY:
7    Q   You were the CEO of Takeover in October
8 2022, correct?
9    A   Yep.
10    Q   You don't know whether Mr. Deppoleto
11 provided --
12    A   Well, no, I wasn't. No, I was not. I
13 was suspended.
14    Q   Okay.
15    A   Sorry.
16    Q   No problem. Were you still suspended
17 -- well, give me one moment here. I want to make
18 sure the date that I'm asking you about is
19 correct. Were you still suspended as of November
20 4th, 2022?
21    A   Yes, sir.
22    Q   Okay. And when you say suspended, were
23 you just suspended as your role as CEO or were you
24 totally out of the company while you were on
25 suspension?

181

1    A   I had no access to my employees or
2 anything.
3    Q   Okay.
4    A   Just my attorney.
5    Q   Okay. So if money from Mr. Deppoleto
6 came in -- well, and I know the answer to this,
7 but let me make sure it's clear in the transcript
8 -- during October -- well, strike that.
9    So if Mr. Deppoleto was asked to
10 provide supplemental loans totaling a little over
11 500,000 between October 22 and November 4, 2022,
12 because you were frozen onto the company, you
13 would have no way of knowing whether he was, in
14 fact, asked to provide loans in that dollar
15 amount, correct?
16    A   Correct. I'm sure.
17    Q   Okay. Are you familiar with a company
18 called Great Northern Corp. or Corporation based
19 out of Appleton?
20    A   Great Northern. Great Northern. Great
21 Northern.
22    MR. BENNION: Appleton, Wisconsin.
23    THE WITNESS: That's -- that sounds
24 like a -- that sounds like a shot company, or --
25 or -- or --

182

1 BY MR. HARVEY:
2    Q   A shot company?
3    A   They make stuff for -- they make, like,
4 sites that --
5    Q   Displays?
6    A   There you go.
7    THE REPORTER: I -- I missed what you
8 had said.
9 BY MR. HARVEY:
10    Q   Is that --
11    THE REPORTER: What they --
12    MR. HARVEY: I'm sorry.
13    THE REPORTER: I missed what -- what
14 they make.
15    THE WITNESS: I believe that's who they
16 are, Patrick. I can't tell you right now.
17    THE REPORTER: No. I -- I'm just
18 saying I missed what Patrick --
19    MR. HARVEY: For the court reporter.
20    THE REPORTER: Yeah.
21    MR. HARVEY: Yeah. Yeah. I'll -- I'll
22 clear it up. I'll clear it up.
23 BY MR. HARVEY:
24    Q   For the court reporter's benefit, you
25 think Great Northern Corp. makes displays?

183

1    A   I believe that's who they are. They --
2 they bring the shots in, they fill the shots, they
3 make the displays, they send them out. That's
4 what we -- I believe that's what we found out.
5    Q   Okay. And so Great Northern Corp. was
6 a company that Takeover did business with, correct?
7    A   Not to my knowledge. We didn't find
8 this out till I came back. I had no knowledge --
9    Q   When you say we didn't find this out?
10    A   I had no knowledge of it.
11    Q   So Takeover did business with Great
12 Northern Corp., you just didn't find out about
13 that until after the fact, is that what you're
14 saying?
15    A   Well, Jason Tucker --
16    MR. BENNION: Objection. Objection.
17 Calls for a legal conclusion. Go ahead, Toby.
18    THE WITNESS: Jason Tucker did business
19 with as Takeover with Great Northern with nobody
20 else knowing about it, but him.
21 BY MR. HARVEY:
22    Q   Okay.
23    A   No board -- no board consent, no board
24 of directors. Anything -- just let me be clear.
25 Anything that at that kind of level would've had

184

1 to have me, Joe, and Jason vote on. Plain and
2 simple. Especially that kind of money moving
3 around, anything over 20 grand, it -- you had to
4 have authorization to do -- all that stuff had to
5 have -- we voted on. There was no one guy making
6 a call. That's why Jason got us pushed out so he
7 could go try to get this deal done and spend
8 Deppoleto's money on stupid shit. We would've --
9 I would've never spent James's money on that. I
10 would've never even asked him for the money to do
11 that. It's absolutely insane. I feel bad. Is he
12 owed it back? Of course he is. Of course, he is.
13    Q    You -- but again, you were suspended
14 from the company in October '22 and early part of
15 November '22, so you wouldn't have been voting on
16 anything during that time frame, correct?
17    A    So, well, if I'd have found out about
18 it, it would've been squashed so James would've
19 never lost his money because the money would have
20 never -- we would have never -- he would have
21 never been in this position. All he had to do --
22 all he had to do was talk to me.
23    Q    Again -- again, I'm -- I'm asking a
24 simpler question than the one you're answering.
25 You were suspended in October 22 and through

185

1 November 20 -- November 4, 2022, correct?
2    A    Yeah. Like, late -- late -- last week
3 September all the way through first, second week
4 of November.
5    Q    And so during that time frame, you
6 would not have been voting on anything for
7 Takeover, correct?
8    A    No, but Joe Pavlik would've been
9 involved and Joe knew nothing either.
10    Q    Okay. And since you were suspended,
11 you don't know what anyone from Takeover said to
12 Mr. Deppoleto in that October '22 through November
13 4, '22 time frame, correct?
14    A    No. Jason gave me a call when they --
15 I was supposed to be at NXT that year, which is
16 the convenience show in Vegas, which is the
17 biggest one. I believe it's the second week of
18 October. And that's what he suspended me for --
19 before it so I couldn't go to it, so they could
20 sit down with 5-hour. Because if I had have found
21 out about it, I would have squashed it. So I
22 didn't know any of this until after I got back.
23 But he did call me from NXT. Deppoleto showed up
24 at that event. They tried meeting with Jeff
25 Sigouin from 5-hour, who I know very well, and

186

1 then tried setting up meetings after that, and I
2 started getting the emails on my private e-mail.
3    Q    Again, I -- I was asking a much -- I
4 was asking a much simpler question. You don't
5 know what anyone from Takeover was telling Mr.
6 Deppoleto in the October '22 through November 4,
7 2022 time frame, correct?
8    A    No. No.
9    Q    That's incorrect --
10    A    No.
11    Q    -- or did we have a double negative?
12    A    No, I don't -- I don't know what they
13 were telling him, what Jason was telling him. It
14 would've just been Jason.
15    Q    Okay. Do you know what those
16 supplemental loans were used for?
17    A    I couldn't tell you. I know what we
18 found --
19    Q    I'll show you another Exhibit --
20    A    -- I know what we found out, that what
21 they had to pay for.
22    Q    I'm going to show you another exhibit.
23 One second. Okay. Are you able to see my screen?
24    A    Yeah.
25       MR. HARVEY: This is November 8th.

187

1       Oh, and by the way, this is
2 Exhibit 7, I believe.
3       (EXHIBIT 7 MARKED FOR IDENTIFICATION)
4       THE REPORTER: Yes.
5 BY MR. HARVEY:
6    Q    Thank you. So November 8th, 2022
7 letter from Husch Blackwell to a number of people,
8 and it says, Notice of Default Demand for Payment
9 and Cease and Desist. Do you see that?
10    A    Yes, sir.
11    Q    Do you recognize this document?
12    A    I've seen it before.
13    Q    What was your reaction to receiving
14 that notice?
15    A    I pushed everything to the attorneys.
16    Q    Okay. Did you discuss the notice with
17 anyone after you received it?
18    A    I don't recall.
19    Q    You don't remember any discussions with
20 Mr. Holley and Mr. Pavlik? Anyone?
21    A    I'm assuming we had phone calls with
22 our Counsel, and we let them deal with --
23    Q    Was anyone else -- was anyone else on
24 the calls other than --
25    A    No.

188

1    Q    -- if I'm hearing you correctly?
2    A    It would've just been me, Joe, Mike
3 Ghini, and Jennifer.
4    Q    And no one other than the people you
5 just named was on the -- were -- were on those
6 calls; is that right?
7    A    I don't believe so.
8    Q    You understood that what this notice
9 Mr. Deppoleto is providing notice to Takeover that
10 it defaulted on Mr. Deppoleto's loans, correct?
11    A    Yes.
12        MR. BENNION:  Sustain an objection to
13 the extent it may call for a legal conclusion.
14        Go ahead, Toby.
15        THE WITNESS:  That's what it appears to
16 be.
17 BY MR. HARVEY:
18    Q    You agree that Takeover defaulted on
19 its obligations to Mr. Deppoleto?
20        MR. BENNION:  Same objection.  May call
21 for a legal conclusion.
22        Go ahead.
23        THE WITNESS:  No, I do not.  I don't
24 believe Takeover defaulted.
25 BY MR. HARVEY:

189

1    Q    Upon receiving this notice, did
2 Takeover begin a process to repay Mr. Deppoleto's
3 loans?
4    A    He was contacted right when we took the
5 company back over to try to negotiate it.  He
6 didn't want nothing to do with it.  He wanted to
7 stick by Jason's side.
8    Q    Well, negotiation's one thing, but I'm
9 asking, was there an official process to start
10 repaying him?
11    A    I don't recall.
12        MR. BENNION:  Objection.  May call for
13 speculation.  May call for legal conclusion.
14        Go ahead, Toby.
15        THE WITNESS:  Yeah.  I don't recall.
16 BY MR. HARVEY:
17    Q    Did Takeover begin a process to cure
18 its default?
19    A    I don't --
20        MR. BENNION:  Same -- same objection.
21        Go ahead, Toby.
22        THE WITNESS:  I don't recall.
23 BY MR. HARVEY:
24    Q    To date, has Takeover repaid any amount
25 of the funds that Mr. Deppoleto loan to Takeover?

190

1        MR. BENNION:  Same objection.
2        THE WITNESS:  I have no knowledge.
3 BY MR. HARVEY:
4    Q    Does Takeover intend to repay Mr.
5 Deppoleto?
6    A    While I was --
7        MR. BENNION:  Objection.  Lacks
8 foundation.  Vague and ambiguous.
9        Go ahead.
10        THE WITNESS:  While I was there; you
11 bet your ass.  Yes, sir.
12 BY MR. HARVEY:
13    Q    Okay.  Let me show you another document
14 now.  Are you able to see my screen?
15    A    Yes, sir.
16        MR. HARVEY:  This will be Exhibit
17 Number 8.
18        (EXHIBIT 8 MARKED FOR IDENTIFICATION)
19 BY MR. HARVEY:
20    Q    And this is a letter from Husch
21 Blackwell dated November '22.  Looks like to the
22 same recipients of the letter or as the recipients
23 from Exhibit 7.
24    A    Right.
25    Q    And this one's subject to second notice

191

1 of default and demand for payment, correct?
2    A    Yes.
3    Q    Have you seen this document before?
4    A    Briefly.  Yes.
5    Q    And it is a second notice of default in
6 Mr. Deppoleto demanding payment a second time,
7 correct?
8    A    That's what it says.
9    Q    After you received this notice, did you
10 discuss it with anyone?
11    A    Same as before.
12    Q    Meaning you did with Mr. Holley, Mr.
13 Pavlik, and your Counsel?
14    A    Yes, sir.
15    Q    Was anyone else involved in those
16 discussions?
17    A    Not that I'm aware of.
18    Q    For instance, was Mr. Zarro involved in
19 those discussions?
20    A    Not that I'm aware of.
21    Q    And other than that joint, was it a
22 phone call, or was it several calls?  What was it?
23    A    I believe Zooms, Mr. Harvey.
24    Q    Zooms plural, or just one Zoom.
25    A    There might have been one for the first

192

1  one and one for this one.
2      Q   Okay.  And other than that, you didn't
3  discuss this notice with any other individual
4  after that Zoom, or Zooms?
5      A   Not that I'm aware of.
6      Q   After receiving this notice, did
7  Takeover begin a process to repay Mr. Deppoleto's
8  loans?
9      A   Not that I'm aware of.
10     Q   Why not?
11     A   I -- I don't recall.  I'd have to ask
12  the attorneys.
13     Q   We briefly touched on this a little bit
14  before, but now I'm asking a little bit broader
15  question.  Has Takeover ever considered a spin out
16  or a spinoff?
17     A   Not that I'm aware of.
18         MR. BENNION:  Objection.  That's vague
19  and ambiguous.
20  BY MR. HARVEY:
21     Q   Has Takeover ever considered trying to
22  go public?
23     A   Well, it's already public.  Takeover is
24  -- it's already a public company.  You mean, go
25  private?

193

1      Q   Your understanding is that Takeover is
2  a publicly traded company?
3      A   Well, it's through LTNC.  It's one of
4  the same.  Like I said, you'd have to get more in
5  the -- the weeds with Mike.  Mike can explain
6  these more to you than I can.  LTNC and Takeover.
7      Q   Okay.  And -- and that's fair.  You
8  defer to Mr. Holley when it comes to questions
9  about whether Takeover was public versus Labor
10  Smart being public, that type of thing?
11     A   Yeah.  Just there's levels to it.  So
12  he can explain it better than I can.
13     Q   Okay.  To your knowledge, did anyone
14  from Takeover ever discuss with Mr. Deppoleto
15  spinning out Takeover or having Takeover go public?
16     A   No, sir.
17     Q   Now, you're aware of the lawsuit that
18  Takeover filed against Michael Holley in the
19  District of Arizona, correct?
20     A   I'm aware of it.  Yeah.
21     Q   And after the initial lawsuit was
22  filed, you were added as a third party defendant,
23  correct?
24     A   I believe so.
25     Q   And that case is still pending, correct?

194

1      A   Yeah.  We're filing counters, so that's
2  eventually going to get thrown out pretty quick.
3         MR. HARVEY:  I'm going to show you
4  another document, which will be Exhibit 9.
5         (EXHIBIT 9 MARKED FOR IDENTIFICATION)
6  BY MR. HARVEY:
7      Q   You're able to see my screen?
8      A   Yes, sir.
9      Q   And this is the verified complaint in
10  the Arizona case, correct?
11     A   I believe so.
12     Q   And if we look at the file stamp date,
13  it tells us it was filed on March 8th, 2022,
14  correct?
15     A   Yes.
16     Q   Now, you were still the CEO of Takeover
17  as of March 8th, 2022, correct?
18     A   Yes.
19     Q   Did you review this complaint before it
20  was filed?
21     A   I don't believe so.
22     Q   Did you provide any information that
23  was used in the complaint?
24     A   I don't believe so.  This is all Jason
25  Tucker.

195

1      Q   Who approved filing the complaint.
2      A   Jason Tucker did.  This is all Jason
3  Tucker.
4      Q   Did he discuss it with you before it
5  was filed?
6      A   I didn't want to file anything.
7      Q   So he did discuss it with you --
8      A   Probably, it was --
9      Q   -- before it was filed?
10     A   Yeah.
11     Q   Okay.  Before Mr. Deppoleto's first
12  loan on May 25th, 2022, did you ever tell Mr.
13  Deppoleto about the Arizona litigation?
14     A   As I've said before, we had a brief
15  conversation when we were in Dallas, but this was
16  public information.
17     Q   And when was this -- you -- you keep
18  referencing this Dallas -- Dallas trip.  When was
19  this Dallas trip?
20     A   May.  June.
21     Q   And this complaint was filed on March
22  8th, 2022, so that would've been after?  The
23  Dallas trip would've been after, correct?
24     A   Yeah.
25     Q   Okay.  So my question was, before May

196

1  25th, 2022, did you -- did you personally tell Mr.
2  Deppoleto about the Arizona litigation?
3      A   No.
4      Q   Are you aware of anyone else from
5  Takeover notifying Mr. Deppoleto about the Arizona
6  litigation before May 25th, 2022?
7      A   No.  Just Jason Tucker.
8      Q   And do you know for a fact that he told
9  Mr. Deppoleto about this lawsuit before May 25?
10     A   Jason was in constant contact with
11  Deppoleto.  So I would -- I would 99 percent
12  guarantee that happened.
13     Q   But you don't personally know that?
14     A   No.
15     Q   You never heard Mr. Tucker?
16     A   No, sir.
17     Q   We're -- we're talking over each other.
18  Let me make sure the question or the transcript's
19  clear.  You don't personally know for a fact that
20  Mr. Deppoleto, or I'm sorry, Mr. Tucker told Mr.
21  Deppoleto about the lawsuit in Arizona before May
22  25th, 2022, correct?
23     A   No, sir.
24     Q   I think we had a double negative there.
25  Do you have personal knowledge of Mr. Tucker

197

1  telling Mr. Deppoleto about the Arizona litigation
2  before May 25th, 2022?
3      A   No, sir.
4      Q   Okay.  To your knowledge, did take over
5  file a stipulation to dismiss all the claims
6  against Michael Holley and his wife in February
7  2023?
8      A   I believe so.
9      Q   Do you know who at Takeover made the
10  decision to dismiss the claims against the Holleys?
11     A   I believe it was me, Joe, me, Joe
12  Pavlik, and -- and our attorney, because they were
13  false claims.
14     Q   Now, I thought you told me that you --
15     A   Yeah.
16     Q   I thought you told me you left Takeover
17  in January 2023.  Is that -- did I misunderstand
18  you earlier?
19     A   Oh, yeah.  But that would have -- that
20  would have been -- that would have been whoever's
21  there now.
22     Q   Okay.  So --
23     A   Sorry.
24     Q   -- let me make sure I've got it.  Let
25  me make sure I've got it clear.

198

1      A   Yeah.
2      Q   In terms of who made the decision to
3  authorize the dismissal in February 2023, do you
4  know who from Takeover made that decision?
5      A   It would had have been the board of
6  directors.
7      Q   And you're saying would have had to
8  have been because you're -- you're assuming that
9  you don't actually know though; is that fair?
10     A   Yeah.  Yeah.  Yes, sir.
11         MR. BENNION:  I'm going to state a
12  belated objection.  Calls for speculation.  Lacks
13  foundation.
14         Go -- go ahead, Patrick.
15  BY MR. HARVEY:
16     Q   And I think I know the answer to this,
17  but I have to ask anyways.  Why did Takeover
18  decide to dismiss all the claims against the
19  Holleys?
20     A   I have no --
21         MR. BENNION:  Same -- same objection.
22  BY MR. HARVEY:
23     Q   I'm sorry.  You -- you were talking
24  over your attorney.  What was your answer?
25     A   I have no -- I -- I have no knowledge

199

1  of that.
2      Q   Okay.  Do you know whether anyone at
3  Takeover sought Mr. Deppoleto's consent to dismiss
4  all the claims against the Holleys before they
5  were dismissed?
6      A   I have no knowledge of that.
7      Q   To your knowledge, has Takeover ever
8  maintained directors and officers liability
9  insurance?
10     A   I believe we have, but I'm not
11  confident.
12     Q   What period of time do you believe
13  Takeover had D&O insurance?
14     A   I couldn't tell you.
15     Q   Do you know what the liability limits
16  were?
17     A   I know what it was on the product.  It
18  had to be over a million, so.
19     Q   Did you say if it was on a product?
20     A   We had to have liability insurance on
21  product when we went to a distributor or retailer.
22  So it would have to be $1,000,000 at least, I
23  believe.  It's a standard --
24     Q   Oh, you're talking about -- you're
25  talking about product liability insurance.  I was

200

1 asking --
2   A   Yeah.
3   Q   -- a slightly different question.
4 Directors' and officers' liability insurance.  So
5 --
6   A   More of a Mike --
7   Q   -- insurance that would cover the board
8 of directors --
9   A   Yeah, more of a --
10   Q   -- stuff like that.
11   A   More of a --
12       MR. BENNION:  I'm -- I'm -- I'm going
13 to state an -- an objection that this may call for
14 speculation for Mr. McBride.  Go ahead, Toby
15       THE WITNESS:  More of a Mike question.
16 BY MR. HARVEY:
17   Q   Okay.  Fair enough.  You don't happen
18 to know who the carrier was if you did have it --
19   A   No, sir.
20   Q   -- do you?
21   A   No, sir.
22       MR. HARVEY:  Okay.  I'm going to show
23 you another exhibit now.
24       Oh, by the way, Counsel, so this
25 will -- well, this will be Exhibit Number 10.  I'm

201

1 going to show it to you.
2       (EXHIBIT 10 MARKED FOR IDENTIFICATION)
3       MR. HARVEY:  Yesterday -- this is a
4 spreadsheet that is labeled Takeover Industries
5 Balance Sheet as of December 31, 2022.  Counsel,
6 yesterday you were asking me if I had the Bates
7 number for it.  It looks like it's DEF-338.
8       MR. BENNION:  Thank you very much.
9       MR. HARVEY:  No problem.
10 BY MR. HARVEY:
11   Q   Mr. McBride, I'm showing you Exhibit
12 Number 10, which as I said is Bates-labeled
13 DEF-338.  It's a spreadsheet called Takeover
14 Industries Inc. Balance Sheet as of December 31,
15 2022.  Have you seen this document before?
16   A   I have not.
17   Q   Okay.  And I was asking you some
18 questions earlier about when Takeover's
19 liabilities exceeded its assets.  Do you remember
20 those questions?
21   A   Yeah.
22   Q   Just to try and orient ourselves a
23 little bit better, I'll be brief with this, if we
24 go down to Row 36 of the spreadsheet.  It says,
25 Total Assets, 329,000 and change, correct?

202

1   A   Yes.
2   Q   And that's as of December 31, 2022,
3 according to the top, correct?
4   A   Okay.
5   Q   And then if we go down to Row 85, it
6 says, Total Liabilities for Takeover
7 $3,923,492.91, correct?
8   A   Correct.
9   Q   So at least as of that date, we would
10 agree that Takeover's liabilities exceeded its
11 assets, correct?
12   A   Okay.  It's a beverage company.  It's --
13   Q   By --
14   A   Go ahead.
15   Q   By about a factor of 10, correct?
16       THE REPORTER:  I'm sorry.  I didn't --
17 I -- I didn't catch your last answer.
18       MR. BENNION:  Toby?
19       THE WITNESS:  Go ahead.  Say it again.
20 BY MR. HARVEY:
21   Q   I'll ask again.  I -- I caught it, but
22 I'll ask again so the court reporter can get it.
23 So you'd agree with me that at least as of
24 December 31, 2022 Takeover's liabilities exceeded
25 its assets because the liabilities are 3.9 million

203

1 and the assets are 329,000, correct?
2   A   Correct.  But it's also a beverage
3 company.  That's what's going to happen.  This
4 happens in beverage companies all the time.
5   Q   And the liabilities were factor of
6 about 10 greater than its -- or exceeded the
7 assets by a factor of about 10; is that correct?
8   A   Basically.
9   Q   Okay.  And then if we go to Row 61 of
10 Takeover's balance sheet, as of December 31, 2022,
11 it's showing liabilities to James Deppoleto in the
12 amount of $2,016,697, correct?
13   A   That's what it says.
14   Q   Okay.  Make this one down.  Give me
15 just one second.  I'm making a couple notes that I
16 think is going to make this go a little quicker.
17       MR. BENNION:  Sure.  I'm going to
18 stretch my legs.  I can hear you.  I'm just
19 walking in my office.
20       MR. HARVEY:  Okay.
21       THE WITNESS:  Hopefully, we're -- get
22 this done sooner.
23 BY MR. HARVEY:
24   Q   You mentioned -- it was probably about
25 15, 20 minutes ago, you mentioned that you think

204

1 that there were revised copies of the notes. Do
2 you remember saying that a few minutes ago? 15
3 minutes ago, maybe?
4    A   Yes, sir.
5    Q   Do you have copies of the drafts or
6 revised versions of the notes?
7    A   I don't have Takeover e-mail anymore.
8 I have no access to any of that anymore. I know
9 that they were -- they were in the Arizona case,
10 so you could go to there and find everything.
11 They're definitely in that.
12   Q   Who provided them in that case?
13   A   We did because we found them in -- in
14 Tucker's emails. And Veronica's.
15   Q   Have you heard of a company called
16 Illumination Holdings, Inc.?
17   A   I have no idea who that is.
18   Q   How about Illumination Brands, Inc. Do
19 you know who that is?
20   A   I have no idea who that is.
21   Q   Let's go off the record for just 30
22 seconds. I want to talk to your counsel for one
23 second.
24       THE VIDEOGRAPHER:  We are going off the
25 record. The time is 11:06 a.m.

205

1       (OFF THE RECORD)
2       THE VIDEOGRAPHER:  We are going back on
3 the record. The time is 11:09 a.m.
4 BY MR. HARVEY:
5    Q   Mr. McBride, have you ever heard of a
6 company called Illumination Brands, Inc.?
7    A   I have not.
8    Q   Do you know an individual named Brad
9 Wyatt, W-Y-A-T-T?
10   A   Why does the name sound familiar to me?
11 Name sounds familiar, but I can't place it.
12   Q   Okay. How about someone named Mike
13 Ghini? And I'm not sure I'm -- or I'm not sure
14 I'm spelling it right, but it might be G-H-I-N-I.
15 Do you know a Mike Ghini?
16   A   No, no. And Wyatt might be another
17 person's last name that I know too, so --
18   Q   Okay. And I think I know the answer to
19 this because of your previous answers, but do you
20 know what the distinction is being Next Gen
21 Beverages, LLC, and NextGen Holdings?
22   A   I have no idea about any of that.
23   Q   Do you know who Labor Smart's
24 subsidiaries or affiliates are as of today?
25   A   No, sir. No, sir.

206

1    Q   Have you had any interaction whatsoever
2 with Next Gen or any other Labor Smart affiliate
3 or subsidiary since --
4    A   I left?
5    Q   Yeah, sure.
6    A   No. No.
7    Q   Okay. There was a time when you and
8 Mr. Holley were personally taking a percentage of
9 the investments that Takeover received from
10 investors, correct?
11       MR. BENNION:  I'm going to state an
12 objection. Calls for a legal conclusion. Lacks
13 foundation. May call for speculation. Go ahead.
14       THE WITNESS:  Not that I'm aware of.
15 BY MR. HARVEY:
16   Q   If Mr. Holley testified to that effect,
17 would you disagree with him?
18   A   No.
19   Q   And did you ever disclose to investors
20 that that was going on?
21       MR. BENNION:  Same objection.
22       THE WITNESS:  I'm not aware.
23 BY MR. HARVEY:
24   Q   And I may have asked you this and --
25 when I first was taking your deposition last

207

1 Friday, but just to make sure before I let you go,
2 when Labor Smart purchased Takeover, what was the
3 purchase price?
4    A   That's going to be more of a Mike
5 question. I know -- I believe Ryan put in just
6 under a million, but it was -- it was bled in,
7 like, 200 here, 500 there because we had to clean
8 it up. There was things that we found out about
9 that we had to clean up that cost us money. So --
10 so it was just under a million, Patrick.
11   Q   You're talking --
12   A   Ryan Schadel.
13   Q   You're talking about Ryan Schadel
14 putting in about $1,000,000 into Takeover?
15   A   And to LTNC to get it cleaned -- to get
16 us going with -- with Takeover being the
17 subsidiary of that.
18   Q   So money, he -- some of the money he
19 put into Labor Smart, which was then passed down
20 to Takeover. Is that what you're saying?
21   A   More of a Mike question.
22       MR. BENNION:  Objection. Objection.
23 May call for a legal conclusion.
24 BY MR. HARVEY:
25   Q   I'm sorry. I didn't hear your answer.

208

1    A   That's more Mike than -- than me.  I
2 don't want to confuse things.
3        MR. HARVEY:  Let me just glance through
4 my notes for one second.  We don't even need to go
5 off the record because it's probably going to be
6 15, 30 seconds.
7 BY MR. HARVEY:
8    Q   That's all I have for you, Mr. McBride.
9 Thank you.
10   A   Yes, sir.  Glad you got home safe.
11       MR. BENNION:  No -- no -- no questions.
12       MR. HARVEY:  Thanks.
13       THE VIDEOGRAPHER:  All right.
14       THE WITNESS:  All right, guys.
15       THE VIDEOGRAPHER:  This marks the end
16 of the deposition of Toby McBride.  The time on
17 the monitor is 11:14 a.m.
18       (Off the record at 11:14 a.m.)
19
20
21
22
23
24
25

210

1        CERTIFICATE OF TRANSCRIBER
2        I, Krystin Spolar, CET, do hereby certify
3 that this transcript was prepared from the digital
4 audio recording of the foregoing proceeding; that
5 said proceedings were reduced to typewriting under
6 my supervision; that said transcript is a true and
7 accurate record of the proceedings to the best of
8 my knowledge, skills, and ability; and that I am
9 neither counsel for, related to, nor employed by any
10 of the parties to the case and have no interest,
11 financial or otherwise, in its outcome.
12 _Krystin Spolar_
13 _____
14 Krystin Spolar, CET
15 Planet Depos, LLC
16 December 6, 2024
17
18
19
20
21
22
23
24
25

209

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2        I, Charlie McGrath, AAERT CER, the officer
3 before whom the foregoing proceedings were
4 taken, do hereby certify that any witness(es) in
5 the foregoing proceedings were fully sworn;
6 that the proceedings were recorded by me and
7 thereafter reduced to typewriting by a
8 qualified transcriptionist; that said digital
9 audio recording of said proceedings are a
10 true and accurate record to the best of my
11 knowledge, skills, and ability; and that I am
12 neither counsel for, related to, nor employed
13 by any of the parties to this case and have
14 no interest, financial or otherwise, in its
15 outcome.
16
17 _____
18 Charlie McGrath, AAERT CER, Notary Public, for the
19 State of California
20 December 6, 2024
21
22
23
24
25

## A

**aaert**
72:25, 73:14,
209:2, 209:18
**ability**
209:11, 210:8
**able**
77:19, 77:25,
81:25, 84:21,
157:2, 168:7,
186:23, 190:14,
194:7
**absence**
154:25, 155:3,
155:6, 155:11,
169:7
**absolutely**
175:24, 184:11
**abstain**
169:3
**abstained**
168:25
**access**
100:20, 104:6,
104:20, 104:22,
116:12, 116:17,
117:9, 123:25,
144:16, 170:12,
170:13, 170:20,
176:20, 176:23,
177:1, 180:3,
180:5, 181:1,
204:8
**accomplish**
81:25
**according**
202:3
**account**
82:21, 84:11,
116:12, 116:13,
116:14, 117:9,
117:10, 117:11,
117:24, 117:25,
118:2, 118:6,
123:25, 144:2,
144:17, 176:21,
176:24, 177:1,
180:3
**accountant**
82:24
**accountants**
84:1, 111:16,
111:17, 165:16
**accounting**
82:21, 82:22,
83:9, 83:17,
83:21, 111:24,
139:3
**accounts**
131:11
**accurate**
134:17, 209:10,
210:7
**act**
162:14, 169:8
**actions**
170:17
**active**
160:11
**actively**
132:18
**actual**
91:17, 91:20,
103:1
**actually**
86:22, 99:1,
101:1, 103:10,
109:11, 110:14,
119:6, 138:15,
154:2, 155:12,
198:9
**added**
193:22
**addition**
177:6
**additional**
109:15, 124:5,
178:17, 179:17
**administer**
76:25
**advertise**
95:6
**advertising**
86:18
**advised**
163:21

**advisor**
162:24
**affairs**
107:16
**affect**
170:18
**affiliate**
206:2
**affiliated**
172:8
**affiliates**
205:24
**affirmed**
77:13
**after**
82:25, 111:24,
119:25, 127:21,
127:25, 128:6,
128:7, 128:8,
128:14, 128:17,
129:22, 129:24,
133:23, 136:24,
141:13, 144:18,
144:19, 152:6,
158:24, 166:10,
166:22, 170:11,
170:14, 170:24,
171:3, 171:18,
172:12, 172:19,
173:15, 174:1,
174:4, 174:24,
178:22, 183:13,
185:22, 186:1,
187:17, 191:9,
192:4, 192:6,
193:21, 195:22,
195:23
**again**
77:24, 78:2,
82:13, 83:5,
83:6, 84:11,
90:2, 96:3,
96:18, 99:3,
111:6, 111:18,
112:2, 116:11,
117:7, 117:16,
119:15, 121:21,
122:10, 123:21,

123:25, 124:4,
126:16, 127:11,
131:11, 136:9,
141:13, 147:16,
147:24, 149:5,
176:15, 184:13,
184:23, 186:3,
202:19, 202:21,
202:22
**against**
135:9, 172:21,
175:22, 193:18,
197:6, 197:10,
198:18, 199:4
**ago**
81:24, 83:4,
92:22, 93:23,
109:12, 109:13,
117:17, 148:8,
150:22, 151:1,
151:8, 203:25,
204:2, 204:3
**agree**
77:2, 129:24,
130:2, 131:5,
188:18, 202:10,
202:23
**agreed**
103:22
**agreeing**
78:7
**agreement**
134:5, 134:12,
137:12, 138:20,
139:7, 140:9,
140:14, 140:24,
141:3, 142:2,
144:20, 166:22
**agreements**
132:13
**ah**
102:17
**ahead**
78:12, 79:8,
80:8, 82:7,
103:16, 103:17,
104:14, 106:11,
119:2, 119:3,

126:19, 127:9,
131:2, 132:9,
145:3, 145:4,
147:9, 148:12,
149:15, 151:16,
156:5, 156:20,
160:5, 160:20,
160:22, 163:17,
169:23, 171:22,
180:1, 183:17,
188:14, 188:22,
189:14, 189:21,
190:9, 198:14,
200:14, 202:14,
202:19, 206:13

**al**
72:8, 76:5

**alert**
101:5

**all**
76:10, 76:22,
77:1, 77:4,
81:16, 86:4,
87:9, 87:23,
88:19, 89:2,
91:19, 91:24,
92:1, 92:3,
92:9, 95:20,
103:21, 105:2,
105:5, 108:10,
118:1, 122:15,
122:20, 123:2,
123:7, 123:19,
124:3, 124:5,
124:6, 124:11,
124:12, 124:16,
124:18, 126:1,
126:2, 126:6,
126:9, 129:11,
135:1, 135:10,
139:14, 140:16,
143:18, 144:11,
153:9, 154:1,
154:10, 158:17,
159:3, 162:15,
167:25, 176:14,
177:3, 177:16,
178:20, 184:4,

184:21, 184:22,
185:3, 194:24,
195:2, 197:5,
198:18, 199:4,
203:4, 208:8,
208:13, 208:14

**allegations**
81:5, 81:12,
82:12, 82:16,
145:11, 148:19,
148:24, 149:9,
151:20, 152:13

**allege**
81:9, 81:11

**alleged**
145:15, 145:18

**alleging**
82:4, 177:9,
178:16

**allow**
156:21

**along**
85:18

**already**
91:2, 141:14,
167:21, 175:14,
176:11, 192:23,
192:24

**also**
74:24, 76:19,
81:19, 83:25,
94:10, 94:21,
95:4, 98:16,
103:21, 115:12,
124:10, 132:3,
165:8, 177:8,
178:16, 203:2

**always**
111:13

**amazing**
121:6

**ambiguous**
127:10, 148:12,
190:8, 192:19

**america**
84:23

**amount**
103:7, 116:5,

116:7, 118:9,
118:16, 120:2,
121:9, 121:19,
122:4, 138:6,
145:14, 181:15,
189:24, 203:12

**amounts**
124:7, 124:12

**anchoring**
148:9

**another**
84:5, 84:18,
93:14, 102:15,
106:14, 109:2,
110:25, 119:24,
120:1, 121:8,
122:23, 125:6,
134:9, 138:7,
141:10, 146:6,
154:2, 156:24,
168:6, 186:19,
186:22, 190:13,
194:4, 200:23,
205:16

**answer**
79:19, 96:6,
104:16, 119:6,
122:13, 123:9,
126:21, 136:7,
146:3, 152:10,
152:15, 158:12,
173:22, 181:6,
198:16, 198:24,
202:17, 205:18,
207:25

**answered**
119:2, 119:8,
156:7

**answering**
88:22, 123:10,
184:24

**answers**
151:12, 205:19

**anthony**
149:17, 171:18,
175:5, 175:9,
175:13, 175:15

**anthony's**
172:1

**antica**
92:18

**any**
77:2, 79:13,
88:1, 97:1,
99:16, 101:24,
102:8, 108:1,
114:10, 123:25,
124:17, 127:25,
144:1, 144:21,
145:6, 153:25,
160:8, 169:7,
169:22, 170:2,
170:6, 170:7,
170:14, 170:17,
171:4, 171:7,
172:9, 176:1,
185:22, 187:19,
189:24, 192:3,
194:22, 204:8,
205:22, 206:1,
206:2, 209:4,
209:13, 210:9

**anybody**
149:18, 150:24,
173:20

**anymore**
83:18, 83:19,
135:19, 204:7,
204:8

**anyone**
78:17, 79:4,
79:11, 81:9,
82:4, 82:14,
89:1, 92:9,
94:15, 103:18,
106:1, 108:23,
110:20, 135:25,
136:13, 141:2,
151:19, 152:12,
185:11, 186:5,
187:17, 187:20,
187:23, 191:10,
191:15, 193:13,
196:4, 199:2

**anything**
81:4, 81:16,
94:5, 95:22,

95:25, 96:19,
97:6, 116:13,
125:13, 140:7,
144:1, 144:9,
144:17, 144:19,
148:1, 149:2,
160:15, 161:3,
161:20, 166:12,
166:13, 166:22,
178:22, 181:2,
183:24, 183:25,
184:3, 184:16,
185:6, 195:6
**anyway**
151:6
**anyways**
146:25, 198:17
**anywhere**
103:24, 150:24
**apologies**
133:13
**apologize**
91:18
**apparently**
92:16
**appear**
158:2
**appearing**
161:24
**appears**
188:15
**appleton**
181:19, 181:22
**applicable**
77:5, 77:8
**appointed**
170:4, 170:9
**appreciate**
147:16, 177:22
**approval**
80:4
**approved**
102:23, 134:6,
195:1
**april**
110:25, 122:22,
131:16
**aquarium**
112:6, 112:14,

113:2, 113:4,
113:8, 113:16
**area**
119:17
**arizona**
83:13, 83:14,
155:13, 193:19,
194:10, 195:13,
196:2, 196:5,
196:21, 197:1,
204:9
**around**
81:7, 82:5,
113:10, 113:11,
133:21, 135:3,
155:2, 159:3,
184:3
**arrival**
92:16, 107:11
**aside**
177:18, 178:10,
178:14, 179:16
**asked**
109:11, 112:15,
119:2, 123:6,
140:20, 150:10,
150:12, 151:7,
152:11, 171:16,
172:5, 181:9,
181:14, 184:10,
206:24
**asking**
77:23, 79:1,
81:14, 82:1,
87:19, 91:19,
120:16, 125:14,
154:13, 161:22,
161:23, 164:13,
178:13, 180:18,
184:23, 186:3,
186:4, 189:9,
192:14, 200:1,
201:6, 201:17
**aspects**
162:15
**ass**
190:11
**assertion**
126:9

**assets**
129:21, 130:15,
130:24, 130:25,
131:7, 131:19,
201:19, 201:25,
202:11, 202:25,
203:1, 203:7
**associate**
162:25
**assume**
125:22, 126:7
**assumes**
104:11
**assuming**
125:24, 187:21,
198:8
**at&t**
113:21
**athletes**
108:20
**attached**
75:7, 175:5
**attend**
153:15, 154:3,
154:15, 157:18,
160:25, 161:4,
161:6
**attended**
154:18
**attending**
76:11
**attorney**
181:4, 197:12,
198:24
**attorneys**
150:2, 162:2,
165:17, 166:3,
169:21, 187:15,
192:12
**audio**
209:9, 210:4
**audit**
111:22
**auditors**
111:16, 111:17,
165:16
**audits**
82:20, 111:23,

139:2
**august**
114:13, 115:1,
122:25, 174:19,
174:21
**authority**
162:14, 169:8
**authorization**
90:5, 103:12,
108:25, 184:4
**authorize**
88:8, 103:19,
105:24, 198:3
**authorized**
76:24, 81:6,
82:4, 83:11,
87:8, 87:19,
88:2, 89:1,
89:25, 93:24,
99:14, 103:9,
105:20, 108:21,
113:15, 129:17
**authorizing**
129:1, 129:7,
129:9
**aware**
79:11, 79:15,
80:2, 81:5,
82:3, 82:8,
82:15, 144:24,
145:8, 151:19,
152:12, 153:21,
156:15, 160:6,
160:12, 169:22,
170:2, 170:6,
176:20, 177:6,
177:12, 178:16,
191:17, 191:20,
192:5, 192:9,
192:17, 193:17,
193:20, 196:4,
206:14, 206:22
**away**
133:5, 134:3,
135:7, 135:22

**B**

**back**
79:17, 80:11,

81:22, 99:3,
100:4, 100:5,
100:12, 100:14,
100:21, 109:11,
111:4, 111:5,
111:12, 111:14,
112:1, 114:4,
114:16, 114:17,
115:6, 115:16,
115:22, 115:23,
120:18, 129:4,
132:4, 132:5,
135:21, 138:13,
143:5, 144:3,
148:4, 152:24,
153:12, 154:2,
154:10, 155:8,
155:13, 158:25,
161:22, 167:11,
171:5, 171:8,
171:12, 173:15,
174:1, 174:4,
174:10, 174:12,
176:15, 183:8,
184:12, 185:22,
189:5, 205:2

**bad**
184:11

**balance**
75:16, 201:5,
201:14, 203:10

**ballpark**
130:8

**bank**
75:9, 84:23,
94:8, 100:16,
100:19, 123:25,
131:11, 176:3,
176:11, 176:21,
176:24, 177:1

**bannon**
74:15

**based**
181:18

**basically**
167:18, 203:8

**basis**
82:19

**bates**
85:8, 85:15,
146:24, 157:4,
201:6

**bates-labeled**
201:12

**because**
95:18, 97:6,
100:11, 106:2,
111:22, 114:22,
117:12, 118:11,
121:5, 128:23,
131:24, 135:4,
137:13, 138:24,
139:20, 140:16,
143:5, 143:16,
148:8, 151:3,
159:17, 159:20,
161:14, 166:24,
175:4, 175:6,
175:13, 176:23,
181:12, 184:19,
185:20, 197:12,
198:8, 202:25,
204:13, 205:19,
207:7, 208:5

**become**
153:21, 170:25

**been**
91:1, 95:18,
97:7, 100:23,
118:25, 120:5,
120:8, 123:10,
123:12, 123:24,
128:2, 128:15,
128:18, 128:19,
131:15, 132:5,
134:2, 134:10,
136:25, 137:10,
137:11, 137:14,
139:23, 140:8,
140:14, 140:24,
143:15, 143:16,
144:18, 144:19,
150:21, 154:16,
154:19, 154:24,
155:4, 155:7,
162:1, 162:20,

170:1, 171:11,
172:11, 172:12,
173:12, 174:19,
174:20, 178:23,
184:15, 184:18,
184:21, 185:6,
185:8, 186:14,
188:2, 191:25,
195:22, 195:23,
197:20, 198:5,
198:8

**beer**
86:25, 91:21,
93:17

**before**
73:13, 79:13,
88:22, 91:8,
119:8, 123:20,
136:4, 136:13,
137:6, 140:20,
140:23, 141:4,
144:4, 144:10,
147:12, 147:13,
148:22, 149:7,
151:18, 152:6,
152:12, 157:13,
159:14, 160:20,
162:11, 169:16,
169:19, 170:4,
170:8, 174:18,
176:9, 185:19,
187:12, 191:3,
191:11, 192:14,
194:19, 195:4,
195:9, 195:11,
195:14, 195:25,
196:6, 196:9,
196:21, 197:2,
199:4, 201:15,
207:1, 209:3

**began**
173:14

**begin**
173:24, 189:2,
189:17, 192:7

**beginning**
115:24, 167:23

**begins**
76:2

**behalf**
74:3, 74:12,
139:11, 139:21,
162:14, 169:8

**behind**
91:1, 163:24,
175:16

**being**
77:13, 86:19,
126:7, 163:19,
163:21, 165:2,
178:25, 193:10,
205:20, 207:16

**belated**
93:10, 132:8,
198:12

**believe**
93:1, 99:11,
125:1, 127:19,
128:8, 131:10,
133:16, 137:5,
137:11, 138:10,
138:12, 138:17,
138:21, 139:13,
139:14, 139:25,
141:5, 141:19,
141:22, 144:8,
144:13, 144:15,
144:23, 145:21,
157:20, 166:9,
168:4, 169:11,
174:2, 174:17,
177:13, 178:5,
178:8, 179:13,
179:15, 182:15,
183:1, 183:4,
185:17, 187:2,
188:7, 188:24,
191:23, 193:24,
194:11, 194:21,
194:24, 197:8,
197:11, 199:10,
199:12, 199:23,
207:5

**belonged**
103:7

**beneath**
113:25, 116:24

**benefit**
90:13, 90:24,
98:7, 98:14,
102:10, 113:4,
113:8, 165:23,
182:24
**benefited**
94:22, 97:3,
97:16, 101:25
**benefiting**
108:2, 108:5
**benefits**
113:7
**bennion**
74:13, 74:14,
76:16, 78:10,
79:7, 80:6,
82:7, 85:7,
85:11, 93:9,
96:9, 97:18,
104:10, 119:1,
126:17, 127:8,
131:1, 132:7,
134:11, 134:15,
134:24, 142:22,
142:25, 145:1,
146:12, 146:17,
148:11, 149:11,
149:14, 150:25,
151:4, 151:14,
152:19, 153:1,
153:4, 153:8,
156:2, 156:19,
158:16, 158:21,
160:3, 168:12,
179:23, 181:22,
183:16, 188:12,
188:20, 189:12,
189:20, 190:1,
190:7, 192:18,
198:11, 198:21,
200:12, 201:8,
202:18, 203:17,
206:11, 206:21,
207:22, 208:11
**best**
99:2, 99:13,
101:4, 101:14,

101:19, 127:2,
128:5, 131:17,
209:10, 210:7
**bet**
190:11
**better**
113:11, 174:11,
193:12, 201:23
**between**
130:11, 139:7,
159:22, 164:15,
167:9, 173:14,
173:24, 177:14,
181:11
**beverage**
176:13, 202:12,
203:2, 203:4
**beverages**
205:21
**bf**
82:22, 83:7,
83:22, 83:23
**big**
142:5
**biggest**
185:17
**bill**
113:24
**bills**
114:6, 123:19,
143:19, 180:4
**bit**
80:19, 97:19,
192:13, 192:14,
201:23
**black**
119:17
**blackwell**
74:5, 187:7,
190:21
**blah**
150:15
**blame**
147:23
**bled**
207:6
**board**
75:11, 75:12,

80:5, 81:18,
129:6, 133:18,
134:6, 153:16,
153:18, 153:22,
153:23, 154:15,
154:21, 155:16,
155:17, 157:5,
157:6, 157:18,
157:21, 158:13,
159:10, 159:16,
159:20, 159:23,
159:25, 160:8,
160:10, 160:11,
162:3, 162:4,
162:20, 162:23,
163:2, 163:11,
168:2, 168:9,
183:23, 198:5,
200:7
**book**
111:24
**bookend**
130:7
**books**
84:3
**borgers**
82:23, 83:7,
83:22, 83:23,
84:7, 84:9,
84:10, 84:14
**bottom**
85:15, 162:11,
165:1, 168:21
**bought**
109:25
**box**
83:6
**brad**
205:8
**brand**
108:6, 108:13,
108:16
**brands**
204:18, 205:6
**break**
146:13, 150:19,
150:24, 151:1,
151:7, 151:12,

151:15, 152:18
**brief**
195:14, 201:23
**briefly**
152:5, 191:4,
192:13
**bring**
103:8, 130:19,
178:17, 183:2
**broadening**
108:6
**broader**
192:14
**broadway**
74:6
**brookside**
102:19, 103:25,
105:14, 109:3,
109:14, 109:15,
110:10, 110:18,
114:1
**brought**
82:25, 84:1,
102:24, 121:4,
150:13, 155:13,
158:25, 166:11,
171:15, 172:6,
174:14
**buddy**
171:25
**budweiser**
89:10, 90:12,
106:3, 110:3
**buena**
106:16
**building**
90:19, 113:6,
113:9, 113:11,
113:14
**bullshit**
148:5
**business**
89:9, 92:19,
92:21, 93:2,
94:4, 94:6,
95:9, 95:14,
95:15, 95:17,
96:17, 96:19,

102:25, 108:7,
108:14, 113:12,
113:13, 132:19,
183:6, 183:11,
183:18
**business-related**
96:1, 96:2,
97:7
**busy**
171:1
**buy**
101:14, 101:19
**buying**
90:23, 101:21
**bylaws**
81:19, 166:2

**C**

**cadence**
117:20, 120:7,
120:9, 120:10
**california**
73:15, 86:5,
92:18, 94:18,
103:9, 104:3,
104:24, 105:7,
105:9, 105:12,
111:2, 209:19
**call**
78:11, 79:7,
88:9, 93:10,
126:18, 131:2,
132:13, 154:16,
156:3, 157:9,
157:21, 158:10,
160:4, 160:20,
161:14, 179:25,
184:6, 185:14,
185:23, 188:13,
188:20, 189:12,
189:13, 191:22,
200:13, 206:13,
207:23
**called**
113:6, 157:23,
158:3, 158:5,
158:6, 158:24,
159:7, 159:10,

171:17, 175:3,
181:18, 201:13,
204:15, 205:6
**calling**
95:15, 135:14,
160:9
**calls**
80:7, 104:11,
127:9, 145:2,
149:14, 179:25,
183:17, 187:21,
187:24, 188:6,
191:22, 198:12,
206:12
**came**
81:17, 107:6,
111:6, 112:11,
129:24, 144:17,
151:23, 152:4,
172:19, 173:9,
181:6, 183:8
**can't**
88:25, 89:4,
101:16, 113:1,
121:21, 165:25,
182:16, 205:11
**canini**
161:21
**cannot**
117:9, 117:10
**car**
86:19, 88:10,
96:20, 96:24,
98:17, 98:21,
99:6, 99:9,
99:11
**card**
94:5, 100:9,
111:9, 114:21,
115:9, 115:18,
115:19, 115:21
**care**
143:19, 144:3,
176:8
**cared**
123:19
**careful**
96:7

**carrier**
200:18
**case**
72:6, 76:6,
83:13, 83:15,
85:14, 96:16,
140:21, 155:13,
179:2, 193:25,
194:10, 204:9,
204:12, 209:13,
210:10
**castro**
74:25, 76:10
**catch**
158:12, 202:17
**caught**
143:16, 143:22,
144:4, 161:5,
161:7, 161:9,
202:21
**cause**
126:8
**cease**
187:9
**cell**
113:24
**ceo**
90:2, 90:9,
125:5, 125:17,
131:15, 135:22,
162:6, 162:13,
163:1, 163:3,
163:5, 163:9,
163:12, 163:20,
164:5, 169:6,
169:12, 169:16,
169:19, 170:4,
170:9, 170:11,
170:15, 171:3,
180:7, 180:23,
194:16
**cer**
72:25, 73:14,
209:2, 209:18
**certain**
127:6, 127:13,
158:3, 175:7
**certificate**
209:1, 210:1

**certification**
77:7
**certified**
77:2
**certify**
209:4, 210:2
**cet**
210:2, 210:14
**cetera**
98:24, 108:20
**change**
78:8, 98:24,
114:1, 179:22,
201:25
**changed**
166:23
**changes**
99:6, 99:8
**changing**
81:18, 165:23,
166:1, 166:6,
166:8
**charge**
86:25, 89:8,
92:13, 100:2,
101:13, 104:4,
106:15, 106:20,
108:2, 112:6,
114:13, 117:25
**charged**
86:4, 144:25,
145:19, 145:24
**charges**
86:1, 86:3,
86:7, 86:17,
87:20, 88:2,
88:5, 89:1,
91:25, 92:3,
113:20
**charging**
145:9, 145:12
**charlie**
72:25, 73:13,
76:19, 209:2,
209:18
**chase**
83:24, 88:10
**chatted**
172:12

check
101:1, 118:15
checked
139:4
cigar
111:1
claim
97:2, 97:15,
102:10, 179:5
claimed
125:8
claiming
83:10, 86:16,
108:1, 129:11,
129:16
claims
135:16, 197:5,
197:10, 197:13,
198:18, 199:4
clarification
134:11
clarify
91:22
clause
160:19, 160:24
clean
207:7, 207:9
cleaned
207:15
clear
100:25, 123:24,
139:20, 173:7,
179:1, 181:7,
182:22, 183:24,
196:19, 197:25
client
78:24, 81:20,
111:25, 121:5,
127:16, 136:5,
141:1, 161:12
clients
102:24, 103:8
climbing
175:15
closer
146:16
club
102:20, 102:24,

103:5, 103:24,
103:25, 104:7,
104:19, 105:14,
105:17, 105:20,
105:21, 105:25,
109:3, 109:14,
109:16, 110:11,
110:18, 111:1,
114:1, 114:9
clubhouse
114:14
clubs
105:25
coexist
164:8
column
91:17, 91:18
combobulate
164:23
come
105:3, 105:5,
107:8, 114:22,
123:23, 140:7,
169:21, 172:20,
174:2, 175:13,
176:7, 176:15,
180:4
comes
193:8
comfortable
172:17
coming
175:13
commit
123:13
communication
162:1, 169:24
companies
124:14, 203:4
company
79:18, 81:4,
81:22, 83:16,
84:2, 86:11,
86:25, 87:17,
87:19, 90:2,
91:21, 93:17,
95:4, 100:9,
101:1, 101:22,

112:1, 114:20,
115:8, 115:18,
120:25, 124:21,
124:25, 125:17,
125:19, 127:21,
128:1, 128:15,
128:20, 128:24,
129:2, 129:5,
130:8, 133:17,
133:21, 135:2,
135:11, 135:19,
138:23, 140:11,
140:12, 141:14,
144:10, 148:23,
149:21, 150:5,
154:7, 162:13,
162:15, 163:13,
165:15, 171:12,
176:13, 180:24,
181:12, 181:17,
181:24, 182:2,
183:6, 184:14,
189:5, 192:24,
193:2, 202:12,
203:3, 204:15,
205:6
company's
95:2, 111:8
complaint
75:15, 179:1,
194:9, 194:19,
194:23, 195:1,
195:21
compound
132:9
concern
160:13, 160:17
concerning
165:10, 165:14
concerns
160:8
concert
142:25
conclusion
78:11, 93:11,
156:4, 180:1,
183:17, 188:13,
188:21, 189:13,

206:12, 207:23
conducted
72:16, 165:13
conference
157:9
confident
138:18, 199:11
confirmation
78:3
confuse
208:2
confused
133:1, 133:13
conjunction
159:9
consent
75:12, 168:9,
169:16, 169:19,
170:4, 170:8,
183:23, 199:3
considered
192:15, 192:21
consistent
77:8, 176:16
constant
196:10
constitute
77:6
consult
136:2, 136:13
contact
83:18, 172:9,
196:10
contacted
189:4
continue
120:10
continued
76:3, 120:7,
120:9
control
100:19, 118:2,
118:5, 120:17,
120:18, 171:5,
171:8, 171:10
controlled
94:13
convenience
185:16

**conversation**
140:25, 169:21,
195:15
**conversations**
172:16
**cooperative**
140:19
**copied**
147:6
**copies**
204:1, 204:5
**corp**
181:18, 182:25,
183:5, 183:12
**corporate**
164:15, 167:2,
167:6
**corporation**
181:18
**correctly**
166:7, 188:1
**cost**
207:9
**costello**
162:5, 162:12,
162:19, 163:18,
166:11, 166:12
**could**
85:7, 89:13,
98:14, 124:15,
124:18, 126:4,
129:25, 135:20,
140:17, 142:6,
143:19, 162:8,
173:23, 174:3,
174:16, 174:19,
174:20, 175:8,
176:14, 184:7,
185:19, 204:10
**couldn't**
79:9, 83:12,
86:8, 86:23,
87:3, 89:24,
93:22, 94:12,
94:20, 94:21,
100:18, 101:20,
103:13, 107:22,
109:17, 111:10,

112:20, 114:25,
117:5, 131:3,
132:20, 138:18,
145:16, 152:3,
152:7, 170:23,
175:20, 185:19,
186:17, 199:14
**counsel**
76:12, 77:16,
85:7, 97:21,
134:8, 134:9,
134:21, 143:2,
146:12, 153:6,
158:14, 160:16,
187:22, 191:13,
200:24, 201:5,
204:22, 209:12,
210:9
**count**
146:9
**counters**
194:1
**country**
102:19, 102:24,
103:5, 103:24,
103:25, 104:6,
104:19, 105:14,
105:17, 105:20,
105:21, 105:25,
109:3, 109:14,
109:15, 110:10,
110:18, 114:1,
114:9
**couple**
87:15, 102:13,
109:11, 109:12,
112:11, 113:20,
115:24, 133:15,
146:25, 148:8,
150:20, 167:24,
203:15
**course**
100:15, 184:12
**court**
72:1, 76:6,
76:18, 78:22,
134:17, 148:1,
151:5, 182:19,

182:24, 202:22,
209:1
**courts**
159:19
**cover**
200:7
**covered**
87:17
**cpa**
82:23, 83:7,
83:22, 83:23
**credit**
100:9, 111:8,
114:20, 115:8,
115:19
**crosstalk**
110:7
**cure**
189:17
**curious**
135:13
**cut**
101:1

**D**

**d&o**
199:13
**dallas**
150:9, 150:13,
151:23, 152:1,
172:23, 195:15,
195:18, 195:19,
195:23
**damages**
179:5
**date**
76:7, 91:17,
91:18, 91:20,
107:11, 107:12,
126:15, 130:6,
130:9, 130:14,
131:20, 154:12,
180:18, 189:24,
194:12, 202:9
**dated**
78:4, 147:3,
148:6, 190:21
**dates**
84:25, 91:16,

122:20, 123:2,
123:3, 123:9,
123:14, 126:2,
133:10, 143:1,
143:3, 152:1,
152:2
**day**
95:20, 107:18,
129:22, 133:11,
133:14, 165:15
**days**
100:8, 100:22,
107:20, 114:19,
162:14, 165:2
**deadline**
156:12
**deal**
137:18, 163:24,
164:1, 164:2,
175:24, 184:7,
187:22
**dealing**
166:18
**debit**
136:18
**debits**
116:1
**december**
84:25, 89:7,
91:3, 91:8,
91:21, 91:22,
91:24, 118:7,
120:14, 122:25,
123:1, 123:5,
124:7, 128:9,
128:11, 133:4,
134:1, 135:4,
136:3, 136:15,
137:7, 138:21,
144:6, 144:10,
144:22, 153:16,
154:4, 154:5,
154:13, 154:21,
155:15, 159:22,
201:5, 201:14,
202:2, 202:24,
203:10, 209:20,
210:16

decent
142:5
decide
198:18
decision
167:13, 167:16,
197:10, 198:2,
198:4
def
85:10, 85:17,
85:22, 93:14,
102:13, 102:14,
106:13, 110:25,
112:5, 113:19,
115:25, 119:23,
121:16, 122:2,
128:10, 136:17,
140:2, 141:9,
141:23, 142:7,
142:15, 143:10,
146:25, 168:22,
201:7, 201:13
def-1
157:5
def-3
162:10
def-4
164:25
def5
157:16
default
75:13, 75:14,
187:8, 189:18,
191:1, 191:5
defaulted
188:10, 188:18,
188:24
defendant
193:22
defendants
72:9, 74:12,
76:17
defer
164:14, 193:8
defined
163:13
definitely
204:11

demand
187:8, 191:1
demanding
191:6
departure
92:17, 107:12
depos
76:10, 76:20,
210:15
deposition
72:14, 73:1,
75:8, 76:3,
76:11, 76:25,
77:22, 167:2,
167:6, 206:25,
208:16
deposits
117:10
deppoleto
72:4, 76:4,
78:14, 78:18,
79:6, 79:13,
131:22, 132:3,
136:2, 136:13,
140:23, 141:4,
148:22, 148:24,
149:2, 149:7,
149:9, 151:18,
151:21, 165:23,
166:17, 169:15,
172:9, 173:9,
173:14, 173:18,
173:24, 174:25,
175:19, 177:7,
177:8, 178:16,
179:21, 180:10,
181:5, 181:9,
185:12, 185:23,
186:6, 188:9,
188:19, 189:25,
190:5, 191:6,
193:14, 195:13,
196:2, 196:5,
196:9, 196:11,
196:20, 196:21,
197:1, 203:11
deppoleto's
166:15, 169:18,

170:3, 170:8,
171:13, 175:11,
176:1, 176:18,
179:4, 184:8,
188:10, 189:2,
192:7, 195:11,
199:3
describing
137:17, 139:23,
140:14, 157:7
desist
187:9
detail
96:13, 97:2,
97:10, 97:14,
98:3, 101:24,
102:9
detailed
99:12, 138:23
detailing
98:22
dick's
97:25, 98:6,
98:13
difference
93:3
different
79:1, 111:23,
119:11, 124:19,
129:7, 139:2,
143:7, 161:18,
178:13, 200:3
differing
124:6, 124:12
digital
209:8, 210:3
diligence
150:3
dillard's
100:1, 101:8,
101:9
direct
170:17
direction
84:8, 130:21
directly
81:1, 84:9,
149:3

director
114:10, 160:1,
170:3
directors
75:11, 75:12,
80:5, 81:18,
104:7, 129:6,
134:7, 153:22,
153:24, 155:18,
157:6, 158:14,
159:16, 159:20,
163:11, 168:3,
168:10, 183:24,
198:6, 199:8,
200:4, 200:8
disagree
80:11, 81:12,
129:23, 130:2,
132:1, 132:2,
163:2, 206:17
disagreeing
131:18
disclose
79:5, 140:22,
141:3, 206:19
disclosing
79:12, 151:20
discuss
187:16, 191:10,
192:3, 193:14,
195:4, 195:7
discussed
152:4
discussing
155:7
discussion
87:11, 88:5,
88:6
discussions
173:13, 173:23,
174:7, 187:19,
191:16, 191:19
dismiss
197:5, 197:10,
198:18, 199:3
dismissal
198:3
dismissed
199:5

| | | | |
|---|---|---|---|
| **displays** | **documents** | **drive** | 151:7 |
| 182:5, 182:25, | 85:15, 129:5, | 74:15 | **either** |
| 183:3 | 129:6, 152:9, | **driving** | 89:3, 93:19, |
| **dispute** | 165:9, 165:13, | 87:14, 94:23 | 120:13, 130:3, |
| 166:24 | 165:22 | **drove** | 160:16, 185:9 |
| **disputed** | **doing** | 97:7 | **electronic** |
| 135:16 | 87:16, 90:4, | **due** | 77:1 |
| **distance** | 108:7, 108:13, | 114:5, 150:3 | **else** |
| 132:16 | 127:15, 129:2, | **dues** | 78:17, 82:14, |
| **distinction** | 130:18, 131:12, | 114:9 | 92:9, 94:15, |
| 91:11, 91:12, | 132:18, 135:21, | **duly** | 108:23, 123:18, |
| 91:14, 205:20 | 147:24, 161:11, | 77:13 | 147:23, 154:18, |
| **distribution** | 161:12, 164:1, | **during** | 161:3, 183:20, |
| 90:14, 90:19, | 167:21 | 108:16, 109:23, | 187:23, 191:15, |
| 91:13, 110:22 | **dollar** | 109:24, 110:1, | 196:4 |
| **distributions** | 145:14, 163:24, | 160:1, 162:15, | **else's** |
| 80:3, 80:4, | 164:2, 175:23, | 168:1, 181:8, | 106:1 |
| 80:14, 80:20, | 181:14 | 184:16, 185:5 | **email** |
| 81:6, 82:5, | **dollars** | | 75:10 |
| 83:11 | 121:19, 121:24 | **E** | **emailing** |
| **distributor** | **don** | **e-mail** | 160:14 |
| 87:4, 89:10, | 74:13, 74:14, | 147:3, 147:6, | **emails** |
| 89:11, 90:13, | 76:16 | 148:4, 150:21, | 147:1, 186:2, |
| 93:19, 199:21 | **done** | 158:2, 186:2, | 204:14 |
| **distributors** | 97:6, 104:15, | 204:7 | **employed** |
| 87:15, 90:17, | 119:4, 135:23, | **each** | 209:12, 210:9 |
| 103:8, 106:3, | 143:22, 151:13, | 80:19, 86:3, | **employees** |
| 106:4 | 160:21, 162:1, | 110:6, 118:16, | 181:1 |
| **district** | 167:24, 170:1, | 139:20, 143:6, | **end** |
| 72:1, 72:2, | 171:23, 175:23, | 164:8, 173:6, | 88:22, 124:6, |
| 76:6, 193:19 | 184:7, 203:22 | 196:17 | 124:23, 125:8, |
| **document** | **double** | **earlier** | 158:12, 167:12, |
| 78:6, 78:15, | 79:24, 102:6, | 148:7, 197:18, | 208:15 |
| 78:19, 78:20, | 186:11, 196:24 | 201:18 | **ended** |
| 78:24, 79:6, | **double-checked** | **early** | 126:2, 126:6 |
| 88:1, 90:7, | 139:4 | 127:19, 129:22, | **ends** |
| 115:24, 122:17, | **down** | 132:22, 145:22, | 124:9 |
| 122:19, 128:25, | 86:24, 94:23, | 184:14 | **enlarge** |
| 134:9, 139:6, | 106:13, 119:23, | **easier** | 158:17 |
| 157:11, 159:25, | 138:25, 162:10, | 96:11 | **enough** |
| 167:11, 168:7, | 168:5, 185:20, | **eat** | 132:4, 133:15, |
| 187:11, 190:13, | 201:24, 202:5, | 110:17 | 200:17 |
| 191:3, 194:4, | 203:14, 207:19 | **effect** | **enter** |
| 201:15 | **drafted** | 171:4, 206:16 | 138:19 |
| **documentation** | 134:12 | **efficient** | **entered** |
| 103:11, 129:17, | **drafts** | 122:16 | 135:5 |
| 129:18 | 204:5 | **eight** | **enterprise** |
| **documented** | **drawing** | 107:20, 136:24, | 94:18, 95:23, |
| 177:11, 178:15 | 91:11 | | |

96:14
**entry**
93:15, 116:25
**especially**
124:18, 184:2
**esquire**
74:4, 74:13
**essentially**
129:21
**et**
72:8, 76:5,
98:24, 108:20
**even**
95:4, 104:23,
135:2, 139:4,
140:10, 146:16,
160:10, 175:9,
184:10, 208:4
**event**
106:21, 107:3,
108:1, 112:10,
112:13, 150:9,
150:13, 185:24
**events**
107:15, 107:17,
107:19
**eventually**
194:2
**ever**
78:14, 110:17,
110:20, 169:18,
176:16, 192:15,
192:21, 193:14,
195:12, 199:7,
205:5, 206:19
**every**
85:4, 87:15,
106:6, 107:18,
118:19, 122:13,
126:25, 130:18
**everybody**
90:3, 118:1,
123:18
**everything**
81:19, 84:3,
84:7, 98:23,
138:22, 138:23,
138:24, 138:25,

139:1, 139:3,
161:11, 161:13,
165:17, 165:25,
167:20, 169:25,
173:3, 187:15,
204:10
**everything's**
138:22
**evidence**
104:11, 133:17
**evidentiary**
77:5
**exact**
130:9, 177:15
**exactly**
84:16, 86:21,
90:11, 91:9,
93:7, 95:3,
95:10, 101:11,
104:5, 105:23,
106:19, 108:4,
112:8, 164:4,
176:25
**exaggerated**
145:17
**examination**
75:2, 77:16
**examined**
77:15
**example**
95:5, 110:20,
116:24, 124:7,
124:10, 126:14,
128:10
**exceeded**
129:21, 130:15,
130:25, 131:6,
131:19, 201:19,
202:10, 202:24,
203:6
**excerpts**
75:9
**exchange**
129:2, 129:11
**exclusive**
172:21
**excuse**
119:1, 132:22

**executed**
141:4
**exhibit**
75:8, 75:9,
75:10, 75:11,
75:12, 75:13,
75:14, 75:15,
75:16, 77:22,
78:2, 79:13,
83:2, 83:6,
84:5, 84:18,
84:19, 85:3,
85:8, 146:6,
146:9, 146:21,
146:24, 154:2,
156:24, 156:25,
157:4, 168:12,
168:15, 168:16,
186:19, 186:22,
187:2, 187:3,
190:16, 190:18,
190:23, 194:4,
194:5, 200:23,
200:25, 201:2,
201:11
**exited**
133:8
**exiting**
133:3
**expenditure**
113:15
**expense**
92:19, 92:21,
93:2, 93:6,
94:4, 94:6,
95:2, 96:17,
96:19, 97:16,
98:1, 98:10,
98:12, 115:4,
115:12
**expenses**
144:25, 145:9,
145:12, 145:19
**expensive**
88:12
**explain**
90:15, 138:4,
193:5, 193:12

**explanation**
124:17
**exposed**
161:14, 163:23
**express**
160:8, 160:13,
160:17
**extent**
78:11, 188:13

**F**

**fact**
83:11, 124:16,
126:6, 126:13,
133:18, 157:18,
159:7, 161:16,
165:12, 181:14,
183:13, 196:8,
196:19
**factor**
202:15, 203:5,
203:7
**facts**
104:11
**fair**
164:19, 175:2,
176:24, 177:3,
177:4, 193:7,
198:9, 200:17
**false**
81:10, 197:13
**familiar**
181:17, 205:10,
205:11
**family**
110:17, 145:23
**far**
105:14
**father**
150:14, 152:3,
152:4, 172:24
**fault**
102:7, 154:7
**faults**
147:23
**favor**
155:20
**february**
121:18, 121:25,

122:3, 122:8,
122:19, 122:21,
123:4, 130:11,
141:20, 141:23,
197:6, 198:3
**feel**
172:17, 184:11
**fees**
103:3, 103:5,
103:6, 109:7,
114:9
**few**
106:13, 204:2
**fight**
175:17
**fighters**
108:17
**fighting**
106:24, 171:1
**figure**
167:25
**file**
194:12, 195:6,
197:5
**filed**
128:18, 134:7,
134:13, 134:14,
134:18, 193:18,
193:22, 194:13,
194:20, 195:5,
195:9, 195:21
**filing**
194:1, 195:1
**fill**
183:2
**filming**
107:17
**financial**
209:14, 210:11
**find**
183:7, 183:9,
183:12, 204:10
**finding**
127:15
**fine**
88:12, 130:8
**fine-tooth**
139:1

**finish**
97:13, 110:6,
120:19
**finra**
135:23
**fired**
81:17
**firm**
83:1
**firms**
82:21, 82:22,
83:10, 83:17,
83:22, 111:24,
139:3
**first**
75:13, 77:13,
81:15, 85:8,
86:2, 91:19,
93:15, 102:16,
108:10, 111:9,
121:16, 130:17,
130:23, 130:24,
141:19, 146:24,
148:22, 149:8,
151:19, 162:21,
166:9, 166:21,
171:13, 171:18,
171:20, 172:8,
173:2, 173:8,
173:16, 174:3,
174:13, 174:16,
175:18, 177:11,
177:13, 178:3,
178:11, 178:15,
178:20, 178:22,
185:3, 191:25,
195:11, 206:25
**five**
114:18, 118:18,
128:9, 130:20,
146:16, 151:1,
177:18, 178:21
**five-day**
107:15
**five-page**
139:5
**fixed**
98:23

**florida**
171:18, 173:16
**focus**
179:17
**focusing**
166:4, 166:5
**folks**
76:23, 158:1
**following**
91:5, 91:10
**follows**
77:15
**food**
109:23
**foregoing**
209:3, 209:5,
210:4
**forget**
154:17, 174:14
**forging**
165:22
**form**
80:6, 97:18,
127:8, 142:23,
179:24
**formal**
87:24, 134:4,
159:25
**forming**
145:20
**fort**
174:12, 174:24
**fortunately**
155:23
**forward**
85:17, 102:13,
113:13, 167:16
**found**
161:12, 166:23,
183:4, 184:17,
185:20, 186:18,
186:20, 204:13,
207:8
**foundation**
80:7, 104:12,
126:18, 131:2,
143:5, 145:2,
149:14, 179:24,

**florida**
190:8, 198:13,
206:13
**four**
89:17, 89:19,
89:21, 130:20,
139:5, 150:21,
155:14, 166:10,
172:19, 172:20,
177:14, 177:18,
178:21
**fourth**
164:25
**frame**
148:7, 160:1,
174:5, 184:16,
185:5, 185:13,
186:7
**francisco**
89:8
**friday**
72:17, 77:22,
207:1
**friend**
110:21
**front**
108:17, 108:18,
108:19
**frozen**
153:1, 153:5,
181:12
**frustrates**
150:17
**fully**
209:5
**funds**
175:19, 176:1,
177:2, 189:25
**funny**
120:24

**G**

**g-h-i-n-i**
205:14
**games**
161:9
**gas**
94:25
**gave**
185:14

gen
205:20, 206:2
general
163:24, 164:2,
175:23
generally
124:14
georgia
112:6, 112:14,
113:2
getting
98:23, 108:17,
108:18, 116:23,
120:14, 137:1,
137:3, 143:16,
143:22, 158:23,
172:16, 172:18,
176:5, 186:2
ghini
188:3, 205:13,
205:15
give
85:7, 140:18,
146:10, 171:16,
180:17, 203:14
given
124:19
giving
91:15, 122:12
glad
208:10
glance
208:3
go
78:12, 79:8,
80:8, 81:17,
82:7, 84:2,
85:4, 85:5,
86:24, 90:4,
90:5, 91:13,
94:24, 97:19,
102:12, 102:17,
103:16, 103:17,
104:14, 106:5,
106:11, 106:13,
112:15, 115:23,
119:2, 119:3,
122:15, 123:14,

124:4, 126:19,
127:9, 128:10,
130:21, 131:2,
132:9, 133:18,
136:17, 138:13,
140:2, 141:9,
141:18, 142:7,
142:15, 144:5,
145:3, 145:4,
147:9, 148:12,
149:15, 151:16,
153:7, 156:5,
156:20, 158:20,
160:5, 160:20,
160:22, 162:10,
163:17, 163:25,
169:22, 171:22,
176:14, 180:1,
182:6, 183:17,
184:7, 185:19,
188:14, 188:22,
189:14, 189:21,
190:9, 192:22,
192:24, 193:15,
198:14, 200:14,
201:24, 202:5,
202:14, 202:19,
203:9, 203:16,
204:10, 204:21,
206:13, 207:1,
208:4
goal
82:1
going
77:24, 78:25,
84:5, 85:16,
85:17, 87:17,
93:9, 100:16,
112:15, 113:1,
113:4, 113:8,
113:19, 130:1,
130:2, 131:13,
132:7, 134:10,
138:7, 139:1,
142:4, 142:22,
143:5, 145:1,
146:6, 149:6,
149:11, 150:10,

150:11, 150:12,
150:23, 152:21,
152:24, 153:6,
153:10, 153:12,
154:1, 156:2,
156:13, 156:23,
160:3, 160:25,
161:4, 161:14,
161:24, 164:23,
165:8, 165:16,
168:5, 174:17,
177:19, 177:21,
179:23, 186:22,
194:2, 194:3,
198:11, 200:12,
200:22, 201:1,
203:3, 203:16,
203:17, 204:24,
205:2, 206:11,
206:20, 207:4,
207:16, 208:5
gone
132:20, 155:12
good
77:18, 114:5,
146:12, 151:9
goods
97:25, 98:7,
98:13
gotcha
136:11
governance
164:15
grab
88:10
grand
118:18, 128:9,
184:3
gray
119:17
great
92:13, 92:25,
181:18, 181:20,
182:25, 183:5,
183:11, 183:19
greater
203:6
guarantee
196:12

guess
158:14
guessing
106:17, 110:13
guitar
174:15
guy
164:12, 172:2,
172:23, 184:5
guys
111:19, 176:8,
208:14

**H**

handled
177:16
happen
88:15, 132:5,
200:17, 203:3
happened
88:15, 125:23,
125:25, 150:16,
153:18, 162:8,
196:12
happens
203:4
happy
124:4
harvey
74:4, 75:3,
76:14, 77:17,
78:13, 79:10,
80:10, 82:10,
84:17, 84:20,
85:10, 85:12,
88:24, 93:12,
96:12, 97:22,
104:13, 110:8,
119:5, 126:20,
127:12, 131:4,
132:17, 134:8,
134:22, 134:25,
142:24, 143:9,
145:4, 145:7,
146:8, 146:15,
146:20, 146:22,
148:15, 149:19,
151:5, 151:10,

151:17, 152:17,
152:20, 153:14,
156:6, 156:23,
157:1, 158:19,
159:1, 160:7,
168:13, 168:17,
178:9, 180:6,
182:1, 182:9,
182:12, 182:19,
182:21, 182:23,
183:21, 186:25,
187:5, 188:17,
188:25, 189:16,
189:23, 190:3,
190:12, 190:16,
190:19, 191:23,
192:20, 194:3,
194:6, 198:15,
198:22, 200:16,
200:22, 201:3,
201:9, 201:10,
202:20, 203:20,
203:23, 205:4,
206:15, 206:23,
207:24, 208:3,
208:7, 208:12
**hear**
77:19, 77:20,
80:25, 99:19,
104:16, 108:10,
108:11, 126:21,
146:2, 149:25,
153:4, 156:8,
166:6, 203:18,
207:25
**heard**
81:9, 81:11,
151:2, 160:15,
175:1, 196:15,
204:15, 205:5
**hearing**
77:9, 188:1
**held**
73:1, 151:8
**hello**
153:2
**help**
174:5

**here**
76:2, 81:20,
81:24, 83:20,
84:6, 85:6,
85:20, 86:1,
87:5, 88:15,
88:25, 91:16,
93:5, 93:14,
99:7, 101:23,
102:17, 103:9,
104:21, 105:2,
105:10, 106:5,
106:15, 110:15,
113:21, 117:13,
118:21, 119:12,
120:21, 130:7,
136:10, 147:1,
149:6, 151:6,
153:3, 179:1,
180:17, 207:7
**hereby**
209:4, 210:2
**hey**
88:10, 150:25,
151:4, 174:8
**hiding**
161:11
**highlighted**
83:7
**hilton**
106:16
**hold**
126:17, 137:9
**holdings**
204:16, 205:21
**holley**
80:2, 80:13,
80:20, 81:6,
82:4, 99:23,
127:23, 128:2,
133:16, 139:16,
139:17, 139:22,
144:24, 145:8,
145:12, 145:18,
147:17, 147:21,
148:9, 148:20,
148:24, 149:10,
151:20, 153:23,

155:17, 157:8,
159:9, 159:15,
159:23, 159:25,
160:9, 164:14,
167:5, 167:9,
187:20, 191:12,
193:8, 193:18,
197:6, 206:8,
206:16
**holley's**
145:23, 167:2
**holleys**
197:10, 198:19,
199:4
**home**
114:19, 208:10
**hopefully**
203:21
**hospital**
145:21, 146:1,
146:5, 148:10,
148:16, 174:19
**hotel**
93:3, 93:4,
174:15
**house**
105:15, 105:21,
106:1
**husch**
74:5, 187:7,
190:20
**hydrogen**
130:16, 130:18

**I**

**idea**
90:21, 96:22,
101:17, 103:10,
117:12, 117:14,
121:20, 126:4,
172:1, 175:16,
204:17, 204:20,
205:22
**identification**
84:19, 146:21,
156:25, 168:16,
187:3, 190:18,
194:5, 201:2

**identify**
76:13
**ii**
72:15
**illumination**
204:16, 204:18,
205:6
**immediately**
100:6, 173:15
**inc**
157:7, 168:10,
201:14, 204:16,
204:18, 205:6
**including**
158:1
**inconsistent**
176:6
**incorporated**
72:7, 76:5
**incorrect**
97:5, 102:3,
105:1, 186:9
**indirect**
170:18
**individual**
110:9, 192:3,
205:8
**individually**
84:15
**individuals**
90:20
**industries**
72:7, 76:4,
78:7, 84:24,
168:10, 201:4,
201:14
**information**
141:6, 149:2,
149:17, 150:1,
150:4, 150:9,
165:9, 165:13,
194:22, 195:16
**initial**
193:21
**insane**
184:11
**instance**
191:18

**instead**
94:24
**insurance**
199:9, 199:13,
199:20, 199:25,
200:4, 200:7
**intend**
190:4
**intended**
77:4
**interaction**
206:1
**interest**
209:14, 210:10
**invest**
173:11
**invested**
149:21
**investment**
172:10
**investments**
206:9
**investors**
171:8, 173:20,
206:10, 206:19
**invited**
107:8
**involved**
92:9, 108:19,
166:3, 170:25,
174:13, 175:8,
185:9, 191:15,
191:18
**issues**
167:22
**items**
85:6

**J**

**james**
72:4, 166:17,
171:17, 175:3,
184:18, 203:11
**james's**
184:9
**january**
84:25, 93:15,
93:17, 94:17,

97:24, 98:16,
98:17, 100:1,
101:13, 116:4,
116:10, 116:25,
117:15, 118:3,
118:23, 119:13,
119:24, 119:25,
120:12, 120:23,
121:8, 121:13,
123:1, 123:3,
132:22, 133:4,
133:8, 135:3,
140:11, 141:19,
142:8, 142:16,
197:17
**jason**
78:24, 81:15,
81:16, 82:13,
84:8, 84:9,
84:12, 84:13,
87:10, 87:21,
89:3, 90:3,
102:23, 103:10,
103:18, 105:2,
105:9, 108:22,
111:25, 114:23,
115:20, 117:11,
117:24, 118:4,
120:15, 121:4,
121:15, 121:22,
122:10, 123:21,
124:2, 129:24,
130:21, 133:11,
133:14, 138:24,
145:13, 145:17,
145:20, 147:3,
147:22, 148:21,
149:3, 150:5,
151:23, 154:9,
154:20, 155:8,
157:22, 157:23,
157:25, 158:23,
159:13, 161:17,
162:21, 163:21,
171:1, 171:12,
172:11, 173:5,
173:21, 176:25,
177:16, 178:23,

183:15, 183:18,
184:1, 184:6,
185:14, 186:13,
186:14, 194:24,
195:2, 196:7,
196:10
**jason's**
120:25, 161:9,
189:7
**jay**
114:4
**jeff**
185:24
**jennifer**
188:3
**jesse**
74:25, 76:9
**job**
72:23, 149:1,
150:3, 150:4
**joe**
87:10, 87:21,
103:20, 105:2,
105:5, 105:7,
107:6, 112:24,
139:14, 139:18,
139:22, 150:10,
150:12, 151:22,
154:8, 154:19,
158:8, 159:8,
166:9, 171:11,
172:17, 184:1,
185:8, 185:9,
188:2, 197:11
**join**
130:8
**joint**
191:21
**josh**
149:17, 171:18
**josh's**
172:1
**judge**
158:25
**july**
113:22, 114:8,
122:24, 136:6
**june**
112:5, 122:24,

195:20
**justification**
93:6
**justified**
163:19

**K**

**keep**
132:16, 137:17,
144:14, 150:14,
195:17
**kept**
94:10, 132:14
**kind**
92:19, 92:21,
96:20, 133:4,
183:25, 184:2
**kirby**
107:6
**knew**
87:23, 90:3,
103:20, 103:21,
115:21, 149:17,
149:18, 149:21,
150:7, 150:9,
172:25, 174:2,
175:5, 185:9
**know**
78:17, 83:17,
86:22, 92:22,
97:8, 98:2,
98:9, 107:23,
110:14, 110:16,
111:18, 118:22,
120:11, 120:21,
121:23, 123:8,
123:10, 124:1,
125:5, 128:23,
129:25, 130:20,
130:22, 131:21,
132:10, 133:2,
133:3, 136:19,
138:7, 139:5,
142:5, 145:18,
147:20, 150:8,
150:11, 150:12,
150:23, 151:25,
152:11, 152:15,

153:18, 160:21,
161:16, 161:17,
161:25, 165:12,
171:19, 171:24,
172:17, 173:13,
173:23, 174:7,
175:4, 175:21,
176:15, 176:23,
177:2, 177:15,
180:5, 180:10,
181:6, 185:11,
185:22, 185:25,
186:5, 186:12,
186:15, 186:17,
186:20, 196:8,
196:13, 196:19,
197:9, 198:4,
198:9, 198:16,
199:2, 199:15,
199:17, 200:18,
204:8, 204:19,
205:8, 205:15,
205:17, 205:18,
205:20, 205:23,
207:5
**knowing**
181:13, 183:20
**knowledge**
80:17, 80:22,
80:24, 81:2,
81:3, 130:23,
131:17, 132:11,
135:25, 136:12,
141:2, 166:2,
183:7, 183:8,
183:10, 190:2,
193:13, 196:25,
197:4, 198:25,
199:6, 199:7,
209:11, 210:8
**known**
178:23
**krystin**
210:2, 210:14

**L**

**labeled**
85:21, 146:24,

157:5, 201:4
**labor**
157:6, 162:6,
163:6, 163:9,
163:10, 163:13,
163:20, 164:3,
164:5, 164:8,
164:9, 164:11,
164:17, 165:8,
165:12, 167:13,
193:9, 205:23,
206:2, 207:2,
207:19
**lacks**
80:7, 104:12,
126:18, 131:1,
145:2, 149:14,
179:24, 190:7,
198:12, 206:12
**laptop**
101:21
**las**
74:17
**last**
77:22, 85:14,
146:2, 157:15,
185:2, 202:17,
205:17, 206:25
**late**
120:13, 145:21,
174:17, 185:2
**later**
154:6
**lauderdale**
174:12, 174:24
**launch**
90:23, 90:25
**launched**
91:2
**launching**
91:4, 91:6
**law**
74:14, 77:8
**laws**
77:6
**lawsuit**
128:17, 128:18,
193:17, 193:21,

196:9, 196:21
**lawyer**
126:22, 165:18,
170:6
**lawyers**
169:25, 170:7
**league**
106:24
**least**
125:18, 130:14,
131:20, 148:18,
199:22, 202:9,
202:23
**leave**
132:21, 154:24,
155:3, 155:5,
155:10, 169:7
**leaving**
128:20, 129:2
**left**
77:21, 128:24,
134:19, 135:1,
135:2, 136:24,
140:11, 141:14,
144:18, 144:19,
197:16, 206:4
**legal**
78:11, 93:11,
156:4, 179:25,
183:17, 188:13,
188:21, 189:13,
206:12, 207:23
**legs**
203:18
**less**
94:25
**let's**
96:10, 102:16,
130:5, 130:6,
151:3, 164:25,
174:8, 204:21
**letter**
187:7, 190:20,
190:22
**level**
86:9, 183:25
**levels**
193:11

**liabilities**
129:21, 130:14,
130:25, 131:6,
131:19, 201:19,
202:6, 202:10,
202:24, 202:25,
203:5, 203:11
**liability**
199:8, 199:15,
199:20, 199:25,
200:4
**lies**
82:9, 82:17,
148:5, 149:4,
163:22
**life**
135:20, 135:21
**likely**
99:2, 109:9,
109:22, 116:21,
117:18, 119:8
**limits**
199:15
**line**
83:23, 85:6,
147:15, 178:12
**listed**
83:1
**listening**
117:8
**litigation**
135:9, 195:13,
196:2, 196:6,
197:1
**little**
80:19, 90:15,
97:19, 102:14,
106:22, 108:9,
113:19, 122:16,
138:4, 178:18,
179:5, 179:10,
181:10, 192:13,
192:14, 201:23,
203:16
**live**
104:23, 105:4,
105:7, 105:9,
105:12, 107:19

**lives**
104:2
**llc**
205:21, 210:15
**llp**
74:5
**loan**
148:23, 149:8,
151:19, 171:14,
171:16, 172:9,
173:25, 175:1,
175:11, 189:25,
195:12
**loaned**
149:7, 178:17,
179:21
**loans**
79:14, 173:9,
176:18, 177:7,
177:10, 177:12,
178:19, 181:10,
181:14, 186:16,
188:10, 189:3,
192:8
**lodge**
92:14, 92:25
**lodging**
107:23, 107:25
**lodi**
86:25, 87:1,
87:2, 91:21,
93:17, 97:25
**long**
95:21, 150:18,
155:10
**longer**
159:15, 160:10
**look**
83:13, 115:25,
123:15, 137:15,
138:13, 143:10,
152:8, 164:24,
177:5, 194:12
**looking**
77:22, 94:8,
100:17, 122:18,
150:14
**looks**
138:17, 143:6,

153:5, 157:17,
190:21, 201:7
**loop**
132:14
**lost**
146:9, 184:19
**lot**
79:2, 110:7,
149:7, 166:14,
175:7
**ltnc**
175:14, 193:3,
193:6, 207:15
**lunch**
87:4, 89:9,
89:15, 89:21,
90:1, 90:5,
90:12, 91:23,
110:1
**lunches**
109:23
**lying**
148:2

---

**M**

---

m-a-t-a-g-r-a-n-o
89:14
**macy's**
101:9, 101:10
**made**
78:24, 79:13,
80:2, 80:16,
80:20, 102:10,
109:19, 123:18,
132:12, 136:14,
148:22, 151:19,
155:8, 197:9,
198:2, 198:4
**maintained**
199:8
**majority**
137:22
**make**
80:14, 87:8,
88:13, 100:25,
101:5, 117:10,
121:21, 133:9,
139:19, 140:21,

145:23, 171:4,
173:7, 176:4,
176:8, 180:17,
181:7, 182:3,
182:14, 183:3,
196:18, 197:24,
197:25, 203:14,
203:16, 207:1
**makes**
95:19, 96:11,
175:25, 182:25
**making**
109:15, 148:21,
175:22, 184:5,
203:15
**manage**
140:18, 143:19
**manufactured**
78:23
**many**
112:21
**march**
78:4, 102:18,
105:11, 106:15,
107:12, 109:2,
109:10, 109:13,
109:16, 122:21,
123:4, 130:11,
140:3, 140:13,
141:9, 147:3,
148:6, 148:18,
194:13, 194:17,
195:21
**mark**
146:8
**marked**
84:19, 146:21,
146:23, 156:25,
168:16, 187:3,
190:18, 194:5,
201:2
**market**
89:7, 91:23,
131:13
**marketing**
86:10
**marks**
208:15

**matagrano**
89:12
**matter**
76:4
**maybe**
102:6, 117:7,
117:11, 146:13,
146:16, 151:8,
178:25, 204:3
**mcbride**
72:14, 73:1,
75:2, 76:3,
76:17, 77:12,
77:18, 81:23,
85:13, 85:21,
93:15, 102:15,
104:14, 106:14,
110:25, 116:2,
134:19, 143:4,
145:4, 153:15,
156:7, 169:6,
200:14, 201:11,
205:5, 208:8,
208:16
**mcgrath**
72:25, 73:13,
76:19, 209:2,
209:18
**mean**
103:6, 107:2,
123:8, 137:2,
143:23, 154:8,
161:7, 161:8,
171:15, 174:6,
192:24
**meaning**
80:3, 80:24,
135:17, 142:1,
161:9, 165:18,
166:3, 191:12
**means**
77:1, 135:15,
174:7
**meant**
107:1
**media**
170:21
**meet**
87:15, 90:17,

meeting
93:19, 106:2,
153:16, 153:19,
154:4, 154:15,
154:18, 155:16,
157:8, 157:19,
157:21, 157:23,
158:4, 158:13,
158:23, 159:7,
159:11, 159:15,
159:22, 159:24,
160:10, 162:3,
162:5, 167:22,
168:1, 168:19,
185:24

meetings
186:1

member
154:21, 160:11,
162:23, 163:2

members
145:23, 160:8

membership
105:17, 105:20

memberships
103:24, 105:25

memory
123:14, 161:5

mentioned
81:23, 203:24,
203:25

merited
163:18

message
160:24

met
171:18, 171:21,
171:25, 172:23

mexico
151:24, 152:1

michael
80:2, 80:13,
144:3, 144:4,
144:24, 159:15,
162:5, 162:12,
193:18, 197:6

might
140:20, 191:25,

205:14, 205:16

mike
81:4, 87:10,
87:21, 88:10,
89:3, 90:3,
92:7, 94:14,
99:22, 99:23,
101:7, 117:23,
124:2, 127:22,
127:23, 127:24,
128:2, 139:13,
139:16, 139:17,
139:22, 145:21,
147:25, 148:1,
148:13, 154:5,
154:8, 158:8,
158:9, 159:8,
164:12, 171:11,
173:5, 173:21,
174:18, 188:2,
193:5, 200:6,
200:15, 205:12,
205:15, 207:4,
207:21, 208:1

mike's
84:12, 165:18

miles
87:14

miller
106:3, 110:4

million
130:17, 172:20,
175:19, 177:7,
178:10, 178:14,
178:18, 179:5,
179:11, 179:19,
199:18, 202:25,
207:6, 207:10

milwaukee
74:8

mind
148:3

mine
121:1

minus
118:18

minute
156:21

minutes
105:16, 105:21,
109:12, 146:14,
146:16, 150:21,
151:1, 151:8,
152:19, 160:20,
203:25, 204:2,
204:3

missed
182:7, 182:13,
182:18

mistaken
162:8

mister
140:22

misunderstand
197:17

mixed
158:23

mlb
115:2

modesto
111:2

moment
76:22, 81:23,
146:11, 159:14,
179:17, 180:17

moments
148:8

money
78:15, 78:18,
78:20, 78:23,
79:5, 79:12,
82:6, 88:14,
116:23, 119:15,
124:1, 131:25,
147:25, 148:20,
148:25, 149:10,
165:21, 172:3,
172:5, 172:16,
172:19, 172:25,
173:18, 173:19,
175:21, 176:3,
176:7, 176:10,
181:5, 184:2,
184:8, 184:9,
184:10, 184:19,
207:9, 207:18

monitor
76:8, 208:17

month
109:16, 109:20,
109:24, 110:11,
118:19, 120:8,
130:17, 130:18,
130:20, 148:17,
155:14

monthly
100:24, 101:2,
101:6, 103:3,
109:7, 117:21,
117:24, 118:15

months
87:15, 103:4,
114:3, 130:20,
133:15, 136:24,
159:5, 167:25

more
82:25, 90:15,
99:2, 106:13,
106:22, 108:9,
109:9, 109:22,
113:20, 116:21,
117:18, 119:8,
122:15, 122:16,
132:4, 138:4,
140:18, 149:7,
150:18, 150:20,
151:10, 151:15,
156:11, 164:11,
164:20, 164:23,
172:13, 172:15,
172:17, 172:24,
177:9, 179:10,
193:4, 193:6,
200:6, 200:9,
200:11, 200:15,
207:4, 207:21,
208:1

morning
77:18

move
167:16

moving
128:20, 130:16,
174:9, 184:2

much
107:20, 129:10,
129:14, 137:21,
137:23, 137:24,
143:18, 148:7,
148:17, 172:19,
186:3, 186:4,
201:8
multiple
107:21
myself
135:7, 167:19

## N

name
84:11, 89:1,
89:4, 113:1,
120:25, 205:10,
205:11, 205:17
named
188:5, 205:8,
205:12
names
112:19
nba
115:11
nd
76:8
near
105:25
necessary
97:20
need
90:5, 102:12,
130:8, 134:16,
150:18, 150:24,
208:4
needed
88:11, 135:19
negative
79:24, 102:6,
186:11, 196:24
negotiate
189:5
negotiation's
189:8
neither
209:12, 210:9

nevada
72:2, 74:17,
76:6
never
80:16, 80:20,
81:9, 84:11,
88:12, 88:13,
88:15, 121:4,
123:17, 145:8,
147:25, 148:1,
162:20, 162:23,
162:24, 170:13,
171:10, 172:3,
172:5, 172:15,
172:19, 175:20,
175:23, 175:24,
184:9, 184:10,
184:19, 184:20,
184:21, 196:15
new
114:14, 120:4
next
86:9, 89:6,
92:12, 93:13,
94:17, 97:23,
98:16, 99:25,
101:12, 102:12,
106:7, 106:12,
109:2, 110:24,
112:4, 113:18,
114:12, 119:22,
119:23, 121:2,
121:7, 121:16,
122:2, 146:13,
146:15, 205:20,
206:2
nextgen
205:21
nice
172:2, 172:23
nobody
93:25, 113:17,
161:20, 183:19
none
104:23, 176:17
nope
83:23, 90:22,
94:16, 98:5

northern
181:18, 181:20,
181:21, 182:25,
183:5, 183:12,
183:19
notary
73:14, 76:24,
209:1, 209:18
note
81:21, 166:17,
166:24, 166:25,
177:11, 177:13
notes
165:23, 166:1,
166:4, 166:5,
166:6, 166:8,
166:16, 166:20,
177:8, 177:18,
177:19, 177:24,
178:3, 178:11,
178:15, 179:12,
179:16, 203:15,
204:1, 204:6,
208:4
nothing
77:14, 84:2,
110:21, 130:4,
135:18, 156:10,
163:7, 185:9,
189:6
nothing's
176:16
notice
73:13, 75:13,
75:14, 187:8,
187:14, 187:16,
188:8, 188:9,
189:1, 190:25,
191:5, 191:9,
192:3, 192:6
noticed
91:16, 121:3,
157:25
notifying
196:5
november
72:17, 76:7,
118:7, 127:19,

128:8, 131:5,
133:17, 133:21,
143:17, 145:22,
148:13, 148:16,
157:7, 157:19,
158:1, 159:24,
168:18, 180:19,
181:11, 184:15,
185:1, 185:4,
185:12, 186:6,
186:25, 187:6,
190:21
null
81:20
number
76:7, 77:23,
78:2, 83:6,
84:18, 85:8,
113:10, 124:9,
145:17, 149:1,
149:3, 163:21,
177:16, 187:7,
190:17, 200:25,
201:7, 201:12
numbered
169:5
numbers
85:15, 124:12,
124:16, 124:18,
126:3, 126:7
nxt
185:15, 185:23

## O

oaths
76:25
object
97:20, 156:21,
179:23
objection
77:9, 78:10,
79:7, 80:6,
82:7, 93:10,
97:18, 104:10,
119:2, 126:18,
127:8, 131:1,
132:8, 142:23,
145:2, 148:11,

149:12, 156:3,
156:19, 160:4,
183:16, 188:12,
188:20, 189:12,
189:20, 190:1,
190:7, 192:18,
198:12, 198:21,
200:13, 206:12,
206:21, 207:22
**obligations**
188:19
**obtain**
118:5
**obviously**
137:14, 139:10
**october**
143:17, 145:22,
155:14, 179:22,
180:7, 181:8,
181:11, 184:14,
184:25, 185:12,
185:18, 186:6
**odd**
121:1
**office**
74:14, 203:19
**officer**
114:10, 170:2,
209:2
**officers**
104:7, 199:8,
200:4
**official**
189:9
**oh**
119:23, 123:2,
154:5, 187:1,
197:19, 199:24,
200:24
**oil**
98:23, 99:6,
99:8
**once**
99:10, 106:6,
138:22, 144:2,
148:3, 175:3
**one**
76:22, 82:22,

85:5, 86:2,
89:3, 89:6,
89:15, 91:19,
92:12, 93:13,
93:16, 94:17,
97:23, 98:16,
99:15, 99:25,
100:11, 101:12,
101:17, 104:2,
106:2, 106:7,
106:12, 107:21,
109:2, 110:24,
112:4, 113:10,
113:18, 114:12,
117:6, 119:22,
119:24, 119:25,
121:2, 121:7,
121:16, 122:2,
122:13, 122:15,
122:16, 122:23,
123:14, 123:15,
124:8, 125:5,
126:13, 126:25,
131:24, 136:2,
141:19, 142:5,
146:4, 146:10,
147:2, 149:1,
151:3, 158:5,
158:14, 158:24,
159:12, 160:9,
163:22, 164:7,
168:5, 168:6,
172:22, 173:2,
177:5, 177:6,
178:7, 178:14,
178:20, 178:22,
180:17, 184:5,
184:24, 185:17,
186:23, 188:4,
189:8, 191:24,
191:25, 192:1,
193:3, 203:14,
203:15, 204:22,
208:4
**one's**
190:25
**ones**
96:5, 104:23,

159:10, 160:9
**online**
91:4, 91:6,
170:25
**only**
91:6, 104:2,
119:15, 123:23,
127:4, 129:12,
131:11, 132:15,
138:15, 160:14,
166:17, 168:24,
176:25
**opened**
84:3, 129:22
**opinion**
131:14
**opposed**
95:9, 95:17,
96:5
**orient**
201:22
**other**
76:17, 80:19,
83:9, 83:21,
83:22, 84:1,
88:7, 89:16,
89:18, 90:20,
100:11, 103:18,
103:25, 104:7,
104:23, 107:18,
108:18, 108:19,
110:6, 113:3,
114:10, 115:25,
116:1, 118:9,
139:20, 158:1,
162:22, 164:8,
166:16, 173:6,
187:24, 188:4,
191:21, 192:2,
192:3, 196:17,
206:2
**others**
127:6, 127:13,
159:23
**otherwise**
122:21, 209:14,
210:11
**ourselves**
201:22

**out**
78:21, 81:24,
87:4, 100:23,
101:2, 101:6,
104:3, 107:8,
111:6, 113:19,
123:22, 127:7,
127:14, 127:15,
127:18, 127:21,
128:1, 128:15,
132:3, 132:12,
132:15, 136:9,
138:2, 138:25,
149:6, 150:17,
151:23, 152:4,
161:13, 166:23,
167:19, 167:25,
172:7, 174:14,
179:10, 180:4,
180:24, 181:19,
183:3, 183:4,
183:8, 183:9,
183:12, 184:6,
184:17, 185:21,
186:20, 192:15,
193:15, 194:2,
207:8
**outcome**
209:15, 210:11
**over**
81:22, 82:5,
99:17, 118:1,
128:14, 132:6,
133:18, 134:16,
135:20, 138:23,
139:20, 151:5,
154:7, 165:15,
173:6, 178:18,
179:5, 179:18,
181:10, 184:3,
189:5, 196:17,
197:4, 198:24,
199:18
**owe**
78:7
**owed**
138:6, 184:12
**own**
135:11, 135:20,

139:10
**owned**
175:14

**P**

**pablo**
112:24
**page**
75:2, 75:8,
85:3, 85:21,
85:22, 114:13,
119:23, 135:10,
146:25, 157:15,
162:11, 168:21,
179:19
**pages**
72:24, 102:13,
106:13, 177:18
**paid**
100:3, 100:12,
100:21, 111:4,
114:6, 114:16,
115:20, 115:21,
117:20, 118:9,
120:5, 120:8,
120:14, 123:18,
123:19, 123:20,
124:23, 132:5,
143:16, 155:8,
180:4
**palace**
106:16
**paperwork**
174:8
**paragraph**
169:5
**park**
93:1, 93:4
**part**
112:18, 116:11,
116:18, 116:19,
117:16, 119:9,
119:16, 119:20,
122:9, 123:12,
123:24, 129:4,
132:15, 134:2,
137:10, 137:11,
140:8, 140:13,

141:17, 142:1,
142:20, 143:15,
144:18, 144:19,
146:2, 159:20,
184:14
**particular**
147:22
**parties**
76:10, 77:1,
77:7, 209:13,
210:10
**party**
78:3, 193:22
**passed**
207:19
**past**
80:18, 150:21
**patrick**
74:4, 76:14,
132:11, 136:11,
140:8, 151:6,
158:16, 174:22,
178:8, 180:3,
182:16, 182:18,
198:14, 207:10
**patrick's**
153:5
**pattern**
123:16, 123:17
**pavlik**
103:20, 139:18,
139:22, 154:20,
157:8, 159:10,
166:19, 185:8,
187:20, 191:13,
197:12
**pay**
84:9, 84:10,
100:5, 111:5,
114:17, 115:6,
115:16, 124:23,
132:4, 142:6,
162:14, 186:21
**paycheck**
124:22
**paying**
95:5, 100:13,
104:19, 111:11,

111:13, 114:6,
114:9
**payment**
96:14, 97:3,
97:24, 102:19,
103:1, 109:3,
109:13, 109:15,
111:1, 118:23,
119:20, 120:11,
120:13, 121:24,
124:8, 128:11,
129:1, 129:7,
129:8, 134:1,
135:4, 136:3,
136:14, 136:19,
136:22, 140:3,
140:6, 140:12,
141:10, 141:16,
142:5, 142:8,
142:16, 143:11,
143:14, 143:24,
144:7, 187:8,
191:1, 191:6
**payments**
75:10, 109:19,
114:4, 117:21,
117:22, 122:18,
123:8, 123:11,
124:4, 124:10,
125:7, 126:9,
126:14, 126:25,
144:21, 148:2,
155:8, 176:6
**payroll**
116:25, 117:4,
124:16, 125:15,
126:9, 126:15,
127:1, 127:20,
128:6, 144:7,
144:12, 144:18,
176:4, 176:6
**pc**
82:23, 83:7
**pd**
74:25
**pdf**
85:22
**pending**
193:25

**people**
81:11, 81:13,
83:18, 88:8,
89:18, 94:24,
104:3, 108:13,
112:11, 112:25,
113:10, 162:4,
172:8, 175:7,
187:7, 188:4
**percent**
117:18, 196:11
**percentage**
206:8
**perhaps**
134:13
**period**
162:13, 162:16,
199:12
**permanent**
155:25, 156:16
**permitted**
77:4
**person**
89:16, 172:22,
173:8
**person's**
205:17
**personal**
80:24, 82:24,
95:11, 95:17,
95:18, 98:9,
98:12, 100:3,
100:10, 111:4,
114:16, 115:4,
115:12, 115:14,
144:25, 145:9,
145:12, 145:19,
145:24, 172:15,
172:24, 196:25
**personally**
196:1, 196:13,
196:19, 206:8
**pettis**
149:17
**pfl**
106:21, 107:1,
107:3, 107:10,
107:15, 107:17,

112:10, 112:11,
112:13, 112:18,
112:25, 113:3,
131:25, 174:13
**phone**
74:9, 74:18,
172:2, 187:21,
191:22
**phonetic**
161:21
**pieced**
140:17
**piecing**
142:18
**pier**
89:7, 91:23
**place**
111:9, 118:1,
162:21, 205:11
**placed**
147:17, 147:21,
154:24, 155:2,
155:5, 155:10
**plain**
184:1
**plaintiff**
72:5, 74:3,
76:15, 77:16
**planet**
76:10, 76:20,
210:15
**planned**
165:1, 165:5,
167:14
**pleads**
76:12
**please**
85:9, 134:16,
151:4
**plethora**
165:24
**plot**
145:20
**plural**
191:24
**plus**
99:18, 99:20
**point**
91:3, 127:6,

127:13, 128:6,
128:7, 153:22,
170:14, 178:4
**portion**
125:18, 129:12,
129:13
**pos**
176:15
**position**
162:13, 163:19,
184:21
**positive**
95:8, 95:13,
95:16, 96:17,
109:21, 111:20,
119:19, 126:25,
144:14
**possible**
81:25, 125:25,
130:22
**possibly**
89:12, 94:14,
94:15, 98:14,
129:25, 131:21,
146:4
**posting**
91:16
**potential**
173:25, 175:1
**power**
163:4, 163:6,
163:10, 166:12
**prefer**
137:14
**prepared**
210:3
**present**
74:10, 74:19,
74:24
**pretty**
114:5, 143:18,
148:17, 194:2
**previous**
166:20, 205:19
**price**
207:3
**prior**
143:1

**private**
150:5, 150:6,
186:2, 192:25
**pro**
86:4, 87:9,
88:19, 89:2,
91:20, 91:25,
92:3, 92:9
**probably**
87:3, 94:23,
98:22, 98:25,
101:20, 102:7,
103:3, 109:7,
109:8, 113:24,
114:3, 116:11,
116:18, 116:19,
117:16, 121:4,
129:25, 130:19,
136:25, 138:1,
138:5, 138:6,
143:17, 145:25,
155:13, 156:18,
174:1, 174:21,
195:8, 203:24,
208:5
**problem**
136:12, 159:2,
164:24, 180:16,
201:9
**procedural**
77:5
**proceeding**
77:4, 210:4
**proceedings**
209:3, 209:5,
209:6, 209:9,
210:5, 210:7
**process**
139:5, 189:2,
189:9, 189:17,
192:7
**processes**
135:24
**produced**
77:3
**product**
90:18, 98:13,
199:17, 199:19,

199:21, 199:25
**products**
101:18
**professional**
106:24
**promote**
108:16
**promoting**
108:12
**proof**
166:12
**proved**
83:10
**proven**
78:22, 82:20,
83:25, 148:1
**provide**
169:15, 181:10,
181:14, 194:22
**provided**
134:10, 137:14,
175:19, 177:8,
177:9, 180:11,
204:12
**providing**
188:9
**pst**
72:18
**public**
73:14, 112:2,
134:7, 134:14,
141:5, 149:2,
149:17, 150:1,
150:4, 150:5,
150:8, 171:4,
192:22, 192:23,
192:24, 193:9,
193:10, 193:15,
195:16, 209:1,
209:18
**publicly**
134:18, 193:2
**pull**
77:24, 83:5,
117:10, 128:6
**purchase**
95:23, 98:4,
98:6, 99:14,

99:17, 100:10,
101:25, 102:5,
102:9, 115:11,
207:3
**purchased**
86:22, 115:2,
207:2
**purchases**
87:9, 87:12,
88:17, 92:10,
145:24
**purpose**
86:7, 98:20,
140:6
**purposes**
178:12
**pursuant**
73:13
**push**
113:13, 114:4
**pushed**
127:7, 127:14,
127:17, 127:21,
128:1, 128:15,
173:3, 184:6,
187:15
**put**
84:13, 94:5,
95:25, 96:19,
140:19, 179:18,
207:5, 207:19
**putting**
147:23, 177:17,
177:24, 207:14

**Q**

**qualified**
209:8
**quarter**
130:17
**question**
79:2, 79:4,
79:19, 80:7,
82:3, 88:22,
93:10, 96:3,
96:10, 97:9,
97:13, 97:19,
102:3, 119:7,

119:11, 120:19,
121:15, 121:17,
124:13, 126:8,
127:9, 127:11,
132:8, 132:9,
136:7, 142:23,
143:4, 147:11,
149:23, 152:11,
161:18, 164:13,
178:12, 179:24,
184:24, 186:4,
192:15, 195:25,
196:18, 200:3,
200:15, 207:5,
207:21
**questioning**
178:13
**questions**
77:23, 79:3,
82:1, 96:5,
115:25, 117:12,
120:15, 122:13,
123:6, 123:7,
143:1, 143:7,
149:6, 150:20,
151:10, 151:15,
177:19, 193:8,
201:18, 201:20,
208:11
**quick**
147:10, 194:2
**quicker**
79:2, 96:4,
203:16
**quickly**
81:24, 136:10,
143:2, 147:10,
149:7

**R**

**raising**
82:11, 148:19
**rather**
94:25
**rattled**
143:2
**rd**
113:22

**reached**
132:3, 132:11
**reaction**
187:13
**read**
147:9, 147:13,
160:20, 162:17,
169:10, 179:1
**ready**
90:25
**real**
147:9, 176:16
**really**
133:2
**reappointed**
169:6, 169:12,
169:16, 169:19,
170:14
**reappointment**
170:11, 170:24,
171:3
**reason**
123:23, 127:4,
127:5, 135:11
**reasons**
131:24, 161:4
**recall**
83:3, 88:20,
89:19, 98:8,
98:11, 98:15,
101:22, 102:4,
102:11, 109:18,
111:10, 112:22,
116:22, 117:17,
118:20, 119:10,
121:14, 124:20,
125:4, 125:13,
125:16, 125:18,
125:21, 125:23,
126:5, 126:16,
126:23, 129:15,
130:1, 136:16,
137:5, 138:12,
138:22, 143:20,
145:6, 145:25,
151:7, 152:7,
152:9, 152:16,
160:18, 162:7,

165:7, 165:25,
167:15, 167:18,
169:4, 169:17,
169:20, 171:6,
172:25, 180:2,
187:18, 189:11,
189:15, 189:22,
192:11
**receipt**
92:23, 94:1,
94:2, 94:7,
94:9, 99:21
**receipts**
91:24, 92:1,
92:4, 94:10,
99:16
**receivable**
78:3
**receive**
119:15, 121:12,
122:7, 136:22,
143:24
**received**
119:13, 120:22,
121:23, 123:8,
123:11, 136:4,
138:5, 138:15,
143:4, 144:10,
144:21, 187:17,
191:9, 206:9
**receiving**
126:1, 133:25,
135:3, 136:3,
138:10, 140:12,
142:2, 187:13,
189:1, 192:6
**recipients**
190:22
**recognize**
157:11, 187:11
**recollection**
99:3, 99:13,
101:4, 101:24,
127:2, 128:5,
143:25, 170:5,
170:10
**record**
91:23, 100:13,

134:17, 143:8,
152:22, 152:23,
152:25, 153:7,
153:10, 153:11,
153:13, 173:7,
204:21, 204:25,
205:1, 205:3,
208:5, 208:18,
209:10, 210:7
**record's**
139:19
**recorded**
72:25, 77:1,
209:6
**recording**
77:3, 151:6,
209:9, 210:4
**records**
111:11, 111:13,
111:15, 111:21
**reduced**
209:7, 210:5
**reentered**
133:17, 133:21
**referenced**
78:15, 78:19,
78:20, 79:5,
79:12, 122:18,
126:2
**referencing**
195:18
**referred**
160:24
**referring**
140:24, 147:20,
148:8, 164:25,
165:1, 165:6,
167:12, 168:18
**regarding**
167:13
**regular**
118:8, 118:14,
123:16, 123:17
**regularly**
99:8
**reinstated**
156:13
**related**
78:3, 86:17,

179:11, 209:12,
210:9
**relationship**
90:19, 113:6,
113:9, 113:14
**relationships**
113:11
**relied**
124:2
**relying**
83:14, 83:16
**remain**
168:2
**remainder**
137:1, 137:2,
137:4, 137:8
**remaining**
138:2
**remember**
83:21, 87:5,
95:22, 96:13,
96:20, 96:23,
97:1, 97:9,
97:14, 98:3,
102:8, 110:9,
119:12, 130:10,
138:1, 145:11,
145:14, 160:23,
162:9, 178:20,
187:19, 201:19,
204:2
**reminder**
110:6
**reminding**
168:14
**remote**
76:9
**remotely**
76:11
**removal**
155:20, 155:25,
156:16
**remove**
153:23, 155:17
**removed**
162:23
**removes**
159:12

**renegotiate**
81:21
**rent**
94:25
**rent-a-car**
94:18, 95:23,
96:14
**rented**
96:21
**repaid**
131:23, 189:24
**repay**
79:16, 79:17,
79:21, 79:25,
131:25, 189:2,
190:4, 192:7
**repaying**
189:10
**reported**
161:23
**reporter**
76:19, 76:22,
88:21, 110:5,
134:17, 146:10,
146:18, 158:11,
178:6, 182:7,
182:11, 182:13,
182:17, 182:19,
182:20, 187:4,
202:16, 202:22,
209:1
**reporter's**
182:24
**reporters**
151:6
**reports**
163:3, 163:9
**represent**
76:13, 129:19,
177:25
**representative**
167:3, 167:7
**represented**
84:14
**representing**
76:10, 76:20
**request**
134:10

**requested**
151:15
**requesting**
134:20
**required**
124:14
**resolution**
75:11, 157:5,
157:6, 169:3
**resolutions**
133:18, 168:24
**resolved**
162:10, 162:12,
165:1, 168:1,
169:6
**respond**
161:21
**responsible**
127:20, 128:3
**rest**
163:22
**retail**
90:18, 91:13
**retailer**
93:20, 199:21
**retailers**
87:16, 103:8,
106:3, 110:4
**returning**
114:19
**reveal**
165:20
**review**
165:9, 165:13,
165:19, 165:20,
167:12, 167:24,
194:19
**reviewed**
167:1
**revised**
204:1, 204:6
**revisions**
166:21
**revocation**
169:7
**revoked**
162:15
**rid**
133:11, 133:14

**ridiculous**
176:4
**right**
76:22, 100:12,
112:3, 115:22,
118:13, 120:25,
133:23, 135:1,
135:23, 140:16,
143:13, 147:14,
153:9, 154:1,
154:10, 159:18,
159:21, 162:17,
169:10, 176:15,
182:16, 188:6,
189:4, 190:24,
205:14, 208:13,
208:14
**role**
162:6, 180:23
**rolling**
86:10
**room**
107:21
**roughly**
174:23
**round**
124:9, 124:12,
124:16, 124:18,
126:3, 126:7
**row**
201:24, 202:5,
203:9
**rules**
77:5
**running**
176:12
**ryan**
207:5, 207:12,
207:13
**ryder**
161:21, 165:18

**S**

**safe**
208:10
**said**
90:9, 94:7,
94:15, 98:25,

100:21, 104:18,
108:11, 113:1,
143:3, 144:16,
146:4, 151:15,
160:23, 161:15,
161:20, 161:22,
166:1, 166:5,
166:14, 166:19,
171:10, 171:19,
171:24, 172:24,
173:17, 176:10,
182:8, 185:11,
193:4, 195:14,
201:12, 209:8,
209:9, 210:5,
210:6
**salaries**
176:2
**salary**
78:21, 79:17,
100:24, 101:2,
101:6, 111:7,
114:18, 114:22,
115:20, 116:11,
116:19, 116:20,
116:23, 117:3,
117:17, 117:19,
117:22, 118:8,
118:16, 119:9,
119:16, 119:20,
120:13, 122:10,
123:12, 123:24,
144:1, 176:18,
176:22
**sales**
91:7, 131:12,
162:24, 170:25
**same**
82:7, 83:1,
109:16, 109:19,
114:12, 115:1,
115:3, 115:10,
115:13, 118:9,
118:16, 122:12,
123:6, 123:7,
135:10, 141:25,
142:1, 142:12,
142:19, 156:19,

159:3, 159:5,
177:11, 179:19,
188:20, 189:20,
190:1, 190:22,
191:11, 193:4,
198:21, 206:21
**san**
89:7
**sarcasm**
150:23
**saw**
175:16, 175:20
**say**
81:2, 82:16,
85:16, 85:17,
88:10, 95:19,
103:5, 104:17,
106:22, 108:9,
116:18, 116:19,
117:4, 122:20,
125:3, 131:9,
132:3, 135:8,
143:22, 147:24,
155:22, 161:3,
161:19, 179:8,
180:22, 183:9,
199:19, 202:19
**saying**
80:13, 80:19,
80:23, 81:2,
81:3, 82:19,
95:20, 108:3,
109:8, 112:25,
117:8, 130:13,
134:23, 137:7,
138:4, 144:6,
144:15, 156:14,
159:4, 159:6,
159:25, 163:1,
163:12, 179:15,
182:18, 183:14,
198:7, 204:2,
207:20
**says**
83:7, 84:23,
84:24, 86:14,
89:22, 90:7,
91:16, 116:1,

116:25, 130:3,
147:15, 157:5,
157:25, 165:8,
168:9, 169:2,
169:11, 187:8,
191:8, 201:24,
202:6, 203:13
**scattered**
118:1
**schadel**
207:12, 207:13
**screen**
77:25, 84:21,
153:1, 153:5,
157:2, 186:23,
190:14, 194:7
**scroll**
102:14, 113:19
**sec**
135:23
**second**
75:14, 91:18,
137:9, 158:5,
158:14, 177:5,
185:3, 185:17,
186:23, 190:25,
191:5, 191:6,
203:15, 204:23,
208:4
**second-to-last**
162:11
**seconds**
151:13, 204:22,
208:6
**section**
85:20, 85:23,
93:15, 102:15,
106:14, 110:25,
116:1, 116:4,
136:18, 140:2
**see**
77:25, 80:24,
84:21, 85:4,
85:6, 85:22,
85:24, 86:1,
86:5, 94:2,
94:7, 98:18,
102:14, 102:16,

102:20, 106:18,
107:13, 109:4,
112:7, 116:2,
117:1, 120:25,
121:8, 121:19,
121:20, 122:5,
124:10, 124:15,
137:10, 140:4,
141:10, 142:8,
142:18, 147:4,
147:15, 157:2,
158:22, 163:14,
163:15, 164:25,
165:3, 165:10,
168:7, 174:16,
178:1, 186:23,
187:9, 190:14,
194:7
**seeing**
122:14, 131:11,
131:12, 180:3
**seek**
169:18
**seeking**
170:3, 170:6,
170:7
**seem**
122:12
**seems**
107:11
**seen**
137:15, 147:12,
157:12, 157:13,
187:12, 191:3,
201:15
**selling**
129:12
**sells**
101:19
**send**
92:4, 92:6,
183:3
**sent**
92:1, 92:7
**separate**
135:7, 167:19,
179:12
**separation**
139:9

**september**
122:25, 123:4,
124:11, 136:19,
136:23, 137:6,
143:17, 154:25,
155:2, 185:3
**served**
160:14
**servicer**
88:11
**set**
130:7, 178:10,
179:14, 179:16
**setting**
178:14, 186:1
**settlement**
132:13, 134:3,
134:4, 134:12,
134:18, 135:5,
135:8, 135:14,
135:15, 135:17,
137:4, 137:12,
137:17, 139:23,
140:8, 140:14,
140:23, 141:3,
141:17, 142:2,
142:13, 142:20,
144:20
**settling**
135:15
**seven**
118:18
**several**
131:23, 160:20,
191:22
**shall**
77:6
**shares**
128:21, 129:3,
129:4, 129:12,
135:18, 137:22,
175:14
**sheet**
75:16, 201:5,
201:14, 203:10
**shell**
164:9
**shit**
150:17, 184:8

**short**
103:7, 130:21
**shot**
181:24, 182:2
**shots**
175:22, 183:2
**should**
114:4, 117:11,
150:21, 154:16,
154:19, 162:20
**show**
78:24, 84:5,
90:17, 107:11,
146:6, 154:1,
156:23, 168:6,
177:20, 185:16,
186:19, 186:22,
190:13, 194:3,
200:22, 201:1
**showed**
185:23
**showing**
83:5, 84:17,
129:17, 134:18,
146:23, 201:11,
203:11
**shows**
133:17
**sick**
145:21
**side**
139:12, 177:25,
189:7
**sign**
139:14, 162:22,
166:13
**signature**
157:16, 168:22
**signature-5tm1q**
210:12
**signature-b7fzp**
209:16
**signed**
83:2, 129:6,
139:7, 139:10,
139:11, 139:22,
140:23, 166:9,
166:19, 168:24

**sigouin**
185:25
**simple**
149:22, 149:23,
184:2
**simpler**
184:24, 186:4
**since**
131:16, 136:5,
143:17, 144:22,
185:10, 206:3
**single**
85:5, 96:13,
97:10, 97:14,
98:3
**sir**
97:13, 115:7,
115:15, 115:17,
120:20, 122:1,
139:9, 140:5,
141:15, 142:4,
142:14, 142:19,
142:21, 144:13,
147:14, 149:5,
149:20, 157:3,
157:10, 161:2,
162:18, 164:20,
165:4, 165:11,
168:20, 179:9,
180:21, 187:10,
190:11, 190:15,
191:14, 193:16,
194:8, 196:16,
196:23, 197:3,
198:10, 200:19,
200:21, 204:4,
205:25, 208:10
**sit**
87:5, 88:25,
93:5, 101:23,
110:14, 117:13,
118:21, 119:12,
120:21, 150:7,
150:14, 185:20
**sites**
182:4
**sitting**
83:20

situation
147:17, 147:21
six
114:18
skills
209:11, 210:8
slightly
79:1, 119:11,
161:18, 178:13,
200:3
slower
97:20
smaller
178:21
smart
157:7, 162:6,
163:6, 163:9,
163:10, 163:13,
163:20, 164:3,
164:6, 164:8,
164:9, 164:11,
164:17, 165:8,
165:12, 193:10,
206:2, 207:2,
207:19
smart's
167:13, 205:23
smog
86:4, 87:9,
88:19, 89:2,
91:20, 91:25,
92:3, 92:10
social
170:21
sold
129:4
solely
83:14
solicit
173:9, 175:11
solicited
171:13, 172:3
soliciting
171:15
some
77:23, 85:5,
85:25, 90:4,
92:19, 92:21,

128:25, 145:16,
153:21, 171:25,
201:17, 207:18
somebody
88:13, 147:23
somehow
175:5
someone
148:19, 205:12
something
80:25, 81:1,
86:17, 88:14,
94:25, 101:21,
108:11, 150:2,
178:4
soon
81:22
sooner
203:22
sorry
86:20, 88:21,
89:13, 92:20,
99:19, 103:16,
104:16, 106:9,
110:5, 119:24,
123:2, 125:2,
136:11, 143:21,
146:3, 146:9,
146:10, 154:6,
154:11, 157:5,
158:11, 158:22,
158:25, 164:23,
169:22, 171:22,
177:23, 178:6,
179:9, 180:15,
182:12, 196:20,
197:23, 198:23,
202:16, 207:25
sort
88:1, 172:9
sought
199:3
sound
88:13, 205:10
sounds
181:23, 181:24,
205:11
speaking
174:23

special
158:13
specific
87:11, 88:5,
88:6, 89:1,
97:1, 102:8,
110:9
specifically
87:19, 88:16,
89:4, 92:2,
108:15, 110:10,
120:22, 129:10,
143:23
speculation
79:8, 80:8,
104:12, 126:19,
127:9, 131:2,
145:3, 149:15,
156:3, 160:4,
179:25, 189:13,
198:12, 200:14,
206:13
speed
85:17
spell
89:13
spelled
138:25
spelling
205:14
spend
89:25, 107:3,
184:7
spending
98:20
spent
89:15, 89:21,
175:24, 177:3,
184:9
spin
192:15
spinning
193:15
spinoff
165:2, 165:5,
167:14, 192:16
spitting
163:22

spoke
151:22
spoken
167:5
spolar
210:2, 210:14
sponsored
106:25
sponsors
108:19, 113:3
sporting
97:25, 98:7,
98:13
spreadsheet
201:4, 201:13,
201:24
squared
144:2
squashed
138:2, 184:18,
185:21
st
153:16
stacking
143:20
stamp
194:12
standard
199:23
start
135:19, 189:9
started
130:18, 133:3,
159:15, 186:2
state
73:14, 76:13,
78:10, 93:9,
132:7, 142:22,
143:7, 145:1,
149:11, 156:2,
160:3, 198:11,
200:13, 206:11,
209:19
statement
94:8, 99:20,
100:17
statements
75:9, 81:10,

100:20, 171:4
**states**
72:1, 76:5,
106:4
**stay**
132:15, 133:5
**staying**
92:25
**steal**
88:14
**stealing**
81:18
**stick**
79:3, 82:1,
96:4, 149:5,
189:7
**still**
86:12, 86:14,
94:11, 114:12,
121:5, 138:1,
159:19, 159:20,
164:7, 164:8,
164:9, 180:16,
180:19, 193:25,
194:16
**stipulate**
77:7
**stipulation**
77:6, 197:5
**stock**
175:14
**stockton**
86:4, 94:18
**stop**
132:18
**stopping**
146:13
**store**
115:2, 115:11
**stow**
100:2
**straight**
111:24, 133:10
**stretch**
203:18
**strike**
80:12, 105:18,
167:10, 181:8

**stuff**
106:6, 111:14,
167:25, 182:3,
184:4, 200:10
**stupid**
184:8
**style**
100:2
**subject**
190:25
**submit**
91:24, 92:23,
94:1, 99:16,
99:21
**subsidiaries**
205:24
**subsidiary**
164:11, 206:3,
207:17
**substantiate**
97:2, 97:12,
97:15, 99:17,
102:9
**sue**
135:11
**suite**
74:7, 74:16
**supervision**
210:6
**supplemental**
177:10, 178:19,
181:10, 186:16
**supplier**
108:7
**suppliers**
108:18
**supposed**
118:18, 137:24,
138:10, 150:2,
169:9, 185:15
**sure**
92:15, 92:24,
99:1, 100:25,
101:5, 104:9,
104:18, 109:8,
118:22, 119:12,
120:14, 123:18,
128:22, 131:21,

133:9, 138:3,
139:19, 140:21,
152:20, 156:9,
158:19, 173:7,
174:21, 176:8,
180:18, 181:7,
181:16, 196:18,
197:24, 197:25,
203:17, 205:13,
206:5, 207:1
**suspect**
123:13
**suspend**
162:5, 164:5
**suspended**
162:12, 162:19,
163:19, 165:2,
180:13, 180:16,
180:19, 180:22,
180:23, 184:13,
184:25, 185:10,
185:18
**suspension**
180:25
**sustain**
188:12
**swear**
77:9
**sworn**
76:21, 77:13,
209:5

**T**

**tagged**
86:9
**take**
90:4, 99:16,
106:5, 110:1,
110:3, 110:4,
110:17, 110:20,
111:25, 143:19,
143:25, 144:1,
144:3, 150:6,
151:3, 151:11,
152:17, 168:5,
170:17, 197:4
**taken**
78:23, 84:12,

100:23, 101:2,
101:6, 123:19,
145:15, 159:17,
159:18, 159:21,
176:8, 209:4
**takeover's**
80:4, 82:6,
102:10, 129:20,
130:14, 130:24,
130:25, 131:6,
131:19, 148:25,
153:15, 168:2,
169:8, 170:7,
170:12, 170:25,
171:7, 201:18,
202:10, 202:24,
203:10
**taking**
94:24, 165:21,
167:11, 206:8,
206:25
**talk**
83:19, 88:16,
134:16, 151:5,
172:25, 173:18,
173:19, 173:20,
175:4, 184:22,
204:22
**talked**
85:13, 136:5,
148:3, 149:3,
172:2
**talking**
80:18, 92:2,
103:12, 109:12,
121:5, 126:22,
139:20, 152:2,
160:19, 166:15,
173:6, 174:25,
196:17, 198:23,
199:24, 199:25,
207:11, 207:13
**taxes**
124:15, 124:21,
124:23, 125:6,
125:8, 125:11,
125:15, 125:19,
126:7

team
131:12, 163:23
tell
78:14, 79:9,
83:12, 86:8,
86:23, 87:3,
89:24, 93:22,
94:12, 94:20,
94:21, 95:16,
100:18, 101:20,
103:13, 107:22,
109:17, 112:20,
114:25, 117:5,
122:14, 122:17,
124:3, 131:3,
132:20, 145:16,
148:23, 149:1,
149:8, 150:8,
152:3, 170:23,
171:7, 175:20,
182:16, 186:17,
195:12, 196:1,
199:14
telling
88:4, 94:3,
99:12, 101:3,
114:6, 125:7,
125:10, 125:12,
125:20, 126:14,
126:24, 128:3,
135:6, 138:14,
138:16, 139:21,
152:12, 163:8,
172:10, 186:5,
186:13, 197:1
tells
194:13
temporary
156:1, 156:10
term
87:18
terminated
169:10
terms
131:22, 164:14,
166:2, 166:8,
198:2
testified
77:15, 129:20,

131:23, 206:16
testify
77:13
testimony
77:8, 105:19,
128:2, 129:23,
132:1, 135:2,
140:10, 143:3,
144:11, 167:2,
167:6, 172:7,
176:17
th
92:17, 119:24,
123:21, 140:3,
140:13, 195:12,
196:1, 196:6,
196:22, 197:2
thank
85:11, 88:23,
110:7, 146:20,
158:21, 168:13,
187:6, 201:8,
208:9
thanks
97:21, 208:12
themselves
76:13
thereafter
209:7
thereby
169:9
thing
115:3, 174:16,
177:6, 189:8,
193:10
things
85:18, 138:8,
148:21, 162:22,
165:24, 166:23,
180:3, 207:8,
208:2
think
80:18, 85:13,
118:11, 137:25,
138:15, 143:3,
145:6, 150:11,
159:4, 159:6,
169:9, 174:18,

175:8, 175:21,
182:25, 196:24,
198:16, 203:16,
203:25, 205:18
thinking
154:6, 154:7
third
193:22
thought
143:21, 148:10,
171:22, 171:25,
173:17, 176:10,
177:20, 197:14,
197:16
thousand
121:19, 121:24
threatened
135:9
three
82:20, 92:22,
93:22, 102:18,
103:21, 114:3,
149:4, 155:12,
155:14, 166:10,
171:17, 177:12,
178:3, 178:11,
178:15, 178:21,
179:11, 179:16
through
79:2, 82:20,
84:3, 84:25,
85:4, 85:5,
96:4, 105:3,
105:5, 111:22,
111:23, 114:22,
122:15, 123:14,
124:4, 125:17,
135:23, 135:24,
138:8, 139:2,
143:6, 162:2,
165:16, 168:25,
169:25, 170:1,
184:25, 185:3,
185:12, 186:6,
193:3, 208:3
throughout
106:4
throw
175:25

thrown
78:21, 194:2
till
183:8
time
76:6, 85:14,
89:12, 90:10,
92:1, 92:8,
96:1, 96:18,
97:11, 102:11,
103:8, 104:4,
105:2, 105:5,
105:11, 107:17,
109:10, 109:24,
110:2, 110:16,
118:16, 120:18,
130:24, 138:6,
143:4, 146:13,
148:7, 151:9,
152:22, 152:25,
153:10, 153:13,
156:18, 156:22,
160:1, 171:19,
173:5, 173:16,
174:5, 178:7,
184:16, 185:5,
185:13, 186:7,
191:6, 199:12,
203:4, 204:25,
205:3, 206:7,
208:16
times
132:4, 171:17
tire
86:4, 87:9,
88:19, 89:2,
91:20, 92:10
titled
78:3
toby
72:14, 73:1,
75:2, 76:3,
76:16, 77:12,
85:21, 93:14,
97:20, 102:15,
106:14, 119:1,
119:3, 134:15,
134:18, 151:4,

151:14, 153:4,
156:5, 156:20,
169:6, 180:1,
183:17, 188:14,
189:14, 189:21,
200:14, 202:18,
208:16

**today**
76:9, 76:19,
79:3, 81:25,
83:20, 87:6,
88:25, 93:5,
101:23, 110:15,
111:15, 117:13,
118:21, 119:12,
120:21, 205:24

**today's**
76:7

**told**
78:18, 111:18,
118:11, 130:10,
131:13, 151:23,
163:25, 177:14,
196:8, 196:20,
197:14, 197:16

**tom**
130:3, 131:13,
131:14, 131:15,
139:13, 139:15,
139:22, 148:2,
148:3

**tom's**
131:14

**took**
81:22, 87:3,
96:23, 110:10,
110:14, 110:16,
135:24, 138:23,
147:25, 148:1,
154:7, 165:15,
167:24, 189:4

**top**
84:23, 157:4,
163:13, 165:17,
202:3

**total**
113:22, 137:24,
137:25, 138:10,

139:9, 178:18,
179:18, 201:25,
202:6

**totaled**
109:20

**totaling**
181:10

**totally**
180:24

**totals**
178:3

**touched**
81:16, 192:13

**tracking**
138:3

**traded**
193:2

**transaction**
91:17, 91:20,
129:9, 165:10,
165:14

**transactions**
143:6

**transcriber**
210:1

**transcript**
75:7, 77:2,
181:7, 210:3,
210:6

**transcript's**
196:18

**transcriptionist**
96:11, 209:8

**transfer**
116:5, 116:6,
116:16, 120:1,
121:9, 121:18,
122:3, 141:23

**transferred**
117:14

**transferring**
116:9

**transfers**
121:22, 122:14,
126:1, 127:5,
127:25

**trevor**
174:14

**tried**
81:21, 111:25,
144:3, 150:6,
162:2, 185:24,
186:1

**trip**
108:16, 108:21,
115:10, 174:11,
174:24, 195:18,
195:19, 195:23

**triple-checked**
139:4

**truck**
86:8, 94:24,
95:5, 98:22

**true**
95:24, 96:21,
96:24, 96:25,
102:1, 115:1,
209:10, 210:6

**truth**
77:14, 77:15,
150:1

**try**
88:21, 110:6,
122:16, 142:4,
184:7, 189:5,
201:22

**trying**
81:24, 83:24,
83:25, 88:14,
130:6, 136:9,
137:9, 144:2,
147:24, 158:18,
166:14, 192:21

**tucker**
81:15, 81:16,
82:13, 83:24,
84:8, 84:9,
84:12, 84:13,
84:15, 102:23,
103:18, 105:20,
108:22, 111:25,
117:11, 120:15,
121:15, 121:22,
122:11, 123:22,
127:7, 127:14,
128:1, 128:15,

130:7, 145:17,
147:3, 154:20,
157:22, 157:23,
158:1, 158:2,
158:3, 160:13,
160:16, 161:17,
165:21, 165:22,
166:1, 166:6,
171:2, 172:14,
173:2, 173:4,
173:8, 173:14,
175:1, 175:2,
176:25, 183:15,
183:18, 194:25,
195:2, 195:3,
196:7, 196:15,
196:20, 196:25

**tucker's**
84:13, 204:14

**twice**
99:10, 132:5,
148:3, 175:3

**two**
82:21, 82:25,
83:3, 84:1,
86:2, 89:3,
90:20, 100:8,
100:21, 103:3,
109:19, 109:24,
111:23, 113:21,
117:17, 120:4,
136:1, 139:2,
149:3, 151:10,
151:15, 166:9,
166:20, 166:21,
171:17, 174:1,
174:4, 174:23,
176:14

**type**
177:11, 193:10

**typewriting**
209:7, 210:5

**typically**
107:15, 135:15

**U**

**unauthorized**
80:3, 80:14,

80:16, 80:20,
81:6, 82:5
**unaware**
153:25
**under**
77:5, 207:6,
207:10, 210:5
**underneath**
121:1
**understand**
77:2, 113:12,
135:20, 164:10,
164:22, 166:15,
175:8, 175:12,
179:4
**understanding**
137:13, 137:16,
138:9, 147:17,
159:19, 193:1
**understood**
107:1, 134:22,
174:25, 188:8
**undertake**
165:9
**unfortunately**
144:5, 155:21,
155:22, 155:24
**united**
72:1, 76:5,
106:4
**unless**
122:20, 177:25
**unraveled**
161:10
**unraveling**
161:10
**until**
81:17, 96:10,
130:20, 144:18,
171:25, 175:16,
183:13, 185:22
**untrue**
80:9
**upfront**
137:21, 137:23,
140:17
**use**
77:7, 100:7,

100:9, 101:18,
111:8, 114:20,
115:8, 115:18,
130:5, 130:6,
175:18
**uses**
77:4
**using**
87:18, 148:25,
149:10, 162:21

## V

**vague**
87:18, 127:10,
148:11, 190:8,
192:18
**value**
118:17
**van**
108:16
**vary**
118:20
**vegas**
74:17, 185:16
**vehicle**
86:10, 86:12,
86:18, 87:13,
87:14, 87:16
**verified**
75:15, 194:9
**veronica**
160:15, 160:23,
161:11
**veronica's**
204:14
**versions**
204:6
**versus**
193:9
**via**
74:10, 74:19,
157:9, 158:1,
177:8, 177:11
**video**
76:8, 76:11
**videoconference**
74:10, 74:19
**videographer**
74:25, 76:2,

76:9, 76:18,
152:21, 152:24,
153:6, 153:9,
153:12, 204:24,
205:2, 208:13,
208:15
**videotaped**
72:14
**virtually**
72:16, 73:1
**vista**
106:16
**voice**
76:12
**void**
81:20
**volume**
72:15
**vote**
155:16, 155:20,
162:5, 163:6,
184:1
**voted**
81:17, 153:22,
159:23, 184:5
**voting**
167:22, 184:15,
185:6
**vs**
72:6

## W

**w-y-a-t-t**
205:9
**wait**
88:21, 96:10,
110:6, 156:20,
176:7
**walk**
135:7
**walked**
134:3
**walking**
135:21, 135:22,
203:19
**want**
85:4, 85:5,
85:25, 86:2,

92:12, 100:25,
110:24, 115:23,
133:19, 139:19,
140:1, 143:7,
147:10, 149:24,
149:25, 172:22,
173:7, 174:8,
175:7, 177:5,
178:1, 179:17,
180:17, 189:6,
195:6, 204:22,
208:2
**wanted**
89:6, 91:22,
93:13, 93:16,
97:23, 99:25,
101:12, 102:16,
106:9, 106:12,
112:4, 113:18,
113:20, 119:22,
121:7, 121:17,
130:21, 135:18,
140:21, 147:2,
172:20, 173:11,
174:2, 175:6,
175:12, 189:6
**wash**
98:17, 98:21,
99:6, 99:9
**water**
93:1, 93:4,
130:16, 130:18
**way**
91:15, 123:22,
125:5, 132:15,
135:23, 140:19,
147:22, 159:18,
159:21, 164:10,
167:19, 175:12,
181:13, 185:3,
187:1, 200:24
**ways**
136:1
**we'll**
79:2, 81:25,
96:4, 146:8,
151:12
**we're**
80:18, 81:20,

| | | | |
|---|---|---|---|
| 100:17, 102:13,<br>108:7, 108:13,<br>113:19, 114:12,<br>119:25, 122:17,<br>123:24, 134:20,<br>136:18, 143:5,<br>149:6, 164:1,<br>173:6, 194:1,<br>196:17, 203:21<br>**we've**<br>85:20, 93:14,<br>98:16, 102:12,<br>102:19, 106:15,<br>109:2, 111:1,<br>112:5, 113:25,<br>114:13, 122:3,<br>141:23, 146:23,<br>155:7<br>**weber**<br>100:1, 100:2<br>**website**<br>170:12, 170:19,<br>170:21<br>**weeds**<br>164:12, 193:5<br>**week**<br>107:4, 107:7,<br>119:25, 148:4,<br>176:14, 185:2,<br>185:3, 185:17<br>**weekly**<br>117:21, 118:15<br>**weeks**<br>120:4, 155:12,<br>155:14, 174:1,<br>174:4, 174:24<br>**went**<br>88:9, 99:22,<br>107:8, 111:22,<br>112:10, 112:16,<br>112:23, 113:2,<br>123:22, 174:18,<br>175:21, 175:22,<br>199:21<br>**weren't**<br>107:18, 150:16,<br>160:25, 161:4,<br>161:24 | **wh**<br>86:4<br>**whatever**<br>85:17, 88:11,<br>118:15, 130:3,<br>131:13, 133:13,<br>154:17, 177:15,<br>178:21<br>**whatsoever**<br>206:1<br>**wheel**<br>87:9, 88:19,<br>89:2<br>**whenever**<br>140:17<br>**whereas**<br>104:7, 160:19,<br>160:24, 164:22<br>**whereupon**<br>77:11<br>**whether**<br>78:17, 93:4,<br>97:7, 118:14,<br>125:6, 125:18,<br>165:12, 180:10,<br>181:13, 193:9,<br>199:2<br>**white**<br>119:17<br>**whoever**<br>180:4<br>**whoever's**<br>197:20<br>**whole**<br>77:14, 107:4,<br>129:9, 143:18,<br>148:17, 155:14<br>**why'd**<br>115:8, 115:18<br>**wife**<br>197:6<br>**wire**<br>116:16, 124:1<br>**wisconsin**<br>74:8, 181:22<br>**withdrawal**<br>140:2<br>**withdrawals**<br>116:1, 136:18 | **withheld**<br>125:19, 126:8<br>**withhold**<br>124:15, 124:21,<br>124:25, 125:11,<br>125:15<br>**withholding**<br>125:6<br>**within**<br>100:8, 100:21,<br>114:18, 133:14,<br>176:14<br>**without**<br>80:4<br>**witness**<br>76:20, 77:10,<br>79:9, 80:9,<br>82:8, 97:17,<br>118:25, 119:4,<br>127:11, 131:3,<br>132:10, 134:14,<br>145:5, 148:13,<br>149:13, 149:16,<br>151:2, 151:16,<br>153:3, 156:22,<br>158:13, 158:18,<br>158:20, 158:22,<br>160:6, 178:8,<br>180:2, 181:23,<br>182:15, 183:18,<br>188:15, 188:23,<br>189:15, 189:22,<br>190:2, 190:10,<br>200:15, 202:19,<br>203:21, 206:14,<br>206:22, 208:14<br>**witness(es**<br>209:4<br>**witnesses**<br>131:23<br>**wolf**<br>92:14, 92:25<br>**words**<br>118:9<br>**worked**<br>139:25<br>**working**<br>167:19 | **worried**<br>138:8<br>**would've**<br>99:22, 100:23,<br>111:6, 118:25,<br>120:8, 120:9,<br>123:12, 123:23,<br>125:22, 125:25,<br>128:2, 128:19,<br>134:2, 136:25,<br>137:10, 137:11,<br>140:7, 140:8,<br>143:15, 144:17,<br>144:18, 144:19,<br>155:4, 169:20,<br>170:1, 171:10,<br>171:11, 172:11,<br>172:12, 173:3,<br>177:16, 183:25,<br>184:8, 184:9,<br>184:10, 184:18,<br>185:8, 186:14,<br>188:2, 195:22,<br>195:23<br>**wouldn't**<br>95:18, 95:25,<br>96:18, 117:4,<br>130:22, 132:2,<br>160:15, 173:12,<br>176:23, 178:23,<br>184:15<br>**written**<br>75:12, 77:6,<br>88:1, 108:25,<br>128:25, 138:25,<br>168:9, 169:15,<br>169:19, 170:8,<br>179:12<br>**wrong**<br>81:4, 91:15,<br>119:24, 174:3<br>**wrongfully**<br>148:20, 148:25,<br>149:10<br>**wyatt**<br>205:9, 205:16<br>**Y**<br>**yankee's**<br>114:14 |

**yeah**
77:20, 78:1,
85:19, 86:21,
99:10, 107:18,
127:15, 135:7,
139:25, 142:10,
142:19, 145:13,
146:15, 146:18,
147:19, 148:21,
151:2, 152:17,
154:11, 154:16,
156:15, 158:6,
158:18, 158:19,
159:8, 163:15,
164:16, 164:18,
168:8, 174:20,
176:12, 177:17,
177:24, 178:2,
179:3, 182:20,
182:21, 185:2,
186:24, 189:15,
193:11, 193:20,
194:1, 195:10,
195:24, 197:15,
197:19, 198:1,
198:10, 200:2,
200:9, 201:21,
206:5
**year**
99:10, 118:12,
120:4, 124:24,
125:9, 128:14,
128:17, 132:25,
133:10, 133:11,
143:18, 154:13,
185:15
**years**
83:4, 92:22,
93:22, 117:17,
133:13
**yep**
84:22, 85:10,
86:6, 98:19,
99:24, 102:21,
107:14, 109:5,
115:3, 115:5,
116:3, 117:2,
122:6, 134:6,

136:21, 141:12,
147:8, 180:9
**yesterday**
129:20, 201:3,
201:6
**york**
114:14
**yourself**
147:9, 176:19

---
**Z**
---

**zarro**
129:20, 139:15,
139:22, 148:2,
191:18
**zarro's**
129:23
**zelle**
116:13, 116:15,
116:16, 117:9,
121:21
**zero**
116:17, 117:9,
123:25, 124:6,
124:8, 124:9
**zeros**
85:16
**zoom**
98:17, 99:9,
154:16, 191:24,
192:4
**zooms**
191:23, 191:24,
192:4

---
**$**
---

**$1,000**
86:3, 87:8,
87:12, 94:17,
95:23, 96:14
**$1,000,000**
199:22, 207:14
**$1,200**
102:19, 109:14
**$10,000**
116:7, 116:10,
117:14, 118:22,
119:13, 120:2,

120:22, 124:11,
128:12, 129:1,
129:11, 135:4,
136:3, 136:14
**$111**
93:17
**$15,000**
138:15
**$2,000**
86:17, 95:5,
109:20, 114:1,
142:16
**$2,016,697**
203:12
**$20,000**
120:5
**$240,000**
118:12
**$243,000**
78:7, 79:21
**$243,253.84**
79:16, 79:25
**$262**
98:17
**$262.49**
98:21
**$281**
111:1
**$3,000**
142:8
**$3,200**
143:11
**$3,923,492.91**
202:7
**$300**
92:13
**$342**
114:14
**$374.44**
97:25
**$4,000**
141:11
**$40,000**
120:8
**$404.32**
89:8
**$434**
89:15, 89:21,

89:25
**$45,000**
138:11
**$450**
124:9, 126:14
**$472.46**
100:1
**$477.44**
101:13
**$5,000**
122:4, 122:7,
136:20, 136:22,
140:3, 141:24
**$550**
113:22
**$6,400**
107:3, 108:2
**$6,463.95**
106:16
**$7,500**
121:9, 121:12
**$726**
109:3
**$750,000**
81:7, 82:6,
83:11

---
**.**
---

**.0777**
74:18
**.2100**
74:9

---
**0**
---

**00012**
85:10
**01**
152:25, 153:10
**02013**
72:7, 76:7
**05**
153:13
**06**
204:25
**08**
72:18, 76:8
**09**
205:3

**1**

**1.5**
175:18, 175:24,
177:7, 178:10,
178:14, 179:11
**10**
75:16, 91:21,
92:3, 93:17,
119:24, 120:12,
120:23, 123:2,
123:4, 142:8,
142:15, 146:13,
146:15, 151:8,
152:19, 152:25,
153:10, 153:13,
200:25, 201:2,
201:12, 202:15,
203:6, 203:7
**10,000**
129:14
**100**
130:19
**11**
168:22, 204:25,
205:3, 208:17,
208:18
**1100**
74:7
**112**
112:5
**12**
85:17, 86:3,
86:24, 92:3,
92:13, 123:1,
124:7, 143:11,
154:12
**127**
113:19
**13**
86:3, 94:17,
106:15, 107:12,
122:23
**14**
85:22, 91:22,
122:3, 122:8,
122:21, 208:17,
208:18

**146**
75:10
**15**
105:16, 105:21,
110:25, 122:22,
123:21, 137:25,
138:5, 146:14,
146:15, 151:8,
203:25, 204:2,
208:6
**150,000**
130:19
**156**
75:11
**16**
86:24, 123:1
**168**
75:12
**17**
112:5
**187**
75:13
**19**
91:24, 92:17,
122:23, 123:1,
143:11, 144:6,
144:10
**190**
75:14
**194**
75:15
**197**
143:10
**1st**
114:13, 123:20

**2**

**20**
92:13, 92:17,
100:1, 105:16,
105:21, 122:22,
122:24, 138:1,
138:7, 153:16,
154:4, 154:13,
181:11, 184:3,
185:1, 203:25
**200**
207:7

**201**
75:16
**2020**
94:17
**2021**
78:21, 84:25,
86:3, 91:3,
91:8, 99:5,
129:22, 148:14,
148:16, 153:16,
154:4, 154:12,
154:13, 154:22,
154:25, 155:2,
155:15, 159:22
**2022**
75:16, 78:4,
85:1, 91:12,
93:17, 97:24,
100:1, 102:18,
105:11, 106:15,
109:13, 112:5,
113:22, 114:8,
114:13, 116:10,
117:15, 118:3,
118:23, 119:9,
119:14, 119:25,
120:12, 120:23,
121:8, 121:13,
121:18, 121:25,
122:3, 122:8,
122:20, 123:2,
124:7, 131:5,
133:6, 133:7,
133:12, 138:21,
143:11, 144:6,
144:11, 147:3,
148:6, 148:19,
148:23, 149:8,
151:18, 152:6,
152:12, 155:5,
155:6, 157:8,
157:19, 158:2,
159:24, 168:19,
179:22, 180:8,
180:20, 181:11,
185:1, 186:7,
187:6, 194:13,
194:17, 195:12,

195:22, 196:1,
196:6, 196:22,
197:2, 201:5,
201:15, 202:2,
202:24, 203:10
**2023**
123:3, 125:18,
128:11, 131:16,
133:6, 133:8,
134:1, 135:3,
135:4, 136:4,
136:15, 136:19,
136:23, 137:6,
137:7, 140:3,
140:11, 140:13,
141:10, 142:16,
144:22, 197:7,
197:17, 198:3
**2024**
72:17, 76:8,
209:20, 210:16
**21**
89:7, 97:24,
98:16, 98:17,
118:7, 122:24,
123:4, 130:12,
136:19, 153:16,
154:4, 154:5,
154:12, 154:13,
174:20, 174:21
**210**
72:24
**211**
142:7
**22**
72:7, 72:17,
76:7, 76:8,
98:17, 100:1,
122:25, 124:11,
133:22, 136:6,
137:9, 155:4,
181:11, 184:14,
184:15, 184:25,
185:1, 185:12,
185:13, 186:6,
190:21
**222**
141:23

**23**
113:22, 115:25,
132:24, 133:12,
137:9
**234**
141:9
**235**
140:2
**24**
101:13, 119:23,
122:19, 122:21
**240**
155:7
**25**
78:4, 195:12,
196:1, 196:6,
196:9, 196:22,
197:2
**26**
122:23
**27**
121:8, 121:13,
122:24, 123:4,
140:3, 140:13
**28**
122:25
**29**
109:2, 109:10,
109:16, 122:22
**2:cv**
72:7, 76:7
**2nd**
121:25

**3**

**3.9**
202:25
**30**
138:1, 138:7,
151:13, 162:13,
204:21, 208:6
**300**
136:17
**31**
122:15, 124:5,
126:1, 143:3,
201:5, 201:14,
202:2, 202:24,

203:10
**32**
93:14
**3200**
143:20
**329,000**
201:25, 203:1
**334**
128:10
**338**
201:7, 201:13
**35**
138:11
**36**
201:24
**386,000**
179:22
**39**
121:16
**3rd**
109:13, 116:4,
116:10, 117:15,
119:14, 119:25

**4**

**40**
122:2
**400**
74:16, 124:8,
174:3
**414.273**
74:9
**46**
152:22
**47**
102:13, 102:14
**4th**
180:20

**5**

**5-hour**
185:20, 185:25
**500**
207:7
**500,000**
177:9, 178:17,
179:18, 181:11
**511**
74:6

**53**
85:3, 85:22
**53202**
74:8
**559923**
72:23
**560**
146:25

**6**

**61**
203:9
**64**
106:13
**6980**
74:15

**7**

**700**
87:14
**702.333**
74:18
**72**
72:24
**77**
75:3
**78**
110:25
**7th**
84:25

**8**

**8**
72:18, 76:8
**84**
75:9
**85**
202:5
**89117**
74:17
**8th**
84:25, 186:25,
187:6, 194:13,
194:17, 195:22

**9**

**9**
152:22

**9-**
137:9
**90**
165:2
**960**
100:1
**98**
117:18
**99**
196:11