# EXHIBIT 5

# EXHIBIT A

## CONVERTIBLE NOTE PURCHASE AGREEMENT

This Convertible Note Purchase Agreement (this "**Agreement**"), dated as of May 25, 2022 (the "**Effective Date**"), is entered into among Takeover Industries, Inc., a Nevada corporation (the "**Company**"), James V. Deppoleto Jr., an individual ("**Purchaser**"), and for the limited purposes provided in Sections 4 and 8.5, Labor Smart, Inc., a Nevada corporation and majority shareholder of the Company ("**Labor Smart**").

**WHEREAS**, subject to the terms and conditions set forth in this Agreement, the Company wishes to issue and sell to the Purchaser, and the Purchaser wishes to purchase from the Company, a secured convertible promissory note in exchange for the consideration provided below.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.   <u>Purchase and Sale of Note</u>. In exchange for Five Hundred Thousand Dollars ($500,000) (the "**Consideration**") paid by Purchaser, the Company shall sell and issue to Purchaser a secured convertible promissory note in the form attached hereto as <u>Exhibit A</u> (the "**Note**"). The Note will have a principal balance in the amount of the Consideration.

2.   <u>Closing</u>. The closing of the sale of the Note in return for the Consideration (the "**Closing**") will take place remotely via the exchange of documents and signatures on the Effective Date. At the Closing, Purchaser will deliver the Consideration to the Company, and the Company will deliver the Note to Purchaser and well as a certificate executed by a duly authorized officer of the Company certifying (i) the Certificate of Incorporation and Bylaws of the Company as in effect at the Closing, (ii) resolutions of the Board of Directors of Company (the "**Board**") approving the Agreement and the transactions contemplated under the Agreement, and (iii) resolutions of the stockholders of the Company approving the Agreement.

3.   <u>Conversion</u>. The Note will be convertible into Conversion Shares pursuant to this Section 3.

3.1   <u>Optional Conversion upon Next Equity Financing</u>. Upon the closing of a Next Equity Financing that does not amount to a Qualified Equity Financing, the principal balance and unpaid accrued interest on the Note (the "**Outstanding Balance**") will convert into Conversion Shares, but only at the option of the Lender in its sole discretion. The number of Conversion Shares the Company shall issue upon such conversion will equal the quotient (rounded up to the nearest whole share) obtained by dividing (x) the Outstanding Balance on a date that is no more than five (5) days prior to the closing of such Next Equity Financing by (y) the applicable Equity Financing Conversion Price. At least ten (10) days prior to the closing of a Next Equity Financing, the Company will notify the Purchaser in writing of the terms of the Equity Securities that are expected to be issued in such financing. The issuance of Conversion Shares pursuant to the conversion of the Note will be on, and

HB: 4892-6440-8352.4




subject to, the same terms and conditions applicable to the Equity Securities issued in the Next Equity Financing.

3.2    Mandatory Conversion upon Qualified Equity Financing. The Outstanding Balance shall automatically convert into Conversion Shares upon the occurrence of a Qualified Equity Financing (effective in connection with the initial closing of such Qualified Equity Financing). The number of Conversion Shares the Company issues upon such conversion will equal the quotient (rounded up to the nearest whole share) obtained by dividing (x) the Outstanding Balance on a date that is no more than five (5) days prior to the closing of the Qualified Equity Financing by (y) the applicable Equity Financing Conversion Price. At least ten (10) days prior to the closing of the Qualified Equity Financing, the Company will notify the Purchaser in writing of the terms of the Equity Securities that are expected to be issued in such financing. The issuance of Conversion Shares pursuant to the conversion of the Note will be on, and subject to, the same terms and conditions applicable to the Equity Securities issued in the Qualified Equity Financing.

3.3    Corporate Transaction Conversion. In the event of a Corporate Transaction prior to the conversion of the Note pursuant to Section 3.1, Section 3.2 or Section 3.4 or the repayment of the Note, at the closing of such Corporate Transaction, the Purchaser may elect that either: (a) the Company will pay the Purchaser an amount equal to the Outstanding Balance plus one-times (1x) the outstanding principal amount of the Note; or (b) the Outstanding Balance will convert into that number of fully paid and non-assessable Conversion Shares equal to the quotient (rounded up to the nearest whole share) obtained by dividing (x) the Outstanding Balance on a date that is no more than five (5) days prior to the closing of such Corporate Transaction by (y) at a price per share determined such that, after the Follow-On Investment were made, the Purchaser would hold twenty-five percent (25%) of the Company after factoring in the Fully-Diluted Capitalization (excluding from such calculation the unused portion of any equity incentive plans) as of immediately prior to such Corporate Transaction without giving effect to any changes to the capitalization arising from such transaction.

3.4    Maturity Conversion. Notwithstanding any other provision of this Agreement, in the event that, as of the Maturity Date (as may be extended by Purchaser), the Note has not been converted or otherwise repaid, and at the option of the then holder, all of the Outstanding Balance may be converted into fully paid and non-assessable Conversion Shares at a price per share determined such that, after the Follow-On Investment were made, the Purchaser would hold twenty-five percent (25%) of the Company after factoring in the Fully-Diluted Capitalization (excluding from such calculation the unused portion of any equity incentive plans) as of immediately prior to such Maturity Conversion.

3.5    Mechanics of Conversion.

(a)    Financing Agreements. Purchaser acknowledges that the conversion of the Note into Conversion Shares pursuant to Section 3.1, Section 3.2 or Section 3.4 may require the Purchaser's execution of certain agreements relating to the purchase

-2-

and sale of the Conversion Shares, as well as registration rights, rights of first refusal and co-sale, rights of first offer and voting rights, if any, relating to such securities (collectively, the "**Financing Agreements**"). The parties agree that the Financing Agreements will be negotiated between the Company and Purchaser prior to their implementation and Purchaser's obligation to enter into such Financing Agreements and that such agreements are intended to follow the model agreements of the National Venture Capital Association (NVCA).

(b)     <u>Certificates</u>. As promptly as practicable after the conversion of the Outstanding Balance and the issuance of the Conversion Shares, the Company (at its expense) will issue and deliver to the Purchaser a certificate or certificates evidencing the Conversion Shares (if certificated), or if the Conversion Shares are not certificated, will deliver a true and correct copy of the Company's share register reflecting the Conversion Shares held by the Purchaser. The Company will not be required to issue or deliver the Conversion Shares until the Purchaser has surrendered the Note to the Company (or provided an instrument of cancellation or affidavit of loss).

(c)     <u>No Fractional Shares</u>.   Upon the conversion of the Note into Conversion Shares, any fraction of a share will be rounded down to the next whole share of the Conversion Shares.  In lieu of any fractional shares to which the holder of the Note would otherwise be entitled, the Company shall pay the respective Lender cash equal to such fraction multiplied by the Conversion Price.

4.     <u>Representations and Warranties of the Company</u>. In connection with the transactions contemplated by this Agreement, the Company and Labor Smart hereby represent and warrant to the Purchaser as follows:

4.1     <u>Due Organization; Qualification and Good Standing</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify or to be in good standing would have a material adverse effect on the Company.

4.2     <u>Capitalization</u>.  The authorized capital stock of the Company immediately prior to the Closing consists of: (i) 20,000,000,000 shares of $.0001 Par Value Common Stock, 15,063,918,000 shares of which are issued and outstanding prior to the Closing; and (ii) 10,000,000 shares of Preferred Stock (250,000 of which have been designated as Series A Preferred Stock), 160,825 shares of which are issued and outstanding prior to the Closing, in the form of Series A Preferred Stock.  The Fully Diluted Capitalization of the Company as of the date hereof is more particularly set forth on the Company's Capitalization Table, which is set forth on <u>Exhibit B</u>.  The Company does not presently maintain an incentive plan for its employees or advisors that could result in the issuance of stock options, restricted stock, phantom stock rights, or similar rights, and no persons hold any such contingent equity ownership rights.  Upon conversion of the Outstanding Balance to Conversion

-3-

Shares, the Conversion Shares will be fully paid and nonassessable, free and clear of all lien, encumbrances, and similar restrictions (other than customary transfer restrictions).

4.3     Authorization and Enforceability. All corporate action has been taken on the part of the Company, Labor Smart, and their respective officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and the Note. Except as may be limited by applicable bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditors' rights, the Company has taken all corporate action required to make all of the obligations of the Company reflected in the provisions of this Agreement and the Note valid and enforceable in accordance with their terms.   The shares of capital stock issuable upon conversion of the Notes have been authorized or will be authorized prior to the issuance of such shares.

4.4     Governmental Consents. All consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any governmental authority required on the part of the Company in connection with issuance of this Agreement and the Note have been obtained.

4.5     Compliance with Laws. The Company is not in violation of any applicable statute, rule, regulation, order or restriction of any state or federal governmental authority or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its assets.

4.6     Compliance with Other Instruments. The Company is not in violation or default of any term of its Articles of Organization or other governing documents, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ. The execution, delivery and performance of this Agreement and the Note will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder, and delivered copies of them to Purchaser.

4.7     Litigation. There is no action, suit, proceeding or investigation pending or, to the Company's knowledge, threatened in writing against the Company.   The foregoing includes, without limitation, actions pending or, to the Company's knowledge, threatened in writing (or any basis therefore known by the Company) involving the prior employment of

-4-

any of the Company's employees, their use in connection with the Company's business of any information or techniques allegedly proprietary to any of their former employers, or their obligations under any agreements with prior employers. The Company is not a party to, or subject to, the provisions of any order, writ, injunction, judgment or decree of any arbitration panel or tribunal, court or other government agency or instrumentality, other than executive or similar government orders of general societal application. There is no action, suit, proceeding or investigation by the Company currently pending or which the Company intends to initiate.

       4.8    <u>Agreements; Actions</u>**.**  The Company is not in material breach of any agreement.  The Company has not (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) made any loans or advances to any Person, other than ordinary course advances for travel or other business expenses, or (iii) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory or non-exclusive licenses of its technology in the ordinary course of business.

       4.9    <u>Certain Transaction</u>.  The Company is not indebted, directly or indirectly, to any of its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business or employee relocation expenses and for other customary employee benefits made generally available to all employees. None of the Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company.

       4.10    <u>Property</u>**.**  The property and assets that the Company owns are free and clear of all mortgages, deeds of trust, liens, loans and encumbrances, except for statutory liens for the payment of current taxes that are not yet delinquent and encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets. With respect to the property and assets it leases, the Company is in compliance with such leases and holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets. The Company does not own any real property.

       4.11    <u>Tax Returns and Payments</u>.  There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed.  There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency. The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

4.12  <u>Permits</u>.  The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a material adverse effect. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

4.13  <u>Qualified Small Business Stock</u>.  To the knowledge of the Company: (i) the Company will be an eligible gross corporation as defined in Section 1202(e)(4) of the Code, (ii) the Company will not have made purchases of its own stock described in Code Section 1202(c)(3)(B) during the one (1) year period preceding the Closing, except for purchases that are disregarded for such purposes under Treasury Regulation Section 1.1202-2, and (iii) the Company's aggregate gross assets, as defined by Code Section 1202(d)(2), at no time between its incorporation and through the Closing have exceeded $50 million, taking into account the assets of any corporations required to be aggregated with the Company in accordance with Code Section 1202(d)(3).

4.14  <u>Loan</u>.  The Company hereby represents that it intends to use the proceeds of the Notes for the operations of its business and not for any personal, family or household purpose.  The Company hereby represents that its Board, in the exercise of its fiduciary duty, has approved the execution of this Agreement based upon a reasonable belief that the loan provided for herein is appropriate for the Company after reasonable inquiry concerning its financial objectives and financial situation.

4.15  <u>Disclosure</u>.  The Company has made available to the Purchaser all the information that the Lenders have requested from the Company for deciding whether to acquire the Note. No representation or warranty of the Company contained in this Agreement, and no certificate furnished or to be furnished to Purchaser at the Closing contains any untrue statement of a material fact. The materials provided to Purchaser have been prepared in good faith; however, the Company does not warrant that it will achieve any results projected in any such materials.

4.16  <u>Offering</u>. Assuming the accuracy of the representations and warranties of the Purchaser contained in Section 5 below, the offer, issue, and sale of this Agreement and the Conversion Shares are and will be exempt from the registration and prospectus delivery requirements of the Securities Act and all applicable state securities laws.

5.  <u>Representations and Warranties of the Purchaser</u>. In connection with the transactions contemplated by this Agreement, the Purchaser hereby represents and warrants to the Company as follows:

5.1  <u>Authorization</u>. The Purchaser has full power, authority, and capacity to enter into this Agreement and to perform all obligations required to be performed by Purchaser hereunder. This Agreement, when executed and delivered by the Purchaser, will constitute the Purchaser's valid and legally binding obligation, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization,

moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

5.2     <u>Purchase Entirely for Own Account</u>. The Purchaser acknowledges that this Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which the Purchaser confirms by executing this Agreement, that the Note and the Conversion Shares, and any Equity Securities issuable upon conversion of the Conversion Shares (collectively, the "**Securities**") will be acquired for investment for the Purchaser's own account, not as a nominee or agent (unless otherwise specified on the Purchaser's signature page hereto), and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Securities.

5.3     <u>Investment Experience</u>. The Purchaser acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities.

5.4     <u>Accredited Investor</u>. The Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act. The Purchaser agrees to furnish any additional information requested by the Company to assure compliance with applicable U.S. federal and state securities laws in connection with the purchase and sale of the Securities.

5.5     <u>Restricted Securities</u>. The Purchaser understands that the Securities have not been, and will not be, registered under the Securities Act or any state securities laws, by reason of specific exemptions under the provisions thereof which depend upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Securities are "restricted securities" under U.S. federal and applicable state securities laws and that, pursuant to these laws, the Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission ("**SEC**") and registered or qualified by state authorities, or an exemption from such registration and qualification requirements is available.

5.6     <u>No Public Market</u>. The Purchaser understands that no public market now exists for the Securities.

5.7     <u>Residence</u>. The Purchaser resides in the state or province identified in the address shown on the Purchaser's signature page hereto.

-7-

6.    <u>Subordination of Other Debt</u>. The Company agrees that all obligations due under this Agreement and under the Note (the "**Obligations**") shall be senior in priority to any debt or other payment obligations of the Company, except for trade accounts payable incurred in the ordinary course of business. Until the full and final payment and satisfaction of the Obligations, the Company shall not incur any debt or other payment obligations, except for trade accounts payable incurred in the ordinary course of business, unless the holders of such other debt or payment obligations execute a subordination agreement in form and substance satisfactory to the Purchaser in the Purchaser's sole discretion.

7.    <u>Security</u>.

7.1    As security for the prompt payment in full of the Obligations, the Company hereby pledges and grants to the Purchaser a continuing general lien upon, and security interest in, the Collateral (defined below). The security interests granted hereunder shall extend and attach to all Collateral that is presently in existence or hereafter acquired and that is owned by the Company or in which the Company has any interest, whether held by the Company or by others for the Company's account, and wherever located. "**Collateral**" means all of the Company's right, title and interest in and to the following, whether now owned and existing or hereafter created or acquired, wherever located, together with all additions and accessions, substitutions and replacements and all Proceeds (including insurance proceeds) and products thereof (capitalized terms have the meanings ascribed to them in Articles 8 and 9, as the case may be, of the UCC): all Accounts, cash and cash equivalents, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, hedging contracts, Instruments, Intellectual Property, Inventory, Investment Property, letters of credit and Letter-of-Credit Rights, option contracts, Software, source code, deeds, any Supporting Obligations relating to the foregoing, any insurance coverage relating to the foregoing and all books and records, customer lists, credit files, computer files, programs, printouts and other computer and electronic materials and records of the Company pertaining to any of the foregoing and any insurance coverage relating to the forgoing.

7.2    The rights and security interests granted to the Purchaser hereunder shall continue in full force and effect, until: (a) the termination of this Agreement and the Note, and (b) the full and final payment and satisfaction of the Obligations. The liens and security interests granted to Purchaser herein and any other lien or security interest which Purchaser may have in any other assets of the Company secure payment and performance of all present and future Obligations.

7.3    The Company represents, warrants and agrees that: (a) upon the filing of UCC financing statements covering the Collateral in all required jurisdictions, this Agreement creates a valid, perfected and first priority security interest in all personal property of the Company as to that property which may be perfected by filing and the security interests granted herein constitute and shall at all times constitute the first and only liens on the Collateral; (b) the Company is, or will be at the time additional Collateral is acquired by the Company, the absolute owner of the Collateral with full right to pledge, sell, transfer and

-8-

create a security interest therein, free and clear of any and all claims or liens in favor of others; and (c) the Company will, at its expense, forever warrant and, at the Purchaser's request, defend the same from any and all claims and demands of any other person.

7.4     The Purchaser is hereby authorized by the Company to file from time to time any financing statements, continuations or amendments covering the Collateral without the Company's signature in accordance with the provisions of the UCC. The Company hereby consents to and ratifies the filing of any financing statements covering the Collateral by the Purchaser. The Company agrees to do whatever Purchaser may reasonably request, from time to time, by way of: (a) filing notices of liens, financing statements, amendments, renewals and continuations thereof; (b) cooperating with the Purchaser; (c) keeping Collateral records; and (d) performing such further acts as the Purchaser may reasonably require in order to effect the purposes of this Agreement and the Note.

8.     <u>Lender Protective Provisions</u>. The Company covenants and agrees to the following protective provisions for the Purchaser, as required consideration for Purchaser to enter into this Agreement.

8.1     <u>Consent Requirements</u>. Until the earlier of conversion or full satisfaction of the Outstanding Balance, the prior written consent of the Purchaser is required before the Company can take any of the following actions:

    (a)     repurchases or redemptions of equity securities, or payment of dividends or other distributions on equity securities (other than employee stock repurchases pursuant to vesting agreements which had been approved by the Company's Board);

    (b)     any fundamental changes in the nature of the Company's business;

    (c)     any acquisition of the operations or assets of another business (regardless of the form such acquisition takes and including, without limitation, by merger, consolidation, purchase of securities or assets, exclusive license, or lease);

    (d)     any Corporate Transaction;

    (e)     any issuance by the Company of Equity Securities, or securities that are convertible into equity securities, other than the Note;

    (f)     any registration of any of the capital stock of the Company pursuant to a public or quasi-public offering, or SPAC arrangement or similar transaction;

    (g)     the liquidation, dissolution, winding-up, recapitalization or reorganization of the Company; and

(h)    any increase or decrease in the size of the Board.

8.2    <u>Most Favored Nation</u>. While the Note is outstanding (but subject to Section 8.1 above), if the Company sells or issues any convertible notes or SAFEs ("**Subsequent Convertible Instruments**") on terms that differ from the Note (including the terms of this Agreement), the Company will provide the Purchaser with written notice of such sale or issuance, including the terms of the Subsequent Convertible Instruments, no later than ten (10) business days before the closing date thereof. In the event the Purchaser determines, in its sole discretion, that any Subsequent Convertible Instrument contains terms more favorable to the holder(s) thereof than the terms set forth in the Note, the Purchaser may elect to exchange the Note for such Subsequent Convertible Instrument based on the Note's Outstanding Balance. If the Purchaser elects to exchange the Note for a Subsequent Convertible Instrument, the Company agrees to enter into a side letter with the Purchaser relating to such Subsequent Convertible Instrument, which side letter will have substantially the same terms as those set forth in this Agreement.

8.3    <u>Right of First Offer</u>. Subject also to Section 8.1 above, each time the Company proposes to offer Equity Securities at any time following the Effective Date, up to and including the closing of each Next Equity Financing, the Company will provide the Purchaser with at least ten (10) business days' prior written notice of such offering, including the price and terms thereof. The Purchaser will have the right, but not the obligation, to invest an amount equal to up to one hundred percent (100%) of the purchase price for the Equity Securities offered. Such investments by the Purchaser will be on the same terms and at the same price as the Company offers to the other investors purchasing Equity Securities in such offerings.

8.4    <u>Major Investor Rights</u>. In connection with the conversion of the Note upon a Next Equity Financing, to the extent the Financing Agreements include the concept of a "Major Investor" (or a similar concept), the Company will ensure that the Purchaser is included within the definition of "Major Investor" for all purposes under the Financing Agreements (including, without limitation, with respect to rights of first offer and information rights).

8.5    <u>Board Seat</u>. While the Outstanding Balance remains outstanding, the Purchaser shall have the right to designate and appoint one (1) member of the Company's Board (the "**Purchaser Director**") as a full voting member thereof. The Company and Labor Smart shall take all such actions as are necessary to appoint the Purchaser Director to the Company's Board. The initial Purchaser Director shall be James V. Deppoleto Jr. Notwithstanding the above, the Purchaser's right to designate and appoint the Purchaser Director shall terminate in the event the Outstanding Balance is repaid in full or if, by the Maturity Date, the Purchaser opts to not pursue the Follow-On Investment.

8.6    <u>Registration of Company's Capital Stock</u>. The Company shall not, without the written consent of the Purchaser, register (including, for this purpose, a registration effected

-10-

by the Company for stockholders other than the Purchaser) any of its Capital Stock under the Securities Act in connection with the public offering of such securities.

8.7    Maintenance of Business.  The Company shall preserve and maintain its existence.  The Company shall preserve and keep in force and effect all licenses, permits, approvals, trademarks, trade names, trade styles, copyrights, and other proprietary rights necessary to the proper conduct of its business where the failure to do so could reasonably be expected to have a material adverse effect.

8.8    Insurance.  The Company shall maintain insurance to such extent, covering such risk and with such insurers as is usual and customary for similarly situated borrowers, including insurance for fire and other risks insured against by extended coverage, public liability insurance and workers' compensation insurance, as well as customary directors and officers liability insurance extending to the Purchaser Director.  Upon request by the Company, within 30 days of Closing, the Company will enter into a customary indemnification agreement under the NVCA form for the benefit of the Purchaser Director.

8.9    Reporting. The Company shall furnish to Purchaser, and its duly authorized representatives, such information respecting the business and financial condition of the Company as the Purchaser may reasonably request in writing; and shall furnish or cause to be furnished to the Purchaser:

(a)    as soon as available, and in any event within seventy-five (75) days after the year's end annual unaudited financial statements from an independent qualified accounting firm acceptable to Purchaser; and

(b)    as soon as available, and in any event within sixty (60) days after the last day of each fiscal quarter, the Company shall provide to the Purchaser unaudited quarterly financial statements in accordance with generally accepted accounting principles.

8.10    Inspection of the Business.  The Company shall permit a duly authorized representative of the Purchaser during regular business hours, to visit and inspect the Company, any of its books and financial records, to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees, or Affiliates at such reasonable times and intervals as Purchaser may reasonably request and with reasonable prior written notice to the Company.

8.11    Lien Matters. The Company shall not, without the prior written consent of Purchaser, create, assume or permit to exist any security interest, encumbrance, mortgage, deed of trust, or other lien (including, but not limited to, a lien of attachment, judgment or execution) affecting any of the Company's properties, or execute or allow to be filed any financing statement or continuation thereof affecting any of such properties, except for

-11-

permitted liens or as otherwise provided in this Agreement (collectively, "**Permitted Liens**").  Permitted Liens shall include:

(a)     liens arising by statute;

(b)     mechanics', workmen's, materialmen's, suppliers', landlords', warehousemen's, carriers' or other similar Liens arising in the ordinary course of business with respect to obligations which are not due or which are being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest;

(c)     liens resulting from taxes, fees, assessments or other government charges or levies which either (i) have not yet become delinquent, or (ii) as to which adequate reserves have been provided;

(d)     purchase money liens and capital leases (i) on equipment acquired or held by the Company incurred for financing the acquisition of the equipment securing no more than $75,000 in the aggregate amount outstanding, or (ii) existing on equipment when acquired, if the lien is confined to the property and improvements and the proceeds of the equipment;

(e)     liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business (other than liens imposed by ERISA);

(f)     leases or subleases of real property granted in the ordinary course of the Company's business (or, if referring to another Person, in the ordinary course of such Person's business), and leases, subleases, licenses or sublicenses of personal property granted in the ordinary course of the Company's business (or, if referring to another Person, in the ordinary course of such Person's business);

(g)     liens arising from attachments or judgments, orders, or decrees in circumstances not constituting an Event of Default;

(h)     liens in favor of financial institutions arising in connection with the Company's deposit and/or securities accounts held at such institutions;

(i)     the filing of financing statements solely as a precautionary measure in connection with operating leases, consignment of goods or similar transactions;  and

(j)     easements, zoning restrictions, rights-of-way, minor defects or irregularities of title and other similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary

obligations and do not interfere with the ordinary course of business of the Company in any material respect.

8.12    Prepayment Prohibited.  The principal and accrued interest on the Notes may not be prepaid unless approved in writing by the Purchaser.

8.13    Future Opportunity and Good Faith Obligation; Labor Smart Restructuring. The Company and Purchaser agree to negotiate in good faith, subsequent Closing, on a follow-on investment by Purchaser of $1,500,000 (the "**Follow-On Investment**"), including with respect to the applicable valuation of such investment.  The parties agree that the investment documentation for a subsequent financing round for the issuance of preferred shares shall be created using model legal documentation from the National Venture Capital Association (NVCA), including, specifically, registration rights, preemptive rights, dividend rights, liquidation preferences, and additional customary investor rights for Series A investment offerings.  Further, notwithstanding anything else in this Agreement to the contrary, the Purchaser's conversion of the Outstanding Balance under Section 3 and its pursuit of the Follow-On Investment are wholly contingent on the Company completing a restructuring (whether by reverse split or otherwise) whereby Labor Smart's ownership of the Company's capital stock would be reduced to such extent that the Purchaser shall obtain a position with the Company, when factoring in conversion of the Outstanding Balance and the Follow-On Investment, amounting to ownership of twenty-five percent (25%) of the Company's outstanding capital stock (when taking into account Fully Diluted Capitalization of the Company).

9.    Miscellaneous.

9.1    Definitions. Capitalized terms not otherwise defined in this Agreement will have the meanings set forth in this Section 9.1.

(a)    "**Articles of Incorporation**" means the articles of incorporation of the Company, as amended.

(b)    "**Collateral**" has the meaning set forth in Section 7.1.

(c)    "**Common Stock**" means the Company's common stock, par value $0.001.

(d)    "**Conversion Shares**" (for purposes of determining the type of Equity Securities issuable upon conversion of the Note) means:

(a)    with respect to a conversion pursuant to Section 3.1 or Section 3.2, shares of the Equity Securities issued in applicable Next Equity Financing;

-13-

(b)     with respect to a conversion pursuant to Section 3.3, shares of Series A Preferred Stock (subject to incorporation of standard preferred stock investor terms); and

(c)     with respect to a conversion pursuant to Section 3.4, shares of Series A Preferred Stock (subject to incorporation of standard preferred stock investor terms).

(e)     "**Corporate Transaction**" means:

(a)     the closing of the sale, transfer or other disposition, in a single transaction or series of related transactions, of all or substantially all of the Company's assets or the exclusive license of all or substantially all of the Company's material intellectual property;

(b)     the consummation of a merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of capital stock of the Company immediately prior to such merger or consolidation continue to hold a majority of the outstanding voting securities of the capital stock of the Company or the surviving or acquiring entity immediately following the consummation of such transaction); or

(c)     the closing of the transfer (whether by merger, consolidation or otherwise), in a single transaction or series of related transactions, to a "person" or "group" (within the meaning of Section 13(d) and Section 14(d) of the Exchange Act) of the Company's capital stock if, after such closing, such person or group would become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act) of more than 50% of the outstanding voting securities of the Company (or the surviving or acquiring entity).

For the avoidance of doubt, a transaction will not constitute a "Corporate Transaction" if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction. Notwithstanding the foregoing, the sale of Equity Securities in a bona fide financing transaction will not be deemed a "Corporate Transaction."

(f)     "**Discount**" means twenty-five percent (25%).

(g)     "**Equity Financing Conversion Price**" means the product of (x) 100% less the Discount and (y) the lowest per share purchase price of the Equity Securities issued in the applicable Next Equity Financing.

-14-

(h)     "**Equity Securities**" means (i) Common Stock; (ii) Preferred Stock; (iii) any securities conferring the right to purchase Common Stock or Preferred Stock; or (iii) any securities directly or indirectly convertible into, or exchangeable for (with or without additional consideration) Common Stock or Preferred Stock (including convertible notes and SAFEs). Notwithstanding the foregoing, "Equity Securities" shall not include any security granted, issued or sold by the Company to any director, officer, employee, consultant or adviser of the Company for the primary purpose of soliciting or retaining their services.

(i)     "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(j)     "**Fully Diluted Capitalization**" means the number of issued and outstanding shares of the Company's capital stock, assuming (a) the conversion or exercise of all of the Company's outstanding convertible or exercisable securities, including shares of convertible Preferred Stock and all outstanding vested or unvested options or warrants to purchase the Company's capital stock; and (b) the issuance of all shares of the Company's capital stock reserved and available for future issuance under any of the Company's existing equity incentive plans or any equity incentive plan created or expanded in connection with a Next Equity Financing. Notwithstanding the foregoing, "Fully Diluted Capitalization" excludes: (i) any convertible promissory notes issued by the Company (including the Note issued pursuant to this Agreement); (ii) any SAFEs issued by the Company; and (iii) any Equity Securities that are issuable upon conversion of any outstanding convertible promissory notes or SAFEs.

(k)     "**Maturity Date**" means the date that is one hundred eighty (180) days after the Effective Date; *provided, however*, Purchaser may extend the Maturity Date up to one hundred eighty (180) days in its sole discretion upon written notice to the Company.

(l)     "**Next Equity Financing**" means the next sale (or series of related sales) by the Company of its Equity Securities following the date of this Agreement with the principal purpose of raising capital.

(m)     "**Obligations**" has the meaning set forth in Section 6.

(n)     "**Outstanding Balance**" has the meaning set forth in Section 3.1.

(o)     "**Permitted Transferee**" means (i) a trust controlled by Purchaser and under which distributions may be made only to Purchaser and/or Purchaser's spouse, descendants (including adoptive relationships and stepchildren), and the spouses of each such natural persons (collectively, "**Family Members**"); (ii) a corporation, partnership, or limited liability company controlled by Purchaser and the shareholders,

-15-

partners, or members of which are only Purchaser and/or Family Members of Purchaser; or (iii) Purchaser's executors, administrators, testamentary trustees, legatees, or beneficiaries, by will or the laws of intestate succession.

(p)     "**Preferred Stock**" means the Company's preferred stock, whether now existing or hereafter created.

(q)     "**Qualified Equity Financing**" means a Next Equity Financing from which the Company receives aggregate gross proceeds of not less than $1,500,000 (excluding, for the avoidance of doubt, the aggregate principal amount of the Note).

(r)     "**Registrable Securities**" means (i) the Common Stock issuable or issued upon conversion of the Preferred Stock; (ii) any Common Stock, or any Common Stock issued or issuable (directly or indirectly) upon conversion and/or exercise of any other securities of the Company, acquired by Purchaser on or after the date hereof; and (iii) any Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, the shares referenced in clause (i) and (ii) above.

(s)     "**SAFE**" means any simple agreement for future equity (or other similar agreement) that is issued by the Company for bona fide financing purposes and that may convert into the Company's capital stock in accordance with its terms.

(t)     "**Securities Act**" means the Securities Act of 1933, as amended.

(u)     "**Series A Preferred Stock**" means the Company's Series A Preferred Stock, having the rights and obligations provided in the Company's Articles of Incorporation.

(v)     "**UCC**" means the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of Nevada; provided, however, in the event that, by reason of mandatory provisions of law, the attachment, perfection or priority of the security interest granted to the Purchaser in any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Nevada, then the term "UCC" means the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for the purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

9.2     Successors and Assigns. The Company shall not transfer or assign any of its rights, interests, duties or obligations under this Agreement or the Note without the Purchaser's prior written consent, which may be given or withheld in the Purchaser's sole discretion. Any attempted or purported transfer or assignment by the Company in violation

HB: 4892-6440-8352.4

of this Section shall be null and void. The Purchaser may, in its sole discretion, transfer or assign any or all of its rights, interests, duties or obligations under this Agreement and the Note to a Permitted Transferee upon written notice thereof to the Company. Except for such a transfer or assignment to a Permitted Transferee, Purchaser shall not transfer or assign any of its rights, interests, duties or obligations under this Agreement or the Note without the Company's prior written consent, which may be given or withheld in the Company's sole discretion. Any attempted or purported transfer or assignment by the Purchaser in violation of this Section shall be null and void. The terms and conditions of this Agreement and the Note shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, except as expressly provided in this Agreement.

9.3     Choice of Law. This Agreement and the Note, and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

9.4     Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. Counterparts may be delivered via email (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

9.5     Titles and Subtitles. The titles and subtitles used in this Agreement are included for convenience only and are not to be considered in construing or interpreting this Agreement.

9.6     Notices. All notices and other communications given or made pursuant hereto will be in writing and will be deemed effectively given: (a) upon personal delivery to the party to be notified; (b) when sent by email; (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications will be sent to the respective parties at the addresses shown on the signature pages hereto (or to such email address or other address as subsequently modified by written notice given in accordance with this Section).

9.7     No Finder's Fee. Each party represents that it neither is nor will be obligated to pay any finder's fee, broker's fee or commission in connection with the transactions contemplated by this Agreement. The Purchaser agrees to indemnify and to hold the

-17-

Company harmless from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of the transactions contemplated by this Agreement (and the costs and expenses of defending against such liability or asserted liability) for which the Purchaser or any of its officers, employees or representatives is responsible. The Company agrees to indemnify and hold the Purchaser harmless from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of the transactions contemplated by this Agreement (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

9.8    <u>Expenses</u>. At the Closing, the Purchaser shall receive a credit to the Consideration payable for the Note in an amount equal to the reasonable fees and out-of-pocket expenses of the Purchaser's counsel, not to exceed $12,000. Except for the foregoing, each party will pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Agreement.

9.9    <u>Attorneys' Fees</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

9.10    <u>Entire Agreement; Amendments and Waivers</u>. This Agreement, the Note and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof. The terms of this Agreement and the Note may be amended and the observance of any term of this Agreement or the Note may be waived (either generally or in a particular instance and either retroactively or prospectively) only in a writing executed by the Company and the Purchaser.

9.11    <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provisions will be excluded from this Agreement and the balance of the Agreement will be interpreted as if such provisions were so excluded and this Agreement will be enforceable in accordance with its terms.

9.12    <u>Acknowledgment</u>. For the avoidance of doubt, it is acknowledged that the Purchaser will be entitled to the benefit of all adjustments in the number of shares of the Company's capital stock as a result of any splits, recapitalizations, combinations or other similar transactions affecting the Company's capital stock underlying the Conversion Shares that occur prior to the conversion of the Note.

9.13    <u>Further Assurances</u>. From time to time, the parties will execute and deliver such additional documents and will provide such additional information as may reasonably be required to carry out the full intent and purpose of this Agreement and the Note and any agreements executed in connection herewith, and to comply with state or federal securities laws or other regulatory approvals.

9.14     <u>Waiver of Jury Trial</u>. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER REPRESENTS AND WARRANTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

COMPANY:

TAKEOVER INDUSTRIES, INC.

By: _Jason Tucker_____

Print Name: Jason Tucker

Title: President

Address:     c/o Eric Bjorgum
             Karish & Bjorgum
             119 E. Union St., Suite B
             Pasadena, CA 91103

Email Address: eric.bjorgum@kb-ip.com
                  cc: Jason@takeoverind.com

Solely for the limited purposes provided in Sections 4 and 8.5:

LABOR SMART:

LABOR SMART, INC.

By: _Michael Costello_____

Print Name: Michael Costello

Title: Chief Executive Officer

Address:     c/o Eric Bjorgum
             Karish & Bjorgum
             119 E. Union St., Suite B
             Pasadena, CA 91103

Email Address: eric.bjorgum@kb-ip.com
                  cc: Jason@takeoverind.com

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

PURCHASER:

*James V. Deppoleto Jr.*
DocuSigned by:
1E505C93B8A5402...

James V. Deppoleto Jr.

Address:      1600 Paramount Drive
                 Waukesha, WI 53186

Email Address: jdeppoleto@quintecconveyor.com

**EXHIBIT A**

**Form of Convertible Promissory Note**

[Attached.]

## SECURED CONVERTIBLE PROMISSORY NOTE

**$500,000.00**                                                              **May 25, 2022**

FOR VALUE RECEIVED, Takeover Industries, Inc., a Nevada corporation (the "**Company**"), hereby promises to pay to James V. Deppoleto Jr. (the "**Holder**"), the principal sum of Five Hundred Thousand Dollars ($500,000), together with interest thereon from the date of this Convertible Promissory Note (the "**Note**"). Interest will accrue at a rate of eight percent (8%) per annum, compounded annually. Unless earlier converted into Conversion Shares pursuant to Section 3 of that certain Convertible Note Purchase Agreement dated May 24, 2022, by and among the Company, the Holder, and, for limited purposes, Labor Smart, Inc. (the "**Purchase Agreement**"), the unpaid principal amount of this Note, together with any then unpaid accrued interest, shall be due and payable by the Company on the Maturity Date or as otherwise provided in the Purchase Agreement.

Capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

1.    Payment. All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal. No principal or accrued interest under this Note may be prepaid by Company.

2.    Security. All Obligations evidenced by this Note are secured by a continuing general lien upon, and security interest in, the Collateral.

3.    Conversion of the Notes. This Note and any amounts due hereunder will be convertible into Conversion Shares in accordance with the terms of Section 3 of the Purchase Agreement.

4.    Amendments and Waivers; Resolutions of Dispute; Notice. The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice among the Company and the Holder will be governed by the terms of the Purchase Agreement.

5.    Successors and Assigns. This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto; provided, however, that the Company shall not assign its obligations under this Note without the written consent of the Holder. The Holder may, in its sole discretion, transfer or assign any or all of its rights, interests, duties or obligations under this Note to a Permitted Transferee with written notice thereof to the

-1-

Company. Except for a transfer or assignment to a Permitted Transferee, Holder shall not transfer or assign its obligations under this Note without the written consent of the Company.

    6.    <u>Limitation on Interest</u>. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment made by the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holder as a payment of principal.

    7.    <u>Events of Default; Remedies</u>.

    7.1    The occurrence of any one or more of the following shall constitute an "**Event of Default**":

    (a)    the Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable;

    (b)    the Company breaches any representation, warranty, or covenant provided in the Purchase Agreement;

    (c)    the Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

    (d)    an involuntary petition is filed against the Company (unless such petition is dismissed or discharged within thirty (30) days under any bankruptcy statute now or hereafter in effect), or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company.

    7.2    Upon the occurrence of any Event of Default, the Holder may declare all or any portion of the Obligations to be immediately due and payable in full; <u>provided</u>, that in the event of an Event of Default under <u>Section 7.1(c)</u> or <u>(d)</u> above, all Obligations and all other sums payable hereunder shall become and be immediately due and payable in full without any action on the part of the Holder.

    7.3    Upon the occurrence of any Event of Default and during any period in which such Event of Default is ongoing, all amounts due but not paid under this Note shall automatically bear interest at a rate of eighteen percent (18%) per annum (or, if lower, the highest rate permissible under applicable law), compounded monthly.

HB: 4892-6440-8352.4

8.  <u>Company Waiver; Delays and Omissions.</u> The Company hereby waives demand, notice, presentment, protest and notice of dishonor. It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.

9.  <u>Choice of Law</u>. This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

10. <u>Approval</u>. The Company hereby represents that its Board, in the exercise of its fiduciary duty, has approved the Company's execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it intends to use the principal of this Note for the operations of its business, and not for any personal, family or household purpose.

TAKEOVER INDUSTRIES, INC.

By: _____

Print Name: Jason Tucker _____

Title: President _____

HB: 4892-6440-8352.4

**EXHIBIT B**

**Capitalization Table**

(see attached)

# CERTIFIED SHAREHOLDER LIST

## CLEARTRUST, LLC

| Issue: TAKEOVER INDUSTRIES, INC. - COMMON | Abbrev: | Cusip:TAKEOVERCOM |
|---|---|---|
| Account/TIN | Name & Address | Shares Held |

| 6 | JAMES DEPPOLETO<br>1600 PARAMOUNT DRIVE<br>WAUKESHA WI 53186 | 200,000,000<br>1.328% |
|---|---|---|

| Certificate # / Book | Issue Date | Cancel Date | Denomination | Restricted |
|---|---|---|---|---|
| * RSTR * | 05/02/2022 | | 200,000,000 | RESTRICTED |
| | | Total Active Shares | 200,000,000 * | |
| | | Total Restricted Shares | 200,000,000 * | |

| 4 | LABOR SMART, INC.<br>C/O JASON TUCKER<br>4790 CAUGHLIN PARKWAY #387<br>RENO NV 89509 | 14,663,918,000<br>97.345% |
|---|---|---|

| Certificate # / Book | Issue Date | Cancel Date | Denomination | Restricted |
|---|---|---|---|---|
| * RSTR * | | 03/03/2022 | -50,000 | RESTRICTED - CONTROL POSITION |
| * RSTR * | 03/03/2022 | | 14,663,918,000 | RESTRICTED - CONTROL POSITION |
| * RSTR * | 02/27/2021 | | 50,000 | RESTRICTED - CONTROL POSITION |
| | | Total Active Shares | 14,663,918,000 * | |
| | | Total Restricted Shares | 14,663,918,000 * | |

| 5 | ANTHONY PETTIS<br>2786 HERA HEIGHTS COURT<br>HENDERSON NV 89052 | 100,000,000<br>0.664% |
|---|---|---|

| Certificate # / Book | Issue Date | Cancel Date | Denomination | Restricted |
|---|---|---|---|---|
| * RSTR * | 05/02/2022 | | 100,000,000 | RESTRICTED |
| | | Total Active Shares | 100,000,000 * | |
| | | Total Restricted Shares | 100,000,000 * | |

| 7 | JOSHUA RAPKIN<br>4 MOSS POINT DR<br>ORMOND BEACH FL 32174 | 100,000,000<br>0.664% |
|---|---|---|

| Certificate # / Book | Issue Date | Cancel Date | Denomination | Restricted |
|---|---|---|---|---|
| * RSTR * | 05/02/2022 | | 100,000,000 | RESTRICTED |
| | | Total Active Shares | 100,000,000 * | |
| | | Total Restricted Shares | 100,000,000 * | |

| | 4 | Holders Qualified | Total Outstanding Shares | 15,063,918,000 |
|---|---|---|---|---|
| | | | Total Restricted Shares | 15,063,918,000 |
| | | | Total Non-Restricted Shares | 0 |

# CERTIFIED SHAREHOLDER LIST

## CLEARTRUST, LLC

**Restriction Breakdown**

| Restriction Name | Shares |
|---|---|
| Restricted Book | 15,063,918,000 |

# REGISTRAR CONTROL
## CLEARTRUST, LLC

**For the period from 01/01/22 to 05/25/22**
**Authorized shares for TAKEOVER INDUSTRIES, INC. - SERIES A PRF: 250,000**

| | |
|---|---|
| **Transactions Effective Before** | 01/01/2022 |
| **Shares Cancelled:** | 0 |
| **Shares Issued:** | 0 |

**Transactions Effective After** 05/25/2022

| | | | |
|---|---|---|---|
| **Shares Cancelled:** | 0 | **Begin Balance:** | 0 |
| **Shares Issued:** | 0 | **Shares Cancelled:** | 0 |
| | | **Shares Issued:** | 160,825 |
| | | **Ending Balance:** | 160,825 |

| Certificate/Book | Holder | Denomination | Batch # | Type | Effective | Posted |
|---|---|---|---|---|---|---|
| * RESTR BOOK * | TOBY MCBRIDE | 79,000 | 160928 | OIS | 05/16/2022 | 05/16/2022 |
| * RESTR BOOK * | JASON TUCKER | 79,000 | 160928 | OIS | 05/16/2022 | 05/16/2022 |
| * RESTR BOOK * | JOE PAVLIK | 2,825 | 160928 | OIS | 05/16/2022 | 05/16/2022 |

3 Restr Book Issued For: 160,825 SHS/PV

0 Cert/Book Cancelled For: 0 SHS/PV
3 Cert/Book Issued For: 160,825 SHS/PV

160,825 * Net Change