# EXHIBIT 15

James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 2 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1                UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEVADA

3

4    JAMES V. DEPPOLETO JR.,

5              Plaintiff,

6         vs.                      No. 2:22-cv-02013-GMN-MDC

7    TAKEOVER INDUSTRIES,
     INCORPORATED, et al.,
8
               Defendants.
9    _____/

10

11

12

13

14              VIDEOCONFERENCE DEPOSITION OF

15                 JAMES V. DEPPOLETO JR.

16              Thursday, December 5, 2024

17

18

19

20

21

22

23

24         Reported by:  Barbara Clark, CCR No. 953

25

Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 3 of 53
James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

```
 1                         APPEARANCES

 2

 3   For Plaintiff:

 4          HUSCH BLACKWELL LLP
            BY:  PATRICK M. HARVEY, ESQ.
 5          511 North Broadway, Suite 1100
            Milwaukee, Wisconsin 53202
 6          (414) 273-2100
            patrick.harvey@buschblackwell.com
 7

 8   For Defendants:

 9          LAW OFFICE OF S. DON BENNION
            BY:  S. DON BENNION, ESQ.
10          6980 O'Bannon Drive, Suite 400
            Las Vegas, Nevada 89117
11          (702) 333-0777
            don@bennionlaw.com
12

13

14   Also Present:  Daniel Holmstock, Exhibit Tech

15                  Joseph Pavlik

16

17

18

19

20

21

22

23

24

25
```



James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

```
 1                         INDEX

 2

 3   WITNESS

 4   JAMES V. DEPPOLETO JR.

 5

 6   EXAMINATION
                                                  PAGE
 7

 8   BY MR. BENNION                                  5

 9

10   DEPOSITION EXHIBITS
```

```
11   Exhibit 1     Notice of Taking Zoom Deposition
                   of James V. Deppoleto Jr.          14
12
     Exhibit 2     Plaintiff's First Amended
13                 Verified Complaint                 15

14   Exhibit 3     Convertible Note Purchase
                   Agreement                          27
15
     Exhibit 4     Secured Convertible Promissory
16                 Note                               32

17   Exhibit 5     First Amendment to Convertible
                   Note Purchase Agreement            33
18
     Exhibit 6     Second Amendment to Convertible
19                 Note Purchase Agreement            60

20   Exhibit 7     Plaintiff's Response to Takeover
                   Industries Incorporated's First
21                 Set of Interrogatories            69

22   Exhibit 8     Receipt Dated 11/04/2022         101

23   Exhibit 9     Receipt Dated 10/13/2022          97

24   Exhibit 10    Family Dollar Vendor Funding
                   Invoice                           44
25
```



Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 5 of 53
James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1    (Exhibits cont.)

2

3   Exhibit 11    Notice of Default, Demand for
                  Payment & Cease and Desist              91
4
    Exhibit 12    NXT LVL/5-hour Energy Accelerator
5                 Partnership                             80

6

7
                           -o0o-
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

James V. Deppoleto, Jr. – 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 6 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1           Thursday, December 5, 2024
2           10:35 a.m.
3
4         JAMES V. DEPPOLETO JR.,
5 having been administered an oath, was examined and
6 testified as follows:
7
8           EXAMINATION
9 BY MR. BENNION:
10    Q   Please state your name and address for the
11 record.
12    **A   James Deppoleto.**
13    Q   Mr. Deppoleto, I'm Don Bennion. I represent
14 the Defendants in a case that you filed, Case No.
15 2:22-cv-02013-GMN-MDC in the United States --
16      (Audio difficulties.)
17      (Discussion held off the record.)
18 BY MR. BENNION:
19    Q   Mr. Deppoleto, have you been deposed
20 previously?
21    **A   Previously? Previously what?**
22    Q   Have you been deposed? Has your deposition
23 been taken before today?
24    **A   No.**
25    Q   Have you ever been a party to a lawsuit such

1 as the Plaintiff or Defendant prior to this lawsuit?
2    **A   Yes.**
3    Q   And let me go through the admonitions of a
4 deposition and then we will proceed to ask further
5 questions.
6      The oath which you just took is the same as
7 any you would take in a court of law. With that oath
8 you have the obligation and responsibility to tell the
9 truth and we expect that you will do so.
10      Do you understand that?
11    **A   Yes.**
12    Q   Are you currently under any medication that
13 might inhibit or impair your ability to testify
14 truthfully?
15    **A   No.**
16    Q   If you answer a question would it be fair for
17 us to assume that you understood the question?
18      MR. HARVEY: Objection. Incomplete
19 hypothetical.
20      Go ahead.
21      THE WITNESS: I'm not sure how to answer that.
22 BY MR. BENNION:
23    Q   I'm going to ask you questions today in the
24 deposition. If you don't understand the question,
25 please tell me you don't understand.

1      Do you understand?
2    **A   Yes.**
3      MR. HARVEY: Can I clarify one other thing?
4 It looks like Joe Pavlik is also on with us. Either
5 way, is it just him or are there other people?
6      MR. BENNION: My understanding, Patrick, is
7 it's just Joe Pavlik.
8      MR. HARVEY: Okay. Thank you.
9      MR. BENNION: And he's a party to this case.
10 He's allowed to participate or to listen in.
11      MR. HARVEY: Yep. I was just making it clear.
12 BY MR. BENNION:
13    Q   Following the deposition, Mr. Deppoleto, the
14 transcript of this deposition will be provided to you
15 to review for accuracy for what you said today. At
16 that time you will have the opportunity to review your
17 answers, to sign it was a true and accurate statement
18 or to make changes to your deposition testimony at the
19 time that you sign it, but if you make changes, myself
20 or another attorney will have the opportunity to
21 comment upon or to argue that the changes that you
22 make from the date of your testimony, which is today,
23 until the time that you sign the deposition transcript
24 with changes, to make comments upon those changes to
25 seek to impeach your credibility.

1      Do you understand that?
2      MR. HARVEY: Objection. I don't think that
3 accurately states the rule.
4      Go ahead.
5      THE WITNESS: Yes, I believe so.
6 BY MR. BENNION:
7    Q   What did you do to prepare for your deposition
8 today?
9    **A   My attorney gave me a letter to read. That**
10 **was it.**
11    Q   Did you review any documents in preparation
12 for your deposition?
13    **A   No documents were provided.**
14    Q   Did you meet with your attorney to prepare for
15 your deposition?
16    **A   I was here 30 minutes early.**
17    Q   And how long did you meet with your attorney?
18    **A   30 minutes.**
19    Q   Did you have a telephone conference -- and I'm
20 not asking you about the substance or anything that was
21 said in the telephone conference with your attorney,
22 but did you have a telephone conference with your
23 attorney to prepare for today's deposition?
24    **A   No.**
25    Q   You said that you reviewed a letter. What was

James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 7 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1 the nature of the letter that you reviewed to prepare
2 for your deposition?
3       MR. HARVEY: I'm going to object and instruct
4 you not to answer. Attorney-client privilege.
5 BY MR. BENNION:
6    Q   When did you receive that letter?
7    A   Yesterday.
8    Q   What's the extent of your formal education?
9    A   Bachelor's degree in business administration.
10   Q   From which school?
11   A   Cardinal Stritch University.
12   Q   And where is that located?
13   A   In Milwaukee, Wisconsin.
14   Q   And when did you receive that degree?
15   A   I can't recall the exact date.
16   Q   In the last 10 years?
17   A   No.
18   Q   So prior to that time?
19   A   Correct.
20   Q   Okay. When did you graduate from high school?
21   A   1989.
22   Q   And was that in Milwaukee?
23   A   Oak Creek, Wisconsin.
24   Q   A suburb of Milwaukee?
25   A   Correct.

Page 9

1    A   We do not receive material property. We are a
2 material handling company.
3    Q   So perhaps you can explain what that means to
4 handle material.
5    A   An example could be an Amazon warehouse.
6 Conveyors that go throughout that, that's material
7 handling equipment, fork trucks, racking, material
8 handling equipment that goes through all the warehouse,
9 we would do things of that nature.
10   Q   So material handling equipment, does your
11 business provide that?
12   A   Correct.
13   Q   Such as -- what type of equipment would that
14 be?
15   A   Predominantly conveyor equipment.
16   Q   So conveyor equipment, meaning a conveyor
17 belt, for lack of a better term?
18   A   I'm sorry. I don't understand that question.
19   Q   Perhaps you can explain the nature of the
20 conveyor equipment. What is that? Is that a conveyor
21 belt? Please describe it for us.
22   A   Conveyor belts, yes.
23   Q   And what else do you provide? What other
24 conveyor equipment do you provide?
25   A   Could be vision systems. Could be belting.

Page 11

1    Q   How are you employed?
2    A   I'm self-employed.
3    Q   And what does that mean?
4    A   I have my own company.
5    Q   And what is the name of that company?
6    A   Quintec Integration, Inc.
7    Q   And what is the nature of Quintec Integration,
8 Inc.'s business?
9    A   Material handling.
10   Q   Material handling of what?
11   A   Material.
12   Q   Such as?
13   A   It could be a box. It could be a foundry
14 part. It could be a generator. Material.
15   Q   And how does your company handle that
16 material? How does it process it?
17   A   How do you mean?
18   Q   Well, you just receive the material property
19 and take it in to your company?
20   A   No.
21   Q   What do you do with that property?
22   A   What do you mean?
23   Q   Well, perhaps you can explain the nature of
24 the business that you're in when you receive material
25 property. What is the nature of your business?

Page 10

1 Could be the actual conveyor. It varies. Material
2 handling equipment is what we handle.
3    Q   And what is the name of your company?
4    A   Quintec.
5    Q   I'm sorry. You testified to that previously.
6 Quintec Integration, Inc.; correct?
7    A   Correct.
8    Q   And what is your position at Quintec
9 Integration?
10   A   President.
11   Q   And how long have you been president of
12 Quintec Integration?
13   A   25 years.
14   Q   When was Quintec Integration founded as a
15 company?
16   A   1999.
17   Q   And you founded the company?
18   A   Correct.
19   Q   Are you a member of the Board of Directors at
20 Quintec Integration?
21   A   Correct.
22   Q   Who else is on the Board of Directors at
23 Quintec Integration?
24   A   No one.
25   Q   Are you on the Board of Directors of any other

Page 12



James V. Deppoleto. Jr.  -  12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 8 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1  companies?

2  A  No.

3  Q  Do you know Amy Allen?

4  A  Former employee.

5  Q  And when did she stop working for you at

6  Quintec Integration?

7  A  I'm not sure.

8  Q  Do you recall how long she worked for you at

9  Quintec Integration?

10  A  Also not sure.

11  Q  You don't recall her position with Quintec

12  Integration?

13  A  I did not say that.

14  Q  What was her position with Quintec

15  Integration?

16  A  Accounting.

17  Q  Accounting, such as?

18  A  Every day daily accounting work.

19  Q  And just to inform us as to what daily

20  accounting work is at Quintec Integration, what is

21  that?

22  A  Accounts receivable, accounts payable.

23  Q  I see.

24  A  Regular accounting work.

25  Q  Thank you.  Have you ever been charged with or

1  convicted of a felony?

2  A  No.

3  Q  I'd like to pull up Exhibit 1 to the Notice of

4  Deposition.  It's been marked as Exhibit 1.

5  MR. HARVEY:  Hold on one second, Counsel.  I'm

6  trying to make sure we can see it.  Counsel or whoever

7  is controlling it, can you zoom in a little bit?  We

8  can see it, but not well at all.

9  EXHIBIT TECH:  I'll wait for your instruction

10  to do the scrolling when you need me to.

11  MR. HARVEY:  What is the question?

12  MR. BENNION:  If you can scroll down, Daniel,

13  on Exhibit 1, Notice of Taking Zoom Deposition of James

14  V. Deppoleto Jr.  It has today's date listed.

15  BY MR. BENNION:

16  Q  Have you seen this document before today,

17  Mr. Deppoleto?

18  A  I have not.

19  MR. BENNION:  I'd like to scroll down further

20  or farther, Daniel.  Thank you.

21  BY MR. BENNION:

22  Q  Is it your understanding, Mr. Deppoleto, that

23  today is the day, December 5, 2024, that your

24  deposition is to be taken in the case referenced above?

25  A  That is my understanding.

1  Q  And did you file this lawsuit as a Plaintiff?

2  A  Yes.

3  Q  Okay.  So let's go to Exhibit 2 now.  This

4  document has been marked as Exhibit 2.

5  MR. BENNION:  If you could scroll down to the

6  next page, Daniel.

7  BY MR. BENNION:

8  Q  Have you seen this document before,

9  Mr. Deppoleto?

10  A  I have not.

11  Q  This is Plaintiff's First Amended Verified

12  Complaint.

13  MR. BENNION:  And if you can scroll up,

14  Daniel, just for a moment, up higher in the page.

15  BY MR. BENNION:

16  Q  That was filed August 30, 2023.

17  Do you see that, Mr. Deppoleto?

18  A  I see that filed, yes.

19  Q  And you've never seen this document before,

20  Plaintiff's First Amended Verified Complaint, which

21  lists you as the Plaintiff?

22  A  I don't recall it.

23  Q  Okay.

24  MR. BENNION:  Let's go to the last page of the

25  document, Daniel.  So pull that up.

1  BY MR. BENNION:

2  Q  This is page 28 of 28 of the First Amended

3  Verified Complaint.

4  Do you see that verification page,

5  Mr. Deppoleto?

6  A  I do.

7  Q  And is that your signature at the bottom via

8  Docusign?

9  A  It appears so.

10  Q  And you authorized the verification Docusign

11  for your name verifying that you certify:  I verily

12  believe the same to be true as set forth in the First

13  Amended Verified Complaint?

14  A  What was the question?

15  Q  This is the verification page, page 28 of

16  Exhibit 2, which is the First Amended Verified

17  Complaint; correct?

18  A  It appears so, sure.

19  Q  So take a moment to read the verification

20  paragraph above your signature.

21  A  And?

22  Q  You've read that?

23  A  Correct.

24  Q  And that's your authorized signature below

25  dated August 30, 2023?

James V. Deppoleto, Jr. — 12/5/2024
Case 2:22-cv-02013-GMN-BNW   Document 102-15   Filed 01/10/25   Page 9 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**Page 17**

1  A  It appears so.
2  Q  You don't recall signing this or authorizing
3  it to be signed?
4  A  It's August 30, 2023.  I do not specifically
5  recall that, no.
6  Q  Did you authorize your attorneys to file the
7  lawsuit, which is set forth here in the First Amended
8  Verified Complaint?
9  A  Yes.
10 Q  Okay.  Let's move on.
11    When did you first meet the Defendants you've
12 sued in this case, the individual Defendants:  Toby
13 McBride, Joe Pavlik, Mike Holley and Tom Zarro?  I
14 realize that's compound, but to try and streamline the
15 questioning, are you familiar with Toby McBride, Joe
16 Pavlik, Mike Holley and Tom Zarro?
17 A  Yes.
18 Q  And who was the first of those four whom you
19 met?
20 A  I don't recall who was the first.  I believe
21 it was all at the same time.
22 Q  And where and when did you meet them?
23 A  I believe it was at a PFL event, I believe.
24 Q  PFL, meaning Professional Fighters League
25 event?

**Page 18**

1  A  Correct.
2  Q  What is the Professional Fighters League?
3  A  A professional fighters league.
4  Q  Okay.
5  A  What is your question?
6  Q  Your understanding of the Professional
7  Fighters League?
8  A  Professional fighters league.  That's my
9  understanding.
10 Q  Sure.  So you indicated that you met these
11 four gentleman at a Professional Fighters League event?
12 A  Three of them, I believe.
13 Q  And which three?
14 A  I believe it was Toby McBride, Joe Pavlik and
15 Jason Tucker.
16 Q  So it wasn't Mike Holley or Tom Zarro at that
17 time?
18 A  Not at that time.
19 Q  And how did you come to meet them?
20 A  I don't understand the question.
21 Q  Did somebody introduce you to them?
22 A  I don't understand the question.
23 Q  Let's take Toby McBride.  How did you come to
24 meet Toby McBride?
25 A  At a PFL event.

**Page 19**

1  Q  And you just ran into him?
2  A  Incorrect.
3  Q  Please explain how you met him.
4  A  I met him at a PFL event.
5  Q  I understand that.  I'm asking for the
6  specifics.  Was it at a dinner?  Was it at the event?
7  Where was it at the event?
8  A  It was at the event.  At the hotel of the
9  event or wherever they were hosting the hotel stay.
10 Q  And who's hosting the hotel stay?
11 A  Don't know.  PFL, I imagine.  Don't know.
12 Q  So you don't know if Toby McBride or Joe
13 Pavlik or Jason Tucker were hosting that event?
14 A  It was my understanding that they hosted it,
15 but I don't know for sure.
16 Q  And when you say they, is that them
17 individually or as part of a company?
18 A  They as whatever company they were with, yes.
19 Q  Those three individuals, Toby McBride, Joe
20 Pavlik and Jason Taylor, were members of one company;
21 is that your testimony?
22 A  Jason Tucker.  Yes, I believe so.  I don't
23 know for a fact, but I believe so.
24 Q  What was Jason Tucker's position with Takeover
25 Industries when you met him?

**Page 20**

1  A  I don't recall.
2  Q  Do you recall what Joe Pavlik's position with
3  Takeover Industries was when you met him?
4  A  I don't recall.
5  Q  Would your answer be the same for Toby
6  McBride?
7  A  Correct.  I believe all three to be principals
8  of this company.
9  Q  Principals in what form?
10 A  At one point I believe we all held a president
11 title or a CEO title -- or I don't know.  I don't know
12 specifically what their titles were.
13 Q  Who did you attend the Professional Fighters
14 League event with in Dallas when you met these
15 individuals?
16 A  My father, I believe.
17 Q  And what's your father's name?
18 A  James Deppoleto Sr.
19 Q  Makes sense.  Do you know Anthony Pettis?
20 A  He's my cousin.
21 Q  And was Anthony Pettis the one, your cousin,
22 that introduced you to Toby McBride, Joe Pavlik and
23 Jason Tucker?
24 A  He introduced me to the opportunity.
25 Q  What does that mean?



James V. Deppoleto, Jr. – 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 10 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1  A   The business opportunity that we're talking
2  about.  He introduced me to that.  We initially came in
3  as investors, I guess, on the front end.
4  Q   Did you say he initially came in as an
5  investor on the front end?
6  A   I did not say that.
7  Q   Well, then can you please restate what you
8  said with respect to investor on the front end?
9  A   I said I believe we were involved with that as
10 investors on the front end.  Whatever date that was,
11 November, December, whenever we invested initially,
12 that was the start of it.
13 Q   Do you recall when the event was at
14 Professional Fighters League in Dallas?
15 A   I do not.
16 Q   Could that have been April of 2022?
17 A   I don't know.
18 Q   Do you recall who fought there when you met
19 these gentleman?
20 A   My cousin was really the only fight I was
21 interested in.
22 Q   Would that be Anthony Pettis?
23 A   Correct.
24 Q   You indicated just a moment ago that -- did
25 this meeting lead to your investment as you describe on

Page 21

1  the front end with Takeover Industries?
2  A   I don't recall.
3  Q   What investment was made on the front end, as
4  you describe?
5  A   I believe I invested 500,000 and Anthony
6  invested 250,000 and another friend of ours invested
7  another 250,000.
8  Q   Do you recall who the other friend of yours
9  was?
10 A   Josh Rapkin.
11 Q   How do you spell Rapkin?
12 A   R-A-P-K-I-N.
13 Q   Thank you.  And how do you know Mr. Rapkin?
14 A   It's my cousin's friend.
15 Q   Anthony Pettis's friend?
16 A   Correct.
17 Q   What did you do to investigate Takeover
18 Industries prior to investing with Takeover?
19 A   What did I do?  I don't understand your
20 question.
21 Q   Did you investigate the company at all other
22 than meeting with Mr. McBride, Mr. Pavlik and
23 Mr. Tucker, prior to investing $500,000 in Takeover?
24 A   We reviewed the documentation I think that
25 they sent us.

Page 22

1  Q   And when you say we, who is we?
2  A   Anthony Pettis, Josh Rapkin and myself.
3  Q   Do Anthony Pettis and Josh Rapkin work with
4  you at your company?
5  A   They do not.
6  Q   Is Mr. Pettis still a fighter in the
7  Professional Fighters League?
8  A   I don't believe so.
9  Q   Have you spoke with either Mr. Rapkin or
10 Mr. Pettis regarding this lawsuit?
11 A   I have not.
12 Q   When was the last time you spoke with either
13 one of them?
14 A   I had dinner with my cousin two weeks ago.
15 Q   Does Mr. Pettis live in the Milwaukee area as
16 well?
17 A   He does not.
18 Q   Where does he live?
19 A   Las Vegas.
20 Q   Good deal.  So your testimony is you did
21 nothing other than review documents that were provided
22 to you by Takeover Industries before investing the
23 initial $500,000 in Takeover; is that correct?
24 A   No.  My testimony was that we reviewed the
25 documents that they sent.

Page 23

1  Q   When you say they, who do you mean?
2  A   Whoever was in charge there.  So I don't
3  remember if it was Tucker, McBride, Pavlik, not sure.
4  Q   Did you ever meet with Jason Tucker in Puerto
5  Vallarta, Mexico in or about the spring of 2022?
6  A   I'm not sure of the date.
7  Q   Did you meet with Jason Tucker in Puerto
8  Vallarta, Mexico at any time?
9  A   I met with Jason in Mexico, yes.
10 Q   Was that before or after you invested in
11 Takeover Industries?
12 A   Before, I believe.
13 Q   Do you recall when you first invested in
14 Takeover Industries?
15 A   I do not.  No.  No.
16 Q   You met with Mr. Tucker at the event,
17 Professional Fighters League event, in April 2022 and
18 then you met with him subsequently before you invested
19 in Takeover Industries; correct?
20 A   I cannot recall the timing of those meetings.
21 Q   But you met with him twice; would that be fair
22 to say?
23 A   Well, I met with all three of them once and
24 then Tucker, yes, I met there to look him in the eye,
25 look him in the face over this deal.

Page 24



James V. Deppoleto, Jr. – 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 11 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

1  Q   What was Mr. Tucker's position with Takeover
2  Industries at the time of your second meeting, which
3  would have been in Puerto Vallarta, Mexico?
4  A   I'm not sure.
5  Q   Did he represent himself to you as holding a
6  certain position with Takeover Industries at that
7  second meeting in Mexico?
8  A   He did not represent themself any way.
9  Q   What did he say to you at that meeting?
10  A   I don't really recall. I think we talked
11  vaguely about some business stuff and potential of the
12  business. That's about it. Kind of a fact-finding, I
13  guess, if you will.
14  Q   And what did Mr. Tucker tell you in response
15  to your fact-finding investigation of the nature of
16  Takeover's business?
17  A   It was a very fluffy conversation similar to
18  the ones that they all have. They all have very fluffy
19  flowery words, not a lot of substance, so it was tough
20  to get a good conversation in.
21  Q   And you're talking about Toby McBride, Joe
22  Pavlik and Jason Tucker; is that correct?
23  A   Yes. They consistently pitched the dream.
24  Q   And what was your understanding on the nature
25  of Takeover Industries' business when you first

Page 25

1  invested the $500,000 in Takeover?
2  A   I believe it was up-and-coming hydrogen water
3  and other drink type products.
4  Q   Such as gamer shots?
5  A   I don't know if that was -- I don't know when
6  that came about.
7  Q   Are you familiar with the term gamer shot?
8  A   I don't know what the term they use for their
9  shot, but they had some shot that was geared towards
10  gaming.
11  Q   And what was your understanding of Joe
12  Pavlik's role with the company with respect to the
13  energy drink and/or gamer shot?
14  A   Again, they all kind of -- at one point they
15  represented themselves as president. I wasn't clear on
16  any of their titles, to be honest.
17  Q   So you weren't aware Joe Pavlik was the chief
18  science officer at Takeover Industries when you --
19  A   I don't recall that title.
20  Q   Did Joe Pavlik speak to you about the content
21  of the energy drink and/or gamer shot?
22  A   I do not recall.
23  Q   Did anyone, either Jason Tucker or Toby
24  McBride, ask you about -- or tell you, explain for you,
25  the contents, recipe of these products?

Page 26

1  A   I don't recall. I don't believe so, but I
2  don't recall.
3  Q   What led you to invest $500,000 with Takeover
4  Industries initially in the spring of 2022?
5  A   I'm sorry. Repeat that.
6  Q   What led you to invest $500,000 in Takeover
7  Industries in the spring of 2022?
8  A   I don't believe that was the date. I'm not
9  sure on that date.
10  Q   What's your recollection?
11       MR. HARVEY:  Counsel, I don't want to be
12  convoluting things here. It's obviously your
13  deposition, I'm just trying to speed things along. I
14  think the term investment, are you distinguishing
15  between investment meaning when he bought shares or
16  investment when he loaned money? I think you guys are
17  talking past each other a little bit. Again, your
18  deposition. You ask questions that you want, I'm just
19  trying to speed it along.
20       MR. BENNION:  I'll tell you what I'll do,
21  Patrick, I'll pull up the Convertible Note Purchase
22  Agreement. So let's go to Exhibit 3.
23       THE WITNESS:  So you understand you're talking
24  about two different things; right?
25  BY MR. BENNION:

Page 27

1  Q   What we do here, Mr. Deppoleto, is I ask you
2  questions. That's what a deposition is. Just so you
3  know the process. Do you need to know more explanation
4  about the nature of a deposition before we proceed?
5  A   No. I'm good.
6  Q   Okay. I ask the questions. Your counsel can
7  object. And then you answer. Understood?
8  A   Yep.
9  Q   Okay. Thank you.
10       Let's go to -- this is Exhibit No. 3, if you
11  go down to the bottom of the page. This is the
12  Convertible Note Purchase Agreement. It's marked as
13  Exhibit 3 to this deposition. Take a moment to review
14  it. It's a lengthy document. I'm not going to ask you
15  to review the entire document. Take a moment to review
16  the top three paragraphs.
17  A   Okay.
18  Q   Are you familiar with this document?
19  A   Yes.
20  Q   You've seen it before?
21  A   Yes.
22  Q   And it's dated May 25, 2022. I'll just speed
23  this up and read it:  This Convertible Note Purchase
24  Agreement, this Agreement, dated as of May 25, 2022,
25  effective date is entered into among Takeover

Page 28



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW Document 102-15 Filed 01/10/25 Page 12 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

1 Industries, a Nevada corporation, James V. Deppoleto
2 Jr, an individual purchaser for the limited purposes
3 provided in Sections 4 and 8.5, Labor Smart, Inc., a
4 Nevada corporation and majority shareholder of the
5 company.
6     And then if we skip down to paragraph No. 1,
7 it says:  Purchase and Sale:  In exchange for $500,000
8 the consideration paid by purchaser, the company shall
9 sell and issue to purchaser a secured convertible
10 promissory note in the form attached hereto as Exhibit
11 A.  The note will have a principal balance in the
12 amount of the consideration.
13     Did I read that correctly?
14 **A  It appears so.**
15 Q   Thank you.  So let's go to, I believe it's not
16 going to be the last page.  It's going to be page 20
17 and 21.
18     Do you see these signature lines here,
19 Mr. Deppoleto?
20 **A  Yes.**
21 Q   We'll go to the next page.  So Mr. Deppoleto,
22 do you see the signature lines for Jason Tucker,
23 President of Takeover Industries and Michael Costello,
24 Chief Executive Officer of Takeover Industries?
25     MR. HARVEY:  Counsel, we're not on that page
Page 29

1 on our screen.
2     MR. BENNION:  I apologize.  There we have it.
3 BY MR. BENNION:
4 Q   Do you see those signatures, Mr. Deppoleto?
5 **A  I see them.**
6 Q   And were these the two individuals that you
7 negotiated with when you entered into the convertible
8 note purchase agreement May 25, 2022?
9     MR. HARVEY:  Objection.  Vague.  Also
10 compound.
11     Go ahead.
12     THE WITNESS:  I believe Tucker was the
13 representation, I believe.
14 BY MR. BENNION:
15 Q   Did you speak with Michael Costello about your
16 signing of the Convertible Note Purchase Agreement,
17 which is identified as Exhibit 3, prior to your signing
18 of the document?
19 **A  I did not.**
20 Q   Have you ever met Michael Costello?
21 **A  I have.**
22 Q   When did you meet him?
23 **A  I cannot recall.**
24 Q   Let's go to the next page.  And is that your
25 authorized signature as a purchaser on this Convertible
Page 30

1 Note Purchase Agreement, identified in this deposition
2 as Exhibit 3?
3 **A  It appears so, yes.**
4 Q   And it's your testimony that you paid $500,000
5 on or about May 25, 2022, to Takeover Industries as
6 part of this agreement?
7 **A  Yes.**
8 Q   Did you speak -- let's go back.
9     So after the meeting with Mr. McBride and
10 Mr. Pavlik and Mr. Tucker in April of 2022, at the
11 Dallas -- we'll call it PFL event, meaning Professional
12 Fighters League; correct?
13 **A  I'm not sure of the question.**
14 Q   Would you agree with the acronym PFL for
15 Professional Fighters League?
16 **A  Yes.**
17 Q   Okay.  Did you speak with Toby McBride or Joe
18 Pavlik after that event prior to signing the
19 Convertible Note Purchase Agreement May 25, 2022?
20 **A  I don't recall.**
21 Q   When did you first meet Michael Costello?
22 **A  I don't recall that either.**
23 Q   When was the last time you spoke with Michael
24 Costello?
25 **A  I don't recall that either.**
Page 31

1 Q   What is your understanding of Mr. Costello's
2 role with Takeover Industries?
3     MR. HARVEY:  I'll just object as vague as to
4 time.
5     Go ahead.
6     THE WITNESS:  I believe he was sales capacity,
7 also CEO.  I'm not sure, but more on the sales
8 capacity.
9 BY MR. BENNION:
10 Q   In sales capacity, we'll take May 25, 2022 as
11 the time period, what was your understanding of
12 Mr. Costello's role as a salesperson for Takeover
13 Industries?
14 **A  I don't have any understanding of that role**
15 **other than that he was in sales.**
16 Q   Did he do sales for the gamer shot or for the
17 energy drink?
18 **A  I don't know that for sure.**
19 Q   Okay.  Let's move on for a second.  We'll come
20 back to Exhibit 3 momentarily.
21     Let's go to Exhibit 4.  This is the Secured
22 Convertible Promissory Note dated May 25, 2022.  It
23 says $500,000.  Take a moment to read the first
24 paragraph.  I won't read it to you.
25 **A  Okay.**
Page 32



James V. Deppoleto, Jr. – 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 13 of 53

Page 33

1  Q   Are you familiar with this document?  Have you
2  seen it before?
3     A   I believe so, yes.
4     Q   Let's go to the last page.  Are you familiar
5  with that signature that is above the line that says:
6  Print Name: Jason Tucker?
7     A   I wouldn't say I'm familiar with the
8  signature, but it looks like Jason Tucker's signature,
9  yes.
10    Q   Okay.  Let's go down further, please, or
11 farther.
12       EXHIBIT TECH:  This is the last page, Counsel,
13 so I'm sorry.  Did you need to go back?  It's a
14 three-page document.
15       MR. BENNION:  Let me double-check.
16 BY MR. BENNION:
17    Q   Okay.  Mr. Deppoleto, you've seen this
18 document before?
19    A   I believe so.
20    Q   Let's go to Exhibit 4 -- or that's Exhibit 4.
21 Let's go to Exhibit 5.
22       Exhibit 5 is the First Amendment to
23 Convertible Note Purchase Agreement and it's made and
24 entered into as of July 6, 2022.
25       Do you see that at the bottom of the first

Page 34

1  paragraph, Mr. Deppoleto?
2     A   Yes.
3     Q   Do you recall entering into a First Amendment
4  to Convertible Note Purchase Agreement that's reflected
5  in Exhibit 5?
6     A   I don't specifically recall.
7     Q   Do you recall -- if you look at the second
8  paragraph under Recitals:  Whereas, the purchaser
9  desires to provide additional capital to the company
10 for operating expenses in the amount of $500,000, the
11 additional note consideration.
12       Does that sound familiar?
13    A   Actually, the sentence below that, the second
14 note, that makes it more familiar.
15    Q   The Whereas paragraph below that?
16    A   Correct.  If this is the second note, then
17 yes.  I remember giving them a second note for
18 $500,000, yes.
19    Q   On or about July 6, 2022; is that correct?
20    A   I don't recall the date.
21    Q   Let's go back to the top of the document.  The
22 date of the document, July 6, 2022, do you see that?
23    A   Yes.
24    Q   Does that refresh your recollection?
25    A   It does not.

Page 35

1  Q   How was it that you came to invest or to pay
2  another $500,000 to Takeover Industries for operating
3  expenses?
4     A   I'm sorry.  What is the question?
5     Q   Here you are paying another $5,000 to Takeover
6  Industries, is that correct, as of --
7     A   Not correct.  $500,000.
8     Q   For operating expenses; is that correct?
9     A   It says that on the agreement, yes.  And that
10 was our second note for $500,000.  This was a grouping
11 for 2 million.  This was the second note that came
12 through.
13    Q   When you say grouping of 2 million, what do
14 you mean?
15    A   The investment was for 2 million.  It came in
16 four different tranches of 500,000 apiece.
17       MR. BENNION:  Can you all see me?  I just lost
18 you off the screen.
19       THE WITNESS:  We see you.
20       MR. HARVEY:  I see you.
21       MR. BENNION:  I can't see any of you.
22       (Discussion held off the record.)
23 BY MR. BENNION:
24    Q   Okay.  Let's go down to pages 4 and 5 of
25 Exhibit 5.

Page 36

1       Do you see that page 4, Mr. Deppoleto?
2     A   Yes.
3     Q   Okay.  Once again, it's signed Takeover
4  Industries, Jason Tucker, President.
5       Do you see that?
6     A   I do.
7     Q   And then Labor Smart, Inc, Michael Costello,
8  Chief Executive Officer.
9       Do you see that as well?
10    A   I do.
11    Q   What is Labor Smart, Inc?
12       MR. HARVEY:  Objection.  Foundation.
13       Go ahead.
14       THE WITNESS:  I'm not sure how to answer that.
15 And I don't know how that would be categorized.
16 BY MR. BENNION:
17    Q   Are you familiar with Labor Smart, Inc., that
18 company?
19    A   Yes.
20    Q   How so?
21    A   Just that it was part of this deal here.  It
22 was commingled with Takeover, I believe.
23    Q   Was their vehicle for stock trading, perhaps?
24    A   (No audible answer.)
25    Q   And once again, it's your understanding that



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 14 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1 Michael Costello's role at Labor Smart was as a
2 salesman?
3    MR. HARVEY: Objection. Misstates previous
4 testimony.
5    THE WITNESS: I'm not sure what his title was.
6 BY MR. BENNION:
7    Q  It says here chief executive officer; correct?
8    A  It does.
9    Q  Okay. Let's go to the next page.
10    Is that your authorized signature, the
11 Docusign document by James V. Deppoleto Jr.?
12    A  It appears so, yes.
13    Q  Do you recall signing this document or
14 authorizing the Docusigning of this document?
15    A  I remember authorizing a second note, yes.
16    Q  Is that your email address below the signature
17 line at the bottom?
18    A  Yes.
19    Q  Is that your current email address?
20    A  Yes.
21    Q  So while we're here, quintecconveyor.com, do
22 you operate solely in the State of Wisconsin?
23    A  How do you mean?
24    Q  In your business. You're president of --
25 what's the name of the company? I can go back to it

Page 37

1 and find it. You spoke of it earlier.
2    A  Quintec.
3    Q  What's the full name?
4    A  Quintec Integration, Inc.
5    Q  Now, does Quintec Integration, Inc. -- and for
6 ease and reference we'll just call it Quintec now --
7 does it operate solely in Wisconsin?
8    A  What does that mean?
9    Q  Do you do business only in the State of
10 Wisconsin?
11    A  No.
12    Q  What states do you do business in --
13    A  45 out of the 50 states.
14    Q  So for example, you do business in Nevada,
15 perhaps?
16    A  I'm not sure if we've done any business in
17 Nevada, but perhaps.
18    MR. BENNION: Okay. Let's take a five-minute
19 break right now. Is that all right, Counsel?
20    MR. HARVEY: Sure.
21    (Recess taken.)
22    THE WITNESS: Mr. Bennion, we wanted to
23 clarify that you asked about a deposition I think when
24 we were missing each other on targets for -- you were
25 talking about the notes, I was talking about the

Page 38

1 investment. Same thing with the deposition, I assumed
2 you were referring to the deposition time. But I've
3 been deposed before. I'm not sure if I've answered
4 that, that I've been deposed before in a different
5 case, but years ago.
6 BY MR. BENNION:
7    Q  I'll ask you some more about that. Thank you.
8    A  Okay.
9    Q  Mr. Deppoleto, you just stated that you were
10 deposed previously, meaning before this case in another
11 case; is that correct?
12    A  Correct.
13    Q  And what was the nature of that lawsuit?
14    A  27 years ago, I believe, it was a non-compete
15 of some sort.
16    Q  Involving which company that you worked for?
17    A  Babush Corporation.
18    Q  And what was your role at Babush Corporation?
19    A  Sales.
20    Q  And what was the nature of the business that
21 Babush Corporation was involved in?
22    A  Material handling equipment.
23    Q  How do you spell Babush?
24    A  B-A-B-U-S-H. They're out of business.
25    Q  Did you have an ownership interest in that

Page 39

1 business?
2    A  I did not.
3    Q  And you haven't been deposed other than in
4 this case or in the Babush case?
5    A  Yeah. I believe that's it.
6    Q  Let's go to -- well, did you attend an event
7 in June of 2022 in Atlanta, a PFL event?
8    A  I went to see my cousin fight again, yes.
9    Q  Mr. Pettis?
10    A  Yes.
11    Q  I see. And did you meet with Jason Tucker at
12 that event?
13    A  I believe he might have been there. I'm not
14 sure who of the group was there. Maybe McBride and
15 maybe Pavlik. I'm not sure.
16    Q  Tucker was there?
17    A  Yes.
18    Q  And you met with Jason Tucker before that
19 event?
20    A  During that event.
21    Q  When you say during, what does that mean?
22    A  Sitting in the seats watching the fight.
23    Q  So you didn't meet with Jason Tucker prior to
24 the fight?
25    A  I don't believe so, no.

Page 40



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW Document 102-15 Filed 01/10/25 Page 15 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

1  Q   Did you meet with a rapper by the name of
2  T-Pain at that time in Atlanta with Mr. Tucker?
3  A   I don't recall.
4  Q   Do you know who T-Pain is?
5  A   I do, yes.
6  Q   What was the nature of his involvement with
7  Takeover Industries?
8  A   They were using his image in one of their
9  shots, I think.
10  Q   On an energy drink or --
11  A   Whatever their little shot -- I believe it was
12  energy, yes.
13  Q   So it wasn't a gamer shot, it was an energy
14  drink?
15  A   I believe that's what it is.  It's an energy
16  drink or an energy shot.
17  Q   Was that meeting attended by you and
18  Mr. Tucker with T-Pain, were Toby McBride or Joe Pavlik
19  there?
20  A   Again, I don't recall the meeting and I
21  wouldn't recall if Joe or McBride were there.
22  Q   So you don't recall meeting with T-Pain in
23  June of 2022 at the PFL event in Atlanta, Georgia?
24  A   I don't.  I've seen him on multiple occasions.
25  I don't recall for that, though.

1  A   We met at his office.  I don't remember when.
2  Q   Have you met with T-Pain more than one time at
3  his office in Atlanta?
4  A   No.
5  Q   What was the purpose of your meeting when you
6  and Jason Tucker met with T-Pain in Atlanta at his
7  office?
8  A   I was there observing.  It was just a chance
9  to meet T-Pain and they were talking, I think, about
10  the energy shot.  I'm not sure.
11  Q   Was there a reason why it was important to
12  meet with T-Pain about the energy shot?
13  A   I don't know what -- Mr. Tucker's agenda, I
14  just tagged along.
15  Q   And Mr. Tucker's position at the time with
16  Takeover Industries was president?
17  A   I don't recall.  Again, like I said, I saw
18  that moniker around on all of their titles at one
19  point.
20  Q   Were you ever a member of the Board of
21  Directors for Takeover Industries?
22  A   I was not.
23  Q   Did you ever ask to be a member of the
24  Takeover Board of Directors?
25  A   I did not and my attorneys did not allow that

1  Q   You don't recall when you met T-Pain?
2  A   Correct.
3  Q   Do you recall when you first met T-Pain?
4  A   I do not.
5  Q   Could it have been at the June 2022 PFL event
6  in Atlanta?
7  A   It was not at that event.
8  Q   T-Pain was not at that event?
9  A   I don't believe so.
10     MR. HARVEY:  I'm sorry I think you guys -- do
11  you mind asking that question again?  I think he didn't
12  hear you.  I think he gave an answer that was not
13  answering your question.  Sorry.
14  BY MR. BENNION:
15  Q   I simply asked:  You testified that T-Pain was
16  not at the PFL event in Atlanta in 2022; is that
17  correct?
18  A   I believe he was not.
19  Q   Did you meet with T-Pain in 2022 with Jason
20  Tucker at T-Pain's offices in Atlanta?
21  A   We met with him.  I don't remember the date or
22  time, no.
23  Q   You don't remember if you met with T-Pain and
24  Jason Tucker at T-Pain's offices in June of 2022 in
25  Atlanta?

1  as well.  That was one of the stipulations we were not
2  going to do right from the start.  In fact, they
3  prematurely listed me as a member or listed me as a
4  member and my attorney sent cease and desist letters.
5  I was not supposed to be there.
6  Q   Who do you say listed you as member of the
7  Board of Directors?
8  A   Whoever from that company listed -- put a post
9  out there that was not accurate.
10  Q   What was the nature of the post?
11  A   I believe listing -- trying to list me as a
12  Board member of some sort that was just not accurate.
13  Q   Are you familiar with the name Mike
14  Tzanetatos?
15  A   Mike T maybe?
16  Q   That would be better.
17  A   I think that's his name Tiz.  I don't know his
18  last name, but T-I-Z.
19  Q   Let's go to Exhibit 10.  Take a minute to
20  review this invoice.
21  A   Okay.
22  Q   Are you familiar with it?
23     MR. HARVEY:  What number was this?
24     MR. BENNION:  I believe it's Exhibit 10.
25     MR. HARVEY:  Okay.  Thank you.



James V. Deppoleto, Jr. – 12/5/2024
Case 2:22-cv-02013-GMN-BNW   Document 102-15   Filed 01/10/25   Page 16 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

1    MR. BENNION:  Let me know when everybody is
2  there.
3    THE WITNESS:  I've never seen that invoice.
4  BY MR. BENNION:
5    Q   Let's go back to the body of it.  Thank you.
6    Now, it says ATTN in the first rectangle box,
7  Michael Tzanetatos?
8    A   Mike T is what I'm familiar with, yes.
9    Q   Is this the Mike T that you're referring to?
10   A   I don't think that's the right spelling of his
11  name, but I'm going to say probably.
12   Q   I'm not sure, I believe that's a Greek name.
13  I'd like to refer to him as Mike T for accuracy.
14   Who is Mike T?
15   A   Again, sales capacity, but maybe something
16  with product, the trucking, I'm not sure.  I'm not
17  exactly sure of Mike's position.
18   Q   You see how it says Family Dollar, are you
19  familiar with Takeover Industries' involvement with a
20  deal, contract with Family Dollar?
21   MR. HARVEY:  Objection.  Vague and compound.
22   Go ahead.
23   THE WITNESS:  I'm not personally aware of
24  that, no.
25  BY MR. BENNION:

Page 45

1    Q   Do you have any awareness of Takeover
2  Industries doing business or attempting to do business
3  with Family Dollar?
4    MR. HARVEY:  Same objections.
5    Go ahead.
6    THE WITNESS:  Attempting to do business?  I
7  believe they're attempting to do business, yes.
8  BY MR. BENNION:
9    Q   And how so was Takeover Industries attempting
10  to do business with Family Dollar?
11   A   I don't know.  I'm not involved.  I wasn't
12  involved in their day-to-day.  I just was aware that
13  this was a potential.
14   Q   What was your involvement day to day with
15  Takeover Industries after signing the Convertible Note
16  Purchase Agreement, the First Amendment to the
17  Convertible Note Purchase Agreement and the Second
18  Amendment to the Convertible Note Purchase Agreement,
19  at which time $500,000 was paid to Takeover?
20   MR. HARVEY:  Objection.  Compound and vague.
21   Go ahead.
22   THE WITNESS:  I had no day-to-day activities.
23  BY MR. BENNION:
24   Q   So what was your involvement when you
25  contributed this money to Takeover?  Did you simply --

Page 46

1    A   An investor.  I would call on my investment
2  and I guess would get whatever token these guys were
3  throwing out.
4    Q   You testified earlier that there was four
5  tranches, I believe you used that term, of $500,000
6  each that you contributed to Takeover; is that correct?
7    A   I believe there was three and then the last
8  one was payment direct to the vendor.
9    Q   Which vendor?
10   A   Great Northern.
11   Q   What was the purpose of that?
12   A   They were making scans for their energy
13  drinks, I believe.
14   Q   So let's go back to Exhibit 10, which is in
15  front of us.  Under the description it says:  Slotting
16  fees T-Pain energy drink.  You testified earlier that
17  you met with T-Pain on at least one occasion prior to
18  the date of this invoice, November 2, 2022; is that
19  correct?
20   A   I did not testify to that.
21   Q   It's your testimony that you had not met with
22  T-Pain before November 2, 2022?
23   A   I don't know the correlation of the date so
24  that's what I'm not sure of.
25   Q   But you testified that you did meet with

Page 47

1  T-Pain at his office in Atlanta; correct?
2    A   I met with him once, according to what you
3  said, yes.  One time, yes.
4    Q   And you don't know whether it was before or
5  after --
6    A   I don't recall.  I don't recall the timing of
7  this.  I never saw this invoice.
8    Q   If you can just allow me to finish the
9  question before you answer, Mr. Deppoleto, that will be
10  easier.
11   Do you know what a slotting fee is?
12   A   I do not.
13   Q   It says here:  Slotting fees T-Pain energy
14  shot, then down below a slotting allowance, a total of
15  $3,047,200.
16   Do you see that?
17   A   Sure.
18   Q   Were you aware in or about November of 2022
19  that Takeover Industries had received this Family
20  Dollar vendor funding invoice?
21   A   I'm not aware of their invoices.
22   Q   Had you spoken to Mike T with regard to Family
23  Dollar?
24   A   I did not.
25   Q   Have you spoken to Mike Costello with regard

Page 48



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW   Document 102-15   Filed 01/10/25   Page 17 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

Page 49

1  to Family Dollar?
2  **A   Possibly vague generalities with him.**
3  Q   When did you first meet Mike Holley?
4  **A   I can't hear you.**
5  Q   When did you first meet Mike Holley?
6  **A   I believe in Arizona at a court case.**
7  Q   You don't recall when?
8  **A   I do not.**
9  Q   Did you ever speak to Jason Tucker about
10  Takeover Industries doing a deal with Family Dollar?
11  **A   As far as I know, there was no deal with**
12  **Family Dollar.**
13  Q   And how do you know that?
14  **A   Same way I don't know about this.  I don't**
15  **know.  I don't know of any deal.  I don't know of a**
16  **deal.  I wasn't privy to their day-to-day operations.**
17  Q   Did anybody at Takeover Industries ask you to
18  contribute monies to Takeover Industries to do a deal
19  with Family Dollar?
20  **A   They asked for more money, that was not**
21  **coming.  So what it was for, I would assume -- maybe it**
22  **would be for this, but again, I've never seen this**
23  **invoice so I don't know.**
24  Q   So they didn't have -- who are they, by the
25  way?

Page 50

1  **A   Whoever was -- I don't recall who was in**
2  **charge at that time.**
3  Q   Jason Tucker?
4  **A   Tucker would have been one of them, I would**
5  **assume.**
6  Q   Let's go back to Mike T for a minute.  When
7  was the last time you spoke to Mike T, meaning the
8  Michael Tzanetatos referenced in Exhibit 7 -- or
9  Exhibit 10?
10  **A   I do not recall.**
11  Q   Do you recall the first time you met him?
12  **A   Mike?  I don't really.  I cannot recall.**
13  Q   Michael Costello, when did you first meet him?
14  **A   I don't recall when I first met him either.**
15  Q   Did you ever meet Melissa Tucker?
16  **A   Yes.**
17  Q   And when was that?
18  **A   I don't recall when I first met her.**
19  Q   What is your understanding of Melissa Tucker's
20  role at Takeover Industries?
21  **A   I believe in marketing.**
22  Q   And is she Jason Tucker's wife?
23  **A   I believe so.**
24  Q   When was the last time you spoke to Jason
25  Tucker?

Page 51

1  **A   Couple weeks ago.**
2  Q   And what was the nature of your conversation?
3  What was it about?
4  **A   Him looking for money.**
5  Q   Jason Tucker looking for money for what?
6  **A   Another business venture that is not**
7  happening, at least not for me.
8  Q   With what company?
9  **A   I don't recall.  His company, I think.**
10  Q   And what is his company?
11  **A   I don't know what the name of that is called**
12  **just yet.**
13  Q   What's the nature of his company's business?
14  **A   I don't know.**
15  Q   But he was looking for you to pay or
16  contribute money to his company; is that correct?
17  **A   Looking for investors, yes.**
18  Q   Mr. Deppoleto, do you recall attending a
19  meeting in Las Vegas with Living Essentials, the parent
20  company of 5-hour Energy with Jason Tucker in
21  October of 2022?
22  **A   I don't recall the date, but I did sit in on a**
23  **meeting.  I believe it was at a time of a NACS Show.**
24  Q   That's NACS; is that correct?
25  **A   That I don't know.**

Page 52

1  Q   Do you know what NACS stands for?
2  **A   Some kind of, like, gas station, grocery store**
3  **type event, I think.**
4  Q   And you attended that event with Mr. Tucker in
5  Las Vegas?
6  **A   That's inaccurate.  I flew down there on my**
7  **own to visit my cousin and I decided to go to that**
8  **show.**
9  Q   Was Mr. Tucker at that show?
10  **A   He was, yes.**
11  Q   And you attended a meeting at the NACS Show in
12  Las Vegas with Living Essentials, the parent company of
13  5-hour Energy with Jason Tucker; is that correct?
14  **A   I didn't go --**
15  MR. HARVEY:  Asked and answered.
16  Go head.
17  THE WITNESS:  I sat in on a meeting.
18  BY MR. BENNION:
19  Q   And who was there from Living Essentials?
20  **A   One individual.**
21  Q   And what was his or her name?
22  **A   I don't recall.  It was whoever was at the**
23  **booth, I believe, at that time.**
24  Q   And where was this event held, which hotel?
25  **A   I'm not sure of the hotel.  It was in Las**



James V. Deppoleto, Jr.   –   12/5/2024
Case 2:22-cv-02013-GMN-BNW   Document 102-15   Filed 01/10/25   Page 18 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1  Vegas.
2      Q    What was the purpose of that meeting?
3          MR. HARVEY:  Objection.  Foundation.
4          Go ahead.
5          THE WITNESS:  I just sat in on that meeting.
6  BY MR. BENNION:
7      Q    Were you asked by Mr. Tucker to go to that
8  meeting?
9      **A    I was there, so yeah, he asked me to attend.**
10     Q    You don't recall the nature of what was
11  discussed at that meeting?
12     **A    Again, pie in the sky, talking about their**
13  **drinks, talking about Takeover drinks, but I don't**
14  **believe it went anywhere.**
15     Q    Did that meeting have any -- were there any
16  discussions regarding the gamer shot that had been
17  produced and marketed by Takeover Industries?
18     **A    I don't recall.**
19     Q    Do you recall the nature of that meeting with
20  5-hour Energy/Living Essentials was with respect to
21  marketing a gamer shot?
22     **A    It was a general meeting.  It really was not**
23  **substantive at all.**
24     Q    Have you had any business dealings with Living
25  Essentials, the parent company of 5-hour Energy?

1      **A    I have not.**
2      Q    Do you know if Mr. Tucker has had any business
3  dealings with Living Essentials, the parent company of
4  5-hour Energy?
5          MR. HARVEY:  Objection.  Foundation.
6          Go ahead.
7          THE WITNESS:  I have no idea.
8  BY MR. BENNION:
9      Q    Did Mike Costello and Mike T, did they attend
10  that meeting or that conference in Las Vegas, the NACS
11  Show?
12         MR. HARVEY:  Compound.
13         Go ahead.
14         THE WITNESS:  I believe they were at that
15  show.
16  BY MR. BENNION:
17     Q    And do you know why they were there?
18     **A    It's their industry.**
19     Q    Did it have anything to do with promoting
20  gamer shots?
21         MR. HARVEY:  Objection.  Foundation.
22         Go ahead.
23         THE WITNESS:  I couldn't tell you.  I'm not
24  them.
25  BY MR. BENNION:

1      Q    Did you have any discussions with Mike T or
2  Mike Costello at the NACS Show in Las Vegas in
3  October of 2022?
4      **A    Did I have a conversation with them?**
5      Q    Yes.
6      **A    Yes.**
7      Q    Did they attend the meeting that you and Jason
8  Tucker attended with Living Essentials, the parent
9  company of 5-hour Energy?
10     **A    I believe Costello might have been there.  I'm**
11  **not sure about Mike T.**
12     Q    Do you recall anything Mr. Costello said at
13  that meeting?
14     **A    I don't believe he said anything.**
15     Q    And it's your testimony that you didn't say
16  anything in that meeting either; correct?
17     **A    I was observing.**
18     Q    So Jason Tucker was the spokesperson with the
19  people at Living Essentials and 5-hour Energy?
20         MR. HARVEY:  Objection.  Vague.
21         Go ahead.
22         THE WITNESS:  I don't really know how to
23  answer that, but yes, did he talk.
24  BY MR. BENNION:
25     Q    So Mr. Tucker was the primary speaker at that

1  meeting from the Takeover Industries group, including
2  you and Mr. Costello; correct?
3          MR. HARVEY:  Hold on.  Objection.  Misstates
4  previous testimony and the evidence and vague.
5          Go ahead.
6          THE WITNESS:  I'm sorry.  Can you ask that
7  again?
8  BY MR. BENNION:
9      Q    Yes.  So you indicated that you just observed
10  at that meeting with Living Essentials, 5-hour Energy
11  at the NACS Show in October 2022; correct?
12     **A    Yes.**
13     Q    And you don't recall anything that
14  Mr. Costello said at that meeting; correct?
15     **A    Correct.**
16     Q    And you do recall Mr. Tucker speaking at that
17  meeting; correct?
18     **A    I recall him speaking, yes.**
19     Q    About what?
20     **A    It was a very general conversation.  It really**
21  **was not that fascinating of a conversation.**
22     Q    Do you know if Joe Pavlik planned to attend
23  that conference in Las Vegas in October of 2022?
24         MR. HARVEY:  Objection.  Foundation.  Calls
25  for speculation.

James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 19 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1    Go ahead.
2    THE WITNESS: I do not know.
3  BY MR. BENNION:
4    Q    Was there an award presented at that
5  conference in Las Vegas that you and Jason Tucker and
6  Mike T and Mike Costello attended known as the Product
7  of the Year?
8    A    I did not attend anything. I took a picture
9  with them with their plaque.
10    Q    What type of plaque was it?
11    A    A cheap little plastic plaque, I believe.
12    Q    Was it for a Product of the Year plaque for a
13  NXT LVL gamer shot?
14    A    I believe it was for a product that they were
15  trying -- I believe it was that, but I'm not sure.
16    Q    Did that photo appear on Twitter, as far as
17  you know?
18    A    I believe so, but again, not sure.
19    Q    Do you know why it would be important to post
20  that photo on Twitter?
21    MR. HARVEY: Objection. Foundation. Calls
22  for speculation.
23    Go ahead.
24    THE WITNESS: Not my business. I'm not sure.
25  Not a big Twitter man.
                                        Page 57

1  BY MR. BENNION:
2    Q    Did you have any discussions with Joe Pavlik
3  about your decision to attend the conference at NACS
4  event in October of 2022?
5    A    I don't believe I had very many conversations
6  with Joe, if any.
7    Q    So you don't recall if you had any
8  conversations with Joe Pavlik about attending that
9  event in Las Vegas in October of 2022; correct?
10    A    Not at all.
11    Q    When was the last time you spoke to Joe
12  Pavlik?
13    A    I cannot recall.
14    Q    When was the last time you spoke with T-Pain?
15    A    It could have been at that meeting. Could
16  have been the last time.
17    Q    In Las Vegas in October of 2022?
18    A    No. No. I don't believe he was there.
19    Q    At what meeting?
20    A    When we met at his office, whatever date that
21  was when we were there. I believe that's the only time
22  I've had a face-to-face meeting with him.
23    Q    In or about June of 2022 in Atlanta?
24    A    I do not recall. I do not recall that. I
25  don't know the date.
                                        Page 58

1    Q    Have you spoken with T-Pain since that time on
2  the phone?
3    A    I have not.
4    Q    Have you had any communications with T-Pain,
5  text, email or otherwise, since that meeting?
6    A    I don't have T-Pain's number.
7    Q    The question is: Have you texted him, emailed
8  him or communicated in writing with T-Pain otherwise
9  since that meeting?
10    A    I do not have his contact information.
11    Q    So your answer is you have not written to him
12  since that time?
13    A    Correct.
14    Q    Thank you.
15    Have you had any business dealings with 5-hour
16  Energy?
17    A    No.
18    Q    Do you know if Jason Tucker has any business
19  dealings with 5-hour Energy?
20    A    I don't know what Jason does.
21    Q    Were you invited to attend a meeting of the
22  Board of Directors of Takeover Industries on
23  November 7, 2022?
24    A    I don't believe so.
25    Q    Do you know if Jason Tucker was invited to
                                        Page 59

1  attend a meeting of the Takeover Industries' Board of
2  Directors on November 7, 2022?
3    A    I would not know that information.
4    Q    Have you ever attended a meeting of the
5  Takeover Industries' Board of Directors?
6    A    I do not recall. I don't believe so.
7    Q    Do you know who the Takeover Industries' Board
8  of Directors were comprised of, which individuals in
9  October of 2022?
10    A    I do not.
11    Q    Let's go to Exhibit 6. Pull up Exhibit 6.
12    It's the Second Amendment to Convertible Note
13  Purchase Agreement.
14    Do you see that, Mr. Deppoleto?
15    A    Yes.
16    Q    Have you seen this document before?
17    A    Looks like it's the third note of the
18  $2 million loan to them.
19    Q    And once again, if we go to page 4 of
20  Exhibit 6, this is signed by Jason Tucker.
21    Does that appear to be his Docusign signature
22  as president of Takeover Industries?
23    A    I don't know his Docusign signature, but that
24  looks to be his name and a signature.
25    Q    So this note, if we go back to page 1, and
                                        Page 60

James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW   Document 102-15   Filed 01/10/25   Page 20 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

1 this is the third Whereas paragraph under Recitals, it
2 says: Whereas the purchaser desires to provide for
3 additional capital to the company for operating
4 expenses of $500,000.
5     What were the operating expenses that you were
6 providing additional capital for to Takeover?
7   **A   I don't -- I don't recall specifically what**
8 **they were.  We just wanted them to be for the**
9 **day-to-day operation of business, but we couldn't**
10 **dictate that other than what our note stated.**
11   Q   You say day-to-day operation of business.
12 What is your understanding of that?
13   **A   To me it would be regular business activities,**
14 **nothing fluffy.  It had to go towards stuff that was**
15 **actual business operations.**
16   Q   What was your understanding of Toby McBride's
17 role at Takeover at the time that you signed the Second
18 Amendment to the Convertible Note Purchase Agreement
19 reflected here as Exhibit 6?
20   **A   I don't know what his title was at any given**
21 **time.**
22   Q   What was his role at the company at that time?
23   **A   Again, another guy listed as president.**
24   Q   So when you say another guy listed as
25 president, you met with Mr. McBride in April of 2022 in

Page 61

1 Dallas at the PFL event; correct?
2   **A   I believe so, yes.**
3   Q   What was the nature of your conversation with
4 Mr. McBride at that time?
5   **A   He was pitching fluffy dreams.**
6   Q   And you invested in these fluffy dreams?
7   **A   No.  I dug a little further and felt like**
8 **there was -- Tucker seemed to be a guy that, you know,**
9 **got along with them that understood the nature of**
10 **business.**
11   Q   Have you ever invested in other companies
12 besides Takeover Industries?
13   **A   Small investments maybe here and there with**
14 **some companies, but nothing to this nature.**
15   Q   When you invested with Takeover Industries or
16 contributed, and it says here in Exhibit 6 -- keep the
17 highlight on that paragraph, please -- under Recitals:
18 Whereas, the purchaser desires to provide additional
19 capital for operating expenses in the amount of
20 $500,000.
21     And that's the third $500,000 payment you
22 made; correct?
23   **A   Yes.**
24   Q   When you made these payments to Takeover did
25 you understand that there was a risk, that you might

Page 62

1 not have a return on your payment of $1.5 million?
2     MR. HARVEY:  Objection.  Vague.
3     Go ahead.
4     THE WITNESS:  Again, I don't quite understand
5 the question.
6 BY MR. BENNION:
7   Q   So when you paid three payments of $500,000,
8 each in May, July and in August of 2022, did you
9 understand there was a risk that you may not have a
10 return on your investment?
11     MR. HARVEY:  Objection.  Vague.
12     THE WITNESS:  Is it a possibility?  Probably.
13 But was it a possibility that I could consider?
14 Probably.
15 BY MR. BENNION:
16   Q   That you may not -- that you might lose the
17 $1.5 million?
18   **A   No.  I didn't think that at all during the**
19 **time, no.  Everything seemed viable and everything**
20 **seemed that they would request each time and that was**
21 **the reason for the third tranche.  They needed working**
22 **capital.**
23   Q   For operating expenses; correct?
24   **A   I believe so, yes.**
25   Q   Did you monitor those operating expenses after

Page 63

1 you made these payments to the company, the first,
2 second and third $500,000 payments?
3   **A   We would call in and check and try to keep our**
4 **thumb out of it as much as possible, but it's worth**
5 **listening to people's words other than anything else.**
6 **I believe we had a stipulation in there as well in the**
7 **agreement that they could only use 10 percent for**
8 **salaries.  We wanted the remainder being used as**
9 **working capital.**
10   Q   Do you know who was paid salaries during this
11 period of time, let's say, from May through September
12 of 2022 at Takeover Industries?
13   **A   I do not.**
14   Q   Do you know if Jacob -- or Jason and Melissa
15 Tucker were receiving salaries from Takeover Industries
16 during this period of time?
17   **A   I do not know that.**
18   Q   Did you receive any reports as to who was
19 receiving salaries?
20   **A   I did not.**
21   Q   Did you ask for reports from Takeover
22 Industries as to who was receiving salaries during this
23 period of time in or about the summer of 2022?
24   **A   I don't recall that.  I don't remember asking**
25 **for any reports, but it's possible.**

Page 64



James V. Deppoleto, Jr. – 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 21 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1  Q   And in asking for reports from Takeover
2  Industries, did you ever email either Mr. Tucker or
3  Mr. McBride with respect to who was receiving salaries
4  from Takeover Industries during this period of time?
5  **A   So I just stated that I'm unaware of those**
6  **salaries.  So I just don't know what they were using the**
7  **money for.  I did not have access or day-to-day -- I**
8  **wasn't involved in day-to-day operations.  I wanted to**
9  **protect my money.**
10  Q   And wanting to protect your money, did you
11  send emails to either Mr. Tucker or Mr. McBride during
12  this period of time from May through August of 2022 as
13  to who was receiving salaries at Takeover Industries?
14  **A   I don't recall that.**
15  Q   Do you recall sending any emails to Takeover
16  Industries during this period of time, May to August of
17  2022?
18  **A   I don't recall sending those, but I'm assuming**
19  **there was some communication.**
20  Q   In writing?
21  **A   Possibly.  I don't feel like I had very many**
22  **communications with McBride or Pavlik.**
23  Q   Do you recall the last time you spoke to Toby
24  McBride?
25  **A   I do not.**

Page 65

1  Q   Did you have any written communications with
2  Joe Pavlik or Toby McBride after you met with them in
3  April of 2022 regarding Takeover Industries?
4  **A   I don't recall.**
5  Q   Was there a person who was your point of
6  contact at Takeover Industries during this period of
7  time?
8  MR. HARVEY:  Objection.  Vague.
9  Go head.
10  THE WITNESS:  Generally, we made that
11  Mr. Tucker because he was the only one not pitching
12  dreams and seemed to be the one that had at least
13  something to say.  The other two did not.
14  BY MR. BENNION:
15  Q   So it's your testimony that Mr. McBride and
16  Mr. Pavlik were simply pitching dreams as part of
17  Takeover Industries?
18  MR. HARVEY:  Objection.  Asked and answered.
19  Vague and misstates previous testimony.
20  Go ahead.
21  THE WITNESS:  I'm sorry.  Can you repeat that?
22  BY MR. BENNION:
23  Q   Sure.  Is it your testimony that Mr. McBride
24  and Mr. Pavlik were, when you spoke to them, including
25  your meeting in April of 2022 and thereafter, were

Page 66

1  simply pitching dreams as --
2  **A   That seems to be the flavor of their -- I'm**
3  **sorry.  Go ahead.  I apologize.**
4  MR. HARVEY:  You gotta let him finish his
5  question.
6  THE WITNESS:  Yes, sir.
7  BY MR. BENNION:
8  Q   -- were simply pitching dreams as part of
9  their work at Takeover Industries?
10  MR. HARVEY:  Objection.  Misstates previous
11  testimony.  Vague and compound and asked and answered.
12  Go ahead.
13  THE WITNESS:  Yes.  I believe that every
14  conversation was not substantive.  It seemed to be
15  fluffy and about the dreams of the company.
16  BY MR. BENNION:
17  Q   You invested with the company a month after
18  you met Mr. McBride and Mr. Pavlik; correct?
19  **A   Correct.  Or I don't know the timing, but yes,**
20  **I invested.**
21  Q   Why did you pay Takeover Industries
22  $1.5 million from May 2022 through August 19, 2022?
23  MR. HARVEY:  Objection.  Asked and answered
24  and vague.
25  Go ahead.

Page 67

1  THE WITNESS:  I don't understand the question.
2  You're asking me why?  In what way?
3  BY MR. BENNION:
4  Q   Well, you paid them $1.5 million; correct?
5  **A   Yes.**
6  Q   Why, if they were just -- if Mr. McBride and
7  Mr. Pavlik were just promoting dreams?
8  MR. HARVEY:  Objection.  Asked and answered.
9  Vague.  Compound.
10  Go ahead.
11  THE WITNESS:  Despite them, they did seem to
12  have good products.  They did seem to have some
13  traction and so they were a detriment to the company,
14  but I was able to see, I thought, what was behind the
15  curtain and it looked to be viable products and the
16  potential of a good company.
17  BY MR. BENNION:
18  Q   What were the products that were good, in your
19  opinion?
20  **A   The hydrogen water, specifically, was decent**
21  **and then their energy drinks seemed to be decent as**
22  **well.**
23  Q   Did you sample these products?
24  **A   I did.**
25  Q   Let's go to Exhibit 7.  I'm going to represent

Page 68

Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 22 of 53
James V. Deppoleto, Jr. -    12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1 these are your answers to interrogatories. Let's scan
2 down to the next page. It says: Plaintiff's Response
3 to Takeover Industries Incorporated First Set of
4 Interrogatories.
5      Do you see that, Mr. Deppoleto?
6  A  Yes.
7  Q  Let's scroll down to page 4 of Exhibit 7.
8      Do you recall seeing these interrogatories and
9 the response to Interrogatory No. 1 previously?
10  A  I'm sorry. What was the question?
11  Q  Do you recall seeing these interrogatories
12 previously?
13  A  I believe so, yes.
14  Q  Is your date of birth December 8, 1970?
15  A  Yes.
16  Q  Let's go to the final page of Exhibit 7, the
17 verification page --
18      MR. HARVEY: You're cutting out there,
19 Counsel.
20 BY MR. BENNION:
21  Q  This is the last page of Exhibit 7.
22 Verification at the top, As to Answers to
23 Interrogatories, it reads: I, James V. Deppoleto Jr
24 declare the following.
25      Do you see that?

Page 69

1  A  Yes.
2  Q  Is that your authorized signature at the
3 bottom of the page?
4  A  Yes.
5  Q  Did you review these answers to
6 interrogatories before you authorized your electronic
7 signature on the verification page?
8  A  Yes.
9  Q  Let's go back to Exhibit -- or to page 4 of
10 Exhibit 7. Let's go down to Interrogatory 2 and
11 Response to Interrogatory No. 2 on that page.
12      Interrogatory No. 2 states: Describe, in
13 detail, whether Mr. Zarro -- and do you know who that's
14 referring to, Mr. Zarro?
15  A  How do you mean?
16  Q  Do you know if that refers to Tom Zarro?
17  A  I believe it does.
18  Q  Who is a Defendant in your case; is that
19 correct?
20  A  Yes.
21  Q  It says: Describe, in detail, whether
22 Mr. Zarro provided consent to the notes and other loans
23 referenced in paragraphs 36 to 48 of your amended
24 complaint prior to those transactions being finalized
25 and memorialized, including the date that Mr. Zarro

Page 70

1 provided his consent and whether he provided consent
2 via verbal or written means.
3      Did I read that correctly?
4  A  Yes.
5  Q  Okay. So let's go down. There's some
6 objections stated in response to Interrogatory No. 2 at
7 the beginning.
8      Do you see that?
9  A  Yes.
10  Q  Let's go to the next page, page 5. It
11 reads -- this is your Answer to Interrogatory No. 2
12 starting with the first full sentence on page 5 of
13 Exhibit 7: Subject to and without waiving said
14 objections, Plaintiff does not know whether Mr. Zarro
15 provided consent for the loans described in paragraph
16 36 to 48 of the amended complaint.
17      And we'll go back to the amended complaint in
18 a minute.
19      Plaintiff further states that the Takeover
20 Board of Directors Tucker McBride and Pavlik and Labor
21 Smart (Costello) signed joint written consents
22 approving the note purchase agreement, first amendment,
23 second amendment and first note, second note and third
24 note. Plaintiff further states it is his understanding
25 that Mr. Zarro was not on Takeover's Board of Directors

Page 71

1 at the time Plaintiff loaned Takeover the funds that
2 are the subject of this lawsuit.
3      Did I read that correctly?
4  A  Yes.
5  Q  You state in the second sentence there:
6 Plaintiff further states that the Takeover Board of
7 Directors (Tucker, McBride, and Pavlik) and Labor Smart
8 (Costello) signed joint written consents approving the
9 note purchase agreement, first amendment, second
10 amendment and the first note.
11      Did I read that sentence again correctly?
12  A  Yes.
13  Q  Okay. Have you produced any documents that
14 show that Toby McBride or Joe Pavlik signed joint
15 written consents approving these notes?
16      MR. HARVEY: Objection. Vague. Are you
17 referring to something other than the exhibits to the
18 complaint?
19      MR. BENNION: No. I'm referring to the
20 documents that are listed here, the note purchase
21 agreement.
22      MR. HARVEY: Right. So for example, Exhibit G
23 to the complaint is one of the joint written consent.
24 Are you referring to something other than that?
25      You were breaking up. We couldn't hear you.

Page 72




James V. Deppoleto, Jr. – 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 23 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1    MR. BENNION:  State your objection if you have
2  one.
3    MR. HARVEY:  I'll object to the extent that
4  it's misleading, it misstates the documents in the
5  case, including the pleadings in the case, which
6  include the joint written consents.
7    THE WITNESS:  What's the question?
8  BY MR. BENNION:
9    Q    Have you produced the joint written consents
10  referred to here in your Answer to Interrogatory No. 2
11  approving the note purchase agreement, the first
12  amendment, the second amendment and the first note,
13  second note and third note?
14    A  I believe my attorney answered that.  I
15  believe we have, yes.
16    Q    When did you first speak to Tom Zarro?
17    A  I don't recall.
18    Q    Not in 2022, according to your Answer to
19  Interrogatory No. 2; is that correct?
20    A  I don't believe we had a conversation in
21  2022 -- I don't know.  I'm not sure.
22    MR. HARVEY:  Counsel, I'm sorry.  I misstated.
23  I just want to clarify for the record, I was referring
24  to Exhibit G to the complaint.  I don't think it was
25  Exhibit G to the complaint.  I was referring to

Page 73

1    A  I spoke to him then.  I met him in the April
2  time frame.
3    Q    And what gave rise to your conversation via
4  phone with Mr. Tucker in 2021?
5    A  They were -- really was a spinoff of having
6  conversations with my cousin.  I believe they were
7  asking him to be some kind of influencer and then
8  offered him an ability to buy-in for some shares of the
9  company.  That was the initial.
10    Q    And how many times did you speak with
11  Mr. Tucker in November or December 2021?
12    A  Maybe once.  I believe my cousin did most --
13  was handling most of it in the beginning.
14    Q  Are you talking about Mr. Pettis?
15    A  Correct.
16    Q  It says:  The parties' relationship was
17  limited to an arms-length, professional relationship.
18    What was the professional relationship?
19    A  I was an investor.  This guy is not my friend.
20  He is a guy I was doing business with and I would use
21  that moniker for all these guys.  None of these guys
22  are my friends.  I was here doing business with them.
23    Q    You testified previously that you invested in
24  other companies, but in lesser amounts than your
25  payments to Takeover; is that correct?

Page 75

1    A  I believe I said if I did it was smaller
2  amounts to different smaller companies, potentially.  I
3  cannot recall them.
4    Q    Which companies --
5    A  I cannot recall them.
6    Q    Was your investment in these companies before
7  or after your investment in Takeover?
8    A  It would be before.
9    Q    Okay.  Let's go further down to Interrogatory
10  No. 6 in Exhibit 7.  These are Plaintiff's Answers to
11  Interrogatories.  It says in Interrogatory No. 6:
12  Explain in detail the factual basis for your
13  allegations in paragraph 72 of your amended complaint
14  that Defendants shared and/or transferred Takeover's
15  proprietary information, trade secrets, inventory,
16  product ingredients, and other assets with NextGen
17  Beverages.
18    Did I read that correctly?
19    A  Yes.
20    Q    So what is your basis for stating that
21  Defendants transferred Takeover's proprietary
22  information and specifically product ingredients with
23  NextGen Beverages?
24    MR. HARVEY:  Objection.  Vague as to time as
25  to whether -- you mean when he signed this or today?

Page 76

1  Document 25-7, which is, I think, Exhibit G to
2  something else.  I just want to clarify.  I apologize
3  for being misleading.
4    MR. BENNION:  Thank you.
5  BY MR. BENNION:
6    Q    Now, let's go to Interrogatory No. 3 down a
7  little farther.  Interrogatory No. 3 says:  Describe in
8  detail your relationship with Jason Tucker, including
9  how long you have known him, when you first met, the
10  circumstances of your meeting, and the nature of your
11  relationship.
12    Response:  Plaintiff objects to Interrogatory
13  No. 3 because the circumstances of your meeting and
14  the nature of your relationship are undefined, vague
15  and ambiguous.
16    Skipping ahead a sentence it says:  Subject to
17  and without waiving said objections, Plaintiff states
18  that he met Mr. Tucker in November or December of 2021
19  through Plaintiff's involvement with Takeover.  The
20  parties' relationship was limited to an arms-length,
21  professional relationship.
22    Did I read that correctly?
23    A  Yes.
24    Q    So you met Mr. Tucker in November or December
25  of 2021, not April 2022; correct?

Page 74



Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 24 of 53
James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1    Go ahead.
2    BY MR. BENNION:
3    Q    At the time you signed the Answers to
4    Interrogatories, which are Exhibit 7.
5    A    And then what is the question?
6    Q    What is your basis for stating that Defendants
7    transferred Takeover's proprietary information,
8    specifically product ingredients and other aspects to
9    NextGen Beverages?
10    MR. HARVEY:  I'll just object that the
11    document speaks for itself.
12    Go ahead.
13    THE WITNESS:  It's our opinion that they --
14    everything that they're holding now is from the
15    Takeover time period.  They have not ceased doing
16    business and they have done it from Takeover's end.
17    BY MR. BENNION:
18    Q    So product ingredients, what do you mean by
19    that?
20    A    Ingredients in a product.
21    MR. HARVEY:  Same objections.
22    Go ahead.
23    BY MR. BENNION:
24    Q    And how do you know Takeover Industries shared
25    or transferred product ingredients with NextGen
Page 77

1    Beverages?
2    A    Again, I believe it states there:  He believes
3    the Defendant shared or transferred Takeover's
4    propriety information.
5    Q    And what's your basis of that statement?
6    MR. HARVEY:  Same objection.
7    Go ahead.
8    THE WITNESS:  Logic.
9    BY MR. BENNION:
10    Q    How so?
11    A    Well, the business hasn't stopped doing
12    business and has continued to do business and then spun
13    it off into another area with the same products.  It
14    seemed to be the same business to me.
15    Q    Would that also apply to the 5-hour Energy
16    shot?
17    A    What 5-hour Energy shot?
18    Q    You've never done business with 5-hour Energy?
19    A    I stated that repeatedly that I have not.
20    Q    Let's go down further or farther.
21    Have you ever met Manny Pacquiao?
22    A    I have not.
23    Q    Are you aware of any business dealings between
24    Takeover and/or NextGen Beverages with Manny Pacquiao?
25    A    I believe he is a brand ambassador, as it
Page 78

1    states.
2    Q    A brand ambassador for whom?
3    A    All -- I believe all those companies.  I've
4    seen him wearing LockedIn.  I've seen him wearing NXT
5    LVL shirts.  So he's very much involved with Takeover
6    and now they have moved it over to NextGen and all the
7    companies in their umbrella now.  I believe he's a
8    brand ambassador to them.
9    Q    And when you say them, who are you referring
10    to specifically?
11    A    Takeover, NextGen, Legacy, whatever company
12    names they've tried to convolute.  All of them.
13    Q    Okay.  Let's -- I think I'm going to go to an
14    exhibit that I didn't plan to go to.
15    MR. BENNION:  Patrick, did I send you 11
16    exhibits?
17    THE WITNESS:  Yes.
18    MR. BENNION:  Let's take a three-minute break
19    and I'm going to try to adhere to the three-minute
20    break because I'm going to use an exhibit that I didn't
21    provide.  It's a one-page document.  So we'll take a
22    three-minute break.
23    (Recess taken.)
24    (Discussion held off record.)
25    BY MR. BENNION:
Page 79

1    Q    This is Exhibit 12.
2    Mr. Deppoleto, do you see where it says
3    NXT LVL at the top of the document on the top left?
4    A    Mm-hmm.
5    Q    Is that yes?
6    A    Yes.
7    Q    What does that reference for you?
8    A    NXT LVL.
9    Q    Okay.  It says: /5-hour Energy Accelerator
10    Partnership; correct?
11    A    Mm-hmm.
12    Q    Is that yes?
13    A    Yes.
14    Q    Have you ever had any discussions with Jason
15    Tucker regarding 5-hour Energy will invest in NXT LVL'S
16    parent company?
17    A    No.
18    Q    Have you had any emails or sent any emails to
19    Jason Tucker or Michael Costello regarding:  The
20    investment will provide Living Essentials LLC with a
21    stake in the company and its brands?
22    A    To my knowledge, there's no deal, no anything.
23    So I'm not quite sure what you're discussing here.
24    Q    When you say no deal, what do you mean?
25    A    I don't believe that a deal exists.  I don't
Page 80

James V. Deppoleto, Jr.  -  12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 25 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1 believe this exists.

2 Q  Have you seen this document before?

3 A  I have not.

4 Q  If you go down to bullet point No. 3 -- I'm

5 sorry, 4, it says:  Support NXT LVL Gamer Shot,

6 T-Pain's NXT LVL Gamer Shot, and future products to

7 include T-Pain's NXT LVL Gamer Energy Drink.

8      Is it your testimony you've had no

9 negotiations with T-Pain regarding this NXT LVL gamer

10 shot?

11 A  I've had no dealings with T-Pain on any of

12 this, no.

13 Q  And it's your testimony the last time that you

14 had dealings with T-Pain directly was in June of 2022

15 when you met him at his office in Atlanta?

16      MR. HARVEY:  Objection.  Misstates previous

17 testimony.

18      Go ahead.

19      THE WITNESS:  The last time I met T-Pain, yes,

20 I did not have any business discussions at all.

21 BY MR. BENNION:

22 Q  Ever?

23 A  No.

24 Q  Not with T-Pain?

25 A  Not with T-Pain, no.

Page 81

1 Q  Have you had discussions, negotiations with

2 Jason Tucker regarding doing business with T-Pain?

3 A  I haven't had any negotiation discussions with

4 Jason Tucker discussing T-Pain.

5 Q  Have you provided financial loans or

6 investment to any other companies in which Jason Tucker

7 is or has been involved?

8 A  No.

9 Q  So if you go down farther on this Exhibit 12

10 under the heading:  Why is NXT LVL a good fit to

11 partner with 5-hour.  The third to the last bullet

12 point in that section says:  NXT LVL is aligned with

13 the leading beverage broker in the country, LA

14 Libations.

15      Are you familiar with LA Libations?

16 A  Not really.

17 Q  When say not really, what does that mean?

18 A  I heard their name before, but I don't know

19 really what they do.

20 Q  You've had no association with them?

21 A  Zero.

22 Q  And then the last bullet point on the page,

23 Exhibit 12, says:  NXT LVL is in the R&D process of

24 creating brand extensions (Gamer Energy Drinks).

25      What has been your involvement with NXT LVL?

Page 82

1 A  I'm an investor.  I loaned them money.

2 Q  How much?

3 A  $2 million.

4 Q  Okay.  Let's go back to -- step away from

5 Exhibit 12 for a minute.

6      Do you know who Nicolette Carothers is?

7      MR. HARVEY:  I'm sorry.  You're cutting out,

8 Counsel.

9 BY MR. BENNION:

10 Q  Do you know who Nicolette Carothers is?

11 A  I do not.

12 Q  Are you familiar with Nappy Boy Entertainment?

13 A  I believe it's something associated with

14 T-Pain.

15 Q  To your knowledge, have you received emails

16 from Nappy Boy Entertainment?

17 A  To my knowledge, I have not received anything

18 from them.

19 Q  Let's go back to Answers to Interrogatories,

20 Exhibit 7.  So if we go to page 8 of Exhibit 7, this is

21 Interrogatory No. 9.  Actually, it looks like there's a

22 mistake in numbers.  There's two Answers to

23 Interrogatories No. 9 here on page 8.

24      Do you see that, Mr. Deppoleto, at the top?

25 A  I see four No. 9s there, yes.

Page 83

1 Q  Right.  There's two Interrogatory No. 9s here.

2 So we're going to talk about the second Interrogatory

3 No. 9.  And going back just to refresh your

4 recollection --

5      MR. BENNION:  Go back to the last page,

6 Daniel -- actually, page -- there we are.  The

7 verification.

8 BY MR. BENNION:

9 Q  These are the Answers to Interrogatories that

10 you verified; correct?

11 A  Are you asking me a question?

12 Q  Yes.  That's your verification to these

13 Answers to Interrogatories; correct?

14 A  I believe we've answered that, but yes.

15 Q  Okay.  Just refreshing your recollection.

16 So Interrogatory No. 9, it says:  Explain in

17 detail the factual basis for your allegation in

18 Paragraph 26 of your Amended Complaint that Mike Holley

19 authorized over $750,000 in distributions without

20 obtaining approval from Takeover's Board of Directors.

21      After your objections and the response to

22 Interrogatory 9, in the last sentence it says:  Subject

23 to and without waiving the foregoing objections, these

24 allegations are based on paragraph 34(a) of Takeover's

25 Verified Complaint filed in Takeover v. Holley case in

Page 84



James V. Deppoleto, Jr. – 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 26 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1 the District of Arizona, with a case number listed.
2     Are you involved in that case, the Takeover v.
3 Holley, et al. case in the District of Arizona as a
4 party?
5     A  I don't believe that I am.
6     Q  Do you recall, as we sit here in this
7 deposition, the allegations that are contained in
8 paragraph 34(a) of Takeover's Verified Complaint in
9 that case?
10     A  What are you asking?
11     Q  What is your basis for stating that Mike
12 Holley authorized over $750,000 in distributions
13 without obtaining approval from Takeover's Board of
14 Directors?
15     A  Let me read it to you.  It says:  Subject to
16 and without waiving the foregoing objections, these
17 allegations are based on paragraph 34(a) of Takeover's
18 Verified Complaint filed in Takeover v. Holley, et al.
19 in the United States District Court for the District of
20 Arizona, Case No. 2:22-cv-00357.
21     That's my answer.
22     Q  I understand that.  Do you have any personal
23 knowledge?
24     A  I do not.
25     Q  Thank you.

1     Let's go down to Interrogatory No. 10, just a
2 few lines below.
3     Interrogatory No. 10:  Identify and describe
4 in detail all conversations and communications you have
5 had with Jason Tucker (whether the person, via phone,
6 text, email, or other means) that are in any way
7 related to any Defendants or any of your claims in the
8 Amended Complaint from January 1, 2021 to the present.
9     Now, let's go to the next page and skip
10 through the objections.  It says in the last sentence
11 here it says:  Plaintiff further -- the last two
12 sentences to Answer to Interrogatory 10:  Plaintiff
13 further objects that Interrogatory calls for a
14 narrative response that is better suited for deposition
15 testimony.  Based on these objections, Plaintiff is
16 unable to respond to this Interrogatory.
17     So what communications -- we'll start with
18 conversations you've had with Jason Tucker that are in
19 any way related to the Defendants or any of your claims
20 in the Amended Complaint from January 1, 2021 through
21 now?
22     MR. HARVEY:  Objection.  Vague and overbroad.
23     Go ahead.
24     THE WITNESS:  I don't know how to answer that
25 question.

1 BY MR. BENNION:
2     Q  You agree that in your answer to interrogatory
3 that you said that Plaintiff further objects to this
4 interrogatory as it calls for a narrative response that
5 is better suited for deposition testimony; correct?
6     MR. HARVEY:  Objection.  Misstates all of the
7 objections that apply.
8     Go ahead.
9     THE WITNESS:  What is the question again?
10 BY MR. BENNION:
11     Q  Well, rather than answer, you object to the
12 interrogatory, it's better suited for deposition
13 testimony.  We're here for your deposition today so
14 I'd --
15     A  And I believe -- go ahead.  I'm sorry.  My
16 fault.
17     Q  Identify and describe in detail all
18 conversations that you've had with Jason Tucker that
19 are in any way related to any Defendants or any of your
20 claims in the Amended Complaint of January 1, 2021 to
21 the present.
22     A  I cannot recall any conversations about the
23 Defendants at all.
24     Q  Have you ever suffered from memory loss
25 problems that you're aware of?

1     A  No.
2     Q  Never been treated for that?
3     A  No.
4     Q  Okay.  Thank you.
5     Let's go to page 9 of Exhibit 7.  It's a
6 little bit farther down, Interrogatory No. 12.
7     Do you see this, Mr. Deppoleto?
8     A  Yes.
9     Q  Explain in detail the factual basis for your
10 allegation in Paragraph 74 of your Amended Complaint
11 that Defendants "transferred assets and inventory to
12 NextGen Beverages, without reasonable consideration in
13 return."
14     And then you refer to answers 6 and 8.  So
15 we're doing a little bit of going back and forth here.
16 So let's go back to your Response to Interrogatory
17 No. 6.  You remember we're talking about transferred
18 assets and inventory from Takeover to NextGen
19 Beverages; do you recall that?
20     A  The question you just asked, I believe?
21     Q  Yes.  Do you recall that's the subject matter
22 of what we're talking about, transfer of assets from
23 Takeover Industries to NextGen Beverages?
24     A  Yes.
25     Q  Go back to Response to Interrogatory No. 6.

James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 27 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1 It states: Explain in detail the factual basis for
2 your allegation in Paragraph 72 of your Amended
3 Complaint that Defendants shared and/or transferred
4 Takeover's proprietary information, trade secrets,
5 inventory, product ingredients, and other assets with
6 NextGen Beverages.
7      And you state in your answer to interrogatory
8 in the second to last line:  Plaintiff states that he
9 believes that Defendants shared and/or transferred
10 Takeover's proprietary information, trade secrets,
11 inventory, product ingredients, and other assets with
12 NextGen beverages.
13      And then you go on to list five bullet points
14 on the next page.
15      Do you see that?
16  **A   Yes.**
17  Q   In No. 3 you say:  NextGen Beverages
18 manufactures similar products as Takeover did.
19      What products are similar?
20  **A   Energy shots, hydrogen drinks, whatever they**
21 **had originally they're doing with this other company,**
22 **or so it appears.**
23  Q   And you state in No. 5:  NextGen Beverages
24 advertised Takeover's products on NextGen Beverages'
25 website lockedin.com.

1      Do you see that?
2  **A   I do.**
3  Q   What is your basis for saying that?
4  **A   I believe they were selling T-Pain products**
5 **off of that website and selling old products to people**
6 **in the early going.  So pretty factual.  Check their**
7 **Amazon sheet.**
8  Q   For how long?
9  **A   I'm sorry?**
10  Q   For how long a period of time do you allege
11 that they were doing that?
12  **A   I believe until that product expired and they**
13 **no longer could sell it because it was expired.**
14  Q   So how long is that?
15  **A   When the product expired.  So I'm not sure**
16 **when that was.**
17  Q   So you don't know?
18  **A   There's an expiration date on those bottles**
19 **that they have.  I'm not sure what that date was.**
20  Q   But you're not aware of the period of time;
21 correct?
22  **A   Correct.**
23  Q   Let's go to Interrogatory 8.  Before we go to
24 Response to Interrogatory No. 8, let's go to
25 Exhibit 11.  This is the Notice of Default.  This is

1 also Exhibit 7 to the Michael Holley deposition.
2      Have you seen this document before,
3 Mr. Deppoleto?
4  **A   I believe so, yes.**
5  Q   And this is a letter from your attorneys, the
6 Defendants?
7      MR. BENNION:  Let's go up a little higher on
8 the document, Dan.
9 BY MR. BENNION:
10  Q   Who is this letter written to?
11  **A   The individuals listed on the letter.**
12  Q   Let's go down a little further.  It's
13 addressed to Joe Pavlik on his own; correct?
14  **A   Looks to be, yes.**
15  Q   It's titled Notice of Default, Demand for
16 Payment & Cease and Desist and it's dated November 8,
17 2022; is that correct?
18  **A   I don't see the date.**
19      **There you go, yes.**
20  Q   And did you authorize this letter to be sent?
21  **A   If it came from my attorneys, then yes.**
22  Q   Husch Blackwell, that's your attorney?
23  **A   Hush Blackwell is my attorney.**
24  Q   This came on your behalf; is that correct?
25  **A   Correct.**

1  Q   Let's go down a little farther.
2      Why was this demand letter sent on your behalf
3 on November 8, 2022?
4      MR. HARVEY:  I'm going to caution you not to
5 disclose attorney-client privileged communications.  To
6 the extent that your answer would require you to
7 disclose privileged communications, I'm instructing you
8 not to answer.  If you can answer this question without
9 disclosing attorney-client privileged communications,
10 you may answer.
11      Go ahead.
12      THE WITNESS:  Looks to be Notice of Default,
13 Demand for Payment & Cease and Desist.
14 BY MR. BENNION:
15  Q   I understand that.  Why did you instruct your
16 attorneys to send this letter dated November 8, 2022?
17 Again, agreeing with Counsel not to disclose any
18 attorney-client privilege.
19  **A   I don't know how to answer that question.**
20  Q   Was there something that happened prior to
21 November 8, 2022, that made you instruct your attorneys
22 to issue this letter?
23      MR. HARVEY:  Same instructions.  Also, I'll
24 object that the document speaks for itself.
25      Go ahead.



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 28 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

Page 93

1    THE WITNESS:  What is the question again?  I'm
2 sorry.
3 BY MR. BENNION:
4    Q    Was there something that happened prior to
5 November 8, 2022, that caused you to have your
6 attorneys issue this letter?
7    MR. HARVEY:  Same instruction and same
8 objection.  The document speaks for itself.
9    THE WITNESS:  The document speaks for itself.
10 BY MR. BENNION:
11    Q    So there's nothing that happened before this
12 that caused you to think that you should have your
13 attorneys issue this letter?
14    A    I did not say that.
15    Q    Well, then please answer the question.
16    A    Again, the document speaks for itself.
17    Q    Was there something that happened before this
18 document was written?
19    A    The document speaks for itself.
20    Q    Was there something that happened before this
21 letter was written that caused you to instruct your
22 attorneys to issue this letter?
23    MR. HARVEY:  I'm going to object.  This seems
24 to be an attempt to invade the attorney-client
25 privilege.

Page 94

1 To the extent you can answer without
2 disclosing privileged communications, you may answer.
3 If you have to disclose privileged communications, I'm
4 instructing you not to answer.
5    THE WITNESS:  I cannot answer.
6 BY MR. BENNION:
7    Q    I just want to be clear.  I'm not seeking to
8 invade the attorney-client privilege.  I'm just seeking
9 was there an event that happened prior to this day --
10    A    Again -- go ahead.  I didn't mean to cut you
11 off.
12    Q    -- November 8, 2022, such as something that
13 Toby McBride did or something that Joe Pavlik did?
14    MR. HARVEY:  Again, object.  The document
15 speaks for itself and object to the extent he's being
16 asked to disclose attorney-client privileges and asked
17 and answered, which I think he has.
18    Go ahead.
19    THE WITNESS:  The document speaks for itself.
20 I don't know how else to answer that for you, sir.
21 BY MR. BENNION:
22    Q    All right.  Well, let's go through the
23 document.
24    You've seen this document before, correct,
25 Mr. Deppoleto?

Page 95

1    A    I believe so, yes.
2    Q    Let's go to page 4 of Exhibit 11, the very
3 bottom of paragraph 4.  It says, underlined:  Matters
4 Concerning the Company's Management and Messrs. Holley,
5 McBride, and Pavlik.  It says in bold and all caps:
6 MR. DEPPOLETO HEREBY DEMANDS THAT MESSRS. HOLLEY,
7 MCBRIDE, AND PAVLIK CEASE AND DESIST ACTING ON BEHALF
8 OF THE COMPANY.
9    Did I read that accurately?
10    A    I believe so, yes.
11    Q    I'm not going to try to beat a dead horse
12 here, but -- and I'm not trying to invade the
13 attorney-client privilege, but if I were to ask you if
14 there was an event prior to November 8, 2022, that
15 caused you to have your attorneys write this letter,
16 what would your answer be?
17    MR. HARVEY:  Again, objection.  The document
18 speaks for itself.  I'd also ask that the witness be
19 allowed to read all of paragraph 4.
20    MR. BENNION:  Sure.  Read the entire document.
21 I'm not trying to rush him through this.
22    MR. HARVEY:  I have a printed copy.  I don't
23 know if he'll be able to read it because it's printed
24 four sheets per page, but I do think in fairness he
25 should be able to review the document.

Page 96

1    MR. BENNION:  I agree.  I'm just going to
2 stand up and stretch my legs.
3    THE WITNESS:  Okay.
4 BY MR. BENNION:
5    Q    So you've read this document in its entirety,
6 Mr. Deppoleto?
7    A    I read paragraph 4, yes, or statement 4.
8    Q    Why don't you read the entire -- well, let's
9 stay on paragraph 4 that you've read and get as much
10 traction as we can, or not.
11    Was there an event that occurred before
12 November 8, 2022, regarding the company's management
13 and Messrs. Holley, McBride, and Pavlik that caused you
14 to instruct your attorneys to write this letter?
15    MR. HARVEY:  And again, if you have personal
16 knowledge outside of your discussions with your
17 attorneys, you can answer as to your personal
18 knowledge.  If your knowledge comes from discussions
19 with attorneys, I'm instructing you not to answer.
20    THE WITNESS:  Yeah.  No.  I mean, everything
21 was discussed with you guys, so.
22 BY MR. BENNION:
23    Q    So there's no answer provided; is that
24 correct?
25    MR. HARVEY:  He's saying he has no personal

James V. Deppoleto, Jr.  -  12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 29 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

Page 97

1 knowledge outside of discussions with his attorneys.  I
2 don't know if you heard his answer.
3        MR. BENNION:  I did hear his answer.
4 BY MR. BENNION:
5    Q    Is that correct, Mr. Deppoleto, what your
6 attorney said, that's your testimony?
7    A    Correct.
8    Q    Okay.  Let's go back to -- let's go to
9 Exhibit 8.  You know what?  Let's go to Exhibit 9.  I
10 want to do this in chronological order.  Yeah, let's go
11 to Exhibit 9.
12        So Exhibit 9 says at the top, it says
13 October 13, 2022.
14        Have you seen this document before,
15 Mr. Deppoleto?
16    A    I'm not sure.
17    Q    Let's go down to the bottom -- well, are you
18 familiar with Great Northern Corporation --
19    A    Yes.
20    Q    What is that corporation?
21    A    I believe that's the company that made the
22 displays that, I believe, Mr. Zarro has in his
23 warehouse.
24    Q    When you say -- and why do you say -- well,
25 first of all, displays, what does that mean?

Page 98

1    A    They made energy drink displays for the
2 company.
3    Q    For Takeover Industries?
4    A    I believe so, yes.
5    Q    And what is your understanding of the purpose
6 of the display?
7    A    To house their energy drinks.  I believe
8 they're supposed to be going into Walgreens.
9    Q    Did you authorize payment -- strike that.
10        Let's go down -- under Customer Information it
11 lists your name and American Express Card, credit card
12 type and then your address.
13        Is that your address, 1600 Paramount Drive,
14 Waukesha, Wisconsin?
15    A    Yes.
16    Q    Did you issue and authorize this payment?
17    A    I did.
18    Q    Who authorized you to make this payment?
19    A    I authorized me to make that payment.
20    Q    How so?
21    A    I don't understand your question.
22    Q    Did somebody at Takeover authorize you to make
23 this payment?
24    A    So again, our loan was supposed to be
25 $2 million.  You listed three notes of 500,000.  This

Page 99

1 is the fourth note that instead of giving them money
2 direct, because I began to lose confidence in them, I
3 paid this bill direct to Great Northern for their
4 displays.
5    Q    Who asked you to make this payment?
6    A    The company.
7    Q    Who at the company?
8    A    Whoever was in charge at the time expressed
9 that they needed money to pay for these displays and I
10 was no longer interested in giving them money direct,
11 but I offered to pay this bill direct so I knew the
12 money was going exactly where it was supposed to go.
13    Q    And so you don't recall if it was Jason Tucker
14 that authorized this payment of $386,773.86?
15    A    He did not authorize the payment, no.
16    Q    Well, who did?
17        MR. HARVEY:  I'll object as vague as to the
18 term authorized.
19        Go ahead.
20        THE WITNESS:  Yes.  So I'm the one who
21 authorized the payment.  The company is who requested
22 that they needed their additional 500,000 and I knew it
23 was going to this bill.  I preferred to pay this direct
24 instead.
25 BY MR. BENNION:

Page 100

1    Q    And when you say they, is that just a
2 reference to the company or is that --
3    A    Yeah -- I'm sorry.  It's a reference to the
4 company and which one of the presidents was in charge
5 at the time, I guess.
6    Q    Do you have any other written documentation
7 regarding your payment of this invoice?
8    A    In what way?  I'm sorry.
9    Q    Any other written documentation?
10    A    I would assume we have recordkeeping for us,
11 yes.
12    Q    Recordkeeping for us, which means?
13    A    Quintec or James.
14    Q    Did you say James?
15    A    Myself, James Deppoleto.
16    Q    Okay.  Thank you.  I'm just clarifying.
17        Is this your personal American Express account
18 or the company Quintec --
19    A    All personal to me.
20    Q    Okay.  Let's go to Exhibit 8 -- well, I want
21 to TO back to, I apologize, back to Exhibit 9 for one
22 more question.
23        So this receipt is dated October 13, 2022;
24 correct?
25    A    Looks to be.



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW   Document 102-15   Filed 01/10/25   Page 30 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

1  Q   Do you know what Toby McBride's involvement
2  with Takeover Industries was on October 13, 2022?
3  A   I do not.
4  Q   So let's go to Exhibit 8.  This is another
5  receipt from Great Northern Corporation.
6     Do you see that?
7  A   Yes.
8  Q   Dated November 4, 2022; correct?
9  A   Yes.
10  Q   This appears to be on your American Express
11  Card again; is that correct?
12  A   Yes.
13  Q   For $128,924.62; correct?
14  A   Yes.
15  Q   So the same question with respect to Exhibit 8
16  as Exhibit 9, is there any difference in your answer?
17  I can go back through them individually if you'd like,
18  but --
19  **A   It's the same bill -- or it's a different**
20  **bill, but again, it totaled up to 480-some thousand**
21  **dollars, I believe, total.**
22  Q   Okay.  And you don't recall who specifically
23  authorized you at Takeover Industries to make this
24  payment reflected in Exhibit 8; correct?
25     MR. HARVEY:  Objection.  Vague as to

1  authorized.
2     Go ahead.
3     THE WITNESS:  Again, they were requesting the
4  500,000 and this is where my 500,000 went.
5  BY MR. BENNION:
6  Q   Okay.  So --
7  **A   I no longer felt comfortable giving them**
8  **money.  I wasn't confident in any of those guys at that**
9  **point.**
10  Q   So they were requesting, but once again,
11  that's a reference to the company, not to individuals?
12  A   Correct.
13  Q   Okay.
14     MR. BENNION:  We'd simply request production
15  of any additional documents that as Mr. Deppoleto said
16  previously that may exist that Quintec or personally
17  with respect to these two receipts, which are reflected
18  in Exhibits 8 and 9.
19     MR. HARVEY:  I believe we've produced
20  everything that we have.
21     MR. BENNION:  Okay.  Duly noted.
22     Let's take about a 10-minute break here.  Off
23  the record.
24     (Recess taken.)
25     MR. BENNION:  During the break Patrick had a

1  question about Joe Pavlik, who is on the call.  He's a
2  Defendant in this case.  Is this you Joe, you're a
3  Defendant in this case?
4     MR. PAVLIK:  Yes.  I'm just listening in on
5  mute.
6     MR. BENNION:  Okay.
7     MR. HARVEY:  I don't mean to be picky, but --
8  so he just spoke through Zoom, my question was about
9  the person who joined recently under the phone number
10  216-970-8229.  Mr. Pavlik, is that your phone number?
11     MR. PAVLIK:  Yeah.  I had to run out to the
12  drugstore to pick up a prescription.
13     MR. HARVEY:  That's fine.  Thank you for
14  clarifying.
15     MR. PAVLIK:  You got it.
16  BY MR. BENNION:
17  Q   Let's go to Exhibit 6.  We skipped this
18  before.
19     So Mr. Deppoleto, can you see Exhibit 6, which
20  is the Second Amendment to Convertible Note Purchase
21  Agreement?
22  A   Yes.
23     MR. HARVEY:  I think we did this one before
24  because I wrote it down.
25     THE WITNESS:  We did the second note, third

1  note and first note.
2     MR. HARVEY:  You did bring it up before.
3     MR. BENNION:  I did ask questions about it.
4  Barbara, have we used this exhibit before?
5     EXHIBIT TECH:  I can tell you from my history,
6  Counsel, you did bring it up.
7  BY MR. BENNION:
8  Q   All right.  Let's be very brief about this.
9  Referenced it briefly previously.
10     So Mr. Deppoleto, trying to streamline this --
11     MR. BENNION:  If you can go down to the bottom
12  of the page, Daniel, to show Mr. Deppoleto Exhibit 6.
13  BY MR. BENNION:
14  Q   Do you see that, Mr. Deppoleto?
15  A   Yes.
16  Q   Have you seen this Second Amendment to
17  Convertible Note Purchase Agreement previously?
18  A   Yes.
19  Q   Okay.  And I don't believe I asked you this
20  question about Exhibit 6 before, but under the
21  Recitals, paragraph 3 -- let's go to paragraph 2 -- no,
22  we're just going to go to paragraph 3 -- no.
23     MR. BENNION:  I'm sorry, Daniel, go back into
24  the Whereas.
25     EXHIBIT TECH:  That's what we've covered.  You



James V. Deppoleto, Jr. – 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 31 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1 covered page 1 and page 4, in case you need reference.
2     MR. BENNION:  Thank you.
3 BY MR. BENNION:
4     Q    So this says, again, Mr. Deppoleto, Whereas
5 paragraph 3, on page 1 of Exhibit 6:  Whereas the
6 Purchaser desires to provide additional capital to the
7 company for operating expenses in the amount of
8 $500,000 (the Additional Note Consideration).
9         Did you ever -- is that correct, did I read
10 that correctly?
11    A    Yes.
12    Q    Did you ever receive a report from Jason
13 Tucker at Takeover Industries as to how these operating
14 expenses were being used?
15    A    I don't recall.  It's possible.  It's also
16 possible it wasn't so I'm not sure.
17    Q    Do you recall receiving a report about how the
18 operating expenses were being used by anyone other than
19 Jason Tucker at Takeover, such as Toby McBride or Joe
20 Pavlik?
21    A    As I said, I don't recall any of -- a specific
22 individual.
23    Q    And you don't recall receiving a report
24 regarding how your additional capital for the company
25 for operating expenses --

Page 105

1     A    The only thing I could see that relating to is
2 the fact that, again, we put a percentage that we only
3 wanted to be used for salaries at 10 percent and I
4 think the remainder had to be used for all operating
5 expenses, whatever they were.  So I don't remember
6 calling for a list because I don't know that I needed a
7 list.  They could only do 10 percent for salaries and
8 the remainder had to go to operating expenses.
9     Q    So when you issued your -- when your attorneys
10 wrote the notice of default letter dated November 12,
11 2022, do you know how much money Takeover Industries
12 had in its account on or about November 8, 2022?
13    A    No.  I'm sorry, I do not.
14    Q    Did you ever request reports from anybody at
15 Takeover Industries with regard to the status of the
16 money in Takeover Industries' accounts during the time
17 that you -- from May 25, 2022, through November 8,
18 2022, that Takeover had in its possession?
19    A    Say that again.  I'm sorry, I missed that
20 first part.
21    Q    Sure.  We were talking a minute ago about you
22 didn't ask for reports with respect to how much money
23 was being used by Takeover Industries for operating
24 expenses, say, on a monthly basis; correct?
25    A    Correct.

Page 106

1     Q    And you didn't receive even annual reports or
2 let's say a quarterly report?
3     A    I don't believe they produced any quarterly or
4 yearly reports, as far as I know.
5     Q    Did you ask for any such reports?
6     A    I don't believe so.  But again, we were
7 monitoring our money.  We wanted to make sure that it
8 was being used for operating, but I don't know that we
9 requested anything in that regard.  We just hit that
10 point home.
11    Q    When you testified that you're monitoring your
12 money, what does that mean?
13    A    Just calling and inquiring:  How's business?
14 How are things going?  How are sales?
15        Again, we're investing in a business.  We're
16 hoping that they do well.  And everything pointed to
17 the direction that they looked like they were doing
18 well.
19    Q    Have you ever lost money as an investor of a
20 company either before or after the payment of your
21 monies to Takeover?
22    A    No.  I don't believe there's anything that
23 would show a loss, no.
24    Q    I'm trying to wrap it up here, but I need
25 30 seconds to gather my notes.

Page 107

1         You testified previously, Mr. Deppoleto, that
2 you didn't meet Mike Holley until, I believe, you were
3 at a hearing in the case in Arizona; is that correct?
4     A    I believe that's correct.
5     Q    Do you know why Mike Holley was not involved
6 in the company, or at least that you didn't meet him
7 when you went to these events in April and June of 2022
8 in Dallas and Atlanta?
9     A    I don't know when I heard about it, but I just
10 had heard that there was some improprieties that had
11 happened or that they had discovered or something and I
12 think that included Holley, Pavlik and McBride.
13    Q    What were the improprieties that you heard
14 about involving Mike Holley?
15    A    I believe they were stealing money from the
16 company.
17    Q    And who told you that?
18    A    Tucker, for one.  I would say probably Tucker
19 was the one who maybe discovered it.
20    Q    Jason Tucker?
21    A    Yes.
22    Q    And did he tell you how he discovered this
23 alleged impropriety?
24    A    I believe they said their accounting team
25 potentially found the improprieties and dug backwards

Page 108



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 32 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

1  and found amounts that were missing or gone or
2  something to that nature.
3     Q   And you also mentioned Toby McBride and Joe
4  Pavlik. Are you alleging that there were improprieties
5  that Toby McBride -- that you were made aware of, when
6  Mr. McBride was at Takeover?
7     A   I'm sorry. Restate that again.
8     Q   Sure. You talked about alleged improprieties
9  with Mike Holley, Toby McBride and Joe Pavlik. What
10 were these alleged improprieties that you were told of
11 about Toby McBride?
12    A   I believe they were all taking money. Taking
13 inordinate amounts of money from the investors from the
14 start of the business until it ended. Taking
15 exorbitant salaries. Basically, they were using the
16 checkbook -- or the company account as a personal
17 checkbook, it sounded like. I believe there's records
18 to back that up.
19    Q   Do you know who was authorized to have access
20 to the Takeover Industries' bank account from the time
21 you first signed the Convertible Note Purchase
22 Agreement, May 25, 2022, until November 8, 2022?
23    A   I do not have knowledge of who had access, no.
24    Q   Do you know who was authorized to withdrawal
25 funds from the Takeover Industries' bank account during

Page 109

1     Q   And Joe Pavlik, you spoke about Joe Pavlik.
2  Did you review any documents or have you seen any
3  documents that would indicate that Mr. Pavlik, there
4  were improprieties in how he used money of Takeover
5  Industries?
6     A   Again, I believe something was produced and I
7  believe my attorneys have it, but there's records on
8  the bookkeeping that they needed to do showing funds
9  that all three of them took.
10    Q   Are you aware that Takeover Industries had
11 audits performed to review the accounting of its books
12 in or about 2022?
13        MR. HARVEY: Objection. Foundation. Calls
14 for speculation and assumes facts not in evidence.
15        Go ahead.
16        THE WITNESS: Yeah, I'm not sure about that.
17 I wouldn't be privy to that, I don't believe.
18 BY MR. BENNION:
19    Q   You were never told that audits were conducted
20 by Takeover Industries into the assets or into the
21 expenditures and payments to Toby McBride, Joe Pavlik
22 and Mike Holley?
23        MR. HARVEY: Same objections. Also vague and
24 compound.
25        Go ahead.

Page 111

1  that period of time?
2     A   I do not.
3     Q   Okay. Who provided you with this information
4  that you just testified to --
5     A   I believe Tucker, and I believe I provided
6  that information to my attorneys as well with whatever
7  documentation we had.
8     Q   Do you recall what that documentation is?
9     A   I don't. It's part of the records, but I
10 believe it was documenting their theft.
11    Q   And you referred to Joe Pavlik as well --
12 well, let me go back to Mike Holley for a minute.
13        Are you aware that Mike Holley was not able to
14 be with the company or to operate in the company for a
15 period of time in 2022?
16    A   Again, I don't remember the dates, but I do
17 believe that he was somehow axed out in some fashion.
18    Q   Are you aware that Mike Holley had COVID and
19 was hospitalized for COVID during some of that period
20 of time in 2022?
21    A   I'm not aware of anything with Mike Holley,
22 no.
23    Q   You're not aware of anything about him being
24 hospitalized for COVID?
25    A   No. No.

Page 110

1        THE WITNESS: I was under the understanding
2  that was needed to be done in order to become
3  tradeable, if that makes sense. So I believe they had
4  accounting firms or something trying to get them
5  current to trade or whatnot. So I believe that's how
6  they discovered those things.
7  BY MR. BENNION:
8     Q   Do you know if Takeover Industries filed tax
9  returns while Jason Tucker was president of Takeover
10 Industries?
11    A   I would not know that. I don't know.
12    Q   Did you ever request that information such as
13 tax returns?
14    A   We did not, no.
15    Q   Do you know how much money Takeover Industries
16 had left in its account and/or bank accounts when you
17 left the company or you issued your first Notice of
18 Default November 8, 2022?
19    A   I do not know that.
20    Q   Did you ever receive records of any Takeover
21 Industries' bank accounts?
22    A   I'm not certain. I don't believe so, but I'm
23 not sure.
24    Q   You don't recall?
25    A   I don't recall, no.

Page 112



James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 33 of 53

1    Q    If you had received information regarding the
2  status of Takeover Industries' bank accounts in 2022,
3  who would that have come from?
4    **A    I would assume Tucker, but I'm not positive.**
5    Q    Jason Tucker was your primary point of contact
6  at Takeover Industries?
7    **A    Yes.  He became a primary point of contact,**
8  **yes.**
9    Q    Before Jason Tucker became the primary point
10  of contact with you, was somebody else at Takeover a
11  primary point of contact with you?
12    **A    As far as I know, I believe he was kind of the**
13  **voice.  When my cousin was involved early in, whatever**
14  **it was, 2021, and when we first got involved, he was**
15  **the voice that I heard, but again, I met McBride, I met**
16  **Pavlik, but Jason was kind of the voice, I believe.**
17    Q    And your cousin is not a party to this action,
18  correct, Mr. Pettis?
19    **A    He is not.**
20    Q    Mr. Deppoleto, to your knowledge, have you
21  produced all email correspondence you have received
22  from Jason Tucker regarding Takeover Industries in this
23  case?
24    **A    I believe so, yes.**
25    Q    Do you still have access to your emails from

1  Jason Tucker?
2    **A    Whatever I had I turned over to my attorneys,**
3  **yes.**
4    Q    But you still have access to those emails?
5    **A    Yes.  They're probably in my archive, sure.**
6    Q    I have no further questions at this time.
7        MR. HARVEY:  No questions from me either.  We
8  reserve the right to read and sign.
9        MR. BENNION:  Yes.  Let's do that.
10        MR. HARVEY:  Would you like to read and sign
11  your transcript?
12        THE WITNESS:  Yes.
13        THE COURT REPORTER:  Mr. Harvey, would you
14  like a copy of the transcript?
15        MR. HARVEY:  Just electronic, please.
16        THE COURT REPORTER:  Thank you.
17        (Deposition concluded at 2:22 p.m.)
18
19
20
21
22
23
24
25

James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 34 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1                    REPORTER'S CERTIFICATE

2    STATE OF NEVADA  )
                      )  ss.
3    COUNTY OF CLARK  )

4

5         I, Barbara Clark, a Certified Court Reporter

6    of the State of Nevada, do hereby certify:

7         That the foregoing proceedings were taken

8    before me at the time and place herein set forth; that

9    any witnesses in the foregoing proceedings, prior to

10   testifying, were placed under oath; that a verbatim

11   record of the proceedings was made by me using machine

12   shorthand which was thereafter transcribed under my

13   direction; further, that the foregoing is an accurate

14   transcription thereof.

15        I further certify that I am neither

16   financially interested in the action nor a relative or

17   employee of any attorney or any of the parties.

18        IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20   Dated:  December 20, 2024

21

22

23   _____
                         BARBARA CLARK
24                       CCR No. 953

25



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW   Document 102-15   Filed 01/10/25   Page 35 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3         I, JAMES V. DEPPOLETO JR., do hereby declare

 4   under penalty of perjury that I have read the foregoing

 5   transcript; that I have made any corrections as appear

 6   noted, in ink, initialed by me, or attached hereto;

 7   that my testimony as contained herein, as corrected, is

 8   true and correct.

 9         EXECUTED this _____ day of _____,

10   2024, at _____, _____.
                        (City)                 (State)
11

12

13                  _____
                    JAMES V. DEPPOLETO JR.
14

15

16

17

18

19

20

21

22

23

24

25
```



James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

```
 1                    DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for Change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for Change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for Change:_____

23   _____

24   SIGNATURE:_____DATE:_____

25            JAMES V. DEPPOLETO JR.
```



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 37 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

## WORD INDEX

**< $ >**
**$1.5** 63:*1, 17* 67:*22* 68:*4*
**$128,924.62** 101:*13*
**$2** 60:*18* 83:*3* 98:*25*
**$3,047,200** 48:*15*
**$386,773.86** 99:*14*
**$5,000** 35:*5*
**$500,000** 22:*23* 23:*23* 26:*1* 27:*3, 6* 29:*7* 31:*4* 32:*23* 34:*10, 18* 35:*2, 7, 10* 46:*19* 47:*5* 61:*4* 62:*20, 21* 63:*7* 64:*2* 105:*8*
**$750,000** 84:*19* 85:*12*

**< 1 >**
**1** 3:*11* 14:*3, 4, 13* 29:*6* 60:*25* 69:*9* 86:*8, 20* 87:*20* 105:*1, 5*
**10** 3:*24* 9:*16* 44:*19, 24* 47:*14* 50:*9* 64:*7* 86:*1, 3, 12* 106:*3, 7*
**10/13/2022** 3:*23*
**10:35** 5:*2*
**101** 3:*22*
**10-minute** 102:*22*
**11** 4:*3* 79:*15* 90:*25* 95:*2*
**11/04/2022** 3:*22*
**1100** 2:*5*
**12** 4:*3* 80:*1* 82:*9, 23* 83:*5* 88:*6* 106:*10*
**13** 97:*13* 100:*23* 101:*2*
**14** 3:*11*
**15** 3:*13*
**1600** 98:*13*
**19** 67:*22*
**1970** 69:*14*
**1989** 9:*21*
**1999** 12:*16*

**< 2 >**
**2** 3:*11* 15:*3, 4* 16:*16* 35:*11, 13, 15* 47:*18, 22* 70:*10, 11, 12* 71:*6, 11* 73:*10, 19* 104:*21*
**2:22** 114:*17*
**2:22-cv-00357** 85:*20*
**2:22-cv-02013-GMN-MDC** 1:*6* 5:*15*
**20** 29:*16* 115:*20*
**2021** 74:*18, 25* 75:*4, 11* 86:*8, 20* 87:*20* 113:*14*
**2022** 21:*16* 24:*5, 17* 27:*4, 7* 28:*22, 24* 30:*8* 31:*5, 10, 19* 32:*10, 22* 33:*24* 34:*19, 22* 40:*7* 41:*23* 42:*5, 16, 19, 24* 47:*18, 22* 48:*18* 51:*21* 55:*3* 56:*11, 23* 58:*4, 9, 17, 23* 59:*23* 60:*2, 9* 61:*25* 63:*8* 64:*12, 23* 65:*12, 17* 66:*3, 25* 67:*22* 73:*18, 21* 74:*25* 81:*14* 91:*17* 92:*3, 16, 21* 93:*5* 94:*12* 95:*14* 96:*12* 97:*13* 100:*23* 101:*2, 8* 106:*11, 12, 17, 18* 108:*7* 109:*22* 110:*15, 20* 111:*12* 112:*18* 113:*2*
**2023** 15:*16* 16:*25* 17:*4*
**2024** 1:*16* 5:*1* 14:*23* 115:*20* 116:*10*
**21** 29:*17*
**216-970-8229** 103:*10*
**25** 12:*13* 28:*22, 24* 30:*8* 31:*5, 19* 32:*10, 22* 106:*17* 109:*22*
**250,000** 22:*6, 7*

**25-7** 74:*1*
**26** 84:*18*
**27** 3:*14* 39:*14*
**273-2100** 2:*6*
**28** 16:*2, 15*

**< 3 >**
**3** 3:*14* 27:*22* 28:*10, 13* 30:*17* 31:*2* 32:*20* 74:*6, 7, 13* 81:*4* 89:*17* 104:*21, 22* 105:*5*
**30** 8:*16, 18* 15:*16* 16:*25* 17:*4* 107:*25*
**32** 3:*16*
**33** 3:*17*
**333-0777** 2:*11*
**34(a** 84:*24* 85:*8, 17*
**36** 70:*23* 71:*16*

**< 4 >**
**4** 3:*14* 29:*3* 32:*21* 33:*20* 35:*24* 36:*1* 60:*19* 69:*7* 70:*9* 81:*5* 95:*2, 3, 19* 96:*7, 9* 101:*8* 105:*1*
**400** 2:*10*
**414** 2:*6*
**44** 3:*24*
**45** 38:*13*
**48** 70:*23* 71:*16*
**480-some** 101:*20*

**< 5 >**
**5** 1:*16* 3:*8, 17* 5:*1* 14:*23* 33:*21, 22* 34:*5* 35:*24, 25* 71:*10, 12* 89:*23*
**50** 38:*13*
**500,000** 22:*5* 35:*16* 98:*25* 99:*22* 102:*4*
**511** 2:*5*
**53202** 2:*5*
**5-hour** 51:*20* 52:*13* 53:*20, 25* 54:*4* 55:*9, 19* 56:*10* 59:*15, 19* 78:*15, 17, 18* 80:*9, 15* 82:*11*

**< 6 >**

**6** 3:*17* 33:*24* 34:*19, 22* 60:*11, 20* 61:*19* 62:*16* 76:*10, 11* 88:*14, 17, 25* 103:*17, 19* 104:*12, 20* 105:*5*
**60** 3:*19*
**69** 3:*21*
**6980** 2:*10*

**< 7 >**
**7** 3:*20* 50:*8* 59:*23* 60:*2* 68:*25* 69:*7, 16, 21* 70:*10* 71:*13* 76:*10* 77:*4* 83:*20* 88:*5* 91:*1*
**702** 2:*11*
**72** 76:*13* 89:*2*
**74** 88:*10*

**< 8 >**
**8** 3:*22* 69:*14* 83:*20, 23* 88:*14* 90:*23, 24* 91:*16* 92:*3, 16, 21* 93:*5* 94:*3* 95:*14* 96:*12* 97:*9* 100:*20* 101:*4, 15, 24* 102:*18* 106:*12, 17* 109:*22* 112:*18*
**8.5** 29:*3*
**80** 4:*5*
**89117** 2:*10*

**< 9 >**
**9** 3:*23* 83:*21, 23* 84:*3, 16, 22* 88:*5* 97:*9, 11, 12* 100:*21* 101:*16* 102:*18*
**91** 4:*3*
**953** 1:*24* 115:*24*
**97** 3:*23*
**9s** 83:*25* 84:*1*

**< A >**
**a.m** 5:*2*
**ability** 6:*13* 75:*8*
**able** 68:*14* 95:*23, 25* 110:*13*
**Accelerator** 4:*3* 80:*9*



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 38 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

access 65:7 109:*19*,
*23* 113:*25* 114:*4*
account 100:*17*
106:*12* 109:*16, 20,
25* 112:*16*
Accounting 13:*16,
17, 18, 20, 24*
108:*24* 111:*11*
112:*4*
Accounts 13:22
106:*16* 112:*16, 21*
113:*2*
accuracy 7:*15*
45:*13*
accurate 7:*17* 44:*9,
12* 115:*13*
accurately 8:*3* 95:*9*
acronym 31:*14*
ACTING 95:7
action 113:*17*
115:*16*
activities 46:22
61:*13*
actual 12:*1* 61:*15*
additional 34:*9, 11*
61:*3, 6* 62:*18*
99:*22* 102:*15*
105:*6, 8, 24*
address 5:*10* 37:*16,
19* 98:*12, 13*
addressed 91:*13*
adhere 79:*19*
administered 5:5
administration 9:9
admonitions 6:*3*
advertised 89:*24*
agenda 43:*13*
ago 21:*24* 23:*14*
39:*5, 14* 51:*1*
106:*21*
agree 31:*14* 87:2
96:*1*
agreeing 92:*17*
Agreement 3:*14, 17,
19* 27:22 28:*12, 24*
30:*8, 16* 31:*1, 6, 19*
33:23 34:*4* 35:*9*
46:*16, 17, 18* 60:*13*
61:*18* 64:*7* 71:22
72:*9, 21* 73:*11*

103:*21* 104:*17*
109:22
ahead 6:*20* 8:*4*
30:*11* 32:*5* 36:*13*
45:22 46:*5, 21*
53:*4* 54:*6, 13, 22*
55:*21* 56:*5* 57:*1,
23* 63:*3* 66:20
67:*3, 12, 25* 68:*10*
74:*16* 77:*1, 12, 22*
78:*7* 81:*18* 86:*23*
87:*8, 15* 92:*11, 25*
94:*10, 18* 99:*19*
102:*2* 111:*15, 25*
al 1:*7* 85:*3, 18*
aligned 82:*12*
allegation 84:*17*
88:*10* 89:2
allegations 76:*13*
84:*24* 85:*7, 17*
allege 90:*10*
alleged 108:*23*
109:*8, 10*
alleging 109:*4*
Allen 13:*3*
allow 43:*25* 48:*8*
allowance 48:*14*
allowed 7:*10* 95:*19*
Amazon 11:5 90:7
ambassador 78:*25*
79:2
ambiguous 74:*15*
Amended 3:*11*
15:*11, 20* 16:2, *13,
16* 17:*7* 70:*23*
71:*16, 17* 76:*13*
84:*18* 86:*8, 20*
87:20 88:*10* 89:2
Amendment 3:*17*
33:22 34:*3* 46:*16,
18* 60:*12* 61:*18*
71:22, *23* 72:*9, 10*
73:*12* 103:*20*
104:*16*
American 98:*11*
100:*17* 101:*10*
amount 29:*12*
34:*10* 62:*19* 105:*7*
amounts 75:*24*
76:2 109:*1, 13*
Amy 13:*3*

and/or 26:*13, 21*
76:*14* 78:24 89:*3,
9* 112:*16*
annual 107:*1*
answer 6:*16, 21*
9:*4* 20:*5* 28:*7*
36:*14, 24* 42:*12*
48:*9* 55:23 59:*11*
71:*11* 73:*10, 18*
85:*21* 86:*12, 24*
87:*2, 11* 89:*7* 92:*6,
8, 10, 19* 93:*15*
94:*1, 2, 4, 5, 20*
95:*16* 96:*17, 19, 23*
97:*2, 3* 101:*16*
answered 39:*3*
52:*15* 66:*18* 67:*11,
23* 68:*8* 73:*14*
84:*14* 94:*17*
answering 42:*13*
answers 7:*17* 69:*1,
22* 70:*5* 76:*10*
77:*3* 83:*19, 22*
84:*9, 13* 88:*14*
Anthony 20:*19, 21*
21:22 22:*5, 15*
23:*2, 3*
anybody 49:*17*
106:*14*
apiece 35:*16*
apologize 30:2
67:*3* 74:2 100:*21*
appear 57:*16*
60:*21* 116:5
APPEARANCES
2:*1*
appears 16:*9, 18*
17:*1* 29:*14* 31:*3*
37:*12* 89:22 101:*10*
apply 78:*15* 87:*7*
approval 84:*20*
85:*13*
approving 71:22
72:*8, 15* 73:*11*
April 21:*16* 24:*17*
31:*10* 61:25 66:*3,
25* 74:25 75:*1*
108:*7*
archive 114:*5*
area 23:*15* 78:*13*
argue 7:*21*

Arizona 49:*6* 85:*1,
3, 20* 108:*3*
arms-length 74:*20*
75:*17*
asked 38:*23* 42:*15*
49:*20* 52:*15* 53:*7,
9* 66:*18* 67:*11, 23*
68:*8* 88:20 94:*16*
99:*5* 104:*19*
asking 8:*20* 19:*5*
42:*11* 64:24 65:*1*
68:*2* 75:*7* 84:*11*
85:*10*
aspects 77:*8*
assets 76:*16* 88:*11,
18, 22* 89:*5, 11*
111:*20*
associated 83:*13*
association 82:*20*
assume 6:*17* 49:*21*
50:*5* 100:*10* 113:*4*
assumed 39:*1*
assumes 111:*14*
assuming 65:*18*
Atlanta 40:*7* 41:*2,
23* 42:*6, 16, 20, 25*
43:*3, 6* 48:*1* 58:*23*
81:*15* 108:*8*
attached 29:*10*
116:*6*
attempt 93:*24*
attempting 46:*2, 6,
7, 9*
attend 20:*13* 40:*6*
53:*9* 54:*9* 55:*7*
56:22 57:*8* 58:*3*
59:*21* 60:*1*
attended 41:*17*
52:*4, 11* 55:*8* 57:*6*
60:*4*
attending 51:*18*
58:*8*
ATTN 45:*6*
attorney 7:*20* 8:*9,
14, 17, 21, 23* 44:*4*
73:*14* 91:22, *23*
97:*6* 115:*17*
Attorney-client 9:*4*
92:*5, 9, 18* 93:*24*
94:*8, 16* 95:*13*

James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 39 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**attorneys** 17:*6*
43:*25* 91:*5, 21*
92:*16, 21* 93:*6, 13,*
*22* 95:*15* 96:*14, 17,*
*19* 97:*1* 106:*9*
110:*6* 111:*7* 114:*2*
**audible** 36:*24*
**Audio** 5:*16*
**audits** 111:*11, 19*
**August** 15:*16*
16:*25* 17:*4* 63:*8*
65:*12, 16* 67:*22*
**authorize** 17:*6*
91:*20* 98:*9, 16, 22*
99:*15*
**authorized** 16:*10,*
*24* 30:*25* 37:*10*
70:*2, 6* 84:*19*
85:*12* 98:*18, 19*
99:*14, 18, 21*
101:*23* 102:*1*
109:*19, 24*
**authorizing** 17:*2*
37:*14, 15*
**award** 57:*4*
**aware** 26:*17* 45:*23*
46:*12* 48:*18, 21*
78:*23* 87:*25* 90:*20*
109:*5* 110:*13, 18,*
*21, 23* 111:*10*
**awareness** 46:*1*
**axed** 110:*17*

**< B >**
**Babush** 39:*17, 18,*
*21, 23* 40:*4*
**B-A-B-U-S-H** 39:*24*
**Bachelor's** 9:*9*
**back** 31:*8* 32:*20*
33:*13* 34:*21* 37:*25*
45:*5* 47:*14* 50:*6*
60:*25* 70:*9* 71:*17*
83:*4, 19* 84:*3, 5*
88:*15, 16, 25* 97:*8*
100:*21* 101:*17*
104:*23* 109:*18*
110:*12*
**backwards** 108:*25*
**balance** 29:*11*
**bank** 109:*20, 25*
112:*16, 21* 113:*2*

**Barbara** 1:*24*
104:*4* 115:*5, 23*
**based** 84:*24* 85:*17*
86:*15*
**Basically** 109:*15*
**basis** 76:*12, 20*
77:*6* 78:*5* 84:*17*
85:*11* 88:*9* 89:*1*
90:*3* 106:*24*
**beat** 95:*11*
**began** 99:*2*
**beginning** 71:*7*
75:*13*
**behalf** 91:*24* 92:*2*
95:*7*
**believe** 8:*5* 16:*12*
17:*20, 23* 18:*12, 14*
19:*22, 23* 20:*7, 10,*
*16* 21:*9* 22:*5* 23:*8*
24:*12* 26:*2* 27:*1, 8*
29:*15* 30:*12, 13*
32:*6* 33:*3, 19*
36:*22* 39:*14* 40:*5,*
*13, 25* 41:*11, 15*
42:*9, 18* 44:*11, 24*
45:*12* 46:*7* 47:*5, 7,*
*13* 49:*6* 50:*21, 23*
51:*23* 52:*23* 53:*14*
54:*14* 55:*10, 14*
57:*11, 14, 15, 18*
58:*5, 18, 21* 59:*24*
60:*6* 62:*2* 63:*24*
64:*6* 67:*13* 69:*13*
70:*17* 73:*14, 15, 20*
75:*6, 12* 76:*1* 78:*2,*
*25* 79:*3, 7* 80:*25*
81:*1* 83:*13* 84:*14*
85:*5* 87:*15* 88:*20*
90:*4, 12* 91:*4* 95:*1,*
*10* 97:*21, 22* 98:*4,*
*7* 101:*21* 102:*19*
104:*19* 107:*3, 6, 22*
108:*2, 4, 15, 24*
109:*12, 17* 110:*5,*
*10, 17* 111:*6, 7, 17*
112:*3, 5, 22* 113:*12,*
*16, 24*
**believes** 78:*2* 89:*9*
**belt** 11:*17, 21*
**belting** 11:*25*
**belts** 11:*22*

**BENNION** 2:*9* 3:*8*
5:*9, 13, 18* 6:*22*
7:*6, 9, 12* 8:*6* 9:*5*
14:*12, 15, 19, 21*
15:*5, 7, 13, 15, 24*
16:*1* 27:*20, 25*
30:*2, 3, 14* 32:*9*
33:*15, 16* 35:*17, 21,*
*23* 36:*16* 37:*6*
38:*18, 22* 39:*6*
42:*14* 44:*24* 45:*1,*
*4, 25* 46:*8, 23*
52:*18* 53:*6* 54:*8,*
*16, 25* 55:*24* 56:*8*
57:*3* 58:*1* 63:*6, 15*
66:*14, 22* 67:*7, 16*
68:*3, 17* 69:*20*
72:*19* 73:*1, 8* 74:*4,*
*5* 77:*2, 17, 23* 78:*9*
79:*15, 18, 25* 81:*21*
83:*9* 84:*5, 8* 87:*1,*
*10* 91:*7, 9* 92:*14*
93:*3, 10* 94:*6, 21*
95:*20* 96:*1, 4, 22*
97:*3, 4* 99:*25*
102:*5, 14, 21, 25*
103:*6, 16* 104:*3, 7,*
*11, 13, 23* 105:*2, 3*
111:*18* 112:*7* 114:*9*
**better** 11:*17* 44:*16*
86:*14* 87:*5, 12*
**beverage** 82:*13*
**Beverages** 76:*17, 23*
77:*9* 78:*1, 24*
88:*12, 19, 23* 89:*6,*
*12, 17, 23, 24*
**big** 57:*25*
**bill** 99:*3, 11, 23*
101:*19, 20*
**birth** 69:*14*
**bit** 14:*7* 27:*17*
88:*6, 15*
**BLACKWELL** 2:*4*
91:*22, 23*
**Board** 12:*19, 22, 25*
43:*20, 24* 44:*7, 12*
59:*22* 60:*1, 5, 7*
71:*20, 25* 72:*6*
84:*20* 85:*13*
**body** 45:*5*

**bold** 95:*5*
**bookkeeping** 111:*8*
**books** 111:*11*
**booth** 52:*23*
**bottles** 90:*18*
**bottom** 16:*7* 28:*11*
33:*25* 37:*17* 70:*3*
95:*3* 97:*17* 104:*11*
**bought** 27:*15*
**box** 10:*13* 45:*6*
**Boy** 83:*12, 16*
**brand** 78:*25* 79:*2,*
*8* 82:*24*
**brands** 80:*21*
**break** 38:*19* 79:*18,*
*20, 22* 102:*22, 25*
**breaking** 72:*25*
**brief** 104:*8*
**briefly** 104:*9*
**bring** 104:*2, 6*
**Broadway** 2:*5*
**broker** 82:*13*
**bullet** 81:*4* 82:*11,*
*22* 89:*13*
**business** 9:*9* 10:*8,*
*24, 25* 11:*11* 21:*1*
25:*11, 12, 16, 25*
37:*24* 38:*9, 12, 14,*
*16* 39:*20, 24* 40:*1*
46:*2, 6, 7, 10* 51:*6,*
*13* 53:*24* 54:*2*
57:*24* 59:*15, 18*
61:*9, 11, 13, 15*
62:*10* 75:*20, 22*
77:*16* 78:*11, 12, 14,*
*18, 23* 81:*20* 82:*2*
107:*13, 15* 109:*14*
**buy-in** 75:*8*

**< C >**
**call** 31:*11* 38:*6*
47:*1* 64:*3* 103:*1*
**called** 51:*11*
**calling** 106:*6*
107:*13*
**Calls** 56:*24* 57:*21*
86:*13* 87:*4* 111:*13*
**capacity** 32:*6, 8, 10*
45:*15*



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 40 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**capital** 34:*9* 61:*3,*
*6* 62:*19* 63:*22*
64:*9* 105:*6, 24*
**caps** 95:*5*
**Card** 98:*11* 101:*11*
**Cardinal** 9:*11*
**Carothers** 83:*6, 10*
**case** 5:*14* 7:*9*
14:*24* 17:*12* 39:*5,*
*10, 11* 40:*4* 49:*6*
70:*18* 73:*5* 84:*25*
85:*1, 2, 3, 9, 20*
103:*2, 3* 105:*1*
108:*3* 113:*23*
**categorized** 36:*15*
**caused** 93:*5, 12, 21*
95:*15* 96:*13*
**caution** 92:*4*
**CCR** 1:*24* 115:*24*
**Cease** 4:*3* 44:*4*
91:*16* 92:*13* 95:*7*
**ceased** 77:*15*
**CEO** 20:*11* 32:*7*
**certain** 25:*6* 112:*22*
**CERTIFICATE**
115:*1*
**Certified** 115:*5*
**certify** 16:*11* 115:*6,*
*15*
**chance** 43:*8*
**change** 117:*4, 7, 10,*
*13, 16, 19, 22*
**changes** 7:*18, 19,*
*21, 24*
**charge** 24:*2* 50:*2*
99:*8* 100:*4*
**charged** 13:*25*
**cheap** 57:*11*
**check** 64:*3* 90:*6*
**checkbook** 109:*16,*
*17*
**chief** 26:*17* 29:*24*
36:*8* 37:*7*
**chronological** 97:*10*
**circumstances**
74:*10, 13*
**City** 116:*10*
**claims** 86:*7, 19*
87:*20*
**clarify** 7:*3* 38:*23*
73:*23* 74:*2*

**clarifying** 100:*16*
103:*14*
**Clark** 1:*24* 115:*3,*
*5, 23*
**clear** 7:*11* 26:*15*
94:*7*
**come** 18:*19, 23*
32:*19* 113:*3*
**comes** 96:*18*
**comfortable** 102:*7*
**coming** 49:*21*
**comment** 7:*21*
**comments** 7:*24*
**commingled** 36:*22*
**communicated** 59:*8*
**communication**
65:*19*
**communications**
59:*4* 65:*22* 66:*1*
86:*4, 17* 92:*5, 7, 9*
94:*2, 3*
**companies** 13:*1*
62:*11, 14* 75:*24*
76:*2, 4, 6* 79:*3, 7*
82:*6*
**company** 10:*4, 5,*
*15, 19* 11:*2* 12:*3,*
*15, 17* 19:*17, 18, 20*
20:*8* 22:*21* 23:*4*
26:*12* 29:*5, 8* 34:*9*
36:*18* 37:*25* 39:*16*
44:*8* 51:*8, 9, 10, 16,*
*20* 52:*12* 53:*25*
54:*3* 55:*9* 61:*3, 22*
64:*1* 67:*15, 17*
68:*13, 16* 75:*9*
79:*11* 80:*16, 21*
89:*21* 95:*8* 97:*21*
98:*2* 99:*6, 7, 21*
100:*2, 4, 18* 102:*11*
105:*7, 24* 107:*20*
108:*6, 16* 109:*16*
110:*14* 112:*17*
**company's** 51:*13*
95:*4* 96:*12*
**Complaint** 3:*13*
15:*12, 20* 16:*3, 13,*
*17* 17:*8* 70:*24*
71:*16, 17* 72:*18, 23*
73:*24, 25* 76:*13*
84:*18, 25* 85:*8, 18*

86:*8, 20* 87:*20*
88:*10* 89:*3*
**compound** 17:*14*
30:*10* 45:*21* 46:*20*
54:*12* 67:*11* 68:*9*
111:*24*
**comprised** 60:*8*
**Concerning** 95:*4*
**concluded** 114:*17*
**conducted** 111:*19*
**conference** 8:*19, 21,*
*22* 54:*10* 56:*23*
57:*5* 58:*3*
**confidence** 99:*2*
**confident** 102:*8*
**consent** 70:*22* 71:*1,*
*15* 72:*23*
**consents** 71:*21*
72:*8, 15* 73:*6, 9*
**consider** 63:*13*
**consideration** 29:*8,*
*12* 34:*11* 88:*12*
105:*8*
**consistently** 25:*23*
**cont** 4:*1*
**contact** 59:*10* 66:*6*
113:*5, 7, 10, 11*
**contained** 85:*7*
116:*7*
**content** 26:*20*
**contents** 26:*25*
**continued** 78:*12*
**contract** 45:*20*
**contribute** 49:*18*
51:*16*
**contributed** 46:*25*
47:*6* 62:*16*
**controlling** 14:*7*
**conversation** 25:*17,*
*20* 51:*2* 55:*4*
56:*20, 21* 62:*3*
67:*14* 73:*20* 75:*3*
**conversations** 58:*5,*
*8* 75:*6* 86:*4, 18*
87:*18, 22*
**Convertible** 3:*14,*
*17* 27:*21* 28:*12, 23*
29:*9* 30:*7, 16, 25*
31:*19* 32:*22* 33:*23*
34:*4* 46:*15, 17, 18*
60:*12* 61:*18*

103:*20* 104:*17*
109:*21*
**conveyor** 11:*15, 16,*
*20, 22, 24* 12:*1*
**Conveyors** 11:*6*
**convicted** 14:*1*
**convolute** 79:*12*
**convoluting** 27:*12*
**copy** 95:*22* 114:*14*
**corporation** 29:*1, 4*
39:*17, 18, 21* 97:*18,*
*20* 101:*5*
**Correct** 9:*19, 25*
11:*12* 12:*6, 7, 18,*
*21* 16:*17, 23* 18:*1*
20:*7* 21:*23* 22:*16*
23:*23* 24:*19* 25:*22*
31:*12* 34:*16, 19*
35:*6, 7, 8* 37:*7*
39:*11, 12* 42:*2, 17*
47:*6, 19* 48:*1*
51:*16, 24* 52:*13*
55:*16* 56:*2, 11, 14,*
*15, 17* 58:*9* 59:*13*
62:*1, 22* 63:*23*
67:*18, 19* 68:*4*
70:*19* 73:*19* 74:*25*
75:*15, 25* 80:*10*
84:*10, 13* 87:*5*
90:*21, 22* 91:*13, 17,*
*24, 25* 94:*24* 96:*24*
97:*5, 7* 100:*24*
101:*8, 11, 13, 24*
102:*12* 105:*9*
106:*24, 25* 108:*3, 4*
113:*18* 116:*8*
**corrected** 116:*7*
**corrections** 116:*5*
**correctly** 29:*13*
71:*3* 72:*3, 11*
74:*22* 76:*18* 105:*10*
**correlation** 47:*23*
**correspondence**
113:*21*
**Costello** 29:*23*
30:*15, 20* 31:*21, 24*
36:*7* 48:*25* 50:*13*
54:*9* 55:*2, 10, 12*
56:*2, 14* 57:*6*
71:*21* 72:*8* 80:*19*



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW  Document 102-15  Filed 01/10/25  Page 41 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

Costello's 32:1, 12
37:1
Counsel 14:5, 6
27:11 28:6 29:25
33:12 38:19 69:19
73:22 83:8 92:17
104:6
country 82:13
COUNTY 115:3
Couple 51:1
COURT 1:1 6:7
49:6 85:19 114:13,
16 115:5
cousin 20:20, 21
21:20 23:14 40:8
52:7 75:6, 12
113:13, 17
cousin's 22:14
covered 104:25
105:1
COVID 110:18, 19,
24
creating 82:24
credibility 7:25
credit 98:11
Creek 9:23
current 37:19
112:5
currently 6:12
curtain 68:15
Customer 98:10
cut 94:10
cutting 69:18 83:7

< D >
daily 13:18, 19
Dallas 20:14 21:14
31:11 62:1 108:8
Dan 91:8
Daniel 2:14 14:12,
20 15:6, 14, 25
84:6 104:12, 23
date 7:22 9:15
14:14 21:10 24:6
27:8, 9 28:25
34:20, 22 42:21
47:18, 23 51:22
58:20, 25 69:14
70:25 90:18, 19
91:18 115:18

Dated 3:22, 23
16:25 28:22, 24
32:22 91:16 92:16
100:23 101:8
106:10 115:20
dates 110:16
day 13:18 14:23
46:14 94:9 116:9
day-to-day 46:12,
22 49:16 61:9, 11
65:7, 8
dead 95:11
deal 23:20 24:25
36:21 45:20 49:10,
11, 15, 16, 18 80:22,
24, 25
dealings 53:24
54:3 59:15, 19
78:23 81:11, 14
December 1:16 5:1
14:23 21:11 69:14
74:18, 24 75:11
115:20
decent 68:20, 21
decided 52:7
decision 58:3
DECLARATION
116:1
declare 69:24 116:3
Default 4:3 90:25
91:15 92:12
106:10 112:18
Defendant 6:1
70:18 78:3 103:2, 3
Defendants 1:7 2:8
5:14 17:11, 12
76:14, 21 77:6
86:7, 19 87:19, 23
88:11 89:3, 9 91:6
degree 9:9, 14
Demand 4:3 91:15
92:2, 13
DEMANDS 95:6
deposed 5:19, 22
39:3, 4, 10 40:3
DEPOSITION 1:14
3:10, 11 5:22 6:4,
24 7:13, 14, 18, 23
8:7, 12, 15, 23 9:2
14:4, 13, 24 27:13,
18 28:2, 4, 13 31:1

38:23 39:1, 2 85:7
86:14 87:5, 12, 13
91:1 114:17 117:1
DEPPOLETO 1:4,
15 3:4, 11 5:4, 12,
13, 19 7:13 14:14,
17, 22 15:9, 17
16:5 20:18 28:1
29:1, 19, 21 30:4
33:17 34:1 36:1
37:11 39:9 48:9
51:18 60:14 69:5,
23 80:2 83:24
88:7 91:3 94:25
95:6 96:6 97:5, 15
100:15 102:15
103:19 104:10, 12,
14 105:4 108:1
113:20 116:3, 13
117:25
describe 11:21
21:25 22:4 70:12,
21 74:7 86:3 87:17
described 71:15
description 47:15
desires 34:9 61:2
62:18 105:6
Desist 4:3 44:4
91:16 92:13 95:7
Despite 68:11
detail 70:13, 21
74:8 76:12 84:17
86:4 87:17 88:9
89:1
detriment 68:13
dictate 61:10
difference 101:16
different 27:24
35:16 39:4 76:2
101:19
difficulties 5:16
dinner 19:6 23:14
direct 47:8 99:2, 3,
10, 11, 23
direction 107:17
115:13
directly 81:14
Directors 12:19, 22,
25 43:21, 24 44:7
59:22 60:2, 5, 8

71:20, 25 72:7
84:20 85:14
disclose 92:5, 7, 17
94:3, 16
disclosing 92:9
94:2
discovered 108:11,
19, 22 112:6
discussed 53:11
96:21
discussing 80:23
82:4
Discussion 5:17
35:22 79:24
discussions 53:16
55:1 58:2 80:14
81:20 82:1, 3
96:16, 18 97:1
display 98:6
displays 97:22, 25
98:1 99:4, 9
distinguishing 27:14
distributions 84:19
85:12
DISTRICT 1:1, 2
85:1, 3, 19
document 14:16
15:4, 8, 19, 25
28:14, 15, 18 30:18
33:1, 14, 18 34:21,
22 37:11, 13, 14
60:16 74:1 77:11
79:21 80:3 81:2
91:2, 8 92:24 93:8,
9, 16, 18, 19 94:14,
19, 23, 24 95:17, 20,
25 96:5 97:14
documentation
22:24 100:6, 9
110:7, 8
documenting 110:10
documents 8:11, 13
23:21, 25 72:13, 20
73:4 102:15 111:2,
3
Docusign 16:8, 10
37:11 60:21, 23
Docusigning 37:14
doing 46:2 49:10
75:20, 22 77:15

Case 2:22-cv-02013-GMN-BNW   Document 102-15   Filed 01/10/25   Page 42 of 53

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

78:*11* 82:*2* 88:*15*
89:*21* 90:*11* 107:*17*
**Dollar** 3:*24* 45:*18,*
*20* 46:*3, 10* 48:*20,*
*23* 49:*1, 10, 12, 19*
**dollars** 101:*21*
**DON** 2:*9* 5:*13*
**don@bennionlaw.co
m** 2:*11*
**double-check** 33:*15*
**dream** 25:*23*
**dreams** 62:*5, 6*
66:*12, 16* 67:*1, 8,*
*15* 68:*7*
**drink** 26:*3, 13, 21*
32:*17* 41:*10, 14, 16*
47:*16* 81:*7* 98:*1*
**drinks** 47:*13* 53:*13*
68:*21* 82:*24* 89:*20*
98:*7*
**Drive** 2:*10* 98:*13*
**drugstore** 103:*12*
**dug** 62:*7* 108:*25*
**Duly** 102:*21*

**< E >**
**earlier** 38:*1* 47:*4,*
*16*
**early** 8:*16* 90:*6*
113:*13*
**ease** 38:*6*
**easier** 48:*10*
**education** 9:*8*
**effective** 28:*25*
**Either** 7:*4* 23:*9, 12*
26:*23* 31:*22, 25*
50:*14* 55:*16* 65:*2,*
*11* 107:*20* 114:*7*
**electronic** 70:*6*
114:*15*
**email** 37:*16, 19*
59:*5* 65:*2* 86:*6*
113:*21*
**emailed** 59:*7*
**emails** 65:*11, 15*
80:*18* 83:*15*
113:*25* 114:*4*
**embassador** 79:*8*
**employed** 10:*1*
**employee** 13:*4*

115:*17*
**ended** 109:*14*
**Energy** 4:*3* 26:*13,*
*21* 32:*17* 41:*10, 12,*
*13, 15, 16* 43:*10, 12*
47:*12, 16* 48:*13*
51:*20* 52:*13* 53:*25*
54:*4* 55:*9, 19*
56:*10* 59:*16, 19*
68:*21* 78:*15, 17, 18*
80:*9, 15* 81:*7*
82:*24* 89:*20* 98:*1, 7*
**Energy/Living**
53:*20*
**entered** 28:*25* 30:*7*
33:*24*
**entering** 34:*3*
**Entertainment**
83:*12, 16*
**entire** 28:*15* 95:*20*
96:*8*
**entirety** 96:*5*
**equipment** 11:*7, 8,*
*10, 13, 15, 16, 20, 24*
12:*2* 39:*22*
**ERRATA** 117:*1*
**ESQ** 2:*4, 9*
**Essentials** 51:*19*
52:*12, 19* 53:*20, 25*
54:*3* 55:*8, 19*
56:*10* 80:*20*
**et** 1:*7* 85:*3, 18*
**event** 17:*23, 25*
18:*11, 25* 19:*4, 6, 7,*
*8, 9, 13* 20:*14*
21:*13* 24:*16, 17*
31:*11, 18* 40:*6, 7,*
*12, 19, 20* 41:*23*
42:*5, 7, 8, 16* 52:*3,*
*4, 24* 58:*4, 9* 62:*1*
94:*9* 95:*14* 96:*11*
**events** 108:*7*
**everybody** 45:*1*
**evidence** 56:*4*
111:*14*
**exact** 9:*15*
**exactly** 45:*17* 99:*12*
**EXAMINATION**
3:*6* 5:*8*
**examined** 5:*5*

**example** 11:*5*
38:*14* 72:*22*
**exchange** 29:*7*
**EXECUTED** 116:*9*
**Executive** 29:*24*
36:*8* 37:*7*
**Exhibit** 2:*14* 3:*11,*
*14, 17, 20, 22, 23, 24*
4:*3* 14:*3, 4, 9, 13*
15:*3, 4* 16:*16*
27:*22* 28:*10, 13*
29:*10* 30:*17* 31:*2*
32:*20, 21* 33:*12, 20,*
*21, 22* 34:*5* 35:*25*
44:*19, 24* 47:*14*
50:*8, 9* 60:*11, 20*
61:*19* 62:*16* 68:*25*
69:*7, 16, 21* 70:*9,*
*10* 71:*13* 72:*22*
73:*24, 25* 74:*1*
76:*10* 77:*4* 79:*14,*
*20* 80:*1* 82:*9, 23*
83:*5, 20* 88:*5*
90:*25* 91:*1* 95:*2*
97:*9, 11, 12* 100:*20,*
*21* 101:*4, 15, 16, 24*
103:*17, 19* 104:*4, 5,*
*12, 20, 25* 105:*5*
**EXHIBITS** 3:*10*
4:*1* 72:*17* 79:*16*
102:*18*
**exist** 102:*16*
**exists** 80:*25* 81:*1*
**exorbitant** 109:*15*
**expect** 6:*9*
**expenditures** 111:*21*
**expenses** 34:*10*
35:*3, 8* 61:*4, 5*
62:*19* 63:*23, 25*
105:*7, 14, 18, 25*
106:*5, 8, 24*
**expiration** 90:*18*
**expired** 90:*12, 13,*
*15*
**explain** 10:*23* 11:*3,*
*19* 19:*3* 26:*24*
76:*12* 84:*16* 88:*9*
89:*1*
**explanation** 28:*3*
**Express** 98:*11*

100:*17* 101:*10*
**expressed** 99:*8*
**extensions** 82:*24*
**extent** 9:*8* 73:*3*
92:*6* 94:*1, 15*
**eye** 24:*24*

**< F >**
**face** 24:*25*
**face-to-face** 58:*22*
**fact** 19:*23* 44:*2*
106:*2*
**fact-finding** 25:*12,*
*15*
**facts** 111:*14*
**factual** 76:*12*
84:*17* 88:*9* 89:*1*
90:*6*
**fair** 6:*16* 24:*21*
**fairness** 95:*24*
**familiar** 17:*15*
26:*7* 28:*18* 33:*1, 4,*
*7* 34:*12, 14* 36:*17*
44:*13, 22* 45:*8, 19*
82:*15* 83:*12* 97:*18*
**Family** 3:*24* 45:*18,*
*20* 46:*3, 10* 48:*19,*
*22* 49:*1, 10, 12, 19*
**far** 49:*11* 57:*16*
107:*4* 113:*12*
**farther** 14:*20*
33:*11* 74:*7* 78:*20*
82:*9* 88:*6* 92:*1*
**fascinating** 56:*21*
**fashion** 110:*17*
**father** 20:*16*
**father's** 20:*17*
**fault** 87:*16*
**fee** 48:*11*
**feel** 65:*21*
**fees** 47:*16* 48:*13*
**felony** 14:*1*
**felt** 62:*7* 102:*7*
**fight** 21:*20* 40:*8,*
*22, 24*
**fighter** 23:*6*
**Fighters** 17:*24*
18:*2, 3, 7, 8, 11*
20:*13* 21:*14* 23:*7*
24:*17* 31:*12, 15*
**file** 15:*1* 17:*6*



James V. Deppoleto, Jr.  -  12/5/2024
Case 2:22-cv-02013-GMN-BNW   Document 102-15   Filed 01/10/25   Page 43 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**filed** 5:14 15:16,
18 84:25 85:18
112:8
**final** 69:16
**finalized** 70:24
**financial** 82:5
**financially** 115:16
**find** 38:1
**fine** 103:13
**finish** 48:8 67:4
**firms** 112:4
**First** 3:11, 17, 20
15:11, 20 16:2, 12,
16 17:7, 11, 18, 20
24:13 25:25 31:21
32:23 33:22, 25
34:3 42:3 45:6
46:16 49:3, 5
50:11, 13, 14, 18
64:1 69:3 71:12,
22, 23 72:9, 10
73:11, 12, 16 74:9
97:25 104:1
106:20 109:21
112:17 113:14
**fit** 82:10
**five** 89:13
**five-minute** 38:18
**flavor** 67:2
**flew** 52:6
**flowery** 25:19
**fluffy** 25:17, 18
61:14 62:5, 6 67:15
**Following** 7:13
69:24
**follows** 5:6
**foregoing** 84:23
85:16 115:7, 9, 13
116:4
**fork** 11:7
**form** 20:9 29:10
**formal** 9:8
**Former** 13:4
**forth** 16:12 17:7
88:15 115:8
**fought** 21:18
**found** 108:25 109:1
**Foundation** 36:12
53:3 54:5, 21
56:24 57:21 111:13

**founded** 12:14, 17
**foundry** 10:13
**four** 17:18 18:11
35:16 47:4 83:25
95:24
**fourth** 99:1
**frame** 75:2
**friend** 22:6, 8, 14,
15 75:19
**friends** 75:22
**front** 21:3, 5, 8, 10
22:1, 3 47:15
**full** 38:3 71:12
**Funding** 3:24
48:20
**funds** 72:1 109:25
111:8
**further** 6:4 14:19
33:10 62:7 71:19,
24 72:6 76:9
78:20 86:11, 13
87:3 91:12 114:6
115:13, 15
**future** 81:6

**< G >**
**gamer** 26:4, 7, 13,
21 32:16 41:13
53:16, 21 54:20
57:13 81:5, 6, 7, 9
82:24
**gaming** 26:10
**gas** 52:2
**gather** 107:25
**geared** 26:9
**general** 53:22
56:20
**generalities** 49:2
**Generally** 66:10
**generator** 10:14
**gentleman** 18:11
21:19
**Georgia** 41:23
**given** 61:20
**giving** 34:17 99:1,
10 102:7
**go** 6:3, 20 8:4
11:6 15:3, 24
27:22 28:10, 11
29:15, 21 30:11, 24
31:8 32:5, 21 33:4,

10, 13, 20, 21 34:21
35:24 36:13 37:9,
25 40:6 44:19
45:5, 22 46:5, 21
47:14 50:6 52:7,
14, 16 53:4, 7 54:6,
13, 22 55:21 56:5
57:1, 23 60:11, 19,
25 61:14 63:3
66:9, 20 67:3, 12,
25 68:10, 25 69:16
70:9, 10 71:5, 10,
17 74:6 76:9 77:1,
12, 22 78:7, 20
79:13, 14 81:4, 18
82:9 83:4, 19, 20
84:5 86:1, 9, 23
87:8, 15 88:5, 16,
25 89:13 90:23, 24
91:7, 12, 19 92:1,
11, 25 94:10, 18, 22
95:2 97:8, 9, 10, 17
98:10 99:12, 19
100:20 101:4, 17
102:2 103:17
104:11, 21, 22, 23
106:8 110:12
111:15, 25
**goes** 11:8
**going** 6:23 9:3
28:14 29:16 44:2
45:11 68:25 79:13,
19, 20 84:2, 3
88:15 90:6 92:4
93:23 95:11 96:1
98:8 99:12, 23
104:22 107:14
**Good** 23:20 25:20
28:5 68:12, 16, 18
82:10
**gotta** 67:4
**graduate** 9:20
**Great** 47:10 97:18
99:3 101:5
**Greek** 45:12
**grocery** 52:2
**group** 40:14 56:1
**grouping** 35:10, 13
**guess** 21:3 25:13
47:2 100:5

**guy** 61:23, 24 62:8
75:19, 20
**guys** 27:16 42:10
47:2 75:21 96:21
102:8

**< H >**
**handle** 10:15 11:4
12:2
**handling** 10:9, 10
11:2, 7, 8, 10 12:2
39:22 75:13
**happened** 92:20
93:4, 11, 17, 20
94:9 108:11
**happening** 51:7
**HARVEY** 2:4 6:18
7:3, 8, 11 8:2 9:3
14:5, 11 27:11
29:25 30:9 32:3
35:20 36:12 37:3
38:20 42:10 44:23,
25 45:21 46:4, 20
52:15 53:3 54:5,
12, 21 55:20 56:3,
24 57:21 63:2, 11
66:8, 18 67:4, 10,
23 68:8 69:18
72:16, 22 73:3, 22
76:24 77:10, 21
78:6 81:16 83:7
86:22 87:6 92:4,
23 93:7, 23 94:14
95:17, 22 96:15, 25
99:17 101:25
102:19 103:7, 13,
23 104:2 111:13,
23 114:7, 10, 13, 15
**head** 52:16 66:9
**heading** 82:10
**hear** 42:12 49:4
72:25 97:3
**heard** 82:18 97:2
108:9, 10, 13 113:15
**hearing** 108:3
**held** 5:17 20:10
35:22 52:24 79:24
**he'll** 95:23
**hereto** 29:10 116:6
**high** 9:20



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 44 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

higher 15:*14* 91:7
highlight 62:*17*
history 104:*5*
hit 107:*9*
Hold 14:5 56:3
holding 25:5 77:*14*
Holley 17:*13, 16*
18:*16* 49:*3, 5*
84:*18, 25* 85:*3, 12,
18* 91:*1* 95:*4, 6*
96:*13* 108:2, *5, 12,
14* 109:9 110:*12,
13, 18, 21* 111:*22*
Holmstock 2:*14*
home 107:*10*
honest 26:*16*
hoping 107:*16*
horse 95:*11*
hospitalized 110:*19,
24*
hosted 19:*14*
hosting 19:*9, 10, 13*
hotel 19:*8, 9, 10*
52:*24, 25*
house 98:7
How's 107:*13*
HUSCH 2:*4* 91:*22*
Hush 91:*23*
hydrogen 26:2
68:*20* 89:*20*
hypothetical 6:*19*

< I >
idea 54:7
identified 30:*17*
31:*1*
Identify 86:*3* 87:*17*
image 41:*8*
imagine 19:*11*
impair 6:*13*
impeach 7:*25*
important 43:*11*
57:*19*
improprieties
108:*10, 13, 25*
109:*4, 8, 10* 111:*4*
impropriety 108:*23*
inaccurate 52:6
Inc.'s 10:*8*
include 73:6 81:7
included 108:*12*

including 56:*1*
66:*24* 70:*25* 73:*5*
74:*8*
Incomplete 6:*18*
INCORPORATED
1:*7* 69:*3*
Incorporated's 3:*20*
Incorrect 19:2
INDEX 3:*1*
indicate 111:*3*
indicated 18:*10*
21:*24* 56:9
individual 17:*12*
29:2 52:*20* 105:*22*
individually 19:*17*
101:*17*
individuals 19:*19*
20:*15* 30:6 60:*8*
91:*11* 102:*11*
INDUSTRIES 1:7
3:*20* 19:*25* 20:*3*
22:*1, 18* 23:*22*
24:*11, 14, 19* 25:*2,
6, 25* 26:*18* 27:*4, 7*
29:*1, 23, 24* 31:*5*
32:*2, 13* 35:*2, 6*
36:*4* 41:*7* 43:*16,
21* 45:*19* 46:*2, 9,
15* 48:*19* 49:*10, 17,
18* 50:*20* 53:*17*
56:*1* 59:*22* 60:*1, 5,
7, 22* 62:*12, 15*
64:*12, 15, 22* 65:*2,
4, 13, 16* 66:*3, 6, 17*
67:*9, 21* 69:*3*
77:*24* 88:*23* 98:*3*
101:*2, 23* 105:*13*
106:*11, 15, 16, 23*
109:*20, 25* 111:*5,
10, 20* 112:*8, 10, 15,
21* 113:*2, 6, 22*
industry 54:*18*
influencer 75:7
inform 13:*19*
information 59:*10*
60:*3* 76:*15, 22*
77:*7* 78:*4* 89:*4, 10*
98:*10* 110:*3, 6*
112:*12* 113:*1*

ingredients 76:*16,
22* 77:*8, 18, 20, 25*
89:*5, 11*
inhibit 6:*13*
initial 23:*23* 75:9
initialed 116:*6*
initially 21:*2, 4, 11*
27:*4*
ink 116:*6*
inordinate 109:*13*
inquiring 107:*13*
instruct 9:*3* 92:*15,
21* 93:*21* 96:*14*
instructing 92:7
94:*4* 96:*19*
instruction 14:9
93:7
instructions 92:*23*
Integration 10:*6, 7*
12:*6, 9, 12, 14, 20,
23* 13:*6, 9, 12, 15,
20* 38:*4, 5*
interest 39:*25*
interested 21:*21*
99:*10* 115:*16*
Interrogatories
3:*21* 69:*1, 4, 8, 11,
23* 70:6 76:*11*
77:*4* 83:*19, 23*
84:*9, 13*
Interrogatory 69:9
70:*10, 11, 12* 71:*6,
11* 73:*10, 19* 74:*6,
7, 12* 76:*9, 11*
83:*21* 84:*1, 2, 16,
22* 86:*1, 3, 12, 13,
16* 87:*2, 4, 12* 88:*6,
16, 25* 89:7 90:*23,
24*
introduce 18:*21*
introduced 20:*22,
24* 21:2
invade 93:*24* 94:*8*
95:*12*
inventory 76:*15*
88:*11, 18* 89:*5, 11*
invest 27:*3, 6* 35:*1*
80:*15*
invested 21:*11*
22:*5, 6* 24:*10, 13,*

18 26:*1* 62:*6, 11,
15* 67:*17, 20* 75:*23*
investigate 22:*17, 21*
investigation 25:*15*
investing 22:*18, 23*
23:*22* 107:*15*
investment 21:*25*
22:*3* 27:*14, 15, 16*
35:*15* 39:*1* 47:*1*
63:*10* 76:*6, 7*
80:*20* 82:*6*
investments 62:*13*
investor 21:*5, 8*
47:*1* 75:*19* 83:*1*
107:*19*
investors 21:*3, 10*
51:*17* 109:*13*
invited 59:*21, 25*
Invoice 3:*24* 44:*20*
45:*3* 47:*18* 48:*7,
20* 49:*23* 100:*7*
invoices 48:*21*
involved 21:*9*
39:*21* 46:*11, 12*
65:*8* 79:*5* 82:*7*
85:*2* 108:*5* 113:*13,
14*
involvement 41:*6*
45:*19* 46:*14, 24*
74:*19* 82:*25* 101:*1*
Involving 39:*16*
108:*14*
issue 29:9 92:*22*
93:*6, 13, 22* 98:*16*
issued 106:*9*
112:*17*
its 80:*21* 96:*5*
106:*12, 18* 111:*11*
112:*16*

< J >
Jacob 64:*14*
JAMES 1:*4, 15*
3:*4, 11* 5:*4, 12*
14:*13* 20:*18* 29:*1*
37:*11* 69:*23*
100:*13, 14, 15*
116:*3, 13* 117:*25*
January 86:*8, 20*
87:*20*



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW   Document 102-15   Filed 01/10/25   Page 45 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**Jason** 18:*15* 19:*13, 20, 22, 24* 20:*23 24:4, 7, 9* 25:22 26:*23* 29:22 33:*6, 8* 36:4 40:*11, 18, 23* 42:*19, 24* 43:6 49:9 50:*3, 22, 24* 51:*5, 20* 52:*13* 55:*7, 18* 57:5 59:*18, 20, 25* 60:20 64:*14* 74:8 80:*14, 19* 82:*2, 4, 6* 86:5, 18 87:*18* 99:*13* 105:*12, 19* 108:*20* 112:9 113:*5, 9, 16, 22* 114:*1*

**Joe** 7:*4, 7* 17:*13, 15* 18:*14* 19:*12, 19* 20:*2, 22* 25:*21* 26:*11, 17, 20* 31:*17* 41:*18, 21* 56:22 58:*2, 6, 8, 11* 66:2 72:*14* 91:*13* 94:*13* 103:*1, 2* 105:*19* 109:*3, 9* 110:*11* 111:*1, 21*

**joined** 103:9
**joint** 71:*21* 72:*8, 14, 23* 73:6, 9
**Joseph** 2:*15*
**Josh** 22:*10* 23:2, *3*
**JR** 1:*4, 15* 3:*4, 11* 5:*4* 14:*14* 29:2 37:*11* 69:*23* 116:*3, 13* 117:25
**July** 33:*24* 34:*19, 22* 63:8
**June** 40:7 41:*23* 42:*5, 24* 58:*23* 81:*14* 108:7

**< K >**
**keep** 62:*16* 64:3
**Kind** 25:*12* 26:*14* 52:2 75:7 113:*12, 16*
**knew** 99:*11, 22*
**know** 13:*3* 19:*11, 12, 15, 23* 20:*11, 19* 21:*17* 22:*13* 26:*5, 8* 28:*3* 32:*18*

36:*15* 41:*4* 43:*13* 44:*17* 45:*1* 46:*11* 47:*23* 48:*4, 11* 49:*11, 13, 14, 15, 23* 51:*11, 14, 25* 52:*1* 54:*2, 17* 55:22 56:*22* 57:*2, 17, 19* 58:*25* 59:*18, 20, 25* 60:*3, 7, 23* 61:*20* 62:8 64:*10, 14, 17* 65:6 67:*19* 70:*13, 16* 71:*14* 73:*21* 77:*24* 82:*18* 83:*6, 10* 86:*24* 90:*17* 92:*19* 94:*20* 95:*23* 97:*2, 9* 101:*1* 106:*6, 11* 107:*4, 8* 108:*5, 9* 109:*19, 24* 112:*8, 11, 15, 19* 113:*12*
**knowledge** 80:*22* 83:*15, 17* 85:*23* 96:*16, 18* 97:*1* 109:*23* 113:*20*
**known** 57:*6* 74:*9*

**< L >**
**LA** 82:*13, 15*
**Labor** 29:*3* 36:*7, 11, 17* 37:*1* 71:*20* 72:*7*
**lack** 11:*17*
**Las** 2:*10* 23:*19* 51:*19* 52:*5, 12, 25* 54:*10* 55:2 56:*23* 57:*5* 58:*9, 17*
**LAW** 2:*9* 6:7
**lawsuit** 5:*25* 6:*1* 15:*1* 17:*7* 23:*10* 39:*13* 72:2
**lead** 21:*25*
**leading** 82:*13*
**League** 17:*24* 18:*2, 3, 7, 8, 11* 20:*14* 21:*14* 23:7 24:*17* 31:*12, 15*
**led** 27:*3, 6*
**left** 80:*3* 112:*16, 17*
**Legacy** 79:*11*
**legs** 96:*2*

**lengthy** 28:*14*
**lesser** 75:*24*
**letter** 8:*9, 25* 9:*1, 6* 91:*5, 10, 11, 20* 92:*2, 16, 22* 93:*6, 13, 21, 22* 95:*15* 96:*14* 106:*10*
**letters** 44:*4*
**Libations** 82:*14, 15*
**limited** 29:2 74:*20* 75:*17*
**line** 33:*5* 37:*17* 89:*8*
**lines** 29:*18, 22* 86:2
**list** 44:*11* 89:*13* 106:*6, 7*
**listed** 14:*14* 44:*3, 6, 8* 61:*23, 24* 72:*20* 85:*1* 91:*11* 98:*25*
**listen** 7:*10*
**listening** 64:*5* 103:*4*
**listing** 44:*11*
**lists** 15:*21* 98:*11*
**little** 14:7 27:*17* 41:*11* 57:*11* 62:7 74:7 88:*6, 15* 91:*7, 12* 92:*1*
**live** 23:*15, 18*
**Living** 51:*19* 52:*12, 19* 53:*24* 54:*3* 55:*8, 19* 56:*10* 80:*20*
**LLC** 80:*20*
**LLP** 2:*4*
**loan** 60:*18* 98:*24*
**loaned** 27:*16* 72:*1* 83:*1*
**loans** 70:*22* 71:*15* 82:*5*
**located** 9:*12*
**LockedIn** 79:*4*
**lockedin.com** 89:*25*
**Logic** 78:*8*
**long** 8:*17* 12:*11* 13:*8* 74:*9* 90:*8, 10, 14*
**longer** 90:*13* 99:*10* 102:*7*
**look** 24:*24, 25* 34:*7*

**looked** 68:*15* 107:*17*
**looking** 51:*4, 5, 15, 17*
**looks** 7:*4* 33:*8* 60:*17, 24* 83:*21* 91:*14* 92:*12* 100:*25*
**lose** 63:*16* 99:*2*
**loss** 87:*24* 107:*23*
**lost** 35:*17* 107:*19*
**lot** 25:*19*
**LVL** 57:*13* 79:*5* 80:*3, 8* 81:*5, 6, 7, 9* 82:*10, 12, 23, 25*
**LVL/5-hour** 4:*3*
**LVL'S** 80:*15*

**< M >**
**machine** 115:*11*
**majority** 29:*4*
**making** 7:*11* 47:*12*
**man** 57:*25*
**Management** 95:*4* 96:*12*
**Manny** 78:*21, 24*
**manufactures** 89:*18*
**marked** 14:*4* 15:*4* 28:*12*
**marketed** 53:*17*
**marketing** 50:*21* 53:*21*
**Material** 10:*9, 10, 11, 14, 16, 18, 24* 11:*1, 2, 4, 6, 7, 10* 12:*1* 39:22
**matter** 88:*21*
**Matters** 95:*3*
**McBride** 17:*13, 15* 18:*14, 23, 24* 19:*12, 19* 20:*6, 22* 22:*22* 24:*3* 25:*21* 26:*24* 31:*9, 17* 40:*14* 41:*18, 21* 61:*25* 62:*4* 65:*3, 11, 22, 24* 66:*2, 15, 23* 67:*18* 68:*6* 71:*20* 72:*7, 14* 94:*13* 95:*5, 7* 96:*13* 105:*19* 108:*12* 109:*3, 5, 6, 9, 11* 111:*21* 113:*15*

James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 46 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

**McBride's** 61:*16*
101:*1*
**mean** 10:*3, 17, 22*
20:25 24:*1* 35:*14*
37:23 38:8 40:*21*
70:15 76:25 77:*18*
80:24 82:17 94:*10*
96:20 97:25 103:*7*
107:*12*
**meaning** 11:*16*
17:24 27:15 31:*11*
39:*10* 50:7
**means** 11:*3* 71:2
86:6 100:*12*
**medication** 6:*12*
**meet** 8:*14, 17*
17:*11, 22* 18:*19, 24*
24:*4, 7* 30:22
31:*21* 40:*11, 23*
41:*1* 42:*19* 43:9,
*12* 47:*25* 49:*3, 5*
50:*13, 15* 108:2, *6*
**meeting** 21:25
22:22 25:2, *7, 9*
31:*9* 41:*17, 20, 22*
43:5 51:*19, 23*
52:*11, 17* 53:2, *5, 8,*
*11, 15, 19, 22* 54:*10*
55:*7, 13, 16* 56:*1,*
*10, 14, 17* 58:*15, 19,*
*22* 59:*5, 9, 21* 60:*1,*
*4* 66:25 74:*10, 13*
**meetings** 24:*20*
**Melissa** 50:*15, 19*
64:*14*
**member** 12:*19*
43:*20, 23* 44:*3, 4, 6,*
*12*
**members** 19:*20*
**memorialized** 70:*25*
**memory** 87:*24*
**mentioned** 109:*3*
**Messrs** 95:*4, 6*
96:*13*
**met** 17:*19* 18:*10*
19:*3, 4, 25* 20:*3, 14*
21:*18* 24:*9, 16, 18,*
*21, 23, 24* 30:20
40:*18* 42:*1, 3, 21,*
*23* 43:*1, 2, 6* 47:*17,*
*21* 48:2 50:*11, 14,*

*18* 58:*20* 61:*25*
66:2 67:*18* 74:*9,*
*18, 24* 75:*1* 78:*21*
81:*15, 19* 113:*15*
**Mexico** 24:*5, 8, 9*
25:*3, 7*
**Michael** 29:*23*
30:*15, 20* 31:*21, 23*
36:7 37:*1* 45:7
50:*8, 13* 80:*19* 91:*1*
**Mike** 17:*13, 16*
18:*16* 44:*13, 15*
45:*8, 9, 13, 14*
48:*22, 25* 49:*3, 5*
50:*6, 7, 12* 54:*9*
55:*1, 2, 11* 57:6
84:*18* 85:*11* 108:2,
*5, 14* 109:*9* 110:*12,*
*13, 18, 21* 111:22
**Mike's** 45:*17*
**million** 35:*11, 13,*
*15* 60:*18* 63:*1, 17*
67:22 68:*4* 83:*3*
98:25
**Milwaukee** 2:*5*
9:*13, 22, 24* 23:*15*
**mind** 42:*11*
**minute** 44:*19* 50:6
71:*18* 83:5 106:*21*
110:*12*
**minutes** 8:*16, 18*
**misleading** 73:*4*
74:*3*
**missed** 106:*19*
**missing** 38:*24*
109:*1*
**misstated** 73:22
**Misstates** 37:*3*
56:*3* 66:*19* 67:*10*
73:*4* 81:*16* 87:6
**mistake** 83:22
**Mm-hmm** 80:*4, 11*
**moment** 15:*14*
16:*19* 21:*24* 28:*13,*
*15* 32:23
**momentarily** 32:*20*
**money** 27:*16* 46:*25*
49:20 51:*4, 5, 16*
65:*7, 9, 10* 83:*1*
99:*1, 9, 10, 12*
102:*8* 106:*11, 16,*

*22* 107:*7, 12, 19*
108:*15* 109:*12, 13*
111:*4* 112:*15*
**monies** 49:*18*
107:*21*
**moniker** 43:*18*
75:*21*
**monitor** 63:*25*
**monitoring** 107:*7,*
*11*
**month** 67:*17*
**monthly** 106:*24*
**move** 17:*10* 32:*19*
**moved** 79:6
**multiple** 41:*24*
**mute** 103:*5*

**< N >**
**NACS** 51:*23, 24*
52:*1, 11* 54:*10*
55:*2* 56:*11* 58:*3*
**name** 5:*10* 10:*5*
12:*3* 16:*11* 20:*17*
33:6 37:25 38:*3*
41:*1* 44:*13, 17, 18*
45:*11, 12* 51:*11*
52:*21* 60:24 82:*18*
98:*11* 115:*19*
**names** 79:*12*
**Nappy** 83:*12, 16*
**narrative** 86:*14*
87:*4*
**nature** 9:*1* 10:*7, 23,*
*25* 11:*9, 19* 25:*15,*
*24* 28:*4* 39:*13, 20*
41:*6* 44:*10* 51:*2,*
*13* 53:*10, 19* 62:*3,*
*9, 14* 74:*10, 14*
109:*2*
**need** 14:*10* 28:*3*
33:*13* 105:*1* 107:*24*
**needed** 63:*21* 99:*9,*
*22* 106:*6* 111:*8*
112:*2*
**negotiated** 30:*7*
**negotiation** 82:*3*
**negotiations** 81:*9*
82:*1*
**neither** 115:*15*

**NEVADA** 1:2 2:*10*
29:*1, 4* 38:*14, 17*
115:2, *6*
**never** 15:*19* 45:*3*
48:7 49:22 78:*18*
88:2 111:*19*
**NextGen** 76:*16, 23*
77:*9, 25* 78:*24*
79:6, *11* 88:*12, 18,*
*23* 89:6, *12, 17, 23,*
*24*
**Nicolette** 83:6, *10*
**No.____Change**
117:2, *5, 8, 11, 14,*
*17, 20*
**No.____Line** 117:2,
*5, 8, 11, 14, 17, 20*
**non-compete** 39:*14*
**North** 2:*5*
**Northern** 47:*10*
97:*18* 99:*3* 101:*5*
**Note** 3:*14, 16, 17,*
*19* 27:*21* 28:*12, 23*
29:*10, 11* 30:8, *16*
31:*1, 19* 32:22
33:23 34:*4, 11, 14,*
*16, 17* 35:*10, 11*
37:15 46:*15, 17, 18*
60:*12, 17, 25* 61:*10,*
*18* 71:22, *23, 24*
72:9, *10, 20* 73:*11,*
*12, 13* 99:*1* 103:*20,*
*25* 104:*1, 17* 105:*8*
109:*21*
**noted** 102:*21* 116:*6*
**notes** 38:25 70:22
72:15 98:25 107:*25*
**Notice** 3:*11* 4:*3*
14:*3, 13* 90:25
91:*15* 92:*12*
106:*10* 112:*17*
**November** 21:*11*
47:*18, 22* 48:*18*
59:23 60:2 74:*18,*
*24* 75:*11* 91:*16*
92:*3, 16, 21* 93:*5*
94:*12* 95:*14* 96:*12*
101:8 106:*10, 12,*
*17* 109:22 112:*18*
**number** 44:*23*



James V. Deppoleto, Jr.   -   12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 47 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

59:6  85:1  103:9, 10
numbers  83:22
NXT  4:3  57:13
79:4  80:3, 8, 15
81:5, 6, 7, 9  82:10,
12, 23, 25

< O >
o0o  4:5
Oak  9:23
oath  5:5  6:6, 7
115:10
O'Bannon  2:10
object  9:3  28:7
32:3  73:3  77:10
87:11  92:24  93:23
94:14, 15  99:17
Objection  6:18  8:2
30:9  36:12  37:3
45:21  46:20  53:3
54:5, 21  55:20
56:3, 24  57:21
63:2, 11  66:8, 18
67:10, 23  68:8
72:16  73:1  76:24
78:6  81:16  86:22
87:6  93:8  95:17
101:25  111:13
objections  46:4
71:6, 14  74:17
77:21  84:21, 23
85:16  86:10, 15
87:7  111:23
objects  74:12
86:13  87:3
obligation  6:8
observed  56:9
observing  43:8
55:17
obtaining  84:20
85:13
obviously  27:12
occasion  47:17
occasions  41:24
occurred  96:11
October  51:21
55:3  56:11, 23
58:4, 9, 17  60:9
97:13  100:23  101:2
offered  75:8  99:11

OFFICE  2:9  43:1,
3, 7  48:1  58:20
81:15
officer  26:18  29:24
36:8  37:7
offices  42:20, 24
Okay  7:8  9:20
15:3, 23  17:10
18:4  28:6, 9, 17
31:17  32:19, 25
33:10, 17  35:24
36:3  37:9  38:18
39:8  44:21, 25
71:5  72:13  76:9
79:13  80:9  83:4
84:15  88:4  96:3
97:8  100:16, 20
101:22  102:6, 13,
21  103:6  104:19
110:3
old  90:5
once  24:23  36:3,
25  48:2  60:19
75:12  102:10
one-page  79:21
ones  25:18
operate  37:22  38:7
110:14
operating  34:10
35:2, 8  61:3, 5
62:19  63:23, 25
105:7, 13, 18, 25
106:4, 8, 23  107:8
operation  61:9, 11
operations  49:16
61:15  65:8
opinion  68:19
77:13
opportunity  7:16,
20  20:24  21:1
order  97:10  112:2
originally  89:21
outside  96:16  97:1
overbroad  86:22
ownership  39:25

< P >
p.m  114:17
Pacquiao  78:21, 24
PAGE  3:6  15:6, 14,
24  16:2, 4, 15

28:11  29:16, 21, 25
30:24  33:4, 12
36:1  37:9  60:19,
25  69:2, 7, 16, 17,
21  70:3, 7, 9, 11
71:10, 12  82:22
83:20, 23  84:5, 6
86:9  88:5  89:14
95:2, 24  104:12
105:1, 5  117:2, 5, 8,
11, 14, 17, 20
pages  35:24
paid  29:8  31:4
46:19  63:7  64:10
68:4  99:3
paragraph  16:20
29:6  32:24  34:1, 8,
15  61:1  62:17
71:15  76:13  84:18,
24  85:8, 17  88:10
89:2  95:3, 19  96:7,
9  104:21, 22  105:5
paragraphs  28:16
70:23
Paramount  98:13
parent  51:19  52:12
53:25  54:3  55:8
80:16
part  10:14  19:17
31:6  36:21  66:16
67:8  106:20  110:9
participate  7:10
parties  74:20
75:16  115:17
partner  82:11
Partnership  4:5
80:10
party  5:25  7:9
85:4  113:17
PATRICK  2:4  7:6
27:21  79:15  102:25
patrick.harvey@bus
chblackwell.com  2:6
Pavlik  2:15  7:4, 7
17:13, 16  18:14
19:13, 20  20:22
22:22  24:3  25:22
26:17, 20  31:10, 18
40:15  41:18  56:22
58:2, 8, 12  65:22
66:2, 16, 24  67:18

68:7  71:20  72:7,
14  91:13  94:13
95:5, 7  96:13
103:1, 4, 10, 11, 15
105:20  108:12
109:4, 9  110:11
111:1, 3, 21  113:16
Pavlik's  20:2  26:12
pay  35:1  51:15
67:21  99:9, 11, 23
payable  13:22
paying  35:5
Payment  4:3  47:8
62:21  63:1  91:16
92:13  98:9, 16, 18,
19, 23  99:5, 14, 15,
21  100:7  101:24
107:20
payments  62:24
63:7  64:1, 2  75:25
111:21
PENALTY  116:1, 4
people  7:5  55:19
90:5
people's  64:5
percent  64:7  106:3,
7
percentage  106:2
performed  111:11
period  32:11  64:11,
16, 23  65:4, 12, 16
66:6  77:15  90:10,
20  110:1, 15, 19
PERJURY  116:1, 4
person  66:5  86:5
103:9
personal  85:22
96:15, 17, 25
100:17, 19  109:16
personally  45:23
102:16
Pettis  20:19, 21
21:22  23:2, 3, 6, 10,
15  40:9  75:14
113:18
Pettis's  22:15
PFL  17:23, 24
18:25  19:4, 11
31:11, 14  40:7
41:23  42:5, 16  62:1



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 48 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**phone** 59:*2* 75:*4*
86:*5* 103:*9, 10*
**photo** 57:*16, 20*
**pick** 103:*12*
**picky** 103:*7*
**picture** 57:*8*
**pie** 53:*12*
**pitched** 25:*23*
**pitching** 62:*5*
66:*11, 16* 67:*1, 8*
**place** 115:*8*
**placed** 115:*10*
**Plaintiff** 1:*5* 2:*3*
6:*1* 15:*1, 21* 71:*14,*
*19, 24* 72:*1, 6*
74:*12, 17* 86:*11, 12,*
*15* 87:*3* 89:*8*
**Plaintiff's** 3:*11, 20*
15:*11, 20* 69:*2*
74:*19* 76:*10*
**plan** 79:*14*
**planned** 56:*22*
**plaque** 57:*9, 10, 11,*
*12*
**plastic** 57:*11*
**pleadings** 73:*5*
**Please** 5:*10* 6:*25*
11:*21* 19:*3* 21:*7*
33:*10* 62:*17* 93:*15*
114:*15*
**point** 20:*10* 26:*14*
43:*19* 66:*5* 81:*4*
82:*12, 22* 102:*9*
107:*10* 113:*5, 7, 9,*
*11*
**pointed** 107:*16*
**points** 89:*13*
**position** 12:*8*
13:*11, 14* 19:*24*
20:*2* 25:*1, 6* 43:*15*
45:*17*
**positive** 113:*4*
**possession** 106:*18*
**possibility** 63:*12, 13*
**possible** 64:*4, 25*
105:*15, 16*
**Possibly** 49:*2* 65:*21*
**post** 44:*8, 10* 57:*19*
**potential** 25:*11*
46:*13* 68:*16*

**potentially** 76:*2*
108:*25*
**Predominantly**
11:*15*
**preferred** 99:*23*
**prematurely** 44:*3*
**preparation** 8:*11*
**prepare** 8:*7, 14, 23*
9:*1*
**prescription** 103:*12*
**Present** 2:*14* 86:*8*
87:*21*
**presented** 57:*4*
**President** 12:*10, 11*
20:*10* 26:*15* 29:*23*
36:*4* 37:*24* 43:*16*
60:*22* 61:*23, 25*
112:*9*
**presidents** 100:*4*
**pretty** 90:*6*
**previous** 37:*3* 56:*4*
66:*19* 67:*10* 81:*16*
**previously** 5:*20, 21*
12:*5* 39:*10* 69:*9,*
*12* 75:*23* 102:*16*
104:*9, 17* 108:*1*
**primary** 55:*25*
113:*5, 7, 9, 11*
**principal** 29:*11*
**principals** 20:*7, 9*
**Print** 33:*6*
**printed** 95:*22, 23*
**prior** 6:*1* 9:*18*
22:*18, 23* 30:*17*
31:*18* 40:*23* 47:*17*
70:*24* 92:*20* 93:*4*
94:*9* 95:*14* 115:*9*
**privilege** 9:*4* 92:*18*
93:*25* 94:*8* 95:*13*
**privileged** 92:*5, 7, 9*
94:*2, 3*
**privileges** 94:*16*
**privy** 49:*16* 111:*17*
**probably** 45:*11*
63:*12, 14* 108:*18*
114:*5*
**problems** 87:*25*
**proceed** 6:*4* 28:*4*
**proceedings** 115:*7,*
*9, 11*

**process** 10:*16* 28:*3*
82:*23*
**produced** 53:*17*
72:*13* 73:*9* 102:*19*
107:*3* 111:*6* 113:*21*
**product** 45:*16*
57:*6, 12, 14* 76:*16,*
*22* 77:*8, 18, 20, 25*
89:*5, 11* 90:*12, 15*
**production** 102:*14*
**products** 26:*3, 25*
68:*12, 15, 18, 23*
78:*13* 81:*6* 89:*18,*
*19, 24* 90:*4, 5*
**Professional** 17:*24*
18:*2, 3, 6, 8, 11*
20:*13* 21:*14* 23:*7*
24:*17* 31:*11, 15*
74:*21* 75:*17, 18*
**Promissory** 3:*14*
29:*10* 32:*22*
**promoting** 54:*19*
68:*7*
**property** 10:*18, 21,*
*25* 11:*1*
**proprietary** 76:*15,*
*21* 77:*7* 89:*4, 10*
**propriety** 78:*4*
**protect** 65:*9, 10*
**provide** 11:*11, 23,*
*24* 34:*9* 61:*2*
62:*18* 79:*21* 80:*20*
105:*6*
**provided** 7:*14* 8:*13*
23:*21* 29:*3* 70:*22*
71:*1, 15* 82:*5*
96:*23* 110:*3, 5*
**providing** 61:*6*
**Puerto** 24:*4, 7* 25:*3*
**pull** 14:*3* 15:*25*
27:*21* 60:*11*
**Purchase** 3:*14, 17,*
*19* 27:*21* 28:*12, 23*
29:*7* 30:*8, 16* 31:*1,*
*19* 33:*23* 34:*4*
46:*16, 17, 18* 60:*13*
61:*18* 71:*22* 72:*9,*
*20* 73:*11* 103:*20*
104:*17* 109:*21*

**purchaser** 29:*2, 8, 9*
30:*25* 34:*8* 61:*2*
62:*18* 105:*6*
**purpose** 43:*5*
47:*11* 53:*2* 98:*5*
**purposes** 29:*2*
**put** 44:*8* 106:*2*

**< Q >**
**quarterly** 107:*2, 3*
**question** 6:*16, 17,*
*24* 11:*18* 14:*11*
16:*14* 18:*5, 20, 22*
22:*20* 31:*13* 35:*4*
42:*11, 13* 48:*9*
59:*7* 63:*5* 67:*5*
68:*1* 69:*10* 73:*7*
77:*5* 84:*11* 86:*25*
87:*9* 88:*20* 92:*8,*
*19* 93:*1, 15* 98:*21*
100:*22* 101:*15*
103:*1, 8* 104:*20*
**questioning** 17:*15*
**questions** 6:*5, 23*
27:*18* 28:*2, 6*
104:*3* 114:*6, 7*
**Quintec** 10:*6, 7*
12:*4, 6, 8, 12, 14, 20,*
*23* 13:*6, 9, 11, 14,*
*20* 38:*2, 4, 5, 6*
100:*13, 18* 102:*16*

**quintecconveyor.com**
37:*21*
**quite** 63:*4* 80:*23*

**< R >**
**R&D** 82:*23*
**racking** 11:*7*
**ran** 19:*1*
**Rapkin** 22:*10, 11,*
*13* 23:*2, 3, 9*
**R-A-P-K-I-N** 22:*12*
**rapper** 41:*1*
**read** 8:*9* 16:*19, 22*
28:*23* 29:*13* 32:*23,*
*24* 71:*3* 72:*3, 11*
74:*22* 76:*18* 85:*15*
95:*9, 19, 20, 23*
96:*5, 7, 8, 9* 105:*9*



James V. Deppoleto, Jr. — 12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 49 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

114:*8*, *10*  116:*4*
**reads**  69:*23*  71:*11*
**realize**  17:*14*
**really**  21:20  25:*10*
  50:*12*  53:22  55:22
  56:*20*  75:5  82:*16*,
  *17*, *19*
**reason**  43:*11*  63:*21*
  117:*4*, *7*, *10*, *13*, *16*,
  *19*, *22*
**reasonable**  88:*12*
**recall**  9:*15*  13:*8*,
  *11*  15:22  17:2, *5*,
  *20*  20:*1*, *2*, *4*  21:*13*,
  *18*  22:2, *8*  24:*13*,
  *20*  25:*10*  26:*19*, *22*
  27:*1*, *2*  30:*23*
  31:*20*, *22*, *25*  34:*3*,
  *6*, *7*, *20*  37:*13*  41:*3*,
  *20*, *21*, *22*, *25*  42:*1*,
  *3*  43:*17*  48:6  49:7
  50:*1*, *10*, *11*, *12*, *14*,
  *18*  51:9, *18*, *22*
  52:22  53:*10*, *18*, *19*
  55:*12*  56:*13*, *16*, *18*
  58:*7*, *13*, *24*  60:6
  61:7  64:24  65:*14*,
  *15*, *18*, *23*  66:4
  69:*8*, *11*  73:*17*
  76:*3*, 5  85:6  87:22
  88:*19*, *21*  99:*13*
  101:22  105:*15*, *17*,
  *21*, *23*  110:8
  112:*24*, *25*
**Receipt**  3:22, *23*
  100:*23*  101:5
**receipts**  102:*17*
**receivable**  13:22
**receive**  9:6, *14*
  10:*18*, *24*  11:*1*
  64:*18*  105:*12*
  107:*1*  112:*20*
**received**  48:*19*
  83:*15*, *17*  113:*1*, *21*
**receiving**  64:*15*, *19*,
  *22*  65:*3*, *13*  105:*17*,
  *23*
**Recess**  38:*21*  79:*23*
  102:*24*
**recipe**  26:*25*

**Recitals**  34:*8*  61:*1*
  62:*17*  104:*21*
**recollection**  27:*10*
  34:*24*  84:*4*, *15*
**record**  5:*11*, *17*
  35:22  73:*23*  79:*24*
  102:*23*  115:*11*
**recordkeeping**
  100:*10*, *12*
**records**  109:*17*
  110:9  111:7  112:*20*
**rectangle**  45:6
**refer**  45:*13*  88:*14*
**reference**  38:6
  80:7  100:2, *3*
  102:*11*  105:*1*
**referenced**  14:*24*
  50:*8*  70:*23*  104:9
**referred**  73:*10*
  110:*11*
**referring**  39:2
  45:9  70:*14*  72:*17*,
  *19*, *24*  73:*23*, *25*
  79:9
**refers**  70:*16*
**reflected**  34:*4*
  61:*19*  101:*24*
  102:*17*
**refresh**  34:*24*  84:*3*
**refreshing**  84:*15*
**regard**  48:22, *25*
  106:*15*  107:9
**regarding**  23:*10*
  53:*16*  66:*3*  80:*15*,
  *19*  81:9  82:2
  96:*12*  100:7
  105:*24*  113:*1*, *22*
**Regular**  13:*24*
  61:*13*
**related**  86:7, *19*
  87:*19*
**relating**  106:*1*
**relationship**  74:*8*,
  *11*, *14*, *20*, *21*  75:*16*,
  *17*, *18*
**relative**  115:*16*
**remainder**  64:*8*
  106:*4*, *8*
**remember**  24:*3*
  34:*17*  37:*15*  42:*21*,

*23*  43:*1*  64:24
  88:*17*  106:5  110:*16*
**Repeat**  27:5  66:*21*
**repeatedly**  78:*19*
**report**  105:*12*, *17*,
  *23*  107:2
**Reported**  1:*24*
**REPORTER**
  114:*13*, *16*  115:5
**REPORTER'S**
  115:*1*
**reports**  64:*18*, *21*,
  *25*  65:*1*  106:*14*, 22
  107:*1*, *4*, *5*
**represent**  5:*13*
  25:5, *8*  68:25
**representation**
  30:*13*
**represented**  26:*15*
**request**  63:*20*
  102:*14*  106:*14*
  112:*12*
**requested**  99:*21*
  107:9
**requesting**  102:*3*, *10*
**require**  92:6
**reserve**  114:*8*
**respect**  21:8  26:*12*
  53:20  65:*3*  101:*15*
  102:*17*  106:22
**respond**  86:*16*
**Response**  3:*20*
  25:*14*  69:2, *9*
  70:*11*  71:6  74:*12*
  84:*21*  86:*14*  87:*4*
  88:*16*, *25*  90:*24*
**responsibility**  6:*8*
**restate**  21:7  109:7
**return**  63:*1*, *10*
  88:*13*
**returns**  112:9, *13*
**review**  7:*15*, *16*
  8:*11*  23:*21*  28:*13*,
  *15*  44:20  70:5
  95:25  111:2, *11*
**reviewed**  8:25  9:*1*
  22:24  23:24
**right**  27:*24*  38:*19*
  44:2  45:*10*  72:22
  84:*1*  94:22  104:8

114:*8*
**rise**  75:*3*
**risk**  62:25  63:9
**role**  26:*12*  32:2, *12*,
  *14*  37:*1*  39:*18*
  50:*20*  61:*17*, 22
**rule**  8:*3*
**run**  103:*11*
**rush**  95:*21*

**< S >**
**salaries**  64:*8*, *10*, *15*,
  *19*, 22  65:*3*, *6*, *13*
  106:*3*, *7*  109:*15*
**Sale**  29:7
**sales**  32:*6*, *7*, *10*, *15*,
  *16*  39:*19*  45:*15*
  107:*14*
**salesman**  37:2
**salesperson**  32:*12*
**sample**  68:*23*
**sat**  52:*17*  53:5
**saw**  43:*17*  48:7
**saying**  90:*3*  96:25
**says**  29:7  32:*23*
  33:5  35:9  37:7
  45:*6*, *18*  47:*15*
  48:*13*  61:2  62:*16*
  69:2  70:*21*  74:7,
  *16*  75:*16*  76:*11*
  80:2, *9*  81:5  82:*12*,
  *23*  84:*16*, 22  85:*15*
  86:*10*, *11*  95:*3*, 5
  97:*12*  105:*4*
**scan**  69:*1*
**scans**  47:*12*
**school**  9:*10*, *20*
**science**  26:*18*
**screen**  30:*1*  35:*18*
**scroll**  14:*12*, *19*
  15:5, *13*  69:7
**scrolling**  14:*10*
**seats**  40:22
**Second**  3:*17*  14:5
  25:2, *7*  32:*19*  34:*7*,
  *13*, *16*, *17*  35:*10*, *11*
  37:*15*  46:*17*  60:*12*
  61:*17*  64:2  71:*23*
  72:5, *9*  73:*12*, *13*
  84:2  89:*8*  103:*20*,



James V. Deppoleto, Jr. - 12/5/2024
Case 2:22-cv-02013-GMN-BNW Document 102-15 Filed 01/10/25 Page 50 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

25  104:*16*

seconds  107:*25*

secrets  76:*15*  89:*4, 10*

section  82:*12*

Sections  29:*3*

Secured  3:*14*  29:*9* 32:*21*

see  13:*23*  14:*6, 8* 15:*17, 18*  16:*4* 29:*18, 22*  30:*4, 5* 33:*25*  34:*22*  35:*17, 19, 20, 21*  36:*1, 5, 9* 40:*8, 11*  45:*18* 48:*16*  60:*14*  68:*14* 69:*5, 25*  71:*8*  80:*2* 83:*24, 25*  88:*7* 89:*15*  90:*1*  91:*18* 101:*6*  103:*19* 104:*14*  106:*1*

seeing  69:*8, 11*

seek  7:*25*

seeking  94:*7, 8*

seen  14:*16*  15:*8, 19* 28:*20*  33:*2, 17* 41:*24*  45:*3*  49:*22* 60:*16*  79:*4*  81:*2* 91:*2*  94:*24*  97:*14* 104:*16*  111:*2*

self-employed  10:*2*

sell  29:*9*  90:*13*

selling  90:*4, 5*

send  65:*11*  79:*15* 92:*16*

sending  65:*15, 18*

sense  20:*19*  112:*3*

sent  22:*25*  23:*25* 44:*4*  80:*18*  91:*20* 92:*2*

sentence  34:*13* 71:*12*  72:*5, 11* 74:*16*  84:*22*  86:*10*

sentences  86:*12*

September  64:*11*

Set  3:*21*  16:*12* 17:*7*  69:*3*  115:*8*

shared  76:*14* 77:*24*  78:*3*  89:*3, 9*

shareholder  29:*4*

shares  27:*15*  75:*8*

sheet  90:*7*  117:*1*

sheets  95:*24*

shirts  79:*5*

shorthand  115:*12*

shot  26:*7, 9, 13, 21* 32:*16*  41:*11, 13, 16* 43:*10, 12*  48:*14* 53:*16, 21*  57:*13* 78:*16, 17*  81:*5, 6, 10*

shots  26:*4*  41:*9* 54:*20*  89:*20*

Show  51:*23*  52:*8, 9, 11*  54:*11, 15*  55:*2* 56:*11*  72:*14* 104:*12*  107:*23*

showing  111:*8*

sign  7:*17, 19, 23* 114:*8, 10*

signature  16:*7, 20, 24*  29:*18, 22*  30:*25* 33:*5, 8*  37:*10, 16* 60:*21, 23, 24*  70:*2, 7*

SIGNATURE:_____ _____

__DATE  117:*24*

signatures  30:*4*

signed  17:*3*  36:*3* 60:*20*  61:*17*  71:*21* 72:*8, 14*  76:*25* 77:*3*  109:*21*

signing  17:*2*  30:*16, 17*  31:*18*  37:*13* 46:*15*

similar  25:*17* 89:*18, 19*

simply  42:*15*  46:*25* 66:*16*  67:*1, 8* 102:*14*

sir  67:*6*  94:*20*

sit  51:*22*  85:*6*

Sitting  40:*22*

skip  29:*6*  86:*9*

skipped  103:*17*

Skipping  74:*16*

sky  53:*12*

Slotting  47:*15* 48:*11, 13, 14*

Small  62:*13*

smaller  76:*1, 2*

Smart  29:*3*  36:*7, 11, 17*  37:*1*  71:*21* 72:*7*

solely  37:*22*  38:*7*

somebody  18:*21* 98:*22*  113:*10*

sorry  11:*18*  12:*5* 27:*5*  33:*13*  35:*4* 42:*10, 13*  56:*6* 66:*21*  67:*3*  69:*10* 73:*22*  81:*5*  83:*7* 87:*15*  90:*9*  93:*2* 100:*3, 8*  104:*23* 106:*13, 19*  109:*7*

sort  39:*15*  44:*12*

sound  34:*12*

sounded  109:*17*

speak  26:*20*  30:*15* 31:*8, 17*  49:*9* 73:*16*  75:*10*

speaker  55:*25*

speaking  56:*16, 18*

speaks  77:*11*  92:*24* 93:*8, 9, 16, 19* 94:*15, 19*  95:*18*

specific  105:*21*

specifically  17:*4* 20:*12*  34:*6*  61:*7* 68:*20*  76:*22*  77:*8* 79:*10*  101:*22*

specifics  19:*6*

speculation  56:*25* 57:*22*  111:*14*

speed  27:*13, 19* 28:*22*

spell  22:*11*  39:*23*

spelling  45:*10*

spinoff  75:*5*

spoke  23:*9, 12* 31:*23*  38:*1*  50:*7, 24*  58:*11, 14*  65:*23* 66:*24*  75:*1*  103:*8* 111:*1*

spoken  48:*22, 25* 59:*1*

spokesperson  55:*18*

spring  24:*5*  27:*4, 7*

spun  78:*12*

Sr  20:*18*

ss  115:*2*

stake  80:*21*

stand  96:*2*

stands  52:*1*

start  21:*12*  44:*2* 86:*17*  109:*14*

starting  71:*12*

state  5:*10*  37:*22* 38:*9*  72:*5*  73:*1* 89:*7, 23*  115:*2, 6* 116:*10*

stated  39:*9*  61:*10* 65:*5*  71:*6*  78:*19*

statement  7:*17* 78:*5*  96:*7*

STATES  1:*1*  5:*15* 8:*3*  38:*12, 13* 70:*12*  71:*19, 24* 72:*6*  74:*17*  78:*2* 79:*1*  85:*19*  89:*1, 8*

stating  76:*20*  77:*6* 85:*11*

station  52:*2*

status  106:*15*  113:*2*

stay  19:*9, 10*  96:*9*

stealing  108:*15*

step  83:*4*

stipulation  64:*6*

stipulations  44:*1*

stock  36:*23*

stop  13:*5*

stopped  78:*11*

store  52:*2*

streamline  17:*14* 104:*10*

stretch  96:*2*

strike  98:*9*

Stritch  9:*11*

stuff  25:*11*  61:*14*

Subject  71:*13*  72:*2* 74:*16*  84:*22*  85:*15* 88:*21*

subscribed  115:*19*

subsequently  24:*18*

substance  8:*20* 25:*19*

substantive  53:*23* 67:*14*

suburb  9:*24*

sued  17:*12*

suffered  87:*24*

Suite  2:*5, 10*

James V. Deppoleto, Jr.   -   12/5/2024
Case 2:22-cv-02013-GMN-BNW   Document 102-15   Filed 01/10/25   Page 51 of 53
James V. Deppoleto, Jr. v. Takeover Industries, Inc., et al.

**suited** 86:*14* 87:*5*, *12*
**summer** 64:*23*
**Support** 81:*5*
**supposed** 44:*5* 98:*8*, *24* 99:*12*
**sure** 6:*21* 13:*7*, *10* 14:*6* 16:*18* 18:*10* 19:*15* 24:*3*, *6* 25:*4* 27:*9* 31:*13* 32:*7*, *18* 36:*14* 37:*5* 38:*16*, *20* 39:*3* 40:*14*, *15* 43:*10* 45:*12*, *16*, *17* 47:*24* 48:*17* 52:*25* 55:*11* 57:*15*, *18*, *24* 66:*23* 73:*21* 80:*23* 90:*15*, *19* 95:*20* 97:*16* 105:*16* 106:*21* 107:*7* 109:*8* 111:*16* 112:*23* 114:*5*
**systems** 11:*25*

**< T >**
**tagged** 43:*14*
**take** 6:*7* 10:*19* 16:*19* 18:*23* 28:*13*, *15* 32:*10*, *23* 38:*18* 44:*19* 79:*18*, *21* 102:*22*
**taken** 5:*23* 14:*24* 38:*21* 79:*23* 102:*24* 115:*7*
**TAKEOVER** 1:*7* 3:*20* 19:*24* 20:*3* 22:*1*, *17*, *18*, *23* 23:*22*, *23* 24:*11*, *14*, *19* 25:*1*, *6*, *25* 26:*1*, *18* 27:*3*, *6* 28:*25* 29:*23*, *24* 31:*5* 32:*2*, *12* 35:*2*, *5* 36:*3*, *22* 41:*7* 43:*16*, *21*, *24* 45:*19* 46:*1*, *9*, *15*, *19*, *25* 47:*6* 48:*19* 49:*10*, *17*, *18* 50:*20* 53:*13*, *17* 56:*1* 59:*22* 60:*1*, *5*, *7*, *22* 61:*6*, *17* 62:*12*, *15*, *24* 64:*12*, *15*, *21* 65:*1*,

*4*, *13*, *15* 66:*3*, *6*, *17* 67:*9*, *21* 69:*3* 71:*19* 72:*1*, *6* 74:*19* 75:*25* 76:*7* 77:*15*, *24* 78:*24* 79:*5*, *11* 84:*25* 85:*2*, *18* 88:*18*, *23* 89:*18* 98:*3*, *22* 101:*2*, *23* 105:*13*, *19* 106:*11*, *15*, *16*, *18*, *23* 107:*21* 109:*6*, *20*, *25* 111:*4*, *10*, *20* 112:*8*, *9*, *15*, *20* 113:*2*, *6*, *10*, *22*
**Takeover's** 25:*16* 71:*25* 76:*14*, *21* 77:*7*, *16* 78:*3* 84:*20*, *24* 85:*8*, *13*, *17* 89:*4*, *10*, *24*
**talk** 55:*23* 84:*2*
**talked** 25:*10* 109:*8*
**talking** 21:*1* 25:*21* 27:*17*, *23* 38:*25* 43:*9* 53:*12*, *13* 75:*14* 88:*17*, *22* 106:*21*
**targets** 38:*24*
**tax** 112:*8*, *13*
**Taylor** 19:*20*
**team** 108:*24*
**Tech** 2:*14* 14:*9* 33:*12* 104:*5*, *25*
**telephone** 8:*19*, *21*, *22*
**tell** 6:*8*, *25* 25:*14* 26:*24* 27:*20* 54:*23* 104:*5* 108:*22*
**term** 11:*17* 26:*7*, *8* 27:*14* 47:*5* 99:*18*
**testified** 5:*6* 12:*5* 42:*15* 47:*4*, *16*, *25* 75:*23* 107:*11* 108:*1* 110:*4*
**testify** 6:*13* 47:*20*
**testifying** 115:*10*
**testimony** 7:*18*, *22* 19:*21* 23:*20*, *24* 31:*4* 37:*4* 47:*21* 55:*15* 56:*4* 66:*15*, *19*, *23* 67:*11* 81:*8*,

*13*, *17* 86:*15* 87:*5*, *13* 97:*6* 116:*7*
**text** 59:*5* 86:*6*
**texted** 59:*7*
**Thank** 7:*8* 13:*25* 14:*20* 22:*13* 28:*9* 29:*15* 39:*7* 44:*25* 45:*5* 59:*14* 74:*4* 85:*25* 88:*4* 100:*16* 103:*13* 105:*2* 114:*16*
**theft** 110:*10*
**themself** 25:*8*
**thereof** 115:*14*
**thing** 7:*3* 39:*1* 106:*1*
**things** 11:*9* 27:*12*, *13*, *24* 107:*14* 112:*6*
**think** 8:*2* 22:*24* 25:*10* 27:*14*, *16* 38:*23* 41:*9* 42:*10*, *11*, *12* 43:*9* 44:*17* 45:*10* 51:*9* 52:*3* 63:*18* 73:*24* 74:*1* 79:*13* 93:*12* 94:*17* 95:*24* 103:*23* 106:*4* 108:*12*
**third** 60:*17* 61:*1* 62:*21* 63:*21* 64:*2* 71:*23* 73:*13* 82:*11* 103:*25*
**thought** 68:*14*
**thousand** 101:*20*
**Three** 18:*12*, *13* 19:*19* 20:*7* 24:*23* 28:*16* 47:*7* 63:*7* 98:*25* 111:*9*
**three-minute** 79:*18*, *19*, *22*
**three-page** 33:*14*
**throwing** 47:*3*
**thumb** 64:*4*
**Thursday** 1:*16* 5:*1*
**time** 7:*16*, *19*, *23* 9:*18* 17:*21* 18:*17*, *18* 23:*12* 24:*8* 25:*2* 31:*23* 32:*4*, *11* 41:*2* 42:*22* 43:*2*, *15* 46:*19* 48:*3* 50:*2*, *7*, *11*, *24* 51:*23* 52:*23* 58:*11*,

*14*, *16*, *21* 59:*1*, *12* 61:*17*, *21*, *22* 62:*4* 63:*19*, *20* 64:*11*, *16*, *23* 65:*4*, *12*, *16*, *23* 66:*7* 72:*1* 75:*2* 76:*24* 77:*3*, *15* 81:*13*, *19* 90:*10*, *20* 99:*8* 100:*5* 106:*16* 109:*20* 110:*1*, *15*, *20* 114:*6* 115:*8*
**times** 75:*10*
**timing** 24:*20* 48:*6* 67:*19*
**title** 20:*11* 26:*19* 37:*5* 61:*20*
**titled** 91:*15*
**titles** 20:*12* 26:*16* 43:*18*
**Tiz** 44:*17*
**T-I-Z** 44:*18*
**Toby** 17:*12*, *15* 18:*14*, *23*, *24* 19:*12*, *19* 20:*5*, *22* 25:*21* 26:*23* 31:*17* 41:*18* 61:*16* 65:*23* 66:*2* 72:*14* 94:*13* 101:*1* 105:*19* 109:*3*, *5*, *9*, *11* 111:*21*
**today** 5:*23* 6:*23* 7:*15*, *22* 8:*8* 14:*16*, *23* 76:*25* 87:*13*
**today's** 8:*23* 14:*14*
**token** 47:*2*
**told** 108:*17* 109:*10* 111:*19*
**Tom** 17:*13*, *16* 18:*16* 70:*16* 73:*16*
**top** 28:*16* 34:*21* 69:*22* 80:*3* 83:*24* 97:*12*
**total** 48:*14* 101:*21*
**totaled** 101:*20*
**tough** 25:*19*
**T-Pain** 41:*2*, *4*, *18*, *22* 42:*1*, *3*, *8*, *15*, *19*, *23* 43:*2*, *6*, *9*, *12* 47:*16*, *17*, *22* 48:*1*, *13* 58:*14* 59:*1*, *4*, *8* 81:*9*, *11*, *14*, *19*, *24*, *25* 82:*2*, *4* 83:*14* 90:*4*



James V. Deppoleto, Jr.   -   12/5/2024
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 52 of 53
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**T-Pain's** 42:*20, 24*
59:*6* 81:*6, 7*
**traction** 68:*13*
96:*10*
**trade** 76:*15* 89:*4,*
*10* 112:*5*
**tradeable** 112:*3*
**trading** 36:*23*
**tranche** 63:*21*
**tranches** 35:*16*
47:*5*
**transactions** 70:*24*
**transcribed** 115:*12*
**transcript** 7:*14, 23*
114:*11, 14* 116:*5*
**transcription** 115:*14*
**transfer** 88:22
**transferred** 76:*14,*
*21* 77:*7, 25* 78:*3*
88:*11, 17* 89:*3, 9*
**treated** 88:2
**tried** 79:*12*
**trucking** 45:*16*
**trucks** 11:7
**true** 7:*17* 16:*12*
116:*8*
**truth** 6:9
**truthfully** 6:*14*
**try** 17:*14* 64:*3*
79:*19* 95:*11*
**trying** 14:*6* 27:*13,*
*19* 44:*11* 57:*15*
95:*12, 21* 104:*10*
107:*24* 112:*4*
**Tucker** 18:*15*
19:*13, 22* 20:*23*
22:*23* 24:*3, 4, 7, 16,*
*24* 25:*14, 22* 26:*23*
29:*22* 30:*12* 31:*10*
33:*6* 36:*4* 40:*11,*
*16, 18, 23* 41:*2, 18*
42:*20, 24* 43:*6*
49:*9* 50:*3, 4, 15, 25*
51:*5, 20* 52:*4, 9, 13*
53:*7* 54:*2* 55:*8, 18,*
*25* 56:*16* 57:*5*
59:*18, 25* 60:*20*
62:*8* 64:*15* 65:*2,*
*11* 66:*11* 71:*20*
72:*7* 74:*8, 18, 24*
75:*4, 11* 80:*15, 19*

82:*2, 4, 6* 86:*5, 18*
87:*18* 99:*13*
105:*13, 19* 108:*18,*
*20* 110:*5* 112:*9*
113:*4, 5, 9, 22* 114:*1*
**Tucker's** 19:*24*
25:*1* 33:*8* 43:*13,*
*15* 50:*19, 22*
**turned** 114:*2*
**twice** 24:*21*
**Twitter** 57:*16, 20,*
*25*
**two** 23:*14* 27:*24*
30:*6* 66:*13* 83:*22*
84:*1* 86:*11* 102:*17*
**type** 11:*13* 26:*3*
52:*3* 57:*10* 98:*12*
**Tzanetatos** 44:*14*
45:*7* 50:*8*

**< U >**
**umbrella** 79:*7*
**unable** 86:*16*
**unaware** 65:*5*
**undefined** 74:*14*
**underlined** 95:*3*
**understand** 6:*10,*
*24, 25* 7:*1* 8:*1*
11:*18* 18:*20, 22*
19:*5* 22:*19* 27:*23*
62:*25* 63:*4, 9* 68:*1*
85:*22* 92:*15* 98:*21*
**understanding** 7:*6*
14:*22, 25* 18:*6, 9*
19:*14* 25:*24* 26:*11*
32:*1, 11, 14* 36:*25*
50:*19* 61:*12, 16*
71:*24* 98:*5* 112:*1*
**understood** 6:*17*
28:*7* 62:*9*
**UNITED** 1:*1* 5:*15*
85:*19*
**University** 9:*11*
**up-and-coming** 26:2
**use** 26:*8* 64:*7*
75:*20* 79:*20*

**< V >**
**Vague** 30:*9* 32:*3*
45:*21* 46:*20* 49:*2*
55:*20* 56:*4* 63:*2,*

*11* 66:*8, 19* 67:*11,*
*24* 68:*9* 72:*16*
74:*14* 76:*24* 86:*22*
99:*17* 101:*25*
111:*23*
**vaguely** 25:*11*
**Vallarta** 24:*5, 8*
25:*3*
**varies** 12:*1*
**Vegas** 2:*10* 23:*19*
51:*19* 52:*5, 12*
53:*1* 54:*10* 55:*2*
56:*23* 57:*5* 58:*9, 17*
**vehicle** 36:*23*
**Vendor** 3:*24* 47:*8,*
*9* 48:*20*
**venture** 51:*6*
**verbal** 71:*2*
**verbatim** 115:*10*
**verification** 16:*4, 10,*
*15, 19* 69:*17, 22*
70:*7* 84:*7, 12*
**Verified** 3:*13*
15:*11, 20* 16:*3, 13,*
*16* 17:*8* 84:*10, 25*
85:*8, 18*
**verifying** 16:*11*
**verily** 16:*11*
**viable** 63:*19* 68:*15*
**VIDEOCONFEREN**
**CE** 1:*14*
**vision** 11:*25*
**visit** 52:*7*
**voice** 113:*13, 15, 16*
**vs** 1:*6*

**< W >**
**wait** 14:*9*
**waiving** 71:*13*
74:*17* 84:*23* 85:*16*
**Walgreens** 98:*8*
**want** 27:*11, 18*
73:*23* 74:*2* 94:*7*
97:*10* 100:*20*
**wanted** 38:*22* 61:*8*
64:*8* 65:*8* 106:*3*
107:*7*
**wanting** 65:*10*
**warehouse** 11:*5, 8*
97:*23*

**watching** 40:*22*
**water** 26:2 68:*20*
**Waukesha** 98:*14*
**way** 7:*5* 25:*8*
49:*14, 25* 68:*2*
86:*6, 19* 87:*19*
100:*8*
**wearing** 79:*4*
**website** 89:*25* 90:*5*
**weeks** 23:*14* 51:*1*
**Well** 10:*18, 23*
14:*8* 21:*7* 23:*16*
24:*23* 36:*9* 40:*6*
44:*1* 64:*6* 68:*4, 22*
78:*11* 87:*11* 93:*15*
94:*22* 96:*8* 97:*17,*
*24* 99:*16* 100:*20*
107:*16, 18* 110:*6,*
*11, 12*
**went** 40:*8* 53:*14*
102:*4* 108:*7*
**we're** 21:*1* 29:*25*
37:*21* 84:*2* 87:*13*
88:*15, 17, 22*
104:*22* 107:*15*
**we've** 38:*16* 84:*14*
102:*19* 104:*25*
**whatnot** 112:*5*
**WHEREOF** 115:*18*
**wife** 50:*22*
**Wisconsin** 2:*5*
9:*13, 23* 37:*22*
38:*7, 10* 98:*14*
**withdrawal** 109:*24*
**WITNESS** 3:*3*
6:*21* 8:*5* 27:*23*
30:*12* 32:*6* 35:*19*
36:*14* 37:*5* 38:*22*
45:*3, 23* 46:*6, 22*
52:*17* 53:*5* 54:*7,*
*14, 23* 55:*22* 56:*6*
57:*2, 24* 63:*4, 12*
66:*10, 21* 67:*6, 13*
68:*1, 11* 73:*7*
77:*13* 78:*8* 79:*17*
81:*19* 86:*24* 87:*9*
92:*12* 93:*1, 9* 94:*5,*
*19* 95:*18* 96:*3, 20*
99:*20* 102:*3*
103:*25* 111:*16*

James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.
Case 2:22-cv-02013-GMN-BNW    Document 102-15    Filed 01/10/25    Page 53 of 53

112:*1*  114:*12*
115:*18*
**witnesses**  115:*9*
**words**  25:*19*  64:*5*
**work**  13:*18, 20, 24*
23:*3*  67:*9*
**worked**  13:*8*  39:*16*
**working**  13:*5*
63:*21*  64:*9*
**worth**  64:*4*
**wrap**  107:*24*
**write**  95:*15*  96:*14*
**writing**  59:*8*  65:*20*
**written**  59:*11*  66:*1*
71:*2, 21*  72:*8, 15,*
*23*  73:*6, 9*  91:*10*
93:*18, 21*  100:*6, 9*
**wrote**  103:*24*
106:*10*

**< Y >**
**Yeah**  40:*5*  53:*9*
96:*20*  97:*10*  100:*3*
103:*11*  111:*16*
**Year**  57:*7, 12*
**yearly**  107:*4*
**years**  9:*16*  12:*13*
39:*5, 14*
**Yep**  7:*11*  28:*8*
**Yesterday**  9:*7*

**< Z >**
**Zarro**  17:*13, 16*
18:*16*  70:*13, 14, 16,*
*22, 25*  71:*14, 25*
73:*16*  97:*22*
**Zero**  82:*21*
**Zoom**  3:*11*  14:*7,*
*13*  103:*8*