# EXHIBIT 17

# EXHIBIT H

## HUSCH BLACKWELL

**Scott W. Brunner**
Partner

511 North Broadway
Suite 1100
Milwaukee, WI 53202
Direct: 414.978.5440
Fax: 414.223.5000
scott.brunner@huschblackwell.com

November 8, 2022

**SENT BY FEDEX & E-MAIL**

Veronica L. Manolio
Manolio & Firestone, PLC
8686 E. San Alberto Drive, Suite 200
Scottsdale, AZ 85258
vmanolio@mf-firm.com

Eric Bjorgum
Karish & Bjorgum
119 E. Union Street, Suite B
Pasadena, CA 91103
eric.bjorgum@kb-ip.com

Matthew P. Canini
Sills Cummis & Gross P.C.
101 Park Avenue, 28th Floor
New York, NY 10178
mcanini@sillscummis.com

Jennifer A. Reiter
Reiter Law, PLC
4500 N. 32nd Street, Suite 201H
Phoenix, AZ 85018
jenreiter@reiterlawaz.com

Joseph Pavlik (e-mail only)
joe@takeoverind.com

### Re: Notice of Default, Demand for Payment & Cease and Desist

Counsels & Mr. Pavlik:

This firm represents James V. Deppoleto Jr. ("<u>Mr. Deppoleto</u>"). We send this Notice of Default and Demand for Payment on Mr. Deppoleto's behalf, with respect to his debt interest in Takeover Industries, Inc., a Nevada corporation (the "<u>Company</u>"). As you know, in addition to holding 200,000,000 shares of the Company's common stock, Mr. Deppoleto has a material secured convertible debt interest, which is documented by way of that certain Convertible Note Purchase Agreement dated as of May 25, 2022 by and between Mr. Deppoleto, the Company, and the Company's majority shareholder, Labor Smart, Inc., a Nevada corporation ("<u>Labor Smart</u>"), as amended by that certain First Amendment (the "<u>First Amendment</u>") to Convertible Note Purchase Agreement dated as of July 6, 2022, and by that certain Second Amendment (the "<u>Second Amendment</u>") to Convertible Note Purchase Agreement dated as of August 19, 2022 (collectively, the "<u>NPA</u>"). The NPA and the three secured promissory notes (the "<u>Notes</u>"; the Notes and NPA together referred to as the "<u>Loan Documents</u>") that the Company has issued Mr. Deppoleto pursuant thereto are attached to this letter as Exhibit A. Capitalized terms used in this letter but not defined herein have the meanings set forth in the Loan Documents.

**Exhibit**

**Exhibit 14**
11/19/24 - CM

HOLLEY
Exhibit

**7**
10/04/24  M. Yohler

This Notice of Default, Demand for Payment & Cease and Desist (the "Demand Notice") is addressed to Ms. Manolio, the Company's counsel and Mr. Bjorgum, who we understand has been counsel for the Company and Labor Smart. However, Mr. Deppoleto understands that, during a special meeting of Labor Smart's Board of Directors held on November 7, 2022, and a written resolution of the (alleged) Company board immediately following, Messrs. Mike Holley, Toby McBride, and Joseph Pavlik resolved to reset the Company's board of directors and name new Company officers (attached as Exhibit B, for reference; the "Takeover Board Resolutions"). Because the Takeover Board Resolutions were deficient, as far as Mr. Deppoleto is concerned, Mr. Jason Tucker remains the acting President of the Company. Nevertheless, we are sending this Demand Notice to Mr. Canini (counsel for Mr. Holley), Ms. Reiter (counsel for Mr. McBride), and Mr. Pavlik (who we are not aware is represented by counsel) as well, for full transparency to all who claim to have a present role with respect to the Company's affairs—although this is not an indication that Mr. Deppoleto recognizes such attempted organizational changes as valid.

In any event, this Demand Notice retains full force and effect regardless of whomever is currently controlling or acting on behalf of the Company.

1.    Amount Owed & Demanded.  The loan principal owed to Mr. Deppoleto, as evidenced by the Notes, is $1,500,000 (the "Note Principal").  In addition, Mr. Deppoleto, on October 27, 2022, loaned the Company an additional $386,773.86 and on November 3, 2022, an additional $128,924.62 to facilitate his final Follow-On Investment amount and also provide further working capital (together, the "Supplemental Loan").  Mr. Deppoleto and the Company were in the process of documenting the Supplemental Loan prior to yesterday's extraordinary disruption of the Company's business; his agreement with the Company was that this Supplemental Loan would be funded as part of the NPA and result in a fourth (4th) convertible note similar to the third (3rd) convertible note and similarly as secured indebtedness.  In total, the principal balance owed to Mr. Deppoleto is $2,015,698.48 (the "Outstanding Principal").

**MR. DEPPOLETO HEREBY DEMANDS IMMEDIATE PAYMENT OF THE ENTIRE OUTSTANDING PRINCIPAL, PLUS ACCRUED INTEREST, TOTALING $2,057,733.75 (COLLECTIVELY, THE "OBLIGATIONS").**

2.    Events of Default.  Under Section 7.1(b) of the Secured Convertible Promissory Note, Section 7.1(b) of the (Second) Secured Convertible Promissory Note, and Section 7.1(b) of the (Third) Secured Convertible Promissory Note, certain Events of Default have occurred due to the Company's breach of representations, warranties, and covenants provided in the NPA, specifically (but not limited to):

      a.  The Company and Labor Smart breached the representation made under Section 4.7 of the NPA, as there was, at the time of the NPA's execution, and still remains, material litigation involving the Company, including, without limitation, Takeover Industries Incorporated v. Holley et al, Case No. 2:2022cv00357, filed in the U.S. Dist. Arizona, and that certain trademark opposition matter Next Level Fitness Water Inc v Takeover Industries Inc filed with the USPTO 91275126;

b. The Company and Labor Smart breached the representation made in Section 4.9 of the NPA on account of the monies owed by the Company's directors and officers to the Company, including, without limitation, $243,253.84 owed by Mr. Toby McBride referenced in the Related Party Receivable Communication attached to this letter as Exhibit C;

c. The Company and Labor Smart breached the representation made under Section 4.15 of the NPA due to their intentional withholding of information related to the above two-highlighted misrepresentations;

d. The Company breached Section 8.8 of the NPA on account of its apparent failure to maintain Directors & Officer's liability insurance, which Mr. Deppoleto has requested be put in place many times (*this having been a requirement of Mr. Deppoleto's prior to acting on the right Mr. Deppoleto has for a board seat, which is referenced in Section 8.5*);

e. The Company breached Section 10 of each Note due to misuse by the Company of Mr. Deppoleto's loan proceeds—notably, personal misuse by Mr. McBride;

f. The Company breached Section 4 of the First Amendment and Section 4 of the Second Amendment due to the above-referenced misrepresentations being made upon the execution of such amendments; and

g. The Company breached Section 3 of the First Amendment and Section 3 of the Section Amendment due to the misuse by the Company (notably, Mr. McBride) of proceeds from Mr. Deppoleto's loans, including unpermitted and excessive payments to himself as compensation and otherwise.

In addition to the above, the recent actions of Messrs. Holley, McBride, and Pavlik, which attempt to adjust the Company's board and officers, bring to light additional Events of Default, to the extent such actions are actual valid actions on behalf of the Company. Mr. Deppoleto questions whether (and, indeed, strongly doubts that) the Takeover Board Resolutions are valid, but to the extent they are, then the following Events of Default have also occurred:

h. Section 8.1(b) of the NPA was breached due to the Company's attempt to remove its acting President without obtaining Mr. Deppoleto's consent and, further, naming replacement officers for who Mr. Deppoleto has not provided (and does not provide) prior written consent; and

i. Section 5 of the First Amendment and Section 5 of the Second Amendment were both breached because no board member may be appointed without Mr. Deppoleto's written approval, yet the November 7 Resolutions seek to adjust the Company's board and Mr. Deppoleto has not provided written approval of (and expressly does not agree with) such proposed adjustment.

Under the Loan Documents, upon the occurrence of an Event of Default, and during any period in which such Event of Default is ongoing, (1) Mr. Deppoleto, as Holder, may declare all amounts of the Obligations immediately due and payable in full and (2) all amounts due but not paid under the Notes shall bear interest at a rate of eighteen percent (18%) per annum (or, if lower, the highest rate permissible under applicable law), compounded monthly. **Effective today, Mr. Deppoleto hereby declares the Outstanding Principal, plus all accrued interest (including default interest) immediately due and payable.** The Company has also waived demand, notice, presentment, protest, and notice of dishonor.

3. <u>Reservation of Rights and Additional Remedies</u>. Mr. Deppoleto reserves all the rights and remedies set forth in the Loan Documents, in any written agreement or instrument relating to any of the Obligations or any security therefor, as a secured party under the UCC, and as otherwise provided at law or in equity. The Company is hereby advised that Mr. Deppoleto is evaluating all available courses of action with respect to the Events of Default and hereby reserves the right to exercise any such rights and remedies at any time, in his sole discretion.

Nothing in this letter modifies the Loan Documents, all of which remain in full force and effect. Furthermore, any failure or delay by Mr. Deppoleto in enforcing his rights and remedies under the Loan Documents, at law or in equity, or the acceptance from time to time by Mr. Deppoleto of any payments or performance on account of the Obligations shall not, in any way, constitute or act as (a) a rescission or waiver of any requirements under the Loan Documents, (b) a modification of any of the Loan Documents, (c) an accord or satisfaction with respect to the entire amount of the Obligations due thereunder, or (d) a course of dealing or course of conduct by Mr. Deppoleto. Even further, nothing in this letter, any other correspondence, any oral communications between Mr. Deppoleto and any other party, the making of any advances to the Company, or any action, delay in acting, or failure to act by Mr. Deppoleto should be construed to be or is a waiver, modification, or release of the defaults under the Loan Documents, of any other breach or default thereunder, whether now existing or hereafter arising, or of any of Mr. Deppoleto's rights and remedies under the Loan Documents or any other documents or agreements between him and the Company or under applicable law. The lack of inclusion herein of any other default under the Loan Documents, whether known or unknown to Mr. Deppoleto, shall not be deemed to be a waiver of such default. Nothing in this letter shall confer on the Company any right to notice or cure periods with respect to any default under the Loan Documents. This letter supersedes any oral communications concerning the Events of Default specified herein. Mr. Deppoleto further requests full compensation of his reasonable attorneys' fees with respect to enforcing his interests set forth in this Demand Notice.

4. <u>Matters Concerning the Company's Management and Messrs. Holley, McBride, and Pavlik</u>. **MR. DEPPOLETO HEREBY DEMANDS THAT MESSRS. HOLLEY, MCBRIDE, AND PAVLIK CEASE AND DESIST ACTING ON BEHALF OF THE COMPANY**. As far as Mr. Deppoleto is concerned, the Company's board of directors consists of Jason Tucker, Joseph Pavlik, and Toby McBride, with Jason Tucker acting as President of the Company; *provided, however,* Mr. McBride is subject to a voluntary suspension while the Company assesses his role with respect to and the extent of wrongful conduct not in the best interest of the Company or of Mr. Deppoleto's interest as a lender to and investor in the Company. The actions of Messrs. Holley, McBride, and Pavlik in attempting to set the Company's board of

directors runs contrary to, and, indeed, represent intentional acts in contravention of Mr. Deppoleto's rights under the Loan Documents, putting aside that it appears highly likely that such actions have been improperly noticed and, even if properly noticed, are invalid under the respective governing documents of Labor Smart and the Company and applicable law. Further, the actions of Messrs. Holley, McBride, and Pavlik following such actions, including public-facing actions with respect to the Company's business partners and social media and interference with banking operations, is damaging the Company's business relationships—it appears maliciously—and further is damaging Mr. Deppoleto and the Company. As such, Mr. Deppoleto reserves any and all claims against Labor Smart, and Messrs. Holley, McBride, and Pavlik, individually, for their intentional actions which serve to disrupt the Company's operations and Mr. Deppoleto's financial interest with respect to the Company, including enforcement of the Loan Documents (and documentation of the Supplemental Loan).

Please feel free to contact me with any questions.

Very truly yours,

HUSCH BLACKWELL LLP

By: _____
   Scott W. Brunner
   Partner

mmb

cc   Michael Brandess (via email)
     James V. Deppoleto (via email

# EXHIBIT A

(See Attached)

## CONVERTIBLE NOTE PURCHASE AGREEMENT

This Convertible Note Purchase Agreement (this "**Agreement**"), dated as of May 25, 2022 (the "**Effective Date**"), is entered into among Takeover Industries, Inc., a Nevada corporation (the "**Company**"), James V. Deppoleto Jr., an individual ("**Purchaser**"), and for the limited purposes provided in Sections 4 and 8.5, Labor Smart, Inc., a Nevada corporation and majority shareholder of the Company ("**Labor Smart**").

**WHEREAS**, subject to the terms and conditions set forth in this Agreement, the Company wishes to issue and sell to the Purchaser, and the Purchaser wishes to purchase from the Company, a secured convertible promissory note in exchange for the consideration provided below.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Purchase and Sale of Note. In exchange for Five Hundred Thousand Dollars ($500,000) (the "**Consideration**") paid by Purchaser, the Company shall sell and issue to Purchaser a secured convertible promissory note in the form attached hereto as Exhibit A (the "**Note**"). The Note will have a principal balance in the amount of the Consideration.

2.    Closing. The closing of the sale of the Note in return for the Consideration (the "**Closing**") will take place remotely via the exchange of documents and signatures on the Effective Date. At the Closing, Purchaser will deliver the Consideration to the Company, and the Company will deliver the Note to Purchaser and well as a certificate executed by a duly authorized officer of the Company certifying (i) the Certificate of Incorporation and Bylaws of the Company as in effect at the Closing, (ii) resolutions of the Board of Directors of the Company (the "**Board**") approving the Agreement and the transactions contemplated under the Agreement, and (iii) resolutions of the stockholders of the Company approving the Agreement.

3.    Conversion. The Note will be convertible into Conversion Shares pursuant to this Section 3.

3.1    Optional Conversion upon Next Equity Financing. Upon the closing of a Next Equity Financing that does not amount to a Qualified Equity Financing, the principal balance and unpaid accrued interest on the Note (the "**Outstanding Balance**") will convert into Conversion Shares, but only at the option of the Lender in its sole discretion. The number of Conversion Shares the Company shall issue upon such conversion will equal the quotient (rounded up to the nearest whole share) obtained by dividing (x) the Outstanding Balance on a date that is no more than five (5) days prior to the closing of such Next Equity Financing by (y) the applicable Equity Financing Conversion Price. At least ten (10) days prior to the closing of a Next Equity Financing, the Company will notify the Purchaser in writing of the terms of the Equity Securities that are expected to be issued in such financing. The issuance of Conversion Shares pursuant to the conversion of the Note will be on, and

-1-

subject to, the same terms and conditions applicable to the Equity Securities issued in the Next Equity Financing.

3.2     Mandatory Conversion upon Qualified Equity Financing. The Outstanding Balance shall automatically convert into Conversion Shares upon the occurrence of a Qualified Equity Financing (effective in connection with the initial closing of such Qualified Equity Financing). The number of Conversion Shares the Company issues upon such conversion will equal the quotient (rounded up to the nearest whole share) obtained by dividing (x) the Outstanding Balance on a date that is no more than five (5) days prior to the closing of the Qualified Equity Financing by (y) the applicable Equity Financing Conversion Price. At least ten (10) days prior to the closing of the Qualified Equity Financing, the Company will notify the Purchaser in writing of the terms of the Equity Securities that are expected to be issued in such financing. The issuance of Conversion Shares pursuant to the conversion of the Note will be on, and subject to, the same terms and conditions applicable to the Equity Securities issued in the Qualified Equity Financing.

3.3     Corporate Transaction Conversion. In the event of a Corporate Transaction prior to the conversion of the Note pursuant to Section 3.1, Section 3.2 or Section 3.4 or the repayment of the Note, at the closing of such Corporate Transaction, the Purchaser may elect that either: (a) the Company will pay the Purchaser an amount equal to the Outstanding Balance plus one-times (1x) the outstanding principal amount of the Note; or (b) the Outstanding Balance will convert into that number of fully paid and non-assessable Conversion Shares equal to the quotient (rounded up to the nearest whole share) obtained by dividing (x) the Outstanding Balance on a date that is no more than five (5) days prior to the closing of such Corporate Transaction by (y) at a price per share determined such that, after the Follow-On Investment were made, the Purchaser would hold twenty-five percent (25%) of the Company after factoring in the Fully-Diluted Capitalization (excluding from such calculation the unused portion of any equity incentive plans) as of immediately prior to such Corporate Transaction without giving effect to any changes to the capitalization arising from such transaction.

3.4     Maturity Conversion. Notwithstanding any other provision of this Agreement, in the event that, as of the Maturity Date (as may be extended by Purchaser), the Note has not been converted or otherwise repaid, and at the option of the then holder, all of the Outstanding Balance may be converted into fully paid and non-assessable Conversion Shares at a price per share determined such that, after the Follow-On Investment were made, the Purchaser would hold twenty-five percent (25%) of the Company after factoring in the Fully-Diluted Capitalization (excluding from such calculation the unused portion of any equity incentive plans) as of immediately prior to such Maturity Conversion.

3.5     Mechanics of Conversion.

(a)     Financing Agreements. Purchaser acknowledges that the conversion of the Note into Conversion Shares pursuant to Section 3.1, Section 3.2 or Section 3.4 may require the Purchaser's execution of certain agreements relating to the purchase

-2-

and sale of the Conversion Shares, as well as registration rights, rights of first refusal and co-sale, rights of first offer and voting rights, if any, relating to such securities (collectively, the **"Financing Agreements"**). The parties agree that the Financing Agreements will be negotiated between the Company and Purchaser prior to their implementation and Purchaser's obligation to enter into such Financing Agreements and that such agreements are intended to follow the model agreements of the National Venture Capital Association (NVCA).

       (b)   <u>Certificates</u>. As promptly as practicable after the conversion of the Outstanding Balance and the issuance of the Conversion Shares, the Company (at its expense) will issue and deliver to the Purchaser a certificate or certificates evidencing the Conversion Shares (if certificated), or if the Conversion Shares are not certificated, will deliver a true and correct copy of the Company's share register reflecting the Conversion Shares held by the Purchaser. The Company will not be required to issue or deliver the Conversion Shares until the Purchaser has surrendered the Note to the Company (or provided an instrument of cancellation or affidavit of loss).

       (c)   <u>No Fractional Shares</u>.  Upon the conversion of the Note into Conversion Shares, any fraction of a share will be rounded down to the next whole share of the Conversion Shares. In lieu of any fractional shares to which the holder of the Note would otherwise be entitled, the Company shall pay the respective Lender cash equal to such fraction multiplied by the Conversion Price.

    4.   <u>Representations and Warranties of the Company</u>. In connection with the transactions contemplated by this Agreement, the Company and Labor Smart hereby represent and warrant to the Purchaser as follows:

       4.1   <u>Due Organization; Qualification and Good Standing</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify or to be in good standing would have a material adverse effect on the Company.

       4.2   <u>Capitalization</u>. The authorized capital stock of the Company immediately prior to the Closing consists of: (i) 20,000,000,000 shares of $.0001 Par Value Common Stock, 15,063,918,000 shares of which are issued and outstanding prior to the Closing; and (ii) 10,000,000 shares of Preferred Stock (250,000 of which have been designated as Series A Preferred Stock), 160,825 shares of which are issued and outstanding prior to the Closing, in the form of Series A Preferred Stock. The Fully Diluted Capitalization of the Company as of the date hereof is more particularly set forth on the Company's Capitalization Table, which is set forth on <u>Exhibit B</u>. The Company does not presently maintain an incentive plan for its employees or advisors that could result in the issuance of stock options, restricted stock, phantom stock rights, or similar rights, and no persons hold any such contingent equity ownership rights. Upon conversion of the Outstanding Balance to Conversion

-3-

Shares, the Conversion Shares will be fully paid and nonassessable, free and clear of all lien, encumbrances, and similar restrictions (other than customary transfer restrictions).

4.3    <u>Authorization and Enforceability</u>. All corporate action has been taken on the part of the Company, Labor Smart, and their respective officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and the Note. Except as may be limited by applicable bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditors' rights, the Company has taken all corporate action required to make all of the obligations of the Company reflected in the provisions of this Agreement and the Note valid and enforceable in accordance with their terms.   The shares of capital stock issuable upon conversion of the Notes have been authorized or will be authorized prior to the issuance of such shares.

4.4    <u>Governmental Consents</u>. All consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any governmental authority required on the part of the Company in connection with issuance of this Agreement and the Note have been obtained.

4.5    <u>Compliance with Laws</u>. The Company is not in violation of any applicable statute, rule, regulation, order or restriction of any state or federal governmental authority or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its assets.

4.6    <u>Compliance with Other Instruments</u>. The Company is not in violation or default of any term of its Articles of Organization or other governing documents, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ. The execution, delivery and performance of this Agreement and the Note will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties. Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder, and delivered copies of them to Purchaser.

4.7    <u>Litigation</u>. There is no action, suit, proceeding or investigation pending or, to the Company's knowledge, threatened in writing against the Company.   The foregoing includes, without limitation, actions pending or, to the Company's knowledge, threatened in writing (or any basis therefore known by the Company) involving the prior employment of

-4-

any of the Company's employees, their use in connection with the Company's business of any information or techniques allegedly proprietary to any of their former employers, or their obligations under any agreements with prior employers. The Company is not a party to, or subject to, the provisions of any order, writ, injunction, judgment or decree of any arbitration panel or tribunal, court or other government agency or instrumentality, other than executive or similar government orders of general societal application. There is no action, suit, proceeding or investigation by the Company currently pending or which the Company intends to initiate.

4.8     Agreements; Actions.     The Company is not in material breach of any agreement. The Company has not (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) made any loans or advances to any Person, other than ordinary course advances for travel or other business expenses, or (iii) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory or non-exclusive licenses of its technology in the ordinary course of business.

4.9     Certain Transaction.     The Company is not indebted, directly or indirectly, to any of its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business or employee relocation expenses and for other customary employee benefits made generally available to all employees. None of the Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company.

4.10     Property.     The property and assets that the Company owns are free and clear of all mortgages, deeds of trust, liens, loans and encumbrances, except for statutory liens for the payment of current taxes that are not yet delinquent and encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets. With respect to the property and assets it leases, the Company is in compliance with such leases and holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets. The Company does not own any real property.

4.11     Tax Returns and Payments.     There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid. There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed. There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency. The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

-5-

4.12   Permits.  The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a material adverse effect. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

4.13   Qualified Small Business Stock.  To the knowledge of the Company: (i) the Company will be an eligible corporation as defined in Section 1202(e)(4) of the Code, (ii) the Company will not have made purchases of its own stock described in Code Section 1202(c)(3)(B) during the one (1) year period preceding the Closing, except for purchases that are disregarded for such purposes under Treasury Regulation Section 1.1202-2, and (iii) the Company's aggregate gross assets, as defined by Code Section 1202(d)(2), at no time between its incorporation and through the Closing have exceeded $50 million, taking into account the assets of any corporations required to be aggregated with the Company in accordance with Code Section 1202(d)(3).

4.14   Loan.  The Company hereby represents that it intends to use the proceeds of the Notes for the operations of its business and not for any personal, family or household purpose.  The Company hereby represents that its Board, in the exercise of its fiduciary duty, has approved the execution of this Agreement based upon a reasonable belief that the loan provided for herein is appropriate for the Company after reasonable inquiry concerning its financial objectives and financial situation.

4.15   Disclosure.  The Company has made available to the Purchaser all the information that the Lenders have requested from the Company for deciding whether to acquire the Note. No representation or warranty of the Company contained in this Agreement, and no certificate furnished or to be furnished to Purchaser at the Closing contains any untrue statement of a material fact. The materials provided to Purchaser have been prepared in good faith; however, the Company does not warrant that it will achieve any results projected in any such materials.

4.16   Offering. Assuming the accuracy of the representations and warranties of the Purchaser contained in Section 5 below, the offer, issue, and sale of this Agreement and the Conversion Shares are and will be exempt from the registration and prospectus delivery requirements of the Securities Act and all applicable state securities laws.

5.   Representations and Warranties of the Purchaser. In connection with the transactions contemplated by this Agreement, the Purchaser hereby represents and warrants to the Company as follows:

5.1   Authorization. The Purchaser has full power, authority, and capacity to enter into this Agreement and to perform all obligations required to be performed by Purchaser hereunder. This Agreement, when executed and delivered by the Purchaser, will constitute the Purchaser's valid and legally binding obligation, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization,

HB: 4892-6440-8352.4

moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

5.2     Purchase Entirely for Own Account. The Purchaser acknowledges that this Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which the Purchaser confirms by executing this Agreement, that the Note and the Conversion Shares, and any Equity Securities issuable upon conversion of the Conversion Shares (collectively, the "**Securities**") will be acquired for investment for the Purchaser's own account, not as a nominee or agent (unless otherwise specified on the Purchaser's signature page hereto), and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Securities.

5.3     Investment Experience. The Purchaser acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities.

5.4     Accredited Investor. The Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act. The Purchaser agrees to furnish any additional information requested by the Company to assure compliance with applicable U.S. federal and state securities laws in connection with the purchase and sale of the Securities.

5.5     Restricted Securities. The Purchaser understands that the Securities have not been, and will not be, registered under the Securities Act or any state securities laws, by reason of specific exemptions under the provisions thereof which depend upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Securities are "restricted securities" under U.S. federal and applicable state securities laws and that, pursuant to these laws, the Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission ("SEC") and registered or qualified by state authorities, or an exemption from such registration and qualification requirements is available.

5.6     No Public Market. The Purchaser understands that no public market now exists for the Securities.

5.7     Residence. The Purchaser resides in the state or province identified in the address shown on the Purchaser's signature page hereto.

6.   Subordination of Other Debt. The Company agrees that all obligations due under this Agreement and under the Note (the "**Obligations**") shall be senior in priority to any debt or other payment obligations of the Company, except for trade accounts payable incurred in the ordinary course of business. Until the full and final payment and satisfaction of the Obligations, the Company shall not incur any debt or other payment obligations, except for trade accounts payable incurred in the ordinary course of business, unless the holders of such other debt or payment obligations execute a subordination agreement in form and substance satisfactory to the Purchaser in the Purchaser's sole discretion.

7.   Security.

7.1   As security for the prompt payment in full of the Obligations, the Company hereby pledges and grants to the Purchaser a continuing general lien upon, and security interest in, the Collateral (defined below). The security interests granted hereunder shall extend and attach to all Collateral that is presently in existence or hereafter acquired and that is owned by the Company or in which the Company has any interest, whether held by the Company or by others for the Company's account, and wherever located. "**Collateral**" means all of the Company's right, title and interest in and to the following, whether now owned and existing or hereafter created or acquired, wherever located, together with all additions and accessions, substitutions and replacements and all Proceeds (including insurance proceeds) and products thereof (capitalized terms have the meanings ascribed to them in Articles 8 and 9, as the case may be, of the UCC): all Accounts, cash and cash equivalents, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, hedging contracts, Instruments, Intellectual Property, Inventory, Investment Property, letters of credit and Letter-of-Credit Rights, option contracts, Software, source code, deeds, any Supporting Obligations relating to the foregoing, any insurance coverage relating to the foregoing and all books and records, customer lists, credit files, computer files, programs, printouts and other computer and electronic materials and records of the Company pertaining to any of the foregoing and any insurance coverage relating to the forgoing.

7.2   The rights and security interests granted to the Purchaser hereunder shall continue in full force and effect, until: (a) the termination of this Agreement and the Note, and (b) the full and final payment and satisfaction of the Obligations. The liens and security interests granted to Purchaser herein and any other lien or security interest which Purchaser may have in any other assets of the Company secure payment and performance of all present and future Obligations.

7.3   The Company represents, warrants and agrees that: (a) upon the filing of UCC financing statements covering the Collateral in all required jurisdictions, this Agreement creates a valid, perfected and first priority security interest in all personal property of the Company as to that property which may be perfected by filing and the security interests granted herein constitute and shall at all times constitute the first and only liens on the Collateral; (b) the Company is, or will be at the time additional Collateral is acquired by the Company, the absolute owner of the Collateral with full right to pledge, sell, transfer and

-8-

create a security interest therein, free and clear of any and all claims or liens in favor of others; and (c) the Company will, at its expense, forever warrant and, at the Purchaser's request, defend the same from any and all claims and demands of any other person.

7.4    The Purchaser is hereby authorized by the Company to file from time to time any financing statements, continuations or amendments covering the Collateral without the Company's signature in accordance with the provisions of the UCC. The Company hereby consents to and ratifies the filing of any financing statements covering the Collateral by the Purchaser. The Company agrees to do whatever Purchaser may reasonably request, from time to time, by way of: (a) filing notices of liens, financing statements, amendments, renewals and continuations thereof; (b) cooperating with the Purchaser; (c) keeping Collateral records; and (d) performing such further acts as the Purchaser may reasonably require in order to effect the purposes of this Agreement and the Note.

8.    <u>Lender Protective Provisions</u>. The Company covenants and agrees to the following protective provisions for the Purchaser, as required consideration for Purchaser to enter into this Agreement.

8.1    <u>Consent Requirements</u>. Until the earlier of conversion or full satisfaction of the Outstanding Balance, the prior written consent of the Purchaser is required before the Company can take any of the following actions:

    (a)    repurchases or redemptions of equity securities, or payment of dividends or other distributions on equity securities (other than employee stock repurchases pursuant to vesting agreements which had been approved by the Company's Board);

    (b)    any fundamental changes in the nature of the Company's business;

    (c)    any acquisition of the operations or assets of another business (regardless of the form such acquisition takes and including, without limitation, by merger, consolidation, purchase of securities or assets, exclusive license, or lease);

    (d)    any Corporate Transaction;

    (e)    any issuance by the Company of Equity Securities, or securities that are convertible into equity securities, other than the Note;

    (f)    any registration of any of the capital stock of the Company pursuant to a public or quasi-public offering, or SPAC arrangement or similar transaction;

    (g)    the liquidation, dissolution, winding-up, recapitalization or reorganization of the Company; and

-9-

(h)     any increase or decrease in the size of the Board.

8.2     <u>Most Favored Nation</u>. While the Note is outstanding (but subject to Section 8.1 above), if the Company sells or issues any convertible notes or SAFEs ("**Subsequent Convertible Instruments**") on terms that differ from the Note (including the terms of this Agreement), the Company will provide the Purchaser with written notice of such sale or issuance, including the terms of the Subsequent Convertible Instruments, no later than ten (10) business days before the closing date thereof. In the event the Purchaser determines, in its sole discretion, that any Subsequent Convertible Instrument contains terms more favorable to the holder(s) thereof than the terms set forth in the Note, the Purchaser may elect to exchange the Note for such Subsequent Convertible Instrument based on the Note's Outstanding Balance. If the Purchaser elects to exchange the Note for a Subsequent Convertible Instrument, the Company agrees to enter into a side letter with the Purchaser relating to such Subsequent Convertible Instrument, which side letter will have substantially the same terms as those set forth in this Agreement.

8.3     <u>Right of First Offer</u>. Subject also to Section 8.1 above, each time the Company proposes to offer Equity Securities at any time following the Effective Date, up to and including the closing of each Next Equity Financing, the Company will provide the Purchaser with at least ten (10) business days' prior written notice of such offering, including the price and terms thereof. The Purchaser will have the right, but not the obligation, to invest an amount equal to up to one hundred percent (100%) of the purchase price for the Equity Securities offered. Such investments by the Purchaser will be on the same terms and at the same price as the Company offers to the other investors purchasing Equity Securities in such offerings.

8.4     <u>Major Investor Rights</u>. In connection with the conversion of the Note upon a Next Equity Financing, to the extent the Financing Agreements include the concept of a "Major Investor" (or a similar concept), the Company will ensure that the Purchaser is included within the definition of "Major Investor" for all purposes under the Financing Agreements (including, without limitation, with respect to rights of first offer and information rights).

8.5     <u>Board Seat</u>. While the Outstanding Balance remains outstanding, the Purchaser shall have the right to designate and appoint one (1) member of the Company's Board (the "**Purchaser Director**") as a full voting member thereof. The Company and Labor Smart shall take all such actions as are necessary to appoint the Purchaser Director to the Company's Board. The initial Purchaser Director shall be James V. Deppoleto Jr. Notwithstanding the above, the Purchaser's right to designate and appoint the Purchaser Director shall terminate in the event the Outstanding Balance is repaid in full or if, by the Maturity Date, the Purchaser opts to not pursue the Follow-On Investment.

8.6     <u>Registration of Company's Capital Stock</u>. The Company shall not, without the written consent of the Purchaser, register (including, for this purpose, a registration effected

-10-

by the Company for stockholders other than the Purchaser) any of its Capital Stock under the Securities Act in connection with the public offering of such securities.

8.7     Maintenance of Business.   The Company shall preserve and maintain its existence.  The Company shall preserve and keep in force and effect all licenses, permits, approvals, trademarks, trade names, trade styles, copyrights, and other proprietary rights necessary to the proper conduct of its business where the failure to do so could reasonably be expected to have a material adverse effect.

8.8     Insurance.   The Company shall maintain insurance to such extent, covering such risk and with such insurers as is usual and customary for similarly situated borrowers, including insurance for fire and other risks insured against by extended coverage, public liability insurance and workers' compensation insurance, as well as customary directors and officers liability insurance extending to the Purchaser Director.   Upon request by the Company, within 30 days of Closing, the Company will enter into a customary indemnification agreement under the NVCA form for the benefit of the Purchaser Director.

8.9     Reporting. The Company shall furnish to Purchaser, and its duly authorized representatives, such information respecting the business and financial condition of the Company as the Purchaser may reasonably request in writing; and shall furnish or cause to be furnished to the Purchaser:

     (a)     as soon as available, and in any event within seventy-five (75) days after the year's end annual unaudited financial statements from an independent qualified accounting firm acceptable to Purchaser; and

     (b)     as soon as available, and in any event within sixty (60) days after the last day of each fiscal quarter, the Company shall provide to the Purchaser unaudited quarterly financial statements in accordance with generally accepted accounting principles.

8.10     Inspection of the Business.   The Company shall permit a duly authorized representative of the Purchaser during regular business hours, to visit and inspect the Company, any of its books and financial records, to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees, or Affiliates at such reasonable times and intervals as Purchaser may reasonably request and with reasonable prior written notice to the Company.

8.11     Lien Matters. The Company shall not, without the prior written consent of Purchaser, create, assume or permit to exist any security interest, encumbrance, mortgage, deed of trust, or other lien (including, but not limited to, a lien of attachment, judgment or execution) affecting any of the Company's properties, or execute or allow to be filed any financing statement or continuation thereof affecting any of such properties, except for

-11-

permitted liens or as otherwise provided in this Agreement (collectively, "**Permitted Liens**"). Permitted Liens shall include:

(a) liens arising by statute;

(b) mechanics', workmen's, materialmen's, suppliers', landlords', warehousemen's, carriers' or other similar Liens arising in the ordinary course of business with respect to obligations which are not due or which are being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest;

(c) liens resulting from taxes, fees, assessments or other government charges or levies which either (i) have not yet become delinquent, or (ii) as to which adequate reserves have been provided;

(d) purchase money liens and capital leases (i) on equipment acquired or held by the Company incurred for financing the acquisition of the equipment securing no more than $75,000 in the aggregate amount outstanding, or (ii) existing on equipment when acquired, if the lien is confined to the property and improvements and the proceeds of the equipment;

(e) liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business (other than liens imposed by ERISA);

(f) leases or subleases of real property granted in the ordinary course of the Company's business (or, if referring to another Person, in the ordinary course of such Person's business), and leases, subleases, licenses or sublicenses of personal property granted in the ordinary course of the Company's business (or, if referring to another Person, in the ordinary course of such Person's business);

(g) liens arising from attachments or judgments, orders, or decrees in circumstances not constituting an Event of Default;

(h) liens in favor of financial institutions arising in connection with the Company's deposit and/or securities accounts held at such institutions;

(i) the filing of financing statements solely as a precautionary measure in connection with operating leases, consignment of goods or similar transactions; and

(j) easements, zoning restrictions, rights-of-way, minor defects or irregularities of title and other similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary

-12-

obligations and do not interfere with the ordinary course of business of the Company in any material respect.

8.12   Prepayment Prohibited.  The principal and accrued interest on the Notes may not be prepaid unless approved in writing by the Purchaser.

8.13   Future Opportunity and Good Faith Obligation; Labor Smart Restructuring. The Company and Purchaser agree to negotiate in good faith, subsequent Closing, on a follow-on investment by Purchaser of $1,500,000 (the "**Follow-On Investment**"), including with respect to the applicable valuation of such investment.  The parties agree that the investment documentation for a subsequent financing round for the issuance of preferred shares shall be created using model legal documentation from the National Venture Capital Association (NVCA), including, specifically, registration rights, preemptive rights, dividend rights, liquidation preferences, and additional customary investor rights for Series A investment offerings.  Further, notwithstanding anything else in this Agreement to the contrary, the Purchaser's conversion of the Outstanding Balance under Section 3 and its pursuit of the Follow-On Investment are wholly contingent on the Company completing a restructuring (whether by reverse split or otherwise) whereby Labor Smart's ownership of the Company's capital stock would be reduced to such extent that the Purchaser shall obtain a position with the Company, when factoring in conversion of the Outstanding Balance and the Follow-On Investment, amounting to ownership of twenty-five percent (25%) of the Company's outstanding capital stock (when taking into account Fully Diluted Capitalization of the Company).

9.   Miscellaneous.

9.1   Definitions.  Capitalized terms not otherwise defined in this Agreement will have the meanings set forth in this Section 9.1.

(a)     "**Articles of Incorporation**" means the articles of incorporation of the Company, as amended.

(b)     "**Collateral**" has the meaning set forth in Section 7.1.

(c)     "**Common Stock**" means the Company's common stock, par value $0.001.

(d)     "**Conversion Shares**" (for purposes of determining the type of Equity Securities issuable upon conversion of the Note) means:

(a)     with respect to a conversion pursuant to Section 3.1 or Section 3.2, shares of the Equity Securities issued in applicable Next Equity Financing;

-13-

(b)      with respect to a conversion pursuant to Section 3.3, shares of Series A Preferred Stock (subject to incorporation of standard preferred stock investor terms); and

(c)      with respect to a conversion pursuant to Section 3.4, shares of Series A Preferred Stock (subject to incorporation of standard preferred stock investor terms).

(e)      **"Corporate Transaction"** means:

(a)      the closing of the sale, transfer or other disposition, in a single transaction or series of related transactions, of all or substantially all of the Company's assets or the exclusive license of all or substantially all of the Company's material intellectual property;

(b)      the consummation of a merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of capital stock of the Company immediately prior to such merger or consolidation continue to hold a majority of the outstanding voting securities of the capital stock of the Company or the surviving or acquiring entity immediately following the consummation of such transaction); or

(c)      the closing of the transfer (whether by merger, consolidation or otherwise), in a single transaction or series of related transactions, to a "person" or "group" (within the meaning of Section 13(d) and Section 14(d) of the Exchange Act) of the Company's capital stock if, after such closing, such person or group would become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act) of more than 50% of the outstanding voting securities of the Company (or the surviving or acquiring entity).

For the avoidance of doubt, a transaction will not constitute a "Corporate Transaction" if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction. Notwithstanding the foregoing, the sale of Equity Securities in a bona fide financing transaction will not be deemed a "Corporate Transaction."

(f)      **"Discount"** means twenty-five percent (25%).

(g)      **"Equity Financing Conversion Price"** means the product of (x) 100% less the Discount and (y) the lowest per share purchase price of the Equity Securities issued in the applicable Next Equity Financing.

(h)     "**Equity Securities**" means (i) Common Stock; (ii) Preferred Stock; (iii) any securities conferring the right to purchase Common Stock or Preferred Stock; or (iii) any securities directly or indirectly convertible into, or exchangeable for (with or without additional consideration) Common Stock or Preferred Stock (including convertible notes and SAFEs). Notwithstanding the foregoing, "Equity Securities" shall not include any security granted, issued or sold by the Company to any director, officer, employee, consultant or adviser of the Company for the primary purpose of soliciting or retaining their services.

(i)     "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(j)     "**Fully Diluted Capitalization**" means the number of issued and outstanding shares of the Company's capital stock, assuming (a) the conversion or exercise of all of the Company's outstanding convertible or exercisable securities, including shares of convertible Preferred Stock and all outstanding vested or unvested options or warrants to purchase the Company's capital stock; and (b) the issuance of all shares of the Company's capital stock reserved and available for future issuance under any of the Company's existing equity incentive plans or any equity incentive plan created or expanded in connection with a Next Equity Financing. Notwithstanding the foregoing, "Fully Diluted Capitalization" excludes: (i) any convertible promissory notes issued by the Company (including the Note issued pursuant to this Agreement); (ii) any SAFEs issued by the Company; and (iii) any Equity Securities that are issuable upon conversion of any outstanding convertible promissory notes or SAFEs.

(k)     "**Maturity Date**" means the date that is one hundred eighty (180) days after the Effective Date; *provided, however*, Purchaser may extend the Maturity Date up to one hundred eighty (180) days in its sole discretion upon written notice to the Company.

(l)     "**Next Equity Financing**" means the next sale (or series of related sales) by the Company of its Equity Securities following the date of this Agreement with the principal purpose of raising capital.

(m)     "**Obligations**" has the meaning set forth in Section 6.

(n)     "**Outstanding Balance**" has the meaning set forth in Section 3.1.

(o)     "**Permitted Transferee**" means (i) a trust controlled by Purchaser and under which distributions may be made only to Purchaser and/or Purchaser's spouse, descendants (including adoptive relationships and stepchildren), and the spouses of each such natural persons (collectively, "**Family Members**"); (ii) a corporation, partnership, or limited liability company controlled by Purchaser and the shareholders,

-15-

partners, or members of which are only Purchaser and/or Family Members of Purchaser; or (iii) Purchaser's executors, administrators, testamentary trustees, legatees, or beneficiaries, by will or the laws of intestate succession.

(p)  **"Preferred Stock"** means the Company's preferred stock, whether now existing or hereafter created.

(q)  **"Qualified Equity Financing"** means a Next Equity Financing from which the Company receives aggregate gross proceeds of not less than $1,500,000 (excluding, for the avoidance of doubt, the aggregate principal amount of the Note).

(r)  **"Registrable Securities"** means (i) the Common Stock issuable or issued upon conversion of the Preferred Stock; (ii) any Common Stock, or any Common Stock issued or issuable (directly or indirectly) upon conversion and/or exercise of any other securities of the Company, acquired by Purchaser on or after the date hereof; and (iii) any Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, the shares referenced in clause (i) and (ii) above.

(s)  **"SAFE"** means any simple agreement for future equity (or other similar agreement) that is issued by the Company for bona fide financing purposes and that may convert into the Company's capital stock in accordance with its terms.

(t)  **"Securities Act"** means the Securities Act of 1933, as amended.

(u)  **"Series A Preferred Stock"** means the Company's Series A Preferred Stock, having the rights and obligations provided in the Company's Articles of Incorporation.

(v)  **"UCC"** means the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of Nevada; provided, however, in the event that, by reason of mandatory provisions of law, the attachment, perfection or priority of the security interest granted to the Purchaser in any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Nevada, then the term "UCC" means the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for the purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

9.2  <u>Successors and Assigns</u>. The Company shall not transfer or assign any of its rights, interests, duties or obligations under this Agreement or the Note without the Purchaser's prior written consent, which may be given or withheld in the Purchaser's sole discretion. Any attempted or purported transfer or assignment by the Company in violation

-16-

of this Section shall be null and void. The Purchaser may, in its sole discretion, transfer or assign any or all of its rights, interests, duties or obligations under this Agreement and the Note to a Permitted Transferee upon written notice thereof to the Company. Except for such a transfer or assignment to a Permitted Transferee, Purchaser shall not transfer or assign any of its rights, interests, duties or obligations under this Agreement or the Note without the Company's prior written consent, which may be given or withheld in the Company's sole discretion. Any attempted or purported transfer or assignment by the Purchaser in violation of this Section shall be null and void. The terms and conditions of this Agreement and the Note shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, except as expressly provided in this Agreement.

9.3     Choice of Law. This Agreement and the Note, and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

9.4     Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. Counterparts may be delivered via email (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

9.5     Titles and Subtitles. The titles and subtitles used in this Agreement are included for convenience only and are not to be considered in construing or interpreting this Agreement.

9.6     Notices. All notices and other communications given or made pursuant hereto will be in writing and will be deemed effectively given: (a) upon personal delivery to the party to be notified; (b) when sent by email; (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications will be sent to the respective parties at the addresses shown on the signature pages hereto (or to such email address or other address as subsequently modified by written notice given in accordance with this Section).

9.7     No Finder's Fee. Each party represents that it neither is nor will be obligated to pay any finder's fee, broker's fee or commission in connection with the transactions contemplated by this Agreement. The Purchaser agrees to indemnify and to hold the

-17-

Company harmless from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of the transactions contemplated by this Agreement (and the costs and expenses of defending against such liability or asserted liability) for which the Purchaser or any of its officers, employees or representatives is responsible. The Company agrees to indemnify and hold the Purchaser harmless from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of the transactions contemplated by this Agreement (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

9.8    Expenses. At the Closing, the Purchaser shall receive a credit to the Consideration payable for the Note in an amount equal to the reasonable fees and out-of-pocket expenses of the Purchaser's counsel, not to exceed $12,000. Except for the foregoing, each party will pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Agreement.

9.9    Attorneys' Fees. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

9.10    Entire Agreement; Amendments and Waivers. This Agreement, the Note and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof. The terms of this Agreement and the Note may be amended and the observance of any term of this Agreement or the Note may be waived (either generally or in a particular instance and either retroactively or prospectively) only in a writing executed by the Company and the Purchaser.

9.11    Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provisions will be excluded from this Agreement and the balance of the Agreement will be interpreted as if such provisions were so excluded and this Agreement will be enforceable in accordance with its terms.

9.12    Acknowledgment. For the avoidance of doubt, it is acknowledged that the Purchaser will be entitled to the benefit of all adjustments in the number of shares of the Company's capital stock as a result of any splits, recapitalizations, combinations or other similar transactions affecting the Company's capital stock underlying the Conversion Shares that occur prior to the conversion of the Note.

9.13    Further Assurances. From time to time, the parties will execute and deliver such additional documents and will provide such additional information as may reasonably be required to carry out the full intent and purpose of this Agreement and the Note and any agreements executed in connection herewith, and to comply with state or federal securities laws or other regulatory approvals.

9.14    Waiver of Jury Trial. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER REPRESENTS AND WARRANTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

[SIGNATURE PAGES FOLLOW]

HB: 4892-6440-8352.4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

COMPANY:

TAKEOVER INDUSTRIES, INC.

By: _Jason Tucker_____

Print Name: _Jason Tucker_____

Title: _President_____

Address:      c/o Eric Bjorgum
              Karish & Bjorgum
              119 E. Union St., Suite B
              Pasadena, CA 91103

Email Address: eric.bjorgum@kb-ip.com
               cc: Jason@takeoverind.com

Solely for the limited purposes provided in Sections 4 and 8.5:

LABOR SMART:

LABOR SMART, INC.

By: _Michael Costello_____

Print Name: _Michael Costello_____

Title: _Chief Executive Officer_____

Address:      c/o Eric Bjorgum
              Karish & Bjorgum
              119 E. Union St., Suite B
              Pasadena, CA 91103

Email Address: eric.bjorgum@kb-ip.com
               cc: Jason@takeoverind.com

-20-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

PURCHASER:

DocuSigned by:

*James V. Deppoleto Jr.*

1E565C93B8A5402...

James V. Deppoleto Jr.

Address:     1600 Paramount Drive
                 Waukesha, WI 53186

Email Address: jdeppoleto@quintecconveyor.com

-21-

**EXHIBIT A**

**Form of Convertible Promissory Note**

[Attached.]

# SECURED CONVERTIBLE PROMISSORY NOTE

**$500,000.00**                                                    **May 25, 2022**

FOR VALUE RECEIVED, Takeover Industries, Inc., a Nevada corporation (the **"Company"**), hereby promises to pay to James V. Deppoleto Jr. (the **"Holder"**), the principal sum of Five Hundred Thousand Dollars ($500,000), together with interest thereon from the date of this Convertible Promissory Note (the **"Note"**). Interest will accrue at a rate of eight percent (8%) per annum, compounded annually. Unless earlier converted into Conversion Shares pursuant to Section 3 of that certain Convertible Note Purchase Agreement dated May 24, 2022, by and among the Company, the Holder, and, for limited purposes, Labor Smart, Inc. (the **"Purchase Agreement"**), the unpaid principal amount of this Note, together with any then unpaid accrued interest, shall be due and payable by the Company on the Maturity Date or as otherwise provided in the Purchase Agreement.

Capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

1.    Payment. All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal. No principal or accrued interest under this Note may be prepaid by Company.

2.    Security. All Obligations evidenced by this Note are secured by a continuing general lien upon, and security interest in, the Collateral.

3.    Conversion of the Notes. This Note and any amounts due hereunder will be convertible into Conversion Shares in accordance with the terms of Section 3 of the Purchase Agreement.

4.    Amendments and Waivers; Resolutions of Dispute; Notice. The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice among the Company and the Holder will be governed by the terms of the Purchase Agreement.

5.    Successors and Assigns. This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto; provided, however, that the Company shall not assign its obligations under this Note without the written consent of the Holder. The Holder may, in its sole discretion, transfer or assign any or all of its rights, interests, duties or obligations under this Note to a Permitted Transferee with written notice thereof to the

-1-

Company. Except for a transfer or assignment to a Permitted Transferee, Holder shall not transfer or assign its obligations under this Note without the written consent of the Company.

6. <u>Limitation on Interest</u>. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment made by the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holder as a payment of principal.

7. <u>Events of Default; Remedies</u>.

7.1 The occurrence of any one or more of the following shall constitute an "**Event of Default**":

(a) the Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(b) the Company breaches any representation, warranty, or covenant provided in the Purchase Agreement;

(c) the Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(d) an involuntary petition is filed against the Company (unless such petition is dismissed or discharged within thirty (30) days under any bankruptcy statute now or hereafter in effect), or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company.

7.2 Upon the occurrence of any Event of Default, the Holder may declare all or any portion of the Obligations to be immediately due and payable in full; <u>provided</u>, that in the event of an Event of Default under <u>Section 7.1(c)</u> or <u>(d)</u> above, all Obligations and all other sums payable hereunder shall become and be immediately due and payable in full without any action on the part of the Holder.

7.3 Upon the occurrence of any Event of Default and during any period in which such Event of Default is ongoing, all amounts due but not paid under this Note shall automatically bear interest at a rate of eighteen percent (18%) per annum (or, if lower, the highest rate permissible under applicable law), compounded monthly.

-2-

8.  <u>Company Waiver; Delays and Omissions.</u> The Company hereby waives demand, notice, presentment, protest and notice of dishonor. It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.

9.  <u>Choice of Law</u>. This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

10. <u>Approval</u>. The Company hereby represents that its Board, in the exercise of its fiduciary duty, has approved the Company's execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it intends to use the principal of this Note for the operations of its business, and not for any personal, family or household purpose.

TAKEOVER INDUSTRIES, INC.

By:_____

Print Name: <u>Jason Tucker</u>

Title: <u>President</u>

-3-

**EXHIBIT B**

**Capitalization Table**

(see attached)

# CERTIFIED SHAREHOLDER LIST

## CLEARTRUST, LLC

| Issue: TAKEOVER INDUSTRIES, INC. - COMMON | | Abbrev: | Cusip: TAKEOVERCOM |
|---|---|---|---|
| **Account/TIN** | **Name & Address** | | **Shares Held** |

| 6 | JAMES DEPPOLETO | | 200,000,000 |
|---|---|---|---|
| | 1600 PARAMOUNT DRIVE | | 1.328% |
| | WAUKESHA WI 53186 | | |

| Certificate # / Book | Issue Date | Cancel Date | Denomination | Restricted |
|---|---|---|---|---|
| * RSTR * | 05/02/2022 | | 200,000,000 | RESTRICTED |
| | | Total Active Shares | 200,000,000 * | |
| | | Total Restricted Shares | 200,000,000 * | |

| 4 | LABOR SMART, INC. | | 14,663,918,000 |
|---|---|---|---|
| | C/O JASON TUCKER | | 97.345% |
| | 4790 CAUGHLIN PARKWAY #387 | | |
| | RENO NV 89509 | | |

| Certificate # / Book | Issue Date | Cancel Date | Denomination | Restricted |
|---|---|---|---|---|
| * RSTR * | | 03/03/2022 | -50,000 | RESTRICTED - CONTROL POSITION |
| * RSTR * | 03/03/2022 | | 14,663,918,000 | RESTRICTED - CONTROL POSITION |
| * RSTR * | 02/27/2021 | | 50,000 | RESTRICTED - CONTROL POSITION |
| | | Total Active Shares | 14,663,918,000 * | |
| | | Total Restricted Shares | 14,663,918,000 * | |

| 5 | ANTHONY PETTIS | | 100,000,000 |
|---|---|---|---|
| | 2786 HERA HEIGHTS COURT | | 0.664% |
| | HENDERSON NV 89052 | | |

| Certificate # / Book | Issue Date | Cancel Date | Denomination | Restricted |
|---|---|---|---|---|
| * RSTR * | 05/02/2022 | | 100,000,000 | RESTRICTED |
| | | Total Active Shares | 100,000,000 * | |
| | | Total Restricted Shares | 100,000,000 * | |

| 7 | JOSHUA RAPKIN | | 100,000,000 |
|---|---|---|---|
| | 4 MOSS POINT DR | | 0.664% |
| | ORMOND BEACH FL 32174 | | |

| Certificate # / Book | Issue Date | Cancel Date | Denomination | Restricted |
|---|---|---|---|---|
| * RSTR * | 05/02/2022 | | 100,000,000 | RESTRICTED |
| | | Total Active Shares | 100,000,000 * | |
| | | Total Restricted Shares | 100,000,000 * | |

| 4 | Holders Qualified | Total Outstanding Shares | 15,063,918,000 |
|---|---|---|---|
| | | Total Restricted Shares | 15,063,918,000 |
| | | Total Non-Restricted Shares | 0 |

# CERTIFIED SHAREHOLDER LIST

## CLEARTRUST, LLC

### Restriction Breakdown

| Restriction Name | Shares |
|---|---|
| Restricted Book | 15,063,918,000 |

# REGISTRAR CONTROL

## CLEARTRUST, LLC

**For the period from 01/01/22 to 05/25/22**

**Authorized shares for TAKEOVER INDUSTRIES, INC. - SERIES A PRF: 250,000**

| | | | | |
|---|---|---|---|---|
| Transactions Effective Before | 01/01/2022 | | | |
| Shares Cancelled: | 0 | | | |
| Shares Issued: | 0 | | | |
| Transactions Effective After | 05/25/2022 | | Begin Balance: | 0 |
| Shares Cancelled: | 0 | | Shares Cancelled: | 0 |
| Shares Issued: | 0 | | Shares Issued: | 160,825 |
| | | | Ending Balance: | 160,825 |

| Certificate/Book | Holder | Denomination | Batch # | Type | Effective | Posted |
|---|---|---|---|---|---|---|
| * RESTR BOOK * | TOBY MCBRIDE | 79,000 | 160928 | OIS | 05/16/2022 | 05/16/2022 |
| * RESTR BOOK * | JASON TUCKER | 79,000 | 160928 | OIS | 05/16/2022 | 05/16/2022 |
| * RESTR BOOK * | JOE PAVLIK | 2,825 | 160928 | OIS | 05/16/2022 | 05/16/2022 |

|  |  | | |
|---|---|---|---|
| 3 | Restr Book Issued For: | 160,825 | SHS/PV |

| | | | |
|---|---|---|---|
| 0 | Cert/Book Cancelled For: | 0 | SHS/PV |
| 3 | Cert/Book Issued For: | 160,825 | SHS/PV |

| | | |
|---|---|---|
| | 160,825 | * Net Change |

### FIRST AMENDMENT
### TO
### CONVERTIBLE NOTE PURCHASE AGREEMENT

This First Amendment (this "**Amendment**") to the Convertible Note Purchase Agreement, dated May 25, 2022 (the "**Purchase Agreement**"), by and among Takeover Industries Inc., a Nevada corporation (the "**Company**"), James V. Deppoleto Jr., an individual ("**Purchaser**"), and for the limited purposes provided in Sections 4 and 8.5 of the Purchase Agreement, Labor Smart, Inc., a Nevada corporation and majority shareholder of the Company ("**Labor Smart**"), is made and entered into as of July 6, 2022 (the "**Effective Date**").

RECITALS:

**WHEREAS**, a convertible promissory note was issued to the Purchaser pursuant to the Purchase Agreement (the "Note");

**WHEREAS**, the Purchaser desires to provide additional capital to the Company for operating expenses in the amount of Five Hundred Thousand Dollars ($500,000.00) (the "**Additional Note Consideration**");

**WHEREAS**, in exchange for the Additional Note Consideration, the Company desires to sell and issue to the Purchaser a second secured convertible promissory note (the "**Second Note**") in the form attached hereto as Exhibit A;

**WHEREAS**, the Additional Note Consideration is necessary to fulfill operating objectives of the Company that inure to the benefit of both the Company and the Purchaser;

**WHEREAS**, pursuant to Section 9.10 of the Purchase Agreement, the Purchase Agreement may be amended with the written consent of the Company and the Purchaser;

**WHEREAS**, the Company and the Purchaser now desire to amend the Purchase Agreement as set forth herein;

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  Definitions. Capitalized terms used but not defined herein shall have their meanings as set forth in the Purchase Agreement. Capitalized terms defined herein shall have the meanings indicated in the internally set definitions provided in this Amendment. The term "**Follow-On Investment**" as set forth in the Purchase Agreement is hereby amended to mean $1,000,000. The term "**Outstanding Balance**" as set forth in the Purchase Agreement is hereby amended such that it shall include the outstanding principal and interest balance of the Second Note.

2.  Purchase and Sale of Second Note. In exchange for the Additional Note Consideration paid by the Purchaser, the Company shall sell and issue to the Purchaser the Second Note. The Second Note will

have a principal balance in the amount of the Additional Note Consideration. For the avoidance of doubt, the principal amount under the Second Note will only accrue interest from and after July 6, 2022.

3.  Usage of Funds. Except as otherwise expressly permitted by the Purchaser, the Company shall use the proceeds it receives as Additional Note Consideration only for the funding of physical goods made for sale, marketing expenses and costs (e.g., its online affiliate program and board-approved events), ordinary course employee compensation, contractors, and service agreements; provided, no greater than ten percent (10%) of the proceeds will be used for executive compensation.

4.  Restatement of Representations and Warranties. The representations and warranties made by the Company and Labor Smart under Section 4 of the Purchase Agreement are fully restated hereby and accurate and complete as of the Effective Date (in addition to and not as a replacement for the making of such representations and warranties when initially made by the Company and Labor Smart as part of the Purchaser Agreement). The Purchaser does not waive any of its rights with respect to the representations and warranties made by the Company and Labor Smart under Section 4 of the Purchase Agreement by virtue of its execution of this Amendment or otherwise, and the Purchaser's rights with respect to such representations and warranties and the representations and warranties made by the Company and Labor Smart under this Amendment are regardless of its knowledge of the facts or circumstances that give rise to a claim.

5.  Board Appointment Matters. Any additional appointment of a Board Member shall be subject to the written approval of the Purchaser.

6.  Access to Company Financials/Materials. In addition to the access rights granted under Section 8.10 of the Purchase Agreement, the Company grants to the Purchaser access to the Company's systems (inclusive of financial, purchasing/vendor, sales and customer, and other business operations) when and as reasonably requested by the Purchaser.

7.  Intellectual Property Matters. The Company and Labor Smart represent and warrant that they have all proper right and authority for usage in the Company's business with respect to (i) issued patents and patent applications; (ii) trademarks, service marks, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing; (iii) copyrights, including all applications and registrations; (iv) trade secrets, know-how, inventions (whether or not patentable), technology, and other confidential and proprietary information and all rights therein; (v) internet domain names and social media accounts and pages; and (vi) other intellectual or industrial property and related proprietary rights, interests, and protections. The Company covenants and agrees that the Purchaser's review and approval shall be required prior to settlement or agreement (co-existence or otherwise) by the Company with respect to any trademark or other intellectual property matters.

8.  Indemnification Agreement. Promptly after closing on the Second Note under this Amendment, the parties shall enter into the form of Indemnification Agreement referenced in the Purchase Agreement, to be provided by the Purchaser.

9.  Further Assurances. The parties hereto agree to execute such other and further documents and instruments as the Company or the Purchaser may reasonably request to implement the terms of this Amendment.

2

HB: 4859-6078-3655.3

10.     <u>Benefit of Amendment</u>. This Amendment shall be binding upon, inure the benefit of and be enforceable by the parties hereto and their successors and assigns. No other person shall be entitled to claim any right or benefit hereunder, including the status of a third-party beneficiary of this Amendment.

11.     <u>Attorneys' Fees</u>. In addition to the attorneys' fees that shall be credited to the Purchaser under Section 9.8 of the Purchase Agreement, the Purchaser shall be credited an amount equal to the reasonable fees and out-of-pocket expenses of the Purchaser's counsel with respect to this Amendment; in that respect, with respect to the Purchaser's fees under Section 9.8 of the Purchase Agreement and this Section 6, an amount of $30,000.00 shall be credited against the delivery of Additional Note Consideration.

12.     <u>Entire Agreement</u>. Except as expressly set forth herein, there are no agreements or understandings, written or oral, among the parties hereto relating to this Amendment.

13.     <u>Effectiveness</u>. Except as modified hereby, the Purchase Agreement shall remain in full force and effect. All other terms and conditions of the Purchase Agreement, unless context expressly requires otherwise, shall apply to the Second Note and the Purchaser's rights hereunder and with respect thereto in the same manner and to the same extent applicable to the Note. On and after the Effective Date of this Amendment, each reference in the Purchase Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import shall mean and be a reference to the Purchase Agreement, as amended by this Amendment. If there is any inconsistency between the Purchase Agreement on the one hand, and this Amendment on the other hand, then this Amendment shall control.

14.     <u>Amendment</u>. Neither this Amendment nor any provision hereof may be waived, modified, amended, discharged or terminated except in the manner permitted by Section 9.10 of the Purchase Agreement.

15.     <u>Counterparts, Facsimile Signatures</u>. This Amendment may be executed in any number of counterparts and by different parties to this Amendment on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile or e-mail transmissions shall be deemed to be an original signature hereto.

*[Signature page follows.]*

HB: 4859-6078-3655.3

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the Effective Date.

COMPANY:

TAKEOVER INDUSTRIES, INC.

By: _Jason Tucker_____
DocuSigned by:
895AD2F120DE494...

Print Name: Jason Tucker_____

Title: President_____

Address:     c/o Eric Bjorgum
             Karish & Bjorgum
             119 E. Union St., Suite B
             Pasadena, CA 91103

Email Address: eric.bjorgum@kb-ip.com
               cc: Jason@takeoverind.com

Solely for the limited purposes provided in
Sections 4 and 8.5 of the Purchas Agreement:

LABOR SMART:

LABOR SMART, INC.

By: _Michael Costello_____
DocuSigned by:
8071DDA64F63444...

Print Name: Michael Costello_____

Title: Chief Executive Officer_____

Address:     c/o Eric Bjorgum
             Karish & Bjorgum
             119 E. Union St., Suite B
             Pasadena, CA 91103

Email Address: eric.bjorgum@kb-ip.com
               cc: Jason@takeoverind.com

[Signature Page to First Amendment to Convertible Note Purchase Agreement]

HB: 4859-6078-3655.3

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the Effective Date.

PURCHASER:

DocuSigned by:

*James V. Deppoleto Jr.*

1E505C839BA5403...

James V. Deppoleto Jr.

Address:     1600 Paramount Drive
                 Waukesha, WI 53186

Email Address: jdeppoleto@quintecconveyor.com

**EXHIBIT A**

Form of Convertible Promissory Note

[Attached.]

## (SECOND) SECURED CONVERTIBLE PROMISSORY NOTE

**$500,000.00**                                                    **July 6, 2022**

FOR VALUE RECEIVED, Takeover Industries, Inc., a Nevada corporation (the "**Company**"), hereby promises to pay to James V. Deppoleto Jr. (the "**Holder**"), the principal sum of Five Hundred Thousand Dollars ($500,000), together with interest thereon from the date of this Convertible Promissory Note (the "**Note**"). Interest will accrue at a rate of eight percent (8%) per annum, compounded annually. Unless earlier converted into Conversion Shares pursuant to Section 3 of that certain Convertible Note Purchase Agreement dated May 24, 2022, by and among the Company, the Holder, and, for limited purposes, Labor Smart, Inc., as amended (the "**Purchase Agreement**"), the unpaid principal amount of this Note, together with any then unpaid accrued interest, shall be due and payable by the Company on the Maturity Date as defined in the Purchase Agreement) or as otherwise provided in the Purchase Agreement.

Capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

1.       Payment. All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal. No principal or accrued interest under this Note may be prepaid by Company.

2.       Security. All Obligations evidenced by this Note are secured by a continuing general lien upon, and security interest in, the Collateral.

3.       Conversion of the Notes. This Note and any amounts due hereunder will be convertible into Conversion Shares in accordance with the terms of Section 3 of the Purchase Agreement.

4.       Amendments and Waivers; Resolutions of Dispute; Notice. The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice among the Company and the Holder will be governed by the terms of the Purchase Agreement.

5.       Successors and Assigns. This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto; provided, however, that the Company shall not assign its obligations under this Note without the written consent of the Holder. The Holder may, in its sole discretion, transfer or assign any or all of its rights, interests, duties or obligations under this Note to a Permitted Transferee with written notice thereof to the Company. Except for a transfer or assignment to a Permitted Transferee, Holder shall not transfer or assign its obligations under this Note without the written consent of the Company.

6.       Limitation on Interest. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment made by

the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holder as a payment of principal.

7.   Events of Default; Remedies.

7.1   The occurrence of any one or more of the following shall constitute an "**Event of Default**":

(a)   the Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(b)   the Company breaches any representation, warranty, or covenant provided in the Purchase Agreement;

(c)   the Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(d)   an involuntary petition is filed against the Company (unless such petition is dismissed or discharged within thirty (30) days under any bankruptcy statute now or hereafter in effect), or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company.

7.2   Upon the occurrence of any Event of Default, the Holder may declare all or any portion of the Obligations to be immediately due and payable in full; provided, that in the event of an Event of Default under Section 7.1(c) or (d) above, all Obligations and all other sums payable hereunder shall become and be immediately due and payable in full without any action on the part of the Holder.

7.3   Upon the occurrence of any Event of Default and during any period in which such Event of Default is ongoing, all amounts due but not paid under this Note shall automatically bear interest at a rate of eighteen percent (18%) per annum (or, if lower, the highest rate permissible under applicable law), compounded monthly.

8.   Company Waiver; Delays and Omissions. The Company hereby waives demand, notice, presentment, protest and notice of dishonor. It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.

9.   Choice of Law. This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to the conflict of laws provisions

thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

10.     Approval. The Company hereby represents that its Board, in the exercise of its fiduciary duty, has approved the Company's execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it intends to use the principal of this Note for the operations of its business, and not for any personal, family or household purpose.

TAKEOVER INDUSTRIES, INC.

By: _Jason Tucker_____

Print Name: _Jason Tucker_____

Title: _President_____

DocuSign Envelope ID: 42AA2302-00B5-42F8-931B-B57A2DB06848

**SECOND AMENDMENT**
**TO**
**CONVERTIBLE NOTE PURCHASE AGREEMENT**

This Second Amendment (this "**Second Amendment**") to that certain Convertible Note Purchase Agreement, dated May 25, 2022, as amended by that certain First Amendment to Convertible Note Purchase Agreement dated July 6, 2022 (the "**First Amendment**" and together, the "**Purchase Agreement**"), by and among Takeover Industries Inc., a Nevada corporation (the "**Company**"), James V. Deppoleto Jr., an individual ("**Purchaser**"), and for the limited purposes provided in Sections 4 and 8.5 of the Purchase Agreement, Labor Smart, Inc., a Nevada corporation and majority shareholder of the Company ("**Labor Smart**"), is made and entered into as of August 19, 2022 (the "**Effective Date**").

RECITALS:

**WHEREAS**, two convertible promissory notes have, prior to this Second Amendment, been issued to the Purchaser pursuant to the Purchase Agreement (the "**Notes**");

**WHEREAS**, the prior issued Notes mistakenly reference May 24, 2022, as the date of the Purchase Agreement, but the Parties acknowledge and agree this was a typographical error and instead such Notes should have referenced May 25, 2022;

**WHEREAS**, the Purchaser desires to provide additional capital to the Company for operating expenses in the amount of Five Hundred Thousand Dollars ($500,000.00) (the "**Additional Note Consideration**");

**WHEREAS**, in exchange for the Additional Note Consideration, the Company desires to sell and issue to the Purchaser a third secured convertible promissory note (the "**Third Note**") in the form attached hereto as Exhibit A;

**WHEREAS**, the Additional Note Consideration is necessary to fulfill operating objectives of the Company that inure to the benefit of both the Company and the Purchaser;

**WHEREAS**, pursuant to Section 9.10 of the Purchase Agreement, the Purchase Agreement may be amended with the written consent of the Company and the Purchaser;

**WHEREAS**, the Company and the Purchaser now desire to amend the Purchase Agreement as set forth herein;

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Definitions. Capitalized terms used but not defined herein shall have their meanings as set forth in the Purchase Agreement. Capitalized terms defined herein shall have the meanings indicated in the internally set definitions provided in this Second Amendment. The term "**Follow-On Investment**" as set forth in the Purchase Agreement is hereby amended to mean $500,000. The term "**Outstanding Balance**" as

DocuSign Envelope ID: 42AA2302-00B5-42F8-931B-B57A2DB06848

set forth in the Purchase Agreement is hereby amended such that it shall include the outstanding principal and interest balance of the Third Note.

2.     <u>Purchase and Sale of Third Note</u>. In exchange for the Additional Note Consideration paid by the Purchaser, the Company shall sell and issue to the Purchaser the Third Note. The Third Note will have a principal balance in the amount of the Additional Note Consideration. For the avoidance of doubt, the principal amount under the Third Note will only accrue interest from and after August 19, 2022.

3.     <u>Usage of Funds</u>. Except as otherwise expressly permitted by the Purchaser, the Company shall use the proceeds it receives as Additional Note Consideration only for the funding of physical goods made for sale, marketing expenses and costs (e.g., its online affiliate program and board-approved events), ordinary course employee compensation, contractors, and service agreements; *provided,* no greater than ten percent (10%) of the proceeds will be used for executive compensation.

4.     <u>Restatement of Representations and Warranties</u>. The representations and warranties made by the Company and Labor Smart under Section 4 of the Purchase Agreement and in the First Amendment are fully restated hereby and accurate and complete as of the Effective Date (in addition to and not as a replacement for the making of such representations and warranties when initially made by the Company and Labor Smart as part of the Purchaser Agreement). The Purchaser does not waive any of its rights with respect to the representations and warranties made by the Company and Labor Smart under Section 4 of the Purchase Agreement or in the First Amendment by virtue of its execution of this Second Amendment or otherwise, and the Purchaser's rights with respect to such representations and warranties and the representations and warranties made by the Company and Labor Smart under this Second Amendment are regardless of its knowledge of the facts or circumstances that give rise to a claim.

5.     <u>Board Appointment Matters</u>. Any additional appointment of a Board Member shall be subject to the written approval of the Purchaser.

6.     <u>Access to Company Financials/Materials</u>. In addition to the access rights granted under Section 8.10 of the Purchase Agreement, the Company grants to the Purchaser access to the Company's systems (inclusive of financial, purchasing/vendor, sales and customer, and other business operations) when and as reasonably requested by the Purchaser.

7.     <u>Further Assurances</u>. The parties hereto agree to execute such other and further documents and instruments as the Company or the Purchaser may reasonably request to implement the terms of this Second Amendment.

8.     <u>Benefit of Amendment</u>. This Second Amendment shall be binding upon, inure the benefit of and be enforceable by the parties hereto and their successors and assigns. No other person shall be entitled to claim any right or benefit hereunder, including the status of a third-party beneficiary of this Second Amendment.

9.     <u>Attorneys' Fees</u>. The Purchaser shall be credited an amount equal to the reasonable fees and out-of-pocket expenses of the Purchaser's counsel with respect to this Second Amendment in an amount of $10,000, which shall be credited against the delivery of Additional Note Consideration.

HB: 4887-1256-7598.1

DocuSign Envelope ID: 42AA2302-00B5-42F8-931B-B57A2DB06848

      10.     <u>Entire Agreement</u>. Except as expressly set forth herein, there are no agreements or understandings, written or oral, among the parties hereto relating to this Second Amendment.

      11.     <u>Effectiveness</u>. Except as modified hereby, the Purchase Agreement shall remain in full force and effect. All other terms and conditions of the Purchase Agreement, unless context expressly requires otherwise, shall apply to the Third Note and the Purchaser's rights hereunder and with respect thereto in the same manner and to the same extent applicable to the Notes. On and after the Effective Date of this Second Amendment, each reference in the Purchase Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import shall mean and be a reference to the Purchase Agreement, as amended by this Second Amendment. If there is any inconsistency between the Purchase Agreement on the one hand, and this Second Amendment on the other hand, then this Second Amendment shall control.

      12.     <u>Amendment</u>. Neither this Second Amendment nor any provision hereof may be waived, modified, amended, discharged or terminated except in the manner permitted by Section 9.10 of the Purchase Agreement.

      13.     <u>Counterparts, Facsimile Signatures</u>. This Second Amendment may be executed in any number of counterparts and by different parties to this Second Amendment on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by DocuSign, facsimile or e-mail transmissions shall be deemed to be an original signature hereto.

*[Signature page follows.]*

HB: 4887-1256-7598.1

DocuSign Envelope ID: 42AA2302-00B5-42F8-931B-B57A2DB06848

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment as of the Effective Date.

COMPANY:

TAKEOVER INDUSTRIES, INC.

By: _Jason Tucker_

Print Name: Jason Tucker

Title: President

Address: c/o Eric Bjorgum
Karish & Bjorgum
119 E. Union St., Suite B
Pasadena, CA 91103

Email Address: eric.bjorgum@kb-ip.com
cc: Jason@takeoverind.com

Solely for the limited purposes provided in Sections 4 and 8.5 of the Purchase Agreement:

LABOR SMART:

LABOR SMART, INC.

By: _Michael Costello_

Print Name: Michael Costello

Title: Chief Executive Officer

Address: c/o Eric Bjorgum
Karish & Bjorgum
119 E. Union St., Suite B
Pasadena, CA 91103

Email Address: eric.bjorgum@kb-ip.com
cc: Jason@takeoverind.com

[Signature Page to Second Amendment to Convertible Note Purchase Agreement]

HB: 4887-1256-7598.1

DocuSign Envelope ID: 42AA2302-00B5-42F8-931B-B57A2DB06848

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment as of the Effective Date.

PURCHASER:

_____
James V. Deppoleto Jr.

Address:          1600 Paramount Drive
                  Waukesha, WI 53186

Email Address: jdeppoleto@quintecconveyor.com

DocuSign Envelope ID: 42AA2302-0085-42F8-931B-B57A2DB06848

**EXHIBIT A**

**Form of Convertible Promissory Note**

[Attached.]

HB: 4887-1256-7598.1

DocuSign Envelope ID: 42AA2302-00B5-42F8-931B-B57A2DB06848

# (THIRD) SECURED CONVERTIBLE PROMISSORY NOTE

**$500,000.00**                                                                      **August 19, 2022**

FOR VALUE RECEIVED, Takeover Industries, Inc., a Nevada corporation (the **"Company"**), hereby promises to pay to James V. Deppoleto Jr. (the **"Holder"**), the principal sum of Five Hundred Thousand Dollars ($500,000), together with interest thereon from the date of this Convertible Promissory Note (the **"Note"**). Interest will accrue at a rate of eight percent (8%) per annum, compounded annually. Unless earlier converted into Conversion Shares pursuant to Section 3 of that certain Convertible Note Purchase Agreement dated May 25, 2022, by and among the Company, the Holder, and, for limited purposes, Labor Smart, Inc., as amended (the **"Purchase Agreement"**), the unpaid principal amount of this Note, together with any then unpaid accrued interest, shall be due and payable by the Company on the Maturity Date (as defined in the Purchase Agreement) or as otherwise provided in the Purchase Agreement.

Capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

1.   <u>Payment</u>. All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal. No principal or accrued interest under this Note may be prepaid by Company.

2.   <u>Security</u>. All Obligations evidenced by this Note are secured by a continuing general lien upon, and security interest in, the Collateral.

3.   <u>Conversion of the Notes</u>. This Note and any amounts due hereunder will be convertible into Conversion Shares in accordance with the terms of Section 3 of the Purchase Agreement.

4.   <u>Amendments and Waivers; Resolutions of Dispute; Notice</u>. The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice among the Company and the Holder will be governed by the terms of the Purchase Agreement.

5.   <u>Successors and Assigns</u>. This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto; provided, however, that the Company shall not assign its obligations under this Note without the written consent of the Holder. The Holder may, in its sole discretion, transfer or assign any or all of its rights, interests, duties or obligations under this Note to a Permitted Transferee with written notice thereof to the Company. Except for a transfer or assignment to a Permitted Transferee, Holder shall not transfer or assign its obligations under this Note without the written consent of the Company.

6.   <u>Limitation on Interest</u>. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment

DocuSign Envelope ID: 42AA2302-00B5-42F8-931B-B57A2DB06848

made by the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holder as a payment of principal.

7. <u>Events of Default; Remedies.</u>

7.1 The occurrence of any one or more of the following shall constitute an "**Event of Default**":

(a) the Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(b) the Company breaches any representation, warranty, or covenant provided in the Purchase Agreement;

(c) the Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(d) an involuntary petition is filed against the Company (unless such petition is dismissed or discharged within thirty (30) days under any bankruptcy statute now or hereafter in effect), or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company.

7.2 Upon the occurrence of any Event of Default, the Holder may declare all or any portion of the Obligations to be immediately due and payable in full; <u>provided</u>, that in the event of an Event of Default under <u>Section 7.1(c)</u> or <u>(d)</u> above, all Obligations and all other sums payable hereunder shall become and be immediately due and payable in full without any action on the part of the Holder.

7.3 Upon the occurrence of any Event of Default and during any period in which such Event of Default is ongoing, all amounts due but not paid under this Note shall automatically bear interest at a rate of eighteen percent (18%) per annum (or, if lower, the highest rate permissible under applicable law), compounded monthly.

8. <u>Company Waiver; Delays and Omissions.</u> The Company hereby waives demand, notice, presentment, protest and notice of dishonor. It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.

9. <u>Choice of Law.</u> This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance

DocuSign Envelope ID: 42AA2302-00B5-42F8-931B-B57A2DB06848

with the internal laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

10. <u>Approval</u>. The Company hereby represents that its Board, in the exercise of its fiduciary duty, has approved the Company's execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it intends to use the principal of this Note for the operations of its business, and not for any personal, family or household purpose.

TAKEOVER INDUSTRIES, INC.

By: *Jason Tucker*

Print Name: <u>Jason Tucker</u>

Title: <u>President</u>

## SECURED CONVERTIBLE PROMISSORY NOTE

**$500,000.00**                                                      **May 25, 2022**

FOR VALUE RECEIVED, Takeover Industries, Inc., a Nevada corporation (the "Company"), hereby promises to pay to James V. Deppoleto Jr. (the "Holder"), the principal sum of Five Hundred Thousand Dollars ($500,000), together with interest thereon from the date of this Convertible Promissory Note (the "Note"). Interest will accrue at a rate of eight percent (8%) per annum, compounded annually. Unless earlier converted into Conversion Shares pursuant to Section 3 of that certain Convertible Note Purchase Agreement dated May 24, 2022, by and among the Company, the Holder, and, for limited purposes, Labor Smart, Inc. (the "Purchase Agreement"), the unpaid principal amount of this Note, together with any then unpaid accrued interest, shall be due and payable by the Company on the Maturity Date or as otherwise provided in the Purchase Agreement.

Capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

1.     <u>Payment</u>. All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal. No principal or accrued interest under this Note may be prepaid by Company.

2.     <u>Security</u>. All Obligations evidenced by this Note are secured by a continuing general lien upon, and security interest in, the Collateral.

3.     <u>Conversion of the Notes</u>. This Note and any amounts due hereunder will be convertible into Conversion Shares in accordance with the terms of Section 3 of the Purchase Agreement.

4.     <u>Amendments and Waivers; Resolutions of Dispute; Notice</u>. The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice among the Company and the Holder will be governed by the terms of the Purchase Agreement.

5.     <u>Successors and Assigns</u>. This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto; provided, however, that the Company shall not assign its obligations under this Note without the written consent of the Holder. The Holder may, in its sole discretion, transfer or assign any or all of its rights, interests, duties or obligations under this Note to a Permitted Transferee with written notice thereof to the

-1-

Company. Except for a transfer or assignment to a Permitted Transferee, Holder shall not transfer or assign its obligations under this Note without the written consent of the Company.

6.   Limitation on Interest. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment made by the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holder as a payment of principal.

7.   Events of Default; Remedies.

7.1   The occurrence of any one or more of the following shall constitute an "Event of Default":

(a)   the Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(b)   the Company breaches any representation, warranty, or covenant provided in the Purchase Agreement;

(c)   the Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(d)   an involuntary petition is filed against the Company (unless such petition is dismissed or discharged within thirty (30) days under any bankruptcy statute now or hereafter in effect), or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company.

7.2   Upon the occurrence of any Event of Default, the Holder may declare all or any portion of the Obligations to be immediately due and payable in full; provided, that in the event of an Event of Default under Section 7.1(c) or (d) above, all Obligations and all other sums payable hereunder shall become and be immediately due and payable in full without any action on the part of the Holder.

7.3   Upon the occurrence of any Event of Default and during any period in which such Event of Default is ongoing, all amounts due but not paid under this Note shall automatically bear interest at a rate of eighteen percent (18%) per annum (or, if lower, the highest rate permissible under applicable law), compounded monthly.

-2-

HB: 4892-6440-8352.4

8.   <u>Company Waiver; Delays and Omissions.</u> The Company hereby waives demand, notice, presentment, protest and notice of dishonor. It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.

9.   <u>Choice of Law.</u> This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

10.   <u>Approval.</u> The Company hereby represents that its Board, in the exercise of its fiduciary duty, has approved the Company's execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it intends to use the principal of this Note for the operations of its business, and not for any personal, family or household purpose.

TAKEOVER INDUSTRIES, INC.

By:

Print Name: Jason Tucker

Title: President

-3-

## (SECOND) SECURED CONVERTIBLE PROMISSORY NOTE

**$500,000.00**                                                    **July 6, 2022**

FOR VALUE RECEIVED, Takeover Industries, Inc., a Nevada corporation (the **"Company"**), hereby promises to pay to James V. Deppoleto Jr. (the **"Holder"**), the principal sum of Five Hundred Thousand Dollars ($500,000), together with interest thereon from the date of this Convertible Promissory Note (the **"Note"**). Interest will accrue at a rate of eight percent (8%) per annum, compounded annually. Unless earlier converted into Conversion Shares pursuant to Section 3 of that certain Convertible Note Purchase Agreement dated May 24, 2022, by and among the Company, the Holder, and, for limited purposes, Labor Smart, Inc., as amended (the **"Purchase Agreement"**), the unpaid principal amount of this Note, together with any then unpaid accrued interest, shall be due and payable by the Company on the Maturity Date as defined in the Purchase Agreement) or as otherwise provided in the Purchase Agreement.

Capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

1.    Payment. All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal. No principal or accrued interest under this Note may be prepaid by Company.

2.    Security. All Obligations evidenced by this Note are secured by a continuing general lien upon, and security interest in, the Collateral.

3.    Conversion of the Notes. This Note and any amounts due hereunder will be convertible into Conversion Shares in accordance with the terms of Section 3 of the Purchase Agreement.

4.    Amendments and Waivers; Resolutions of Dispute; Notice. The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice among the Company and the Holder will be governed by the terms of the Purchase Agreement.

5.    Successors and Assigns. This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto; provided, however, that the Company shall not assign its obligations under this Note without the written consent of the Holder. The Holder may, in its sole discretion, transfer or assign any or all of its rights, interests, duties or obligations under this Note to a Permitted Transferee with written notice thereof to the Company. Except for a transfer or assignment to a Permitted Transferee, Holder shall not transfer or assign its obligations under this Note without the written consent of the Company.

6.    Limitation on Interest. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment made by

the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holder as a payment of principal.

7.    <u>Events of Default; Remedies.</u>

7.1    The occurrence of any one or more of the following shall constitute an "**Event of Default**":

(a)    the Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(b)    the Company breaches any representation, warranty, or covenant provided in the Purchase Agreement;

(c)    the Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(d)    an involuntary petition is filed against the Company (unless such petition is dismissed or discharged within thirty (30) days under any bankruptcy statute now or hereafter in effect), or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company.

7.2    Upon the occurrence of any Event of Default, the Holder may declare all or any portion of the Obligations to be immediately due and payable in full; <u>provided</u>, that in the event of an Event of Default under <u>Section 7.1(c)</u> or <u>(d)</u> above, all Obligations and all other sums payable hereunder shall become and be immediately due and payable in full without any action on the part of the Holder.

7.3    Upon the occurrence of any Event of Default and during any period in which such Event of Default is ongoing, all amounts due but not paid under this Note shall automatically bear interest at a rate of eighteen percent (18%) per annum (or, if lower, the highest rate permissible under applicable law), compounded monthly.

8.    <u>Company Waiver; Delays and Omissions.</u> The Company hereby waives demand, notice, presentment, protest and notice of dishonor. It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.

9.    <u>Choice of Law.</u> This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to the conflict of laws provisions

thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

10. <u>Approval</u>. The Company hereby represents that its Board, in the exercise of its fiduciary duty, has approved the Company's execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it intends to use the principal of this Note for the operations of its business, and not for any personal, family or household purpose.

TAKEOVER INDUSTRIES, INC.

DocuSigned by:

*Jason Tucker*

By: _____
805AD32120DE434

Print Name: Jason Tucker

Title: President

DocuSign Envelope ID: 42AA2302-00B5-42F8-931B-B57A2DB06848

# (THIRD) SECURED CONVERTIBLE PROMISSORY NOTE

**$500,000.00**                                                                             **August 19, 2022**

FOR VALUE RECEIVED, Takeover Industries, Inc., a Nevada corporation (the "**Company**"), hereby promises to pay to James V. Deppoleto Jr. (the "**Holder**"), the principal sum of Five Hundred Thousand Dollars ($500,000), together with interest thereon from the date of this Convertible Promissory Note (the "**Note**"). Interest will accrue at a rate of eight percent (8%) per annum, compounded annually. Unless earlier converted into Conversion Shares pursuant to Section 3 of that certain Convertible Note Purchase Agreement dated May 25, 2022, by and among the Company, the Holder, and, for limited purposes, Labor Smart, Inc., as amended (the "**Purchase Agreement**"), the unpaid principal amount of this Note, together with any then unpaid accrued interest, shall be due and payable by the Company on the Maturity Date (as defined in the Purchase Agreement) or as otherwise provided in the Purchase Agreement.

Capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

1.      _Payment._ All payments will be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the Holder may from time to time designate in writing to the Company. Payment will be credited first to accrued interest due and payable, with any remainder applied to principal. No principal or accrued interest under this Note may be prepaid by Company.

2.      _Security._ All Obligations evidenced by this Note are secured by a continuing general lien upon, and security interest in, the Collateral.

3.      _Conversion of the Notes._ This Note and any amounts due hereunder will be convertible into Conversion Shares in accordance with the terms of Section 3 of the Purchase Agreement.

4.      _Amendments and Waivers; Resolutions of Dispute; Notice._ The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice among the Company and the Holder will be governed by the terms of the Purchase Agreement.

5.      _Successors and Assigns._ This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto; provided, however, that the Company shall not assign its obligations under this Note without the written consent of the Holder. The Holder may, in its sole discretion, transfer or assign any or all of its rights, interests, duties or obligations under this Note to a Permitted Transferee with written notice thereof to the Company. Except for a transfer or assignment to a Permitted Transferee, Holder shall not transfer or assign its obligations under this Note without the written consent of the Company.

6.      _Limitation on Interest._ In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment

DocuSign Envelope ID: 42AA2302-0085-42F8-931B-B57A2DB06848

made by the Company under this Note exceeds such maximum rate, then such excess sum will be credited by the Holder as a payment of principal.

7. <u>Events of Default; Remedies.</u>

7.1 The occurrence of any one or more of the following shall constitute an "**Event of Default**":

(a) the Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(b) the Company breaches any representation, warranty, or covenant provided in the Purchase Agreement;

(c) the Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(d) an involuntary petition is filed against the Company (unless such petition is dismissed or discharged within thirty (30) days under any bankruptcy statute now or hereafter in effect), or a custodian, receiver, trustee or assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company.

7.2 Upon the occurrence of any Event of Default, the Holder may declare all or any portion of the Obligations to be immediately due and payable in full; <u>provided</u>, that in the event of an Event of Default under <u>Section 7.1(c)</u> or <u>(d)</u> above, all Obligations and all other sums payable hereunder shall become and be immediately due and payable in full without any action on the part of the Holder.

7.3 Upon the occurrence of any Event of Default and during any period in which such Event of Default is ongoing, all amounts due but not paid under this Note shall automatically bear interest at a rate of eighteen percent (18%) per annum (or, if lower, the highest rate permissible under applicable law), compounded monthly.

8. <u>Company Waiver; Delays and Omissions.</u> The Company hereby waives demand, notice, presentment, protest and notice of dishonor. It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.

9. <u>Choice of Law.</u> This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance

DocuSign Envelope ID: 42AA2302-00B5-42F8-931B-B57A2DB06848

with the internal laws of the State of Delaware, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

10. <u>Approval</u>. The Company hereby represents that its Board, in the exercise of its fiduciary duty, has approved the Company's execution of this Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it intends to use the principal of this Note for the operations of its business, and not for any personal, family or household purpose.

TAKEOVER INDUSTRIES, INC.

By: _Jason Tucker_____

Print Name: _Jason Tucker_____

Title: _President_____

# EXHIBIT B

(See Attached)

**Resolution of the Board of Directors**
**of**
**Labor Smart Inc.**

**WHEREAS**, a special meeting of the Board of Directors of Labor Smart Inc. (the "Company") was noticed to Toby McBride, Michael Holley, Jason Tucker and Joseph Pavlik on November 4, 2022 via email;

**WHEREAS**, on November 7, 2022 at 9:00 a.m. MST, Michael Holley, Toby McBride, and Joseph Pavlik appeared by conference call;

**WHEREAS**, Several minutes before the time of the call, Veronica Manolio, Esq., had communicated by e-mail to Matthew P. Canini, Esq., counsel for Mike Holley, and Jennifer Reiter, Esq., counsel for Toby McBride, that neither she nor her client Jason Tucker would be appearing at the meeting;

**WHEREAS**, Veronica Manolio also represents Joseph Pavlik and, as such, Mr. Canini and Ms. Reiter immediately departed the call before the meeting commenced and did not participate in any portion of the meeting;

**WHEREAS**, On September 13, 2021, pursuant to Section 10 of the Company's bylaws and by unanimous exercise of all 51 shares of the Company's Series A Preferred Stock of which Michael Holley owns 17 shares, Jason Tucker owns 17 shares, and Joseph Pavlik owns 17 shares, the Shareholders of the Company by a vote of 19,283,582,170 out of a total 29,282,150,656 available votes (66%) filled the Company's vacant director positions by appointing Toby McBride, Jason Tucker and Michael Holley as directors of the Company;

**WHEREAS**, on December 21, 2021, by motion of Jason Tucker the Board of Directors of the Company convened and by a vote of Toby McBride, Jason Tucker, and Joseph Pavlik resolved and did attempt to remove Michael Holley as a Director of the Company, and as a director and officer of the Company's wholly owned subsidiary Takeover Industries, Inc. ("TI") (the "December 2021 Meeting");

**WHEREAS**, Michael Holley was hospitalized with COVID-19 at the time of the December 2021 Meeting, and was known by Jason Tucker, Toby McBride and Joseph Pavlik to have been hospitalized, and he did not receive notice of the December 2021 Meeting, attend the Meeting, vote on the issues raised thereat, or subsequently ratify any actions taken at that Meeting;

1

**WHEREAS**, Joseph Pavlik was not a Director of the Company at the time of the December 2021 Meeting, but voted at the December 2021 Meeting;

**WHEREAS**, pursuant to N.R.S. 78.335 titled "Directors: Removal; filling vacancies," a director can, in most circumstances, only be removed by a two-thirds vote of the shareholders;

**WHEREAS**, pursuant to Wyoming Stat. 17-16-808(d) titled "Removal of Directors" a director may be removed by the shareholders only at a shareholder meeting called for that purpose;

**WHEREAS**, the Company never convened a shareholder meeting for the purpose of removing directors of the Company under either Nevada or Wyoming law;

**WHEREAS**, even had Jason Tucker, Joseph Pavlik and Toby McBride voted their Common and Series A Preferred shares at the December 21, 2021 Meeting, which they did not, their votes, including their exercise of 34 of the Company's Series A Preferred shares, would only have represented 12,445,721,447 of the 29,282,150,656 available votes (42.54%), which is not enough to remove a director under either Nevada or Wyoming law;

**WHEREAS**, based on the foregoing the actions taken at the December 2021 Meeting were unauthorized and not in conformity with the law or Company Bylaws;

**WHEREAS**, by virtue of Holley being unlawfully frozen out from the Board of Directors actions taken by the Board of Directors subsequent to the December 2021 Meeting are ultra-vires;

**WHEREAS**, during the December 2021 Meeting, Jason Tucker claimed Michael Holley had committed various improprieties, including theft and embezzlement;

**WHEREAS**, during the December 2021 meeting Jason Tucker attempted to cause the Company to transfer Holley's shares in the Company to other individuals, including himself;

**WHEREAS**, at the direction of Jason Tucker, TI commenced a lawsuit against Michael Holley in the Central District of California and later in the District of Arizona (the "Lawsuit");

**WHEREAS**, during the course and time frame of the Lawsuit information was made available to Jason Tucker, Toby McBride, and Joseph Pavlik based on which Toby McBride and Joseph Pavlik now understand that that their actions at the December 2021 Meeting were a nullity and not in conformity with the law and Company Bylaws;

**WHEREAS**, based on information on information obtained during the lawsuit, Toby McBride and Joseph Pavlik now understand that Jason Tucker's allegations against Michael Holley were wrong and for the purpose of attempting to personally enrich Jason Tucker;

**WHEREAS,** since Michael Holley was frozen out of the Company and TI, Tucker has engaged in wrongful conduct, and failed to meet his fiduciary duties, as President and Director of TI and a Director of the Company, including withholding information from undisputed officers and directors, subverting the directions of TI's CEO, hiring vendors without approval that only answer to Jason Tucker, and keeping secret TI's financial situation, which is not in the best interest of TI's shareholders;

**WHEREAS,** Jason Tucker has been untruthful to other Officers and Directors of the Company and TI concerning material information regarding investors, products, and sales, which is not in the best interests of TI and Company shareholders;

**WHEREAS,** Jason Tucker has instructed others at TI not to communicate with other TI Officers and Directors, which is not in the best interests of TI and Company shareholders;

**WHEREAS,** Jason Tucker has caused TI to fail to honor its contractual obligations, leading to potential, threatened, and/or actual claims and/or litigation against TI, which is not in the best interests of TI and Company shareholders;

**WHEREAS,** Eric Bjorgum has previously been retained to the do legal work for the Company;

**WHEREAS,** at the November 7, 2022 Meeting a quorum was present;

**WHEREAS,** at the November 7, 2022 Meeting the foregoing matters were discussed and all directors had a full and fair opportunity to ask questions and be heard;

**WHEREAS,** given the dispute in the Lawsuit and Joseph Pavlik's vote at the December 2021 Meeting, he was invited to attend and participate in the November 7, 2022 meeting and, although not a director of the Company, indicate what his vote would be were he a Director;

**THEREFORE, IT IS:**

**RESOLVED,** all actions Taken at the December 21, 2021 meeting to the extent they were ever effective are voided;

**RESOLVED,** Michael Costello is suspended from his position as CEO of the Company for a period of thirty days, with pay, and his authority to act on behalf of the Company is in all aspects revoked during this period;

**RESOLVED,** Michael Costello shall turn over to the Board of Directors of the Company all accounts, documents, passwords or other material belonging to the Company;

**RESOLVED,** the Board of Directors shall conduct a review of Michael Costello's actions from the period September 1, 2021 to the date hereof;

**RESOLVED,** the Board of Directors shall reconvene in thirty-days to discuss Michael Costello's position at LTNC;

**RESOLVED,** Michael Holley is appointed interim CEO of the Company until the Board Directors makes a determination with respect Michael Costello;

**RESOLVED,** Jason Tucker shall immediately turn over to the Board of Directors all contracts, documents, information, communications, passwords and financial accounts of the Company;

**RESOLVED,** Eric Bjorgum shall immediately turn over to the Board of Directors all contracts, documents, information, communications, passwords and financial accounts of the Company;

**REVOLVED,** the Board of Director will conduct a review of all actions taken by the Company since September 21, 2021 to the present;

**RESOLVED,** the Board of Directors shall conduct a review of all actions taken by Jason Tucker from September 21, 2021 to the present;

**RESOLVED,** Eric Bjorgum is terminated as the Company's counsel;

**RESOLVED,** the Board of Directors will conduct a review of the Lawsuit;

**RESOLVED,** the planned spinoff of Takeover is suspended for ninety days, while the Company undertakes a review of documents and information concerning the transaction, which have been withheld by Jason Tucker;

**RESOLVED,** effective immediately, by exercise of a vote of the shares of TI owned by the Company, which is between 97.345% and 100% of all issued and outstanding shares of TI, the Company hereby removes Jason Tucker from TI's board of directors and appoints Michael Holley to replace him.

**RESOLVED,** Joseph Pavlik and Toby McBride shall remain on TI's board of directors; and

**RESOLVED,** TI's board of directors is to meet immediately for the purpose of taking corrective action regarding the matters discussed at the November 7, 2022 meeting.

**IN WITNESS WHEREOF**, the undersigned, being two of the three Directors of the Company **Agree, Approve and Adopt** the foregoing resolutions as of November 7, 2022 following the duly noticed meeting of the Board of Directors held on this date.

_____
Joseph Pavlik, Observer

_____          _____
Toby McBride, Director                                Michael Holley, Director

## WRITTEN CONSENT
## BOARD OF DIRECTORS OF TAKEOVER INDUSTRIES, INC

The undersigned, constituting the Board of Directors of Takeover Industries, Inc., a Nevada Corporation ("Takeover"), does in lieu of convening a meeting hereby waive notice and approve and consent to the adoption of the following resolutions pursuant to N.R.S., 78.010 *et seq.*

**WHEREAS**, a special meeting of the Board of Directors of Labor Smart, Inc. ("LTNC"), Takeover's parent corporation, was held on November 7, 2022.

**WHEREAS**, the Board of Directors of Takeover (the "Board") was instructed by Resolution of the Board of Directors of LTNC to "meet immediately for the purpose of taking corrective action regarding the matters discussed at the November 7, 2022." See Exhibit A.

**WHEREAS**, the Board has determined Jason Tucker has been untruthful to other Officers and Directors of Takeover concerning material information regarding investors, products, and sales, which is not in the best interests of Takeover;

**WHEREAS,** the Board has determined that Jason Tucker has acted in breach of corporate formalities and in breach of his fiduciary duties;

**WHEREAS**, the Board has determined Jason Tucker has instructed others at Takeover not to communicate with other Takeover Officers and Directors, which is not in the best interests of Takeover; and

**WHEREAS**, the Board has determined Jason Tucker has caused Takeover to fail to honor its contractual obligations, leading to potential, threatened, and/or actual claims and/or litigation against Takeover, which is not in the best interests of Takeover.

1

**NOT THEREFORE**, it is

1. **RESOLVED**, Jason Tucker is suspended from all position he holds at Takeover, including President for a period of thirty days, with pay, and his authority to act on behalf of Takeover is in all aspects revoked during this period;

2. **RESOLVED**, Melissa Tucker is suspended from all her positions at Takeover for a period of thirty days, with pay, and her authority to act on behalf of Takeover is in all aspects revoked during this period;

3. **RESOLVED**, Jason and Melissa Tucker shall turn over to the Board all accounts, documents, passwords or other material belonging to Takeover;

4. **RESOLVED,** the Board shall conduct a review of Jason Tucker's actions from the period September 1, 2021 to the date hereof;

5. **RESOLVED,** the Board shall reconvene in thirty-days to discuss Jason Tucker's continuing with Takeover in any capacity;

6. **RESOLVED,** Joseph Pavlik is appointed interim President of the Company until the Board makes a determination with respect Jason Tucker;

7. **RESOLVED**, Toby McBride is reappointed as CEO of Takeover, and any leave of absence or revocation of his authority to act on Takeover's behalf his hereby terminated; and

8. **RESOLVED**, Veronica Manolio, counsel for Takeover, shall immediately turn over to the President and CEO, all contracts, documents, information, communications, passwords and financial accounts of Takeover.

**IN WITNESS WHEREOF,** the undersigned, being all of the Directors of the Company **Agreed, Approve and Adopt** the foregoing resolutions as of November 7, 2022.

_____
Joseph Pavlik, Director

_____
Michael Holley, Director, as to
Resolutions 1-7, and abstaining from
Resolution 8.

_____
Toby McBride, Director, as to
Resolutions 1-6, and 8, and
abstaining from Resolution 7.

3

# EXHIBIT C

(See Attached)

DocuSign Envelope ID: 6B2A339E-9171-43B5-9C44-5A4C79012CAE

**RELATED PARTY RECEIVABLE CONFIRMATION**

March 25, 2022

**BF Borgers CPA PC**
**Attn: Nikita Sikarwar**

The following information relating to amount owed by me to **Takeover Industries Inc.**'s as of December 31, 2021 agrees to my records:

Due from related party as on December 31, 2021: **$ 243,253.84**

After reviewing (and revising, as necessary) the above information, and signing and dating your reply, please mail it directly to BF Borgers CPA PC, 5400 W. Cedar Avenue, Lakewood, CO 80226 or email to Nikita Sikarwar at nikita.sikarwar@bfbcpa.us (preferred).

Sincerely,

DocuSigned by:

C16132C28CFC4C4...
Signature
**Toby McBride (CEO)**
**Takeover Industries Inc.**