# EXHIBIT 22

Transcript of Thomas Zarro
Conducted on November 21, 2024

**Page 1**

```
1           UNITED STATES DISTRICT COURT
2                    for the
3                District of Nevada
4    --------------------------------x
5    JAMES DEPPOLETO,
6         Plaintiff,              :
7            v.           : Civil Action No.
8    TAKEOVER INDUSTRIES INCORPORATED,: 2:22CV02013
9    ET AL.                :
10       Defendant.        :
11   --------------------------------x
12     Deposition of THOMAS ZARRO, in His Individual
13                  Capacity
14              Las Vegas, Nevada
15          Thursday, November 21, 2024
16                  8:22 a.m.
17
18
19
20
21
22
23   Job No.: 561644
24   Pages 1 - 279
25   TranscribedBy: Jennifer Candela-Alvarez
```

**Page 2**

```
1    Deposition of THOMAS ZARRO, held at the offices of:
2
3              Shea Larsen
4              1731 Village Center Circle
5              Suite 150
6              Las Vegas, NV 89134
7              (702) 471-7432
8
9
10
11         Pursuant to agreement, before
12   Mylene Santiano, Notary Public, in and for the
13   state of Nevada.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1           A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFF, JAMES DEPPOLETO:
3          PATRICK HARVEY, ESQUIRE
4          511 North Broadway
5          Suite 1100
6          Milwaukee, WI  53202
7          (414) 273-2100
8
9    ON BEHALF OF DEFENDANT, TAKEOVER INDUSTRIES
10   INCORPORATED, ET AL.:
11         DON BENNION, JR., ESQUIRE
12         LAW OFFICE OF S. DON BENNION
13         6980 O'Bannon Drive
14         Suite 400
15         Las Vegas, Nevada  89117
16         (702) 333-0777
17
18   ALSO PRESENT:
19         Esteban Horta, Videographer
20
21
22
23
24
25
```

**Page 4**

```
1              C O N T E N T S
2    EXAMINATION OF THOMAS ZARRO
3        By Mr. Harvey                          7
```

```
5              E X H I B I T S
6            (Attached to transcript.)
7    ZARRO DEPOSITION EXHIBIT                  PAGE
8    Exhibit 1  Convertible Note Purchase Agreement  98
9    Exhibit 2  Emails Re: Stay of Default        104
10   Exhibit 3  Emails Re: Payment Information     111
11   Exhibit 4  Emails Re: Notes and Payments      112
12   Exhibit 5  Letter Re: Convertible Note Purchase
13             Agreement                          115
14   Exhibit 6  Resolution of the Board of Directors  132
15   Exhibit 7  Labor Smart Inc.
16   Exhibit 8  Proposed Term Sheet                167
17   Exhibit 9  Labor Smart Inc.
18   Exhibit 10 Responses to Plaintiff's First Set of
19             Interrogatories                    182
20   Exhibit 11 Takeover Industries Inc.,
21             Balance Sheet                      184
22   Exhibit 12 Resolution of the Board of
23             Directors Takeover                 192
24   Exhibit 13 Tom's Response to Subpoena
25   Duces Tecum                                  194
```

5

C O N T E N T S (Continued)

1
2  Exhibit 14 Personal Bank Statement        199
3  Exhibit 15 Takeover Bank Statement        239
4  Exhibit 16 Letter from Whitehead & Burnett    255
5  Exhibit 17 Takeover Withdrawals and Deposits'
6          Statement                         256
7  HOLLEY DEPOSITION EXHIBIT                  PAGE
8  Exhibit 1  Cease and Desist
9  Exhibit 4  Board of Directors of Takeover
10         Industries                        134
11 Exhibit 10 Related Party Receivable
12         Confirmation                      162
13
14
15
16
17
18
19
20
21
22
23
24
25

7

1  a stipulation.  I am a notary authorized to
2  administer oaths, and this deposition will be
3  recorded by electronic means.  All parties
4  understand and agree that any certified transcript
5  produced from the recording of this proceeding is
6  intended for all uses permitted under applicable
7  procedural and evidentiary rules and laws and shall
8  constitute written stipulation.  The parties
9  stipulate to the use and certification of this
10 testimony consistent with applicable law of such.
11 If there are no objections, I will now swear in the
12 witness.
13 Whereupon,
14        THOMAS ZARRO,
15 being first duly sworn or affirmed to testify to
16 the truth, the whole truth, and nothing but the
17 truth, was examined and testified as follows:
18       EXAMINATION BY COUNSEL FOR THE PLAINTIFF
19 BY MR. HARVEY:
20    Q   Good morning, Mr. Zarro.
21    A   Hey, Patrick.
22    Q   Could you state and spell your full name
23 for us, please.
24    A   Thomas Zarro.
25 Q    And spell it, please.

6

P R O C E E D I N G S

1
2       THE VIDEOGRAPHER:  Here begins Media No.
3  1 in the videotaped deposition of Tom Zarro,
4  individually, in the matter of James Deppoleto,
5  Plaintiff v. Takeover Industries, Incorporated, et
6  al., Defendants in the United States District Court
7  of the District of Nevada, Case No. 2:22CV02013.
8       Today's date is Thursday, November 21st,
9  2024.  The time on the video monitor is 8:22 a.m.
10      The videographer today is Esteban Horta,
11 representing Planet Depos.  This video deposition
12 is taking place at 1731 Village Center Circle,
13 Suite 150, Las Vegas, Nevada 89134.
14      Will Counsel please voice identify
15 themselves and state whom they represent?
16      MR. HARVEY:  Patrick Harvey for the
17 Plaintiff.
18      MR. BENNION:  Don Bennion for the
19 Defendants, specifically, for Tom Zarro here today
20 in his individual and corporate capacities.
21      THE VIDEOGRAPHER:  The court reporter
22 today is Mylene Santiano, representing Planet
23 Depos.  Would the reporter please swear in the
24 witness.
25 THE REPORTER:  Thank you.  First, I have

8

1     A   T-H-O-M-A-S, Zarro, Z-A-R-R-O.
2     Q   And what's your address, sir?
3     A   1100 Boletus Drive, Henderson, Nevada,
4  89011.
5     Q   Any plans to move in the near future?
6     A   None scheduled.
7     Q   Okay.  Can you quickly walk me through
8  your education?  Just high school onwards.
9     A   I went to San Diego State for two years.
10 Well, high school at Saint Augustine High School in
11 San Diego, California, then San Diego State for two
12 years.
13    Q   And what were you studying at San Diego
14 State?
15    A   Economics.
16    Q   Did you receive a degree?
17    A   I did not.
18    Q   Okay.  Anything else?
19    A   For education?
20    Q   Yes.
21    A   No, sir.
22    Q   Okay.  Have you ever been deposed before
23 today?
24    A   I have not.
25 Q   Okay.  I assume you had a chance to

Transcript of Thomas Zarro
Conducted on November 21, 2024

**9**

1  speak with your counsel about things like answering
2  verbally and deposition tips and tricks, that type
3  of thing?
4      A  Yes.  We have.
5      Q  Do I need to waste time going over
6  those, or do you feel comfortable?
7      A  I don't know if there's any rules, laws.
8  I have no objection of you going over them.  I've
9  never done this before.  So --
10     Q  Okay.  Well, I --
11     A  If you want to give me the highlights,
12  feel free.
13     Q  I don't feel like I need to, but if you
14  need to, then I will.
15     A  Okay.  Can I ask you?
16         THE REPORTER:  The court reporter would
17  ask that, if you do, slow down.  Just, like, take a
18  breath and slow down the general conversation.
19  Thank you.
20         MR. HARVEY:  I'll go through them
21  quickly.
22         So, one, answer verbally instead of
23  uh-huh or huh-uh.  I understand what you're saying
24  perfectly in regular conversation, but it makes it
25  very difficult for the court reporter if you don't

**10**

1  say yes or no.
2         Similarly, it makes it difficult for her
3  to take down two people talking at once.  So if you
4  can let me finish my question before you answer it,
5  and I will let you finish your answer before I
6  answer the next question, so we don't get in
7  trouble with the court reporter --
8      A  Okay.
9      Q  -- because that you  don't want to do.
10  If you don't understand one of my questions, let me
11  know.  I'm happy to rephrase it to make sure that
12  we're on the same page before you give an answer.
13  Fair?
14     A  Yes, sir.
15     Q  Okay.  By the same token, if you answer
16  one of my questions, though, I'm going to assume
17  that you understood it.  Is that fair?
18     A  Yes.
19     Q  Okay.  Did you review any documents to
20  prepare for your deposition today?
21     A  I did.
22     Q  What did you review?
23     A  I don't have the specifics, but there's
24  a mountain of paperwork if you will.  So I've
25  reviewed some of the exhibits you've presented that

**11**

1  we've supplied you.  We've reviewed some of the
2  documents that we've submitted on our behalf that
3  you requested, and we've spoken briefly about
4  things that you're saying that you're short on in
5  the way of documents that we believe we've
6  submitted or I've submitted.  Excuse me.  So --
7      Q  Let me try to come at it this way:  Did
8  you review your discovery responses, your written
9  responses?
10     A  Some.
11     Q  Okay.  And you said you reviewed some
12  exhibits that -- or documents that your side has
13  produced in this litigation; is that correct?
14     A  Yes.
15     Q  Do you remember any specific exhibits?
16     A  Bank statements.
17     Q  Anything else?
18     A  None specifically that I recall, but
19  there was a lot, Mr. Harvey.
20     Q  Okay.  Do you remember any other
21  specific document other than the bank statements
22  and discovery responses that you reviewed?
23     A  I reviewed the exhibit, I think you
24  provided, with the -- an invoice from Great
25  Northern that Mr. Deppoleto paid for, I guess.

**12**

1      Q  Had you seen that document before you
2  reviewed it for your deposition?
3      A  No, sir, I did not.
4      Q  And there were two invoices; correct?
5      A  I recall one.
6      Q  Okay.  I'm going to get into the
7  timeline in a little bit more detail, but since
8  we're talking about it now, were you involved at
9  all with Takeover when those two invoices were
10  generated?  And the dates on those were October and
11  November 2022.  Were you involved with Takeover?
12     A  No, I was not.
13         MR. HARVEY:  That may have just cut
14  about two hours off your deposition.
15         THE WITNESS:  Thank you.
16         MR. HARVEY:  But we'll see.
17         THE WITNESS:  Thank you.
18         MR. BENNION:  And if I could just
19  interject, you may want to go a little bit slower,
20  Mr. Zarro, in case I need to object.  I -- anyway.
21         MR. HARVEY:  Oh, that's one of the other
22  rules too.  As you can see, there's no judge in the
23  -- in the conference room with us today.  So there
24  will probably be a couple of times where your
25  lawyer wants to get an objection on the record.

Transcript of Thomas Zarro
Conducted on November 21, 2024

---

13

1    THE WITNESS: New pen, please. That one
2 doesn't work.
3    MR. HARVEY: If and when that happens,
4 go ahead and let him just get his objection on the
5 record. And then, unless he tells you otherwise,
6 go ahead and answer.
7    THE WITNESS: Got it.
8    MR. HARVEY: He's just preserving the
9 objection.
10 BY MR. HARVEY:
11    Q   Okay. So -- okay. So you said you
12 reviewed the invoice from Great Northern, but you
13 weren't involved with Takeover in the October or
14 November 2022 time frame?
15    A   Correct. I was not.
16    Q   Okay. Other than the bank statements,
17 the invoice from Great Northern or invoices from
18 Great Northern and the discovery responses, do you
19 remember reviewing any other documents to prepare
20 for (crosstalk).
21    A   Not specifically.
22    Q   All right. Okay. And I see that you
23 brought some documents with you. What did you
24 bring with you?
25 A These are the documents you sent me. I

---

14

1 just got these in the mail. I was out of town.
2 Just got them, and these are your documents. I
3 don't know if they're from you, but --
4    Q   Do you mind if I take a look at them?
5    THE WITNESS: I didn't know if they'd be
6 relevant for today.
7    MR. BENNION: There's no question before
8 you.
9    THE WITNESS: Okay. Thank you.
10    Q   So this appears to be a November 6,
11 2024, letter from my office about your discovery
12 responses and generally asking you to supplement
13 them. Is that fair?
14    A   Yes, sir.
15    Q   Okay. Thank you. Okay. Any other
16 documents you remember reviewing in preparation for
17 your deposition?
18    A   None specifically.
19    Q   And you said mountains. Were you being
20 -- were you exaggerating a little bit, or was it
21 essentially as thick as this folder I've got next
22 to me which is --
23    A   No. It was nowhere near as thick, and
24 it was electronic. So there was no mountain. It
25 was only virtual.

---

15

1    Q   A figurative mountain.
2    A   Yes.
3    Q   Okay. Can you briefly walk me through
4 your employment history for the last ten years.
5    A   I was a salesman for a logistics company
6 selling ocean freight services to Hawaii, Guam, and
7 Alaska. I've also been --
8    MR. HARVEY: Hold on a second.
9    THE WITNESS: Oh, sorry.
10    Q   Who was the logistics company?
11    A   Triple B Forwarders.
12    Q   Triple B --
13    A   Triple B Forwarders, as in ocean freight
14 forwarding.
15    Q   Okay. And from when to when were you a
16 salesman for logistics for Triple B Forwarders?
17 Approximate is fine.
18    A   I'm going to say 2014ish, 2013, '14 to
19 2020. These are very approximate, Mr. Harvey.
20    Q   That's fine. Yeah.
21    A   Yeah. And then I had a trucking
22 company. I've been somewhat of an entrepreneur.
23 So I've had a trucking company. I have real
24 estate, rental real estate, and I work in the
25 recovery community here in Las Vegas. So I have

---

16

1 multiple dwellings to help the addicted, homeless,
2 and abused.
3    Q   So when you say recovery, meaning
4 recovering from addiction, not recovery, such as
5 collections --
6    A   No.
7    Q   -- to --
8    A   Addiction, abuse, homelessness.
9    Q   Got it. Okay. So the trucking company
10 -- how long have you had that? Do you still have
11 it?
12    A   That should be a yes or no. I do not.
13 I do not. I still have it. I don't operate it
14 anymore.
15    Q   From when to when were you operating it?
16    A   2019 to -- through 2024.
17    Q   And what was that called?
18    A   Cargo Management Group.
19    Q   And was that operating in Nevada or --
20    A   It was an over-the-road hauler. So we
21 were licensed in Nevada but carried freight
22 throughout the 48 states.
23    Q   Okay. And you said a rental real estate
24 company; correct?
25 A No. Not a -- I own rental real estate.

---

Transcript of Thomas Zarro
Conducted on November 21, 2024

---

**17**

1  I don't own a rental real estate company.
2      Q   Do you run that through an LLC or
3  something similar?
4      A   I do.
5      Q   And what's that called?
6      A   TK Zarro.
7      Q   And is that in Nevada or somewhere else?
8      A   Nevada.
9      Q   Okay.  And the recovery addiction piece
10 -- is that a for profit or is that a nonprofit?
11     A   Both.  We have a nonprofit and a for
12 profit.  The rental real estate side is for profit,
13 even though it struggles, and the nonprofit is
14 embedded in that.
15     Q   Oh, I see.  So they -- some of the real
16 estate that you own goes to the recovery addiction.
17     A   For housing for the people.  And then we
18 have the nonprofit side which provides the services
19 for the residents.
20     Q   Got it.  Okay.  Thanks.  So is that
21 under the TK Zarro name too, or is that under
22 something else?
23     A   Something else.
24     Q   What's that one called?
25 A   Clean Shot Living.

---

**18**

1      Q   Okay.  Any other employment in the last
2  ten years?
3      A   None that I can speak of.  No.
4      Q   Okay.  We're here in part because
5  there's a Defendant called Takeover Industries
6  Incorporated.  What's your understanding of what
7  Takeover Industries Incorporated is?
8      A   It's a -- can you rephrase that,
9  Mr. Harvey.  I'm confused.
10     Q   Sure.  Sure.
11     A   Like, it's a company.  It's a company
12 based in Nevada.
13     Q   Okay.  And what -- to your
14 understanding, what does Takeover do for a
15 business?
16     A   Nothing now.
17     Q   What did it do?
18     A   It was in the business of selling energy
19 drinks.
20     Q   And I believe they've been called Gamer
21 Shots in previous depositions.  Is that a term
22 you're familiar with?
23     A   I am familiar with it.
24     Q   And did you understand that Takeover
25 sold Gamer Shots?

---

**19**

1      A   I think gamer -- I think Takeover made
2  Gamer Shots.  I don't know that they sold Gamer
3  Shots.
4      Q   Okay.
5      A   Again, that was before my time,
6  Mr. Harvey.  So I know they manufactured Gamer
7  Shots.  I just don't know if they sold them.
8      Q   Okay.
9      A   I --
10     Q   Oh, I'm sorry.  Go ahead if you weren't
11 done.
12     A   I'm done.
13     Q   Okay.  Are you --
14         THE WITNESS:  I'm getting kicked under
15 the table.  That was a joke.
16         MR. BENNION:  He's not getting kicked.
17     Q   Are you familiar with a brand called
18 NXTLVL, N-X-T-L-V-L?
19     A   I am.
20     Q   And what's your understanding of what
21 NXTLVL is?
22     A   NXTLVL was the brand that Takeover
23 Industries sold for its hydrogen water and energy
24 shots.
25 Q   Okay.  And I think you just said it.

---

**20**

1  Well, you said NXTLVL sold hydrogen water and
2  energy shots; correct?
3      A   Correct.
4      Q   Is your understanding that NXTLVL was
5  used on any products other than hydrogen water and
6  energy shots?
7         THE WITNESS:  Interesting question,
8  Mr. Harvey.
9         MR. HARVEY:  I get a couple per
10 deposition.
11     A   Yeah.  The answer to your question is
12 yes.
13     Q   What else did they sell?
14     A   They -- when you say they, define they.
15     Q   NXTLVL and/or Takeover.
16     A   When you say NXTLVL, do you mean NXTLVL
17 for Takeover or NXTLVL for the company that owned
18 the trademark?  Because there's a product -- well,
19 should I continue or just wait for Mr. Harvey to
20 ask me more questions?
21         MR. BENNION:  The process here, if you
22 don't mind, Counsel, is that he asks you questions
23 and you answer.  And if there's -- if I have an
24 objection, then I interpose the objection before
25 you answer.

---

Transcript of Thomas Zarro
Conducted on November 21, 2024

21

1    THE WITNESS: But -- okay. I'd like to
2  be able to give Mr. Harvey some color. The court
3  reporter asked me to tell the whole truth. So what
4  are the rules?
5    MR. BENNION: He asks you questions, and
6  you answer to the best of your knowledge.
7    THE WITNESS: Go ahead, Mr. Harvey.
8  BY MR. HARVEY:
9    Q   Okay. So, to me, that last answer you
10 gave -- it sounded like you were drawing a
11 distinction between Takeover and NXTLVL on the one
12 silo, I'll call it, and then a different NXTLVL and
13 a different silo. Is that what you were getting
14 at?
15    A   Yeah. I think it's relevant to this
16 case, and there was another product, another brand,
17 another water called NXTLVL.
18    Q   And that other company you're talking
19 about -- did it have anything to do with Takeover?
20    A   It did not other than a litigant.
21    Q   Okay. So I think I understand where
22 you're going. This other company -- do you know
23 where it's based out of -- the NXTLVL?
24    A   I think New Jersey.
25 Q   Okay. Now let me go back to my -- a

22

1  couple of questions ago. In terms of the NXTLVL
2  involved with Takeover in that silo, as it were,
3  other than hydrogen water and energy drinks, were
4  you aware of Takeover/NXTLVL selling any other
5  products?
6    A   No.
7    Q   Okay. To your knowledge, are there any
8  products that are still being sold under the brand
9  name NXTLVL that's affiliated with Takeover?
10    A   No.
11    Q   When, to your knowledge, did the -- did
12 the NXTLVL/Takeover products stop being sold?
13    A   Well, the NXTLVL hydrogen water stopped
14 being sold, I think, in -- sometime in 2022. It
15 was discontinued due to manufacturer issues and
16 conflicts with the previous management. So the
17 hydrogen water was discontinued. The energy shots,
18 I believe, were still being sold in November -- in
19 late 2022, November, Decemberish.
20    Q   You said the hydrogen water was -- they
21 stopped selling it because of manufacturer issues
22 and conflict issues with --
23    A   Well, I didn't --
24    Q   -- management? Oh, go ahead.
25 THE WITNESS: I'm sorry. That was a

23

1  rule I broke, clearly.
2    MR. HARVEY: No. You've been doing
3  pretty good so far. Don't worry about it.
4    THE WITNESS: Thank you.
5    A   Ask the question again, Mr. Harvey.
6    Q   Sure. I thought you told me that they
7  stopped selling the hydrogen water because of
8  manufacturer issues and also conflict issues with
9  -- and I didn't hear if you said owners or
10 something similar. Is that --
11    A   The manufacturer issues were, in my
12 opinion, perceived.
13    Q   What do you mean by that?
14    A   That I don't believe they were
15 insurmountable and the conflict came with previous
16 management that began a lawsuit or began the
17 process of a lawsuit with the manufacturer of the
18 hydrogen water. So it was completely discontinued
19 for NXTLVL and Takeover.
20    Q   Can you say a little bit more about
21 that? So the manufacturer issues -- let's just
22 stick with that for one moment. You said it -- you
23 thought it was kind of a perceived issue, but it
24 wasn't really an issue and it could have been
25 worked through. Is that fair?

24

1    A   Fair.
2    Q   And what -- can you put a little more
3  meat on the bones? What specifically was the
4  debate or the hiccup?
5    A   The hiccup was that, on a rare occasion,
6  there would be a sulfur smell from one of the cans
7  of the hydrogen water. It was nontoxic. It was
8  just an unfavorable smell. And the previous
9  management took that as an opportunity to do what I
10 believe they do for a living, which is sue people,
11 and he tried to -- forgive my adjective -- extort
12 that company for millions of dollars.
13    Q   And the previous management -- who are
14 you referring to when you say that?
15    A   Well, Jason Tucker specifically, but I
16 think James Deppoleto --
17    Deppoleto?
18    Q   Deppoleto.
19    A   -- Deppoleto was part of that with
20 Jason, Mr. Tucker.
21    Q   So your understanding is that Takeover,
22 the company, sued the manufacturer?
23    A   They began the process of a lawsuit by
24 engaging attorneys, sending letters, if not suing,
25 threatening to sue.

Transcript of Thomas Zarro
Conducted on November 21, 2024

25

1    Q    And which manufacturer was this?
2    A    Faith Springs.
3    Q    And do you know the time period when
4  this was all happening?
5    A    I think -- I'm going to say mid-2022
6  when the water -- I believe, the water was
7  completely discontinued.
8    Q    Do you know how much they were demanding
9  from Faith Springs?
10    A    I believe $2 million.  That's a fuzzy
11  recollection, Mr. Harvey.
12    Q    Okay.  And when you said conflict issues
13  with the owners and management, were you referring
14  to something separate from what you just told me or
15  essentially the same as what you just told me?
16    A    I believe it's essentially the same.
17  Like, the previous manager, the president and CEO
18  of Takeover, was Jason Tucker.  His director -- one
19  of them was James Deppoleto.  And Jason's line of
20  work was suing people.  That's what he does for a
21  living.  So he took that trade and brought it into
22  this energy company -- energy drink company, and I
23  believe that was his intention with Faith Springs.
24    Q    And when you say that Mr. Tucker's line
25  of work is suing people, what's your basis for

26

1  saying that?
2    A    He's an intellectual rights -- I don't
3  know the legal term -- intellectual property.
4  Like, he tries to find people in violation of
5  something and then goes after them.
6    Q    And where are you -- from what source
7  are you --
8    A    It's common knowledge.  Social media.
9    Q    Okay.  And you said a conflict issue.
10  Why is that a conflict?
11    A    Well, I'm using the term conflict as he
12  couldn't get along with them.
13    Q    Okay.
14    A    Not a legal term where he had a
15  conflict.
16    Q    Okay.  So not a conflict of interest
17  like lawyers might use?
18    A    No, no, no.
19    Q    Now you told me that -- so it was your
20  understanding that this was all occurring in
21  mid-2022; correct?
22    A    That's my recollection.
23    Q    But at the beginning of the deposition,
24  you said you weren't involved with Takeover in at
25  least November of 2022; correct?

27

1    A    Yeah.  I guess I should ask you to
2  define involved.  I was a shareholder, I was a
3  customer, and I was an investor, but I wasn't
4  involved to the degree where I think I'm involved
5  now.
6        MR. BENNION:  I'm going to state a
7  belated objection that it may be vague and
8  ambiguous.  Lacks foundation.
9        Go ahead.
10    Q    Well, so let me -- I'll ask it this way:
11  When did you first, in any capacity, become
12  involved with Takeover?
13        MR. BENNION:  The same objection.
14        Go ahead.
15    A    I've been a shareholder of the parent
16  company that Takeover is owned by for many, many
17  years.  So when Takeover began, I guess I was
18  involved as an investor and then as a customer of
19  their products.
20    Q    And the parent company you're referring
21  to -- is that Labor Smart?
22    A    Correct.  Yes.
23    Q    When did you first become a shareholder
24  of Labor Smart?
25  A    2013 or '14?

28

1    Q    When did you first hear the name
2  Takeover and/or NXTLVL?
3    A    I want to say January-February of 2021.
4    Q    And what was the -- what were the
5  circumstances in which you first heard that name?
6    A    Social media where it had become -- made
7  public that Takeover was going to enter the Labor
8  Smart public vehicle.
9    Q    And when you say that, you mean that
10  Takeover was going to be able to be publicly traded
11  through its affiliation with Labor Smart?
12    A    Correct.  Yes.
13    Q    What was Labor Smart, to your knowledge,
14  doing in early 2021?
15    A    A labor -- they were a labor business.
16    Q    When you say labor business --
17    A    They owned -- they operated branches of
18  you know, Labor Ready, the on-demand day labor.
19    Q    A temp agency?
20    A    Temp agency.  Thank you.
21    Q    Okay.  So you heard of Takeover because
22  you got word that Takeover was going to be able to
23  be offered publicly through Labor Smart in early
24  2021; is that correct?
25  A    Correct.  Yes.

---

**29**

1    Q   Okay.  From that point forward, what was
2   the next involvement of any kind that you had with
3   Takeover?
4    **A   Officially, as an investor, I invested.**
5   **They needed money.  I invested.  I was an investor.**
6    Q   You invested directly in Takeover?
7    **A   Into the parent company of LTNC.**
8    Q   Okay.  So when you -- I don't know if
9   you wrote a check like they did in the old days but
10  whatever.
11   **A   I sent a wire.**
12   Q   Okay.  When you sent the wire transfer,
13  it was a wire transfer to Labor Smart, not to
14  Takeover; correct?
15   **A   I don't recall the exact beneficiary on**
16  **the wire.**
17   Q   Do you remember when that was?
18   **A   June of '21.**
19   Q   And whether the wire went to Labor Smart
20  or directly to Takeover, your understanding was
21  that it was going to be used for Takeover; is that
22  true?
23   **A   Yes.**
24   Q   Okay.  Who approached you about doing
25  that?

---

**30**

1    **A   Jason Tucker.**
2    Q   And do you remember the circumstances
3   around that?
4    **A   Not really.  Not specifically.**
5    Q   How long had you known Jason Tucker?
6    **A   I hadn't.  I was introduced to him, and**
7   **he introduced himself and asked me if I would be**
8   **interested in helping the company, and I said yes.**
9    Q   Okay.  By the way, to your knowledge,
10  does Takeover have any employees today?
11   **A   No.**
12   Q   Do you know whether Takeover ever had
13  employees?
14   **A   I believe it did.  Yeah.  I believe so.**
15   Q   From when to when do you understand?
16   **A   I would say when it started, sometime in**
17  **January '21, until it was -- it ceased while**
18  **operations sometime in mid- to late '22.**
19   THE WITNESS:  Am I allowed to ask a
20  question?
21   MR. HARVEY:  Unfortunately not.
22   THE WITNESS:  Okay.
23   MR. BENNION:  Well, if you need to go to
24  the bathroom or something like that --
25  THE WITNESS:  Oh.  No.  No, no, no.

---

**31**

1   It's a -- it's a question about the deposition and
2   the answers and stuff.
3    MR. BENNION:  Just we're here for the
4   deposition.  Mr. Harvey's going to ask you
5   questions.  I will object.  You answer.  If you
6   feel like you need to have a discussion with me,
7   there's no question before you now; so we could
8   take a break if Mr. Harvey allows it.
9    THE WITNESS:  I don't need a break.
10  It's really just a very quick question.  No?  It
11  doesn't work like that?  Okay.
12   MR. HARVEY:  I'm hoping to get him out
13  of here as quickly as possible.  If you want to ask
14  it -- and we'll say whether you can -- whether we
15  can or will.
16   THE WITNESS:  Okay.
17   MR. HARVEY:  How about that?
18   THE WITNESS:  Okay.  There's not a lot
19  of yes or no questions.
20   MR. BENNION:  These are conversations
21  between you and me.
22   THE WITNESS:  Oh, okay.
23   MR. BENNION:  You're on the record here.
24  He asks questions.  Answer the questions and -- the
25  best of your knowledge.

---

**32**

1    THE WITNESS:  Okay.
2    MR. BENNION:  You're under oath, and
3   that's been explained to you.
4   BY MR. HARVEY:
5    Q   At any point, have you ever been an
6   officer of Takeover?
7    **A   Yes.**
8    Q   From when to when?
9    **A   I'm believing April 23ish to current.**
10   Q   And do you have a specific title as an
11  officer?  CEO?  COO?  anything like that?
12   **A   Yes.**
13   Q   And what -- has it been more than one or
14  --
15   **A   I believe it's CEO.**
16   Q   That whole time frame?
17   **A   Yeah.  Well, I believe so, and don't**
18  **quote me, please, Mr. Harvey.  No.  I guess you**
19  **have to, but I don't -- I don't recall if it is, in**
20  **fact, CEO.**
21   Q   Okay.  In any event, your understanding
22  is you've been an officer since around April of
23  2023?
24   **A   Yes.  Yes.  Yes.**
25   Q   And you remain an officer today?

---

33

1    A   Yes.
2    Q   Okay.
3        THE REPORTER:  Could I pause for just a
4    second?  My battery's running low.
5        MR. HARVEY:  Sure.
6        MR. BENNION:  Yeah, please.  Please.  I
7    need to stretch my leg.
8        THE VIDEOGRAPHER:  Go off the record?
9        MR. BENNION:  Let's go off the record.
10       THE VIDEOGRAPHER:  Yeah.  Sure.  We are
11   going off the record.  The time is 8:50 a.m.
12       (Off the record.)
13       (On the record.)
14       THE VIDEOGRAPHER:  We are back on the
15   record.  The (audio dropped.)
16   BY MR. HARVEY:
17       Before we went off the record, you said
18   you had been an officer of Takeover from about
19   April 2023 to the present; correct?
20   A   That's my recollection.
21   Q   And you thought you were a CEO?
22   A   Yes.
23   Q   Okay.  Did James Deppoleto provide
24   written consent for your appointment as Takeover's
25   CEO?

34

1        MR. BENNION:  Objection to the extent it
2    m may call for speculation.  Lacks foundation.
3        Go ahead.
4    A   I don't recall.
5    Q   Are you aware of any officer or director
6    of Takeover seeking Mr. Deppoleto's consent to have
7    you appointed as Takeover's CEO?
8        MR. BENNION:  Same objection.
9    A   I don't recall.
10   Q   What's your understanding of your duties
11   and responsibilities to Takeover since April of
12   2023?
13   A   I believe it's my obligation to do
14   everything I can to protect it, preserve it, and
15   help it, you know.
16   Q   Now when I asked you about your
17   employment history before, you didn't mention
18   working for Takeover as its CEO.  Should we add
19   that to your list of employment for the last ten
20   years?
21   A   Well, I'm not compensated, Mr. Harvey.
22   So I guess I should have asked -- been more clear.
23   If you're asking me what I've gotten paid for,
24   that's what I asked, or that's what I answered.
25   Q Okay.  Thank you for clarifying that.

35

1    A   Yeah.
2    Q   So when I asked you earlier, whether you
3    were compensated or not, have you had any other
4    employment history in the last ten years other than
5    what we've talked about so far?
6    A   Then the answer is yes.  I've worked
7    with Takeover and Next Gen Beverages.
8    Q   Okay.  What is your title at Next Gen
9    Beverages?
10   A   CEO -- interim CEO, officially.
11   Q   And from when to when did you -- well,
12   you still are with Next Gen Beverages; correct?
13   A   Correct.
14   Q   When did you begin any affiliation with
15   Next Gen Beverages?
16   A   I believe when that company was formed,
17   and I'm guessing Juneish, June '23.
18   Q   June 2023?
19   A   Yes, sir.
20   Q   Okay.  Other than Takeover and Next Gen
21   and the other positions that you told me about
22   about ten minutes ago, any other employment in the
23   last ten years whether compensated or not?
24   A   No.
25   Q   Okay.  So when I asked you what your

36

1    roles or responsibility or obligations to Takeover
2    were, you said, do everything you can to protect
3    and preserve it; correct?
4    A   Yes.
5    Q   What specifically have you done to
6    fulfill that obligation?
7    A   Well, I think if we talk about the
8    earlier engagement, it was negotiate -- try to
9    negotiate settlements, try to get products back
10   online, try to position it so it could proceed.  It
11   was being sued by multiple people.  Still is.
12   Capitalized it, spoke to the shareholders and the
13   owners of it, including Mr. Deppoleto.
14   Q   Anything else?
15   A   Handled all -- everything that I -- that
16   was in my purview for compliance issues.
17   Q   Meaning?
18   A   Accounting, licensing, insurances.  I
19   mean, just everything that could be done to help
20   the company, I did to the best of my ability.
21   Q   And you prefaced all that by saying the
22   earlier engagement.  Do you mean when you came on
23   board in April of 2023?
24   A   Yeah.  I was -- I was working from a
25   distance, if you will, prior to April of '23.  I

37

1 officially took the role in April.
2    Q   When you say working from a distance,
3 what do you mean by that?
4    A   Like, just trying to help.  Just trying
5 -- you know, saw a genuine need.  That people were
6 disenfranchised.  There was a lot of misconception,
7 misinformation.  I knew the company was in dire
8 straits, and I did what I could to try and jump in
9 and help it.
10    Q   And, again, you prefaced all that by
11 saying the earlier engagement.  Moving all that
12 list of things you just told me from -- you started
13 in April of 2023 with those things.  When did you
14 stop doing those things?
15    A   No.  The -- all of those things were
16 done prior to the official April '23 date.  Like,
17 that took place when I started, when I realized
18 that they were not making payments to me and there
19 were challenges financially with the company, and
20 I'm guessing that was sometime Decemberish '22.  I
21 believe that's when I first reached out to
22 Mr. Deppoleto.
23    Q   Okay.  So when you took over the
24 official position in April of 2023, how, if at all,
25 did your work on behalf of the company change?

38

1    Q   Only in an official capacity.
2    Q   Okay.  So things like accounting, you
3 were doing that before and after?
4    A   Not accounting.  I'm not the accountant.
5    Q   Okay.  Well, I thought you mentioned
6 that was something that you were helping out with
7 as you said accounting, insurance.
8    A   Yeah.  Like, making sure the accounting
9 was done for compliance reasons.  Takeover is owned
10 by Labor Smart, Mr. Harvey, and, as such, it has
11 responsibilities to its parent company.
12    Q   Okay.  Okay.  Do you have any formal
13 title with Labor Smart?
14    A   I believe interim CEO.
15    Q   How long have you had that title?
16    A   I would say mid-'23, officially,
17 Mr. Harvey.
18    Q   Why did you become the interim CEO of
19 Labor Smart in mid-2023?
20    A   The goal, the purpose for my engagement,
21 was to get the company trading publicly.  And --
22    Q   When you say the company, do you mean
23 Labor Smart?
24    A   Yeah.  Labor Smart.  That was
25 -- and help the shareholders.  That was

39

1 the purpose of my whole engagement was to help the
2 shareholders that were disenfranchised by
3 Mr. Tucker and Mr. Deppoleto's actions.
4    Q   When you say your goal is to get Labor
5 Smart trading publicly, wasn't it trading publicly
6 before mid-2023?
7    A   It was, and then it became delisted due
8 to lack of -- I don't even know the words.  Just --
9 it just was not -- all those things I did, that I
10 said I did to protect it and the shareholders,
11 those things weren't being done by the previous
12 management.
13    Q   Of Labor Smart?
14    Q   Of Labor Smart, of Takeover.
15    Q   Now, as I understand it from previous
16 depositions, there was an overlap in management at
17 both Takeover and Labor Smart.  Is that accurate?
18    MR. BENNION:  Objection to the extent
19 that it may call for speculation.  Vague and
20 ambiguous.  Lacks foundation.
21    Go ahead.
22    THE WITNESS:  I'm sorry.  Say the
23 question again.
24    MR. HARVEY:  Sure.
25 Q   My understanding from previous

40

1 deposition testimony in this case is that there was
2 overlap in the management between Labor Smart and
3 Takeover.  Is that a fair characterization?
4    A   I believe so.  I don't know the
5 specifics, but I believe so.
6    Q   And it was also my understanding, from
7 previous testimony that although Labor Smart
8 started off in the temping space, like you just
9 told me about, when Takeover was brought on board,
10 perhaps not right away, but the temping function in
11 Labor Smart was moved out to a private company.  Is
12 that your understanding?
13    A   Yes.
14    Q   And from that point forward, although
15 Labor Smart was still called Labor Smart,
16 essentially its only asset, for at least a period
17 of time, was Takeover in the drink business.  Is
18 that fair?
19    A   I believe so.
20    Q   Okay.  Do you know why Labor Smart got
21 out of the temp space?
22    A   I do not.
23    Q   And in terms of the overlap in
24 management, is it your understanding that that was
25 taking place because Labor Smart, for all intents

Transcript of Thomas Zarro
Conducted on November 21, 2024

---

41

1 and purposes, was only operating through Takeover
2 in the energy and hydrogen water business?
3     MR. BENNION: Objection to the extent it
4 may call for a legal conclusion.
5     You can go ahead.
6     **A   Oh, yeah.  I think at the time they were**
7 **--**
8     MR. HARVEY: And, again, if he objects,
9 unless he tells you not to answer, go ahead and
10 just answer.
11    THE WITNESS: Okay.
12    Q   Okay.  So in terms of your -- taking you
13 back to your role as Takeover's CEO, I just want to
14 close the loop here.  In terms of insurance, you
15 were making sure that insurance was taken care of.
16 Is that fair?
17    **A   I was making a generality that, you**
18 **know, with any company, there's a million things,**
19 **and those million things were being watched to the**
20 **best of my ability.**
21    Q   Did Takeover ever have directors and
22 officers' insurance?
23    **A   I don't believe it did when I came on.**
24    Q   And you seem like you qualified that by
25 saying when you came on?  Did it later?

---

42

1     **A   Yes.**
2     Q   From when to when?
3     **A   I don't -- I don't recall, but I made**
4 **sure of it when I -- when I came on, you know,**
5 **trying to do the right things for the company.**
6     Q   So at some point after April of 2023,
7 when you became the CEO, you did, in fact, procure
8 D&O insurance for Takeover; correct?
9     **A   I instructed others to make sure it got**
10 **procured.**
11    Q   Who did you instruct to do that?
12    **A   Mike Holley.**
13    Q   And did Mike Holley actually do that?
14    **A   I believe so.**
15    Q   So there's an insurance policy somewhere
16 that you believe Mike Holley procured at some point
17 after April of 2023?
18    **A   I believe so.**
19    Q   Okay.
20    MR. HARVEY: Counsel, that has not been
21 produced to us.  Obviously, we're making a request
22 for it.
23    MR. BENNION: Understood.
24    MR. HARVEY: Thank you.
25 QTo your knowledge, is that policy still

---

43

1 in effect today or a new policy?
2     **A   I sure hope so.**
3     Q   All right.
4     **A   I don't have the particulars,**
5 **Mr. Harvey.  I don't know if it's, you know.**
6     Q   Okay.  Now I was asking you about
7 positions as an officer with Takeover.  I want to
8 transition slightly.  Have you ever been a board
9 member of Takeover?
10    **A   I believe I am on the board of Takeover.**
11    Q   Okay.  When did you first become a board
12 member?
13    **A   I believe that was in early '23ish.**
14    Q   And have you had -- have you been, for
15 example, the board chairman in that time -- during
16 that timeframe?
17    **A   I don't believe I'm chairman.**
18    Q   Okay.  But you are still a board member
19 today, to your knowledge?
20    **A   I believe so.**
21    Q   Did James Deppoleto ever provide written
22 consent for your appointment to the Takeover Board?
23    **A   I don't -- I don't believe so.**
24    Q   Are you aware of any other officer or
25 director of Takeover seeking Mr. Deppoleto's

---

44

1 consent to have you appointed to the Takeover
2 Board?
3     **A   I don't recall.  I honestly don't know.**
4 **They were -- yeah.  I don't know.**
5     Q   And what's your understanding of your
6 responsibility as a board member of Takeover?
7     **A   To protect the company to the best of my**
8 **ability and its owners.**
9     Q   And you said owners, plural.  Is there
10 another owner other than Labor Smart?
11    **A   Yes.**
12    Q   Who or what?
13    **A   Well the shareholders of Labor Smart are**
14 **the owners, including Mr. Deppoleto.  He's a big**
15 **one.**
16    MR. BENNION: A belated objection to the
17 extent it may call for a legal conclusion.
18    Q   In terms of your board member role with
19 Takeover -- so set aside your CEO role -- what have
20 you done to fulfill your duty as a board member of
21 Takeover since you became a board member?
22    MR. BENNION: Objection to the extent it
23 may call for a legal conclusion.  Vague and
24 ambiguous.
25 Go ahead.

45

1     A    The -- you know, we have -- I believe
2  all board members have fiduciary duties to protect,
3  preserve, you know, be honest, be forthright,
4  monetize all involved in the entity.  And in this
5  particular entity, it was owned by a public
6  company.  The public company has many, many
7  shareholders, including your client.  So I've
8  worked very hard to make sure that the owners of
9  that company get their due, and I've delivered on
10 that in large degree, again, for Mr. Deppoleto.
11     Q    So correct me if I'm wrong, but I'm
12 guessing you don't track your time like we lawyers
13 are sometimes forced to do?
14     A    Yeah.  Don't talk to me about lawyers'
15 time, please.
16          MR. BENNION:  There's no question before
17 you.
18          THE WITNESS:  Oh, I'm sorry, sir.
19     Q    Actually, do you track your time like
20 lawyers do?
21     A    I do not.
22     Q    Okay.
23     A    I do not.
24     Q    Congratulations.
25 A    Yes.

46

1     Q    What I'm getting at, though, with the
2  question is -- I understand you gave me a bunch of
3  things that you did in terms of your role as
4  Takeover's CEO.  Are there things that you have
5  done solely in your capacity as a board member for
6  Takeover that are distinct from what you told me
7  you did in your role as a CEO?
8          MR. BENNION:  Same objection to the
9  extent it's vague and ambiguous.  Lacks foundation.
10 May call for a legal conclusion.
11          Go ahead.
12     A    It would be very hard for me to
13 differentiate, Mr. Harvey.
14     Q    Okay.  Have you ever received any
15 compensation from Takeover at all?
16     A    I have not gotten paid.
17     Q    And even if you haven't been paid,
18 compensation could include, for example, additional
19 shares that have not been cashed in.  Any
20 compensation whatsoever.  Have you received any
21 compensation?
22     A    I believe I've been issued shares.  They
23 have not been cashed in or recognized.
24     Q    You've been issued shares in Takeover or
25 Labor Smart?

47

1     A    In Labor Smart.
2     Q    For your efforts to assist Takeover.  Is
3  that what you're saying?
4     A    Yes.  And the company in general.
5     Q    How many shares were you issued?
6     A    I believe -- for Takeover?
7     Q    For your work that you did for Takeover.
8     A    I believe 50 million.
9     Q    And when was this?
10     A    Months ago.
11     Q    In 2024?
12     A    I believe so, yes.
13     Q    And was there a document that documents
14 this transfer of shares?
15     A    I would assume.  Again, I don't handle
16 the share issuances.
17     Q    Who authorized this issuance of shares?
18     A    Mike Holley and the board.
19     Q    Of Labor Smart?
20     A    Yes.
21     Q    Who's on the Board of Labor Smart today?
22     A    Tom, me; Mike Holley, Manny Pacquiao,
23 Luis Sequeira -- I don't know how to pronounce his
24 last name -- Luis Sequeira; Tom Fitzgerald, Sr.,
25 Brad Wyatt, and Scott Darnell.

48

1     Q    Other than in terms of your involvement
2  with Labor Smart, you told me that you began
3  investing in around 2013 or 2014, and then you also
4  told me that you were -- you've been the interim
5  CEO since around mid-2023.  Have you had any other
6  involvement with Labor Smart?
7     A    Since '23 or in between?
8     Q    At any point other than --
9     A    Well, since '23, yes, very much so.
10 It's like a full-time job.
11     Q    Let me ask it this way:  So your first
12 involvement with Labor Smart -- you were a
13 shareholder beginning in '23 -- in 2013-2014;
14 correct?
15     A    Correct.
16     Q    And then in mid-2023, you became the
17 interim CEO of Labor Smart; correct?
18     A    Correct.
19     Q    So that's kind of two hats that you've
20 had with Labor Smart.  Fair?
21     A    Well, in fact, just retail investor and
22 then insider director.  Yes.
23     Q    Okay.  Have you ever held any other
24 positions with Labor Smart, be it employee? board
25 member?  Well, I think you just told me board

Transcript of Thomas Zarro
Conducted on November 21, 2024

---

49

1  member too.
2      A  Mm-hmm.  Yeah.  Board member.
3      Q  Okay.  So you've had three roles --
4  interim CEO, board member, and shareholder?
5      A  Yes.
6      Q  Okay.  Any other roles that you've had
7  with Labor Smart other than those three?
8      A  Not that I can put a title to.
9      Q  When did you become a board member of
10  Labor Smart?
11      A  I think it was in that mid-'23
12  timeframe.
13      Q  Now if you became an investor in Labor
14  Smart around 2013-2014, why did you not take on a
15  larger role with Labor Smart until around mid-2023?
16      A  The reason I became involved was because
17  my private note was not getting paid.  That caused
18  me to insert myself to understand the facts.  Once
19  I did that, I realized kind of what was taking
20  place and found an opportunity to try and help out.
21  Prior to that, the company was being managed and
22  ran.
23      Q  Okay.  So in terms of your duties and
24  responsibilities at Labor Smart -- let's say the
25  day before you became a board member or the interim

50

1  CEO -- what were your duties and responsibilities
2  for that time frame?
3      A  I think I was doing most of the same but
4  not in an official capacity.
5      Q  When did you begin doing those duties?
6      A  I believe early '23.  Very early '23.
7      Q  Okay.  And so the fact that you were
8  named interim CEO and/or board member in mid-2023,
9  that didn't bring about a change in your duties or
10  responsibilities to Labor Smart?  It was just a
11  continuation of what you had already been doing.
12  Is that fair?
13          MR. BENNION:  Objection.  Calls for a
14  legal conclusion.  Lacks foundation.
15      A  For the most part, Mr. Harvey.
16      Q  Okay.  Is Labor Smart the sole
17  shareholder of Takeover?
18      A  I can't answer the question.  I don't
19  understand it.
20      Q  Does Takeover have shareholders?
21      A  Yes.
22      Q  Is Labor Smart the only shareholder of
23  Takeover?
24      A  Labor Smart is the owner of Takeover.
25      Q  Are there shareholders other than Labor

51

1  Smart?
2          MR. BENNION:  I'm going to state an
3  objection to this line of questioning to the extent
4  it may call for a legal conclusion.
5          Go ahead.
6      A  Are there other shareholders of
7  Takeover, yes, I believe so.
8      Q  That own direct shares in Takeover or --
9      A  I believe so.  Yes.
10      Q  Okay.  Who else are you aware of who
11  owns a direct share?
12      A  I think James Deppoleto is one of them.
13  I don't know the others because -- yeah.  I think
14  James.
15      Q  Is, to your knowledge, Labor Smart the
16  majority shareholder of Takeover?
17      A  The majority owner.  Yes.
18      Q  What's the distinction you draw between
19  owner and shareholder?
20      A  I don't know the exact share structure
21  of Takeover.  I do on Labor Smart, and I do -- I
22  know that Labor Smart is a 97ish percent owner of
23  Takeover.
24      Q  Who, to your knowledge, would know the
25  exact breakdown of the shares of Takeover in terms

52

1  of who owns what?
2      A  The transfer agent.
3      Q  Who's the transfer agent?
4      A  Clear Trust.
5      Q  Where are they based out of?
6      A  Florida.
7      Q  Is there a specific individual at Clear
8  Trust?
9      A  Not that I deal with.  I don't -- I
10  don't get into the weeds.
11      Q  Okay.  What is Next Gen Beverages LLC?
12      A  It is a wholly owned subsidiary of Labor
13  Smart.
14      Q  And I think you told me a little bit
15  earlier, but let me just -- now that we're focusing
16  on Next Gen Beverages, what is your involvement
17  with Next Gen beverages?
18      A  Interim CEO.  Actually, hang on.  Yeah,
19  I think interim CEO.  Oh, no, I take that back.
20  There is no officers.  I am a member -- a member,
21  comanager.
22      Q  Who are the other members?
23      A  It's me and Mike Holley.  There's only
24  two of us.
25      Q  Is Mike Holley also a manager, or is he

Transcript of Thomas Zarro
Conducted on November 21, 2024

53

1   just a member?
2       A   I don't know the distinction, sir.  I'm
3   considering them both the same.
4       Q   Okay.  Why are you two the only members?
5       A   Because the goal was to make sure it was
6   wholly owned by Labor Smart.
7       Q   Why was that the goal?
8       A   Well, because it all points back to the
9   original goal, which is to protect the, at that
10  time, disenfranchised owners of Labor Smart and
11  Takeover.
12      Q   And when you say disenfranchised owners,
13  what do you mean by that?
14      A   None of the requirements were being met
15  to get the company trading.
16      Q   Such as what?
17      A   Audits for financials, forming an
18  official board, verifying profile on OTC Markets.
19  The list is horrendous.
20      Q   OT -- what did -- the last thing you
21  said -- OTC Markets.  What --
22      A   Yes, sir.  OTC Markets is where the
23  parent company trades.
24      Q   What did you say before OTC Markets?  I
25  didn't catch the phrase.  You said something OTC

54

1   Markets.
2       A   I don't recall.  Should we ask our
3   lovely court reporter for --
4       Q   That's okay.  I'll ask it a different --
5   you said the company, to get trading again, needed
6   audits and something.  It needed to do something
7   with OTC Markets.  What was that?
8       A   Oh.  Oh, a verified profile.  Like,
9   there's an official checklist that's required in
10  order to get trading on OTC Markets.  None of those
11  were being done.  We did them to protect the owners
12  of Takeover and Labor Smart.
13      Q   So you were doing all of this on behalf
14  of Next Gen Beverages; correct?
15          MR. BENNION:  Objection to the extent it
16  may call for a legal conclusion.
17      A   No.  We were doing it on behalf of the
18  shareholders of Takeover, Labor Smart.
19      Q   So that's where I'm getting tripped up
20  because what led to this question was I was asking
21  you about Next Gen Beverages.  And I said, Why were
22  you and Mr. Holley the only members?
23          And then you went on to say, Well, the
24  goal is to make sure that it was wholly owned by
25  Labor Smart; and then you said to protect the

55

1   disenfranchised owners, et cetera, et cetera.
2       A   Correct.  For Labor Smart.  Not Next
3   Gen, for Labor Smart.
4       Q   Okay.  So that's where I'm getting
5   tripped up.  How does Next Gen Beverages help you
6   do any of what you were trying to accomplish?
7       A   Well, because Labor Smart needed a
8   company that could survive an exchange in commerce
9   so that its stock would be tradable.
10      Q   And Takeover, by this point, had already
11  been going for, if my math's right, about two and a
12  half years; correct?
13      A   No.  Incorrect.
14      Q   What's incorrect about it?
15      A   It stopped going.
16      Q   Okay.  Well, Takeover was formed in
17  early 2021.  We agree on that.
18      A   Correct.  Correct.
19      Q   And Takeover for a time was operating;
20  correct?
21      A   For a time.
22      Q   And so why not do all of those steps
23  that you just described for Takeover?
24      A   We did, to the best of our ability, but
25  Takeover was being sued.  It had lost its

56

1   trademark.  It had lost its Amazon store.  It had
2   lost its website.  It had no money.  It had
3   absolutely no viable path to success in commerce.
4       Q   So you said a few things there:  Let me
5   try and unpack it.  Sticking with the trademark
6   issue.
7       A   Mm-hmm.
8       Q   Takeover could have gotten another
9   trademark; correct?
10          MR. BENNION:  Objection to the extent it
11  may call for a legal conclusion.
12      A   It's possible.
13      Q   Did you ever attempt to obtain another
14  trademark for Takeover?
15      A   I don't recall.  I'm sure, at the
16  beginning, yes, we did.  In fact, Mr. Harvey, we
17  fought valiantly for the NXTLVL trademark and lost
18  that in litigation.
19      Q   Sure.  But, for example, my
20  understanding is that Next Gen operates under the
21  brand name of LOCK'D IN, which is L-O-C-K'D I-N; is
22  that correct?
23      A   Yes.  That's one of the brands.
24      Q   And is that trade -- LOCK'D IN -- is
25  that trademarked?

Transcript of Thomas Zarro
Conducted on November 21, 2024

---

57

1    A  It is.
2    Q  So why not trademark LOCK'D IN for
3 Takeover?
4    A  I think the decision was made, in our
5 best judgment, that Takeover could not be saved.
6 It's like, why take anything viable and put it in
7 an inviable vehicle?
8    Q  When Next Gen -- well, when was Next Gen
9 formed?
10   A  I'm thinking, again, Juneish '23.
11   Q  June of 2023?
12   A  Juneish.  Don't hold me to it, please.
13   Q  At that time Takeover's liabilities were
14 greater than its assets; correct?
15   A  Substantially.
16   Q  And even though Takeover could have
17 trademarked LOCK'D IN, neither you nor anyone else
18 from Takeover tried to trademark LOCK'D IN for
19 Takeover; correct?
20   A  I don't recall.
21      MR. BENNION:  Objection.  Calls for a
22 legal conclusion.  Lacks foundation.
23      Go ahead.
24   A  I don't recall.  We may have.
25 Q  Well, if Next Gen was able to get the

---

58

1 trademark for LOCK'D IN, why would Takeover not
2 have been able to do the same?
3    A  I don't recall whether we officially
4 tried to get LOCK'D IN under Takeover.  Takeover
5 was substantially damaged, tarnished, horrible
6 name, and embroiled in multiple cases of
7 litigation.  Those things do not allow for federal
8 trademarks, federal licensing, federal trading,
9 trading on the OTC Markets.
10   Q  Why do you say that it doesn't allow for
11 it?
12   A  Because they scrutinize companies.  Like
13 there's standards.
14   Q  Say some more on that.  I'm not quite
15 following you.
16      MR. BENNION:  Objection.  Vague and
17 ambiguous.  Lacks foundation.
18      Go ahead.
19   A  Like, there's standards that companies
20 are held to in order to apply for bank accounts,
21 trading accounts, audits.  Like, for example,
22 Mr. Harvey, Takeover -- there was no taxes filed
23 for Takeover.
24   Q  Why not?
25 A  AI -- because of the incompetence of the

---

59

1 previous manager.
2    Q  When you came along, did you attempt to
3 rehabilitate the taxes?
4    A  Yeah.  Not only did I attempt to, I did.
5 I got it done.
6    Q  So after that hurdle was cleared, why
7 couldn't you move forward with trying to trademark
8 LOCK'D IN or any other name?
9    A  Just way too many hurdles.
10   Q  Such as?
11   A  Repeating myself, embroiled in
12 litigation for starters, substantially upside down
13 in debt, upside down millions and millions of
14 dollars and didn't see any ability to create
15 investor -- an environment where an investor would
16 want to come in and capitalize a company that was
17 so far upside down, tarnished, damaged, wounded,
18 kicked.
19   Q  Did you consider changing the name of
20 Takeover?
21   A  Like -- no.  I think that would be, I
22 would almost suggest, illegal in my mind.
23   Q  The same individuals who were involved
24 in Next Gen Beverages were the same, for the most
25 part, individuals who were involved with Takeover;

---

60

1 correct?
2    A  No.  Different.  Mostly a different cast
3 of characters.
4    Q  Well, yourself and Mr. Holly -- you were
5 both involved with Takeover; correct?
6    A  Well, yeah, I guess.  Me, for a very
7 short period, him from the beginning.  Yes.
8    Q  Okay.  And you were also involved with
9 Next Gen; correct?
10   A  Correct.
11   Q  And when you were attempting to move
12 forward with Next Gen and make it profitable, you
13 did things on behalf of Next Gen; correct?
14   A  Correct.
15   Q  And when you were doing those things, by
16 definition, you were not spending that time
17 resurrecting Takeover; true?
18      MR. BENNION:  Objection.  Vague and
19 ambiguous.  Lacks foundation.
20      Go ahead.
21   A  That's a -- it sounds like a tricky
22 question, Mr. Harvey.  Everything we did for Next
23 Gen benefited the owners of Takeover.  So one might
24 say everything we did here benefited here.  Does
25 that mean that they were done simultaneously, no,

---

61

1 but they benefited each other. I'm not trying to
2 get cute, but --
3    Q   Well, let me ask it more direct. Did
4 anything you were doing with Next Gen Beverages
5 lead to dollars being placed in Takeover's bank
6 account?
7    A   Yes.
8       MR. BENNION: Objection. Vague and
9 ambiguous.
10      Go ahead.
11   Q   Okay. Explain that to me. How?
12   A   Well, because we've had to fund it
13 legally for this defense. So we have had to seek
14 investment, if you will, into the parent company so
15 that we could fund its subsidiaries and keep them
16 viable and hope something could, you know, change,
17 break free, be sold, monetized.
18   Q   But you're referring to Labor Smart with
19 that last answer, not Next Gen Beverages; correct?
20   A   Yeah.
21   Q   So in terms of -- let's say you spent an
22 hour on a Tuesday doing work for Next Gen
23 Beverages. Are you with me?
24   A   Yes.
25 Q   How would that lead to dollars being

62

1 placed in Takeover's bank account directly?
2       MR. BENNION: Objection. Vague and
3 ambiguous. Lacks foundation.
4       Go ahead.
5    A   Well, everything we do for Next Gen is
6 for the benefit of Labor Smart and its
7 shareholders. Because we have that benefit, we're
8 able to function. And because we're able to
9 function, we're able to fund its subsidiaries --
10 Takeover.
11   Q   And when you say fund it, other than
12 funding the litigation, how else is Labor Smart
13 funding it?
14   A   Like what else does the money go for?
15   Q   Sure.
16   A   Accounting, legal, compliance.
17   Q   Anything to actually grow Takeover?
18      MR. BENNION: Objection. Vague and
19 ambiguous. Calls for speculation. Lacks
20 foundation.
21      Go ahead.
22   A   Anything to grow Takeover? No. I can't
23 specifically point to anything.
24   Q   And anything that you do for Next Gen
25 doesn't specifically benefit Takeover's creditors

63

1 either; correct?
2       MR. BENNION: Objection. Calls for
3 speculation.
4    A   False. Incorrect.
5    Q   How is that false?
6    A   Because if there was no parent company
7 being protected by the commerce of its other
8 subsidiaries, Takeover would be folded. The parent
9 company would be folded, and there would be no
10 ability to pay any creditors.
11   Q   What are you doing today to
12 affirmatively grow Takeover?
13   A   We're growing its parent company.
14   Q   But to specifically grow Takeover?
15      MR. BENNION: Objection. Calls for a
16 legal conclusion. Vague and ambiguous.
17   A   When you say the word grow, that's a
18 subjective word. If you're saying what are we
19 doing today to make Takeover better, things like
20 this -- trying to settle lawsuits, trying to
21 eliminate debt on its books.
22   Q   Are you doing anything today to bring in
23 dollars into Takeover?
24      MR. BENNION: Same objection to this
25 entire line of questioning.

64

1    A   Once again, Mr. Harvey, yes, but we have
2 to protect its sister subsidiaries, its parent, so
3 that we can continue to fund it in hopes that maybe
4 something will break free.
5    Q   Are you doing anything today to increase
6 Takeover's sales?
7    A   No.
8    Q   When is the last time you did something
9 to increase Takeover's sales?
10   A   January, February, March, April of '23
11 would probably be the last, you know. It's my
12 guess, but I don't recall specifically. I would
13 say early '23 would be a better answer.
14   Q   When is the last time you did anything
15 to increase Takeover's profit?
16      MR. BENNION: Objection. Calls for a
17 legal conclusion. Vague and ambiguous.
18   A   I don't know how to answer the question.
19 When there's no revenue, how can you have profit?
20   Q   Well, I -- my first -- my question
21 before that was about sales. I wanted to broaden
22 it a little bit.
23   A   No sales, no profit.
24   Q   Okay. When's the last time you were
25 aware of -- not just you, but anybody doing

Transcript of Thomas Zarro
Conducted on November 21, 2024

65

1 anything to increase Takeover's sales?
2    **A   I think early '23.**
3    Q    And what specifically was done at that
4 time?
5    **A   I think resurrect everything that we**
6 **thought was there but wasn't.  For example,**
7 **Mr. Harvey, save the trademark, get the trade --**
8 **get the website up and running, get the Amazon**
9 **store up and running, get the social media up and**
10 **running, to do all the things that the company once**
11 **had that -- or -- excuse me -- that the company**
12 **thought it had but didn't.  So, yes, early '23 was**
13 **a mad scramble to try and save Takeover, of course.**
14   Q    And why did you and/or others stop doing
15 those things?
16   **A   Because it was just a futile task.**
17   Q    And you understood at that time that
18 Takeover had creditors; correct?
19   **A   Yes.**
20   Q    Including Mr. Deppoleto?
21   **A   Absolutely.  We were in contact often.**
22   Q    Circling back to Next Gen, you told me
23 that you are a member/manager of Next Gen; correct?
24   **A   I think technically, yes.**
25 Q Have you had any other roles with Next

66

1 Gen? COO? CEO? anything like that? employee?
2    Q    Just the multiple hats that anybody
3 wears in a small, underfunded company.
4    Q    But in terms of formal titles --
5    **A   Yes.**
6    Q    -- as far as you know, you've only been
7 a member/manager?  Yes?
8    **A   Yes.  I'm sorry.**
9    Q    Thank you.  Have you received any
10 compensation from Next Gen Beverages?
11   **A   None.  Cash compensation, no.**
12   Q    Other than cash or --
13   **A   Cash compensation, no; shares, yes.**
14   Q    And these were shares in Next Gen
15 Beverages or Labor Smart?
16   **A   Labor Smart as Next Gen Beverages is**
17 **wholly owned.**
18   Q    How many shares did you receive?
19   **A   400 million.**
20   Q    How much are those worth today?
21   **A   600,000, maybe, dollars.**
22   Q    When did you --
23   **A   Six to 800,000.**
24   Q    When did you receive those?
25 A I really don't know.  I think sometime

67

1 in 2024.
2    Q    And why did you receive those shares?
3 What specifically was the purpose?
4    **A   I think as incentive to stay involved**
5 **and try to get it turned into something.  The**
6 **company has no cash.  So --**
7    Q    Now you said you've been an investor in
8 Labor Smart since 2013-2014.  So fair to assume you
9 had shares since at least that point in Labor
10 Smart?
11   **A   Yes.**
12   Q    And those 400 million shares, that you
13 just described, those were in addition to whatever
14 you held before you received them; true?
15   **A   Yes.**
16   Q    How many shares do you own in Labor
17 Smart today?
18   **A   I could not tell you, Mr. Harvey.**
19   Q    Do you have even a ballpark?
20   **A   Yes.  My assumption is 1.3 billion.**
21   Q    So if my math, which is not good, but if
22 it's sort of --
23   **A   Actually --**
24   Q    -- good --
25 A   -- can I go -- I need to clarify

68

1 something.
2       MR. BENNION:  Can you just wait till he
3 asks the question?
4       THE WITNESS:  I'm sorry.  Go ahead,
5 Mr. Harvey.
6       MR. HARVEY:  It sounded like you wanted
7 to clarify something.
8    Q    Did you want to clarify something?
9    **A   Not if I'm going to be in trouble.  I**
10 **need to take my answer back.  I don't have 1.3**
11 **billion shares of common shares of Labor Smart.  I**
12 **think I have about 850 -- 850,000 -- 850 million**
13 **common shares.**
14   Q    And you said common shares.  Is there a
15 different type of share that you own?
16   **A   We can't get anything past you, can we?**
17 **Yes.**
18   Q    What's the other?
19   **A   The preferred eight shares.**
20   Q    And what's a preferred eight share?
21   **A   A preferred eight share converts into**
22 **100 million common shares, and I believe I own four**
23 **of those.**
24   Q    What would be the event that would
25 trigger the converting?

---

69

1    A   I believe it's upon my request as the
2  shareholder.
3    Q   When did you receive those preferred
4  eight shares?
5    A   I believe that was earlier in '24. I
6  don't know exactly when.
7    Q   Okay. So if we're just talking about
8  the common shares, it sounds like 850 million if my
9  math is right. Based on what you told me about the
10 400 million, those are probably worth ballpark 1.2
11 to 1.6 million?
12       MR. BENNION: I'm going to state an
13 objection. Lacks foundation. May call for
14 speculation.
15       Go ahead.
16    A   Approximately. Yes.
17    Q   And then you've got the four preferred
18 eight shares, a hundred million if and when you
19 convert them. So that's probably another 600- to
20 $800,000; correct?
21    A   Yes. Yes.
22    Q   Okay. So other than the shares in Labor
23 Smart, I asked you if you got compensation from
24 Next Gen, and you said no cash, but you did get
25 shares in Labor Smart. Did you receive any other

---

70

1  compensation from Next Gen?
2    A   Not to my -- no, not to my knowledge.
3    Q   Okay. Are there any other current
4  officers of Next Gen Beverages?
5    A   Mike Araghi is the president of Next Gen
6  Beverages.
7    Q   Do you happen to know how to spell his
8  last name?
9    A   I do.
10    Q   How do you spell it?
11    A   A-R-A-G-H-I.
12    Q   How long has he been the president of
13 Next Gen?
14    A   Since early or mid-2024.
15    Q   Who was the president before Mr. Araghi?
16    A   I don't think we named one.
17    Q   Do you know how much he's paid?
18    A   He is not paid in cash.
19    Q   Did he also receive shares, or is he
20 also receiving shares?
21    A   Yes. I don't think that's been
22 formalized.
23    Q   Okay. Other than Mr. Araghi, are there
24 any other current officers of Next Gen?
25 A   Not to my knowledge.

---

71

1    Q   Are there any current directors of Next
2  Gen Beverages?
3    A   Not to my knowledge.
4    Q   How did Next Gen Beverages obtain its
5  start-up capital?
6    A   I'm sure I funded it to some degree.
7    Q   What do you mean by that?
8    A   I am sure I sent money into the Next Gen
9  bank account to begin its operations.
10    Q   How much did you send?
11    A   I do not recall.
12    Q   And you said some of it. Who else?
13    A   Well, we've had various investors into
14 Labor Smart that we've used for Next Gen.
15    Q   Who else invested?
16    A   Luis --
17    Q   Sequeira?
18    A   Yeah. Mike Araghi, myself. The board
19 primarily, Mr. Harvey. Mr. Fitzgerald.
20    Q   The board of Labor Smart?
21    A   Correct. Correct.
22    Q   How much did Mr. Sequeira --
23    A   I don't recall.
24    Q   How about Mr. Araghi? How much did he
25 invest?

---

72

1    A   I don't have a specific number.
2    Q   Ballpark is fine.
3    A   One million.
4    Q   Dollars?
5    A   Yes.
6    Q   How about Mr. Fitzgerald?
7    A   400,000.
8    Q   Other than Mr. -- well, yourself,
9  Mr. Sequeira, Mr. Araghi, and Mr. Fitzgerald, any
10 other investors in Next Gen?
11    A   I think Mike Holley.
12    Q   How much did he invest?
13    A   I think 70,000.
14       THE WITNESS: That's me. I apologize.
15 I think that's my phone.
16       MR. HARVEY: Oh, okay. No problem.
17    Q   Anyone else?
18    A   I don't recall. Yes. I'm sure there's
19 others. I don't recall the names and amounts and
20 -- nothing monumental.
21    Q   Who would have the records for those
22 investments?
23    A   Mike Holley, the transfer agent or the
24 transfer agent?
25 Q   Do you think Mike Holley is the transfer

Transcript of Thomas Zarro
Conducted on November 21, 2024

19 (73 to 76)

**73**

1 agent?
2    A    No, no, no.  Mike Holley or the transfer
3 agent.  The transfer agent is Clear Trust as we've
4 discussed.
5    Q    Okay.  What products does Next Gen
6 Beverages sell?
7    A    We sell nootropic energy drinks,
8 nootropic coffee, hydrogen water, stick packs.
9    Q    What's a stick pack?
10    A    Those electrolyte stick packs that you
11 mix with water and they give you minerals and
12 nutrient hydration.
13    Q    Okay.  Anything else?
14    A    Merchandise -- hats, shirts.
15    Q    Anything else?
16    A    Not off the top of my head.
17    Q    And they sell those all under the LOCK'D
18 IN brand name; correct?
19    A    And -- oh, and artesian water.
20    Q    Okay.
21    A    And alkaline water.  Forgive me.
22    Q    No problem.  But all those are sold
23 under the LOCK'D IN brand name; correct?
24    A    Yes.  Yes.
25 Q And at least some of those products are

**74**

1 similar to the NXTLVL products; correct?
2    A    No.  We don't sell energy shots.
3    Q    Hydrogen water is the same though;
4 correct?
5    A    Yeah.  But NXTLVL wasn't selling
6 hydrogen water.
7    Q    Okay.  At some point, though, NXTLVL was
8 selling hydrogen water; correct?
9    A    At the very beginning, yeah, and it was
10 discontinued.
11    Q    Okay.  Has Takeover transferred any
12 assets to Next Gen Beverages?
13    MR. BENNION:  Objection to the extent it
14 may call for a legal conclusion.  Lacks foundation.
15    Go ahead.
16    A    No, not to my knowledge.
17    Q    Has Takeover transferred any trade
18 secrets to Next Gen beverages?
19    A    Not to my knowledge.
20    Q    Did Next Gen enter into an agreement
21 with Manny Pacquiao?
22    A    I don't know how to answer that.  I
23 think you need to be more specific, Mr. Harvey.
24    Q    Does Next Gen have a contract with
25 Manny Pacquiao?

**75**

1    A    I don't -- I don't recall.
2    Q    Who would know the answer to that?
3    A    Mike Holley would have the agreements.
4    Q    So, to your knowledge, it's possible
5 that Mr. Pacquiao entered into a contract with Next
6 Gen?  You just can't say one way or another?
7    A    Correct.
8    Q    And so if there was an agreement, you
9 don't know when it would have been executed?
10    A    Not specifically.  I would say somewhere
11 in that early '23, maybe mid-23.
12    Q    Does Mr. Pacquiao promote Next Gen
13 products?
14    A    I would ask for you to define promote.
15    Q    As broad as you can possibly define it,
16 does Mr. Pacquiao do anything to promote the sales
17 of Next Gen or -- I'm sorry -- not Next Gen, LOCK'D
18 IN products or Next Gen Beverage products?
19    A    I would think so.  Yes.
20    Q    What specifically does he do?
21    A    He would wear our shirt.
22    Q    Okay.  Is that something he would do if
23 he wasn't being compensated by Next Gen?
24    A    Yeah.  I think so.  I think he likes it.
25 I really do.

**76**

1    Q    Okay.  In any event, your testimony is
2 that Mike Holley would be the more appropriate
3 person to ask about contracts with Manny Pacquiao?
4    A    He would.  He would, Mr. Harvey.
5    Q    Okay.
6    MR. BENNION:  And, Counsel, just for
7 clarification, we're -- Mr. Zarro's here as a -- as
8 the -- for deposition topics for Next Gen and for
9 Takeover, and we're kind of crossing --
10    MR. HARVEY:  We're -- no.  So this is
11 just your personal deposition.  Once your personal
12 deposition is done, we're going to do a new
13 transcript for your Takeover topics.  Then we're
14 going to do a new transcript for your Next Gen
15 topics where you're the corporate representative
16 for both of those second and third ones.  So right
17 now I'm just asking you in your individual
18 capacity.
19    THE WITNESS:  I'm not sure I can answer.
20    MR. BENNION:  No.  No.  There's no
21 question before you.
22    THE WITNESS:  Oh.
23    MR. HARVEY:  So hopefully that clarifies
24 things.
25 BY MR. HARVEY:

77

1    Q   Is, to your knowledge, Manny Pacquiao
2  featured on LOCK'D IN products?
3    A   Yes.
4    Q   What products?
5    A   The hydrogen water.  The hydrogen water
6  and a nootropic drink.
7    Q   Which one?
8    A   The hydrogen water, unflavored;
9  nootropic, pineapple coconut.
10   Q   What is a nootropic drink, by the way?
11   A   An energy drink, but it's all natural.
12   Q   Okay.  Did LOCK'D IN sell NXTLVL
13 products on the LOCK'D IN website?
14   A   There was -- the answer is no.
15       MR. HARVEY:  Okay.  I'm going to hand
16 you your first exhibit of the day.
17       THE WITNESS:  Yeah.  No problem.
18       MR. HARVEY:  Now this has previously
19 been marked as Exhibit 1 in Mr. Holley's
20 deposition.  That's why it's got the deposition
21 sticker at the bottom.
22       (Holley Exhibit 1 was marked for
23 identification.)
24       If you can flip, the first page of that
25 is obviously a Husch Blackwell letter.  It's dated

78

1  June 14, 2023.  If you could flip over a couple of
2  pages, probably about four pages in, maybe five
3  pages in.
4        THE REPORTER:  Just try to be careful of
5  the microphone.
6        THE WITNESS:  I'm sorry.
7        Okay.
8        MR. HARVEY:  Keep going.  And then this
9  is a screen capture that was taken from the LOCK'D
10 IN website.
11       THE WITNESS:  Mm-hmm.
12 BY MR. HARVEY:
13   Q   If you go to page 2 of 4 in the bottom
14 right corner -- do you see that?
15   A   Yes.
16   Q   Those are NXTLVL products being sold on
17 the LOCK'D IN website; correct?
18   A   Correct.
19   Q   Okay.  So LOCK'D IN did, in fact, sell
20 NXTLVL products on the LOCK'D IN website; correct?
21   A   No.
22   Q   It advertised for sale NXTLVL products
23 on the LOCK'D IN website; correct?
24   A   Yes.
25 Q   Okay.  And did LOCK'D IN pay Takeover

79

1  for those products?
2    A   Did LOCK'D IN pay Takeover for those
3  products?  Well, no products sold.  So I don't know
4  how to answer that.
5    Q   Did Next Gen pay Takeover for the
6  products being advertised on the website?
7        MR. BENNION:  Objection.  Vague and
8  ambiguous.  May call for a legal conclusion.
9        THE WITNESS:  Mr. Harvey, forgive me.
10 Can you please ask one more time.
11       MR. HARVEY:  Sure.
12   Q   I'll come at it this way:  Maybe it will
13 be a little easier to understand.  Next Gen/LOCK'D
14 IN wouldn't advertise products on its website
15 unless it actually had product that it could ship
16 if an individual clicked purchase on the website;
17 true?
18   A   True.
19   Q   It'd be fraud otherwise; correct?
20   A   I can't define fraud.
21       MR. BENNION:  Objection.  May call for a
22 legal conclusion.
23   Q   So the fact that, as we see in Exhibit
24 Holly 1, NXTLVL products were advertised on the
25 LOCK'D IN website, which means that LOCK'D IN/Next

80

1  Gen had to have had NXTLVL products, that it could
2  have fulfilled an order had a customer purchased;
3  true?
4    A   Orders could have been fulfilled.  But
5  this -- if you clicked on that, it would have taken
6  you to the Takeover website, and the money would
7  have gone to Takeover.  So I know you're trying to,
8  you know, combine Next Gen and Takeover.  They're
9  very different, and it even says Takeover
10 Industries on it if you look.
11   Q   Let me ask it this way:  LOCK'D IN
12 products that are sold -- is there a central
13 warehouse that houses all of the LOCK'D IN
14 products?
15   A   Yes.
16   Q   Okay.  And so at this time that the
17 NXTLVL products were being advertised on the LOCK'D
18 IN website, were there NXTLVL products in that same
19 warehouse, or were they kept somewhere else?
20   A   Same warehouse.
21   Q   Okay.  How -- well, was Takeover paying
22 -- well, who owns that warehouse?
23   A   A fulfillment center in Georgia.
24   Q   Okay.  So Next Gen doesn't own it;
25 correct?

81

1     A    Correct.
2     Q    Takeover doesn't own it; correct?
3     A    Correct.
4     Q    How did Next Gen go about obtaining
5   NXTLVL products in the same warehouse that Next Gen
6   was paying for?
7         MR. BENNION:  I state an objection to
8   the extent it might be vague and ambiguous.
9         Go ahead.
10        THE WITNESS:  Please ask the question
11  one more time, Mr. Harvey.
12        MR. HARVEY:  Sure.
13    Q    As of June 14, 2023, who was leasing the
14  warehouse space?  Was it Takeover cutting a check
15  or sending a wire transfer each month, or was it
16  Next Gen?
17    A    I think it was Next Gen.
18    Q    Okay.  So how did it come to be that
19  Next Gen ended up with NXTLVL product in the
20  warehouse that Next Gen was leasing?
21    A    The NXTLVL product was purchased by me
22  and combined at that warehouse for the purpose of
23  benefiting Takeover.
24    Q    So you said a couple of things there, I
25  think.  I just want to make sure that I have them.

82

1   Next Gen never paid Takeover for any NXTLVL
2   products; true?
3     A    Say it again.
4     Q    Next Gen never paid Takeover for NXTLVL
5   products; true?
6     A    Well, Takeover has its own bank account.
7   So if anything was sold for Takeover, it went into
8   the Takeover bank account.
9     Q    I'm asking a slightly different and, I
10  think, even simpler question.  Did Next Gen ever pay
11  Takeover for NXTLVL products?
12    A    I can't -- I don't know.  I don't
13  recall.  If there was any sales through Next Gen,
14  then, yes, they would have paid Takeover, of
15  course.
16    Q    Okay.  And yet we see on this exhibit
17  that Next Gen was advertising NXTLVL products on
18  NXTLVL/LOCK'D IN website; correct?
19    A    Correct.  For the purpose of funding
20  Takeover.  So, for example, it was just hosting
21  Takeover products.  If you clicked on it, it would
22  go to a link for Takeover, not for Next Gen.
23    Q    Why not just leave the Takeover products
24  on Takeover's own website?
25  A Because everything that was associated

83

1   with Takeover was not really owned by Takeover.  It
2   was owned by the previous management, previous
3   manager's wife.
4     Q    I'm not sure I'm tracking.  Can you say
5   a little more on that.
6     A    It's confusing, Mr. Harvey.  The
7   trademarks, the websites, the Amazon stores, all
8   that stuff was not in Takeover's name.  It was in
9   individual contractors that were set up by the
10  previous manager.
11    Q    As of June 2023?
12    A    As of when they started in '21, '22.
13    Q    I get it was when they started.
14    A    Yeah.
15    Q    But I'm saying, as of June 2023, was
16  that still the case?
17    A    Yeah.  Everything was owned by them.  We
18  never -- Takeover -- we were never able to get all
19  of that information and all of those rights, if you
20  will, transferred so that we could monetize and
21  grow that business specifically.  So, no.  The
22  answer to your question is it did not have a site,
23  per se, to sell its products.  It didn't have the
24  social media presence to sell its products.  That
25  was all privately held by individuals.

84

1     Q    Oh, so now I'm officially confused.
2     A    Welcome to the club.
3     Q    So you told me a couple of times that if
4   you clicked on these links for these NXTLVL
5   products --
6     A    It went to the next -- it went to the
7   Takeover bank account.  Not the Takeover website,
8   the Takeover bank account.
9     Q    So you did have control of the Takeover
10  bank account as of June 2023?  Is that what you're
11  saying?
12    A    Define you.
13    Q    Well, how did you -- how would you be --
14  if you didn't have control over it, how would you
15  be --
16    A    Well, you're saying you as if it's me.
17  I'm an individual.  Takeover is a company.  Next
18  Gen is a company.  Labor Smart is a company.  So,
19  yes, there was the ability for the website
20  developers to take that clicked button and
21  immediately push that money to the Takeover bank
22  account.
23        However, I believe the cease and desist
24  immediately shut down the sales.  In other words,
25  that was only there for a very short period.

Transcript of Thomas Zarro
Conducted on November 21, 2024

---

85

1    Q   If not you personally, who had control
2  over the Takeover bank account as of June 2023?
3    **A   I think Mike Holley.**
4    Q   Okay.  And when did he obtain control
5  over the Takeover bank account?
6    **A   I don't -- I don't know specifically.**
7  **My assumption is after the Arizona legal case in**
8  **November or December of '22.**
9    Q   And that case is still ongoing; correct?
10   **A   Yeah.**
11   Q   Now if we look at the website printout,
12 the NXTLVL products are being sold -- being sold at
13 a discount; correct?
14   **A   Yes.**
15   Q   Have you ever -- well, I'll back up.  Do
16 you have any personal social media channels?
17   **A   Personally?**
18   Q   Sure.
19   **A   I mean, I have a Twitter feed.  I'm**
20 **Tom Zarro on Twitter if that's what you mean.**
21   Q   Yeah.  Or Instagram, anything like that.
22   **A   Not really.  Just Twitter.**
23   Q   Okay.  Have you ever promoted LOCK'D IN
24 products on your Twitter account?
25 **A   I'm sure.**

---

86

1    Q   When did you begin promoting those
2  products?
3    **A   Probably after they were formed, like,**
4  **developed.  My guess, mid- to late '23.**
5    Q   Did you ever promote NXTLVL products on
6  your social media account?
7    **A   I don't know.  I don't recall.**
8    Q   When did you first meet Toby McBride?
9    **A   I've never met Toby McBride.**
10   Q   When did you first meet Michael Holley?
11   **A   I want to say mid-23.**
12   Q   And when I say met, I mean phone as
13 well.
14   **A   Oh, phone?**
15   Q   Yeah.
16   **A   Oh, well, ask again for Toby McBride.**
17   Q   Yeah.  When did you first meet
18 Toby McBride?  Zoom, phone, anything.
19   **A   Late 2021, mid-2021, when I made the**
20 **investment in the company.**
21   Q   And when you say investment in the
22 company, this is what we were talking about before.
23 You're not sure if the wire went to Takeover
24 directly from Labor Smart; correct?
25 **A   Correct.**

---

87

1    Q   Okay.  And what were the circumstances?
2  Was this a phone call or --
3    **A   Yeah.  Just an introductory and --**
4    Q   Did you speak before you invested?
5    **A   I'm sure.  My guess is yes.**
6    Q   Did you speak to he and several other
7  individuals on the same call, or did you have
8  individual calls with Mr. McBride, Mr. Holley, and
9  Mr. Tucker?
10   **A   It's possible him and Mr. Tucker.  I**
11 **don't recall.**
12   Q   Do you remember anything about the
13 conversation?
14   **A   Not specifically.**
15   Q   And in terms of your first meeting with
16 Mr. Holley, was it in that same time frame, mid- to
17 late 2021?
18   **A   No.**
19   Q   When did you first interact with
20 Mr. Holley?
21   **A   I think late 2022.**
22   Q   What were those circumstances?
23   **A   What the hell is going on?**
24   Q   Why you weren't getting paid?  Is that
25 what you mean?

---

88

1    **A   Yeah.  Pretty much, like.**
2    Q   Okay.  How about Mr. Pavlik?  When did
3  you first meet him?
4    **A   Same.**
5    Q   As Mr. Holley?
6    **A   Yes.  Yes.**
7    Q   Okay.  Have you ever met someone named
8  Ryan Schadel?  S-C-H-A-D-E-L.
9    **A   I have.**
10   Q   When did you first meet Mr. Schadel?
11   **A   I think 2014 or 2015.**
12   Q   What were the circumstances?
13   **A   I was in Atlanta, Georgia, on a business**
14 **trip.  I was an investor in Labor Smart.  The stock**
15 **price was going down, and I wanted to understand**
16 **why.  So I went to his place of business to try and**
17 **validate my investment.**
18   Q   I don't want to pry too much into your
19 personal affairs; so I'm going to ask this as a
20 broad way and give you some context.  You seem like
21 you've put a lot of effort into Labor Smart,
22 Takeover, and Next Gen over the years.  Fair?
23   **A   It's been consuming the last couple of**
24 **years.**
25   Q   Do you put this type of effort into your

---

89

1  other investments?
2     **A   My ministry with Clean Shot helping**
3  **those in recovery.**
4     Q   And I appreciate it. I mean, your
5  monetary investments.
6     **A   No. Not like this. I mean, this is --**
7     Q   And, again, I don't want to get into all
8  the specifics of your portfolio, but is this your
9  largest investment in Labor Smart and whatnot? Is
10 that why you've put so much effort into it?
11    **A   I think it's my largest time investment**
12 **at this point. It's not my largest monetary**
13 **investment.**
14    Q   Okay. To your knowledge, has
15 Mr. Schadel ever been an employee, agent, officer,
16 or director of Takeover?
17    **A   No.**
18    Q   Has Mr. Schadel ever been an employee,
19 agent, officer, or director of Next Gen?
20    **A   No.**
21    Q   Has Mr. Schadel been involved with Labor
22 Smart since, let's say, April of 2021?
23    **A   I don't believe. I'm sorry. Say -- ask**
24 **the question again, Mr. Harvey.**
25 Q Sure. Well, let me -- I'll ask it this

90

1  way: It will probably be more clear. You said
2  that, at some point after Labor Smart acquired
3  Takeover, Labor Smart disassociated itself from the
4  temp staffing agency portion of the business;
5  correct?
6     **A   That's my understanding.**
7     Q   When did that happen? Ballpark is fine.
8     **A   I -- early '21.**
9     Q   Okay.
10    **A   Yeah.**
11    Q   From that point on, once the temp
12 staffing agency was moved out of Labor Smart and
13 maybe a month later or whatever, but was
14 Mr. Schadel at all involved with Labor Smart after
15 the temp?
16    **A   Not to my knowledge.**
17    Q   Okay.
18    **A   With Labor Smart --**
19    Q   Or Next Gen or Takeover?
20    **A   No, not in the context you're asking. I**
21 **believe he owned the Labor Smart labor business.**
22 **So when you say Labor Smart, there's the staffing**
23 **business that he owned or retained but nothing with**
24 **this company.**
25 Q   But that -- is that staffing business --

91

1  once it was moved out of Labor Smart, did it have a
2  different name? Schadel, Inc. or something?
3     **A   I really don't know.**
4     Q   In other words, I thought you told me
5  earlier that as of, say, mid-2021, Labor Smart's
6  only real asset was Takeover because the staffing
7  agency had been moved out.
8     **A   Correct. That's a -- that's a correct**
9  **statement.**
10    Q   So it would seem, then, that the
11 staffing agency had a different name than Labor
12 Smart.
13    **A   Quite possible.**
14    Q   Okay. Let me go through these people
15 fairly quickly --
16    **A   Sure.**
17    Q   -- hopefully. Do you know an individual
18 named Mike Tzanetatos? T-Z-A-N-E-T-A-T-O-S.
19    **A   I know of Mike. I've never met him.**
20    Q   Okay. What's your understanding of --
21    **A   He was a salesperson at Takeover.**
22    Q   Have you ever spoken to him?
23    **A   I have.**
24    Q   When's the last time you spoke to him?
25 A   **I think he congratulated me when we**

92

1  **became fully trading in April of '24.**
2     Q   And you say we. Meaning Next Gen?
3     **A   Labor Smart.**
4     Q   And that's trading again for Labor Smart
5  because it had been tradable before.
6     **A   It had. It had a -- it was in probation**
7  **if you will.**
8     Q   Okay. How about Mike Costello? Do you
9  know Mike Costello?
10    **A   I've talked to him once.**
11    Q   What was the context?
12    **A   Seeing if we could get him back to sell**
13 **products.**
14    Q   For?
15    **A   For, I believe, Takeover at the**
16 **beginning.**
17    Q   When was this?
18    **A   Probably Decemberish. Well,**
19 **January-February '23 trying to resurrect Takeover.**
20    Q   And he said no?
21    **A   I really don't recall. I think -- I**
22 **think he wanted to come back. I think the existing**
23 **management at Takeover did not want him back.**
24    Q   Why is that?
25 A   **I don't recall. I mean, I don't know.**

Transcript of Thomas Zarro
Conducted on November 21, 2024

---

93

1    Q   Okay.  How about Maurice Salem? Do you
2  know who Maurice Salem is?
3    A   I do.
4    Q   Who's Maurice Salem.
5    A   He's a shareholder and an investor.
6    Q   For?
7    A   Next Gen, Labor Smart.
8    Q   When did he first become a
9  shareholder/investor?
10   A   I believe prior to 2021, I believe.
11   Q   He was an investor of Labor Smart before
12 2021?
13   A   I don't know exactly when.
14   Q   He couldn't have been an investor in
15 2021 for Next Gen, though, because it wasn't formed
16 by that point.
17   A   There's no investors in Next Gen, only
18 Labor Smart.
19   Q   Okay.  Did he add additional investment
20 once Next Gen came into being?
21   A   Yes.
22   Q   How much did he invest?
23   A   I believe 50,000.
24   Q   Does he have any formal role with Next
25 Gen specifically?

94

1    A   No, no formal role.
2    Q   When is the first time you met
3  Mr. Salem?  And, again, phone, Zoom counts too.
4    A   December-January.  Let's say January
5  '23.
6    Q   What were the circumstances?
7    A   He operated a discord group.
8    Q   What's a discord group?
9    A   It's a -- it's a platform, communication
10 platform, primarily used by gamers, video gamers.
11 He was very active on there.
12   Q   And were you interacting with him on the
13 discord group?
14   A   Yes.  That's -- when you say, do you
15 know him, that's how I got to know him.
16   Q   And what was the -- can you walk me
17 through that?
18   A   Yeah.  It had become public knowledge
19 that I was the first and original noteholder, and
20 all hell had broken loose with the company.
21 James Deppoleto and I were front and center as the
22 investors in this company where many people were
23 screaming from the mountaintop what's going on.
24   Q   And you said, This company.  You were
25 the first investor in Takeover Inc.?

95

1    A   Labor Smart, Takeover, yes.  I was the
2  first noteholder if you will.
3    Q   Oh, I'm sorry.
4    A   Yeah.
5    Q   And people online were asking questions
6  when that became public knowledge.  Is that what
7  you said?
8    A   Yeah.  Because -- yes.
9    Q   And so you got on discord and interacted
10 with some of these individuals?
11   A   Yeah.  Clarified my position.
12   Q   And is this still online, or is it
13 something like a Snapchat that disappears?
14   A   God.  I don't know.  I don't know.
15   Q   Do you have to have an account/password
16 in order to --
17   A   Probably.  I'm not -- I'm not on it
18 anymore.  I'm not active.
19   Q   So what was Maurice Salem's role in this
20 discord group?  Was he the owner of that particular
21 group?
22   A   I don't know if owner is the right word,
23 but --
24   Q   Controller, maybe?
25 A   Primary contributor.

96

1    Q   Was he asking questions in that session?
2    A   Yeah, I think there was some Q -- yeah,
3  I think.  Yeah, probably.
4    Q   Have you interacted with Mr. Salem since
5  that January 2023 discord group?
6    A   We talk periodically.
7    Q   About what?  If it's hunting, I don't
8  care but anything about the business?
9    A   He brought a customer to us from Dubai.
10 So our most recent conversations were fulfilling
11 that customer's order overseas.
12   Q   Kerby Fortner -- have you heard that
13 name?
14   A   I have.
15   Q   Have you ever met Mr. Fortner?
16   A   We spoke on the phone when I desperately
17 pleaded with him to give us the logins for the
18 Takeover social media accounts so we could try and
19 sell products for Takeover.
20   Q   Did he give those to you?
21   A   No.
22   Q   Did he say why?
23   A   I couldn't get a straight answer.  He
24 was nonresponsive.  I couldn't get a straight
25 answer.  He offered them most recently, I think,

---

Transcript of Thomas Zarro
Conducted on November 21, 2024

---

97

1 after we became trading again. That was a big
2 milestone.
3    Q   I might have asked you this, but maybe I
4 didn't: Did -- was Mr. Costello -- is he or was he
5 an employee, a officer, or agent, director of Next
6 Gen?
7    A   No.
8    Q   How about Mr. Salem? Did he hold any of
9 those titles?
10    A   No.
11    Q   How about Mr. Fortner? Is he --
12    A   No.
13    Q   Okay. When did you first meet
14 Mr. Deppoleto?
15    A   By phone or email?
16    Q   Sure.
17    A   I think when both of us were in the same
18 boat which is what's going on with this company,
19 and why aren't we getting paid.
20    Q   Late 2022?
21    A   Yeah. Yeah.
22    Q   And was this a phone interaction?
23    A   I think I spoke to him on the phone and
24 traded emails.
25 MR. HARVEY: Okay. I'm going to hand

---

98

1 you our next exhibit of the day here.
2        THE WITNESS: What do I do with these?
3        MR. BENNION: Give them to the court
4 reporter, I think.
5        MR. HARVEY: Yeah. We'll just do a
6 stack right here, and we'll try and keep them in
7 order if we need to go back to them.
8        THE WITNESS: This is my note.
9        MR. BENNION: There's no question before
10 you.
11        THE WITNESS: Oh, sorry.
12        MR. HARVEY: So I've handed you -- oh, I
13 better put a sticker on that. This will be Exhibit
14 1 for your deposition.
15    (Zarro Exhibit 1 was marked for
16 identification.)
17        I'm neglecting my duties. I'm supposed
18 to put the sticker on before I hand it to you.
19        THE WITNESS: Thank you.
20        THE REPORTER: So the previous one was
21 Holley Exhibit 1?
22        MR. HARVEY: Yes. This will be
23 Mr. Zarro Exhibit 1.
24 BY MR. HARVEY:
25 Q   Okay. So I've handed you what we marked

---

99

1 as Zarro Exhibit 1. Do you recognize this
2 document?
3    A   I do.
4    Q   And at the top, it says, Convertible
5 Note Purchase Agreement; correct?
6    A   Yes.
7    Q   And in the bottom right corner, there's
8 what we call Bates labels. It says D-E-F. There's
9 a couple zeros --
10    A   Mm-hmm. Mm-hmm.
11    Q   -- and then some numbers. Do you see
12 those?
13    A   I do.
14    Q   To speed us up today, I'm just going to
15 say D-E-F and then, you know, for the first one
16 466. I'm not going to say the zeros each time.
17 Okay? So if you go to DEF477, which is towards --
18 a little bit towards the back. And let me know
19 when you're there.
20    A   Here.
21    Q   Okay. DEF477. That's your electronic
22 signature; correct?
23    A   It is.
24    Q   Okay. And this is a note that was
25 entered into between you and Labor Smart; correct?

---

100

1    A   Correct.
2    Q   And just in general -- I mean, I can
3 read the words -- what were the terms of the note?
4    A   The major terms were -- I believe there
5 was a delay on payments back, like a forbearance, 8
6 percent.
7    Q   Interest?
8    A   Interest and then equal payments of
9 26,000 and change for six months. Well, no, it had
10 to be more than that. Eighteen months, maybe.
11 Yeah.
12    Q   Okay. So then if you can flip over to
13 DEF478. It should be the next page.
14    A   Four seven what, sir?
15    Q   Eight.
16    A   Eight. Got it. Okay.
17    Q   This is labeled Schedule of Purchasers,
18 and it says, Initial closing date June 11, 2021;
19 correct? Right at the top.
20    A   Four seven eight?
21        MR. BENNION: Go another page.
22        THE WITNESS: Oh, I'm on 479.
23        MR. BENNION: Yeah. Yeah.
24        THE WITNESS: At least you know I'm
25 paying attention. Okay. Got it.

Transcript of Thomas Zarro
Conducted on November 21, 2024

---

101

1    Q    It says, Schedule of Purchasers, and
2  then it's got the date --
3    A    Mm-hmm.
4    Q    -- June 11, 2021; correct?
5    A    Yes.
6    Q    Okay.  And this tells us you purchased a
7  note from Labor Smart for $300,000; correct?
8    A    Correct.
9    Q    And it was effective as of June 18,
10 2021; correct?
11   A    Correct.
12   Q    How did Labor Smart intend to use the
13 funds from your investment?
14   A    My assumption was to capitalize for
15 marketing sales for Takeover and production.
16   Q    Is that how the funds were, in fact,
17 used?
18   A    I do not know.  I wasn't there.
19   Q    Did you, in fact, provide Labor Smart
20 with the 300,000, pursuant to this note?
21   A    I did.
22   Q    When did you make that payment to Labor
23 Smart?
24   A    I don't -- I don't have the exact date.
25   Q    Do you know whether it was paid all at

102

1  once or --
2    A    All at once.  Yes.
3    Q    And then if you can go to DEF479, at the
4  top, it says, Exhibit A, Loan Amortization and
5  Payment Schedule; correct?
6    A    Mm-hmm.
7    Q    And it outlines the agreed upon payment
8  schedule for the note; correct?
9    A    Correct.
10   Q    And so Labor Smart agreed to make you a
11 monthly payment of, as you said, a little over
12 $26,000 each month beginning on December 16, 2021;
13 correct?
14   A    Correct.
15   Q    And did Labor Smart make monthly
16 payments to you as agreed upon in the note?
17   A    No.
18   Q    Never or not all of them?
19   A    Not all of them.
20   Q    Okay.  And the note says you were going
21 to be fully repaid as of December 10, 2022;
22 correct?
23   A    Correct.
24   Q    But you said you didn't get fully paid
25 by that date?

103

1    A    Correct.
2    Q    To date, has Labor Smart fully repaid
3  you?
4    A    No.
5    Q    How much does Labor Smart still owe you?
6    A    127 and change.
7    Q    When do you expect to be fully repaid?
8    A    I don't know.
9    Q    Do you expect to be fully repaid?
10   A    Absolutely.
11   Q    When did Labor Smart first miss a
12 monthly payment that was due to you?
13   A    I don't know.
14   Q    What was your response to Labor Smart
15 missing payments?
16   A    A phone call to Jason Tucker.
17   Q    What role did Mr. Tucker have at that
18 time with Labor Smart?
19   A    It was my understanding he was the
20 president and CEO of Labor Smart and Takeover.
21   Q    By the way, we've talked a couple of
22 times now about the fact that Labor Smart began as
23 a staffing company; correct?
24   A    Yes.
25   Q    Do you know why it shifted from focusing

104

1  on staffing to the beverage industry which seems a
2  little different than a staffing company?
3    A    I don't.  I had absolutely no
4  involvement.
5    Q    Okay.  When you -- when you -- oh,
6  strike that.  At the time you signed this note, did
7  you expect Labor Smart to honor it?
8    A    Absolutely.
9    Q    And to pay you back in accordance with
10 the terms and conditions of the note?
11   A    Absolutely.
12        MR. HARVEY:  Okay.  You can put that one
13 aside or on our stack here.  This will go a lot
14 quicker once this folder starts getting a little
15 bit less full.  I've handed you what we marked as
16 Exhibit 2.
17        (Exhibit 2 was marked for identification.)
18        And just generally speaking, Exhibit 2
19 -- there's a couple emails in an email chain, but
20 it's -- generally speaking, it's some emails
21 between you and Mr. Tucker in the February and
22 March 2022 time frame; correct?
23   A    Yes.
24   Q    Or March 2022.  Sorry.  Do you recognize
25 this email exchange?

105

1    A  Not specifically, but it looks
2  authentic.
3    Q  Okay. Was your email address at the
4  time TomZarro@gmail.com?
5    A  Yes.
6    Q  And go ahead and read the substance of
7  his -- Mr. Tucker's March 2, 2022, email to you;
8  and then let me know when you're done, and I'll ask
9  you a couple of questions about it.
10   A  Okay. Out loud or just by myself?
11   Q  No. Just read it to yourself.
12   A  Okay. Okay. I've read this email in
13 the last couple of days as well.
14   Q  Okay. The portion where he says, Please
15 let this serve as confirmation that you've agreed
16 to stay a default against Labor Smart for the funds
17 owed to you, pursuant to our convertible note
18 purchase agreement.
19      Do you see that part?
20   A  I do.
21   Q  Was his email accurate that you had, in
22 fact, agreed to stay a default against Labor Smart
23 for the funds owed to you?
24   A  For a very short period.
25   Q  What was the period that you agreed to?

106

1    A  I believe 30 days.
2    Q  Okay.
3    A  As I mentioned in my correspondence to
4  him.
5    Q  Why did you agree to stay a default?
6    A  I don't recall exactly.
7    Q  Do you remember what he told you to
8  convince you to give him the 30 or give them the
9  30-day grace period?
10   A  My assumption -- I have -- my
11 recollection is that he said there was a big
12 investor coming in that would be able to make them
13 current and pay their bills.
14   Q  Was that Mr. Deppoleto?
15   A  That's my assumption.
16   Q  Okay. And he refers to A situation
17 Holley placed us in.
18      Do you see that towards the end of the
19 email?
20   A  Yes.
21   Q  What's he referring to there?
22   A  I believe he's referring to a
23 distribution that was alleged.
24   Q  That Mr. Holley was stealing money from
25 the company?

107

1    A  I believe that was alleged.
2    Q  Did Mr. Holley steal money from the
3  company?
4    A  I don't -- I don't believe so.
5    Q  Why do you say that?
6    A  Because I believe Jason Tucker
7  authorized all disbursements and handled the bank
8  account.
9    Q  When you became the CEO of Takeover, did
10 you ever go back over the books and records as part
11 of your role as CEO?
12   A  Not specifically.
13   Q  Why not?
14   A  We were -- we were and have been in a
15 fire fight since day one trying to bring solvency
16 to the entities. So we were forward looking
17 primarily.
18   Q  So you didn't go back and look to see,
19 for example, if Mr. Holley owed the company
20 something along the lines of $250,000?
21   A  I don't know. Ask the question again,
22 Mr. Harvey. Like --
23   Q  Did you ever --
24   A  -- I mean, I knew those things were
25 alleged.

108

1    Q  Sure. So you said, when you got
2  involved, you were involved in a fire fight, and
3  you were trying to figure out a way to salvage the
4  company; correct?
5    A  Salvage the parent company and Takeover
6  for that matter.
7    Q  And money in the door would certainly
8  help that; correct?
9    A  Yes.
10   Q  So did you ever go back and look at the
11 books and records to see if either Mr. Holley or
12 Mr. McBride or some combination of them owed the
13 company something along the lines of $250,000?
14   A  That was all dealt with legally prior to
15 my official capacity.
16   Q  And why were you confident that it was
17 appropriately dealt with?
18   A  Because I believe there was a lawsuit
19 between the company and my colleague that was
20 settled -- the Arizona suit.
21   Q  Do you know who at Takeover authorized
22 the settlement of that suit?
23   A  I believe it was the officers at that
24 time which would have been, my assumption, McBride,
25 Pavlik, Holley, and the legal counsel.

109

1    Q   So Mr. Holley authorized the settlement
2   of Takeover's suit against him?
3    A   I really don't recall. That was before
4   my time.
5    Q   Okay. And I'm just asking for your
6   understanding.
7    A   No problem. Before my time.
8    Q   In any event, you didn't go back when
9   you did come in -- become the CEO of the company.
10  You didn't go back and look over any of that to see
11  if that was an appropriate settlement; true?
12       MR. BENNION:  I'm going to state an
13  objection. It may call for a legal conclusion.
14  Vague and ambiguous.
15   A   Did I second guess the lawyers and
16  everything, no.
17   Q   Did you second guess the officers and
18  directors?
19   A   Every day. Every day.
20   Q   And -- but even though you're second
21  guessing them, you didn't go back and revisit the
22  lawsuit to see whether it was appropriate to settle
23  it?
24   A   I believe at my -- I believe at my level
25  everything seemed appropriate.

110

1    Q   Okay.
2    A   So I did scan it, but did I go through
3   legal to get second opinions, no.
4    Q   And you didn't go back over the books
5   and records to see whether, in fact, Mr. Holley
6   and/or Mr. McBride owed the company something to
7   the tune of $250,000; is that correct?
8    A   Well, you're combining McBride and
9   Holley. Can you separate them in your request,
10  please?
11   Q   Either of them. Did you --
12   A   I know there was some McBride money
13  discussed -- that it would be owed. I don't
14  believe anything was collectible.
15   Q   So I think I understood you, but let me
16  make sure. You understood that Mr. McBride owed
17  the company money; true?
18   A   I believe a much smaller amount than
19  what is being claimed but yes.
20   Q   What was the amount you understood?
21   A   I don't recall the books and the audits
22  that took place. Please remember everything went
23  through an audit, a PCAOB audit. Very, very
24  thorough. And I want to say 20,000 was the number,
25  not 240. I don't recall, though.

111

1    Q   And that was just for Mr. McBride?
2    A   I believe so.
3    Q   Did you understand that Mr. Holley owed
4   the company money?
5    A   I did not.
6    Q   Okay.
7    A   Or there was an offset. Something may
8   have taken place, but our audit did not reveal that
9   we have an open receivable from Mike Holley, to my
10  recollection.
11       MR. HARVEY:  Okay. You can put that one
12  in the pile, and I'll hand you what we've marked as
13  Exhibit 3.
14       (Exhibit 3 was marked for identification.)
15   Q   Do you recognize this document?
16   A   I do now. I haven't seen this one
17  recently. This must have been after James came in.
18   Q   What is this document that you're
19  looking at as Exhibit 3?
20   A   It looks like me trying to collect and
21  Jason saying here you go. We'll pay you.
22   Q   So the top email in that chain is from
23  you, dated July 6th to Mr. Tucker, and you're
24  copying Mr. McBride; correct?
25   A   Yes.

112

1    Q   Okay. And you're saying, Can I get an
2   update on the now very delinquent payment; correct?
3    A   Correct.
4    Q   And what -- it says payment, singular,
5   not payments, plural. What payment are you
6   referring to in this email?
7    A   I'm sure the 26,000 due monthly for the
8   note.
9    Q   Did you receive an update on the
10  payment?
11   A   Apparently, I did.
12   Q   Why do you say that?
13   A   Because it says -- Jason responded:  I'm
14  sorry for the delay. Please see your wire.
15       MR. HARVEY:  Okay. Okay. You can put
16  that one aside. I'm handing you Exhibit 4.
17       (Exhibit 4 was marked for identification.)
18   Q   And just generally speaking, the top
19  substantive email is from you to Mr. Tucker, and
20  you're copying Patrick Morris, dated November 16,
21  2022; correct?
22   A   Yes.
23   Q   And the first -- well, the first
24  sentence of the second paragraph says, I hope all
25  is well in Arizona. However, it looks like things

Transcript of Thomas Zarro
Conducted on November 21, 2024

29 (113 to 116)

113

1  are not going our way. We lost the TRO, and it
2  looks like we now have a protracted legal battle on
3  our hands.
4      Did I read that correctly?
5      A  Yes.
6      Q  What did you mean when you said Things
7  are not going our way?
8      A  Well, at that point, Jason and James had
9  taken the company to court to get a receivership.
10 So at that point, Jason and James, both of them
11 directors, took the company to court to try and get
12 a receivership and remove the existing officers
13 from control.
14     Q  So this email is to Jason, and you're
15 saying It looks like things are not going our way.
16     A  Correct.
17     Q  You're saying that he's adverse to you.
18     A  Well, a lot has happened since then. At
19 that point he was calling me. He was telling me
20 that everything was going to be fine. James was
21 coming in, ongoing capital. You're going to get
22 paid. Don't worry about a thing. So at that point
23 he was my path to payment and I believed was doing
24 the right thing.
25     Q  So you supported the appointment of a

114

1  receivership, and you're saying Things are not
2  going our way because the judge didn't appoint a
3  receiver?
4      A  At that point I was -- my only
5  communication with the company was with
6  Jason Tucker. And as he explained things, I
7  believed that was the best path for me and the
8  company as he explained it.
9      Q  Did Mr. Tucker respond to this email in
10 any way? Either via email, text, phone call?
11     A  We had several phone calls after this.
12 I don't recall specifically.
13     Q  You don't remember anything that he
14 said?
15     A  Not specifically.
16     Q  Generally?
17     A  Not really. Not specific. I mean,
18 that's when the whole hurricane started.
19     Q  What do you mean by that?
20     A  Well, that's when James pulled out,
21 threatened lawsuit. I was threatening lawsuit.
22 Jason and the existing officers weren't getting
23 along at all. The company wasn't selling anything.
24 That was, like, the beginning of the end.
25     Q  After you got this email on November 16,

115

1  2022, did you receive any payments from Labor
2  Smart?
3      A  I don't believe so.
4         MR. HARVEY: Okay. You can put that one
5  aside. Put it back on the stack. I've handed you
6  Exhibit 5.
7      (Exhibit 5 was marked for identification.)
8      Q  And, generally speaking, this looks like
9  it's a demand letter from Attorney Patrick Morris.
10     A  Yeah. He's my attorney. My securities
11 attorney.
12     Q  And it's dated January 22, 2023;
13 correct?
14     A  Yes.
15     Q  And it's directed to the board of
16 directors of Labor Smart and Takeover Industries
17 Inc.; correct?
18     A  Mm-hmm. Mm-hmm.
19     Q  Yes?
20     A  Yes.
21     Q  And he says in the first sentence, I
22 represent Thomas Zarro -- I'm going to leave out
23 the parenthetical -- and he has asked me to inform
24 you that the convertible note purchase agreement
25 dated June 18, 2021, is now past due and that

116

1  payment must be made immediately; correct?
2      A  Correct.
3      Q  Did Labor Smart or Takeover immediately
4  pay you as demanded?
5      A  No.
6      Q  What was Labor Smart's response to this
7  letter?
8      A  We have no money.
9      Q  Did you get a separate response from
10 Takeover?
11     A  I don't recall.
12     Q  Who sent that response?
13     A  I don't recall.
14     Q  And if you go to page 3 of that, about a
15 third of the way down -- well, actually more like
16 halfway down on page 3, there's a paragraph that
17 starts off with Based upon the express written
18 obligations contained in the note and the
19 promissory note, Zarro hereby demands that the
20 company immediately pay the outstanding principal
21 and interest due to him and, in the pendency of
22 such payment, that the company, its officers and
23 directors acknowledge the following: And then
24 there's six numbered paragraphs; correct?
25     A  Yes.

117

1    Q   After this letter was sent, did you
2   reach an agreement with Labor Smart regarding
3   repayment of the note?
4    A   No.
5    Q   Did you execute an amended agreement
6   with Labor Smart?
7    A   I don't recall.
8    Q   Did you execute a new note with Labor
9   Smart?
10   A   I don't recall.
11   Q   One of the --
12   A   I don't believe so. On this. I don't
13   believe so.
14   Q   One of the conditions that he's got
15  listed is he wanted the company to acknowledge
16  numbered paragraph five -- that numbered paragraph
17  five -- excuse me -- Zarro did not approve, nor was
18  he given the opportunity to approve the Deppoleto
19  convertible note.
20   A   Correct. I was not. James was a
21  surprise to me and not a good one.
22   Q   Why is that?
23   A   Because he believes he's the senior
24  noteholder, and it was against the terms of my note
25  that there would be any other debt taken on without

118

1   my permission, because I would have said no. If
2   James comes on, he can, and he can assume my
3   position; but, first, he has to pay me which he did
4   not do.
5    Q   And one of the other conditions was
6   paragraph six: Zarro's note and promissory note
7   are senior to the Deppoleto convertible note;
8   correct?
9    A   Yes.
10   Q   Did Mr. Deppoleto ever agree to that?
11   A   I don't believe so.
12   Q   Okay. Besides this note that we're
13  talking about in Exhibit 5, have you executed any
14  other notes with Labor Smart?
15   A   No convertible notes.
16   Q   Any other note of any kind?
17   A   Private placement type stuff. Yes.
18   Q   What do you mean by that?
19   A   Well, like, investments. New
20  investments to keep the company going.
21   Q   But no other note of any kind?
22   A   Not specifically, I don't believe, but
23  it's been a long two years.
24   Q   Have you executed any notes directly
25  with Takeover?

119

1    A   Not to my knowledge.
2    Q   Have you executed any notes with Next
3   Gen Beverages?
4    A   Not to my knowledge.
5    Q   Okay. I'm going to ask you a couple
6   timeline questions because that might help us be a
7   little more efficient here. I know we've kind of
8   talked about your involvement with Takeover, and
9   your first appointment as CEO was mid- or April
10  2023, but you said you were doing things --
11  basically the same things before that point;
12  correct?
13   A   Trying.
14   Q   When did you first start doing those
15  types of actions?
16   A   I think, if we refer to that document,
17  you'll see that in November '22 I was reaching out
18  to Jason to speak to Mr. Deppoleto to see what we
19  could do to resolve the issues that they created.
20   Q   So it's your understanding that so it's
21  around November 2022 that you began taking on -- if
22  not the formal title of CEO, you were doing the
23  type of things that you were doing once you became
24  CEO. Is that fair?
25  MR. BENNION: Objection to the form of

120

1   the question. It's vague and ambiguous.
2       Go ahead.
3    A   No.
4    Q   What was incorrect about it?
5    A   I -- this has been a gradual increase in
6   activity. So at this point I was acting as a
7   investor that wasn't getting paid -- somebody that
8   was defrauded.
9    Q   So as of -- and that's helpful. Thank
10  you. So as of November of 2022 -- let's say
11  November 1, 2022 -- did you have any say-so, input,
12  anything along those lines in terms of signing off
13  on any investments that Takeover might bring into
14  the company?
15   A   I was supposed to.
16   Q   What do you mean by that?
17   A   My note clearly said that other
18  investments need to be approved by me, but they
19  weren't presented as such.
20   Q   Okay. And so regardless of what your
21  note said, in terms of the rubber hitting the road,
22  facts on the ground, you weren't signing off on or
23  even involved in discussions about investments or
24  potential investments in Takeover before November
25  1, 2022. Is that --

121

1    A   That is my recollection, yes,
2  Mr. Harvey.
3    Q   Okay.  So, for example, there's been
4  testimony about a June 10, 2021, special meeting of
5  the Takeover Board of Directors.  Did you have any
6  involvement in that whatsoever?
7    A   No.
8    Q   Do you have any knowledge of it now?
9    A   No.
10    Q   Okay.  And in terms of -- we talked a
11  little bit about you had an understanding that
12  Mr. McBride was alleged to have spent Takeover
13  money on personal expenses; correct?
14    A   Correct.
15    Q   But do you have any personal knowledge
16  about whether he did or did not do that?
17    A   I have -- I know for the audit and for
18  tax purposes, we had to drill down to some of those
19  expenses, and some of those were found to be
20  legitimate business expenses.
21    Q   But not all of them?
22    A   I don't know.
23    Q   Okay.
24    A   It was a laundry list.
25    Q   What's your understanding of the timing

122

1  in which those expenditures in question -- what's
2  your understanding of the timing of when those
3  occurred?
4    A   All prior to November '22?
5    Q   Okay.  And to the extent you have
6  knowledge of them, it's through the audit.  You
7  didn't personally go back and look at them; true?
8    A   Well, that's not entirely true.  I mean,
9  obviously, I tried to navigate the path so I could
10  understand who was -- who I was dealing with.  So,
11  again, many of those expenses were found to be
12  legitimate business expenses.
13    Q   Did you have any discussions with
14  Mr. McBride about those expenditures?
15    A   Yes.
16    Q   And what did he tell you?
17    A   Many of them were legitimate business
18  expenses and authorized by Jason Tucker.
19    Q   And you keep saying many, not all.  So
20 --
21    A   I don't think I could say all,
22  personally.
23    Q   And why do you say that?
24    A   Because I still think there was maybe
25  20,000 that was almost an advance or something that

123

1  was authorized by Jason Tucker according to
2  Mr. McBride.
3    Q   And the number $250,000 -- that sounds
4  way out of line with you?
5    A   Yeah.  Most -- a lot of those were
6  business expenses put on a company credit card.
7    Q   Okay.  And the ones that were not
8  business expenses -- did Mr. McBride ever repay the
9  company for those?
10      MR. BENNION:  Objection.  Lacks
11  foundation.  May call for speculation.
12      Go ahead.
13    A   I believe he did.  I think he did pay
14  some.
15    Q   But not all?
16    A   I don't know.
17    Q   Okay.
18    A   I don't know.
19    Q   And are you aware of allegations that
20  Michael Holley made unauthorized distributions from
21  Takeover?
22    A   I'm aware of the allegations.
23    Q   When did you become aware of the
24  allegations?
25    A   I think sprinkled in the conversations

124

1  with Jason as to where's my money, he went into the
2  Mike took it all.
3    Q   Did Mr. Holley make unauthorized
4  distributions without approval from the Takeover
5  Board of Directors?
6    A   I was not there at the time.
7    Q   Whether you were there or not, do you
8  have any knowledge of it today?
9    A   I do have knowledge.  I believe he was
10  issued authorization and instruction by
11  Jason Tucker to do disbursements, like
12  distributions almost.
13    Q   Do you remember what the dollar figure
14  attached to those --
15    A   I think it was hundreds of thousands of
16  dollars.
17    Q   Close to $750,000?
18    A   Yes.  Yeah.  That's the number in my
19  head that I recall.
20    Q   Who received those distributions?
21    A   I think Jason Tucker.  I think -- you
22  know, again, at that point, a disgruntled investor
23  thinking I was defrauded, everybody under the sun
24  like it was Christmas.
25    Q   So Mr. Pavlik, Mr. Holley --

125

1  A  All of them.
2  A  -- Mr. McBride?
3  A  Jason Tucker, all the salespeople. I
4  mean, just everybody that was involved.
5      THE REPORTER:  What was the first name
6  you said in that list?
7      MR. HARVEY:  I'll ask it this way
8  because I don't remember.
9  Q  Was it your understanding that
10 Mr. Pavlik, Mr. Holley, and Mr. McBride received
11 unauthorized distributions?
12 A  No. I don't believe they were
13 unauthorized. I think they were authorized.
14 Q  Whether they were authorized or not, was
15 it your understanding that Mr. Pavlik, Mr. Holley,
16 and Mr. McBride received distributions?
17 A  Compensation/distributions.
18 Q  When was your understanding about when
19 they received those?
20 A  I don't know. I wasn't there.
21 Q  Do you have any understanding today?
22 A  All before November '22. My best
23 recollection is somewhere in '21, late '21. That's
24 a guess. That's speculating.
25 Q  Are you aware of -- well, have you read

126

1  any deposition transcripts from this case?
2  A  I have not. We -- I have not.
3  Q  Okay. Are you aware of a time when
4  Takeover was bringing in money from investors, and
5  Mr. Holley and Mr. McBride were taking a percentage
6  of that money and pocketing it without disclosing
7  that to investors?
8      MR. BENNION:  Objection. Vague and
9  ambiguous. May call for speculation. Lacks
10 foundation.
11     Go ahead.
12     THE WITNESS:  One more time, sir.
13 Q  Are you aware of a time in Takeover in
14 which Takeover was bringing in money from investors
15 and Mr. McBride and Mr. Holley were taking a
16 percentage of those investments and pocketing that
17 money themselves without disclosing that to the
18 investors?
19 A  I -- was I aware of that, no.
20 Absolutely not.
21 Q  Are you aware of whether that happened
22 or not before you -- before you came on?
23 A  I was not aware.
24 Q  You'd agree with me that that's wrong,
25 correct, if that did happen?

127

1  A  (Crosstalk).
2      MR. BENNION:  Objection. Calls for
3  legal conclusion. Lacks foundation.
4      Go ahead.
5  A  I would think the only way that would be
6  appropriate is if it was part of the organized
7  compensation plan, you know, for these people.
8  Q  And so if Mr. Holley testified that he
9  was taking a percentage and didn't disclose it to
10 investors?
11 A  I would think, again, depending on what
12 he was getting paid. I don't know the whole
13 program. I would think it would be in bad form
14 unless it was part of a complete package that was
15 clearly understood.
16 Q  And if there's nothing written saying
17 that, it would be fraud; correct?
18     MR. BENNION:  Objection. Calls for
19 legal conclusion.
20 A  I don't believe -- from everything I've
21 seen, I don't believe fraud was committed by those
22 gentlemen. I think everything was done in the
23 daylight with the executive management, and they
24 were the board.
25 Q  Well, you told me a minute ago that you

128

1  weren't even aware that this was happening.
2  A  Correct.
3  Q  Mr. Holley --
4  A  At that time. At that time.
5  Absolutely.
6  Q  And Mr. Holley testified that he did, in
7  fact, do this. So I'm asking you, if there's no
8  written authorization for him to do that, you'd
9  agree with me that's fraud; correct?
10     MR. BENNION:  Objection. Asked and
11 answered. Calls for a legal conclusion.
12     Go ahead.
13 A  I believe, if my colleague did that and
14 said he did that, that that was done in daylight
15 with an understanding with the other team members,
16 including the executive management, Mr. Tucker.
17 Q  When you say done in daylight --
18 A  In other words, not -- you know, the
19 money didn't -- I'm trusting the money didn't
20 vanish in the middle of the night and that there
21 was a discussion that, hey, we got X and with this
22 X we're getting boom as part of our compensation
23 plan.
24 Q  There would need to be something in
25 writing authorizing something like that; correct?

129

1    A   I don't know.  I don't know how they ran
2   things.  I know that when we get investor money
3   now, no percentage is given to people.  They go for
4   company expenses.
5    Q   Well, let me ask it this way:  You were
6   one of the first -- you were the first noteholder
7   --
8    A   Yeah.
9    Q   -- related to Takeover; correct?
10   A   Yes.
11   Q   If, say, 5 percent of your investment
12  went directly to Mr. Holley and Mr. McBride, would
13  you have been pleased about that, given that it
14  wasn't disclosed to you before you invested?
15   A   The only way I would have tolerated that
16  is if it was they're making, you know, less than
17  they should be, and this is a way we get to pay
18  them.  In other words, your money allows us to make
19  a payment to keep them employed.  If it was a
20  bonus, per se, I would tend to agree with you.
21   Q   And it should be in writing; correct?
22   A   There should have been an understanding.
23  Writing or not, an understanding.
24   Q   Okay.  Are you aware of instances of
25  Mr. Holley charging personal expenses to Takeover?

130

1    A   I am not.
2    Q   Did you ever hear allegations to that
3   effect?
4    A   Not really.  Not charging.  No.
5    Q   What do you mean by that?  Why are you
6   qualifying it?
7    A   I don't -- I don't -- because you've
8   said that he -- there was alleged monies rerouted
9   or misdirected -- cash expenses.  Now you're saying
10  charged.  I'm aware of the allegations of
11  Toby McBride charging fraudulent transactions.  I'm
12  not aware of any alleged allegations of Mike Holley
13  charging fraudulent transactions.
14   Q   Are you aware of Mr. Holley's family
15  members making personal purchases that were charged
16  to Takeover?
17   A   I am not.  I heard -- I did hear one
18  thing.  That I think Courtney was doing marketing
19  work for the company and did -- and took a charge
20  if you will.
21   Q   Who's Courtney?
22   A   Mike's daughter.  She did the marketing.
23  She was doing social media, I believe.  Again, all
24  before my time, Mr. Harvey.
25   Q   Okay.  Do you know when those purchases

131

1   occurred?
2    A   I do not.
3    Q   Okay.  The December -- there was a
4   December 21, 2021, Takeover Board Meeting.  Were
5   you involved at all with that meeting?
6    A   I was not.
7    Q   Do you have any knowledge --
8    A   Oh, wait.  I'm sorry, sir.  No.
9   December 21.  No, I was not.
10   Q   December 21, 2021.
11   A   No, sir.  I was not.
12   Q   Do you have any understanding about what
13  occurred at that meeting?
14   A   I do not.
15   Q   There was a November 7, 2022, board
16  meeting.  Did you have any involvement with the
17  November 7, 2022, board meeting?
18   A   I did not.
19   Q   Do you have an understanding of what
20  occurred at that meeting?
21   A   Not specifically, Mr. Harvey.  I have a
22  hunch but not a specific answer.
23   Q   What's your hunch?
24   A   That it has something to do with the
25  insanity of that TRO and James and Jason and

132

1   removals and --
2        THE WITNESS:  Would it be appropriate --
3   can I ask -- can I -- I just -- that phone has
4   rang, like, 20 times.  I just want to make sure
5   it's not my wife.
6        MR. HARVEY:  Sure.  Sure.
7        THE WITNESS:  Okay.  Thank you.
8        THE VIDEOGRAPHER:  Do you want to go off
9   the record?
10       MR. HARVEY:  If he's just going to check
11  it --
12       THE WITNESS:  I was just going to check.
13       MR. HARVEY:  If he's going to make a
14  call, then yeah.  I'm trying to get him out of here
15  as quickly as possible.  So --
16       THE WITNESS:  Okay.  (Inaudible).
17       MR. HARVEY:  I've handed you what we
18  marked as Exhibit 6 which is a resolution of the
19  board of directors of Labor Smart, Inc.
20   (Exhibit 6 was marked for identification.)
21   Q   Have you seen that document before
22  today?
23   A   Not that I can recall.  What is the date
24  on this?  Oh, '21.  Okay.
25   Q   Okay.  No.  November 7, 2022.

133

1    A   Okay. I'm confused now. Hang on.
2    Okay.
3    Q   If you look, the second whereas clause
4    is the November 7, 2022.
5    A   Okay. Got it. Got it. I was looking
6    down here at the --
7    Q   Okay. So I just asked you if you had
8    involvement in that meeting, and I don't see your
9    name listed up there. Did you have any indirect
10   involvement?
11   A   No. No. Nothing that I can recall.
12   No.
13   Q   Okay. It goes on to talk about -- and
14   you can -- I can point you to the clauses, but I'll
15   just ask you. It talks about suspending
16   Mr. Costello at that meeting. Do you know why
17   Mr. Costello was suspended?
18   A   I -- my only assumption is he -- there
19   was no money.
20   Q   Why would no money result in a
21   suspension from his position of CEO?
22   A   How do you keep somebody if you don't
23   pay them?
24   Q   And I can point you to the whereas
25   clauses too. It also talks about Mike Holley being

134

1    appointed interim CEO until the board of directors
2    makes a determination with respect to Mr. Costello.
3    Do you know why Mr. Holley was appointed interim
4    CEO --
5    A   I don't.
6    Q   -- of Labor Smart?
7    A   I don't, Mr. Harvey. This is all part
8    of that, like, insanity.
9    Q   I get it. I get it. I have to ask you.
10   A   This is where -- this sounds like where
11   James and I started getting -- like, the insanity
12   of it all.
13   Q   Okay. There's also discussion of a,
14   quote, planned spinoff of Takeover. Do you have
15   any idea what that refers to?
16   A   I do.
17   Q   What's that refer to?
18   A   I thought we were going to try and get
19   out of here early today. Labor Smart -- from what
20   we were told as outsiders, Labor Smart could not
21   get traded and could not be audited. Therefore,
22   the only way to save the shareholders, so to speak,
23   was to spin off Takeover industries. So it was my
24   understanding, as an investor and an outsider, that
25   that spinoff was being worked on by Jason Tucker

135

1    and the management so the shareholders could get
2    trading again.
3    Q   Why couldn't Labor Smart get trading or
4    audited?
5    A   Because it was never -- the work wasn't
6    being done to get that done. There was a lot of
7    work, Mr. Harvey. Again, tax returns, accounting
8    audits.
9    Q   Okay.
10   A   Assets.
11   Q   Did you receive communications about
12   this planned spinoff?
13   A   Through social media. Through the
14   company's social media and Jason Tucker's social
15   media.
16   A   That was the only information you
17   received? You didn't get --
18   A   Yes. Nothing inside. No.
19   Q   Okay. When was the planned spinoff
20   supposed to -- when you first heard about it, when
21   was it supposed to take place?
22   A   I think soon after LTNC, Labor Smart,
23   got delisted.
24   Q   When was that?
25   A   Sometime in mid-'21, I think. Mid-'21.

136

1    Q   Why did Labor Smart get delisted?
2    A   They did not -- well, I don't know. OTC
3    Markets would not allow them to become trading.
4    Regulatory, promotional -- like, they could have
5    named many things.
6    Q   Okay. Do you know -- and that same
7    paragraph talks about review of documents and
8    information concerning the transaction. Do you
9    know whether Labor Smart actually conducted a
10   review of documents and information concerning the
11   transaction?
12   A   Which paragraph are you on, Mr. Harvey?
13   Q   Yeah. This one's at DEF4.
14   A   Oh, hang on. Yep.
15   Q   And there's a bunch of resolved --
16   A   Okay. Here we go.
17   Q   This is the fourth one from the bottom.
18   A   Okay.
19   Q   It says, Resolved. The planned spinoff
20   from Takeover suspended for 90 days, while the
21   company undertakes a review of documents and
22   information concerning the transaction, which have
23   been withheld by Jason Tucker.
24   A   I don't know. This is --
25   Q   So my question was do you know whether

Transcript of Thomas Zarro
Conducted on November 21, 2024

35 (137 to 140)

137

1  Labor Smart conducted a review of documents and
2  information concerning the transaction?
3      A  I don't. I don't know.
4          MR. HARVEY: Okay. Okay. You can put
5  that one on the stack. This document has been
6  already labeled as Holley Exhibit 4. So we won't
7  relabel it.
8      (Holley Exhibit 4, previously marked, was
9  identified.)
10         And at the top of this one, it says,
11 Written Consent Board of directors of Takeover
12 Industries Inc.
13     Q  Do you see that?
14     A  I do.
15     Q  Do you recognize this document?
16     A  I don't.
17     Q  And it -- in the numbered paragraph six
18 on the second page, it says, Joseph Pavlik was
19 appointed interim president of the company until
20 the board makes a determination with respect to
21 Jason Tucker.
22         Do you see that?
23     A  I do.
24     Q  Did you or anyone else from Takeover
25 provide -- well, strike that. To your knowledge,

138

1  did Mr. Deppoleto provide written consent for
2  Mr. Pavlik's appointment as Takeover's president?
3      A  No. I don't know. I take that back. I
4  don't know. I wasn't there.
5      Q  To your knowledge, did any officer or
6  director of Takeover ask for Mr. Deppoleto's
7  consent to have Mr. Pavlik appointed as president?
8      A  Not to my knowledge.
9      Q  On this same document, paragraph seven
10 says that Mr. McBride has been appointed as the CEO
11 of Takeover; correct?
12     A  Yes.
13     Q  Did Mr. Deppoleto provide written
14 consent for Mr. McBride's appointment as Takeover's
15 CEO?
16     A  All before my time, Mr. Harvey. I don't
17 know.
18     Q  And I have to ask you because you're
19 only here once. So I assumed as much, but --
20     A  Yeah.
21     Q  -- I've just got to check it off my box.
22     A  Sure. It's no problem.
23     Q  Are you aware of any officer or director
24 of Takeover seeking Mr. Deppoleto's consent?
25     A  As of this time period, I can't answer.

139

1      I don't know.
2      Q  Okay. And, again, like I said, I've got
3  a checklist. I just need to check the boxes. So
4  if the answer is no, just say no, and we'll move on
5  to the next exhibit.
6      A  No.
7      Q  Okay. And, again, a broader timeline
8  question: You understand that the company, being
9  Takeover, entered into several notes with
10 Mr. Deppoleto. Fair?
11     A  Yes.
12     Q  Did you have any involvement with the
13 May 25th, 2022, note between Takeover and
14 Mr. Deppoleto?
15     A  I did not.
16     Q  Did you have any involvement with the
17 secured convertible promissory note Takeover
18 entered into with Mr. Deppoleto?
19     A  No.
20     Q  Did you have any involvement in the
21 joint written consent of the board of directors and
22 shareholders of Takeover Industries Inc. on May
23 2022 authorizing the company to enter into the note
24 with Mr. Deppoleto?
25     A  No.

140

1      Q  Did you have any involvement with the
2  first amendment to the convertible note purchase
3  agreement, dated July 6th, 2022 --
4      A  No.
5      Q  -- between Mr. Deppoleto --
6          Hold on.
7      A  Oh, sorry.
8      Q  -- Mr. Deppoleto and Takeover?
9      A  No.
10     Q  Okay. And, again, I'm just checking
11 boxes.
12     A  No. I got you.
13     Q  I've got to get the question out first.
14 Did you have any involvement in the second secured
15 convertible promissory note, dated July 6th, 2022,
16 between Mr. Deppoleto and the company?
17     A  No.
18     Q  Did you have any involvement in the
19 joint written consent of the board of directors and
20 shareholders of Takeover Industries Inc., dated
21 July 1, 2022?
22     A  No.
23     Q  Did you have any involvement in the
24 second amendment to convertible note purchase
25 agreement, dated August 19, 2022?

Transcript of Thomas Zarro
Conducted on November 21, 2024

36 (141 to 144)

141

1    A   No.
2    Q   Did you have any involvement in the
3   third secured convertible promissory note, dated
4   August 19, 2022?
5    A   No.
6    Q   Did you have any involvement in the
7   joint written consent to the board of directors and
8   shareholders of Takeover Industries Inc., dated
9   August 18, 2022?
10   A   No.
11   Q   I'm trying to think of a way to short
12  circuit this a little bit.  You're aware that
13  Mr. Deppoleto provided at least 1.5 million to
14  Takeover; correct?
15   A   I am.
16   Q   Do you know how Takeover used that 1.5
17  million that Mr. Deppoleto provided?
18   A   I don't.  I wasn't there.  My assumption
19  is for the whole gamer shot campaign.
20   Q   Do you know whether any of it was used
21  to fund salaries?
22   A   I don't know.
23   Q   So if it was used to fund a salary for
24  Mr. McBride, you don't know one way or another
25  whether that --

142

1    A   I don't.
2    Q   Okay.  Setting aside the 1.5 million
3   that was -- that Mr. Deppoleto provided to the note
4   -- provided pursuant to the notes, you're also
5   aware that Mr. Deppoleto provided additional monies
6   that totaled about $500,000; correct?
7        MR. BENNION:  Objection.  Vague and
8   ambiguous.  Lacks foundation.  May call for
9   speculation.
10       Go ahead.
11   A   I don't.  Are you saying in addition to
12  the 1.5?
13   Q   Correct.
14   A   He -- I -- yeah.  He bought a private
15  placement, a subscription, if you will, which he's
16  been paid back for since my involvement.
17   Q   What do you mean by that?  Can you say a
18  little more?
19   A   I believe he paid $500,000 for 400
20  million shares of the parent company which, since
21  my involvement, we have made right with
22  Mr. Deppoleto.  So he's gotten paid for that if
23  that's what you're referring to.
24   Q   That's helpful.  No, that's actually not
25  what I'm referring to.

143

1    A   Okay.
2    Q   I'll ask it this way:  Have you read the
3   complaint in this case?
4    A   At various times.  Yes.
5    Q   Okay.  And you understand, from reading
6   the complaint, that there was -- that Mr. Deppoleto
7   is alleging he provided not only the 1.5 million
8   pursuant to notes, setting those aside, he also
9   provided supplemental loans that totaled about
10  500,000.
11   A   I'm aware that they're in the complaint
12  in the aggregate total of being claimed.  Yes.
13   Q   About 2 million is the total; correct?
14   A   I think it's 2.1.
15   Q   Okay.
16   A   Yeah.
17   Q   Takeover received that additional
18  supplemental loan; correct?
19       MR. BENNION:  Objection.  Lacks
20  foundation.  Calls for speculation.  May call for a
21  legal conclusion.
22       Go ahead.
23   A   I'm not aware of that.
24   Q   Did you ever look into, after looking at
25  the complaint, whether Mr. Deppoleto was, in fact,

144

1   entitled to the supplemental loans of about
2   $500,000?
3        MR. BENNION:  Objection.  Calls for a
4   legal conclusion.
5    A   I don't -- I do not begrudge
6   Mr. Deppoleto and take him at his word that if
7   those funds were sent, then they were sent for the
8   benefit of Takeover.
9    Q   Okay.  And I think I know the answer to
10  this, but I have to ask it anyways.  In terms of
11  discussions that Mr. Deppoleto had with Takeover
12  about additional loans in the October of 2022 and
13  November 2022 time frame, you were not involved in
14  any of those discussions?  Fair?
15   A   Fair.  Yes.
16       MR. BENNION:  Is this planned.
17       THE WITNESS:  Finally, a friendly face.
18       MR. HARVEY:  I've never had that happen
19  before.  So --
20       MR. BENNION:  Nor I.
21       MR. HARVEY:  I can't keep my water on
22  the table.  I guess we'll continue to soldier
23  forward here.  And I'll show it to you if you'd
24  like to see it, but I will tell you that
25  Mr. Deppoleto, through counsel, sent a first notice

145

1  of default and demand for payment on November 8,
2  2022. Did you see that document at any point
3  around that time frame -- November 8, 2022?
4      A   No.
5      Q   Have you since seen it?
6      A   I may have. I don't recall.
7      Q   Were you involved in any discussions
8  with anyone from Takeover about what to do in
9  response to that November 8 notice of default?
10         MR. BENNION: Objection. Vague and
11 ambiguous.
12         Go ahead.
13     A   I spoke to, I think, Jason Tucker about
14 what does all this mean, how do we get paid, how do
15 we get James handled?
16     Q   So it sounds like you saw or were made
17 aware of the November 8, 2022 --
18     A   I was aware that all hell had broken
19 loose and the shit hit the fan.
20     Q   Was it specifically triggered by
21 Mr. Deppoleto?
22     A   Yes.
23     Q   Hold on.
24         MR. BENNION: You have to let him finish
25 his question.

146

1          THE WITNESS: Okay. Sorry.
2          MR. HARVEY: I know you know where I'm
3  going, but, again, we don't want to get in trouble
4  with the court reporter.
5          THE WITNESS: Okay. Sorry, guys.
6      Q   So shortly after, fair to say, November
7  8, 2022, you were made aware of Mr. Deppoleto's
8  notice of default; correct?
9          MR. BENNION: Objection. May call for
10 speculation. Vague and ambiguous.
11     A   I was aware that the hammer was coming
12 down. Specifically, a notice of default has been
13 delivered, I can't recall that, but I knew the
14 hammer was coming.
15     Q   How did you know the hammer was coming
16 down?
17     A   Because I was -- I had the same hammer
18 in my hand.
19     Q   Okay. Who did you first talk to about
20 Mr. Deppoleto's hammer?
21     A   Jason Tucker.
22     Q   And you might not remember the exact
23 date, but do you remember approximately when it
24 was?
25     A   My assumption is November '22 when that

147

1  court thing all went to hell.
2      Q   And what was your discussion with
3  Mr. Tucker specifically related to Mr. Deppoleto's
4  claim?
5      A   That he's done. He's done.
6      Q   Who's the he in that sentence?
7      A   James is done. Mr. Deppoleto.
8      Q   And when you say he's done --
9      A   Like, he's not going to participate any
10 further with funding Takeover.
11     Q   Okay. And at that time that you had the
12 discussion with Mr. Tucker, he was still with --
13 well, let me back up. When you had the discussion
14 with Mr. Tucker, was he disputing the amounts that
15 James was claiming he was owed?
16     A   No.
17     Q   So -- well, actually, let me back up.
18 Have you ever seen -- well, I'll tell you
19 Mr. Deppoleto sent a second notice of default,
20 dated November 22, 2022, and I'm happy to show it
21 to you if you'd like, but --
22     A   I trust you and him.
23         MR. BENNION: There's no question before
24 you.
25         THE WITNESS: Oh, I'm sorry.

148

1      Q   Have you ever seen that second notice of
2  default?
3      A   I may have.
4      Q   Okay. Well, actually, let me back up.
5  You described a discussion with Mr. Tucker about
6  Mr. Deppoleto's claim. Did you discuss
7  Mr. Deppoleto's claim around November 2022 with
8  anyone from Takeover other than Mr. Tucker?
9      A   I think with Mr. Deppoleto himself.
10     Q   When was that discussion?
11     A   Sometime around that.
12     Q   Okay. And what do you remember about
13 that discussion?
14     A   He was angry.
15     Q   Anything else?
16     A   Not specifically. My call was a -- I
17 don't want to say olive branch, but it was kind of
18 like, hey, we're in this boat. How do we get out?
19     Q   Did you discuss Mr. Deppoleto's claim in
20 or around November 2022 with either Mr. Pavlick,
21 Mr. McBride, or Mr. Holley?
22     A   If not then, soon after, but --
23     Q   You don't -- what do you remember?
24 Well, with all three of them or with one of them or
25 --

149

1    A    Probably, at that point, all three.
2    Q    And what do you remember about that
3    discussion?
4    A    How do I get paid? What's going on?
5    Like, what is really going on here? Like, how can
6    this even be, like, not a movie at this point.
7    Q    And in terms of Mr. Deppolito's claim,
8    did you discuss Mr. Deppolito's claim with him?
9    A    I'm sure it came up. I don't remember
10   specifically, Mr. Harvey.
11   Q    Do you remember them disputing any part
12   of Mr. Deppolito's claim?
13   A    Yes. They felt very wronged by
14   Mr. Deppoleto.
15   Q    What do you mean by that?
16   A    He came in and left, and he short-
17   circuited all the opportunities with the company.
18   Q    But in terms of the amount he was
19   claiming from the amount of --
20   A    I don't think anybody's -- I'm sorry.
21   Q    Were they disputing the amount he was
22   claiming he was owed from the company?
23   A    Nobody's disputing the money, that 1.5
24   for sure was put into Takeover and that the other
25   dollars are being claimed. I think the dispute

150

1    arises in the validity of the debt, not the money
2    that went in. So their position at that time is we
3    don't owe him the money because these obligations
4    were not done properly.
5    Q    But they admitted receiving the money?
6    A    I think nobody argued. I mean, wires
7    show money in.
8    Q    Correct.
9    A    The company received the money. If
10   that's what you're asking, the company received the
11   money.
12   A    Correct. So why were they disputing it?
13   Q    I don't believe -- I believed at that
14   time they were saying that the notes were all done
15   in a fraudulent fashion and that they weren't
16   signed with the proper authority, and I believe the
17   judge, to some degree, agreed with them in the
18   Arizona case.
19   Q    Have you seen a written decision that
20   actually says that, I guess? I've had the same
21   conversation in depositions with the other
22   witnesses, and no one seems to be able to point me
23   to a written decision that actually says that. Are
24   you aware of a written decision that says that?
25   A    I am not. I am not. I -- yeah, I am

151

1    not. Not on the notes if that's what you mean. I
2    can point to a decision that points to there's
3    concerns with the notes. That we can point to.
4    Q    Are you aware of the supplemental --
5    you're talking about the Arizona judge; correct?
6    A    Yes, yes, yes, Mr. Harvey.
7    Q    Are you aware of the Arizona judge
8    requiring your Nevada counsel to file a
9    clarification in the Nevada court --
10   A    Yes.
11   Q    -- about that very point?
12   A    Yeah. Not about that very point. I do
13   remember there was a not so happy judge in Arizona
14   with a Nevada statement. I do not know
15   specifically what that referred to.
16   Q    Okay. In any event, when you discussed
17   with Mr. McBride, Mr. Pavlik, and Mr. Holley, in
18   terms of the specific dollar amount that
19   Mr. Deppoleto was claiming, did they say, yeah,
20   that dollar amount is not right or words to that
21   effect?
22        MR. BENNION: Objection. Vague and
23   ambiguous.
24   A    Only that it wasn't -- they didn't feel
25   it was due.

152

1    Q    But in terms of the dollar figure?
2    A    No. Everybody agrees that that 1.5 plus
3    is mostly valid.
4    Q    And when you say plus, the additional
5    500-, 600,000?
6    A    Yeah. I don't think anybody's trying to
7    get cute there, but I don't have all the specifics.
8    Q    Okay. Okay. So I --
9    A    And, Mr. Harvey, may I? Nobody, again,
10   is begrudging James Deppolito. Okay? I still hope
11   to get to a point where we can have a conversation
12   with him, and I've worked very hard to have that
13   conversation to prevent all of this.
14   Q    I appreciate it.
15   A    So I'm not going to come out now and say
16   he this, he that, you know.
17   Q    I appreciate that. In terms of the --
18   so I pointed you to -- again, I'll show it to you
19   if you'd like -- the November '22 second notice of
20   default. After that came in, did you have any
21   discussions with anyone at Takeover about the
22   second notice of default?
23   A    Not specifically.
24   Q    Did you have any discussions at all
25   about Mr. Deppolito's claim on or shortly after

Transcript of Thomas Zarro
Conducted on November 21, 2024

---

153

1 November 2022?
2    MR. BENNION: Objection. Asked and
3 answered.
4    MR. HARVEY: Go ahead.
5    A  Oh, what was the question again?
6    Q  After November 2022 -- so before I had
7 asked you about the first notice of default, which
8 was dated November 8, 2022, and I said, did you
9 talk to anyone from Takeover? And you said, yes,
10 Tucker, and then I spoke to the three other --
11 Pavlik --
12    A  After. Yeah, soon after. Like, what's
13 going on?
14    Q  Right.
15    A  Yeah.
16    Q  That was after the first notice of
17 default which was --
18    A  I would assume.
19    Q  -- November 8. My question -- I'm
20 asking you basically the same thing but after
21 November '22.
22    A  Same answer. Same answer.
23    Q  So you spoke to both Mr. -- well, did
24 you speak to Mr. Tucker individually?
25    A  Yes.

---

154

1    Q  What do you remember about that
2 discussion?
3    A  All geared towards what are we going to
4 do to fix this.
5    Q  And in that discussion, he, again, was
6 not disputing Mr. Deppoleto's claim; true?
7    A  He was not.
8    Q  And then you had -- if I'm understanding
9 you correctly, you had a different discussion than
10 that, but you had one with Mr. Pavlik, Mr. McBride,
11 and Mr. Holley; correct?
12    A  Correct.
13    Q  What do you remember about that
14 discussion?
15    MR. BENNION: Objection. Asked and
16 answered.
17    A  Again, same answer -- that they believed
18 that a lot of the -- there was fraud in the way the
19 notes were done and that, while the dollars came
20 into the account, they weren't necessarily
21 authorized by them. That was their contention.
22    Q  Setting aside Mr. Tucker, Mr. Pavlik,
23 Mr. McBride, and Mr. Holly, did you discuss
24 Mr. Deppoleto's claims with anyone else with any
25 affiliation with Takeover or Labor Smart?

---

155

1    A  Not to my knowledge. No.
2    Q  Did you have a discussion with
3 Mr. Deppoleto after November 2022?
4    A  Yes.
5    Q  What do you remember about -- was it one
6 discussion or several?
7    A  We've talked many times.
8    Q  What do you remember about -- does
9 anything stick out about those discussions?
10    A  I mean, we both share a common disdain
11 for what took place prior to -- you know, during
12 his involvement. And in these time frames, most of
13 our conversations have been towards trying to get
14 him monetized for his investment in Takeover, which
15 we've done, and get him settled on his outstanding
16 claims and put this litigation to bed in hopes that
17 maybe Takeover could become something.
18    Q  As far as you're aware, after
19 Mr. Deppoleto sent these two notices, did Takeover
20 begin a process to repay Mr. Deppoleto's loans?
21    A  I don't think there was any ability.
22    Q  So you're not aware of any processes?
23    A  I'm not aware.
24    Q  We were talking briefly a moment ago
25 about the proposed spinoff or spinout of Takeover.

---

156

1 Do you know whose idea it was to do that?
2    A  I think Jason Tucker.
3    Q  And do you know what specific actions,
4 if any, were taken in order to facilitate that or
5 attempt to facilitate that?
6    A  He engaged an auditor, and he engaged
7 legal counsel.
8    Q  Anything else?
9    A  No.
10    Q  Do you know why -- well, we agree that
11 Takeover is not public today; correct?
12    A  It's public through its parent company.
13 No. Excuse me. Takeover is a private company.
14    Q  Do you know why the spinout or spinoff
15 didn't occur?
16    A  Because the work that was necessary to
17 follow up with those engaged auditors and engaged
18 legal counsel was not done.
19    Q  Do you know why?
20    A  I have a suspicion.
21    Q  What's your suspicion?
22    A  It required a lot of work, Mr. Harvey.
23    Q  And what do you mean by that?
24    A  There's a lot of work that takes place
25 to get a company trading that's been delisted, and

157

1  I believe Mr. Tucker chose not to pursue that that
2  work.
3      Q   Well, Takeover wasn't delisted, though;
4  correct?
5      A   It was never publicly listed.  It was
6  never listed.
7      Q   And so my question was why wasn't
8  Takeover spun out as contemplated?
9      A   Because the work was never done.
10     Q   Do you know why?
11     A   I do not.
12     Q   To your knowledge, did anyone from
13 Takeover seek Mr. Deppoleto's consent to spin out
14 Takeover?
15     A   I wasn't there at the time.  I had no
16 conversations with Mr. Deppoleto and Mr. Tucker as
17 it relates to what they were doing with the
18 company.
19     Q   And I'm asking you, as you sit here
20 today, are you aware of anyone seeking
21 Mr. Deppoleto's consent to spin out Takeover?
22     A   I'm not aware.  I wasn't there.
23     Q   Okay.  Even today are you aware?
24 Looking back, did anyone tell you we sought his
25 consent?

158

1      A   I'm not aware of anybody specifically.
2      Q   Do you know whether Takeover made public
3  its intention to spin out Takeover?
4      A   They did.
5      Q   Through what medium?
6      A   Social media, press releases.
7      Q   When was this?
8      A   I'm sure later 2021 and 2022 through
9  that whole period leading up to the insanity of
10 November '22.
11     Q   Okay.
12     A   That's what kept the shareholders
13 engaged.
14     Q   You've described the Arizona lawsuit a
15 couple of times in the last, you know, 10, 15
16 minutes.  I believe it was filed on March 8, 2022.
17 Did you have any involvement in the decision to
18 file that lawsuit against Mr. Holley?
19     A   Say the dates again, Mr. Harvey?
20     Q   I believe the lawsuit was filed on March
21 8, 2022, and I can get you --
22     A   March 8th.  Okay.
23     Q   I can get you a copy of that.
24     A   Okay.  No, no, no.  Okay.  Now ask your
25 question, please.

159

1      Q   Did you have any involvement whatsoever
2  in the decision to file the Takeover v. Holley
3  lawsuit in Arizona?
4      A   No.
5      Q   You've seen the complaint from that
6  case; correct?
7      A   I'm aware of it.
8      Q   When was the first time you saw the
9  complaint or (crosstalk)?
10     A   I think through the public filings.
11     Q   Now as of March 8, 2022, were you on the
12 Takeover Board of Directors at that time?
13     A   No.
14     Q   Did you ever review the complaint before
15 it was filed?
16     A   No.
17     Q   Did you provide any information that was
18 used in the complaint?
19     A   No.
20     Q   Do you know who approved filing the
21 complaint?
22     A   No.  Do you know whether Takeover
23 notified Mr. Deppoleto about the Arizona litigation
24 before it was filed?
25     A   I'm not aware.  No.

160

1      Q   Okay.  And it's my understanding that
2  Takeover filed a stipulation to dismiss all claims
3  against Michael Holley and his wife, Chirine, C-H-
4  I-R-I-N-E.
5      A   Possible.
6      Q   Did you -- well, are you aware of that?
7      A   That was all before my time.
8      Q   Okay.  So did you have any decision --
9  any input or involvement in the decision to dismiss
10 those claims against --
11     A   No.
12     Q   -- Mr. Holley and his wife?
13     A   No.
14     Q   Were you on -- and that was -- I believe
15 the stipulation to dismiss those claims was in
16 February 2023.  Were you on the Takeover Board of
17 Directors in February of 2023?
18     A   I was not.
19     Q   Do you know who at Takeover made the
20 decision to dismiss the claims against Mr. Holley
21 and his wife?
22     A   I'm assuming it was Toby, Mike, and Joe
23 with their legal counsel.
24     Q   Toby McBride, Mike Holley, and
25 Joe Pavlik?

161

1    A   Correct.
2    Q   Do you know why Takeover decided to
3  dismiss those claims against the Holleys?
4    A   No.
5    Q   Do you know whether Takeover received
6  any meaningful consideration in exchange for
7  dismissing the claims against the Holleys?
8        MR. BENNION:  Objection.  Vague and
9  ambiguous.
10   A   I'm not aware.  I mean, specifically, I
11 don't know the terms.
12   Q   And when I say meaningful consideration,
13 are you aware of Takeover receiving any money or
14 any other thing of value in exchange for dismissing
15 the claims against the Holleys?
16   A   I am not aware.
17   Q   Do you know whether Takeover obtained
18 Mr. Deppoleto's consent to dismiss the claims
19 against the Holleys?
20   A   I am not aware.
21       MR. HARVEY:  Okay.  Let me show you
22 another --
23       THE WITNESS:  Can we take, like, a
24 five-minute break?
25       MR. HARVEY:  Oh, yeah.

162

1        MR. BENNION:  Yes.  Absolutely.
2        MR. HARVEY:  Yeah.
3        THE VIDEOGRAPHER:  We're going off the
4  record.  The time is 11:22 a.m.
5    (Off the record.)
6    (On the record.)
7        THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 11:31 a.m.
9        MR. HARVEY:  I'm going to hand you what
10 was previously marked as Holley Exhibit 10.
11       (Holley Exhibit 10, previously marked, was
12 identified.)
13 BY MR. HARVEY:
14   Q   Have you ever seen that document,
15 Mr. Zarro?
16   A   What have we got here?
17   Q   So just to orient ourselves, it says,
18 Related Party Receivable Confirmation.  It's dated
19 March 25, 2022, at the top.  Do you see that?
20   A   Yes.
21   Q   Have you seen that before today?
22   A   No, not to my recollection.
23   Q   It says, The following information --
24 well, actually, let me back up.  Do you know who BF
25 Brogers, CPA PC --

163

1    A   I do.
2    Q   Who's that?
3    A   That's the audit firm.  The PCAOB audit
4  firm.
5    Q   Okay.  And it says, The following
6  information relating to amount owed by me to
7  Takeover Industries Inc, as of December 31, 2021,
8  agrees to my records:  due from related party as on
9  December 31, 2021, $243,000 -- 200 -- oh, 243, 250
10 -- strike that.  $243,253.84.  Do you see that?
11   A   Yes.
12   Q   And then it's signed by Toby McBride;
13 correct?
14   A   Yes.
15   Q   So this is telling us that Toby McBride
16 is admitting to owning Takeover Industries $243,000
17 and change as of December 31, 2021; correct?
18   A   That's what it appears like.
19   Q   Okay.  Do you disagree with this
20 document?
21   A   I believe that has proven not to be --
22 like, a lot of those expenses were business
23 expenses.
24   Q   Do you have any idea why Mr. McBride
25 would say -- would sign something saying he owes

164

1  $243,000 to the company?
2    A   There are many things that happened
3  before my involvement that make no sense.
4    Q   And this is from Takeover's auditors,
5  though; correct?
6    A   Well, it's -- no.  It's from the
7  auditor, but the source of the information is not
8  -- like, the auditor just accounts.  Doesn't
9  instruct, doesn't direct.
10   Q   Is there anything in here indicating
11 that the auditor disagrees that Mr. McBride owes
12 243,000?
13   A   No.
14   Q   Would you sign something saying I owe
15 $243,000 if you didn't, in fact, owe?
16   A   No.  No.  There we agree, Mr. Harvey.
17   Q   Okay.  Do you know -- well, did you ever
18 tell Mr. Deppoleto about Mr. McBride owing Takeover
19 $243,000?
20   A   No.  This was -- no -- all before my
21 time.
22   Q   Are you aware of anyone from Takeover
23 telling Mr. Deppoleto that Mr. McBride owed
24 Takeover 243,000?
25   A   I am not aware.

165

1    MR. HARVEY: Okay. You can put that one
2  on the pile.
3    Q  We talked briefly before about directors
4  and officers' liability insurance for Takeover, and
5  you said that you made sure that that was put in
6  place sometime after April 2023; correct?
7    A  It was my instruction.
8    Q  Do you know what the liability limits
9  were?
10   A  I don't.
11   Q  Do you know who the carrier was?
12   A  I don't.
13   Q  Who actually -- you said you made sure
14 that it got put in place, but who actually executed
15 to make sure that --
16   A  Mike Holley.
17   Q  Mike Holley.
18   MR. HARVEY: All right. This will be
19 Exhibit 7.
20   (Exhibit 7 was marked for identification.)
21   Q  This is dated March 23, 2023; correct?
22   A  (No verbal response.)
23   Q  And it says Labor Smart, Inc. to the --
24   A  Okay. Yep.
25   Q  0.0002 per unit private placement

166

1  agreement of Labor Smart, Inc.; correct?
2    A  Yes.
3    Q  Do you recognize this document?
4    A  Yes. And not specifically, but yes.
5    Q  And pursuant to this agreement, you
6  received 165 million shares of Labor Smart in
7  exchange for your payment of $33,000; correct?
8    A  I don't believe I've received those
9  shares yet, but they're owed. They're due me.
10   Q  Okay. When did you make that $33,000
11 payment to Labor Smart?
12   A  It looks like March '23.
13   Q  Okay. How did Labor Smart intend to use
14 your investment in the company?
15   A  I don't know. I don't recall. I
16 shouldn't say I don't know. I don't recall.
17   Q  Did you have any discussions before you
18 came to this agreement with anyone from Labor
19 Smart?
20   A  I'm sure. I'm sure.
21   Q  All right. You don't remember anything
22 specific?
23   A  Not specifically.
24   Q  When are you going to receive those
25 shares?

167

1    A  When I take the time and insist that
2  they be issued which is coming very soon.
3    MR. HARVEY: Probably after this
4  deposition.
5    THE WITNESS: Yeah.
6    MR. BENNION: There's no question before
7  you.
8    THE WITNESS: Oh, sorry.
9    MR. HARVEY: You can put that one in the
10 file.
11   THE WITNESS: I don't know how you guys
12 do this.
13   MR. HARVEY: All right. I've handed you
14 what we marked as Zarro Exhibit 8.
15   (Exhibit 8 was marked for identification.)
16   THE WITNESS: Good times.
17   Q  Do you recognize this document?
18   A  I do.
19   Q  Can you just generally describe what is
20 it.
21   A  It looks like a payment plan to pay one
22 of the providers that the company had prior to my
23 involvement. Just evidence to your point -- what
24 was I doing trying to help Takeover. There you go.
25   Q  Okay.

168

1    A  Right there.
2    Q  At the top, it's called Proposed Term
3  Sheet; correct?
4    A  Mm-hmm.
5    Q  Yes?
6    A  Yes, sir.
7    Q  And then the date is April 14, 2023;
8  correct?
9    A  Yes.
10   Q  So does that narrow the time? Well, let
11 me -- let me back up. You signed at the bottom
12 left corner; correct?
13   A  I did.
14   Q  So that helps us narrow it down that, at
15 least as of April 14, 2023, you were CEO of the
16 company and able to sign documents on its behalf.
17 Is that fair?
18   A  I don't know if April is the drop-dead
19 date, but it looks like I was making moves.
20   Q  What is Boost Transport?
21   A  That's the fulfillment company.
22   Q  What's a fulfillment company?
23   A  Shipping, receiving, storage, 3PL.
24   Q  3PO. What's that?
25   A  3PL, third-party logistics.

Transcript of Thomas Zarro
Conducted on November 21, 2024

43 (169 to 172)

169

1    Q   Is that who owns the warehouse?
2    A   Yes.
3    Q   Who's Dusty Benefield?
4    A   One of the managers there. One of the
5    principals or managers.
6    Q   Okay. And what's the purpose of this
7    term sheet?
8    A   To settle the debt. We owed them
9    $80,000. We were trying to make it right and
10   maintain the services.
11   Q   Why did it Takeover owe Boost about
12   $84,000.
13   A   Because Jason, the previous management,
14   decided to send a bunch of product to every
15   7-Eleven in the country and created a shipping bill
16   that they didn't -- couldn't pay.
17   Q   Did Takeover fully repay Boost?
18   A   No.
19   Q   How much -- well, does it still owe
20   Boost?
21   A   No. They issued shares in settlement.
22   A couple payments were made. Cash was scarce. So
23   then shares were issued.
24   Q   Shares in Labor Smart?
25   A   Correct.

170

1    Q   How many shares? Do you know?
2    A   I want to say 25 million, but I'm not
3    sure.
4    Q   Do you know how much -- you said there
5    were a couple of payments? Do you know how much
6    those payments amounted to?
7    A   Not off the top of my head.
8        MR. HARVEY: Okay. You can set that one
9    aside. I've handed you what we marked as Exhibit
10   9.
11       (Exhibit 9 was marked for identification.)
12       THE WITNESS: Thank you.
13       MR. HARVEY: And this is --
14       THE WITNESS: I appreciate the reminder.
15   Q   This is -- at the top, it says Labor
16   Smart, Inc., the same similar numbers, Private
17   Placement Agreement, and it looks like it's dated
18   June '23 or June 2023; is that correct?
19   A   Yes.
20   Q   What is this?
21   A   It's another investment I've made to try
22   and keep the company afloat.
23   Q   Now, as I flip through this, I don't see
24   signatures actually on it. Do you know whether
25   there's an executed version of this document?

171

1    A   I don't. I don't.
2    Q   If you flip to DEF509, so the very last
3    page -- the very last page --
4    A   I must have given you this.
5    Q   -- that's confirmation that you actually
6    paid $50,000 to Labor Smart; correct?
7    A   Yes.
8    Q   And you made that payment on June 22,
9    2023; correct?
10   A   Yeah. Uh-huh.
11   Q   So having refreshed your memory a touch,
12   seeing the payment confirmation, does this refresh
13   your memory at all about whether there's a fully
14   executed document?
15   A   I really don't know if it's been fully
16   executed. For all I know, it's sitting in my
17   DocuSign inside or --
18   Q   Okay.
19   A   I believe it's a valid document, if
20   that's what you're after, Mr. Harvey.
21   Q   I was just wondering if there's a
22   different version of this or if you believe this is
23   the final version. It just hasn't been signed.
24   A   I believe this is the final version.
25   Q   Okay. And on the first page, it tells

172

1    us that you are receiving 250 million shares of
2    Labor Smart; correct?
3    A   Yep.
4    Q   For the payment of $50,000; correct?
5    A   Yep.
6    Q   And then if you go on to the next page,
7    DEF494, it says, Private -- in the middle of the
8    page -- it says, Private placement subscription
9    agreement to Labor Smart, Inc., care of Next Gen
10   Beverages LLC; correct?
11   A   Mm-hmm.
12   Q   Yes?
13   A   Yes.
14   Q   So what is going on with this particular
15   subscription agreement?
16   A   In what respect?
17   Q   Well, what led to this?
18   A   The company needed money to survive.
19   Q   Which company?
20   A   Labor Smart, Next Gen, and Takeover.
21   Q   So explain that to me if you would. I
22   don't --
23   A   Labor Smart's the parent company. It's
24   got two subsidiaries -- Next Gen and Takeover. At
25   any one time any one of them needs money, and the

173
1  money will come in through the only operating bank
2  account for Next Gen. It is this one. So the
3  money came in, and then it'll be disbursed as
4  needed.
5      Q   So why is it specifically pointing to
6  Next Gen Beverages, though?
7      A   That's the name of the bank account.
8  The bank account is in Next Gen Beverages' name.
9      Q   So you invested $50,000 in June of 2023;
10 correct?
11     A   Yes.
12     Q   And that money did not go to Takeover;
13 correct?
14     A   I cannot say that. It may have. It may
15 have been loaned, paid a bill for. It's possible.
16     Q   Do you think it would say Next Gen
17 Beverages if it was really going to Takeover?
18     A   Yeah.
19     Q   Why do you say that?
20     A   Next Gen is the operating account, if
21 you will, for the parent company until the parent
22 company gets its own operating account.
23     Q   So Next Gen's money is Takeover's money?
24     A   No.
25     MR. BENNION: Objection. Calls for

174
1  legal conclusion.
2      Go ahead.
3      Q   So explain that, then -- I'm not
4  following -- if you would.
5      A   Next Gen is the operating bank account
6  for all the entities right now. For example, we
7  just had our filings done. We had to pay an
8  accountant. The filings were for Takeover, Next
9  Gen, and Labor Smart. Next Gen wrote the check.
10     Q   Does Takeover have its own bank account?
11     A   It does.
12     Q   And yet Next Gen -- the Next Gen bank
13 account was used to pay for Takeover's services.
14     A   It's hard to break out.
15     Q   Why do you say that?
16     A   Well, we didn't take -- you know, if the
17 bill was $10,000, we didn't take money from Next
18 Gen, put 3,000 into Takeover and now to take that
19 3,000, pay the accountant. It was just all paid
20 through Next Gen.
21     Q   So Next Gen is paying Takeover debts;
22 correct?
23     A   I think if you drill down, you'd
24 probably find some of that to be true.
25     Q   Okay. After this June 2023 investment,

175
1  did you make any other investments in Labor Smart?
2      A   Yes.
3      Q   When?
4      A   I don't have the dates.
5      Q   And if you don't have the specific
6  dates, that's fine.
7      A   Just periodically. Like, periodically.
8      Q   Ballpark? Well, let me ask. How many?
9      A   Probably six or eight.
10     Q   And from when to when?
11     A   I would say, like, use this date and
12 then go forward to current. So from June to
13 November '24.
14     Q   Are they all pursuant to similar private
15 placement agreements like this one we're looking
16 at?
17     A   Yes. Yes.
18     Q   So they're all documented?
19     A   Yes.
20     MR. HARVEY: I don't believe those have
21 been produced, Counselor. I'd make a request for
22 those.
23     THE WITNESS: I --
24     MR. BENNION: No. There's no question
25 for you.

176
1      THE WITNESS: Okay.
2      MR. BENNION: He's talking to me.
3      THE WITNESS: Okay.
4      MR. BENNION: And so this is the last
5  one you have?
6      MR. HARVEY: Yeah. Otherwise, I would
7  have questions about the other ones.
8      MR. BENNION: Right. Okay. Understood.
9      MR. HARVEY: Okay.
10 BY MR. HARVEY:
11     Q   So there's been six to eight others.
12 Were they all approximately 50,000 or similar in
13 value?
14     A   Some more, some less.
15     Q   Do you remember what the biggest one
16 was?
17     A   I think 125.
18     Q   When was that approximately?
19     A   Last month. Actually, hang on. Maybe
20 September. In the last couple of months,
21 Mr. Harvey.
22     Q   Do you know what those funds were going
23 to be used for?
24     A   For Labor Smart to acquire another
25 company.

177

1    Q   What company is that?
2    A   A private company and Illumination
3  Holdings.  It just did a acquisition -- all in the
4  public filings.
5    Q   You said a couple things I'm not sure I
6  was quite tracking.  So you made the payment
7  because Labor was going to acquire another company.
8  Was that company Illumination Holdings?
9    A   Illumination Holdings.  It needed money.
10 Yeah.  Labor Smart needed money to --
11   Q   Hold on.  I think we're talking over
12 each other.  Was the money for Labor Smart to
13 acquire Illumination Holdings, or was the money for
14 Illumination Holdings to purchase another company?
15   A   No.  The money was to fulfill an
16 acquisition for Labor Smart for two companies.
17 There's one company that I don't want to name.
18 It's top secret and very confidential for
19 competitive reasons, and the other one was
20 Illumination.





**183**

BY MR. HARVEY:

Q   And these are your responses to Plaintiff's first set of interrogatories; correct?

A   Yes.

Q   Let me back up. I want to ask you one precursor question as we're here today. I think I asked you before, but I want to make sure: Are Takeover's liabilities worth more than its assets right now?

A   Yes.

Q   Since when?

A   Like, probably the second day they operated in business.

Q   In 2021?

A   Yeah.

Q   So it's -- Takeover's assets has essentially never been worth -- have never been greater than its liabilities; is that correct?

A   I would -- yeah.

Q   Okay. If you could look at Exhibit 10 and in particular Interrogatory No. 2, which is on page 3, it asks you individually to describe in detail any efforts that Takeover made to repay Mr. Deppoleto and produce documents, communications that reflect those efforts.

**184**

The first portion of your answer says, After Takeover was able to get rid of Jason, there was nothing left but debts. The company's assets were gone. The bank account -- I think you meant bank accounts -- or bank account was empty, and Jason had left various debts incurred; correct?

A   Yes.

Q   When did Takeover, quote, get rid of Jason?

A   I -- that was before my time.

Q   Okay. Do you know the total amount of debt that Takeover owed at that time?

A   I think it's between 4 and $5 million.

Q   And some of that was Mr. Deppoleto's?

A   Yes.

Q   Has Takeover brought in any revenue since Mr. Tucker was let go?

A   Nothing meaningful that I can think of.

Q   When you say meaningful, meaning?

A   No money, like.

MR. HARVEY: You can put that one aside. Put it on the stack, rather. I'm handing you Exhibit 11 or Zarro Exhibit 11.

(Exhibit 11 was marked for identification.)

Q   At the top of this, it says, Takeover

**182**

I'm going to hand you another exhibit. You can put that one on the pile. This will be Zarro Exhibit 10.

(Exhibit 10 was marked for identification.)

Transcript of Thomas Zarro
Conducted on November 21, 2024

47 (185 to 188)

185

1 Industries Inc. Balance Sheet as of December 31,
2 2022; correct?
3   **A   Mm-hmm.**
4   Q   Yes?
5   **A   Yes. Sorry.**
6   Q   And if you look about two thirds of the
7 way down on page 1, there's a row that says, Total
8 Assets; correct?
9   **A   Correct.**
10   Q   And it says $329,480.64; correct?
11   **A   Correct.**
12   Q   And then if you go about two thirds of
13 the way down on page 2, or actually a little more
14 than that, there's a column or a row that says,
15 Total liabilities. Do you see that? Almost all
16 the way down on the bottom of page 2.
17   **A   Bottom of page 2. Total liabilities.**
18   Q   Yep. Do you see that?
19   **A   Yes. 3.7.**
20   Q   I'm seeing 3.9.
21   **A   That's -- okay. Total, yeah, 3.9.**
22   Q   Yep. Total liabilities. And then if
23 you go about -- if you go about halfway down on
24 that same page 2 -- we're still in the liabilities
25 column --

186

1   **A   Mm-hmm.**
2   Q   -- and there's a reference to
3 James Deppoleto; correct?
4   **A   Yes.**
5   Q   And the total amount listed is 2 million
6 16,697; correct?
7   **A   Yes.**
8   Q   So as of Takeover Industries' balance
9 sheet, dated December 31, 2022, Takeover is booking
10 a liability to Mr. Deppoleto of over $2 million;
11 correct?
12   **A   Correct.**
13   Q   And that would be consistent with our
14 discussions earlier about not only the 1.5 million
15 being owed but approximately 500,000 more; correct?
16   **A   Yeah. That's the claim.**
17   Q   And this is Takeover's own balance
18 sheet, though; correct?
19   **A   It appears that way.**
20     MR. BENNION: Is there a Bates stamp
21 number for this document, Counsel?
22     MR. HARVEY: I don't know. It's
23 something that you guys produced. It's a
24 spreadsheet. So in any event -- strike that.
25 Okay. You can put that one aside. The

187

1 next one I'm going to hand you has already been
2 marked Holley Exhibit 12. So we'll just leave that
3 as Holley Exhibit 12.
4     (Holley Exhibit 12, previously marked, was
5 identified.)
6 BY MR. HARVEY:
7   Q   The first Holley Exhibit 12 is Bates
8 labeled DEF484 through 486, and the first question
9 I wanted to ask you about was on DEF486. It's a
10 little confusing because it spans some pages but
11 the email there, if you look at the page before,
12 it's from you, dated January 3 to Brian Calka, C-A-
13 L-K-A.
14   **A   Mm-hmm.**
15   Q   Correct?
16   **A   Yes.**
17   Q   And on January 3, 2024, you say, Hi,
18 Brian -- unaudited confidential -- here are the
19 2022 numbers for Takeover that are under audit that
20 you asked for. As you can see, it is a big mess.
21     Did I read that right?
22   **A   Yes.**
23   Q   And then you say, We are still being
24 challenged by one creditor; correct?
25   **A   Yes.**

188

1   Q   Who's that?
2   **A   James, I believe. Hang on. Yes. I'm**
3 **referring to James.**
4   Q   Okay. Now why did you refer to
5 Takeover's financials as a big mess?
6   **A   I mean, I know I'm not allowed to ask**
7 **questions here, Mr. Harvey, but you've got to be**
8 **kidding me.**
9   Q   Well --
10     MR. BENNION: You cannot ask questions.
11 It's the deposition process. That may be part of
12 your answer, but go ahead and answer it if you can.
13     I'm going to object as to vague and
14 ambiguous. Go ahead.
15     THE WITNESS: I apologize. I mean --
16 certainly mean no disrespect.
17   **A   It -- because it's a big mess.**
18   Q   Okay.
19   **A   Liabilities, nothing's affirmed, sued**
20 **from everybody. I mean, just it's a mess.**
21   Q   You go on to say, This is the reason we
22 are wanting to give you a new note.
23     What do you mean by Give you a new note?
24   **A   Give him a convertible note, an LTNC,**
25 **like we offer James so he could get paid.**

189

1  Q  And you go on to say, New brand.  What
2  do you mean by New brand?
3  A  Well, LOCK'D IN.  Like, in other words,
4  new note with new life in the company.
5  Q  And so you're saying Takeover was not
6  going to issue this new note; correct?
7  A  They couldn't.  They're a private
8  company.
9  Q  Private companies can't issue new notes?
10  A  It would be worthless.  That would be
11  fraud.  It would be fraud for me to even suggest
12  that, Mr. Harvey.
13  Q  Could Next Gen beverages issue a note?
14  A  No.  No.
15  Q  Maybe I'm not understanding.  I
16  understand your point about Next Gen being a
17  private company, so it couldn't issue publicly
18  traded shares, but why couldn't it enter into a
19  promissory note?
20  A  Oh, well, when I say note, I'm referring
21  to convertible note, not a promissory note.  A
22  convertible note.
23  Q  Okay.
24  A  A securities instrument like I have,
25  like my note.

190

1  Q  Got you.  Okay.  Thank you for
2  clarifying.
3  A  No problem.
4  Q  Did Brian agree to a new convertible
5  note?
6  A  He did not.
7  Q  Why not?
8  A  Let me think.  This is still an active
9  litigation.  I think we -- our last conversation
10  with them was a settlement talk.  Our attorney in
11  New York does not believe that they have a valid
12  debt to the tune that they're asking.  So it's
13  currently in litigation.
14  Q  Okay.  Going up to DEF484, the first
15  page of that exhibit, you say, Hi, Brian.  Yes, we
16  can, but it's important to note that Takeover is
17  dead.  Absolutely.
18      Do you see that?
19  A  Yes.
20  Q  What did you mean by Takeover is dead?
21  Absolutely.
22  A  It has no -- there's no life to it.
23  There's no monetary value.  There's no money in it.
24  Q  You go on to say Anything we can do to
25  work with you in 2024 and meet arrears must be done

191

1  in our new and separate company.
2      Do you see that?
3  A  Yes.
4  Q  And are you referring to Next Gen
5  Beverages?
6  A  Yes.
7  Q  Then you go on to say Sales are almost
8  non-existent, but I can make a case for
9  partnership; correct?
10  A  Yes.
11  Q  What do you mean by that?
12  A  I was always hopeful that we could do
13  something with Next Gen Beverages and LOCK'D IN,
14  the brand.
15  Q  Now, when you say Sales are
16  non-existent, are you referring to sales for
17  Takeover or sales for Next Gen Beverages?
18  A  Probably both.
19  Q  Was Brian interested in the partnership?
20  A  Yeah.  But Brian was -- soon left.  This
21  was turned over, I think, to their CFO.  So our
22  conversation stopped, and it kind of got escalated,
23  and we no longer talked about partnerships and, you
24  know, ambassadorships.  It was more strictly on the
25  financial, and they chose litigation, and that's

192

1  where we're at right now with that.
2  Q  As of January 2024, did Takeover owe
3  money to the Professional Fighters League?
4  A  Yes.
5  Q  How much?
6  A  They're claiming 1 million and some odd.
7  I don't remember.  We can go back to the balance
8  sheet and look if you want.
9  Q  And you've said you're in litigation
10  over it; correct?
11  A  Yes.
12      MR. HARVEY:  Okay.  All right.  You can
13  put that one on the stack.  I'm handing you what we
14  marked as Zarro Exhibit 12.
15      (Exhibit 12 was marked for identification.)
16  Q  This is labeled Resolution of Board of
17  Directors of Takeovers Industry or Takeover
18  Industries Inc., and it's dated April -- well, it's
19  referring to a meeting that was held on April 17,
20  2023; correct?
21  A  Yes.
22  Q  Do you recognize this document?
23  A  I believe so.
24  Q  Okay.  What did -- can you just
25  generally describe what's going on here?

193

1    A    I think Toby stepped out and Tom stepped
2    in officially.
3        Q    Toby stepped out, and Tom Zarro --
4        A    Yeah.  Me.
5        Q    -- okay -- stepped in.  Did you attend
6    that April 17, 2023, board meeting?
7        A    It was virtual.
8        Q    Okay.  So you attended virtually,
9    though?
10       A    Yes.
11       Q    And you became a member of Takeover's
12   Board of Directors as of April 17, 2023; correct?
13       A    Yes.
14       Q    Who actually asked you to join the
15   Takeover Board of Directors?
16       A    I think it was collective.
17       Q    When were you first asked to join
18   Takeover's Board of Directors?
19       A    I'm sure soon before that date.  I don't
20   recall the exact date.
21       Q    Why did you agree to serve on the
22   Takeover Board of Directors?
23       A    It was the only way Takeover had a shot
24   at surviving.  It was not going to survive with
25   Toby.

194

1        Q    Why do you say that?
2        A    There was just a lot of negativity
3    around Toby.
4        Q    Why do you say that?
5        A    Because of all the allegations you've
6    made against him today that were made public.
7        Q    Anything else?
8        A    Not specifically.  No.
9        Q    Before you accepted this appointment,
10   had -- did you have any experience serving on a
11   company's board of directors?
12       A    No.
13           MR. HARVEY:  Okay.  You can put that one
14   in the pile.
15           THE WITNESS:  Thank you.
16           MR. HARVEY:  The next one I'm going to
17   hand you will be Zarro Exhibit 17.  Did I say -- I
18   think I said the wrong number.
19           THE REPORTER:  Yeah.  You said Exhibit
20   --
21           MR. HARVEY:  Zarro Exhibit 13.
22           MR. BENNION:  Exhibit 13.
23           MR. HARVEY:  Sorry about that.  That
24   will be Zarro Exhibit 13.
25           (Exhibit 13 was marked for identification.)

195

1        Q    And these are your responses to the
2    subpoena duces tecum; correct?
3        A    If you say so.
4        Q    That's what it says on the top.
5        A    Okay.  The first one I wanted to ask you
6    about is Request No. 1 which is on page 2.
7        Q    Okay.
8        Q    You can read the request and your
9    response.  I just wanted to ask you actually about
10   the second paragraph.  It says, Responding party
11   also states that his role was to fill a void in
12   leadership at Takeover.
13           Do you see that portion?  Last sentence
14   of the second paragraph of your response.
15       A    What am I missing?  Oh, here.  Yep.  Got
16   it.  Got it.  Got it.  Yes, I see it.
17       Q    What did you mean by fill a void in
18   leadership at Takeover?
19       A    Well, it would have left a board seat
20   vacant if it was not filled immediately.
21       Q    Because Mr. McBride was stepping down --
22       A    Correct.
23       Q    -- regardless?
24       A    Correct.
25       Q    Anything else you meant by that?

196

1        A    Nope.
2        Q    Okay.  When did he announce his
3    intention to step down regardless of what was going
4    on?
5        A    Soon before.
6        Q    Was there a particular precipitating
7    event?
8        A    I think just the culmination of the
9    mess.
10       Q    Then I wanted to ask you about your
11   response to Request No. 9, which is on page 5, at
12   the bottom of page 5.  You say Responding party
13   purchased some water from Takeover in an effort to
14   help get rid of some stale inventory.
15       A    Mm-hmm.
16       Q    Yes?
17       A    Yes.
18       Q    When you reference water, what product
19   or products are you referring to?
20       A    The hydrogen water.
21       Q    When was this purchased?
22       A    I don't know.  I don't recall the exact
23   date.
24       Q    Now I thought you told me before that
25   Takeover stopped selling hydrogen water in the

197

1  middle of 2022. Is that your testimony?
2      A  Yeah. I -- that's my recollection. I
3  don't know that that's a fact, but that's my
4  recollection.
5      Q  So this hydrogen water -- well, when was
6  this purchase?
7      A  I'm going to assume it was early '23.
8  So it sounds to me like Takeover needed money. So
9  I bought the remaining inventory, put the money in
10 for Takeover so they could use it to continue, and
11 I took custody of that water.
12     Q  When was this water made if they stopped
13 selling it in 2022?
14     A  Probably earlier that year or in 2021.
15     Q  Because I don't know anything about
16 hydrogen water. Does it go bad?
17     A  There's dates on it. I personally don't
18 think it goes bad, but the dates require a stop
19 sell date.
20     Q  How much water did you purchase?
21     A  I think a truckload.
22     Q  How much money did you pay?
23     A  If memory serves, $50,000, somewhere
24 around there.
25     Q  Did you use personal funds to pay for

198

1  that?
2      A  Yes.
3      Q  What did you do with the water after you
4  -- well, did you take possession of the water?
5      A  Send me your address, and you'll get a
6  case for Christmas. I still have many pallets of
7  it. Some was sold. Some was sold, and some was
8  taken by me, and it's sitting in a warehouse now,
9  and I actually enjoy it.
10     Q  Was it just one payment that you made,
11 or was it several?
12     A  I think it was two, totaling about 50.
13     Q  And when did you make the payment?
14 Sorry. I just asked you that.
15     A  No problem. I think it was early on,
16 Mr. Harvey, in the engagement here. So I'm going
17 to say Januaryish '23.
18     Q  And how did Takeover use the money that
19 you gave?
20     A  I think probably for fulfillment, small
21 salaries, stay alive money, legal, accounting. No
22 distributions, I can assure you.
23     Q  The -- you said you sold some of it;
24 correct?
25     A  Yes.

199

1      Q  How and where did you sell it?
2      A  I sold it on Shopify. I don't have the
3  specifics.
4      Q  And when you sold it on Shopify, did the
5  proceeds from those sales go to you personally?
6      A  Yeah, the proceeds went to me.
7      Q  Did you ever advertise it on Next Gen's
8  website?
9      A  No, not Next Gen's website. No. That
10 was all Takeover.
11     Q  Okay. Next Gen or LOCK'D IN. Did you
12 advertise it on the LOCK'D IN website?
13     A  No. I don't think so.
14        THE WITNESS: To the stack?
15        MR. HARVEY: Yep, to the stack. All
16 right. I'll hand you Zarro Exhibit 14.
17     (Exhibit 14 was marked for identification.)
18     Q  Is this -- am I reading this correctly?
19 This is your personal bank statement?
20     A  Yeah.
21     Q  Okay. And so on December 16, 2022, it
22 shows a withdrawal payment made to Takeover for
23 20,000; is that right?
24     A  Yes.
25     Q  What was that for?

200

1      A  That was for the -- this is for the --
2  these two are for the water purchase.
3      Q  Okay. So the payment on December 19,
4  2022, for 32,000 and change -- that was for water
5  too?
6      A  Yeah. Both of these combined for that
7  approximate 50 purchase.
8      Q  Aside from that 52,000 and change, did
9  you make any other payments to Takeover?
10     A  I did. I did.
11     Q  When and for what?
12     A  I don't -- I don't know exactly when,
13 but I did the same thing with the energy shots. I
14 bought them at fair value to try and keep Takeover
15 alive.
16     Q  When you say fair value, was it the list
17 price, or was it half off like the LOCK'D IN
18 website was showing?
19     A  That was half off retail -- what you saw
20 on the website. I paid cost for manufacturing for
21 the shots.
22     Q  Did you pay costs for manufacturing for
23 the water?
24     A  I believe so. Or more -- or more.
25     Q  So what --

Transcript of Thomas Zarro
Conducted on November 21, 2024

51 (201 to 204)

201

1    A    I think more.
2    Q    It's the LOCK'D IN website. It looked
3  like it was about 50 percent off of the list price.
4    A    Mm-hmm.
5    Q    Did you pay -- you paid 50 percent off
6  the list price for the energy shots?
7    A    No. I think I paid -- I bought it in
8  two payments. I think one was for actual cost, and
9  then the next purchase was for a reduced off cost.
10    Q    And when you say actual cost, that's
11 less than 50 percent; correct?
12    A    Less than 50 percent of selling price.
13 I think, Mr. Harvey, you're confused on cost to
14 manufacture and selling price.
15    Q    That's what I'm trying to clarify.
16    A    Sure.
17    Q    The higher number is the selling price
18 obviously.
19    A    Correct.
20    Q    So when you say you purchase for actual
21 cost, approximately what percentage of retail price
22 is actual cost?
23    A    Forty percent, rough.
24    Q    Okay. So the first energy shots you
25 purchased, you got for 40 percent retail price?

202

1    A    Approximate. Yeah.
2    Q    And the second you got for less than 40
3  percent --
4    A    Yeah.
5    Q    -- because you said it was reduced cost.
6    A    Correct. Probably 25, 30.
7    Q    Who authorized those purchases?
8    A    Everybody that worked there.
9    Q    And how much were the energy shot
10 purchases for?
11    A    Total somewhere -- if memory serves,
12 125ish. I don't know why 126 is sticking, but low
13 100s.
14    Q    A hundred and twenty-five thousand?
15    A    Yes.
16    Q    And approximately when was this?
17    A    I'm assuming mid-first quarter, maybe
18 second quarter 2023. I don't -- I don't recall
19 Mr. Harvey. I don't recall.
20        MR. HARVEY: And I don't see any -- I
21 don't remember seeing any documents that reflects
22 those transactions, Counsel. So I'd ask that those
23 be produced too.
24        MR. BENNION: A hundred and twenty-six
25 thousand dollars?

203

1        MR. HARVEY: Well, that was two
2  payments, it sounds like.
3        MR. BENNION: Correct.
4        THE WITNESS: I believe there were two
5  or somewhere around that dollar figure. I can
6  certainly get them for you.
7        MR. BENNION: Thank you.
8    Q    What did you do with those energy shots
9  after you purchased them?
10    A    I still have them.
11    Q    Did you resell any of them?
12    A    Trying to.
13    Q    On what platform?
14    A    Neither. When you guys sent that cease
15 and desist, we stopped selling. I, frankly, just
16 don't know what to do with them, but I don't want
17 to throw them out.
18    Q    Where are they stored right now?
19    A    In Georgia at the facility that we've
20 spoken about.
21    Q    What's the retail value if you were able
22 to sell them?
23    A    Well, I don't think we can get retail
24 because of the dating on them, but I would say we
25 should be able to get 150-, 200,000. Yeah.

204

1    Q    Okay. Oh, I'm sorry. I had maybe one
2  or two more questions about Exhibit -- I'm sorry.
3  I had another question or two about Exhibit 10.
4  This one -- let me see -- is Interrogatory No. 1.
5  So it's on page 2.
6        Your answer to Interrogatory No. 1 --
7  you're talking about getting Mr. Pavlik and
8  Mr. McBride to sign various documents. Do you see
9  that?
10    A    Yes.
11    Q    What specific documents are you
12 referring to?
13    A    Oh, man. Jason was an oppressor when it
14 came to documents, and Toby and Joe were both very
15 pliable, in my opinion. So I'm starting with Joe's
16 shares -- to purchase shares from Joe. What Toby
17 alleged was on that 243,000 -- he said that was all
18 coerced and pressured.
19    Q    Let me ask it this way: You don't have
20 any personal knowledge of any of that happening;
21 correct? Because you weren't there at the time.
22    A    True. True.
23    Q    So to the extent you're saying this
24 here, everything you're responding to in
25 Interrogatory No. 1 is not personal knowledge of

Transcript of Thomas Zarro
Conducted on November 21, 2024

52 (205 to 208)

205

1  yours. It's hearsay; correct?
2       MR. BENNION: I'm going to state an
3  objection. Calls for a legal conclusion. It may
4  be vague and ambiguous.
5       THE WITNESS: Should I answer.
6       MR. BENNION: The question is before
7  you. Yes.
8       THE WITNESS: Okay.
9  **A  So the answer to your question is, as it**
10 **relates to the signing and the pressures, correct,**
11 **I was not there, but paragraph one has more to do**
12 **with just that.**
13 **Q  Well, I mean, I'll ask it this way:**
14 You've told me several times today you didn't
15 really get involved with the company until at least
16 after November 2022; correct?
17 **A  Correct.**
18 **Q  And all of this stuff that you're**
19 talking about in Interrogatory No. 1, the response
20 -- these are all things that happened before
21 December 2022; correct?
22 **A  Correct. But some things have come to**
23 **light after December 2022; so I can't rule out**
24 **everything in paragraph one.**
25 **Q  Well, when you say come to light, you**

206

1  weren't, for example, in the room or on a phone
2  call with Mr. McBride or Mr. Pavlik or Mr. Tucker
3  when any of this threatening was allegedly
4  occurring; correct?
5  **A  Correct. When -- okay. Correct. Yeah.**
6  **Q  And you weren't copied on any emails,**
7  for example, at the time when any of this was
8  occurring?
9  **A  Correct. Correct.**
10 **Q  So in terms of personal knowledge,**
11 things that you witnessed with your own two eyes,
12 heard with your own two ears, you don't have any
13 personal knowledge about anything you're referring
14 to in Interrogatory No. 1; correct?
15 **A  I have seen texts documenting the**
16 **pressure and the false claims to get things signed**
17 **from Mr. Tucker. I have seen screenshots and**
18 **texts.**
19      MR. HARVEY: Okay. And we haven't been
20 produced or provided with any texts even though we
21 asked for them.
22      THE WITNESS: From me?
23      MR. HARVEY: From any of the
24 Defendants.
25 THE WITNESS: It may not be -- I mean,

207

1  Mr. Harvey, we're going to get you whatever you ask
2  for, obviously.
3       MR. HARVEY: Okay.
4       THE WITNESS: So if you -- if there's --
5  if you're asking in general to document bad faith
6  and pressure and these campaigns, we can get you
7  those. Not me. Not me but the other guys.
8       MR. HARVEY: Right. Yeah. So I would
9  request those.
10      THE WITNESS: Okay. Sure.
11 BY MR. HARVEY:
12 **Q  But even those you've seen copies of**
13 after the fact, you don't have any contemporaneous
14 personal knowledge that supports anything you're
15 saying in Interrogatory No. 1; correct?
16      MR. BENNION: Objection. May call for a
17 legal conclusion.
18      Go ahead.
19 **A  I -- define contemporary or --**
20 **Q  As these things were allegedly going on,**
21 you weren't involved with the company. That's what
22 you've been telling me all day. You weren't.
23 **A  Correct. I was not involved with the**
24 **company, but when I got involved, I saw evidence**
25 **that points to this stuff.**

208

1  **Q  Sure. But this is all looking**
2  backwards. It's not in the moment. You weren't
3  there. You didn't hear anything. You didn't see
4  anything as it was occurring; correct?
5  **A  Correct. In the moment, I did not.**
6  **Q  Okay.**
7  **A  Correct. Yes, sir.**
8  **Q  So in terms of personal knowledge, you**
9  -- the only personal knowledge you have is based on
10 your review of after the fact or your after-the-
11 fact review of texts or emails; correct?
12 **A  And any events that took place after the**
13 **fact relating to this. Yes.**
14 **Q  Okay. So that's a little different than**
15 what you've been saying. What events were you just
16 referring to?
17 **A  Like, for example, the 5-hour Energy.**
18 **5-hour Energy just came out with our energy shot --**
19 **our energy shot. The Takeover shot that**
20 **Mr. Deppoleto's money and my money went to pay for**
21 **was just produced and put on a shelf by 5-hour**
22 **Energy. That connects Mr. Deppoleto and Mr. Tucker**
23 **to 5-hour Energy. I've seen the emails. Now the**
24 **product is on the shelf -- selling our product.**
25 **Q  I don't think I'm tracking you there.**

209

1  When you say your product, the same --
2     A   Takeover's product.
3     Q   The same set of ingredients?
4     A   I believe so.  Darn close if not -- if
5  not the same.
6     Q   And your testimony is that Mr. Tucker
7  and Mr. Deppoleto stole the formula?
8     A   They -- stole is a big word, and I don't
9  like to use that as it relates to Mr. Deppoleto.
10  Okay?  But Gamer Shots -- Takeover's name is now
11  stamped on a 5-hour Energy drink that is on a shelf
12  for sale now.  We have emails and correspondence
13  between 5-hour Energy Company and Takeover
14  discussing the purchase of that brand from us.
15     Q   When?
16     A   When were these conversations?
17     Q   Yes.
18     A   '20 -- late '22.
19     Q   So did 5-hour Energy purchase the
20  Takeover?
21     A   No.  Because Gamer Shots was not owned
22  by Takeover which speaks to the bad faith
23  management that I identify.  The trademark, if you
24  will, the Gamer Shots website was all owned by
25  Jason Tucker or James Deppoleto or, better yet,

210

1  James -- Jason Tucker with James Deppoleto's
2  knowledge and Jason Tucker's wife.  So when we went
3  to grab that and take control of the website and
4  continue sales, we couldn't.  And that's what this
5  points to.  And now there's evidence.  They just
6  came out with this energy shot a couple of months
7  ago.  It's insane.  It basically proves everything
8  that these guys were saying.  It has now been
9  proven on a store shelf with 5-hour Energy.
10     Q   I thought you told me that the Takeover
11  name was so sullied in the marketplace that you
12  couldn't possibly go out and revive it.
13     A   Takeover was.  Gamer Shots was not.
14  Takeover was.
15     Q   So then now I'm confused.  I thought you
16  told me the 5-hour Energy drink says Takeover on
17  it?
18     A   No.  I says Gamer Shots.  But you're
19  free to pull it up on the website if anybody's got
20  Google.
21     Q   Was Gamer Shots a trademark name of
22  Takeover's?
23     A   No.  It could not be trademarked, but it
24  was the name that we put on the product.  It was --
25     Q   Why couldn't it be trademarked?

211

1        MR. BENNION:  It's a generic.
2     A   Because it's a generic.  Yeah, generic.
3     Q   Okay.
4     A   The trademark attorney said it could not
5  be trademarked.
6     Q   Okay.  So how do you know that it's the
7  same gamer shot that Takeover was making?
8     A   Well, it's the same name.  Well, it's
9  the same concept -- a shot for gamers, meaning
10  video gamers, which was its sector that everybody
11  was going after, and there was communication --
12     Q   But if it's a generic name, that's like
13  tissue.
14     A   There may not be a legal case here,
15  Mr. Harvey, against them, but it certainly points
16  to the bad faith management that I recite.  And
17  that's why I can't say throw out Interrogatory No.
18  1.
19     Q   And how do you know that Mr. Tucker
20  and/or Mr. Deppoleto are involved with 5-hour
21  Energy?
22     A   Because there was emails that came from
23  5-hour Energy with Mr. Deppoleto's name on it.
24     Q   When?
25     A   I don't have the exact dates.

212

1     Q   How did you get them?
2     A   They were sent to me.
3     Q   By?
4     A   Numerous people in the company.
5     Q   What company?
6     A   Takeover.  Takeover.  At the time,
7  Takeover.  Takeover emails.
8     Q   At what time?
9     A   Early 2023, best recollection.
10     Q   So was anyone from 5-hour Energy sending
11  you these emails, or was it --
12     A   Not me directly.
13     Q   Okay.  To the extent you saw them, you
14  received them from individuals at Takeover?
15     A   Correct.
16     Q   Which individuals?
17     A   Probably Mike.  I don't recall exactly.
18  Probably Mike Holley, but I don't recall exactly.
19        MR. HARVEY:  And those are another thing
20  that we have not seen.  So I'll request those too.
21        THE WITNESS:  They -- yeah.  I think
22  that's because we haven't made that an issue yet.
23        MR. HARVEY:  Well, it seems to go to
24  your defense which is something we certainly asked
25  for.

213

1    MR. BENNION:  And just -- as we
2  discussed before the deposition, we have a
3  conference on this tomorrow.  I think that was your
4  request.  I was following up on your letter from
5  yesterday.  Anyway, I'm not here to testify, but it
6  seems that it's noteworthy.
7    MR. HARVEY:  Well, that one, I'm
8  assuming, you're not disputing that we're entitled
9  to them?
10    MR. BENNION:  I haven't seen them, but
11  my belief would be that we're not going to dispute
12  that.
13    MR. HARVEY:  Okay.
14  BY MR. HARVEY:
15    Q   All right.  Other than the 5-hour Energy
16  situation, I'll call it, you were -- what got us
17  down that path was you were talking about
18  after-the-fact actions that you believe supported
19  your response to Interrogatory No. 1.
20    A   Excellent.  Yep.
21    Q   Are there any other after-the-fact
22  actions of which you have personal knowledge that
23  substantiates Interrogatory No. 1, or is that the
24  only instance?
25    A   There's more.

214

1    Q   What else?
2    A   Well, things like the Gamer Shots
3  website was not in the company's name.  The Amazon
4  account selling Gamer Shots was not in the
5  company's name.  The activities to get the company
6  current and trading were not done.  The activities
7  to get the company audited were not done.  The
8  activities necessary to get the company spun out
9  were not done.
10    Q   And these are all things that you
11  believe Mr. Tucker should have been doing; correct?
12    A   And his directors, one of which was
13  Mr. Deppoleto.
14    Q   And directors -- what do you mean by
15  that?
16    A   Mr. Deppoleto was a director of
17  Takeover.
18    Q   On the board of directors?
19    A   I believe so.  That was publicly
20  announced.
21    Q   Is there a corporate document that says
22  that?
23    A   I don't know, but I can -- there's a
24  press release that says it.
25    Q   Okay.  Well, we'd agree that the press

215

1  can lie or people can lie in press releases?
2    A   The people that put -- yeah, but the
3  people that put out press releases are Jason Tucker
4  and James Deppoleto.
5    Q   Okay.  Well, we've looked at corporate
6  resolutions today, and you've been through the
7  discovery.  Have you seen a corporate resolution or
8  a board member meeting that shows Mr. Deppoleto
9  was, in fact, on the board of Takeover?
10    A   Not that I can specifically point to
11  personally.
12    Q   Okay.  And so just because something is
13  in a press release doesn't mean that he was
14  actually on the board; correct?
15    A   Yeah.  I don't know.
16    Q   You're the CEO of the company.  Have you
17  ever seen a company document that says -- an
18  internal company document that formally says he's
19  on the board of directors?
20    A   Well, again, we'd have to define which
21  documents would speak to the truth, and I think
22  there's an argument and a case to be made that
23  Mr. Deppoleto was on the board.  But if you're
24  saying, Tom, show me the board resolution, I can't
25  do that today.

216

1    Q   Other than the press release, are you
2  able to point to any written document that says
3  Mr. Deppoleto is on the board or is going to be
4  appointed to the board?
5    A   I cannot personally, no, because I was
6  not there at the time.
7    Q   But you -- you're the CEO and you still
8  have access --
9    A   I know.  But I --
10    Q   -- to all the company's books and
11  records; correct?
12    A   I can -- I can request them.  I have not
13  specifically requested that.
14    Q   And as you're sitting here today, you've
15  never seen anything other than the press release;
16  correct?
17    A   Incorrect.
18    Q   What have you seen?
19    A   I've seen -- there's -- I think there's
20  multiple social media posts that point to that.
21    Q   By whom?
22    A   From the company.
23    Q   Okay.  Social media posts.  Do you
24  believe all social media posts?
25    A   When I put a social media post out with

**217**

1 the company, I damn well mean it.
2    Q  You do personally, but do you believe
3 every social media post you read?
4    A  No. No, I don't. No, I don't.
5    Q  Okay.
6    A  I mean, I don't want to -- look. I'm
7 not here to point fingers. I'm just -- I can't
8 throw out Interrogatory No. 1 as not relevant
9 because you're asking me to do that, and I can't.
10 There's too much here. I can tell you that
11 paragraph one that speaks to individual pressure
12 campaigns I've only seen after the fact. I wasn't
13 there in real time, but the other stuff has all
14 come up, and it seems to be validated by the post
15 events that have taken place.
16    Q  And that's what I was asking about.
17 What post events other than the 5-hour Energy?
18    A  All those -- like, the websites, the
19 trademarks, the Shopify, the social media, the
20 Kerby Fortners, the Melissa Tucker, you know,
21 owning the Amazon account and having all those
22 passwords, locking Takeover out of all of it -- all
23 of it. It all speaks to bad-faith management.
24 Everything, Mr. Harvey, that I've done with Next
25 Gen is wholly owned and controlled by Labor Smart,

**218**

1 the parent company, so that people like
2 Mr. Deppoleto and shareholders are all protected.
3 There'll never be a case, if Tom gets hit by a bus
4 or gets fired, that the company can't go on and
5 succeed. That was not the case here, and that's
6 what Interrogatory No. 1 is all about. And that is
7 our defense, and it will be our case if we keep
8 going.
9    Q  But, again, these are all things you're
10 blaming Mr. Tucker for.
11    A  And Mr. Deppoleto.
12    Q  And that's why I'm asking you what
13 evidence do you have that --
14    A  It's --
15    Q  -- Mr. Deppoleto --
16    A  I think we should make a list.
17    Q  I didn't finish the question.
18    MR. BENNION: Let him finish the
19 question.
20    THE WITNESS: Oh. I'm sorry. Sorry,
21 Mr. Harvey.
22    Q  What evidence do you have that
23 Mr. Deppoleto had any control over Mr. Tucker when
24 he was doing these things that you're alleging?
25    MR. BENNION: Objection. Vague and

**219**

1 ambiguous. May call for speculation.
2    Go ahead.
3    A  The notes that Mr. Deppoleto drafted and
4 the signatures from Jason Tucker all relied on
5 Jason Tucker incorporating Mr. Deppoleto in those
6 decisions. So if you, Mr. Harvey, are now saying
7 that Mr. Deppoleto was not involved, then really
8 Jason Tucker ought to be sitting here, not me.
9    Q  No. I'm asking you questions. And my
10 question was -- you keep pointing to all these
11 things, like the websites and whatnot, and you're
12 alleging   I'm not saying I even agree with you
13 you're alleging that Mr. Tucker did something
14 untoward --
15    A  On what?
16    Q  Untoward.
17    MR. BENNION: Untoward. Untoward.
18    MR. HARVEY: Wrong --
19    THE WITNESS: Help, please. Okay.
20 Thank you.
21    Q  -- with respect to those. And my
22 question is what evidence do you have that
23 Mr. Deppoleto controlled Mr. Tucker? Assuming
24 you're correct that Mr. Tucker did something wrong,
25 what evidence do you have that Mr. Deppoleto

**220**

1 controlled Mr. Tucker?
2    A  Well, we -- and, again, please forgive
3 me. We've asked for a lot of the documentation
4 from Mr. Deppoleto. I don't know that we've gotten
5 it all. He has not gone through his deposition
6 yet. So at that time, all these questions will be
7 asked of him.
8    Q  As you sit here today, you have no
9 evidence that Mr. Deppoleto controlled Mr. Tucker;
10 true?
11    MR. BENNION: Objection. Misstates his
12 prior testimony. May call for legal conclusion.
13    Go ahead.
14    A  I can't -- I don't have a document that
15 points to control because we have not gone through
16 the discovery process.
17    Q  Well, we actually have gone through the
18 discovery process with the documents. So I'm
19 saying you've reviewed those and I've asked you
20 what written documents you have, and you said
21 you've seen a press release; correct?
22    A  Well, I've -- and -- yeah. And I think
23 there's a couple more. I would have to focus on
24 that and try and bring that to your attention. I
25 can do that in a follow-up if you prefer.

221

1    Q   Well, I don't get to ask you questions
2   then. So I'm asking you today. So you've seen a
3   press release and you've seen social media posts;
4   correct?
5    A   Yes.
6    Q   As you sit here --
7    A   About James being director of Takeover.
8   Yes.
9    Q   As you sit here today, setting those two
10  aside, you have no evidence of Mr. Deppolelo
11  controlling Mr. Tucker; correct?
12       MR. BENNION: Objection. Calls for a
13  legal conclusion.
14       Go ahead.
15    A   Other than verbal testimony from many
16  people.
17    Q   No personal knowledge? You have no
18  personal knowledge; correct?
19    A   No, sir.
20    Q   We might have had a double negative.
21  Maybe that was my fault. Do you have any personal
22  knowledge of Mr. Deppolelo controlling Mr. Tucker?
23    A   I don't have any documents, but, I mean
24  -- but it's clear as day who Mr. Deppolelo was
25  aligned with. Yes. He went to court with him. He

222

1   stood on the same side with Mr. Tucker. They were
2   locked in arms.
3    Q   Well, you were asking for the same thing
4   as of that hearing, you told me, weren't you?
5    A   Yes. Because I was informed by
6   Jason Tucker, and that was before I had done any
7   investigation after the fact.
8    Q   Well, does that mean you were
9   controlling Mr. Tucker? You were asking for the
10  same thing at that same hearing?
11    A   No. No. But I -- but Mr. Tucker was
12  informing me as an outsider and an investor. I was
13  not labeled as a director. I was not calling the
14  shots. I wasn't signing contracts. I wasn't, to
15  your evidence, making payments directly to vendors
16  on behalf of the company. I wasn't doing any of
17  that. We were in very different positions.
18    Q   But you'd agree that merely siding with
19  Mr. Tucker, for purposes of that hearing, doesn't
20  mean that you were controlling Mr. Tucker; true?
21    A   Merely siding. That's a true statement.
22  Yes, sir.
23    Q   Okay. So aside from the press release
24  and the social media posts, what personal knowledge
25  do you have of Mr. --

223

1    A   Only verbal testimony and --
2    Q   From others, though. I'm asking you --
3    A   Yeah.
4    Q   -- if you have personal knowledge.
5    A   Yeah, personal. The only personal
6   knowledge I have is conversations with Mr. Tucker
7   at the time, saying everything that him and James
8   were doing -- they were aligned. He told me that,
9   as the investor, when I was saying, When am I going
10  to get paid? Then I have the verbal testimony from
11  all the employees. And --
12    Q   I'm asking for personal knowledge.
13  Remember?
14    A   Yeah. I don't have any.
15    Q   And Mr. Tucker saying he's aligned with
16  Mr. Deppolelo doesn't sound like he was controlled
17  by Mr. Deppolelo. Wouldn't you agree?
18       MR. BENNION: Vague and ambiguous.
19    A   Again, Mr. Harvey, the question
20  specifically --
21    Q   You said, Mr. Tucker told me that he and
22  Mr. Deppolelo were aligned. That was the word you
23  used.
24    A   Correct. And everything that Mr. Tucker
25  told me would happen, based on the events and

224

1   Mr. Deppolelo's actions after, absolutely painted
2   the very direct line. Everything Jason said
3   Deppolelo did.
4    Q   Okay. But aligned is different than
5   controlled; correct?
6    A   I think controlled is a very strong
7   word. I don't think anybody is controlled, per se.
8    Q   That's what I'm getting at.
9    A   Yeah.
10    Q   You don't have any personal knowledge or
11  evidence of Mr. Deppolelo controlling Mr. Tucker;
12  correct?
13       MR. BENNION: Objection. Calls for a
14  legal conclusion.
15    A   I don't think I have any personal
16  knowledge that I can present to a court.
17    Q   All right.
18       MR. BENNION: Can we go off the record
19  just for a second?
20       MR. HARVEY: We can, but I'm just about
21  done. So I'd rather not.
22       MR. BENNION: Good. Okay. My stomach's
23  growling. I apologize.
24       MR. HARVEY: Oh, yeah. Let's --
25       MR. BENNION: But if you've only got

225

1 five minutes or so, let's get done.
2      MR. HARVEY: Yeah, let's -- I'd
3 recommend we do that.
4      MR. BENNION: Okay.
5 BY MR. HARVEY:
6  Q  Still paragraph or Response No. 1, that
7 paragraph. You say, It is also my understanding
8 that Jason would use their signatures to sign some
9 documents without their consent, approval, or
10 knowledge.
11      I think you've already asked it. I've
12 just got to button it up. You don't have any
13 personal knowledge --
14  A  No.
15  Q  -- of that happening; correct?
16  A  I do not.
17  Q  Okay. You mentioned the company
18 Illumination Holdings. Can you briefly tell me
19 what that is?
20  A  Illumination Holdings is a Canadian
21 company. They tried to go -- they were a public
22 company. They were delisted as well. They had
23 shareholders that needed to be rescued. The CEO
24 and CSO of that company were introduced to me, and
25 it presented an opportunity for us to acquire them

226

1 to advance our brands and build Labor Smart. And
2 it's an additional subsidiary under Labor Smart.
3  Q  What is -- what is its business, though?
4  A  Primarily a distribution center for
5 beverages. It's a facility in Colorado -- 80,000
6 square feet, trucks, employees. It takes us from a
7 direct-to-consumer business to an actual footprint
8 and a delivery -- a beverage delivery and beverage
9 incubator if you will.
10  Q  How is it affiliated with Takeover?
11  A  Only it's a sister subsidiary.
12 Everything we do that benefits the owners of
13 Illuminations now or Next Gen benefits the owners
14 of Takeover.
15  Q  A sister subsidiary through Labor Smart?
16  A  Yes, sir.
17  Q  How is it affiliated with Next Gen?
18  A  The same. Sister subsidiary.
19  Q  So if Next Gen wanted to use
20 Illumination Holdings, would it have to pay
21 Illumination Holdings money?
22  A  Yes.
23  Q  Has it paid Illumination Holdings --
24 Next Gen?
25  A  Its incurred bills. There have been

227

1 intercompany transfers. Yes.
2      Q  What do you mean by intercompany
3 transfers?
4      A  Well, transfer is the wrong word.
5 Intercompany sales. For example, Illuminations
6 owns the Legacy Distribution Center. It delivers
7 to thousands of stores in its market. So now the
8 LOCK'D IN brand is being sold in that market
9 through Legacy. Illuminations Legacy is purchasing
10 product from Next Gen.
11      Q  Is it paying retail?
12      A  Well, the wholesale distribution, but,
13 yes, they're paying fair market value. Mm-hmm.
14      Q  How long has this been going on?
15      A  It's embryonic. A month.
16      Q  And there's a distinction between
17 Illumination Holdings Inc. and Illumination Brands
18 Inc.; correct?
19      A  There is. I don't have all the
20 technical knowledge there.
21      Q  What's your understanding of what
22 Illumination Brands Inc. does?
23      A  I think brands is almost like an IP
24 company; whereas, the Holdings is the distribution
25 center, the footprint.

228

1      Q  Illumination Brands -- how is it
2 affiliated with Takeover?
3      A  It's not.
4      Q  How is it affiliated with Next Gen?
5      A  It's not.
6      Q  And did Labor Smart acquire Illumination
7 Brands Inc. as well or just Illumination Holdings?
8      A  Holdings.
9      Q  Is Brad Wyatt the CEO of Illumination?
10      A  He is.
11      Q  Does he have any affiliation with
12 Takeover?
13      A  He's the co-CEO of Labor Smart which now
14 means he's the -- you know, sits on top of that
15 corporate structure.
16      Q  Does he have any affiliation -- direct
17 affiliation with Takeover?
18      A  Not really.
19      Q  When you say not really, what do you
20 mean?
21      A  Like, I mean, when you say direct
22 affiliation, what do you mean, like?
23      Q  You're the CEO. That would be a direct
24 affiliation. Does he have any title with Takeover?
25      A  No, he does not. No, he does not.

229

1    Q   Does he have any affiliation with Next
2  Gen, direct affiliation?
3    A   No.
4    Q   Do you know an individual named Mike --
5  and I don't know if I'm spelling it correctly or
6  pronouncing it -- Ghini, G-H-I-N-I?
7    A   No. No.
8    Q   Any brand ambassadors for Next Gen with
9  a name similar to that?
10   A   No.
11   Q   What's the -- is there a company called
12 Next Gen Holdings?
13   A   There is.
14   Q   What's the distinction between Next Gen
15 Beverages LLC and Next Gen Holdings?
16   A   Next Gen Holdings is the company that
17 houses all the intellectual property. Remember, we
18 talked about the trademarks and everything being
19 wholly owned? So Next Gen Holdings is wholly owned
20 by Labor Smart, and it houses our trademarks so
21 that they can never be stolen again.
22   Q   What's the -- or what's the purpose
23 behind separating those two out?
24   A   Just protection of the trademarks and
25 any intellectual property.

230

1    Q   Does Next Gen Beverages compensate Next
2  Gen Holdings for use of the trademarks?
3    A   There's no formal agreement but not a --
4    Q   Who's --
5    A   -- but not a bad idea.
6    Q   Who's on the board of Next Gen Holdings?
7    A   There's no board. It's another, like,
8  member only, and that would be me and Mike. It's
9  wholly owned by Labor Smart.
10       MR. HARVEY: You know what? I don't
11 want to be the person that says five minutes and
12 have it not be five minutes. So why don't we go
13 ahead -- we can go off the record.
14       THE VIDEOGRAPHER: We are going off the
15 record. The time is 12:58 p.m.
16   (Off the record.)
17   (On the record.)
18       THE VIDEOGRAPHER: We are going back on
19 the record. The time is 1:38 p.m.
20 BY MR. HARVEY:
21   Q   Mr. Zarro, before we went off, we were
22 talking about Next Gen Holdings.
23   A   Yes, sir.
24   Q   How long has Next Gen Holdings been in
25 existence?

231

1    A   I believe about the same timeline as
2  Next Gen Beverages, so May-June 2023. As soon as
3  the trademark was approved for LOCK'D IN.
4    Q   Other than the subsidiaries that we've
5  already discussed today -- and we can go through
6  them one by one if you want -- does Labor Smart
7  have any other subsidiaries other than the ones
8  we've already talked about?
9    A   No.
10   Q   Out of the other Labor Smart
11 subsidiaries, have any of them received any
12 payments or any other form of compensation from
13 Takeover?
14   A   No.
15   Q   Have any of them received assets from
16 Takeover?
17   A   No.
18   Q   Have any of them received payments or
19 any other form of compensation from Next Gen?
20   A   Illuminations, through its subsidiary,
21 Legacy, is getting payments for fulfillment of
22 direct to consumer LOCK'D IN sales.
23   Q   Anything else?
24   A   No, not that I can recall.
25   Q   Have any of them received assets from

232

1  Next Gen?
2    A   No. I mean, inventory for sale, but
3  that's a purchased asset. Right? Yeah.
4    Q   To your knowledge, who has Takeover
5  discussed James's payments with?
6    A   Well, certainly legal and accounting,
7  all officers, and board members.
8    Q   Any third parties? Other companies, for
9  example?
10   A   No. I think just the PFL in that one
11 document that we talked about.
12   Q   Aside from that email exchange, were
13 there phone calls or anything?
14   A   No. I think there might have been a
15 phone call about, like, we're working with James,
16 to -- like, there were two big creditors -- James
17 and the PFL, and I was trying to share the same
18 solution to both -- the convertible note for the
19 debt they were owed in the public company to get
20 them both paid.
21   Q   Anyone else?
22   A   Not to my recollection.
23   Q   Was the discussion you were just talking
24 about with PFL -- was it around the time of the
25 email we were looking at earlier?

233

1 A Yeah. Yes. Correct.

2 Q Has there been any subsequent

3 discussions with PFL?

4 A We had maybe --

5 Q About James's debt?

6 A Oh, no, no, no. No.

7 Q Who did the company coordinate with over

8 the establishment of Next Gen which was after our

9 lawsuit was filed in late December 2022?

10 MR. BENNION: Objection. Vague and

11 ambiguous.

12 Go ahead.

13 A Your question, as I understand it, is

14 who discussed the formation of Next Gen. That was

15 the board at the time. I think --

16 Q Of Labor Smart?

17 A Of Labor Smart. So that was me, Mike.

18 Primarily Mike and I, Joe Pavlak.

19 Q Anyone else?

20 A Not that I can recall.

21 Q And walk me through those discussions.

22 What specifically was said?

23 A We need to have a entity that is fully

24 capable of spinning out. This was also the time

25 that we did not believe that LTNC Labor Smart could

234

1 get pink current trading, the parent company. So

2 that's -- remember, we talked about the spinout for

3 Takeover. So we realized we needed a company that

4 could be audited and get spun out. So that was the

5 beginning of the conversation for Next Gen.

6 Q When was this?

7 A March, April, May, June '23.

8 Q So this was after the -- after

9 Mr. Deppoleto started his lawsuit in late 2022;

10 correct?

11 A Everything was after. His lawsuit was

12 filed, like, simultaneous with -- yes. The answer

13 is yes. Sorry.

14 Q Did you discuss at all the fact that he

15 had a lawsuit pending against Takeover already and

16 that Next Gen was going to be selling similar

17 products to Takeover?

18 A Well, Next Gen was not selling similar

19 products, and one of the reasons we had to form

20 Next Gen was because James was suing Takeover,

21 making it a non-viable candidate for spinout.

22 Q So part of the motivation for forming

23 Next Gen was James's lawsuit against Takeover?

24 A I don't -- I mean, one piece of it but

25 certainly not all of it. I mean, there were

235

1 multiple lawsuits, multiple creditors, terrible

2 press, and no assets to speak of.

3 Q That initial discussion you were just

4 describing -- was that over the phone, in person,

5 via Zoom?

6 A Most of it was all through -- over the

7 phone.

8 Q Was this at a formal board meeting, or

9 was this some --

10 A Informal. Like, doing everything we

11 could to save Takeover while protecting the

12 shareholders with a new entity.

13 Q Were there emails before this meeting or

14 texts?

15 MR. BENNION: Objection. Vague and

16 ambiguous.

17 Go ahead.

18 A There may have been. We did -- we've

19 done a lot on the phone, but there may have been.

20 Q You think it would have been emails or

21 texts or both?

22 A Probably emails.

23 Q What email addresses would you guys have

24 been using at that time?

25 A Well, if it was before my hack, it would

236

1 have been Tom@Takeover because we didn't have Next

2 Gen or LOCK'D IN, so probably Tom@Takeoverind.com.

3 Q How about Mr. Holley and Mr. Pavlick?

4 A Mike would have been

5 Mike@Takeoverind.com, and Joe would have been

6 Joe@Takeoverind.com.

7 Q So these are all Takeover email

8 addresses that they were still using in the

9 Marchish 2023 time frame?

10 A Right. Because Next Gen had not been

11 formed, and there was no plan to do anything other

12 than just save Takeover.

13 Q And Takeover was paying for hosting of

14 those emails; correct?

15 A I believe so, yes.

16 Q So you were using Takeover resources to

17 plan Next Gen; true?

18 A The parent company was Labor Smart, but

19 Labor Smart doesn't have a checking account. So

20 the active subsidiary at the time served as the

21 operating account for the parent company. So if

22 you want to say the GoDaddy Takeover email account,

23 there were emails crossing that discussed Next Gen

24 -- it's possible -- but I can't point to it because

25 I don't have a Takeover Ind. email.

237

1    Q   You said Labor Smart, at that time,
2   didn't have its own bank account?
3    A   It still doesn't.
4    Q   Okay.
5    A   It still doesn't.
6    Q   So the first dollar that was spent on
7   Next Gen's behalf that came out of Takeover's bank
8   account; correct?
9    A   I don't -- I can't say that. No.
10  Because I believe I funded the Next Gen account.
11  Like, we started Next Gen, funded Next Gen. Like,
12  Next Gen has a bank account. Takeover has a bank
13  account. Now they have two separate bank accounts.
14   Q   When did you open the Next Gen bank
15  account?
16   A   I did not open it.
17   Q   Who did?
18   A   Mike.
19   Q   Is that at the same bank as the Takeover
20  bank account?
21   A   I would assume so, yes. I can't -- I
22  can't swear to it, but I would assume so.
23   Q   And you're positive it was opened before
24  your -- well, was your dollar dollar one for Next
25  Gen?

238

1    A   I don't know. I don't recall.
2    Q   Who would know that?
3    A   Probably Mike.
4    Q   And I think I asked, but I want to make
5   sure. You don't know when it was opened?
6    A   Not exactly. No.
7    Q   What's your best guess?
8    A   May, June. When was Next Gen formed?
9   Have we -- you must have that. Never mind. I know
10  I don't ask a question. Sorry. Thank you. I --
11  whenever -- before Next Gen was formed.
12   Q   Now your initial payment that was going
13  to go to Next Gen -- was that a wire, or was that a
14  check?
15   A   Everything was wired. For the most
16  part, all wires.
17   Q   Just that first one is the one I want to
18  laser focus on.
19   A   My assumption is yes.
20   Q   Okay. And is it your testimony that
21  that first wire went directly into Next Gen's bank
22  account as opposed to going to Takeover first and
23  then into Next Gen's account?
24   A   I don't know. My assumption is it went
25  into Next Gen's bank account, but I can't swear to

239

1   it. I just don't recall.
2    Q   And is it your testimony that no
3   Takeover money was used for Next Gen?
4    A   Yes. And if it was, it'd be unbeknownst
5   to me.
6        MR. HARVEY: I'm handing you Zarro
7   Exhibit 15.
8        (Exhibit 15 was marked for identification.)
9    Q   And at the top of the first page, which
10  is Bates labeled DEF24 -- and I'll tell you too
11  just for context. You'll see the Bates numbers are
12  not direct order because I was trying to save some
13  trees; so I only printed those pages I wanted to
14  talk about.
15   A   Okay.
16   Q   But the first one is DEF24, and at the
17  top it says, Bank of America Takeover Industries
18  Inc., Account Number. It's got a number. And it
19  says, January 1, 2022, to January 31, 2022.
20       Do you see all that?
21   A   Yes.
22   Q   Now stepping away from that for a first
23  second. We looked at your initial note a little
24  bit earlier, and we can pull it out if you want,
25  but your initial note was with Labor Smart;

240

1   correct?
2    A   Correct.
3    Q   Okay. It was not a note between you and
4   Takeover directly; correct?
5    A   Kind of. It encompassed all
6   subsidiaries.
7        MR. HARVEY: Okay. Maybe we should pull
8   it out. The convertible note purchase agreement.
9        MR. BENNION: Which exhibit is that?
10       MR. HARVEY: Exhibit 1. Zarro Exhibit
11  1.
12       THE WITNESS: Somewhere in there it
13  talks about --
14       MR. HARVEY: There's no question before
15  you.
16       THE WITNESS: Oh, sorry.
17       MR. HARVEY: Okay. So I'll hand this to
18  you in a second. Actually, I'll hand it to you.
19       THE WITNESS: Thank you.
20       MR. HARVEY: So I want to ask you a
21  question about the first page.
22       THE WITNESS: Oh, okay.
23   Q   The very top of the first page says,
24  Convertible Note Purchase Agreement. It says, This
25  convertible note purchase agreement -- I'm skipping

241

1  the parenthetical -- dated as of June 18, 2021, is
2  entered into among Labor Smart Inc., a Wyoming
3  corporation, paren, the, quote, company, end paren,
4  and the persons and entities, paren, each
5  individually, quote, purchaser, end quote, and
6  collectively, the, quote, purchasers, end quote,
7  end paren named on the schedule of purchasers
8  attached hereto. And this is the schedule of
9  purchasers.
10      Did I read that right?
11  A  Yes.
12  Q  Okay. And we looked at the schedule of
13  purchasers earlier which is on DEF478; correct?
14  A  Schedule of purchasers. Yes.
15  Q  And the only purchaser listed is
16  yourself, Thomas Zarro; correct?
17  A  Yes.
18  Q  Okay. So taking us back to that first
19  paragraph, it says, The agreement is between Labor
20  Smart Inc. and yourself; correct?
21  A  Yes.
22  Q  Okay. So the note was not directly
23  between you and Takeover; correct?
24  A  I believe that's correct.
25      MR. HARVEY: Okay. You can put that

242

1  back in our stack before we lose it or lose our
2  order.
3      THE WITNESS: All right.
4      MR. HARVEY: Now I'm taking us back to
5  Exhibit 15, Zarro Exhibit 15, the one you've got in
6  front of you. If you look on that first page,
7  DEF24, towards the bottom of that first page,
8  there's a -- and this is the withdrawals and other
9  debits section. There's a notation January 24,
10 2022.
11  Q  Do you see that?
12  A  Yes.
13  Q  And that is a wire transfer to you,
14 Mr. Zarro; correct?
15  A  Yes.
16  Q  And it's for $26,000 and change;
17 correct?
18  A  Yes.
19  Q  And if we go to the top of page 2, which
20 is DEF55, the second entry is March 28th, 2022;
21 correct?
22  A  Yes.
23  Q  And that indicates there was a Takeover
24 payment to you, Mr. Zarro, for $52,000 and change;
25 correct?

243

1  A  Yes.
2  Q  Then if we go to the middle of page 3,
3  which is DEF104, there's a June 6, 2022, notation
4  showing a payment from Takeover to you for $26,000
5  and change; correct?
6  A  Yes.
7  Q  Okay. And then if we go on page 4 about
8  two thirds of the way down, on July 12, 2022,
9  there's a payment from Takeover to you for 26,000
10 and change; correct?
11  A  Yes.
12  Q  Then if we go to page 5, a little more
13 than two thirds of the way down the page, there's a
14 notation September 14, 2022, payment from Takeover
15 to you for $26,000 and change; correct?
16  A  Yes.
17  Q  Then on page 6 about halfway down --
18 well, actually, let me -- let me stop there for one
19 moment. So we've just talked about several
20 payments from Takeover to you; correct?
21  A  Yes.
22  Q  And these -- some of these were in the
23 time frame where Mr. Deppoleto had already invested
24 money in the company; correct?
25  A  Yes. Yes.

244

1  Q  And these were not payments you were
2  receiving from Labor Smart; correct?
3  A  Well, they're certainly on behalf of
4  Labor Smart.
5  Q  Well, but the bank account is Takeover
6  Industries Inc., and it says Takeover Industries to
7  you; correct?
8  A  Yes.
9  Q  Okay. Then if we could look at page 6,
10 which is DEF196 --
11  A  Hang on. I'm lost. DEF page -- I've
12 got page 5, and then it goes to page 3.
13  Q  Yeah. No. No. Look at the Bates
14 number.
15      MR. BENNION: Bates stamp numbers.
16  Q  DEF196.
17  A  Oh, got it. Got it. Got it. Okay. I
18 see it.
19  Q  Yep. So about halfway down, there's a
20 notation from December 16, 2022, for $20,000. Do
21 you see that?
22  A  Yes.
23  Q  What is that for? Do you know?
24  A  That's what we spoke about earlier,
25 Mr. Harvey -- the purchase of the water.

---

245

1    Q   So you were buying water from Takeover
2  at that point?
3    A   Because the company needed money, and
4  this was a way to fund it. Yes.
5    Q   Okay. And then the notation on the 19th
6  --
7    A   The same thing.
8    Q   -- of December 2022 for $32,000. What
9  is that?
10   A   It's the second half of that $52,000
11 payment to buy that truckload of water.
12   Q   Okay. Then if we go to the top of page
13 7, which is DEF210, there's a notation, January 10,
14 2023.
15   A   Mm-hmm.
16   Q   Do you see that?
17   A   Yes.
18   Q   And the description says, Half cost for
19 purchase of TL of shots. What is that payment for?
20   A   That looks like it's the energy shots
21 that we spoke about that I also purchased for the
22 purpose of funding Takeover.
23   Q   And specifically how much product did
24 you receive in exchange for that 33?
25 A   I don't have any -- I don't know.

---

246

1    Q   And you said you never sold any of that
2  product and you still have it; correct?
3    A   Yes.
4    Q   And if we go about halfway down on
5  DEF210, there's a entry, January 24, 2023, for
6  33,692.
7        Do you see that?
8    A   I do.
9    Q   And that says, Final payment on purchase
10 of shots; correct?
11   A   Correct.
12   Q   Is that the remainder of the payment you
13 were talking about earlier?
14   A   Yes. I believe so.
15   Q   And you don't know how much product you
16 acquired?
17   A   I really don't.
18   Q   And you didn't sell any of that second
19 set that you purchased?
20   A   No. It's all in a warehouse.
21   Q   If we go on the top of page 8, which is
22 DEF238, on the very first entry, March 2, 2023,
23 there's a notation for $33,000.
24   A   It's DEF234; correct?
25   Q   234.

---

247

1    A   Okay.
2    Q   Oh, actually, I'm asking you about the
3  wrong one. I'm sorry. Could you go to page 10
4  which is DEF254. Are you at DEF254?
5    A   I am. I am.
6    Q   Okay. About halfway down on May 12,
7  2023, there's a notation for 40,950.
8        Do you see that?
9    A   Mm-hmm. I do.
10   Q   What is that?
11   A   I think that's the -- more shots.
12 Remember, I said it was about 120,000 all in?
13   Q   Okay. And you received those?
14   A   The energy shots?
15   Q   Yes.
16   A   Yes. They're in a warehouse.
17   Q   And you still have all of those too?
18   A   Yeah.
19   Q   Okay. And then there's a series of what
20 looks like Shopify comes up in the description, and
21 I'll show you a couple of them so you can see. But
22 do you know why Shopify would be showing up in the
23 description just as a general?
24   A   Yes.
25   Q   Why?

---

248

1    A   Because the water that I purchased was
2  being sold, and the money for the payments was
3  being remitted back to me. Remember, we spoke
4  about -- remember, I bought the truckload of water?
5    Q   Mm-hmm.
6    A   That water was purchased, paid for at
7  the factory, brought to the fulfillment center, but
8  the money from the proceeds was going back to me to
9  pay for that.
10   Q   I don't -- and it's probably my fault --
11 I'm not quite understanding. Well, let's just look
12 at one. Maybe that'll help me understand a little
13 better.
14       So if we go to page 9, which is DEF246
15 --
16   A   Mm-hmm.
17   Q   -- the very first entry is April 28,
18 2023. It says, Shopify transfer, and then it says,
19 T.K. Zarro, and it's a little over a thousand
20 bucks.
21       Do you see that?
22   A   I do.
23   Q   And that's in the deposits and other
24 credits section. So can you explain why that money
25 would have been coming in then?

249

1  A  Yeah. Because, again, when I first came
2  on the scene, trusting nobody, knowing this company
3  still owed me money, I purchased the water. The
4  company -- Takeover needed money. So instead of
5  just blindly writing a check on the heels of not
6  getting paid and the insanity, I said, I'll buy the
7  water, put it in the inventory as -- you'll get all
8  the money up front to make all your payments, and I
9  will get paid as the water sells. So, basically, I
10  use the water to collateralize my investment and I
11  got paid through the sale of it.
12  Q  So I think I understand that part, but
13  what's tripping me up is -- so, for example, right
14  beneath that it says, Withdrawals and other debits.
15  So if they were -- if Takeover was sending you
16  money, it should show up in that section, but this
17  is showing up in deposits and other credits.
18  A  Oh. And I have no idea. I thought it
19  was -- so this is not me getting paid back. This
20  is more money going from me to the company? That
21  doesn't make sense.
22  Q  That's what it appears.
23  A  Yeah. Something's wrong. I don't know.
24  I don't know.
25  Q  Okay.

250

1  A  If we look at deposits and other credits
2  -- yeah. Interesting.
3  Q  So -- and then if we look at DEF254, so
4  the next page --
5  A  The same but more.
6  Q  -- on -- well, let's just focus on the
7  May 4th entry. It's about a third of the way down
8  the page for $332 Shopify and then IndntnakZarro.
9  So this looks like this is being deposited into
10  Takeovers account. Do you have any recollection of
11  why that would have been?
12  A  No.
13  Q  And then --
14  A  Does it show where it's coming from?
15  Q  I think Shopify is (crosstalk).
16  A  Oh, Shopify. Okay.
17  Q  Yeah.
18  A  I have to drill down.
19  Q  Were you -- is it possible that, instead
20  of paying via one or two big checks, that you paid
21  kind of as you went?
22  A  No. No. Because then it would show
23  that I paid.
24  Q  Well, I think that is saying T.K. Zarro
25  was paying, depositing into Takeover's account that

251

1  amount of money.
2  A  No. Because we've already identified
3  the big checks, and those add up to my amounts.
4  Like, in my head, I'm at 52 for the water and about
5  120 for the shots. So that money has been
6  accounted for. This money, I don't know. This is,
7  like, a trip. I don't know.
8  Q  So then if you look down further on that
9  page, May 12, 2023, through May 19, 2023, all but
10  one of these entries had a Shopify. It looks
11  similar to the one we were just talking about --
12  Shopify. It looks like T.K. Zarro was depositing
13  money into Takeover's account. So you don't
14  understand why?
15  A  I absolutely do not. I do not.
16  Q  Okay.
17  A  But I'm going to know tomorrow. I
18  promise you that.
19  Q  So then if we go --
20  THE WITNESS: Sorry, Don.
21  Q  If we go to page 16, which is DEF255 --
22  oh, I'm sorry -- page 11, DEF255, so the next page
23  -- under the withdrawals and debits, here we've got
24  a Shopify T.K. Zarro and 123 for May 2, 2023. Do
25  you see that one?

252

1  A  I do.
2  Q  And then May 8, 2023, another Shopify.
3  A giant 1482 payment. Do you understand what's
4  going on with those transactions?
5  A  Hang on. Do you show -- hang on.
6  Please give me a second.
7  Q  Sure.
8  A  The specific question, sir?
9  Q  Do you know why you were getting --
10  apparently getting paid on May 2 and May 8?
11  A  Hang on. May 2 and May 8.
12  Q  So DEF255.
13  A  I do not.
14  Q  So then if we look at -- I think I know
15  the answer, but I've got to ask you anyways --
16  DEF268 through 269, there's a -- and this is still
17  in the deposits and other credits -- it looks like
18  a series of similar transactions where Shopify --
19  and your depositing money in at various intervals
20  between June 1, 2023, and June 23, 2023, when you
21  look onto DEF269. Do you understand what's going
22  on with those transactions?
23  A  I have a hunch.
24  Q  What's your hunch?
25  THE WITNESS: Sorry, Don.

253

1    A    I think the Shopify system is showing
2    under my name because I bought the water, but the
3    money was going into the Takeover account. So I
4    think it's the sale of the water going into
5    Takeover's account instead of going into my
6    account. My question for myself is how did I
7    reconcile that?
8        Q    So it was being earmarked for you?
9        A    Yeah. But I'm not seeing it come back
10   to me. So I have to see if there's another
11   transaction where actually -- where it actually
12   comes back, but that's my work to do. But that's
13   my assumption --
14       Q    Okay.
15       A    -- why my name is there, but it didn't
16   come from my account. I think it's the resale of
17   the water going back into Takeover.
18       Q    Okay. Right beneath that on DEF269,
19   there's an entry June 29, 2023. So -- and it's in
20   the deposits and other credits. It appears to show
21   Next Gen Beverages paying $15,000 into Takeover's
22   account. Do you see that?
23       A    I do.
24       Q    Why is that happening?
25       A    Probably because Takeover needed the

254

1    money, and Next Gen was loaning it to it.
2        Q    Is there documentation of that?
3        A    I'm sure. Yeah.
4        Q    Okay. If you go halfway down that page,
5    now we're in the withdrawals and other debits.
6    There's a 6/2023 entry -- Shopify. You're getting
7    a hundred-dollar 0.84 payment.
8        Do you see that?
9        A    I do.
10       Q    Do you understand what's going on there?
11       A    I do not.
12       Q    Who is -- well, actually, strike that.
13   Whitehead Burnett -- Whitehead & Burnett is your --
14   recently filed an appearance on your behalf and on
15   the other Defendants' behalf; correct?
16       A    Yes.
17       Q    Does Whitehead & Burnett -- or has it in
18   the past before filing a notice of appearance, did
19   it represent Next Gen Beverages?
20       A    It did. They did, not it.
21       MR. HARVEY: And I'll show you an
22   exhibit just to kind of orient ourselves.
23       THE WITNESS: Okay.
24       MR. BENNION: I'm looking for the last
25   transaction that you referred to, Counsel, just for

255

1    point of clarification. Did you say Whitehead &
2    Burnett on DEF00629 of Exhibit 15?
3        MR. HARVEY: No.
4        MR. BENNION: Okay.
5        MR. HARVEY: No. I was -- I had moved
6    on from that exhibit.
7        MR. BENNION: Okay. Thank you.
8        THE WITNESS: In the stack --
9        MR. HARVEY: Yeah.
10       THE WITNESS: -- I'm assuming.
11       MR. HARVEY: So this is Zarro Exhibit 16
12   that I'm handing you.
13       (Exhibit 16 was marked for identification.)
14       Q    And, generally speaking, Zarro Exhibit
15   16 Bates labeled DEF464 through 465. It's a letter
16   from Whitehead & Burnett, dated August 3, 2023, to
17   my partner at Husch Blackwell, Michael Brandis, as
18   well as Jennifer Reiter from Reiter Law; correct?
19       A    Yes.
20       Q    Who paid for the legal services of
21   Whitehead & Burnett in August 2023? Was it
22   Takeover?
23       A    August '23. I'm assuming Next Gen.
24       MR. HARVEY: Okay. Let me show you
25   another exhibit. This will be Zarro Exhibit 17.

256

1    (Exhibit 17 was marked for identification.)
2        Q    So if you look at Zarro Exhibit 17, the
3    first page of it's DEF257, just about the middle of
4    it on May 22, 2023. And this is a Takeover
5    Industries' account statement. We're in the
6    withdrawals and other debits section. On May 22,
7    2023, Takeover was paying Whitehead & Burnett
8    $3,000; correct?
9        A    Yes.
10       Q    Why did Takeover pay Whitehead & Burnett
11   3,000 in May 2023?
12       A    I don't know.
13       Q    Has Whitehead & Burnett -- other than
14   before making a notice of appearance in this
15   lawsuit about a week ago, has Whitehead & Burnett
16   ever represented Takeover?
17       A    Yes.
18       Q    When?
19       A    Whitehead was consulted -- I'd have to
20   go back in time but very early on in our
21   engagement.
22       Q    If -- taking you back to Exhibit 16,
23   which is the August 3, 2023, letter from Whitehead
24   & Burnett -- the letter, not the bank statement.
25   Are you following me?

257

1    A  Yeah.  This is when he's responding to,
2  I think, something you guys sent.
3    Q  I agree.
4    A  Okay.
5    Q  In that letter -- go ahead and read
6  through it, but I believe he's purporting to draw a
7  distinction and saying that the Whitehead & Burnett
8  firm only represents Next Gen but does not
9  represent --
10    A  Where are you seeing that, Mr. Harvey?
11    Q  So read the first paragraph.
12    A  Okay.
13    Q  He says, This firm represents Next Gen
14  Beverages LLC, a wholly owned subsidiary of Labor
15  Smart Inc. --
16    A  Okay.
17    Q  -- a Wyoming corporation, and we
18  understand that Ms. Reiter represents Takeover
19  Industries Inc.
20    A  Okay.
21    Q  And then he goes on?  So as I'm reading
22  that he, or the Whitehead & Burnett Law Firm, is
23  drawing a distinction between Next Gen and Takeover
24  and saying Whitehead & Burnett only represents Next
25  Gen.  Is that how you read that?

258

1    A  That's how I read it.
2    Q  Is that your understanding?
3    A  Yeah.  I mean, this particular counselor
4  gave us advice early on.  So I don't know if it was
5  -- what the exact scope of work was.
6    Q  So my -- I want to go back to my other
7  question then.  Why is Takeover paying Next Gen's law
8  firm?
9    A  It's one of two reasons that I can think
10  of:  One, it was paid on behalf of Next Gen, in
11  which point Next Gen paid back Takeover, like a
12  loan, so to speak, or because work was performed
13  for Takeover by this firm.  One of the two.
14    Q  May 2023 was before Next Gen was formed
15  though; correct?
16    A  I don't have the formation date of Next
17  Gen.  I've been struggling with that all day.
18    Q  Okay.  Well, we agree it was formed at
19  least as of June 2023; correct?
20    A  My assumption is yes.  I don't -- I
21  mean, you can show me the document that points to
22  it, but I would think so, yes.
23    Q  Okay.  So taking you back to Exhibit 17,
24  the bank statement, if you go to page 2, the middle
25  of page 2 or roundabouts, the withdrawals and other

259

1  debits section, the first entry on July 3, 2023,
2  shows Takeover paying Whitehead & Burnett $10,000;
3  correct?
4    A  On July 3rd, '23.
5    Q  Correct.
6    A  I do see that.  Yes.
7    Q  Okay.  Why was Takeover paying Whitehead
8  & Burnett 10,000 in July 2023?
9    A  I don't recall.
10    Q  Because we've established that was after
11  Next Gen's formation; correct?
12    A  We believe so, yes.
13    Q  So why wasn't Next Gen paying Whitehead &
14  Burnett's legal fees?
15    A  I don't know.  It's one of two -- one of
16  two reasons:  Either he was doing work for
17  Takeover, or perhaps it was an intercompany loan.
18  One of the two.
19    Q  Was the Next Gen bank account formed as
20  of July 3, 2023?
21    A  I don't know.
22    Q  Was it formed as of May 22, 2023?
23    A  I do not know.
24    Q  Who would know the answer to that
25  question?

260

1    A  Mike Holley.  Mike Holley.  I can tell
2  you that it's not at Bank of America.  It's at
3  Wells Fargo.  So there are two separate -- like,
4  see how Takeover is at Bank of America?
5    Q  Mm-hmm.  Yes, sir.
6    A  Next Gen is at Wells Fargo.
7    MR. HARVEY:  And, Counsel, I don't think
8  we received any Wells Fargo bank statements, and we
9  did ask for Next Gen's bank statements.  So I'll
10  add that to the list of requests.
11    MR. BENNION:  Understood.
12    Q  Takeover and Next Gen are both beverage
13  companies.  Fair?
14    A  Yes.
15    Q  And there's no functional difference
16  between the products that they make; correct?
17    A  Oh, there's major functional
18  differences.
19    Q  What are those?
20    A  Well, like our court reporter mentioned,
21  nootropics.  Nootropics is classified as a
22  functional beverage.  Our coffee is a functional
23  beverage.
24    Q  What's a functional beverage?
25    A  It's -- it serves a purpose beyond

261

1  energy. Like the nootropics, great for legal
2  because it not only energizes the body but also the
3  mind. It allows focus. So it's considered a
4  functional beverage. And the buzzword is
5  nootropic.
6      Q   Gamer shots are also a functional
7  beverage; correct?
8      A   I don't know the makeup. I don't know
9  if it's just energy or if it's, you know, focus.
10 I'm not involved in the formulation.
11     Q   Okay. As of Next Gen's -- well, we
12 agree that, at least as of June 2023, Next Gen was
13 formed and began operating; correct?
14         MR. BENNION: I'm going to state an
15 objection. It misstates his prior testimony.
16         Go ahead and answer it.
17     A   I can't swear to that. My gut says yes,
18 but I don't know.
19     Q   Let's just take an easy date beyond that
20 -- September 2023. Next Gen was up and running;
21 correct?
22     A   I have to assume. Yes. I mean, yeah.
23     Q   Okay. And you and the others who were,
24 and still are in your case, still affiliated with
25 Takeover in September 2023, you applied your best

262

1  efforts to growing Next Gen; correct?
2      A   Absolutely. All the companies.
3      Q   And you stopped using your best efforts
4  to grow Takeover; correct?
5          MR. BENNION: Objection. Misstates his
6  prior testimony. Vague and ambiguous.
7          Go ahead.
8      A   No. We've never stopped trying for
9  Takeover up to and including ongoing settlement
10 discussions with Mr. Deppoleto. That's a Takeover
11 situation.
12     Q   I'm focusing on growing the company.
13     A   Okay. If the answer is did we stop
14 selling products under Takeover, yes, we did.
15     Q   In September 2023, you were using your
16 best efforts to grow Next Gen; correct?
17     A   I would assume so, yes. Yes.
18     Q   In September 2023, you were not
19 attempting to grow, Takeover; correct?
20         MR. BENNION: The same objection.
21     A   I don't recall. That's a year plus ago,
22 and I don't know the exact status -- what we were
23 doing with Takeover.
24     Q   How many hours a week do you spend
25 attempting to grow Next Gen now?

263

1      A   Sixty.
2      Q   How many hours --
3      A   Fifty to 60.
4      Q   How many hours a week do you spend
5  attempting to grow Takeover now?
6      A   Two.
7      Q   And would that basically be the same
8  breakdown as September 2023?
9      A   Somewhere around there. I don't know
10 about September, but there was a shift. Yes.
11     Q   And you shifted while this lawsuit was
12 pending; correct?
13     A   Yes.
14     Q   In, let's say, September 2023, how many
15 hours would you estimate you put into trying to
16 grow Takeover?
17     A   Minimum.
18     Q   Okay.
19     A   Several but minimal.
20     Q   I asked you earlier at what point it was
21 that Takeover's liabilities were larger than its
22 assets, and I think you told me essentially from
23 the day after it was formed; is that correct?
24     A   That's my -- I don't have access to
25 those financials, but that's what my gut tells me.

264

1      Q   Certainly, since you have been involved,
2  that's been the case; correct?
3      A   Absolutely. Yes. Actually, since the
4  day James got involved, I would think.
5      Q   And so that entire time Takeover has
6  been insolvent; correct?
7      A   Yes. By definition.
8      Q   And you understand that an insolvent
9  company owes fiduciary duties to its creditors;
10 correct?
11         MR. BENNION: Objection to the extent --
12 excuse me. Objection to the extent it may call for
13 a legal conclusion.
14     A   Yeah. I think -- I think that's a safe
15 statement, Mr. Harvey.
16     Q   And so, as a matter of best practices,
17 insiders at Takeover should not be putting personal
18 interests ahead of creditors; correct?
19     A   Correct.
20     Q   Insiders at Takeover should not be
21 encouraging third parties to breach their contract
22 with Takeover; correct?
23         MR. BENNION: I'm going to state an
24 objection. This line of questioning calls for a
25 legal conclusion.

265

1    Go ahead.
2         THE WITNESS: Ask the question again,
3   Mr. Harvey.
4         MR. HARVEY: Sure.
5    Q   Insiders at an insolvent company like
6   Takeover should not be encouraging third parties to
7   breach their contracts with Takeover; correct?
8    A   In general, yes. If there's something
9   specific, there might be an explanation for it.
10  Don't forget Takeover is a subsidiary of a parent
11  company.
12   Q   What do you mean by that?
13   A   That means Takeover has additional
14  obligations, and those board members have fiduciary
15  duties to protect not only the creditors but the
16  owners.
17   Q   As between the parent company and the
18  creditors, whose interests should come first?
19        MR. BENNION: Objection to the extent it
20  may call for a legal conclusion.
21   A   I don't know the answer to that. I --
22   Q   How did you operate the company as a CEO
23  when it -- when it came to interests of creditors
24  or interests of Labor Smart?
25   A   I don't think they ever conflicted.

266

1   Show me a conflict.
2    Q   For example, forming a new company to
3   compete in the beverage industry with Takeover.
4    A   There was no competition ever. Takeover
5   had no hydrogen water, and the shots were on
6   lockdown per your cease and desist, and LOCK'D IN
7   doesn't sell energy shots. It sells energy drinks
8   but a very different vertical sector and
9   demographic that we sell to.
10   Q   So your personal opinion is that Next
11  Gen and Takeover don't compete with each other, but
12  you would agree that they're both in the beverage
13  industry; correct?
14   A   Correct.
15   Q   And in a niche of the beverage industry
16  because they're not selling, for example, soda;
17  correct?
18        THE WITNESS: Ask that again.
19   Q   They're not selling Coca-Cola or Pepsi
20  or competing products with Coke or Pepsi; true?
21   A   For the most part. We're not selling
22  colas. Let's say that.
23   Q   Sure. You would agree with me that
24  hydrogen water, Gamer Shots, nootropics -- it's a
25  niche of the larger beverage industry; correct?

267

1    A   Yeah. I think so.
2    Q   Okay. Approximately what percentage of
3   the beverage industry is sold or sells products
4   like hydrogen water and things like that?
5    A   Very small.
6    Q   Ballpark?
7    A   Two percent, 3 percent.
8    Q   Okay.
9    A   Very small.
10   Q   And so your testimony is that, even
11  though Takeover and Next Gen are both in that 2 to
12  3 percent, they're not competing with each other?
13   A   I -- well, I didn't say Next Gen was in
14  the 2 to 3 percent. Because don't forget Next Gen
15  sells alkaline water, artesian water, nootropics
16  energy drinks, hydrogen water, and nootropic
17  coffee. So we've expanded the line substantially.
18   Q   What percentage of the beverage industry
19  do you think would be encompassing those products?
20   A   Forty or 50 percent.
21   Q   Forty or 50?
22   A   Yeah. You're talking waters. Now
23  you're in the water category. Yes.
24   Q   Okay. You've spoken to Mr.
25  (indiscernible). Let me give you context for the

268

1   question. You weren't actively involved with
2   Takeover when Mr. Deppoleto loaned the money that
3   we talked about earlier; correct?
4    A   Correct. Correct?
5    Q   You have, however, subsequently had
6   discussions with individuals who were involved at
7   that time, such as Mr. McBride and Mr. Holley;
8   correct?
9    A   Correct.
10   Q   From those discussions, was it your
11  understanding that they lied to Mr. Deppoleto to
12  get him to loan Takeover the money?
13        MR. BENNION: Objection to the form of
14  the question. Lacks foundation.
15        Go ahead.
16   A   I don't know of any lies they told him.
17   Q   So they intended to pay him back?
18   A   I don't think they signed off on these
19  notes. Well, let me rephrase. I don't -- they
20  weren't the one -- the ones driving the decision to
21  borrow the money from Mr. Deppoleto. It was
22  Jason Tucker that was doing all that and
23  coordinating all that.
24   Q   Jason Tucker was the president of
25  Takeover at the time; correct?

269
1    A    And on the board. And -- no. I think
2  he was CEO.
3    Q    Okay. And I can show them to you if you
4  want, but I assume you've seen the written consents
5  authorizing Mr. Tucker to take all of the actions
6  that he took; correct?
7    A    Most likely, yes.
8    Q    Okay. So Takeover, the company,
9  intended to pay Mr. Deppoleto back; correct?
10   A    Yeah. I believe they took the notes in
11 good faith that there would be repayment. I
12 believe so. I wasn't there.
13   Q    And I'm asking about subsequent
14 discussions you've had with Mr. Holley and
15 Mr. McBride that -- those individuals. When you've
16 discussed them, did they say we didn't intend to
17 pay him back even though we got the money?
18   A    They've never said that ever.
19   Q    Did they say we did intend to pay him
20 back?
21   A    No. The conversations have been more
22 the notes weren't validated. We didn't sign off on
23 this. We didn't sign off on the deal that he was
24 funding. That's their contention.
25   Q    So why didn't they send the money back

270
1  if they didn't want it?
2    A    They weren't in control of the account.
3    Q    Did they tell Mr. Tucker send that money
4  back?
5        MR. BENNION: Objection. Calls for
6  speculation. Lacks foundation.
7    A    I believe they made it very clear that
8  the deal they were doing was not healthy for the
9  business from what they're telling me.
10   Q    Did they say to him send the money back
11 or words to that effect?
12   A    I don't know. I wasn't there.
13   Q    And the money was spent; correct?
14   A    On the deals that Mr. Deppoleto and
15 Jason Tucker wanted. Yes. I think so.
16   Q    I want to make sure. I think I asked
17 you. Is it your testimony that Next Gen never
18 transferred assets to Takeover or -- I'm sorry --
19 that Takeover never transferred assets to Next Gen?
20   A    If they did, it was unbeknownst to me.
21 And if there was any type of asset transfer, I'm
22 sure fair value was paid, but I'm not aware of any,
23 Mr. Harvey.
24   Q    You're the CEO of Takeover and have been
25 since April 2023; correct?

271
1    A    Correct.
2    Q    Who has made the decision not to repay
3  Mr. Deppoleto?
4    A    Nobody's made a decision not to pay
5  Mr. Deppoleto. We've been trying since day one. I
6  have an email to Mr. Deppoleto in, I think,
7  November or December of '22 saying, Let's discuss
8  this. Let's see if we can put this together.
9    Q    Has he been paid even a penny?
10   A    No. But he's been offered. He's been
11 offered compensation to get his note -- to get him
12 paid completely and fully, and if he would have
13 accepted the offer, he would have been paid by now.
14   Q    Why hasn't he just been paid?
15   A    Because there's no money.
16   Q    Is it your testimony there's been no
17 money to repay him since November of 2022 when he
18 sent the first notice of default?
19   A    There was no money to pay him and keep
20 the company operational; correct?
21   Q    But the company is not operational right
22 now anyways; correct?
23   A    It is not. It tried and failed.
24   Q    And it hasn't been operational since
25 when?

272
1    A    May-June '23.
2        MR. BENNION: Objection to the extent it
3  may call for a legal conclusion.
4    Q    So why not just cut him a check for
5  whatever Takeover had as of May-June 2023?
6    A    What did Takeover have May-June 2023?
7    Q    Whatever it was, why didn't they pay
8  him?
9    A    I -- the account was probably negative.
10 Certainly in debt.
11   Q    My understanding from previous testimony
12 is that Takeover does still have a bank account
13 that has a six-figure number in it. Is your
14 understanding different?
15   A    Yes.
16   Q    Okay.
17   A    You're telling me there's a hundred
18 dollars in Takeover?
19   Q    Maybe I'm misremembering the testimony,
20 but I thought that that was -- oh, I take that
21 back. There was value. Let me ask you this: Does
22 Takeover have shares of Labor Smart --
23   A    Yes.
24   Q    -- that it -- that it owns?
25   A    I believe so.

273

1    Q    How many?
2    A    Approximately a hundred million.
3    Q    And how much is that worth?
4    A    A hundred million times -- I don't know
5    what we closed at today, but call it two. So
6    $200,000, maybe.
7    Q    Perhaps that's what I'm thinking.
8    A    Yeah.
9    Q    Why not give that to Mr. Deppoleto in
10   partial repayment of the debt?
11   A    I'd be happy to.
12   Q    Why haven't you? You're the CEO.
13   A    Because we've had trouble finishing
14   conversations with Mr. Deppoleto. We've been at
15   this table many times saying, How do we get you
16   paid? We've provided many solutions. Frankly,
17   James and I have come up with many solutions.
18   Every time it hits Husch Blackwell, it hits a brick
19   wall.
20   Q    My question is slightly different,
21   though. You have said, at least as to the 1.5
22   million, Takeover clearly owes that to
23   Mr. Deppoleto; correct?
24       MR. BENNION: I'm going to object to the
25   form of the question. Misstates prior testimony.

274

1        Go ahead.
2    A    No. What I said was the 1.5 -- I don't
3    debate whether the 1.5 came into the account. It
4    did. Does it owe it? I don't know. I don't know
5    because the people that signed the notes and the
6    people that were there at the time said these notes
7    were not done properly. We have legal counsel that
8    says these notes were not done properly.
9        MR. BENNION: I'm going to object to any
10   -- the question to the extent it seeks to violate
11   the attorney-client privilege.
12       Go ahead.
13   A    So going back to the beginning of the
14   answer, I've seen that the money has gone in.
15   That's been substantiated. The people that were
16   there at the time said the notes were not done
17   properly. So I don't know if the notes and the
18   debt is valid. I can say that I have taken the
19   posture with Mr. Deppoleto that the notes are valid
20   and have made multiple attempts to try and settle
21   him with the only currency that Takeover has, which
22   is its parent's company stock or convertible note
23   to pay him in full for what he's claiming, not even
24   debating that extra 5- or $600,000. All of those
25   deals are done until we get to Husch Blackwell, and

275

1    then a stack that big of a settlement agreement
2    comes across with a personal guarantee from me.
3    That's been the issue.
4    Q    So whether we can agree to disagree on
5    whether -- well, strike that. Let me ask it this
6    way: We are in complete and total agreement that
7    Takeover received the value of at least $1.5
8    million; correct?
9    A    Yes, Mr. Harvey.
10   Q    Who has the final say-so on what to do
11   with Takeover's assets today?
12       MR. BENNION: Objection to the extent
13   that it may call for a legal conclusion.
14       Go ahead.
15   A    The board. I would have strong
16   influence but the board primarily.
17       MR. HARVEY: Why don't we go off the
18   record for two minutes. I just want to flip
19   through my notes, but we may be able to move onto
20   the next deposition.
21       MR. BENNION: Okay.
22       THE VIDEOGRAPHER: We are going off the
23   record. The time is 2:34 p.m.
24       (Off the record.)
25       (On the record.)

276

1        THE VIDEOGRAPHER: We are going back on
2    the record. The time is 2:42 p.m.
3        MR. HARVEY: We're still obviously
4    reserving our rights to ask additional questions
5    about Acme Corporation. We're also reserving our
6    rights to ask him additional questions to the
7    extent we have not been produced documents that we
8    should have been produced in discovery. Other than
9    that, unless your counsel has any questions for
10   you, in which case I'll have some follow-up, I have
11   no further questions for you, Mr. Zarro, in your
12   individual capacity.
13       THE WITNESS: Okay. Am I allowed to
14   object?
15       MR. BENNION: No.
16       THE WITNESS: Okay.
17       MR. BENNION: I have no questions.
18       THE WITNESS: Okay. Okay.
19       THE VIDEOGRAPHER: Before we before we
20   go off the record, Mr. Bennion, would you like a
21   copy of the video from today's deposition?
22       MR. BENNION: I don't think I need the
23   video but definitely the written transcript.
24       THE VIDEOGRAPHER: This marks the end of
25   the deposition of Tom Zarro, individually. We're

277

1  going off the record at 2:43 p.m.
2      (Off the record at 2:43 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

278

1  CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2      I, Mylene Santiano, the officer before
3  whom the foregoing proceedings were taken, do
4  hereby certify that any witness(es) in the
5  foregoing proceedings were fully sworn; that the
6  proceedings were recorded by me and thereafter
7  reduced to typewriting by a qualified
8  transcriptionist; that said digital audio recording
9  of said proceedings are a true and accurate record
10 to the best of my knowledge, skills, and ability;
11 and that I am neither counsel for, related to, nor
12 employed by any of the parties to this case and
13 have no interest, financial or otherwise, in its
14 outcome.
15
16
17
18
19 _____
20 MYLENE SANTIANO,
21 NOTARY PUBLIC FOR THE STATE OF NEVADA
22
23
24
25

279

1      CERTIFICATE OF TRANSCRIBER
2      I, Jennifer Candela-Alvarez, do
3  hereby certify that this transcript was prepared
4  from the digital audio recording of the foregoing
5  proceeding; that said transcript is a true and
6  accurate record of the proceedings to the best of
7  my knowledge, skills, and ability; and that I am
8  neither counsel for, related to, nor employed by
9  any of the parties to the case and have no
10 interest, financial or otherwise, in its outcome.
11
12
13 _____
14 JENNIFER CANDELA-ALVAREZ
15 DECEMBER 9, 2024
16
17
18
19
20
21
22
23
24
25