S. Don Bennion, Esq.
Nevada Bar No. 4530
Law Office of S. Don Bennion
6980 O'Bannon Drive #400
Las Vegas, Nevada 89117
Tel: (702) 333-0777  Fax: (702) 333-0577
email: don@bennionlaw.com

Jeffrey J. Whitehead, Esq.
Nevada Bar No. 3183
Whitehead & Burnett
6980 O'Bannon Drive
Las Vegas, Nevada 89117
Tel: (702)267-6500 Fax: (702)267-6262
Email: jeff@whiteheadburnett.com
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| JAMES V. DEPPOLETO JR., | Case NO. 2:22-cv-02013-GMN-BNW |
| Plaintiff, | **DEFENDANTS' OPPOSITION RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| TAKEOVER INDUSTRIES, INCORPORATED, *et al.* | **Filed concurrently with:** |
| Defendant. | 1. Declaration of S. Don Bennion, Esq. |
| | 2. Declaration of Thomas Zarro |
| | 3. Declaration of Toby McBride |
| | 4. Declaration of Joseph Pavlik |
| | 5. Declaration of Michael Holley |

COME NOW Defendants Takeover Industries Incorporated, Michael Holley, Toby McBride, Joseph Pavlik, Tom Zarro and NextGen Beverage, LLC, ("Defendants" collectively and/or "Takeover" and/or "NextGen") by and through counsel S. Don Bennion, Esq. of the

Law Office of S. Don Bennion and Jeffrey J. Whitehead, Esq. of Whitehead & Burnett, pursuant to Fed R. Civ. P. 56 and LR 56-1, and files this Opposition Response to Plaintiff's Motion For Partial Summary Judgment against Takeover Industries Incorporated, Michael Holley, Toby McBride, Joseph Pavlik, Tom Zarro and NextGen Beverage, LLC. This Opposition is made and based upon the papers and pleadings on file with this Court, Defendants' Memorandum of Points and Authorities, the Exhibits referenced herein, and the Declaration of S. Don Bennion, Esq., with Exhibits set forth therein including, but not limited to, the Declarations of Defendants Thomas Zarro, Toby McBride, Michael Holley, and Joseph Pavlik.   In addition, Defendants' Opposition Response to Plaintiff's Motion for Partial Summary Judgment is filed in concert with Defendants' Motion to Seal proposed Exhibit H including documents produced to Plaintiff labeled DEF01113 to DEF01135, which are not attached to this Opposition Response by Defendants.

# TABLE OF AUTHORITIES

## CASES

*10A Wright, A. Miller & M. Kane*, FEDERAL PRACTICE AND PROCEDURE §§ 2729-2730 at 229, 238 (2d ed. 1983)...............................................................12

Arizona case No. 2:22-cv-00357-PHX-JJT.......................................................24,26

*Bradley v. Nevada* C.O.R.Ry., 42 Nev. 411, 178 P. 906 (1919)...............................16

*Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985) ......................12

*Bulbman, Inc. v. Nev. Bell,* 108 Nev. 105, 111, 825 P.2d 588, 592 (1992). ................12

*Calloway v. City of Reno*, 116 Nev. 250, 993 P.2d 1259 (2000)...............................16

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (applying Fed. R. Civ. P 56)....... ..12

*Certified Fire Prot. Inc. v. Precision Constr.,* 128 Nev, 371, 283 P. 3d 250 (2012). ......17

*Chur v. District Court,* 136 Nev. 68, 72-73, 458 P.3d 336, 340 (2020) ......................13

*Collins v, Union Fed. Sav. & Loan Ass'n*, 99 Nev. 284, 662 P.2d 610 (1983) .............12

*Consolidated Generator-Nevada, Inc. v. Cummins Engine Co, Inc.*, 114 Nev. 1304, 971 P. 2d 1251 (1998). ......................................................................17

*Dugan v. Gotsopoulos*, 117 Nev. 285, 22 P.3d 205, 207 (2001). .........................26,27

*Executive Management, LTD. V. Ticor Title Insurance Co.,* 114 Nev. 823, 963 P. 2d 465 (1998)....................................................................................24

*Foster v. Arata*, 74 Nev. 143, 325 P.2d 759 (1958)..............................................14

*Guzman v. Johnson*, 483 P.3d 531, 534 (Nev. 2021) ......................................13,14

*Hidden Wells Ranch v. Strip Realty*, 83 Nev, 143, 425 P.2d 599 (1967)....................13

*Hilton Hotels v. Butch Lewis Productions*, 107 Nev. 226, 808 P.2d 919 (1991)...........18

*Kaldi v. Farmers Ins. Exch.,* 117 Nev. 273, 21 P.3d 16 (2001)...............................17

*Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1104-1106 (5th Cir. 1973)..................................................................................18

*Laurrance v. Deutsche Bank Nat. Trust Co. ex rel American Home Mortg. Assets Trust* 2006-5, 2015 WL 5521879, *3 (D. Nev. 2015) ...........................26

*May v. Anderson*, 121 Nev. 668, 672, 119 P. 3d 1254, 1257 (2005)....................17

*Morrow v. Morrow*, 103 Nev. 610, 747 P.2d 1386 (1987)................................17

*Perry v. Jordan*, 111 Nev. 943, 900 P.2d 335 (1995).....................................18

*Posadas v. City of Reno*, 109 Nev. 448, 851 P.2d 439 (1993)............................12

*Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 920 (D.Nev. 2006).....................16

*Shoen v. SAC Holding Corp.*, 122 Nev. 621, 137 P.3d 1171 (2006)......................14

*Sportsco Enterprises v. Morris,* 112 Nev. 625, 917 P.2d 934 (1996).................... 23

*Stephans v. State*, 127 Nev. 712, 716, 262 P.3d 727, 731 (2011)........................ 26

*Tahican, LLC v. Eighth Jud. Dist. Ct. in & for Cnty. Of Clark,* 139 Nev., Adv, Op. 2, 523 P. 3d 550, 554 (2023)...................................................................23

*Taylor v. State*, 129 Nev. 1156 (2013).....................................................27

Triangle Capital Corp., 457 P.3d 1001 (Nev. 2020)........................................14

*United States v. Perry,* 431 F.2d 1020, 1022 (9th Cir. 1970)..............................12

*Wood v. Safeway,* 121 Nev. 724, 731, 121 P.3d 1026, 1031 (2005)....................12

TABLE OF AUTHORITIES

RULES, STATUTES AND OTHER AUTHORITIES

FRCP 56 ……………………………………………………………..……….2,12

LR 56-1……………………………………………………………………………2

NRS 78.138………………………………………………………..……… 13

NRS78.138(3)……………………………………………………………13

NRS 78.138(7) ……………………………………………………..…….13

NRS 78.138(7)(a)…………………………………………………..……13,14,24

NRS 112.180(1)(a)……………………………………………………23

NRS 112.180(1)(b) (2)………………………………………………...23

NRS 112.180(1)(b)(3)……………………………………………23,24

NRS 112.180(2)(a),-(d),(h),(i),(j)………………………………………24

NRS 112.190………………………………………………………………23

NRS 112.190(1)…………………………………………………..23

# TABLE OF CONTENTS

MOTION.................................................................................................1

TABLE OF AUTHORITIES...................................................................i-iii

Summary of Motion for Partial Summary Judgment ...........................................4

Introduction of Opposition.............................................................................4

Undisputed Facts.......................................................................................8

Disputed Facts..........................................................................................9

Standard of Review................................................................................11,23

Legal Argument re: Breach of Contract Allegations.........................................16

Legal Argument re: Fraudulent Transfer Allegations.......................................23

CONCLUSION.........................................................................................28

1

2

3

4

5

### <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

6

**INTRODUCTION**

7

        Plaintiff Deppoleto ("Plaintiff" and/or "Deppoleto") complains Defendant

8

Takeover breached its contractual obligations to pay Plaintiff $1.5 million based on three

9

convertible note purchase agreements ("NPAs") executed on or about May 25, 2022, July 6,

10

2022 and August 19, 2022, by Plaintiff and Jason Tucker, as president of Takeover, and

11

Michael Costello as president of Takeover's parent company Labor Smart, Inc. (Labor Smart).

12

Plaintiff also alleges an oral agreement on or about October 27, 2022, whereby Deppoleto made

13

Takeover an additional loan of $386,000, and another alleged oral agreement on or about

14

November 3, 2022, whereby Deppoleto allegedly made Takeover an additional loan of

15

$128,924.62 ("two supplemental loans") via credit card payments to Great Northern Company

16

17

located in Appleton, Wisconsin.

18

        The evidence herein demonstrates these NPAs contained terms that place Takeover in

19

20

technical default from the moment of execution.  Accordingly, the three NPAs were *void ab*

21

*initio* or void from the beginning because Takeover initiated a lawsuit against Michael Holley

22

in Arizona March 8, 2022, in violation of the NPAs.

23

        In 2021, Michael Holley (hereinafter "Holley"), Toby McBride (hereinafter

24

25

"McBride"), and Joseph Pavlik ("Pavlik") founded Takeover Industries in Nevada, a company

26

organized to manufacture and promote specific beverage products.  Takeover sold products

27

under the brand name NXT LVL. Two Takeover products were sold under the brand name

28

NXT LVL: 1-Hydrogen water; and 2- A two-ounce energy shot known as a Gamer shot. Those were the only two products sold under the brand name NXT LVL through Takeover. In early 2021, with Holley as Chief Operating Officer and McBride as Chief Executive Officer they launched Takeover Industries which achieved immediate success with the hydrogen water product, generating approximately $500,000 in revenue during the first weekend of launch.

On or about February 26, 2021, Labor Smart acquired Takeover and became a wholly owned subsidiary of Labor Smart. After the acquisition, McBride was named a Director of Labor Smart and continued in his role as Director and CEO of Takeover. Holley was named a Director of Labor Smart, as well as Chief Operating Officer and Treasurer of Takeover in addition to sitting on the Board of Directors for Takeover. In April 2021, Takeover engaged Jason Tucker as a consultant to assist with contract negotiations and intellectual property matters.

Joseph Pavlik ("Pavlik"), Takeover's Chief Science Officer, and Jason Tucker ("Tucker") were added to the Board of Directors for Takeover in November 2021. Within one month of Tucker's addition to the Board of Directors, Holley was erroneously dismissed from the Board based on Tucker's allegations of misuse of funds to which McBride and Pavlik briefly agreed and subsequently rejected.

In the summer and fall of 2022 Plaintiff undertook actions with Tucker and others to remove Pavlik from the Board of Directors and exclude him from Company meetings, purportedly suspend McBride from the Company (i.e. once again for alleged financial malfeasance in September 2022), and set a course of action representing himself as a "Director" of Takeover marketing products to third parties without the knowledge or

authorization of McBride or Pavlik. In so doing, Plaintiff violated the covenant of good faith and fair dealing inherent in the three NPAs.

The actions of Plaintiff, Tucker and others suffocated the value of Takeover in 2022, damaging Takeover's viability which necessitated the call for a meeting of Labor Smart/Takeover's Board of Directors November 7, 2022. While directors Toby McBride ("McBride") and Michael Holley attended and participated in the said November 7, 2022 meeting of Labor Smart/Takeover's Board of Directors, "director" Jason Tucker apparently decided not to attend the November 7, 2022 meeting. As a result, the Resolution of the Board of Directors of Labor Smart, Inc., Takeover's parent company was issued November 7, 2022. See, Ex. A, Resolution of the Board of Directors of Labor Smart Inc., dated November 7, 2022, and Written Consent Takeover Board of Directors dated November 7, 2022. On November 7, 2022, Pavlik was reinstated as a member of Takeover's Board of Directors, and Tucker was removed as president and director of Takeover. See Ex. A; See also, Ex. B, Declaration of Toby McBride; See also, Ex. C, Declaration of Michael Holley; See also, Ex. D, Declaration of Joseph Pavlik.

It is noteworthy that Plaintiff's instant Motion for Partial Summary Judgment ("Motion") argues at page 9, footnote 3: "Deppoleto does not admit that any of the resolutions allegedly passed by Takeover's Board of Directors from the beginning of November 2022 through the present are valid corporate actions. Nonetheless, for purposes of this Motion, whether Takeover's Board of Directors' resolutions in that timeframe were actually valid corporate actions is not a genuine dispute of material fact." Indeed, this issue is the hinge point of this case, and is certainly a genuine issue of material fact because the November 7, 2022 meeting of the Board of Directors was necessitated in part by Plaintiff Deppoleto's

actions the preceding month and prior thereto.  See Ex. B;  see also Exhibit C, Declaration of

Michael Holley.  Further, the events of the November 7, 2022 Board Meeting are close in time

to Plaintiff's initial Notice of Default dated November 8, 2022, regarding the three NPAs, the

first of which would not allegedly become due until November 22, 2022.  Thus, it cannot be

said that these events are not genuine issues materials to this case.

   While Takeover acknowledges it received $1.5 million from Plaintiff pursuant to the

aforesaid three convertible note purchase agreements ("NPAs) May 25, 2022, July 6, 2022, and

August 19, 2022, the actions of Plaintiff in 2022, to the detriment of Takeover, constitute

breaches of the implied covenant of good faith and fair dealing which govern any and all

agreements in this jurisdiction.

   When Takeover's directors Holley, McBride and Pavlik, were finally able to obtain

passwords and control of Takeover's bank account nearly two months later, they discovered

Takeover was without sufficient funds to viably operate well. See Ex. C, Declaration of

Michael Holley.  In addition, they discovered that Takeover's reputation had been tarnished by

the actions of Plaintiff representing himself as a "Director" of Takeover during the fall of

2022. See Ex. D, Declaration of Joseph Pavlik.

   Plaintiff also alleges fraudulent transfers of assets from Takeover to Defendant

NextGen Beverages, LLC, ("NextGen") were facilitated by Defendants Michael Holley and

Thomas Zarro ("Zarro").  Although certain payments were made by Takeover to NextGen-

related to services on short-term and limited bases, NextGen repaid all such payments made

pursuant to loan agreements between the two companies.  See Ex. C, Declaration of Michael

Holley;  See also, Ex. E, Declaration of Thomas Zarro.  Plaintiff can only infer a fraudulent

transfer scheme and does so here based on disputed facts, immaterial and incomplete facts,

and unsupported legal conclusions. Indeed, the actions of Defendants Holley, Zarro, Pavlik, and McBride have served to increase the value of Plaintiff's interests in Takeover and NextGen, and their actions are protected by Nevada's Business Judgment Rule.

Plaintiff claims Holley and Zarro established NextGen to compete with Takeover, but the evidence establishes that NextGen's products are different from Takeover. See Exh. D, Declaration of Pavlik, Chief Science Officer of Takeover; see also, Ex. E.

Accordingly, Plaintiff's Motion for Partial Summary Judgment must be denied as a matter of law on the claim for Breach of Contract and the claims for Fraudulent Transfer against Holley and Zarro.

**UNDISPUTED FACTS**

Takeover does not dispute the following facts regarding company formation, background, and certain aspects of its relationship with Takeover's parent company publicly traded Wyoming entity Labor Smart Incorporated (hereinafter "Labor Smart"):

In 2021, Michael Holley, Toby McBride, and Joseph Pavlik founded Takeover Industries in Nevada, a company organized to manufacture and promote specific beverage products. See Ex. C, Declaration of Michael Holley. On or about February 26, 2021, Labor Smart acquired Takeover and became a wholly owned subsidiary of Labor Smart. After the acquisition, McBride was named a Director of Labor Smart and continued in his roled as Director and CEO of Takeover. Holley was named a Director of Labor Smart, as well as Chief Operating Officer and Treasurer of Takeover in addition to sitting on the Board of Directors for Takeover. Joseph Pavlik and Jason Tucker were added to the Board of Directors for Takeover later in 2021.

At the same time, Joseph Pavlik served as an Officer and Board of Directors member for Takeover, as well as an Officer for Labor Smart. It was at this point that Jason Tucker

began working with Takeover to purportedly assist in building the company's brand.  On June 10, 2021, the Board of Directors of Takeover held a "Special Meeting" which established that the Board of Directors for Takeover moving forward would consist of Holley, Tucker, Pavlik, and McBride.  On or about December 2021, Takeover's Board of Directors, at the urging of Tucker, held a meeting and voted to remove Holley from the Board due to allegations of mismanagement of Takeover funds, allegations which Holley has vehemently denied. See Ex. C.

From the period of May 25, 2022, through August 19, 2022, Plaintiff Depploeto entered into three claimed Note Purchase Agreements (hereinafter "NPAs") with Takeover.  The Notes were for the total of $500,000 each signed by Tucker, as president of Takeover, Michael Costello (Chief Executive Officer of Labor Smart) and Plaintiff.

With respect to the purported loan agreements (more specifically described below), Takeover does not dispute that Deppoleto provided written notice of Takeover's alleged default on or about November 8, 2022.  See Ex. 17, First Notice of Default to Plaintiff's Motion for Partial Summary Judgment.

On April 17, 2023, Defendant Zarro, himself a senior investor in Takeover prior to May of 2022, was appointed a member of Takeover's Board of Directors, replacing McBride who voluntarily resigned as a director at that time.  See Ex. F, Minutes of April 17, 2023 meeting of Takeover Board of Directors.  It is noteworthy that Zarro is still owed in excess of $300,000 by Takeover, with Zarro's investment in Takeover made well-prior to Plaintiff's involvement with Takeover in spring 2022.  See, Ex. E, Declaration of Zarro.  In January 2023, before becoming an officer or director, Zarro purchased some of Takeover's aging products which were on the verge of expiration.  See Ex. E, Declaration of Zarro.

In September 2023, Plaintiff filed a First Amended Complaint naming Zarro as a defendant and adding more claims for relief including fraudulent transfer.

**DISPUTED MATERIAL FACTS**

The following sets forth facts material to the disposition of Plaintiff's instant motion for partial summary and which Defendants' claim are genuinely in issue, specifically:

-That in December 2021, Takeover's board of directors convened a meeting and voted properly to remove Holley from the board (hereinafter the "December 2021 Meeting").

-Takeover disputes, whether allegedly acting through Pavlik, Holley, McBride or anyone else, that it committed any acts or omissions that constitute any "Event or Default" under the foregoing loan agreements, notes (NPAs) or otherwise, based on the actions of Deppoleto and Tucker. See Ex. C; See also, Ex. D; See also, Ex. E (Declarations of McBride, Holley and Pavlik).

That Takeover, through Tucker purporting to act in the capacity as president of Takeover, assented to, accepted, issued consideration for, or otherwise properly entered into the following agreements and promissory notes with Plaintiff Deppoleto:

- A "Convertible Note Purchase Agreement," dated May 25, 2022 (the "NPA");

- A secured note issued under the NPA, for the principal amount of $500,000, allegedly issued on May 25, 2022 (the "First Note");

- An amendment to the NPA, allegedly entered on July 6, 2022 (the "First Amendment");

- A secured note issued under the NPA for the principal amount of $500,000, allegedly issued on July 6, 2022 (the "Second Note");

- A second amendment to the NPA, allegedly entered on August 19, 2022 (the "Second Amendment");

- A secured note issued under the NPA for the principal amount of $500,000, allegedly issued on August 19, 2022 (the "Third Note");

- An oral agreement on or about October 27, 2022, whereby Deppoleto made Takeover an additional loan of $386,000, and an oral agreement on or about November 3, 2022, whereby Deppoleto made Takeover an additional loan of $128,924.62;

- That Takeover agreed each additional loan made under the oral agreements would be funded as part of the NPA;

- That Deppoleto and Takeover were in the process of documenting each additional oral loan agreement, but the documents were not finalized.

- That Holley and Zarro fraudulently transferred any assets of Takeover to NextGen.

- That the Nevada Business Judgment Rule governs and protects the actions of Defendants related the Plaintiff's allegations of fraudulent transfers in this case.

Takeover further points the Court's attention to a November 7, 2022, resolution of the board of directors of Labor Smart, as well as a written consent of the board of Takeover signed by McBride, Pavlik and Holley. See Ex. A. The resolution concludes that all actions taken at the December 2021 meeting are void and asserts Tucker engaged in wrongful conduct in an attempt to acquire Takeover by improper means.  Specifically, the Declaration of Michael Holley sheds light on the validity of the December 2021 meeting and demonstrates that he was not properly removed from Takeover's board of directors as follows:

In October 2021, while I was hospitalized with Covid-19, Tucker made false accusations about me misappropriating company funds. Though I was later exonerated and reached a settlement with Takeover, Tucker used my absence to gain sole control over company bank accounts and credit cards.
In May 2022, during my forced absence, Tucker executed the first of three convertible note agreements with James Deppoleto without proper board authorization.
Based on my direct knowledge of the alleged 2022 agreements, these convertible notes contained terms that placed Takeover in technical default from the moment of execution.
In November 2022, after my return to the company, we discovered through company communications that Tucker and Deppoleto were engaged in unauthorized negotiations with 5-hour Energy for their personal benefit.

11

See Ex. C, p. 3, para. 9-12.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is proper when there is genuinely no dispute as to any fact of consequence. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986) (applying Fed. R. Civ. P 56). Plaintiff lacks undisputed material evidence and build their case on "gossamer threads of a whimsy, speculation and conjecture" – he is not entitled to summary judgment on any claim. Wood v. Safeway, 121 Nev. 724, 731, 121 P.3d 1026, 1031 (2005); see also Collins v. Union Fed. Sav. & Loan Ass'n, 99 Nev. 284, 662 P.2d 610 (1983) and Bulbman, Inc. v. Nev. Bell, 108 Nev. 105, 111, 825 P.2d 588, 592 (1992).

Plaintiff infers disputed knowledge and intent for Defendants Holley and Zarro. "Questions involving a person's state of mind, e.g., whether a party knew or should have known of a particular condition, are generally factual issues inappropriate for resolution by summary judgment." Braxton-Secret v. A.H. Robins Co., 769 F.2d 528, 531 (9th Cir. 1985) (citing 10A C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE AND PROCEDURE §§ 2729-2730 at 229, 238 (2d ed. 1983)). Even where state of mind might be found by inference, "summary judgment should not be granted where contradictory inferences may be drawn from such facts, even if undisputed." Braxton-Secret., 769 F.2d 528, 531 (9th Cir. 1985) (citing United States v. Perry, 431 F.2d 1020, 1022 (9th Cir. 1970)).

Furthermore, as set forth in Posadas v. City of Reno, 109 Nev. 448, 851 P.2d 439 (1993) trial judges are to exercise great caution granting summary judgment, which is not to be granted if there is the slightest doubt as to the operative facts. In addition, a trial judge may not pass upon the credibility or weight of the opposing declarations and other admissible evidence in granting summary judgment; that function is reserved as genuine issues of

material fact to be determined at trial. Id. When considering a summary judgment motion, the Court is obligated to accept as true all evidence favorable to the party against whom the motion is made. Hidden Wells Ranch v. Strip Realty, 83 Nev. 143, 425 P.2d 599 (1967).

## NEVADA BUSINESS JUDGMENT RULE

As officers of Nevada corporations, the officers and directors of Takeover and NextGen are governed by the Reasonable Business Judgment Rule (hereinafter "RBJ Rule") codified in Nevada at NRS 78.138:

> ...in deciding upon matters of business, [officers] are presumed to act in good faith, on an informed basis and with a view to the interests of the corporation. A director or officer is not individually liable for damages as a result of an act or failure to act as a director or officer except as described in subsection 7."

NRS 78.138(3).

This one exception provides the sole avenue for holding any officer liable for an official act. Guzman v. Johnson, 483 P.3d 531, 534 (Nev. 2021) (citing Chur v. District Court, 136 Nev. 68, 72-73, 458 P.3d 336, 340 (2020)) ("NRS 78.138(7) supplies the **sole   avenue** to hold directors and officers individually liable for damages arising from official conduct") (emphasis in original). See Guzman, 483 P.3d 531, 534 (clarifying that Chur foreclosed the loophole allowing shareholders to shift the burden of proof).

This burden of proof must be carried by the plaintiff and cannot be shifted to the officer. NRS 78.138(7)(a). The RBJ Rule balances the need to protect corporate officers from liability with the need to protect shareholders from mismanagement. The exception to the RBJ Rule is quite narrow and set forth in subsection 7 as follows:

> 7. ... a director or officer is **not individually liable** to the corporation or its stockholders or its creditors for any damages as

a result of any act or failure to act in his or her capacity as a director or officer **unless:**

(a) The presumption established by subsection 3 has been rebutted; **and**

(b) It is proven that:

    (1) The director's or officer's act or failure to act constituted a breach of his or her fiduciary duties as director or officer; **and**

    (2) Such breach involved intentional misconduct, fraud, or a knowing violation of law.

NRS 78.138(7)(a) (emphasis added).  As a result, Plaintiff bears the burden of proving and rebutting the presumption that the individual Defendants herein acted in good faith in making and executing decisions as officers and/or directors of Takeover or NextGen.  Therefore, in this case, as officers and directors in their various positions, the actions of Defendants Pavlik, McBride, Holley and Zarro are governed and even protected in accordance with the RBJ.

In Guzman v. Johnson, 483 P.3d 531, 534 (Nev. 2021), the Nevada Supreme Court explained the reasonable business judgment rule provides the sole avenue for director/officer liability in this case.  As held in Guzman, Plaintiff bears the burden of overcoming this presumption with clear and convincing evidence of bad faith or self-dealing.  Id.

In Foster v. Arata, 74 Nev. 143, 325 P.2d 759 (1958), the Court ruled officers of companies have discretion in managing corporate assets including sales below market value.  Furthermore, the reasonable business judgment rule protects decisions of officers/directors to form entities and transfer assets when done with a legitimate business purpose.  Shoen v. SAC Holding Corp., 122 Nev. 621, 137 P.3d 1171 (2006).  Courts will not second-guess business decisions made in good faith.  In re Triangle Capital Corp., 457 P.3d 1001 (Nev. 2020).  As set forth in Shoen, the formation of NextGen and related transfers were legitimate responses to their business necessity needs after Takeover lost its trademark and faced litigation and other

difficulties.  In fact, the evidence demonstrates that Holley and Zarro acted to preserve the

enterprise value of Takeover through NextGen after Takeover's brand was comprised.

**FORMATION OF NEXTGEN WAS NOT TO COMPETE WITH TAKEOVER**

NextGen was formed and incorporated in June 2023, for the purpose of marketing

and selling products different than Takeover.  Pavlik, who served as chief science officer of

Takeover explained:  "The scope of my work primarily consists, and consisted of, creating

formulas, intellectual property of the products, assisting with education, sales, and distribution,

which was required to help the company market and sell its products." Ex. D, p. 2, ll. 7-21.

Likewise, Zarro explained the reasons for the formation of NextGen as follows:

"Because of the mismanagement by Tucker, Takeover became mired in multiple litigations.

There was no product being produced and no revenue.  After consulting with counsel, it was

decided the only way to save the parent company, Labor Smart Inc.'s ownership and creditors

(of which I am and remain unpaid) of Takeover,  was to make a wholly owned subsidiary with

a new line of beverages.  I became CEO of Labor Smart in April of 2023, and we voted to set

up the Company, Next Gen Beverages on June 14, 2023.  Due to Tucker and Deppoleto's

malfeasance, Next Gen had to pay to get new trademarks, new formulations, new brands, and a

new website. No assets from Takeover Industry were used to establish Next Gen Beverages or

used in the purchase of its assets." See Ex. E, p. 3, ll. 16-28 to p. 4, ll. 1-28.

Holley's testimony adds insightfully to the narrative for the need for the formation of

NextGen as well, to wit:

> "Due to Tucker's mismanagement, Takeover:
>     a.  Lost the NXTL LVL trademark
>     b.  Faced multiple demands from vendors totaling millions of dollars
>     c.  Could not attract new investors due to pending litigation
>     d.  Accumulated substantial debt

The formation of Next Gen Beverages was undertaken to protect shareholder interests and create new value after Takeover's trademark loss and mounting legal challenges made continuing business operations impossible under that entity. Takeover had little to no assets left which none were used for Next Gen. Next Level Fitness water filed the trademark months before Takeover did. They filed an action with the trademark commission and later a lawsuit against Takeover.

Through our efforts with NextGen, we made the stock tradeable, enabling Deppoleto to potentially realize value from approximately 400 million shares he possessed. Today these shares were trading @.0018 which is a value of $720,000.00."

See Ex. C, Declaration of Holley, p. 4, paragraphs 16-18.

Pavlik also testified in his deposition as follows:

A It was for all of – again, going back to what I do, it was for the new creation and development and formulation of all of the new products for the new company after the other former company was left for dead.

Ex. K, Depo. of J. Pavlik 20: 17-21.

Q And when was Takeover left for dead?
A After—I would probably say October of 2022, after the series of events between Mr. Deppoleto and Justin Tucker, the company was left with nothing but lawsuits. So that's why the company was left for dead. It was set up to fail.
Q And who set it up to fail?
A Mr. Deppoleto and Jason Tucker.

Ex. K, Deposition of J. Pavlik 21: 5-13.

**LEGAL ARGUMENT re: BREACH OF CONTRACT ALLEGATIONS**

To prevail on a claim for breach of contract, the following four (4) elements must be proved:

    (1)    A valid contract,
    (2)    Plaintiff's performance, or excuse from performance,
    (3)    Defendant's failure to perform, and
    (4)    Plaintiff's damages as a result of the breach.

Calloway v. City of Reno, 116 Nev. 250, 993 P.2d 1259 (2000); *See also*, Saini v. Int'l Game Tech., 434 F. Supp. 2d 913, 920 (D.Nev. 2006); *See also*, Bradley v. Nevada C.O.R.Ry., 42 Nev. 411, 178 P. 906 (1919).

In <u>May v. Anderson</u>, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005), the Nevada Supreme Court held for there to be an enforceable oral contract, "There must be an offer and acceptance, meeting of the minds, and consideration" with both parties. A meeting of the minds requires "distinct understanding common to both parties." <u>Certified Fire Prot. Inc. v. Precision Constr.</u>, 128 Nev. 371, 283 P.3d 250 (2012). See Ex. D, Declaration of Pavlik.

In this case, there was not clear mutual assent between Takeover and Deppoleto regarding whether the "verbal supplemental loans" in the alleged amounts of $386,000 and $128,924.62 would be governed by the same terms as the formal NPAs. <u>Id.</u>; See also, Ex. C. Deppoleto alleges an oral agreement on or about October 27, 2022, whereby Deppoleto made Takeover an additional loan of $386,000, and an oral agreement on or about November 3, 2022, whereby Deppoleto made Takeover an additional loan of $128,924.62 via credit card payments to Great Northern Company.

Here, there was not "an offer and acceptance, meeting of the minds, and consideration" with "distinct understanding common to both parties." <u>May</u>, 121 Nev. at 672; <u>Certified Fire Prot. Inc.</u> 128 Nev. at 375. Likewise, while Plaintiff argues the supplemental loans were intended to be governed by the NPAs, the NPAs contain integration clauses at Section X that would bar incorporating additional loans. See, Exhibit 17 to Plaintiff's Motion. Under <u>Kaldi v. Farmers Ins. Exch.</u>, 117 Nev. 273, 21 P.3d 16 (2001), these alleged supplemental loans must be independently enforceable and there is no evidence presented to demonstrate independent enforceability in this case. Nevada law requires definite and certain terms for an enforceable contract. See <u>Morrow v. Morrow</u>, 103 Nev. 610, 747 P.2d 1386 (1987).

In addition, the implied covenant of good faith and fair dealing is required under every contract in the state of Nevada. <u>Consolidated Generator-Nevada, Inc. v. Cummins Engine Co.</u>,

Inc., 114 Nev. 1304, 971 P.2d 1251 (1998).  The implied covenant of good faith and fair

dealing in every contract includes the following four elements:

> (1) A valid contract,
> (2) Defendant owed Plaintiffs a duty of good faith and fair dealing;
> (3) Defendant breached that duty by performing in a manner that is unfaithful to the purpose of the contract;
> (4) Plaintiff's justified expectations were thus denied.

Perry v. Jordan,    111 Nev. 943, 900 P.2d 335 (1995);    Hilton Hotels v. Butch Lewis

Productions, 107 Nev. 226, 808 P.2d 919 (1991).  In this case, Plaintiff breached his duty of

good faith and fair dealing owed to Defendants.  Id.

In Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp., 483 F.2d 1098, 1104-

1106 (5th Cir. 1973), the lender liability concept commonly referred to as the "Instrumentality

Theory" is explained.  Specifically, the 5th Circuit Court set forth two elements for determining

liability under the "instrumentality" doctrine:  1- "the dominant corporation must have

controlled the subservient controlled the subservient corporation," and 2- "the dominant

corporation must have proximately caused the plaintiff harm through misuse of this control."

Id. at 1103.  Describing the first element, the Court explained that "the fact that the allegedly

dominant corporation held *no* stock ownership interest in the allegedly subservient corporation

has not precluded application of the 'instrumentality' rule where actual and total control has

been otherwise established."  Id. at 1104.  (emphasis in original).  Further, as the majority

acknowledges, the Court stated: (i)f a ***lender becomes so involved with its debtor that it is in***

***fact actively managing debtor's affairs, then the quantum of control necessary to support***

***liability under the 'instrumentality' theory may be achieved.***"  Id. at 1105 (emphasis added).

Therefore, the question/genuine issue of material fact is one of control, regardless of whether

the control was exercised by virtue of stock ownership, advances of credit, or otherwise.

Unbeknownst to McBride, Pavlik or Holley, Plaintiff promoted himself as "James

Deppoleto, Director," of Takeover Industries Inc." See proposed Ex. H submitted pursuant to

Motion to Seal confidential documents filed in concert with Defendants' Opposition to Motion

for Partial Summary Judgment, DEF01113 to DEF01135.  This is especially noteworthy

18

because Plaintiff testified he was never a "Director" of Takeover.   See, Ex. G, Deppoleto

Deposition at 45:3- 45:24.

Specifically, Plaintiff Deppoleto testified as follows:

Q    *Were you ever a member of the Board of Directors for*
          *Takeover Industries?*
     A    *I was not.*
     Q    *Did you ever ask to be a member of the Takeover Board of Directors?*
     A    **I did not and my attorneys did not allow that as well.  That was one**
          **of The stipulations we were not going to do right from the start.  In**
          **Fact, they prematurely listed me as a member or listed me as a**
          **Member and my attorney sent cease and desist letters.  I was**
          **Not supposed to be there.**
     Q    Who do you say listed you as member of Board of the Board of
          Directors?
     A    **Whoever from that company listed—put a post out there that was**
          **Not accurate.**
     Q    What was the nature of the post?
     A    **I believe listing—trying to list me as a Board member of some sort**
          **That was just not accurate.**
     Q    Are you familiar with the name Mike Tzanetatos?
     A    **Mike T maybe?**
     Q    That would be better.
     A    **I think that's his name Tiz.  I don't know his last name, but T-I-Z.**

p. 45, ll. 3-24 (emphasis added).

        Moreover, email correspondence from October 20 and 26, 2022, between

Plaintiff, Plaintiff's accounting manager Amy Allen at his company known as Quintec

Integration, Inc., and Tucker demonstrates the extent to which Plaintiff was involved in

Takeover's operations and sought to control them.   See Ex. I, email correspondence

between Plaintiff and Tucker, DEF00874 to DEF00882.  On October 20, 2022, Tucker

emailed Plaintiff's accounting manager, writing: "It is a pleasure to e-meet you.  I look

forward to providing information on the landscape, going over accounting items,

introducing you to our third-party bookkeeper, and working with you to properly hand

off.  How does your Friday look?  Best, Jason."  See Ex. I, DEF00879.  Under the

"Subject RE: Accounting Items," Amy Allen wrote to Tucker with a copy of the email to

Plaintiff on October 25, 2022, as follows:

"Jason (Tucker), I look forward to speaking with you tomorrow.  I am excited to hear about Takeover Industries and how I can best support James (Depoletto) and the team.  I wanted to send you a quick list of items I'd like to add to the agenda for discussion tomorrow."  See Ex. I, DEF00874.  Thereafter, Amy Allen writes to Tucker: "I would appreciate it if you would share all your assessments and thoughts during your deep dive into Takeover Ind. As we work through this.  1.  Who are the Key Players/Current Team Members:  a. Jason Tucker (CFP Ventures LLC)- Active b. James Deppoleto- Active c. Joe Pavlik (Elevate Nutraceutices)-Active?  D.  Toby McBride- (Kraze Leprechaun) Terminated e. Trevor Nixon- Terminated f.  Kerby Fortner- Active g.  Michael Costello- Active  h.  Michael Tzanetatos- Active  2.  Current CPA/Accountant  a. Scrubbed- Accounting Outsourced  b.  Marty-CPA currently reviewing financials  3.  Who has company issued Credit Cards  a.  What are the current expectations around use of company credit cards  b. What is the current approval process for expenditures  c.  Who reconciles and posts transactions  d.  How are travel/trade show expenses reviewed and approved  4.  What processes have been implemented regarding use of Company funds?  5.  Payroll  a. How many employees on payroll- 3 (from above)  b.  What is the payroll sched?  Every other week   c.  Who is currently responsible for running payroll and process PR tax?  6.  Investments- Booked to Convertible Note Payables  a. Are there NP's booked for all investments?
No need to get back to on these items/questions prior to our conversation tomorrow.  Thank you, Amy Allen, Accounting Manager, Quintec Integration, Inc."

See Ex. I, DEF00874-875.  The following day, October 26, 2022, after the referenced

"conversation tomorrow" occurred.  Plaintiff's accounting manager Amy Allen again

wrote to Tucker, with a copy to Plaintiff, confirming decisions made on October 26,

2022, as follows:

Jason,  Thank you for the time this morning. . . I am positive that we will be able to streamline the admin and accounting duties for Takeover Ind. So that you can focus on the strategic tasks.  Below is the list of items that we spoke about that I will need to have access to:  QuickBooks, Bank Account(s), Credit Card(s), Shopify, Alalara Sales Tax, Scrubbed's QuickBooks file, if different than above.  Any other portals that will be necessary to property (sic) as the full functioning Accountant/Bookkeeper.  I will need Intro's to:  Scrubbed, Marty, Takeover Team members?  We can discuss this when /if I need to reach out to any of the team members."  Se Ex. I, DEF00881.  Plaintiff's accounting manager then proceeds to list another eight items including, but not limited to, "Employee files with contact information, Employee NDA's/Non-competes (when/if they

are completed), List of Stores/Customers, List of Vendors and List of 1099 Contractors with functions outlined. Ms. Allen concludes her October 26, 2022 email to Tucker and Plaintiff: "I am sure there will be more items and information needed, but let's start here. Thank you."

See Ex. I, DEF00881-00882.

Pavlik, Takeover's chief science officer in the fall of 2022, testified as follows:

Q And what do you mean by they set it up to fail?
A Well, investments were made, to my understanding, and I—again, I wasn't involved in all the financial dealings. However, initially an investment was made. There was a commitment made. It wasn't followed through. And then after that, I was, you know, pretty much not involved in any of the correspondence with the additional investments, but I do know that the primary factor of their decision to, you know, do a deal with Dollar General, which was advised against, was, you know the primary reason for what we're talking about today, I believe with that investment. And that was a decision that was made by Mr. Deppoleto, acting as a director, Justin Tucker, which, you know, I had no real involvement with other than saying that it was not a good deal, and then what's that essentially led to the demise of the company.

See, Ex. K, Depo. of J. Pavlik, 21:14-22:8;  See also, Ex. P, Family Dollar Vendor Invoice.

Q So that means that there were other investments that Mr. Deppoleto made; correct?
Q What's your best memory?
A I would probably say—from what was reported in any of the documentation, I'd probably say it was approximately 1.4 or 1.5 million, of which, from what I recall from the review, 980,000 of that was dedicated to the Dollar General deal, and the rest was paid out in salaries to Jason Tucker, his wife and the sales guys.
So that's why I was always kind of confused where that investment—you know, why— I'm getting lump—pulled into this where, you know, it was just a bad investment, the money was misdirected and its just—you know, it was advise—everybody advised against doing that deal. And that was the—to answer your question, that was the demise of the company—one of the demises.

See, Ex. K, Deposition of J. Pavlik , 23:2-23:24.

Furthermore, Pavlik testified during his deposition how things changed at Takeover in the summer and fall of 2022:

Q Now, other than that 1.4 to 1.5 million, you were aware of an additional $500,000 loan, too; correct?
A I don't recall that.
Q Okay.
A Again, I was not involved—you know, I'm – that was—I was not involved in any of the notes or the financials. And I was actually frozen out.

21

1
2
      Once Mr. Deppoleto came in with Jason Tucker, I was sort of frozen out and had limited knowledge of what was going on, other than what I learned after the fact once all this went down, so . . .

3
4
See Ex.K, Depo. Pavlik, 24:20- 25:8.

5
6
7
8
    Q  What did you mean by that statement?
    A  That commitments were made to support and fund the company in a certain way, and then that stopped.  And from what I understand, Mr. Deppoleto pulled out and decided not to move forward after working a new deal with Jason.  And then the sales guys, they formed a new—sort of a new alliance, and they were operating independently.  So at that point in time, there was no control over what they were doing, and I wasn't involved.

9
See Ex. K, Depo. Pavlik, 25:14- 25:24.

10
11
12
13
14
    Q  Are you talking about an investment or some other commitment?
    A  Well, just a commitment to want to, you know, be involved and fund the company and support it.  And that was when I was involved.  But then shortly thereafter, as you're probably aware, he formed an alliance with Jason Tucker.  And then Jason and the two sales guys mentioned, Costello and Tzanetatos, along with Jason's wife and Kerby, their gamer, social media guy, they began to operate independently and making decisions.  And at that point in time, I had no transparency to what was going on until after—

15
See Ex. K, Depo. Pavlik, 26:3-26:16.

16
17
18
19
20
21
22
23
24
25
26
27
28
      Likewise, the written correspondence from Pavlik to Plaintiff dated October 7, 2022, confirmed by Pavlik's testimony, demonstrates Plaintiff, Tucker and perhaps others were excluding Pavlik from Takeover corporate plans for marketing, distribution of product, and otherwise when they would not respond to Pavlik's reasonable verbal and written inquiries. See Ex. L, October 7, 2022 letter from Pavlik to Plaintiff.  Furthermore, as written in the document titled APPEARANCES AND SOCIAL MEDIA ON BEHALF OF  NXT LVL ENERGY DRINK," it is readily apparent Plaintiff, Tucker and perhaps others made plans for the Company at the exclusion of Pavlik, McBride and Holley.  See Ex. M, Partnership with Shaquille O'Neal/APPEARANCES AND SOCIAL MEDIA ON BEHALF OF NXT LVL ENERGY DRINK, DEF01459 to 01462; See also, Ex. D, Declaration of Pavlik.  Also, it is apparent Tucker and/or Deppoleto and others at Takeover, while Pavlik, Holley, and McBride

were excluded from daily operations of Takeover, prepared memoranda, documents related to a "NXT LVL /5-hour Energy Accelerator Partnership." See Exhibit N, DEF00873; see also Exhibit P, Family Dollar Vendor Funding Invoice in the amount of $3,047,200.00, DEF00825.

**STANDARD OF REVIEW re: FRAUDULENT TRANSFER ALLEGATIONS**

In Sportsco Enterprises v. Morris, 112 Nev. 625, 917 P.2d 934 (1996), the Court defined the elements of fraudulent transfer or conveyance, and the burden of proof of Plaintiff in accordance with NRS 112.190 as follows: (1) the Defendant(s) (debtor) made a transfer of property after a claim arose from the plaintiff (creditor); (2) Defendant did not receive a reasonably equivalent value in exchange for the transfer; (3) Defendant was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) Therefore, pursuant to NRS 112.190, defendant made a fraudulent transfer. See, NRS 112.190.

Further, "a fraudulent transfer claim under Nevada's Uniform Fraudulent Transfer Act (UFTA) is a claim by a creditor that a debtor transferred property with the intent to defraud the creditor by placing the property out of the creditor's reach," Tahican, LLC v. Eighth Jud. Dist. Ct. in & for Cnty. Of Clark, 139 Nev, Adv, Op. 2, 523 P. 3d 550, 554 (2023). Three kinds of fraudulent transfer claims are allowed in Nevada: (1) actual fraudulent transfer under NRS 112.180(1)(b); (2) constructive fraudulent transfer under NRS 112.180(1)(b) and (3) certain transfers by insolvent debtors under NRS 112.190(1).

The burden of proof for a creditor's claim of actual fraudulent transfer when the debtor made the transfer is "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor." NRS 112.180(1)(a). Fraudulent intent is set forth as follows: "consideration may be given, among other factors [and as relevant here], to whether:

> (a) The transfer or obligation was to an insider,....
>
> (d) Before the transfer was made or obligation was incurred, the Debtor had been sued or threatened with suit,...
>
> (h) The value of the consideration received by the debtor was Reasonably equivalent to the value of the asset transferred;

(i)The debtor was insolvent or became insolvent shortly after
The transfer was made or the obligation was incurred.

NRS 112.180(2)(a), -(d), (h), (i), (j).

Constructive Fraud requires a sustainable showing that defendant owed a legal or equitable duty to Plaintiff arising from a fiduciary relationship; (2) the defendant breached that duty by misrepresenting or concealing a material fact; and (3) Plaintiff sustained damages due to the defendant's breach of said duty. <u>Executive Management, LTD. V. Ticor Title Insurance Co.</u>, 114 Nev. 823, 963 P. 2d 465 (1998).

**ALLEGED FRAUDULENT TRANSFERS**

1. **Plaintiff claims Takeover inappropriately settled a lawsuit for $5,000.00 with Holley in the "Arizona lawsuit." Plaintiff's Motion, p. 11, para. 45.**

In accordance with the Reasonable Business Judgment rule this Settlement is protected because this decision comes within the parameters of the provisions of NRS 78 as follows:

    a director or officer is **not individually liable** to the corporation or

    its stockholders or its creditors for any damages as a result of any

    act or failure to act in his or her capacity as a director or officer

    **unless:**

    (c) The presumption established by subsection 3 has been rebutted; **and**
    (d) It is proven that:
        (3) The director's or officer's act or failure to act constituted a breach of his or her fiduciary duties as director or officer; **and**
        (4) Such breach involved intentional misconduct, fraud, or a knowing violation of law.

NRS 78.138(7)(a) (emphasis added).

Here, Plaintiff has failed to satisfy the presumption set forth in subsection 3 that Takeover's officers and directors are presumed to have acted in good faith in making the decision to settle with Holley for a nominal of $5,000.00. NRS 78.138(3). The Arizona case involves Jason Tucker as a named party and is disparate from the instant case. See Ex. J, Complaint filed March 8, 2022, Case No. 2:22-cv-00357-PHX-JJT.

2. **Takeover shared the recipe for its hydrogen water with NextGen.**

1   Plaintiff references the deposition testimony of corporate representative Thomas Zarro in

2   support of this claim.  See, Plaintiff's Motion, p. 12, para. 51.  Conversely, the testimony of

3   Takeover's chief science officer, Joseph Pavlik, confirms that NextGen's products are new and

4   different from Takeover's products as follows:

5       Q Yeah. What led you to getting these shares from Next Gen Beverages? What was the
    series of—
6       A Oh.
7       Q—events that led to you getting them?
8       A    It was for all of – again, going back to what I do, it was for the new creation and
    development and formulation of all of the new products for the new company after the other
9   former company was left for dead.

10  Ex. G , Depo. J. Pavlik, 20:11-20:21.

11      As noted hereinabove, chief science officer Pavlik was and is the sole person

12  responsible for the recipes designed for each beverage product, not Thomas Zarro.  Pavlik

13  further described his scientific work as follows: "The scope of my work primarily consists, and

14  consisted of, creating formulas, intellectual property of the products, assisting with education,

15

16  sales, and distribution, which was required to help the company market and sell its products."

17  Ex. D, Declaration of Pavlik, p. 2, ll. 8-14.

18      Indeed, perhaps Zarro testified inartfully regarding the beverage(s) products' recipes,

19
    but he is not the product scientist nor designer.  Pavlik is the person most knowledgeable
20
21  regarding product recipes and his deposition testimony and Declaration demonstrates these

22  facts convincingly. Id.

23      **3.    In January 2023, Zarro purchased some of Takeover's inventory of hydrogen
            water and gamer shots at less than market value.**
24

25  In January 2023, when Zarro purchased these products, Zarro was not a member, officer or

26  director of Takeover.  Zarro did not become a director of Takeover until April 17, 2023.  While

27
    Zarro testified that he purchased these products at a somewhat reduced price, he also testified
28
    that these products were merely sitting in a Takeover storage facility, and had been there for

some time to his understanding as of January 2023. As set forth in the Declarations of

McBride, Holley, and Pavlik, it was about this time that as the reconstituted Board of Directors

of Takeover that they regained access to Takeover's bank accounts and some company records.

See Exhibits B, C, and D.

As set forth above, Zarro was the earliest substantial investor in Takeover and remains owed in

excess of $300,000.00 by the Company. See Ex. E. Moreover, as explained by Pavlik and

McBride, in particular, by January 2023, Takeover's image was tarnished by prior dealings of

Tucker, Deppoleto, and others including, but not limited to, loss of its trademark. See Ex. J,

Complaint filed March 8, 2022, in the Arizona case No. 2:22-cv-00357-PHX-JJT, against

Holley and others.

Because of these factors, the actual fair market value, not just the retail value, of the

hydrogen water and gamer shots purchased by Zarro from Takeover in January 2023, including

its reasonable value to Takeover at the time, is a genuine issue of material fact precluding

summary judgment. Also, no expert testimony has been submitted by Plaintiff on this issue

regarding the value of the product, although expert testimony is not necessarily required here.

For example, "An owner of property may testify to its value … so long as the

owner has personal knowledge, or the ability to provide expert proof, of value." Laurrance v.

Deutsche Bank Nat. Trust Co. ex rel American Home Mortg. Assets Trust 2006-5, 2015 WL

5521879, *3 (D. Nev. 2015( (citing Stephans v. State, 127 Nev. 712, 716, 262 P.3d 727, 731

(2011)). "A party to a lawsuit may testify as to the value of her personal or real property when

that value is an issue in the case." Id. (citing Dugan v. Gotsopoulos, 117 Nev. 285, 22 P.3d 205,

207 (2001)). "The jury may consider this testimony for its weight in conjunction with other

evidence of value." Id. Significantly, "[e]xpert testimony is not required. Id.

In Laurrance, the plaintiff was allowed to testify that an undisclosed pipeline decreased

his property value by fifteen percent based on his personal knowledge. 2015 WL 5521879, at

1    *3. His personal knowledge was derived from his "research of at least thirty homes prior to

2    purchasing [the property], and his experience living at the property and learning its attributes

3    and flaws." Id.

4           In Taylor v. State, 129 Nev. 1156 (2013), a party was permitted to testify as to the value

5    of a trailer that was stolen from him. Id. at *1. His testimony was based on the value the trailer

6    was insured for, his estimate of its retail value, and the value based on improvements he had

7    made to the trailer. Id.

8           Furthermore, in Dugan, the Nevada Supreme Court held it was an abuse of discretion

9    and reversible error for the district court to refuse to allow a party to testify regarding the value

10   of her vehicle that was severely damaged in an auto accident. 117 Nev. at 288. The court

11   reiterated the rule stated above, noting again that a "party to a lawsuit may testify as to the

12   value of her personal or real property when that value is an issue in the case, **and expert**

13   **testimony is not required**." Id. (emphasis added).

14          It is important to note that these allegedly fraudulent transfers/purchases of hydrogen

15   water and gamer shots to Zarro by Takeover in January 2023, occurred in the ordinary course

16   of business when, according to McBride, Pavlik, and Holley, the Takeover business brand had

17   been tarnished. Accordingly, there is no evidence that these products purchased by Zarro were

18   conducted with fraudulent intent nor does any evidence establish that these purchases were

19   somehow done to the detriment of Takeover and/or its shareholders.

20   **4. NextGen and Takeover has comingled assets.**

21   Plaintiff also argues that Takeover has paid for expenses such as NextGen's legal expenses in

22   the amount of $25,000.00.  See Motion, page 13, para. 57-58.  While it appears that three

23   transactions for legal fees incurred by NextGen were paid July 7, 14, and September 21, 2023,

24   from Takeover's bank account, these amounts were governed by Loan Agreements between

25   NextGen and Takeover. See Ex. O, Loan Agreements, DEF0DEF01271-DEF01280..

26          Once again, this allegation of fraudulent transfer fails to establish any element of

27   fraudulent intent by either Holley or Zarro, and these actions are protected by the Reasonable

28   Business Judgment Rule.  Although, the initial payments of these fees may have been made

27

1  from an erroneous bank account, these amounts were refunded and occurred in the ordinary

2  course of business.  See Ex. E, Declaration of Zarro.

3  **CONCLUSION**

4          In summary, the long and winding road of this case has come to this point in

5  defending the instant Motion for Partial Summary Judgment.  It cannot be overstated that at the

6  very beginning of Plaintiff Deppoleto's involvement with Takeover the evidence demonstrates

7  the three NPAs contained terms that placed Takeover in technical default from the moment of

8  execution because of the failure to disclose pending litigation in Arizona.  Therefore, these

9
10  NPAs were void *ab initio.*  Mr. Holley had been "frozen out" as a director of Takeover in

11  December 2021, and Mr. McBride and Mr. Pavlik were left uninformed about the actions taken

12  by Mr. Tucker and Mr. Costello, particularly when Plaintiff Deppoleto entered Takeover's

13
14  picture in the spring of 2022.  There are many genuine issues of material fact herein.

15          In this case, there was not "an offer and acceptance, meeting of the minds, and

16  consideration" with "distinct understanding common to both parties," not only with regard to

17
18  the "supplemental loans," but also with respect to the three NPAs.  Plaintiff Deppoleto

19  breached the implied covenant of good faith and fair dealing by his conduct in representing

20  himself as a director of Takeover, taking control of Takeover's bank and credit card accounts as

21
22  confirmed by extensive correspondence between Deppoleto and Tucker including Deppoleto's

23  accounting manager, as well as pursuing other business opportunities to the detriment of

24  Takeover and its shareholders.

25          Defendants Holley and Zarro have not engaged in fraudulent transfers of Takeover's

26  assets to NextGen or otherwise.  In fact, the actions of Holley and Zarro simply served to assist

27
28  Takeover after it became mired in multiple litigations.  There was no product being produced

    and no revenue by Takeover as of November 7, 2022, when the reconstituted Board of

Directors convened of McBride, Pavlik, and Holley. No assets from Takeover were used to establish Next Gen Beverages or used in the purchase of its assets. Thus, there have been no fraudulent transfers between Takeover and NextGen. And Zarro entered the picture as a director and officer of Takeover April 17, 2023, when it was needed most. Indeed, the Nevada Business Judgment Rule governs the actions of the parties in this case.

In accordance with the foregoing, Defendants submit that Plaintiff's Motion For Partial Summary Judgment must be denied on all counts as a matter of law.

Dated this 31st day of January 2025

Law Office of S. Don Bennion


_____*S. Don Bennion*_____
S. Don Bennion, Esq.
Nevada Bar No. 4530
Law Office of S. Don Bennion
6980 O'Bannon Drive #400
Las Vegas, Nevada 89117
Tel: (702) 333-0777  Fax: (702) 333-0577
email: don@bennionlaw.com


Whitehead & Burnett

*Jeffrey J. Whitehead*_____
Jeffrey J. Whitehead, Esq.
Nevada Bar No. 3183
Whitehead & Burnett
6980 O'Bannon Drive
Las Vegas, Nevada 89117
Tel: (702)267-6500 Fax: (702)267-6262
Email: jeff@whiteheadburnett.com
*Attorneys for Defendants*

29

## CERTIFICATE OF SERVICE

On January 31, 2025  I served the following document(s): **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

by the following means to the person(s) as listed below:

X☐    a. ECF System
And all other parties requesting notice.

☐    b.  US mail, postage prepaid

I personally delivered the documents(s) to the persons at these addresses:

d.  By direct email (as opposed to the ECF system): Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the person(s) at the email addresses listed below.  I did not receive, within a reasonable time after transmission, any electronic message or other indication that the transmission was unsuccessful.

**James Patrick Shea, Esq.**
Nevada Bar No. 405
**Bart K. Larsen, Esq.**

Nevada Bar NO. 8538
**Kyle M. Wyant, Esq.**
Nevada Bar No. 14652
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
T: 702-471-7432 F: 702-926-9683
blarsen@shea.law
kwyant@shea.law
*Attorney for Plaintiff*

**Jennifer Hoekel, Esq.**
Nevada Bar No. 12775
Husch Blackwell LLP
8001 Forsyth Blvd. Suite 1500
St. Louis, Missouri 63105
T: 314-480-1500
jennifer.hoekel@huschblackwell.com
*Attorney for Plaintiff*

**Patrick M. Harvey, Esq.**
Admitted Pro-Hac Vice
Husch Blackwell LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202
T: 414-273-2100
Patrick.harvey@huschblackwell.com
*Attorney for Plaintiff*

I served the document(s) by placing them in an envelope or package addressed to the person(s) at the addresses listed below and providing them to a messenger for service.

I declare under  penalty of perjury that the foregoing is true and correct.

/s/ S. Don Bennion,Esq_____
Law Office of S. Don Bennion