1   S. Don Bennion, Esq.
    Nevada Bar No. 4530
2   Law Office of S. Don Bennion
3   6980 O'Bannon Drive #400
    Las Vegas, Nevada 89117
4   Tel: (702) 333-0777  Fax: (702) 333-0577
5   email: don@bennionlaw.com

6   Jeffrey J. Whitehead, Esq.
    Nevada Bar No. 3183
7   Whitehead & Burnett
8   6980 O'Bannon Drive
    Las Vegas, Nevada 89117
9   Tel: (702)267-6500 Fax: (702)267-6262
    Email: jeff@whiteheadburnett.com
10  *Attorneys for Defendants*

11

12              **UNITED STATES DISTRICT COURT**

13              **FOR THE DISTRICT OF NEVADA**

14

15  JAMES V. DEPPOLETO JR.,                    Case NO. 2:22-cv-02013-GMN-BNW

16          Plaintiff,

17

18  v.                                         **DEFENDANTS' APPENDIX OF
                                               EXHIBITS TO ERRATA  IN SUPPORT
19                                             OF DEFENDANTS' OPPOSITION
                                               RESPONSE TO MOTION FOR
20  TAKEOVER INDUSTRIES,                       PARTIAL SUMMARY JUDGMENT**
    INCORPORATED, *et al.*
21          Defendant.

22

23

24          Defendants by and through the undersigned counsel, and pursuant to Local Rule IA 10-

25  3, hereby submit the following exhibits in support of their Errata to Opposition Response to

26  Motion for Partial Summary Judgment with page numbers referenced to each Exhibit.

27

28

1

| Exhibit No. | DESCRIPTION | Page(s) |
|---|---|---|
| A. | Resolution of Board of Directors of Labor Smart; Written Consent, Board of Directors, Takeover Industries. | 0001-0012 |
| B. | Declaration of Toby McBride | 0013-0017 |
| C. | Declaration of Michael Holley | 0018-0023 |
| D. | Declaration of Joseph Pavlik | 0024-0030 |
| E. | Declaration of Thomas Zarro | 0031-0037 |
| F. | Resolution of Board of Directors of Takeover | 0038-0040 |
| G. | Deposition Transcript of J. Deppoleto, Jr. | 0041-0073 |
| H. | Submitted For "In Camera Review" Pursuant to Motion to Seal (ECF. 110) DEF01113-DEF01135 | 0074-0097 |
| I. | Email correspondence between Plaintiff Deppoleto and J. Tucker Bates no. DEF01113-DEF01135 | 0098-0112 |
| J. | Complaint; Arizona case no. 2:22-cv-00357-PHX-JJT; Filed March 8, 2022 | 0113-0127 |
| K. | Deposition Transcript of Joseph Pavlik | 0128-0170 |
| L. | Letter from Joseph Pavlik to Plaintiff J. Deppoleto, Jr. | 0171-0172 |

| | | |
|---|---|---|
| M. | Partnership with Shaquille O'Neal | 0173-0177 |
| N. | Next Level/ 5-Hour Energy Partnership<br>Bates No. DEF00873 | 0178-0179 |
| O. | Loan Agreement between NextGen Beverage and Takeover Industries<br>Bates No. DEF01271-DEF01280 | 0180-00190 |
| P. | Family Dollar Vendor Funding Invoice | 0191-0192 |

DATED : February 4, 2025.

Respectfully submitted


By: *S. Don Bennion, Esq.*
    S. Don Bennion, Esq.
    Law Office of  S. Don Bennion
    Nevada Bar No. 4530
    6980 O'Bannon Drive #400
    Las Vegas, Nevada 89117
    Tel: (702) 333-0777  Fax: (702) 333-0577
    email: don@bennionlaw.com


    *Jeffrey J. Whitehead, Esq.*
    Jeffrey J. Whitehead, Esq.
    Whitehead & Burnett
    Nevada Bar No. 3183
    6980 O'Bannon Drive
    Las Vegas, Nevada 89117
    Tel: (702)267-6500 Fax: (702)267-6262
    Email: jeff@whiteheadburnett.com
    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On February 4, 2025 I served the following document(s):

1.  The document(s) were served by the following means to the person(s) as listed below:

**DEFENDANTS' APPENDIX TO EXHIBITS TO DEFENDANTS' OPPOSITION RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

☑    a. ECF System

And all other parties requesting notice.

☐    b. US mail, postage prepaid

     c. Personal Service:

☐    d. By direct email (as opposed to the ECF system): Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the person(s) at the email addresses listed below. I did not receive, within a reasonable time after transmission, any electronic message or other indication that the transmission was unsuccessful.

**James Patrick Shea, Esq.**
Nevada Bar No. 405
**Bart K. Larsen, Esq.**
Nevada Bar NO. 8538
**Kyle M. Wyant, Esq.**
Nevada Bar No. 14652
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
T: 702-471-7432 F: 702-926-9683
blarsen@shea.law
kwyant@shea.law
*Attorneys for Plaintiff*

**Patrick M. Harvey, Esq.**
Admitted Pro-Hac Vice
Husch Blackwell LLP
511 North Broadway, Suite 1100
Milwaukee, WI 53202
T: 414-273-2100
Patrick.Harvey@huschblackwell.com
*Attorney for Plaintiff*

1  **Jennifer Hoekel, Esq.**
   Nevada Bar No. 12775
2  Husch Blackwell LLP
   8001 Forsyth Boulevard Suite 1500
3  St. Louis, Missouri 63105
   T: 314-480-1500
4  Jennifer.hoekel@huschblackwell.com
   *Attorney for Plaintiff*
5

6

7  ☐    e.  By fax transmission
8
       Based upon the written agreement of the parties to accept service by fax transmission
9  or a court order, I faxed the document(s) to the person(s) at the fax numbers listed below.  No
   error was reported by the fax machine that I used.  A copy of the record of the fax transmission
10 is attached.

11

12 ☐    f.  By messenger

13     I served the document(s) by placing them in an envelope or package addressed to the
   person(s) at the addresses listed below and providing them to a messenger for service.
14

15     I declare under penalty of perjury that the foregoing is true and correct.

16                          */s/ S. Don Bennion, Esq*
                            Law Office of S. Don Bennion
17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

**Resolution of Board of Directors of Labor Smart**

11/7/22

# EXHIBIT A

Resolution of the Board of Directors
of
Labor Smart Inc.

WHEREAS, a special meeting of the Board of Directors of Labor Smart Inc. (the "Company") was noticed to Toby McBride, Michael Holley, Jason Tucker and Joseph Pavlik on November 4, 2022 via email;

WHEREAS, on November 7, 2022 at 9:00 a.m. MST, Michael Holley, Toby McBride, and Joseph Pavlik appeared by conference call;

WHEREAS, Several minutes before the time of the call, Veronica Manolio, Esq., had communicated by e-mail to Matthew P. Canini, Esq., counsel for Mike Holley, and Jennifer Reiter, Esq., counsel for Toby McBride, that neither she nor her client Jason Tucker would be appearing at the meeting;

WHEREAS, Veronica Manolio also represents Joseph Pavlik and, as such, Mr. Canini and Ms. Reiter immediately departed the call before the meeting commenced and did not participate in any portion of the meeting;

WHEREAS, On September 13, 2021, pursuant to Section 10 of the Company's bylaws and by unanimous exercise of all 51 shares of the Company's Series A Preferred Stock of which Michael Holley owns 17 shares, Jason Tucker owns 17 shares, and Joseph Pavlik owns 17 shares, the Shareholders of the Company by a vote of 19,283,582,170 out of a total 29,282,150,656 available votes (66%) filled the Company's vacant director positions by appointing Toby McBride, Jason Tucker and Michael Holley as directors of the Company;

WHEREAS, on December 21, 2021, by motion of Jason Tucker the Board of Directors of the Company convened and by a vote of Toby McBride, Jason Tucker, and Joseph Pavlik resolved and did attempt to remove Michael Holley as a Director of the Company, and as a director and officer of the Company's wholly owned subsidiary Takeover Industries, Inc. ("TI") (the "December 2021 Meeting");

WHEREAS, Michael Holley was hospitalized with COVID-19 at the time of the December 2021 Meeting, and was known by Jason Tucker, Toby McBride and Joseph Pavlik to have been hospitalized, and he did not receive notice of the December 2021 Meeting, attend the Meeting, vote on the issues raised thereat, or subsequently ratify any actions taken at that Meeting;

1

DEF00001

WHEREAS, Joseph Pavlik was not a Director of the Company at the time of the December 2021 Meeting, but voted at the December 2021 Meeting;

WHEREAS, pursuant to N.R.S. 78.335 titled "Directors: Removal; filling vacancies," a director can, in most circumstances, only be removed by a two-thirds vote of the shareholders;

WHEREAS, pursuant to Wyoming Stat. 17-16-808(d) titled "Removal of Directors" a director may be removed by the shareholders only at a shareholder meeting called for that purpose;

WHEREAS, the Company never convened a shareholder meeting for the purpose of removing directors of the Company under either Nevada or Wyoming law;

WHEREAS, even had Jason Tucker, Joseph Pavlik and Toby McBride voted their Common and Series A Preferred shares at the December 21, 2021 Meeting, which they did not, their votes, including their exercise of 34 of the Company's Series A Preferred shares, would only have represented 12,445,721,447 of the 29,282,150,656 available votes (42.54%), which is not enough to remove a director under either Nevada or Wyoming law;

WHEREAS, based on the foregoing the actions taken at the December 2021 Meeting were unauthorized and not in conformity with the law or Company Bylaws;

WHEREAS, by virtue of Holley being unlawfully frozen out from the Board of Directors actions taken by the Board of Directors subsequent to the December 2021 Meeting are ultra-vires;

WHEREAS, during the December 2021 Meeting, Jason Tucker claimed Michael Holley had committed various improprieties, including theft and embezzlement;

WHEREAS, during the December 2021 meeting Jason Tucker attempted to cause the Company to transfer Holley's shares in the Company to other individuals, including himself;

WHEREAS, at the direction of Jason Tucker, TI commenced a lawsuit against Michael Holley in the Central District of California and later in the District of Arizona (the "Lawsuit");

WHEREAS, during the course and time frame of the Lawsuit information was made available to Jason Tucker, Toby McBride, and Joseph Pavlik based on which Toby McBride and Joseph Pavlik now understand that that their actions at the December 2021 Meeting were a nullity and not in conformity with the law and Company Bylaws;

WHEREAS, based on information on information obtained during the lawsuit, Toby McBride and Joseph Pavlik now understand that Jason Tucker's allegations against Michael Holley were wrong and for the purpose of attempting to personally enrich Jason Tucker;

2

DEF00002

WHEREAS, since Michael Holley was frozen out of the Company and TI, Tucker has engaged in wrongful conduct, and failed to meet his fiduciary duties, as President and Director of TI and a Director of the Company, including withholding information from undisputed officers and directors, subverting the directions of TI's CEO, hiring vendors without approval that only answer to Jason Tucker, and keeping secret TI's financial situation, which is not in the best interest of TI's shareholders;

WHEREAS, Jason Tucker has been untruthful to other Officers and Directors of the Company and TI concerning material information regarding investors, products, and sales, which is not in the best interests of TI and Company shareholders;

WHEREAS, Jason Tucker has instructed others at TI not to communicate with other TI Officers and Directors, which is not in the best interests of TI and Company shareholders;

WHEREAS, Jason Tucker has caused TI to fail to honor its contractual obligations, leading to potential, threatened, and/or actual claims and/or litigation against TI, which is not in the best interests of TI and Company shareholders;

WHEREAS, Eric Bjorgum has previously been retained to the do legal work for the Company;

WHEREAS, at the November 7, 2022 Meeting a quorum was present;

WHEREAS, at the November 7, 2022 Meeting the foregoing matters were discussed and all directors had a full and fair opportunity to ask questions and be heard;

WHEREAS, given the dispute in the Lawsuit and Joseph Pavlik's vote at the December 2021 Meeting, he was invited to attend and participate in the November 7, 2022 meeting and, although not a director of the Company, indicate what his vote would be were he a Director;

THEREFORE, IT IS:

RESOLVED, all actions Taken at the December 21, 2021 meeting to the extent they were ever effective are voided;

RESOLVED, Michael Costello is suspended from his position as CEO of the Company for a period of thirty days, with pay, and his authority to act on behalf of the Company is in all aspects revoked during this period;

RESOLVED, Michael Costello shall turn over to the Board of Directors of the Company all accounts, documents, passwords or other material belonging to the Company;

3

DEF00003

RESOLVED, the Board of Directors shall conduct a review of Michael Costello's actions from the period September 1, 2021 to the date hereof;

RESOLVED, the Board of Directors shall reconvene in thirty-days to discuss Michael Costello's position at LTNC;

RESOLVED, Michael Holley is appointed interim CEO of the Company until the Board Directors makes a determination with respect Michael Costello;

RESOLVED, Jason Tucker shall immediately turn over to the Board of Directors all contracts, documents, information, communications, passwords and financial accounts of the Company;

RESOLVED, Eric Bjorgum shall immediately turn over to the Board of Directors all contracts, documents, information, communications, passwords and financial accounts of the Company;

REVOLVED, the Board of Director will conduct a review of all actions taken by the Company since September 21, 2021 to the present;

RESOLVED, the Board of Directors shall conduct a review of all actions taken by Jason Tucker from September 21, 2021 to the present;

RESOLVED, Eric Bjorgum is terminated as the Company's counsel;

RESOLVED, the Board of Directors will conduct a review of the Lawsuit;

RESOLVED, the planned spinoff of Takeover is suspended for ninety days, while the Company undertakes a review of documents and information concerning the transaction, which have been withheld by Jason Tucker;

RESOLVED, effective immediately, by exercise of a vote of the shares of TI owned by the Company, which is between 97.345% and 100% of all issued and outstanding shares of TI, the Company hereby removes Jason Tucker from TI's board of directors and appoints Michael Holley to replace him.

RESOLVED, Joseph Pavlik and Toby McBride shall remain on TI's board of directors; and

RESOLVED, TI's board of directors is to meet immediately for the purpose of taking corrective action regarding the matters discussed at the November 7, 2022 meeting.

4

DEF00004

IN WITNESS WHEREOF, the undersigned, being two of the three Directors of the Company Agree, Approve and Adopt the foregoing resolutions as of November 7, 2022 following the duly noticed meeting of the Board of Directors held on this date.

_____
Joseph Pavlik, Observer

_____
Toby McBride, Director

_____
Michael Holley, Director

5

WRITTEN CONSENT
BOARD OF DIRECTORS OF TAKEOVER INDUSTRIES, INC

The undersigned, constituting the Board of Directors of Takeover Industries, Inc., a Nevada Corporation ("Takeover"), does in lieu of convening a meeting hereby waive notice and approve and consent to the adoption of the following resolutions pursuant to N.R.S., 78.010 *et seq.*

WHEREAS, a special meeting of the Board of Directors of Labor Smart, Inc. ("LTNC"), Takeover's parent corporation, was held on November 7, 2022.

WHEREAS, the Board of Directors of Takeover (the "Board") was instructed by Resolution of the Board of Directors of LTNC to "meet immediately for the purpose of taking corrective action regarding the matters discussed at the November 7, 2022." See Exhibit A.

WHEREAS, the Board has determined Jason Tucker has been untruthful to other Officers and Directors of Takeover concerning material information regarding investors, products, and sales, which is not in the best interests of Takeover;

WHEREAS, the Board has determined that Jason Tucker has acted in breach of corporate formalities and in breach of his fiduciary duties;

WHEREAS, the Board has determined Jason Tucker has instructed others at Takeover not to communicate with other Takeover Officers and Directors, which is not in the best interests of Takeover; and

WHEREAS, the Board has determined Jason Tucker has caused Takeover to fail to honor its contractual obligations, leading to potential, threatened, and/or actual claims and/or litigation against Takeover, which is not in the best interests of Takeover.

1

NOT THEREFORE, it is

1. RESOLVED, Jason Tucker is suspended from all position he holds at Takeover, including President for a period of thirty days, with pay, and his authority to act on behalf of Takeover is in all aspects revoked during this period;

2. RESOLVED, Melissa Tucker is suspended from all her positions at Takeover for a period of thirty days, with pay, and her authority to act on behalf of Takeover is in all aspects revoked during this period;

3. RESOLVED, Jason and Melissa Tucker shall turn over to the Board all accounts, documents, passwords or other material belonging to Takeover;

4. RESOLVED, the Board shall conduct a review of Jason Tucker's actions from the period September 1, 2021 to the date hereof;

5. RESOLVED, the Board shall reconvene in thirty-days to discuss Jason Tucker's continuing with Takeover in any capacity;

6. RESOLVED, Joseph Pavlik is appointed interim President of the Company until the Board makes a determination with respect Jason Tucker;

7. RESOLVED, Toby McBride is reappointed as CEO of Takeover, and any leave of absence or revocation of his authority to act on Takeover's behalf his hereby terminated; and

8. RESOLVED, Veronica Manolio, counsel for Takeover, shall immediately turn over to the President and CEO, all contracts, documents, information, communications, passwords and financial accounts of Takeover.

2

DEF00007

IN WITNESS WHEREOF, the undersigned, being all of the Directors of the Company Agreed, Approve and Adopt the foregoing resolutions as of November 7, 2022.

_____
Joseph Pavlik, Director

_____
Michael Holley, Director, as to
Resolutions 1-7, and abstaining from
Resolution 8.

_____
Toby McBride, Director, as to
Resolutions 1-6, and 8, and
abstaining from Resolution 7.

3

DEF00008

WRITTEN CONSENT
BOARD OF DIRECTORS OF TAKEOVER INDUSTRIES, INC

The undersigned, constituting the Board of Directors of Takeover Industries, Inc., a Nevada Corporation ("Takeover"), does in lieu of convening a meeting hereby waive notice and approve and consent to the adoption of the following resolutions pursuant to N.R.S., 78.010 *et seq.*

WHEREAS, a special meeting of the Board of Directors of Labor Smart, Inc. ("LTNC"), Takeover's parent corporation, was held on November 7, 2022.

WHEREAS, the Board of Directors of Takeover (the "Board") was instructed by Resolution of the Board of Directors of LTNC to "meet immediately for the purpose of taking corrective action regarding the matters discussed at the November 7, 2022." See Exhibit A.

WHEREAS, the Board has determined Jason Tucker has been untruthful to other Officers and Directors of Takeover concerning material information regarding investors, products, and sales, which is not in the best interests of Takeover;

WHEREAS, the Board has determined that Jason Tucker has acted in breach of corporate formalities and in breach of his fiduciary duties;

WHEREAS, the Board has determined Jason Tucker has instructed others at Takeover not to communicate with other Takeover Officers and Directors, which is not in the best interests of Takeover; and

WHEREAS, the Board has determined Jason Tucker has caused Takeover to fail to honor its contractual obligations, leading to potential, threatened, and/or actual claims and/or litigation against Takeover, which is not in the best interests of Takeover.

1

NOT THEREFORE, it is

1. RESOLVED, Jason Tucker is suspended from all position he holds at Takeover, including President for a period of thirty days, with pay, and his authority to act on behalf of Takeover is in all aspects revoked during this period;

2. RESOLVED, Melissa Tucker is suspended from all her positions at Takeover for a period of thirty days, with pay, and her authority to act on behalf of Takeover is in all aspects revoked during this period;

3. RESOLVED, Jason and Melissa Tucker shall turn over to the Board all accounts, documents, passwords or other material belonging to Takeover;

4. RESOLVED, the Board shall conduct a review of Jason Tucker's actions from the period September 1, 2021 to the date hereof;

5. RESOLVED, the Board shall reconvene in thirty-days to discuss Jason Tucker's continuing with Takeover in any capacity;

6. RESOLVED, Joseph Pavlik is appointed interim President of the Company until the Board makes a determination with respect Jason Tucker;

7. RESOLVED, Toby McBride is reappointed as CEO of Takeover, and any leave of absence or revocation of his authority to act on Takeover's behalf his hereby terminated; and

8. RESOLVED, Veronica Manolio, counsel for Takeover, shall immediately turn over to the President and CEO, all contracts, documents, information, communications, passwords and financial accounts of Takeover.

2

IN WITNESS WHEREOF, the undersigned, being all of the Directors of the Company

Agreed, Approve and Adopt the foregoing resolutions as of November 7, 2022.

_____
Joseph Pavlik, Director

_____
Toby McBride, Director, as to
Resolutions 1-6, and 8, and
abstaining from Resolution 7.

_____
Michael Holley, Director, as to
Resolutions 1-7, and abstaining from
Resolution 8.

3

DEF00011

# EXHIBIT B

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

## Declaration of Toby McBride

### January 31, 2025

# EXHIBIT B

S. Don Bennion, Esq.
Nevada Bar No. 4530
Law Office of S. Don Bennion
6980 O'Bannon Drive #400
Las Vegas, Nevada 89117
Tel: (702) 333-0777  Fax: (702) 333-0577
email: don@bennionlaw.com

Jeffrey J. Whitehead, Esq.
Nevada Bar No. 3183
Whitehead & Burnett
6980 O'Bannon Drive
Las Vegas, Nevada 89117
Tel: (702)267-6500 Fax: (702)267-6262
Email: jeff@whiteheadburnett.com
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| JAMES V. DEPPOLETO JR., | Case NO. 2:22-cv-02013-GMN-BNW |
| Plaintiff, | |
| v. | DECLARATION OF TOBY MCBRIDE IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| TAKEOVER INDUSTRIES, INCORPORATED, *et al.* | |
| Defendant. | |

DECLARATION OF TOBY MCBRIDE

I, Toby McBride declare and state the following under the penalty of perjury:

1

1.  I am a citizen of the United States, over the age of 18 years old, of sound mind, make this Declaration based upon personal knowledge, and, if called to testify, would testify competently to the facts set forth herein.

2.  I am a Defendant in the above-entitled case filed by Plaintiff James V. Deppoleto, Jr.

3.  In 2021, Michael Holley (hereinafter "Holley") and I incorporated Takeover Industries in Nevada. On or about February 26, 2021, Labor Smart, Inc., acquired Takeover and became a wholly owned subsidiary of Labor Smart. After the acquisition, Holley was named a Director of Labor Smart, as well as Chief Operating Officer and Treasurer of Takeover in addition to sitting on the Board of Directors for Takeover. At that time I was the CEO of Takeover and director of Labor Smart and Takeover.

4.  At that time, Joseph Pavlik (hereinafter "Pavlik") served as Chief Science Officer and a Board of Directors member for Takeover, as well as an Officer for Labor Smart. It was at this point that Jason Tucker (hereinafter "Mr. Tucker") would begin working with Takeover to assist in building the company's brand. On June 10, 2021, the Board of Directors of Takeover held a "Special Meeting" which established that the Board of Directors for Takeover moving forward would consist of Holley, Tucker, Pavlik, and me. In or about December 2021, Takeover's Board of Directors, at the urging of Tucker, held a meeting and voted to remove Holley from the Board due to allegations of mismanagement of Takeover funds, allegations which Holley has vehemently denied. See Exhibit A, Takeover's Minutes of Special Meeting of Board of Directors.

5.  From the period of May 25, 2022, through August 19, 2022, Plaintiff Deppoleto entered into three claimed Note Purchase Agreements (hereinafter "NPAs") with Takeover. The Notes were for the total of $500,000 each signed by Tucker, as president of Takeover, Michael Costello (Chief Executive Officer of Labor Smart) and Plaintiff.

6.  I was, before and after the November 7, 2022 meeting of the Board of Directors of Labor Smart, Inc., the CEO and a director of Takeover Industries, Inc. ("Takeover or the

2

"company"), as well as a director of Takeover's parent company Labor Smart, Inc., until I resigned April 17, 2023, replaced by Thomas Zarro.

7. Even though Jason Tucker was invited to the November 7, 2022 Board Meeting, he did not attend the meeting. As a result, the Resolution of the Labor Smart, Inc., Board of Directors including Michael Holley, and I was issued. See Exhibit B to Defendant's Opposition to Motion for Partial Summary Judgment filed concurrently herewith.

8. Joseph Pavlik attended the November 7, 2022 Board Meeting "given the dispute in the Lawsuit and Joseph Pavlik's vote at the December 2021 Meeting (when Pavlik was a director), he was invited to attend and participate in the November 7, 2022 meeting and, although not a director of the Company, indicate what his vote would be were he a Director." See Exhibit B, p. 3.

9. Plaintiff Deppoleto was invited to attend the November 7, 2022 meeting, but he did not attend.

10. In my work for Takeover from January 2021 until April 17, 2023, I furthered the business through sponsorships and connections with athletes and others in the industry.

11. Although I am not an employee, officer or director of Defendant NextGen Beverages, LLC, in my opinion NextGen Beverages, LLC, is not competing with Takeover because the two companies produced different products.

12. Attached hereto as Exhibit A is a true and complete copy of Takeover's Minutes of Special Meeting of Board of Directors dated December 28, 2021.

13. Attached hereto as Exhibit B is a true and complete copy of the November 7, 2022 Resolution of the Board of Directors of Labor Smart Inc., including the November 7, 2022 Written Consent Board of Directors of Takeover Industries, Inc.

3

14. I have 30+ years of experience in the beverage industry, working behind at least four major brands of performance waters, iced teas, and similar beverages, which have been sold throughout the nation.

I declare under penalty of perjury that the foregoing is true and correct and if called upon as a witness I could and would competently testify thereto.

Dated this 31st day of January 2025.

/s/ Toby McBride
Toby McBride

4

# EXHIBIT C

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

### Declaration of Michael Holley

### January 31, 2025

# EXHIBIT C

1    S. Don Bennion, Esq.
     Nevada Bar No. 4530
2    Law Office of S. Don Bennion
3    6980 O'Bannon Drive #400
     Las Vegas, Nevada 89117
4    Tel: (702) 333-0777  Fax: (702) 333-0577
5    email: don@bennionlaw.com

6    Jeffrey J. Whitehead, Esq.
     Nevada Bar No. 3183
7    Whitehead & Burnett
8    6980 O'Bannon Drive
     Las Vegas, Nevada 89117
9    Tel: (702)267-6500 Fax: (702)267-6262
     Email: jeff@whiteheadburnett.com
10   *Attorneys for Defendants*

11

12              UNITED STATES DISTRICT COURT

13              FOR THE DISTRICT OF NEVADA

14

15   JAMES V. DEPPOLETO JR.,              Case NO. 2:22-cv-02013-GMN-BNW

16              Plaintiff,

17

18   v.                                   DECLARATION OF MICHAEL
                                          HOLLEY IN SUPPORT OF
19                                        OPPOSITION TO PLAINTIFF'S
                                          MOTION FOR PARTIAL SUMMARY
20   TAKEOVER INDUSTRIES,                 JUDGMENT
     INCORPORATED, *et al.*
21              Defendant.

22

23

24              DECLARATION OF MICHAEL HOLLEY

25

26       I, Michael Holley state and declare as follows:

27       I am over the age of eighteen and I am a Defendant in the United States District

28   Court of Nevada case no. 2:22-cv-02013-GMN-BNW. I have personal knowledge of the facts

set forth in this Declaration except the information which is set forth herein based on my information and belief, related to this matter.

1. I am a Defendant in the above-identified action and make this Declaration based on my personal knowledge.

2. I have personal knowledge of the facts stated in this declaration and am competent to testify to them.

3. I have worked in the beverage industry since 1994, accumulating 30 years of experience launching and developing successful beverage brands.

4. In early 2021, as Chief Operating Officer, I launched Takeover Industries of which I am one of the larger Creditors and also the personal Guarantor of the company credit cards. The company achieved immediate success with our hydrogen water product, generating approximately $500,000 in revenue during our first weekend of launch.

5. In April 2021, Takeover engaged Jason Tucker as a consultant to assist with contract negotiations and intellectual property matters. Tucker represented himself as having expertise in negotiations and claimed prior work experience with federal agencies. These credentials were later discovered to be false.

6. Between April and October 2021, I repeatedly addressed concerns with Tucker regarding his conduct, particularly his treatment of team members which was negatively affecting company operations.

7. I have personal knowledge that Tucker manipulated a situation involving Joe Pavlik, presenting false evidence to myself and Toby McBride that resulted in Pavlik losing his shares, which Tucker then acquired.

7. Attached to Defendants' Opposition to Plaintiff's Motion for Summary Judgment as Exhibit A is a true and correct copy of the Resolution of the Board of Directors of Labor Smart, Inc. and the Written Consent Board of Directors of Takeover Industries, Inc., dated November 7, 2022.

8. Attached to Defendants' Opposition to Plaintiff's Motion for Summary Judgment as Exhibits H, I, L, M, and N are true and correct copies of documents contained in the Takeover computer files I reviewed after the Board of Directors as reconstituted November 7, 2022, gained access to these Company records including email(s) correspondence, presentation plans, marketing plans and other documents unknown to me prior to December 2022.

9. In October 2021, while I was hospitalized with Covid-19, Tucker made false accusations about me misappropriating company funds. Though I was later exonerated and reached a settlement with Takeover, Tucker used my absence to gain sole control over company bank accounts and credit cards.

10. In May 2022, during my forced absence, Tucker executed the first of three convertible note agreements with James Deppoleto without proper board authorization.

11. Based on my direct knowledge of the alleged 2022 agreements, these convertible notes contained terms that placed Takeover in technical default from the moment of execution.

12. In November 2022, after my return to the company, we discovered through company communications that Tucker and Deppoleto were engaged in unauthorized negotiations with 5-hour Energy for their personal benefit.

13. Takeover did not receive any type of refund from Great Northern Company for monies paid by Deppoleto.

14. Takeover's Account Quick Report dated December 28, 2024, in the amount of $2,016,697.00, labeled DEF01383 was entered by Takeover's bookkeeper David Eisenberg under the category "loans payable- James Deppoleto," which was the category Tucker initially described these amounts in 2022 , based on my examination of the Takeover records.

15. Upon Tucker's removal from the Board, he retained control of critical company assets by refusing to surrender passwords and access to:

    a.  Company bank accounts

    b.  QuickBooks financial records

    c.  Shopify account

    d.  Social media accounts

    e.  Other vital business platforms

16. Tucker continued using company bank accounts through December 2022, leaving them with negative balances.

17. Due to Tucker's mismanagement, Takeover:

    a.  Lost the NXTL LVL trademark

    b.  Faced multiple demands from vendors totaling millions of dollars

    c.  Could not attract new investors due to pending litigation

    d.  Accumulated substantial debt

18. The formation of Next Gen Beverages was undertaken to protect shareholder interests and create new value after Takeover's trademark loss and mounting legal challenges made continuing business operations impossible under that entity. Takeover had little to no assets left which none were used for Next Gen. Next Level Fitness water filed the trademark

months before Takeover did. They filed an action with the trademark commission and later a lawsuit against Takeover.

19. Through our efforts with NextGen, we made the stock tradeable, enabling Deppoleto to potentially realize value from approximately 400 million shares he possessed. Today these shares were trading @.0018 which is a value of $720,000.00.

20. I have read Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment and hereby confirm that the facts set forth in the Opposition are true and correct to the best of my knowledge other than the information I confirm based on my information and belief.

I declare under penalty of perjury that the foregoing is true and correct and if called upon as a witness I could and would competently testify thereto.

Dated this 31st day of January 2025.

*/s/ Michael Holley*
Michael Holley

# EXHIBIT D

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

### Declaration of Joseph Pavlik

### January 31, 2025

# EXHIBIT D

S. Don Bennion, Esq.
Nevada Bar No. 4530
Law Office of S. Don Bennion
6980 O'Bannon Drive #400
Las Vegas, Nevada 89117
Tel: (702) 333-0777  Fax: (702) 333-0577
email: don@bennionlaw.com

Jeffrey J. Whitehead, Esq.
Nevada Bar No. 3183
Whitehead & Burnett
6980 O'Bannon Drive
Las Vegas, Nevada 89117
Tel: (702)267-6500 Fax: (702)267-6262
Email: jeff@whiteheadburnett.com
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| JAMES V. DEPPOLETO JR.,<br><br>Plaintiff,<br><br>v.<br><br>TAKEOVER INDUSTRIES, INCORPORATED, *et al.*<br>· Defendant. | Case NO. 2:22-cv-02013-GMN-BNW<br><br><br><br>DECLARATION OF JOSEPH PAVLIK IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

DECLARATION OF JOSEPH PAVLIK

I, Joseph Pavlik  state and declare as follows:

I  am over the age of  eighteen and I  am a Defendant in the United States District

Court of Nevada case no. 2:22-cv-02013-GMN-BNW. I have personal knowledge of the facts

1

set forth in this Declaration and will testify if called to do so, except those matters which are based upon my information and belief in this matter.

I have been self-employed, since 2005, through Flexus, LLC, and I have provided consulting services and work for Takeover Industries, Inc., ("Takeover") since on or about January 2021 and LOCK'DIN OR NextGen Beverage, LLC, ("NextGen") since June 2023.

Toby McBride, Michael Holley and I founded Takeover Industries, Inc.,("Takeover") in January 2021. The scope of my work primarily consists, and consisted of, creating formulas, intellectual property of the products, assisting with education, sales, and distribution, which was required to help the company market and sell its products.

Two Takeover products were sold under the brand name NXT LVL: 1-Hydrogen water; and 2- A two-ounce energy shot known as a Gamer shot. Those were the only two products sold under the brand name NXT LVL through Takeover.

In 2021 I served as the Chief Science Officer ("CSO") of Takeover creating the formulas or recipes for the two-ounce energy shot known as a Gamer shot and the Hydrogen water products. During this period of time I also served as CEO of Labor Smart (also known as LTNC) the parent company of Takeover.

I resigned my CSO position from Takeover in September of 2021 because of harassment by Jason Tucker ("Tucker"). At that time I also resigned as CEO of Labor Smart.

In March 2021, Labor Smart purchased Takeover, issuing a total of 6 billion shares, 2 billion shares each to Toby McBride, Mike Holley and me.

In January 2022, I was asked to rejoin the company by Toby McBride("McBride") after Mike Holley ("Holley") was allegedly removed as an officer and director of Takeover in December 2021.

2

On April 28, 2022, at a Professional Fighters League ("PFL") event in Dallas, Texas, Plaintiff James Deppoleto, Jr. ("Plaintiff") was introduced to me and Toby McBride by Plaintiff's cousin and PFL fighter Anthony Pettis. At that time I first discussed with Plaintiff the science, innovation and benefits about Takeover's products hydrogen infused spring water and the Gamer shot.

In May 2022, on a call with McBride, Jason Tucker verbally forced me to return 1.8 billion of my shares in Takeover back to Takeover, to help payback investors they oversold shares in the company, stating that if I would not comply then there will be no company. I was promised that these 1.8 billion shares would be given back to me. However, these 1.8 billion shares were never returned to me, nor was there any financial compensation of any amount exchanged for this.

In or about May 2022, Toby McBride introduced Jason Tucker to Plaintiff. Thereafter, in May 2022, based on my information and belief, Jason Tucker and Plaintiff met for a couple of days in Puerto Vallarta, Mexico regarding Takeover.

On or about May 25, 2022, Jason Tucker, as president of Takeover, and Michael Costello, as chief executive officer of Labor Smart, signed a Convertible Note Purchase Agreement with Plaintiff whereby Plaintiff agreed to invest $500,000.00 in Takeover and participate in good faith with his obligations as an investor in Takeover.

On or about June 24, 2022, Plaintiff, Tucker, McBride and I planned to attend another PFL event in Atlanta, Georgia. However, Plaintiff and Tucker avoided meeting with McBride and me and, unknown to me at that time, Plaintiff and Tucker went to a meeting with T-Pain, a famous rapper and would-be promoter of Takeover products.

3

On or around July of 2022, Tucker informed the founders that there would no longer be weekly company team calls, and that Tucker would be handling all calls "one on one" with each individual.

Later it was discovered via email history, that the weekly company Zoom team calls were still indeed being conducted with Depoletto, but without the founders McBride and Pavlik. During this time Depoletto and Tucker, continued to operate separate of the company with the remaining team in concert.

On or about the first week of October 2022, the company was set to attend the NACS tradeshow in Las Vegas. I notified Tucker that I would like to attend the NACS event, and I was told that only Mike Costello and Takeover salesman Mike Tzanetatos ("Mike T") would be attending the show and that no one else would be attending.

A few days later a photo was posted on Twitter of Tucker, Plaintiff, Costello and Tzanatatos at the show receiving an award for Gamer Shot. When I called Tucker to inquire about their attendance he said "it was a last minute decision".

After gaining access to Takeover's company records, including emails, (December 2022) we found out that there was a private meeting at the October 2022 NACS Show in Las Vegas with representatives of Living Essentials, the parent company of 5-Hour Energy. At this meeting attended by Plaintiff, Tucker, Costello and Mike T, Tucker presented a co-op joint venture business plan (see Exhibit H, DEF01113 to DEF01135 identified pursuant to a Motion to Seal filed in concert with Defendant's Opposition and Response to Motion for Partial Summary Judgment) without the knowledge of the founders NOR ALL DIRECTORS AT THAT TIME. These documents were discovered in December 2022, when we (McBride and Holley and I) regained access to some of Takeover's emails and other Company documents. I hereby confirm that the documents labeled DEF01113 to DEF01135 proposed in Exhibit H to Defendants' Opposition and Response to Motion for Partial Summary Judgment are true and accurate copies of these documents.

4

While they were at the NACS show I reached out to Plaintiff directly to have a discussion. He responded back by asking me to schedule a call time and an provide an agenda for the call, which I did. In preparing this Declaration I discovered the October 7, 2022 letter I prepared and sent to him regarding a list of eight "Brief Items to Touch on for Discussion." See Exhibit L, October 7, 2022 letter labeled DEF01459. Also, in preparing this Declaration I discovered a four-page marketing plan for a "NXT LVL Energy Drink" to a "Partnership with Shaquille O'Neal" which states: "Introduce and promote Shaq's NXT LVL Gamer Energy Drink at Trade Shows & trade publications in Q4 2022." See Exhibit M, DEF01459 to 01462. These documents include a page titled "Appearances and Social Media on Behalf of NXT LVL Energy Drink. Under the list of Appearance on this page it reads: "Appearances: -NACS Convention and Trade Show; -Rewired Fest for Wal-Mart; -7-11 National Franchisee Show; - Visit National Retailer HQ to meet buyers and CEO secure agreements/partnerships; - Will call CEO's of national retailers to request that they bring in Shaq's NXT LVL Energy Drink." See Exhibit M, DEF01460.

On October 7th 2022, when I asked about Deppoleto's attendance at the NACA show in Las Vegas, he said it was a "last minute decision". It is my understanding based on my review of Company records that the meeting with Living Essentials/5 Hour was set in advance, however this was not disclosed to me. See Exhibit M, DEF01460.

On or about October 10th 2022, I had a call with Tucker, and detecting more inconsistencies and secrecy for reasons related to the last-minute attendance of the show, I sensed something was not right. I was also told that I have a choice to either join their side or I would be included (or "Strapped to the Titanic" as he phrased) in the forthcoming complaints against McBride and Holley.

I received notice of the Labor Smart Board Meeting to be held on November 7, 2022. Although I requested that Ms. Manolio attend the meeting as Takeover's counsel, she informed me that she would not be attending. I did attend and vote on the Board Resolutions at that meeting which are set forth in the "Resolution of the Board of Directors of Labor Smart, Inc." and the Written Consent of Takeover Board of Directors, dated November 7, 2022.

5

I have read Defendants' Opposition to Plaintiff's Motion for Summary and hereby confirm the truth and validity of the facts set forth therein including the exhibits.

I declare under penalty of perjury that the foregoing is true and correct and if called upon as a witness I could and would competently testify thereto.

Dated this 31st day of January 2025.

/s/ Joseph Pavlik
Jospeh Pavlik

6

# EXHIBIT E

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

### Declaration of Thomas Zarro

### January 31, 2025

# EXHIBIT E

S. Don Bennion, Esq.
Nevada Bar No. 4530
Law Office of S. Don Bennion
6980 O'Bannon Drive #400
Las Vegas, Nevada 89117
Tel: (702) 333-0777  Fax: (702) 333-0577
email: don@bennionlaw.com

Jeffrey J. Whitehead, Esq.
Nevada Bar No. 3183
Whitehead & Burnett
6980 O'Bannon Drive
Las Vegas, Nevada 89117
Tel: (702)267-6500 Fax: (702)267-6262
Email: jeff@whiteheadburnett.com
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| JAMES V. DEPPOLETO JR., | Case NO. 2:22-cv-02013-GMN-BNW |
| Plaintiff, | |
| v. | DECLARATION OF THOMAS ZARRO IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| TAKEOVER INDUSTRIES, INCORPORATED, *et al.* | |
| Defendant. | |

<u>DECLARATION OF THOMAS ZARRO</u>

I, Thomas Zarro  state and declare as follows:

1. I  am over the age of  eighteen and I  am a Defendant in the United States District

Court of Nevada case no. 2:22-cv-02013-GMN-BNW. I have personal knowledge

1

of the facts set forth in this Declaration and will testify if called to do so, except those matters which are based upon my information and belief in this matter.

2. I am a self-employed entrepreneur, and I made a $300,000 investment in Takeover Industries. Inc. in June of 2021. I was informed and do believe that I was the first monetary investor in Takeover Industries. My loan document signed by the company expressly stated: No additional debt was allowed without my consent. I was not involved in the operations or management of the Company at that time.

3. I am currently owed by Takeover Industries approximately $175,000.00.

4. Toby McBride, Joe Pavlik, and Jason Tucker would occasionally keep me up to date on the progress of the Company. I was told by Tucker that they were working to bring the Company current so that it could be publicly traded. I was led to believe Deppoleto was part of management of the Company by Tucker.

5. I became aware that the principals of the Company were having personality conflicts. To protect my investment, I offered my services as a skilled negotiator to assist in a resolution so that the company could move forward. More importantly than protecting my investment, I wanted to protect the 50,000 plus shareholders.

6. The Company had a board meeting on November 7, 2022, and removed Jason Tucker from his positions at Takeover due to gross misconduct by him based on my information and belief.

7. Tucker was ordered by Board resolution to relinquish control of the bank accounts by November 7, 2022. Based on my information and belief, Tucker refused to hand over control of the Takeover bank accounts and had access up until mid-December of 2022. Based on my information and belief, when the accounts were regained by

2

the new board of directors establish November 7, 2022, all the accounts had negative balances. Based on my information and belief, due to Tucker's misconduct, all employees were laid off from the company.

8. On April 17, 2023, I became an officer and director of Takeover, when Toby McBride resigned. I uncovered that the Company was being badly mismanaged by Jason Tucker and Deppoleto. I reached out to vendors and suppliers, as they refused to do business with Takeover any longer because of issues with Tucker and Deppoleto.

9. Based on my information and belief Tucker and Deppoleto wanted to take the Company private, and wanted to move forward with the private entity with the product known as the "gamer shot." The other principals wanted to keep the Company public and move forward with the hydrogen water.

10. I became aware through dealing with the supplier, Faith Springs, that Tucker and Deppoleto threatened suit against Faith Springs for claims of a sulphury smell in one of the water products. Instead of working with the supplier and trying to fix this issue, formal demands were made, and suits were threatened.

11. Because of the mismanagement by Tucker, Takeover became mired in multiple litigations. There was no product being produced and no revenue. After consulting with counsel, it was decided the only way to save the parent company, Labor Smart Inc.'s ownership and creditors (of which I am and remain unpaid) of Takeover, was to make a wholly owned subsidiary with a new line of beverages.

12. I became CEO of Labor Smart in April of 2023, and we voted to set up the Company, Next Gen Beverages on June 14, 2023. Due to Tucker and Deppoleto's

malfeasance, Next Gen had to pay to get new trademarks, new formulations, new brands, and a new website. No assets from Takeover Industry were used to establish Next Gen Beverages or used in the purchase of its assets.

13. Next Gen Beverages was necessary because Tucker and his associates controlled and refused to turn over access to the following of Takeover's:

    a.  The Company Bank Accounts

    b.  The Shopify Account

    c.  Amazon

    d.  eBay

    e.  Gamershot URL and other websites purchased by Tucker. Tucker has made claims that the Tucker's own these, and they are not the property of Takeover, however Bank records show payment towards the URL.

    f.  QuickBooks Access and the financial records.

    g.  All social media accounts

    h.  All business platforms necessary in the ordinary course of business

14. Further, Tucker and Deppoleto's mismanagement caused Takeover to suffer the following major business setbacks:

    a.  Loss of the NXTL LVL trademark

    b.  Demands from multiple vendors for amounts in excess of a million dollars.

    c.  Lost potential investors due to all the pending litigation

15. I bought the remaining product from Takeover at higher than cost at a substantial loss to myself. Takeover was un-investible and, in an attempt to protect new money and save Takeover, the inventory was purchased to help the company. Takeover was

not able to get the product distributed, the only other offers to purchase were pennies on the dollar and there is a shelf-life to the product. I still am in possession of the bulk of the product, as I was also unable to sell it. We tried to sell it for the benefit of Takeover, and we received a cease and desist from Deppoleto.

16. I met with the accountants engaged by Tucker, ostensibly to bring the Company current. The accountants informed me that Tucker had done none of the things necessary for the Company to be compliant. That is why I re-engaged them, and we all worked together to bring the Company current.

17. I met with Takeover suppliers and manufacturers, flying to meet them at my own expense. I was able to negotiate older invoices.

18. We have established a new board of directors for LTNC, including world renowned boxing Legend and philanthropist Manny Pacquiao, we have all undergone a strict and thorough background check which has allowed us to hire a securities Company to sponsor us for the filing of a 15(c)(211) which will enhance our global trading. Currently we are publicly traded in the United States. None of these things were done under Tucker and Deppoleto management, once again proving they had no intension of protecting the shareholders.

19. My only goal in being involved was to protect Labor Smart, Inc., the shareholders, my previous investment and now my much larger current investment. Mike Holley, Joe Pavlik, and Toby McBride were eager to work to bring the Company current and build a sustainable business which we were able to do in the beginning of 2024.

///

///

5

This was only possible because we left the horrific business practices of Tucker and Deppoleto in the past. We have been current on all our filings since I became involved.

I have read Defendants' Opposition for to Plaintiff's Motion for Partial Summary Judgment and confirm the truth and facts set forth therein to my knowledge, and based on my information and belief otherwise.

Dated this 31st day of January 2025.

/s/ Thomas Zarro
Thomas Zarro

6

# EXHIBIT F

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

**Resolution of Board of Directors**

**April 17, 2023**

# EXHIBIT F

DocuSign Envelope ID: 4E7E272C-1BB4-4ACD-A650-1C6DE78E9C59

Resolution of the Board of Directors
of
Takeover Industries, Inc.

WHEREAS, a special meeting of the Board of Directors of Takeover Industries, Inc. (the "Company") was held on April 17, 2023, and the following Directors appeared by conference call: Toby McBride, Michael Holley, and Joseph Pavlik.    All Directors waived notice requirements for this meeting.  McBride abstained and did not participate from the actions below that pertain to his resignation and agreements to which he would be a party.

WHEREAS, Toby McBride ("McBride") has indicated his wish to resign as a Director and Officer of the Company;

.WHEREAS, the Board wishes to accept the resignation of McBride upon those terms and conditions as set forth in that certain CEO Separation Agreement that has been drafted;

WHEREAS, the Board authorizes and instructs the Company to execute the CEO Separation Agreement with McBride;

WHEREAS, upon the resignation of McBride from the Board of the Company, the Board shall appoint Tom Zarro ("Zarro") as a Director of the Company, and Zarro has indicated his willingness to serve as a Director of the Company;

After discussion, the following resolutions were adopted.

RESOLVED, it is agreed that the Company shall execute the CEO Separation Agreement with McBride;

RESOLVED, accepting McBride's resignation from the Board of the Company, effective at 11:59 pm on April 17, 2023.  Zarro is hereby appointed as a member of the Board of the Company effective immediately upon the resignation of McBride.

RESOLVED, that McBride has also resigned as CEO of the Company, effective immediately.

DEF00421

DocuSign Envelope ID: 4E7E272C-1BB4-4ACD-A650-1C6DE78E9C59

IN WITNESS WHEREOF, the undersigned, being all of the Directors of the Company Agree, Approve and Adopt the foregoing resolutions as of April 17, 2023.


Michael Holley, Director

Toby McBride, Director

Joseph Pavlik, Director

DEF00422

# EXHIBIT G

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

Declaration of J. Deppoleto, Jr.

December 5, 2024

# EXHIBIT G

1          UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEVADA

3

4    JAMES V. DEPPOLETO JR.,

5              Plaintiff,

6         vs.                    No. 2:22-cv-02013-GMN-MDC

7    TAKEOVER INDUSTRIES,
     INCORPORATED, et al.,
8
               Defendants.
9    _____/

10

11

12

13

14          VIDEOCONFERENCE DEPOSITION OF

15            JAMES V. DEPPOLETO JR.

16          Thursday, December 5, 2024

17

18

19

20

21

22

23

24      Reported by:  Barbara Clark, CCR No. 953

25

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

```
1                        APPEARANCES

2

3    For Plaintiff:

4          HUSCH BLACKWELL LLP
           BY:  PATRICK M. HARVEY, ESQ.
5          511 North Broadway, Suite 1100
           Milwaukee, Wisconsin 53202
6          (414) 273-2100
           patrick.harvey@buschblackwell.com
7

8    For Defendants:

9          LAW OFFICE OF S. DON BENNION
           BY:  S. DON BENNION, ESQ.
10         6980 O'Bannon Drive, Suite 400
           Las Vegas, Nevada 89117
11         (702) 333-0777
           don@bennionlaw.com
12

13

14   Also Present:  Daniel Holmstock, Exhibit Tech

15                  Joseph Pavlik

16

17

18

19

20

21

22

23

24

25
```

James V. Deppoleto, Jr.   -   12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

```
 1                           INDEX

 2

 3    WITNESS

 4    JAMES V. DEPPOLETO JR.

 5

 6    EXAMINATION
                                                      PAGE
 7

 8    BY MR. BENNION                                     5

 9

10    DEPOSITION EXHIBITS
```

| | | | |
|---|---|---|---|
| 11 | Exhibit 1 | Notice of Taking Zoom Deposition of James V. Deppoleto Jr. | 14 |
| 12 | | | |
| 13 | Exhibit 2 | Plaintiff's First Amended Verified Complaint | 15 |
| 14 | Exhibit 3 | Convertible Note Purchase Agreement | 27 |
| 15 | | | |
| 16 | Exhibit 4 | Secured Convertible Promissory Note | 32 |
| 17 | Exhibit 5 | First Amendment to Convertible Note Purchase Agreement | 33 |
| 18 | | | |
| 19 | Exhibit 6 | Second Amendment to Convertible Note Purchase Agreement | 60 |
| 20 | Exhibit 7 | Plaintiff's Response to Takeover Industries Incorporated's First | |
| 21 | | Set of Interrogatories | 69 |
| 22 | Exhibit 8 | Receipt Dated 11/04/2022 | 101 |
| 23 | Exhibit 9 | Receipt Dated 10/13/2022 | 97 |
| 24 | Exhibit 10 | Family Dollar Vendor Funding Invoice | 44 |
| 25 | | | |

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1    (Exhibits cont.)

2

3    Exhibit 11    Notice of Default, Demand for
                   Payment & Cease and Desist            91

4

      Exhibit 12    NXT LVL/5-hour Energy Accelerator
5                    Partnership                          80

6

7
                          -o0o-
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

---

**Page 5**

1  Thursday, December 5, 2024
2  10:35 a.m.
3
4  JAMES V. DEPPOLETO JR.,
5  having been administered an oath, was examined and
6  testified as follows:
7
8  EXAMINATION
9  BY MR. BENNION:
10  Q   Please state your name and address for the
11  record.
12  A   James Deppoleto.
13  Q   Mr. Deppoleto, I'm Don Bennion. I represent
14  the Defendants in a case that you filed, Case No.
15  2:22-cv-02013-GMN-MDC in the United States –
16  (Audio difficulties.)
17  (Discussion held off the record.)
18  BY MR. BENNION:
19  Q   Mr. Deppoleto, have you been deposed
20  previously?
21  A   Previously? Previously what?
22  Q   Have you been deposed? Has your deposition
23  been taken before today?
24  A   No.
25  Q   Have you ever been a party to a lawsuit such

---

**Page 6**

1  as the Plaintiff or Defendant prior to this lawsuit?
2  A   Yes.
3  Q   And let me go through the admonitions of a
4  deposition and then we will proceed to ask further
5  questions.
6  The oath which you just took is the same as
7  any you would take in a court of law. With that oath
8  you have the obligation and responsibility to tell the
9  truth and we expect that you will do so.
10  Do you understand that?
11  A   Yes.
12  Q   Are you currently under any medication that
13  might inhibit or impair your ability to testify
14  truthfully?
15  A   No.
16  Q   If you answer a question would it be fair for
17  us to assume that you understood the question?
18  MR. HARVEY: Objection. Incomplete
19  hypothetical.
20  Go ahead.
21  THE WITNESS: I'm not sure how to answer that.
22  BY MR. BENNION:
23  Q   I'm going to ask you questions today in the
24  deposition. If you don't understand the question,
25  please tell me you don't understand.

---

**Page 7**

1  Do you understand?
2  A   Yes.
3  MR. HARVEY: Can I clarify one other thing?
4  It looks like Joe Pavlik is also on with us. Either
5  way, is it just him or are there other people?
6  MR. BENNION: My understanding, Patrick, is
7  it's just Joe Pavlik.
8  MR. HARVEY: Okay. Thank you.
9  MR. BENNION: And he's a party to this case.
10  He's allowed to participate or to listen in.
11  MR. HARVEY: Yep. I was just making it clear.
12  BY MR. BENNION:
13  Q   Following the deposition, Mr. Deppoleto, the
14  transcript of this deposition will be provided to you
15  to review for accuracy for what you said today. At
16  that time you will have the opportunity to review your
17  answers, to sign it was a true and accurate statement
18  or to make changes to your deposition testimony at the
19  time that you sign it, but if you make changes, myself
20  or another attorney will have the opportunity to
21  comment upon and to argue that the changes that you
22  make from the date of your testimony, which is today,
23  until the time that you sign the deposition transcript
24  with changes, to make comments upon those changes to
25  seek to impeach your credibility.

---

**Page 8**

1  Do you understand that?
2  MR. HARVEY: Objection. I don't think that
3  accurately states the rule.
4  Go ahead.
5  THE WITNESS: Yes, I believe so.
6  BY MR. BENNION:
7  Q   What did you do to prepare for your deposition
8  today?
9  A   My attorney gave me a letter to read. That
10  was it.
11  Q   Did you review any documents in preparation
12  for your deposition?
13  A   No documents were provided.
14  Q   Did you meet with your attorney to prepare for
15  your deposition?
16  A   I was here 30 minutes early.
17  Q   And how long did you meet with your attorney?
18  A   30 minutes.
19  Q   Did you have a telephone conference – and I'm
20  not asking you about the substance or anything that was
21  said in the telephone conference with your attorney,
22  but did you have a telephone conference with your
23  attorney to prepare for today's deposition?
24  A   No.
25  Q   You said that you reviewed a letter. What was

---

James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

| | |
|---|---|
| 1 the nature of the letter that you reviewed to prepare | 1    A   We do not receive material property. We are a |
| 2 for your deposition? | 2 material handling company. |
| 3     MR. HARVEY: I'm going to object and instruct | 3    Q   So perhaps you can explain what that means to |
| 4 you not to answer. Attorney-client privilege. | 4 handle material. |
| 5 BY MR. BENNION: | 5    A   An example could be an Amazon warehouse. |
| 6    Q   When did you receive that letter? | 6 Conveyors that go throughout that, that's material |
| 7    A   Yesterday. | 7 handling equipment, fork trucks, racking, material |
| 8    Q   What's the extent of your formal education? | 8 handling equipment that goes through all the warehouse, |
| 9    A   Bachelor's degree in business administration. | 9 we would do things of that nature. |
| 10   Q   From which school? | 10   Q   So material handling equipment, does your |
| 11   A   Cardinal Stritch University. | 11 business provide that? |
| 12   Q   And where is that located? | 12   A   Correct. |
| 13   A   In Milwaukee, Wisconsin. | 13   Q   Such as — what type of equipment would that |
| 14   Q   And when did you receive that degree? | 14 be? |
| 15   A   I can't recall the exact date. | 15   A   Predominantly conveyor equipment. |
| 16   Q   In the last 10 years? | 16   Q   So conveyor equipment, meaning a conveyor |
| 17   A   No. | 17 belt, for lack of a better term? |
| 18   Q   So prior to that time? | 18   A   I'm sorry. I don't understand that question. |
| 19   A   Correct. | 19   Q   Perhaps you can explain the nature of the |
| 20   Q   Okay. When did you graduate from high school? | 20 conveyor equipment. What is that? Is that a conveyor |
| 21   A   1989. | 21 belt? Please describe it for us. |
| 22   Q   And was that in Milwaukee? | 22   A   Conveyor belts, yes. |
| 23   A   Oak Creek, Wisconsin. | 23   Q   And what else do you provide? What other |
| 24   Q   A suburb of Milwaukee? | 24 conveyor equipment do you provide? |
| 25   A   Correct.       Page 9 | 25   A   Could be vision systems. Could be belting.   Page 11 |
| 1    Q   How are you employed? | 1 Could be the actual conveyor. It varies. Material |
| 2    A   I'm self-employed. | 2 handling equipment is what we handle. |
| 3    Q   And what does that mean? | 3    Q   And what is the name of your company? |
| 4    A   I have my own company. | 4    A   Quintec. |
| 5    Q   And what is the name of that company? | 5    Q   I'm sorry. You testified to that previously. |
| 6    A   Quintec Integration, Inc. | 6 Quintec Integration, Inc.; correct? |
| 7    Q   And what is the nature of Quintec Integration, | 7    A   Correct. |
| 8 Inc.'s business? | 8    Q   And what is your position at Quintec |
| 9    A   Material handling. | 9 Integration? |
| 10   Q   Material handling of what? | 10   A   President. |
| 11   A   Material. | 11   Q   And how long have you been president of |
| 12   Q   Such as? | 12 Quintec Integration? |
| 13   A   It could be a box. It could be a foundry | 13   A   25 years. |
| 14 part. It could be a generator. Material. | 14   Q   When was Quintec Integration founded as a |
| 15   Q   And how does your company handle that | 15 company? |
| 16 material? How does it process it? | 16   A   1999. |
| 17   A   How do you mean? | 17   Q   And you founded the company? |
| 18   Q   Well, you just receive the material property | 18   A   Correct. |
| 19 and take it in to your company? | 19   Q   Are you a member of the Board of Directors at |
| 20   A   No. | 20 Quintec Integration? |
| 21   Q   What do you do with that property? | 21   A   Correct. |
| 22   A   What do you mean? | 22   Q   Who else is on the Board of Directors at |
| 23   Q   Well, perhaps you can explain the nature of | 23 Quintec Integration? |
| 24 the business that you're in when you receive material | 24   A   No one. |
| 25 property. What is the nature of your business?  Page 10 | 25   Q   Are you on the Board of Directors of any other  Page 12 |

James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**Page 13**

1 companies?
2 A. No.
3 Q. Do you know Amy Allen?
4 A. Former employee.
5 Q. And when did she stop working for you at
6 Quintec Integration?
7 A. I'm not sure.
8 Q. Do you recall how long she worked for you at
9 Quintec Integration?
10 A. Also not sure.
11 Q. You don't recall her position with Quintec
12 Integration?
13 A. I did not say that.
14 Q. What was her position with Quintec
15 Integration?
16 A. Accounting.
17 Q. Accounting, such as?
18 A. Every day daily accounting work.
19 Q. And just to inform us as to what daily
20 accounting work is at Quintec Integration, what is
21 that?
22 A. Accounts receivable, accounts payable.
23 Q. I see.
24 A. Regular accounting work.
25 Q. Thank you. Have you ever been charged with or

**Page 14**

1 convicted of a felony?
2 A. No.
3 Q. I'd like to pull up Exhibit 1 to the Notice of
4 Deposition. It's been marked as Exhibit 1.
5 MR. HARVEY: Hold on one second, Counsel. I'm
6 trying to make sure we can see it. Counsel or whoever
7 is controlling it, can you zoom in a little bit? We
8 can see it, but not well at all.
9 EXHIBIT TECH: I'll wait for your instruction
10 to do the scrolling when you need me to.
11 MR. HARVEY: What is the question?
12 MR. BENNION: If you can scroll down, Daniel,
13 on Exhibit 1, Notice of Taking Zoom Deposition of James
14 V. Deppoleto Jr. It has today's date listed.
15 BY MR. BENNION:
16 Q. Have you seen this document before today,
17 Mr. Deppoleto?
18 A. I have not.
19 MR. BENNION: I'd like to scroll down further
20 or farther, Daniel. Thank you.
21 BY MR. BENNION:
22 Q. Is it your understanding, Mr. Deppoleto, that
23 today is the day, December 5, 2024, that your
24 deposition is to be taken in the case referenced above?
25 A. That is my understanding.

**Page 15**

1 Q. And did you file this lawsuit as a Plaintiff?
2 A. Yes.
3 Q. Okay. So let's go to Exhibit 2 now. This
4 document has been marked as Exhibit 2.
5 MR. BENNION: If you could scroll down to the
6 next page, Daniel.
7 BY MR. BENNION:
8 Q. Have you seen this document before,
9 Mr. Deppoleto?
10 A. I have not.
11 Q. This is Plaintiff's First Amended Verified
12 Complaint.
13 MR. BENNION: And if you can scroll up,
14 Daniel, just for a moment, up higher in the page.
15 BY MR. BENNION:
16 Q. That was filed August 30, 2023.
17 Do you see that, Mr. Deppoleto?
18 A. I see that filed, yes.
19 Q. And you've never seen this document before,
20 Plaintiff's First Amended Verified Complaint, which
21 lists you as the Plaintiff?
22 A. I don't recall it.
23 Q. Okay.
24 MR. BENNION: Let's go to the last page of the
25 document, Daniel. So pull that up.

**Page 16**

1 BY MR. BENNION:
2 Q. This is page 28 of 28 of the First Amended
3 Verified Complaint.
4 Do you see that verification page,
5 Mr. Deppoleto?
6 A. I do.
7 Q. And is that your signature at the bottom via
8 Docusign?
9 A. It appears so.
10 Q. And you authorized the verification Docusign
11 for your name verifying that you certify: I verily
12 believe the same to be true as set forth in the First
13 Amended Verified Complaint?
14 A. What was the question?
15 Q. This is the verification page, page 28 of
16 Exhibit 2, which is the First Amended Verified
17 Complaint; correct?
18 A. It appears so, sure.
19 Q. So take a moment to read the verification
20 paragraph above your signature.
21 A. And?
22 Q. You've read that?
23 A. Correct.
24 Q. And that's your authorized signature below
25 dated August 30, 2023?

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

| | |
|---|---|
| 1   A   It appears so. | 1   Q   And you just ran into him? |
| 2   Q   You don't recall signing this or authorizing | 2   A   Incorrect. |
| 3   it to be signed? | 3   Q   Please explain how you met him. |
| 4   A   It's August 30, 2023. I do not specifically | 4   A   I met him at a PFL event. |
| 5   recall that, no. | 5   Q   I understand that. I'm asking for the |
| 6   Q   Did you authorize your attorneys to file the | 6   specifics. Was it at a dinner? Was it at the event? |
| 7   lawsuit, which is set forth here in the First Amended | 7   Where was it at the event? |
| 8   Verified Complaint? | 8   A   It was at the event. At the hotel of the |
| 9   A   Yes. | 9   event or wherever they were hosting the hotel stay. |
| 10   Q   Okay. Let's move on. | 10   Q   And who's hosting the hotel stay? |
| 11      When did you first meet the Defendants you've | 11   A   Don't know. PFL, I imagine. Don't know. |
| 12   sued in this case, the individual Defendants: Toby | 12   Q   So you don't know if Toby McBride or Joe |
| 13   McBride, Joe Pavlik, Mike Holley and Tom Zarro? I | 13   Pavlik or Jason Tucker were hosting that event? |
| 14   realize that's compound, but to try and streamline the | 14   A   It was my understanding that they hosted it, |
| 15   questioning, are you familiar with Toby McBride, Joe | 15   but I don't know for sure. |
| 16   Pavlik, Mike Holley and Tom Zarro? | 16   Q   And when you say they, is that them |
| 17   A   Yes. | 17   individually or as part of a company? |
| 18   Q   And who was the first of those four whom you | 18   A   They as whatever company they were with, yes. |
| 19   met? | 19   Q   Those three individuals, Toby McBride, Joe |
| 20   A   I don't recall who was the first. I believe | 20   Pavlik and Jason Taylor, were members of one company; |
| 21   it was all at the same time. | 21   is that your testimony? |
| 22   Q   And where and when did you meet them? | 22   A   Jason Tucker. Yes, I believe so. I don't |
| 23   A   I believe it was at a PFL event, I believe. | 23   know for a fact, but I believe so. |
| 24   Q   PFL, meaning Professional Fighters League | 24   Q   What was Jason Tucker's position with Takeover |
| 25   event? | 25   Industries when you met him? |
| Page 17 | Page 19 |
| 1   A   Correct. | 1   A   I don't recall. |
| 2   Q   What is the Professional Fighters League? | 2   Q   Do you recall what Joe Pavlik's position with |
| 3   A   A professional fighters league. | 3   Takeover Industries was when you met him? |
| 4   Q   Okay. | 4   A   I don't recall. |
| 5   A   What is your question? | 5   Q   Would your answer be the same for Toby |
| 6   Q   Your understanding of the Professional | 6   McBride? |
| 7   Fighters League? | 7   A   Correct. I believe all three to be principals |
| 8   A   Professional fighters league. That's my | 8   of this company. |
| 9   understanding. | 9   Q   Principals in what form? |
| 10   Q   Sure. So you indicated that you met these | 10   A   At one point I believe we all held a president |
| 11   four gentleman at a Professional Fighters League event? | 11   title or a CEO title – or I don't know. I don't know |
| 12   A   Three of them, I believe. | 12   specifically what their titles were. |
| 13   Q   And which three? | 13   Q   Who did you attend the Professional Fighters |
| 14   A   I believe it was Toby McBride, Joe Pavlik and | 14   League event with in Dallas when you met these |
| 15   Jason Tucker. | 15   individuals? |
| 16   Q   So it wasn't Mike Holley or Tom Zarro at that | 16   A   My father, I believe. |
| 17   time? | 17   Q   And what's your father's name? |
| 18   A   Not at that time. | 18   A   James Deppoleto Sr. |
| 19   Q   And how did you come to meet them? | 19   Q   Makes sense. Do you know Anthony Pettis? |
| 20   A   I don't understand the question. | 20   A   He's my cousin. |
| 21   Q   Did somebody introduce you to them? | 21   Q   And was Anthony Pettis the one, your cousin, |
| 22   A   I don't understand the question. | 22   that introduced you to Toby McBride, Joe Pavlik and |
| 23   Q   Let's take Toby McBride. How did you come to | 23   Jason Tucker? |
| 24   meet Toby McBride? | 24   A   He introduced me to the opportunity. |
| 25   A   At a PFL event. | 25   Q   What does that mean? |
| Page 18 | Page 20 |



James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

Page 21

1    A.   The business opportunity that we're talking
2    about.  He introduced me to that.  We initially came in
3    as investors, I guess, on the front end.
4    Q.   Did you say he initially came in as an
5    investor on the front end?
6    A.   I did not say that.
7    Q.   Well, then can you please restate what you
8    said with respect to investor on the front end?
9    A.   I said I believe we were involved with that as
10   investors on the front end.  Whatever date that was,
11   November, December, whenever we invested initially,
12   that was the start of it.
13   Q.   Do you recall when the event was at
14   Professional Fighters League in Dallas?
15   A.   I do not.
16   Q.   Could that have been April of 2022?
17   A.   I don't know.
18   Q.   Do you recall who fought there when you met
19   these gentleman?
20   A.   My cousin was really the only fight I was
21   interested in.
22   Q.   Would that be Anthony Pettis?
23   A.   Correct.
24   Q.   You indicated just a moment ago that – did
25   this meeting lead to your investment as you describe on

Page 22

1    the front end with Takeover Industries?
2    A.   I don't recall.
3    Q.   What investment was made on the front end, as
4    you describe?
5    A.   I believe I invested 500,000 and Anthony
6    invested 250,000 and another friend of ours invested
7    another 250,000.
8    Q.   Do you recall who the other friend of yours
9    was?
10   A.   Josh Rapkin.
11   Q.   How do you spell Rapkin?
12   A.   R-A-P-K-I-N.
13   Q.   Thank you.  And how do you know Mr. Rapkin?
14   A.   It's my cousin's friend.
15   Q.   Anthony Pettis's friend?
16   A.   Correct.
17   Q.   What did you do to investigate Takeover
18   Industries prior to investing with Takeover?
19   A.   What did I do?  I don't understand your
20   question.
21   Q.   Did you investigate the company at all other
22   than meeting with Mr. McBride, Mr. Pavlik and
23   Mr. Tucker, prior to investing $500,000 in Takeover?
24   A.   We reviewed the documentation I think that
25   they sent us.

Page 23

1    Q.   And when you say we, who is we?
2    A.   Anthony Pettis, Josh Rapkin and myself.
3    Q.   Do Anthony Pettis and Josh Rapkin work with
4    you at your company?
5    A.   They do not.
6    Q.   Is Mr. Pettis still a fighter in the
7    Professional Fighters League?
8    A.   I don't believe so.
9    Q.   Have you spoke with either Mr. Rapkin or
10   Mr. Pettis regarding this lawsuit?
11   A.   I have not.
12   Q.   When was the last time you spoke with either
13   one of them?
14   A.   I had dinner with my cousin two weeks ago.
15   Q.   Does Mr. Pettis live in the Milwaukee area as
16   well?
17   A.   He does not.
18   Q.   Where does he live?
19   A.   Las Vegas.
20   Q.   Good deal.  So your testimony is you did
21   nothing other than review documents that were provided
22   to you by Takeover Industries before investing the
23   initial $500,000 in Takeover; is that correct?
24   A.   No.  My testimony was that we reviewed the
25   documents that they sent.

Page 24

1    Q.   When you say they, who do you mean?
2    A.   Whoever was in charge there.  So I don't
3    remember if it was Tucker, McBride, Pavlik, not sure.
4    Q.   Did you ever meet with Jason Tucker in Puerto
5    Vallarta, Mexico in or about the spring of 2022?
6    A.   I'm not sure of the date.
7    Q.   Did you meet with Jason Tucker in Puerto
8    Vallarta, Mexico at any time?
9    A.   I met with Jason in Mexico, yes.
10   Q.   Was that before or after you invested in
11   Takeover Industries?
12   A.   Before, I believe.
13   Q.   Do you recall when you first invested in
14   Takeover Industries?
15   A.   I do not.  No.  No.
16   Q.   You met with Mr. Tucker at the event,
17   Professional Fighters League event, in April 2022 and
18   then you met with him subsequently before you invested
19   in Takeover Industries; correct?
20   A.   I cannot recall the timing of those meetings.
21   Q.   But you met with him twice; would that be fair
22   to say?
23   A.   Well, I met with all three of them once and
24   then Tucker, yes, I met there to look him in the eye,
25   look him in the face over this deal.

James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

Page 25

1 Q   What was Mr. Tucker's position with Takeover
2 Industries at the time of your second meeting, which
3 would have been in Puerto Vallarta, Mexico?
4 A   I'm not sure.
5 Q   Did he represent himself to you as holding a
6 certain position with Takeover Industries at that
7 second meeting in Mexico?
8 A   He did not represent themself any way.
9 Q   What did he say to you at that meeting?
10 A   I don't really recall. I think we talked
11 vaguely about some business stuff and potential of the
12 business. That's about it. Kind of a fact-finding, I
13 guess, if you will.
14 Q   And what did Mr. Tucker tell you in response
15 to your fact-finding investigation of the nature of
16 Takeover's business?
17 A   It was a very fluffy conversation similar to
18 the ones that they all have. They all have very fluffy
19 flowery words, not a lot of substance, so it was tough
20 to get a good conversation in.
21 Q   And you're talking about Toby McBride, Joe
22 Pavlik and Jason Tucker; is that correct?
23 A   Yes. They consistently pitched the dream.
24 Q   And what was your understanding on the nature
25 of Takeover Industries' business when you first

Page 26

1 invested the $500,000 in Takeover?
2 A   I believe it was up-and-coming hydrogen water
3 and other drink type products.
4 Q   Such as gamer shots?
5 A   I don't know if that was — I don't know when
6 that came about.
7 Q   Are you familiar with the term gamer shot?
8 A   I don't know what the term they use for their
9 shot, but they had some shot that was geared towards
10 gaming.
11 Q   And what was your understanding of Joe
12 Pavlik's role with the company with respect to the
13 energy drink and/or gamer shot?
14 A   Again, they all kind of — at one point they
15 represented themselves as president. I wasn't clear on
16 any of their titles, to be honest.
17 Q   So you weren't aware Joe Pavlik was the chief
18 science officer at Takeover Industries when you —
19 A   I don't recall that title.
20 Q   Did Joe Pavlik speak to you about the content
21 of the energy drink and/or gamer shot?
22 A   I do not recall.
23 Q   Did anyone, either Jason Tucker or Toby
24 McBride, ask you about — or tell you, explain for you,
25 the contents, recipe of these products?

Page 27

1 A   I don't recall. I don't believe so, but I
2 don't recall.
3 Q   What led you to invest $500,000 with Takeover
4 Industries initially in the spring of 2022?
5 A   I'm sorry. Repeat that.
6 Q   What led you to invest $500,000 in Takeover
7 Industries in the spring of 2022?
8 A   I don't believe that was the date. I'm not
9 sure on that date.
10 Q   What's your recollection?
11 MR. HARVEY:   Counsel, I don't want to be
12 convoluting things here. It's obviously your
13 deposition, I'm just trying to speed things along. I
14 think the term investment, are you distinguishing
15 between investment meaning when he bought shares or
16 investment when he loaned money? I think you guys are
17 talking past each other a little bit. Again, your
18 deposition. You ask questions that you want, I'm just
19 trying to speed it along.
20 MR. BENNION:   I'll tell you what I'll do,
21 Patrick, I'll pull up the Convertible Note Purchase
22 Agreement. So let's go to Exhibit 3.
23 THE WITNESS:   So you understand you're talking
24 about two different things; right?
25 BY MR. BENNION:

Page 28

1 Q   What we do here, Mr. Deppoleto, is I ask you
2 questions. That's what a deposition is. Just so you
3 know the process. Do you need to know more explanation
4 about the nature of a deposition before we proceed?
5 A   No. I'm good.
6 Q   Okay. I ask the questions. Your counsel can
7 object. And then you answer. Understood?
8 A   Yep.
9 Q   Okay. Thank you.
10 Let's go to — this is Exhibit No. 3, if you
11 go down to the bottom of the page. This is the
12 Convertible Note Purchase Agreement. It's marked as
13 Exhibit 3 to this deposition. Take a moment to review
14 it. It's a lengthy document. I'm not going to ask you
15 to review the entire document. Take a moment to review
16 the top three paragraphs.
17 A   Okay.
18 Q   Are you familiar with this document?
19 A   Yes.
20 Q   You've seen it before?
21 A   Yes.
22 Q   And it's dated May 25, 2022. I'll just speed
23 this up and read it. This Convertible Note Purchase
24 Agreement, this Agreement, dated as of May 25, 2022,
25 effective date is entered into among Takeover

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1  Industries. a Nevada corporation, James V. Deppoleto
2  Jr, an individual purchaser for the limited purposes
3  provided in Sections 4 and 8.5, Labor Smart, Inc., a
4  Nevada corporation and majority shareholder of the
5  company.
6      And then if we skip down to paragraph No. 1,
7  it says:  Purchase and Sale:  In exchange for $500,000
8  the consideration paid by purchaser, the company shall
9  sell and issue to purchaser a secured convertible
10 promissory note in the form attached hereto as Exhibit
11 A. The note will have a principal balance in the
12 amount of the consideration.
13     Did I read that correctly?
14  A   It appears so.
15  Q   Thank you.  So let's go to, I believe it's not
16 going to be the last page.  It's going to be page 20
17 and 21.
18     Do you see these signature lines here,
19 Mr. Deppoleto?
20  A   Yes.
21  Q   We'll go to the next page.  So Mr. Deppoleto,
22 do you see the signature lines for Jason Tucker,
23 President of Takeover Industries and Michael Costello,
24 Chief Executive Officer of Takeover Industries?
25     MR. HARVEY:  Counsel, we're not on that page
Page 29

1  Note Purchase Agreement, identified in this deposition
2  as Exhibit 3?
3   A   It appears so, yes.
4   Q   And it's your testimony that you paid $500,000
5  on or about May 25, 2022, to Takeover Industries as
6  part of this agreement?
7   A   Yes.
8   Q   Did you speak -- let's go back.
9      So after the meeting with Mr. McBride and
10 Mr. Pavlik and Mr. Tucker in April of 2022, at the
11 Dallas -- we'll call it PFL event, meaning Professional
12 Fighters League; correct?
13  A   I'm not sure of the question.
14  Q   Would you agree with the acronym PFL for
15 Professional Fighters League?
16  A   Yes.
17  Q   Okay.  Did you speak with Toby McBride or Joe
18 Pavlik after that event prior to signing the
19 Convertible Note Purchase Agreement May 25, 2022?
20  A   I don't recall.
21  Q   When did you first meet Michael Costello?
22  A   I don't recall that either.
23  Q   When was the last time you spoke with Michael
24 Costello?
25  A   I don't recall that either.
Page 31

1  on our screen.
2      MR. BENNION:  I apologize.  There we have it.
3  BY MR. BENNION:
4   Q   Do you see those signatures, Mr. Deppoleto?
5   A   I see them.
6   Q   And were these the two individuals that you
7  negotiated with when you entered into the convertible
8  note purchase agreement May 25, 2022?
9      MR. HARVEY:  Objection.  Vague.  Also
10 compound.
11     Go ahead.
12     THE WITNESS:  I believe Tucker was the
13 representation, I believe.
14 BY MR. BENNION:
15  Q   Did you speak with Michael Costello about your
16 signing of the Convertible Note Purchase Agreement,
17 which is identified as Exhibit 3, prior to your signing
18 of the document?
19  A   I did not.
20  Q   Have you ever met Michael Costello?
21  A   I have.
22  Q   When did you meet him?
23  A   I cannot recall.
24  Q   Let's go to the next page.  And is that your
25 authorized signature as a purchaser on this Convertible
Page 30

1   Q   What is your understanding of Mr. Costello's
2  role with Takeover Industries?
3      MR. HARVEY:  I'll just object as vague as to
4  time.
5      Go ahead.
6      THE WITNESS:  I believe he was sales capacity,
7  also CEO.  I'm not sure, but more on the sales
8  capacity.
9  BY MR. BENNION:
10  Q   In sales capacity, we'll take May 25, 2022 as
11 the time period, what was your understanding of
12 Mr. Costello's role as a salesperson for Takeover
13 Industries?
14  A   I don't have any understanding of that role
15 other than that he was in sales.
16  Q   Did he do sales for the gamer shot or for the
17 energy drink?
18  A   I don't know that for sure.
19  Q   Okay.  Let's move on for a second.  We'll come
20 back to Exhibit 3 momentarily.
21     Let's go to Exhibit 4.  This is the Secured
22 Convertible Promissory Note dated May 25, 2022.  It
23 says $500,000.  Take a moment to read the first
24 paragraph.  I won't read it to you.
25  A   Okay.
Page 32



James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1   Q   Are you familiar with this document? Have you
2   seen it before?
3   A   I believe so, yes.
4   Q   Let's go to the last page. Are you familiar
5   with that signature that is above the line that says:
6   Print Name: Jason Tucker?
7   A   I wouldn't say I'm familiar with the
8   signature, but it looks like Jason Tucker's signature,
9   yes.
10   Q   Okay. Let's go down further, please, or
11   farther.
12        EXHIBIT TECH: This is the last page, Counsel,
13   so I'm sorry. Did you need to go back? It's a
14   three-page document.
15        MR. BENNION: Let me double-check.
16   BY MR. BENNION:
17   Q   Okay. Mr. Deppoleto, you've seen this
18   document before?
19   A   I believe so.
20   Q   Let's go to Exhibit 4 -- or that's Exhibit 4.
21   Let's go to Exhibit 5.
22        Exhibit 5 is the First Amendment to
23   Convertible Note Purchase Agreement and it's made and
24   entered into as of July 6, 2022.
25        Do you see that at the bottom of the first

Page 33

1   Q   How was it that you came to invest or to pay
2   another $500,000 to Takeover Industries for operating
3   expenses?
4   A   I'm sorry. What is the question?
5   Q   Here you are paying another $5,000 to Takeover
6   Industries, is that correct, as of --
7   A   Not correct. $500,000.
8   Q   For operating expenses; is that correct?
9   A   It says that on the agreement, yes. And that
10   was our second note for $500,000. This was a grouping
11   for 2 million. This was the second note that came
12   through.
13   Q   When you say grouping of 2 million, what do
14   you mean?
15   A   The investment was for 2 million. It came in
16   four different tranches of 500,000 apiece.
17        MR. BENNION: Can you all see me? I just lost
18   you off the screen.
19        THE WITNESS: We see you.
20        MR. HARVEY: I see you.
21        MR. BENNION: I can't see any of you.
22        (Discussion held off the record.)
23   BY MR. BENNION:
24   Q   Okay. Let's go down to pages 4 and 5 of
25   Exhibit 5.

Page 35

1   paragraph, Mr. Deppoleto?
2   A   Yes.
3   Q   Do you recall entering into a First Amendment
4   to Convertible Note Purchase Agreement that's reflected
5   in Exhibit 5?
6   A   I don't specifically recall.
7   Q   Do you recall -- if you look at the second
8   paragraph under Recitals: Whereas, the purchaser
9   desires to provide additional capital to the company
10   for operating expenses in the amount of $500,000, the
11   additional note consideration.
12        Does that sound familiar?
13   A   Actually, the sentence below that, the second
14   note, that makes it more familiar.
15   Q   The Whereas paragraph below that?
16   A   Correct. If this is the second note, then
17   yes. I remember giving them a second note for
18   $500,000, yes.
19   Q   On or about July 6, 2022; is that correct?
20   A   I don't recall the date.
21   Q   Let's go back to the top of the document. The
22   date of the document, July 6, 2022, do you see that?
23   A   Yes.
24   Q   Does that refresh your recollection?
25   A   It does not.

Page 34

1   Q   Do you see that page 4, Mr. Deppoleto?
2   A   Yes.
3   Q   Okay. Once again, it's signed Takeover
4   Industries, Jason Tucker, President.
5        Do you see that?
6   A   I do.
7   Q   And then Labor Smart, Inc, Michael Costello,
8   Chief Executive Officer.
9        Do you see that as well?
10   A   I do.
11   Q   What is Labor Smart, inc?
12        MR. HARVEY: Objection. Foundation.
13        Go ahead.
14        THE WITNESS: I'm not sure how to answer that.
15   And I don't know how that would be categorized.
16   BY MR. BENNION:
17   Q   Are you familiar with Labor Smart, Inc., that
18   company?
19   A   Yes.
20   Q   How so?
21   A   Just that it was part of this deal here. It
22   was commingled with Takeover, I believe.
23   Q   Was their vehicle for stock trading, perhaps?
24   A   (No audible answer.)
25   Q   And once again, it's your understanding that

Page 36



James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

Page 37

1  Michael Costello's role at Labor Smart was as a
2  salesman?
3       MR. HARVEY:  Objection.  Misstates previous
4  testimony.
5       THE WITNESS:  I'm not sure what his title was.
6  BY MR. BENNION:
7    Q    It says here chief executive officer; correct?
8    A    It does.
9    Q    Okay.  Let's go to the next page.
10       Is that your authorized signature, the
11  Docusign document by James V. Deppoleto Jr.?
12   A    It appears so, yes.
13   Q    Do you recall signing this document or
14  authorizing the Docusigning of this document?
15   A    I remember authorizing a second note, yes.
16   Q    Is that your email address below the signature
17  line at the bottom?
18   A    Yes.
19   Q    Is that your current email address?
20   A    Yes.
21   Q    So while we're here, quintecconveyor.com, do
22  you operate solely in the State of Wisconsin?
23   A    How do you mean?
24   Q    In your business.  You're president of –
25  what's the name of the company?  I can go back to it

Page 38

1  and find it.  You spoke of it earlier.
2    A    Quintec.
3    Q    What's the full name?
4    A    Quintec Integration, Inc.
5    Q    Now, does Quintec Integration, Inc. – and for
6  ease and reference we'll just call it Quintec now –
7  does it operate solely in Wisconsin?
8    A    What does that mean?
9    Q    Do you do business only in the State of
10  Wisconsin?
11   A    No.
12   Q    What states do you do business in –
13   A    45 out of the 50 states.
14   Q    So for example, you do business in Nevada,
15  perhaps?
16   A    I'm not sure if we've done any business in
17  Nevada, but perhaps.
18       MR. BENNION:  Okay.  Let's take a five-minute
19  break right now.  Is that all right, Counsel?
20       MR. HARVEY:  Sure.
21       (Recess taken.)
22       THE WITNESS:  Mr. Bennion, we wanted to
23  clarify that you asked about a deposition I think when
24  we were missing each other on targets for – you were
25  talking about the notes, I was talking about the

Page 39

1  investment.  Same thing with the deposition, I assumed
2  you were referring to the deposition here.  But I've
3  been deposed before.  I'm not sure if I've answered
4  that, that I've been deposed before in a different
5  case, but years ago.
6  BY MR. BENNION:
7    Q    I'll ask you some more about that.  Thank you.
8    A    Okay.
9    Q    Mr. Deppoleto, you just stated that you were
10  deposed previously, meaning before this case in another
11  case; is that correct?
12   A    Correct.
13   Q    And what was the nature of that lawsuit?
14   A    27 years ago, I believe, it was a non-compete
15  of some sort.
16   Q    Involving which company that you worked for?
17   A    Babush Corporation.
18   Q    And what was your role at Babush Corporation?
19   A    Sales.
20   Q    And what was the nature of the business that
21  Babush Corporation was involved in?
22   A    Material handling equipment.
23   Q    How do you spell Babush?
24   A    B-A-B-U-S-H.  They're out of business.
25   Q    Did you have an ownership interest in that

Page 40

1  business?
2    A    I did not.
3    Q    And you haven't been deposed other than in
4  this case or in the Babush case?
5    A    Yeah.  I believe that's it.
6    Q    Let's go to – well, did you attend an event
7  in June of 2022 in Atlanta, a PFL event?
8    A    I went to see my cousin fight again, yes.
9    Q    Mr. Pettis?
10   A    Yes.
11   Q    I see.  And did you meet with Jason Tucker at
12  that event?
13   A    I believe he might have been there.  I'm not
14  sure who of the group was there.  Maybe McBride and
15  maybe Pavlik.  I'm not sure.
16   Q    Tucker was there?
17   A    Yes.
18   Q    And you met with Jason Tucker before that
19  event?
20   A    During that event.
21   Q    When you say during, what does that mean?
22   A    Sitting in the seats watching the fight.
23   Q    So you didn't meet with Jason Tucker prior to
24  the fight?
25   A    I don't believe so, no.

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

| | Page 41 |
|---|---|
| 1 | Q   Did you meet with a rapper by the name of |
| 2 | T-Pain at that time in Atlanta with Mr. Tucker? |
| 3 | A   I don't recall. |
| 4 | Q   Do you know who T-Pain is? |
| 5 | A   I do, yes. |
| 6 | Q   What was the nature of his involvement with |
| 7 | Takeover Industries? |
| 8 | A   They were using his image in one of their |
| 9 | shots, I think. |
| 10 | Q   On an energy drink or – |
| 11 | A   Whatever their little shot – I believe it was |
| 12 | energy, yes. |
| 13 | Q   So it wasn't a gamer shot, it was an energy |
| 14 | drink? |
| 15 | A   I believe that's what it is. It's an energy |
| 16 | drink or an energy shot. |
| 17 | Q   Was that meeting attended by you and |
| 18 | Mr. Tucker with T-Pain, were Toby McBride or Joe Pavlik |
| 19 | there? |
| 20 | A   Again, I don't recall the meeting and I |
| 21 | wouldn't recall if Joe or McBride were there. |
| 22 | Q   So you don't recall meeting with T-Pain in |
| 23 | June of 2022 at the PFL event in Atlanta, Georgia? |
| 24 | A   I don't. I've seen him on multiple occasions. |
| 25 | I don't recall for that, though. |

Page 41

| | Page 43 |
|---|---|
| 1 | A   We met at his office. I don't remember when. |
| 2 | Q   Have you met with T-Pain more than one time at |
| 3 | his office in Atlanta? |
| 4 | A   No. |
| 5 | Q   What was the purpose of your meeting when you |
| 6 | and Jason Tucker met with T-Pain in Atlanta at his |
| 7 | office? |
| 8 | A   I was there observing. It was just a chance |
| 9 | to meet T-Pain and they were talking, I think, about |
| 10 | the energy shot. I'm not sure. |
| 11 | Q   Was there a reason why it was important to |
| 12 | meet with T-Pain about the energy shot? |
| 13 | A   I don't know what -- Mr. Tucker's agenda, I |
| 14 | just tagged along. |
| 15 | Q   And Mr. Tucker's position at the time with |
| 16 | Takeover Industries was president? |
| 17 | A   I don't recall. Again, like I said, I saw |
| 18 | that moniker around on all of their titles at one |
| 19 | point. |
| 20 | Q   Were you ever a member of the Board of |
| 21 | Directors for Takeover Industries? |
| 22 | A   I was not. |
| 23 | Q   Did you ever ask to be a member of the |
| 24 | Takeover Board of Directors? |
| 25 | A   I did not and my attorneys did not allow that |

Page 43

| | Page 42 |
|---|---|
| 1 | Q   You don't recall when you met T-Pain? |
| 2 | A   Correct. |
| 3 | Q   Do you recall when you first met T-Pain? |
| 4 | A   I do not. |
| 5 | Q   Could it have been at the June 2022 PFL event |
| 6 | in Atlanta? |
| 7 | A   It was not at that event. |
| 8 | Q   T-Pain was not at that event? |
| 9 | A   I don't believe so. |
| 10 | MR. HARVEY: I'm sorry I think you guys – do |
| 11 | you mind asking that question again? I think he didn't |
| 12 | hear you. I think he gave an answer that was not |
| 13 | answering your question. Sorry. |
| 14 | BY MR. BENNION: |
| 15 | Q   I simply asked: You testified that T-Pain was |
| 16 | not at the PFL event in Atlanta in 2022; is that |
| 17 | correct? |
| 18 | A   I believe he was not. |
| 19 | Q   Did you meet with T-Pain in 2022 with Jason |
| 20 | Tucker at T-Pain's offices in Atlanta? |
| 21 | A   We met with him. I don't remember the date or |
| 22 | time, no. |
| 23 | Q   You don't remember if you met with T-Pain and |
| 24 | Jason Tucker at T-Pain's offices in June of 2022 in |
| 25 | Atlanta? |

Page 42

| | Page 44 |
|---|---|
| 1 | as well. That was one of the stipulations we were not |
| 2 | going to do right from the start. In fact, they |
| 3 | prematurely listed me as a member or listed me as a |
| 4 | member and my attorney sent cease and desist letters. |
| 5 | I was not supposed to be there. |
| 6 | Q   Who do you say listed you as member of the |
| 7 | Board of Directors? |
| 8 | A   Whoever from that company listed – put a post |
| 9 | out there that was not accurate. |
| 10 | Q   What was the nature of the post? |
| 11 | A   I believe listing – trying to list me as a |
| 12 | Board member of some sort that was just not accurate. |
| 13 | Q   Are you familiar with the name Mike |
| 14 | Tzanetatos? |
| 15 | A   Mike T maybe? |
| 16 | Q   That would be better. |
| 17 | A   I think that's his name Tiz. I don't know his |
| 18 | last name, but T-I-Z. |
| 19 | Q   Let's go to Exhibit 10. Take a minute to |
| 20 | review this invoice. |
| 21 | A   Okay. |
| 22 | Q   Are you familiar with it? |
| 23 | MR. HARVEY: What number was this? |
| 24 | MR. BENNION: I believe it's Exhibit 10. |
| 25 | MR. HARVEY: Okay. Thank you. |

Page 44

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**Page 45**

1  MR. BENNION: Let me know when everybody is
2  there.
3  THE WITNESS: I've never seen that invoice.
4  BY MR. BENNION:
5  Q  Let's go back to the body of it. Thank you.
6  Now, it says ATTN in the first rectangle box,
7  Michael Tzanetatos?
8  A  Mike T is what I'm familiar with, yes.
9  Q  Is this the Mike T that you're referring to?
10  A  I don't think that's the right spelling of his
11  name, but I'm going to say probably.
12  Q  I'm not sure, I believe that's a Greek name.
13  I'd like to refer to him as Mike T for accuracy.
14  Who is Mike T?
15  A  Again, sales capacity, but maybe something
16  with product, the trucking, I'm not sure. I'm not
17  exactly sure of Mike's position.
18  Q  You see how it says Family Dollar, are you
19  familiar with Takeover Industries' involvement with a
20  deal, contract with Family Dollar?
21  MR. HARVEY: Objection. Vague and compound.
22  .  Go ahead.
23  THE WITNESS: I'm not personally aware of
24  that, no.
25  BY MR. BENNION:

**Page 46**

1  Q  Do you have any awareness of Takeover
2  Industries doing business or attempting to do business
3  with Family Dollar?
4  MR. HARVEY: Same objections.
5  Go ahead.
6  THE WITNESS: Attempting to do business? I
7  believe they're attempting to do business, yes.
8  BY MR. BENNION:
9  Q  And how so was Takeover Industries attempting
10  to do business with Family Dollar?
11  A  I don't know. I'm not involved. I wasn't
12  involved in their day-to-day. I just was aware that
13  this was a potential.
14  Q  What was your involvement day to day with
15  Takeover Industries after signing the Convertible Note
16  Purchase Agreement, the First Amendment to the
17  Convertible Note Purchase Agreement and the Second
18  Amendment to the Convertible Note Purchase Agreement,
19  at which time $500,000 was paid to Takeover?
20  MR. HARVEY: Objection. Compound and vague.
21  Go ahead.
22  THE WITNESS: I had no day-to-day activities.
23  BY MR. BENNION:
24  Q  So what was your involvement when you
25  contributed this money to Takeover? Did you simply –

**Page 47**

1  A  An investor. I would call on my investment
2  and I guess would get whatever token these guys were
3  throwing out.
4  Q  You testified earlier that there was four
5  tranches, I believe you used that term, of $500,000
6  each that you contributed to Takeover; is that correct?
7  A  I believe there was three and then the last
8  one was payment direct to the vendor.
9  Q  Which vendor?
10  A  Great Northern.
11  Q  What was the purpose of that?
12  A  They were making scans for their energy
13  drinks, I believe.
14  Q  So let's go back to Exhibit 10, which is in
15  front of us. Under the description it says: Slotting
16  fees T-Pain energy drink. You testified earlier that
17  you met with T-Pain on at least one occasion prior to
18  the date of this invoice, November 2, 2022; is that
19  correct?
20  A  I did not testify to that.
21  Q  It's your testimony that you had not met with
22  T-Pain before November 2, 2022?
23  A  I don't know the correlation of the date so
24  that's what I'm not sure of.
25  Q  But you testified that you did meet with

**Page 48**

1  T-Pain at his office in Atlanta; correct?
2  A  I met with him once, according to what you
3  said, yes. One time, yes.
4  Q  And you don't know whether it was before or
5  after –
6  A  I don't recall. I don't recall the timing of
7  this. I never saw this invoice.
8  Q  If you can just allow me to finish the
9  question before you answer, Mr. Deppoleto, that will be
10  easier.
11  Do you know what a slotting fee is?
12  A  I do not.
13  Q  It says here: Slotting fees T-Pain energy
14  shot, then down below a slotting allowance, a total of
15  $3,047,200.
16  Do you see that?
17  A  Sure.
18  Q  Were you aware in or about November of 2022
19  that Takeover Industries had received this Family
20  Dollar vendor funding invoice?
21  A  I'm not aware of their invoices.
22  Q  Had you spoken to Mike T with regard to Family
23  Dollar?
24  A  I did not.
25  Q  Have you spoken to Mike Costello with regard

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**Page 49**

1  to Family Dollar?
2    A.  Possibly vague generalities with him.
3    Q.  When did you first meet Mike Holley?
4    A.  I can't hear you.
5    Q.  When did you first meet Mike Holley?
6    A.  I believe in Arizona at a court case.
7    Q.  You don't recall when?
8    A.  I do not.
9    Q.  Did you ever speak to Jason Tucker about
10  Takeover Industries doing a deal with Family Dollar?
11    A.  As far as I know, there was no deal with
12  Family Dollar.
13    Q.  And how do you know that?
14    A.  Same way I don't know about this. I don't
15  know. I don't know of any deal. I don't know of a
16  deal. I wasn't privy to their day-to-day operations.
17    Q.  Did anybody at Takeover Industries ask you to
18  contribute monies to Takeover Industries to do a deal
19  with Family Dollar?
20    A.  They asked for more money, that was not
21  coming. So what it was for, I would assume -- maybe it
22  would be for this, but again, I've never seen this
23  invoice so I don't know.
24    Q.  So they didn't have -- who are they, by the
25  way?

**Page 51**

1    A.  Couple weeks ago.
2    Q.  And what was the nature of your conversation?
3  What was it about?
4    A.  Him looking for money.
5    Q.  Jason Tucker looking for money for what?
6    A.  Another business venture that is not
7  happening, at least not for me.
8    Q.  With what company?
9    A.  I don't recall. His company, I think.
10    Q.  And what is his company?
11    A.  I don't know what the name of that is called
12  just yet.
13    Q.  What's the nature of his company's business?
14    A.  I don't know.
15    Q.  But he was looking for you to pay or
16  contribute money to his company; is that correct?
17    A.  Looking for investors, yes.
18    Q.  Mr. Deppoleto, do you recall attending a
19  meeting in Las Vegas with Living Essentials, the parent
20  company of 5-hour Energy with Jason Tucker in
21  October of 2022?
22    A.  I don't recall the date, but I did sit in on a
23  meeting. I believe it was at a time of a NACS Show.
24    Q.  That's NACS; is that correct?
25    A.  That I don't know.

**Page 50**

1    A.  Whoever was -- I don't recall who was in
2  charge at that time.
3    Q.  Jason Tucker?
4    A.  Tucker would have been one of them, I would
5  assume.
6    Q.  Let's go back to Mike T for a minute. When
7  was the last time you spoke to Mike T, meaning the
8  Michael Tzanetatos referenced in Exhibit 7 -- or
9  Exhibit 10?
10    A.  I do not recall.
11    Q.  Do you recall the first time you met him?
12    A.  Mike? I don't really. I cannot recall.
13    Q.  Michael Costello, when did you first meet him?
14    A.  I don't recall when I first met him either.
15    Q.  Did you ever meet Melissa Tucker?
16    A.  Yes.
17    Q.  And when was that?
18    A.  I don't recall when I first met her.
19    Q.  What is your understanding of Melissa Tucker's
20  role at Takeover Industries?
21    A.  I believe in marketing.
22    Q.  And is she Jason Tucker's wife?
23    A.  I believe so.
24    Q.  When was the last time you spoke to Jason
25  Tucker?

**Page 52**

1    Q.  Do you know what NACS stands for?
2    A.  Some kind of, like, gas station, grocery store
3  type event, I think.
4    Q.  And you attended that event with Mr. Tucker in
5  Las Vegas?
6    A.  That's inaccurate. I flew down there on my
7  own to visit my cousin and I decided to go to that
8  show.
9    Q.  Was Mr. Tucker at that show?
10    A.  He was, yes.
11    Q.  And you attended a meeting at the NACS Show in
12  Las Vegas with Living Essentials, the parent company of
13  5-hour Energy with Jason Tucker; is that correct?
14    A.  I didn't go --
15    MR. HARVEY:  Asked and answered.
16    Go head.
17    THE WITNESS:  I sat in on a meeting.
18  BY MR. BENNION:
19    Q.  And who was there from Living Essentials?
20    A.  One individual.
21    Q.  And what was his or her name?
22    A.  I don't recall. It was whoever was at the
23  booth, I believe, at that time.
24    Q.  And where was this event held, which hotel?
25    A.  I'm not sure of the hotel. It was in Las

James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1  Vegas.
2      Q.   What was the purpose of that meeting?
3          MR. HARVEY: Objection. Foundation.
4          Go ahead.
5          THE WITNESS: I just sat in on that meeting.
6  BY MR. BENNION:
7      Q.   Were you asked by Mr. Tucker to go to that
8  meeting?
9      A.   I was there, so yeah, he asked me to attend.
10     Q.   You don't recall the nature of what was
11  discussed at that meeting?
12     A.   Again, pie in the sky, talking about their
13  drinks, talking about Takeover drinks, but I don't
14  believe it went anywhere.
15     Q.   Did that meeting have any — were there any
16  discussions regarding the gamer shot that had been
17  produced and marketed by Takeover Industries?
18     A.   I don't recall.
19     Q.   Do you recall the nature of that meeting with
20  5-hour Energy/Living Essentials was with respect to
21  marketing a gamer shot?
22     A.   It was a general meeting. It really was not
23  substantive at all.
24     Q.   Have you had any business dealings with Living
25  Essentials, the parent company of 5-hour Energy?
                                           Page 53

1      A.   I have not.
2      Q.   Do you know if Mr. Tucker has had any business
3  dealings with Living Essentials, the parent company of
4  5-hour Energy?
5          MR. HARVEY: Objection. Foundation.
6          Go ahead.
7          THE WITNESS: I have no idea.
8  BY MR. BENNION:
9      Q.   Did Mike Costello and Mike T, did they attend
10  that meeting or that conference in Las Vegas, the NACS
11  Show?
12         MR. HARVEY: Compound.
13         Go ahead.
14         THE WITNESS: I believe they were at that
15  show.
16  BY MR. BENNION:
17     Q.   And do you know why they were there?
18     A.   It's their industry.
19     Q.   Did it have anything to do with promoting
20  gamer shots?
21         MR. HARVEY: Objection. Foundation.
22         Go ahead.
23         THE WITNESS: I couldn't tell you. I'm not
24  them.
25  BY MR. BENNION:
                                           Page 54

3      Q.   Did you have any discussions with Mike T or
2  Mike Costello at the NACS Show in Las Vegas in
3  October of 2022?
4      A.   Did I have a conversation with them?
5      Q.   Yes.
6      A.   Yes.
7      Q.   Did they attend the meeting that you and Jason
8  Tucker attended with Living Essentials, the parent
9  company of 5-hour Energy?
10     A.   I believe Costello might have been there. I'm
11  not sure about Mike T.
12     Q.   Do you recall anything Mr. Costello said at
13  that meeting?
14     A.   I don't believe he said anything.
15     Q.   And it's your testimony that you didn't say
16  anything in that meeting either, correct?
17     A.   I was observing.
18     Q.   So Jason Tucker was the spokesperson with the
19  people at Living Essentials and 5-hour Energy?
20         MR. HARVEY: Objection. Vague.
21         Go ahead.
22         THE WITNESS: I don't really know how to
23  answer that, but yes, did he talk.
24  BY MR. BENNION:
25     Q.   So Mr. Tucker was the primary speaker at that
                                           Page 55

1  meeting from the Takeover Industries group, including
2  you and Mr. Costello; correct?
3          MR. HARVEY: Hold on. Objection. Misstates
4  previous testimony and the evidence and vague.
5          Go ahead.
6          THE WITNESS: I'm sorry. Can you ask that
7  again?
8  BY MR. BENNION:
9      Q.   Yes. So you indicated that you just observed
10  at that meeting with Living Essentials, 5-hour Energy
11  at the NACS Show in October 2022; correct?
12     A.   Yes.
13     Q.   And you don't recall anything that
14  Mr. Costello said at that meeting; correct?
15     A.   Correct.
16     Q.   And you do recall Mr. Tucker speaking at that
17  meeting; correct?
18     A.   I recall him speaking, yes.
19     Q.   About what?
20     A.   It was a very general conversation. It really
21  was not that fascinating of a conversation.
22     Q.   Do you know if Joe Pavlik planned to attend
23  that conference in Las Vegas in October of 2022?
24         MR. HARVEY: Objection. Foundation. Calls
25  for speculation.
                                           Page 56

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

Page 57

1    Go ahead.
2    THE WITNESS:  I do not know.
3 BY MR. BENNION:
4    Q    Was there an award presented at that
5 conference in Las Vegas that you and Jason Tucker and
6 Mike T and Mike Costello attended known as the Product
7 of the Year?
8    A    I did not attend anything. I took a picture
9 with them with their plaque.
10   Q    What type of plaque was it?
11   A    A cheap little plastic plaque, I believe.
12   Q    Was it for a Product of the Year plaque for a
13 NXT LVL gamer shot?
14   A    I believe it was for a product that they were
15 trying -- I believe it was that, but I'm not sure.
16   Q    Did that photo appear on Twitter, as far as
17 you know?
18   A    I believe so, but again, not sure.
19   Q    Do you know why it would be important to post
20 that photo on Twitter?
21   MR. HARVEY:  Objection.  Foundation.  Calls
22 for speculation.
23   Go ahead.
24   THE WITNESS:  Not my business. I'm not sure.
25 Not a big Twitter man.

Page 58

1 BY MR. BENNION:
2    Q    Did you have any discussions with Joe Pavlik
3 about your decision to attend the conference at NACS
4 event in October of 2022?
5    A    I don't believe I had very many conversations
6 with Joe, if any.
7    Q    So you don't recall if you had any
8 conversations with Joe Pavlik about attending that
9 event in Las Vegas in October of 2022; correct?
10   A    Not at all.
11   Q    When was the last time you spoke to Joe
12 Pavlik?
13   A    I cannot recall.
14   Q    When was the last time you spoke with T-Pain?
15   A    It could have been at that meeting. Could
16 have been the last time.
17   Q    In Las Vegas in October of 2022?
18   A    No. No. I don't believe he was there.
19   Q    At what meeting?
20   A    When we met at his office, whatever date that
21 was when we were there. I believe that's the only time
22 I've had a face-to-face meeting with him.
23   Q    In or about June of 2022 in Atlanta?
24   A    I do not recall. I do not recall that. I
25 don't know the date.

Page 59

1    Q    Have you spoken with T-Pain since that time on
2 the phone?
3    A    I have not.
4    Q    Have you had any communications with T-Pain,
5 text, email or otherwise, since that meeting?
6    A    I don't have T-Pain's number.
7    Q    The question is:  Have you texted him, emailed
8 him or communicated in writing with T-Pain otherwise
9 since that meeting?
10   A    I do not have his contact information.
11   Q    So your answer is you have not written to him
12 since that time?
13   A    Correct.
14   Q    Thank you.
15        Have you had any business dealings with 5-hour
16 Energy?
17   A    No.
18   Q    Do you know if Jason Tucker has any business
19 dealings with 5-hour Energy?
20   A    I don't know what Jason does.
21   Q    Were you invited to attend a meeting of the
22 Board of Directors of Takeover Industries on
23 November 7, 2022?
24   A    I don't believe so.
25   Q    Do you know if Jason Tucker was invited to

Page 60

1 attend a meeting of the Takeover Industries' Board of
2 Directors on November 7, 2022?
3    A    I would not know that information.
4    Q    Have you ever attended a meeting of the
5 Takeover Industries' Board of Directors?
6    A    I do not recall. I don't believe so.
7    Q    Do you know who the Takeover Industries' Board
8 of Directors were comprised of, which individuals in
9 October of 2022?
10   A    I do not.
11   Q    Let's go to Exhibit 6. Pull up Exhibit 6.
12        It's the Second Amendment to Convertible Note
13 Purchase Agreement.
14        Do you see that, Mr. Deppoleto?
15   A    Yes.
16   Q    Have you seen this document before?
17   A    Looks like it's the third note of the
18 $2 million loan to them.
19   Q    And once again. If we go to page 4 of
20 Exhibit 6, this is signed by Jason Tucker.
21        Does that appear to be his Docusign signature
22 as president of Takeover Industries?
23   A    I don't know his Docusign signature, but that
24 looks to be his name and a signature.
25   Q    So this note, if we go back to page 1, and

James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

Page 61

```
 1   this is the third Whereas paragraph under Recitals, it
 2   says:  Whereas the purchaser desires to provide for
 3   additional capital to the company for operating
 4   expenses of $500,000.
 5        What were the operating expenses that you were
 6   providing additional capital for to Takeover?
 7        A.   I don't -- I don't recall specifically what
 8   they were.  We just wanted them to be for the
 9   day-to-day operation of business, but we couldn't
10   dictate that other than what our note stated.
11        Q.   You say day-to-day operation of business.
12   What is your understanding of that?
13        A.   To me it would be regular business activities,
14   nothing fluffy.  It had to go towards stuff that was
15   actual business operations.
16        Q.   What was your understanding of Toby McBride's
17   role at Takeover at the time that you signed the Second
18   Amendment to the Convertible Note Purchase Agreement
19   reflected here as Exhibit 6?
20        A.   I don't know what his title was at any given
21   time.
22        Q.   What was his role at the company at that time?
23        A.   Again, another guy listed as president.
24        Q.   So when you say another guy listed as
25   president, you met with Mr. McBride in April of 2022 in
```

Page 62

```
 1   Dallas at the PFL event; correct?
 2        A.   I believe so, yes.
 3        Q.   What was the nature of your conversation with
 4   Mr. McBride at that time?
 5        A.   He was pitching fluffy dreams.
 6        Q.   And you invested in these fluffy dreams?
 7        A.   No.  I dug a little further and felt like
 8   there was -- Tucker seemed to be a guy that, you know,
 9   got along with them that understood the nature of
10   business.
11        Q.   Have you ever invested in other companies
12   besides Takeover Industries?
13        A.   Small investments maybe here and there with
14   some companies, but nothing to this nature.
15        Q.   When you invested with Takeover Industries or
16   contributed, and it says here in Exhibit 6 -- keep the
17   highlight on that paragraph, please -- under Recitals:
18   Whereas, the purchaser desires to provide additional
19   capital for operating expenses in the amount of
20   $500,000.
21        And that's the third $500,000 payment you
22   made; correct?
23        A.   Yes.
24        Q.   When you made these payments to Takeover did
25   you understand that there was a risk, that you might
```

Page 63

```
 1   not have a return on your payment of $1.5 million?
 2        MR. HARVEY:  Objection.  Vague.
 3        Go ahead.
 4        THE WITNESS:  Again, I don't quite understand
 5   the question.
 6   BY MR. BENNION:
 7        Q.   So when you paid three payments of $500,000,
 8   each in May, July and in August of 2022, did you
 9   understand there was a risk that you may not have a
10   return on your investment?
11        MR. HARVEY:  Objection.  Vague.
12        THE WITNESS:  Is it a possibility?  Probably.
13   But was it a possibility that I could consider?
14   Probably.
15   BY MR. BENNION:
16        Q.   That you may not -- that you might lose the
17   $1.5 million?
18        A.   No.  I didn't think that at all during the
19   time, no.  Everything seemed viable and everything
20   seemed that they would request each time and that was
21   the reason for the third tranche.  They needed working
22   capital.
23        Q.   For operating expenses; correct?
24        A.   I believe so, yes.
25        Q.   Did you monitor those operating expenses after
```

Page 64

```
 1   you made these payments to the company, the first,
 2   second and third $500,000 payments?
 3        A.   We would call in and check and try to keep our
 4   thumb out of it as much as possible, but it's worth
 5   listening to people's words other than anything else.
 6   I believe we had a stipulation in there as well in the
 7   agreement that they could only use 10 percent for
 8   salaries.  We wanted the remainder being used as
 9   working capital.
10        Q.   Do you know who was paid salaries during this
11   period of time, let's say, from May through September
12   of 2022 at Takeover Industries?
13        A.   I do not.
14        Q.   Do you know if Jacob -- or Jason and Melissa
15   Tucker were receiving salaries from Takeover Industries
16   during this period of time?
17        A.   I do not know that.
18        Q.   Did you receive any reports as to who was
19   receiving salaries?
20        A.   I did not.
21        Q.   Did you ask for reports from Takeover
22   Industries as to who was receiving salaries during this
23   period of time in or about the summer of 2022?
24        A.   I don't recall that.  I don't remember asking
25   for any reports, but it's possible.
```



James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1  Q   And in asking for reports from Takeover
2  Industries, did you ever email either Mr. Tucker or
3  Mr. McBride with respect to who was receiving salaries
4  from Takeover Industries during this period of time?
5  A   So I just stated that I'm unaware of those
6  salaries. So I don't know what they were using the
7  money for. I did not have access or day-to-day – I
8  wasn't involved in day-to-day operations. I wanted to
9  protect my money.
10  Q   And wanting to protect your money, did you
11  send emails to either Mr. Tucker or Mr. McBride during
12  this period of time from May through August of 2022 as
13  to who was receiving salaries at Takeover Industries?
14  A   I don't recall that.
15  Q   Do you recall sending any emails to Takeover
16  Industries during this period of time, May to August of
17  2022?
18  A   I don't recall sending those, but I'm assuming
19  there was some communication.
20  Q   In writing?
21  A   Possibly. I don't feel like I had very many
22  communications with McBride or Pavlik.
23  Q   Do you recall the last time you spoke to Toby
24  McBride?
25  A   I do not.
                                        Page 65

1  simply pitching dreams as –
2  A   That seems to be the flavor of their – I'm
3  sorry. Go ahead. I apologize.
4       MR. HARVEY: You gotta let him finish his
5  question.
6       THE WITNESS: Yes, sir.
7  BY MR. BENNION:
8  Q   – were simply pitching dreams as part of
9  their work at Takeover Industries?
10       MR. HARVEY: Objection. Misstates previous
11  testimony. Vague and compound and asked and answered.
12  Go ahead.
13       THE WITNESS: Yes. I believe that every
14  conversation was not substantive. It seemed to be
15  fluffy and about the dreams of the company.
16  BY MR. BENNION:
17  Q   You invested with the company a month after
18  you met Mr. McBride and Mr. Pavlik, correct?
19  A   Correct. Or I don't know the timing, but yes,
20  I invested.
21  Q   Why did you pay Takeover Industries
22  $1.5 million from May 2022 through August 19, 2022?
23       MR. HARVEY: Objection. Asked and answered
24  and vague.
25  Go ahead.
                                        Page 67

1  Q   Did you have any written communications with
2  Joe Pavlik or Toby McBride after you met with them in
3  April of 2022 regarding Takeover Industries?
4  A   I don't recall.
5  Q   Was there a person who was your point of
6  contact at Takeover Industries during this period of
7  time?
8       MR. HARVEY: Objection. Vague.
9  Go head.
10       THE WITNESS: Generally, we made that
11  Mr. Tucker because he was the only one not pitching
12  dreams and seemed to be the one that had at least
13  something to say. The other two did not.
14  BY MR. BENNION:
15  Q   So it's your testimony that Mr. McBride and
16  Mr. Pavlik were simply pitching dreams as part of
17  Takeover Industries?
18       MR. HARVEY: Objection. Asked and answered.
19  Vague and misstates previous testimony.
20  Go ahead.
21       THE WITNESS: I'm sorry. Can you repeat that?
22  BY MR. BENNION:
23  Q   Sure. Is it your testimony that Mr. McBride
24  and Mr. Pavlik were, when you spoke to them, including
25  your meeting in April of 2022 and thereafter, were
                                        Page 66

1       THE WITNESS: I don't understand the question.
2  You're asking me why? In what way?
3  BY MR. BENNION:
4  Q   Well, you paid them $1.5 million; correct?
5  A   Yes.
6  Q   Why, if they were just – if Mr. McBride and
7  Mr. Pavlik were just promoting dreams?
8       MR. HARVEY: Objection. Asked and answered.
9  Vague. Compound.
10  Go ahead.
11       THE WITNESS: Despite them, they did seem to
12  have good products. They did seem to have some
13  traction and so they were a detriment to the company,
14  but I was able to see, I thought, what was behind the
15  curtain and it looked to be viable products and the
16  potential of a good company.
17  BY MR. BENNION:
18  Q   What were the products that were good, in your
19  opinion?
20  A   The hydrogen water, specifically, was decent
21  and then their energy drinks seemed to be decent as
22  well.
23  Q   Did you sample these products?
24  A   I did.
25  Q   Let's go to Exhibit 7. I'm going to represent
                                        Page 68



James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

| | |
|---|---|
| 1 these are your answers to interrogatories. Let's scan | 1 provided his consent and whether he provided consent |
| 2 down to the next page. It says: Plaintiff's Response | 2 via verbal or written means. |
| 3 to Takeover Industries Incorporated First Set of | 3    Did I read that correctly? |
| 4 Interrogatories. | 4    A.   Yes. |
| 5    Do you see that, Mr. Deppoleto? | 5    Q.   Okay. So let's go down. There's some |
| 6    A.   Yes. | 6 objections stated in response to Interrogatory No. 2 at |
| 7    Q.   Let's scroll down to page 4 of Exhibit 7. | 7 the beginning. |
| 8    Do you recall seeing these interrogatories and | 8    Do you see that? |
| 9 the response to Interrogatory No. 1 previously? | 9    A.   Yes. |
| 10   A.   I'm sorry. What was the question? | 10   Q.   Let's go to the next page, page 5. It |
| 11   Q.   Do you recall seeing these interrogatories | 11 reads – this is your Answer to Interrogatory No. 2 |
| 12 previously? | 12 starting with the first full sentence on page 5 of |
| 13   A.   I believe so, yes. | 13 Exhibit 7: Subject to and without waiving said |
| 14   Q.   Is your date of birth December 8, 1970? | 14 objections, Plaintiff does not know whether Mr. Zarro |
| 15   A.   Yes. | 15 provided consent for the loans described in paragraph |
| 16   Q.   Let's go to the final page of Exhibit 7, the | 16 36 to 48 of the amended complaint. |
| 17 verification page – | 17   And we'll go back to the amended complaint in |
| 18   MR. HARVEY:  You're cutting out there, | 18 a minute. |
| 19 Counsel. | 19   Plaintiff further states that the Takeover |
| 20 BY MR. BENNION: | 20 Board of Directors Tucker McBride and Pavlik and Labor |
| 21   Q.   This is the last page of Exhibit 7. | 21 Smart (Costello) signed joint written consents |
| 22 Verification at the top, As to Answers to | 22 approving the note purchase agreement, first amendment, |
| 23 Interrogatories, it reads:  I, James V. Deppoleto Jr | 23 second amendment and first note, second note and third |
| 24 declare the following. | 24 note. Plaintiff further states it is his understanding |
| 25   Do you see that? | 25 that Mr. Zarro was not on Takeover's Board of Directors |
| Page 69 | Page 71 |

| | |
|---|---|
| 1    A.   Yes. | 1 at the time Plaintiff loaned Takeover the funds that |
| 2    Q.   Is that your authorized signature at the | 2 are the subject of this lawsuit. |
| 3 bottom of the page? | 3    Did I read that correctly? |
| 4    A.   Yes. | 4    A.   Yes. |
| 5    Q.   Did you review these answers to | 5    Q.   You state in the second sentence there: |
| 6 interrogatories before you authorized your electronic | 6 Plaintiff further states that the Takeover Board of |
| 7 signature on the verification page? | 7 Directors (Tucker, McBride, and Pavlik) and Labor Smart |
| 8    A.   Yes. | 8 (Costello) signed joint written consents approving the |
| 9    Q.   Let's go back to Exhibit – or to page 4 of | 9 note purchase agreement, first amendment, second |
| 10 Exhibit 7. Let's go down to Interrogatory 2 and | 10 amendment and the first note. |
| 11 Response to Interrogatory No. 2 on that page. | 11   Did I read that sentence again correctly? |
| 12   Interrogatory No. 2 states:  Describe, in | 12   A.   Yes. |
| 13 detail, whether Mr. Zarro – and do you know who that's | 13   Q.   Okay. Have you produced any documents that |
| 14 referring to, Mr. Zarro? | 14 show that Toby McBride or Joe Pavlik signed joint |
| 15   A.   How do you mean? | 15 written consents approving these notes? |
| 16   Q.   Do you know if it refers to Tom Zarro? | 16   MR. HARVEY:  Objection. Vague. Are you |
| 17   A.   I believe it does. | 17 referring to something other than the exhibits to the |
| 18   Q.   Who is a Defendant in your case; is that | 18 complaint? |
| 19 correct? | 19   MR. BENNION:  No. I'm referring to the |
| 20   A.   Yes. | 20 documents that are listed here, the note purchase |
| 21   Q.   It says:  Describe, in detail, whether | 21 agreement. |
| 22 Mr. Zarro provided consent to the notes and other loans | 22   MR. HARVEY:  Right. So for example, Exhibit G |
| 23 referenced in paragraphs 36 to 48 of your amended | 23 to the complaint is one of the joint written consent. |
| 24 complaint prior to those transactions being finalized | 24 Are you referring to something other than that? |
| 25 and memorialized, including the date that Mr. Zarro | 25   You were breaking up. We couldn't hear you. |
| Page 70 | Page 72 |

James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1    MR. BENNION:  State your objection if you have
2  one.
3       MR. HARVEY:  I'll object to the extent that
4  it's misleading, it misstates the documents in the
5  case, including the pleadings in the case, which
6  include the joint written consents.
7       THE WITNESS:  What's the question?
8  BY MR. BENNION:
9    Q   Have you produced the joint written consents
10  referred to here in your Answer to Interrogatory No. 2
11  approving the note purchase agreement, the first
12  amendment, the second amendment and the first note,
13  second note and third note?
14    A   I believe my attorney answered that. I
15  believe we have, yes.
16    Q   When did you first speak to Tom Zarro?
17    A   I don't recall.
18    Q   Not in 2022, according to your Answer to
19  Interrogatory No. 2; is that correct?
20    A   I don't believe we had a conversation in
21  2022 – I don't know. I'm not sure.
22       MR. HARVEY:  Counsel, I'm sorry. I misstated.
23  I just want to clarify the record, I was referring
24  to Exhibit G to the complaint. I don't think it was
25  Exhibit G to the complaint. I was referring to

Page 73

1    A   I spoke to him then. I met him in the April
2  time frame.
3    Q   And what gave rise to your conversation via
4  phone with Mr. Tucker in 2021?
5    A   They were – really was a spinoff of having
6  conversations with my cousin. I believe they were
7  asking him to be some kind of influencer and then
8  offered him an ability to buy-in for some shares of the
9  company. That was the initial.
10    Q   And how many times did you speak with
11  Mr. Tucker in November or December 2021?
12    A   Maybe once. I believe my cousin did most –
13  was handling most of it in the beginning.
14    Q   Are you talking about Mr. Pettis?
15    A   Correct.
16    Q   It says:  The parties' relationship was
17  limited to an arms-length, professional relationship.
18       What was the professional relationship?
19    A   I was an investor. This guy is not my friend.
20  He is a guy I was doing business with and I would use
21  that moniker for all these guys. None of these guys
22  are my friends. I was here doing business with them.
23    Q   You testified previously that you invested in
24  other companies, but in lesser amounts than your
25  payments to Takeover; is that correct?

Page 75

1  Document 25-7, which is, I think, Exhibit G to
2  something else. I just want to clarify. I apologize
3  for being misleading.
4       MR. BENNION:  Thank you.
5  BY MR. BENNION:
6    Q   Now, let's go to Interrogatory No. 3 down a
7  little farther. Interrogatory No. 3 says:  Describe in
8  detail your relationship with Jason Tucker, including
9  how long you have known him, when you first met, the
10  circumstances of your meeting, and the nature of your
11  relationship.
12       Response:  Plaintiff objects to Interrogatory
13  No. 3 because of the circumstances of your meeting and
14  the nature of your relationship are undefined, vague
15  and ambiguous.
16       Skipping ahead a sentence it says:  Subject to
17  and without waiving said objections, Plaintiff states
18  that he met Mr. Tucker in November or December of 2021
19  through Plaintiff's involvement with Takeover. The
20  parties' relationship was limited to an arms-length,
21  professional relationship.
22       Did I read that correctly?
23    A   Yes.
24    Q   So you met Mr. Tucker in November or December
25  of 2021, not April 2022; correct?

Page 74

1    A   I believe I said if I did it was smaller
2  amounts to different smaller companies, potentially. I
3  cannot recall them.
4    Q   Which companies –
5    A   I cannot recall them.
6    Q   Was your investment in these companies before
7  or after your investment in Takeover?
8    A   It would be before.
9    Q   Okay. Let's go further down to Interrogatory
10  No. 6 in Exhibit 7. These are Plaintiff's Answers to
11  Interrogatories. It says in Interrogatory No. 6:
12  Explain in detail the factual basis for your
13  allegations in paragraph 72 of your amended complaint
14  that Defendants shared and/or transferred Takeover's
15  proprietary information, trade secrets, inventory,
16  product ingredients, and other assets with NextGen
17  Beverages.
18       Did I read that correctly?
19    A   Yes.
20    Q   So what is your basis for stating that
21  Defendants transferred Takeover's proprietary
22  information and specifically product ingredients with
23  NextGen Beverages?
24       MR. HARVEY:  Objection. Vague as to time as
25  to whether – you mean when he signed this or today?

Page 76



James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1    Go ahead.
2    BY MR. BENNION:
3        Q    At the time you signed the Answers to
4    Interrogatories, which are Exhibit 7,
5        A.    And then what is the question?
6        Q    What is your basis for stating that Defendants
7    transferred Takeover's proprietary information,
8    specifically product ingredients and other aspects to
9    NextGen Beverages?
10        MR. HARVEY:  I'll just object that the
11    document speaks for itself.
12        Go ahead.
13        THE WITNESS:  It's our opinion that they –
14    everything that they're holding now is from the
15    Takeover time period.  They have not ceased doing
16    business and they have done it from Takeover's end.
17    BY MR. BENNION:
18        Q    So product ingredients, what do you mean by
19    that?
20        A    Ingredients in a product.
21        MR. HARVEY:  Same objections.
22        Go ahead.
23    BY MR. BENNION:
24        Q    And how do you know Takeover Industries shared
25    or transferred product ingredients with NextGen

Page 77

1    states.
2        Q    A brand ambassador for whom?
3        A    All – I believe all those companies.  I've
4    seen him wearing Lockedin.  I've seen him wearing NXT
5    LVL shirts.  So he's very much involved with Takeover
6    and now they have moved it over to NextGen and all the
7    companies in their umbrella now.  I believe he's a
8    brand ambassador to them.
9        Q    And when you say them, who are you referring
10    to specifically?
11        A    Takeover, NextGen, Legacy, whatever company
12    names they've tried to convolute.  All of them.
13        Q    Okay.  Let's – I think I'm going to go to an
14    exhibit that I didn't plan to go to.
15        MR. BENNION:  Patrick, did I send you 11
16    exhibits?
17        THE WITNESS:  Yes.
18        MR. BENNION:  Let's take a three-minute break
19    and I'm going to try to adhere to the three-minute
20    break because I'm going to use an exhibit that I didn't
21    provide.  It's a one-page document.  So we'll take a
22    three-minute break.
23        (Recess taken.)
24        (Discussion held off record.)
25    BY MR. BENNION:

Page 78

1    Beverages?
2        A    Again, I believe it states there:  He believes
3    the Defendant shared or transferred Takeover's
4    propriety information.
5        Q    And what's your basis of that statement?
6        MR. HARVEY:  Same objection.
7        Go ahead.
8        THE WITNESS:  Logic.
9    BY MR. BENNION:
10        Q    How so?
11        A    Well, the business hasn't stopped doing
12    business and has continued to do business and then spun
13    it off into another area with the same products.  It
14    seemed to be the same business to me.
15        Q    Would that also apply to the 5-hour Energy
16    shot?
17        A    What 5-hour Energy shot?
18        Q    You've never done business with 5-hour Energy?
19        A    I stated that repeatedly that I have not.
20        Q    Let's go down further or farther.
21        Have you ever met Manny Pacquiao?
22        A    I have not.
23        Q    Are you aware of any business dealings between
24    Takeover and/or NextGen Beverages with Manny Pacquiao?
25        A    I believe he is a brand ambassador, as it

Page 79

1        Q    This is Exhibit 12.
2        Mr. Deppoleto, do you see where it says
3    NXT LVL at the top of the document on the top left?
4        A    Mm-hmm.
5        Q    Is that yes?
6        A    Yes.
7        Q    What does that reference for you?
8        A    NXT LVL.
9        Q    Okay.  It says:  /5-hour Energy Accelerator
10    Partnership; correct?
11        A    Mm-hmm.
12        Q    Is that yes?
13        A    Yes.
14        Q    Have you ever had any discussions with Jason
15    Tucker regarding 5-hour Energy will invest in NXT LVL'S
16    parent company?
17        A    No.
18        Q    Have you had any emails or sent any emails to
19    Jason Tucker or Michael Costello regarding:  The
20    investment will provide Living Essentials LLC with a
21    stake in the company and its brands?
22        A    To my knowledge, there's no deal, no anything.
23    So I'm not quite sure what you're discussing here.
24        Q    When you say no deal, what do you mean?
25        A    I don't believe that a deal exists.  I don't

Page 80

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1 believe this exists.
2   Q   Have you seen this document before?
3   A   I have not.
4   Q   If you go down to bullet point No. 3 – I'm
5 sorry, 4, it says:  Support NXT LVL Gamer Shot,
6 T-Pain's NXT LVL Gamer Shot, and future products to
7 include T-Pain's NXT LVL Gamer Energy Drink.
8       Is it your testimony you've had no
9 negotiations with T-Pain regarding this NXT LVL gamer
10 shot?
11   A   I've had no dealings with T-Pain on any of
12 this, no.
13   Q   And it's your testimony the last time that you
14 had dealings with T-Pain directly was in June of 2022
15 when you met him at his office in Atlanta?
16   MR. HARVEY:  Objection.  Misstates previous
17 testimony.
18       Go ahead.
19   THE WITNESS:  The last time I met T-Pain, yes,
20 I did not have any business discussions at all.
21 BY MR. BENNION:
22   Q   Ever?
23   A   No.
24   Q   Not with T-Pain?
25   A   Not with T-Pain, no.
                                          Page 81

1   Q   Have you had discussions, negotiations with
2 Jason Tucker regarding doing business with T-Pain?
3   A   I haven't had any negotiation discussions with
4 Jason Tucker discussing T-Pain.
5   Q   Have you provided financial loans or
6 investment to any other companies in which Jason Tucker
7 is or has been involved?
8   A   No.
9   Q   So if you go down farther on this Exhibit 12
10 under the heading:  Why is NXT LVL a good fit to
11 partner with 5-hour.  The third to the last bullet
12 point in that section says:  NXT LVL is aligned with
13 the leading beverage broker in the country, LA
14 Libations.
15       Are you familiar with LA Libations?
16   A   Not really.
17   Q   When say not really, what does that mean?
18   A   I heard their name before, but I don't know
19 really what they do.
20   Q   You've had no association with them?
21   A   Zero.
22   Q   And then the last bullet point on the page,
23 Exhibit 12, says:  NXT LVL is in the R&D process of
24 creating brand extensions (Gamer Energy Drinks).
25       What has been your involvement with NXT LVL?
                                          Page 82

1   A   I'm an investor.  I loaned them money.
2   Q   How much?
3   A   $2 million.
4   Q   Okay.  Let's go back to – step away from
5 Exhibit 12 for a minute.
6       Do you know who Nicolette Carothers is?
7   MR. HARVEY:  I'm sorry.  You're cutting out,
8 Counsel.
9 BY MR. BENNION:
10   Q   Do you know who Nicolette Carothers is?
11   A   I do not.
12   Q   Are you familiar with Nappy Boy Entertainment?
13   A   I believe it's something associated with
14 T-Pain.
15   Q   To your knowledge, have you received emails
16 from Nappy Boy Entertainment?
17   A   To my knowledge, I have not received anything
18 from them.
19   Q   Let's go back to Answers to Interrogatories,
20 Exhibit 7.  So if we go to page 8 of Exhibit 7, this is
21 interrogatory No. 9.  Actually, it looks like there's a
22 mistake in numbers.  There's two Answers to
23 Interrogatories No. 9 here on page 8.
24       Do you see that, Mr. Deppoleto, at the top?
25   A   I see four No. 9s there, yes.
                                          Page 83

1   Q   Right.  There's two interrogatory No. 9s here.
2 So we're going to talk about the second interrogatory
3 No. 9.  And going back just to refresh your
4 recollection –
5   MR. BENNION:  Go back to the last page,
6 Daniel – actually, page – there we are.  The
7 verification.
8 BY MR. BENNION:
9   Q   These are the Answers to Interrogatories that
10 you verified; correct?
11   A   Are you asking me a question?
12   Q   Yes.  That's your verification to these
13 Answers to Interrogatories; correct?
14   A   I believe we've answered that, but yes.
15   Q   Okay.  Just refreshing your recollection.
16       So Interrogatory No. 9, it says:  Explain in
17 detail the factual basis for your allegation in
18 Paragraph 26 of your Amended Complaint that Mike Holley
19 authorized over $750,000 in distributions without
20 obtaining approval from Takeover's Board of Directors.
21       After your objections and the response to
22 interrogatory 9, in the last sentence it says:  Subject
23 to and without waiving the foregoing objections, these
24 allegations are based on paragraph 34(a) of Takeover's
25 Verified Complaint filed in Takeover v. Holley case in
                                          Page 84



James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1  the District of Arizona, with a case number listed.
2      Are you involved in that case, the Takeover v.
3  Holley, et al. case in the District of Arizona as a
4  party?
5      A   I don't believe that I am.
6      Q   Do you recall, as we sit here in this
7  deposition, the allegations that are contained in
8  paragraph 34(a) of Takeover's Verified Complaint in
9  that case?
10     A   What are you asking?
11     Q   What is your basis for stating that Mike
12 Holley authorized over $750,000 in distributions
13 without obtaining approval from Takeover's Board of
14 Directors?
15     A   Let me read it to you. It says: Subject to
16 and without waiving the foregoing objections, these
17 allegations are based on paragraph 34(a) of Takeover's
18 Verified Complaint filed in Takeover v. Holley, et al.
19 in the United States District Court for the District of
20 Arizona, Case No. 2:22-cv-00357.
21     That's my answer.
22     Q   I understand that. Do you have any personal
23 knowledge?
24     A   I do not.
25     Q   Thank you.
                                              Page 85

1      Let's go down to Interrogatory No. 10, just a
2  few lines below.
3      Interrogatory No. 10: Identify and describe
4  in detail all conversations and communications you have
5  had with Jason Tucker (whether the person, via phone,
6  text, email, or other means) that are in any way
7  related to any Defendants or any of your claims in the
8  Amended Complaint from January 1, 2021 to the present.
9      Now, let's go to the next page and skip
10 through the objections. It says in the last sentence
11 here it says: Plaintiff further – the last two
12 sentences to Answer to Interrogatory 10: Plaintiff
13 further objects that Interrogatory calls for a
14 narrative response that is better suited for deposition
15 testimony. Based on these objections, Plaintiff is
16 unable to respond to this Interrogatory.
17     So what communications – we'll start with
18 conversations you've had with Jason Tucker that are in
19 any way related to the Defendants or any of your claims
20 in the Amended Complaint from January 1, 2021 through
21 now?
22     MR. HARVEY: Objection. Vague and overbroad.
23     Go ahead.
24     THE WITNESS: I don't know how to answer that
25 question.
                                              Page 86

1  BY MR. BENNION:
2      Q   You agree that in your answer to interrogatory
3  that you said that Plaintiff further objects to this
4  interrogatory as it calls for a narrative response that
5  is better suited for deposition testimony; correct?
6      MR. HARVEY: Objection. Misstates all of the
7  objections that apply.
8      Go ahead.
9      THE WITNESS: What is the question again?
10 BY MR. BENNION:
11     Q   Well, rather than answer, you object to the
12 interrogatory, it's better suited for deposition
13 testimony. We're here for your deposition today so
14 I'd –
15     A   And I believe – go ahead. I'm sorry. My
16 fault.
17     Q   Identify and describe in detail all
18 conversations that you've had with Jason Tucker that
19 are in any way related to any Defendants or any of your
20 claims in the Amended Complaint of January 1, 2021 to
21 the present.
22     A   I cannot recall any conversations about the
23 Defendants at all.
24     Q   Have you ever suffered from memory loss
25 problems that you're aware of?
                                              Page 87

1      A   No.
2      Q   Never been treated for that?
3      A   No.
4      Q   Okay. Thank you.
5      Let's go to page 9 of Exhibit 7. It's a
6  little bit farther down, Interrogatory No. 12.
7      Do you see this, Mr. Deppoleto?
8      A   Yes.
9      Q   Explain in detail the factual basis for your
10 allegation in Paragraph 74 of your Amended Complaint
11 that Defendants "transferred assets and inventory to
12 NextGen Beverages, without reasonable consideration in
13 return."
14     And then you refer to answers 6 and 8. So
15 we're doing a little bit of going back and forth here.
16 So let's go back to your Response to Interrogatory
17 No. 6. You remember we're talking about transferred
18 assets and inventory from Takeover to NextGen
19 Beverages; do you recall that?
20     A   The question you just asked, I believe?
21     Q   Yes. Do you recall that's the subject matter
22 of what we're talking about, transfer of assets from
23 Takeover Industries to NextGen Beverages?
24     A   Yes.
25     Q   Go back to Response to Interrogatory No. 6.
                                              Page 88

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1  It states: Explain in detail the factual basis for
2  your allegation in Paragraph 72 of your Amended
3  Complaint that Defendants shared and/or transferred
4  Takeover's proprietary information, trade secrets,
5  inventory, product ingredients, and other assets with
6  NextGen Beverages.
7       And you state in your answer to interrogatory
8  in the second to last line: Plaintiff states that he
9  believes that Defendants shared and/or transferred
10 Takeover's proprietary information, trade secrets,
11 inventory, product ingredients, and other assets with
12 NextGen beverages.
13      And then you go on to list five bullet points
14 on the next page.
15      Do you see that?
16  A.  Yes.
17  Q.  In No. 3 you say:  NextGen Beverages
18 manufactures similar products as Takeover did.
19      What products are similar?
20  A.  Energy shots, hydrogen drinks, whatever they
21 had originally they're doing with this other company,
22 or so it appears.
23  Q.  And you state in No. 5:  NextGen Beverages
24 advertised Takeover's products on NextGen Beverages'
25 website lockedin.com.
                                              Page 89

1       Do you see that?
2   A.  I do.
3   Q.  What is your basis for saying that?
4   A.  I believe they were selling T-Pain products
5  off of that website and selling old products to people
6  in the early going. So pretty factual. Check their
7  Amazon sheet.
8   Q.  For how long?
9   A.  I'm sorry?
10  Q.  For how long a period of time do you allege
11 that they were doing that?
12  A.  I believe until that product expired and they
13 no longer could sell it because it was expired.
14  Q.  So how long is that?
15  A.  When the product expired. So I'm not sure
16 when that was.
17  Q.  So you don't know?
18  A.  There's an expiration date on those bottles
19 that they have. I'm not sure what that date was.
20  Q.  But you're not aware of the period of time;
21 correct?
22  A.  Correct.
23  Q.  Let's go to Interrogatory 8. Before we go to
24 Response to Interrogatory No. 8, let's go to
25 Exhibit 11. This is the Notice of Default. This is
                                              Page 90

1  also Exhibit 7 to the Michael Holley deposition.
2       Have you seen this document before,
3  Mr. Deppoleto?
4   A.  I believe so, yes.
5   Q.  And this is a letter from your attorneys, the
6  Defendants?
7       MR. BENNION:  Let's go up a little higher on
8  the document, Dan.
9  BY MR. BENNION:
10  Q.  Who is this letter written to?
11  A.  The individuals listed on the letter.
12  Q.  Let's go down a little further. It's
13 addressed to Joe Pavlik on his own; correct?
14  A.  Looks to be, yes.
15  Q.  It's titled Notice of Default, Demand for
16 Payment & Cease and Desist and it's dated November 8,
17 2022; is that correct?
18  A.  I don't see the date.
19      There you go, yes.
20  Q.  And did you authorize this letter to be sent?
21  A.  If it came from my attorneys, then yes.
22  Q.  Husch Blackwell, that's your attorney?
23  A.  Hush Blackwell is my attorney.
24  Q.  This came on your behalf; is that correct?
25  A.  Correct.
                                              Page 91

1   Q.  Let's go down a little farther.
2       Why was this demand letter sent on your behalf
3  on November 8, 2022?
4       MR. HARVEY:  I'm going to caution you not to
5  disclose attorney-client privileged communications. To
6  the extent that your answer would require you to
7  disclose privileged communications, I'm instructing you
8  not to answer. If you can answer this question without
9  disclosing attorney-client privileged communications,
10 you may answer.
11      Go ahead.
12      THE WITNESS:  Looks to be Notice of Default,
13 Demand for Payment & Cease and Desist.
14 BY MR. BENNION:
15  Q.  I understand that. Why did you instruct your
16 attorneys to send this letter dated November 8, 2022?
17 Again, agreeing with Counsel not to disclose any
18 attorney-client privilege.
19  A.  I don't know how to answer that question.
20  Q.  Was there something that happened prior to
21 November 8, 2022, that made you instruct your attorneys
22 to issue this letter?
23      MR. HARVEY:  Same instructions. Also, I'll
24 object that the document speaks for itself.
25      Go ahead.
                                              Page 92



James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**Page 93**

1    THE WITNESS: What is the question again? I'm
2 sorry.
3 BY MR. BENNION:
4    Q    Was there something that happened prior to
5 November 8, 2022, that caused you to have your
6 attorneys issue this letter?
7    MR. HARVEY: Same instruction and same
8 objection. The document speaks for itself.
9    THE WITNESS: The document speaks for itself.
10 BY MR. BENNION:
11    Q    So there's nothing that happened before this
12 that caused you to think that you should have your
13 attorneys issue this letter?
14    A    I did not say that.
15    Q    Well, then please answer the question.
16    A    Again, the document speaks for itself.
17    Q    Was there something that happened before this
18 document was written?
19    A    The document speaks for itself.
20    Q    Was there something that happened before this
21 letter was written that caused you to instruct your
22 attorneys to issue this letter?
23    MR. HARVEY: I'm going to object. This seems
24 to be an attempt to invade the attorney-client
25 privilege.

**Page 94**

1    . To the extent you can answer without
2 disclosing privileged communications, you may answer.
3 If you have to disclose privileged communications, I'm
4 instructing you not to answer.
5    THE WITNESS: I cannot answer.
6 BY MR. BENNION:
7    Q    I just want to be clear. I'm not seeking to
8 invade the attorney-client privilege. I'm just seeking
9 was there an event that happened prior to this day --
10    A    Again -- go ahead. I didn't mean to cut you
11 off.
12    Q    -- November 8, 2022, such as something that
13 Toby McBride did or something that Joe Pavlik did?
14    MR. HARVEY: Again, object. The document
15 speaks for itself and object to the extent he's being
16 asked to disclose attorney-client privileges and asked
17 and answered, which I think he has.
18    Go ahead.
19    THE WITNESS: The document speaks for itself.
20 I don't know how else to answer that for you, sir.
21 BY MR. BENNION:
22    Q    All right. Well, let's go through the
23 document.
24    You've seen this document before, correct,
25 Mr. Deppoleto?

**Page 95**

1    A    I believe so, yes.
2    Q    Let's go to page 4 of Exhibit 11, the very
3 bottom of paragraph 4. It says, underlined: Matters
4 Concerning the Company's Management and Messrs. Holley,
5 McBride, and Pavlik. It says in bold and all caps:
6 MR. DEPPOLETO HEREBY DEMANDS THAT MESSRS. HOLLEY,
7 MCBRIDE, AND PAVLIK CEASE AND DESIST ACTING ON BEHALF
8 OF THE COMPANY.
9    Did I read that accurately?
10    A    I believe so, yes.
11    Q    I'm not going to try to beat a dead horse
12 here, but -- and I'm not trying to invade the
13 attorney-client privilege, but if I were to ask you if
14 there was an event prior to November 8, 2022, that
15 caused you to have your attorneys write this letter,
16 what would your answer be?
17    MR. HARVEY: Again, objection. The document
18 speaks for itself. I'd also ask that the witness be
19 allowed to read all of paragraph 4.
20    MR. BENNION: Sure. Read the entire document.
21 I'm not trying to rush him through this.
22    MR. HARVEY: I have a printed copy. I don't
23 know if he'll be able to read it because it's printed
24 four sheets per page, but I do think in fairness he
25 should be able to review the document.

**Page 96**

1    MR. BENNION: I agree. I'm just going to
2 stand up and stretch my legs.
3    THE WITNESS: Okay.
4 BY MR. BENNION:
5    Q    So you've read this document in its entirety,
6 Mr. Deppoleto?
7    A    I read paragraph 4, yes, or statement 4.
8    Q    Why don't you read the entire -- well, let's
9 stay on paragraph 4 that you've read and get as much
10 traction as we can, or not.
11    Was there an event that occurred before
12 November 8, 2022, regarding the company's management
13 and Messrs. Holley, McBride, and Pavlik that caused you
14 to instruct your attorneys to write this letter?
15    MR. HARVEY: And again, if you have personal
16 knowledge outside of your discussions with your
17 attorneys, you can answer as to your personal
18 knowledge. If your knowledge comes from discussions
19 with attorneys, I'm instructing you not to answer.
20    THE WITNESS: Yeah. No. I mean, everything
21 was discussed with you guys, so.
22 BY MR. BENNION:
23    Q    So there's no answer provided; is that
24 correct?
25    MR. HARVEY: He's saying he has no personal

James V. Deppoleto, Jr. - 12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

Page 97

1  knowledge outside of discussions with his attorneys. I
2  don't know if you heard his answer.
3      MR. BENNION: I did hear his answer.
4  BY MR. BENNION:
5      Q    Is that correct, Mr. Deppoleto, what your
6  attorney said, that's your testimony?
7      A    Correct.
8      Q    Okay. Let's go back to -- let's go to
9  Exhibit 8. You know what? Let's go to Exhibit 9. I
10 want to do this in chronological order. Yeah, let's go
11 to Exhibit 9.
12     So Exhibit 9 says at the top, it says
13 October 13, 2022.
14     Have you seen this document before,
15 Mr. Deppoleto?
16     A    I'm not sure.
17     Q    Let's go down to the bottom -- well, are you
18 familiar with Great Northern Corporation --
19     A    Yes.
20     Q    What is that corporation?
21     A    I believe that's the company that made the
22 displays that, I believe, Mr. Zarro has in his
23 warehouse.
24     Q    When you say -- and why do you say -- well,
25 first of all, displays, what does that mean?

Page 98

1      A    They made energy drink displays for the
2  company.
3      Q    For Takeover Industries?
4      A    I believe so, yes.
5      Q    And what is your understanding of the purpose
6  of the display?
7      A    To house their energy drinks. I believe
8  they're supposed to be going into Walgreens.
9      Q    Did you authorize payment -- strike that.
10     Let's go down -- under Customer Information it
11 lists your name and American Express Card, credit card
12 type and then your address.
13     Is that your address, 1600 Paramount Drive,
14 Waukesha, Wisconsin?
15     A    Yes.
16     Q    Did you issue and authorize this payment?
17     A    I did.
18     Q    Who authorized you to make this payment?
19     A    I authorized me to make that payment.
20     Q    How so?
21     A    I don't understand your question.
22     Q    Did somebody at Takeover authorize you to make
23 this payment?
24     A    So again, our loan was supposed to be
25 $2 million. You listed three notes of 500,000. This

Page 99

1  is the fourth note that instead of giving them money
2  direct, because I began to lose confidence in them, I
3  paid this bill direct to Great Northern for their
4  displays.
5      Q    Who asked you to make this payment?
6      A    The company.
7      Q    Who at the company?
8      A    Whoever was in charge at the time expressed
9  that they needed money to pay for these displays and I
10 was no longer interested in giving them money direct,
11 but I offered to pay this bill direct so I knew the
12 money was going exactly where it was supposed to go.
13     Q    And so you don't recall if it was Jason Tucker
14 that authorized this payment of $386,773.86?
15     A    He did not authorize the payment, no.
16     Q    Well, who did?
17     MR. HARVEY: I'll object as vague as to the
18 term authorized.
19     Go ahead.
20     THE WITNESS: Yes. So I'm the one who
21 authorized the payment. The company is who requested
22 that they needed their additional 500,000 and I knew it
23 was going to this bill. I preferred to pay this direct
24 instead.
25 BY MR. BENNION:

Page 100

1      Q    And when you say they, is that just a
2  reference to the company or is that --
3      A    Yeah -- I'm sorry. It's a reference to the
4  company and which one of the presidents was in charge
5  at the time, I guess.
6      Q    Do you have any other written documentation
7  regarding your payment of this invoice?
8      A    In what way? I'm sorry.
9      Q    Any other written documentation?
10     A    I would assume we have recordkeeping for us,
11 yes.
12     Q    Recordkeeping for us, which means?
13     A    Quintec or James.
14     Q    Did you say James?
15     A    Myself, James Deppoleto.
16     Q    Okay. Thank you. I'm just clarifying.
17     Is this your personal American Express account
18 or the company Quintec --
19     A    All personal to me.
20     Q    Okay. Let's go to Exhibit 8 -- well, I want
21 to TO back to, I apologize, back to Exhibit 9 for one
22 more question.
23     So this receipt is dated October 13, 2022;
24 correct?
25     A    Looks to be.

James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

**Page 101**

1    Q    Do you know what Toby McBride's involvement
2  with Takeover Industries was on October 13, 2022?
3    A    I do not.
4    Q    So let's go to Exhibit 8. This is another
5  receipt from Great Northern Corporation.
6        Do you see that?
7    A    Yes.
8    Q    Dated November 4, 2022; correct?
9    A    Yes.
10   Q    This appears to be on your American Express
11  Card again; is that correct?
12   A    Yes.
13   Q    For $128,924.62; correct?
14   A    Yes.
15   Q    So the same question with respect to Exhibit 8
16  as Exhibit 9, is there any difference in your answer?
17  I can go back through them individually if you'd like,
18  but —
19   A    It's the same bill — or it's a different
20  bill, but again, it totaled up to 480-some thousand
21  dollars, I believe, total.
22   Q    Okay. And you don't recall who specifically
23  authorized you at Takeover Industries to make this
24  payment reflected in Exhibit 8; correct?
25        MR. HARVEY: Objection. Vague as to

**Page 102**

1  authorized.
2        Go ahead.
3        THE WITNESS: Again, they were requesting the
4  500,000 and this is where my 500,000 went.
5  BY MR. BENNION:
6    Q    Okay. So —
7    A    I no longer felt comfortable giving them
8  money. I wasn't confident in any of those guys at that
9  point.
10   Q    So they were requesting, but once again,
11  that's a reference to the company, not to individuals?
12   A    Correct.
13   Q    Okay.
14        MR. BENNION: We'd simply request production
15  of any additional documents that as Mr. Deppoleto said
16  previously that may exist that Quintec or personally
17  with respect to these two receipts, which are reflected
18  in Exhibits 8 and 9.
19        MR. HARVEY: I believe we've produced
20  everything that we have.
21        MR. BENNION: Okay. Duly noted.
22        Let's take about a 10-minute break here. Off
23  the record.
24        (Recess taken.)
25        MR. BENNION: During the break Patrick had a

**Page 103**

1  question about Joe Pavlik, who is on the call. He's a
2  Defendant in this case. Is this you Joe, you're a
3  Defendant in this case?
4        MR. PAVLIK: Yes. I'm just listening in on
5  mute.
6        MR. BENNION: Okay.
7        MR. HARVEY: I don't mean to be picky, but —
8  so he just spoke through Zoom, my question was about
9  the person who joined recently under the phone number
10  216-970-8229. Mr. Pavlik, is that your phone number?
11        MR. PAVLIK: Yeah. I had to run out to the
12  drugstore to pick up a prescription.
13        MR. HARVEY: That's fine. Thank you for
14  clarifying.
15        MR. PAVLIK: You got it.
16  BY MR. BENNION:
17   Q    Let's go to Exhibit 6. We skipped this
18  before.
19        So Mr. Deppoleto, can you see Exhibit 6, which
20  is the Second Amendment to Convertible Note Purchase
21  Agreement?
22   A    Yes.
23        MR. HARVEY: I think we did this one before
24  because I wrote it down.
25        THE WITNESS: We did the second note, third

**Page 104**

1  note and first note.
2        MR. HARVEY: You did bring it up before.
3        MR. BENNION: I did ask questions about it.
4  Barbara, have we used this exhibit before?
5        EXHIBIT TECH: I can tell you from my history,
6  Counsel, I did bring it up.
7  BY MR. BENNION:
8    Q    All right. Let's be very brief about this.
9  Referenced it briefly previously.
10        So Mr. Deppoleto, trying to streamline this —
11        MR. BENNION: If you can go down to the bottom
12  of the page, Daniel, to show Mr. Deppoleto Exhibit 6.
13  BY MR. BENNION:
14   Q    Do you see that, Mr. Deppoleto?
15   A    Yes.
16   Q    Have you seen this Second Amendment to
17  Convertible Note Purchase Agreement previously?
18   A    Yes.
19   Q    Okay. And I don't believe I asked you this
20  question about Exhibit 6 before, but under the
21  Recitals, paragraph 3 — let's go to paragraph 2 — no,
22  we're just going to go to paragraph 3 — no.
23        MR. BENNION: I'm sorry, Daniel, go back into
24  the Whereas.
25        EXHIBIT TECH: That's what we've covered. You



James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1  covered page 1 and page 4, in case you need reference.
2      MR. BENNION:  Thank you.
3  BY MR. BENNION:
4      Q    So this says, again, Mr. Deppoleto, Whereas
5  paragraph 3, on page 1 of Exhibit 6:  Whereas the
6  Purchaser desires to provide additional capital to the
7  company for operating expenses in the amount of
8  $500,000 (the Additional Note Consideration).
9      Did you ever -- is that correct, did I read
10  that correctly?
11     A    Yes.
12     Q    Did you ever receive a report from Jason
13  Tucker at Takeover Industries as to how these operating
14  expenses were being used?
15     A    I don't recall.  It's possible.  It's also
16  possible it wasn't so I'm not sure.
17     Q    Do you recall receiving a report about how the
18  operating expenses were being used by anyone other than
19  Jason Tucker at Takeover, such as Toby McBride or Joe
20  Pavlik?
21     A    As I said, I don't recall any of -- a specific
22  individual.
23     Q    And you don't recall receiving a report
24  regarding how your additional capital for the company
25  for operating expenses --
                                          Page 105

1      A    The only thing I could see that relating to is
2  the fact that, again, we put a percentage that we only
3  wanted to be used for salaries at 10 percent and I
4  think the remainder had to be used for all operating
5  expenses, whatever they were.  So I don't remember
6  calling for a list because I don't know that I needed a
7  list.  They could only do 10 percent for salaries and
8  the remainder had to go to operating expenses.
9      Q    So when you issued your -- when your attorneys
10  wrote the notice of default letter dated November 12,
11  2022, do you know how much money Takeover Industries
12  had in its account on or about November 8, 2022?
13     A    No.  I'm sorry, I do not.
14     Q    Did you ever request reports from anybody at
15  Takeover Industries with regard to the status of the
16  money in Takeover Industries' accounts during the time
17  that you -- from May 25, 2022, through November 8,
18  2022, that Takeover had in its possession?
19     A    Say that again.  I'm sorry, I missed that
20  first part.
21     Q    Sure.  We were talking a minute ago about you
22  didn't ask for reports with respect to how much money
23  was being used by Takeover Industries for operating
24  expenses, say, on a monthly basis; correct?
25     A    Correct.
                                          Page 106

1      Q    And you didn't receive even annual reports or
2  let's say a quarterly report?
3      A    I don't believe they produced any quarterly or
4  yearly reports, as far as I know.
5      Q    Did you ask for any such reports?
6      A    I don't believe so.  But again, we were
7  monitoring our money.  We wanted to make sure that it
8  was being used for operating, but I don't know that we
9  requested anything in that regard.  We just hit that
10  point home.
11     Q    When you testified that you're monitoring your
12  money, what does that mean?
13     A    Just calling and inquiring:  How's business?
14  How are things going?  How are sales?
15      Again, we're investing in a business.  We're
16  hoping that they do well.  And everything pointed to
17  the direction that they looked like they were doing
18  well.
19     Q    Have you ever lost money as an investor of a
20  company either before or after the payment of your
21  monies to Takeover?
22     A    No.  I don't believe there's anything that
23  would show a loss, no.
24     Q    I'm trying to wrap it up here, but I need
25  30 seconds to gather my notes.
                                          Page 107

1      You testified previously, Mr. Deppoleto, that
2  you didn't meet Mike Holley until, I believe, you were
3  at a hearing in the case in Arizona; is that correct?
4      A    I believe that's correct.
5      Q    Do you know why Mike Holley was not involved
6  in the company, or at least that you didn't meet him
7  when you went to these events in April and June of 2022
8  in Dallas and Atlanta?
9      A    I don't know when I heard about it, but I just
10  had heard that there was some improprieties that had
11  happened or that they had discovered or something and I
12  think that included Holley, Pavlik and McBride.
13     Q    What were the improprieties that you heard
14  about involving Mike Holley?
15     A    I believe they were stealing money from the
16  company.
17     Q    And who told you that?
18     A    Tucker, for one.  I would say probably Tucker
19  was the one who maybe discovered it.
20     Q    Jason Tucker?
21     A    Yes.
22     Q    And did he tell you how he discovered this
23  alleged impropriety?
24     A    I believe they said their accounting team
25  potentially found the improprieties and dug backwards
                                          Page 108



James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1  and found amounts that were missing or gone or
2  something to that nature.
3      Q    And you also mentioned Toby McBride and Joe
4  Pavlik. Are you alleging that there were improprieties
5  that Toby McBride – that you were made aware of, when
6  Mr. McBride was at Takeover?
7      A    I'm sorry. Restate that again.
8      Q    Sure. You talked about alleged improprieties
9  with Mike Holley, Toby McBride and Joe Pavlik. What
10 were these alleged improprieties that you were told of
11 about Toby McBride?
12     A    I believe they were all taking money. Taking
13 inordinate amounts of money from the investors from the
14 start of the business until it ended. Taking
15 exorbitant salaries. Basically, they were using the
16 checkbook – or the company account as a personal
17 checkbook, it sounded like. I believe there's records
18 to back that up.
19     Q    Do you know who was authorized to have access
20 to the Takeover Industries' bank account from the time
21 you first signed the Convertible Note Purchase
22 Agreement, May 25, 2022, until November 8, 2022?
23     A    I do not have knowledge of who had access, no.
24     Q    Do you know who was authorized to withdrawal
25 funds from the Takeover Industries' bank account during
Page 109

1      Q    And Joe Pavlik, you spoke about Joe Pavlik.
2  Did you review any documents or have you seen any
3  documents that would indicate that Mr. Pavlik, there
4  were improprieties in how he used money of Takeover
5  Industries?
6      A    Again, I believe something was produced and I
7  believe my attorneys have it, but there's records on
8  the bookkeeping that they needed to do showing funds
9  that all three of them took.
10     Q    Are you aware that Takeover Industries had
11 audits performed to review the accounting of its books
12 in or about 2022?
13         MR. HARVEY: Objection. Foundation. Calls
14 for speculation and assumes facts not in evidence.
15         Go ahead.
16         THE WITNESS: Yeah, I'm not sure about that.
17 I wouldn't be privy to that, I don't believe.
18 BY MR. BENNION:
19     Q    You were never told that audits were conducted
20 by Takeover Industries into the assets or into the
21 expenditures and payments to Toby McBride, Joe Pavlik
22 and Mike Holley?
23         MR. HARVEY: Same objections. Also vague and
24 compound.
25         Go ahead.
Page 111

1  that period of time?
2      A    I do not.
3      Q    Okay. Who provided you with this information
4  that you just testified to --
5      A    I believe Tucker, and I believe I provided
6  that information to my attorneys as well with whatever
7  documentation we had.
8      Q    Do you recall what that documentation is?
9      A    I don't. It's part of the records, but I
10 believe it was documenting their theft.
11     Q    And you referred to Joe Pavlik as well –
12 well, let me go back to Mike Holley for a minute.
13         Are you aware that Mike Holley was not able to
14 be with the company or to operate in the company for a
15 period of time in 2022?
16     A    Again, I don't remember the dates, but I do
17 believe that he was somehow axed out in some fashion.
18     Q    Are you aware that Mike Holley had COVID and
19 was hospitalized for COVID during some of that period
20 of time in 2022?
21     A    I'm not aware of anything with Mike Holley,
22 no.
23     Q    You're not aware of anything about him being
24 hospitalized for COVID?
25     A    No. No.
Page 110

1          THE WITNESS: I was under the understanding
2  that was needed to be done in order to become
3  tradeable, if that makes sense. So I believe they had
4  accounting firms or something trying to get them
5  current to trade or whatnot. So I believe that's how
6  they discovered those things.
7  BY MR. BENNION:
8      Q    Do you know if Takeover Industries filed tax
9  returns while Jason Tucker was president of Takeover
10 Industries?
11     A    I would not know that. I don't know.
12     Q    Did you ever request that information such as
13 tax returns?
14     A    We did not, no.
15     Q    Do you know how much money Takeover Industries
16 had left in its account and/or bank accounts when you
17 left the company or you issued your first Notice of
18 Default November 8, 2022?
19     A    I do not know that.
20     Q    Did you ever receive records of any Takeover
21 Industries' bank accounts?
22     A    I'm not certain. I don't believe so, but I'm
23 not sure.
24     Q    You don't recall?
25     A    I don't recall, no.
Page 112



James V. Deppoleto, Jr.  -  12/5/2024
James V. Deppoleto, Jr. vs. Takeover Industries, Inc., et al.

1    Q    If you had received information regarding the
2    status of Takeover Industries' bank accounts in 2022,
3    who would that have come from?
4    A    I would assume Tucker, but I'm not positive.
5    Q    Jason Tucker was your primary point of contact
6    at Takeover Industries?
7    A    Yes.  He became a primary point of contact,
8    yes.
9    Q    Before Jason Tucker became the primary point
10   of contact with you, was somebody else at Takeover a
11   primary point of contact with you?
12   A    As far as I know, I believe he was kind of the
13   voice.  When my cousin was involved early in, whatever
14   it was, 2021, and when we first got involved, he was
15   the voice that I heard, but again, I met McBride, I met
16   Pavlik, but Jason was kind of the voice, I believe.
17   Q    And your cousin is not a party to this action,
18   correct, Mr. Pettis?
19   A    He is not.
20   Q    Mr. Deppoleto, to your knowledge, have you
21   produced all email correspondence you have received
22   from Jason Tucker regarding Takeover Industries in this
23   case?
24   A    I believe so, yes.
25   Q    Do you still have access to your emails from

Page 113

1    Jason Tucker?
2    A    Whatever I had I turned over to my attorneys,
3    yes.
4    Q    But you still have access to those emails?
5    A    Yes.  They're probably in my archive, sure.
6    Q    I have no further questions at this time.
7        MR. HARVEY:  No questions from me either.  We
8    reserve the right to read and sign.
9        MR. BENNION:  Yes.  Let's do that.
10       MR. HARVEY:  Would you like to read and sign
11   your transcript?
12       THE WITNESS:  Yes.
13       THE COURT REPORTER:  Mr. Harvey, would you
14   like a copy of the transcript?
15       MR. HARVEY:  Just electronic, please.
16       THE COURT REPORTER:  Thank you.
17       (Deposition concluded at 2:22 p.m.)
18
19
20
21
22
23
24
25

Page 114



# EXHIBIT H

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

Submitted For

"In Camera Review"

Pursuant to Motion to Seal

DEF01113 to DEF01135

# EXHIBIT H

# EXHIBIT I

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

### Email Correspondence between Plaintiff
### J. Deppoleto, Jr. and J. Tucker
### September-October 2022

# EXHIBIT I

From: Jason Tucker
Sent: Friday, September 30, 2022 12:32:02 PM
To: James Deppoleto Jr. <jdeppoleto@quinteconvevor.com>
Subject: Quick Look - Team and Monthly Expense

Hi,

List as of now to review. It's much lighter this week.

There are additional expenses such as one-off contractors for specific services. i.e. content creation, designers, etc.

Best,

Jason


Jason Tucker
President

M: (310) 488-8017
Skype: jtucker001
Twitter: @intelPropHQ
jason@takeoverind.com · nxtlvlusa.com · gamershots.com

The email you have received from this company and individual and any file attachments(s) are confidential and intended solely for use by the identified recipient(s). If you received this message in error, please notify the sender and delete the message and any copies completely from your computer. Distribution or copying of this communication, in whole or in part, by any unauthorized recipient is prohibited and may subject you to liability. All rights reserved.

1

DEF01107

From: mike costelio <mike.c@takeoverind.com>
Sent: Thursday, September 29, 2022 3:35:40 PM
To: Melissa Tucker <melissa@takeoverind.com>
Cc: Mike Tzanetatos <mike.t@takeoverind.com>; Kerby Fortner <kaming@takeoverind.com>; Jason Tucker <jason@takeoverind.com>
Subject: Re: Corp Website Update

Awesome!

Mike C:

Sent from my iPhone

> On Sep 29, 2022, at 5:33 PM, Melissa Tucker <melissa@takeoverind.com> wrote:

Hi Team,

I've made some changes to Takeoverind.com.  It could use a total redo - but for now, I've removed the water, added shots, and edited the About Us and Investor Relations language.

Have a great evening,

Melissa Tucker
Marketing

M: 602-300-6916
melissa@takeoverind.com · nxtlviusa.com

1

DEF01108

Monthly Recurring - Core Team
President, Director, Treasurer                                          Jason Tucker
Chief Operations Officer                                               Michael Tzanetatos
Chief Sales Officer                                                    Michael Costello
CMO, CTO, Developer, & Online Operations                               Melissa Tucker
Director of Gaming & Social Media Manager, Customer Support            Kerby Fortner
Operations Support                                                     David Anderson
Chief Science Officer, Director                                        Joe Pavlik
General Counsel                                                        Eric Bjorgum

Monthly Average                                                $      35,291.67

Outside Contractors                                    Monthly
Ten32 Media                                            $       5,500.00
LA Libations                                           $      15,000.00
Jman Marketing
Saverino                                               $       2,500.00
Scrubbed                                               $       4,000.00
Liquid Brand Builders                                  $       4,000.00

                                                       $      31,000.00

DEF01109

|  | Annual | |
|---|---|---|
|  | TBD | |
| Employee | $ 130,000.00 | Taxed |
| Employee | $ 110,000.00 | Taxed |
| Contractor - Blue Butterfly Digital | $ 90,000.00 | |
| Employee | $ 51,500.00 | Just received raise - Taxed |
| Contractor | $ 24,000.00 | Approximate - Contracted work (not taxed) |
|  | TBD | |
| Hourly (average 1-2K per month) | | |

Marketing Services, Email Mgt, Amazon, Walmart, additional Integration & Online Support
https://lalibations.com/sip/
Affiliate Mgr

Terminating
Broker
Bookkeeping
Canada

DEF01110

$ 10,833.33
9,166.67
$ 7,500.00
$ 4,291.67
$ 2,000.00

$ 1,500.00

DEF01111

From: Amy Allen <aallen@quintecconveyor.com>
Date: Tuesday, October 25, 2022 at 2:13 PM
To: Jason Tucker <jason@takeoverind.com>
Cc: James Deppoleto Jr. <jdeppoleto@quintecconveyor.com>
Subject: RE: Accounting Items

Jason,
I look forward to speaking with you tomorrow.  I am excited to hear about Takeover Industries and how I can best support James and the team. I wanted to send you a quick list of items I'd like to add to the agenda for discussion tomorrow. I know some of the background and history of Takeover Industries, but very surface level.  Below are assumptions that I am making based on my conversations with James, and a brief review of the financial statements and supporting documentation sent over.  The below items are just discussion topics to provide clarification.  As we go through this exercise there will be more items that will come up for discussion.  I would appreciate it if you would share all your assessments and thoughts during your deep dive into Takeover Ind. as we work through this.

1. Who are the Key Players/Current Team Members:

    a.  Jason Tucker (CFP Ventures LLC)- Active

    b.  James Deppoleto-Active

    c.  Joe Pavlik (Elevate Nutraceutics)-Active?

    d.  Toby McBride- (Kraze Leprechaun) Terminated

    e.  Trevor Nixon-Terminated

    f.  Kerby Fortner-Active

    g.  Michael Costello-Active

    h.  Michael Tzanetato-Active

2. Current CPA/Accountant

    a.  Scrubbed-Accounting Outsourced

    b.  Marty-CPA currently reviewing financials

3. Who has company issued Credit Cards

1

DEF00874

    a.  What are the current expectations around use of company Credit Cards

    b.  What is the current approval process for expenditures

    c.  Who reconciles and posts transactions

    d.  How are travel /trade show expenses reviewed and approved

4.  What processes have been implemented regarding use of Company funds?

5.  Payroll

    a.  How many employees on payroll- 3 (from above)

    b.  What is the payroll sched? Every other week

    c.  Who is currently responsible for running payroll and process PR tax?

6.  Investments- Booked to Convertible Note Payables

    a.  Are there NP's booked for all investments?

No need to get back to on these items/questions prior to our conversation tomorrow.

Thank you,



**AMY ALLEN**
ACCOUNTING MANAGER
AALLEN@QUINTECCONVEYOR.COM
O: 262.200.1678 I
QUINTECCONVEYOR.COM
LIKE US ON FACEBOOK!

QUINTEC
INTEGRATION, INC.

*Quintec is a full-service material handling system integrator that engineers, installs, and supports virtually any project that involves a conveyor. Established in 1999, we have become a leader in conveyor integration and the quintessential choice for small businesses, Fortune 500 companies, and the US government.*

**From:** Jason Tucker <jason@takeoverind.com>
**Sent:** Monday, October 24, 2022 10:20 AM
**To:** Amy Allen <aallen@quintecconveyor.com>
**Cc:** James Deppoleto Jr. <jdeppoleto@quintecconveyor.com>
**Subject:** Re: Accounting Items

That sounds nice.

Perfect time.

Thank you, Amy.

DEF00875

Best,

Jason

Jason Tucker
President
M: (310) 488-8017
Skype: jtucker001

Twitter: @IntelPropHQ

jason@takeoverind.com - nxtlvlusa.com - gamershots.com

The email you received from this company and individual and any file attachments(s) are confidential and intended solely for use by the identified recipient(s). If you received this message in error, please notify the sender and delete the message and any copies completely from your computer. Distribution or copying of this communication, in whole or in part, by any unauthorized recipient is prohibited and may subject you to liability. All rights reserved.

From: Amy Allen <aallen@quintecconveyor.com>
Sent: Monday, October 24, 2022 9:26 AM
To: Jason Tucker <jason@takeoverind.com>
Cc: James Deppoleto Jr. <jdeppoleto@quintecconveyor.com>
Subject: RE: Accounting Items

Jason,
Thank you. It was a beautiful weekend to be in Northern Wisconsin.   How does Wednesday 10.26.22 at 10:00 am CST work for you?  If this fits with your calendar, I will send over a team's meeting invite.

I look forward to speaking with you,



A M Y   A L L E N
A C C O U N T I N G   M A N A G E R
AALLEN@QUINTECCONVEYOR.COM
O: 262.200.1878 |
QUINTECCONVEYOR.COM
LIKE US ON FACEBOOK!

QUINTEC
INTEGRATION, INC.

*Quintec is a full-service material handling system integrator that engineers, installs, and supports virtually any project that involves a conveyor. Established in 1996, we have become a leader in conveyor integration and the quintessential choice for small businesses, Fortune 500 companies, and the US government.*

DEF00876

From: Jason Tucker <jason@takeoverind.com>
Sent: Friday, October 21, 2022 10:45 AM
To: Amy Allen <aallen@quintecconveyor.com>
Cc: James Deppoleto Jr. <jdeppoleto.@quintecconveyor.com>
Subject: Re: Accounting Items

Hi Amy,

By the time you read this, I hope that you had a nice weekend. Anytime Wednesday or Thursday works.
Please let me know a day and time.

Best,

Jason



Jason Tucker
President

M: (310) 488-8017
Skype: jtucker001

Twitter: @IntelPropHQ

jason@takeoverind.com · nxtlvlusa.com · gamershots.com


The email you have received from this company and individual and any file attachments(s) are confidential and intended solely for use by the identified recipient(s). If you received this message in error, please notify the sender and delete the message and any copies completely from your computer. Distribution or copying of this communication, in whole or in part, by any unauthorized recipient is prohibited and may subject you to liability. All rights reserved.

From: Amy Allen <aallen@quintecconveyor.com>
Sent: Thursday, October 20, 2022 11:07 AM
To: Jason Tucker <jason@takeoverind.com>
Cc: James Deppoleto Jr. <jdeppoleto@quintecconveyor.com>
Subject: RE: Accounting Items

Jason,
I am only out of office tomorrow for an extended weekend.  I am in the office all next week and open for
meetings.  Please let me know a few dates/times that you have available  and we will make it work.


Thank you,

DEF00877



**AMY ALLEN**
ACCOUNTING MANAGER
AALLEN@QUINTECCONVEYOR.COM
O: 951.280.1578 1
QUINTECCONVEYOR.COM
LIKE US ON FACEBOOK!

QUINTEC
INTEGRATION, INC.

*Quintec is a full-service material handling system integrator that engineers, installs, and supports virtually any project that involves a conveyor. Established in 1996, we have become a leader in conveyor integration and the quintessential choice for small businesses, Fortune 500 companies, and the US government.*

From: Jason Tucker <jason@takeoverind.com>
Sent: Thursday, October 20, 2022 10:53 AM
To: Amy Allen <aallen@quintecconveyor.com>
Cc: James Deppoleto Jr. <jdeppoleto@quintecconveyor.com>
Subject: Re: Accounting Items

Amy,

That can work, anytime. Are you out all week? If not, let's do it sooner.

Best,

Jason

Jason Tucker
President

M: (310) 488-8017
Skype: jtucker001

Twitter: @IntelPropHQ

jason@takeoverind.com - nxtvlusa.com - gamershots.com

The email you have received from this company and individual and any file attachments(s) are confidential and intended solely for use by the identified recipient(s). If you received this message in error, please notify the sender and delete the message and any copies completely from your computer. Distribution or copying of this communication, in whole or in part, by any unauthorized recipient is prohibited and may subject you to liability. All rights reserved.

5

DEF00878

From: Amy Allen <aallen@quintecconveyor.com>
Sent: Thursday, October 20, 2022 10:43 AM
To: Jason Tucker <jason@takeoverind.com>
Cc: James Deppoleto Jr. <jdeppoleto@quintecconveyor.com>
Subject: RE: Accounting Items

Jason,

Thank you. I am out of the office tomorrow 10.21.22, but Friday 10.28.22 works well. My office hours are typically between 8:00 am-4:00 pm CST but can be flexible in the afternoon if needed. Please let me know what time works for you and I can send over a meeting invite.

Thank you,



AMY ALLEN
ACCOUNTING MANAGER
AALLEN@QUINTECCONVEYOR.COM
O: 262.200.1678.1
QUINTECCONVEYOR.COM
LIKE US ON FACEBOOK!

QUINTEC
INTEGRATION, INC.

*Quintec is a full-service material handling system integrator that engineers, installs, and supports virtually any project that involves a conveyor. Established in 1999, we have become a leader in conveyor integration and the quintessential choice for small businesses, Fortune 500 companies, and the US government.*

From: Jason Tucker <jason@takeoverind.com>
Sent: Thursday, October 20, 2022 10:18 AM
To: Amy Allen <aallen@quintecconveyor.com>
Cc: James Deppoleto Jr. <jdeppoleto@quintecconveyor.com>
Subject: Re: Accounting Items

Good Morning Amy,

It is a pleasure to e-meet you. I look forward to providing information on the landscape, going over accounting items, introducing you to our third-party bookkeeper, and working with you to properly hand off.

How does your Friday look?

Best,

Jason

DEF00879

Jason Tucker
President

M: (310) 488-8017
Skype: jtucker001

Twitter: @IntelPropHQ

jason@takeoverind.com - nxtiviusa.com - gamershots.com

The email you have received from this company and individual and any file attachments(s) are confidential and intended solely for use by the identified recipient(s). If you received this message in error, please notify the sender and delete the message and any copies completely from your computer. Distribution or copying of this communication, in whole or in part, by any unauthorized recipient is prohibited and may subject you to liability. All rights reserved.

From: Amy Allen <aallen@quintecconveyor.com>
Sent: Thursday, October 20, 2022 8:08 AM
To: Jason Tucker <jason@takeoverind.com>
Cc: James Deppoleto Jr. <jdeppoleto@quintecconveyor.com>
Subject: Accounting Items

Jason,
Good morning, James requested that I reach out to you to schedule a time to meet and discuss some accounting items.    Can you please let me know your availability, today or next week, so that we can get that discussion set up?

Thank you,



A M Y   A L L E N
ACCOUNTING MANAGER
AALLEN@QUINTECCONVEYOR.COM
O: 262.200.1678 |
QUINTECCONVEYOR.COM
LIKE US ON FACEBOOK!

QUINTEC
INTEGRATION, INC.

*Quintec is a full-service material handling system integrator that engineers, installs, and supports virtually any project that involves a conveyor. Established in 1999, we have become a leader in conveyor integration and the quintessential choice for small businesses, Fortune 500 companies, and the US government.*

**SECURITY NOTE** -External Email. Please do not reply, open attachments or click on links from unknown sources.
**SECURITY NOTE** -External Email. Please do not reply, open attachments or click on links from unknown sources.
**SECURITY NOTE** -External Email. Please do not reply, open attachments or click on links from unknown sources.
**SECURITY NOTE** -External Email. Please do not reply, open attachments or click on links from unknown sources.

7

DEF00880

From: Amy Allen <aallen@quinteoconvevor.com>
Date: Wednesday, October 26, 2022 at 10:12 AM
To: Jason Tucker <jason@takeoverind.com>
Cc: James Deppoleto Jr. <jdeppoleto@quinteoconvevor.com>
Subject: 10.26.22 Meeting Recap

Jason,
Thank you for the time this morning. It was good to put a face with a name. I am positive that we will be able to streamline the admin and accounting duties for Takeover Ind. so that you can focus on the strategic tasks. Below is the list of items that we spoke about that I will need to have access to:
QuickBooks
Bank Account(s)
Credit Card(s)
Shopify
Alalara Sales Tax
Scrubbed's QuickBooks file, if different than above.

Any other portals that will be necessary to property function as the full functioning Accountant/Bookkeeper.

I will need Intro's to:
Scrubbed
Marty
TakeOver Team members? We can discuss this when/if I need to reach out to any of the team members.


Items Needed:
Employee files with contact information
Employee onboarding documentation
Employee NDA's / Non-Competes (when/if they are completed)
List of Stores/Customers
List of Vendors
List of 1099 Contractors with functions outlined
Corporate documents- NDA's collected from Suppliers, Contractors, Customers, etc.

I am sure there will be more items and information needed, but lets start here!

1

DEF00881

Thank you,



QUINTEC
INTEGRATION, INC.

AMY ALLEN
ACCOUNTING MANAGER
AALLEN@QUINTECCONVEYOR.COM
O. 952.260.1616 |
QUINTECCONVEYOR.COM
LIKE US ON FACEBOOK

Quintec is a full-service material handling system integrator that engineers, installs, and supports
virtually any project that involves a conveyor. Established in 1995, we have become a leader in
conveyor integration and the quintessential choice for small businesses, Fortune 500 companies, and
the US government.

DEF00882

# EXHIBIT J

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

## Complaint

Arizona Case No. 2:22-cv-00357-PHX-JJT

March 8, 2022

# EXHIBIT J

LAW OFFICES
MANOLIO & FIRESTONE, PLC
8686 E. San Alberto Dr., Suite 200
Scottsdale, Arizona 85258
(480) 222-9100
vmanolio@mf-firm.com
Veronica L. Manolio, SBN 020230
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Takeover Industries, Inc., a Nevada corporation, | Case No. |
| Plaintiff, | VERIFIED COMPLAINT |
| v. | |
| Michael Holley and Chirine Holley, husband and wife; David Eisenberg and Jane Doe Eisenberg, husband and wife; | |
| Defendants. | |

For its claims against the Defendants, Plaintiff Takeover Industries, Inc. alleges as follows:

THE PARTIES

1.    Plaintiff Takeover Industries, Inc. is a Nevada corporation with offices in Nevada and California (and its principal place of business in California).

2.    Defendants Michael Holley and Chirine Holley are residents of this district and believed to reside in Cave Creek, Arizona.

3.    Defendants David Eisenberg and Jane Doe Eisenberg are believed to be residents of Carmel, Indiana.

4.    Plaintiff is informed and believes that each of the individual Defendants took actions as agent, employee, and/or representative of each of the other Defendants.

1   In taking the actions alleged, each Defendant was acting within the course and scope of

2   the agency, representation, or employment relationship with knowledge, acquiescence

3   and/or ratification by each and every other Defendant for the acts taken.

4        5.      To the extent that any Defendant is married, it is alleged that each actor

5   took the actions for the benefit of and on behalf of his/her martial community.

## JURISDICTION AND VENUE

7        6.      This Court has jurisdiction pursuant to 28 U.S.C. §1332 as the controversy

8   is between citizens of different states and the amount in controversy exceeds $75,000.

9        7.      Venue is proper in this District pursuant to 28 U.S.C. §1391 as a substantial

10  part of the events and omissions giving rise to the claims occurred in this District.

11  Moreover, Defendants each used the means and instrumentalities of interstate commerce,

12  including but not limited to: interstate telephone communications; interstate electronic

13  communications; and interstate transactions between federally insured banking

14  institution(s), all originating from within this District and/or benefitting this District.

## GENERAL ALLEGATIONS

16       8.      Upon information and belief, Defendant Michael Holley is a sales

17  professional specializing in the sports and nutraceutical fields.

18       9.      Defendant Holley has been involved in several companies that have

19  developed or promoted sports beverages and related products.  On information and belief,

20  Defendant Holley has experience in management, accounting, and corporate structuring.

21       10.     In or about 2021, Defendant Holley and a colleague named Toby McBride,

22  an established beverage industry veteran, put together a company and brand based upon

23  performance water products and energy drinks.  The products were to be marketed under

24  the brand NXT LVL.

25       11.     Defendant Holley and Mr. McBride incorporated in Nevada as Takeover

26  Industries, Inc. ("Takeover") but wished to operate as a publicly-traded company.

- 2 -

12.    Defendant Holley was instrumental in a deal where Labor Smart , Inc., a publicly-traded entity, trading on the OTC Markets under the symbol LTNC, acquired Takeover, and Takeover became a wholly-owned subsidiary of Labor Smart.

13.    After the acquisition of Takeover by Labor Smart, Defendant Holley was named a Director of Labor Smart and became the Chief Operating Officer and Treasurer of Takeover, while also sitting on the Board of Directors of Takeover.

14.    Defendant Holley and Mr. McBride worked with a well-known fitness and nutrition advocate, Joseph Pavlik, who was also an Officer and on the Board Takeover and an Officer of Labor Smart.

15.    Defendant Holley, along with Mr. Pavlik and Mr. McBride, quickly put together a brand that developed an industry buzz.  The flagship products were "NXT LVL" hydrogen-infused water and an energy shot developed by Mr. Pavlik.

16.    Takeover began to work with Jason Tucker, a branding and business consultant with expertise in licensing, leveraging intellectual property, Internet sales, marketing, and finance.  Mr. Tucker saw the potential of Takeover and put his efforts into moving the company forward on all fronts.

17.    Takeover offered Mr. Tucker an ownership/shareholder interest in the company as payment for his services.  By June 10, 2021, the Directors of Takeover held a "Special Meeting" and resolved that:

    a.  The Company would have four Directors: Defendant Holley, Messrs. Tucker and Pavlik, and a gentleman named Toby McBride;

    b.  Mr. Tucker would be appointed as the President of the Company, while Defendant Holley would remain its Treasurer and be appointed as both the Chief Operating Officer and Chief Financial Officer;

    c.  Mr. McBride would act as the Company's Chief Executive Officer and Secretary; and

    d.  The parties would cooperate to fulfill all paperwork requirements necessary to complete these elections and appointments.

- 3 -

18.    Under this arrangement, Takeover has become remarkably successful. The company immediately secured an endorsement deal with boxing legend Manny Pacquiao and his Manny Pacquiao Foundation and has since secured endorsement deals with Grammy Award-winning artist and professional gamer "T-Pain," and other notables including MMA Champions, NFL players, and various celebrities.

19.    Takeover's online store is active. The NXT LVL beverage product line (which includes hydrogen-infused water products and 2 oz. "Gamer Shots" that have proven to be very popular and, at times, sold out), are among the highest rated beverage products for their respective categories on Amazon.com, and the Takeover online store continues to generate substantial sales with little advertising.

20.    Takeover has also:
   a.   Secured retail commitments to place its products on the shelves of over 10,000 stores in 2022;
   b.   Entered into exclusive manufacturing deals to source its products; and
   c.   Entered into substantial endorsement deals to promote its products, including the "Official Water of the Professional Fighters League" (PFL).

21.    Takeover has retained experts in beverage sales, marketing, and an established public relations firm to further promote the NXT LVL products.

22.    Defendant Holley hired Defendant David Eisenberg to assist with accounting/bookkeeping functions during the company's growth.

23.    Although Takeover had only begun in or about February 2021, by the time it attended the National Advancing Convenience Store ("NACS") industry trade show in October 2021, Takeover's NXT LVL Hydrogen Water was awarded the CSP Best New Beverage Product (beating Smartwater+, a Coca-Cola® product, and other brands).

24.    As Takeover was skyrocketing, the four principals unanimously agreed that they would not distribute profits to any of them unless distributions were made evenly and with unanimous consent. The goal was to continue growing Takeover and its brands.

- 4 -

25.    At the same time, Takeover was updating the books and accounting of its parent company, Labor Smart.  Labor Smart had been subjected to speculation among OTC "day traders" who often buy and sell large volumes of penny stocks in short periods of time because of the spike/growth in Takeover, which obviously affected Labor Smart's pricing and value.

26.    Despite efforts to bring the Labor Smart books current, it became apparent that Takeover would need to "spin off" from Labor Smart and operate under its own stock ticker.  Mr. Tucker began to oversee the spinoff process, and he (for Takeover) retained the services of third-party Accounting and Legal professionals who specialized in this type of business transaction.

27.    In September and October 2021, vendors began expressing frustrations to Mr. Tucker (and others) about Takeover's late payment(s) or non-payments of outstanding invoices/commitments.

28.    By October 2021, Defendant Holley became ill and was hospitalized.

29.    Officers/Directors Tucker and McBride requested that Defendant Holley provide access to the Takeover bank account(s) so that the bills could be paid/outstanding issues could be resolved.

30.    Defendant Holley was the only Takeover officer/director with access to the bank account(s); Defendant Eisenberg could view the accounts/statements, but only Defendant Holley could manage the funds and/or access the monies.   Nonetheless, Defendant Holley denied any other Takeover officers/directors to have direct access.

31.    Defendant Holley instructed Defendant Eisenberg to "share information" with the others but not to grant access or control, despite Defendant Holley's hospitalization and incapacity.

32.    Mr. Tucker requested .pdf copies of all bank records, which Mr. Tucker then provided to the companies' outside Accountant for review.

- 5 -

33. The records revealed that Defendant Holley had been making significant distributions to himself without any authorization, and Defendant Holley had apparently "hired" his own daughter (Courtney Holley) and was paying her from Takeover funds.

34. Mr. Tucker reported the initial findings and then engaged General Counsel and the Accountant to conduct further review. This review revealed:

    a. Defendant Holley authorized over $750,000 in distributions without obtaining Board Approval. Some of those distributions *may* have been acceptable, but they were done clandestinely and with less than full Board Approval;

    b. Distributions were not made evenly, as the owners had agreed;

    c. Defendant Holley distributed $51,500 to One Elite Sports, LLC, an entity that is controlled/owned by Defendant Holley;

    d. Defendant Holley (and/or Eisenberg) failed to enter certain debts/income into the accounting records;

    e. Third parties were paid without any invoices or documentation;

    f. Vendors and third-party sponsorship partners were not paid; and

    g. Distributions authorized by Holley were not properly taxed or reported for tax accounting purposes.

35. Takeover hired an outside law firm to conduct an independent investigation and learned that Defendant Holley had committed several tortious acts and that Defendant Eisenberg either aided and abetted or facilitated these wrongs by failure to report known issues to the company.

36. In December, the Board of Directors conducted a "Special Meeting" and voted to: a) remove Defendant Holley from the Board of Directors; and, b) direct Takeover's President (Mr. Tucker) to remove Defendant Holley from the bank account(s) and gain access to the accounts.

37. Once Defendant Holley was removed, Takeover's "full access" to the records showed additional discrepancies and misdealing, including:

- 6 -

a. Defendant Holley had charged tens of thousands of dollars in personal expenses to Takeover, even after the hospitalization (and up until December 2021); and

b. Defendant Holley had been allowing his family to make personal purchases through Takeover even while he was hospitalized.

38. On December 22, 2021, outside legal counsel for Takeover made demand to Holley for repayment of improper amounts and disposition of his stock.

39. Takeover also demanded that Defendant Holley return all of the passwords and login information he had in his possession, which gave him access and control to Takeover's banking, its online presence (through domains and purchasing websites), and its emails and shared documents/drives.

40. To date, Defendant Holley has refused to return the company passwords or credentials, essentially holding the company "hostage."

41. Takeover filed suit against Defendant Holley in the U.S. District Court, Central District of California, Western Division on or about January 5, 2021.

42. Takeover also sought injunctive relief in the California matter, arguing that the Company should be granted access to the Company's domain/key accounts to preserve operations of the entity.

43. In response, Defendant Holley:

a. Moved to dismiss the California case, arguing that jurisdiction was proper here, in the United States District Court in and for Arizona;

b. Argued that injunctive relief was inappropriate because he did not intend to harm the Takeover entity in the future;

c. Argued that all of his clandestine activity was justified because he and another Board Member (Mr. McBride) agreed to make distributions without regard to the other officers/directors; and

d. Disputed the Board's removal action of him solely based on **improper notice**.

- 7 -

44.    Despite the pending action in California, and while that matter was pending, Plaintiff further learned that:

    a.  Defendant Holley (or someone at his direction) has caused the Takeover email/Microsoft Outlook administrator passwords to be changed – making employees/contractors unable to access or make changes to certain company email accounts;

    b.  Defendant Holley has continued paying personal expenses on his company credit card, including a personal storage unit in Cave Creek, Arizona;

    c.  Defendant Holley has continued to receive funds/checks paid to the Company through a mail location/Post Office Box in Cave Creek, Arizona.  Defendant Holley has failed to deliver those checks or otherwise "post" the funds to the Company's books;

    d.  Third parties continue to send billing statements/invoices to Defendant Holley and/or other email addresses within the Company, which Plaintiff cannot access (and which causes financial damages to Plaintiff, including past due and delinquency charges); and

    e.  Defendant Holley (or someone acting at his direction) has caused the GoDaddy.com account password to be changed - making employees/contractors unable to make certain changes to Company-owned domains, including www.takeoverind.com, www.nxtlvlusa.com, and www.nxtlvlglobal.com.

45.    Plaintiff has now voluntarily dismissed the California lawsuit and re-filed here to avoid any potential argument on personal jurisdiction. This is done in the interest of efficiency and for the benefit of the Company.

46.    It should be noted that Takeover (through its corporate legal counsel) made a written demand on Defendant Holley on or about December 22, 2021, seeking repayment of a portion of the funds improperly taken from the company. Takeover also demanded Holley return all passwords and login information that he had in possession, allowing the Company to continue performing without interruption. Defendant Holley failed to respond and continually delayed until a lawsuit was filed.

- 8 -

47.    On or about January 7, 2022, Takeover again requested that Defendant Holley at least provide/return the Company's login credentials for www.GoDaddy.com and Microsoft Office account to ensure proper access to the Company domain/accounts. Defendant Holley still refuses to provide equal access.

48.    These acts and omissions have caused Takeover significant financial damages and threaten likely further irreparable harm if the matter is not quickly decided.

COUNT I
<u>Breach of Fiduciary Duties</u>

Against Defendants Holley

49.    Plaintiff incorporates the foregoing paragraphs as if repeated here verbatim.

50.    As a Director and Officer of Takeover, Defendant Holley owed fiduciary duties to the Company, his fellow Officers/Directors and the Shareholders to (at least) act in good faith in the best interest of the Company, putting aside his own personal gain.

51.    By taking the acts described above, Defendant Holley has breached his fiduciary duties by, at least: engaging in intentional misconduct and knowing violations of law; placing his personal interests ahead of the Company, his fellow Officers/Directors, and/or the Company's shareholders; refusing to cooperate in protecting the interest of the Company during independent investigations of misconduct; and, placing the Company/its Shareholders in danger by ignoring the very obvious debts to be paid.

52.    Defendant Holley made his wrongdoing apparent and further actionable by trying to "hide" behind a technical argument that he was permitted to make personal distributions to himself (intentionally withheld from other Officers/Directors) by only seeking cooperation and involvement from one of four Officers/Directors.

53.    Defendant Holley committed such egregious acts that he could not be excused by the "Business Judgment Rule" or any similar rule of construction that would allow him to take such actions.

- 9 -

54.   Defendant Holley's actions have caused damages to the Company, its shareholders, and the other Officers/Directors in an amount to be proven at trial but, in no event, less than the $75,000 amount necessary to establish diversity jurisdiction.

55.   In addition, and because of the intentional nature of this claim, Defendant Holley may be liable for punitive or exemplary damages and/or subject to disgorgement of his shareholder, officer and director positions.

## COUNT II
### Conversion
### Against Defendants Holley

56.   Plaintiff repeats, re-alleges, and incorporates the foregoing paragraphs as if repeated here verbatim.

57.   As the Chief Financial Officer, Treasurer and Chief Operating Officer of the Takeover, Defendant Holley was granted access to all finances/accounts/funds of the Company.

58.   By committing the acts described above, Defendant Holley wrongfully exerted control and dominion over Company property (funds) inconsistent with his rights and deprived the Company, the other Officers/Directors, and/or the Shareholders of their rights, properties, and/or monies.

59.   Defendant Holley's acts cannot be excused by care, good faith, or lack of knowledge, as he has already submitted sworn testimony (a Declaration under oath) stating that he and another Board Member acted in direct violation of a known Resolution of the Board of Directors of the Company.   Defendant Holley has testified that a "technical" variation in the documentation led him to act without authority and to knowingly take funds that were not otherwise authorized or permitted to be taken.

- 10 -

60.    Defendant Holley's actions since the time the California lawsuit was filed cannot be excused or considered good faith or lack of knowledge because he has intentionally kept himself <u>solely</u> in charge of the Company's domains/emails/post office box. While intentionally failing to allow others' access, Defendant Holley has permitted certain Company debt to remain unpaid and has withheld Company payments received.

61.    Defendant Holley's actions have caused damages to the Company, its shareholders, and the other Officers/Directors in an amount to be proven at trial but, in no event, less than the $75,000 amount necessary to establish diversity jurisdiction.

62.    Even if Defendant Holley were to return the wrongfully-obtained property or otherwise repay his theft/conversion, the return of money would not nullify his acts.

63.    In addition, and because of the intentional nature of this claim, Defendant Holley may be liable for punitive or exemplary damages and/or subject to disgorgement of his shareholder, officer and director positions.

<u>COUNT III</u>
<u>Unjust Enrichment</u>

Against Defendants Holley

64.    Plaintiff repeats, re-alleges, and incorporates the foregoing paragraphs as if repeated here verbatim.

65.    Defendant Holley received benefits, both financial and intangible, from Plaintiff and Plaintiff's work. Defendant Holley has retained benefit(s) far in excess of what was expected that he would receive or be compensated, and it would be inequitable for Defendant Holley to retain the full value of the benefits he took/received.

66.    Even if no other claim is proved, Plaintiff may recover on a *quantum meruit* basis for the value of the benefits/monies that Defendant Holley has inequitably retained.

- 11 -

67.    Plaintiff will prove the amount of damage (or *quantum meruit* recovery) at trial, but the amount should, in no event, be less than the statutory minimum for diversity jurisdiction in this forum.

## COUNT IV
### Aiding and Abetting Tortious Misconduct
### Against Defendants Eisenberg

68.    Plaintiff repeats, re-alleges, and incorporates the foregoing paragraphs as if repeated here verbatim.

69.    As described above, Defendant David Eisenberg knew of the relationship between Defendant Holley and the Company/Shareholders as well as Defendant Holley and the other Officers/Directors.

70.    Defendant Eisenberg was specifically made aware that Defendant Holley was failing to provide relevant bookkeeping information/data for recordkeeping, and Defendant Eisenberg was given specific examples of items (debts) to be added to the books and payments (including distributions) that should not have been made.

71.    Defendant Eisenberg knowingly participated in further breach(es) by Defendants Holley and/or continued to commit wrongdoing/erroneous bookkeeping despite the breaches, and with knowledge, participation, and/or encouragement to Defendant Holley of the wrongdoing.

72.    Defendant Eisenberg's actions have further caused damages to the Company, its shareholders, and the other Officers/Directors in an amount to be proven at trial but, in no event, less than the $75,000 amount necessary to establish diversity jurisdiction.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Takeover Industries, Inc. having stated its claims, hereby prays for Judgment as follows:

- 12 -

A.    For judgment against the Defendants, and each of them;

B.    For compensatory, consequential, incidental, and/or equitable damages (including, but not limited to, a disgorgement of benefits under an unjust enrichment theory or *quantum meruit* measure of damages) in amounts to be proven at trial (but in no event less than the statutory minimum for diversity jurisdiction);

C.    For exemplary or punitive damages as deemed appropriate;

D.    For attorneys' fees and costs incurred herein; and

E.    For all further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby respectfully demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED this 7th day of March, 2022.

MANOLIO & FIRESTONE, PLC

By:    /s/ Veronica L. Manolio
       Veronica L. Manolio
       8686 E. San Alberto Dr., Suite 200
       Scottsdale, Arizona 85258
       *Attorneys for Plaintiff*

- 13 -

VERIFICATION

1

2      By signing below, the undersigned verifies under oath and acknowledging the

3  penalties of perjury:

4      I am Jason Tucker, President of Takeover Industries, Inc., and of legal age and

5  competency to testify in Court. I have read the foregoing Complaint dated this 7th day of

6  March, 2022, drafted on behalf of Takeover (Plaintiff). I have also read and granted

7  authority for the previous pleadings (filed in California) and have endeavored to "update"

8  all factual allegations of the Plaintiff as they exist today. I stand ready to testify in Court

9  and would testify consistently with this Verification and the pleadings.

10     I can hereby verify that all matters stated in this Complaint and the request(s) for

11  expedited and injunctive relief are true and correct, upon my information and belief, and I

12  will continue to verify facts and/or update legal counsel on behalf of the Plaintiff.

13

14     I declare these statements to be true and correct and made under the penalty of

15  perjury.

16

17     Executed on this 7th day of March, 2022.

18
                                          /s/ Jason Tucker [1]
19                                        Jason Tucker

20

21

22

23

24  ─────────────────────────────
   [1] This electronic signature is meant to comply with Arizona Rules and/or the Federal
25  Rules that permit such electronic signatures in this Court. Declarant Jason Tucker
26  remains available and ready to testify consistently with this verification/execution.

- 14 -

# EXHIBIT K

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

**Deposition Transcript of Joseph Pavlik**

**August 20, 2024**

# EXHIBIT K

Joseph F. Pavlik
August 20, 2024

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


JAMES DEPPOLETO,

            Plaintiff,

        vs.                        Case No. 2:22-cv-02013

TAKEOVER INDUSTRIES
INCORPORATED, et al.


            Defendants.
_____/




VIRTUAL REMOTE VIDEO-RECORDED

DEPOSITION OF JOSEPH F. PAVLIK

TUESDAY, AUGUST 20, 2024

LAS VEGAS, NEVADA






Reported by:    KENDALL KING-HEATH, NV CCR No. 475
                CA. CSR No. 11861

Joseph F. Pavlik
August 20, 2024

---

**Page 2**

```
1              UNITED STATES DISTRICT COURT
2                   DISTRICT OF NEVADA
3
4    JAMES DEPPOLETO,
5              Plaintiff,
6         vs.                  Case No. 2:22-cv-02013
7    TAKEOVER INDUSTRIES
     INCORPORATED, et al.
8
9              Defendants.
                                           /
10
11
12
13        VIRTUAL REMOTE VIDEO-RECORDED DEPOSITION
14    of JOSEPH F. PAVLIK, taken on behalf of
15    Plaintiff, commencing on Tuesday, August
16    20, 2024, at 1:02 p.m.  The witness
17    appeared remotely from Las Vegas,
18    Nevada, takes before Kendall King-Heath,
19    Certified Court Reporter, No. 475, for
20    the State of Nevada, No. 11861, for the
21    State of California.
22
23
24
25
```

---

**Page 3**

```
1    ZOOM/TELECONFERENCE APPEARANCE:
2    For the Plaintiff:
3         PATRICK HARVEY, ESQ.
          HUSCH BLACKWELL
4         511 North Broadway
          Suite 1100
5         Milwaukee, WI 53202
          (414) 273-2100
6         patrick.harvey@huschblackwell.com
7
8    For the Defendants:
9
10        DAVID SEXTON, ESQ.
          HALL & EVANS
11        1160 North Town Center Drive
          Suite 330
12        Las Vegas, NV 89144
          sextond@hallevans.com
13
14
15
16   ALSO PRESENT:
17        Mary Kate Metzger, Court Videographer
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1                    INDEX
2                 EXAMINATION
3
     WITNESS                              PAGE
4
     JOSEPH F. PAVLIK
5
         By Mr. Harvey ................. 6
6
7
8
9                  EXHIBITS
10
11             [None Marked.]
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 5**

```
1              TUESDAY, AUGUST 20, 2024
2                     1:02 p.m.
3                      -oOo-
4         THE VIDEOGRAPHER:  We are now on the
5    record at 1:02 p.m. Pacific Daylight Time on
6    Tuesday, August 20th, 2024.  Audio and video
7    recording will continue to take place until a
8    parties agree to go off the record.  Please note
9    that the microphones are sensitive and may pick
10   up whispering and private conversations.
11        For the purpose of creating a
12   witness-only video recording, the witness is
13   being spotlighted or locked on all video screens
14   while in speaker view.  We ask that the witness
15   not remove the spotlight setting during the
16   deposition, as it may cause other participants to
17   appear on the final video rather than just the
18   witness.  For anyone who doesn't want the
19   witness' video to take up the large part of your
20   screen, you may chick the gallery view button in
21   the upper right corner of remote depo interface.
22        This is the video-recorded proceeding
23   of Joseph Pavlik taken by counsel for the
24   Plaintiff in the matter of James V. Deppoleto,
25   Jr., versus Takeover Industries, Incorporated.
```

Joseph F. Pavlik
August 20, 2024

Page 6

1    My name is Mary Kate Metzger, remote
2    videographer on behalf of U.S. Legal Support.  I
3    am not related to any party in this action, nor
4    am I financially interested in the outcome.  The
5    court reporter is Kendall Heath on behalf of U.S.
6    Legal Support.
7            Counsel, could you please state your
8    appearances for the record, after which the court
9    reporter will swear in the witness.
10           MR. HARVEY:  Patrick Harvey for the
11    Plaintiff.
12           MR. SEXTON:  David Sexton for
13    Defendants.
14           (Witness sworn.)
15    Thereupon,
16           JOSEPH F. PAVLIK,
17    called as a witness by the Plaintiff
18    having been duly sworn, testified as
19    follows:
20           EXAMINATION
21    BY MR. HARVEY:
22       Q    Could you state and spell your full
23    name for us, please.
24       A    Joseph Pavlik.  J-o-s-e-p-h,
25    P-a-v-l-i-k.

Page 7

1       Q    Middle name?
2       A    Francis.
3       Q    With an "I"?
4       A    F-r-a-n-c-i-s; correct.
5       Q    And what's your address, sir?
6       A    Currently I am at 17047 Racoon Trail in
7    Strongsville, Ohio.
8       Q    Any plans to move in the next couple of
9    months?
10       A    I would like to.
11       Q    And are you going to stay in Ohio or
12    some other state?
13       A    Depends what I can afford.  I've been
14    working without pay.  So I'm -- this whole deal's
15    kind of disrupted my life, so I'm just trying to
16    get through it.
17       Q    Can you walk me through your education,
18    just high school on?
19       A    Yeah.  High school.  Do you want to
20    know the institutions or --
21       Q    Yes, please.
22       A    Went to Cleveland Saint Ignatius.
23    Mount Union college, Baldwin Wallace college,
24    Kent State and focused on exercise physiology,
25    nutrition science, business and marketing.

Page 8

1       Q    You said you went to Kent State.  Did
2    you get a degree from there?
3       A    Did not get a final degree.  Pursued
4    master's studies.
5       Q    And what were the other colleges you
6    mentioned?
7       A    Mount Union college and Baldwin Wallace
8    college.
9       Q    Did you get degrees from Mount Union?
10       A    Baldwin Wallace.  I transferred for my
11    undergrad.
12       Q    Bachelor of science?
13       A    Yes.
14       Q    In what?
15       A    Business and exercise science.
16       Q    Any degrees other than the one from
17    Baldwin Wallace that you have?
18       A    No.
19       Q    Any other education other than what you
20    just told me?
21       A    Formally, no.
22       Q    Okay.  Have you ever had your
23    deposition taken before?
24       A    Once before.
25       Q    And what was the context for that?

Page 9

1       A    That was in maybe April of 2021, when
2    the Takeover company was launched.  It was done
3    by the SEC to confirm that it actually was a real
4    company.
5       Q    So an SEC lawyer was the one asking you
6    questions?
7       A    That's correct.  I don't know -- I'm
8    not sure if it was a lawyer, but it was someone
9    from the SEC.  And it was -- after it was done,
10    it was written off because it proved that we did
11    have a company.
12           At the time, it was -- you know,
13    this -- the Twitter world sort of had some things
14    going on out there that we had to substantiate
15    that the company was real, which we did.
16       Q    Was there a formal lawsuit that was
17    instigated by the SEC that you're aware of?
18       A    No.
19       Q    Was there a formal SEC investigation?
20       A    I believe it was maybe an informal
21    investigation, but I'm not sure what the exact
22    title was.  They just wanted to ask a few
23    questions, that they did to a few people within
24    the company.  And --
25       Q    Who else -- I'm sorry.  Go ahead.  Who

Joseph F. Pavlik
August 20, 2024

Page 10

```
1    else did the SEC interview?
2         A    I think just Toby McBride.
3         Q    Was your interview or deposition, was
4    it recorded, to your knowledge?
5         A    I believe it was.
6         Q    Was it in person or was it via video?
7         A    It was video.
8         Q    Was it similar to what we're doing
9    here, where you were in one location and they
10   were in a totally different location?
11        A    Yes.
12        Q    Okay.  Other than that, have you been
13   deposed at all?
14        A    No, sir.
15        Q    Ever given trial testimony?
16        A    No, sir.
17        Q    And I assume you had a chance to speak
18   with your lawyer.  I don't want to go into the
19   substance of it, other just want to confirm he
20   had a chance to go over the deposition rules,
21   things like make sure you answer out loud and
22   things of that nature.
23             Do I need to go over those again or can
24   we skip past that?
25        A    Yes, sir.  We discussed that.  We can
```

Page 11

```
1    skip past it, but I will —
2         Q    Okay.
3         A    — say that I did have a neck — a
4    cervical epidural in my neck last Friday, which
5    I've been having some side effects from that.  So
6    I've just been feeling off, but I didn't want to
7    cancel the deposition, so I'm going to do my best
8    to complete it.
9         Q    Are you unable to answer questions
10   truthfully today because of that condition or any
11   other condition?
12        A    I'm sorry, could you repeat that?
13        Q    Because of the medical condition that
14   you just mentioned or any other medical
15   condition, is there a reason that you can't
16   answer fully and truthfully today?
17        A    Of course not, no.  I was just making
18   that statement because I've been feeling a little
19   off and I might not be at the full speed that I
20   would normally speak at.  That's all, sir.
21        Q    Okay.  I'm not going to go over all the
22   deposition rules since you had a chance to go
23   over them with your counsel.  The only one I am
24   going to reiterate is, if you don't understand
25   any of my questions today, feel free to let me
```

Page 12

```
1    know.  I'm happy to rephrase them to make sure
2    that we're on the same page before you give any
3    answers; okay?
4         A    Okay.
5         Q    By the same token, though, if you
6    answer one of my questions, I'm going to assume
7    that you understood; it that fair?
8         A    Okay.
9         Q    Okay.  Did you review any documents to
10   prepare for your deposition today?
11        A    Just a few of the documents that were
12   submitted prior that were completed.
13        Q    And what documents were those?
14        A    Just the questions and answers from the
15   last round of questions that was asked to us from
16   you guys, I believe.
17        Q    You're referring to interrogatory
18   questions and written answers to those
19   interrogatory questions?
20        A    Yes.
21        Q    Okay.  Other than those, did review any
22   other documents?
23        A    No.
24        Q    Other than your lawyer, did you speak
25   to anyone else about your deposition today?
```

Page 13

```
1         A    No.
2         Q    None of the other Defendants?
3         A    Correct.
4         Q    Can you walk me through your employment
5    history for the last 10 years, please.
6         A    I've been self-employed through my
7    company, which is Flexus, LLC.
8         Q    Can you spell that?
9         A    F-l-e-x-u-s, LLC.
10        Q    Okay.  For that entire 10 years?
11        A    Yes, sir.
12        Q    What type of company is Flexus, LLC?
13        A    It's a consulting company.
14        Q    Consulting with respect to what?
15        A    To the health and fitness industry.
16        Q    How long have you owned that company?
17        A    Since 2005.
18        Q    Are you the sole owner?
19        A    Sole owner.
20        Q    And what state is that incorporated
21   in?
22        A    Ohio.
23        Q    How many employees do you have now?
24        A    Just myself.
25        Q    Has that been the case since 2005?
```

Joseph P. Pavlik
August 20, 2024

Page 14

1    A.    Correct.

2    Q.    Okay.  So you've been self-employed

3    since 2005, through Flexus, LLC.

4          What other employment have you had in

5    the last 10 years?

6    A.    No real direct employment.  I'm

7    primarily -- I'm usually contracted for different

8    types of work, sometimes sales marketing

9    formulations, but no direct employment.

10   Q.    And when you say "contracted," are they

11   contracting with Flexus, LLC, or are they

12   contracting with you directly?

13   A.    With either -- usually with me directly

14   or with Flexus.  I mean, it's one and the same.

15   Q.    And how many companies approximately

16   have you contracted with in the last 10 years?

17   A.    Oh, maybe half a dozen or so.  Tough to

18   say.

19   Q.    How about in the last four?

20   A.    Maybe one or two.

21   Q.    Which companies were those?

22   A.    Takeover and LOCK'DIN or Next Gen

23   Beverage.

24   Q.    And Next Gen's all one word; correct?

25   N-e-x-t, capital G, e-n, all one word?

Page 15

1    A.    I believe it's two words.

2    Q.    When did you first start working for

3    Takeover?

4    A.    I would probably say January of --

5    well, I was never really working for them.  I was

6    just contracted.  I'd say January 2021 --

7    Q.    And when you say "contracted," what --

8    what specifically was the arrangement?

9    A.    Well, I provided work to the company.

10   So I wasn't really an employee.  I was just, I

11   guess, a -- sort of an 1099 consultant.

12   Q.    Were you billing by the hour or how

13   were you getting paid?

14   A.    Nope.  I was -- usually, it'd be a

15   monthly stipend.

16   Q.    And say a little more about that.  What

17   would the monthly stipend consist of?

18   A.    Anywhere from usually $5,000 a month up

19   to $30,000 a month.

20   Q.    Depending on what?

21   A.    Depending on the scope of work.

22   Q.    Did you keep time sheets or anything

23   like that to keep track of the scope of work?

24   A.    No.  I don't do that type of work with

25   time sheets.

Page 16

1    Q.    So how did you keep track of the scope

2    of your work?

3    A.    Well, the scope of my work primarily

4    consists of creating formulas, intellectual

5    property and then assisting with education, sales

6    distribution, kind of -- pretty much everything

7    that would be required to help a company get

8    started in marketing and sell a product.

9    Q.    Who decided how much you were going to

10   get paid per month?

11   A.    At the time, we collectively decided to

12   each take $5,000 a month back in January of 2021,

13   I believe.

14   Q.    Who is the "we" in that sentence?

15   A.    Toby McBride and Mike Bolley.

16   Q.    Was there some sort of formal

17   resolution that said we're going to each take

18   $5,000 per month?

19   A.    I can't recall if there was a formal

20   resolution.

21   Q.    But you said sometimes you got paid

22   10,000 a month; correct?

23   A.    Further down the road, once the company

24   was up and moving.  But, again, that was all

25   prior to any of the matters at hand.

Page 17

1    Q.    And you said in order to get the

2    stipend, you were creating formulas, creating IP

3    and doing education with regard to sales and

4    marketing; is that right?

5    A.    For the most part.

6    Q.    What else did you do?

7    A.    No, that pretty much encompassed it.  I

8    mean, I'd do whatever it takes, like anything

9    with a start-up company.

10   Q.    And then you said you also either

11   worked for or contracted -- or were contracted by

12   Next Gen Beverages; is that correct?

13   A.    You were breaking up.  Could you repeat

14   that?

15   Q.    Yeah.  You said you were also either

16   employed by or contracted by Next Gen Beverages;

17   correct?

18   A.    I'm sorry, you're still breaking up.

19   Q.    You said you were also employed by or

20   contracted by Next Gen Beverages; correct?

21         You seem to have -- you were frozen

22   there for a second.  Are you able to hear us now?

23   Mr. Pavlik?

24         MR. HARVEY:  Is anyone else able to

25   hear me?

Joseph F. Pavlik
August 20, 2024

Page 18

1    MR. SEXTON:  I can hear you.
2    THE REPORTER:  I can hear you fine.
3    MR. HARVEY:  He looked like he was
4  frozen on my screen.  I don't know —
5    THE WITNESS:  All right.  Now I can
6  hear you.
7    MR. HARVEY:  Okay.  Are we all set now?
8    All right.  He looks like frozen
9  again.
10    THE VIDEOGRAPHER:  Counsel, it appears
11  our witness is having internet issues.
12    THE WITNESS:  Now I can — can you hear
13  me now?
14    MR. HARVEY:  I can now.
15    THE WITNESS:  Okay.
16    MR. HARVEY:  All right.  Are we all
17  set?
18    THE WITNESS:  Yeah — now I can hear
19  you.
20    MR. HARVEY:  Okay.  And for the record,
21  do we have somebody else on?  It looks like we've
22  got another person.
23    MR. SEXTON:  I believe we have —
24    MR. ZARRO:  Tom's here.  Tom's here.
25    MR. SEXTON:  Mike Holley and Tom, two

Page 19

1  of the parties —
2    MR. ZARRO:  Hey, everybody.
3    MR. HARVEY:  Tom who?
4    MR. ZARRO:  Tom Zarro.
5    MR. HARVEY:  Okay.
6  BY MR. HARVEY:
7    Q    All right.  So I was asking you,
8  Mr. Pavlik, you said you also were employed by or
9  contracted by Next Gen Beverages; correct?
10    A    That's correct.
11    Q    And when did that — were you employed
12  by or were you contracted by Next Gen
13  Beverages?
14    A    It was really a volunteer position.  I
15  don't even — so there was really — everybody
16  worked as volunteers, so there was really no —
17  nothing official.
18    Q    Did you receive any compensation from
19  Next Gen Beverages?
20    A    I did receive compensation in shares.
21    Q    How much compensation did you
22  receive?
23    A    300 million shares.
24    Q    When did you receive those?
25    A    June of 2023.

Page 20

1    Q    And when you say "Next Gen Beverages,"
2  is that the Next Gen Beverages that's the
3  defendant in this lawsuit, which is Next Gen
4  Beverages, LLC, or is it a different Next Gen
5  Beverages?
6    A    I'm assuming that's the same one.
7    Q    And how did you go about receiving
8  these shares?
9    A    Could you explain?  I'm not quite sure.
10  How do — how did I receive them?
11    Q    Yeah.  What led you to getting these
12  shares from Next Gen Beverages?  What was the
13  series of —
14    A    Oh.
15    Q    — events that led to you getting
16  them?
17    A    It was for all of — again, going back
18  to what I do, it was for the new creation and
19  development and formulation of all of the new
20  products for the new company after the other
21  former company was left for dead.
22    Q    So you said a lot there.  Let me try
23  and unpack it.
24    So you received 300 million shares in
25  Next Gen Beverages because you created new

Page 21

1  products, new formulas, new IP for Next Gen
2  Beverages after Takeover was left for dead; is
3  that correct?
4    A    That's correct.
5    Q    And when was Takeover left for dead?
6    A    After — I would probably say October
7  of 2022, after the series of events between
8  Mr. Deppoleto and Justin Tucker, the company was
9  left with nothing but lawsuits.  So that's why
10  the company was left for dead.  It was set up to
11  fail.
12    Q    And who set it up to fail?
13    A    Mr. Deppoleto and Jason Tucker.
14    Q    And what do you mean by they set it up
15  to fail?
16    A    Well, investments were made, to my
17  understanding, and I — again, I wasn't involved
18  in all the financial dealings.  However,
19  initially, an investment was made.  There was a
20  commitment made.  It wasn't followed through.
21  And then after that, I was, you know, pretty much
22  not involved in any of the correspondence with
23  the additional investments, but I do know that
24  the primary factor of their decision to, you
25  know, do a deal with Dollar General, which was

Joseph F. Pavlik
August 20, 2024

Page 22

```
 1    advised against, was, you know, the primary
 2    reason for what we're talking about today, I
 3    believe with that investment.  And that was a
 4    decision that was made by Mr. Deppoleto, acting
 5    as a director, Justin Tucker, which, you know, I
 6    had no real involvement with other than saying
 7    that it was not a good deal, and then that's what
 8    essentially led to the demise of the company.
 9        Q    So you said a lot there.  Let me unpack
10    it a little bit.
11             So, initially, you said that there were
12    investments that were made.  What did you mean by
13    that?  Mr. Deppoleto's investments?
14        A    Correct.
15        Q    So you were aware Mr. Deppoleto made
16    investments into Takeover; correct?
17        A    I was aware of the first investment.
18        Q    And how much was that investment for?
19        A    I'm not sure.  May have been around
20    500,000.
21        Q    And when was that?
22        A    I'd probably say May of 2022.
23        Q    And you were drawing a distinction.
24    You said you were aware of the initial
25    investment.  Did I hear you correctly?
```

Page 23

```
 1        A    Correct.
 2        Q    So that means that there were other
 3    investments that Mr. Deppoleto made; correct?
 4        A    I believe so.
 5        Q    And how much were those?
 6        A    I don't have the exact amounts.
 7        Q    What's your best memory?
 8        A    I would probably say — from what was
 9    reported in any of the documentation, I'd
10    probably say it was approximately 1.4 or 1.5
11    million, of which, from what I recall from the
12    review, 980,000 of that was dedicated to the
13    Dollar General deal, and the rest was paid out in
14    salaries to Jason Tucker, his wife and the sales
15    guys.
16             So that's why I was always kind of
17    confused where that investment — you know,
18    why — I'm getting lump — pulled into this
19    where, you know, it was just a bad investment,
20    the money was misdirected and it's just — you
21    know, it was advise — everybody advised against
22    doing that deal.  And that was the — to answer
23    your question, that was the demise of the
24    company — one of the demises.
25        Q    Who are the sales guys you were
```

Page 24

```
 1    referring to?
 2        A    Mike Costello and Mike Tzanetatos.
 3        Q    Can you spell those last names?
 4        A    I can spell Costello, C-o-s-t-e-l-l-o.
 5    I can't spell Tzanetatos.
 6        Q    And you said your understanding was —
 7    of the initial 1.4 to 1.5 million that
 8    Mr. Deppoleto invested in Takeover, your
 9    understanding was that 800 to 900,000 of that was
10    earmarked for the Dollar General deal; is that
11    correct?
12        A    I believe so —
13             MR. SEXTON:  Object to form.
14    BY MR. HARVEY:
15        Q    And then the rest, you said, was paid
16    to the sales guys and — the two you just
17    referenced and then you also said to Mr. Tucker
18    and his wife; is that correct?
19        A    That's correct.
20        Q    Now, other than that 1.4 to 1.5
21    million, you were aware of an additional $500,000
22    loan, too; correct?
23        A    I don't recall that.
24        Q    Okay.
25        A    Again, I was not involved — you know,
```

Page 25

```
 1    I'm — that was — I was not involved in any of
 2    the notes or the financials.  And I was actually
 3    frozen out.
 4             Once Mr. Deppoleto came in with Jason
 5    Tucker, I was sort of frozen out and had limited
 6    knowledge of what was going on, other than what I
 7    learned after the fact once all this went down,
 8    so...
 9        Q    Now, one of the other things you said a
10    couple of minutes ago was that — you were
11    telling me about Takeover being left for dead,
12    and you said, "Commitments were made, but not
13    followed through."
14             What did you mean by that statement?
15        A    That commitments were made to support
16    and fund the company in a certain way, and then
17    that stopped.  And from what I understand,
18    Mr. Deppoleto pulled out and decided not to move
19    forward after working a new deal with Jason.  And
20    then the sales guys, they formed a new — sort of
21    a new alliance, and they were operating
22    independently.  So at that point in time, there
23    was no control over what they were doing, and I
24    wasn't involved.
25        Q    So the commitments were made by whom?
```

Case 2:22-cv-02013-GMN-BNW     Document 102-4     Filed 01/10/25     Page 9 of 79

Joseph F. Pavlik
August 20, 2024

Page 26

1    A    Well, the initial commitment was made
2    by Mr. Deppoleto —
3    Q    Are you talking about an investment or
4    some other commitment?
5    A    Well, just a commitment to want to, you
6    know, be involved and fund the company and
7    support it.  And that was when I was involved.
8    But then shortly thereafter, as you're probably
9    aware, he formed an alliance with Jason Tucker.
10    And then Jason Tucker and the two sales guys
11    mentioned, Costello and Thanetatos, along with
12    Jason's wife and Kerby, their gamer, social media
13    guy, they began to operate independently and
14    making decisions.  And at that point in time, I
15    had no transparency to what was going on until
16    after —
17    Q    This was after Mr. Deppoleto had
18    already loaned money to the company, though;
19    correct?
20    A    Could you repeat that?
21    Q    This was after Mr. Deppoleto had
22    already loaned money to the company; correct?
23    A    Yeah, shortly thereafter.
24    Q    Okay.  Let me back up.  We've been
25    talking about Takeover, and that's Takeover

Page 27

1    Industries, Incorporated; correct?
2    A    Could you repeat that?
3    Q    We've been using the name Takeover.
4    The full name of the company is Takeover
5    Industries, Incorporated; correct?
6    A    Correct.
7    Q    And can you generally describe who
8    started Takeover and when did they start it?
9    A    Did you ask who started Takeover?
10    Q    Yeah.
11    A    Takeover was started by myself, Mike
12    Holley and Toby McBride.
13    Q    And when did you start it?
14    A    I would say approximately January of
15    2021.
16    Q    And what was the genesis of this
17    company?  What led you guys to create it?
18    A    We had worked in the beverage industry
19    prior, and so we decided to create a beverage
20    company.
21    Q    And there's a brand underneath it
22    called NXT LVL; correct?  N-X-T, L-V-L?
23    A    Yeah, correct.
24    Q    What products were sold under the brand
25    name NXT LVL?

Page 28

1    A    There was a hydrogen water and then
2    also a gamer shot, which was like a two-ounce
3    energy shot.
4    Q    Did it have a specific name?
5    A    Yes, it had the name Gamer Shot.
6    Q    Anything else that was sold under the
7    brand name NXT LVL?
8    A    Those were the only two products.
9    Q    Are any products still being sold under
10    the brand name NXT LVL?
11    A    No, not to my knowledge.
12    Q    When was the last time you're aware of
13    products being sold under the brand name NXT LVL
14    having been sold?
15    A    I would estimate probably — maybe Q4
16    2022, October 2022.
17    Q    Does Takeover have any employees
18    today?
19    A    I'm not sure.
20    Q    When was the last time you were aware
21    of Takeover having employees?
22    A    Probably around that time when — the
23    end of 2022, when Jason Tucker was still involved
24    and the two sales guys.
25    Q    Other than Mr. Tucker and the two sales

Page 29

1    guys, were you aware of anyone else being an
2    actual employee of Takeover?
3    A    I'm not sure if they — I don't know
4    what their official status was, but there was
5    another individual by the name of Kerby, who was
6    a social media orchestrator, and then, also, I
7    believe Jason's wife and another consultant, Joe
8    Bel Bruno, all of which were worked with and
9    managed by Jason.  I had limited involvement with
10    any of them.
11    Q    Do you know how to spell Bel Bruno?
12    A    I can try.  B-e-l, B-r-u-n-o.
13    Q    And what was Kerby's last name, the
14    social media guy?
15    A    Fortner, F-o-r-t-n-e-r.
16    Q    Other than the people you just
17    mentioned, are you aware of Takeover ever having
18    any other employees?
19    A    Not that I can recall right now.
20    Q    Are you currently an officer of
21    Takeover?
22         (Brief pause.)
23         Did you hear my question or are you
24    thinking about it?
25    A    My — can you please repeat that?

Joseph F. Pavlik
August 20, 2024

```
                                        Page 30
1     You're breaking up a little bit.
2         Q    Are you an officer of Takeover today?
3         A    No.
4         Q    Are you a director of Takeover today?
5         A    I do not believe -- I may still be.  I
6     don't know what the status is officially.
7         Q    Do you know anyone who is an officer or
8     director of Takeover today?
9         A    I'm not sure of the official status.
10        Q    You were at one point an officer or
11    director of Takeover; correct?
12        A    At one point, yes.
13        Q    When?
14        A    During 2021.  From the beginning -- say
15    from March of 2021, until -- I'd say September
16    2021, when I resigned.
17        Q    After September 2021, were you ever an
18    officer or director again?
19        A    I was not an officer.  May have still
20    been a director, but, again, I was frozen out of
21    a lot of all that communication.
22        Q    What was your position in September of
23    2021, before you resigned it?
24        A    I was the CEO of LTNC.
25        Q    CEO of LTNC?
```

```
                                        Page 31
1         A    Correct.  Or let's say chief science
2     officer of Takeover.
3         Q    What's LTNC?
4         A    It's the parent company.  But if you're
5     referring to Takeover, my title, I guess, was
6     chief science officer.
7         Q    All right.  So you said you resigned
8     your position from Takeover in September of 2021;
9     correct?
10        A    Correct.
11        Q    So as of, let's say, August 2021, what
12    titles did you hold at Takeover?
13        A    Chief science officer.
14        Q    And were you a board member at that
15    time?
16        A    I was a board member at that time.
17        Q    Did you hold any particular position on
18    the board?
19        A    No.  I think I was just on the board.
20        Q    And why did you resign in September
21    2021, from Takeover?
22        A    Because of the harassment that I was
23    receiving from Jason Tucker.  And --
24        Q    What do you mean by "harassment"?
25        A    Pardon?
```

```
                                        Page 32
1         Q    What do you mean by "harassment"?
2         A    Just general being forced to do things
3     that I didn't want to do, sign documents and
4     agreements, and just -- it was just a -- not a
5     good situation.  Conflict of business ethics.
6         Q    When you say "forced," was he
7     physically forcing you?
8         A    No.  Verbally forcing, verbally
9     harassing, making threats.
10        Q    Was he in the same room when he made
11    these threats?
12        A    No.  He was typically hiding out in
13    Mexico.
14        Q    So you resigned because of harassment
15    and threats over the internet from Mr. Tucker?
16        A    Correct.
17        Q    When --
18        A    And I just --
19        Q    Go ahead.  Go ahead.
20        A    No, I just -- I -- it just was a
21    situation I just -- the energy of -- and the
22    overall, you know, demeanor and, you know,
23    attitude was just not something that I wanted to
24    be part of.
25        Q    But you maintained an officer position
```

```
                                        Page 33
1     after September 2021, at Takeover; correct?
2         A    Yes.
3         Q    When did you stop being an officer of
4     Takeover?
5         A    I would probably say -- probably around
6     the time that -- maybe summer of 2022.
7         Q    Were you compensated for your position
8     as an officer of Takeover?
9         A    For a period of time, yes.
10        Q    How much?
11        A    It would range from -- I think at the
12    time when Mr. Deppoleto came in, my compensation
13    was minimal.  It was around 3,750 a month.
14        Q    And what time frame is this?
15        A    May, June, July -- I would say May,
16    June, July, August, September of 2022.  And then
17    --
18        Q    So this is after you resigned your
19    position because of the harassment; correct?
20        A    Yeah.  But that was the year prior, in
21    2021.
22        Q    Right.  You -- I'm saying you were
23    compensated the 3,750 a month even after you
24    resigned because of the harassment you were
25    describing; correct?
```

Joseph F. Pavlik
August 20, 2024

Page 34

1    A.    No.  That's not correct.  I was --
2    they -- Jason Tucker reached back out to me in
3    January of 2023 [sic], after there was a
4    situation where he made the attempt to sideline
5    Mike Holley.  He asked me to come back in and
6    help the company because the company needed help
7    at that time, and that was in January of 2022.
8    Q.    So you said a lot of different dates
9    here.  I want to make sure we get the record
10   straight.
11         You told me that you resigned in
12   September 2021 because of the harassment over the
13   internet from Mr. Tucker; correct?
14   A.    Well, not over the internet.  It was --
15   you know, directly with phone calls and
16   communication.  But that was in September of
17   2021.  And then I was asked to rejoin the company
18   after Mike Holley had been taken out in January
19   of 2022.
20   Q.    Okay.  And then after you rejoined, you
21   were compensated at that 3,750 a month in the May
22   through September 2022 time frame; correct?
23   A.    Correct.
24   Q.    Okay.  What other compensation did you
25   receive for being an officer or director of

Page 35

1    Takeover?
2    A.    No other compensation.
3    Q.    Who was on the board of Takeover from
4    September 2021 through December 2021 -- December
5    31, 2021, I'll say?
6    A.    During that year, I'd -- I would say,
7    to my understanding -- and I'm not sure if this
8    is accurate.  I know myself, Toby McBride, Mike
9    Holley.  I believe we were the three on the
10   board.  Can't -- Jason may have been on the
11   board.  I'm not sure what happened there.
12   Q.    You sound like you're having a little
13   bit of trouble remembering, and I'm not faulting
14   you for it, but would you defer to the corporate
15   record book to say who exactly was on the board
16   at what time --
17   A.    Yeah, that -- that would probably give
18   the most accurate reading.  And the reason I
19   can't exactly recall is because there was so many
20   people coming on and off.  I really wasn't, you
21   know, keeping track.
22   Q.    Okay.
23   A.    But I'm sure the --
24   Q.    Now, you mentioned --
25   A.    -- accurate.

Page 36

1    Q.    I'm sorry, what?
2    A.    I said I'm sure the corporate record
3    book would be the best reference versus my
4    recollection.
5    Q.    Okay.  Now, you mentioned LINC, which
6    you said was the parent company for Takeover;
7    correct?
8    A.    Correct.
9    Q.    And that's -- stands for Labor SMART?
10   That's the name of LINC?
11   A.    Right.
12   Q.    And generally speaking, what is Labor
13   SMART?
14   A.    It's a labor contraction -- contracting
15   company.
16   Q.    Can you say little more about that?
17   A.    That's about all I can really say.
18   Q.    You were the CEO of Labor SMART at some
19   point, weren't you?
20   A.    Correct.
21   Q.    How long did you hold the CEO position
22   of Labor SMART?
23   A.    From what I had mentioned earlier,
24   probably six months, March through September.
25   Q.    Of what year?

Page 37

1    A.    2021.
2    Q.    Why did you hold the CEO position in
3    March through September of 2021 of Labor SMART?
4    A.    Because at the time I was -- felt --
5    everybody involved felt that it was best that I
6    took that position until someone else could step
7    in to handle that role.
8    Q.    To your knowledge, who started Labor
9    SMART?
10   A.    Ryan Schadel.
11   Q.    Schadel is S-c-h-a-d-e-l; is that
12   right?
13   A.    I believe so.
14   Q.    And when did he start it?  Do you
15   know?
16   A.    That, I don't know.  I could estimate
17   maybe 2013, 2014 time frame, but I'm not sure.
18   Q.    Where was Mr. Schadel in this March
19   through September 2021 time frame that you were
20   the CEO?
21   A.    Where was he physically?
22   Q.    No.  Where was he in relation with the
23   company?
24   A.    He had stepped down.
25   Q.    Why did he step down?

Joseph F. Pavlik
August 20, 2024

Page 38

1    A    Because we were essentially taken over
2    by -- we were taken over by the -- you know, we
3    essentially took over the company, so he really
4    didn't have -- I think he continued to manage the
5    labor business, but wasn't really involved with
6    our side of the business.
7    Q    And what do you mean by "we" took it
8    over?  When you say "we" took over Labor SMART,
9    what do you mean by that?
10   A    Well, the Takeover company, the
11   beverage company, essentially, was the first --
12   you know, the company that was involved with
13   Labor SMART.  So I guess it was like a
14   subsidiary.
15   Q    I'm not sure I'm tracking here.  So my
16   understanding from what you said before was that
17   Labor SMART was the parent; Takeover was a
18   subsidiary.  Is that what you told me earlier?
19   A    I believe so.
20   Q    Okay.  And usually the subsidiary is
21   subservient to the parent company.  So why
22   what did you mean by Takeover took over Labor
23   SMART?
24   A    I'm not sure.  I'm not quite sure I'm
25   understanding what you're asking me.

Page 39

1    Q    Well, let's try this way:  So you
2    said -- I asked you where Mr. Schadel was with
3    regard to Labor SMART in the March through
4    September 2021 time frame when you were the CEO
5    of Labor SMART.  And you told me there wasn't
6    really anything for him to do.
7    Do you remember telling me that two
8    minutes ago?
9    A    Yeah.
10   Q    Okay.  So why was there nothing for him
11   to do with regard to Labor SMART, which was the
12   parent company?
13   A    Well, I meant -- you were referencing
14   Takeover, so I thought you were talking about
15   Takeover.  So there was really nothing much for
16   him to do there, but he was still, I believe,
17   running the labor division.
18   Q    So I want to make sure I understand.
19   You were the CEO of Labor SMART, not Takeover;
20   correct?
21   A    Correct.
22   Q    Okay.  And so as the CEO of Labor
23   SMART, you were overseeing the whole company of
24   Labor SMART; correct?
25   A    Very high level.

Page 40

1    Q    Okay.  Why was Mr. Schadel not the CEO
2    in March through September of 2021 of Labor
3    SMART?
4    MR. SEXTON:  Object to form.
5    A    I believe Ryan resigned.  I mean, I --
6    you'd have to check the actual records.  I'm not
7    sure.
8    BY MR. HARVEY:
9    Q    Did Mr. Schadel have anything to do
10   with Takeover?
11   A    In what capacity?
12   Q    Any capacity.
13   A    I'd say no.
14   Q    When did Takeover and Labor SMART start
15   doing business together?  You told me you started
16   Takeover in around January 2021; correct?
17   A    Correct.
18   Q    When and how did Labor SMART and
19   Takeover come to be involved with each other at
20   all after that?
21   A    Takeover was introduced to Labor SMART,
22   Ryan Schadel, by another colleague by the name of
23   Jim Janis, and then that's how the relationship
24   started.
25   Q    And did Labor SMART purchase

Page 41

1    Takeover?
2    A    Yes, I believe Labor SMART purchased
3    Takeover.
4    Q    When was that?
5    A    I believe it was around March of
6    2021.
7    Q    How much did it pay?
8    A    I believe it was 6 billion shares.
9    Q    Of Labor SMART?
10   A    Of Labor SMART, I believe.
11   Q    And you and Mr. McBride and Mr. Holley
12   were the owners of Takeover at that time;
13   correct?
14   A    Correct.
15   Q    So did you each get 2 million -- or 2
16   billion shares?
17   A    We did.
18   Q    Do you still have those shares?
19   A    No, I don't.
20   Q    When did you get rid of them?
21   A    Well, unfortunately, they were extorted
22   from me by Jason Tucker.
23   Q    What do you mean by "extorted"?
24   A    I was harassed continually.  There was
25   a period of time when he was supposedly supposed

Joseph F. Pavlik
August 20, 2024

Page 42

1    to be getting the financials of the company done.
2    He said that he had oversold shares to investors.
3    He needed me to loan the shares back to the
4    company, and they would then be returned to me,
5    which they never were.  And he had never been
6    even working on the financials, so I was extorted
7    and conned out of 1.85 billion shares.
8        Q    When was this?
9        A    That was in May of 2022.
10       Q    And you said 1.85 billion, but you
11   initially got 2 billion.  What happened to the
12   rest of them?
13       A    I retained those.
14       Q    So you still have those today?
15       A    Yes.
16            And that was also partially the reason
17   why I resigned in September of 2021 because of
18   just continual harassments like that.  And then
19   that actual incident happened right before
20   Mr. Deppoleto came involved with the company.
21       Q    And you said you "resigned."  Are you
22   talking about resigning from Labor SMART?
23       A    Correct.
24       Q    Who introduced you to Labor SMART?  Was
25   it Jim Janis introduced you or did he introduce

Page 43

1    Mr. Schadel with somebody else?
2        A    Jim Janis introduced -- he introduced
3    us to Ryan Schadel.
4        Q    All three of you?
5        A    Yes --
6        Q    Mr. McBride, Mr. Bolley and yourself?
7        A    Correct.
8        Q    And how was that introduction made?
9    Was it in person, via the Internet?
10       A    Probably through -- I think through a
11   conference call.
12       Q    What was your compensation as CEO of
13   Labor SMART?
14       A    I want to say like $5,000 a month.
15       Q    Have you worked for Labor SMART in any
16   capacity since September 2022?
17       A    No.
18       Q    Other than CEO of Labor SMART, did you
19   hold any other positions at Labor SMART?
20       A    No.
21       Q    And Mr. Tucker, this whole time you
22   were talking about him in relation to Labor
23   SMART, did he have a position at Labor SMART?
24       A    No.  I don't believe so.
25       Q    And so when you were talking about him

Page 44

1    doing the books for Labor SMART, he was doing
2    that as an unaffiliated party with Labor SMART?
3        A    He -- I believe he was doing that as
4    the president of -- he may have been the
5    president of Labor SMART; he may have been the
6    president of Takeover, but he was doing it.
7        Q    You don't know one way or another?
8        A    He was always changing titles and
9    names, and everything was always just a -- kind
10   of a blur, so, yeah, I really don't know exactly.
11   I mean, he -- I think he was a director and
12   president of Takeover Industries.  That was the
13   title that he gave himself.
14            So at that time, he was assisting or
15   trying to assist or complete the financials that
16   the company needed and was operating, you know,
17   on his own with that.
18       Q    Is Labor SMART the majority shareholder
19   of Takeover?
20       A    I'm not sure.
21       Q    Who would be the best person to answer
22   that question?
23       A    Maybe Mike Bolley.
24       Q    Does Takeover still hold board of
25   director meetings?

Page 45

1        A    No.  All -- all of the Takeover
2    meetings, to my understanding, were stopped in
3    May of -- May and June of 2022, when
4    Mr. Deppoleto became involved with the company
5    and began communicating with Jason Tucker.
6    That's when everything went dark, went silent and
7    everything got frozen out.
8            So I don't have any knowledge of
9    anything that had happened after that, until near
10   the end of the year when we found out there was
11   all these private meetings being held without,
12   you know, no other knowledge.  And at that time,
13   there was no -- everything was being done top
14   secret, and that was when all those other
15   decisions were made to do Dollar General and so
16   on and so forth.
17       Q    Now, you were telling me a little bit
18   about your role with Next Gen Beverages, and you
19   said you created formulas and helped with
20   marketing, things of that nature; correct?
21       A    Correct.
22       Q    Did you have a formal title of any sort
23   with Next Gen Beverages?
24       A    No.  I never took a formal title.
25       Q    Were you ever an officer, director,

Joseph F. Pavlik
August 20, 2024

Page 46

1  member of Next Gen Beverages?
2      A.   No, not to my knowledge.  Like many
3  volunteers, I was just helping out.
4      Q.   And you told me you received 300
5  million shares of Next Gen Beverages; correct?
6      A.   Correct.
7      Q.   Other than those shares, have you
8  received any compensation in any form whatsoever
9  from Next Gen Beverages?
10      A.   No compensation.
11      Q.   Do you still have the 300 million
12  dollar — or 300 million shares?
13      A.   Yes.
14      Q.   To your knowledge, how many shares are
15  outstanding in Next Gen Beverages?
16      A.   I don't know.
17      Q.   Who are the current officers of Next
18  Gen Beverages?
19      A.   I believe we have Tom Zarro as the
20  interim CEO, Mike Bolley as the COO.
21      Q.   Any other officers you're aware of?
22      A.   Not that I'm aware of.
23      Q.   How about directors, who are Next Gen
24  Beverages directors?
25      A.   I believe probably Tom and Mike, but

Page 47

1  I'm not sure who exactly are all the directors at
2  this point.
3      Q.   And you're certain you've never been a
4  director for Next Gen Beverages?
5      A.   Yeah, never been a director.
6      Q.   How long has Tom Zarro been the interim
7  CEO of Next Gen Beverages?
8      A.   Since the inception.
9      Q.   Which was when?
10      A.   I'm not sure the exact date.
11      Q.   Ballpark's fine.
12      A.   Say May or June of 2023.
13      Q.   So Next Gen Beverages was created while
14  this lawsuit was pending; correct?
15      A.   Which lawsuit?
16      Q.   The Nevada that we're here —
17      A.   I know there's been — there's been a
18  number of lawsuits.  Unfortunately, that's what
19  Jason Tucker did.  He just — he lived in
20  creating litigation and all these lawsuits.  So
21  which lawsuit are we talking about?
22      Q.   The Nevada lawsuit that we're here
23  taking your deposition in today.
24      A.   Oh, okay.  I believe so.
25      Q.   And it was after the Arizona lawsuit

Page 48

1  was pending, too; correct?
2      A.   I'm not sure.
3      Q.   You're aware the Arizona lawsuit was
4  started before the Nevada lawsuit; correct?
5      A.   Correct.
6      Q.   What's Next Gen Beverages relationship
7  to Takeover?
8      A.   Completely new, separate company that
9  had to be formed because there was nothing left
10  of Takeover.  So it's a completely new, separate
11  company.
12      Q.   But Mike Bolley is the COO; correct?
13      A.   I believe so.
14      Q.   And you created formulas for Takeover;
15  correct?
16      A.   I created formulas for Takeover.  And
17  then I also created formulas for the new company
18  being Next Gen.
19      Q.   Are they the same formulas?
20      A.   No.  Totally different formulas.
21      Q.   What's different about them?
22      A.   Ingredients, ratios of ingredients,
23  flavor systems and different types of products.
24      Q.   What products does Next Gen make?
25      A.   Next Gen makes a hydrogen water and —

Page 49

1      Q.   Takeover makes a hydrogen water, too;
2  correct?
3      A.   Yes, they did.
4           (Reporter clarification.)
5      MR. HARVEY:  Takeover makes a hydrogen
6  water, too; correct?  And he said, "Yes, they
7  did."
8      A.   Well, yeah.  Takeover had made a
9  hydrogen water, but then that was terminated
10  because Jason, as I had mentioned, through
11  litigation and — and basically destroyed the
12  relationship with that manufacturer, where they
13  no longer wanted to work with Takeover.
14  BY MR. HARVEY:
15      Q.   So other than hydrogen water, what
16  other products does Next Gen make?
17      A.   Next Gen makes Nootropic drink, an
18  alkaline water —
19      Q.   Well —
20      A.   I'm sorry, what was that?
21      Q.   How do you spell Nootropic?
22      A.   N, double o, t-r-o-p-i-c.
23      Q.   And what was the other one you said?
24      A.   A Nootropic coffee.
25      Q.   Any other products?

Joseph F. Pavlik
August 20, 2024

Page 50

1    A.   And an alkaline water.
2    Q.   Does it make Gamer Shots?
3    A.   It does not make Gamer Shots.
4    Q.   Anything that resembles a Gamer Shot?
5    A.   Nothing that resembles a Gamer Shot.
6    Q.   Any two-ounce energy drinks?
7    A.   No two-ounce energy drinks.
8    Q.   How did Next Gen Beverages obtain its
9    startup capital?
10   A.   That, I'm not sure.  But I know it
11   was -- there was new capital that came into the
12   company.
13   Q.   How do you know that?
14   A.   Because from what I recall, there was
15   either -- it was either self -- it was either
16   funded by someone -- somebody new that came in.
17   I'm not sure exactly where it came from, but it
18   was new products, new company, new money,
19   everything was new.
20        And to mention Gamer Shot, it's kind of
21   important.  That was a formula that I did for
22   Takeover, the original Takeover company, and that
23   was sort of the demise of the company because the
24   product did so well, and there was so much greed
25   from Jason Tucker with how well that product was

Page 51

1    doing.
2         That is where he then formed a
3    coalition with James Deppoleto.  They separated
4    the company.  And then I come to find out in late
5    November, December of 2022, that they had a
6    private meeting representing Takeover without my
7    knowledge or consent and was trying to cut a deal
8    with 5-Hour Energy to license Gamer Shot to them.
9         So this is the type of stuff that was
10   going on without my knowledge and why I was
11   frozen out during that time.  And so with that, I
12   said -- you know, at one point when we were going
13   dealing with this negotiation, I said, let them
14   have the Gamer Shot, like we just need to move on
15   and save the new company for all the
16   shareholders.
17        So, you know, they had the Gamer Shot,
18   and, you know, I don't know -- to my
19   understanding, they are still trying to do
20   something with it.
21   Q.   The new money for Next Gen Beverages,
22   who did it come from?
23   A.   That, I don't know --.
24        MR. SEXTON:  Object to form.
25        (Reporter clarification.)

Page 52

1    BY MR. HARVEY:
2    Q.   You don't have any idea?
3    A.   No, I don't, but I know it -- I can't
4    answer exactly where it came from.  I don't know.
5    Q.   What's your best guess?
6    A.   Probably from a private investor, if I
7    had to guess.
8    Q.   Who is that?
9    A.   I don't --
10        MR. SEXTON:  Object to form.
11   BY MR. HARVEY:
12   Q.   I didn't hear you.  I'm sorry, what?
13   A.   I don't know.
14   Q.   You never had any discussions with
15   Mr. Holley, Mr. Zarro, anyone about where the
16   money was coming from for this new company?
17   A.   No.  I was just focused on what I had
18   to do to create new formulas to get the new
19   company up and running, to save the investment
20   for the 50,000 shareholders that were, you know,
21   done wrong by the actions of Jason Tucker and
22   Mr. Deppoleto with what they did with Takeover,
23   the first company, and NXT LVL.
24        Not to mention, NXT LVL trademark was
25   set up for failure as well because Jason didn't

Page 53

1    do that -- those filings properly.  So I know
2    it's -- these are just the things that it's just
3    a shame of what happened and what they did to
4    that company because it could have been a great
5    company.
6    Q.   You said for the investors.  What
7    investors are you talking about?
8    A.   The shareholders, let's say.
9    Q.   What shareholders?
10   A.   The shareholders of the public company.
11   Q.   Which public company?
12   A.   The one that we're in discussion of.
13   Q.   Well, we talked about three separate
14   companies.  Which one are you talking about?
15   A.   Well, we're talking about LTNC.
16   Q.   Okay.  So you thought you had some sort
17   of obligation within the Next Gen Beverages
18   company to make good on the investments that
19   investors made in labor SMART?
20   A.   I'm not quite sure I'm understanding
21   what you're asking.
22   Q.   Well, that's why I'm asking.  I'm not
23   following you either.
24        You said -- I asked where the money
25   came from for Next Gen Beverages, and you said

Joseph F. Pavlik
August 20, 2024

Page 54

1  for the investors. And I said which investors,
2  and you said labor SMART.
3      A   Oh, okay. I — maybe — I meant to say
4  shareholders, but I don't know where the
5  investment came from.
6      Q   So why would shareholders in labor
7  SMART, why would you owe them an obligation
8  within Next Gen?
9      A   Because they put faith in the company,
10  and people did the company wrong.
11     Q   Put faith in labor SMART; correct?
12     A   Yes.
13     Q   Does Labor SMART own Next Gen?
14     A   Labor SMART does own Next Gen, I
15  believe.
16     And there's no functional difference
17  between Next Gen and Takeover because both are
18  owned by labor SMART; correct?
19     MR. SEXTON:  Object as to form.
20     A   It's wholly-owned by Labor SMART, but
21  the functional difference would be that Takeover
22  was essentially run into the background and left
23  for dead, as I had said. There was nothing left.
24  The trademark was gone. They stole the Gamer
25  Shot. They destroyed the relationship with

Page 55

1  H2Forlife, which was making our hydrogen water,
2  so they literally destroyed the company.
3     And the reason that starting the new
4  company to save the investment for the 50,000
5  shareholders was because the intention of Jason
6  and James Deppoleto was to take the company
7  private and run this deal that they were going to
8  do with 5-Hour Energy, which we found out about.
9     And so that was where it was like —
10  all 50,000 shares, if they would have taken that
11  company private, all those people would have been
12  left stranded. So it was just a terrible thing.
13  So I felt an obligation, like many of the
14  volunteers, to put forth the effort to save the
15  company for the shareholders.
16     And that has been, you know, the mantra
17  and the consensus because after all this
18  information has come out, you can't deny the —
19  you know, the facts and the truth of it.
20     And I was really appalled when I saw
21  the correspondence between Jason and Deppoleto
22  and 5-Hour Energy, Living Essentials. It was
23  hurtful because I thought I had, you know, a
24  great relationship. You know, I thought I did a
25  great job with that product, and, you know, they

Page 56

1  tried to hijack it and essentially take the
2  company in private.
3     So that was really the reason why the
4  new company was formed to then save it for the
5  shareholders.
6  BY MR. HARVEY:
7     Q   So you and others stopped using your
8  best efforts for Takeover and, instead, applied
9  those best efforts to Next Gen; correct?
10     MR. SEXTON:  Object to form.
11     A   Well, that's — that's not correct
12  because all efforts were put forth to save
13  Takeover, but it could not be saved after —
14  BY MR. HARVEY:
15     Q   Well, you stopped working for Takeover,
16  though, didn't you?
17     A   I was essentially let go. I was told I
18  was no longer needed.
19     Q   And in the middle of this lawsuit, you
20  started, along with others, Next Gen and applied
21  all your best efforts to Next Gen; correct?
22     A   No. That's not the case. There was —
23     Q   I just asked about it —
24     A   — we tried — everything was tried to
25  save Takeover, but it — between Jason Tucker and

Page 57

1  what was happening, the — there was nothing
2  left. The trademarks were gone. The
3  relationship with Faith Springs and the hydrogen
4  water was gone. They had stolen the Gamer Shot.
5  They raped and pillaged the company. There was
6  nothing left that could be saved. There was
7  nothing there.
8     Q   You said Next Gen was started in May or
9  June of 2023; correct?
10     A   I believe so. That's correct.
11     Q   In July of 2023, while this lawsuit was
12  pending, how many hours did you put forth trying
13  to save Takeover?
14     A   In July of 2023? I —
15     Q   Yes.
16     A   I was on countless hours of phones
17  calls with these negotiations, but, you know,
18  prior to that, there was — all efforts were put
19  forth. There was nothing that could be done, you
20  know, between, you know, the damage that Jason
21  had done, you know, with the —
22     Q   That's not my question.
23     My question was, in July 2023, you put
24  forth no effort to try and save Takeover;
25  correct?

Joseph F. Pavlik
August 20, 2024

Page 58

1    A    Well, the company was already done at
2    that point.  The company was completely trashed.
3    I mean, I'd say probably at the end of 2022.
4        Q    So the answer to my question is yes;
5    true?
6        A    The answer is yes to what?
7        Q    In July 2023, you put forth no effort
8    to try and save Takeover; correct?
9        A    Because it couldn't be saved.  That
10   would be correct.  It was already -- it was done.
11   It was done by the end of 2022.  So it would have
12   been -- there was nothing that could be done at
13   that point.  It was already --
14       Q    Next Gen operates under the brand name
15   of LOCK'DIN; correct?
16       A    Could you repeat -- I missed that first
17   part.
18       Q    Next Gen operates under the brand name
19   LOCK'DIN, L-O-C-K, apostrophe, I-I-N; correct?
20       A    Correct.
21            And also, one other point to mention,
22   just to close out the prior question, is that I
23   believe Jason and Melissa, they stole the website
24   and they shut it down.  So they essentially --
25   the company was shut down -- literally.

Page 59

1            And I -- you know, to me, when I create
2    a product, I treat it like a child.  You know, I
3    always want to see it, you know, grow to its full
4    potential, but this was like child molestation,
5    rape.  I mean, everything that happened.  It was
6    just a tragedy --
7        Q    Takeover transferred assets to Next
8    Gen, didn't they?
9        A    No, I don't believe so.
10       Q    Why do you say you don't believe so?
11       A    Because there was no assets to be
12   transferred.  Everything was destroyed.  The only
13   assets were the trademark, which was destroyed,
14   the Amazon store, which was shut down and stolen
15   by Melissa Tucker, the Gamer Shot they stole, and
16   the hydrogen water, they destroyed the
17   relationship with the manufacturer by putting a
18   lawsuit on them.  So there was literally no
19   assets.
20       Q    Takeover transferred trade secrets to
21   Next Gen, didn't they?
22       A    No.  There was no trade secrets to be
23   transferred.  What trade secrets were
24   transferred?
25       Q    Formulas, for instance.

Page 60

1        A    No.  There was no formulas transferred.
2    Every -- they stole the Gamer Shot formula, and I
3    said they could have it.  And I may have not been
4    on a lot of those legal calls that you were on,
5    but I had given my blessing to say, look, if they
6    want to steal the Gamer Shot and take it.  They
7    want to go start Gamer Shots, they could go and
8    do it.  Let us just move on and -- and build a
9    company.
10       Q    Did Next Gen enter an agreement with
11   Manny Pacquaio?
12       A    I'm not sure what the agreement was.
13       Q    You're aware of an agreement; you just
14   don't know the specifics?
15       A    Correct.  I think -- if I'm not -- I'm
16   not sure what exactly the exact arrangement
17   was.
18       Q    Was it a written agreement?
19       A    That, I don't know.
20       Q    Do you know the length of the
21   agreement?
22       A    No, I do not.  But I do know that he
23   was a creditor to Takeover and that Jason Tucker
24   signed a 1 million dollar agreement with him and
25   then refused to pay him, which caused the demise

Page 61

1    of that relationship as well.  So that was
2    another destroyed contact and resource and asset
3    that Takeover ruined -- or Jason Tucker ruined.
4        Q    And the purpose of the agreement with
5    Next Gen was so that Mr. Pacquaio would serve as
6    a brand ambassador for LOCK'DIN; correct?
7        A    I'm not sure exactly the nature of the
8    agreement.  The only agreement that I knew of
9    was, with Takeover, that he was, you know,
10   contracted to endorse the company at a million
11   dollars, and then he was not paid and that was
12   another lawsuit that came on Takeover to
13   basically shut the company down.
14            In addition to -- that's where -- I'm
15   sorry.  My cat's jumping up here.  Hang on one
16   second.
17            But, no, in addition to the Manny
18   lawsuit, there was the PFL lawsuit that Jason
19   signed a deal.  So there was like -- he committed
20   a multi-year agreement to the PFL, a multi-year
21   agreement to Manny and then refused to pay
22   anybody.
23            And that was where some of those
24   commitments that were made in the early going to
25   support the company were -- with Mr. Deppoleto

Joseph F. Pavlik
August 20, 2024

Page 62

1 were not followed through. And that's, you know,
2 most likely why they went the direction that they
3 went with 5-Hour and the Gamer Shot. So that was
4 in addition to losing the assets. There was more
5 debt and more lawsuits and more litigation that
6 the Takeover company was buried with thanks to
7 Jason Tucker.
8        And whether or not Mr. Deppolete knew
9 that Jason Tucker was doing this, I don't know,
10 but, I mean, if there's anybody to point the
11 finger at, it's him. He did the most damage.
12    Q    Is Manny Pacquaio featured on LOCK'DIN
13 products?
14    A    Yes. He is right now.
15    Q    Give me one second. I'm going to share
16 my screen with you here in a minute.
17        Well, actually, before I do that.
18 LOCK'DIN sold NXT LVL products on LOCK'DIN's
19 website; correct?
20    A    I don't believe so. I don't think
21 there was any product sold.
22    Q    Okay. I'm going to share my screen
23 with you here real quick. Let me know if you can
24 see it.
25        Are you able to see it? This is a June

Page 63

1 14, 2023, letter. Do you see that?
2    A    Okay. Yep. I see it.
3    Q    I'm going to scroll down.
4        Well, actually, have you ever seen this
5 letter before today?
6    A    I'm not sure --
7    Q    This letter dated June 14, 2023?
8    A    I can't recall if I've seen it before.
9    Q    Okay. Here's the LOCK'DIN website.
10 You recognize the LOCK'DIN website?
11    A    Yeah.
12    Q    And this a NXT LVL product; correct?
13    A    Yes, it is.
14    Q    And here's another one. T-Pain's NXT
15 LVL Gamer Shot; correct?
16    A    Yes, it is. Yeah, I believe -- when I
17 see that now, I think that may have been up there
18 for like a day or two, and then it was taken
19 down. And I think records were pulled, but there
20 was no sales even done of those products.
21 Because those were actually the inferior products
22 that Jason and Mike T. and Mike Z. decided to do
23 this with a downgraded formula that didn't sell.
24 And that's part of the reason why the product
25 didn't do well. And then it tanked.

Page 64

1        But, yeah, I do recall that now. That
2 was on the website for a day or two, but it
3 did -- I don't think there was even one unit
4 sold. And you could probably pull that data.
5    Q    Okay. So I asked you before if
6 Takeover transferred any assets to Next Gen, and
7 you said no. This changes your answer, though;
8 correct?
9    A    No. Because I don't really think it's
10 an asset. It might have been a liquidation sale.
11 I mean, I -- that, I don't know officially, but
12 it...
13    Q    Well, liquidation sale is still an
14 asset; correct?
15    A    Perhaps.
16    Q    Well, what's perhaps about it?
17    A    They were discontinued products. I
18 don't -- I mean, I don't know exactly what was
19 done and what was sold, but I just -- I wouldn't
20 consider it an asset. I'd consider that more of
21 a liability and a failed product.
22    Q    Okay. And we see on there that
23 LOCK'DIN was trying to sell the NXT LVL Gamer
24 Shots at a discount, too; correct?
25    A    Well, you know what? Nobody wanted

Page 65

1 those shots. That's why they were returned from
2 Dollar General. And so -- and I -- now that I'm
3 looking at that, I don't even think -- even when
4 those were being sold on the Takeover site, they
5 weren't selling. I would -- it'd probably -- I'd
6 like to see the sales report of that myself
7 because I bet you there was not one unit sold.
8    Q    Okay. But just looking at it, we see
9 the price is listed as 41.99; true?
10    A    Yeah.
11    Q    And it's listed --
12    A    And -- and couldn't give --
13    Q    -- $21; correct?
14        (Reporter clarification.)
15    A    Couldn't -- you couldn't give it away.
16 And I have to defend my formula because that was
17 not my formula. Those guys went and made it a
18 cheaper formula to do that deal, which I advised
19 against, and that's why the whole thing tanked,
20 so...
21        (Reporter clarification.)
22    MR. HARVEY:  Sure. I said we see
23 listed on the website the list price is 41.99.
24 BY MR. HARVEY:
25    Q    True, Mr. Pavlik?

Joseph F. Pavlik
August 20, 2024

Page 66

1     A    That's what it says there, yes.
2     Q    But it's actually being sold on the
3  LOCK'DIN website for $21; correct?
4     A    That's right.  Because I think at the
5  time there's still probably a warehouse filled
6  with all of those products because they did not
7  sell.  None of them sold because they made an
8  ineffective product.
9          Again, part of the reason why the
10 product failed, they decided to downgrade the
11 formula.  They didn't work.  It was like watered
12 down B vitamins with a little caffeine, so --
13    Q    And, sir, I'm trying to get you out of
14 here as quickly as possible today.  We'll go a
15 little bit better if we stick with my questions;
16 okay?
17    A    Oh, no problem.  Sure thing.  I'm just
18 trying to be helpful.
19    Q    Now, did LOCK'DIN pay Takeover for
20 these products?
21    A    I do not believe so.  I'm not sure.
22 That, I don't know.
23    Q    And you've promoted LOCK'DIN products
24 on your personal social media channels;
25 correct?

Page 67

1     A    Sure.  Yes, I have.
2     Q    When did you first meet Michael
3  Holley?
4     A    I met Michael Holley back in 2009.
5     Q    What were the circumstances?
6     A    We were working for -- they were
7  distributing a product for a company that I had
8  developed a Nootropic drink for back in 2009.
9     Q    Who is the "they" in that sentence?
10    A    It was a company called Body Well.
11    Q    Where were they based out of?
12    A    Sunrise, Florida.
13    Q    And you were selling or developing
14 product for Body Well?
15    A    Correct.
16    Q    When did you first -- well, did you
17 keep up with him through that entire 2009 through
18 2021 time frame?
19    A    No.
20    Q    When did you reconnect with him before
21 starting Takeover?
22    A    Probably, say, in 2018, 2019.
23    Q    When did you first meet Toby McBride?
24    A    At the same time.
25    Q    2018, 2019, or back when --

Page 68

1     A    No.  In 2009.  Same time as Mike
2  Holley.
3     Q    He was working for Body Well also?
4     A    Correct.
5     Q    Did you keep up with him the whole time
6  between 20 -- or 2009 and 2021?
7     A    No.  We reconnected around the same
8  time.
9     Q    What were the circumstances under which
10 you reconnected with those two?
11    A    I can't recall specifically.  I think
12 we met at a trade show.  And then there was
13 another opportunity for a company that I was
14 going to formulate a product for.  And since they
15 had the background in beverage distribution, we
16 connected on that, and that company was Ignite.
17 And so that's how we reconnected on that deal.
18    Q    When did you meet Tom Zarro for the
19 first time?
20    A    I met Tom Zarro for the first time -- I
21 would say maybe in March of 2023, maybe.
22    Q    What were the circumstances under which
23 you met Mr. Zarro in March 2023?
24    A    I met him while I was visit -- I was in
25 Vegas for a trade show.

Page 69

1     Q    And what was your understanding of his
2  background?
3     A    I knew that he was involved in sober
4  living homes out in Vegas, helping addicts in
5  recovery, which has been an area I've been
6  passionate about because I've had a number of
7  friends and family that have suffered from that,
8  so...
9     Q    And you said Mr. Schadel, your
10 understanding was, he started Labor SMART in
11 2013, thereabouts?
12    A    I'm not exactly sure the exact date.
13    Q    Mr. Janis introduced you to him,
14 though?
15    A    That's -- yes.  Correct.
16    Q    Was Mr. Schadel ever an employee,
17 agent, officer, director of Takeover?
18    A    I do not believe so.
19    Q    Was he ever an officer, agent,
20 employee, director of Next Gen?
21    A    I don't believe so.
22    Q    The Mike Tzanetatos -- is that how you
23 pronounce his name?
24    A    Something like that.
25    Q    Is it T-z-a-n-e-t-a-t-o-s?  Does that

Joseph F. Pavlik
August 20, 2024

Page 70

1  sound right?
2      A   That sounds right.
3      Q   Okay.  And you said he was an employee
4  of Takeover; correct?
5      A   I believe so.
6      Q   And, to your knowledge, was he just a
7  sales rep or did he hold other roles?
8      A   He originally was hired as the sales
9  rep, but then I believe he gravitated to other
10  roles under Jason Tucker, which involved product
11  development and formulation, which led to his
12  revision of my Gamer Shot formula to a reduced
13  version, which was one of the reasons why the
14  product failed miserably.
15          And he also was probably part of the
16  team that supported doing the Dollar General
17  deal, which also failed miserably.
18      Q   You've referenced the Dollar General
19  deal a couple times.  Can you explain a little
20  more about what happened there?
21      A   Yes.  There was an opportunity that I
22  believe Jason Tucker had, along with Mike
23  Costello and Mike Tzanetatos, that they wanted to
24  do a Gamer Shot for Dollar General.  And with
25  Takeover at the time being a premium brand, it

Page 71

1  did not make sense to go into a closeout store.
2          This discussion started in June of
3  2023, which once I expressed my, you know,
4  feeling that it was a horrible idea, I then was
5  frozen out of communication.  They continued to
6  move forward with the deal.  I believe they put
7  out close to a million dollars for the
8  reduced-cost version Gamer Shot product.
9          I believe that they -- and I found this
10  out after the fact, that Mr. Deppoleto was told
11  by Mike Costello and Tzanetatos to do these
12  displays for Dollar General, which was another,
13  you know, investment there, and also they spent
14  excessive amounts shipping product to Dollar
15  General, I believe 150,000.
16          And then there was still another 3
17  million that was due to Dollar General over the
18  course of 2 to 3 years based on the contract.  So
19  had that thing still went forward, Mr. Deppoleto
20  would have probably been in 5 to 7 million into
21  this deal because of what they decided to do with
22  the Dollar General deal.
23          So in reality, you know, I understand,
24  you know, the reason we're on this deposition now
25  is because Mr. Deppoleto is concerned about his

Page 72

1  investment.  But the truth is his investment was
2  poorly appropriated and allocated towards the
3  Dollar General deal, which, you know, if it was
4  1.5 or 2 million, I would say 90 percent of that
5  went to that deal and went to pay the people that
6  coerced that deal.
7          That's why I just -- it blows my mind
8  that I'm here on this deposition today when I --
9  this all could have been stopped, and truly,
10  those that are responsible for that debt are
11  those individuals:  Jason, Mike Costello, Mike
12  Tzanetatos and, for that matter, Mr. Deppoleto,
13  as a director having invested in the company and
14  then further allowing that to happen.  It was
15  just bad business, bad decision.
16      Q   What year did you say this was or what
17  time frame, this Dollar General deal --
18      A   This was -- this was between, I would
19  say, May 2022 and October 2022.
20          I recall meeting Mr. Deppoleto in May
21  of 2022, at a PFL event; had a great
22  conversation.  Told him who I am, what I did.
23  Got along great.  Shortly thereafter, he went
24  to -- he flew to Mexico to meet Jason Tucker, and
25  that was probably in end of May, June of 2022.

Page 73

1  And that's when Jason started whatever he started
2  with him, you know.  And then the next thing, you
3  know, they separated the company.  They brought
4  in Mike Tzanetatos, Mike Costello.
5          They started operating independently.
6  They wanted to do this Gamer Shot for Dollar
7  General.  Mike Tzanetatos thought he was going to
8  save the company money by doing a cheaper shot,
9  which they did, which we -- of course, as I
10  mentioned, backfired.  And --
11      Q   I think I got it.  Like I said, I'm
12  trying to get you out of here, so --
13      A   Oh, yeah.  No, I -- but I want to give
14  you the right information, too, so that you
15  understand really what happened.  Because, you
16  know, I -- these --
17      Q   Yeah, I --
18      A   -- are the facts where the investment
19  went.  So I just want to make sure I give you all
20  the information I have, you know.
21      Q   I got it.
22          So Mike Costello, he also worked at
23  Takeover; correct?
24      A   That's correct.
25      Q   Was his formal role there sales rep or

Joseph F. Pavlik
August 20, 2024

Page 74

1  did he have other roles?
2      A    Well, he was -- at first, he was just a
3  sales rep, but then I later found out that he
4  moved as -- he moved in as CEO.  And I believe,
5  if I'm not mistaken, he and Jason were the ones
6  that signed the letter notes from Mr. Deppoleto
7  that I was unaware of that were done until after
8  the fact.  So, again, further implicating Jason
9  Tucker and Costello for the misappropriation of
10  those funds towards Dollar General.
11      Q    When was he the CEO of Takeover?
12      A    I would want to say probably summer of
13  2022.
14      Q    And, again, you'd defer to the
15  corporate record books on that?
16      A    That would be best.
17      Q    Was Mr. Tzanetatos, was he ever an
18  employee, agent, officer or director of Next
19  Gen?
20      A    No.  After what he did to Takeover --
21      Q    No, that's fine.
22           Was Mr. Costello --
23      A    -- I -- I would have been -- I would
24  not have volunteered my services had he been
25  involved.

Page 75

1      Q    Was Mr. Costello ever an employee,
2  agent, officer or director of Next Gen?
3      A    No, sir.  Same thing:  I would not have
4  been involved or volunteered my services had
5  those individuals --
6      Q    Who is Maurice Salem?
7      A    What's that?
8      Q    Who is Maurice Salem?
9      A    I'm not sure.  I believe he's a -- is a
10  shareholder.
11      Q    Of?
12      A    Of LTNC.
13      Q    Labor SMART?
14      A    Correct.
15      Q    Have you ever met Mr. Salem?
16      A    Never met him.
17      Q    Ever spoken to him, even if you didn't
18  meet him face-to-face?
19      A    I may have been on a conference call
20  that he was on, but can't recall if I've actually
21  spoken directly to him.
22      Q    To your knowledge, was he ever an
23  employee, agent, officer or director of
24  Takeover?
25      A    Not to my knowledge.

Page 76

1      Q    Was he ever an employee, agent, officer
2  or director of Next Gen?
3      A    Not to my knowledge.
4      Q    And you said Kerby, and that's
5  K-e-r-b-y, not K-i-r-b-y; correct?
6      A    Correct.
7      Q    Kerby Fortner?
8      A    That's correct.
9      Q    And what was his role again at
10  Takeover?
11      A    He was like the gaming director, social
12  media manager.
13      Q    And he was paid in part with
14  investments that Mr. Deppoleto made; correct?
15      A    That, I'm not sure where his pay came
16  from.
17      Q    Was he ever an employee, agent, officer
18  or director of Next Gen?
19      A    No.  And he would go with the same
20  group as Costello and Tzanetatos because they all
21  conspired together.
22      Q    Well, there's been reference throughout
23  the lawsuit to a June 10, 2021, special meeting
24  of Takeovers board of directors.  Do you recall
25  attending that meeting?

Page 77

1      A    June 10th, 2021, can't recall.  It's
2  quite a while ago.
3      Q    Okay.  Do you remember being elected as
4  a director of Takeover at that meeting?
5      A    I don't recall, but if the records
6  state that that happened, then it happened.
7      Q    Okay.  And you'd defer to the records
8  in terms of what resolutions were passed at that
9  meeting; correct?
10      A    I would say so, correct.
11      Q    Did you have any involvement in
12  soliciting celebrity endorsements for Takeover?
13      A    No, not to my --
14      Q    So -- you had no communications with
15  T-Pain?
16      A    No.  That was a relationship that Jason
17  Tucker managed exclusively.
18      Q    How about Manny Pacquaio, did you have
19  communications with him?
20      A    No.  That was another one that Jason
21  Tucker did that.  I think it was a million
22  dollars, the Manny and like 900,000 to T-Pain
23  that he committed to for the company.
24      Q    Have you ever reviewed either T-Pain's
25  contract or Manny Pacquaio's contract with

Joseph F. Pavlik
August 20, 2024

Page 78

1  Takeover?
2      A   No.  I have not reviewed it.  And,
3  truthfully, with all of the contracts always
4  being changed and manipulated by Jason Tucker, I
5  don't -- I mean, it -- he tried to falsify
6  documents a number of times.  Company --
7      Q   Did you --
8      A   -- I wouldn't trust anything that he
9  did.
10     Q   Did you ever sign those contracts on
11  behalf of Takeover?
12     A   I don't believe so.
13     Q   Do you know when Manny Pacquaio's
14  contract was executed with Takeover?
15     A   I don't believe so.  I don't know.
16     Q   If I said April 27, 2021, does that
17  sound correct?
18     A   It could be within that time frame.
19  That was right after Jason came in.
20     Q   And you understood that the Manny
21  Pacquaio contract was an exclusive contract;
22  correct?
23     A   I'm not sure --
24     Q   Meaning --
25     A   -- what the details were.

Page 79

1      Q   Meaning you understood that
2  Mr. Pacquaio was agreeing to refrain from
3  promoting products that would compete with NXT
4  LVL; correct?
5      A   I don't have the contract in front of
6  me, but if it states that.
7      Q   Okay.  You're aware that McBride spent
8  Takeover money on personal expenses; correct?
9          MR. SEXTON:  Object to form.
10     A   No, I -- I have no problem answering
11  that.  Because I was on the phone calls with
12  Jason Tucker, and I'm not here to defend anyone's
13  spending habits, but I do know that he was given
14  authorization from Jason to use his company card
15  for his personal expenses.  And I just heard that
16  --
17  BY MR. HARVEY:
18     Q   So you --
19     A   -- I heard that side line from one of
20  their conversations.
21     Q   So you're aware that Mr. McBride used
22  Takeover funds for personal expenses; true?
23     A   Yeah.  I'm aware of that, just because
24  it was being discussed.
25     Q   And you're aware that Mr. McBride

Page 80

1  charged Takeover for shopping; correct?
2          MR. SEXTON:  Object to form.
3      A   I don't know exactly what he purchased,
4  but I know that was brought up at some point.
5  BY MR. HARVEY:
6      Q   You're aware that Mr. McBride used
7  Takeover money for personal travel; correct?
8      A   I'm not aware of that.  I mean, to my
9  understanding, it was Jason had told them to use
10  the company card, as long as he pays it back.
11  Whether he paid it back or not, I don't know.
12     Q   You're aware that Mr. McBride spent
13  over $250,000 of Takeover's funds for personal
14  expenses; correct?
15         MR. SEXTON:  Object to form.
16     A   Yeah.  That, I don't know.
17  BY MR. HARVEY:
18     Q   Okay.
19     A   Sounds excessive.
20     Q   I thought so too.
21         When did Mr. McBride use Takeover funds
22  for personal expenses?  When was the first
23  instance that you're aware of?
24     A   I don't know.
25     Q   When was the last time you're aware of

Page 81

1  Mr. McBride using Takeover funds for personal
2  expenses?
3      A   I don't know.  I really wasn't keeping
4  tabs on what he was doing, you know.
5      Q   You're aware that Takeover reprimanded
6  Mr. McBride for his use of Takeover funds for
7  personal expenses; correct?
8      A   Yes, I was aware of that.
9      Q   You were aware that Takeover placed
10  Mr. McBride on a leave of absence; correct?
11     A   Correct.
12     Q   For what time period was he placed on a
13  leave of absence?
14     A   To the best of my recollection, I would
15  say it was probably from maybe September of 2022,
16  until October or November of 2022.
17         And I believe the reason for that was
18  to keep him out from going to the NACS show
19  because that's when they had the meeting set with
20  5-Hour Energy, and they didn't want Toby at the
21  NACS show, so they could have that private
22  meeting.
23     Q   Mr. McBride voluntarily stepped down
24  from his position as a director at Takeover;
25  correct?

Joseph F. Pavlik
August 20, 2024

Page 82

1    A    I believe so.

2    Q    What time period?

3    A    I want to say that was maybe around the

4    same time frame.  September of 2022, maybe.  I

5    don't know exactly.  I don't know.

6    Q    And you're aware that Mr. Holley made

7    unauthorized distributions from Takeover, meaning

8    distributions without approval from Takeover's

9    board of directors; correct?

10   A    That, I don't know.  I was never on a

11   bank account.  Never had a company credit card.

12   I never was involved with the financials.

13   Q    Even if you didn't see the financials

14   directly, you're aware that Mr. Holley allowed

15   unauthorized distributions of over $750,000;

16   correct?

17   MR. SEXTON:  Object to form.

18   A    That's what's said, but I don't know if

19   that was what was proven.

20   THE REPORTER:  Sir, can we take a

21   few-minute break?  Been going about an hour and a

22   half now.

23   MR. HARVEY:  Oh, sure.  It's 4:35.

24   Come back at, what, 4:40?  Well, 4:35 my time,

25   I'm sorry.

Page 83

1    THE REPORTER:  Okay.  2 —

2    MR. HARVEY:  40 for you.

3    THE REPORTER:  Yeah.  Come back at —

4    yeah.  2:50?

5    MR. HARVEY:  Sure.

6    THE REPORTER:  Yeah, 10 minutes.

7    MR. HARVEY:  Okay.

8    THE VIDEOGRAPHER:  Counsel, are we

9    prepared to go off the record?

10   MR. HARVEY:  Yeah.

11   THE VIDEOGRAPHER:  Okay.  We are off

12   the record at 2:36 p.m.

13   (Break taken.)

14   THE VIDEOGRAPHER:  We're back on the

15   record at 2:51 p.m.

16   BY MR. HARVEY:

17   Q    Mr. Pavlik, you're aware Michael Holley

18   charged personal expenses to Takeover; correct?

19   MR. SEXTON:  Object to form.

20   A    I'm not aware of all of that, but what

21   I do know or recall is that those were dismissed

22   in the court case.  There was another court case,

23   I believe, I wasn't involved in, but I think that

24   was dismissed.

25   BY MR. HARVEY:

Page 84

1    Q    When did you become aware that

2    Mr. Holley charged personal expenses to

3    Takeover?

4    A    I don't know exactly when, but I just

5    know the result of the court case was that it

6    was — it was dismissed.

7    Q    Okay.  What was the dollar amount of

8    Mr. Holley's personal expenses that were charged

9    to Takeover?

10   A    That I don't know.

11   Q    I asked you before when you became

12   aware of.  Do you know the dates when Mr. Holley

13   actually charged personal expenses to Takeover?

14   A    I don't know the dates, but I was told

15   that that was all dismissed, I think, in one of

16   the court cases.

17   Q    Did Mr. Holley's family members make

18   personal purchases and charge them to Takeover?

19   A    Not that I'm aware of.

20   Q    What was the dollar amount that you

21   heard were charged for personal expenses?

22   A    I really don't know exactly.

23   Q    There was a December 21, 2021, Takeover

24   board meeting; correct?

25   A    December '21, correct.

Page 85

1    Q    And you attended it; correct?

2    A    This may have been — it may have been

3    a phone call board meeting at that time.  So I

4    believe I would have attended.

5    Q    Attended via phone?

6    A    Correct.

7    Q    And you were a board member in December

8    of 2021; correct?

9    A    I believe so.

10   Q    What was the purpose of that meeting?

11   A    I believe Jason Tucker called a meeting

12   to state that he had found some expenses that had

13   to be reported by Mike Holley —

14   Q    Did — did the board vote to remove

15   Mr. Holley from the Takeover board of directors

16   at that meeting?

17   A    The board did vote to do that, although

18   I originally said I wanted to speak to Mr. Holley

19   about this because it sounded excessive.  And at

20   that time — it may have been around 5 minutes to

21   5:00 — he said, no, there's no time for that;

22   you got to sign the DocuSign in your inbox and

23   take my word on this.  So that was what I did.

24   So I did agree to do it, but then after

25   finding out the facts, it turned out that that

Joseph F. Pavlik
August 20, 2024

Page 86

1   was not true.
2       Q.    You did ultimately vote in favor of
3   removing Mr. Holley from the Takeover board of
4   directors; correct?
5       A.    I was forced to do it -- even though I
6   was -- would have liked to have done some due
7   diligence prior.
8       Q.    You did ultimately vote to remove
9   Mr. Holley from the Takeover board of directors;
10  correct?
11      A.    Correct.
12      Q.    And was it a permanent removal or was
13  it temporary?
14      A.    I believe --
15      Q.    At that time, when you voted for it.
16      A.    I believe at that time -- I can't
17  recall if it was permanent or -- I think it may
18  have been temporary.
19      Q.    Okay.  I'm going to share my screen
20  with you again, Mr. Pavlik.
21            Are you able to see, "Resolution Board
22  of directors of Labor SMART, Inc."?
23      A.    What was the date of this?
24      Q.    If -- it was a couple dates on, but it
25  looks like it's a November 7, 2022, meeting.

Page 87

1       A.    Okay.  So --
2       Q.    Via conference call.
3       A.    -- it isn't the December meeting you
4   were just referring to.
5       Q.    No.  This is a different one.
6             Do you recognize this resolution of the
7   board of directors of Labor SMART?
8       A.    I mean, I -- it looks familiar.  I
9   mean, I've seen so many documents.  I -- I mean,
10  it's tough.  But, yeah, I mean, I'm looking at
11  it.
12      Q.    Okay.  And if we go to the last page,
13  is that your signature on the last page there?
14      A.    Doesn't look like my signature.
15      Q.    Does not look like your signature.  You
16  want me to --
17      A.    No.
18      Q.    -- zoom in a little?  You look like
19  you're --
20      A.    Sure.
21      Q.    -- straining.
22      A.    Yeah.  No, zoom it in a little bit.
23            Yeah, that doesn't look like my
24  signature.
25      Q.    Okay.

Page 88

1       A.    Jason forged a lot of signatures.
2       Q.    Okay.  Are you saying that you believe
3   Jason forged your signature on this?
4       A.    I'm not saying that.  I'm just saying
5   that it doesn't look like my signature.
6       Q.    Okay.  Now, in November 2022, this was
7   still in the COVID time frame, and I'm seeing a
8   reference, in fact, to COVID in this here.
9             Were you signing documents physically
10  in November 2022, or would this have been a time
11  you would have been signing electronically.
12      A.    Probably -- at that time, probably
13  electronically.
14      Q.    Okay.  Now, going back to this
15  signature page, does that like look that could
16  have been your electronic signature?
17      A.    Possibly, sure.
18      Q.    Okay.  And then next to your name, it
19  says, "Observer."  What does that mean?
20      A.    Not sure.  Maybe that I was -- that's a
21  good question.  I don't know.
22      Q.    Okay.  Right above it, it says, "In
23  witness whereof, the undersigned being two of the
24  three directors of company," and then it goes on.
25  Do you see that?

Page 89

1       A.    Okay.  Yeah.
2       Q.    So is it your understanding that --
3       A.    I do see it.
4       Q.    Was it your understanding that
5   Mr. McBride and Mr. Holley were both directors of
6   Labor SMART as of December 7, 2022?
7       A.    I -- if the records show that, then
8   yes.
9       Q.    Okay.  Well, it doesn't have "director"
10  next to your name.
11            Was it your understanding you were a
12  director of Labor SMART as of November 7, 2022 --
13      A.    I -- I had been resigned at that time,
14  I believe.
15      Q.    Okay.  Do you remember who called this
16  meeting?
17      A.    Had to be Jason Tucker.
18      Q.    Now, up in the top, it says on November
19  7, 2022, at 9:00 a.m. Mountain time you,
20  Mr. McBride and Mr. Holley appeared by conference
21  call.  Do you see any reference to Mr. Tucker in
22  that attendee of the meeting?
23      A.    No.  I -- you know, I don't.  May --
24  this -- you know, I'm confusing the one meeting
25  you just said that was December 2021.  Now, we're

Joseph F. Pavlik
August 20, 2024

Page 90

1  talking November 2nd, 2022.  So, no, this -- he
2  would not have called this meeting, no.  That --
3  the December 2021 meeting, Tucker would have
4  called.  This one, no.
5      Q.  Okay.  Did Mr. Holley call this
6  meeting?
7      A.  Probably, most likely, Mr. Holley
8  called it.
9      Q.  Okay.  Did it surprise you that
10  Mr. Holley was calling the meeting since he was
11  no longer on Takeover's board of directors at
12  this point?
13      A.  No.  It didn't surprise me, especially
14  after what was -- what transpired in October of
15  2022, at the NACS show with all of the fraudulent
16  activity with 5-Hour.
17      Q.  Okay.  So you attended a board meeting
18  that Mr. Holley called; correct?
19      A.  I believe so.  I --
20      Q.  Did you --
21      A.  -- can't recall exactly who called it,
22  but it would -- had to be either Toby or Mike.
23      Q.  Did you express concern to anyone about
24  Mr. Holley calling a board of directors
25  meeting?

Page 91

1      A.  I don't believe so.  I felt there was
2  probably more concern with Jason Tucker, which I
3  don't know why he's not involved in these
4  discussions.  He -- he's really the
5  one that we need to have in here, you know.
6      Q.  And at this meeting, did -- here, I'll
7  scroll down so you can see it.
8          At this meeting, did you purport to
9  vote to suspend Michael Costello from his role as
10  CEO of Labor SMART?
11      A.  I may have, yes.  And I think it was
12  because of what was happening with the NACS deal
13  and them hijacking and trying to do the 5-Hour
14  deal.
15      Q.  Going down further, we see there's a
16  provision that says, "Resolved, the planned
17  spinoff of Takeover, suspended for 90 days."  Do
18  you see that?
19      A.  I do see it.
20      Q.  What does "planned spinoff" refer to?
21      A.  I'm not sure.
22      Q.  Do you recall there being a planned
23  spinoff of Takeover being in the works as of
24  November 2022?
25      A.  I'm not sure.  I wasn't involved in lot

Page 92

1  of those discussions.  As you know, I was kind of
2  not involved in all those activities.
3      Q.  But you did sign this document at the
4  end as one of the three people to sign it;
5  correct?
6      A.  I believe I did.
7      Q.  And you wouldn't have signed it if
8  there was something in here that you disagreed
9  with; correct?
10      A.  Could you repeat that?
11      Q.  You would not have signed a document
12  where there was something in it where you didn't
13  agree with it; correct?
14      A.  That'd be correct.
15      Q.  Okay.  And this same provision that's
16  highlighted says that the company was going to
17  undertake a review of documents and information
18  concerning the transaction which has been
19  withheld by Jason Tucker; correct?
20      A.  Correct.
21      Q.  Did Labor SMART conduct a review of
22  documents and information concerning the
23  transaction?
24      A.  I'm not sure.
25      Q.  You're not sure if it happened?

Page 93

1      A.  Yeah.  I'm not sure if that was done.
2      Q.  It was a resolution, though, that was
3  supposed to happen; correct?
4      A.  If it says so.
5      Q.  Okay.
6      A.  But I'm not -- wasn't sure if you were
7  asking if it was proposed or if it was done.
8      Q.  I was asking if it was done initially,
9  and you said you weren't sure.  And I said but it
10  was resolved as something that was supposed to be
11  done; correct?
12      A.  Could you repeat that?  I'm not
13  connect --
14      Q.  Yeah.  It was on -- we were just -- I
15  can put it back up if you want.
16          That was in the provision that said
17  "Resolved."  The company was going to undertake a
18  review of documents and information concerning
19  the transaction.  That was something that was
20  supposed to happen; correct?
21      A.  Which transaction?
22      Q.  The planned spinoff of Takeover that
23  was resolved -- or discussed in that same
24  paragraph.
25      A.  Okay.  Yeah.  I'm not sure.

Joseph F. Pavlik
August 20, 2024

Page 94

1    Q    Okay.  I'm going to share my screen
2    with you again.  Give me one moment.
3    A    I mean, I wasn't a director, so I
4    wasn't really involved in a lot of these
5    conversations, you know.
6    Q    But you did sign it; correct?
7    A    I did sign it.
8    Q    Okay.  Got another document up.  Are
9    you able to see it?
10    A    Not that good.
11    Q    It says, "Written consent board of
12    directors of Takeover Industries;" correct?
13    A    Yeah.  Correct --
14    Q    Do you recognize this document?
15    A    Not -- no.  But, I mean, again, a lot
16    of the documents all do look the same, as I'm
17    sure you know.
18    Q    Let's go to the last page here, which
19    is page 3.
20         There's a signature line for you;
21    correct?
22    A    Correct.
23    Q    Is that your signature on the last
24    page?
25    A    It looks like my digital signature.

Page 95

1    Q    Okay.  And it says -- you signed it as
2    a director of Takeover; correct?
3    A    It looks that way.  I may have been put
4    back on as a director at that time.
5    Q    Okay.  And if we go up a little bit.
6         At the same meeting, which is also
7    November 7, 2022.
8    A    I mean, I thought it said "observer" in
9    the other one, didn't it, or?
10    Q    Yes.  Yes.  Paragraph 6 says, "Resolved
11    Joseph Pavlik is appointed interim president of
12    the company until the board makes a determination
13    with respect to Jason -- or with respect" -- I
14    think that means to Jason Tucker; correct?
15    A    That's what it says.
16    Q    So as of November 7, 2022, you were
17    appointed as the interim president of Takeover?
18    A    I -- I never -- I don't think I ever
19    acted as the president.
20    Q    Okay.  So --
21    A    I mean, it -- I mean, that says yes,
22    but I think it eventually got transitioned pretty
23    quickly.
24    Q    Okay.  So in terms of the -- how long
25    the interim period lasted, your testimony is not

Page 96

1    very long, if at all; correct?
2    A    I believe so.
3    Q    And the board never voted to appoint
4    you as a permanent president; correct?
5    A    I don't believe so.
6    Q    And why not?
7    A    I don't think I wanted that role or
8    responsibility.
9    Q    Mr. Deppoleto never provided written
10    consent for your appointment as president;
11    correct?
12    A    I'm not sure.
13    Q    Did you ever ask Mr. Deppoleto for
14    written consent to have you appointed as
15    president?
16    A    No.  I mean, I did try to -- on other
17    occasions, I did try to contact Mr. Deppoleto,
18    but then I was reprimanded by Jason Tucker as to
19    not contact him.  So, therefore, I -- from that
20    point forth, I did not attempt to contact him.
21    Q    Are you aware of any other officer or
22    director of Takeover seeking Mr. Deppoleto's
23    consent to have you appointed as president?
24    A    I'm not sure.  Not aware.
25    Q    As you sit here today, you can't name

Page 97

1    another officer or director of Takeover who
2    actually sought Mr. Deppoleto's consent;
3    correct?
4    A    I don't believe so.
5    Q    Okay.
6    A    Although I can't say, you know -- I
7    mean, I -- any time I tried to -- attempt -- like
8    I said, I tried to contact Mr. Deppoleto a number
9    of times, and it got reported back to Jason.
10    Jason said don't contact anybody.  He said don't
11    contact the CFO, don't contact Mr. Deppoleto.  So
12    that was, you know, kind of the general mantra.
13    Q    I'm going to show you another document
14    here.  Are you able to see this document?
15    A    I can see it.
16    Q    And on the top, it says, "Convertible
17    note purchase agreement;" correct?
18    A    Correct.
19    Q    And we see it's dated May 25, 2022;
20    correct?
21    A    Correct.  Can you make it a little
22    bigger?
23    Q    Sure.  Do you recognize this
24    document?
25    A    I don't recognize it, but, again, a lot

Joseph F. Pavlik
August 20, 2024

Page 98

1 of these documents look the same. But I do
2 remember this date --
3        Q    Go ahead and read the first paragraph
4 to yourself, just to orient yourself.
5        A    Okay.
6        Q    So this is a May 25, 2022, convertible
7 note purchase agreement between Takeover,
8 Mr. Deppoleto, and then Labor SMAFT is also
9 signing on for limited purposes; correct?
10       A    Correct.
11       Q    When did you first review this
12 document?
13       A    Probably around that time, I would
14 guess.
15       Q    Did you provide any feedback on this
16 document before it was executed?
17       A    I can't recall. Typically, with these
18 documents, Jason Tucker accelerated it and tried
19 to do everything on his own.
20       Q    Okay. We see in paragraph 1, the
21 purpose of this document was to memorialize
22 Mr. Deppoleto's $500,000 loan to Takeover;
23 correct?
24       A    Correct. That's what it says.
25       Q    Okay. Did you discuss this document

Page 99

1 before it was -- or did you discuss this document
2 with anyone before it was executed?
3        A    Probably the other parties involved,
4 which I think were Jason and Toby at the time.
5        Q    Okay. And what did you discuss?
6        A    I really can't recall. It's been a
7 couple years ago.
8        Q    And you think it was within a short
9 amount of time around this May 25, 2022,
10 effective date?
11       A    Yeah. It was probably around that date
12 because that was shortly after when Jason -- or
13 Mr. Deppoleto went to visit Jason in Mexico. And
14 they had a two-day meeting there. So it probably
15 was around that time. Because earlier in May was
16 when I met Mr. Deppoleto at the PFL event. So,
17 yeah, that probably was the date of the first
18 note.
19       Q    Okay. Who solicited Mr. Deppoleto's
20 loan to Takeover?
21       A    Could you repeat that?
22       Q    Who solicited Mr. Deppoleto's loan to
23 Takeover? Who asked Mr. Deppoleto to loan this
24 money to Takeover?
25       A    Probably Jason Tucker when they were in

Page 100

1 Mexico.
2        Q    Why did Takeover solicit
3 Mr. Deppoleto's loan?
4        A    I believe Anthony Pettis, who was
5 Mr. Deppoleto's nephew, was invested in the
6 company through Toby McBride. Then that
7 introduction was made at the PFL event, where
8 Toby McBride met Mr. Deppoleto. And then after
9 that introduction, Toby wanted him -- he said,
10 you know, you should go meet Jason Tucker. And
11 that's when he flew to Mexico to meet Jason
12 Tucker.
13            So those two -- I don't know who
14 exactly asked for the loan, but the relationship
15 came from Toby and Pettis to Deppoleto, and then
16 Jason formed the relationship thereafter.
17            My communication was very limited other
18 than one conversation at the PFL event.
19       Q    Did you personally discuss the loan
20 with Mr. Deppoleto before this document was
21 executed?
22       A    What was that?
23       Q    Did you personally have any discussions
24 with Mr. Deppoleto about this loan before the
25 document was executed?

Page 101

1        A    Yeah, I was not involved in any of
2 those discussions.
3        Q    As of May 2022, Takeover intended to
4 repay Mr. Deppoleto in accordance with the terms
5 of this note purchase agreement; correct?
6        A    If that's what the note says, then
7 correct. I mean, I can't see it, but if that's
8 what the note says, then yes.
9        Q    Well, your understanding before the
10 company took this money, you were intending --
11 Takeover was intending to repay it; correct?
12       A    Correct --
13            MR. SEXTON:  Object as to form.
14 BY MR. HARVEY:
15       Q    You said correct?
16       A    I don't know if on this note if it
17 was -- he was putting the money in for shares or
18 if it was to be repaid. I don't know. Again,
19 I'm -- my expertise has always been in product
20 development, sales, marketing. All this
21 financial stuff, I really never got heavily
22 involved in.
23       Q    Well, Takeover wasn't planning to steal
24 the money from Mr. Deppoleto; correct? They were
25 going to give him something in return, either

Joseph F. Pavlik
August 20, 2024

**Page 102**

1  repayment, shares or something --
2      A    It -- it was either shares or
3  repayment, I'm assuming, of course.
4      Q    And what was -- in May 2022, what was
5  Takeover going to use Mr. Deppoleto's loan for?
6      A    At that time, probably product
7  inventory, marketing.  Maybe PFL.  I mean, I'm
8  not sure what the funds were allocated for.
9      Q    You keep saying "PFL."  What's that
10  stand for?
11      A    The Professional Fighters League.
12  That's where Anthony Pettis came through and how
13  the -- I guess the first meeting with Mr.
14  Deppoleto started at the PFL event.
15      Q    Okay.  Showing another one.
16           Are you able to see this document?
17      A    You can enlarge it a little bit,
18  please.
19      Q    Sure.  You able to see it now?
20      A    Yes.
21      Q    And this one says, "Secure convertible
22  promissory note," at the top; correct?
23      A    Correct.
24      Q    And this is dated May 25, 2022;
25  correct?

**Page 103**

1      A    Correct.
2      Q    And there's a $500,000 amount listed in
3  the top left; correct?
4      A    Correct.
5      Q    You recognize this document?
6      A    As good as I've recognized the others.
7      Q    Okay.  So you've seen it before;
8  correct?
9      A    Well, maybe once.  But, again, with all
10  of the financial negotiations that was lead by
11  Jason and, secondarily Toby, I was not really
12  involved.
13      Q    Okay.  Takeover actually received
14  Mr. Deppoleto's $500,000 payment in accordance
15  with this promissory note; correct?
16      A    I believe.
17      Q    And Takeover promised to repay
18  Mr. Deppoleto his $500,000 loan; correct?
19      A    According to the document, correct.
20      Q    Okay.  Take that one down.
21           Okay.  I've got another document up.
22  It says, "Joint written consent to the board of
23  directors and shareholders of Takeover
24  Industries, Inc., May 2022"; correct?
25      A    Correct.

**Page 104**

1      Q    You recognize this document?
2      A    As good as I recognize the others.
3      Q    Okay.  Generally speaking, what is
4  this?
5      A    It's a joint written consent form.
6      Q    Of the board of directors and
7  shareholders as constituted on May 2022, of
8  Takeover; correct?
9      A    Correct.
10      Q    If we go to the last page, that's your
11  electronic signature on the last page?
12      A    Correct.
13      Q    And you signed it on behalf -- or you
14  signed it in your capacity as a director of
15  Takeover; correct?
16      A    Correct.
17      Q    And generally speaking, what's the
18  purpose of this joint written consent?
19      A    The purpose, to formalize the
20  agreement.
21      Q    Okay.  And in this paragraph that I'm
22  highlighting at the bottom of page 1, it also
23  authorizes Takeover's president, Jason Tucker, to
24  take all necessary actions to effect
25  Mr. Deppoleto's note purchase agreement;

**Page 105**

1  correct?
2      A    Correct.
3      Q    And if we go down little further, we
4  see that Jason Tucker, Toby McBride and Michael
5  Costello all also signed it; correct?
6      A    Correct.
7      Q    And there's no other members of
8  Takeover's board of directors who did not sign
9  this agreement; correct?
10      A    I believe that's correct.
11      Q    Okay.  Take that one down.  Show you
12  another document here.
13           Are you able to see this document,
14  Mr. Pavlik?  It says, "First amendment to
15  convertible note purchase agreement"?
16      Q    If you could enlarge it.
17      Q    Sure.  Are you able to see it now?
18      A    Yes.
19      Q    And this one is dated May 25, 2022.
20  It's referring to May 25, 2022, but then goes
21  down and it says, "Made and entered into as of
22  July 6, 2022"; correct?
23      A    That's correct.
24      Q    And you've seen this document before;
25  correct?

Joseph F. Pavlik
August 20, 2024

Page 106

1    A    That, I'm not sure.  I believe I only
2    saw the first one.
3    Q    Okay.  It's referring back to the May
4    25, 2021, convertible note purchase agreement;
5    correct?
6    A    Correct.
7    Q    And with this document, Mr. Deppoleto
8    is loaning Takeover an additional $500,000;
9    correct?
10    A    Correct.
11    Q    So as of July 20 -- July 6, 2022,
12    Mr. Deppoleto has loaned Takeover a total amount
13    of $1 million; correct?
14    A    Correct.
15    Q    Take that one down.
16    Q    Could you go back to the bottom of that
17    agreement, please?
18    Q    Sure.
19    A    Because I know on those second notes
20    that was when Jason was doing that on his own,
21    and I really -- and that's when things started
22    getting shaky during that time.  Because that was
23    when we began the discussions about Dollar
24    General, and I was not agreeing to have any of
25    those funds go to that.  So I want to see if I

Page 107

1    signed this because I don't think I did.
2    Yeah.  See, that's -- I don't think I
3    signed this one.
4    Q    Okay.
5    A    Because that was at the time, like I
6    mentioned earlier, they were wanting to put this
7    money towards Dollar General, and I didn't think
8    it was a good idea.  And then at that point in
9    time, I was excluded from all communication.
10    Q    Okay.  It was signed by Jason Tucker,
11    as the president of Takeover Industries;
12    correct?
13    A    Correct.
14    Q    And it was also signed by Michael
15    Costello, the chief executive officer; correct?
16    A    Correct.  So they should be the ones
17    liable for that note because then they went and
18    misappropriated the funds.  I was not involved in
19    this, with all due respect.
20    Q    Okay.  And then we've got another one
21    to show you here.
22    Are you able to see this?
23    A    Can you make it a little larger,
24    please?
25    Q    Sure.  This one is the second secured

Page 108

1    convertible promissory note; correct?
2    A    Correct.
3    Q    Dated July 6, 2022?
4    A    Correct.
5    Q    And Takeover received Mr. Deppoleto's
6    $500,000 loan in accordance with this second
7    promissory note; correct?
8    A    It appears so.
9    Q    And the plain terms of the document say
10    that Takeover is promising to repay Mr. Deppoleto
11    his $500,000 loan; correct?
12    A    Correct.
13    Q    Okay.
14    A    Can you please go to the bottom of that
15    page again, sir?  That document.
16    Q    Sure.
17    A    Because I remember this was in that
18    June time frame where every -- they split the
19    company, and they started just kind of running in
20    their own direction.
21    So who signed this agreement?  Jason
22    Tucker.  Who else?
23    Q    Jason Tucker, as president.
24    A    Yeah.  And that was at the time -- see,
25    that's -- this is too shady.  This guy is shady.

Page 109

1    This Jason Tucker, man, we got to get him on
2    these depositions.  Let the truth be told here.
3    Because that's when they began coercing
4    to then take the company private, and they wanted
5    to bankrupt it.  I mean, this Jason Tucker is
6    really the guy we need to get, I'll tell you.
7    Q    Yeah, okay.
8    So then I'm going to show you another
9    document here.
10    So this is joint written -- oh, sorry.
11    Are you able to see this?
12    A    Yep.  If you can make it a little bit
13    bigger, that'd be great.
14    Q    All right.
15    A    That's good.
16    Q    Joint written consent of the board of
17    directors and shareholders of Takeover
18    Industries, Inc., dated July 1, 2022; correct?
19    A    Correct.
20    Q    And so this is just a couple days
21    before the July 6 document we were just talking
22    about; correct?  Documents --
23    A    Correct.
24    Q    And on the last page, the board of
25    directors, you signed it; correct?

Joseph F. Pavlik
August 20, 2024

**Page 110**

```
1        A      Looks like a digital signature.
2        Q      Yes.
3        A      But I don't think --
4        Q      That's your signature; correct?
5        A      Correct.  But I don't think -- I
6   remembered at that time I would -- that was when
7   Jason was starting to autopopulate my signature.
8   Because I know after that first round -- once the
9   discussion with Dollar General came in, I was
10  like -- was not agreeing to it.
11       Q      Okay.  So your testimony is that this
12  is not your DocuSign signature with the code
13  underneath?
14       A      I mean, it is a DocuSign signature, but
15  I can't -- I don't recall signing that.
16       Q      Okay.  Well, is it your testimony that
17  you did or did not sign this?
18       A      Under those terms and at that time, I
19  don't believe I signed it.  I don't recall
20  signing it.
21       Q      You don't recall signing it.  So you
22  could have signed it; you just don't remember one
23  way or another?
24       A      But Jason was known to autopopulate
25  these documents.
```

**Page 111**

```
1        Q      Through DocuSign?
2        A      Or I was harassed to sign it.  But I
3   remember I disagreed in signing it, and he was
4   like, well, if you don't sign it, then, you know,
5   we're going to put you on -- there was always
6   some threat.  So it was always a threatening
7   situation.
8        Q      Did he have access to your DocuSign?
9        A      Unfortunately.  But, obviously, you can
10  see that I was correct in that those investments
11  to Dollar General was not a good investment.
12       Q      Okay.  So is it your --
13       A      But --
14       Q      -- testimony that he did forge your
15  signature here or is it possible you were just
16  coerced --
17       A      I -- I really can't recall.  I just
18  know that, based on the context of what was
19  happening at that time, I would have most likely
20  not signed that.  But I may have been forced into
21  signing it.
22       Q      And by "forced," again, not physical
23  force; correct?
24       A      No, verbal harassment, threats.
25       Q      Okay.  And this document also
```

**Page 112**

```
1   authorizes the company's president in this bottom
2   of page 1.  It's the exact same as the other
3   paragraph.  It authorizes Takeover's president,
4   Jason Tucker, to take all necessary actions to
5   effect Mr. Deppoleto's first amendment to the
6   note purchase agreement; correct?
7        A      Hold on.  You just cut out there for a
8   minute.
9        Q      I'll say it again.  This consent at the
10  bottom of page 1 authorizes Takeover's president,
11  Jason Tucker, to take all necessary actions to
12  effect Mr. Deppoleto's first amendment to the
13  note purchase agreement; correct?
14       A      Yeah, it does, and that was a bad
15  move.
16       Q      Okay.  And then if we go to the bottom,
17  not only do we have electronic signature from
18  you, we have an electronic signature from
19  Mr. McBride, Mr. Tucker and Mr. Costello;
20  correct?
21       A      Correct.
22       Q      And you're not aware of any board of
23  directors for Takeover who did not sign this
24  document; correct?
25       Did you hear my question or are you
```

**Page 113**

```
1   thinking?
2        A      No.  You were cutting out there.
3        Q      As of the date this document's signed,
4   July 1, you're not aware of any board of
5   directors of Takeover who did not sign this
6   document; correct?
7        A      You're cutting out again.
8        Q      As of July 1, when this written consent
9   to the board of directors?
10       A      Yep.
11       Q      Everyone who signed it is all the board
12  of directors from Takeover that you're aware of
13  as of that date; correct?
14       I'm sorry, are you thinking or did you
15  not hear my question again?
16       A      No, I'm not -- I'm not getting audio
17  right now.  Now I just heard you right now.
18       Q      How about now?  Can you hear me?
19       A      Now I can hear you.
20       Q      Okay.  So this document is dated July
21  1, 2022, and it's --
22       A      Okay.
23       Q      -- called, "Joint written consent to
24  the board of directors"; correct?
25       A      Correct.
```

Joseph P. Pavlik
August 20, 2024

**Page 114**

1  Q.  And as of that date, as far as you
2  knew, the board of directors of Takeover
3  consisted of Mr. McBride, Mr. Tucker and
4  yourself; correct?
5  A.  Correct.  And I believe that it was
6  announced that Mr. Deppoleto was a director as
7  well, that Jason announced it on Twitter.  So I
8  don't know why he wouldn't be on there.
9  Q.  Okay.  Other than perhaps
10  Mr. Deppoleto, you're not aware of any other
11  Takeover board of director who didn't sign this
12  document; correct?
13  A.  Not that I can recall right now.
14  Q.  Okay.  Show you another document.
15  This document is called, "Second
16  amendment to convertible note purchase
17  agreement"; correct?
18  A.  Correct.
19  Q.  And this one is made and entered into
20  as of August 19, 2022; correct?
21  A.  Correct.
22  Q.  And it amends the convertible note
23  purchase agreement dated May 25, 2022; correct?
24  A.  Correct.
25  Q.  And with this second amendment,

**Page 115**

1  Mr. Deppoleto is loaning Takeover an additional
2  $500,000; correct?
3  A.  Correct.
4  Q.  As of August 19, 2022, Mr. Deppoleto
5  has loaned Takeover a total amount of $1.5
6  million; correct?
7  A.  Correct.
8  Q.  Could you go to the bottom of that
9  document, please?
10  A.  You know, I can do that, but I think
11  it's not going to have your signature, but we're
12  going to find the written consent where you did
13  sign it.  So to save you some time...
14  A.  Okay.  Well, I just — I just know at
15  that time that was the 1.5 that got blown on
16  Dollar General that I advised not to do, but
17  Costello and Jason wanted to do it, and they all
18  went and did it, so...
19  Q.  So now I'm going to show you another
20  document.
21  This is a document dated August 19,
22  2022, and it says, "Third secured convertible
23  promissory note"; correct?
24  A.  Correct.
25  Q.  And, again, we've got the $500 —

**Page 116**

1  $500,000 amount; correct?
2  A.  Correct.
3  Q.  And Takeover actually received
4  Mr. Deppoleto's additional $500,000 loan in
5  accordance with this third promissory note;
6  correct?
7  A.  Correct.
8  Q.  And Takeover promised to repay
9  Mr. Deppoleto his $500,000 loan; correct?
10  A.  Correct.
11  Q.  Can you go to the bottom of that
12  agreement, please?
13  A.  Sure.
14  A.  Yeah.  See, all these were done by
15  Jason, and that's where he — the guy's known for
16  manipulating and falsifying these documents.  And
17  was like — this was all done — this is so
18  inappropriate.  I'm — you know, this has taken
19  three years of my life, and now it's taken three
20  hours of our time here today, which I appreciate,
21  but this Jason Tucker, as you can see, if you
22  read between the lines — I know you're doing
23  your job — but this is just — this is insanity.
24  I can't even believe this.  That this
25  guy is doing this and getting away with that, you

**Page 117**

1  know.  I mean, but, you know — the truth and the
2  facts are there.  That's what he does, and
3  obviously, he set this up for that, so — it's a
4  shame.
5  Q.  All right.  So the next document I'm
6  showing you is a joint written consent of the
7  board of directors and shareholders of Takeover
8  Industries, Inc.; correct?
9  A.  Correct.
10  Q.  Dated August 18, 2022; correct?
11  A.  Correct.
12  Q.  And if we go down to the last page,
13  again, we've got your DocuSign —
14  A.  Now that one looks a little bit
15  different, if you notice.
16  You know, Jason didn't like me.  He
17  just — he excluded me from a lot of stuff and
18  would just go and do things.  So, I mean, all
19  these documents, truthfully, like, they could
20  have all been falsified and manipulated by Jason.
21  I don't trust that guy.
22  Q.  Is it your testimony that that's not
23  your DocuSign signature?
24  A.  I can't say it is.  I don't know —
25  Q.  Okay.

Joseph P. Pavlik
August 20, 2024

Page 118

1    A    -- I mean, it looks like --
2    Q    So it's possible that you signed it?
3    A    What's that?
4    Q    It's possible that you signed it;
5  correct?
6    A    I mean, it's possible, but, you know, a
7  lot of these things were done -- he would just be
8  like, hey, there's a DocuSign in your box, this
9  has to be signed; hey, if you can't do it, I'll
10  get it done for you, so just -- you know, let me
11  go and get this handled.  And that's like the
12  way -- things were always a rush.
13         It was always a fire drill.  It was
14  always like two minutes to the hour.  He'll get
15  it handled, don't worry, I'm protecting us all.
16  And as we can see, he didn't protect anybody
17  other than himself.
18    Q    So you either signed it yourself or he
19  signed it for you with your consent because he
20  was rushing you; is that what you're telling
21  me?
22    A    Most of the time, yeah, I would not
23  have signed it myself.  Like, because it was
24  always last minute; it was always a fire drill.
25    Q    Okay.  And, again, at the bottom of

Page 119

1  page 1 of this document, this consent authorizes
2  Takeover's president, Jason Tucker, to take all
3  necessary actions to effect Mr. Deppoleto's
4  second amendment to the note purchase agreement;
5  correct?
6    A    Correct.
7    Q    And, again, we've got DocuSigns from
8  Mr. McBride, Mr. Tucker, Mr. Pavlik and
9  Mr. Costello; correct?
10    A    Correct.
11    Q    And as of your knowledge, as of August
12  18, 2022, this list of people that we're looking
13  at, that was all of the directors for Takeover;
14  correct?
15    A    I -- other than Mr. Deppoleto.  I mean,
16  he was -- I always thought he was a director.  He
17  was announced as a director.
18    Q    Okay.  Setting aside perhaps
19  Mr. Deppoleto, you're not aware of anyone else
20  who's not listed on that page who is a board of
21  director of Takeover; true?
22    A    Yeah.  To the best of my knowledge, no.
23         And, also, for the record, with Jason,
24  he -- I -- that was why we had a fallout and I
25  resigned originally, because he was always

Page 120

1  wanting to force me to sign these things and
2  he -- and I -- because I wouldn't want to give
3  him my consent to sign, he then would start, you
4  know, various threats.
5         So it was -- many of these -- TIME I
6  said, I was frozen out as of June and July.  So
7  when all this was going on with Costello and
8  Jason and Toby, I wasn't even in the
9  conversation.  Like, I wasn't even involved.
10         I had no -- ever since I voiced my
11  opinion on the Dollar General thing, Jason froze
12  me out.  He -- his wife was handling marketing.
13  I really had no involvement, so, you know --
14    Q    How much of Mr. Deppoleto's money was
15  used for salaries?
16    A    That, I'm not sure.  But I know for
17  myself, it probably wasn't much.  I think the
18  largest salaries were from Costello, Tzanetatos,
19  Jason, his wife, Kerby, Bel Bruno.  These were
20  probably getting the majority of it.  So if you
21  were to find --
22    Q    How much did Mr. Tucker get paid?
23    A    I believe, after reviewing the
24  information, he -- him and his wife would take
25  $20,000 withdrawals after each deposit

Page 121

1  Mr. Deppoleto made.
2    Q    So by this point in time, there's been
3  three deposits for $1.5 million.  You're saying
4  Mr. Tucker had taken three draws of $20,000, so
5  $60,000 --
6    A    I don't -- you'd have to ask Mr. Tucker
7  what he took, but I just remember after reviewing
8  the transactions once, I recall that every time
9  there was a deposit made by Mr. Deppoleto, there
10  was two $20,000 withdrawals.  And you'd have to
11  check with him on that, but that's not for me to
12  answer.
13    Q    Okay.  In any event, your understanding
14  was that his wife -- Mr. Tucker's wife also took
15  a $20,000 draw -- withdrawal?
16    A    I believe between him, his wife, Mike
17  Costello, Mike Tzanetatos, Kerby, Joe Bel Bruno,
18  that's where the salaries went.  I was paid 3,750
19  for like June, July and maybe August.  Then pay
20  was suspended in September, when Toby got
21  suspended.  So I maybe got three payments of
22  3,750 out of the 1.5 or 2 million, where the
23  remainder went to Dollar General and the
24  remainder went to all these people.  So the fact
25  that I'm being sucked into this is not fair.

Joseph F. Pavlik
August 20, 2024

Page 122

1      Q     How much did Rexby Fortner get paid?
2      A     He probably got paid more than — he
3   probably got paid, you know, maybe three, four,
4   five grand a month.  I'm not sure.  Again, I
5   wasn't doing payroll.  I just saw at the end
6   where all the allocations of funds went.  And
7   they were appropriated to Dollar General and to
8   all these peoples' salaries.
9      Q     What about Mr. Tzanetatos, how much was
10  he paid?
11     A     He was — to my understanding, he was
12  probably getting 10 or 12 grand a month.  Same
13  with Costello.  So that's where a lot — all that
14  salaries went.  Certainly not to me.
15     Q     Well, I thought you said you were paid
16  3,750 a month?
17     A     That's a nominal token fee that doesn't
18  cover much, and that was for three months.
19     Q     You did receive it, though; correct?
20     A     I did receive it.
21     Q     Okay.
22     A     But we're talking less than 10 grand
23  when these guys are taking, you know, a lot more
24  than that.
25     Q     And you're not claiming that

Page 123

1   Mr. Deppoleto, out of all the money that he's
2   looking for in this lawsuit, you're not claiming
3   that he didn't pay Takeover any of that money;
4   correct?
5      A     No, I'm not claiming he didn't —
6   rephrase that because I — that might —
7      Q     Sure.  You understood Mr. Deppoleto's
8   claim in this lawsuit is that he's entitled to a
9   little over $2 million that he loaned to
10  Takeover; correct?
11     A     Yes, I understand that.
12     Q     And you're not claiming that he didn't
13  pay all of that to Takeover, are you?  In other
14  words, you're admitting that he paid all of that
15  to Takeover —
16     A     Well —
17     Q     — you just dispute what Takeover did
18  with it after —
19     A     Sure.  Yeah.  I wouldn't — I don't —
20  I wouldn't use the term "admit."  I mean,
21  obviously, based on the notes, he did invest that
22  money into Takeover.  And, you know, what I had
23  advised was not to invest that money into the
24  Dollar General deal —
25     Q     Sure.

Page 124

1      A     — I also said that until the company
2   was profitable, you know, these guys shouldn't be
3   taking 10 and $12,000 salaries —
4      Q     Sure, sure, sure.  We're on the same
5   page.
6      A     — but unfortunately, that's kind of
7   where the whole thing went, where all that money
8   got sucked up, you know —
9      Q     Sure.  I get it.  And we're on the same
10  page.
11           I just —
12     A     Okay.
13     Q     — your complaint is what Takeover did
14  with the money once it received it from
15  Mr. Deppoleto; correct?
16     A     That would be correct because it was —
17  you know, they were in charge —
18     Q     Yeah.  And I get that you got all kinds
19  of complaint.  I'm not here to argue —
20     A     Sure.
21     Q     — my only point is, you're not
22  claim — you — you had — you're conceding that
23  Mr. Deppoleto paid all of the money that he's
24  claiming he paid.  You just don't like what
25  Takeover did with that money once it got it;

Page 125

1   true?
2      A     According to what you presented, it
3   appears that those funds went into the company.
4   I can't say for certain because I wasn't on the
5   bank accounts, and I didn't have access to that
6   information.  But what I can say is that of that
7   money that was invested, it was misappropriated
8   into deals and salaries that had nothing to do
9   with me nor — you know, the Dollar General.
10           It was — it was just a bad investment,
11  you know, and allowing Jason to control it was
12  another bad move.  So, again, just talking man to
13  man, I just don't see how — like, it's pretty
14  obvious what happened here, you know.
15     Q     You're aware that — just so we close
16  the loop on the amounts, we've already gone over
17  the 1.5 million that he loaned up through this
18  August 2022 time frame; correct?
19     A     Yeah, correct —
20     Q     That's what we've been talking about
21  the last 15, 20 minutes.
22           You're aware that Mr. Deppoleto loaned
23  Takeover an additional $386,700 and — well,
24  we'll just say $386,000 in October of 2022;
25  correct?

Joseph F. Pavlik
August 20, 2024

Page 126

```
1        A    In October 2022?  Then that had to be
2   right around the time when they had the private
3   meeting with Living Essentials, the makers of
4   5-Hour Energy, and they were trying to cut that
5   side deal without my knowledge with my formula
6   that was stolen from me --
7        Q    And my question's a lot simpler.  I'm
8   just asking you --
9        A    No, no, I understand.  But with that
10  385 -- I'm trying to answer the question.  With
11  that 385, I believe that was used for the display
12  stands for the Dollar General deal, if I'm not
13  mistaken.  So, again, more money thrown into
14  Dollar --
15       Q    And, Mr. Pavlik, I'm trying to get you
16  out of here as quickly as possible, and we'll do
17  that --
18       A    Well, I -- listen, I'm -- let me tell
19  you right now.  I'm here to have justice served,
20  and I'm in no rush.  I mean, I've got -- I've
21  allocated all night so we can cover all of this
22  because I'm sure there's probably information
23  that you need.  So I'm here to provide that for
24  you, but we can --
25       Q    Right.
```

Page 127

```
1        A    -- we can accelerate the process.
2        Q    And for purposes of the rest of my
3   questions, whether you agree or disagree with
4   what Takeover did with the money, unless I'm
5   specifically asking you that, I only want to know
6   if you're disputing that Takeover got the money.
7             So that I have a clean record, we agree
8   that Mr. Deppoleto loaned Takeover an additional
9   $386,000 and change in October of 2022;
10  correct?
11       A    I -- if I'm not mistaken, that last
12  amount, I believe, went directly to the display
13  company for the Dollar General displays.  So I
14  don't think he loaned it to the company.  I think
15  he paid it to whatever the display company was
16  that did the Dollar General displays.
17       Q    For Takeover; correct?
18       A    For Takeover against what was advised.
19       Q    And then Mr. Deppoleto loaned Takeover
20  an additional $128,524 in November of 2022;
21  correct?
22       A    That, I'm not aware of.  And what that
23  was used for, I -- again, I was not involved with
24  the financial transactions.  And if I'm not
25  mistaken, that may have been an additional
```

Page 128

```
1   payment for the displays --
2        Q    Who from Takeover would have negotiated
3   those supplement loans with Mr. Deppoleto?
4        A    Pardon?
5        Q    Who from Takeover would have negotiated
6   the supplement loans with Mr. Deppoleto?
7        A    Probably Jason Tucker.
8        Q    And what were the terms of those
9   loans?
10       A    That, I don't know.  I don't even know
11  if there was an agreement made, truthfully.  I
12  don't know.
13       Q    Show you another document here.
14            All right.  So this is a letter on
15  Husch Blackwell letterhead dated November 8,
16  2022.  Do you recognize this document?
17       A    Let's see.
18       Q    You are a recipient via e-mail --
19       A    Okay.  I do -- I recall the document.
20       Q    It's titled, "Notice of default, demand
21  for payment, and cease and desist"; correct?
22       A    Correct.
23       Q    What was your reaction on receiving
24  this notice?
25       A    Can't recall specifically.
```

Page 129

```
1        Q    Did you discuss it with anyone after
2   you received it?
3        A    Can you scroll down, please.
4        Q    Sure.
5        A    Yeah.  I think at that time -- now that
6   I'm looking at this, I believe I discussed it
7   with the lawyers.
8        Q    Okay.  And I don't want to know about
9   the substance of your discussion with the
10  lawyers, but other than -- well, when you say
11  "the lawyers," which lawyers?
12       A    The company --
13       Q    I don't want to know what you talked
14  about with them.  I just want to know who.
15       A    The company's counsel.
16       Q    Which was?
17       A    Jennifer Reiter.
18            (Reporter clarification.)
19            MR. HARVEY:  R-e-i-t-e-r.
20  BY MR. HARVEY:
21       Q    And it was your understanding that she
22  was Takeover's counsel as of November 8, 2022?
23  Is that --
24       A    Right.
25       Q    -- why you were calling her the
```

Joseph F. Pavlik
August 20, 2024

Page 130

1    company's counsel?
2        A    Correct.  I believe so.
3        Q    Did you discuss it with anyone other
4    than Ms. Reiter?
5        A    Not that I can recall.
6        Q    Not Mr. Holley, not Mr. McBride, no
7    one?
8        A    I believe we probably all were on a
9    call to discuss it.
10       Q    Any time you were on a call outside of
11   the presence of counsel?
12       A    Not that I can recall.
13       Q    Okay.  And just generally speaking, you
14   understood that in this letter Mr. Deppoleto was
15   providing notice to Takeover that it defaulted on
16   Mr. Deppoleto's loans; correct?
17       A    Correct.
18       Q    Did you agree that Takeover defaulted
19   on its obligations to Mr. Deppoleto?
20       A    I don't believe so.
21       Q    You don't believe Takeover defaulted on
22   its obligations to Mr. Deppoleto; is that what
23   you're telling me?
24       A    I'm not quite sure.
25       Q    Had Mr. -- or had Takeover repaid

Page 131

1    Mr. Deppoleto any money by this point?
2        A    I wasn't -- I have no clue what was
3    paid or what wasn't paid or what was sent out --
4        Q    I don't think it's in dispute that he
5    wasn't paid anything by this point, so just
6    assume that that's true.
7             You would agree with me that that means
8    Takeover was in default in its obligations as of
9    this point; correct?
10       A    Like I said, I don't know.  I mean, if
11   that was the case, but like I said, I was never
12   on any bank account.  Never made any payments.
13   Never saw transactions.  So I really don't know
14   what was paid out or what was done.
15       Q    As far as you're aware, after receiving
16   this notice, did Takeover begin a process to
17   repay Mr. Deppoleto's loans?
18       A    I'm not sure.
19       Q    Are you aware of after receiving this
20   notice whether Takeover began a process to cure
21   the default?
22       A    I'm not sure.
23       Q    To your knowledge, to date, has
24   Takeover paid any amount of the funds that
25   Mr. Deppoleto loaned to Takeover?

Page 132

1        A    That, I'm not sure.
2        Q    Should Takeover repay Mr. Deppoleto?
3        A    I believe he has been issued shares.
4    And I believe that we have been trying to settle.
5    I believe that Mr. Deppoleto is, as an investor,
6    deserving of something, but the full amount of in
7    discussion, the way that it went down, I think
8    it's -- that's not appropriate.
9        Q    And that's because you disagree with
10   the way that Takeover spent the money once it
11   received it from Mr. Deppoleto, as you've
12   explained several times; correct?
13       A    Yes.
14       Q    And it's not because you're claiming
15   that Mr. Deppoleto didn't provide over $2
16   million; true?
17       A    No, I'm not saying that.
18       Q    Take this one down.
19            Okay.  I've got another document up
20   here.  This one, again, is on Husch Blackwell
21   letterhead.  It's dated November 22, 2022.  Do
22   you see that?
23       A    Yes.
24       Q    And, again, you're copied via e-mail
25   only; correct?

Page 133

1        A    Correct.
2        Q    You've seen this before?
3        A    I --
4        Q    Second notice of default and demand for
5    payment.  I can scroll down through it, if you'd
6    like.
7        A    Correct.
8        Q    Now, as of this date, your e-mail
9    address was joe@takeoverind.com; correct?
10       A    Correct.
11       Q    And that's a Takeover Industries e-mail
12   address?
13       A    Correct.
14       Q    So the company was still operating as
15   of that date; true?
16       A    I'm not sure.  I don't believe -- I
17   just -- I mean, the e-mail was still active, but
18   I'm not sure the company was operating.
19       Q    Okay.  After you received this
20   document, did you discuss it with anyone?
21       A    Discussed it with the attorney.
22       Q    Ms. Reiter again?
23       A    Correct.
24       Q    Did you discuss it with anyone outside
25   of the presence of Ms. Reiter?

Joseph F. Pavlik
August 20, 2024

Page 134

1    A    I don't believe so.
2    Q    After receiving this notice, did
3    Takeover begin a process to repay Mr. Deppoleto's
4    loans?
5    A    I'm not sure.
6    Q    Why not?
7    A    Because I was not really involved in
8    the financial transactions.  I don't know what
9    was paid or wasn't.
10   Q    Has Takeover ever considered a spinout
11   or a spinoff?
12   A    I believe that was in the discussion.
13   Q    When was that?
14   A    That, I don't know.
15   Q    Even ballpark's fine if you don't
16   remember the exact date.
17   A    I mean, the term was thrown out, you
18   know, here and there.  I really -- be hard to
19   pinpoint a date.
20   Q    2021?  2022?  2023?
21   A    I mean, probably was maybe mentioned
22   many times, but I really can't recall when.
23   Q    At any point after the lawsuit was
24   commenced?
25        I don't believe so.

Page 135

1    Q    Did Takeover --
2    A    I probably -- I mean, the only time it
3    was first brought up was when we did the deal.
4    Like, in early 2021, we talked about doing the
5    spinoff, but then, like I think after that it
6    wasn't really -- it may have just been brought
7    up, like, oh, are you going to do the spinoff,
8    but I think the main, initial focus was like
9    probably early 2021.
10   Q    If -- say a little more about that.
11   What were you -- why in early 2021?  What spinoff
12   were you talking about then?
13   A    Well, that was just when we first did
14   the deal --
15   Q    Deal with whom or what?
16   A    When Labor SMART acquired Takeover, at
17   that point in time there was, you know, some
18   shareholders, people on Twitter were talking
19   about is there going to be a spinoff, but that
20   was like the only time it was really like brought
21   up and mentioned.
22   Q    And the concept was even though Labor
23   SMART had just purchased Takeover, you were
24   talking about doing a spinoff shortly
25   thereafter --

Page 136

1    A    I wasn't talking about anything.  I was
2    just -- you were asking me when I heard that term
3    being mentioned, and so I want to say it was
4    early 2021.
5    Q    Was there ever consideration about
6    taking Takeover public?
7    A    Well, Takeover was -- in a public
8    company, so it was public --
9    Q    From when to when?  I'm asking for your
10   understanding.  From when to when was Takeover
11   public?
12   A    Well, that's -- I mean, it was -- I
13   mean, that's -- I mean, if you're saying that
14   would have been what the spinoff would have been,
15   so that would have been in early 2021, like
16   March, April 2021.
17   Q    And so are you saying it was taken
18   public then or it was not?
19   A    Well, it wasn't spun off.  It was just
20   as it was.
21   Q    Why hasn't Takeover ever gone public?
22   A    I don't know.
23   Q    Did you seek Mr. Deppoleto's consent to
24   spinoff Takeover?
25   A    I did not.

Page 137

1    Q    Are you aware of anyone else at
2    Takeover seeking Mr. Deppoleto's consent to
3    spinout Takeover?
4    A    No, I'm not.
5        I think that whole thing got squashed
6    when all the lawsuits were involved, and it was
7    just a -- kind of a debacle.
8    Q    We talked about it a little bit
9    earlier, but you're aware of a lawsuit that
10   Takeover filed against Michael Bolley in the
11   District of Arizona?
12   A    Correct.
13   Q    And I'm not going to ask you to look
14   through the whole thing, but I'll just pull it up
15   so you got some context.
16       This is the verified complaint from the
17   District of Arizona case with Takeover Industries
18   listed as the plaintiff, and then Michael Holley
19   and Chirine Bolley -- I don't know if I'm
20   pronouncing that right -- C-h-i-r-i-n-e, Holley
21   and then a couple of other people; correct?
22   A    Correct.
23   Q    And if we move it down, we can see that
24   it was filed on March 8, 2022; correct?
25   A    Correct.

Joseph F. Pavlik
August 20, 2024

Page 138

1    Q    Now, you were still a member of
2  Takeover when this lawsuit was filed; correct?
3    A    I believe -- March 8, 2022, I was just
4  maybe coming back in.
5    Q    Okay.  Did you review the complaint
6  before it was filed?
7    A    I can't recall.
8    Q    Did you provide any information for use
9  in the complaint?
10    A    Can't recall.
11    Q    Who approved the filing of the
12  complaint?
13    A    Most -- I can't recall.  Could have
14  been Jason.  I'm not sure.
15    Q    To your knowledge, is that lawsuit
16  still ongoing?
17    A    I believe it was dismissed.
18    Q    Did you ever tell Mr. Deppoleto about
19  the Arizona litigation?
20    A    I never spoke to Mr. Deppoleto about
21  that.
22    Q    Are you aware of anyone else from
23  Takeover notifying Mr. Deppoleto about the
24  Arizona litigation?
25    A    I'm not sure.

Page 139

1    Q    Are you aware of anyone disclosing the
2  Arizona litigation to Mr. Deppoleto before May
3  25, 2022?
4    A    Not sure.  I think maybe Jason did.  If
5  anybody did, he probably did.
6    Q    Are you aware of whether Takeover filed
7  the stipulation to dismiss all claims against
8  Michael and Chirine Holley in February 2022?
9    A    I believe so.
10    Q    Who at Takeover made the decision to
11  dismiss all the claims against the Holleys?
12    A    I'm not sure.
13    Q    Why did Takeover decide to dismiss all
14  the claims against the Holleys?
15    A    I believe because it was found to be
16  false.  I'm not sure.
17    Q    Did Mr. Deppoleto ever give his consent
18  to dismiss or to have Takeover dismiss all of the
19  claims against the Holleys?
20    A    I'm not sure.
21    Q    Let me show you another document here.
22         This document is dated March 25, 2022,
23  and it says, "Related party receivable
24  confirmation."  Do you see that?
25    A    Yes.

Page 140

1    Q    And you see Toby McBride signed it;
2  correct?
3    A    Correct.
4    Q    And go ahead and read it to yourself,
5  and let me know when you're done reading?
6         (Witness reviewing document.)
7    A    Okay.  Done reading.
8    Q    Okay.  So you'd agree with me that as
9  of March 25, 2022, Toby McBride owed Takeover
10  $243,253.84; correct?
11    A    I mean, according to this document.
12    Q    Okay.  And you never told Mr. Deppoleto
13  about the money that Mr. McBride owed Takeover;
14  correct?
15    A    I was instructed not to -- I mean, I
16  never -- I communicated with Mr. Deppoleto when I
17  met him, and that was it.  So, I mean, I never
18  really engaged in much conversation.
19    Q    Okay.  So you never told Mr. Deppoleto
20  about the money that Mr. McBride owed Takeover;
21  correct?
22    A    I don't believe so.
23    Q    We might have had a double-negative
24  there.  Maybe that was my fault.
25         Did you ever tell Mr. Deppoleto about

Page 141

1  the money that Mr. McBride owed Takeover?
2    A    No, I did not.  I --
3    Q    And you --
4    A    -- again, I was not involved in the
5  financial dealings with this.
6    Q    And are you aware of any other officers
7  or directors of Takeover notifying Mr. Deppoleto
8  about the money that Mr. McBride owed Takeover?
9    A    I'm not sure.  I mean, maybe Jason.
10  That's -- that would be it.
11    Q    As far as you have personal knowledge
12  of, you're not -- you don't have any personal
13  knowledge of anyone -- any officer or director of
14  Takeover notifying Mr. Deppoleto about the money
15  that Mr. McBride owed Takeover; correct?
16    A    I'm -- that, I'm not sure.  I don't
17  know.  I mean, I didn't, but I don't know.
18    Q    Yeah.  That's -- you don't have
19  personal knowledge of anyone else doing it
20  either; correct?
21    A    If I'm understanding the question,
22  correct.
23    Q    Has Takeover ever maintained directors
24  and officers liability insurance?
25    A    I'm not sure.

Joseph F. Pavlik
August 20, 2024

Page 142

1    Q    Who would know that?
2    A    I'm not sure.
3    Q    Who was responsible for purchasing
4  insurance for the company?
5    A    Probably — Mike Holley would be the
6  administrative.
7    Q    As we sit here today, are Takeover's
8  liabilities worth more than its assets?
9    A    Are Takeover's liabilities worth more
10  than its assets?
11    Q    Do its liabilities outweigh its
12  assets?
13    A    Well, there are no assets, so I would
14  have to say that the liabilities would outweigh
15  the assets.
16    Q    And for how long has that been the
17  case?
18    A    Since the company was run into the
19  ground after the Dollar General deal and after
20  the trademark expired in probably October of
21  2022.
22    Q    So at least since October of 2022,
23  Takeover's liabilities have outweighed its
24  assets; correct?
25    A    No.  Probably after that.  Because

Page 143

1  until all that happened, then there was nothing
2  left.  But prior to that, there were — there
3  would have been assets before everything was
4  destroyed.
5    Q    But for how long have the liabilities
6  been outweighing the assets?  Since before
7  October 2022?  Because it sounds like you're
8  saying they had some assets, but they weren't
9  worth a whole heck of a lot.
10    A    I —
11    MR. SEXTON:  Object to form.
12    A    Yeah.  I'm not sure I'm understanding
13  what — the question.
14  BY MR. HARVEY:
15    Q    Sure.  I asked you for how long have
16  Takeover's liabilities outweighed its assets.
17  And I thought initially you were saying October
18  2022, because you said that was when the
19  trademark expired and the Dollar General deal
20  fell through.
21    But then it sounded like you thought
22  about it a little more, and you said, well,
23  actually — it sounded like you thought the
24  assets weren't worth a lot even before October
25  2022.  So the date could have been even earlier

Page 144

1  than October 2022, where the liabilities
2  outweighed the assets.  That's what I'm getting
3  at.  Do you understand?
4    A    Okay.  Yeah, no, it was — I wasn't
5  quite sure how you were phrasing that.  I THINK
6  the major liabilities that came into play, now
7  that I'm understanding what you're asking, would
8  be the PFL debt and the Manny debt that Jason
9  signed on, which were major liabilities.  And so
10  those were, you know, again, on Jason Tucker for
11  that.
12    So, I mean, however — I mean, I don't
13  have those contracts in front of me, but I know
14  they were multi-year contracts that he committed
15  to.  So there was —
16    Q    I understand —
17    A    — there was — there was liabilities
18  and debt brought on by Jason prior with those
19  commitments, so...
20    Q    So whatever the date of those
21  agreements were — and by the PFL debt, you're
22  distinguishing that from the Manny Pacquiao debt;
23  correct?  Or is that the same thing?
24    A    No, they're two separate agreements,
25  two separate debts.

Page 145

1    Q    Okay.  And so you're saying whatever
2  the date on those agreements was, as of the date
3  of those agreements, Takeover's liability
4  outweighed its assets; is that correct?
5    A    I would probably say that's correct.
6    Q    Okay.  Let me show you another document
7  here.
8    So this is a multi-page document that I
9  will tell you your lawyers produced in discovery.
10  You can see at the top it's a Bank of America
11  statement.  I'm not going to ask you about every
12  single thing on here.
13    But what I did want to ask you about
14  is, we go down, see, there's these Bates numbers
15  in the bottom right corner.  We look at DEF 78,
16  and we've got some highlighted.  You see these
17  highlighted right here?
18    A    Yep.
19    Q    And this particular thing that I'm
20  highlighting is an airline ticket with a
21  departure date of April 26, 2022; correct?
22    A    Correct.
23    Q    And it says you're going to airport
24  code Cleveland; correct?
25    A    Correct.

Case 2:22-cv-02013-GMN-BNW    Document 102-4    Filed 01/10/25    Page 39 of 79

Joseph F. Pavlik
August 20, 2024

Page 146

1    Q    What was the purpose of this flight?
2    A    That was probably a flight to --
3  probably to an event.
4    Q    Do you remember the event?
5    A    Actually -- yeah.  It was the PFL --
6  there was a PFL event because airport code DFW.
7  Yeah.  So I was probably going from Cleveland to
8  DFW for the PFL event.
9         There was a couple events that -- in
10 Dallas-Fort Worth, one of which we met Deppoleto
11 at in May.
12   Q    Okay.  And your testimony that these
13 were legitimate business expenses for Takeover?
14   A    Correct.  Yeah.  They would have -- I
15 never -- I mean, they would have been booked by
16 the company, so, yeah, they would have had to
17 have been business expenses.
18   Q    Okay.  And then we've got some
19 highlighted on the next page, too.  These are May
20 3rd?
21   A    Yep.  That was right when I was
22 boarding the plane when Jason was forcing me to
23 sign over my shares with the extortion.  And that
24 was when I was going in to DFW for the PFL
25 event.

Page 147

1    Q    Okay.  Take that one down.  And we've
2  got another document.  It's basically the same
3  layout.  Show you right now.
4         This one starts off Bates DEF 000110.
5  This is June to July 2022 expenses: correct?
6    A    Correct.
7    Q    And then if we go down, we've got an
8  airline ticket for -- the flight's going to be
9  June 21, '22?
10   A    Yep.  That's when we went to meet James
11 Deppoleto and Jason in Atlanta for the PFL in
12 Atlanta.  And that's when they had the private
13 meeting with T-Pain that we were unaware of.
14 But, yeah, that was business travel.
15   Q    Okay.  You were there; you just didn't
16 go to the meeting?
17   A    No.  We actually -- we went there to
18 meet with James and Jason, and then they ended up
19 canceling the meeting.  And that's -- later we
20 found out they went to meet with T-Pain
21 independently.  But, yeah, that was a PFL
22 event.
23   Q    Okay.  And it's your testimony this was
24 a legitimate business expense?
25   A    Absolutely.

Page 148

1    Q    Okay.  Next one, we've got another
2  business expense.  Starts off with DEF 124.  You
3  go down a little bit.  We've got another flight
4  with a departure date of August 3rd, 2022;
5  correct?
6    A    Yep.  That was going to New York,
7  LaGuardia, for the -- another PFL event.  That
8  was the PFL finale, I believe, late July in New
9  York.
10   Q    And it's your testimony this was a
11 legitimate business expense?
12   A    Correct.
13   Q    Have you heard of a company called
14 Illumination Holdings, Inc.?
15   A    I have.
16   Q    What is Illumination Holdings, Inc.?
17   A    I'm not sure exactly what they do.
18   Q    What have you heard about them --
19   A    I believe -- I believe they're a brand.
20 They're like a distribution company or brand
21 incubator.
22   Q    Is Illumination Holdings, Inc.,
23 affiliated with Takeover?
24   A    I don't believe so.
25   Q    Is Illumination Holdings, Inc.,

Page 149

1  affiliated with Next Gen?
2    A    Yes, I believe so.
3    Q    How so?
4    A    I believe they are affiliated via a
5  merger or acquisition.
6    Q    When was this?
7    A    According to Twitter and the news, I
8  don't know the exact date, but within the last
9  few weeks.
10   Q    Did you have anything to do with
11 negotiations over that merger or acquisition?
12   A    I was not involved in any negotiations.
13 And I believe it was with LDNC, not Next Gen.
14   Q    How about a company called -- that
15 was -- and just to clarify, that was Illumination
16 Holdings, Inc.
17        Now, I'm asking about a different
18 company, Illumination Brands, Inc.  Have you ever
19 heard of Illumination Brands, Inc.?
20   A    I have.  And they're probably
21 affiliated with those two entities.
22   Q    Is Illumination Brands, Inc.,
23 affiliated with Takeover?
24   A    No, not that I believe.
25   Q    Is it affiliated with Next Gen?

Joseph F. Pavlik
August 20, 2024

Page 150

1    A.   No.  I believe it's affiliated with
2    LTNC.
3    Q.   And is your understanding the same as
4    basically the other one we were talking about?
5    It was either a merger or an acquisition?
6    A.   Correct.  That's my understanding.
7    Q.   Do you know a gentleman named Brad
8    Wyatt, W-y-a-t-t?
9    A.   I don't know him personally, but I know
10   the name.
11   Q.   Who is he?
12   A.   I'm not sure his exact role, but he is
13   involved with the Illumination company at some
14   level.
15   Q.   Does Brad Wyatt have any affiliation
16   whatsoever with Takeover?
17   A.   No, not that I'm aware of.
18   Q.   Does he have any affiliation with Next
19   Gen?
20   A.   I believe he has affiliations with
21   LTNC.
22   Q.   How about a gentleman named Mike Ghini?
23   Do you know a Mike.Ghini?
24   A.   No, I don't.
25   Q.   Might be spelled G-h-i-n-i.

Page 151

1    A.   Mike Ghini?  Doesn't sound familiar.
2    Q.   So you don't know one way or another
3    whether he has any affiliation with Next Gen?
4    A.   Mike Ghini, no.  Name doesn't sound
5    familiar.
6    Q.   To your knowledge, what's the
7    distinction between Next Gen Beverages, LLC, and
8    Next Gen Holdings?
9    A.   Next — one would be an IP.  I believe,
10   if I'm not mistaken, one's the IP holding
11   company, and the other is the operational,
12   actually company.
13   Q.   Which one do you believe is the IP
14   holding company?
15   A.   Probably the one called Next Gen
16   Holdings.
17   Q.   And to your knowledge, what's the point
18   of separating those out?
19   A.   I'm not sure.  Probably to hold IP.
20   Q.   Did you have any — well, do you know
21   when Next Gen Holdings came into existence?
22   A.   I'm not sure.
23   Q.   Do you know who set it up?
24   A.   I'm not sure.
25   Q.   Do you know who's on the board of Next

Page 152

1    Gen Holdings?
2    A.   I'm not sure who all is on the board.
3    I would maybe guess Tom Zarro and Mike Holley,
4    but I don't know if there's anybody else.  I
5    haven't reviewed any of that paperwork.
6    Q.   Other than the entities that we've
7    talked about — and I can go through a list if
8    you want — are you aware of any other LTNC
9    affiliates other than the ones we've just talked
10   about, that we talked about at the beginning?  So
11   you want me to go through it or?
12   A.   No.  Not that I'm aware of.
13   Q.   Have any of Labor SMART or any of the
14   other affiliates that we've talked about received
15   any payments or any form of compensation from
16   Takeover?
17   A.   Not that I'm aware of.
18   Q.   Have any of them received any assets
19   from Takeover?
20   A.   Not that I'm aware of.
21   Q.   Have any of them received any payments
22   or any other form of compensation from Next
23   Gen?
24   A.   Not that I'm aware of.
25   Q.   Have any of them received any assets

Page 153

1    from Next Gen?
2    A.   Not that I'm aware of.
3    Q.   When Takeover got the payments from
4    Mr. Deppoleto, how did Takeover book them in its
5    accounting books?
6    A.   That would be a Jason Tucker question.
7    I don't know.
8    Q.   Okay.  After the payments came in
9    from —
10   A.   Or that — or that actually would be a
11   Marty question, but there was another individual
12   that I was told not to contact.  He —
13   Q.   Who's Marty?
14   A.   He was the company CFO.
15   Q.   What's his last name?
16   A.   I don't know.
17   Q.   You're talking about Marty was the CFO.
18   A.   I believe he was the one doing the
19   bookings.
20   Q.   And then you said there was another
21   individual who you were told not to contact?
22   A.   That's the same guy.  Jason Tucker at
23   the time — you were asking me when the Deppoleto
24   transactions were going.  That would probably be
25   at that time.

Joseph F. Pavlik
August 20, 2024

Page 154

```
1      Q    When the payments came in, who did you
2   discuss them with in terms of what to do with
3   this money?
4      A    No one.  Because I was unaware when
5   they were coming in.  That was not my -- I was
6   not involved in anything to do with the money or
7   the payments.  I was just products and
8   formulation.
9      Q    Who all was involved in the decision to
10  establish Next Gen and the other entities that
11  were created after we filed this lawsuit in
12  December 2022?
13     A    I believe Mike Holley and Tom Darro, if
14  I'm not mistaken.
15     Q    Anyone else?
16     A    I don't know if there's anyone else.
17     Q    And do you know how soon after this
18  lawsuit was filed, December of 2022, how soon
19  after it was that Mr. Holley and Mr. Darro began
20  establishing Next Gen and the other entities?
21     A    I'm not sure.
22     Q    As we sit here today, is Takeover still
23  selling any products whatsoever?
24     A    I don't believe so.  I haven't been
25  involved since, you know, the demise of the
```

Page 155

```
1   company.
2      Q    To your knowledge, when was the last
3   time that Takeover was selling products?
4      A    I would probably -- I'm not quite sure.
5   Maybe late 2022.
6      Q    Next Gen is still selling products
7   today; correct?
8      A    Is Next Gen selling Next Gen products
9   today?
10     Q    Yes.
11     A    I -- yes.  I believe so --
12     Q    And it has been selling products since
13  shortly after it opened in 2023; correct?
14     A    To the best of my knowledge, yes.
15     Q    And to your knowledge, Next Gen
16  Holdings doesn't sell any products, then; it just
17  holds IP?
18     A    I believe so.
19     Q    Show you another document.
20     .    Are you able to see this document?
21     A    If you could please enlarge it.
22     Q    It says at the top, "Declaration of
23  Joseph Pavlik"; correct?
24     A    Correct.
25     Q    And this is a document that you
```

Page 156

```
1   reviewed and signed; correct?
2      A    Correct.
3      Q    On November 14th, 2022?
4      A    Correct.
5      Q    Now, in paragraph 4, the first sentence
6   says, "Some information has been uncovered this
7   week by Mike Holley, which hopefully can help the
8   Court approve the efforts to have Jason removed
9   and the truth revealed"; correct?
10     A    Correct.
11     Q    And, again, this is dated November 14,
12  2022.  So the week you're referring to must have
13  been right around then; true?
14     A    Correct.
15     Q    What information are you referring to
16  there?
17     A    I believe that there were e-mails that
18  were found that he was communicating with 5-Hour
19  Energy to conspire to take the Gamer Shot to
20  5-Hour.  There was evidence that after June of
21  2022, when he said that we are no longer having
22  company meetings and he's going to communicate
23  with everyone individually, we stopped having all
24  company meetings, all weekly conference calls.
25          And here it turns out they still -- we
```

Page 157

```
1   were getting records because Mike Holley found
2   all the e-mail records of Jason that there still
3   were being weekly calls being held with
4   Mr. Deppoleto, with Mike Costello.  There was
5   extensive communication between them and living
6   Essentials or the 5-Hour Energy company.  So it
7   showed that there was definitely, you know,
8   inappropriate behavior and, you know, potential
9   criminal activity going on.
10     Q    And the information --
11     A    And then what I mentioned right there
12  about, he also informed our company CPA -- that
13  was when at that time I reached out to them, and
14  I was -- wasn't able to get a hold of them.  But
15  that was pretty much essentially the gist of
16  that.
17     Q    And the information you're talking
18  about Mr. Holley uncovering, how did Mr. Holley
19  uncover it?
20     A    I believe they were e-mails.
21     Q    Okay.
22     A    E-mail records.
23          And also, there was some evidence that
24  there was an attempt to change the bylaws of the
25  company by Jason.  So all of that was dug through
```

Joseph F. Pavlik
August 20, 2024

Page 158

1   in going through his e-mails.
2       Q    Then in paragraph 7 you say, "Since
3   June of 2022, he's isolated James Deppoleto,
4   developed his trust over several private
5   meetings, potentially gave him select
6   information, which then led James and
7   Jason strategically — led to James and Jason
8   strategically collaborating without sharing their
9   intent or motives with the other partners and
10  executives"; correct?
11      A    Correct.  And that had to do with
12  the — you know, saying there was no more company
13  meetings, but yet, there was still company
14  correspondence going on.  And they were still
15  collaborating to do the Dollar General deal.  And
16  they were also, without my knowledge,
17  collaborating and trying to do a deal with 5-Hour
18  Energy, so — that's correct.
19      Q    But you don't have any personal
20  knowledge about this; correct?  Because if you
21  look at, for instance, the next paragraph, 7, you
22  say, "I've been at a distance for some time with
23  all that's been going on."
24      A    Right.  I was at a distance in terms of
25  communication with Jason and Deppoleto, but the

Page 159

1   e-mails that were reviewed were very factual.
2   And I even had a call with 5-Hour to confirm that
3   they did have that meeting at NACS in Las Vegas.
4   And, coincidentally, I volunteered on my own dime
5   to fly out to NACS for that trade show because I
6   felt it was important.
7       And I was — that was when I was still
8   not being invited to the show.  Jason Tucker told
9   me, no, James and I aren't going to the show;
10  we're just going to leave it for Mike T. and Mike
11  Z. to go, let it be the Mike show.  And then the
12  day after the first day of the NACS show, there's
13  a picture of James, Jason, Mike and Mike
14  receiving the Gamer Shot product of the year
15  award, and they had just told me two days prior
16  that James and Jason weren't going.
17      So, again, I didn't know this at the
18  time, but then once I found — we found the
19  e-mails later on, it was evident that they did
20  not want me there because they were having that
21  private deal to take my Gamer Shot to 5-Hour
22  Energy to then work a deal, some type of a
23  licensing agreement.
24      And then also in those e-mails we
25  uncovered that there was another presentation

Page 160

1   that was done without my name on it.  It was just
2   James, Jason, Mike and Mike to be presented to
3   5-Hour about that deal that they were trying to
4   collaborate, form another company and raise some
5   additional money.  So that was the reason why I
6   put that information in there — in that
7   document.
8       MR. HARVEY:  All right.  Let's go off
9   the record for two seconds.  I just want to go
10  over my notes and make sure I didn't miss
11  anything.  We might be done.
12      THE VIDEOGRAPHER:  We're off the record
13  at 4:24 p.m.
14      (Break taken.)
15      THE VIDEOGRAPHER:  We're back on the
16  record at 4:26 p.m.
17      MR. HARVEY:  Subject to — we're
18  reserving the right to call Mr. Pavlik back
19  because we don't have some documents that were
20  missing from the Defendants, but other than that,
21  I have nothing further at this time.
22      MR. SEXTON:  And I don't have any
23  questions at this time.
24      THE VIDEOGRAPHER:  Counsel, are we
25  prepared to go off the record?

Page 161

1       MR. HARVEY:  Yes.
2       MR. SEXTON:  Yeah.
3       THE VIDEOGRAPHER:  Okay.  And does our
4   court reporter need anything before we do go off
5   the record?
6       THE REPORTER:  Mr. Sexton, do you need
7   a copy for your side?
8       MR. SEXTON:  We'll read and sign.  I
9   don't need a copy right now, but we'll read and
10  sign.
11      THE VIDEOGRAPHER:  All right.  We are
12  off the record at 4:26 p.m.
13      (Whereupon the deposition was
14      concluded at 4:26 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Joseph F. Pavlik
August 20, 2024

Page 162

1    RE:  JAMES DEPPOLETO v TAKEOVER INDUSTRIES, INC.
2              CERTIFICATE OF DEPONENT
3    PAGE     LINE     CHANGE               REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15
16              * * * * *
17         I,          , deponent herein, do hereby
     certify and declare under penalty of perjury the
18   within and foregoing transcription to be my
     deposition in said action; that I have read,
19   corrected, and do hereby affix my signature to
     said deposition.
20
21
22                              _____
23              _____
              JOSEPH F. PAVLIK
                  Deponent
24
25

Page 163

1              REPORTER'S CERTIFICATE.
2         I, the undersigned, a Certified
3    Shorthand Reporter of the states of California
4    and Nevada, do hereby certify:
5         That the foregoing proceedings were
6    taken before me at the time and place herein set
7    forth; that any witnesses in the foregoing
8    proceedings, prior to testifying, were placed
9    under oath; that a verbatim record of the
10   proceedings was made by me using machine
11   shorthand which was thereafter transcribed under
12   my direction; further, that the foregoing is an
13   accurate transcription thereof.
14        I further certify that I am neither
15   financially interested in the action nor a
16   relative or employee of any attorney of any of
17   the parties.
18        IN WITNESS WHEREOF, I have this date
19   subscribed my name.
20   Dated:  September 4, 2024
21
22
23   _____
              KENDALL KING-HEATH
24   CA CSR NO. 11861, NV CCR NO. 475
25

# EXHIBIT L

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

**J. Pavlik letter to Plaintiff J. Deppoleto, Jr.**

**October 7, 2022**

# EXHIBIT L



NXT LVL

Fall Update

Time: 11:00-11:30 EST / 10:00-10:30 CST

Date: October 7, 2022

Hello James!

I appreciate your time on the call this morning.

As a follow up to our last call, I wanted to speak with you bi-weekly to understand your growing insight into the industry and also provide you with some educational strategy points as to how we tie in science/beverage/messaging to help drive both distributor sales and DTC (Direct to Consumer

Brief Items to Touch on for Discussion

1. NACS Report From Your View
2. Spin Out Perspective
3. McBride Situation Accountability
4. Takeover Joe Comeback via Twitter (20,000 followers = $500K in DTC Sales 4/21)
5. Strategically Defining "CSO" as "Educational Entertainment" After Spin-Out
6. NXT LVL Nootropics – Market Growth & DTC play
7. Fall Travel and In-Person Meeting – in WI, OH or Other.
8. Open Questions for Joe

Look forward to speaking with you!

Joe Pavlik - BS, MS, CSCS
Founder I Director
Chief Science Officer
Takeover Industries Inc.
NXT LVL USA

DEF01458

# EXHIBIT M

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

**Partnership with Shaquille O'Neal**

**Bates No. DEF01459-DEF01462**

**October 2022**

# EXHIBIT M

# Partnership with Shaquille O'Neal

## Below is what NXT LVL needs to do to partner with Shaquille O'Neal:

- $5 - 10 million cash up front to Shaq

- $5-10 million worth of stock in NXT LVL Brands

- 10% of yearly sales on Shaq product(s) (paid end of year)

- 5% NXT LVL annual sales all products if Shaq invests (paid end of year)

- Seat on the NXT LVL Board of Directors

- Shaq will work with NXT LVL on naming, flavoring, packaging and design of cans and participate in the R&D process

- Official Drink of NRG Esports (Shaq's Esports league/team)

- January 2023 product launch

- Introduce and promote Shaq's NXT LVL Gamer Energy Drink at Trade Shows & trade publications in Q4 2022

- LA Libations will be the National partner to take to retail

- Danny Stepper from LAL will receive 1-2% of what we pay Shaq for facilitating the deal

DEF01459

# APPEARANCES AND SOCIAL MEDIA ON BEHALF OF NXT LVL ENERGY DRINK:

## APPEARANCES

- NACS Convention and Trade Show
- Rewired Fest for Wal-Mart
- 7-11 National Franchisee Show
- Visit National Retailer HQ to meet buyers and CEO secure agreements/partnerships
- Will call CEO's of national retailers to request that they bring In Shaq's NXT LVL Energy Drink

## SOCIAL MEDIA:

- Organic posts on all social media platforms
- Announce new stores
- Drink and enjoy NXT LVL on all platforms

## MARKETING & ADVERTISING:

- Print ads for NXT LVL Energy Drink
- Drink NXT LVL on NBA Tonight and have can present sitting with him while on TV

## RETAIL MARKETING:

- Use Shaq's Image for retail displays
- Use Shaq's Image on NXT LVL cans and packaging

## NXT LVL EVENTS:

- NXT LVL participate and sample at Super Bowl (Shaq's Fun House)
- NXT LVL participate and sample at Shaqtober celebration
- NXT LVL participate and sample at Shaq DJ events
- Sampling events at NBA games

DEF01460

## LA LIBATIONS – SHAQUILLE ENERGY DRINK

- Will replicate the ZOA marketing approach

- 2-3% of yearly sales on Shaq product(s) (paid end of year)

- Will represent Shaq's NXT LVL Energy Drink on National level

- Will secure Wal-Mart agreements

- NXT LVL will end water relationship with LAL and move to National coverage on Shaq's Drink

- Deal could be completed by end of July

- Danny Stepper is requesting 1-2% as a fee to complete the deal (same as he did with ZOA and the Rock)

DEF01461

## INFO REQUESTED

- Proof that funds will be available to support the deal

- Balance Sheet

- Cap Table

- LA Libations will create a compelling presentation to share with Shaq

DEF01462

# EXHIBIT N

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

## Next Level/ 5-Hour Energy Partnership

## Bates NO. DEF00873

# EXHIBIT N

NXT LVL /5-hour Energy Accelerator Partnership:

- 5-hour Energy will invest in NXT LVL's parent company. The investment will provide Living Essentials LLC with a stake in the company and its brands. The investment will allow the NXT LVL Gamer brand to grow and become a part of the 5-hour Energy family.
- NXT LVL Company will operate as a separate business entity, using its own employees and management.
- NXT LVL Company will work with 5-hour Energy to define collective goals.
- Support NXT LVL Gamer Shot, T-Pain's NXT LVL Gamer Shot, and future products to include T-Pains NXT LVL Gamer Energy Drink.
- NXT LVL will have access to the 5-hour Energy marketing, supply chain, manufacturing, and distribution networks.
- NXT LVL can serve as an R&D arm for 5-Hour to test new products and take products to market.
- NXT LVL will continue to create brand extensions on the Gamer Shots, T-Pain's NXT LVL Gamer Shots (Gamer Drinks), and the additional beverages in its expansion plan.
- Upon an agreed period of time, Living Essentials LLC will have the option to purchase the NXT LVL Brand and/or its Gamer line.
- Post NDA, further information on existing distribution commitments and expansion can be provided.

Why is NXT LVL a good fit to partner with 5-Hour:

- T-Pain's NXT LVL Gamer Shot won "Best New Product of the Year" from CSP News in the Energy Category.
- NXT LVL is targeting a demographic (gamers) that 5-Hour is not directly targeting.
- NXT LVL has already penetrated the Gamer market.
- NXT LVL has already developed our formula, and packaging, and taken it to market.
- Expansion initiatives include distribution in Canada and Asia-focused products with Manny Pacquiao.
- NXT LVL is aligned with celebrities (T-Pain) to help promote our product.
- Our projected sales are phenomenal for a start-up energy-shot company.
- NXT LVL products are already in and are soon to be launching in major retailers across the country and across all retail channels
- NXT LVL is aligned with the leading beverage broker in the country, LA Libations.
- NXT LVL team is experienced in the shot and beverage categories.
- NXT LVL is in the R&D process of creating brand extensions (Gamer Energy Drinks).

DEF00873

# EXHIBIT O

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

Loan Agreement between NextGen Beverage

And Takeover Industries, Inc.

Bates No. DEF01271-DEF01280

# EXHIBIT O

Loan Agreement

This Loan Agreement (the "Agreement") is made and entered into as of 9-18-23 by and between Next Gen Beverages LLC., a Wyoming LLC with a principal place of business located at 125 S King St. STE 2A , Jackson, WY 83001 (the "Lender"), and Takeover Industries Inc., a Nevada Corp. with a principal place of business located at 401 Ryland St. Reno, NV 89502 (the "Borrower").

1. Loan Amount $10,000.00

1.1 Loan Amount: The Lender agrees to lend to the Borrower the sum of $10,000.00 (the "Loan Amount").

2. The Borrower agrees to re-pay the lender for the loan amount.

_Tom Zarro_

Next Gen Beverages LLC.

Takeover Industries Inc.

DEF01271

Loan Agreement

This Loan Agreement (the "Agreement") is made and entered into as of 8-7-24 by and between Next Gen Beverages LLC., a Wyoming LLC with a principal place of business located at 125 S King St. STE 2A , Jackson, WY 83001 (the "Lender"), and Takeover Industries Inc., a Nevada Corp. with a principal place of business located at 401 Ryland St. Reno, NV 89502 (the "Borrower").

1.  Loan Amount $10,000.00

1.1 Loan Amount: The Lender agrees to lend to the Borrower the sum of $10,000.00 (the "Loan Amount").

2. The Borrower agrees to re-pay the lender for the loan amount.


*Tom Zarro*
_____
Next Gen Beverages LLC.

_____
Takeover Industries Inc.

DEF01272

Loan Agreement

This Loan Agreement (the "Agreement") is made and entered into as of 6-29-23 by and between Next Gen Beverages LLC., a Wyoming LLC with a principal place of business located at 125 S King St. STE 2A , Jackson, WY 83001 (the "Lender"), and Takeover Industries Inc., a Nevada Corp. with a principal place of business located at 401 Ryland St. Reno, NV 89502 (the "Borrower").

1.  Loan Amount $15,000.00

1.1 Loan Amount: The Lender agrees to lend to the Borrower the sum of $15,000.00 (the "Loan Amount").

2. The Borrower agrees to re-pay the lender for the loan amount.


*Tom Zarro*
_____
Next Gen Beverages LLC.


_____
Takeover Industries Inc.


DEF01273

Loan Agreement

This Loan Agreement (the "Agreement") is made and entered into as of 5-20-24 by and between Next Gen Beverages LLC., a Wyoming LLC with a principal place of business located at 125 S King St. STE 2A , Jackson, WY 83001 (the "Lender"), and Takeover Industries Inc., a Nevada Corp. with a principal place of business located at 401 Ryland St. Reno, NV 89502 (the "Borrower").

1. Loan Amount $6,000.00

1.1 Loan Amount: The Lender agrees to lend to the Borrower the sum of $6,000.00 (the "Loan Amount").

2. The Borrower agrees to re-pay the lender for the loan amount.


_Tom Zarro_

Next Gen Beverages LLC.


_____

Takeover Industries Inc.

DEF01274

Loan Agreement


This Loan Agreement (the "Agreement") is made and entered into as of 5-15-24 by and between Next Gen Beverages LLC., a Wyoming LLC with a principal place of business located at 125 S King St. STE 2A , Jackson, WY 83001 (the "Lender"), and Takeover Industries Inc., a Nevada Corp. with a principal place of business located at 401 Ryland St. Reno, NV 89502 (the "Borrower").


1.  Loan Amount $5,000.00

1.1 Loan Amount: The Lender agrees to lend to the Borrower the sum of $5,000.00 (the "Loan Amount").


2. The Borrower agrees to re-pay the lender for the loan amount.



*Tom Zarro*
_____
Next Gen Beverages LLC.

_____
Takeover Industries Inc.

DEF01275

Loan Agreement

This Loan Agreement (the "Agreement") is made and entered into as of 4-29-24 by and between Next Gen Beverages LLC., a Wyoming LLC with a principal place of business located at 125 S King St. STE 2A , Jackson, WY 83001 (the "Lender"), and Takeover Industries Inc., a Nevada Corp. with a principal place of business located at 401 Ryland St. Reno, NV 89502 (the "Borrower").

1.  Loan Amount $5,000.00

1.1 Loan Amount: The Lender agrees to lend to the Borrower the sum of $5,000.00 (the "Loan Amount").

2. The Borrower agrees to re-pay the lender for the loan amount.

_Tom Zarro_

Next Gen Beverages LLC.

_Aleks Alley_

Takeover Industries Inc.

DEF01276

Loan Agreement

This Loan Agreement (the "Agreement") is made and entered into as of 4-2-24 by and between Next Gen Beverages LLC., a Wyoming LLC with a principal place of business located at 125 S King St. STE 2A , Jackson, WY 83001 (the "Lender"), and Takeover Industries Inc., a Nevada Corp. with a principal place of business located at 401 Ryland St. Reno, NV 89502 (the "Borrower").

1.  Loan Amount $7,500.00

1.1 Loan Amount: The Lender agrees to lend to the Borrower the sum of $7,500.00 (the "Loan Amount").

2. The Borrower agrees to re-pay the lender for the loan amount.


_Tom Zarro_

Next Gen Beverages LLC.


_Al-leb H Illy_

Takeover Industries Inc.

DEF01277

Loan Agreement

This Loan Agreement (the "Agreement") is made and entered into as of 3-8-24 by and between Next Gen Beverages LLC., a Wyoming LLC with a principal place of business located at 125 S King St. STE 2A , Jackson, WY 83001 (the "Lender"), and Takeover Industries Inc., a Nevada Corp. with a principal place of business located at 401 Ryland St. Reno, NV 89502 (the "Borrower").

   1.  Loan Amount $10,000.00

   1.1 Loan Amount: The Lender agrees to lend to the Borrower the sum of $10,000.00 (the "Loan Amount").

   2. The Borrower agrees to re-pay the lender for the loan amount.


*Tom Zarro*
_____
Next Gen Beverages LLC.

_____
Takeover Industries Inc.

DEF01278

Loan Agreement

This Loan Agreement (the "Agreement") is made and entered into as of 3-1-24 by and between Next Gen Beverages LLC., a Wyoming LLC with a principal place of business located at 125 S King St. STE 2A , Jackson, WY 83001 (the "Lender"), and Takeover Industries Inc., a Nevada Corp. with a principal place of business located at 401 Ryland St. Reno, NV 89502 (the "Borrower").

1.  Loan Amount $1,500.00

1.1 Loan Amount: The Lender agrees to lend to the Borrower the sum of $1,500.00 (the "Loan Amount").

2. The Borrower agrees to re-pay the lender for the loan amount.

_Tom Zarro_

Next Gen Beverages LLC.

_Michael Helly_

Takeover Industries Inc.

DEF01279

Loan Agreement

This Loan Agreement (the "Agreement") is made and entered into as of 2-14-24 by and between Next Gen Beverages LLC., a Wyoming LLC with a principal place of business located at 125 S King St. STE 2A , Jackson, WY 83001 (the "Lender"), and Takeover Industries Inc., a Nevada Corp. with a principal place of business located at 401 Ryland St. Reno, NV 89502 (the "Borrower").

1.  Loan Amount $4,000.00

1.1 Loan Amount: The Lender agrees to lend to the Borrower the sum of $4,000.00 (the "Loan Amount").

2. The Borrower agrees to re-pay the lender for the loan amount.


*Tom Zarro*

Next Gen Beverages LLC.


Takeover Industries Inc.

DEF01280

# EXHIBIT P

J. Deppoleto, Jr. v. Takeover Industries, Inc.

Case No. 2:22-cv-2013-GMN-BNW

Defendants' Opposition to Motion for Partial Summary Judgment

**Family Dollar Vendor Funding Invoice**

**November 2, 2022**

# EXHIBIT P

# FAMILY 🏷 DOLLAR
## VENDOR FUNDING INVOICE

| | |
|---|---|
| VENDOR: TAKEOVER INDUSTRIES INC | VENDOR# 20165 |
| ADDRESS: 119 E UNION ST | INVOICE# VF-12646179 |
| STE B | DATE: 11/02/2022 |
| PASADENA, CA 91103 | AMOUNT DUE: 3,047,200.0000 |
| ATTN: MICHAEL TIANEBTATOS | |

DESCRIPTION: Slotting Fees T-Pain Energy Shot

| VF TYPE | IMPACT | MMDSE CODE | GL CODE | DEPT / CAT | SKU | UNITS | UNIT COST | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| Slotting Allowance (SA) | COGS | MURADJ | 500090 | 9 / 344 | | | | ************** |
| | | | | | | | Total: | 3,047,200.0000 |

DEF00825