# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JAMES V. DEPPOLETO, JR., <br><br> Plaintiff, <br><br> vs. <br><br> TAKEOVER INDUSTRIES INCORPORATED, *et al.*, <br><br> Defendants. | Case No.: 2:22-cv-02013-GMN-BNW <br><br> **ORDER GRANTING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Pending before the Court is the Motion for Partial Summary Judgment ("MSJ"), (ECF No. 100), filed by Plaintiff James V. Deppoleto, Jr.  The Defendants, Tom Zarro, Takeover Industries Incorporated, Michael Holley, Toby McBride, Joseph Pavlik, and NextGen Beverage, LLC, filed a Response and Errata, (ECF Nos. 108, 109, 111),[1] to which Plaintiff filed a Reply, (ECF No. 114).

Also pending before the Court is Defendants' Motion for Leave to File Documents Under Seal, (ECF No. 110), to which Plaintiff filed a Response, (ECF No. 113), and Defendants filed a Reply, (ECF No. 115).  Lastly, pending before the Court is Plaintiff's Motion for Leave to File Document, (ECF No. 140), to which Defendants filed a Response, (ECF No. 148).  For the reasons discussed below, the Court **GRANTS, in part, and DENIES,**

---

[1] The Response briefs, (ECF Nos. 108 and 109), are identical and filed twice on the docket.  Because the Errata, (ECF No. 111), includes additional citations, the Court will cite to the Errata in this Order.

1  **in part**, Plaintiff's Motion for Partial Summary Judgment.  The Court also **DENIES**

2  Defendants' Motion to Seal[2] and GRANTS Plaintiff's Motion for Leave to File Document.[3]

3  **I.    BACKGROUND**

4         Plaintiff Deppoleto brings this case after making loans to Takeover Industries

5  Incorporated that have not been repaid.  (*See generally* First Am. Compl. ("FAC"), ECF No.

6  25).  He moves for partial summary judgment on his second claim for breach of contract,

7  against Takeover, as well as his seventh claim for fraudulent transfer against Takeover, Holley,

8  Zarro, and NextGen Beverages.

9         Takeover is a beverage business founded by Defendants Michael Holley and Toby

10  McBride in 2021.  (Holley Dep. 13:22–14:7, Ex. 1 to Harvey Decl., ECF No. 102-1).  It sold

11  hydrogen water and "gamer" energy shots.  (Holley Rep. Dep. 12:8–15, Ex. 2 to Harvey Decl.,

12  ECF No. 102-2).  Holley became the Chief Executive Officer, McBride became the Chief

13  Operating Officer, and both became Directors.  (*Id.* 28:13–25).  Not long after its founding,

14  Takeover was acquired by Labor Smart, Inc. and became a wholly-owned subsidiary.  (*Id.* 37:2–

15

16  _____

17  [2] The public has a presumptive right to inspect and copy judicial records and documents. *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).  The Ninth Circuit has rejected efforts to seal

18  documents under the "compelling reasons" standard based on "conclusory statements about the contents of the documents–that they are confidential" and that, in general, their disclosure would be harmful to the movant. *Id.*

19  at 1182.  Under the compelling reasons standard, a court may seal a record only if it finds a "compelling reasons" to support such treatment and articulates "the factual basis for its ruling, without relying on hypothesis or conjecture." *Ctr. For Auto Safety v. Chrysler Grp., LLC,* 809 F.3d 1092, 1096–97 (9th Cir. 2016).

20  Furthermore, any "requests to seal documents must be 'narrowly tailored' to remove from the public sphere only the material that warrants secrecy." *Florence v. Cenlar Fed. Sav. & Loan*, No. 2:16-cv-00587, 2017 WL

21  1078637, (D. Nev. Mar. 20, 2017) (internal citations omitted).  In their Motion to Seal and Reply brief, Defendants ask the Court to seal the marketing slides because the slides have text stating that they are confidential.

22  But this conclusory statement does not meet the compelling reasons standard, and their request is not narrowly tailored.  Accordingly, the Court DENIES Defendants' Motion to Seal.

23  [3] Pursuant to Local Rule 7-2(g), "[a] party may not file supplemental pleadings, briefs, authorities, or evidence without leave of court granted for good cause." D. Nev. Local R. 7-2 (g).  Plaintiff argues that good cause exists

24  because after Plaintiff filed his Motion for Partial Summary Judgment, the Court held a hearing on his Motion to Compel and ordered Takeover to serve additional documents responsive to his discovery requests. (Mot. Leave

25  2:26-3:13).  Takeover produced almost 1,300 pages of documents that should have been produced before the dispositive motion deadline. (*Id.*).  Thus, for good cause appearing, Plaintiff's motion is GRANTED.

12).  In November 2021, the Board of Directors (the "Board") added Joseph Pavlik and Jason Tucker. (Holley Rep. Dep. 77:10–78:7, Ex. 2 to Harvey Decl.); (McBride Decl. ¶ 4, Ex. B to Bennion Decl., ECF No. 109-2.  The Board appointed Tucker to be President. (Holley Dep. 36:4–21, Ex. 1 to Harvey Decl.).

A month later, the Directors voted to remove Holley from the Board, based on accusations that he made unauthorized distributions on behalf of Takeover, charged personal expenses to Takeover, and allowed family members to charge expenses to Takeover. (Holley Dep. 93:19–100:12, Ex. 1 to Harvey Decl.); (Holley Rep. Dep. 81:14–82:20, Ex. 2 to Harvey Decl.).  Holley testified that the accusations were falsely made by Tucker to gain control over company bank accounts and credit cards. (Holley Decl. ¶ 9, Ex. C to Bennion Decl., ECF No. 109-1).  These accusations were the basis of a lawsuit brought by Takeover against Holley in the District of Arizona (the "Arizona lawsuit"). (Holley Dep. 94:20–23, Ex. 1 to Harvey Decl.).

## A.   Facts Involving Claim 2: Breach of Contract

Between May and August 2022, Takeover issued three secured written Notes to Plaintiff for a total amount of $1,500,000. (Holley Rep. Dep. 26:8–11, Ex. 2 to Harvey Decl.).  The principal amount of each Note, under the Convertible Note Purchase Agreement ("NPA"), was $500,000. (NPA, Ex. 5 to Harvey Decl., ECF No. 102-5); (First Note at 1, Ex. 7 to Harvey Decl., ECF No. 102-7); (Second Note at 1, Ex. 10 to Harvey Decl., ECF No. 102-10); (Third Note at 1, Ex. 11 to Harvey Decl., ECF No. 102-11).  The NPA was executed by Tucker, Takeover's President, Costello, the CEO of Labor Smart, and Plaintiff. (NPA at 20–21, Ex. 5 to Harvey Decl.).  They also executed the First and Second Amendments when the two subsequent $500,000 Notes were issued. (First Amendment, Ex. 8 to Harvey Decl., ECF No. 102-8); (Second Amendment, Ex. 11 to Harvey Decl., ECF No. 102-11).  Additionally, Tucker, McBride, Pavlik, and Costello, signed three joint written consents approving the NPA and the subsequent First and Second Amendments. (Consents, Exs. 6, 9, 12 to Harvey Decl., ECF Nos.

102-6, 102-9, 102-12).  The consents authorize and direct the President of Takeover to execute, deliver, and effect the transactions relating to Plaintiff's debt interest. (*Id.*); (Holley Rep. Dep. 20:4–24, Ex. 2 to Harvey Decl.).  Takeover acknowledges that it received $1.5 million from Plaintiff. (Errata 7:7, ECF No. 109).  The maturity dates for the First, Second, and Third Notes were in 2022 and 2023. (NPA at 1, 2, 15, Ex. 5 to Harvey Decl.); (Second Note at 1, Ex. 10 to Harvey Decl.); (Third Note at 1, Ex. 13 to Harvey Decl.).

In addition to the Notes, Plaintiff made two payments to Great Northern Corp. for $386,773.86 and $128,924.62, which he testified were made on Takeover's behalf as additional loans (the "Supplemental Loans"). (Oct. 2022 Receipt, Ex. 13 to Harvey Decl., ECF No. 102-13); (Nov. 2022 Receipt, Ex. 14 to Harvey Decl., ECF No. 102-14); (Pl.'s Decl. ¶¶ 2–6, ECF No. 101).  Plaintiff's Declaration states that he had an agreement with Takeover that these loans would be added to his convertible debt investment, funded as part of the NPA, and would result in a Fourth Note with a Maturity Date of April 11 and May 3, 2023, respectively. (Pl.'s Decl. ¶¶ 2–8).

Takeover has not repaid any amount to Plaintiff. (Holley Rep. Dep. 117:22–25, Ex. 2 to Harvey Decl.).  Therefore, Plaintiff alleges that Takeover has defaulted on its three written Notes and the two Supplemental Loans. (MSJ 8:4–7, ECF No. 100).  Plaintiff sent the first Notice of Default and Demand for Payment on November 8, 2022, and a second Notice of Default 12 days later. (First Not. Default, Ex. 17 to Harvey Decl., ECF No. 102-17); (Second Not. Default, Ex. 18 to Harvey Decl., ECF No. 102-18).  As of the date of the Motion for Partial Summary Judgment, Plaintiff alleges that Takeover owes him $2,070,098.36 in principal, plus interest and attorneys' fees. (MSJ 10:26–28).  Thus, Plaintiff claims that Takeover has breached the Notes and Supplemental Loan agreements by not repaying the loans. (FAC ¶¶ 95–100).

### B.  Facts Involving Claim 7: Fraudulent Transfer

Plaintiff's fraudulent transfer claim generally alleges Defendants transferred Takeover's assets to NextGen Beverages with the intent to defraud Plaintiff, because Takeover believed, or reasonably should have believed, that it would not be able to repay him. (*Id.* ¶¶ 137–42). Beginning in November 2022, Takeover made multiple changes to its Board of Directors. First, it resolved to remove Tucker from the Board and appointed Holley to serve as Interim Chief Executive Officer. (Nov. Labor Smart Resolution at 4–5, Ex. 16 to Harvey Decl., ECF No. 102-16).  Pavlik and McBride remained on the Board. (*Id.*).  A couple months later, the Board voted to dismiss the remaining claim in the Arizona lawsuit against Holley and his wife, but Holley did not participate in the Board's decision. (Holley Dep. 148:2–22, Ex. 1 to Harvey Decl.).  Takeover settled with Holley and paid him $5,000. (*Id.* 185:6–22).

In April 2023, the composition of the Takeover Board changed again when McBride resigned and the Board appointed Zarro as a Board Member and Officer. (April Takeover Resolution at 2, Ex. 20 to Harvey Decl., ECF No. 102-20).  So, the Board of Directors was made up of Zarro, Pavlik, and Holley. (Holley Rep. Dep. 87:10–25, Ex. 2 to Harvey Decl.).  A couple months later, after this lawsuit was filed in December 2022, the new Board began to discuss forming a new beverage company: NextGen Beverages. (Zarro Dep. 233:7–235:7, Ex. 22 to Harvey Decl., ECF No. 102-22).  The goal was to create a new entity capable of "spinning out," and because Takeover had multiple lawsuits and creditors, it was no longer a viable candidate. (*Id.*).  Zarro, in addition to other Labor Smart investors and Board Members, funded NextGen's start-up capital. (*Id.* 71:4–19).  NextGen's manager-members were Holley and Zarro, and it became another wholly-owned subsidiary of Labor Smart. (*Id.* 52:12–53:11). NextGen sold energy drinks, coffee, hydrogen water, and electrolyte stick packs. (*Id.* 73:5–18). Holley and Zarro focused primarily on growing NextGen, not Takeover. (*Id.* 261:25–263:19); (Holley Dep. 191:2–196:5, Ex. 1 to Harvey Decl.).  Zarro also purchased a portion of

1  Takeover's hydrogen water and gamer energy shots, because Takeover needed the money, and

2  paid below retail price. (Zarro Dep. 196:10–202:19, Ex. 22 to Harvey Decl.).  Plaintiff now

3  moves for summary judgment on his breach of contract and fraudulent transfer claims. (*See*

4  *generally* MSJ).

5  **II.  LEGAL STANDARD**

6       The Federal Rules of Civil Procedure provide for summary adjudication when the

7  pleadings, depositions, answers to interrogatories, and admissions on file, together with the

8  affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant

9  is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that

10 may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

11 (1986).  A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on

12 which a reasonable fact-finder could rely to find for the nonmoving party. *See id.*  "The amount

13 of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or

14 judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*,

15 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253,

16 288–89 (1968)).  "Summary judgment is inappropriate if reasonable jurors, drawing all

17 inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's

18 favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).  A principal

19 purpose of summary judgment is "to isolate and dispose of factually unsupported claims."

20 *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

21       In determining summary judgment, a court applies a burden-shifting analysis.  "When

22 the party moving for summary judgment would bear the burden of proof at trial, it must come

23 forward with evidence which would entitle it to a directed verdict if the evidence went

24 uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing

25 the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp.*

1    *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quotation marks and

2    citation omitted).  In contrast, when the nonmoving party bears the burden of proving the claim

3    or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to

4    negate an essential element of the nonmoving party's case; or (2) by demonstrating that the

5    nonmoving party failed to make a showing sufficient to establish an element essential to that

6    party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477

7    U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be

8    denied, and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H.*

9    *Kress & Co.*, 398 U.S. 144, 159–60 (1970).

10           If the moving party satisfies its initial burden, the burden then shifts to the opposing

11    party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v.*

12    *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute,

13    the opposing party need not establish a material issue of fact conclusively in its favor.  It is

14    sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

15    parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

16    *Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  However, the nonmoving party "may not rely on

17    denials in the pleadings but must produce specific evidence, through affidavits or admissible

18    discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404,

19    1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical

20    doubt as to the material facts," *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002).  "The

21    mere existence of a scintilla of evidence in support of the plaintiff's position will be

22    insufficient." *Anderson*, 477 U.S. at 252.  In other words, the nonmoving party cannot avoid

23    summary judgment by "relying solely on conclusory allegations unsupported by factual data."

24    *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go

25

beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.    DISCUSSION

Plaintiff's Motion for Partial Summary Judgment requests that the Court grant him summary judgment on his breach of contract and fraudulent transfer claims. (*See generally* MSJ). The Court begins by addressing Plaintiff's argument that Takeover breached its contracts with Plaintiff.

### A.    Breach of Contract

To prevail on a breach of contract claim under Nevada law, the plaintiff must show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach. *Richardson v. Jones*, 1 Nev. 405 (1865). Generally, a contract is valid and enforceable if there has been "an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005). As the moving party, Plaintiff has the initial burden of providing evidence that would entitle him to a directed verdict and establishing the absence of a genuine issue of fact. *See C.A.R. Transp. Brokerage Co.*, 213 F.3d at 480.

#### 1.    NPA and Written Notes

Beginning with the first element, Plaintiff has met his burden of demonstrating that the NPA, subsequent Amendments, and Notes, are valid contracts. Plaintiff and Takeover signed written contracts that contained the essential terms of their agreement. Plaintiff agreed to make three loans to Takeover for $500,000, in exchange for three secured convertible promissory

notes. (NPA at 1, Ex. 5 to Harvey Decl.); (First Amendment, Ex. 10 to Harvey Decl.); (Second Amendment, Ex. 11 to Harvey Decl.). The NPA and Amendments are signed by Plaintiff, the President of Takeover, Jason Tucker, and the CEO of Labor Smart. (*Id.*). Plaintiff accepted the terms of the contract and paid the required principal. (Holley Decl. 19:8–11, 23:21–24, 28:8–11, Ex. C to Bennion Decl.). Bank of America records confirm that Takeover received three $500,000 payments from Plaintiff in accordance with the terms of the Notes. (BOA Records, Ex. B to Mot. Leave, ECF No. 140-4).

As for the second element, Plaintiff has also provided evidence that Takeover breached the contracts by failing to repay the loans by their maturity dates and taking other actions that place it in default. Plaintiff's First Notice of Default, sent on November 8, 2022, demanded immediate payment of the principal, plus accrued interested. (First Not. Default at 2, Ex. 17 to Harvey Decl.). Section 7 of the First Note, for example, states that an "Event of Default" occurs when "the Company fails to timely pay any of the principal amount due under this Note on the date the same becomes due and payable . . . ." (*See, e.g.*, First Note at 2 ¶ 7.3, Ex. 7 to Harvey Decl.). Upon the occurrence of an Event of Default, the Plaintiff may declare all amounts immediately due and payable in full. (*Id.*). Holley, in his capacity as Takeover's Corporate Representative, also testified that Takeover breached its warranties by failing to maintain Directors and Officers liability insurance. (Holley Rep. Dep. 94:3–8, Ex. 2 to Harvey Decl.). Per the Note, that is also an Event of Default. (NPA at 11, Ex. 5 to Harvey Decl.); (First Note at 2, Ex. 7 to Harvey Decl.). The Corporate Representative also testified that Takeover defaulted on its obligations to Plaintiff, and that as of the date of his deposition on November 19, 2024, Takeover had not repaid any amount of the funds that Plaintiff loaned to Takeover. (Holley Rep. Dep. 90:2–20, 117:22–25, Ex. 2 to Harvey Decl.). The maturity dates for the First, Second, and Third Notes were in 2022 and 2023. (NPA at 1, 2, 15, Ex. 5 to Harvey Decl.); (Second Note at 1, Ex. 10 to Harvey Decl.); (Third Note at 1, Ex. 13 to Harvey Decl.).

Plaintiff has been damaged as a result of Takeover's breaches, satisfying Plaintiff's burden of establishing the third element.

The burden now shifts to Takeover to establish that a genuine issue of material fact exists.  Takeover first cites Holley's Declaration, which states that he was improperly removed from the Board, and that during his forced absence, Tucker signed the first of the Notes without proper board authorization. (Errata 11:18–28).  This argument fails because the NPA and Notes were executed between May 2022 and August 2022, when the Takeover Board Members were McBride, Tucker, and Pavlik. (Holley Rep. Dep. 82:11–20, Ex. 2 to Harvey Decl.).  Those three Members signed the three Consents that authorized the President to execute the transactions and approved Takeover entering into the NPA. (Consents, Exs. 6, 9, 12 to Harvey Decl., ECF Nos. 102-6, 102-9, 102-12).  The Consents resolved that the Purchase Agreement was adopted and approved, to be evidenced by an Authorized Officer's execution, and then "authorized, empowered, and directed" Jason Tucker to execute the Purchase Agreement and "consummate the transactions contemplated thereby." (*Id.*).  And even if Holley was improperly removed and should have been on the Board, three of the four Members signed the Consents, and thus they constituted a majority of the Board, and the actions were valid. *See* NRS 78.315(1); *Pope Invs., LLC v. China Yida Holding, Co.*, 490 P.3d 1282, 1288 (2021) ("NRS 78.315(1) provides simply that an act by directors holding a majority of the directors' voting power is an act of the board[.]")

After the Board Members signed the Consents, Tucker signed the NPA and Notes. Takeover disputes that Tucker, "purporting to act in the capacity as president of Takeover," properly entered into the NPA and its associated Notes. (Errata 10:12–28).  However, Takeover provides no evidence that Tucker was not the Board President when he signed the contracts.  In fact, Holley himself testified Mr. Tucker remained President of Takeover from November 2021 until he was removed in 2023, meaning he was President when the NPA and Notes were

executed in 2022. (Holley Dep. 36:7–24, Ex. 1 to Harvey Decl.).  Takeover thus fails to raise a genuine issue of material fact as to the validity of the NPA, Consents, and Notes.

### i.    *Void ab initio*

Takeover's next argument is that the written Notes placed Takeover in default from the moment of execution, and thus the contract was *void ab initio*, because Takeover failed to disclose that it had initiated a lawsuit against Holley in March of 2022, which constituted an Event of Default per the terms of the contract. (Errata 4:19–23, 28:5–10).  Takeover provides no further argument or explanation, nor does it provide case law to support this assertion.  Per Black's Law Dictionary, (12th ed. 2024), a contract is *void ab initio* when it is "Null from the beginning, as from the first moment when a contract is entered into."  By signing the NPA, Takeover represented to Plaintiff that it was not a party to a lawsuit but admits now in its Response Brief that it *was* a party to the Arizona lawsuit against Holley at the time.  The contract is not void simply because Takeover breached a warranty in the Purchase Agreement the instant it was signed, and thus the Court rejects this argument.  If anything, this argument provides support for Plaintiff's claim that Takeover breached the NPA by initiating an "Event of Default," and not repaying his loan in full upon demand.

### ii.    *Implied Covenant of Good Faith as an Affirmative Defense*

Takeover also argues that there was no valid contract at all, because Plaintiff breached the implied covenant of good faith and fair dealing by representing himself to be a Director of Takeover, taking control of Takeover accounts, and pursuing other business opportunities to the detriment of Takeover. (Errata 28:15–23).  As Plaintiff points out, Takeover did not raise this affirmative defense in its answer. (*See* Reply 9:4–15).  This does not automatically preclude Takeover from bringing this defense however, because defendants may assert an affirmative defense at the summary judgment stage, even if it was not included in the answer, "unless the plaintiff would be prejudiced by the delay." *Garcia v. Salvation Army*, 918 F.3d 997, 1008–09

1   (9th Cir. 2019).  The plaintiff must "point to a 'tangible way in which it was prejudiced by the

2   delay.'" *Id.* at 1008 (quoting *Ledo Fin. Corp. v. Summers*, 122 F.3d 825, 827 (9th Cir. 1997)).

3   Plaintiff alleges he would be prejudiced because "discovery is closed," but fails to provide any

4   detail or statement as to how the close of discovery would prejudice him or what discovery he

5   would seek.  Thus, the Court considers the merits of Takeover's argument.

6           In Nevada, "[e]very contract imposes upon each party a duty of good faith and fair

7   dealing in its performance and execution." *A.C. Shaw Constr. v. Washoe Cty.*, 784 P.2d 9, 9

8   (Nev. 1989) (quoting Restatement (Second) of Contracts § 205).  To establish a claim for

9   breach of the implied covenants of good faith and fair dealing, a plaintiff must prove: (1) the

10  existence of a contract between the parties; (2) that defendant breached its duty of good faith

11  and fair dealing by acting in a manner unfaithful to the purpose of the contract; and (3) the

12  plaintiff's justified expectations under the contract were denied. *See Perry v. Jordan*, P.2d 335,

13  338 (Nev. 1995) (citing *Hilton Hotels Corp. v. Butch Lewis Prod. Inc.*, P.2d 919, 922–23 (Nev.

14  1991)).  "The implied covenants of good faith and fair dealing impose a burden that requires

15  each party to a contract to 'refrain from doing anything to injure the right of the other to receive

16  the benefits of the agreement.'" *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*, No.

17  5:12-CV-06209-EJD, 2013 WL 3974537, at *7 (N.D. Cal. July 31, 2013) (quoting *San Jose*

18  *Prod. Credit Ass'n v. Old Republic Life Ins. Co.*, 723 F.2d 700, 703 (9th Cir. 1984)).  A breach

19  of the implied covenants of good faith and fair dealing is "limited to assuring compliance with

20  the express terms of the contract, and cannot be extended to create obligations not contemplated

21  by the contract." *McKnight v. Torres*, 563 F.3d 890, 893 (9th Cir.2009).

22          Although neither party cites a Nevada case in which the defendant uses an alleged

23  breach of the covenant as an affirmative defense, the Court rejects Takeover's argument on the

24  basis that it does not provide evidence or explanation as to how it was prevented from receiving

25  the benefits of Plaintiff's loan, or how its justified expectations were denied.  Takeover alleges

that Plaintiff violated the covenant of good faith and fair dealing by taking action to remove Pavlik from the Board and exclude him from meetings, suspend McBride, and represent himself as a director while marketing products to third parties without McBride or Pavlik's authorization. (Errata 5:22–6:2). Specifically, Takeover cites Plaintiff's action taken in November 2022 to engage in "unauthorized negotiations" with Five Hour Energy, along with Tucker, for their personal benefit. (citing Holley Decl. ¶ 12, Ex. C to Bennion Decl.). It also cites Pavlik's Deposition, explaining that of the $1.5 million loan, $980,000 was used for a deal with Dollar General, which was a decision made by Tucker and Plaintiff. (Pavlik Dep. 21:14–23:24, Ex. K to Bennion Decl., ECF No. 109-2). He testified that it was this deal that set the company up to fail, and that it was advised against. (*Id.*). Takeover argues that these actions, along with the actions of Tuckers and others, suffocated its value. (Errata 6:4–6).

As an initial matter, Takeover fails to cite evidence demonstrating that Plaintiff removed Pavlik or McBride from the Board, and Plaintiff was not listed as a Member on the Board Resolutions when votes were taken on those actions. The parties dispute whether Deppoleto held himself out as a Director of Takeover, but whether or not he did so, Takeover has not explained why this issue would be material to the claim. The contract at issue is a Loan Agreement, and Plaintiff's only duty was to provide the $500,000 loan, which the parties do not dispute that he did. Even if Plaintiff held himself out as a Director of Takeover, Takeover does not state why this would injure its right to receive the $500,000 loan.

Takeover has also failed to explain how Plaintiff's actions in negotiating with Five Hour Energy were related to its contracts with Plaintiff in any way. Viewing the evidence in the light most favorable to the Takeover, Pavlik testified that Plaintiff worked with Takeover's President to decide that some of the loan money should be used to make a deal with Dollar General. (Pavlik Dep. 21:14–23:24, Ex. K to Bennion Decl.). That deal ended up harming Takeover. (*Id.*). However, because Takeover does not allege that this action was prohibited by the

contracts, nor explain which of its justified expectations were denied by these actions, its non-performance is not excused.  Takeover admits that it received the $1.5 million from Plaintiff, which is the benefit promised to it in the contract. (Errata 7:7–12).  The purpose of the contracts was to enable Plaintiff to loan Takeover three payments of $500,000, which he did, and Takeover does not explain how his actions of holding himself out as a director or pursuing other business activities are unfaithful to the purpose of the contract: a $1.5 million loan.

### iii.    Instrumentality Theory

Lastly, Takeover cites a Fifth Circuit case describing the common law "instrumentality theory," and stating that there is a genuine issue of material fact as to Plaintiff's level of control over it. (*Id.* 18:15–28).  "Where the theory is recognized, a lender may be held liable under the common-law instrumentality theory when the lender exerts such a degree of control over the borrower that the borrower becomes a mere business conduit for the lender." *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 104 (1st Cir. 2009).  To establish a claim of lender liability under the instrumentality theory, a plaintiff must make "a strong showing that the creditor assumed actual, participatory, total control of the debtor" and "the facts must 'unmistakably show that the subservient corporation was being used to further the purposes of the dominant corporation and that the subservient corporation in reality had no separate, independent existence of its own." *Id.* at 105 (quoting *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1104 (5th Cir. 1973)).

As Plaintiff points out, however, Takeover fails to cite case law, and the Court has not otherwise found any case law, demonstrating that Nevada recognizes the instrumentality theory as a claim or defense.  Even if Nevada were amenable to this theory, the First Circuit explained that this theory "has generally been used by third party creditors seeking to hold a lender liable for the debts of the borrower." *FAMM Steel, Inc.*, 571 F.3d at 104 (collecting cases).  In *Famm Steel*, like here, the moving party was a debtor trying to recover damages from their creditor,

but the moving party was not misled as to who the creditor was. *Id.* "[Defendant] points to no cases that recognize this novel application, and there is no indication that such an application would be accepted . . . ." *Id.* Additionally, Takeover lacks evidence to support its argument that Plaintiff exercised such a high level of control such that it would give rise to liability. The mere existence of a creditor-debtor relationship is not enough, "even when the creditor "tak[es] an active part in the management of the debtor corporation." *Id.* (citing *Krivo*, 483 F.2d at 1105). Accordingly, the Court finds no genuine issue for trial relating to Plaintiff's breach of contract claim for the written contracts and GRANTS summary judgment.

### 2. Payments to Great Northern

Plaintiff also seeks summary judgment on his breach of contract claim as it relates to the two Supplemental Loans. Takeover's Corporate Representative testified that Great Northern was making a display for Takeover and that Takeover would have owed money to Great Northern. (Holley Rep. Dep. 67:21–68:6, Ex. 2 to Harvey Decl.). In support of his position that the Supplemental Loans were an enforceable contract, which Takeover disputes, Plaintiff provides his own deposition and declaration. (*See* MSJ 15:22–16:17). Plaintiff testified that on October 13, 2022, he loaned Takeover $386,773.86, which he and Takeover agreed would be added to his convertible debt investment. (Pl.'s Decl. ¶ 2). He made the payment to Takeover's vendor, Great Northern Corporation, who built retail display shelves for the "gamer shot" product. (*Id.* ¶ 3). Plaintiff states that he and Takeover's management agreed that the payment would be made directly to Great Northern, rather than to Takeover, because he was concerned that his previous loan money was not being used in the agreed upon manner. (*Id.*). In November 2022, he made another loan for $128,924.62 directly to Great Northern, for the same reasons. (*Id.* ¶¶ 4–5). Takeover and Plaintiff agreed that the Supplemental Loans would be funded as part of the NPA and would result in a Fourth Note with a maturity date of 180 days after issuance. (*Id.* ¶ 8). Thus, the maturity dates would be April 11, 2023, and May 3, 2023,

respectively. (*Id.* ¶¶ 8–9).  In February 2023, Great Northern issued Plaintiff a refund of $35,177.93, because the shelves did not cost the amount that he had already paid. (*Id.* ¶ 11).

For additional evidence, Plaintiff also submits Takeover's Balance Sheet showing a liability of $2,016,697 due to Plaintiff, which would include both his $1.5 million loan in the written contracts, plus his two Supplemental Loans. (Takeover Balance Sheet, Ex. 24 to Harvey Decl., ECF No. 102-24).  And on one of Takeover's corporate records time-stamped December 28, 2024, it states "Loans Payable" to Plaintiff as the entire balance of $2,016.697. (Account Quick Report at DEF01383, Ex. 25 to Harvey Decl., ECF No. 102-25).  Lastly, Plaintiff demonstrates that in January 2023, Great Northern Corporation sent "revised" invoices to McBride, Holley, and Pavlik totaling $469,146.94 and communicating that it would be issuing Takeover a $46,236.47 credit because it received $515,699.48 after sending the initial invoice in August 2022. (*Id.*).  That $515,699.48 invoice is the total amount that Plaintiff paid to the Great Northern Corporation. (Oct. 2022 Receipt, Ex. 13 to Harvey Decl.); (Nov. 2022 Receipt, Ex. 14 to Harvey Decl.).

Added together, this evidence is sufficient for Plaintiff to meet his initial burden of establishing the absence of a genuine issue of fact on his breach of contract claim relating to the Supplemental Loans.  Plaintiff has provided evidence that he had an oral contract with Takeover, paid the loan amount to Great Northern as requested, the loan amount was recorded in Takeover's balance sheet as the total loans payable to Plaintiff, but he has never been paid by Takeover and is still an outstanding liability on Takeover's balance sheet.

Takeover disputes that an oral agreement was made at all, or that it agreed that the additional loans would be funded as part of the NPA. (Errata 11:10–13).  In support of its Reply, it broadly cites to the Declarations of Pavlik and Holley, but does not cite to a particular paragraph supporting this position, nor can the Court find one. (*Id.* 17:11–14).  Holley's Declaration states that Takeover did not receive a refund from Great Northern Company, but

does not dispute that Plaintiff made the two payments on Takeover's behalf in the form of additional loans. (*See* Holley Decl. ¶ 13, Ex. C to Bennion Decl.). He also states that the $2,016,697 "Loans Payable – James Deppoleto" line item was the category that Takeover's bookkeeper initially used to describe these amounts in 2022, but Takeover does not connect this statement to its argument nor explain why it is relevant. (*Id.* ¶ 14). Pavlik's Declaration does not appear to make any mention of the Supplemental Loans. Thus, Takeover's evidence does not demonstrate a genuine issue for trial as to Plaintiff's breach of contract claim related to the Supplemental Loans.

Takeover's additional and final argument is that because the NPA contains an integration clause, it bars incorporating additional loans. (Errata 17:20–25). But the integration clause states only that the documents "constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof." (NPA at 18, Ex. 5 to Harvey Decl.). It goes on to say that the terms may be amended or waived only in a writing. (*Id.*). As Plaintiff explains, the clause does not purport to limit additional agreements or loans, and the Supplemental Loans do not modify or waive the terms of the NPA, First Amendment, or Second Amendment. Accordingly, the Court thus GRANTS summary judgment on Plaintiff's breach of contract claim.

### B.    Fraudulent Transfer

Plaintiff also seeks summary judgment on Count VII of the FAC for fraudulent transfer against Takeover, Holley, McBride, Pavlik, and Zarro. He alleges that these Defendants transferred Takeover's assets to NextGen Beverages with the intent to hinder, delay, or defraud him in violation of NRS 112.180. (FAC ¶¶ 137–42). Nevada law provides for a claim of actual fraudulent transfer, *see* NRS 112.180(1)(a), as well as a claim of constructive fraudulent transfer, *see* NRS 112.180(1)(b). *See Herup v. First Boston Fin., LLC*, 162 P.3d 870, 873 (Nev.

2007). Nevada's Fraudulent Transfer Act was implemented to prevent debtors from defrauding creditors by "placing subject property beyond the creditors' reach." *Id.* at 872.

### 1. Actual Fraudulent Transfer

Actual fraudulent transfer requires that the transfer be made with "actual intent to hinder, delay or defraud any creditor of the debtor." NRS 112.180(1)(a). To determine actual intent, courts consider factors such as whether the transfer was made to an insider, the debtor retained possession after the transfer, the debtor had been threatened with suit before transfer, the value of the consideration was reasonably equivalent to the value of the asset transferred, the debtor was insolvent or became insolvent shortly after the transfer was made, and the transfer occurred shortly before or after the debt was incurred. NRS 112.180(2). "The UFTA list of 'badges of fraud' provides neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales toward actual intent." *United States v. Boyce*, 38 F. Supp. 3d 1135, 1157 (C.D. Cal. 2014) (quoting *In re SCI Real Estate Invs., LLC*, 2013 WL 1829648, at *4 (C.D. Cal. May 1, 2013)). "A trier of fact is entitled to find actual intent based on the evidence in the case, even if no 'badges of fraud' are present." *Id.* The Nevada Revised Statutes define transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." NRS 112.150(12).

The first step in analyzing whether actual or constructive fraudulent transfer occurred is to determine whether the debtor made a transfer. *MOH Mgmt., LLC v. Michelangelo Leasing*, Inc., 437 P.3d 1054 (Nev. 2019). The Court agrees with Plaintiff that transfers were made to Holley, Zarro, and NextGen Beverages. Beginning with Holley, Takeover dismissed its legal claims against Holley and paid him a $5,000 settlement. (Holley Dep. 147:4–148:22, 185:6–187:3, Ex. 1 to Harvey Decl., ECF No. 102-1). Holley testified that the payment was made because Takeover unjustly accused him of stealing money and put him through a lawsuit. (*Id.*).

1    Takeover also sold hydrogen water and gamer shots to Zarro for $50,000 and $100,000, which

2    is less than its retail value. (Zarro Dep. 197:20–202:15, Ex. 22 to Harvey Decl.).  Zarro stated

3    that it seemed like Takeover needed money, so he took custody of the products so that

4    Takeover could continue. (*Id.*).  Takeover also transferred its hydrogen water recipe to

5    NextGen, which Zarro stated was because Takeover did not want to continue to sell that

6    product but instead focus on their energy shots. (Zarro Corp. Rep. Dep. 13:17–14:16, Ex. 23 to

7    Harvey Decl., ECF No. 102-23).  Takeover also transferred $25,000 to NextGen, and Zarro

8    testified that the transfers were done to pay back a loan. (*Id.* 17:17–22:11).

9        Plaintiff argues that five of the eleven "badges" of fraud are met in this case.  The first

10   badge is whether the transfer was made to an insider. NRS 112.180(2)(a).  The transfer of

11   hydrogen water and gamer shots to Zarro, as well as the dismissal of the claims and $5,000

12   settlement made to Holley, were to "insiders," as Directors of Takeover. *See* NRS

13   112.150(7)(b).  Second, the transfers to Zarro, Holley, and NextGen occurred after Plaintiff

14   sued Takeover. *See* NRS 112.180(d).  Plaintiff filed this Complaint on December 2, 2022. (*See*

15   *generally* Compl., ECF No. 1).  Zarro purchased the water and gamer shots in January 2023,

16   the lawsuit was dismissed against Holley in February 2023, and Takeover transferred money to

17   NextGen between July and September 2023. (Zarro Dep. 196:10–201:23, Ex. 22 to Harvey

18   Decl.); (Holley Dep. 147:4–7, Ex. 1 to Harvey Decl.); (Zarro Corp. Rep. Decl. 17:17–22:18,

19   Ex. 23 to Harvey Decl.).  Third, Plaintiff argues that Takeover did not receive consideration for

20   dismissing the lawsuit against Holley or transferring its hydrogen water recipe, nor did it

21   receive equivalent consideration for selling products to Zarro. *See* NRS 112.180(2)(h).  As

22   discussed below, this factor does not weigh as strongly in Plaintiff's favor.  However, the

23   fourth badge is strongly in Plaintiff's favor because Takeover was insolvent at the time of the

24   transfers. (Holley Dep. 153:23–154:15, Ex. 1 to Harvey Decl.); (Text Message, Ex. C to Mot.

25

Leave, ECF No. 140-5). And is the last badge, because the transfers occurred shortly after the approximately $2 million debt was incurred. *See* NRS 112.180(2)(j).

In the Ninth Circuit, "[t]he presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994) (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*, 926 F.2d 1248, 1254–55 (1st Cir. 1991)). In this case, although there are multiple badges of fraud present, the Court finds that Plaintiff has not met his initial burden of demonstrating that there are no genuine issues of fact as they relate to Defendants' intent in making these transfers.

Evidence exists for each transfer that they were done for a legitimate purpose. Holley testified that the remaining claim against him in the Arizona lawsuit was settled because the allegations made against him had been untruthful, so Takeover wanted to pay him for the trouble of going through the lawsuit. (Holley Decl. 185:6–22, Ex. C to Bennion Decl.). Zarro testified that he purchased the hydrogen water and gamer shots at, or close to, the manufacturing cost, because Takeover needed cash to continue operating. (Zarro Dep. 197:20–202:15, Ex. 22 to Harvey Decl.). And the recipe was transferred to NextGen because Takeover had no desire to continue making hydrogen water because they were "laser focused" on their energy shots. (Zarro Corp. Rep. Dep. 13:17–14:16, Ex. 23 to Harvey Decl.). Zarro testified that Takeover discontinued the product and sued the manufacturer. (*Id.*). Lastly, regarding the monetary transfers, Zarro testified that the $25,000 transfers were made to pay back a loan that NextGen gave Takeover. (*Id.* 17:17–22:11). Accordingly, the Court finds a genuine issue of material fact for the trial as to Defendants' fraudulent intent and DENIES summary judgment on Plaintiff's actual fraudulent transfer claim.

### 2. Constructive Fraudulent Transfer

A transfer is constructively fraudulent if: (1) the debtor did not receive reasonably equivalent value in exchange for the transfer; and (2) the debtor "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond his or her ability to pay as they became due" or "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." NRS 112.180(1)(b); *see also Herup*, 162 P.3d 873 n.12. The creditor bears the burden of proving both elements. *Sportsco Enters. v. Morris*, 917 P.2d 934, 938 (Nev. 1996).

The Court finds that a genuine issue of material fact exists as to whether Takeover received reasonably equivalent value for its transfers. Reasonableness is generally left as a question of fact for the jury. *See West v. State Farm Fire & Cas. Co.*, 868 F.2d 348, 350 (9th Cir. 1989). On each of the transfers at issue here, the Court finds that reasonable jurors could disagree whether Takeover received a reasonably equivalent value in return.

First, Plaintiff argues that Takeover did not receive any consideration for its transfers to Holley: the release of legal claims against him and a $5,000 settlement payment. (MSJ 24:4–28). The Court cannot say that, as a matter of law, Takeover did not receive a reasonably equivalent value by agreeing to settle the last remaining claim in a lawsuit that would otherwise cost Takeover time and more money. Second, as to the water recipe transfer to NextGen, it should be a question of fact left to the jury as to whether it was reasonable for Takeover to transfer the recipe for a product that it had discontinued to NextGen for no cost because there is a genuine issue of material fact as to the monetary value of the recipe. Third, because Zarro testified that the $25,000 monetary transfers to NextGen were done to pay back a loan, it appears that Takeover received reasonably equivalent value. Lastly, as to the gamer shots and hydrogen water that Zarro purchased for manufacturing cost, or close to it, the Court also finds

it to be a question of fact for the jury as to whether Zarro's payment amount was reasonable. Thus, the Court DENIES summary judgment on Plaintiff's fraudulent transfer claim.

## IV. <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment, (ECF No. 100), is **GRANTED, in part, and DENIED, in part.** Plaintiff's claim for fraudulent transfer, as well as the claims he did not move for summary judgment on, will proceed to trial.

**IT IS FURTHER ORDERED** that the parties will have thirty days from the date of this Order to file a jointly proposed pretrial order pursuant to LR 16-3(b) using the form provided in LR 16-4.

**IT IS FURTHER ORDERED** that Defendants' Motion to Seal, (ECF No. 110), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave, (ECF No. 140), is **GRANTED.**

**DATED** this __15__ day of August, 2025.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT